UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **RMS TITANIC, INC.,** *et al.* | § | **Case No. 3:16-bk-02230** |
| | § | **Chapter 11** |
| | § | |
| Debtors. | § | |
| | § | |

UNITED STATES' OBJECTION TO DEBTORS' MOTION FOR
ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363
AND BANKRUPTCY RULES 6003, 6004, AND 9014 AUTHORIZING
THE DEBTORS TO MARKET AND SELL CERTAIN TITANIC ARTIFACTS
<u>FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS</u>

The United States, on behalf of the Department of Commerce (<u>Commerce</u>), objects to the

Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy

Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts

Free and Clear of Liens, Claims, and Interests (the <u>Motion</u>), ECF No. 28, and states its objection

as follows:

<div align="center">

**I**NTRODUCTION

</div>

RMS Titanic, Inc. (<u>RMST</u>) and several related companies[1] (collectively, the <u>Debtors</u>)

have asked for authority to market, <u>not</u> sell, artifacts RMST holds in trust for the public benefit.

At this early stage in the case RMST is unable to identify the property it desires to sell, the

procedure by which it will decide on a buyer, the identity of any proposed buyer, or the time and

place for a sale.  Despite its title, the Motion is not an attempt by RMST to authorize a sale or

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions
Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC
(5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867), and Dinosaurs Unearthed
Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

<div align="center">1</div>

sale procedures.  Instead, RMST really seeks an advisory opinion from this Court, that RMST may sell unidentified artifacts it holds in trust to fund not only its own bankruptcy case but also the bankruptcy cases of the co-debtors.  The United States opposes RMST's motion because it is not, in actuality, a motion to sell and because it suffers from fatal procedural and substantive defects.

### STATEMENT OF RELEVANT FACTS AND PROCEDURE

1.      In 1987, RMST's predecessor-in-interest, Titanic Ventures Limited Partnership (TVLP), and the Institut Francais de Recherche Pour l'Exploitation de la Mer, the French government oceanographic institute, recovered artifacts during an expedition to the wreck of the RMS Titanic (the French Artifacts), which the Motion describes as consisting of 2,100 artifacts.[2] The charter for the 1987 expedition noted that objects recovered would not be sold but would only be used for exhibition purposes.  Exhibit 1 at ¶ 20.2.

2.      In fall 1993, TVLP sought title to the French Artifacts from the French Ministry of Equipment, Transportation, and Tourism, claiming that "the artifacts will only be used [for] a cultural purpose and will not, therefore, be part of any operations which would lead to their dispersion, but to the exception of exhibition purposes, and none of the artifacts will be sold." See R.M.S. Titanic, Inc., 435 F.3d at 527 (alteration in original).  On October 22, 1993, an administrator in the French Ministry of Equipment, Transportation and Tourism awarded TVLP title to the French Artifacts subject to the assurances made by TVLP in its letter requesting title. Id. at 527-28.

---

[2] The Motion poses a discrepancy concerning the number of items comprising the French Artifacts.  Although the Motion asserts the number is 2,100 items, Motion at ¶ 26, the Fourth Circuit, in a 2006 decision involving the French Artifacts, stated that "approximately 1,800 artifacts . . . were taken to France for conservation and restoration."  R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel, 435 F.3d 521, 524 (4th Cir. 2006).  The unexplained discrepancy is further proof that NOAA must be afforded an opportunity to determine the provenance of any artifacts identified for sale.

3.      In May 1993, RMST merged with TVLP and acquired all the assets and liabilities of TVLP.  ECF No. 8 at 2.  Also in 1993, RMST mounted a second expedition to the R.M.S. Titanic wreck and recovered more artifacts.  Motion at 3.

4.      In August 1993, RMST commenced an in rem action in the United States District Court for the Eastern District of Virginia (the District Court) against the artifacts recovered in its 1993 expedition and against the wreck of the R.M.S. Titanic in its entirety.  R.M.S. Titanic, Inc., 435 F.3d at 524.

5.      From 1994 to 2004, RMST conducted further expeditions to the R.M.S. Titanic wreck and recovered approximately 3000 more artifacts (together with the artifacts recovered in 1993, the American Artifacts).

6.      On August 15, 2011, the District Court granted RMST an in specie salvage award of title to the American Artifacts subject to Covenants and Conditions (C&Cs) drafted jointly between RMST and the United States.  R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011); see also Exhibit 2.  The C&Cs require RMST to maintain the American Artifacts and the French Artifacts together as an integrated whole to the maximum extent possible.  Exhibit 2 at 5.

7.      On June 14, 2016 (Petition Date), Debtors filed voluntary petitions for bankruptcy relief under chapter 11 of the Bankruptcy Code.  ECF No. 1.

8.      On June 20, 2016, RMST filed the Motion seeking to sell artifacts recovered from the R.M.S. Titanic free and clear of the interests of third parties including the United States.

<u>**ARGUMENT**</u>

**A.      The Motion is Procedurally Flawed**

9.      The Motion is defective for failing to respect the requirements of 11 U.S.C.

§ 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004.  The Motion fails to:

(1) identify the property to be sold; (2) state the time and place of the sale; (3) state the

procedures RMST will use to execute the sale; and (4) provide proper notice.

10.      The Bankruptcy Code authorizes RMST to sell property of the estate outside

the normal course of business only after notice and a hearing.  11 U.S.C. § 363(b)(1).  The

Bankruptcy Code and applicable rules of bankruptcy procedure require RMST to describe the

property to be sold.  <u>See</u> Fed. R. Bankr. P. 6004.

11.      The Motion fails to meet that requirement.  Rather than identify items of

property it wishes to sell, RMST merely identifies a general class of property—artifacts of the

R.M.S. Titanic—and requests carte blanche permission to sell any or all such items.  In effect,

RMST seeks blanket authority to sell all of the assets of the estate.  The Motion even concedes

that it omits a proper identification of what is to be sold: "This list is provided merely as an

example of some of the artifacts within the French Collection; <u>it is not intended as an election</u>

<u>to sell any specific artifacts</u>."  Motion at 13 (emphasis added).  The Motion fails to identify the

property to be sold and thus fails to comply with the requirements for a sale under 11 U.S.C.

§ 363(b)(1).

12.      RMST's failure is especially dangerous given the acknowledged interest of the

United States in the American Artifacts.  Motion at 6.  RMST claims it will only sell French

Artifacts, but RMST's failure to identify the property intended for sale denies the United States

the ability to safeguard the American Artifacts and places those artifacts at risk.  The

4

Bankruptcy Code requires RMST to identify property and give notice so that interest holders have the opportunity to safeguard their interests in the property.  See Metal Foundation Acquisition, LLC v. Reinert (In re Reinert), 467 B.R. 830, 831 (Bankr. W.D. Pa. 2012) (noting debtor's failure to "specifically describe or identify any of the domain names subject to sale"). RMST's wholesale failure to identify the property it wishes to sell deprives the United States of its right to safeguard the public interest in the artifacts and, therefore, fails to satisfy the requirements of the Bankruptcy Code.  The Court should deny the Motion because RMST has failed to identify the property to be sold.

13.     RMST must also identify the time and place intended for a public sale, Fed. R. Bankr. P. 2002(c)(1), but has not done so.  If no public sale is contemplated, RMST must disclose the terms and conditions of any private sale, but RMST has not done that either.  Id. RMST's failure to disclose the manner of the contemplated sale deprives interest holders of the ability to assess the fairness of the sale.  Further, RMST has failed even to disclose the objection deadline for the proposed sale as required.  Id. ("notice . . . shall include . . . the time fixed for filing objections.").  The Court should deny the Motion because RMST has failed to identify the manner of the sale or the objection deadline.

14.     Before a sale can occur under 11 U.S.C. § 363(b)(1), free and clear of interests, RMST must demonstrate that it has given proper notice to parties in interest.  11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease . . .) (emphasis added); Fed. R. Bankr. P. 6004(c) ("A motion for authority to sell property free and clear of liens or other interests . . . shall be served on the parties who have liens or other interests in the property to be sold.").  RMST has not satisfied this notice obligation.

15.     RMST has provided no notice to France, and instead goes to great lengths to assert that France has no interest in the French Artifacts.  See ECF No. 28-5.  The declaration offered by Denis Mouralis is mere legal argument couched as an expert opinion, and its proffer underscores the need to give notice to France.  The United States concurs with the United States Trustee in his objection that a 363 motion is not a proper mechanism for disputing or determining France's interest in the French Artifacts.  See ECF No. 67 at ¶ 33.  Even if RMST's position had merit, RMST admits that it obtained the grant of title to the French Artifacts by the French Ministry of Equipment, Transportation and Tourism subject to assurances made by its predecessor, TVLP, in its letter requesting title.  Motion at 3 ("The Administrator's decision noted assurances made by the Company . . .).  The Fourth Circuit has also acknowledged this interest in these artifacts:

> The Administrator's decision also incorporated Titanic Ventures' assurances made in its September 22, 1993 letter, stating that '[Titanic Ventures] agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition.'

R.M.S. Titanic, Inc., 435 F.3d at 527-28.  On this record, RMST must give proper notice to France.

16.     Rather than give proper notice, however, RMST seeks to paper over that omission with a self-serving affidavit.  That is not the procedure authorized by the Bankruptcy Code.  As noted by the objection of the United States Trustee, RMST carved-out 363 sales from its Motion to Limit Notice.  ECF No. 4 at ¶ 10.  The Court should require RMST to give proper notice to France before it considers any request by RMST to sell property free and clear of any French interest in the R.M.S. Titanic's artifacts.  The Court should deny the Motion because RMST has failed to provide proper notice to France.

**B.**     **The Motion is Also Substantively Flawed**

17.     Although the Bankruptcy Code empowers RMST to sell property of the estate free and clear of interests in that property, 11 U.S.C. § 363(b), such sales may occur only if the requirements of 11 U.S.C. § 363(f) are satisfied.  RMST has failed to do so for the proposed sale. Section 363(f) allows a sale free and clear of an interest if applicable nonbankruptcy law would permit sale of the property free and clear of the interest.  11 U.S.C. § 363(f)(1).  Alternatively, RMST may sell property free and clear of an interest if the entity holding the interest consents. 11 U.S.C. § 363(f)(2).

18.     RMST has not satisfied either prong of 11 U.S.C. § 363(f).  The United States and France each have interests in the R.M.S. Titanic artifacts.  RMST has not obtained the consent of either country and applicable nonbankruptcy law does <u>not</u> permit RMST to sell the artifacts free and clear of the United States' and France's interests.  To the contrary, the District Court and the French Ministry of Equipment, Transportation and Tourism both expressly conditioned the grant of title to RMST on its ability to keep the collections of artifacts together. RMST cannot, therefore, sell any artifacts without the consent of interest holders to include the United States and France.  <u>See, e.g.</u>, <u>In re Sw. Fla. Heart Group, P.A.</u>, 342 B.R. 639, 643-44 (Bankr. M.D. Fla. 2006) (holding that trustee could not sell facility free and clear because interest-holder in facility did not consent to sale).

19.     RMST also bears the burden of identifying a business justification for the sale of property but has not done so.  <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d. Cir. 1983) (holding that sale under § 363(b) requires a sound business justification beyond mere appeasement of creditors); <u>In re Diplomat Const.</u>, 481 B.R. 215, 218 (Bankr. N.D. Ga. 2012) (citing <u>In re Lionel Corp.</u> with approval in requiring business justification for transaction).

7

RMST's <u>only</u> justification for the proposed sale is that the proceeds will be used to pay creditors and equity.  Motion at 13.  But satisfying creditors, alone, does not justify holding a sale in advance of confirmation.  <u>In re Lionel Corp.</u>, 722 F.2d at 1071.  RMST has proffered <u>no</u> evidence why a sale is necessary at this early stage in the bankruptcy case.  RMST and its co-debtors have not filed schedules, <u>see</u> Fed. R. Bankr. P. 1007(a)(1) and (b), or submitted to examination pursuant to Section 341.  Rather, RMST and its co-debtors extended the deadline for filing their schedules and statements of financial affairs to coincide with the hearing on the Motion, thus the record is devoid of any evidence justifying a proposed sale of assets outside of the ordinary course of business.  The Court, therefore, should deny the Motion for lack of a business justification for the proposed sale.

20.     Finally, RMST offers no authority for its presumption that it is able to sell off assets it holds in order to fund the bankruptcy cases of co-debtors.  Substantive consolidation must be ordered before the assets and liabilities of multiple entities can be pooled.  <u>See Eastgroup Props. v. S. Motel Ass'n, Ltd.</u> 935 F.2d 245, 248-49 (11th Cir. 1991) (noting standard for substantive consolidation and that it "should be used sparingly").  Absent substantive consolidation, the various bankruptcy estates of the co-debtors (and associated, non-bankrupt Canadian entities) have no claim on the proceeds of the sale of property of RMST's estate.  RMST thus lacks authority to fund the bankruptcy cases of its co-debtors with its bankruptcy estate, and its claim that it will do so, absent court authorization, is improper.  The Court should, therefore, deny the Motion because RMST's proposed use of the proceeds is improper.

