IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
   Plaintiff,

v.                Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL,
ITS ENGINES, TACKLE, APPAREL,
APPURTENANCES, CARGO, ETC., LOCATED
WITHIN ONE (1) NAUTICAL MILE OF A POINT
LOCATED AT 41 43/ 32' NORTH LATITUDE
AND 49 56' 49" WEST LONGITUDE,
BELIEVED TO BE THE R.M.S. TITANIC
<u>in rem</u>,
   Defendant.

UNITED STATES' REPORT IN RESPONSE
TO RMST'S MAY 23, 2017 PERIODIC REPORT

   On May 23, 2017, RMST filed a Periodic Report ("Periodic Report") as required by the Court. Pursuant to Part V(A) of the Covenant's and Conditions ("C&Cs"), the United States submits this report to address and respond to the various points RMST raises.

   The Court has scheduled a status hearing in this matter for June 28, 2017 at 2:00 p.m.

   I.   BANKRUPTCY PROCEEDINGS

   In its Periodic Report, RMST provided an update on its bankruptcy proceeding pending in the Middle District of Florida, noting that the Bankruptcy Court had authorized a clerk's default against France. Periodic Report at 1-2. RMST also advised that a hearing on its motion for a default judgment was scheduled for June 22, 2017, *id.*, but did not note that this motion had already once been denied. *See In re: RMS Titanic, Inc., et al.*, Case No. 3:16ap183-PMG (M. Dist. Fl, Jacksonville Div., April 25, 2017), "Order on Plaintiff RMS Titanic, Inc.'s Amended

Motion for Entry of Clerk's Default [etc.]" (ECF No. 52) at 20-21 (explaining that "the record at this time is not satisfactory to establish that the debtor's title to the French Artifacts is unconditional," or that "the French Republic has no interest in the French Artifacts").

RMST also advised that it had moved for approval of a "Plan Support Agreement" ("PSA") and for "Debtor-in-Possession Financing." Periodic Report at 2-3. The PSA contemplates the sale of RMST in its entirety, or "the entire artifact collection held by RMST," both the French Artifacts and the Subject Titanic Artifact Collection ("STAC").[1] Periodic Report at 2. In addition, because of a consolidation provision, the PSA contemplates that the proceeds from the sale of RMST or the artifacts would be used to satisfy the creditors and equity holders of **all** co-debtors, not just the creditors and equity holders of RMST. See "Complete Transaction Term Sheet," Ex. 2 of Periodic Report, at p. 5 ("Limited Consolidation" provision).

The Department of Commerce has opposed the PSA motion. See Exhibit A, attached hereto.[2] Generally, Commerce objects to the PSA because: (1) the proposed sale is outside the ordinary course of business; (2) the proposed sale "does not require a sale transaction that complies with the C&Cs;" and (3) "us[ing] the artifact collections as the crown jewels to fund a payout" to satisfy the debts and equity holders of related companies is unjustified and conflicts with the C&Cs. *Id.* at 2, 6-10; *see also* C&Cs, Part VI (provisions regarding protection of the Subject Titanic Artifact Collection in the event of sale).

---

[1] RMST previously sought a more limited permission from the Bankruptcy Court "to market and sell certain French artifacts." July 15, 2016 Periodic Report at 2. That motion was denied.

[2] Exhibit A consists of Commerce's objection (ECF No. 630) and Exhibit 1 thereto, the Charter Agreement for the French expedition (ECF No. 630-1). *See* Exhibit A at 3 ¶ 4. Exhibit 2 to Commerce's objection (ECF No. 630-2) is the C&Cs, which are not attached to this Exhibit A.

## II. NOAA'S CONTINUING OVERSIGHT ACTIVITIES

The bulk of the Periodic Report addresses RMST's purported concerns about certain of NOAA's activities, and requests the Court convene an evidentiary hearing to assess whether NOAA should continue to have an oversight role in this case. Periodic Report at 3-6. In particular, RMST complains of NOAA's role in recent legislation concerning the *Titanic*, and NOAA's purported disclosure of "confidential and proprietary information" in violation of a non-disclosure agreement ("NDA"). *Id.* at 5-6.

