```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
 5                                      )
     R.M.S. TITANIC, INC.,              )
 6   SUCCESSOR IN INTEREST TO           )
     TITANIC VENTURES, LIMITED          )
 7   PARTNERSHIP,                       )
                                        )    CIVIL ACTION NO.
 8             Plaintiff,               )    2:93cv902
                                        )
 9        v.                            )
                                        )
10   THE WRECKED AND ABANDONED          )
     VESSEL, ETC.,                      )
11                                      )
               Defendant.               )
12   - - - - - - - - - - - - - - - - - -

13

14                     TRANSCRIPT OF PROCEEDINGS

15                        Norfolk, Virginia

16                         June 28, 2017

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
               Chief United States District Judge
19

20
     APPEARANCES:
21
               KALEO LEGAL
22             By:  Brian A. Wainger
                         And
23             McGUIRE WOODS LLP
               By:  Robert W. McFarland
24                  Counsel for R.M.S. Titanic

25
```

```
1

2    APPEARANCES CONTINUED:

3
            UNITED STATES ATTORNEY'S OFFICE
4           By:   Kent Porter
                  Assistant United States Attorney
5                 Counsel for Amicus United States

6           THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
            By:   Jackie Rolleri
7                 Counsel for NOAA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Hearing commenced at 2:00 p.m.)

2         THE CLERK:  In case 2:93cv902, RMS Titanic, Inc.,

3    et cetera, plaintiff, versus The Wrecked and Abandoned

4    Vessel, et cetera, defendant.

5         Mr. McFarland, Mr. Wainger, is the plaintiff ready

6    to proceed?

7         MR. McFARLAND:  Good afternoon.  Yes, Your Honor,

8    the plaintiff is ready to proceed.

9         THE COURT:  Good afternoon, gentlemen.

10         THE CLERK:  Mr. Porter, is Amicus United States of

11    America ready to proceed?

12         MR. PORTER:  We are.  Thank you.

13         THE COURT:  Counsel, I believe we are here this

14    afternoon on a status hearing to review some matters in

15    R.M.S.T.'s recent periodic reports, and I see four general

16    issues before the Court to be addressed.  The first is

17    related to R.M.S.T.'s report dated January 3, 2017, in which

18    it was stated that R.M.S.T. would welcome an opportunity to

19    appear before the Court to discuss NOAA's alleged disregard

20    of a non-disclosure agreement between R.M.S.T. and the

21    United States Department of Commerce regarding potential

22    sale of artifacts from the French Titanic artifact

23    collection.

24         I'm just reviewing these basically in the

25    chronological order in which they have come before the

1    Court.  If it will facilitate argument, then you can reverse

2    some of the arguments.  Just don't overblend the arguments

3    so that you confuse the points in lawyerly ways.

4            The second is related to R.M.S.T.'s report dated

5    May 23, 2017, in which, again, R.M.S.T. requested an

6    evidentiary hearing because of continued concerns that NOAA

7    had concealed its efforts to include in the Department of

8    Commerce Appropriations Act a provision relating to the

9    Titanic wreck.

10           Third, in that same report, R.M.S.T. made reference

11   to documents that it believes would support a complete sale

12   transaction, and there was a copy in that document of the

13   planned support agreement but there was not a copy submitted

14   to the Court of the debtor-in-possession loan agreement, and

15   the Court wants to review that and review these documents

16   before you proceed any further in regard to them.

17           Then, finally, I would like to hear a status report

18   of the bankruptcy proceedings that are ongoing in Florida.

19   Those are the issues that I have enumerated for this

20   afternoon.  If there are others, you can let me know at this

21   time.

22           Are you aware of any others, Mr. McFarland?

23           MR. McFARLAND:  No, Your Honor.  I think that

24   covers what, from R.M.S.T.'s standpoint, we thought should

25   be before the Court.

