```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - - -
                                         )
 5   R.M.S. TITANIC, INC.,               )
     SUCCESSOR IN INTEREST TO            )
 6   TITANIC VENTURES, LIMITED           )
     PARTNERSHIP,                        )
 7                                       )  CIVIL ACTION NO.
              Plaintiff,                 )  2:93cv902
 8                                       )
        v.                               )
 9                                       )
     THE WRECKED AND ABANDONED           )
10   VESSEL, ETC.,                       )
                                         )
11            Defendant.                 )
     - - - - - - - - - - - - - - - - - - -
12

13

14                   TRANSCRIPT OF PROCEEDINGS

15                      Norfolk, Virginia

16                        May 3, 2018

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
              Chief United States District Judge
19

20   APPEARANCES:

21           KALEO LEGAL
             By:  Brian A. Wainger
22                    And
             McGUIRE WOODS LLP
23           By:  Robert W. McFarland
                  Counsel for R.M.S. Titanic
24

25
```

JODY A. STEWART, Official Court Reporter

1
APPEARANCES CONTINUED:
2

3
          UNITED STATES ATTORNEY'S OFFICE
          By:  Kent Porter
4
               Assistant United States Attorney
               Counsel for Amicus United States
5
          THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
6
          By:  Jackie Rolleri
                    And
7
          DEPARTMENT OF JUSTICE
          By:  Matt Troy
8
               Counsel for NOAA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE CLERK:  In case 2:93cv902, R.M.S. Titanic,
 2  Inc., et cetera, versus The Wrecked and Abandoned Vessel, et
 3  cetera.
 4            Mr. McFarland, Mr. Wainger, is the plaintiff ready
 5  to proceed?
 6            MR. McFARLAND:  Good morning, Your Honor.  Yes, the
 7  plaintiff is ready.
 8            THE COURT:  Good morning, Mr. McFarland.
 9            MR. WAINGER:  Good morning, Your Honor.
10            THE COURT:  Good morning, Mr. Wainger.
11            THE CLERK:  Mr. Porter, is the Amicus, United
12  States of America, ready to proceed?
13            MR. PORTER:  We are, Your Honor.  Good morning.  I
14  just want to introduce, in case you don't remember, Jackie
15  Rolleri.
16            THE COURT:  I do remember her.
17            MR. PORTER:  Office of General Counsel of NOAA.
18  She has been here before as my primary agent and contact.
19  Matthew Troy is with the civil division at the Department of
20  Justice.  He has been handling the bankruptcy proceedings in
21  Florida on behalf of Commerce and NOAA.  He graciously
22  volunteered to come down here to address any questions the
23  Court may have as to that particular proceeding.  And then
24  lastly Dave Alberg from the Monitor National Marine
25  Sanctuary is here as well, and he has been here before, too.
```

1          THE COURT:  Nice to see you again, Mr. Alberg and

2     Ms. Rolleri.  It's nice to have you, Mr. Troy.

3          Counsel, I have reviewed all of the status reports

4     that had been prepared, and I thought that it was time for

5     us to convene, as we do periodically, so that the Court

6     could be updated on the various issues.

7          The four issues that I have for update are:  The

8     status of the bankruptcy proceedings, and I have some

9     questions about that, but I will listen to any presentation

10    you have first; the second is the Ocean Gate expedition and

11    the status of that and if any action needs to be taken by

12    the Court in respect thereto; the third is the status of the

13    artifacts that have been retained and, I believe, pledged as

14    collateral by a G. Michael Harris, who was an officer and

15    director of R.M.S.T.; and, finally, the status of any

16    projected or planned 2018 Titanic expeditions on behalf of

17    R.M.S.T.

18          Those are the four areas that I have to be

19    addressed.  I am open, obviously, to any others that you

20    feel the Court needs to be apprised of and/or any issues

21    that you think the Court needs to address outside of these

22    matters that I've raised.  So perhaps the easiest way to

23    proceed, does anyone want to make any type of opening

24    statement or should we just get right into the issues?

