**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

R.M.S. TITANIC, INC.,
successor in interest to Titanic
Ventures, limited partnership,

        Plaintiff,

v.

        Civil Action No.  2:93cv902

The Wrecked and Abandoned
Vessel, . . .believed to be
the RMS TITANIC, in rem,

        Defendant.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION TO APPROVE ASSET PURCHASE AGREEMENT AND AUTHORIZE THE
SALE OF 100% OF RMST'S STOCK TO PREMIER ACQUISITION HOLDINGS LLC
OR OTHER QUALIFIED PURCHASER AS APPROVED BY THE BANKRUPTCY
COURT**

NOW COMES Plaintiff RMS Titanic, Inc., ("RMST"), by counsel, and respectfully

requests that the Court enter an order granting its Motion to Approve the Asset Purchase

Agreement (the "Motion") executed by Premier Exhibitions, Inc. ("Premier"), RMST and other

affiliates of Premier (collectively the "Company"), and Premier Acquisition Holdings LLC, a

Delaware limited liability company (the "Stalking Horse Purchaser") and authorizing the sale of

100% of RMST's stock to the Stalking Horse Purchaser, or such other prevailing qualified

bidder as determined by the Bankruptcy Court. In support of its Motion, RMST states as follows:

**I.      PRELIMINARY STATEMENT**

As the Court is well aware, RMST and its affiliates have been in a chapter 11 proceeding

pending before the United States Bankruptcy Court for the Middle District of Florida (the

"Bankruptcy Court") for over two years. In that time, the Company, together with its creditor

1

constituencies, considered a variety of options for restructuring the Company's obligations so that it could successfully emerge from chapter 11. Ultimately, the Company determined that a sale process was the best (and likely only) path to maximizing value for stakeholders. After an extensive marketing process and months of negotiations, RMST is pleased to report to this Court that on June 14, 2018, the Company entered into an Asset Purchase Agreement (the "APA"), with the Stalking Horse Purchaser, subject to higher and better offers as determined through a competitive bidding process in the Bankruptcy Court.

Under the APA, the Stalking Horse Purchaser will acquire 100% of the stock of RMST, along with substantially all of the other assets of the Company, in a transaction that will keep the artifacts together and provide a viable path to resolve the bankruptcy cases in a manner consistent with RMST's obligations as Trustee under the Covenants and Conditions (as defined below). Given the numerous objections raised to prior efforts to sell the Company's artifacts piecemeal in chapter 11 and the Company's deteriorating cash position after being in chapter 11 for an extended term, entry into the APA with the Stalking Horse Purchaser(to serve as a floor bid for the Debtors' auction process) was a significant achievement. The end result of the APA keeps the artifact collections together; maintains the existing conservation and curation teams; and avoids future, extensive litigation costs.

As with all bankruptcy sales outside the ordinary course of business, the transactions contemplated by the APA are subject to Bankruptcy Court approval. As further detailed below, the sale approval process in bankruptcy is a multi-step process. First, the debtor executes an asset purchase agreement. Then the debtor seeks approval of procedures for competitive bidding on the assets to be sold (referred to as "bidding procedures"). Upon approval of bidding procedures, the debtor then commences a marketing period during which it is permitted – pursuant to the

terms of the bidding procedures – to solicit "higher and better" offers for the assets to be sold. In the event one or more competing qualified bids are received timely in accordance with the bidding procedures, then the debtors will conduct an auction. At the conclusion of the auction, the debtors will designate the "highest and best" offer, and proceed to seek bankruptcy court approval of a sale to the qualified bidder submitting the highest and best offer. If the bankruptcy court approves a sale, it will then enter a sale order, which will authorize the debtors, subject to the terms of the asset purchase agreement and the sale order, to consummate the transaction.