C.     **The Motion is Also Improper Because It Seeks Only an Advisory Opinion**

21.     The Motion is not, as RMST claims, a motion to sell free and clear under 11

U.S.C. § 363(b)(1).  It is instead a bald attempt by RMST to obtain an advisory opinion from

this Court stating that, at some point in the future, RMST is free to sell artifacts taken from the

R.M.S. Titanic, clear of strict conditions imposed by the United States and France and agreed to

by RMST.  RMST does not state a valid business reason for the Motion because the Motion has

nothing to do with business.  The Motion is an attempt, early in the case—before schedules are

filed, before proper notice to France is given, and before creditors and the United States have

any insights into RMST's financial status—to gain a free hand to sell the R.M.S. Titanic

artifacts.

22.     Although an advisory opinion might be helpful to RMST's planning efforts,

this Court must deny the Motion.  The Supreme Court has long recognized that "the implicit

policies embodied in Article III, and not history alone, impose the rule against advisory

opinions on federal courts."  Flast v. Cohen, 392 U.S. 83, 96 (1968); see also Miller v. FCC, 66

F.3d 1140, 1145-46 (11th Cir. 1995) (noting that the "prohibition on advisory opinions is a

logical corollary of the case or controversy requirement."); see also In re Inn on the Old Bay,

Ltd., 154 B.R. 364, 367 (Bankr. S.D. Fla. 1993) ("Bankruptcy courts do not exist for the

purpose of solving abstract, academic, or hypothetical questions.").  Yet RMST asks for just

that: an advisory opinion, and the Court should decline RMST's improper entreaty.

23.     Further, as the United States Trustee points out in his objection, a motion under

11 U.S.C. § 363 is not the proper method to determine France's interest in the French Artifacts.

See ECF No. 67 at ¶ 33.  The proper method for RMST to determine the extent of France's

interest is an adversary proceeding, not a motion to sell.  Fed. R. Bankr. P. 7001(2).  The Court

should deny RMST's attempt to determine the extent of that interest through a motion and without notice to France.

<u>**Conclusion**</u>

Accordingly, the United States respectfully requests that the Court deny the Debtor's motion to sell.

Dated:  July 6, 2016                         Respectfully submitted,


BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

A. LEE BENTLEY, III
United States Attorney

*/s/ Theodore B. Randles*
RUTH A. HARVEY
MICHAEL J. QUINN
MATTHEW TROY
THEODORE B. RANDLES
(Florida Bar No. 115790)
U. S. Department of Justice, Civil Division
P. O. Box 875
Ben Franklin Station
Washington, D.C.  20044-0875
(202) 307-3242


ATTORNEYS FOR THE UNITED STATES

<u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that on June 29 and July 1, 2016, the United States conferred with

counsel for RMST in an attempt to resolve the United States' objection.  The parties were

unable to resolve the matter.

*/s/ Theodore B. Randles*
THEODORE B. RANDLES

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2016, a true and correct copy of the foregoing objection

was duly served upon all parties via the Court's electronic case filing system (ECF).

*/s/ Theodore B. Randles*
THEODORE B. RANDLES

# Exhibit 1

AMENDED "SUPPLYTIME" FORM PART I

| 1. Place and date<br><br>PARIS, 24th of JUNE 1987 | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME"<br><div align="right">PART I</div> |
|---|---|
| 2. Owners/Disponent Owners/Place of business<br><br>IFREMER, hereafter called the OWNERS<br>or IFREMER<br>66, avenue d'IENA<br>75116 - PARIS | 3. Charterers/Place of business<br><br>OCEANIC RESEARCH AND EXPLORATION LTD<br>28, IRISH TOWN<br>GIBRALTAR. |
| 4. Vessel's name<br><br>NADIR SURFACE VESSEL together with<br>- NAUTILE SUBMERSIBLE (~6000 m)<br>- ROBIN (ROV)<br>7. Port or place of delivery (Cl. 2(A)) (NAUTILE Positionning System) | 5. Date of delivery (Cl. 2(A))<br><br>8th JULY 1987 |
| | 6. Cancelling date (Cl. 2(A))<br><br>NOT APPLICABLE |
| 7. Port or place of delivery (Cl. 2(A))<br><br>TOULON LA SEYNE (FRANCE) | 8. Port or place of re-delivery (Cl. 8(A))<br><br>FORT DE FRANCE (MARTINIQUE) |
| 9. Period of hire (Cl. 1(A))<br><br>54 days | 10. Extension of period of hire (optional) (Cl. 1(B))<br><br>17 days with a prior written notice<br>given to IFREMER by August 10, 1987 |
| 11. Trading limits (Cl. 3(A))<br><br>NORTH ATLANTIC OCEAN AND WESTERN MEDITERRANEAN SEA | |
| 12. Employment of vessel restricted to (state nature of service(s)) (Cl. 3(A))<br><br>DIVING ON HMS TITANIC TO PROMOTE THE SURVEY OF THE WRECK AND TO RECOVER OBJECTS<br>OF THE TITANIC | |
| 13. Charter hire (Cl. 7(A))<br><br>SEE ARTICLE 24 | 14. Hire payment (state currency, mode and place of payment; also beneficiary and bank account) (Cl. 7(A))<br>French francs ; irrevocable letter of credit<br>in favour of IFREMER<br>Crédit Lyonnais, Agence Ligne ENTREPRISES<br>75008 - PARIS, 55 CHAMPS ELYSEES<br>ACCOUNT N° 2335 A |
| 15. Mobilisation charge (lump sum) (Cl. 2(B))<br><br>included | 16. Port or place of delivery (Mobilisation) (Cl. 2(b))<br><br>TOULON (LA SEYNE) FRANCE |
| 17. Demobilisation charge (lump sum) (Cl. 8(B))<br><br>included | 18. Number of days' notice of re-delivery (Cl. 8(C))<br><br>not applicable ; see box 10 |
| 19. Early termination of charter (state number of months' hire payable)<br>NOT APPLICABLE       (Cl. 8(D)) | 20. Number of months' notice of early termination (Cl. 8(D))<br><br>NOT APPLICABLE |
| 21. Meals (state rate agreed) (Cl. 9(I))<br><br>Free of charge | 22. Passenger accommodation (state rate agreed) (Cl. 9(I))<br><br>Free of charge |
| 23. Port or place of drydocking (Cl. 11(C))<br><br>IRRELEVANT | 24. War (only to be filled in if Sub-Clause (C) agreed) (Cl. 22)<br>SEE ARTICLE 13 |
| 25. Sub-let (state amount of daily increment to charter hire) (Cl. 20(B))<br><br>SEE ARTICLE 12 | 26. Place of arbitration (only to be filled in if place other than London agreed) (Cl. 27)<br><br>LONDON |
| 27. Numbers of additional clauses covering special provisions, if agreed<br><br>1 to 24 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of Part I, including additional clauses, if any agreed and stated in Box 27, and Part II as well as Appendix A and Appendix B as annexed to this Charter. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II and Appendix A and Appendix B. and any other

| document incorporated by reference herein. | In the event of a conflict of conditions |
|---|---|
| the provisions of Part I shall prevail over | those of part II and Appendix A and |
| Appendix B. | |

PART II

"SUPPLYTIME" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**

(A) The Owners let and the Charterers hire the Vessel described in Appendix "A" for the period as indicated in Box 9 from the time the Vessel is delivered to the Charterers

(B) Charterers have the option, subject to Clause 7(D), to extend the Charter in direct continuation for the period as indicated in Box 10, but such an option must be declared 90 days prior to the expiry of the charter period

**2. Delivery**

(A) Subject to Sub-Clause (B) of this Clause and to Clause 21 hereof, the Vessel shall be delivered by the Owners and accepted by the Charterers between the date indicated in Box 5 and the date indicated in Box 8 (the latter date being hereinafter referred to as "the cancelling date") at the port or place indicated in Box 7 in such available berth or mooring where the Vessel can safely lie always afloat, as the Charterers may direct. Owners not to be responsible for any delay in delivery arising or resulting from strikes, lock-out or stoppage or restraint of labour whether partial or general.

*Mobilisation*

(B) (i) The Charterers shall pay a lump sum in the amount as stated in Box 15 without discount by way of mobilisation charge in consideration of Owners giving delivery at the port or place indicated in Box 16. This shall be payable 50% at the commencement of the voyage to (the delivery port which portion shall be non-returnable Vessel lost or not lost, and the balance on safe arrival at the delivery port

(ii) Should the Charterers agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of re-delivery, then the terms, conditions and indemnities of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the period of the Charter excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, Vessel and/or goods lost or not lost.

*Cancelling*

(C) At any time, not later than seven days prior to the cancelling date indicated in Box 5, the Owners may give notice in writing to the Charterers that they will be unable to deliver the Vessel by the cancelling date but will deliver the Vessel by such date as may be specified in such notice. Charterers may within forty-eight hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party, in which event this Charter Party shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party. If Charterers do not give such notice then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party.

**3. Employment**

(A) The Vessel shall be employed in lawful offshore activities restricted to the service(s) stated in Box 12 and on voyages between any good and safe port or place and any place of offshore unit where the Vessel can safely lie always afloat within the trading limits indicated in Box 11 which shall in no circumstances be exceeded without prior agreement and adjustment of the Charter Hire and such other terms as appropriate to be agreed and stated in Box 27. Provided always (i) That the Charterers do not warrant the safety of any such port or place or offshore units but shall act with prudence in their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment, (ii) Charterers shall be responsible for any loss or damage sustained by the Vessel by reason of the condition of berth or offshore unit.

(B) Permission from responsible Authorities for Vessel and its Crew to work in the area defined in Clause 3(A) and Box 11, if required, shall be the responsibility of Charterers and Owners shall assist, if necessary, in every way possible to secure such permission.

**4. Owners to Provide**

(A) The Owners shall provide and pay for all provisions and wages, for all shipping and communication expenses of the Master, officers and crew; for all insurance of the Vessel; for all deck and engineroom stores (except those which by the terms of this Charter Party are expressly payable by the Charterers) and the expense of maintaining the hull and machinery of the Vessel during her employment

*Maintenance of Vessel*

(B) The Owners undertake that throughout the period under this Charter they will, whenever the passage of time, wear and tear or any event may require, take all reasonable steps to maintain the Vessel in efficient state in hull and machinery or to restore the Vessel to such state, the Charterers agreeing to release the Vessel as necessary for this purpose in accordance with the provisions of Clause 11(C)

**5. Charterers to Provide**

The Charterers shall provide and pay for all fuel and lubricants and transport thereof (including auxiliary machinery and galley fuel), water, port charges, pilotage and boatmen (whether compulsory or not), canal steersmen, launch services incurred in connection with the Owners' business, light dues, tug assistance, consular charges (except those appertaining to the Master, Officers and Crew), canal, dock and other dues and charges other than those of the nature of those imposed in any way calculated on the amount of the Owners' disbursements, agency fees, commissions, income or state taxes; harbour and tonnage dues at the ports of delivery and re-delivery, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, expenses of fumigation including decontamination and extermination of vermin, and of quarantine if occasioned by the nature of the cargo carried or the ports visited

offshore units or necessitated by any special requirements of harbour authorities; and all ropes, slings and special runners including bulk cargo discharge hoses) actually used for loading or discharging. Charterers shall further provide and pay for customs duties, permits, import duties, including cost involved in establishing temporary or permanent importation bond(s) clearance expenses both for the Vessel and/or equipment, also special modifications to offshore platforms, wires, nylons, spring lines, slings, etc., used for offshore works; all discharge hoses to supply platforms, hose connections and adaptors, refill oxygene/acetylene bottles supply electrodes used for offshore works.

**6. Bunkers**

Unless otherwise agreed, the Vessel shall be delivered with bunkers and lubricants as on board and re-delivered with not less than sufficient bunkers to reach the next bunkering stage en route the Vessel's next port of call. The Charterers upon delivery and Owners upon re-delivery shall take over and pay for the bunkers and lubricants on board at the current contract installation price at time and port of delivery and re-delivery.

**7. Hire**

(A) The Charterers shall pay as Hire for the Vessel at the rate as stated in Box 13 per day or part thereof from the time that the Vessel is delivered to until the expiration of this Charter or earlier termination of this Charter Party. Such Hire being based on a complement of Master, Officers and Crew at prevailing rates of pay. Payment of Hire shall be made in cash in the manner prescribed in Box 17 without discount, every 30 days, in advance, the first payment to be made on the day of delivery of the Vessel to the Charterers. In default of payment, the Owners shall have the right of termination of this Charter and withdrawing the Vessel from the service of Charterers, without being required to note any protest or to make any application to any court and without any other formality whatsoever and without prejudice to any claim the Owners may otherwise have on the Charterers under the Charter. Should the Vessel be lost or missing Hire shall cease from the date when she was lost. If the date of loss cannot be ascertained, half Hire shall be paid from the date the Vessel was last reported until the calculated date arrival of the Vessel at her destination. Any Hire paid in advance shall be adjusted accordingly.