NOAA serves in the capacity it does at the request of the Court, and will continue to perform its oversight responsibilities as the Court deems appropriate. NOAA believes that it has acted in a manner that is consistent with and in furtherance of those responsibilities, as well as its independent duties as a federal agency, that no evidentiary hearing is required, and that no change in its oversight role is warranted.

### A. Pertinent Background[3]

On June 7, 1994, RMST was granted exclusive salvor-in-possession status. Judgment Order dated June 7, 1994 (ECF No. 37). In granting such status and "in entering subsequent orders protecting RMST from competitive interference," the Court "relied on RMST's statement of mission" that it would keep the artifacts together as a collection for exhibit to the public and "for the general use and education of all mankind." *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 537 (4th Cir. 2006); *see also id.* at 536 (noting that applying salvage law to an historic wreck "creat[ed] a trust relationship between the salvor and the court on behalf of the public interest").

---

[3] A full discussion of the history of this case is set forth in this Court's opinion in *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 788-93 (E.D. Va. 2010).

On October 1, 2007, the Court directed RMST to file for a salvage award. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2010). The Court also called upon the United States to review RMST's actions, finding that "additional oversight is necessary in order to preserve and protect the *R.M.S. Titanic* and its artifacts as an international treasure for posterity . . . and to ensure compliance with this court's rulings and final orders." *Id.*

On November 30, 2007, RMST moved for a salvage award. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 792 (E.D. Va. 2010); *see also* ECF No. 280. After the United States filed an *amicus* brief suggesting that an "*in specie* award with limitations could serve as an appropriate award mechanism," the Court directed RMST "to submit proposed restrictive covenants" that would be issued as a condition of any such award. *Id.* RMST concurred with that approach and expressly advocated for the imposition of such covenants, noting that such conditions could mimic those that the French maritime tribunal adopted in connection with its grant of title to the French Artifacts. ECF No. 281 at 53-54; ECF No. 292 ("RMST's Reply Brief); *see also R.M.S. Titanic, Inc.*, 435 F.3d at 528 (quoting the "assurances" RMST's predecessor had given to the French authorities).

On August 12, 2010, the Court granted RMST a salvage award equal to 100% of the fair market value of the STAC, but reserved the right to determine the manner in which that award would be paid. *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 808. The Court stated that it "maintain[ed] reservations about granting RMST title to the artifacts, for fear that the court would end up in a perpetual legal battle with RMST over the meaning and scope of the covenants and conditions" (appended as Exhibit A to the Court's opinion). *Id.* at 808-09.

In 2011, with no prospective buyer having come forward with an interest in the *Titanic* Collection, the Court granted RMST an *in specie* award of title to the STAC. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, Its Engines, Tackle, Apparel, Appurtenances, Cargo, Etc.*, 804 F. Supp. 2d 508 (E.D. Va. 2011). The award was expressly subject to the C&Cs, *id.* at 509, which "the court [previously] stressed . . . would need to protect the *Titanic* and its artifacts as an international treasure for posterity." *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 793.

Although the Court does not possess *in rem* jurisdiction over the French Artifacts, *R.M.S. Titanic, Inc.*, 435 F.3d at 528, RMST expressly agreed in the C&Cs to assume certain obligations and responsibilities "in regards to the *TITANIC* Collections" as a whole, expressly defined in the C&Cs to mean "the total assemblage of the French *Titanic* Artifact Collection and the Subject *Titanic* Artifact Collection." C&Cs, Part II(H) and Part VIII(A). For example, the C&Cs required RMST: (i) to ensure proper management of the entire collection; (ii) to ensure that the entire collection is made "available to present and future generations for public display and exhibition, historical review;" (iii) to ensure "to the maximum extent possible" that the entire collection was "conserved and curated . . . as an integral whole;" and (iv) by implication, to ensure NOAA's continued access to the entire collection. C&Cs at Part III(A) and (B), Part IV, Part V. RMST expressly consented to *in personam* jurisdiction "for the purpose of oversight of compliance with the Covenants and Conditions." C&Cs, at Part V(F).