```
 1              THE COURT:  All right.  Are there any others,
 2   Mr. Porter?
 3              MR. PORTER:  I'm not aware of other issues, Your
 4   Honor.
 5              THE COURT:  Then, Mr. McFarland or Mr. Wainger, you
 6   can proceed with your allegations in the January 3rd report
 7   about NOAA disregarding the non-disclosure agreement, as
 8   well as follow that up with your concern about the latest
 9   provision in a law that was passed or the provisions that
10   basically you thought were writing out the Court.
11              MR. McFARLAND:  Potentially, Your Honor, that's
12   correct.  May it please the Court, Robert McFarland on
13   behalf of plaintiff R.M.S.T.  With me at counsel table is
14   Brian Wainger, who the Court knows, and then Ms. Jessica
15   Sanders, who is the corporate secretary for Premier
16   Exhibitions and has attended hearings in the past, Your
17   Honor, in this matter.
18              Your Honor, with respect to our concerns that we
19   expressed in the January periodic report, and then raised
20   separate concerning the May periodic report, perhaps a
21   little history is pertinent here.
22              In our February 23rd, 2016, report, we advised the
23   Court of discussions that we were having and had had with
24   NOAA about the company's financial status and about certain
25   undertakings that we might be pursuing and advised the Court
```

1    of our discussions with NOAA and advised the Court that we

2    had entered into a non-disclosure agreement with NOAA dated

3    January 7th, 2016.  Although it was attached to our periodic

4    report, Your Honor, if the Court would like, for the

5    evidentiary record, I have the same exhibits that I can

6    offer into evidence as part of the record.

7            THE COURT:  I have it here, but the file is rather

8    large, so to facilitate the proceedings, it would probably

9    be better if you passed up the relevant documents.

10            MR. McFARLAND:  Thank you, Your Honor.  If I could,

11    I have marked them and put them together as a group.  Here

12    is one for the Court and one for your clerk.

13            THE COURT:  All right.

14            MR. McFARLAND:  Exhibit A, Your Honor, which we

15    would offer into evidence, is the non-disclosure agreement

16    dated January 7th of 2016 between Premier Exhibitions, Inc.,

17    and the U.S. Department of Commerce.  As I say, that

18    non-disclosure followed extensive discussions between the

19    parties and the agreement that my client was going to be

20    sharing confidential proprietary information about its plans

21    with the Government and that we would expect that that would

22    be kept confidential.

23            Discussions continued, and part of what we advised

24    at the time, NOAA and the government, was that we were

25    looking to enter possibly for a sale of part of the French

1    collection of artifacts, wholly distinct from -- this Court

2    has been aware there were past efforts for sale for the

3    entire collection, which did not bear fruit, but that this

4    would be a distinct possibility of a sale of certain items

5    in the French collection.  That was not public knowledge.

6            In the Government's opposition they seem to be

7    taking the position that, well, the sale of the artifacts

8    collection was public knowledge and was known as far back as

9    2012 through 2014.  That was different.  That isn't the

10   issue here.  The specific sale of certain items in the

11   French collection was proprietary, confidential information,

12   and we only shared it with NOAA and the government pursuant

13   to this non-disclosure agreement that they would agree to

14   keep it confidential.

15           So we advised them of that and advised them of what

16   our financial status was at the time, and, of course, all

17   this predates the filing of the bankruptcy in June 2016, and

18   expected that that information would remain confidential.

19           Let me say first, Your Honor, or go back, our issue

20   is not with the folks who are in the courtroom today,

21   counsel for the Government and Mr. Albert, I think is here

22   on behalf of the museum.  That's not where the problem is.

23   The problem arose, that we later learned, that in March of

24   2016, approximately two months after we've entered into this

25   non-disclosure agreement, folks at NOAA decide that they

1    want to let officials in the French Government know about

2    our plan to potentially -- and it wasn't a finalized plan,

3    obviously, at that point.  It was something we were

4    considering and reviewing.  They let the different French

5    Government officials know of that in direct violation of the

6    non-disclosure agreement.  That, Your Honor, is found at

7    what we have offered to the Court previously and what we

8    will show here as Exhibits B and C.

9         This is very disconcerting, Your Honor, because not

10   only had we entered into the non-disclosure agreement that

11   specifically covered the possible sale of the French

12   artifacts, but in discussions with representatives at NOAA,

13   they essentially asked or stated that they wanted to

14   disclose this, and we said no, it's covered by the NDA.  It

15   should not be public at this point in time, and, yet, they

16   went ahead and, in fact, we now know that as early as March

17   26, they violated the NDA and provided this information to

18   people in the French Government.

19        We then continue, and there is an e-mail, March

20   28th, in which information is exchanged with Mr. Michel -- I

21   believe is how you pronounce his name -- in the French

22   Government.  We continue.  The bankruptcy was filed on or

23   about June 16th of 2016, Chapter 11 proceeding, in

24   Jacksonville.  Before that there were still discussions

25   about whether this information about the possible sale of

1    the French artifacts could be disclosed to the French

2    Government, and we indicated that we would let the French

3    Government officials know at the appropriate time but now

4    was not the time.  There were conference calls and meetings,

5    and as of, I believe June 2nd, we made known that we did not

6    want this information disclosed at the present time.  Of

7    course, it was, and what was not told to us at that time was

8    not simply that they wanted to disclose it, and in the

9    conference call Mr. Varmer of NOAA, who I think is now

10   retired but at the time was one of the senior counsel and

11   has appeared before this Court in these proceedings, let our

12   client know that he felt it was his duty to disclose

13   regardless of the NDA.

14           THE COURT:  This is Mr. Varmer?

15           MR. McFARLAND:  Ole Varmer.  What he didn't advise

16   us at that point in time was that, in fact, he'd already

17   violated the NDA and disclosed this as early as March 26 or

18   March 28th of 2016.

19           THE COURT:  Where is that?  I do notice there is a

20   CC to him on the March 28 e-mail.

21           MR. McFARLAND:  Right.

22           THE COURT:  As an aside, you mentioned that these

23   individuals here today had not violated, but they are the

24   attorneys for NOAA, so, consequently, they are responsible

25   for their client's conduct.  An attorney may not be the one

1   who actually violates, but an attorney and a representative

2   of the agency, when they're here, they are the ones held

3   responsible by the Court.

4          Oftentimes the actual sender of the e-mail, the

5   perpetrator of the chain, may not be in front of the Court,

6   but the attorneys are responsible for what their client

7   does, the same as you are responsible for what your client

8   does when you are in front of the Court.

9          MR. McFARLAND:  Yes, Your Honor.  But I did want to

10  say that Mr. Porter and Ms. Rolleri, our dealings with them

11  have been essentially without incident, other than we have

12  different positions at times, and I did want to make that

13  distinction.

14         THE COURT:  I realize they, themselves, did not

15  violate, but they're going to have to defend any potential

16  violations, if appropriate.

17         MR. McFARLAND:  Right.

18         THE COURT:  Again, going back to my question, I see

19  Mr. Varmer copied but I don't see where he actually

20  initiated.  It could be later in the e-mails.

21         MR. McFARLAND:  Your Honor, if I may, there is

22  Catherine Marzin further back in e-mail, and, of course, you

23  go back to front.

24         THE COURT:  Who is Catherine Marzin?

25         MR. McFARLAND:  My understanding, she is an

1   attorney with NOAA.  The e-mail address there is

2   CatherineMarzin@NOAA.gov.  Then if you go even a little

3   farther back, Your Honor, and to help the Court, I was just

4   citing from Page 2 of 5 in this e-mail chain of March 29th,

5   2010, and going back to 28.  If you go back to Page 3 of 5,

6   the top of that page is an e-mail from Mr. Varmer writing

7   to, I think the Jim there is Jim Delgado.

8              THE COURT:  All right.

9              MR. McFARLAND:  So we have, first, Your Honor, a

10  disturbing series of events in which NOAA feels it is not

11  bound by the covenants and provisions of the non-disclosure

12  agreement that it agreed to on January 7th, just

13  approximately two and a half months before, and so contacts

14  officials in the French Government about a potential sale,

15  and that's very disconcerting.

16             THE COURT:  Did the non-disclosure agreement, does

17  it cover the French artifacts?

18             MR. McFARLAND:  The potential sale, yes, Your

19  Honor.  This was not public information at the time, and if

20  we look at the first page of Exhibit A, there is, in

21  Paragraph 1, what we are agreeing to in Paragraph 2, what

22  the commerce department is agreeing to, and in Paragraph 5

23  it has the exclusions, if it was in commerce's possession

24  before receipt or it becomes a matter of public knowledge.

25  Well, it was not public knowledge about the sale of the

1    French collection.  That was something specifically we

2    hadn't even reached final decision on in January of 2016 and

3    certainly was not public knowledge.

4            Commerce didn't pertain that knowledge that we were

5    thinking about a sale of part of the French collection from

6    a third party.  That's in 5-C on this page, et cetera.  So

7    this was definitely covered by the NDA.  They knew it was

8    covered by the NDA.  It's why we wanted an NDA, and,

9    unfortunately, it was violated.  But it doesn't stop there,

10   Your Honor.  In, I believe the same time frame, March of

11   2016, Mr. Varmer reaches out to one of our most senior

12   employees.

13           THE COURT:  Let's go back to the NDA.  There is no

14   specific mention of the French artifact.

15           MR. McFARLAND:  No, Your Honor.

16           THE COURT:  I want the record to be clear, there is

17   no specific mention of the French artifacts in the

18   non-disclosure agreement.  It was a generalized agreement

19   between Premier and the Department of Commerce.

20           MR. McFARLAND:  But let me say there is no question

21   that the Government knew that we considered the sale of the

22   French artifacts to be covered by the NDA because in later

23   discussions, when they asked if they could broach this topic

24   with French Government officials, we said no, not yet, it's

25   still part of the NDA, it should not be public knowledge.

1          In fact, Your Honor, if I may, we have minutes of

2     telephone conferences that were held on this subject shortly

3     before the bankruptcy was filed.  Let me hand up -- I think

4     we run through, Your Honor, the last exhibit in what we

5     presented to the Court is H.  So if the Court pleases, I

6     would mark these as I and J, I believe they would be.  Let

7     me hand a copy to counsel.

8          THE COURT:  Mr. McFarland, I am marking as

9     Plaintiff's Exhibit I the call notes that have the last line

10    in blue with a strike-through on it.

11         MR. McFARLAND:  Right.  Then we would ask that the

12    one that does not have that blue strike-through would be J.

13         THE COURT:  All right.  They are so marked.

14         (The documents were received in evidence as

15    Plaintiff's Exhibits I & J.)

16         THE COURT:  Jackie is referring to Ms. Rolleri

17    here?

18         MR. McFARLAND:  Yes, Your Honor.  These are the

19    minutes of a conference call on June 1st, 2016, and it was

20    brought by the Government that they wanted to memorialize

21    the call by keeping minutes, to which we agreed, and there

22    were draft minutes sent out.

23         So in Exhibit I we see Mr. Wainger made certain

24    revisions.  And in the final version in J certain of his

25    revisions were accepted and certain ones were not.  And it

1    was agreed that the final version would not contain the very

2    last phrase that Mr. Wainger had inserted in I at the very

3    end of Page 1, which is referencing Mr. Varmer announcing in

4    this conference call that he would rather -- actually, let

5    me state the exact wording, "That he would prefer to violate

6    the NDA rather than to perceive legal duty to France."  That

7    was his comments in this telephone call.

8          So Mr. Wainger thought it was important enough that

9    it ought to be included in the final version of the minutes.

10   The Government disagreed.  But it was acknowledged that this

11   statement was said, and so that's why it's reflected in

12   these draft minutes and preserved.

13         Sure enough, it wasn't that just Mr. Varmer would

14   prefer to violate, the reality is that on June 1st, 2016,

15   there had already been violations of the NDA through