25          MR. McFARLAND:  Your Honor, good morning.  Robert

1    McFarland.  Let me introduce Jessica Sanders who is the

2    corporate secretary has been before the Court before.

3              THE COURT:  Nice to see you, Ms. Sanders.

4              Then why don't we proceed into the status of the

5    bankruptcy proceedings.  Are you handling those on behalf of

6    R.M.S.T.?

7              MR. McFARLAND:  At least in certain measure, Your

8    Honor, and if certain questions are beyond my ken, then

9    Mr. Wainger can address those.

10             THE COURT:  If you would address that, and then

11   I'll hear from Mr. Troy, and we'll go from there.

12             MR. McFARLAND:  Thank you, Your Honor.  When we

13   were last here on June 28th, the company had filed, in the

14   Chapter 11 proceedings, a motion for planned support

15   agreement and a notice of sale.  We were seeking the

16   bankruptcy court's approval for a plan that they had which

17   would have permitted them to come out of the Chapter 11

18   reorganization.

19             That plan was approved by the bankruptcy court on

20   September 6th of 2017.  The plan at that time for the

21   company was to proceed with a bidding and auction process

22   and proceed that way.  There were certain objections that

23   were voiced to the process that the company proposed for the

24   auction.

25             The company studied the objections, looked at the

1    timing, and withdrew the notice of sale on December 15th of

2    last year.  Since then, the company continues to seek the

3    best possible way to emerge from the Chapter 11 proceedings

4    that will satisfy the interest of the creditors, the

5    company, and shareholders, to the extent possible.

6            In that sense, Your Honor, there was a two-day

7    court directed mediation that occurred on February 26th and

8    February 27th of this year with all interested parties

9    convened, and that included representatives of the equity

10   committee, the creditors committee, NOAA was a participant

11   in that, I believe Ms. Rolleri was there, and there were two

12   days' worth of cordial and detailed discussions with a

13   professional mediator.

14           At the end of the two days, there was not a

15   resolution that was reached.  The mediator filed his report

16   with the Court, but he also did not declare an impasse so

17   that it is possible that the parties may engage in future

18   discussions going forward.

19           From that, Your Honor, that brings us from the end

20   of February to now, beginning of May.  The company continues

21   to look at what can be done to emerge from this bankruptcy

22   proceeding, including entertaining if there are offers for

23   the sale of the assets or the sale of the stock.

24           THE COURT:  Well, what are you seeking?  In other

25   words, if I ask you, what's your end goal, what are you

1    seeking?  If I said, Mr. McFarland, number one, what are you

2    seeking, what would be the optimal outcome that you would

3    seek for the parties that you represent, and what do you

4    think is the outcome that you might be able to get?

5              MR. McFARLAND:  I wouldn't want to speculate too

6    much, Your Honor, on the outcome that we might get, but I

7    think, if we could, what we would like is a solution whereby

8    there was a cash infusion into the company that would enable

9    us to take care of the obligations that are there in return

10   for either sale of stock, in which someone would become a

11   shareholder, large shareholder in the company, or it is

12   possible that there could be an asset sale, which, depending

13   on the assets that were sold, might involve, obviously, not

14   only the bankruptcy court's approval but this Court's

15   approval if there was implicated the covenants and

16   conditions.  But the company wants to keep going.  It's a

17   Chapter 11.  They want to be a going concern.  They need

18   some further financing to make that happen.

19             THE COURT:  Well, obviously, as you've indicated in

20   your filings, and as the Court would be aware, this has got

21   to be a financial drain whenever you are in any type of

22   extended litigation, and these bankruptcy proceedings have

23   certainly been extended litigation.  That is a continued

24   financial drain on the company.

25             MR. McFARLAND:  It is, Your Honor.  I'm not