A sale of all of RMST's stock as provided for in the APA does not implicate section VI of the Covenants and Conditions (set forth below). Nevertheless, in light of this Court's oversight of RMST, the APA requires this Court's approval of the APA and authorization for the sale of RMST's stock to the Stalking Horse Purchaser (or such other purchaser submitting a higher and better bid as determined by the Bankruptcy Court in a sale order) as a condition to closing. A hearing to consider approval of the proposed bidding procedures is scheduled with the Bankruptcy Court on July 25, 2018. The proposed bidding procedures contemplate a marketing period after approval of the bidding procedures, and then a bid deadline, auction (if necessary), and sale hearing to occur in August 2018. Likewise, the APA requires this Court's approval to be obtained by September 7, 2018.

Accordingly, RMST respectfully requests that this Court schedule a hearing for a date after the sale hearing in the Bankruptcy Court,[1] and before September 7, 2018, to consider approval of the APA and authorize the sale of 100% of RMST's stock to the Stalking Horse

---

[1] The Bankruptcy Court has scheduled a hearing for July 25, 2018, to consider approval of the proposed bidding procedures. At that hearing, RMST anticipates that the Bankruptcy Court will then set the date for the sale hearing in the Bankruptcy Court. RMST will supplement this motion, as necessary, with additional relevant information as the sale process proceeds through the Bankruptcy Court.

3

Purchaser, or such other prevailing qualified bidder as determined by the Bankruptcy Court at the sale hearing.

## II.    BACKGROUND

### A.    The Revised Covenants and Conditions.

On April 15, 2008, this Court entered an Order directing RMST to submit proposed restrictive covenants to ensure that, "the artifacts are conserved and curated in an intact collection that is available to the public and accessible for historical research, educational purposes, and scientific research, in perpetuity." *See, R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 742 F. Supp. 2d 784, 792 (E.D. Va. 2010*).* On August 12, 2010, this Court entered an Order granting RMST a salvage award in the amount of one hundred percent (100%) of the fair market value of the artifacts recovered in the 1993, 1994, 1996, 1998, 2000 and 2004 expeditions to the wreck of the RMS TITANIC. *Id.* The Court reserved the right to determine the manner in which to pay the award, and attached as Exhibit A to its August 12, 2010 Order the Revised Covenants and Conditions (the "Covenants and Conditions"), approved by the Court pursuant to its April 15, 2008 Order.

On August 15, 2011, this Court entered an Order granting RMST title to the artifacts recovered in the 1993, 1994, 1996, 1998, 2000 and 2004 salvage expeditions conducted by RMST, subject to the Covenants and Conditions. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 804 F.Supp.2d 508, 509 (E.D. Va. 2011).

### B.    The Bankruptcy.

On June 14, 2016, RMST, together with its parent company, Premier and certain of its affiliates, filed voluntary petitions for relief under chapter 11 of Title 11, 11 U.S.C., §§ 101 *et*

*seq.* in the Bankruptcy Court in Jacksonville, Florida. The Company remains in bankruptcy, and continues to operate its businesses.

Over the last two years, the Company has explored numerous options to successfully exit the bankruptcy proceedings. At the outset of the bankruptcy cases in June 2016, the Company filed a motion in the Bankruptcy Court to market and sell certain artifacts recovered by RMST in the 1987 expedition, which artifacts the Covenants and Conditions define as the "French Titanic Artifact Collection." On July 22, 2016, however, the Bankruptcy Court entered an Order denying that motion.[2]

On September 30, 2016, the Debtors retained GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), as financial advisor and investment banker to advise them in connection with their chapter 11 cases and various restructuring alternatives. The Debtors, with the assistance of GlassRatner and its other professionals, evaluated each of their various options, and engaged in extensive negotiations with the legal and financial advisors to the Official Committee of Unsecured Creditors of Premier Exhibitions, Inc. (the "Creditors Committee"), the Official Committee of Equity Holders of Premier Exhibitions, Inc. (the "Equity Committee," and together with the Creditors Committee, the "Committees"), National Oceanic Atmospheric Association ("NOAA"), and other constituents regarding a consensual resolution to the chapter 11 cases. During this time, the Company and the Committees considered all potential restructuring and liquidation options for the Companies' businesses and assets.

---

[2] RMST subsequently commenced an adversary proceeding in the Bankruptcy Court seeking a determination that the Republic of France and its government agencies have no interest in these artifacts. On September 29, 2017, the Bankruptcy Court entered a default Final Judgment in RMST's favor, granting the requested relief.