(B) The Owners shall be entitled to add 1% per month interest charter hire not received within 15 days of due payment as per Clause 7(A).

*Increase in Owners' Costs*

(C) In the event of any increase in the rates of pay of the Master Officers and the Crew (in accordance with officially negotiated rates of pay) taking effect after the date of this Charter Party the rate Hire shall be increased according to the formula Hire (1 + 0.8 × P/100) (where Hn = hire rate after increase) (where Ho = hire rate in force at time of wage increase) (where P = c percentage of aggregated cost increase in rates of pay, including thus purpose overtime, bonus, gratuity, leave, pension contribution social charges and related end all similar payments.)

(D) If the option under Sub-Clause 1(B) is exercised, hire to negotiated between Owners and Charterers on the basis of the r mentioned in Box 13, but changes in Owners' expenses includ but not limited to salaries, wages and running costs to be tal into consideration.

**8. Re-delivery**

(A) The Vessel shall be re-delivered on the expiration of earl termination of this Charter Party clear of cargo and in the sa good order as when delivered to the Charterers (fair wear and t excepted) at the port or place stated in Box 8 or, if no place named, at an ice-free place to be agreed between the Owners a the Charterers, and failing such agreement at the place of deliver

*Demobilisation*

(B) The Charterers shall pay a lump sum in the amount as stated Box 17 by way of demobilisation charge which amount shall be p on the expiration or earlier termination of the Charter and shall disbursements and non-returnable Vessel lost or not lost

(C) The Charterers shall give not less than the number of da notice in writing of their intention to re-deliver the Vessel, as sta in Box 18.

*Early Termination of Charter*

(D) In the event that the Charterers abandon all operations wit the trading limits specified in Box 11 and at any time before expiry of this Charter they may terminate this Charter by giving less than the number of months notice in writing as indicated Box 20 to the Owners of their intention to so terminate and unsued to the Owners upon such termination a sum equal to the number months hire as indicated in Box 19.

*Laying up of Vessel*

(E) The Charterers shall have the option of laying up the Vessel all or any portion of the Charter period in which case the Hire he under shall continue to be paid but if the period of such lay exceeds 30 days they shall be credited against such hire the amo which the Owners shall have saved by reason of reduction in penses and overheads as a result of the lay-up of the Vessel dur so much of such period of lay-up as exceeds 30 days

*The Owners' Space*

The whole reach and burden and decks of the Vessel shall be under their control reserving proper and sufficient space the Vessel's Master, Officers, Crew tackle, apparel, furniture p visions and stores. The Charterers shall be entitled to carry, so as space is available and for their purposes in connection with operations and otherwise then for reward

(ii) Lawful cargo whether carried on or under deck. 206

(iii) Explosives and dangerous cargo provided such are packed and 207
stowed in accordance with ship's national regulations and/or 208
IMCO Dangerous Goods Code and/or other pertinent regulations. 209
The Charterers accept responsibility for any additional expenses 210
(including restoration expenses) incurred by the Owners in rela- 211
tion to the carriage of such cargo. 212

## 10. Master and Crew 213

(A) The Master shall carry out his duties promptly and the Vessel 214
shall render all reasonable services within her capabilities by day 215
and by night and at such times and on such schedules as the 216
Charterers may reasonably require without any obligations of the 217
Charterers to pay for the time. Officers or the Crew of the 218
of the Vessel any excess or overtime payments. The Master shall be 219
under the orders of the Charterers as regards employment, agency 220
and other arrangements and the Charterers shall indemnify the 221
Owners against all consequences or liabilities arising from com- 222
pliance with such orders. The Charterers shall furnish the Master 223
with all instructions and sailing directions and the Master and En- 224
gineer shall keep full and correct logs accessible to the Charterers 225
or their agents. The Master shall sign cargo documents as and in 226
the form presented same, however not to be Bills of Lading, but 227
receipts which shall be non-negotiable and shall be 228
marked as such. Charterers shall indemnify Owners against all con- 229
sequences and liabilities arising from the Master, Officers or agents 230
signing under the direction of Charterers, those cargo documents or 231
other documents inconsistent with this Charter Party or from any 232
irregularity in the papers supplied by Charterers or their agents. 233

(B) The Vessel's Crew if required by Charterers will connect and 234
disconnect electric cables, fuel, water and pneumatic hoses when 235
placed on board the Vessel in port as well as alongside the offshore 236
units; will operate the machinery on board the Vessel for loading 237
and unloading cargoes; and will sling and hook on cargo when 238
loading or discharging alongside offshore units. If the port regula- 239
tions or the seamen and/or labour unions do not permit the Crew 240
of the Vessel to carry out any of this work, then the Charterers shall 241
make, at their own expense, whatever other arrangements may be 242
necessary, always under the direction of the Master. 243

(C) If the Charterers have reason to be dissatisfied with the conduct 244
of the Master or any Officer, Engineer or member of the Crew, the 245
Owners and Master on receiving particulars of the complaint shall 246
promptly investigate the matter and, if, in their opinion, it is neces- 247
sary and practicable make a change in the appointment. 248

## 13. Suspension of Hire 249

(A) If as a result of any deficiency of Crew or Owners' stores, strike 250
of Master, Officers and Crew, breakdown of machinery, damage to 251
hull or other accident, the Vessel is prevented from working for a 252
period of more than 48 consecutive hours no Hire shall be payable 253
in respect of time lost in excess of 48 hours and any Hire paid in 254
advance shall be adjusted accordingly provided always however that 255
Hire shall not cease in the event of the Vessel being prevented from 256
working as aforesaid as a result of: 257

(i) the carriage of dangerous cargo; 258

(ii) quarantine or risk of quarantine unless caused by the Master, 259
Officers or Crew having communication with the shore at any 260
infected area not in connection with the employment of the Ves- 261
sel and without the consent of the instructions of the Charterers; 262

(iii) deviation from her Charter duties or exposure to abnormal risks 263
at the request of the Charterers; 264

(iv) Working alongside or in the proximity of any offshore unit, 265
provided that there has been no gross dereliction of duty on 266
the part of the Master, Officers or Crew of the Vessel; 267

(v) detention in consequence of being driven into port or to an- 268
chorage through stress of weather or trading to shallow harbours 269
or to river or ports with bars or suffering an accident to her 270
cargo when the expenses resulting from such detention shall 271
be for the Charterers' account howsoever incurred; 272

(vi) any act or omission of the Charterers, their servants or agents; 273

(vii) detention or damage by ice. 274

### Liability for Vessel not Working 275

(B) The Owners shall be under no liability whatsoever to the Char- 276
terers for any loss, damage or delay sustained by Charterers as a 277
result of the Vessel being prevented from working by any cause 278
whatsoever other than the Owners' failure to comply with their obliga- 279
tion to make the Vessel seaworthy and fit for her duties in ac- 280
cordance with this Charter when such liability shall be limited as 281
provided under Clause 15(A). 282

### Drydocking 283

(C) The Vessel shall be drydocked at regular intervals to be mutually 284
agreed and all expenses including port charges incurred and fuel 285
consumed during the drydocking period to be for Owners' account. 286
Charterers shall place the Vessel at Owners' disposal clear of cargo 287
at the port or place named in Box 21 or at the nearest port suitable 288
for the purpose. The Vessel shall be off-hire, unless the full time 289
allowed in Clause 11(D) is not used, from the time of arrival at the 290
drydocking port when clear of cargo and shall remain off-hire until 291
ready to resume Charterers' service at the place at which the off-hire 292
period commenced. 293

### Repairs and Maintenance 294

(D) Notwithstanding the foregoing provisions of this Clause, Char- 295
terers shall grant Owners a maximum of 24 hours on Hire, which 296
time to be cumulative over each month (or pro-rata for part of a month) from 297
the commencement of the Charter period until the final redelivery of the 298
Vessel, for maintenance and repairs including drydocking on com- 299
pletion in Owners' duties under Clause 4(E). Any accumulated time 300
for drydocking, maintenance and repairs saved but not used shall be 301
payable to Charterers annually and any balance upon redelivery at 302
the then prevailing daily Hire. 303

## 13. Excluded Ports 309

(A) The Vessel not to be ordered to nor bound to enter without the 310
Owners' written permission (a) any place where fever or epidemics 311
are prevalent or to which the Master, Officers and Crew by law are 312
not bound to follow the Vessel; (b) any ice-bound place or any place 313
where lights, lightships, marks and buoys are or are likely to be 314
withdrawn by reason of ice on the Vessel's arrival or where there 315
is risk that ordinarily the Vessel will not be able on account of ice 316
to reach the place or to get out after having completed her opera- 317
tions. The Vessel shall not be obliged to force ice nor to follow ice- 318
breakers. If, on account of ice, the Master considers it dangerous 319
to remain at the loading or discharging place for fear of the Vessel 320
being frozen in and/or damaged, he has liberty to sail to a con- 321
venient open place and await the Charterers' fresh instructions. 322

(B) If the Vessel shall with or without the Owners' permission enter 323
any such place as is mentioned under Sub-Clause(A) of this Clause 324
the Charterers shall be responsible for and shall hold harmless and 325
indemnify the Owners from and against all loss of and damage and 326
delay to the Vessel and to the Owners and all loss of life and 327
personal injuries to the Owners' Master, Crew, servants and others 328
in the Vessel giving rise to legal liability to Owners' part howsoever 329
the same may arise or result from entering such place. 330

## 14. Towage, Anchor Handling 331

(A) On delivery the Vessel shall be equipped at Owners' expense 332
with equipment described in Appendix B. If during the Charter period 333
such equipment become(s) damaged and unserviceable during opera- 334
tions a replacement shall be provided by Charterers at their expense. 335

(B) All towage performed by the Vessel for the Charterers shall be 336
subject to the United Kingdom Standard Towing Conditions. 337

## 15. Owners' Responsibilities and Exceptions 338

(A) The Owners shall be liable to the Charterers for any loss or 339
damage incurred by the Charterers by reason of a want of due 340
diligence by the Owners in making the Vessel seaworthy and fit for 341
her duties under the Charter, but the Owners' liability in respect of 342
any non-performance by the Vessel of her duties under the Charter 343
shall be limited to suspension of Hire. The Owners shall not be liable 344
to the Charterers or Charterers' Contractors in respect of: 345

(i) any loss of life, injury, loss or damage to any passenger or 346
other person (not being the Master or an Officer or member of 347
the Crew of the Vessel) on board the Vessel at the request or 348
with the knowledge or consent of the Charterers or any loss or 349
damage to cargo howsoever caused notwithstanding that such 350
loss of life, injury, loss or damage is due to any act or omission 351
of the Master or any Officer or member of the Crew of the 352
Vessel; or 353

(ii) any loss or damage to offshore units whether direct or indirect 354
and including, but not restricted to, any consequential loss; or 355

(iii) any actual or potential spill, seepage and/or emission of any 356
pollutant occurring within the offshore site and any pollution 357
resulting therefrom, wheresoever it may occur; 358

(iv) any loss of life, injury, loss or damage to any person on or in 359
the vicinity of offshore units unless due solely to a negligent act 360
or omission of the Master or any Officer or member of the Crew 361
of the Vessel only in the course of or in relation to work which 362
would normally be done by the Vessel's Crew; 363

(v) loss, damage or delay arising or resulting from strikes, lock-outs, 364
or stoppages or restraint of labour (including the Master, Officers 365
and Crew) whether partial or general. 366

### Charterers' Responsibilities 367

(B) The Charterers shall be responsible for loss of damage caused 368
to the Vessel or to the Owners: 369

(i) by goods being loaded contrary to the terms of the Charter or 370
by improper or careless bunkering or loading, stowing or dis- 371
charging of goods; 372

(ii) by any improper or negligent act or omission on their part or 373
that of their servants or agents; 374

(iii) by improper or negligent act or omission of any passenger 375
member of the Crew of an offshore unit or other person (not 376
being the Master or an Officer or a member of the Vessel's 377
Crew) on board the Vessel at the request of or with the know- 378
ledge or consent of the Charterers; 379

(iv) by reason of any actual or potential spill, seepage and or emis- 380
sion of any pollutant occurring within the offshore site and any 381
pollution resulting therefrom, wheresoever it may occur and in- 382
cluding but not limited to the cost of such measures as are 383
reasonably necessary to prevent or mitigate pollution damage. 384

### Charterers' Indemnities 385

(C) The Charterers shall indemnify the Owners against any liability 386
(including cost and expenses) in respect of any loss of life, injury 387
damage or other loss to person or property, howsoever caused even 388
if caused by the neglect or fault of Owners' servants or agents, to: 389