NOAA was not a party to the underlying *in rem* action or the C&Cs (although it is an "intended beneficiary" thereof on behalf of the public interest), and it has no legal obligations vis-à-vis the C&Cs. *See* C&Cs, Part II(K) and Part V(A). NOAA was brought into the case (through the United States) as an "interested party," and was tasked to provide "reasonable, ongoing oversight . . . in order to protect the United States' [public] interests in the *Titanic* wreck

site and the artifacts recovered therefrom, and to ensure compliance with all court-imposed covenants." *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 792 (citing *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel,* No. 2:93cv902, at 6 n. 12 (E.D. Va. Apr. 15, 2008)).  The public interest encompasses the entire *Titanic* Collection, French Artifacts and the STAC, C&Cs, Part II(K), and derives from the *R.M.S. Titanic* Maritime Memorial Act of 1986 ("1986 Act"), 16 U.S.C. § 450rr *et seq.*, the "Agreement Concerning the Shipwrecked Vessel *RMS Titanic*" ("International Agreement")[4], and NOAA's "Guidelines for Research, Exploration and Salvage of *RMS Titanic*" ("NOAA Guidelines"), 66 Fed. Reg. 18905, 18906 (Apr. 12, 2001).  *Id.* at 792-93; *see also* ECF No. 289 at 3, n. 2 (United States' March 17, 2008 *Amicus* Brief describing the United States' interest in the *Titanic* and its artifacts, including that the Navy funded a large part of the expedition that located *Titanic*).

### B. Section 113 of the Appropriations Act

Pursuant to the 1986 Act, NOAA was given the responsibility to negotiate international guidelines concerning the *Titanic* and to assist the State Department in negotiation of an international agreement with interested nations.  16 U.S.C. §§ 450rr-3, 450rr-4.  Once completed, the State Department would notify Congress and provide Congressional committees "recommendations for legislation to implement the agreement."  *Id.* at § 450rr-4(d).  On May 5, 2017, the President signed the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 (May 5, 2017), which included appropriations for the Department of Commerce, *id.* at Div. B, Title 1. Section 113 of that Act provides:

> For fiscal year 2017 and each fiscal year thereafter, no person shall conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or

---

[4] The text of the International Agreement can be found on NOAA's website.  http://www.gc.noaa.gov/gcil_titanic-intl.html.  The United Kingdom ratified the International Agreement on November 6, 2003, and the United States signed the agreement on June 18, 2004, subject to implementing legislation for ratification.  Periodic Report at 5.

wreck site of the RMS Titanic unless authorized by the Secretary of Commerce per the provisions of the Agreement Concerning the Shipwrecked Vessel RMS Titanic [i.e., the International Agreement]. The Secretary of Commerce shall take appropriate actions to carry out this section consistent with the Agreement.

Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat 135, 192 (2017).

RMST contends that NOAA's role in this legislation amounts to a "deliberate end-run around this Court's Orders and jurisdiction," and impacts its "property interests in the wreck site as its salvor-in-possession." Periodic Report at 5-6. The United States disagrees that NOAA has engaged in conduct with respect to § 113 that warrants alteration of its oversight role.[5]

NOAA provided technical drafting assistance for § 113 to and at the specific request of both the House and Senate Committees on Appropriations. Not only does federal law expressly contemplate that agencies may engage with Congress in these types of activities, *see* 18 U.S.C. § 1913 (providing that agencies may communicate with Congress when requested, or through official channels, with regard to legislation), executive branch policy explicitly authorizes agencies to provide technical drafting assistance to Congressional committees when requested. *See* Office of Management and Budget Circular A-19, § 7.i (revised Sept. 20, 1979).[6] Moreover, NOAA was established as the "nation's principal advocate for coastal and ocean stewardship," but "has evolved into a science agency with conservation management and regulatory responsibilities," including protection and preservation of marine sanctuaries containing "the remains of historical shipwrecks."[7] It is not surprising that NOAA would be