16   disclosure to the French Government officials, as we see in

17   Exhibits B and C.  But that's not the only disturbing thing

18   that occurred during this time frame, Your Honor.  P.H.

19   Nargellet is a longstanding employee of R.M.S.T.  In fact,

20   he testified before the Court in the salvage hearing, I do

21   believe.

22         THE COURT:  One cannot forget Mr. Nargellet.

23         MR. McFARLAND:  Yes.  Mr. Varmer, although he is,

24   himself, an attorney, and certainly should be, and is

25   presumed to be aware of the ethical rules, directly

1   contacted Mr. Nargellet, without first seeking approval or

2   even advising Mr. Wainger, myself or any other counsel for

3   R.M.S.T., and contacted Mr. Nargellet and asked him to not

4   only provide the 1987 charter agreement but discuss its

5   implications with Mr. Nargellet and his understanding of it.

6           That's simply inappropriate, Your Honor.  That

7   communication should have initially come to us, and we could

8   have reviewed it and either accepted it or asked that we be

9   on the call or we could have denied it.  But what isn't

10  appropriate is for Mr. Varmer to reach out to our employee,

11  obtain information that could potentially be used in a

12  proceeding or be used to our detriment.

13          THE COURT:  Let me ask you this, and I'm not doing

14  this as any conclusion, but what so far you have presented

15  to the Court is you feel that NOAA has violated their

16  non-disclosure agreement with you in regard to the French

17  artifacts; is that correct?

18          MR. McFARLAND:  Correct.

19          THE COURT:  But the French artifacts aren't under

20  the jurisdiction of this Court?

21          MR. McFARLAND:  Correct.

22          THE COURT:  So they haven't violated any agreement

23  of the non-disclosure agreement in regard to artifacts that

24  are under the jurisdiction of this Court.  Is your argument

25  here more appropriate with the bankruptcy court that is

1    looking to the sale of these artifacts than with this Court?

2          MR. McFARLAND:  Not in the context that we are

3    here, Your Honor.  NOAA is before this Court as the

4    overseer.

5          THE COURT:  Yes.

6          MR. McFARLAND:  This Court controls that.  What we

7    are saying to this Court is, in light of these actions and

8    activities, which seem to show a complete disregard for

9    signed agreements and basic ethical responsibilities and

10   duties about not contacting an adversary's employees, we

11   think this Court -- it is time for this Court to review,

12   and, we think, to change NOAA's status as the overseer.

13         Let me say this, Your Honor.  Part of the overseer

14   role is that we trust each other and we collaborate

15   together.  So let's step back and look at what happened

16   here.  In a full spirit of collaboration, as my client has

17   always exhibited, we go to NOAA and say, we want you to

18   know, first off, we were not in the strongest of financial

19   conditions at the time.  That was not public knowledge other

20   than what you could read in the SEC filings.  We gave them

21   more information.

22         What we further did is to say, by the way, in order

23   to try and deal with our financial situation, we are

24   considering a sale, not of the public sale we have talked

25   about before, but we are considering a limited sale of

1    certain of the French artifacts.  That is confidential, that

2    is proprietary, to the extent that we are going to require

3    you to enter into an NDA, and they breach it.  And

4    unbeknownst to us until later on, they then contact our

5    employee without our permission, without even advising us,

6    and they show a blatant disregard.  I mean, you can see

7    Mr. Varmer's statement, and were he to be here today, I

8    don't think he would deny it.

9            THE COURT:  Your employee being?

10           MR. McFARLAND:  P.H. Nargellet.  They contact him

11   and obtain information from him that could potentially be

12   used against the company or could jeopardize this potential

13   sale of the French artifacts.  I think this Court needs to

14   step back and look and say, wait a minute, do we have the

15   right overseer?

16           First off, is an overseer needed at this point in

17   time, particularly given the bankruptcy court and our

18   working with this Court?  But is this the right overseer,

19   people who don't seem to have the general respect for legal

20   agreements and ethical responsibilities?

21           Remember, this is a relationship, in large part,

22   depends on trust and collaboration.  We have been given the

23   trust, and we have been collaborating.  Again, that's why I

24   wanted to distinguish Ms. Rolleri and Mr. Porter.  But

25   others on NOAA seem to be willing to take our information

1    and then do whatever they think is necessary in their mind,

2    regardless of legal obligations and regardless of signed

3    contracts.  That's disturbing.  But it continues into this

4    year, and that's the Appropriations Act, Your Honor.

5            THE COURT:  Well, the Appropriations Act is

6    certainly of more concern to the Court than your former

7    argument.

8            MR. McFARLAND:  Yes, ma'am.

9            THE COURT:  Because you're not happy with something

10   that NOAA has done in regard to the French artifacts, those

11   artifacts are not under this Court's jurisdiction.  I

12   understand that you're upset that they contacted one of your

13   employees.  I understand that you're upset that they may

14   have given a heads-up on your plans to sell the French

15   artifacts, and I've known about that plan because it's

16   before the bankruptcy court there, and this Court has made

17   it clear that anything past those French artifacts better

18   not occur without running something by this Court.

19           But in point of fact, you're really asking this

20   Court to interfere or to get into a contract dispute that

21   you have over NOAA's actions in regard to the French

22   artifacts, and I don't have jurisdiction over the French

23   artifacts.  I do have *in rem* jurisdiction over the Titanic

24   wreck site, and I do have jurisdiction over the salvaged

25   items under the agreements that are in place, that salvage,

 1    not including the French artifacts.

 2              MR. McFARLAND:  Right, Your Honor.  We understand

 3    that.  What I'm asking this Court is, I would ask this Court

 4    to review, this Court does have the authority, it controls

 5    who should be the overseer here and should NOAA continue to

 6    occupy this role when given these actions that have

 7    occurred.

 8              THE COURT:  You mean the role in regard to the

 9    artifacts before this Court?

10              MR. McFARLAND:  Yes.

11              THE COURT:  You want NOAA out?

12              MR. McFARLAND:  Exactly.

13              THE COURT:  Who do you want in?

14              MR. McFARLAND:  I would say to the Court I don't

15    know that at this point in time.  Given our long history

16    together and the reportings that have been done and where we

17    are, I don't know that there needs to be any overseer at

18    this point in time.

19              THE COURT:  Mr. McFarland, I would strongly

20    disagree with you because the reason that NOAA is here is

21    because of all the machinations and happenings through the

22    years with the Court, in and of itself, Judge Clark and then

23    me, having to constantly be in a combative relationship with

24    R.M.S.T. over these artifacts.

25              The Court invoked the treaties and the protections

1   of the United States and the United States Attorney so that

2   it would not just be R.M.S.T. presenting to the Court and

3   saying we are doing this, we are doing that, and the Court

4   constantly having to rein in R.M.S.T.  So what you really

5   want is NOAA out so that you could be on your own again.

6   I'm just taking it down to what I view as the bottom line.

7   You want NOAA out so you can run with your plans, and you're

8   using these French artifacts, in my mind, as an excuse.  You

9   may have a point on the French artifacts, and you may have a

10  disagreement with NOAA.  I'm not reaching that, but that, as

11  far as I'm concerned, is not for this Court to determine.

12  If they have breached some agreement over the French

13  artifacts and the non-disclosure, that's for you to take up

14  before the bankruptcy court that is involved in those sales.

15          NOAA has done, to my knowledge, nothing so far that

16  breaches any obligation to this Court except, perhaps, this

17  Appropriations Act, and I haven't heard the rationale for

18  it.  You're basically wasting your time if you're going to

19  try to get this Court to remove NOAA because of a breach of

20  a non-disclosure agreement over the French artifacts.  I'm

21  just trying to save you some time.

22          MR. McFARLAND:  Well, I appreciate that.  Let me

23  suggest this, and I certainly don't want to waste the

24  Court's time, but I would suggest that it is perhaps -- we

25  would say that it would be time to look at a different

1    overseer than NOAA.

2          THE COURT:  Well, you're going to have to have some

3    proposals.  I am not going to let, to use a colloquialism,

4    the fox guard the hen house.  That is basically what occurs

5    when R.M.S.T. is guarding the artifacts.  I, frankly, with

6    the Court's experience, would not be very confident with

7    that arrangement.  So if you want to propose some substitute

8    entities, you can do that, but I would be loath to do a

9    private entity.

10          MR. McFARLAND:  All right, Your Honor.

11          THE COURT:  Because those entities, through my

12    experience and all the reports, you've changed boards of

13    directors, you've changed stockholders, you've changed

14    corporate headquarters.  You move around like a shell game.

15          So, consequently, I don't know who else would be an

16    appropriate entity than the United States, who is involved

17    in a treaty with a number of other countries, and NOAA is

18    the organization that the United States has put in charge of

19    that treaty.

20          MR. McFARLAND:  I understand that, Your Honor.  But

21    NOAA seems to have its own agenda here and an unwillingness

22    to abide by -- and I understand what the Court is saying in

23    terms of its jurisdiction as to the NDA, but this Court

24    obviously has an interest in this and in making sure that,

25    first, there is a relationship that is mutual and that is

1    productive for all the parties.

2           I think that trust is gone now on our side, that

3    when we have shared confidential and proprietary information

4    only to see it be disclosed to the party that we

5    specifically did not want it disclosed to, that affects our

6    trust and our willingness.  That goes to, and let me say, on

7    the Appropriations Act, and I'm going to jump just a little

8    bit ahead.

9           THE COURT:  You don't have a choice in trust and

10   willingness if this Court says that's the representative.

11   If you don't have trust and willingness, you may not have a

12   choice.  A lot of times entities have to work together, and

13   there may not be the highest level of trust, but if the law

14   requires you to do that, you have to do it.

15          MR. McFARLAND:  We understand, Your Honor.  Let me

16   say, I mean, since I have been involved in this action for,

17   give or take, less a decade plus, we have really tried to

18   work with NOAA and the Government, and, more importantly, to

19   be transparent with the Court and to work with the Court and

20   advise the Court of what is going on.  I hear the Court's

21   concerns.

22          THE COURT:  I agree, for the most part, you have,

23   Mr. McFarland, but there have been a number of times when

24   you've tried end runs, and we are all aware of that and all

25   aware of the history, and I'm not going to go back through

1    that.  We are where we are at this point.  The Court has

2    awarded the title to the artifacts with certain covenants

3    and conditions, and those are a court order, and they are in

4    effect, and the Court retains jurisdiction over those, as

5    well as any future salvage operations to the direct site of

6    the Titanic, which is where this Appropriations Act might

7    interfere in the Court's jurisdiction.

8              MR. McFARLAND:  Yes, Your Honor.  With the Court's

9    pleasure, I'll go into that.

10             THE COURT:  All right.

11             MR. McFARLAND:  We did not learn of this

12   Appropriations Act Section 113 of the commerce

13   appropriations bill, it was apparently signed by the

14   president on May 5th, 2017, until sometime after.  We were

15   never contacted about this as to review a draft, asked to

16   discuss it, anything whatsoever.  That concerns us deeply.

17             I wasn't today going to go into the legal aspects

18   too much of what it may or may not do, but the wording, as I

19   understand it, certainly does seem to implicate this Court's

20   jurisdiction, and it certainly does seem to implicate what

21   this Court has awarded us, as the salvor-in-possession, and

22   not only the right but the duty to protect that wreck site,

23   and at times when it's appropriate to go in on expedition,

24   this seems to directly affect that.

25             It seems, as I read it, to indicate that without

1    NOAA's or commerce approval, we couldn't do a dive to the

2    wreck site.  Now, we certainly have always advised this

3    Court when we are going to the wreck site and always

4    discussed it with this Court.  But I don't think that this