```
 1    divulging any strategy or work product.  When the objections
 2    came in to the notice of sale last year, at the end of last
 3    year, that was something the company had to consider, was,
 4    if we want to proceed in this fashion, before we ever get to
 5    a sale process and see what happens with bidders and
 6    stalking horse bidder and that aspect, we are going to be
 7    litigating just can we do this?  And Your Honor is directly
 8    right, it has been a more involved, contentious, in some
 9    respects, bankruptcy proceeding than would have been ideal
10    from the company's standpoint, and we are very cognizant of
11    the costs.  That's why we would like to emerge as quickly as
12    possible.
13            THE COURT:  All right.  Thank you.  Anything else
14    you want to add, Mr. Wainger?
15            MR. WAINGER:  Not at this time, Your Honor.
16            THE COURT:  All right.
17            Mr. Porter, Ms. Rolleri or Mr. Troy, all of you,
18    who wants to speak first?
19            MR. PORTER:  I'll address a few questions first,
20    Your Honor.  As to the bankruptcy and the possibility that
21    there is a transfer of the assets, following the planned
22    support agreement that was filed back in the fall, we've had
23    several conversations with Mr. Wainger about trying to plan
24    for a transfer of the artifacts or a transfer of the
25    company, and to that end, in December we provided a letter
```

1    to Mr. McFarland, Mr. Wainger outlining the various

2    conversations that NOAA would want to evaluate for purposes

3    of, like, transfer of the artifacts or some sort of transfer

4    of the salvor-in-possession status.  I would be happy to

5    share a copy of that letter with the Court, if you'd like.

6            THE COURT:  I would like a copy of that letter,

7    please.

8            MR. PORTER:  If there happened to be a transfer, a

9    stock sale, it would be a little different because under the

10   covenants.  We'd simply need to make sure that the

11   management conservation and curation of the artifacts

12   remained stable as they were, and that could be the case if

13   all of the same personnel stayed in place.  But that's just

14   to let you know that we are planning for this possibility of

15   an artifact sale or an artifact transfer and trying to be in

16   the best position to evaluate this as quickly as possible to

17   be able to advise the Court of what NOAA's position is on

18   that.

19           THE COURT:  If there is any, wasn't it called the

20   complete sale plan?  Is that what they were calling it?

21           MR. PORTER:  I believe that may have been the term.

22           THE COURT:  I know there's a planned support

23   agreement.

24           MR. PORTER:  Yes.

25           THE COURT:  But then they were talking at some

1    point about if they have a complete sale plan, they would

2    obviously have to seek approval of this Court, and obviously

3    if any artifacts that are under the jurisdiction of this

4    Court were involved in anything, they would have to get the

5    approval of the Court.

6            MR. PORTER:  Right.  My understanding from our last

7    hearing last June, I believe it was, is, of course, any of

8    the STAC, the American artifacts, would have to come to this

9    Court for approval, and at least with regard to the French

10   artifacts, even though the Court does not have jurisdiction,

11   they would bring that issue to the Court before any transfer

12   so that we could address any concerns that NOAA may have.

13           THE COURT:  Didn't the bankruptcy court rule that

14   France has no interest in the artifacts recovered?

15           MR. PORTER:  They did, yes.

16           THE COURT:  That's been a ruling by the bankruptcy

17   court?

18           MR. PORTER:  It did.

19           THE COURT:  So what is the status of those

20   artifacts?  They would be under the auspices of this Court?

21           MR. PORTER:  Well, as we pointed out in our motion

22   or our response of the periodic report last year, we think

23   there is at least some consideration in the CNCs that the

24   Court has personal jurisdiction over the company as to their

25   treatment of the entire artifact collection.

1          But until, quite frankly, a proposal is put before

2     us to evaluate, we can't really assess what they're doing,

3     if there is a sale of five artifacts or a sale of the entire

4     collection.

5          THE COURT:  I'm going to have this letter marked as

6     Hearing Exhibit Number 1.

7          (The document was received in evidence as Hearing

8     Exhibit No. 1.)

9          MR. PORTER:  The only other issue I would bring up

10    on the bankruptcy, before I turn it over to Mr. Troy for any

11    questions Your Honor may have, is we are aware -- this is

12    fairly recent, just two days ago, there was a motion filed

13    in the bankruptcy court by one of the creditors to appoint a

14    Chapter 11 trustee.  That is obviously very new, and I do

15    have a copy of that for the Court if you would like.

16         THE COURT:  All right.  A copy for Mr. McFarland,

17    and there is no objection, I will mark this as Hearing

18    Exhibit Number 2.

19         (The document was received in evidence as Hearing

20    Exhibit No. 2.)

21         MR. PORTER:  With that, Your Honor, I'd be happy to

22    turn it over to Mr. Troy if you have any specific questions

23    on the commerce NOAA side of things in the bankruptcy

24    proceeding.

25         THE COURT:  I'll ask my next question to Mr. Troy

1   since he is apparently more of the bankruptcy expert, so to

2   speak.

3           MR. PORTER:  Indeed, yes, Your Honor.

4           THE COURT:  All right, Mr. Troy.  Before you

5   proceed, let me ask you the question that's on my mind.

6   What do you see as the implications of the appointment of a

7   Chapter 11 trustee?

8           MR. TROY:  Thank you, Your Honor, for letting me

9   appear.  Matthew Troy, civil division, Department of Justice

10  on behalf of NOAA.  I will give you my bankruptcy answer as

11  a bankruptcy practitioner.  Chapter 11 trustee, if

12  appointed, is selected from a panel of trustees maintained

13  by the U.S. Trustee for that particular district.  That

14  person is appointed, and, in effect, in layman's terms,

15  becomes management for the company, runs the company.

16          The creditor that has filed this motion in its

17  pleadings is pressing for, and I'm not sure that -- I'm just

18  reflecting what its position is as stated in the papers, is

19  pressing for a sale of the French artifacts and wants a

20  third-party objective, court-appointed trustee to pursue

21  that course.

22          Whether or not the trustee actually pursues that

23  course will be up to the trustee once and if -- and that's a

24  big if as well -- a trustee gets appointed, will make an

25  assessment on their own on what the proper course or action