After extensive negotiations and evaluation, the Debtors and the Committees determined that a sale of all the Debtors' assets as a going concern, including the sale of the Titanic Artifacts as a whole collection, was in the best interests of the Debtors and their estates. Accordingly, in April of 2017, the Debtors and the Committees entered into a Plan Support Agreement (the "PSA") which was approved by the Bankruptcy Court on July 6, 2017. The PSA contemplated a sale of all of the Debtors' assets as a going concern after a marketing period to be conducted by the Company and GlassRatner.

As required by the PSA, the Company, through GlassRatner, marketed the Debtors' assets to potential purchasers over several months. GlassRatner conducted a far-reaching marketing campaign, contacting potential buyers and interested parties (as identified through independent research and Company and Committee contacts) across the globe. In addition, the Company retained Kekst, a well-known public relations firm, to conduct a national campaign to uncover and reach other potential buyers. From these efforts, news of the sale of the artifacts reached a global audience – the sale was featured on the Today Show, national television nightly news programs, and newspapers worldwide.

Despite receiving expressions of interest from a number of interested buyers, the Company failed to execute a definitive agreement with a stalking horse bidder within the time table originally contemplated by the PSA. The Debtors and Committees initially determined to proceed toward an auction, and filed a motion to approve a "naked auction" (*i.e.*, one without a stalking horse purchaser) process for some or all of the Debtors' artifacts on November 14, 2017. On December 15, 2017, RMST filed a Notice of Withdrawal of that motion, in response to a number of factors, including objections filed by several interested parties.

Since its withdrawal of the auction motion, the Company, with the help of its professionals and GlassRatner, continued to engage in discussions with potential buyers and other potential sources of financing to restructure the Companies' businesses. On February 25 and 26, 2018, the Company and the various interested parties, including NOAA, convened for a mediation to attempt to reach agreement on the best path forward to exit the chapter 11 cases. The mediation did not yield a formal resolution; however, the parties agreed that continued pursuit of a sale transaction was in the best interests of the Company and its estates.

The administrative costs of the Company's bankruptcy have proven to be significant, currently exceeding approximately $6 million. On May 18, 2017, the Debtors entered into a post-petition financing agreement with Bay Point Capital (the "DIP Lender") for up to $5 million (the "DIP Loan") to fund the Company's business and the administrative costs of the bankruptcy during the marketing process. The current balance of the DIP Loan exceeds $4,600,000.00, plus accrued interest in excess of $100,000.00. On May 29, 2018, the Debtors exercised an extension option extending the maturity date of the DIP Loan for one year to June 29, 2019. With its operating assets dwindling, the Company must now move quickly to exit the chapter 11 proceedings.

As of February 14, 2018, the Company's exclusive rights to propose its own chapter 11 plan under the Bankruptcy Code expired. See 11 U.S.C. § 1121. As such, any party in interest can now propose a plan to resolve the Company's bankruptcy cases. Indeed, as has been previously reported to this Court, on June 1, 2016, the Equity Committee filed a chapter 11 plan for the Company, in which the Equity Committee proposes to separate and auction off the French Titanic Artifact Collection, market and sell the Subject Titanic Artifact Collection to a Qualified

Institution (as that term is defined in the Covenant and Conditions), and then liquidate the Company. As has also previously been reported to this Court, on May 1, 2018, Euclid Claim Recovery LLC ("Euclid") – a claims trader that holds less than $30,000 in claims that it acquired after the bankruptcy filing – filed a motion in the Bankruptcy Court seeking appointment of a chapter 11 trustee for the Company to pursue "an auction-house sale of individual French Artifacts." The Bankruptcy Court held a hearing on Euclid's motion on June 7, 2018, and has taken the matter under advisement.