(i) any third party owning or having an interest in an offshore unit; 390

(ii) any third party in respect of cargo carried by the Vessel; 391

(iii) any third party arising by reason of any actual or potential spill 392
seepage and/or emission of any pollutant howsoever caused oc- 393
curring within the offshore site and any pollution resulting there- 394
from, wheresoever it may occur; 395

(iv) any passenger or other person (not being the Master or any Of- 396
ficer or a member of the Vessel's Crew) on board the Vessel at 397
the request or with the knowledge or consent of the Charterers; 398

(v) any other person in the vicinity of an offshore unit provided 399
always that the provisions of this Charter shall not be read as 400
in any way diminishing any of the Charterers' liabilities in their 401
capacity as owners or hirers of such offshore unit or in any 402
capacity other than that of the Charterers of the Vessel. 403

### Liability on Master, Officers and Crew 404

The Master, Officers and Crew of the Vessel shall in no circum- 405

PART II

"SUPPLYTIME" Uniform Time Charter Party for Offshore Service Vessels

to the Owners or to which the Owners are entitled hereunder shall 412
also be available and shall extend to protect the Master and Crew 413
of the Vessel; action as aforesaid, for the purpose of this Clause 414
the Owners are or shall be deemed to be acting as agent on behalf 415
of and for the benefit of the Master and Crew of the Vessel who 416
shall to this extent be or be deemed to be parties to the contract 417
contained under this Charter Party, and the Charterers agree not to 418
institute any proceedings against them in respect of any such matters. 419

### 16. Deviation to Assist
The Vessel shall be entitled at all times to assist vessels and other 421
property in distress, to deviate for the purpose of saving life or 422
property and for the purpose to call at any port or ports for fuel 423
and/or other supplies and to carry cargo on or under deck. 424

### 17. Salvage
425
Subject to the provisions contained in Clause 18, all salvage and 426
assistance to other vessels shall be for the Owners and the Char- 427
terers' equal benefit after deducting the Master's and Crew's pro- 428
portion and all legal and other expenses including hire paid under 429
the Charter for time lost in the salvage, repairs of damage and oil 430
consumed. The Charterers shall be bound by all measures taken by 431
the Owners in order to secure payment of salvage and fix its amount. 432
Charterers agreed that if within their control shall so arrange that all 433
salvage against oilless illicitnative items be agreed with Owners, else 434
this to be on terms of Lloyd's Open Form "No cure no pay". 435

### 18. Assistance to Charterers' Offshore Units
436
Notwithstanding any other provisions contained in this Charter, if 437
the Owners consent to assist any offshore unit in distress owned by 438
or contracted to the Charterers on the basis of the claim for 439
salvage then even in the event of neglect or default of Master and 440
Officers or Crew: 441

(i) Charterers shall be responsible for and shall indemnify the 442
Owners against payments made under any legal rights to the 443
Master and Crew in relation to such assistance. 444

(ii) Charterers shall be responsible for and shall reimburse the 445
Owners for any loss of damage sustained by the Vessel or her 446
equipment by reason of giving such assistance and shall also 447
pay the Owners' expenses. 448

(iii) Charterers shall be responsible for any actual or potential spill, 449
seepage and/or emission of any pollutant howsoever caused 450
occurring within the offshore site and any pollution resulting 451
therefrom, whatsoever it may occur and including but not limited 452
to the cost of such measures as are reasonably necessary to 453
prevent or mitigate pollution damage and Charterers shall indem- 454
nify Owners against any liability, cost or expense arising by 455
reason of such actual or potential spill, seepage and/or emission. 456

(iv) The Vessel shall not be off-hire as a consequence of giving such 457
assistance or effecting repairs under sub-paragraph (ii) of this 458
Clause and time lessen for such repairs shall not count against 459
time granted under Sub-Clause (i) of Clause 11. 460

(v) Charterers shall indemnify the Owners against any liability, cost 461
and/or expense in respect of any loss of life, injury, damage or 462
other loss to person or property caused by such assistance. 463

### 19. Lien
464
The Owners shall have a lien upon all cargoes for all claims against 465
the Charterers under this Charter and the Charterers shall have a 466
lien on the Vessel for all monies paid in advance and not earned. 467
Charterers will not suffer nor permit to be continued, any lien or 468
encumbrance incurred by them or their agents, which might have 469
priority over the title and interest of the Owners in the Vessel. 470
Charterers shall indemnify and hold Owners harmless against any 471
lien of whatsoever nature arising upon the Vessel during the Charter 472
period while she is under the control of Charterers, and against any 473
claims against Owners arising out of the operation of the Vessel by 474
Charterers or out of any neglect of Charterers in relation to the 475
Vessel or the operation thereof. Should the Vessel be arrested by 476
reason of claims or liens arising out of her operation hereunder by 477
Charterers, Charterers shall at their own expense take all reasonable 478
steps to secure that within a reasonable time the Vessel is released 479
and at their own expense put up bail to secure release of the Vessel. 480

### 20. Sublet
481
(A) The Charterers shall have the option of sub-letting the Vessel by 482
any charter or company not connected with the Owners, subject to 483
the Owners' prior approval which shall not be unreasonably withheld. 484
Upon giving notice in writing to the Owners, but the original Char- 485
terers shall always remain responsible to the Owners for due per- 486
formance of the Charter and contractors of the person or company 487
taking such sub-letting shall be deemed Contractors of the Charterers 488
for all the purposes of this Charter Party. The Owners make it a 489
condition of such consent that additional hire shall be paid as agreed 490
between Charterers and Owners having regard to the nature of and 491
any additional hazards of any intended service of the Vessel. 492

(B) If the Vessel is sub-let or loaned to undertake rig anchor 493
handling and or towing operations connected with equipment, other 494
than that used by the Charterers, then a daily increment to the 495
Charter hire of the amount stated in Box 25 or pro rata shall be 496
paid or for the period between departure for such operations until return 497
to her normal duties for the Charterers. 498

### 21. Substitute Vessel
499
The Owners shall be entitled at any time whether before the com- 500
mencing date or at any other time during the Charter period, to 501
substitute for the Vessel named in Box 4 another Vessel of equivalent 502
capacity and capability. 503

### 22. War
(A) The Vessel unless the consent of the Owners be first obtained 
not to be ordered nor continue to any place or on any voyage nor 
be used on any service which will bring her within a zone which is 
dangerous as the result of any actual or threatened act of war, war 
hostilities, warlike operations, acts of piracy or of hostility or mali- 
cious damage against this or any other vessel or its cargo by any 
person, body or State whatsoever, revolution, civil war, civil com- 
motion or the operation of international law, nor be exposed in any 
way to any risks or penalties whatsoever consequent upon the im- 
position of Sanctions, nor carry any goods that may in any way 
expose her to any risks of seizure, capture, penalties or any other 
interference of any kind whatsoever by the belligerent or fighting 
powers or parties or by any Government or Ruler.

(B) Should the Vessel's approach or be brought or ordered within 
such zone, or be exposed in any way to the said risks, (1) the Owner 
to be entitled from time to time to insure their interests in the Vessel 
and or hire against any of the risks likely to be involved thereby, at 
such terms as they shall think fit, the Charterers to make a return 
to the Owners of the premium on demand; and (2) notwithstanding 
the terms of Clause 11 hire to be paid for all time lost including any 
lost owing to loss of or injury to the Master, Officers or Crew or to 
the action of the Crew in refusing to proceed to such zone or to be 
exposed to such risks.

(C) In the event of the wages of the Master, Officers and/or Crew 
or the cost of provisions and/or stores for deck and/or engine room 
and/or insurance premiums being increased by reason of or during 
the existence of any of the matters mentioned in Sub-Clause (A) the 
amount of any increase to be added to the hire and paid by the 
Charterers on production of the Owners' account therefor, such 
account being rendered monthly.

(D) The Vessel to have liberty to comply with any orders or direction 
as to departure, arrival, routes, ports of call, stoppages, destination, 
delivery or in any other wise whatsoever given by the Government 
of the nation under whose flag the Vessel sails or any other Govern- 
ment or any person (or body) acting or purporting to act with the 
authority of such Government or by any committee or person having 
under the terms of the war risks insurance on the Vessel the right 
to give any such orders or directions.

(E) In the event of the nation under whose flag the Vessel sails be 
coming involved in war, hostilities, warlike operations, revolution or 
civil commotion, and if as a result thereof the Vessel is prevented 
from carrying out her duties under this Charter Party, both the Owner 
and the Charterers may cancel the Charter and, unless otherwise 
agreed, the Vessel to be redelivered to the Owners at the port of 
destination or, if prevented through the provisions of Sub-Clause (A) 
from reaching or entering it, then at a near open and safe port at 
the Owners' option, after discharge of any cargo on board.

(F) If in compliance with the provisions of this Clause anything is 
done or is not done, such not to be deemed a deviation.

* Sub-Clause (C) is optional and should be considered deleted unless 
agreed according to Box 24.

### 23. General Average
General Average to be adjusted according to York Antwerp Rules 
1974. Hire not to contribute to General Average.

### 24. Both-to-Blame Collision Clause
If the Vessel comes into collision with another ship as a result of the 
negligence of the other ship and any act, neglect or default of the 
Master, mariner, pilot or the servants of the Owners in the naviga- 
tion or the management of the Vessel, the Charterers will indemnify the 
Owners against all loss or liability to the other or non-carrying ship 
or her owners in so far as such loss or liability represent loss of or 
damage to, or any claim whatsoever of the owners of any good 
carried under this Charter paid or payable by the other or non- 
carrying ship or her owners to the owners of the said goods and 
set-off, recouped or recovered by the other or non-carrying ship or 
her owners as part of their claim against the Vessel or the Owners. 
The foregoing provisions shall also apply where the owners, oper- 
ators or those in charge of any ship or ships or objects other than or 
in addition to the colliding ships or objects are at fault in respect 
of a collision or contact.

### 25. Structural Alterations
The Charterers shall have the option of making at their expense 
structural alterations to the Vessel with the written consent of the 
Owners but unless otherwise agreed the Vessel is to be re-delivere 
reinstated to her original condition. The Vessel is to remain on hire 
during any period of such alteration or reinstatement. The Owner 
shall in no way be responsible for any consequences arising out of 
the Charterers carrying out any such alteration or re-instatement.

### 26. Definitions
"Offshore unit" is defined for the purposes of this Charter as a 
vessel, offshore installation, structure and or mobile unit used in 
offshore exploration, exploitation or production.
"Offshore site" is defined for the purposes of this Charter as the 
area within three nautical miles of an offshore unit from or to which 
the Owners are requested to take their Vessel by the Charterers.

### 27. Arbitration
This Charter Party shall be governed by English law and any dispute 
arising under this Charter shall be referred to arbitration in London... 
Arbitrator to be nominated by the Owners and the other by the 
Charterers, and in case the Arbitrators shall not agree then to the 
decision of an Umpire to be appointed by them, the award of the 
Arbitrators or the Umpire to be final and binding upon both parties.

- 2 -

## Maintenance of Vessel

(B) The Owners undertake that throughout the period under this Charter they will take all reasonable steps to maintain the Vessel in efficient state in hull and machinery or to restore the Vessel to such state.

(C) The Owners shall further provide and pay for all fuel and lubricants and transport thereof (including auxiliary machinery and galley fuel), water, port charges, pilotage and boatmen (whether compulsory or not) canal steersmen, light dues, solid ballast, tug assistance, consular charges, canal, dock and other dues and charges, dock, harbour and tonnage dues at the ports of delivery and re-delivery, agencies and commissions costs for security or other watchmen, expenses of fumigation (including de-ratisation and  extermination of vermin) and of quarantine (if occasioned by the nature of the cargo carried or the port visited whilst employed under this Charter). The Owners shall also provide and pay for the loading and unloading of cargoes except the objects covered by clause 21 and for all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage (excluding such as is required for ordinary ship's purposes, mooring alongside in harbour but including such as is required for securing to the offshore units or necessitated by any special requirements of the harbour authorities), and all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging. Owners shall further provide and pay for custom duties, permits, import duties, including costs involved in establishing temporary or permanent importation bond(s), clearance expenses both for the Vessel and/or equipment except in respect of the objects covered by clause 21, also special mooring lines to offshore platforms, wires, nylons, spring lines, slings etc...used for offshore works with hose connections and adaptors, refill oxygene/acetylene bottles and supply electrodes for offshore works.

## 5. BUNKERS AND LUBRICANTS

The owners shall be responsible for providing and paying for all bunkers and lubricants.

## 6. RE-DELIVERY

The Vessel shall be re-delivered on the expiration of this Charter-Party;

.../...



- 3 -

## 7. THE VESSEL'S SPACE

The whole reach and burden and decks of the Vessel shall be at the Charterer's disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations :

(i) Passengers including T.V.and filming crews, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel and Crew. The Owners shall provide suitable provisions and requisites for such passengers.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo provided such are packed and stowed in accordance with ship's national regulations and/or IMCO Dangerous Goods Code and/or other pertinent regulations. The Charterers accept responsibility for any additional expenses (including restoration expenses) incurred by the Owners in relation to the carriage of such cargo.