---

[5] RMST states it expects to file a "separate proceeding . . . [to] address the legal implications" of this legislation on RMST and the Court's jurisdiction. *Id.* The nature of this "separate proceeding" is not known, but NOAA will respond as necessary or as required when that proceeding is filed.

[6] https://obamawhitehouse.archives.gov/omb/circulars_a019/ (last visited June 7, 2017).

[7] *See* http://www.noaanews.noaa.gov/stories/s508.htm (last visited June 8, 2017).

asked to provide its subject matter expertise in legislation relating to an International Agreement it helped forge to protect the *Titanic*.

Section 113 is also a part of an ongoing process that began with passage of the 1986 Act to seek international acknowledgement of the *Titanic* and its artifacts as historical treasures. RMST has long bristled at NOAA's and the State Department's efforts to implement this Act through the International Agreement, agency Guidelines and implementing legislation. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel RMS TITANIC*, No. 293CV902, 2000 WL 1946826, at *1 (E.D. Va. Sept. 15, 2000) (dismissing as not ripe RMST's motion for a declaratory judgment that NOAA and the State Department were interfering with its salvage rights "by virtue of their efforts to implement the *R.M.S. Titanic* Maritime Memorial Act of 1986.") Yet the Court has encouraged legislative efforts to protect the *Titanic* and its artifacts,[8] even while recognizing that such legislation may have some effect on this case. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 323 F. Supp. 2d 724, 741 n. 12 (E.D. Va. 2004) ("The court is mindful, however, that implementation of the international agreement may require evaluation by the court of RMST's continued salvor-in-possession status."), *aff'd in part, vacated in part, remanded sub nom. R.M.S. Titanic, Inc.*, 435 F.3d 521 (4th Cir. 2006).

Further, the Court's *in rem* jurisdiction is "imperfect" or "inchoate," meaning that it "falls short of giving the court sovereignty over the wreck" to the exclusion of all other nations. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 968 (4th Cir. 1999). Thus, the Court's *in rem* jurisdiction is constrained by the potential competing interests and concerns of other nations,

---

[8] During a November 18, 2008 Status Hearing, the issue of legislative efforts to fulfill the stated purpose of the 1986 Act was addressed and the Court "express[ed] no objection" to those efforts. "If I had an objection, I would have voiced it. . . . I am concerned that the *Titanic* is not only a national treasure, but in its own way an international treasure, and it needs protection and it needs to be monitored, and this court is doing the best that it can to do that, but would certainly not object to this legislation." Transcript of November 18, 2008 Status Hearing at pg. 46-47.

and, in turn, those nations' cooperative relationships between each other.  *Id.* ("[A]sserting sovereignty through a claim of exclusive judicial action beyond the territorial limits of a nation would disrupt the relationship among nations that serves as the enforcement mechanism of international law and custom.").  NOAA's role in the development of the International Agreement, with memoranda of understanding with international partners concerning *Titanic* or other archeological sites, and, as relevant here, with legislation to implement the International Agreement, aids international recognition and protection of *Titanic* and its artifacts.  Thus, what RMST sees as an "end-run" around this Court's jurisdiction, the United States views as part of NOAA's independent responsibilities, and wholly compatible with and in furtherance of the Court's desire to protect *Titanic* and its artifacts "as an international treasure for posterity." *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 793.