5    Appropriations Act is appropriate, and it certainly, and

6    this goes to the trust I said, Your Honor, in terms of our

7    concern about dealing with the current overseer, it was

8    never even raised to us.

9           In fact, the legislative history indicates that

10   this was slipped in at the last minute in the final version

11   of the bill and then just went in for congressional approval

12   and signature.  This is something, knowing the history here,

13   and this Court knows not only my client's history but the

14   attempt by the Government since the passage of not only the

15   Titanic Act in 1986 but the international agreement in 1987,

16   of the efforts that NOAA has taken to try and get the U.S.

17   to be a full member of that.  While Congress passed it, it

18   did not pass the implementing legislation necessary for it

19   to take effect.

20          NOAA has tried for years to get that implementing

21   legislation passed, and it is not.  We have had concerns

22   with it over the years because of things like this where it

23   would affect our property rights, longstanding property

24   rights that this Court has awarded.

25          So what do they do?  In an effort to bypass the

1   need for implementing legislation, they slip a rider into a

2   bill at the last minute that goes into effect without even

3   giving us a chance to look at it, comment on it, have some

4   say in it.  I mean, if there is ever an interested party on

5   the other side of the fence here, and if the legislative

6   process is supposed to work, in terms of people having a

7   chance to view legislation, comment on it before it goes to

8   their representatives for approval, we ought to have had a

9   chance to look at this, and, quite frankly, the Court should

10  have been aware of this before it went through.

11         I don't mean to speak for the Court, Your Honor,

12  but I have the sense, from the comments that the Court has

13  made in this hearing, that it was not advised of this before

14  it went to the president for signature.

15         THE COURT:  No.  The Court was not advised and had

16  no knowledge of it until you brought it to the Court's

17  attention.

18         MR. McFARLAND:  Exactly, Your Honor.  I'm not

19  asking for a declaratory opinion today, obviously, but just

20  the passage of this is deeply troubling to us, deeply

21  concerning.

22         THE COURT:  I certainly want to hear from NOAA as

23  to why and how this was put into a bill because it could be

24  viewed as contrary to the law of salvage, and I'm not

25  exactly sure how they can put into a bill that no one can

1    conduct any salvage after this Court's salvage jurisdiction

2    has been established all the way up through the United

3    States Supreme Court in the wreck of the Titanic.  I don't

4    know how NOAA can come in.  I'm not saying they can or they

5    can't at this juncture, but it's puzzling to the Court how

6    they think they can come in and direct that no person can

7    conduct any research, exploration or salvage.

8           Now, had they put in there, without the approval of

9    the United States District Court of the Eastern District of

10   Virginia and the courts of the United States, meaning the

11   appellate court and the Supreme Court, that's another thing.

12   But the law of salvage was established from basically

13   English law before this country was even founded.  The law

14   of salvage is very clear, and this Court has been declared

15   the appropriate jurisdiction to approve, to supervise, to

16   maintain and to rule on salvage operations and

17   salvors-in-possession.

18          On its face, this looks like it's authorizing the

19   Secretary of Commerce to do so, and I don't know how you can

20   do that contrary to the established law of salvage.  Perhaps

21   there is some explanation, and I don't know.  Per the

22   provisions of the agreement you're referring to, I assume

23   that's the agreement with the other countries.

24          MR. McFARLAND:  Right.  1987 international

25   agreement, my recollection is England has signed that.

1  Congress passed, or agreed to it, but, again, in order for

2  it to take effect, for the U.S. to be a signatory

3  implementing legislation, was necessary.  What also concerns

4  us, I'll be straight up with the Court, is that this is an

5  end run on the implementing legislation that is required,

6  that this is an attempt to try and avoid necessary

7  implementing legislation and just say that this satisfies

8  that.

9        At the appropriate time, if that's the position the

10  Government is going to take, we will brief it.  But I should

11  tell the Court that this concerned us so much that we had

12  originally set up a conference call with NOAA to say, hey,

13  what's going on here and what is your interpretation of

14  this?  Because as the Court knows, if we were going to

15  conduct an expedition, a salvage operation, the window for

16  doing that is very short, the time because of the weather

17  and the conditions, and, quite frankly, to arrange

18  financing, takes a good effort to get the necessary

19  equipment.  Timing is everything.

20        So we set up a call with NOAA to say, hey, would

21  you please tell us, A, why you didn't consult us in the

22  first place; and, B, what is your understanding of this?  Is

23  it going to affect our ability if we want to come to this

24  Court and say, hey, we are planning on doing a salvage

25  expedition in the summer of 2018, do you think that we first

1   have to come to you?

2         A conference call was set up, and when we filed the

3   periodic report, to simply advise the Court of this

4   legislation so it will be aware of it, the conference call

5   was canceled.  That's why I said a few minutes ago, Your

6   Honor, the collaboration and the trust, we are struggling.

7         THE COURT:  Collaboration and trust aside, if you

8   decide to do a salvage operation, then you make the call.

9   You go do the salvage operation, and if they don't like it,

10  they can come to this Court and litigate it.

11        MR. McFARLAND:  I understand, Your Honor.

12        THE COURT:  That's the way to proceed.  You say

13  this law is contrary to the orders of the Court, and we want

14  to conduct a salvage operation, and you go about it.  If

15  they object to it, they can come and object to the Court,

16  the Court will litigate it.

17        MR. McFARLAND:  Understood, Your Honor, and we

18  recognize that, but, remember, we are in a bankruptcy.  We

19  are trying to conserve resources, and so if we have to, we

20  will, but the last thing we would like to avoid is having to

21  litigate over rights that this Court has already given us

22  and awarded us.

23        THE COURT:  You may not have to litigate it.  It's

24  one of those things, it's like most things in life and the

25  law, nobody can give you a 100 percent assurance of an

1    answer.  It cannot be done.  It can never be done.  So what

2    you'd have to do is decide, if you wanted to do salvage

3    operations, that you wanted to conduct them, that in your

4    opinion you were still the salvor-in-possession under the

5    jurisdiction of this Court, proceed, and under the auspices

6    of this Court, and if there is an objection, as there have

7    been through many salvors and entities in the years, they

8    have to come before this Court.  They have to file them, and

9    they have to object.  They may or may not.  If they don't,

10   they don't, and you're not litigating.  If they do, we do,

11   and we litigate it.  No different as it's been through the

12   years in that regard.

13          MR. McFARLAND:  Well, I think, Your Honor, that

14   there is some difference in that the person who we would be

15   litigating with is the some overseer.

16          THE COURT:  Then that's another matter.  That's

17   another matter, but it's not ripe.  It's not a case and

18   controversy yet before the Court.

19          MR. McFARLAND:  No, but the passage of the act is,

20   Your Honor, and we were bringing it to the Court's

21   attention.  I think it shows a pattern and course of conduct

22   by the overseer and NOAA that is of concern.

23          THE COURT:  But courts do not create cases and

24   controversy.  They rule on them.

25          MR. McFARLAND:  Absolutely.

1          THE COURT:  Courts do not reach out and say I don't

2     like that law so I'm going to declare it unconstitutional

3     and contrary to the law.  There has to be a case and

4     controversy before the Court.

5          MR. McFARLAND:  Understood.

6          THE COURT:  I can certainly express any displeasure

7     I have with this law, but I cannot do anything about it

8     until there is a case and controversy before the Court.

9          MR. McFARLAND:  Understood.

10          THE COURT:  At which point I have the jurisdiction

11     to act.

12          MR. McFARLAND:  We fully understand that, Your

13     Honor.  But, obviously, the first, or at least a relevant

14     step was to let the Court be aware of the act.

15          THE COURT:  Well, I'd like to hear from Mr. Porter

16     as to how this act came about and the provisions in regard

17     to giving the Secretary of Commerce the authority to give

18     permission for salvage operations.

19          MR. McFARLAND:  Thank you, Your Honor.

20          MR. PORTER:  Good afternoon, Your Honor.  First

21     off, let me just back up just a second in terms of once this

22     legislation was passed, I had spoke with the NOAA

23     representatives, and we were prepared to bring this to the

24     Court's attention.

25          Then the periodic report was filed, obviously

1   teeing up the whole issue.  So that was the reason that

2   we -- well, we didn't get it here as quickly as they did,

3   but that was the reason we had not yet brought it to the

4   Court's attention.  However, since this has surfaced, I have

5   gone back and talked with NOAA representatives to determine

6   sort of the course of events of how this came about.

7        What I have learned is that starting in about

8   September of '16, that NOAA's budget office was contacted by

9   the House Appropriations Committee about potential

10  legislations for an appropriations bill.  Following that,

11  the Senate Appropriations Committee also reached out to the

12  house -- excuse me, to NOAA's budget office, and therefore,

13  those two committees, the House and Senate, coordinated

14  through NOAA's budget office and NOAA's legislative affairs

15  office with certain questions about the international

16  agreement.

17       At some point in late September of last year, the

18  House Committee provided to NOAA some draft language to

19  review and to provide the technical drafting assistance that

20  we referenced in our response.

21       That led to a series of exchanges.  The objective

22  always was to protect the wreck site and the artifacts and

23  attempt to implement international agreement, and I will

24  come back to that in just a second.

25       There was a period of back and forth with the

1    NOAA's office of general counsel working with their budget

2    and legislative affairs offices to work with the committee

3    staffs at both the House and the Senate.  There was then a

4    period of lull, quite frankly, until March of 2017 when,

5    again, some language was discussed.  I don't want to get too

6    far into internal NOAA deliberations on the language.

7         Suffice it to say that what NOAA may suggest or

8    propose is not necessarily what a Congressman chooses to put

9    into a bill.  And I think we can look back at prior

10   legislation that was offered and see that there was always

11   attempts to protect this Court's ongoing jurisdiction and

12   the existing orders of this Court.

13        So that's how this language came about.  That's how

14   this insertion came.  It came from Congress first to NOAA.

15   It was not the other way around of NOAA pushing forward.

16   There are a few open questions as to this that are clear,

17   is, first off, is whether this is a provision that

18   implements the international agreement, and that is not

19   known at this time because the department of state has to

20   weigh in on that.

21        At this point I know that that information is out

22   there to them.  I don't know what process is going on in

23   Department of State to determine whether this actually acts

24   as an implementation of the international agreement that was

25   done previously.

1          The other question is, as the language of the

2    legislation states, is that the implementing authority with

3    the Secretary of Commerce right now?  That, too, is an open

4    question of whether that will come down to NOAA.  We don't

5    know that at this point.  There are questions in some

6    agencies, as the Court is probably well aware, that

7    political appointees have not been named to run the

8    agencies, and so some of those questions may be deferred

9    until that, but at this point the implementing authority for

10   this particular piece of legislation remains with the

11   secretary and not with NOAA.

12          NOAA, I think, Your Honor, should be aware.  NOAA

13   has always taken the position that the Court's orders should

14   be protected, that the Court's orders should be enforced,

15   and that the Court's salvage award and the

16   salvor-in-possession status remain in effect.

17          But, again, this is admittedly somewhat of a fluid

18   situation right now with this passage, again, that initiated

19   from the hill down to NOAA and not vice versa.  So the idea

20   that -- quite frankly, the idea that NOAA, in some act of

21   subterfuge, has gone and tried to implement something to