```
 1   is and how to resolve the bankruptcy.

 2           THE COURT:  All right.  Thank you.  You can go

 3   ahead.

 4           MR. TROY:  The only other thing I was going to add,

 5   Your Honor, it sounded like you had a question about how did

 6   any type of sale of any of the artifacts interact with this

 7   Court and your jurisdiction.  I just wanted to point out and

 8   make clear that in the order approving the planned support

 9   agreement that we requested insertion of language to the

10   order that the debtors agreed to, R.M.S.T. agreed to that

11   said that any sale of the American artifact collection is

12   expressly conditioned upon entry of an order from this

13   Court, the United States District Court for the Eastern

14   District of Virginia, approving such sale, consistent with

15   the covenants and conditions applicable to such artifacts.

16           So in the sense there is a carve-out here for your

17   role in any sale of the American artifacts.

18           THE COURT:  All right.

19           MR. TROY:  That was all I had, Your Honor, unless

20   you had any other questions.

21           THE COURT:  Well, what do you see, and then I know

22   this is like asking somebody a pie in the sky question, but

23   what do you see as the optimal outcome of this bankruptcy

24   proceeding and what do you see as the practical outcome of

25   it, if you can project either one of those at this point?
```

```
 1            MR. TROY:  Well, I think from all parties'
 2   perspectives an optimal outcome is that creditors get paid
 3   in full, and the company is able to find a transaction,
 4   either through a stock sale, an artifact sale, that complies
 5   with the covenants and conditions and satisfies Your Honor
 6   that such a transaction complies with the covenants and
 7   conditions, and that going forward we have a healthy, viable
 8   company that can take care of, properly curate these
 9   artifacts in accordance with the covenants and conditions.
10            THE COURT:  All right.
11            MR. TROY:  Practically, that's pretty hard, Your
12   Honor.  I think that's what the debtor probably has
13   struggled with for two years in bankruptcy.  We are not a
14   creditor in the case.  We are exercising our role through
15   this Court and the covenants and conditions to make sure
16   that what happens in the bankruptcy does not run afoul of
17   the covenants and conditions.  So our knowledge, our
18   intimate knowledge of what is actually going on behind the
19   scenes is fairly limited, and what I'm referring to is the
20   actual sale efforts.
21            THE COURT:  You also have a role, remember, the
22   treaty and the agreement that was entered into.  So the
23   United States, that's how you were brought in initially.  I
24   mean, you have a role representing the United States and the
25   interest of the United States, as well as following through
```

1   the continuum.  I won't go back through all of it when

2   Mr. Leonard, who's now a magistrate judge with the court,

3   all of the hearings and all of the roles of the United

4   States, and then I think Mr. Porter may be third round.

5   Wasn't Ms. Watt in there for a while, and then Ms. Watt

6   left, and then there was Mr. Leonard?  Now there's

7   Mr. Porter, and I'm still around.

8              MR. TROY:  Thankfully.

9              THE COURT:  Thank you, Mr. Troy.

10              MR. TROY:  Thank you, Your Honor.

11              THE COURT:  All right.  I do have a question for

12   you, Mr. McFarland.

13              MR. McFARLAND:  Thank you, Your Honor, and I did

14   want to make a couple of points.

15              THE COURT:  Go ahead.

16              MR. McFARLAND:  Let me take the Court's questions.

17              THE COURT:  Go ahead.  Make your points.

18              MR. McFARLAND:  Well, I think one is the company

19   has always recognized and acknowledged that a sale of the

20   American artifacts would require this Court's approval.  So

21   when the term carve-out was used, that isn't the term we

22   would call.  We acknowledge that.  I think the French

23   artifacts is different, and I have not had a chance to study

24   what was filed either two days ago or yesterday.  I have

25   learned of it.  I will say that as I understand it, it is

1    largely a contention that the French artifacts should be

2    sold individually and that should have been carried out.  So

3    the company will review this and respond in time, Your

4    Honor.

5            The other thing I wanted to say is, in terms of

6    keeping the government and NOAA involved, which we always

7    have done here and had good communications, we actually have

8    recently offered them a non-disclosure agreement whereby

9    they would get further details about what is going on in

10   terms of potential sales or bidders, and to date they have

11   not agreed to execute an NDA.  So, obviously, we can't share

12   but so much with them.  But we have offered that, and I

13   wanted the Court to be aware of that.

14           THE COURT:  Well, that leads me into my next

15   question, which, obviously, you are not going to give the

16   Court and NOAA but so much information on this.  What have

17   you been doing to market and sell this idea because to me,

18   and I realize that, and I'll express whatever bias I may

19   have here after having been with this case for numerous

20   years, that it is such a valuable and unique collection and

21   opportunity for any museum or someone who wants to make a

22   contribution, a lasting eternal contribution to history.

23   I'm talking about people that obviously have financial means

24   and are looking for some way to contribute to the history of

25   the world, really, that it would seem to me, this is an

1    attractive offer and to, as I say, a museum or a collector

2    or someone who wants to contribute.

3         I just hope that you all are exercising strenuous

4    marketing or reaching out, or whatever you're doing, to make

5    this happen because to me that's the most important thing at

6    this juncture.

7         MR. McFARLAND:  Yes, Your Honor.  We fully agree

8    with you.  Let me say this.  Because R.M.S.T. is publicly

9    traded and because of FCC requirements, we cannot even

10   disclose people who are interested publicly.  We will

11   provide the Court further details under seal and are happy

12   to do that.

13        In fact, one of the things I was going to ask,

14   which is, I know, not the usual modus operandi of the Court,

15   but we are hoping that there can be a resolution in short

16   order.  It would be very helpful for us to know if we could

17   be on the Court's schedule in about six weeks or seven weeks

18   or eight weeks or something in that range.  I acknowledge

19   that normally we don't set hearings in this court before

20   things are briefed and presented, but it would be very

21   helpful to my client if we could have an idea of, yes, the

22   Court could hear you in the week of --

23        THE COURT:  My schedule, I know, is open in August.

24   I don't have any plans to be away, and I would tell you that

25   May, June and July are just jammed but that August is fairly