C.    The Stalking Horse Purchaser and Asset Purchase Agreement.

After considering numerous alternatives and extensive arms-length negotiations with various potential buyers, lenders, and investors, the Company, in consultation with its professionals and advisers, negotiated the proposed sale of the Transferred Assets (as defined in the APA, and which includes 100% of the stock of RMST) to the Stalking Horse Purchaser. The Stalking Horse Purchaser is an entity formed by affiliates of or funds managed by Apollo Global Management, LLC ("Apollo"), Alta Fundamental Advisers LLC ("Alta"), Pacbridge Capital Partners (HK) Ltd. ("Pacbridge"), and the Debtors' secured lenders, Haiping Zou, Jihe Zhang, and Lange Feng (collectively the "Secured Lenders"). Collectively, the Secured Lenders own 2,232,143 shares of Premier's common stock;[3] funds managed by Alta own 1,057,624 shares of Premier's common stock, and funds managed by Apollo own 463,038 shares of Premier's common stock. Thus, the ultimate equity holders (or affiliates thereof) of the Stalking Horse Purchaser hold a total of 3,752,805 shares of Premier's common stock, or approximately 40% of the issued and outstanding shares of Premier's common stock on a fully diluted basis.

---

[3] Secured Lender Haiping Zou owns his shares of Premier common stock through High Nature Holdings, Ltd.

On June 14, 2018, the Stalking Horse Purchaser and the Company executed the APA. *See*, Exhibit A, attached hereto. The APA results from extensive negotiations involving complex issues of bankruptcy law, admiralty law, Canadian law and other issues related to the unique nature of the assets to be transferred, in addition to those issues commonly arising in a more traditional M&A transaction or bankruptcy Section 363 sale.

The APA sets forth a strict timeline for a successful closing, as is necessary given the Debtors' liquidity position. The APA was filed with the Bankruptcy Court in conjunction with Debtors' Motion for Entry of an Order Approving Competitive Bidding and Sale Procedures. *See*, Exhibit B, attached hereto. As it relates to RMST and the artifacts, that motion seeks entry of an order from the Bankruptcy Court:

a) approving the Bidding Procedures establishing the competitive bidding and auction procedures in connection with the sale;

b) approving the form of the APA;

c) scheduling (i) an auction (if one or more competing Qualified Bids (as defined in the Bidding Procedures)) are received by the Company in accordance with the Bidding Procedures and (ii) a hearing to consider the results of the auction (if any), and approval of the Sale;

d) approving the form and manner of notice of the Auction and sale hearing; and

e) authorizing the sale to the Stalking Horse Purchaser or such other party that is the successful bidder at the auction, free and clear of all liens, interests, claims and encumbrances.

The Bidding Procedures set forth the terms and conditions under which qualified

competing bidders may bid on the Transferred Assets, and require the Company to consider higher

and better offers submitted in accordance with the Bidding Procedures.

### D.      The APA Requires Sale Approval by this Court.

Under the APA, the Stalking Horse Purchaser will acquire 100% of the stock of RMST,

and RMST will be a wholly-owned subsidiary of the Stalking Horse Purchaser.[4]  The APA

requires that this Court enter an Order on or before September 7, 2018, approving the

transactions contemplated by the APA as to RMST.

## III.   ARGUMENT

### A.      The Sale of RMST Stock to the Stalking Horse Purchaser Does Not Implicate Section VI of the Covenants and Conditions.

Section VI of the Covenants and Conditions provides for the Protection of the Subject

Titanic Artifact Collection (the "STAC") in the event of its sale, and sets forth the requirements

for the designation of Subsequent Trustees. Section VI.A states, in relevant part, the STAC,

"may not be sold, transferred, assigned, or otherwise be the subject of a commercial transaction,

except as approved by the Court." Under the APA, the Stalking Horse Purchaser will acquire

100% of the stock of RMST, and RMST will be a wholly-owned subsidiary of the Stalking

Horse Purchaser.  The proposed transaction does not implicate the STAC in a commercial

transaction, as the STAC will not be sold, transferred, or assigned. RMST will continue to own

the STAC and be subject to the Covenants and Conditions. Accordingly, the APA does not

implicate Section VI.A of the Covenants and Conditions.