(iv) The OWNERS shall permit passengers including film or T.V. personnel to travel aboard "Nautile" but those passengers will be carried at their own risk and subject to satisfactory medical assessment.

## 8. MASTER AND CREW

(A) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such time and on schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. Subject to article 18.2. hereafter, the Master shall be under the orders of the Charterers as regards employment, agency and other arrangements. The Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents. The Master shall sign cargo documents as and in the form presented.

(B) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer, Engineer or member of the Crew, the Owners and Master on receiving particulars of the complaint shall promptly investigate the matter and, if, in their opinion, it is necessary and practicable make a change in the appointment.

.../...

- 4 -

For the purpose of this clause, the Charterers shall deal solely with the Owners Senior Representative at sea and the Owners will implement the Charterers wishes in respect of the Master, Engineer and Crew in relation to this clause.


## 9. DEVIATION TO ASSIST

The Vessel shall be entitled at all times to assist vessels and other property in distress, to deviate for the purpose of saving life or property and for that purpose to call at any port or ports for fuel and/or other supplies and to carry cargo on or under deck. Such deviation shall be considered as a period of hire.


## 10. SALVAGE

All salvage (other than is contemplated by and arises from the activities described in Box 12) and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's and Crew's proportion and all legal and other expenses including hire paid under the Charter for time lost in the salvage, repairs of damage and oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and fix its amount. Charterers agree and if within their control shall so arrange that all salvage assistance unless alternative terms be agreed with Owners, shall be on terms of LLoyd's Open Form "No cure-no pay".

The Owners shall indemnify and hold harmless the Charterers from any claim for salvage made by the Master, any crew servant or agent of the Owner.

If any conflict arises between this clause and clause 21 then the latter shall prevail.


## 11. LIEN

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel.

.../...



~ 5 ~

Charterers shall indemnify and hold Owners harmless against any
lien or whatsoever nature arising upon the Vessel during the Charter
period while she is under the control of Charterers, and against any
claims against Owners arising out of the operation of the Vessel by
Charterers or out of any neglect of Charterers in relation to the Vessel
or the operation thereof. Should the Vessel be arrested by reason of
claims or liens arising out of her operation hereunder by Charterers,
Charterers shall at their own expense take all reasonable steps to
secure that within a reasonable time the Vessel is released and at their
own expense put up bail to secure release of the Vessel.


12. SUB-LET

Subject to the prior written approval of the OWNERS, the Charterers
shall be authorized of sub-letting the vessel to any person or company
not competing with the Owners.


13. WAR

(A)  The Vessel unless the consent of the Owners be first obtained
not to be ordered nor continue to any place or on any voyage nor be used
on any service which will bring her within a zone which is dangerous as
the result of any actual or threatened act of war, war, hostilites,
warlike operations, acts of piracy or of hostility or malicious damage
against this or any other vessel or its cargo by any person, body or
State whatsoever, revolution, civil war, civil commotion or the
operation of international law, nor be exposed in any way to any risks
or penalties whatsoever consequent upon the imposition of sanctions.

.../...



(B)  If as a result of such aforementioned acts or warlike operations the Vessel is prevented from carrying out her duties under this Charter Party, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be redelivered to the Owners in port of re-delivery defined in box 8.

The Owners shall not be liable for the consequences of such early termination of the charter and the total charter hire defined in box 13 shall be paid to the Owners.

## 14. GENERAL AVERAGE

General Average to be adjusted according to York/Antwerp Rules, 1974. Hire not to contribute to General Average.

## 15. BOTH-TO-BLAME COLLISION CLAUSE

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

## 16. STRUCTURAL ALTERATIONS

The Charterers shall have the option of making at their expense structural alterations to the Vessel with the written consent of the Owners but unless otherwise agreed the Vessel is to be re-delivered re-instated to her original condition. The Vessel is to remain on hire during any period of these alterations or re-instatement.

.../...

ENT BY:Xerox Telecopier 7020 ; 8-16-88 ; 1:19PM ;                2038669724→                        ;# 9

17.  ARBITRATION

    Any dispute arising under this Charter which cannot be settled in
an amicable manner shall be referred to arbitration in London according
to the rules and regulations of the International Chamber of Commerce of
LONDON.

    This Charter Party shall be governed by English law.

18. POSITION OF TITANIC WRECK

    Owners warrant that they have accurate knowledge of the exact
position of the "TITANIC" wreck and undertake to bring the vessel to
such position and to dive their submersible on the TITANIC site (as
defined in Clause 19..Owners undertake to supply the TITANIC's accurate
position to the charterer. The charterer will not unnecessarily divulge
the position of the TITANIC WRECK to any third party.

19. DEFINITION OF THE SITE

    "THE SITE" is :

1. The bow and stern sections of "RMS TITANIC".

2. The area which lies half a nautical mile to either side of the
   line from the front of the bow section to the rear of the stern
   section, extended one nautical mile to the rear of the stern
   section.

20. RECOVERY OF OBJECTS

20.1. OWNERS will forthwith hand over to the Charterers all objects
   collected on or from the Titanic site during the performance of
   this charter party. OWNERS renounce all property rights in the
   objects collected during the expedition performed under this
   charter party, both for themselves and on behalf of the Master,
   Officers, crew, servants and agents, provided all payments defined
   in article 24 be made to the OWNERS.
   In particular, the Charterers may only keep the safes if the
   corresponding term of payment is made to IFREMER.

20.2. Owing to the fact that the objects collected by OWNERS on behalf
   of the Charterers are not the property of OWNERS, the Charterers
   shall indemnify and hold harmless OWNERS against all and any claim
   related to the recovery of the aforementioned objects
   excepting always any claims made by any master, crew, agents
   servants or employees of OWNERS.

.../...



- 8 -

Charterers shall reimburse OWNERS of all legal expenses incurred
by OWNERS in connection with such claims.

Charterers shall not sell the objects collected by OWNERS, but
shall use them only for exhibition purpose.

20.3   OWNERS shall not be responsible for the process of conditioning
and preservation of these objects on board the vessel.

20.4   OWNERS shall be entitled to collect a few specific samples of the
Titanic wreck for scientific experimental purposes in corrosion
research and/or biological research.

The selection of samples and the collection of the same shall be
mutually agreed between the representative of OWNERS and of the
Charterers on the vessel and the collection of these samples shall
in no way interfere with the Charterers use of the vessel.

## 21.  AUDIO VISUAL RIGHTS AND OTHER COMMERCIAL RIGHTS

21.1. The charterer shall at all times have and be entitled to the
benefit of all media, T.V., audio-visual rights relating to and arising
from the activities of the charter.

21.2. All logos appearing on the vessel will remain as they are and
where they are, nevertheless the charterers shall have the right to
place such additional logos as they wish on the vessel and/or ancillary
equipement in such a position as they wish, provided that such
positioning shall not interefere with the operation of the vessel or any
part of it or obscure any of OWNERS or other logos or names currently on
the "vessel" and its ancillary equipements.

### 21.3. - Merchandising arrangements for toys and models

Subject to the provisions of this section the Charterers shall
retain and be entitled to the benefit of all merchandising and other
commercial rights relating to and arising from the activities of the
Charter. The Charterers shall be fully entitled to authorize and licence
the production of models, toys and all representations of the vessels
and equipment used by IFREMER for the purpose of the Charter Party ("the
vessels and the equipment") for merchandising and commercial gain in
connection with the 1987 TITANIC Expedition.

.../...

- 9 -

IFREMER shall be entitled to receive 5% of the whole sale turnover of the sales of toys and models representing IFREMER's equipment.

After 31st August 1992, the Charterers will not, without the prior written consent of the Owners, enter into new contracts for the licensing of the merchandising, production and sale of the toys, but all contracts entered into by the Charterers prior to that date shall be allowed to run to expiry.

21.4. The charterers shall keep OWNERS informed of preparations for any film or book relating to the RMS TITANIC expeditions or to the TITANIC site.

## 22. FUTURE EXPEDITIONS ON THE TITANIC SITE

22.1. In the event that the charterer intends to plan additional expeditions to the TITANIC site during the years 1988 to 1992 inclusive the charterer shall inform OWNERS of its intentions before the 31st January of the year during which the expedition will take place.

22.2. In the event IFREMER will be approached during the years 1988 to 1992 by a new entity in order to perform similar expeditions on the TITANIC site, IFREMER shall grant a first refusal right to the CHARTERER in order to allow him to participate in a new TITANIC expedition.

The first refusal right has to be exercised by the CHARTERER within three weeks after notice given in writing by IFREMER.

## 23. LIABILITY

23.1. OWNERS warrant that the vessel is seaworthy and fit in all aspects for her duties under this charter.

23.2. The navigation management and operation of the vessel, the diving operations and the overall safety of the vessel and all loss damages costs expenses and liabilities arising out of or connected therewith shall be the sole responsibility of the OWNERS.

.../...



ENT BY:Xerox Telecopier 7020 ; 9-16-88 ; 1:21PM ;                    2038868724→                    ;#12

~ 10 ~

OWNERS shall be solely liable for all loss damages expense and
claims for death or for personal injury to any Master, crew, servant,
agent or employee of OWNERS or any other person on board the vessel at
their request and for all damage or loss caused to or incurred by the
vessel or other property of OWNERS or OWNERS itself arising out of or in
any way connected with the performance of the work at sea or sub-sea
under this agreement, howsoever caused. Subject to sub-Clause 23.3.
hereof OWNERS shall be liable for all loss damage expense or costs
suffered or incurred in connection with claims made by third parties
excepting the journalists, T.V. companies and all persons invited on
board by the charterers and. OWNERS shall indemnify and hold harmless the
charterers from all claims for such losses, damage, expenses, costs.

Nothing in this clause or in the charter-party as a whole may
be regarded as transfering the aforesaid responsibilities and
liabilities to the Charterers.

OWNERS shall not however be liable for loss or damage caused
to the objects from the wreck of RMS TITANIC from the time of correction
or recovery by OWNERS until such objects are handed over to the
Charterers pursuant to clause 20.1.

23.3. The Charterers shall be solely liable for all loss damages
expense and claims for death or for personal injury to any
passenger or other person (not being the Master, crew servant agent
or employee of OWNERS) on board the vessel at their request or with
the knowledge or consent of the Charterers. The charterers shall be
responsible for all loss or damage to objects from the wreck of RMS
TITANIC after they are handed over by OWNERS. For the avoidance of
doubt the charterers and his insurance companies waive any right
to sue the OWNERS in respect of all matters covered by this
paragraph.

23.4. The Owners shall not be held liable for any delay caused by a
strike by persons other the Owners own employees or agents.


ARTICLE 24 - CONDITIONS OF PAYMENT


24.1. The global charter hire for the basis charter period (54
days), subject to the option arrangement described in paragraph 24.2
below, shall be a lump sum of French francs 8,610,000 (eight million six
hundred ten thousand francs) plus French francs 3,690,000 (three million
six hundred ninety thousand French francs) for the recovery of the first
TITANIC safe, plus French francs 615 000 (six hundred and fifteen
thousand French francs) for each of the two additional TITANIC safes.

.../...



- 11 -

The global charter hire for the basis charter period (54 days) shall be paid as follows :

a/ The charterers shall issue by July 3, 1987 an irrevocable letter of credit in favour of IFREMER, Account nr 2335 A

> CREDIT LYONNAIS, Agence Ligne Entreprises
> 75008 - PARIS, 55 Champs Elysées
> Telex 660 021 F

with following condition of payments :

- FF 1,291,500 payable by July 3, 1987

- FF 2,000,000 payable on reception of a telex issued by IFREMER confirming the departure of the NADIR VESSEL from TOULON for the TITANIC SITE,

- FF 2,000,000 payable on reception of a telex issued by IFREMER confirming that the first NAUTILE dive takes place on the TITANIC SITE,

- FF 2,000,000 payable thirty days after the date of the first NAUTILE DIVE on the TITANIC SITE.

- FF 1,318,500 payable on September 30, 1987 upon presentation of an invoice by IFREMER.

b/ The Charterers shall issue an irrevocable letter of credit in favour of IFREMER account defined in paragraph a of FF 3,690,000 for the recovery of the first TITANIC SAFE.

This letter of credit has to be issued by the Charterers no later than 48 hours after recovery of the safe notified to the charterers by telex sent by IFREMER.

The FF 3,690,000 shall be payable on September 30, 1987 upon presentation of an invoice by IFREMER.

c/ The Charterers shall issue an irrevocable letter of credit in f   r of IFREMER account defined in paragraph a of FF 615,000 for the recovery of each ot the two additional TITANIC SAFES.

These letters of credit have to be issued by the Charterers no later than 48 hours after recovery of the safe notified to the charterers by telex sent by IFREMER.

The FF 615,000 shall be payable for each two additional safes recovered on November 30, 1987 upon presentation of an invoice by IFREMER.

.../...