Finally, NOAA's role in this matter is to "protect the United States' interests" in *Titanic* and to "ensure [RMST's] compliance" with the C&Cs.  *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 793.  The C&Cs impose no other legal obligations on NOAA.  *See* C&Cs, Part V(A).  The United States believes that it misconstrues NOAA's role to say that NOAA is prohibited from responding to Congressional requests for assistance, or that NOAA's participation in such efforts was in some way off-limits or prohibited because of the Court's *in rem* jurisdiction or RMST's salvor-in-possession status.  *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 206 (4th Cir. 2002) ("RMST is not entitled to a guarantee that it remain in business as a viable company to conduct salvage services.")

NOAA has and will continue to respect the orders of the Court, and takes seriously its oversight role and responsibilities pursuant to the C&Cs, as well as its independent responsibilities pursuant to other law or policy.  *See e.g.* Ex. 2 to April 21, 2017 Periodic Report

(NOAA's report of RMST's operations during the January 2017 site visit).  Those responsibilities are not incompatible or inconsistent with NOAA's efforts to implement the International Agreement called for by Congress pursuant to the 1986 Act.

### C. Purported Violation of the NDA

NOAA and RMST entered into a NDA (drafted by RMST) on January 7, 2016 that precluded disclosure of proprietary information or data given to the Commerce Department for "official purpose" on and after January 7, 2016.[9]  *See* Ex. A to January 3, 2017 Periodic Report (¶ 1).  Information already known to NOAA or public information was not subject to the NDA.  *Id.* at ¶ 5(a) and (b).  RMST contends that NOAA violated the NDA when it "extracted confidential and proprietary information from [RMST and] . . . secretly provided that . . . to France, in an effort to obstruct future . . . efforts to sell the French artifacts."[10]  Periodic Report at 6.  As evidence, RMST cited to an email from March 2016 in which a NOAA representative advised representatives of France's government "of the possible sale of [French] artifacts." January 3, 2017 Periodic Report at 5 and Ex. C.[11]  NOAA denies any disclosure of any confidential or proprietary information contrary to the NDA.[12]

---

[9] The NDA did not specifically define proprietary data or information.  That ambiguity should be construed against RMST.  *See Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia*, 759 F. Supp. 2d 789, 804 (E.D. Va. 2011) (it "is a fundamental tenant of contract law that ambiguity is construed against the drafter"), *aff'd*, 715 F.3d 501 (4th Cir. 2013).

[10] The "tug-of-war" over RMST's ability and desire to sell artifacts has been going on for close to twenty years. *R.M.S. Titanic, Inc.*, 286 F.3d at 201-02 (noting RMST's interpretation of an earlier Court order that it was the "absolute owner of the artifacts, free and clear, . . . and, therefore, that it is entitled to sell them, notwithstanding its earlier expressions to the court of an intent not to sell them").

[11] RMST did not identify other information (such as financial data) purportedly disclosed to French officials, such as the type of information reflected in RMST's February 23, 2016 Periodic Report at 2-3 (UNDER SEAL).  A number of the emails contained in Exhibit B of the January 3, 2017 Periodic Report are in French.  Based on unofficial translations, those emails do not contain confidential financial data or intellectual property of RMST.

[12] RMST became aware of the purported violations of the NDA as of October 7, 2016, but did not advise the Court (or the undersigned) attention until the January 2017 Periodic Report.  *See* January 3, 2017 Periodic Report at 3.  Nor did it object to NOAA conducting detailed oversight activities during the January 2017 site visit.

The "possible sale" of *Titanic* Artifacts was public knowledge well before the March 2016 email and the January 2016 NDA. For example, in 1999, new management of RMST's parent company (Premier) "expanded [RMST's] strategic plan to include 'the possible disposition of artifacts to increase revenues.'" *R.M.S. Titanic, Inc.*, 286 F.3d at 198. More recently, in 2012, Premier issued news releases concerning its planned public auction of the *Titanic* collection.[13] During an April 22, 2014 "shareholder conference call," Premier's CEO advised shareholders that the Company "continue[d] to explore alternatives for the sale of RMS *Titanic*, Inc."[14] In September 2014, a shareholder noted that the Company had been "hinting at a potential sale of its *Titanic* assets for quite a while" (also stating that "[t]he company has moved from profits to losses").[15] And on March 28, 2016, AJB Capital, a significant shareholder in the Company publically called upon Premier to prioritize the immediate monetization of the *Titanic* artifacts and Premier's exclusive salvor-in-possession rights (also noting that Premier's operations "are losing money and bleeding cash").[16] In light of the longstanding position of the Company to consider sale of the artifacts, communications to French officials about the possible sale of French artifacts in March 2016 did not violate the NDA. *See Hanwha Azdel, Inc. v. C &*