22   deliberately undercut R.M.S.T. is false.

23          THE COURT:  Well, it's not clear at this juncture

24   where it stands.  It may well be an effort, as everyone

25   says, to implement the 1987 international agreement, which

1    basically protects the wreck site.  Protection of the wreck

2    site is one thing from people going in and out of there.

3    It's another when you start into salvage operations, because

4    the law of salvage controls.  Then that's where this Court

5    has the jurisdiction over the actual salvage rights.

6           This could be viewed as a preventive legislative

7    measure that keeps anyone out of there, and except if

8    someone does go in, then it would have to come before this

9    Court to determine any salvage rights.  I don't know the

10   extent.  It's a very brief provision.  I think that both of

11   you indicated that you all would make a separate filing

12   about the implications as you viewed them on this Court's

13   jurisdiction.  I don't think you have made those filings

14   yet.

15          MR. PORTER:  Well, I believe we referenced that

16   R.M.S.T. indicated they intended to file some separate

17   action and that we would respond accordingly at that time.

18   Again, as I indicate, this is somewhat fluid.  I can

19   represent to the Court, based on my conversations with a lot

20   of the NOAA folks involved in this, including Mr. Varmer,

21   who has received some special attention from R.M.S.T., there

22   is an extraordinary desire and motivation to protect the

23   Titanic wreck site and to protect the artifacts and to

24   maintain the wreck site and to maintain the artifacts in the

25   public domain and for the public benefit.  That is, quite

1   frankly, a motivation that overrides, perhaps sometimes with

2   some zeal that maybe shouldn't have, but overrides what NOAA

3   is doing throughout this.

4         We believe that NOAA's desires and its intent to

5   foster the public's interest in the artifacts is, quite

6   frankly, consistent with what the Court has directed.  I've

7   gone back through in preparations and read a lot of the

8   Court's opinions from the past, and it is absolutely clear

9   to us that that is the Court's desire, that these artifacts,

10  this wreck site, be protected in posterity for the public.

11  That is what NOAA is attempting to do.  We think NOAA is the

12  ideal and the proper person to oversee the public interest

13  and these covenants and conditions.

14        I will simply note that the Court has pointed out

15  that there has been in the past perhaps a combative, at

16  times, between the Court and R.M.S.T.  Quite frankly, we

17  have tried to cooperate.  I suppose it's from whose

18  perspective you look at this, but we would suggest that it

19  is not -- there has been some combative from this side of

20  the bar, as well as NOAA has attempted to enforce the public

21  interest.

22        We certainly recognize that there is not *in rem*

23  jurisdiction over the French artifacts.  We certainly

24  recognize that a number of the restrictive covenants and the

25  covenants and conditions do not apply to the French

1    artifacts.  At the same time, however, we recognize and we

2    believe that the *in personam* jurisdiction provisions of the

3    covenants and conditions, and the items that R.M.S.T. agreed

4    to with respect to the Titanic collections as a whole, we

5    outlined some of those in our response, and I'd be happy to

6    even address more of those.

7           Some of those provisions, quite frankly, if there

8    is a violation of those provisions as to the Titanic

9    collections, or in the material default section, or assumed

10   to be material defaults of the covenants and conditions,

11   that is an issue, and that is the tension that has existed

12   between NOAA and R.M.S.T.  R.M.S.T. has taken the position,

13   is certainly their right to do so, that the CNCs impose

14   absolutely no obligations or continuing commitments as to

15   the French artifacts in the event of their sale.

16          Quite frankly, we disagree with that.  Perhaps

17   today is not the day to have that debate.  Perhaps the time

18   to have that debate is when R.M.S.T. brings to the Court's

19   attention a possibility of a sale of something that includes

20   the French artifacts.  But that is a real, genuine debate

21   that is driving a lot of this, which is the protection of

22   the entire Titanic collection, and that is, the CNCs

23   actually made clear, NOAA's public interest relates to the

24   entire Titanic collection, and it takes that responsibility

25   quite seriously.

1          I would simply note one last point is that NOAA

2     really has sort of two tracks in this.  NOAA has its

3     obligations from the Court and through the CNCs, but it has

4     these independent obligations that arise because of its

5     status and because of its involvement with the international

6     agreement.

7          Those two things may conflict at some times, but,

8     again, I come back to the point that at no time has NOAA

9     acted in such a way as to try to undercut this company.

10    This company has often been combative in terms of NOAA's

11    attempt to address issues with respect to the French

12    artifacts.  It's a healthy discussion, it's a reasonable

13    discussion we can have.

14         THE COURT:  Well, two things, Mr. Porter:  Number

15    one, I task you and Ms. Rolleri, the NOAA attorneys, as well

16    as NOAA representative and you, with keeping the Court

17    informed as there are any developments or any enforcement

18    provisions that arise as a result of the 2017 Appropriations

19    Act and the pertinent provision, I think it's § 113.

20         MR. PORTER:  I will do that, Your Honor.

21         THE COURT:  You need to keep the Court apprised.

22    At this juncture, I don't see a tension between NOAA's

23    objective and the Court's objective from the standpoint of

24    preserving this wreck site for posterity.  I think that that

25    has always been an important driving force of this Court

1    from my predecessors, who are now deceased, to today, that

2    this is a wreck site, it's a cemetery in the sea, it's of

3    international importance and significance, of historical

4    value, and it can't just be decimated without proper

5    controls and provisions.

6          So I think that the ultimate goals of NOAA and the

7    Court are the same.  The only place I see a clash is if

8    there is some provision that NOAA is enacting that somehow

9    makes an end run around the salvage law and what has been

10   established all the way up through the Supreme Court.  That

11   you're protecting the wreck site is one thing, but if there

12   are salvage operations that go forward, they need to be

13   under the auspices and direction of this Court, not in the

14   Department of Commerce.

15         Certainly, the Department of Commerce can monitor

16   it, and if a Government or some entity comes in, then as far

17   as I'm concerned, it's the Department of Commerce's

18   responsibility, with the law of this case having been

19   established, to notify this Court.  I think it's a public

20   protection and legal duty.

21         It's a protection for everyone to have NOAA

22   overseeing the site, as long as the Court is made aware of

23   any attempts by any Government or any entity to disturb the

24   site or make future salvage operations, because I do view

25   this Court as having jurisdiction over the salvage

1   operations and having continued *in rem* jurisdiction over the

2   Titanic wreck site.

3           MR. PORTER:  Understood, Your Honor, and as we said

4   in our response, we continue to abide by that and will

5   continue to do so going forward.

6           THE COURT:  In terms of any case or controversy,

7   I'll have to await that, if there is one, if there is any

8   filing by R.M.S.T. that asserts problems with the statute or

9   any other issue in this regard.  But for now I think that

10  the Court has made its point clear, and I think that you're

11  on notice that the Court is of the opinion that it retains

12  its jurisdiction over the *in rem* salvage of the wreck site.

13          MR. PORTER:  Understood, Your Honor.  May I bring

14  up one other point?  I don't believe Mr. McFarland, you were

15  going to ask about some updates on the bankruptcy

16  proceeding.

17          THE COURT:  Yes.

18          MR. PORTER:  Well, if I may, I'll let Mr. Wainger

19  go, and he probably will cover everything I need to cover,

20  perhaps, unless we're combative.

21          THE COURT:  What about this DIP agreement?

22          MR. WAINGER:  Judge, I'll cover all of those issues

23  that Your Honor raised.  It's nice to see Your Honor.

24  Before I dive into those other issues, Mr. Porter just

25  raised a point that's very, very important to the company.

1    It has been at the core of the communications between NOAA

2    and the company for well over a year.  NOAA's role here

3    comes through the covenants and conditions, by what the

4    Court ordered for NOAA to have oversight.

5          Last year when we were here, almost just about a

6    year ago, the Court noted, when we told the Court that we

7    were looking to sell certain French artifacts, the Court

8    said those were carved out of the covenants and conditions

9    and this Court has no jurisdiction over the French

10   artifacts.  That's certainly our understanding as well.

11         The Court again reminded us that with respect to

12   their oversight role and a potential sell of French

13   artifacts, that's not before this Court because the Court

14   has no jurisdiction.

15         But NOAA is taking an extraordinarily broad view of

16   the covenants and conditions such that because of an

17   aspirational line in the covenants that we should do, to the

18   extent possible, what we can to keep all of the collections

19   together, NOAA is somehow trying to suggest that this Court

20   can fine the company in contempt of the covenants because it

21   chooses to sell the French artifacts.

22         NOAA has made filings in the bankruptcy court to

23   disrupt the company's efforts to sell French artifacts.  It

24   has engaged, in all of our conversations with the these same

25   issues, it has brought the issue to the Court both in a

1    filing made last week and today, and I think it's high time
2    that we put this issue to rest.
3          The company has the authority, based on the
4    bankruptcy court's rulings, to either go forward with a sale
5    of French artifacts or not, and I'll explain to the Court in
6    a minute where we are with that.  But the covenants and
7    conditions, and this Court's jurisdiction, and NOAA's
8    oversight, do not and should not extend to any actions taken
9    by the company with respect to the French artifacts.
10          Now, I say that with the full knowledge that the
11   company intends to inform this Court of anything it does
12   with respect to the French artifacts.  It would have to get
13   approval from the Jacksonville court.  But the notion that
14   the covenants and conditions somehow, by virtue of their
15   extension of personal jurisdiction over the company, somehow
16   vests in this Court the authority to regulate, or for NOAA's
17   authority to regulate, what we do with the French artifacts,
18   is a leap beyond which the law will not allow, and that has
19   caused the company significant problems in the Jacksonville
20   court.  And the issue rests here because NOAA is seeking to
21   bootstrap this Court's jurisdiction to somehow regulate the
22   company's actions with respect to the French artifacts.
23   It's inappropriate.  It's not supported by this Court's
24   rulings last year, by this Court's remarks today, by the
25   Fourth Circuit's rulings in 2006, and I would tell the Court

1    that when the covenants were drafted by Professor Bederman,

2    with my assistance and with the Court's input and with

3    NOAA's input, we all made a very real effort to carefully

4    draft them.  So to the greatest extent possible, they

5    encompass this Court's desire to keep all the collections

6    together but without impinging on the Fourth Circuit's

7    decision with respect to subject matter jurisdiction.

8         So that's a very, very important issue, and delay

9    simply doesn't work for the company on that.  We need the

10   clarity.  We feel very comfortable on the law, and yet,

11   because NOAA takes certain positions in the Jacksonville

12   court, it has created great obstacles for us.  So that's a

13   very important issue that I wanted to bring to the Court's

14   attention and make it as clear as I can.

15        We do not view the covenants as requiring the

16   company to do anything affirmatively or to prohibit anything

17   affirmatively with respect to the French artifacts.  That's

18   the point I wanted to be clear with the Court.

19        THE COURT:  What are you asking this Court to do?

20        MR. WAINGER:  The Court has already said it has no

21   jurisdiction today, has already said it has no jurisdiction

22   today over the French artifacts.  NOAA needs to understand

23   that no jurisdiction means no jurisdiction and that they

24   should not take the position in this court, Jacksonville or

25   anywhere else, that they have the authority or that this

1   Court has the authority to decide what this company can or

2   should or might do with the French artifacts.  That's an

3   issue to be decided by a French adversary proceeding inside

4   of the bankruptcy court, and that's why we are taking those

5   steps.

6           I'll update the Court on that proceeding

7   momentarily.  But the idea that the Jacksonville judge