```
 1    open.  I'm sure Ms. Cherry will, after this hearing, be glad
 2    to give you a date, and if for some reason you need to
 3    cancel it, it can be removed from the docket in a timely
 4    manner.
 5              MR. McFARLAND:  Thank you, Your Honor.  We would
 6    appreciate that.  I think I could say for my client we would
 7    like to be back here this summer.
 8              THE COURT:  Well, let's put that on.  Of course,
 9    set the date with the attorneys from NOAA and the United
10    States and Mr. Troy, if it looks like it may be necessary
11    for him to be here.  I don't know what all this involves,
12    and certainly if there's information the Court needs in
13    advance of the hearing, you should file it under seal, if
14    you don't feel it is something that should be public, but
15    I'd like to be prepared for any hearing.
16              MR. McFARLAND:  Absolutely, Your Honor.  We will
17    make sure for the hearing, and I think there probably would
18    be things that would need to be under seal.  There are
19    certain things going on right now, Your Honor, but I can't
20    publicly discuss them.  We will certainly be happy to
21    provide to the Court, under seal, information.  As I said,
22    we have offered that to the government through an NDA, and
23    that's their decision.
24              THE COURT:  That's their decision.
25              MR. McFARLAND:  Exactly.
```

```
 1              THE COURT:  I understand.  Maybe they feel like as
 2    representing the United States and the public it's not
 3    appropriate to have the information.  I don't know what
 4    their reasons are, but that's their decision.
 5              MR. McFARLAND:  Absolutely.
 6              THE COURT:  Thank you.  Was that everything on this
 7    one?
 8              MR. McFARLAND:  That is everything I've got, Your
 9    Honor.
10              THE COURT:  I'll move to the next point in a
11    minute.  I wanted to just mention the date to Ms. Cherry.
12              If there is nothing more today on the bankruptcy,
13    I'd like to hear a report on this Ocean Gate expedition,
14    Mr. McFarland.
15              MR. McFARLAND:  We became aware of the Ocean Gate
16    expedition and advised the Court what we knew and what was
17    available publicly.  It is our understanding, as of
18    currently, that they are trying to go forward with dives,
19    bringing tourists down.  I think they were testing a
20    submersible, is the last I read, that was publicly
21    disclosed, and they were doing tests in, I believe it was
22    the Bahamas this month.
23              THE COURT:  The waters at the Titanic are a lot
24    chillier, and the tides and the current could be a lot more
25    dangerous.  But I don't know that the Bahamas is, from my
```

1    knowledge of this case and the tides and the currents and

2    the movements that I've looked at over the years, that

3    that's necessarily a compatible environment, but that's not

4    up to us.

5            MR. McFARLAND:  No, Your Honor.  And far be it for

6    me to advise someone who is -- yes.

7            THE COURT:  Let me ask you this:  I have not gone

8    on the Internet or done any independent research on Ocean

9    Gate.  Who comprises the entity?  How long have they been

10   around?  What is the background on them that you have been

11   able to determine?

12           MR. McFARLAND:  I think there are some people with

13   some means, and then there is some folks who I think have

14   some definite experience in this area, and Mr. Wainger may

15   be able to provide more detail on that.

16           I think it's Mr. Gallo, who the Court may recall

17   from this proceeding, is at least familiar with the

18   gentleman and may be advising them who were looking to do

19   these dives.

20           THE COURT:  Well, in one of the reports, I think it

21   was the February 6th periodic report, you indicated that

22   they were advertising and selling tickets and that they were

23   planning something in June of 2018.  Is that still a

24   projected date?

25           MR. McFARLAND:  The last time I looked at the

1   website they were still testing the submersible.  So whether

2   they are going to meet that timeline in terms of June 2018,

3   I don't know and wouldn't be able to comment specifically.

4   I know given that today is May 3rd, and at least the most

5   public -- the last public announcement they were still not

6   saying that we are going forward with dives in these dates.

7   The Court knows the window to do this is somewhat limited

8   once you get into certain months, it's really not feasible

9   because of weather and conditions.

10          THE COURT:  Is this a private limited liability

11   company?  I assume it's not a public company.

12          MR. McFARLAND:  I don't believe it's a public

13   company, Your Honor.  I think they are, at least for U.S.

14   base, I believe it is the State of Washington, Seattle, so

15   they're not on our coast.

16          THE COURT:  Well, that's where they've

17   incorporated.

18          MR. McFARLAND:  Yes.

19          THE COURT:  These tickets, you say they are selling

20   tickets.  Has anybody looked at a ticket?  What does it say

21   you're entitled to?  How much are the tickets?  What does

22   the ticket say?  Does it have an expiration date?  Does it

23   have a specific dive date?  I think the tickets, which are

24   being offered to the public, may be the most revealing fact

25   as to whether it's going to go forward, if somebody's paid

1    money for a ticket.  How much are they selling it for?

2    Mr. Wainger looks like he has information.

3             MR. McFARLAND:  He can provide the details.

4             MR. WAINGER:  Some detail but not everything, Your

5    Honor.  Good morning.

6             THE COURT:  Good morning.

7             MR. WAINGER:  We understand that it is over

8    $100,000 per opportunity or per ticket and that they have at

9    least 50, is what they have publicized, passengers who

10   intend to go down to the bottom of the wreck.  That's the

11   information we have right now, Judge.