---

[4] In most typical bankruptcy cases, a stalking horse purchaser in a sale under Section 363 of the Bankruptcy Code (11 U.S.C. § 363) would seek to acquire assets – not stock – of a debtor. Given the unique nature of RMST's assets, and in order to ensure RMST remains in compliance with the Covenants and Conditions (as discussed below), the Stalking Horse Purchaser agreed, subject to the terms of the APA and this Court's approval, to purchase 100% of the stock of RMST, instead of its assets.

Section VI.E.1 of the Covenants and Conditions further underscores this point, as the APA does not require the appointment of a Subsequent Trustee. Section VI.E.1 states that Section VI, "does not apply, however, in situations where the corporate identity of the Trustee is changed or altered by sale, purchase, merger, acquisition, or similar transaction, the form and purpose of which does not effectuate a change in the management, conservation and curation of the STAC. As set forth in Section III.B., *infra*, the transaction contemplated by the APA *will not change the management, conservation and curation of the STAC*. Accordingly, the Covenants and Conditions do not require approval of the transaction by this Court.

In this respect, and as it relates to the Covenants and Conditions and RMST, the transactions contemplated by the APA are somewhat analogous to the merger transaction in November 2015, in which Premier Exhibitions, Inc. merged with DinoKing Tech, Inc. ("DinoKing"). In that merger, new directors and officers assumed management of the Company, but RMST remained the Trustee of the STAC, and the merger did not change the management, conservation and curation of the STAC.[5]

Similarly, the APA requires the Stalking Horse Purchaser to purchase 100% of the stock of RMST. RMST will remain the Trustee of the STAC and will continue to fulfill the requirements to serve as Trustee, and no Subsequent Trustee will be designated. Thus, the terms of the Covenants and Conditions do not require this Court's approval of the transactions provided for in the APA. Nevertheless, the Stalking Horse Purchaser has required, as a condition to closing under the APA, that this Court approve the transactions contemplated by the APA.

---

[5] Because the Covenants and Conditions did not require this Court's approval of that transaction, the Company did not seek or obtain such approval, but timely apprised the Court of it.

**B.     The APA Will Not Effectuate a Change in the Management, Conservation and Curation of the STAC, and RMST will Continue to Comply with the Covenants and Conditions.**

The Stalking Horse Purchaser is an entity formed under the laws of the State of Delaware. *See*, Exhibit C, attached hereto   Pursuant to the transactions contemplated by the APA, RMST will continue to be a corporation organized under the laws of Florida, and will remain subject to the personal jurisdiction of this Court. Insofar as the Stalking Horse Purchaser will be acquiring its stock, RMST will continue to be the Trustee of the STAC, and this transaction will not require the designation of a Subsequent Trustee, nor the due diligence or assurances associated with the designation of a Subsequent Trustee.

The transaction will not change the corporate structure of RMST as Trustee, nor effectuate a change in the management, conservation and curation of the STAC. In the event the transaction closes, RMST will continue to be bound by the Covenants and Conditions. Consistent with its obligations thereunder, RMST will continue to: serve as salvor in possession of the wreck; employ Ms. Alex Klingelhofer and her curation team; store and treat the artifacts in its "lab" and warehouse in Atlanta; employ its team of exhibition experts; and exhibit the artifacts in the Company's permanent and traveling exhibitions. RMST also expects to conduct future expeditions to the wreck site (perhaps as soon as summer 2019), and intends to continue to engage Dr. Dave Gallo, a world-renowned oceanographer, to lead its maritime team. In short, nothing under the APA contemplates any change with regard to RMST's care and use of the artifacts, and duties as salvor. The only impact the APA has on RMST is that, upon closing, RMST will have a new parent company.[6] As required by the Covenants and Conditions, RMST will remain subject to the personal jurisdiction of this Court.

---

[6] But even in that regard, the Stalking Horse Purchaser's ultimate equity owners (or affiliates thereof) already currently hold approximately 40% of Premier's common stock. If the transactions contemplated by the APA close,

C.     **The Stalking Horse Purchaser Will Provide Stability, Capitalization and Necessary Resources for RMST to Fulfill its Obligations Under the Covenants and Conditions.**

As noted above, the Stalking Horse Purchaser is an acquisition entity formed by Premier's secured lenders and funds managed by or affiliates of entities that collectively own approximately 40% of Premier's common stock. The ultimate equity holders of the Stalking Horse Purchaser are well-capitalized, prominent financial institutions and have the resources necessary to ensure that RMST can continue to comply with its obligations under the Covenants and Conditions.