Appendix "A" to the Charter Party

Name of Vessel :               NADIR

Support vessel for underwater research

- main characteristics :

    class of vessel : BV + 1 - 3 - 3 E (haute mer) Glace III
    length overall  : 55,75 m
    beam  overall   : 11,89 m
    draught max.    :  4,69 m
    depth moulded   :  5,50 m et main deck
    displacement    : 2 025 tons
    deck cargo      :   360 tons
    deck area       : 33 m x 11 m
    deadweigh       : 1 173 tons

    main propulsion :

    . four engines, total output 2 400 HP
    . two engines on each controllable pitch propeller
    . auxiliary propulsion : gill jet bow thruster 420 HP
    . electrical power 970 KVA
      380 V 50 Hz 3 phases

  - Equipment

    Satellite navigation system
    Telephone - telex by INMARSAT

    - facilities for carrying Nautile

      - one special stern gantry (20 tons)
      - one rolling platform for transfering the submersible to the
        workshop

    - facilities for carrying major surface equipment

      - one main crane (3 tons at 14,7m)

    - laboratory containers (20')

  - accommodation officers and men 14

  - technical personal : 15

  - passengers : 10

INSTITUT FRANÇAIS DE RECHERCHE
POUR L'EXPLOITATION DE LA MER
Cd, .. ... .. ..
75... .....
TEL .......
......

Appendix "B" to the Charter Party
Particulars of vessel's equipment

<u>NAUTILE</u>

manned submersible

| | |
|---|---|
| depth rating | 6 000 m |
| weight in air | 18, 5 T |
| length | 8,00 m |
| width | 2,70 m |
| heigth | 3,45 m |
| pay-load | 200 kg |

manned sphere

. crew                   3
. inside diameter        2,10 m
. sphere material titanium allog
. view posts
          number         3
          diameter       .120 mm

pitch and trim control with mercury pump    12°

power system : Ni-Cd battery       40 Kwh

propulsion :   1 axial motor
               2 vertical thrusters
               1 lateral thruster
highspeed       2,5 knots
underwater range at 1 knot : 15 miles

autonomy
          safety          130 hours

telemanipulation

. 2 arms

communications

. 1 underwater telephone
. 1 acoustic broadcast system for still pictures
miscellaneous equipments

. 1 scanning sonar
. 1 TV camera   3 CCD.
. 2 photo cameras
. 6 extern lights
. 1 sub bottom profiler
. 1 dead reckoning

A navis positionning system will be supplied to position Nautile and Nadir
on the seabed

INSTITUT FRANÇAIS DE RECHERCHE
POUR L'EXPLOITATION DE LA MER
66, Avenue d'Iéna
75116 PARIS
Tél. 723.74.28
720.55.01

. . . / . . .

Appendix "B" to the Charter Party
Particulars of vessel's equipment

## R.O.V. ROBIN

- tethered remote operated vehicle powered and controlled from the
  Nautile

- located at the lower front end of the Nautile when not in operation.

max. operating depths      6 000 m

neutral umbilical length     70 m
weight                        130 kg

dimensions     L    0,67 m
               W    0,70 m
               H    0,55 m

forward speed     up to 1 knot

propulsion     4 oil filled electrical thrusters
               (5 kg thrust each)

sensors   - low drift gyro
          - high accuracy pressure sensor

auto heading and auto depth capability

light   2 x 250 W quartz iodide
        1 x 100 W quartz iodide

television  1 colour low ligth
            2 black and white
still picture camera (option)

flash head   100 j

emergency locator flashes

telemetry MUX date and video

INSTITUT FRANÇAIS DE RECHERCHE
POUR L'EXPLOITATION DE LA MER
66, Avenue d'Iéna
75116 PARIS
TÉL. 723.55.25
720.63.01

Appendix "B" to the Charter Party
Particulars of vessel's equipment


Autonomous shuttle

    5 made of 1,2 x 1,2 x 1,5 basket fitted with acoustic release
system will be supplied.

    For safety reasons these shuttles have to be lowered down prior to
the Nautile's dive.

# Exhibit 2

# Exhibit A

# Revised Covenants and Conditions

## COVENANTS AND CONDITIONS
## FOR THE FUTURE DISPOSITION OF OBJECTS
## RECOVERED FROM THE *RMS TITANIC* BY RMS TITANIC, INC.
## PURSUANT TO AN *IN SPECIE* SALVAGE AWARD
## GRANTED BY THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### I. RECITALS OF PURPOSE

A. WHEREFORE, These covenants are entered into by R.M.S. Titanic, Inc., d/b/a/ Premier Exhibitions, Inc. (hereinafter "RMST") as a condition precedent for receiving an *in specie* salvage award from the U.S. District Court for the Eastern District of Virginia ("the Court") in relation to RMST's Motion for an Interim Salvage Award (dated November 30, 2007) in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902) ("the pending admiralty action");

B. WHEREFORE, RMST has, by order of the Court (since June 1994) served as salvor-in-possession of The RMS TITANIC wreck site, and (since 1993) as substitute custodian of the artifacts recovered therefrom;

C. WHEREFORE, RMST has conducted six dive expeditions to The TITANIC wreck site, logging 360 day-equivalents on the site, and has devoted thousands of hours to the recovery, stabilization, conservation, curation and exhibition of artifacts salvaged from The TITANIC;

D. WHEREFORE, These Covenants and Conditions shall apply to the present and future disposition, care, conservation, and management of the Subject TITANIC Artifact Collection;

E. WHEREFORE, It is the intent to grant RMST an *in specie* salvage award in the form of title to the artifacts that RMST has recovered and which are within the Court's jurisdiction in the pending admiralty action, such *in specie* salvage award shall be a trust for the benefit of and

1

subject to the beneficial interest of the public in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, and the Covenants and Conditions herein expressed;

F. WHEREFORE, These Covenants and Conditions shall be perpetual in duration, and are intended to govern the disposition, care, conservation, and management of the Subject TITANIC Artifact Collection within the scope of its terms, forever, and irrespective of whether such artifacts continue to be possessed by RMST, and shall be applied to all subsequent owners or possessors of TITANIC artifacts within the scope of its terms; {Court 4/15/2008 Order, at 5}

G. WHEREFORE, These Covenants and Conditions are intended to ensure that TITANIC artifacts within the scope of its terms are, for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7; Court 4/15/2008 Order, at 3 & 4}

II. DEFINITIONS OF OPERATIVE TERMS

For the purposes of these Covenants and Conditions:

A. "RMS TITANIC" means the shipwrecked vessel Royal Mail Ship *Titanic*, sunk in the North Atlantic on April 15, 1912, and includes the wreck site and debris field of the shipwrecked vessel. {Titanic Memorial Act 3(c); NOAA Guidelines Scope (f); International Agreement art. 1(a)}

B. "TITANIC Artifacts" means the cargo, tackle, appurtenances and hull of RMS TITANIC, and other contents, including those associated objects (or portions thereof) that are scattered in its vicinity on the ocean floor within the wreck site and debris field, and all such property recovered from the wreck site since September 1, 1985, and any human remains of those aboard the vessel who perished. {NOAA Guidelines Scope (a); International Agreement art. 1(b); Proposed Legislation § 3(d)-sub(e)}

C. "RMST" means R.M.S. Titanic, Inc., d/b/a/ Premier Exhibitions, Inc., its heirs, successors, and assigns, in exercise of its rights and obligations under these Covenants and Conditions. {Proposed Legislation § 17(h)}

D. "The Court" means the U.S. District Court for the Eastern District of Virginia exercising its jurisdiction in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a*

2

point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the *R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

E. "The Pending Admiralty Action" means the case styled *R.M.S. Titanic, Inc., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

F. "The French TITANIC Artifact Collection" means the entirety of artifacts that were recovered by RMST's predecessor entity in the 1987 dive expedition on The TITANIC, and which were the subject of an *in specie* salvage award granted in favor of RMST's predecessor entity in a Procès-Verbal issued October 20, 1993, by the French Maritime Tribunal, exercising appropriate jurisdiction over those artifacts. {Proposed Legislation §§ 3(c)-sub (a)(3) & 6(d)}

G. "The Subject TITANIC Artifact Collection" means all objects recovered from the RMS TITANIC wreck site and debris field by RMST that are within the jurisdiction of the Court, namely all those objects and artifacts recovered by RMST during the course of its dive expeditions (conducted in 1993, 1994, 1996, 1998, 2000 and 2004) on the site after the initiation of the pending admiralty action in 1992. For the purposes of this operative definition, the Subject TITANIC Artifact Collection does not include (1) lumps of coal recovered from The RMS TITANIC wreck site; (2) extraneous objects removed from the site that, according to the best scientific and historic evidence, were not associated with the RMS TITANIC at the time of its sinking; or (3) objects that are determined to be human remains. {NOAA Guidelines Comment (17); Proposed Legislation § 3(c)-sub (a) & 6(d)}

H. "The TITANIC Collections" refers to the total assemblage of the French TITANIC Artifact Collection and the Subject TITANIC Artifact Collection. {Court 4/15/2008 Order, at 4-5; U.S. Amicus Br. 11 & n.7}

I. "Qualified Institution" means any entity (whether governmental, not-for-profit, corporate, or otherwise in form or character) that has demonstrated the willingness and capacity (by virtue of facilities, financial resources, personnel, accreditation and/or otherwise) to conserve, curate, manage, and generally care for the Subject TITANIC Artifact Collection, and to ensure that such is available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. Considerations for any evaluation of whether an entity is a qualified institution are included as Annex A to these Covenants and Conditions. For the purposes of entering into these Covenants and Conditions, RMST is, as of the effective date of these Covenants and Conditions, a qualified institution. {NOAA Guidelines Scope (g); 36 C.F.R. § 79.9}

J. "The Trustee" means any qualified institution which shall have the responsibility and authority to conserve, curate, manage, and generally care for the TITANIC Collections for the

3

public interest. For the purposes of the Covenants and Conditions, RMST shall be the first Trustee of the Subject TITANIC Artifact Collection.

K. "National Oceanic and Atmospheric Administration (NOAA)" refers to the federal agency that represents the public interest in TITANIC Collections and exercises oversight functions in relation to these Covenants and Conditions. NOAA's authority to represent the public interest in this matter is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines. Such authority shall be carried out consistent with the 1986 Act, other applicable law, and orders of the Court, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions. NOAA shall, however, be an intended beneficiary of these Covenants and Conditions, with the authority to enforce their terms as appropriate on behalf of the public interest. References to NOAA in the context of court proceedings shall, as appropriate, be interpreted to refer to actions by NOAA acting through its counsel the United States Department of Justice.

L. "Conservation" means, in relation to The TITANIC Collections, the handling, cleaning, stabilizing, restoration and conserving of objects in such a manner to preserve them for posterity. {36 C.F.R. § 79.4(b)(6)}

M. "Curation" means managing and preserving The TITANIC Collections for posterity, including, but not limited to: (1) inventorying, accessioning, labeling and cataloging objects; (2) identifying, evaluating and documenting objects; (3) storing and maintaining objects using appropriate methods and containers, and under appropriate environmental conditions and physically secure controls; (4) periodically inspecting objects and taking such actions as may be necessary to preserve them; (5) providing access and facilities for study and research. {Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44737; 36 C.F.R. § 79.4(b)}

N. "Performance guarantee" means the reserve account established under Section V.D. hereof in order to fund an endowment the income of which is sufficient to cover the annual costs to conserve and curate the Subject TITANIC Artifact Collection. It may also include such additional financial undertakings or guarantees as the Court may order under these Covenants and Conditions.

O. "Reserve Account" means that fund set aside by the Trustee and irrevocably pledged for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Artifact Collections for the public interest, as provided by Section V.D. herein;.