---

[13] *See also* http://www.premierexhibitions.com/corporate/all/news?page=6 (last visited June 1, 2017) (reflecting company press releases dated 1/2/2012 and 4/10/2012). Several articles in the Virginian-Pilot also appeared in December, 2011 and February, 2012 about the upcoming auction.

[14] http://www.premierexhibitions.com/corporate/all/news/premier-exhibitions-announces-shareholder-call-discuss-strategic-alternatives-and-initiatives (last visited June 6, 2017) ("Call Transcript" link to April 22, 2014 shareholder call).

[15] Value Fail: Premier Exhibitions (Sept. 10, 2014), https://www.gurufocus.com/news/278015/value-fail-premier-exhibitions/WSJhttps://seekingalpha.com/news/2008665-premier-exhibitions-secures-8m-in-short-term-funding (Shareholder speculating whether to sell shares since "Premier has been hinting at a potential sale of its Titanic assets for quite a while.").

[16] https://globenewswire.com/news-release/2016/03/28/823299/0/en/AJB-Capital-Calls-on-Leadership-of-Premier-Exhibitions-to-Immediately-Prioritize-Monetization-of-Titanic-Assets-and-Fulfill-Its-Reporting-Requirements.html. Premier was delisted from the NASDAQ exchange and trading in its shares suspended on February 10, 2016. *See* https://www.sec.gov/Archives/edgar/data/796764/000117184315006211/gff8k_111015.htm (last visited June 6, 2017).

*D Zodiac, Inc.*, 617 F. App'x 227, 235 (4th Cir. 2015) (Defendant company did not violate NDA where it provided plaintiff's competitor a "Historic Pricing Board" that contained prices "that were the same or similar to" confidential pricing letters provided by plaintiff to defendant company, because the information disclosed did not indicate it came from plaintiff, but only reflected what defendant was willing to pay.)

Further, notifying France of a possible sale of French artifacts inconsistent with the French Award is consistent with NOAA's dual charge "to protect the United States' interests in the *Titanic* wreck site and the artifacts," and "to ensure compliance with all court-imposed covenants." *R.M.S. Titanic,* 742 F. Supp. 2d at 792.

The public interest derives from the 1986 Act, the International Agreement and NOAA's guidelines. C&Cs, Part II(K). Generally speaking, it is in the public interest for *Titanic* and all its artifacts to be protected, and for the artifacts to be maintained in intact collections for the public's education and benefit. *See* 16 U.S.C. § 450rr-5 (1986 Act, stating that the sense of Congress is that activities relating to *Titanic* should be for the "purpose of enhancing public knowledge of its scientific, cultural, and historical significance"); International Agreement at Art. III (describing that, for artifacts recovered after implementation, they be "kept together and intact as project collections"); NOAA Guidelines at Part I(1), 66 Fed. Reg. 18,905, 18,912 (noting that activities relating to *Titanic* should be granted "only when justified by educational, scientific, or cultural interests" and that all recovered artifacts should be "kept together and intact as project collections"); *see also* NOAA Guidelines, at 18906 (Response to Comment 5) ("Basic professional archaeological standards dictate that artifacts recovered or salvaged from a wreck site should be kept intact as a collection."). Dividing the *Titanic* Collection, which a sale of the

French Artifacts would do, runs counter to the public interest, which prefers the entire collection remain intact.