8   should think that this Court may weigh in on the French

9   artifacts is a notion that we need to end.  We thought it

10  had ended last June, and reported to the Court in

11  Jacksonville what this Court had to say, and filed the

12  transcript.

13          NOAA chose to disregard the Court's comments then,

14  and as soon as we left that hearing, some of the members of

15  the NOAA team, who are not here today, showed some dismay at

16  the Court's reaction and then decided that they would

17  somehow bootstrap the *in personam* argument and the notional

18  ideas of keeping the artifacts together in the covenants to

19  somehow lock the company into the covenants with respect to

20  the French artifacts.  So I think we just need the clarity

21  that that is not appropriate and that no jurisdiction is no

22  jurisdiction when it comes to that subset of artifacts.

23          THE COURT:  Don't you need to file something?  I

24  mean, I'm not totally privy to what's going on in the

25  bankruptcy court, but, obviously, something is going on down

1    there.  Wouldn't it be appropriate to file some type of

2    motion that brings this to the Court, and if the bankruptcy

3    court or the attorneys seek a more definitive ruling from

4    this Court, then to seek it.  I don't know exactly what

5    you're asking this Court to do without a specific motion

6    before the Court.

7           All I can say is I act through what my rulings and

8    orders.  They are all of writing or of record.  My

9    assumption is, is that you take those before the bankruptcy

10   court, and the bankruptcy court makes a determination.  If

11   the bankruptcy court seeks input from this Court, that's one

12   thing.  NOAA is the Government representative on this matter

13   to be sure that the covenants and conditions are properly

14   upheld and enforced and that there not be a wholesale

15   disposition of the artifacts.

16          MR. WAINGER:  That's the interesting point, Judge.

17   NOAA's presence is here by virtue of the covenants.  The

18   covenants themselves speak to their governance of the

19   artifact over which this Court has jurisdiction; namely, the

20   subject Titanic artifact collection.  But NOAA has taken

21   certain language of the covenants to try to regulate the

22   company's use or disposition of the French artifacts.  It's

23   not appropriate.  In the same way that this Court said

24   earlier, with respect to possible violation of the NDA,

25   well, that involves French artifacts that aren't before me,

1    maybe you should bring that to Florida.

2          Judge, NOAA is suggesting by virtue of these

3    covenants that it can regulate the French artifacts.  We are

4    in the unique situation here where we are the only party to

5    the case, but with an overseer who has its own agenda with

6    respect to the protection of the collection.  It may be the

7    same as the Court's.  But clearly Mr. Porter spoke of the

8    zeal and the enthusiasm with respect to protecting the

9    collection and that that zeal that may have contributed to

10   some decisions certain NOAA personnel made with respect to

11   the NDA in contacting -- it's that same zeal that allows

12   them to use these covenants as a shield to try to prevent

13   the company from doing what it should in the French

14   adversary proceeding.  So we are the only party here, and it

15   seems strange.  We are in Neverland.

16         THE COURT:  Now you know how it feels.

17         MR. WAINGER:  I understand.  But to the extent that

18   the Court seeks a formal motion, we will be happy to -- I

19   know the Court doesn't seek a motion, but to the extent that

20   the Court feels that a motion is the proper vehicle.

21         THE COURT:  I can't tell you how to practice law,

22   but it seems to me that what you're trying to do is get a

23   question before a Court, whether it be this Court or the

24   bankruptcy court.  The question that you seek to get before

25   the Court is whether the covenants and conditions cover the

1    French artifacts and the extent to which NOAA has a role

2    under the covenants and conditions in regard to the French

3    artifacts.  That's the issue that you're having.  Now,

4    whether you as attorneys think you need to take that before

5    the bankruptcy court or whether you need to take that before

6    this Court or both, that's your decision.

7            At this juncture, I have no motion for declaratory

8    judgment or a motion to properly enforce.  I don't know how

9    I would word it.  I haven't thought it through from a legal

10   standpoint, but that's basically what you want.  You want to

11   get before a Court for some declaration of the extent of

12   NOAA's involvement in the approved covenants and conditions

13   that are in effect in this case.

14           MR. WAINGER:  And whether this Court, by virtue of

15   the covenants, has any jurisdiction or input over a

16   disposition of the French artifacts.  Those are exactly the

17   issues.  It is a positive development that we have brought

18   the issue out instead of just the conversations we have had

19   in front of the Court, and I think that's a step in the

20   right direction.  To the extent that the client feels that

21   we need affirmative resolution on that, then we will make

22   the appropriate decision and file papers here, there, et

23   cetera.

24           THE COURT:  All right.

25           MR. WAINGER:  Thank you for allowing me to speak to

1   that issue, Judge.  We had raised a number of points in

2   our periodic reports.  Let me go through them.  First with

3   respect to the debtor-in-possession financing, we will

4   provide the Court the appropriate agreement, the financing

5   agreement with the company and the third party presenting

6   the financing.

7           The financing is up to $5 million.  It is to be

8   used as a priority to pay the professional fees that the

9   company has incurred in the process of its bankruptcy, which

10  has now been going on for over a year, and we'll get you a

11  copy of the agreement.  The important thing for the Court to

12  note is that great steps were taken to ensure that the

13  security arrangement, security agreements and the collateral

14  utilized with respect to the financing agreement, does not

15  impinge or violate the covenants and conditions of the

16  artifacts.

17          THE COURT:  It's mystifying to me why you didn't

18  give it to me up front.

19          MR. WAINGER:  That was an oversight.

20          THE COURT:  Then please present it to the Court on

21  or before close of business this Friday.

22          MR. WAINGER:  We will.

23          THE COURT:  You've got it.  Give it to the Court.

24          MR. WAINGER:  We will.  I should also note, Judge,

25  and I should have done this before, Jeff Cavender is the

1    company's lead bankruptcy attorney from Troutman Sanders.

2    He is here.  He is from Atlanta, and he's not barred in

3    Virginia, but he is here should the Court have any specific

4    questions on anything relating to the bankruptcy that I

5    can't answer.  He is here for that reason.  We will get that

6    immediately, Judge.

7            THE COURT:  Just give me a summary of the status of

8    the bankruptcy.

9            MR. WAINGER:  Status of the bankruptcy.  We have a

10   planned support agreement that is in place which will govern

11   a potential sale of the entire stock of R.M.S.T. and/or the

12   entire collection, both collections as a whole.  So we have

13   deviated, for a variety of reasons.  Last year when we were

14   here we were talking about a limited sale of the few French

15   artifacts.

16           Now we have negotiated with the various committees

17   a planned support agreement.  We have copied the planned

18   support agreement and the complete sale transaction term

19   sheets to our most recent periodic report.  The means of

20   implementation are as follows:  The debtors, with the

21   consent of the supporting committees, shall conduct a

22   process to market and sell the common shares in R.M.S.T. or

23   the entire artifact collection held by R.M.S.T. and to the

24   operations of Premier Exhibition and its subsidiaries with a

25   continuing licensing right for existing operations, which we

1  call the complete sale.

2       So the goal here, Judge, and the company's in the

3  process of trying to move this forward, is to market and

4  sell the entire stock of R.M.S.T. and/or all of the

5  operations of Premier.  The plan will provide for the

6  formation of a liquidation trust for distribution to

7  creditors and equity holders according to lawful priority.

8       One thing that I know is important to the Court, as

9  it is to the company, is that we have a number of conditions

10 on the effective date of a sale.  One of the conditions is

11 entry of an order of the United States District Court for

12 the Eastern District of Virginia approving any sale of the

13 common shares of R.M.S.T. or the artifact collection of

14 R.M.S.T.

15      THE COURT:  What are you reading from?

16      MR. WAINGER:  This is the complete sale transaction

17 term sheet, which is an exhibit -- and I'll find out which

18 exhibit -- to our most recent periodic report.  We require,

19 obviously, as a contingency, that we will be in front of

20 this Court before a subsequent trustee is designated or any

21 sale happens.  That is a contingency built into the plan

22 itself.

23      You may have seen that the Government filed an

24 objection to our planned support agreement last week on a

25 variety of grounds, all related to this Court's jurisdiction

1    and approvals and treatment of the entire collections

2    together.

3         THE COURT:  I'm going to tell you I pretty much

4    agree with their objections.  I will put that on the record

5    for you to take to the bankruptcy court because I read them,

6    and to the extent I'm reading your PSA, I think you may be

7    trying to make end runs around this Court and the covenants

8    and conditions.

9         MR. WAINGER:  That issue has been resolved, Judge,

10   because in the last couple of days since they made their

11   filing, we negotiated a settlement, and they have withdrawn

12   their objection.  And the settlement is in addition to the

13   order approving the PSA, which reads as follows:

14   "Notwithstanding anything contained in this order, the

15   motion or the planned support agreement, any sale of the

16   American artifact collection is expressly conditioned on the

17   entry of an order from the Eastern District of Virginia,

18   Norfolk Division, approving such sale, consistent with the

19   covenants and conditions applicable to such artifacts, and

20   such order has not been appealed or, if appealed, no stay

21   has been entered."

22        THE COURT:  You're referring to the United States

23   District Court, not the bankruptcy court?

24        MR. WAINGER:  We are referring to this court, the

25   United States District Court for the Eastern District of

1  Virginia, and that's the language in the agreement between

2  the Government and the company.  So it is expressly noticed

3  in the order itself that before anything happens, we will be

4  here before Your Honor.  That has always been the intent,

5  and the company had no problem putting it in an order, and I

6  think it's fair that I can represent that the Government has

7  withdrawn or intends to withdraw its objections based on

8  that language.

9            THE COURT:  Is that correct, Mr. Porter?

10            MR. PORTER:  That is correct, Your Honor.  I will

11  have a comment about that objection when Mr. Wainger is

12  done, but that is correct, yes.

13            THE COURT:  All right.

14            MR. WAINGER:  Judge, that is the big picture of the

15  bankruptcy right now.  It's worth noting that the company is

16  making progress at this point in the bankruptcy.  We are

17  thrilled to have this PSA in place.  One aspect of the

18  bankruptcy, which we have alluded to, is the French

19  adversary proceeding.  We have informed the Court of where

20  we stand.  Essentially, Judge, back in April, the clerk in

21  Jacksonville entered default.

22            THE COURT:  You talking about against the French

23  Government?

24            MR. WAINGER:  Against the French Government.  The

25  Court, when you're seeking default, that the Court is

1  probably aware, against a foreign state, the evidence must

2  be satisfactory to the Court in order for the judgment to be

3  entered.  We presented some evidence to the Court on the

4  legal implications of the *proces verbal*.  In April the Court

5  said that we had not presented sufficient evidence to its

6  satisfaction, raised a number of questions, and asked us to

7  answer those questions.

8         We had a preliminary evidentiary hearing last week

9  where we agreed to present additional expert opinion from

10  legal, French legal experts on those issues.  We will

11  present that evidence via, in all likelihood, the affidavit

12  by July the 13th, and then absent any objections from any

13  parties, the Court will consider the additional evidence.

14  That is where that stands, and, obviously, we would await

15  that Court's decision.

16         That issue is determining whether or not the French

17  Government has any interest in what we have been calling the

18  French artifacts.  So that is what that issue is about.  So

19  resolution of that adversary proceeding certainly appears to

20  be forthcoming one way or the other.  Judge, frequently when

21  we are here the Court asks for updates on officers and

22  directors of the company.

23         THE COURT:  Yes.

24         MR. WAINGER:  Since we were here last year, there

25  are three new directors, including the chief financial

```
1   officer.  I submit this as Exhibit K, Your Honor, providing

2   that information.  In the past I believe the Court has asked

3   for addresses and maybe phone numbers of these folks.  To

4   the extent the Court wants that, we can provide that.

5           THE COURT:  I do, and their citizenship.

6           MR. WAINGER:  Will do.

7           THE COURT:  Looks like Mr. Bains is from Canada?

8           MR. WAINGER:  Yes, Your Honor.

9           THE COURT:  Mr. Guo David Ding?

10          MR. WAINGER:  Canada, as well.

11          THE COURT:  Well, he is associated with China, U.S.

12  and Hong Kong, among other countries, but Canada?

13          MR. WAINGER:  Mr. Henshall is a Canadian citizen,

14  as well, Your Honor.

15          THE COURT:  The moving target of the board of

16  directors.  Go ahead.

17          MR. WAINGER:  Good news is that we have been here

18  the whole time.

19          THE COURT:  I'll mark this as Defense Exhibit K.

20  If you would follow through with the nationalities and the

21  residence address.  You file that under seal, since it's

22  personal identifiers, under the eGovernment Act.

23          MR. WAINGER:  We will do, Your Honor.  That is all

24  I have at this time.

25          (The documents were received in evidence as
```

1  Plaintiff's Exhibit K.)

2         THE COURT:  All right.

3         MR. PORTER:  Just a couple of points, Your Honor.

4  First, I would like to thank Mr. Wainger for suggesting I

5  have zeal.  That doesn't happen very often.

6         THE COURT:  Suggesting he has zeal?

7         MR. PORTER:  Suggest that I might have zeal, along

8  with NOAA, and I appreciate that.  With regard to the

9  objections filed in the bankruptcy court, I just feel like I

10  need to make one point.  As it states at the end of those

11  objections, you'll note that there was an attempt to resolve

12  the objection before they were filed.  There was a good

13  faith effort on behalf of commerce.  That was not me.  That

14  was a Mr. Ted Randall with the department who is handling

15  the bankruptcy proceedings in Florida.  That, quite frankly,

16  went nowhere.  That's why the objections had to be filed in

17  the first instance.

18         Two points about the resolution of that.  First, I

19  would suggest to you it shows that NOAA and commerce are

20  more than willing to cooperate when we are trying to reach

21  interest and make sure that the artifacts are protected.  I

22  would note that the resolution of that objection ensured

23  that there was language that made sure the sale came to you

24  first, because that is our objective, to make sure that this

25  Court has an opportunity to pass on any transaction that

1    disposes of the artifacts, either as a whole or the French

2    artifacts, and that's -- I would come back to the French

3    artifacts, that that has been one of our objectives.  Quite

4    frankly, it's been longstanding not just with NOAA people

5    that aren't here, my predecessor, Susan Watt, wrote a letter

6    in '15 addressing this issue of the CNCs and the French

7    artifacts.  I wrote one last year once I came an board to

8    address the same thing.

9           This has been an ongoing issue, and our request,

10   really, we wanted to get this before the Court before there

11   was any transaction.  My understanding in talking with

12   Mr. Wainger and Mr. McFarland this morning, that the

13   statements in the periodic report and, again, their

14   statements today, that they will bring any effort to sell

15   the French artifacts also before you to give us the

16   opportunity to address whether the covenants and conditions

17   apply and whether this Court should take some action.

18          With that addition, I have nothing further, Your

19   Honor.

20          THE COURT:  All right.  Are you in agreement with

21   that, Mr. Wainger?

22          MR. WAINGER:  Yes, Judge.  Wanted to respond to

23   that and one additional point.  We plan to come to this

24   Court, as we have done, with respect to any material

25   developments in the company before anything takes place, and

1    notwithstanding our position on the French artifacts, we

2    will be here.  There will be no efforts to do anything but

3    be very direct with the Court.  So we have no problem

4    agreeing to that.  We will be here before that takes place.

5    As I told the Court, that is not the objective at this

6    point.  The objective is not to sell the limited French

7    artifacts.  The company should have, we believe, the

8    flexibility to do so, but should that ever occur, we would

9    be here first, and that's a representation to the Court.

10          One issue that Mr. Cavender raised that I want to

11   bring to the Court's attention.  When we filed the

12   debtor-in-possession financing motion, NOAA did not object

13   to that, and that hearing is to be held tomorrow in

14   Jacksonville for approval of that financing.

15          With that in mind, you know, we intend to go

16   forward with that hearing.  We also want to present the

17   financing agreement to the Court as quickly as possible, for

18   obvious reasons.  So when we leave here, we will be sure

19   that a copy of that is immediately faxed to Your Honor's

20   chambers, and we don't anticipate any problems or concerns,

21   but we want the Court to have it before that hearing

22   tomorrow.  Of course, Mr. McFarland and I would be available

23   at any time should the Court read that financing agreement

24   and have questions or concerns ahead of tomorrow's hearing

25   in Jacksonville.

1          THE COURT:  Do not represent to the judge in

2     Jacksonville that we faxed that to Judge Smith and told her

3     if she had any objections or comments to let us know, and we

4     haven't heard from her.

5          MR. WAINGER:  We will not.

6          THE COURT:  Because I cannot assure you that I am

7     going to.  In fact, I can probably assure you that I am not

8     going to read it between now and tomorrow given the other

9     matters on the docket and the schedule for even today and

10    tomorrow.

11         So my silence is not agreement, and my silence does

12    not mean that I had no comment.

13         MR. WAINGER:  We will not make any representations

14    to the Court in Florida about this Court's position with

15    respect to DIP financing.  We will simply go forward with

16    the proceedings in Florida.

17         THE COURT:  Counsel, is there anything else?

18         MR. PORTER:  Your Honor, the only other thing is,

19    if you would care to, there are certain visitors in the

20    courtroom are here on their own volition.  I would be happy

21    to introduce them to the Court.

22         THE COURT:  That would be fine.

23         MR. PORTER:  First off, Dr. Bob Ballard, who I

24    believe you may recognize as the person who discovered the

25    Titanic.

JODY A. STEWART, Official Court Reporter

```
1              THE COURT:  Nice to see you, Dr. Ballard.

2              MR. PORTER:  He is here.  He has indicated that he

3    wished to make a statement to the Court, but I told him that

4    that was entirely up to the Court.  We were not proffering

5    any statement.

6              THE COURT:  He can make a statement if he would

7    like.

8              MR. PORTER:  If may introduce the remaining

9    individuals.  In the back to the far left, Maria Wilhelm.

10   She is the chief operating officer of Cameron Companies.

11   Next to her is Christina Simmons, who is an Ocean scientist.

12   And next to her is Janet Carros, who runs the foundation.  I

13   would just simply say, again, these are not individuals we

14   invited here.  They are here on their own volition in

15   support of the Titanic and the artifacts.

16             THE COURT:  The Court welcomes their presence and

17   their support of the Titanic and everyone's work in the

18   preservation of the site and the artifacts.

19             Dr. Ballard.

20             DR. BALLARD:  May I approach?

21             THE COURT:  Yes, you may.

22             MR. BALLARD:  As he just introduced, I'm Dr. Robert

23   Ballard, and I'm the person who discovered the Titanic in

24   1985.  But I also speak not only on my behalf but on a group

25   of organizations and individuals that cannot be here today.
```

1    Those organizations include Titanic Belfast, which is a

2    public exhibition center on the Titanic that is located in

3    the very Harlan and Wolf Shipyard where the Titanic and her

4    two sisters were built.  I also am here to speak for the

5    National Maritime Museum at Greenwich in London, which is

6    the leading maritime museum of the United Kingdom and an

7    expert on the conservation and preservation of England's

8    maritime history for the British Government.

9         Jim Cameron, as you know, a famed explorer and

10   academy award winning filmmaker who told the story of the

11   tragic loss of the Titanic to the world.  Also, the National

12   Geographic Society, which participated in our discovery in

13   1985, and has long chronicled the Titanic and which produced

14   the documentary on our discovery, which was the highest

15   rated cable television program in the history at the time.

16   And the Woods Hole Oceanographic Institution, who shipped

17   and submersible, I used, defined and explored the Titanic

18   and where I am presently a senior scientist emeritus.

19        We all met, everyone I just mentioned, recently to

20   discuss steps that might be taken to protect the site, as

21   well as bring all of the artifacts back home to the United

22   Kingdom to be the primary displayer of the artifacts in

23   Belfast where they belong, where England's National Maritime

24   Museum can safely take care of them in perpetuity for the

25   British Government and where we are assured they will have

1    access at all times to the public.

2         The group I mentioned is deeply concerned by what

3    has happened to the Titanic since my discovery.  Speaking

4    from myself, I naively thought the site would be treated

5    like the USS ARIZONA in Pearl Harbor.  I served 30 years in

6    the Navy.  And the debris field surrounding the bows and the

7    stern of the Titanic would be treated like the battlefield

8    of Gettysburg where my family fought on both sides.

9         Sadly, that did not happen.  Even worse,

10   highlighted in the bankruptcy court, now taking place in

11   Jacksonville, is the intent of the RMS Titanic to break up

12   the historical collection, although I'm very encouraged by

13   what I heard now.  My fear is, as well as the other

14   organizations I just spoke of, is that the artifacts could

15   potentially disappear from public view, be damaged or lost

16   to the world at large.

17        Finally, I have a question of the Court.  RMS

18   Titanic, Inc., the present salvor-in-possession of the

19   wreck, has not returned to the site for more than seven

20   years, as required, as I understand it.  For that reason, I

21   question why it continues to be the salvor-in-possession.

22   Perhaps the time has come for the Court to consider naming

23   another entity, a non-profit entity with the technology that

24   is needed to make regular trips to the Titanic, to continue

25   our long-term study of its condition and to better determine

1    how best to preserve and conserve this history site.

2         I request the Court consider the 1,503 souls who

3    perished that cold night in April of 1912 and give them the

4    honor and respect they so deserve.  Thank you so much for

5    letting me speak.

6         THE COURT:  Mr. Ballard, I would respond with two

7    statements:  Number one, the advantage of my position is

8    that I get to ask questions, as the attorneys know, but I'm

9    not under any obligation to answer them.  However, the

10   second thing that I would tell you, and you may want to, or

11   whoever is interested, consult salvage attorneys, under the

12   salvage laws of how a person or entity is declared a

13   salvor-in-possession.  They have to do and take certain

14   actions to maintain that position, and if they don't

15   maintain it, once they're a salvor does not mean they are a

16   salvor in perpetuity.  They are only a salvor if they take

17   certain steps, and that does not preclude a Court from later

18   declaring that they have lost their position.  I'm not

19   talking specifically about R.M.S.T. at this time.  I'm

20   talking generalities of salvage law.

21        A Court can, under salvage law, declare that a

22   salvor-in-possession has waived that right or given up that

23   right or forfeited that right and that there is a new

24   salvor.  So it's not an in-perpetuity decision, but there is

25   no case or controversy, again, before the Court about

1    another entity seeking to do salvage at this juncture of the

2    Titanic wreck site.

3              MR. BALLARD:  Could another entity do so?

4              THE COURT:  Not without some Court permission.

5    They just can't do that.

6              MR. BALLARD:  They could come to the Court and ask?

7              THE COURT:  You can check on that, but, yes, anyone

8    can come to the Court and seek to be a salvor following the

9    tenets of the law.

10             MR. BALLARD:  Thank you.

11             THE COURT:  R.M.S.T. is not in perpetuity but they

12   are at the moment the salvor-in-possession.

13             MR. BALLARD:  Thank you.

14             THE COURT:  All right.

15             MR. BALLARD:  I also wanted you to be aware that

16   the group is very interested in working with the courts to

17   acquire the entire collection.

18             THE COURT:  Thank you, Mr. Ballard.

19             MR. BALLARD:  Thank you.

20             THE COURT:  Mr. Porter, is there anything?

21             MR. PORTER:  No, Your Honor.

22             THE COURT:  Anything else, Mr. McFarland?

23             MR. McFARLAND:  No, Your Honor, not on behalf of

24   R.M.S.T.  We appreciate the opportunity to be back before

25   the Court.

1        THE COURT:  All right.  Mr. Wainger, Mr. McFarland

2   and Mr. Porter, I just need to give you a personal update

3   for scheduling matters that doesn't have anything to do with

4   the substance.  If you can come up to the podium.

5        (Side-bar conference.)

6        THE COURT:  Mr. Porter, the only thing I mentioned,

7   I have a scheduling conflict in July.  The parties had

8   wanted me to visit the Mariner's Museum, and I had agreed to

9   do that, but I explained my scheduling conflict to the

10  attorneys, in particular Mr. Porter, and that I would be

11  available in the fall, and he can explain it.

12       MR. PORTER:  Be happy to accommodate Your Honor.

13       THE COURT:  I'll be up and running.

14       All right.  The Court stands in recess until

15  tomorrow morning.

16       (Hearing adjourned at 3:38 p.m.)

17                       CERTIFICATION

18

19     I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21

22

23       X_____/s/_____x

24                   Jody A. Stewart

25                   X_____6-28-2017 _____x

JODY A. STEWART, Official Court Reporter



```
1                        Date
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```