12            THE COURT:  All right.  What are the means to

13   monitor this?

14            MR. WAINGER:  That's a great question, Judge.  I

15   don't have the answer there.  To monitor?

16            THE COURT:  Well, to monitor what they are doing

17   and whether they are going to go forward with something down

18   to the wreck.

19            MR. WAINGER:  What they intend to do is to go down

20   multiple times to show the wreck off, to use sonar, to take

21   video.  In terms of monitoring them, we don't have the

22   capacity to monitor them.  I don't know that NOAA had the

23   capacity to monitor them.  So what we are stuck with is

24   relying on what they publicize that they are going to do.

25            One of our great concerns is that they don't have

1    the expertise.  We don't have the ability to monitor them,

2    and that they will do things intentionally or

3    unintentionally that could damage the wreck site, from

4    dropping substantial amounts of ballast, to potentially

5    recovering artifacts, although they've never made any claims

6    that they intend to recover artifacts.

7             But we are concerned about their ability to pilot

8    this in a professional manner.  As the Court, I believe,

9    knows, it is very dangerous, and the currents are very

10   strong down there, and we are concerned that the submersible

11   could be led unintentionally into the wreck site, and there

12   really is no great way to monitor what's going on down

13   there.

14            THE COURT:  When I said monitor, I'm referring to

15   three different aspects here:  Have they been made aware

16   that this court has jurisdiction over the salvage

17   operations; that R.M.S.T. has been declared

18   salvor-in-possession; and that any violation of that will be

19   reported to the Court for appropriate action?

20            In other words, it's one thing to send a

21   submersible down if all it is going to do is go down.  But

22   knowing the currents and so forth, there could be some

23   repercussions from just sending a submersible down.  So I

24   don't know that anyone can prevent someone going down.

25            On the other hand, if it damages the wreck site or

1    the artifacts or interferes with future salvage operations,

2    there is jurisdiction there.  So the first thing is I think

3    they need to have notice and with a copy of that letter to

4    the Court and the United States.

5            So, in other words, I think that they need to be

6    put on written notice that this is still an ongoing salvage

7    case in this court over which, however you word it, so that

8    they can't say, well, we didn't realize that.  I think

9    that's the first thing, you put somebody on notice.

10           Then in that letter you should probably request,

11   and you might not get it, if you do schedule any activity to

12   the wreck site, you need to notify R.M.S.T., the Court, and

13   the United States.  Sometimes just telling somebody they

14   need to do something, and I can decide whether to follow up

15   with correspondence to them or not once I see what you've

16   done.

17           Number three, if there is any indication, there may

18   be something on websites that they're going down.  Now, I'm

19   beginning to think out of the box here, I'm going to tell

20   you.  I do not know that the Court would have the legal

21   capacity, or the physical capacity, and I don't know that

22   I'd have any marshals that wanted to do it.  But there can

23   be marshals monitoring to prevent a violation of a court

24   order.

25           When you have a ship attachment, and the Court has

1  attached the ship, you send the marshals to be sure that

2  that ship doesn't leave port.  Now, I don't know that there

3  are the resources to send United States Marshals to those

4  waters, or whether it's safe, but I'm saying the Court is

5  not without resources.  I know that the United States, NOAA

6  people can't just get up and circle around in a boat.  I

7  know that R.M.S.T. can't, but there may be jurisdiction.

8  There are certain nationwide procedures.  For instance, the

9  marshals from Maine we used in another case, and we had to

10 use a marshal service in Florida on the Columbus America

11 case.

12        In other words, I'm not saying it's possible.

13 Again, I'm thinking out of the box on this one, but there

14 could be ways to prevent, if someone is going to openly, or

15 is in the process of openly violating a Court's jurisdiction

16 and order.  But I think at a threshold level they need to be

17 put on notice of the parameters, and that they need to

18 notify you and the Court if they actually are planning any

19 type of expedition to send down submersibles.  I don't know

20 that it will ever happen because it's certainly not an easy

21 thing to do.  But I think they've got to be put on some kind

22 of notice.

23        MR. PORTER:  Your Honor, I may be able to help

24 close a little bit of that circle for you.

25        THE COURT:  All right.

1          MR. PORTER:  It doesn't close it all the way but

2     somewhat.  As you recall, one of the issues we've discussed

3     in the past is this new Section 113 and what it does.  There

4     have actually been multiple conversations between NOAA and

5     Ocean Gate over the last several months, Ms. Rolleri and

6     Mr. Alberg, advising them under 113 of their obligation to

7     submit a project plan to NOAA.

8          They have also been told in writing via e-mail,

9     they have been told, recommended that they notify R.M.S.T.

10    of any plan, as well as this Court.  Now, I will say that

11    they have indicated they are not planning to notify R.M.S.T.

12    They have not said anything about notifying the Court.

13          At this juncture, NOAA has received information,

14    some information from Ocean Gate about plans.  There is no

15    specific date that has been provided.  We, NOAA, has asked

16    for information that would be consistent with what is in the

17    annex to the international agreement, which is also

18    consistent with the NOAA guidelines about the plan, the

19    scope of the plan, the key players.  We don't have all of

20    that information.  We do have some information, and that is

21    being evaluated.

22          Ocean Gate has been expressly told by NOAA of the

23    Court's jurisdiction, has been expressly told that R.M.S.T.

24    has salvage rights.  So they know those things.  The

25    information that we now have is being evaluated.  Right now,

1    and I believe either Rob or Brian alluded to this, right now

2    our information is not beyond dive and view and photograph,

3    so we are not aware of something beyond that.

4              As Your Honor knows, and I wish the process were a

5    little further along as to how 113 is delegated.  That

6    decision has not been entirely made, but it is certainly our

7    expectation from NOAA, with the caveat that it hasn't been

8    fully delegated to them, to implement 113, that any request,

9    any request that impinged on the salvage rights of R.M.S.T.,

10   we would advise the Court, and any request that did that, we

11   would condition any issuance of an authorization on further

12   review and consent by this Court.  So I think that closes a

13   little bit, not all the way, but that may help the Court

14   somewhat.

15             THE COURT:  Let me suggest two things, and I'll get

16   your reaction to it, Mr. Porter, and then you, Mr. Wainger.

17   Number one, I still think it would be helpful or beneficial

18   and a protective measure for R.M.S.T. to go ahead and write

19   the letter so that no one can claim they sat on their

20   rights.  In other words, you don't want any claim, well,

21   they knew about us, there was a court hearing, it was

22   discussed, and they never contacted us.

23             So I think it's important that R.M.S.T. issue that

24   letter to remind them that they are the

25   salvor-in-possession, that the Court has jurisdiction over

1   all salvage operations with the Titanic, and that if there
2   is any expedition, they would expect notification to
3   R.M.S.T. and the Court.  Then on that letter specifically
4   copy me and copy Mr. Porter so that they know that we are
5   all on the same page with being aware of what they're doing.
6   So I do think that letter is important, number one.
7          Number two, if you're comfortable, I think at least
8   the e-mail that you sent to them should probably come to the
9   Court and to R.M.S.T. so that we could make that exhibit
10  Court Exhibit 3 here.  If you don't have it today, you can
11  send it in and give the R.M.S.T. counsel a copy of it so
12  that, again, it shows that we are all on the same page.  We
13  are not trying to exercise jurisdiction we don't have, on
14  the one hand.  On the other hand, we are not going to stand
15  by and let them disturb the wreck site and the artifacts and
16  so forth.
17         MR. PORTER:  We can file that as an attachment to a
18  notice later today.
19         THE COURT:  That would be great.  So we will have
20  the e-mail, and we will have the letter from R.M.S.T.  Then
21  whatever your review is, if you are comfortable sharing it
22  with the Court and/or R.M.S.T., you can do that.  But
23  certainly, Mr. Porter, if NOAA receives any kind of
24  indication that there's going to be activity, you should
25  call it to the attention of the Court.  I will make myself

1    available.  I have no plans to be anywhere for the rest of

2    the year except here.  So you can make us aware of it so

3    that we can determine if action is needed.

4           MR. PORTER:  We will certainly do that, Your Honor.

5           THE COURT:  I think that then closes some of this,

6    at least the letter from R.M.S.T., the e-mail notice from

7    NOAA, and with the understanding that if NOAA reaches some

8    kind of conclusion that they think is appropriate for the

9    Court and R.M.S.T. to have, they will pass that on after

10   review of the documents.

11          In the meantime, if they get any type of definitive

12   word that they are just going down there with a submersible,

13   it would be nice to bring them before the Court and have

14   them make a representation to the Court, with you all

15   present, that their plans are limited to this.  Because they

16   would send an attorney, and an attorney is an officer of the

17   Court, and then you'd have that representation on record

18   before the Court that these are our plans and this is what

19   we are going to do.

20          I'm not saying anybody would prevent them, depends

21   upon what their plan is, but they would have to stand before

22   a Court, say this is what we are going to do, and, of

23   course, the Court is going to ask them for a written plan of

24   what they are going to do, and everybody would have that.

25          MR. WAINGER:  We certainly appreciate those

1    suggestions, Your Honor, and directions, and we will comply

2    and try to get that letter out immediately.

3         The one thing I wanted to add very briefly, and

4    this gets a little bit tricky, but the company is concerned

5    about enforcing its rights, and the government is concerned

6    about making sure that no one steps on R.M.S.T.'s rights,

7    but also that it comply with what it perceives to be its

8    obligations under Section 113.

9         For the record, R.M.S.T. doesn't believe that 113

10   is enforceable or constitutional, but we haven't taken any

11   action on that yet.  But I want to make sure that the Court

12   is aware that there are varying positions with respect to

13   the enforceability of that provision.

14        THE COURT:  I understand, but let's for now say we

15   are all on the same page to protect the wreck site and the

16   artifacts.

17        MR. WAINGER:  Absolutely.

18        THE COURT:  So for right now, regardless of your

19   legal positions on 113, we are all on the same page for this

20   one.

21        MR. WAINGER:  Understood.

22        THE COURT:  All right.  I think that brings us to

23   the third issue that I'm not sure there is anything

24   anybody's going to be able to do.  Mr. George Tulloch, when

25   he was president of R.M.S.T., wrote this nice letter to

1    Mr. Harris, passed on four artifacts; three from the 1987

2    expedition and one from the 1994 expedition; and in the

3    meantime Mr. Harris has pledged them as collateral in a

4    commercial transaction with Packwood Investments, LLC.

5            Do you have any information on that or anything

6    that you think we can do?

7            MR. McFARLAND:  The only further information I

8    have, Your Honor, is that I think the artifacts are

9    presently with an escrow agent and that there was a dispute

10   between Mr. Harris and his creditor as to whether he really

11   owes the obligation.  We have put them on notice of our

12   position and that we would get notice of anything that would

13   cause for a transfer of those artifacts, title of those

14   artifacts, we would get notice and certainly advise the

15   Court and also look at what means we could take and should

16   take given all the circumstances.

17           THE COURT:  You all may or may not know this, but

18   what would be the relative valuations in today's terms?  I

19   don't really know.  I have listened to the valuations.  But

20   we've got a 1912 gold coin, we've got a 1902 $5 U.S. bank

21   note, we have a $5 U.S. legal tender, and a one 8-pound

22   piece of coal.  I know the coal's been shipped away before

23   and sold.

24           MR. WAINGER:  We haven't looked at the appraisal of

25   the coal, Judge, because we think that's negligible because

1   so much has been sold.  We did look at the three artifacts

2   and relied on Richard Raymond Alasko's report and spoke to

3   Mr. Alasko to get an idea.  At the low end, those three

4   artifacts collectively could be worth 10 to $15,000,

5   according to Mr. Alasko.  At the high end, perhaps 120 to

6   $150,000 collectively.

7           THE COURT:  All right.  Thank you.  Well, then I

8   will conclude this segment by being satisfied that R.M.S.T.

9   at least is aware of the situation with Mr. Harris and

10  Packwood Investments and will monitor it as best we can.

11          Is there anything, Mr. Porter, Ms. Rolleri?

12          MR. PORTER:  Nothing on that, Your Honor.  The

13  three pieces of currency, though, are French artifacts, if

14  that has any distinction.

15          THE COURT:  We are trying to hold on to everything

16  we can, right?

17          MR. PORTER:  We agree, yes.

18          THE COURT:  Not we meaning the Court, but you all

19  in terms of value.

20          MR. PORTER:  I'm sorry.  One other point on this.

21  On the three-pieces of currency, as Your Honor knows, NOAA

22  has in the past tracked inventories.  Only one of those

23  pieces of currency was on the inventory.  I'm not suggesting

24  that there is an overall issue as you recall from the report

25  that Mr. Alberg prepared during the site visit.  Overall the

1    management and the documentation is well in order, but we

2    did notice in checking that it appeared that only one of

3    them was on the original inventories.

4            That is a matter I don't believe the Court needs to

5    be immediately addressing.  We can address directly with

6    R.M.S.T.  Just wanted to bring that to your attention.

7            THE COURT:  Also, remember they went out in 1997,

8    Mr. Tulloch.  I don't keep the dates tracked in my mind of

9    when they started cataloging, but I do note that these went

10   out on August 15th, 1997 from Mr. Tulloch to Mr. Harris,

11   also known as Mikey.

12           That brings us to the last aspect of the Court's

13   concerns or the matters that needed to be addressed, and

14   that was if there are any 2018 expeditions planned?  Since

15   our last hearing, and your September 7th, 2017 report, there

16   was a letter of intent with STI to partner on an expedition

17   to the wreck site in 2018, and if you could update the Court

18   as to what is the status of that letter of intent, number

19   one; and, number two, if there is anything other than that

20   letter of intent with any other entity?

21           MR. McFARLAND:  Your Honor, the company carefully

22   considered a possible expedition in 2018, including the

23   letter of intent that Your Honor mentioned.  That is not

24   going forward, and at this point in time, given where the

25   company is in the bankruptcy proceedings, we need to get

1 through the Chapter 11 reorganization before there would be

2 an expedition this year.

3   THE COURT:  All right.  Mr. Wainger, Mr. McFarland,

4 is there anything further you want to advise the Court of or

5 discuss this morning?

6   MR. McFARLAND:  Just one point, if I may, Your

7 Honor.  Obviously, the artifacts are always a tremendous

8 consideration for this Court so I did want to say that even

9 with the Chapter 11 proceedings going on, Mrs. Klingelhofer

10 and her staff continue to maintain, carry, curate and

11 conserve the artifacts in the same fashion that they always

12 have, meticulous and to standards, and above and beyond the

13 standards, but I did want to assure the Court that we

14 recognize and still are adhering to our obligations in that

15 respect.

16   THE COURT:  Thank you.

17   Then, Mr. Porter, Ms. Rolleri, Mr. Troy, is there

18 anything further you want to advise the Court of this

19 morning?

20   MR. PORTER:  Nothing further from NOAA, Your Honor.

21 Thank you.

22   THE COURT:  Thank you, counsel.  If you will set a

23 date in August, and if you need any type of hearing or

24 matter heard between now and then, just notify the Court,

25 and we will make appropriate arrangements.

```
 1            Have a good weekend.  The Court stands in recess
 2   until this afternoon.
 3            (Hearing adjourned at 11:52 a.m.)
 4                       CERTIFICATION
 5
 6       I certify that the foregoing is a correct transcript
 7   from the record of proceedings in the above-entitled matter.
 8
 9
10           X_____/s/_____x
11                    Jody A. Stewart
12                    X_____5-3-2018 _____x
13                         Date
14
15
16
17
18
19
20
21
22
23
24
25
```

JODY A. STEWART, Official Court Reporter