The Stalking Horse Purchaser intends to retain all the Company's employees, and also plans to add to the team and implement a succession plan to ensure a seamless transition for the curation and exhibition teams. The directors of the new ownership entity will be identified and their biographies provided to the Court after the Bankruptcy Court's approval of the final transaction.

D.     **The Bidding Procedures Permit a Sale to Another Qualified Bidder Submitting a Higher and Better Offer, Subject to Approval of Both the Bankruptcy Court and this Court.**

As is customary in sales pursuant to Section 363 of the Bankruptcy Code, the APA requires Bankruptcy Court approval of competitive bidding and auction procedures in connection with the sale of the Transferred Assets. The requirements of the proposed Bidding Procedures (a copy of which is attached hereto as Exhibit D) provide that any competing transaction be on substantially similar, the same, or better terms as the APA, and that any competing transaction propose to buy substantially all of the Transferred Assets (including the stock of RMST). Accordingly, should Premier accept and the Bankruptcy Court approve a competing bid pursuant

---

those existing equity owners will then own 100% of the equity of RMST's parent company. The APA and exhibits thereto also contemplate that upon or shortly after closing, RMST's bankruptcy case will be dismissed.

13

to the Bidding Procedures, such competing transaction would likewise be subject to the approval of this Court.[7]

**E.    The APA Reflects the Best Option for the Company to Successfully Exit the Chapter 11 Cases.**

After more than two years in bankruptcy, the Company now has a viable path toward financial stability through a sale to the Stalking Horse Purchaser. As previously expressed to and recognized by this Court, given the Company's financial condition, time is of the essence in closing a transaction, and a material delay in the above timeline could jeopardize the transaction, resulting in a potential liquidation.

## IV.    CONCLUSION

For the foregoing reasons, RMST respectfully requests that the Court (a) schedule a hearing for a date after the sale hearing in the Bankruptcy Court and before September 7, 2018, to consider approval of the APA and authorize the sale of 100% of RMST's stock to the Stalking Horse Purchaser, or such other prevailing qualified bidder as determined by the Bankruptcy Court at the sale hearing; (b) grant its Motion to Approve the Asset Purchase Agreement; (c) authorize the sale of 100% of RMST's stock to the Stalking Horse Purchaser or such other prevailing qualified bidder as determined by the Bankruptcy Court at the sale hearing; and (d) grant such other related relief as the Court deems appropriate.

Respectfully submitted,

R.M.S. TITANIC, INC.

By Counsel

---

[7] Given the nature of the competitive bidding process in the Bankruptcy Court, as set forth in the Bidding Procedures, the Company may supplement this motion after the auction and sale hearing in the Bankruptcy Court, to provide any additional information that may be relevant to this Court which may arise out of the Bankruptcy Court sale process.

Counsel:

_Robert W McFarland_

Robert W. McFarland (VSB #24021)
McGuireWoods LLP
9000 World Trade Center
Norfolk, VA  23510
Tele: 757/640-3716
Fax: 757/640-3966
Email: rmcfarland@mcguirewoods.com

Brian A. Wainger (VSB #38476)
Kaleo Legal
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tele: 757/965-6804
Fax: 757/304-6175
Email: bwainger@kaleolegal.com

## CERTIFICATION

I hereby certify that a copy of the foregoing has been delivered to Kent Porter Esq., U.S. Attorney's Office, 8000 World Trade Center, Norfolk, VA 23510, this 29ᵗʰ day of June, 2018.

_____
Robert W. McFarland (VSB #24021)
McGuireWoods LLP
9000 World Trade Center
Norfolk, VA  23510
Tele: 757/640-3716
Fax: 757/640-3966
Email: rmcfarland@mcguirewoods.com

104020898_1