4

III. ENSURING THE UNITY AND INTEGRITY OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 11-12; Court 4/15/2008 Order, at 4-5}

A. The Subject TITANIC Artifact Collection shall be kept together and intact forever, pursuant to the terms of these Covenants and Conditions. Individual objects or artifacts, or groups of objects or artifacts, as well as all supporting documentation, shall not be dispersed through sale or other disposition (including pledge, collateralization, or similar treatment), except as through a process of deaccessioning, as provided under these Covenants and Conditions. The Subject TITANIC Artifact Collection shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the French TITANIC Artifact Collection as an integral whole by the Trustee. {NOAA Comment (5) & Guideline 28; & International Agreement art. 3}

B. The TITANIC Collections shall be available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7 & Rule 28}

1. *Public Display and Exhibition.* Popular presentation and public display and exhibition of the TITANIC Collections may, at the Trustee's discretion, be at a fixed venue or location, or through one or more traveling exhibitions, and such displays or exhibitions may be permanent, continuous, intermittent, or occasional in character. Public display and exhibition of the TITANIC Collections may include temporary loans of objects to qualified institutions under terms no less exacting than those contained in these Covenants and Conditions. {NOAA Guideline 31; International Agreement Rule 31; 36 C.F.R. § 79.10(e)}

2. Historical Review, Scientific and Scholarly Research.

a. *Research in the Ordinary Course.* Individual objects or artifacts, or groups of objects or artifacts, within the TITANIC Collections shall be made available by the Trustee, in its discretion and consistent with professional standards, to qualified scholars, researchers, and scientists for viewing and study on appropriate terms and conditions, depending on the character of the object being studied, and the nature of the study being conducted, and consistent with best collections management practices. The Trustee may condition access to objects within the TITANIC Collections to reasonable restrictions, in order to ensure fair access, conservation of the Trustee's resources, and preservation of its rights of exhibition and media in such objects (including any relevant intellectual property rights). The Trustee shall (where appropriate) promote the public dissemination of researches and studies in relation to the TITANIC Collections. {NOAA Guideline 27; International Agreement Rule 27; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44734 (std . IV); 36 C.F.R. § 79.10(b)}

b. *Destructive or Invasive Research.* The Trustee may, in its discretion based on best scientific and research practices, permit the destructive or invasive testing or analysis of selected objects within the TITANIC Collections by highly qualified investigators,

using established protocols or techniques of investigation, who are pursuing studies for which no other alternative means of investigation is possible, provided that all efforts are taken to ensure that objects that are truly of an irreplaceable or historically significant nature will not be harmed. An example of legitimate destructive or invasive research within the contemplation of this provision would be metallurgical and forensic analysis of portions of The TITANIC hull, in order to determine the true causes of the vessel's sinking. The Trustee may allow access to objects within the TITANIC Collections for destructive or invasive testing or analysis, subject to the payment of a user fee to the Trustee for the conduct of such research, and the Trustee may insist that the results of such destructive or invasive research be made publicly available. Research that involves potential harm or destruction of artifacts may only be conducted under a research plan approved by the Court. {NOAA Guideline 3; International Agreement Rule 3; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44734 (stds. II & IV); 36 C.F.R. § 79.10(d)(5); 36 C.F.R. § 79.9(b)(5)(iii))}

3. *Education.* The Trustee shall make all reasonable and appropriate efforts to develop and promote public educational uses and applications of the TITANIC Collections, including curricular materials and items in a variety of mediums. Without derogating its intellectual property rights in such educational materials, the Trustee shall make such materials available on preferential terms to educational institutions at all appropriate levels of instruction. {NOAA Guideline 31}

C. Deaccessioning of Objects within the Subject TITANIC Artifact Collection (STAC).

1. *General Principle.* Deaccessioning of objects in the Subject TITANIC Artifact Collection (STAC) may occur only under extraordinary circumstances and only after a rigorous process of evaluation by the Trustee, which process has demonstrated that a particular artifact or object, or group of artifacts or objects, within the Subject TITANIC Artifact Collection no longer hold historical, cultural or archaeological significance or that such items can no longer be properly conserved or curated, based on then-current best collections management practices. {NOAA Guidelines Comment (6); U.S. Amicus Br. 12 n.8}

2. *Considerations for Deaccessioning.* Considerations that may be relevant to the Trustee in any rigorous process of evaluation for deaccessioning from the STAC, include: (a) whether an object has sufficient intrinsic or historical value or aesthetic merit as an item for further study, research or exhibition; (b) whether an object is redundant or duplicative and has no value as part of a series; (c) whether the physical condition of the object is so poor as to render stabilization, conservation or restoration impossible; (d) whether the physical condition of the object is so poor that it no longer has value for exhibition, research, study or teaching purposes. Any evaluative report made by the Trustee to deaccession an object must fully document its conclusions based on then-current best collections management practices. {AAMD Practices; ICOM Professional Ethics Code 2.13 & 2.15}

3. *Modalities of Disposition by Deaccessioning.* Once an object within the STAC is deaccessioned it may be disposed of in a variety of ways by the Trustee without violating the principle that objects or artifacts, within the Subject TITANIC Artifact Collection, shall not be dispersed through sale or other disposition. {NOAA Guidelines Comment (6)}

      a. Disposition of a deaccessioned object from the STAC may be accomplished by (i) sale to a designated buyer, or by public auction, or by other means in an appropriate arms-length transaction; (ii) sale, exchange or gift to a museum or educational institution in an appropriate arms-length transaction; or (iii) destruction (in the case of an object that is too badly damaged or deteriorated to be properly conserved or restored). {ICOM Professional Ethics Code 2.13 & 2.15}

      b. Before disposition, an object shall be fully and permanently documented by the Trustee, including analysis and imaging, so that future researchers may consult some record of the object. {ICOM Professional Ethics Code 2.13 & 2.15}

      c. Any moneys received from the disposition of a deaccessioned object from the STAC shall be applied solely for the benefit of the TITANIC Collections. {ICOM Professional Ethics Code 2.16}

      4. Any decision made concerning the deaccessioning of an object from the STAC, and the modalities of such disposition, shall be made upon the initiative of the Trustee. Such shall be based upon an evaluative analysis prepared by the Trustee and directed to the Court. After the filing of such a request and analysis, NOAA may submit information and/or a report and recommendation to the Court regarding the proposed deaccessioning of an object and the modalities of such disposition. The Trustee may make a timely response to any NOAA submission. No deaccession or disposition of an object from the STAC shall occur or be valid except with the approval of the Court. {U.S. Amicus Br. 12 n.8}

IV. ENSURING THE PROPER MANAGEMENT OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 12-13; Court 4/15/2008 Order, at 4-5}

      A. The TITANIC Collections shall be maintained in accordance with current internationally recognized museum standards and practices for collections management. {Proposed Legislation § 17(i)}

      B. Specifically, the TITANIC Collections shall be maintained in accordance with the following rules:

      1. Conservation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the conservation project is to be

undertaken. {International Agreement Rule 24; NOAA Guideline 24}

2. Curation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the curation project is to be undertaken. {International Agreement Rule 30; NOAA Guideline 30}

3. Transport, exhibition, and security of objects in the TITANIC Collections, to the extent that such are not otherwise subsumed within standards for curation, shall be carried out in accordance with best practices current at the time a particular activity is to be undertaken. {International Agreement Rule 23; NOAA Guideline 23}

4. Documentation of objects in the TITANIC Collections shall be carried out in accordance with reasonably prudent archaeological standards current at the time the documentation project is to be undertaken, and shall include, where relevant, the systematic and complete recording of the provenance of objects in the TITANIC Collections in order to preserve historical, cultural and archaeological information, and the preservation of field notes, plans, sections, photographs, and imaging/recording of the objects. {International Agreement Rules 5, 21-22; NOAA Guidelines 5, 21-22; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44735-37; 36 C.F.R. § 79.9(b)(6)}

C. The Trustee shall ensure that all conservation, curation, documentation and related projects for the TITANIC Collections shall be undertaken only under the guidance of, and in the presence of, qualified technical and/professional experts with the knowledge, experience and demonstrated competence appropriate to the projects undertaken, and that all persons associated with a project should be (1) qualified and have demonstrated experience appropriate to their project roles; and (2) fully briefed and understand the work required. {International Agreement Rules 17 & 18; NOAA Guidelines 17 & 18; 36 C.F.R. § 79.4(h); Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44739-40}

D. The Trustee shall take all necessary measures to protect the physical security of the TITANIC Collections and shall insure it against casualty or loss. {36 C.F.R. § 79.9(b)(3)}

V. *OVERSIGHT OF COMPLIANCE WITH THE COVENANTS AND CONDITIONS* {U.S. Amicus Br. 13-14; Court 4/15/2008 Order, at 5}

A. NOAA has the authority to gather information and to submit information and/or make reports and recommendations to the Court regarding the compliance of the Trustee with these Covenants and Conditions, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions.

8

B. NOAA's authority shall be exercised within the terms of these Covenants and Conditions.

C. In order to make reports and recommendations to the Court, NOAA shall have the authority under these Covenants and Conditions:

1. To periodically inspect the TITANIC Collections and the Trustee's operations for the conservation, curation, documentation, and other activities in relation to the STAC. For these purposes, NOAA shall have full access to the TITANIC Collections, the Trustee's facilities and personnel, and any documentation NOAA determines is reasonably necessary to evaluate the condition of the STAC.  {36 C.F.R. § 79.11}

2. To consult with, and seek advice from, any entity or individual who may be of assistance to evaluate the condition of the TITANIC Collections, including other federal governmental departments and agencies, and those entities or individuals who have such relevant or appropriate professional or academic credentials. Any written reports and views of such entities and individuals consulted shall be timely shared with the Trustee, which shall have the opportunity to timely respond.  {16 U.S.C. § 450rr-3; 66 Fed. Reg. 18911}

3. To make recommendations to the Trustee about measures to be adopted to improve the condition of the STAC. The Trustee shall have the opportunity to respond to such recommendations, and shall subsequently report to the Court how it has implemented, or why it has not implemented, such recommendations.

4. To make recommendations as to the deaccessioning of objects from the STAC, pursuant to the procedures detailed in Covenant and Condition III.C.4, *supra.*

5. To make recommendations relating to the performance guarantee detailed in Covenant and Condition V.D, *infra.*

6. To make recommendations as to whether the Trustee is in significant default of an essential Covenant and Condition, pursuant to the procedures detailed in Covenant and Condition V.E, *infra.*

7. To make recommendations as to the designation of a Subsequent Trustee, pursuant to the procedures detailed in Covenant and Condition VI.E, *infra.*

8. To make recommendations in the event of a Trustee's bankruptcy, pursuant to the procedures detailed in Covenant and Condition VII.D, *infra.*

9. To make recommendations that the Court should appoint experts to offer opinions regarding the compliance of the Trustee with these Covenants and Conditions and/or any other matter relevant to the STAC.

9

10. To make periodic reports to the Court as to the Trustee's compliance with these Covenants and Conditions.

11. Subject to the availability of resources, appropriations, and other authorized funds, to perform any other functions requested by the Court regarding oversight of the STAC.

12. If NOAA determines it will no longer participate in these Covenants and Conditions, it will provide timely notice to the Court and the Trustee.

D. Performance Guarantees: Trust and Reserve Account.

1. An incumbent Trustee hereby covenants that it will set aside and pay a designated sum of monies into a reserve account (as specified below) separate and segregated from other accounts, which may not be used for general operating or other routine expenses of the Trustee.

2. The payments shall be made out of the money which it may now or later have on hand and available for such purposes commencing with the fiscal quarter in which these Covenants and Conditions are executed and the *in specie* salvage award is granted, and quarterly thereafter in equal amounts of US $25,000 per quarter, as a performance guarantee. The payments shall be adequate so that within twenty-five (25) years from the date hereof, and based upon reasonably anticipated rates of return, there shall be an endowment, the annual income of which (based on reasonable rates of return) would be sufficient to cover the estimated annual costs and expenses of conserving and curating the TITANIC Collections for that year. For these purposes the amount of an adequate endowment will be deemed equal to 5 million dollars (US $5,000,000), which may be adjusted from time to time to address changes in circumstances and inflation. Interest that may accrue on said reserve fund shall be retained in the reserve account until such time as the fund shall accumulate 5 million dollars (US $5,000,000), as that amount may be adjusted from time-to-time as hereinabove provided.

3. Said reserve account shall be and is hereby irrevocably pledged to and held in trust by Trustee for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Collections for the public interest.

4. All monies in the reserve account may be kept in cash or invested in direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States Government, obligations of agencies of the United States Government or certificates of deposit secured by such obligations. In all other respects, investment decisions related to the reserve fund are committed to the sound business discretion of the Trustee. Interest on such investments and/or any profits realized from the sale thereof shall be deposited in and become a part of the reserve account until the aggregate amount equals 5 million dollars (US $5,000,000), as from time-to-time may be adjusted.

10

5. No funds from the reserve account may be withdrawn except upon the prior written request of the Trustee with sufficient explanation as to its need and use, and with the approval of the Court. If a deficiency is created in the Reserve Account by reason of a withdrawal either for purposes of maintaining or preserving the TITANIC Collections or any item thereof, then said deficiency in the reserve account shall be made up from the money first available to the Trustee after covering current expenses of maintaining and preserving the TITANIC Collections.

6. In making any determination related to performance guarantees, the Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing.

7. NOAA may submit information and/or prepare a report and recommendation for the Court, as to any issue related to performance guarantees, and the Trustee may make a timely response to such a submission. The Court may consider any information and/or report and recommendation submitted by NOAA.

E. Trustee's Material Default.

1. A "Material Default" is defined to include that conduct or omission by the Trustee, or such conditions in relation to the TITANIC Collections, that seriously compromise and jeopardize the TITANIC Collections and the objective of ensuring that it is available to posterity. Any violation of Covenants and Conditions III.A, III.C, IV.B, and IV.D will normally be assumed to be a material default.

2. Procedures to be Followed in the Event of a Material Default.

a. NOAA may, in a notice directed to the Trustee (or in a report to the Court in the event of extraordinary circumstances) indicate that a material default has occurred, or will imminently occur, and may recommend a means of response or remediation of such default. The Trustee shall have thirty (30) days to respond to such a notice or report, indicating (i) whether its conduct, or the condition of the Titanic Collections, is such as to merit characterization as a significant default, and (ii) what response or remediation efforts have, in any event, been implemented. If NOAA is satisfied with the Trustee's response that shall end the matter, but if not, NOAA may request a further set of responses from the Trustee, or shall direct a report to the Court indicating that a material default has occurred, or will imminently occur, and recommending a means of response or remediation of such default

b. The Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing in order to ascertain whether a material default has occurred, and what steps the Trustee must undertake to respond or remediate;

11

c. At the conclusion of any evidentiary hearing NOAA may submit additional information and/or prepare a report and recommendation for the Court, as to whether there has been a material default, and whether the Trustee is unwilling or unable to satisfactorily respond or remediate. The Trustee may make a timely response to such submissions;

d. The Court may consider any information and/or report and recommendation submitted by NOAA and the Trustee;

e. The Court may enter an Order as to whether there has been a material default, and, if so, any such action as the Trustee must make, within a specified period of time, to respond or remediate,

f. If the Court finds that there has been a material default of an essential Covenant and Condition, and the Trustee is unable or unwilling to comply with the Court's order for response or remediation, the Court may order (i) the Trustee to make other reasonable undertakings in order to respond to or remediate the material default; (ii) the Trustee to post additional performance guarantee(s); or (iii) the use of the reserve account in a manner subject to the Court's determination to best protect and preserve the TITANIC Collections.

F. The Continuing Jurisdiction of the Court.

1. The Court shall be deemed to have continuing jurisdiction over the Subject TITANIC Artifact Collection as part of the pending admiralty action.

2. Any Trustee designated under these Covenants and Conditions shall submit itself *in personam* to the jurisdiction of the Court, for the purpose of oversight of compliance with these Covenants and Conditions.

G. Funding of Oversight

1. The Trustee shall, as part of its obligations under these Covenants and Conditions, pay reasonable expenses of court-appointed experts. Such experts may be appointed where necessary and appropriate to assist with any issue or determination arising under these Covenants and Conditions.

2. NOAA may recommend appointment of an expert, or the Trustee may make such recommendation, or the Court may do so *sua sponte*.

12

VI. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF ITS SALE {U.S. Amicus Br. 14-15; Court 4/15/2008 Order, at 5 & 6 n.12}

A. The Subject TITANIC Artifact Collection (STAC) may not be sold, transferred, assigned, or otherwise be the subject of a commercial transaction, except as approved by the Court. Such transfer or assignment will be subject to orders of the Court including the provisions of these Covenants and Conditions. {U.S. Amicus Br. 15}

B. These Covenants and Conditions for the STAC shall run in perpetuity and shall be applied to all subsequent Trustees within the scope of their terms. {Court 4/15/2008 Order, at 5}

C. Subsequent purchasers, assignees, transferees, or otherwise of the Subject TITANIC Artifact Collection (henceforth "subsequent Trustees") shall be deemed to be on notice of the restrictions contained in these Covenants and Conditions as constituting an equitable servitude and trust imposed for the public interest and that NOAA may represent the public interest in the STAC and exercise oversight functions in relation to these Covenants and Conditions. NOAA may file or cause to be published such public notice of these Covenants and Conditions as it deems in its discretion to be necessary or convenient to protect the public interest. The Trustee shall execute such documents as may be reasonably appropriate to provide such notice.

D. Any subsequent Trustee must be a qualified institution, as defined in provision II.I, *supra*, and in light of the considerations contained in Annex A, *infra*.

E. Procedure for Designating a Subsequent Trustee.

1. The Trustee may propose to the Court a transaction for the sale, transfer, assignment or otherwise of the Subject TITANIC Artifact Collection. The proposal should include all details of the transaction, shall identify the proposed Subsequent Trustee, and indicate how the candidate Subsequent Trustee is, or will become, a qualified institution, and shall include a signed acknowledgement by the proposed Subsequent Trustee to be bound by these Covenants and Conditions. The procedures outlined in this section (Section VI) of the Covenants and Conditions do not apply, however, in situations where the corporate identity of the Trustee is changed or altered by sale, purchase, merger, acquisition, or similar transaction, the form and purpose of which does not effectuate a change in the management, conservation and curation of the STAC.

2. The Court may appoint experts to conduct and complete due diligence investigations of the candidate Subsequent Trustee, to no less an extent as permitted in regards to the operations of the Trustee. Such experts may, by communication to the Court, Trustee, and NOAA, offer opinions whether (a) the candidate Subsequent Trustee is a qualified institution; and (b) whether the transaction may proceed under the terms and conditions proposed, or whether such must be modified in order that the transaction be in conformance with these Covenants and Conditions.

13

3. The Court may request information from the Trustee on this matter, and/or may convene and conduct a hearing, in order to ascertain whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed.

4. The Court may consider any information and/or report and recommendation submitted by NOAA as to whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed. The incumbent Trustee may timely respond to such NOAA submissions.

5. The Court may enter an Order indicating whether the transaction may proceed, and (if appropriate) designating the candidate proposed as the next Trustee of the Subject TITANIC Artifact Collection. As part of its Order, the Court may confirm that, in the transfer of the STAC, the disposition of any funds having accumulated in the reserve account established in Covenant and Condition V.D. remains with the former Trustee, provided that the subsequent Trustee immediately replaces any such funds, thereby irrevocably pledging those funds for the purpose of providing for the maintenance and preservation of the TITANIC Collections for the public interest, and undertakes its continuing accretion at not less than its then-current levels, such funds being pledged for the conservation and curation of the TITANIC Collection for the public interest.

F. Special Provisions in the Event of a Transaction with an Overseas Entity.

1. Nothing in these Covenants and Conditions precludes the sale, transfer, assignment or other transaction of the Subject TITANIC Artifact Collection to a qualified institution located or constituted outside the United States ("an overseas entity").

2. An Overseas Entity must make, as a condition of the transaction, the declaration contained in provision V.F.2, in a form satisfactory to the Court.

3. As ordered by the Court, an Overseas Entity may be required to post an additional performance guarantee as a condition for being confirmed as the Subsequent Trustee, unless:

a. The overseas entity is located or constituted in a State Party to the International Agreement Concerning the Shipwrecked Vessel RMS Titanic, done at London, November 6, 2003, or in a country mentioned in 16 U.S.C. § 450rr-3(a); or

b. The transaction approved pursuant to the procedures indicated at provision VI.E, *supra*, requires that the STAC be leased-back to, or otherwise effectively managed by, a United States entity that has previously served as a Trustee.

14

4. Any performance guarantee required pursuant to provision VI.F.3 of the Covenants and Conditions shall have such additional purposes and objectives as designated by the Court.

VII. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF A TRUSTEE'S BANKRUPTCY {U.S. Amicus Br. 16; Court 4/15/2008 Order, at 5}

A. Having been declared that any Trustee's title to and possession and use of the Subject TITANIC Artifact Collection (STAC) pursuant to the *in specie* salvage award is subject to a trust to further the public interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, any Trustee of the STAC that is organized as a business association (whether for-profit, or not-for-profit), shall be required to take all appropriate measures to ensure that these Covenants and Conditions will continue to apply to the STAC for the benefit of the public interest even in the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event.

B. To the extent allowed by federal law, the beneficial interests to the STAC, including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate of the Trustee in the event of bankruptcy, insolvency, dissolution, winding up, or similar event, and all measures taken by a trustee, debtor-in-possession or similar agent of the Trustee shall be subject to review by the United States District Court for the Eastern District of Virginia to protect the unity and integrity of the STAC under these Covenants and Conditions; provided, however, nothing in this subparagraph shall be construed to deprive the Trustee of any economic benefits relating to the *in specie* salvage award and its title to the STAC consistent with these Covenants and Conditions.

C. Deleted.

D. Procedures in the Event of a Trustee's Bankruptcy.

1. In the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event, the Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions;

2. The Court may request information from the Trustee and/or may convene and conduct a hearing in order to ascertain whether the Trustee's insolvency bond should be forfeited and recommend the modalities under which the funds will be applied to protect the TITANIC Collections;

15

3. Deleted.

4. Deleted.

5. NOAA shall have the right to make submissions in the foregoing proceedings and represent the public interest.

6. As set forth in V.F.1, jurisdiction over this matter shall remain in the United States District Court for the Eastern District of Virginia. If, however, another bankruptcy court attempts to exercise jurisdiction over the STAC artifacts, the district court in which the bankruptcy case is pending may have the reference withdrawn under 28 U.S.C. § 157, or transfer venue to this Court under 28 U.S.C. § 1412.

## VIII. OTHER PROVISIONS

A. These Covenants and Conditions constitute the entirety of a Trustee's obligations in regards to the TITANIC Collections.

B. Any controversy or claim arising out of or relating to these Covenants and Conditions shall be within the primary competence of the Court exercising jurisdiction in the pending admiralty action.

C. If any provision of these Covenants and Conditions is found to be unconstitutional or unenforceable by a court or tribunal of competent jurisdiction, such provision shall be severed from the whole and the remaining provisions shall be given full force and effect.

D. These Covenants and Conditions shall be interpreted in accordance with federal law.

## ANNEX A

### Considerations for any Evaluation of Whether an Entity is a Qualified Institution

The following considerations are relevant to a determination whether an entity is a qualified institution within the meaning of the Covenants and Conditions. An entity will be deemed to have the capability to provide adequate long-term conservation and curatorial services when the entity is able to:

(a) Accession, label, catalog, store, maintain, inventory and conserve the TITANIC Collections on a long-term basis using reasonable museum and archival practices; and

(b) Comply with the following, as appropriate to the nature and content of the collection;

　(1) Maintain complete and accurate records of the TITANIC Collections, including:

　　(i) Records on acquisitions;

　　(ii) Catalog and artifact inventory lists;

　　(iii) Descriptive information, including field notes, site forms and reports;

　　(iv) Photographs, negatives and slides;

　　(v) Locational information, including maps;

　　(vi) Information on the condition of the TITANIC Collections, including any completed conservation treatments;

　　(vii) Approved loans and other uses;

　　(viii) Inventory and inspection records, including any environmental monitoring records;

　　(ix) Records on lost, deteriorated, or damaged objects within the Subject TITANIC Artifact Collection (STAC); and

　　(x) Records on any deaccessions and subsequent transfers, repatriations or discards of objects within the STAC;

　(2) Dedicate the requisite facilities, equipment and space in the physical plant to properly store, study and conserve the collection. Space used for storage, study, conservation and, if

17

exhibited, any exhibition must not be used for non-curatorial purposes that would endanger or damage the collection;

(3) Keep the TITANIC Collections under physically secure conditions within storage, laboratory, study and any exhibition areas by:

(i) Having the physical plant meet local electrical, fire, building, health and safety codes;

(ii) Having an appropriate and operational fire detection and suppression system;

(iii) Having an appropriate and operational intrusion detection and deterrent system;

(iv) Having an adequate emergency management plan that establishes procedures for responding to fires, floods, natural disasters, civil unrest, acts of violence, structural failures and failures of mechanical systems within the physical plant;

(v) Providing fragile or valuable items in a collection with additional security such as locking the items in a safe, vault or museum specimen cabinet, as appropriate;

(vi) Limiting and controlling access to keys, the collection and the physical plant; and

(vii) Inspecting the physical plant for possible security weaknesses and environmental control problems, and taking necessary actions to maintain the integrity of the collection;

(4) Require staff and any consultants who are responsible for managing and preserving the STAC to be qualified professionals;

(5) Handle, store, clean, conserve and, if exhibited, exhibit the TITANIC Collections in a manner that:

(i) Is appropriate to the nature of the material remains and associated records;

(ii) Protects them from breakage and possible deterioration from adverse temperature and relative humidity, visible light, ultraviolet radiation, dust, soot, gases, mold, fungus, insects, rodents and general neglect; and

(iii) Preserves data that may be studied in future laboratory analyses. When material remains in a collection are to be treated with chemical solutions or preservatives that will permanently alter the remains, when possible, retain untreated representative samples of

18

each affected artifact type, environmental specimen or other category of material remains to be treated. Untreated samples should not be stabilized or conserved beyond dry brushing;

(6) Store site forms, field notes, artifacts inventory lists, computer disks and tapes, catalog forms and a copy of the final report in a manner that will protect them from theft and fire such as:

(i) Storing the records in an appropriate insulated, fire resistant, locking cabinet, safe, vault or other container, or in a location with a fire suppression system;

(ii) Storing a duplicate set of records in a separate location;

(7) Inspect the collection for possible deterioration and damage, and perform only those actions as are absolutely necessary to stabilize the collection and rid it of any agents of deterioration;

(8) Conduct inventories to verify the location of the material remains, associated records and any other Federal personal property that is furnished to the repository; and

(9) Provide access to the collection by the public and researchers.

{36 CFR § 79.9}