The C&Cs also imposed on RMST certain responsibilities for the entire "*Titanic* Collections," to include the French Artifacts. *See e.g.* C&Cs at Part II(H) (defining "*Titanic* Collections"); Part III(B) (mandating that the Collection "shall be available to present and future generations" for various educational purposes); Part IV (management and security of the *Titanic* Collections); Part V(C) (authorizing NOAA's authority to take certain actions regarding the Collection). RMST agreed to these provisions, and agreed to *in personam* jurisdiction "for the purpose of oversight of compliance with the Covenants and Conditions." C&Cs at Part V(F). Even in the absence of *in rem* jurisdiction over the French Artifacts, the possible sale of French Artifacts implicates RMST's ability to fully comply with the responsibilities it agreed to under the C&Cs. Its claim of unconditional title to the French Artifacts, *see* August 19, 2016 Periodic Report at 2 (noting RMST had sought a declaratory judgment that France had no interest in the French artifacts), does not eliminate its independent assurances to this Court, or its consent to *in personam* jurisdiction in order to enforce those assurances.[17] *See ExxonMobil Oil Corp. v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755 (E.D. Va. 2016) (Personal jurisdiction is a "waivable right" and will be enforced if "'freely negotiated' and not 'unreasonable and unjust.'").

---

[17]*At a minimum* the question of RMST's title to the French Artifacts remains an open question. *See In re: RMS Titanic, Inc., et al.*, Case No. 3:16ap183-PMG (M. Dist. Fl, Jacksonville Div., April 25, 2017), "Order on Plaintiff RMST Titanic, Inc.'s Amended Motion for Entry of Clerk's Default [etc.]" (ECF No. 52) at 20 ("[T]he record at this time is not satisfactory to establish that the debtor's title to the French Artifacts is unconditional"); *see R.M.S. Titanic, Inc.*, 435 F.3d at 528 (noting that the French maritime administrator's decision granting title "incorporated [RMST's] assurances" concerning use or disposition of the artifacts); *see also* ECF No. 281 at 53-54 (RMST noting in its 2007 motion for a salvage award the conditions attendant to its receipt of the French artifacts); *see also* Order on Motion for Order Authorizing to Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests, *In re: RMS Titanic, Inc., et al.*, Case No. 3:16ap183-PMG (M. Dist. Fl, Jacksonville Div.) (ECF No. 102 at 7) (noting that RMST "acknowledged that (1) they had agreed with French officials not to carry out a commercial transaction concerning the French Artifacts 'nor any sale of any one of them nor any transaction entailing their dispersion,' (2) that the agreement is a restriction on their ability to transfer the French Artifacts, and (3) that the market views the Debtors as lacking clear title to convey the French Artifacts.").

In short, the possible sale of French Artifacts implicates the public interest NOAA is charged with protecting, and RMST's compliance with the C&Cs NOAA is tasked with enforcing. The United States therefore suggests that it was entirely reasonable and wholly justified for NOAA to notify France, in the non-specific way it did, of the "possible sale" of the *Titanic* Artifacts inconsistent with the French Award and the C&Cs.

### III.   CONCLUSION

The United States asserts that NOAA has conducted its oversight activities professionally and in furtherance of its responsibility to protect the public interest and ensure compliance with the law and the C&Cs, and that nothing in the Periodic Report dictates a contrary conclusion, requires the convening of an evidentiary hearing, or warrants a change in NOAA's oversight role.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:   /s/ *Kent P. Porter*
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2017, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger** <br> Kaleo Legal <br> 4456 Corporation Lane <br> Suite 135 <br> Virginia Beach, VA 23462 <br> Email: bwainger@kaleolegal.com | **Robert William McFarland** <br> McGuireWoods LLP <br> 101 W Main St <br> Suite 9000 <br> Norfolk, VA 23510-1655 <br> Email: rmcfarland@mcguirewoods.com |

   /s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov