# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

       Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

---

## DISCLOSURE STATEMENT TO ACCOMPANY CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF <u>EQUITY SECURITY HOLDERS OF PREMIER EXHIBITIONS, INC.</u>

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

45353982;2

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION. ............................................................................................................. 1

    A.  Commencement of the Bankruptcy Cases. .......................................................... 1

    B.  Corporate Structure. ............................................................................................ 1

    C.  The Equity Committee's Liquidating Plan and this Disclosure Statement ............ 2

    D.  Purpose of this Document. ................................................................................... 3

    E.  Voting Classes. .................................................................................................... 4

    F.  Balloting. ............................................................................................................. 4

    G.  Deadlines for Voting and Objecting to the Plan; Confirmation Hearing
        Date. .................................................................................................................... 5

    H.  Additional Information. ....................................................................................... 5

    I.  Disclaimer. .......................................................................................................... 6

    J.  Overview of the Plan. .......................................................................................... 7

    K.  Recommendation. ................................................................................................ 8

II.  BACKGROUND. ............................................................................................................ 8

    A.  The French Artifacts, the American Artifacts and the Covenants and
        Conditions. ........................................................................................................... 8

    B.  The Debtors' Motion to Sell the French Artifacts. ............................................... 9

    C.  Plan Discussions and Proposals. ........................................................................ 10

    D.  Plan Mediation. .................................................................................................. 12

    E.  Use of Cash Collateral and Debtor-in-Possession Financing. .............................. 13

    F.  Debtor-in-Possession Administration. ................................................................ 14

III.  THE PLAN. ................................................................................................................... 15

    A.  Plan Overview ................................................................................................... 15

B.      Limited Consolidation for Voting, Confirmation, and Distribution Purposes. .......................................................................................... 17

C.      Implementation of the Plan. ....................................................................... 17

D.      Summary of Certain Other Provisions of the Plan. ................................... 21

E.      Executory Contracts and Unexpired Leases. ............................................. 22

F.      Claims Allowance Process. ........................................................................ 25

G.      Distributions. .............................................................................................. 26

H.      Effectiveness of Plan. ................................................................................. 28

I.      Retention of Jurisdiction. ........................................................................... 28

J.      Limitation of Liability, Releases and Injunction. ...................................... 30

K.      Revocation or Withdrawal of the Plan. ..................................................... 32

L.      Modification of the Plan. ........................................................................... 32

M.      Payment of Statutory Fees. ........................................................................ 33

N.      Governing Law. .......................................................................................... 33

O.      Withholding, Reporting, and Payment of Taxes. ...................................... 33

IV.     CONFIRMATION PROCEDURE. ........................................................................ 34

A.      Voting; Acceptance. ................................................................................... 34

B.      Confirmation Hearing. ............................................................................... 35

C.      Feasibility. .................................................................................................. 37

D.      Best Interest Test. ....................................................................................... 38

V.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN. ..................................................................................................................... 39

VI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES. ................................. 39

A.      Introduction. ............................................................................................... 39

B.      Consequences to the Debtor. ...................................................................... 40

45353982;2

      C.     Consequences to Holders of Allowed Class 3 Claims and Class 4 Premier Interests. .................................................................................................................. 41

VII.   FEES AND EXPENSES. ................................................................................................ 49

VIII.  SUMMARY OF ADDITIONAL SOURCES OF INFORMATION. .............................. 49

IX.    RECOMMENDATION AND CONCLUSION. ............................................................... 50

45353982;2

## I.     INTRODUCTION.

### A.     Commencement of the Bankruptcy Cases.

On June 14, 2016 ("Petition Date")[2], voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, as amended ("Bankruptcy Code"), were filed in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division ("Bankruptcy Court") for each of the following (collectively "Debtors" and each a "Debtor"):  Premier Exhibitions, Inc. (Case No. 3:16-bk-02232-PMG) ("Premier"); RMS Titanic, Inc. (Case No. 3:16-bk-02230-PMG) ("RMST");     Premier  Exhibitions  Management,  LLC  (Case  No.  3:16-bk-02233-PMG) ("Exhibitions Management"); Arts and Exhibitions International, LLC (Case No. 3:16-bk-02238-PMG)  ("AEI");  Premier  Exhibitions  International,  LLC  (Case  No.  3:16-bk-02234-PMG ) ("Exhibitions International"); Premier Exhibitions NYC, Inc. (Case No. 3:16-bk-02235-PMG) ("Exhibitions  NYC");  Premier  Merchandising,  LLC  (Case  No.  3:16-bk-02236-PMG) ("Merchandising"); and Dinosaurs Unearthed Corp. (Case No. 3:16-bk-02237-PMG) ("DUC").

On July 22, 2016, the Bankruptcy Court entered its order that the Debtors' Chapter 11 cases (collectively "Cases" and each a "Case") be jointly administered under RMST's Case, Case No. 3:16-bk-02230-PMG.  The Debtors have operated as debtors-in-possession since the Petition Date. No trustee or examiner has been appointed in the Debtors' Cases.   On August 24, 2016, the Acting United States Trustee for Region 21, acting pursuant to Bankruptcy Code section 1102(a), appointed an Official Committee of Unsecured Creditors ("Creditors Committee") and an Official Committee of Equity Security Holders  ("Equity Committee" and, together with the Creditors Committee, the "Committees") to serve in the Debtors' consolidated Cases.

### B.     Corporate Structure.

All of the Debtors are direct or indirect subsidiaries of Premier.  Premier is also the direct or indirect parent of additional entities that did not seek relief under the Bankruptcy Code, specifically: 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British

---

[2] All capitalized terms used but not defined herein shall bear the same meaning as ascribed to them in the Plan.

Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd., all of which collectively, together with the Debtors, are referred in this Disclosure Statement and in the Plan as the "Premier Entities." An organizational chart of the Premier Entities is attached hereto as Exhibit __.

### C. The Equity Committee's Liquidating Plan and this Disclosure Statement.

This document is the *Equity Committee's Disclosure Statement to Accompany Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders* (the "Disclosure Statement") in the Debtors' Cases. The purpose of the Disclosure Statement is to describe the Equity Committee's concurrently-filed *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders* of Premier Exhibitions, Inc. (along with any amendments, supplements, or exhibits hereto, collectively, the "Plan").

In its First Day Pleadings, Premier stated that its reason for filing the bankruptcy cases was to sell a handful of the artifacts salvaged from the wreck of the *H.M.S. Titanic* that are the principal assets of the Debtors' Estates, pay off its creditors, and emerge from chapter 11 expeditiously. That has not happened. In nearly two years after the Debtors commenced these Cases, the Debtors have been unable to successfully sell any assets or to successfully propose a Chapter 11 plan, despite extensions of the period in which the Debtors exclusively may propose and solicit acceptances for such a plan and the cooperation and support of the Equity Committee and the Official Committee of General Unsecured Creditors (the "Creditors Committee"). The statutory period of plan exclusivity expired on February 8, 2018. The Equity Committee is proposing its Plan in order to bring these Cases to a conclusion in a manner that the Equity Committee believes is in the best interest of the Debtors, their Estates and all having an interest in them.

The Plan further provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's Assets, including all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under

Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein.

As set forth in more detail below, the Equity Committee's Plan provides for continued operation of the Debtors by a Chief Restructuring Officer pending liquidation of the Estate's assets, marketing and sale of the American Artifacts to a Qualified Institution as defined in, and in a manner consistent with certain Covenants and Conditions described more specifically below, and the marketing and sale by auction[3] of the artifacts salvaged from the wreck of the R.M.S. Titanic that are generally referred to as the "French Artifacts", with such sale processes commencing on the Effective Date of the Plan.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of allowed claims and interests of the proceeds of the sale of the French Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's administration of the assets of the Liquidating Trust, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust assets.

### D.   Purpose of this Document.

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims as a part of the proceedings seeking confirmation of the Plan.  It sets forth, among other things, information concerning the Debtors, their Chapter 11 Cases, the events that have taken place during the Cases, and the Plan.  Its purpose is to provide the Holders of impaired Claims and Interests adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan.  Each Holder of an impaired Claim and Interest should read this Disclosure Statement and the Plan in their entirety and consider them fully.  No person has been authorized by the Equity Committee or the Bankruptcy Court to utilize, for purposes of solicitation, any information other than the information contained or referred to herein.

---

[3] Guernsey's, a Division of Barlan Enterprises, Ltd, will be retained as auction house to conduct an auction of the French Artifacts.  For further information on Guernsey's, see www.guernseys.com.

E.      <u>Voting Classes.</u>

There are two voting Classes under the Plan – Class 3 Claims and Class 4 Premier Equity Interests.  The Plan proposes to pay all Allowed Claims in Classes 1 and 2 in full on the Effective Date of the Plan, with the result that the Holders of Claims in those Classes are unimpaired, are conclusively deemed to have accepted the Plan, and are not entitled to vote on the Plan.  The Plan proposes to cancel Class 5 Intercompany Claims, and such Claims are conclusively deemed to reject the Plan, and also are not entitled to vote.   As a result, only Class 3 Claims and Class 4 Premier Equity Interests are impaired and entitled to vote on the Plan.

The Bankruptcy Code defines "acceptance" (i) with respect to a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class, and (ii) with respect to an impaired class of interests if the Holders of at least two-thirds in dollar amount of the interests actually voting in each such Class have voted to accept the Plan, in each case counting only those holders who cast Ballots (as defined below).

**THE EQUITY COMMITTEE BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS.  THE EQUITY COMMITTEE THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS AND INTERESTS VOTE TO ACCEPT THE PLAN.**

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section IV of this Disclosure Statement entitled "Confirmation Procedure."

F.      <u>Balloting.</u>

**TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT.**

45353982;2

**PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.**

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Equity Committee's Ballot Tabulator, Jennifer Meehan, at jennifer.meehan@akerman.com.

After carefully reviewing this Disclosure Statement and the Equity Committee's Plan, including the respective exhibits, the Holders of Claims in Class 3 and Premier Interests in Class 4 should decide whether to accept or reject the Plan and should indicate that Holder's vote on the enclosed Ballot and return it in a timely manner in the envelope provided.

G.      **Deadlines for Voting and Objecting to the Plan; Confirmation Hearing Date.**

Pursuant to the entered order of the Bankruptcy Court approving this Disclosure Statement (Docket No. ____) (the "Disclosure Statement Order"), in order to be counted, a Ballot must be delivered to and received by the Balloting Agent (as that term is hereinafter defined), in accordance with the procedures set forth therein, on or before 5:00 p.m. Prevailing Eastern Time on _____, 2018. The Disclosure Statement Order sets _____, 2018 as the last day on which written objections to confirmation of the Plan (if any) must be filed. A hearing in the Bankruptcy Court to consider final approval of this Disclosure Statement and confirmation of the Plan has been set for _:__ _.m. on _____ __, 2018.

H.      **Additional Information.**

Attached as Exhibits to this Disclosure Statement are copies of the following:

1.      The Equity Committee Plan (Exhibit 1);

2.      Hypothetical Chapter 7 Liquidation Analysis (Exhibit 2);

45353982;2

3.      Premier Exhibitions, Inc., Corporate Organizational Chart (Exhibit 3); and

4.      The Declaration of Arlan Ettinger in Support of the Retention of Guernsey's to Sell the French Artifacts (Exhibit 4).

In conjunction with the approval of this Disclosure Statement by the Bankruptcy Court, the Equity Committee will obtain approval to distribute to each Holder of an Allowed Claim and Allowed Interest in the Voting Classes, the form of ballot for casting an acceptance or rejection of the Plan (the "Ballot").

## I.      Disclaimer.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE EQUITY COMMITTEE OR BY ANY OF ITS ADVISORS.  NOR HAS THE EQUITY COMMITTEE OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE EQUITY COMMITTEE FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE EQUITY COMMITTEE'S KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE EQUITY COMMITTEE FOR PURPOSES OF ANY LITIGATION AGAINST THE EQUITY COMMITTEE.

ALTHOUGH THE EQUITY COMMITTEE'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTORS,

45353982;2

**THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.**

**J.**     <u>**Overview of the Plan.**</u>

**THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A.  IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.**

The Plan provides for the Liquidating Trustee to offer the American Artifacts for sale only to potential bidders that are Qualified Institutions, as defined in the Covenants, to serve as the subsequent trustee and subsequent salvor-in-possession of the American Artifacts under the Covenants.  Any transfer of the American Artifacts to a successor trustee and salvor shall be subject to approval of the District Court and shall be made only on notice to NOAA and all other parties entitled to notice in the US Artifacts Litigation.   The CRO shall manage and administer the American Artifacts consistent with the Covenants pending disposition of the American Artifacts by the Liquidating Trustee.

The Plan also provides for the marketing and sale by auction, run by Guernsey's, of the French Artifacts, with such sale process commencing on the Effective Date of the Plan.

The Plan further provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein.  The Liquidating Trustee also will market and sell the remaining assets of the Estate either as going concerns or as individual assets.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of allowed claims and interests of the proceeds of the sale of the American Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's administration of the assets of the Liquidating Trust, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust assets.

K.    **Recommendation.**

The Equity Committee believes that the Plan is in the best interests of all Holders of Claims and Interests.

**ACCORDINGLY, THE EQUITY COMMITTEE RECOMMENDS THAT THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ACCEPT THE PLAN.**

II.    **BACKGROUND.**

A.    **The French Artifacts, the American Artifacts and the Covenants and Conditions.**

The Debtors' predecessor in interest, Titanic Ventures Limited Partnership, a predecessor in interest to RMST (the "Company"), with the assistance of the Institut Francais de Recherche Pour l'Exploitation de la Mer ("INFREMER"), the French government's oceanographic institute, conducted a joint expedition to the wreck of the RMS Titanic in 1987. Over the course of 32 dives during that expedition, recovered in excess of 2,100 artifacts from the Titanic wreck site (the "French Artifacts" or the "French Collection"). The Company took the French Artifacts to France for conservation and restoration. On October 20, 1993, an Administrator in the French Office of Maritime Affairs (Ministry of Equipment, Transportation and Tourism) awarded the Company title to the French Artifacts. *See*, *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel etc.*, 435 F.3d 521, 524 (4th Cir. 2006). The Administrator's decision noted assurances made by the Company that it "agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition." *See id*. at 528.

In 1993, RMST conducted an additional research and recovery expedition to the wreck of the Titanic, and on August 26, 1993, commenced an in rem action in the United States District Court for the Eastern District of Virginia (the "District Court") against the artifacts recovered in the 1993 expedition, and the wreck itself. *Id*. A few months later, the District Court entered an

45353982;2

Order which assumed in rem jurisdiction over the artifacts recovered by the Company in 1993, as well as the wreck itself, and declared the Company to be the salvor-in-possession of the wreck and wreck site. *Id.* RMST remains salvor-in-possession of the Titanic wreck site today.

RMST conducted further salvage operations at the Titanic wreck site in 1994, 1996, 1998, 2000, and 2004 and recovered over 3000 additional artifacts (the artifacts recovered in 1993, 1994, 1996, 1998, 2000, and 2004 are referred to as the "American Artifacts").

The American Artifacts are held by RMST in trust as salvor-in-possession subject to Covenants and Conditions ("Covenants") as ordered by the District Court in 2010.[4]  The District Court granted RMST a salvage award of $110,859,200, which the Court found to be the appropriate approximate value of the American Artifact Collection.  *Id.*  Any transfer of RMST's rights in the American Artifacts is subject to the Covenants and the approval of the District Court.

However, the Fourth Circuit Court of Appeals has ruled that United States courts, including the District Court, do not have jurisdiction over the French Artifacts.[5]  The District Court has repeatedly stated on the record that it does not have jurisdiction over the French Artifacts.

By contrast, the Bankruptcy Court does have jurisdiction over the French Artifacts as property of the estate under Bankruptcy Code § 541(a), and can authorize their sale under Bankruptcy Code § 363 or the Plan.

### B.      The Debtors' Motion to Sell the French Artifacts.

On June 20, 2016, Premier filed the *Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105 And 363 And Bankruptcy Rules 6003, 6004, And 9014 Authorizing The Debtors To Market And Sell Certain Titanic Artifacts Free And Clear Of Liens, Claims, And Interests* (Docket No. 28) (the "French Artifacts Sale Motion").

The French Artifact Sale Motion did not identify specific property to be sold, did not state the time and place for the sale, did not state any procedures for potential purchasers to bid for the

---

[4]*See RMS Titanic v Wrecked and Abandoned Vessel etc.*, 742 F. Supp. 2d 784 (E.D. Va. 2010).

[5]*See RMS Titanic v Wrecked and Abandoned Vessel etc.,* 435 F. 3d 521 (4th Cir. 2006).

artifacts, did not state the price for which the assets would be sold, and did not identify any buyers for the assets. Rather, what Premier filed as a "sale motion" was in effect a request for an advisory opinion that Premier had the authority to sell French artifacts – effectively a quiet title action for declaratory relief.

The Justice Department on behalf of the National Oceanographic and Atmospheric Administration ("NOAA") and the Office of the U.S. Trustee both objected to the French Artifact Sale Motion. In their objections, each noted, among other things, that Premier had failed to provide France with notice of the sale motion under which the French Artifacts were to be sold in Bankruptcy Court. NOAA and the U.S. Trustee also argued that the relief requested by Premier was actually declaratory relief, which could only be granted in an adversary proceeding in which France would have an opportunity to defend any interest it might have in the French artifacts.

The Bankruptcy Court agreed and, by order entered July 22, 2016, denied the French Artifacts Sale Motion with leave to re-file if and when Premier obtained a judgment in an adversary proceeding that France had no interest in the French artifacts. On August 17, 2016, the Debtors filed the adversary proceeding that was required in order to quiet title to the French Artifacts, *RMS Titanic, Inc. v. The French Republic*, Adv. Pro. No. 3:16-ap-00183-PMG ("RMST v France"). It was not until 13 months later, on September 29, 2017, that the Court finally ruled in favor of the Debtors in RMST v. France, holding that France did not have any interest in the French Artifacts. See *RMST v France, Final Default Judgment*, Docket No. 67.

### C.    Plan Discussions and Proposals.

In February 2017, the Debtors met with the Equity Committee for the first time to discuss a consensual reorganization plan. At that time, the Debtors' preference remained to sell certain assets and emerge from Chapter 11 as an on-going business. The Debtors drafted and distributed to potential purchasers of the Debtors or their assets solicitation material in which the Debtors stated their intention to obtain exit financing in the amount of $22.5 million that would be used to pay approximately $12 million in general unsecured claims and about $3.5 million in prepetition secured claims. Another $3 million to $5 million would be used to pay chapter 11 expenses. After

payment of loan fees and interest, including establishment of an interest reserve, approximately $475,000 would have been available for working capital.

The Equity Committee opposed that proposal because, among other reasons, it would leave the Debtor with more debt than when it entered Chapter 11, and also would have converted all of its unsecured prepetition debt to secured debt, encumbering substantially all of the Debtors' assets for a loan of only $22.5 million.   GlassRatner Advisory & Capital Group LLC ("GlassRatner"), which is employed as financial advisor to Debtors in their Cases, also projected that the Debtors would not be able to repay the exit facility out of cash flow from operations but would have required a post-confirmation liquidity event to repay the loan.  Faced with opposition from both official committees, the Debtors ultimately abandoned their plans for an exit facility.

The Debtors and the Committees began negotiating a consensual plan in earnest after the Debtors abandoned their plan for the exit financing facility.   These negotiations resulted in the Committees and the Debtors entering into a Plan Support Agreement (the "PSA") that was approved by Order of the Bankruptcy Court entered on July 6, 2017.  A copy of the PSA is attached as Exhibit 1 to the *Order Authorizing The Debtors, The Official Committee  Of Unsecured Creditors And The Official Committee Of Equity Security Holders To Enter Into And Perform Their Obligations Under A Plan Support Agreement*, Docket No. 642.

Under the PSA, the Debtors and the Committees agreed that the Debtors would conduct a sale process under which they would pursue a sale of (a) the entire company, (b) RMST and/or the artifact collection, or (c) the other operating companies among the Premier Entities.

GlassRatner conducted the sale for the Debtors.  GlassRatner reported that they contacted 126 parties, of which 26 parties entered into non-disclosure agreements with the Debtors (each, an "NDA") and received a solicitation package from GlassRatner.  Ten of those parties who executed NDAs conducted due diligence in a data room maintained by GlassRatner.  By the deadline for

submission of proposals, July 31, 2017, only five of these submitted letters of intent.[6]  These finalists were invited to bid for position as stalking horse bidder in a second round of solicitation with bids due in October 2017.   In the end, no proposal was received that qualified as a stalking horse bid.

The Debtors then embarked upon a sale process without a stalking horse and on or about December 14, 2017,  filed a second sale motion, *Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Bid Protections; and (VI) Granting Related Relief*, (the "Second Sale Motion") (Docket No. 811), under which the Debtors proposed a bulk sale of their assets at a "naked" auction.  At the same time the Debtors filed the *Debtors Joint Plan under Chapter 11 of the Bankruptcy Code* (the "Debtors' Plan") (Docket No. 859) which contemplated completion of the sale proposed by the Second Sale Motion.  Ultimately, the Debtors withdrew both the Second Sale Motion (Docket No. 863) and the Debtors' Plan (Docket No. 944).  As of the date of the filing of this Disclosure Statement, the Debtors have not filed a new Chapter 11 plan or  a new Sale Motion, although they continue to negotiate for the sale of the Debtors or their assets.

### D.    Plan Mediation.

In January 2018, the Debtors and the Committees met and agreed to pursue mediation to resolve the Debtors' Cases (the "Plan Mediation").   On February 26 and 27, 2018, mediation was held in Atlanta, Georgia, with Edward Dobbs as mediator.  Over two days the parties to the mediation met but were unable to reach agreement on a consensual Chapter 11 plan or other exit strategy.  The mediation closed without resolution and the Debtors re-embarked upon a process to sell the Debtors or their assets.

---

[6] The proposals, including letters of intent, received from various potential purchasers of estate assets were submitted in confidence.  Accordingly, the Equity Committee is disclosing the results of the Debtors' marketing efforts, but not the specifics of any proposals received by the Debtors.

45353982;2

E.      **Use of Cash Collateral and Debtor-in-Possession Financing.**

Lang Feng, Haiping Zou and Jihe Zhang (collectively, the "Lenders") assert liens on the assets, including cash collateral, of Debtors Premier, Premier Exhibitions Management, Premier Merchandising, and RMST in connection with a pre-petition loan in the original principal amount of $3,000,000 (the "Lenders' Loan"). The Equity Committee disputes whether the Lenders' Loan is secured and asserts that any security interest that may secure the Lenders' Loan may be avoidable under Chapter 5 of the Bankruptcy Code, but has consented to the Debtors use of the alleged cash collateral of the Lenders pursuant to an Order of the Bankruptcy Court (Docket No. 532) authorizing such use (the "Cash Collateral Order"). Under the terms of the Cash Collateral Order, the Lenders are granted a replacement lien on all alleged cash collateral of the Lenders to the same extent, validity and priority as the security interests asserted by the Lenders as of the Petition Date.

On May 18, 2017, the Debtors filed their *Motion for Entry of Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors* (Docket No. 588) (the "DIP Financing Motion"). The DIP Financing Motion sought authority of the Bankruptcy Court for the Debtors to enter into a post-petition loan agreement with Bay Point Capital Partners LP (the "DIP Lender") to obtain debtor-in-possession financing in an amount of up to $5,000,000 in principal amount (the "DIP Loan") upon terms set forth in the DIP Loan agreements. On July 12, 2017, the Bankruptcy Court entered its order granting the DIP Financing Motion (Docket No. 650).

The DIP Loan, *inter alia,* bears an interest rate of 13% per annum and a default interest rate of 18% per annum. It is secured by first priority liens on all assets of the Debtors' Estates, except for avoidance actions under Chapter 5 of the Bankruptcy Code. As of the date of this Disclosure Statement, the Equity Committee is informed that there remains approximately $400,000 in credit available to the Debtors under the DIP Loan. The DIP Loan has been extended to May 2019.

F.    **Debtor-in-Possession Administration.**

1.    Retention of Professionals.

During the course of the Chapter 11 Cases, the Debtors and the Committees sought and obtained orders of the Bankruptcy Court authorizing the employment of various professionals. The identities of such professionals, when each was employed and for what purpose, and the order of the Bankruptcy Court authorizing such employment may be summarized as follows:

a.    *Debtors' Professionals*

- Nelson Mullins Reilly & Scarborough LLP – general bankruptcy counsel.  Order entered August 11, 2016 (Docket No. 128).

- Kaleo Legal – special litigation counsel.  Order entered August 15, 2016 (Docket No. 132).

- McGuireWoods LLP – special litigation counsel.  Order entered on August 15, 2016 (Docket No. 133).

- GlassRatner – financial advisor.  Order entered on December 8, 2016 (Docket No. 372).

- Troutman Sanders LLP – co-counsel for the Debtors.  Order entered on December 16, 2016 (Docket No. 378).

- Carr, Riggs & Ingram – tax advisor.  Order entered on June 26, 2017 (Docket No. 604).

b.    *Creditors Committee's Professionals*

- Storch Amini & Munves PC – general bankruptcy counsel.  Order entered on October 3, 2016 (Docket No. 249).

- Thames Markey & Heekin, P.A. – local counsel.  Order entered on October 3, 2016 (Docket No. 248).

c.    *Equity Committee's Professionals*

- Akerman LLP – general bankruptcy counsel.  Order entered on October 13, 2016 (Docket No. 274).

- Landau Gottfried & Berger LLP – general bankruptcy counsel.  Order entered on October 14, 2016 (Docket No. 277).
- Teneo Securities LLC ("Teneo") – financial advisor.  Order entered on December 8, 2016 (Docket No. 371).[7]
- Lincoln Partners Advisors LLC ("Lincoln") – financial advisor.[8]  Order entered on July 13, 2017 (Docket No. 652).
- Agentis PLLC—special litigation counsel.  Order entered on May 29, 2018 (Docket No. 1038).

## III.    THE PLAN.

**THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.   THE PLAN IS ATTACHED HERETO AS EXHIBIT 1.**

### A.    Plan Overview.

The Plan provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein.

The Plan provides for the liquidation of all of the Estate's assets either as going concerns or as individual asset sales.  The Plan provides for the marketing and sale of the French Artifacts by auction, run by Guernsey's,  The Liquidating Trustee also will market and sell the American

---

[7] Pursuant to the Court's Order authorizing the employment of Teneo and agreement between the Equity Committee, the Creditors Committee and Teneo, Teneo also provides its services to the Creditors Committee, without additional expense to the Debtors' Estates.

[8] On April 3, 2017, Brent C. Williams and Brendan J. Murphy, hitherto Managing Directors at Teneo, became Managing Directors at Lincoln.  Teneo and Lincoln now jointly serve as financial advisors to the Committees.

45353982;2

Artifacts and rights attendant thereto to a Qualified Institution, as defined in the Covenants. Finally, the Plan provides for the Liquidating Trustee to market and sell, or abandon, all remaining Liquidating Trust Assets.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of allowed Claims and Interests of the proceeds of the sale of the French Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's administration of the Liquidating Trust Assets, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust Assets.

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Unclassified claims include Administrative Claims – i.e., claims for costs or expenses of administering the Chapter 11 case which are allowed under section 507(a)(1) of the Bankruptcy Code – and Priority Tax Claims.

The Debtors will pay all Allowed Administrative Claims (estimated at approximately $1,500,000-$2,000,000 excluding Allowed Priority Tax Claims, in full in Cash on the Effective Date.

In accordance with the Bankruptcy Code, the Plan also classifies certain Claims separately and provides, separately for each Class, that Holders of Allowed Claims will receive various types of consideration, thereby giving effect to the different rights of the Holders in each Class. The following chart summarizes the proposed classification and treatment of the Holders of Allowed Claims under the Plan:

| Class | Claims | Treatment | Status | Voting Rights |
|-------|--------|-----------|--------|---------------|
| Class 1 | Non-Tax Priority Claims | Paid in full on the Effective Date | Unimpaired | Deemed to Accept |
| Class 2 | Secured Creditors | Paid in full on the Effective Date | Unimpaired | Deemed to Accept |

16

| Class | Claims | Treatment | Status | Voting Rights |
|-------|--------|-----------|--------|---------------|
| Class 3 | General Unsecured Claims, other than Class 5 Intercompany Claims | Each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Initial Distribution, the Interim Distribution(s) and the Final Distribution from the Liquidating Trust. | Impaired | Entitled to Vote |
| Class 4 | Premier Equity Interests | After payment of Allowed Class 3 Claims in full, each Holder of a Class 4 Equity Interest shall receive its Pro Rata share of the Initial Distribution, the Interim Distribution(s) and the Final Distribution from the Liquidating Trust. | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled and Holders of Intercompany Claims shall receive nothing under the Plan. | Impaired | Deemed to Reject |

### B.    Limited Consolidation for Voting, Confirmation, and Distribution Purposes.

The Plan is predicated on the Court providing in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of this Plan, its confirmation and Distributions made pursuant to it.  *See* Plan, Article III.

### C.    Implementation of the Plan.

#### 1.    Sale of American Artifacts.

On the Effective Date, the Liquidating Trustee will be authorized and instructed to conduct a sale of the American Artifacts collection to a Qualified Institution, as defined in the Covenants and Conditions, in such manner as the Liquidating Trustee determines, in the exercise of his sole discretion, is in the best interests of the Debtors, their Estates and all parties having an interest therein.  Until the sale of the American Artifacts has closed, and possession of the American

Artifacts has been transferred to the Qualified Institution, the Reorganized Premier shall conserve and protect the American Artifacts as required under the Covenants and Conditions.

> 2.  **Employment of the CRO.**

On the Effective Date, or as soon thereafter as practicable, the Liquidating Trustee shall be authorized and instructed to employ the CRO.  The CRO will be selected by the Liquidating Trustee, subject to the approval of the Equity Committee.

> 3.  **Administration and Sale of Liquidating Trust Liquidating Trust Assets Other than the American Artifacts and the Estate Causes of Action.**

From and after the Effective Date the Liquidating Trustee shall be authorized and instructed to administer the Liquidating Trust Assets other than the American Artifacts, including, without limitation, the French Artifacts and the Estate Causes of Action, in a manner that the Liquidating Trustee determines, in the exercise of his sole discretion after consultation with the CRO is in the best interests of the Debtors, their Estates and all parties having an interest therein, including, without limitation, by operating one or more of the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities and/or the French Artifacts when and if the Liquidating Trustee in his sole discretion after consultation with the CRO determines any such sale is in the best interests of the Debtors, their Estates and all parties having an interest therein.

> 4.  **Vesting of Assets.**

On the Effective Date, the Liquidating Trust Assets – comprising all of Premier's right, title and interest in and to the Premier Entities and their respective Assets, including (without limitation) the French Artifacts, the American Artifacts and the Estate Causes of Action – will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests.  On and after the Effective Date, the transfer of the Liquidating Trust Assets from the Premier Estate (as the case may be) to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.  *See* Plan, Art.VI(E).

5.    Establishment of the Liquidating Trust.

On the Effective Date, the Liquidating Trust Agreement will become effective, and, if not previously signed, the Equity Committee, as Plan Proponent, on behalf of the Estate, and the Liquidating Trustee will execute the Liquidating Trust Agreement.

The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).  In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Class 3 Claims and Class 4 Premier Equity Interests.  The Holders of such Allowed Class 3 Claims and Class 4 Premier Equity Interests will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

6.    Liquidating Trustee as Representative of the Debtors' Estates.

The Liquidating Trustee will be appointed as the representative of the Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) object to Claims against (including, without limitation, seeking the subordination and/or reclassification of such Claims); (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iii) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Case.  As the representative of the Debtors and their Estates, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to the Liquidating Trust Assets assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all  litigation pending or the Estate Causes of Action as of the Effective Date and may bring

19

additional claims as the Liquidating Trustee deems appropriate, including through the use of Federal Rule of Bankruptcy Procedure 2004.

       7.     <u>No Liability of Liquidating Trustee.</u>

The Plan contains customary provisions that, to the maximum extent permitted by law, the Liquidating Trustee, his employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents") will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. *See* Plan, Art. VI E 5.

       8.     <u>Federal Income Tax Compliance Provisions.</u>

The Liquidating Trustee will be appointed as the representative of the Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) control, manage, and liquidate as appropriate all Litigating Trust Assets, (ii) object to Claims against the Estate (including, without limitation, seeking the subordination and/or reclassification of such Claims); (iii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iv) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims and/or Interests; and (v) take such action as required to administer, wind-down, and close the Chapter 11 Case.  As the representative of the Debtors and their Estates, and the individual in control of the Liquidating Trust Assets, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to Estate Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

9.     <u>Prosecution of Estate Causes of Action by the Liquidating Trustee.</u>

The Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan in accordance with the terms of the Plan. All recoveries derived therefrom will be included within the Liquidating Trust Assets.

"Estate Causes of Action" is defined in the Plan to mean, with respect to each of the Debtors, any and all manner of causes of action, claims, obligations, suits, debts, judgments, demands, rights of offset or recoupment, damages (actual, compensatory or punitive), counterclaims or affirmative defenses, whatsoever, whether in law or in equity including, but not limited to, the claims arising under or pursuant to sections 541 through 551, inclusive, and section 553, of the Bankruptcy Code, objections to Filed proofs of Claim, and claims against the former officers and/or directors of the Debtors and any director and officer liability policy. For avoidance of doubt, the Liquidating Trustee's right to recover against the former officers and/or directors of the Debtors shall not be limited to the proceeds of any director and officer liability policy.

**D.**     <u>**Summary of Certain Other Provisions of the Plan.**</u>

1.     <u>Court Approval of Professional Fees Required</u>

By order entered on August 17, 2016 (Docket No. 141), the Bankruptcy Court granted the Debtors' *Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals* (Docket No. 89), pursuant to which the Debtors are authorized to pay, monthly and upon an interim basis pursuant to monthly statements timely filed by such professionals, up to 80% of the fees and 100% of the expenses of each professional employed in the Debtors' Cases.

These interim payments and any and all other professional claims for compensation and reimbursement of expenses incurred by professionals employed in the Cases must be approved, on a final basis, by the Court. Such professionals must File and serve properly noticed fee applications and the Bankruptcy Court must rule on the applications. Only the Allowed amount of fees and costs awarded on a final basis by the Bankruptcy Court will be paid under the Plan. Objections to

applications of professionals or others for compensation or reimbursement of expenses must be Filed and served on the Equity Committee and its counsel, as well as other professionals and others to whose application the objection is addressed, in accordance with the Bankruptcy Code, the Bankruptcy Rules or pursuant to any other procedure set forth by an order of the Bankruptcy Court.

<div align="center">2.    <u>Deadlines for Filing Claims and Administrative Expenses.</u></div>

All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition obligations incurred through the Effective Date in the ordinary course under section 1930 of title 28 of the United States Code) shall be Filed no later than forty-five (45) days after the Effective Date.

<div align="center">3.    <u>Priority Tax Claims.</u></div>

The Bankruptcy Code requires that each holder of a Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period ending not later than five years after the date of the bankruptcy filing (in this case, not later than June 14, 2021). The Debtors' Estates will pay all Allowed Priority Tax Claims in full on the Effective Date.

**E.    <u>Executory Contracts and Unexpired Leases.</u>**

<div align="center">1.    <u>Assumption.</u></div>

Upon the Effective Date, the Debtors shall be deemed to assume those executory contracts and unexpired leases which are listed in the Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement. Pursuant to this Plan, the Debtors will also assume the executory contracts and unexpired leases that are the subject of any specific order of the Bankruptcy Court. The Equity Committee reserves the right to delete any contract or lease from the Schedule of Executory Contracts and Unexpired Leases exhibit, thereby rejecting the contract or lease, up until the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Schedule of Executory Contracts and Unexpired Leases exhibit and by giving notice to counsel for the non-debtor party to the contract or lease.

2.    Cure Payments.

The Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement specifies the amount of the Cure Payment, if any, that the Equity Committee believes must be tendered on the Effective Date, in order to provide cure and compensation in accordance with sections 365(b)(1)(A) & (B) of the Bankruptcy Code.  The deadline for any objections to the Cure Payment amounts set forth in Exhibit "__" shall be the date for filing objections to the Plan, and no other objections to such Cure Payment will be timely.  In the event that any party to a listed contract or lease on the Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement contends that the Cure Payment amount so listed is incorrect, such party must timely file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof specifying the amounts allegedly owing under sections 365(b)(1)(A) & (B).  Failure to timely file and serve such statement shall result in the determination that the tender of the Cure Payment, as specified in the Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement on the Effective Date, shall provide cure and compensation for any and all defaults and unpaid obligations under such assumed executory contract or unexpired lease.

In the event that any party to a listed contract or lease specified in the Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement objects to the proposed assumption by any Debtor, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof no later than the date fixed for filing objections to the confirmation of the Plan.  Failure timely to file and serve such statement shall result in the determination that the assumption is appropriate.  The Equity Committee has the right to respond to any such objections.

Entry of the Confirmation Order shall constitute approval of the assumptions under the Plan pursuant to section 365 of the Bankruptcy Code.  All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code shall be made on the Effective Date or as soon

45353982;2

thereafter as is practicable or as may otherwise be agreed by the parties to any particular contracts or leases.

    3.    <u>Rejection.</u>

With the exception of those executory contracts and unexpired leases that have been previously assumed, assumed pursuant to the Plan, or rejected by order of the Bankruptcy Court, as of the Effective Date, the Debtors shall reject, pursuant to Bankruptcy Code section 365, all other executory contracts and unexpired leases.

    4.    <u>General.</u>

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Bankruptcy Court on or before such date as the Bankruptcy Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day, the first Business Day occurring thereafter. Any such Claims which are not filed within such time will be forever barred from assertion against the Debtors' Estates and their property, or the Liquidating Agent.

    5.    <u>Insurance Policies.</u>

For the avoidance of doubt, the Debtors' rights with respect to all insurance policies under which the Debtors, and each of them, may be a beneficiary (including all insurance policies that may have expired prior to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies entered into by the Debtors after the Petition Date, and all insurance policies, including all officer and director liability policies, under which any Debtor holds rights to make, amend, prosecute and benefit from claims), are retained and will be transferred or assigned to the Liquidating Trust pursuant to this Plan. Notwithstanding any provision providing for the rejection

of executory contracts, any insurance policy that is deemed to be an executory contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a specific motion by the Liquidating Trustee who shall retain the right to assume or reject any such executory contracts pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code following the Effective Date.

      **F.**    **Claims Allowance Process.**

          1.    <u>Resolution of Disputed Claims.</u>

      As of the Effective Date, the Liquidating Trustee will have sole authority for investigating, administering, monitoring, implementing, litigating and settling all Disputed Claims. From and after the Effective Date, the Liquidating Trustee will have the sole and exclusive right to make and file, and to prosecute, objections to Claims, including, but not limited to, Administrative Expenses and Priority Tax Claims. All objections shall be filed prior to the Liquidating Trustee Claim Objection Deadline and served upon the Holder of the Claim to which the objection is made.

          2.    <u>Reserve for Disputed Claims.</u>

      Under the Plan, Cash which would be issued and distributed on account of holders of Disputed Claims in the event that such Disputed Claims become Allowed Claims, will instead be placed in a Disputed Claims Reserve maintained by the Liquidating Trustee. Such Cash in the Disputed Claims Reserve will be reserved for the benefit of holders of such Disputed Claims, pending determination of their entitlement thereto. Unless the Bankruptcy Court orders otherwise, the Liquidating Trustee will reserve Pro Rata distributions for such Disputed Claims based upon the full amount of the Disputed Claims or (a) in the case of a Disputed Class 3 Claim, in the full amount of the Allowed Class 3 Claim Amount, and (b) in the case of a Disputed Claim that is an Administrative Claim, Cash in the full amount of such Disputed Claim. No reserve shall be required for any Disputed Claim to the extent of any effective insurance coverage therefore. Such Cash so reserved will be distributed by the Liquidating Trustee to the holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash will be allocated among holders of Allowed Claims in the Class in which the Disputed Claim was classified, as provided in the Plan.

Prior to or on the Final Distribution Date, the Liquidating Trustee will make all distributions on account of any Disputed Claim that has become an Allowed Claim and remains unpaid as of the Final Distribution Date. To the extent that any portion of a Disputed Claim is not disputed, the Liquidating Trustee may establish a reserve in the Disputed Claims Reserve only on account of that portion of the Disputed Claim that is in dispute and may make one or more interim Distributions on account of the portion of such Disputed Claim that is not in dispute.

The Liquidating Trustee may, at the Liquidating Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor liquidating trust. If the election is made, the Liquidating Trustee will comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

**G.** **Distributions.**

    1.   <u>Generally.</u>

Distributions to be made on account of Allowed Claims, other than Allowed Class 3 Claims and Class 4 Premier Equity Interests, shall be made on the Effective Date, unless otherwise provided for in the Plan or ordered by the Bankruptcy Court. The dates for Distributions by the Liquidating Trust on account of Allowed Class 3 Claims and Class 4 Premier Equity Interests will be selected by the Liquidating Trustee. Such Distributions will be made as soon as practicable after the Effective Date.

2.     <u>Manner of Payment.</u>

Any payment of Cash made by the Liquidating Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

3.     <u>Distributions of Property Other Than Cash.</u>

Any distribution under the Plan of property other than Cash shall be made by the Liquidating Trustee in accordance with the terms of the Plan.

4.     <u>Setoffs.</u>

The Liquidating Trustee may set off against any Claim any claims of any nature whatsoever that the Liquidating Trust may have against the Holder of such Claim. Neither the failure to effect such set off nor the allowance of any Claim that otherwise would be subject to set off, shall constitute a waiver or release by the Liquidating Trust of any such claim the Liquidating Trust may have against such Holder.

5.     <u>Distribution of Unclaimed Property.</u>

Any distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one year following the Effective Date or (ii) ninety (90) days after such distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

6.     <u>Delivery of Distributions, Address of Holder</u>

For purposes of all notices and Distributions under this Plan, the Liquidating Trustee shall be entitled to rely on the name and address of the holder of each Claim as shown on, and Distributions to holders of Allowed Claims shall be made by regular U.S. first class mail to, the following addresses: (a) the address set forth on in the proofs of Claim Filed by such holders; (b) the address set forth in any written notice of address change delivered by the holder to the Debtor concerned or Liquidating Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on the Schedules if no proof of Claim is Filed and the Debtor concerned or Liquidating Trustee has not received a written notice of a change of address. The Liquidating

45353982;2

Trustee shall be under no duty to attempt to locate holders of Allowed Claims who are entitled to unclaimed Distributions.

**H.** **Effectiveness of Plan.**

1. Conditions Precedent.

The Effective Date shall not occur until all of the following have occurred:

(i)     The Bankruptcy Court shall have entered the Confirmation Order, which order shall not have been amended, modified, reversed, vacated, enjoined or stayed pending appeal;

(ii)    All authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained;

(iii)   The District Court shall have entered an order approving any Sale transaction of the American Artifacts;

(iv)    The Equity Committee shall have appointed the Liquidation Trustee, and the Liquidating Trust Agreement and the other Liquidating Trust Documents shall have been executed and delivered; and

(v)     No order of a court shall have been entered and shall remain in effect restraining the Equity Committee from consummating the Plan.

Notwithstanding the foregoing, the conditions to confirmation of this Plan and to the Effective Datemay be waived by the Equity Committee without notice, leave, or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

2. Notice of the Effective Date.

As soon as practicable after the Effective Date has occurred, the Liquidating Trustee shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

**I.** **Retention of Jurisdiction.**

The Plan provides that the Bankruptcy Court will retain and have exclusive jurisdiction to the fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to the Chapter 11 Case or the Plan, including but not limited to the following:

(i)     To hear and determine pending motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if any are pending as of the Effective Date, the determination of any cure payments related thereto, and the allowance or disallowance of Claims resulting therefrom;

(ii)     To hear and determine pending motions for sale of assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code, if any are pending as of the Effective Date;

(iii)     To determine any and all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Bankruptcy Cases;

(iv)     To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(v)     To hear and determine any objections to Administrative Expenses and to Proofs of Claims filed both before and after the Effective Date, and to allow or disallow any Disputed Claim in whole or in part;

(vi)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vii)     To issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

(viii)     To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(ix)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

45353982;2

(x)     To hear and determine any disputes arising in connection with the interpretation; implementation, execution, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(xi)    To hear or determine any action to recover assets of the Debtors' Estates, wherever located, including any and all Estate Causes of Action (including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and all non-avoidance actions owned by the Debtors' Estates including, but not limited to, claims of tort, breach of contract and claims lying in law or in equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise);

(i)     To hear and determine any actions or matters related to Estate Causes of Action and the Premier Insider Claims, whether or not such actions or matters are pending on the Effective Date;

(ii)    To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(iii)   To hear any other matter not inconsistent with the Bankruptcy Code; and

(iv)    To enter a Final Decree closing the Bankruptcy Cases.

**J.      Limitation of Liability, Releases and Injunction.**

      1.      Exculpation.

Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date, the Debtors, the Equity Committee, the Creditors Committee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case, including, without limiting the generality of the foregoing, all sales of assets

of any Debtor's Estate, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the negotiation, formulation, and/or consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan or any acts or omissions taken with respect to any contract, instrument, release or other agreement or document created in connection with the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.  Notwithstanding the foregoing, this provision of the Plan is not intended to waive or release any cause of action based on prepetition actions or conduct, including but not limited to any Estate Causes of Action.

2.     <u>Injunction Enjoining Holders of Claims and Equity Interests.</u>

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests.  To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors arising prior to the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtors, their Estates, the Liquidating Trust or its property (other than actions brought to enforce any rights or obligations under the Plan):

(i)      commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

(ii)      Enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets;

45353982;2

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien, security interest or encumbrance against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets; and

(iv)     proceeding in any manner in any place whatsoever against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets, that does not conform to or comply with the provisions of the Plan.

3.     <u>Nondischarge of the Debtors.</u>

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**K.     <u>Revocation or Withdrawal of the Plan.</u>**

The Equity Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Equity Committee revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or their Estates or any other person or to prejudice in any manner the rights of the Debtors or their Estates or any person in any further proceedings involving the Debtors or any of them.

**L.     <u>Modification of the Plan.</u>**

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Equity Committee.  After the Effective Date, the

45353982;2

Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

**M.     Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code. The Liquidating Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Bankruptcy Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Disbursing Agent under the Plan. After the Effective Date and until the Chapter 11 Case is closed, the Liquidating Trustee shall file with the Office of the United States Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

**N.     Governing Law.**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

**O.     Withholding, Reporting, and Payment of Taxes.**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall report and pay taxes on the income of the Liquidating Trust Assets, if any, as required

45353982;2

by applicable law. In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

## IV. **CONFIRMATION PROCEDURE.**

For the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met. These include, among others, the requirements that the Plan: (i) is accepted by all impaired Classes of Claims and Interests; (ii) is feasible; and (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Bankruptcy Court. A Confirmation Hearing with respect to the Plan is scheduled to commence on_____ __, 2018, at __:__ _.m. At the confirmation hearing, the Equity Committee will request the Bankruptcy Court to confirm the Plan on the basis that all confirmation requirements have been satisfied.

### A. **Voting; Acceptance.**

Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent, unknown, or unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been disallowed for voting purposes by the Bankruptcy Court, or is disallowed under the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of Class 4 Equity Interests as of the Record Date will be entitled to vote to accept or reject the Plan.

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

Impaired Class 3 Claims will have accepted the Plan if (i) the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in Class 3 have voted to accept the Plan and (ii) more than one-half in number of the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in each such Class have voted to accept the Plan.

Impaired Class 4 Interests shall have accepted the Plan if the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Interests actually voting in Class 4 have voted to accept the Plan (other than any entity designated under section 1126(e) of the Bankruptcy Code).

**B.** **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Equity Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy Rules and Local Bankruptcy Rules.  Objections must be filed and served pursuant to

the Confirmation Notice in the manner set forth therein, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Equity Committee, as Plan Proponent, has complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and not by any means proscribed by law.

4. Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable

5. Each Holder of an impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claims, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Estate were liquidated on such date under Chapter 7 of the Bankruptcy Code.

6. Unless the Equity Committee proposes a nonconsensual plan of liquidation, each class of Claims has either accepted the Plan or is not impaired under the Plan.

7. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and such Other Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full on the

Effective Date and that holders of Priority Tax Claims will receive on account of such Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

8.    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

9.    The Plan contemplates the disposition of all of the assets of the Debtors' Estates and the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity Interests in order of priority and as provided for in the Plan.

The Equity Committee believes that the Plan will be accepted by at least one of the Classes entitled to vote to accept or reject the Plan and will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Equity Committee has complied or will have complied with all of the requirements of Chapter 11, and that the Plan is being proposed and submitted in good faith.

### C.    <u>Feasibility.</u>

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless liquidation is contemplated by the Plan.  Here, the Plan contemplates that all of Premier's right, title and interest in the Premier Entities will be vested in the Liquidating Trust on the Effective Date and that the Liquidating Trustee will employ Guernsey's  to undertake a process of marketing and selling the French  Artifacts to fund the Initial Distribution.  It further provides for the retention of the CRO to assist the Liquidating Trustee in his administration of the Liquidating Trust Assets including, without limitation, the American Artifacts and the Estate Causes of Action, by operating the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities in the best interests of the Debtors, their Estates and all parties having an interest therein and to make Interim Distribution(s) and a Final Distribution from the Liquidating Trust.  As such, the Plan essentially provides for a

45353982;2

controlled and orderly administration and liquidation of the assets of the Debtors' Estates, and is not likely to or the need for further financial reorganization of the Debtor.

     **D.**     **Best Interest Test.**

Confirmation of the Plan requires that each Holder of an impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors' Estates were liquidated under chapter 7 of the Bankruptcy Code.

The Equity Committee has determined that confirmation of the Plan will provide each Holder of a Claim or Class 4 Equity Interest with a recovery that is not less than that which it would receive pursuant to a liquidation of the Debtors' Estates under Chapter 7 of the Bankruptcy Code. This determination is based upon a consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders. *See* Liquidation Analysis attached hereto as Exhibit 2. See, also, Declaration of Arlan Ettinger in support of retention of Guernsey's to sell the French Artifacts, attached hereto as Exhibit 4.

Conversion of the Debtors' Cases to Chapter 7 at this stage would simply add complexity and additional layers of administrative expenses which would only serve to diminish the distributions to all creditors and Interest Holders.

As such, the distributions to creditors will likely be larger under the Plan. Additionally, distributions to creditors contemplated by the terms of the Plan will be made more quickly than any likely distribution that would be made by a Chapter 7 trustee because a Chapter 7 trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Estates.

Based on the foregoing, the Equity Committee believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a conversion of the Debtors' Cases to Chapter 7 case and the appointment of a Chapter 7 trustee.

## V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

The Equity Committee believes that the Plan affords Holders of Claims and Interests the potential for the greatest feasible realization out of the Debtors' Estates, and, therefore, is in the best interest of such Holders. The Equity Committee has considered alternatives to the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code. In the opinion of the Equity Committee, such alternatives would not afford Holders of Claims and Interests a return greater than that achieved under the Plan.

THE EQUITY COMMITTEE BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.

## VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES.

### A. Introduction.

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Holders of Class 3 Claims and Class 4 Premier Equity Interests who receive Distributions under the Plan. The following summary does not address the federal income tax consequences to Holders of any other Claims and Claims that are not Impaired by the Plan. The following summary is based on the Internal Revenue Code of 1986, as amended ("IRC"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. Further, any discussion of the Liquidating Trust and the powers, obligations and/or actions of the Litigating Trustee that may be set forth below is subject to the applicable provisions of the Plan and the Liquidating Trust Agreement; if and to the extent that there is any inconsistency between

39

such discussion on one hand and the Plan and the Liquidating Trust Agreement on the other hand, the terms of the latter documents shall control. Holders of Claims and Premier Equity Interests should read the Plan and the Liquidating Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Equity Committee has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Holders that hold Claims or Premier Equity Interests as part of a hedge, straddle or conversion transaction, Holders who acquired their Claims as compensation, and Holders who do not hold their Claims and Premier Equity Interests as capital assets).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR PREMIER EQUITY INTEREST. ALL HOLDERS OF CLAIMS OR PREMIER EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

B.    **Consequences to the Debtor.**

The transfer of the Liquidating Trust Assets to the Liquidating Trust may result in the Debtor recognizing gain or income, depending in part on the value of such assets on the Effective Date and the adjusted basis of such assets on the Effective Date.

### C. Consequences to Holders of Allowed Class 3 Claims and Class 4 Premier Interests.

#### 1. Recognition of Gain or Loss Generally.

Pursuant to the Plan, on the Effective Date, each Holder of an Allowed 3 Claim and Class 4 Premier Equity Interest will receive an interest in the Liquidating Trust, which is a beneficial interest in the Liquidating Trust, entitling the holder thereof to distributions from the Liquidating Trust as provided for in the Plan and in the Liquidating Trust Agreement. Except to the extent that the holder of an Allowed Claim or Premier Equity Interest, or beneficial interest therein, agrees to a different treatment, said Persons will receive on account of their Allowed Claim or Premier Equity Interest, in full and complete satisfaction thereof, from the Liquidating Trust, one or more Pro Rata Distributions based upon the amount of the respective Holder's Allowed Claim or Premier Equity Interest, in accordance with the priorities of the Plan. In general, each holder of such an Allowed Claim or Premier Equity Interest will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including, as discussed below, its undivided interest in the Liquidating Trust Assets) that such Allowed Claim or Premier Equity Interest holder receives in satisfaction of its Claim or Premier Equity Interest (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims), and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest) or Premier Equity Interest, as applicable. For a discussion of the U.S. federal income tax consequences of any Claim for accrued interest, *see* Section 2 below.

Where a Holder recognizes gain or loss in respect of its Allowed Claim or Premier Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim or Premier Equity Interest constitutes a capital asset in the hands of the Holder and how long it has been so held, whether, in the case of an Allowed Claim,

the Holder had acquired the Claim at a market discount, and, in the case of an Allowed Claim, whether and to what extent the Holder had previously claimed a bad debt deduction. A Holder that holds its Premier Equity Interest as a capital asset will recognize capital gain or loss. A Holder that purchased its Allowed Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

The Liquidating Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, each holder of an Allowed Claim and Premier Equity Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating Trust Assets (see Section 3 below). As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all parties, including the Holders of Allowed Claims and Premier Equity Interests, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidating Trust may receive more than one Distribution subsequent to the Effective Date, the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim or Premier Equity Interest may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders of such Allowed Claims and Premier Equity Interests are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability

to elect out of the installment method of reporting any gain realized in respect of their Claims or Premier Equity Interests.

After the Effective Date, any amount that a Holder receives on account of an Allowed Claim or Premier Equity Interest as a Distribution from the Liquidating Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) generally should not be included for federal income tax purposes in the Holder's amount realized in respect of its Allowed Claim or Premier Equity Interest, but should be separately treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the Liquidating Trust.

In general, a Holder's tax basis in any beneficial interest received (and undivided interest in the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate share of the Liquidating Trust Assets on the Effective Date. The holding period for such assets generally will begin the day following the Effective Date.

2.      Distributions in Payment of Accrued but Unpaid Interest.

Distributions to any Holder of an Allowed Class 2 or 3 Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a Holder of debt receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such Holder generally recognizes taxable interest income in such amount (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

3.    <u>Tax Treatment of the Liquidating Trust and Holders of Interests Therein.</u>

On the Effective Date, the Liquidating Trust will be established for the benefit of Holders of all Allowed Claims and Premier Equity Interests. The Liquidating Trust is intended to qualify and be treated as a "grantor" (i.e., a pass-through tax entity), rather than as a separate taxable entity. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries of the Liquidating Trust) are required for federal income tax purposes to treat the Liquidating Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as a transfer of such Liquidating Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust. Consistent therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax

45353982;2

purposes. Each such Person will have a tax basis in its proportionate share of the Liquidating Trust Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim or Class 4 Premier Equity Interest receiving a beneficial interest in the Liquidating Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidating Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a Holder are not dependent upon the Liquidating Trust distributing any Cash or other proceeds. Therefore, a Holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidating Trust regardless of the fact that the Holder has not received any prior or concurrent Distribution. Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidating Trust Assets.

The assets set aside or reserved to fund the payment of the Disputed Claims Reserve will be treated and taxed for federal income tax purposes similar to the other assets transferred and held by the Liquidating Trust (i.e. the reserved assets will be treated as transferred to the grantor Liquidating Trust owned by the Holders) unless the Liquidating Trustee files a tax election to treat the Disputed Claim Reserve as a Disputed Ownership Fund. Under the Plan, the Liquidating

Trustee is allowed, for federal income tax purposes, to treat the Disputed Claims Reserve as either (a) a part of the assets of the grantor Liquidating Trust owned by the Beneficiaries (i.e., the Beneficiaries, rather than the Liquidating Trust, will pay tax on their share of Tax Items, as that term is defined in the Liquidating Trust, attributable to the Disputed Claims) or (b) a Disputed Ownership Fund ("DOF"), taxable under IRC Section 468B and Treasury Income Tax Regulation Section 1.468B-9 (separate taxable entity). If the Liquidating Trustee fails to file a DOF tax election, the tax consequences with respect to the transfer of assets used to fund the Disputed Claims reserve will be the same as described above for the other assets transferred by the Debtor to the Liquidating Trustee.

If the Liquidating Trustee files a tax election to treat the Disputed Claims reserve accounts as a DOF, then the DOF will be treated as a separate taxable entity for federal income tax purposes (rather than a pass-through tax entity) that is required to file federal income tax returns and pay any federal income tax due with respect to Tax Items that are attributable to the Disputed Claims. All of the federal income tax liability of the DOF will reduce the distributions of all of the Holders, including the Disputed Claimants. The DOF will be taxed for federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the fund by or on behalf of transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of IRC Section 468B and the Treasury Income Tax Regulations thereunder (a "QSF"), if all the assets transferred to the fund are passive investment assets. For purposes of determining the DOF's federal income tax liability, a DOF is not required to report as income transfers of assets to the DOF, but is required to include in income all income received or accrued from the assets transferred to the DOF. The DOF is not allowed a tax deduction for a distribution of disputed assets or the net after tax income earned by the DOF made to a Holder. The initial tax basis of assets transferred to a DOF is the fair market value of the asset determined on the date of transfer to the DOF, and the DOF's holding period begins on the date of the transfer.

45353982;2

4.     Tax Reporting.

Except to the extent of the Liquidating Trust Assets with respect to which there is a DOF tax election, all parties (including the Debtors, the Liquidating Trustee and the Holders) shall, for all federal income tax purposes, treat the transfer of assets to the Liquidating Trust in accordance with the terms of the Plan as a transfer of such assets directly to the Holders, followed by the transfer thereof by such Holders to the Liquidating Trust.  Consistent therewith, for federal income tax purposes, all parties shall treat the Liquidating Trust as a grantor trust of which such Holders are the owners and grantors.  Thus, such Holders (and any subsequent Holders) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidating Trust for all federal income tax purposes.  The Liquidating Trustee will determine the fair market value of the assets, and all parties, including the Holders, must consistently use such valuation for all federal income tax purposes.

The Liquidating Trustee will file with the Internal Revenue Service tax returns as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).  The Liquidating Trustee will also send to each Holder a separate statement setting forth the Holder's share of the Liquidating Trustee's Tax Items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Each of the Holders will be required to report on his/her federal income tax return(s) the Holder's allocable share of any Tax Items such as income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust and that is set forth on the tax statement provided to the Holder.  The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deduction or losses may depend on the particular situation of the Holder.

The federal income tax reporting obligation of the Holders is not dependent upon the Liquidating Trustee's distribution of cash or other proceeds.  Therefore, Holders may receive Tax Items in a taxable year regardless of the fact that the Liquidating Trustee has not made, or will not make, any concurrent or subsequent distributions to the Holders.  If a Holder does not receive

47

distributions from the Liquidating Trustee commensurate with the Tax Items allocated to it, the Holder may be entitled to a subsequent loss or deduction.

If the Liquidating Trustee files a DOF tax election with respect to the Disputed Claims Reserve then, for federal income tax purposes, the Liquidating Trustee will file a tax return for the DOF and pay any federal income tax due.

For federal income tax purposes, Disputed Claimants are not treated as transferring assets to the DOF.  The taxability of distributions to Disputed Claimants is determined by reference to the Disputed Claim in which the distribution is made.

5.  <u>Information Reporting and Backup Withholding</u>.

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain Distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES**

ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING UPON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## VII.    FEES AND EXPENSES.

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings have been and will be borne by the Debtors' Estates.  The solicitation has been and is being made principally by mail.  Arrangements also have been or will be made with brokerage houses and other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and other pertinent materials to the beneficial holders of the Debentures.  The Debtors' Estates have reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses incurred by them, but no compensation has been or will be paid for their services.

In addition to the foregoing, the Debtors' Estates are obligated to pay fees and reimburse expenses for the various professionals employed in connection with the Chapter 11 Cases to the extent such fees and expenses are allowed by the Bankruptcy Court.

## VIII.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION.

Additional sources of information regarding the Debtors and documents relating to the Plan are available to holders of Claims and Equity Interests.  The following is a summary of certain documents and the places they can be reviewed or obtained:

A.    Both prior to and after the Petition Date, the Debtors filed documents with the Securities and Exchange Commission ("SEC") in accordance with the informational requirements of the 1934 Act.  Copies of such material can be obtained from the Public Reference Section of the SEC at 450 Fifth Street, NW, Washington, D.C. 20549, at prescribed rates.  Certain of such

material may be accessible via online computer at https://www.sec.gov/cgi-bin/browse-edgar?company=premier+exhibitions&owner=exclude&action=getcompany.

B.      Orders of the Bankruptcy Court and related papers pertaining to transactions outside of the Debtors' ordinary course of business may be inspected at the office of the Clerk of the Bankruptcy Court located at 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202 or maybe accessed at the Committee's website, http://www.jndla.com/cases/premiercommittee, under "Court Docket."

C.      The Debtors' Schedules of Assets and Liabilities, Statement of Affairs, and Schedules of Executory Contracts and Unexpired Leases, as amended, may be inspected at the office of the Clerk of the Bankruptcy Court located at 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202 or maybe accessed at the Committee's website, http://www.jndla.com/cases/premiercommittee, under "Court Docket".

D.      Periodic post-petition financial reports as filed with the Court may be accessed at the Court's docket or at the Committee's website, http://www.jndla.com/cases/premiercommittee, under "Court Docket."

## IX.    <u>**RECOMMENDATION AND CONCLUSION.**</u>

The Equity Committee believes that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for holders of Claims.  Accordingly, the Equity Committee urges holders of Claims and Interests in the Voting Classes to accept the Plan.

DATED: June 1, 2018

OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS

By: _____
Andrew Shapiro
Its:     Chairman

**SUBMITTED BY:**

**LANDAU GOTTFRIED & BERGER LLP**
Peter J. Gurfein, Esq.
Jon L. R. Dalberg, Esq.
1801 Century Park East, Suite 700
Los Angeles, California 90067
(310) 557-0050
(310) 557-0056 (Facsimile)
pgurfein@lgbfirm.com

-and-

**AKERMAN LLP**

By: /s/ Jacob A. Brown_____
Jacob A. Brown
Florida Bar No. 170038
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (Facsimile)
Jacob.brown@akerman.com

Attorneys for the Official Committee of Equity
Security Holders of Premier Exhibitions, Inc.

45353982;2

# Exhibit 1

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

_____

# CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF PREMIER EXHIBITIONS, INC.

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

# TABLE OF CONTENTS

**Page**

I.   DEFINITIONS AND RULES OF CONSTRUCTION ..................................................... 2

    A.    Defined Terms. ............................................................................................... 2

    B.    Other Terms. ................................................................................................ 13

    C.    Computation of Time. ................................................................................. 13

    D.    Exhibits. ...................................................................................................... 13

II.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS ......................................................................................................... 13

    A.    Summary. .................................................................................................... 13

    B.    Unclassified Claims (All Debtors). ............................................................ 14

    C.    Classification and Treatment (Classes 1 – 4 Premier Claims and Class 5
    Intercompany Claims). ............................................................................... 16

III.   LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND
    DISTRIBUTION PURPOSES. .............................................................................. 18

IV.   ACCEPTANCE OR REJECTION OF THE PLAN ............................................... 19

    A.    Voting Classes. .......................................................................................... 19

    B.    Record Date for Holders of Impaired Class 4 Premier Equity Interests. .............. 19

    C.    Voting Rights of Holders of Disputed Claims. .......................................... 20

    D.    Acceptance by Impaired Classes. ............................................................... 20

    E.    Acceptance by Impaired Interests. ............................................................. 20

    F.    Presumed Acceptance of the Plan. ............................................................. 20

    G.    Presumed Rejection of the Plan .................................................................. 20

V.   PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR
    UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES .......................... 21

    A.    Resolution of Disputed Claims. ................................................................. 21

    B.    Reserve for Disputed Claims. ..................................................................... 21

| | | | |
|---|---|---|---|
| VI. | | IMPLEMENTATION OF THE PLAN | 22 |
| | A. | Employment of the CRO. | 22 |
| | B. | Disposition of the French Artifacts. | 22 |
| | C. | Disposition of the American Artifacts | 22 |
| | D. | Administration and Sale of Liquidating Trust Assets Other than the French Artifacts. | 23 |
| | E. | Vesting of Assets. | 23 |
| | F. | Establishment of the Liquidating Trust. | 24 |
| | G. | Prosecution of Estate Causes of Action by the Liquidating Trustee. | 28 |
| VII. | | DISTRIBUTIONS UNDER THE PLAN | 28 |
| | A. | In General. | 28 |
| | B. | Manner of Payment Under the Plan. | 29 |
| | C. | Manner of Distribution of Other Property. | 29 |
| | D. | Setoffs. | 29 |
| | E. | Distribution of Unclaimed Property. | 29 |
| | F. | De Minimus Distributions | 29 |
| | G. | Saturday, Sunday or Legal Holiday. | 29 |
| | H. | Delivery of Distributions, Address of Holder. | 30 |
| VIII. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 30 |
| | A. | Assumption. | 30 |
| | B. | Assumption and Cure Payment Objection. | 30 |
| | C. | Rejection. | 32 |
| | D. | General. | 32 |
| | E. | Insurance Policies. | 33 |
| IX. | | EFFECTIVENESS OF THE PLAN | 33 |
| | A. | Conditions Precedent. | 33 |

45353971;6

|   | B. | Notice of Effective Date. ............................................................................ | 34 |
| X. |   | RETENTION OF JURISDICTION ........................................................................... | 34 |
| XI. |   | LIMITATION OF LIABILITY, RELEASES AND INJUNCTION. ........................... | 37 |
|   | A. | Exculpation. ................................................................................................... | 37 |
|   | B. | Injunction Enjoining Holders of Claims Against and Equity Interests in the Debtors. ......................................................................................................... | 38 |
|   | C. | No Discharge of the Debtors.......................................................................... | 39 |
| XII. |   | MISCELLANEOUS PROVISIONS......................................................................... | 39 |
|   | A. | Payment of Statutory Fees. ............................................................................ | 39 |
|   | B. | Headings. ....................................................................................................... | 39 |
|   | C. | Binding Effect................................................................................................ | 40 |
|   | D. | Revocation or Withdrawal. ............................................................................ | 40 |
|   | E. | Governing Law. ............................................................................................. | 40 |
|   | F. | Withholding, Reporting, and Payment of Taxes............................................ | 40 |
|   | G. | Other Documents and Actions. ...................................................................... | 41 |
|   | H. | Modification of the Plan. ............................................................................... | 41 |
|   | I. | Notices. ......................................................................................................... | 41 |
|   | J. | Severability of Plan Provisions. .................................................................... | 43 |
|   | K. | Successors and Assigns.................................................................................. | 44 |
|   | L. | Post-Effective Date Notice. ........................................................................... | 44 |

45353971;6

The Official Committee of Equity Security Holders (the "Equity Committee") of Premier Exhibitions, Inc. ("Premier"), Chapter 11 Debtor in Case No. 3:16-bk-02232-PMG proposes the following Chapter 11 Plan (along with any amendments, supplements or exhibits hereto, collectively, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code  for the resolution of all Claims against and interests in the following jointly administered Chapter 11 debtors (collectively, "Debtors" and each a "Debtor"): Premier; RMS Titanic, Inc. ("RMST") (Case No. 3:16-bk-02230-PMG);   Premier Exhibitions Management, LLC ("Exhibitions Management") (Case No. 3:16-bk-02233-PMG); Arts and Exhibitions International, LLC ("AEI") (Case No. 3:16-bk-02238-PMG); Premier Exhibitions International, LLC ("Exhibitions International") (Case No. 3:16-bk-02234-PMG ); Premier Exhibitions NYC, Inc. ("Exhibitions NYC") (Case No. 3:16-bk-02235-PMG); Premier Merchandising, LLC ("Merchandising") (Case No. 3:16-bk-02236-PMG); and Dinosaurs Unearthed Corp. ("DUC") (Case No. 3:16-bk-02237-PMG) and their respective bankruptcy estates.

The Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders ("Disclosure Statement"), which accompanies the Plan, discusses the Debtors' history, business, contracts, leases, results of operations, resolution of material disputes, significant potential litigation, financial projections for the liquidation and distribution of the Debtors' assets, and contains a summary discussion of the Plan.  Holders of Claims are encouraged to read the Disclosure Statement before voting to accept or reject the Plan.

Following solicitation of acceptances for the Plan, the Equity Committee, as Plan proponent, will seek the Bankruptcy Court's confirmation of the Plan.  No solicitation materials other than the Disclosure Statement and any schedules, exhibits or letters attached thereto or referenced therein have been authorized by the Equity Committee or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

I. **DEFINITIONS AND RULES OF CONSTRUCTION**

   A. **Defined Terms.**

As used herein, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural, and masculine and feminine forms of the terms defined):

1. "Administrative Expense" means any cost or expense of administration of the Debtors' jointly administered Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Debtors' Estates, any actual and necessary post-petition expenses of administering and liquidating the Debtors' Estates, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330, 331, or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code.

2. "AEI" means Arts and Exhibitions International, LLC, debtor and debtor in possession in Case No. 3:16-bk-02238-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

3. "Allowed Claim" means, except as otherwise allowed or otherwise provided herein, a Claim, proof of which was timely and properly filed or, if no proof of claim was filed, which has been or hereafter is listed on the Debtors' Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which no objection to the allowance thereof has been interposed. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not include interest on such Claim accruing after the Petition Date.

4. "Allowed Class __ Claim" means an Allowed Claim in the Class specified.

5. "American Artifacts" means artifacts recovered by RMST from the site of the wreck of RMS Titanic during expeditions held in 1993, 1994, 1996, 1998, 2000 and 2004.

6. "Artifacts" means the American Artifacts and the French Artifacts and all associated assets and rights including, without limitation, all intellectual property, intangibles, contract rights, cash and receivables.

7. "Assets" means all assets of the Debtors' Estates including "property of the estate" as described in section 541 of the Bankruptcy Code and shall, without limitation, include Cash, Estate Causes of Action, any and all claims and causes of action that may be asserted by one or more of the Debtors against any third party or third parties, securities, proceeds of insurance and insurance policies, all rights and interests, all real and personal property, and all files, books and records of the Debtors' Estates.

8. "Bankruptcy Cases" means the Debtors' jointly administered cases under Chapter 11 of the Bankruptcy Code.

9. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended.

10. "Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division or, in the event such court ceases to exercise jurisdiction over any of the Debtors' jointly administered Chapter 11 Cases, such other court(s) that may exercise jurisdiction over such Chapter 11 Case(s).

11. "Bankruptcy Rules" means, collectively, (i) the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, and (ii) the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect or hereafter amended.

12. "Beneficiary" means beneficiary of the Liquidating Trust.

13. "Business Day" means any day which is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

14. "Cash" means cash or cash equivalents.

15. "Chapter 11 Cases" means the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code, commenced by the Debtors on the Petition Date.

45353971;6

16.     "Claim" means (a) any right to payment from a Debtor's Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from such Debtor's Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

17.     "Claim Objection Deadline", means the date set in the Confirmation Order as the last date by which objections may be made to the allowance of claims or interests, which date shall not exceed 180 days after the Effective Date.

18.     "Claims Bar Date" means October 24, 2016 or, in the case of a Governmental Entity, 180 days after the Petition Date, as set pursuant to the Bankruptcy Court's Notice of Chapter 11 Bankruptcy Case (Premier Docket No. 83).

19.     "Class" means one of the Classes of Claims or Classes of Equity Interests designated in the Plan.

20.     "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket, provided, however, that if such Confirmation Order is subject to a stay issued by a court of competent jurisdiction, "Confirmation Date" means the date upon which the Confirmation Order is no longer subject to a stay.

21.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

22.     "Covenants" means the Revised Covenants and Conditions set forth in Exhibit A to the August 12, 2010 Opinion of the District Court in the US Artifact Litigation, *R.M.S. Titanic v. Wrecked & Abandoned Vessel, its Engines, Tackle, Apparel, Appurtenances, Cargo, etc*., 742 F. Supp. 2d 784 (E.D. VA, 2010).

23.     "CRO" means the Person selected by the Liquidating Trustee, with the consent of the Equity Committee and in accordance with the terms of this Plan and the Liquidating Trust

Agreement, to act as the Chief Reorganization Officer for the Premier Debtors after the Effective Date.

24.    "Debtors" means Premier, RMST, AEI, Exhibitions Management, Exhibitions International, Exhibitions NYC, Merchandising and DUC as debtors and debtors in possession in the Bankruptcy Cases.

25.    "Disbursing Agent" means the Liquidating Trustee or any entity selected by the Liquidating Trustee to act as its agent in conducting the disbursements to Holders of Allowed Claims pursuant to the Liquidating Trust Agreement.

26.    "Disclosure Statement" means that certain document entitled "*The Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders*" filed in the Chapter 11 Case of Premier, including the exhibits attached thereto and to the Plan Supplement, either in its present form or as it may be amended, modified or supplemented from time to time.

27.    "Disputed Claim" means any Claim (i) which is listed in the Schedules as unliquidated, disputed, contingent, and/or unknown and for which no proof of Claim has been filed; (ii) as to which a Proof of Claim has been filed and the dollar amount of such Claim is not specified in a fixed amount; or (iii) as to which a Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan and/or any order of the Bankruptcy Court, which objection or request for estimation has not been withdrawn or determined by a Final Order.

28.    "Disputed Claims Reserve" means the Cash to be set aside for, and in an amount sufficient to pay the required distribution under the Plan to all Disputed Claims which have not been finally adjudicated as of the Effective Date and which may become Allowed Claims prior to the Final Distribution Date.

29.    "District Court" means the United States District Court for the Eastern District of Virginia.

45353971;6

30.    "DUC" means Dinosaurs Unearthed Corp., debtor and debtor in possession in Case No. 3:16-bk-02237-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

31.    "DUC Equity Interests" means any and all equity interest in DUC.

32.    "Effective Date" means the first day Business Day after all conditions precedent shall have been satisfied or waived pursuant to the provisions of Article IX, below, the Confirmation Order has been entered on the docket of the Bankruptcy Court and the District Court Order has been entered on the docket of the District Court, and no stay of the Confirmation Order is in effect.

33.    "Equity Committee" shall have the meaning ascribed to it in the preamble to this Plan.

34.    "Equity Interests" means, collectively, the Exhibitions International Equity Interests, the Exhibitions Management Equity Interests, the Exhibitions NYC Equity Interests, the Merchandising Equity Interests and the RMST Equity Interests.

35.    "Estate" means, with respect to each Debtor, the estate created by section 541(a) of the Bankruptcy Code upon the Petition Date.

36.    "Estate Causes of Action" means, with respect to each of the Debtors, any and all claims, demands, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages (actual, compensator or punitive), judgments, third-party claims, counterclaims and cross claims (including, but not limited to, any Chapter 5 avoidance or recovery actions under the Bankruptcy Code or recognized under any applicable state law) whether known or unknown, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively in law, equity, or otherwise, that are or may be pending on, or instituted after, the Effective Date.  Estate Causes of Action include, without limitation, those which are: (i) property of the Bankruptcy Estates under and pursuant to section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover including

6

pursuant to section 542 of the Bankruptcy Code; (iv) for avoidable transfers and preferences under and pursuant to sections 542 through 550 and 553 of the Bankruptcy Code or any applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under section 506(c) of the Bankruptcy Code; (vii) for subordination under section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) against any and all current and/or former officers and directors of the Debtors or any affiliates; (xi) for breach of fiduciary duty or aiding and abetting breach of fiduciary duty; (xii) under and pursuant to any policies for insurance, including for bad faith, maintained by the Debtors, including, without limitation, any liability insurance policy; (xiii) for theft of corporate opportunity; (xiv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xv) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (xvi) which arise under or as a result of any section of the Bankruptcy Code; (xvii) for common law torts or aiding and abetting common law torts; (xviii) contract or quasi contract; (xix) derivative based; (xx) statutory claims; (xxi) arise out of or are related in any way to actions or claims pending as of the Effective Date; (xxii) for negligence including professional negligence; (xxiii) for unjust enrichment; (xxiv) to disallow or subordinate any proof of claim filed in the Chapter 11 Cases; (xxv) to recover an avoidable transfer from any mediate or subsequent transferee; or (xxvi) any claim held or assertable by either the Bankruptcy Estates or Liquidating Trustee.

37. "Exhibitions International Equity Interests" means any and all equity interest in Exhibitions International.

38. "Exhibitions International" means Premier Exhibitions International, LLC, debtor and debtor in possession in Case No. 3:16-bk-02234-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

45353971;6

39. "Exhibitions Management" means Premier Exhibitions Management, LLC, debtor and debtor in possession in Case No. 3:16-bk-02233-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

40. "Exhibitions Management Equity Interests" means any and all equity interest in Exhibitions Management.

41. "Exhibitions NYC" means Premier Exhibitions NYC, Inc., debtor and debtor in possession in Case No. 3:16-bk-02235-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

42. "Exhibitions NYC Equity Interests" means any and all equity interest in Exhibitions NYC.

43. "File," "Filed," "Files," or "Filing" means any document(s) properly and timely filed with the Bankruptcy Court in the Chapter 11 Cases, as reflected on the official docket of the Bankruptcy Court for each of the Chapter 11 Cases, served on Persons, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

44. "Final Distribution" means the final distribution made to Holders of Equity Interests or Allowed Claims on the Final Distribution Date.

45. "Final Distribution Date" means the first Business Day on which any and all Disputed Claims have been resolved pursuant to a Final Order and the Liquidating Trust Assets have been liquidated, reduced to Cash, and distributed *pro rata* to holders of Allowed Claims.

46. "Final Order" means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; or as to which any right to appeal, reargue, rehear, or petition for certiorari shall have been waived in writing in form and substance satisfactory to the Equity Committee prior to the Effective Date; or Reorganized Premier [or the Liquidating Trustee, as the case may be,] after the Effective Date, respectively, or, in the event that an appeal,

45353971;6

writ of certiorari, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed or from which reargument or rehearing was sought, or certiorari shall have been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

47.     "First Day Pleadings", means the pleadings filed by the Debtors on the Petition Date in connection with their respective Chapter 11 cases.

48.     "French Artifacts" means approximately 2,100 artifacts recovered from the site of the wreck of RMS Titanic by Titanic Ventures Limited Partnership, predecessor in interest to RMST with the assistance of Institut Francaise de Recherche Pour l'Exploitation de la Mer over the course of 32 dives during an expedition in 1987.

49.     "General Unsecured Claim" means any Claim that is not a Secured Claim, an Administrative Expense, a Priority Tax Claim, a Class 5 Intercompany Claim, or an Equity Interest.

50.     "Governmental Unit" has the meaning ascribed to it in 11 U.S.C. §101(27).

51.     "Guernsey's" means Guernsey's, a division of Barlan Enterprises, Ltd.

52.      "Holder" means the owner of a Claim or Equity Interest.

53.     "Initial Distribution" means a distribution, made as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, to Holders of Allowed Class 2 Claims, Allowed Class 3 Claims, and Premier Equity Interests, on account of such Allowed Claims and Premier Equity Interests, their Pro Rata Shares of Available Cash in accordance with the terms of this Plan.

54.     "Interim Distributions" means one or more Pro Rata Distributions of Available Cash made in accordance with the Plan and/or any Order of the Bankruptcy Court on account of Allowed Claims before the Final Distribution.

55.      "Intercompany Claims" means any and all Claims (if any) held by one of the Debtors against any other Debtor(s), including (a) any account reflecting intercompany book

entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor(s).

56.    "Liquidating Trust" means the trust created pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement.

57.    "Liquidating Trust Agreement" means that certain liquidating trust agreement by and between the Debtor and the Liquidating Trustee to be entered pursuant to the Plan and the Confirmation Order, substantially in the form included in Exhibit "_" to the Plan Support Agreement, as may be amended from time to time.

58.    "Liquidating Trust Assets" means all of Premier's Assets and all of Premier's right, title and interest in and to the Premier Entities and all of their respective Assets, including (without limitation) the French Artifacts, the American Artifacts (subject to the Covenants), and the Estate Causes of Action.

59.    "Liquidating Trustee" means the Person [2] approved by the Court as Liquidating Trustee, and any successor trustee(s) appointed pursuant to the Liquidating Trust Agreement, that has the powers and responsibilities set forth in the Plan, the Confirmation Order and the Liquidating Trust Agreement.  Whenever the Liquidating Trustee is referred to herein, all such references are qualified by the Liquidating Trustee's powers, rights and obligations as set forth in the Liquidating Trust Agreement.

60.    "Merchandising" means Premier Merchandising, LLC, debtor and debtor in possession in Case No. 3:16-bk-02236-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code;

61.    "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense.

---

[2] The identity of the Liquidating Trustee and a copy of the Liquidating Trustee Agreement will be included in the Plan Supplement.

62. "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any political subdivision, Governmental Unit, official committee appointed by the Office of the United States Trustee, unofficial committee of creditors, or other entity.

63. "Petition Date" means June 14, 2016, the date on which the Debtors filed their respective voluntary petitions commencing the Chapter 11 Cases.

64. "Plan" means this Chapter 11 Plan including all exhibits hereto, either in their present form or as they may be altered, amended, or modified from time to time.

65. "Plan Supplement" means the compilation of documents and forms of documents, schedules, attachments and exhibits to this Plan, to be filed by the Equity Committee following the filing of this Plan as set forth herein, by no later than (A) ten (10) calendar days prior to any voting deadline set by the Court for casting ballots to accept or reject this Plan or (B) such later date as may be approved by the Court on notice to parties in interest, as such Plan Supplement documents may be amended, modified, or supplemented from time to time.

66. "Premier Entities" means the Debtors, 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd. and any and all direct or indirect subsidiaries of Premier in existence on the Effective Date.

67. "Premier" means Premier Exhibitions, Inc., debtor and debtor in possession in Case No. 3:16-bk-02232-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

68. "Premier Operating Capital Distribution", means a distribution to, or retention by the Liquidating Trust on the Effective Date of cash from the estate to be reserved for working capital needs of the Liquidating Trust.

45353971;6

69.     "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

70.     "Professional Person" means for purposes of this Plan, any professional person employed by the Debtor pursuant to sections 327 or 1103 of the Bankruptcy Code.

71.     "Pro Rata," "Pro Rata Share," and "Pro Rata Basis" means, at any time, the proportion that the face amount of a Claim in a particular Class or Classes bears to the aggregate face amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes; and "face amount," as used herein, means (a) when used in reference to a Disputed or disallowed Claim, the full stated liquidated amount claimed by the claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicably bankruptcy law; and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

72.     "Premier Equity Interests" means all the equity interest in Premier represented by the issued and outstanding equity securities of Premier.

73.     "Record Date" means the date set forth in the Order Approving the Disclosure Statement that accompanies this Plan for determination of Allowed Interests for purposes of casting Ballots.

74.     "RMST" means RMS Titanic, Inc., successor to Titanic Ventures Limited Partnership, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code in Case No. 3:16-bk-02230-PMG pending before the Bankruptcy Court.

75.     "Secured Claim" means a Claim against a Debtor to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Debtor's Estate securing such Claim.

76.     "Taxes" means all income, gaming, franchises, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign governmental authority.

12

77.    "Titanic Artifacts" means the French Artifacts and the American Artifacts that were property of the Estate of RMST as of the Petition Date.

78.    "US Artifact Litigation", means the admiralty case pending in the District Court, styled *R.M.S. Titanic v. Wrecked & Abandoned Vessel, its Engines, Tackle, Apparel, Appurtenances, Cargo, etc,* Action No. 2:93cv902.

### B.    Other Terms.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. Terms defined in the singular shall include the plural and vice versa.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules and shall be construed in accordance with the rules of construction thereunder.

### C.    Computation of Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

### D.    Exhibits.

All exhibits to the Plan and to the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

## II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Summary.

Premier and Intercompany Claims

The chart below summarizes the classes of Claims and Equity Interests of Premier for all purposes, including voting, confirmation, and distribution pursuant to the Plan:

| CLASS | STATUS |
|---|---|
| Class 1: Other Priority Claims | Unimpaired - not entitled to vote |
| Class 2: Secured Claims | Unimpaired -  not entitled to vote |
| Class 3: General Unsecured Claims | Impaired – entitled to vote |

| CLASS | STATUS |
|---|---|
| Class 4: Premier Equity Interests | Impaired – entitled to vote |
| Class 5: Intercompany Claims | Impaired, Deemed to Reject Plan. |

**B.    Unclassified Claims (All Debtors).**

Administrative Expense Claims.

a.    General.

Subject to the allowance procedures and deadlines provided herein, the Liquidating Trustee or, at the discretion of the Liquidating Trustee, the CRO shall pay to each holder of an Allowed Administrative Expense, on account of the Allowed Administrative Expense, and in full satisfaction thereof, Cash equal to the amount of such Allowed Administrative Expense, unless the holder agrees to other treatment.  Except as otherwise provided herein or a prior order of the Bankruptcy Court: (i) payment of an Administrative Expense that is an Allowed Claim as of the Effective Date shall be made on the later of forty-five (45) calendar days after the Effective Date or the date such payment would have become due for payment of such Allowed Administrative Expense in the absence of the Chapter 11 Case, whether pursuant to contract or applicable non-bankruptcy law; and (ii) payment of an Administrative Expense that becomes an Allowed Claim following the Effective Date shall be made on or before (a) the date that is thirty (30) days after an order deeming such Administrative Expense an Allowed Claim becomes a Final Order, or (b) the Final Distribution Date, whichever is earlier.

b.    Deadlines for Filing Claims for Administrative Expenses.

**(1)    Pre-Effective Date Claims and Expenses.**

All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Expenses incurred before the Effective Date pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition obligations incurred through the Effective Date in the ordinary course of Debtor's post-petition

14

business and obligations under section 1930 of title 28 of the United States Code) shall be filed no later than the first Business Day that is not less than forty-five (45) days after the Effective Date (the "Administrative Expense Claims Bar Date"). Professional Persons and others that do not file such requests on or before the Administrative Expense Claims Bar Date shall be barred from asserting such Claims against the Liquidating Trust, the Liquidating Trustee, the Debtors, the Premier Entities or any other Person or entity, or any of their respective property. Objections to applications of Professional Persons or others for compensation or reimbursement of expenses must be Filed and served on the jointly administered Debtors and their counsel, the Liquidating Trustee and its counsel, as well as the Professional Persons and others to whose application the objection is addressed, in accordance with the Bankruptcy Code, the Bankruptcy Rules or pursuant to any other procedure set forth by an order of the Bankruptcy Court. From and after the Effective Date, the Liquidating Trustee will comply with such reporting requirements, and payment of quarterly fees to the Office of the United States Trustee as required by applicable law.

<p style="text-align:center;">(2)      <strong>Tax Claims.</strong></p>

Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, all requests for payment of Claims by a governmental unit (as defined under section 101(27) of the Bankruptcy Code) for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) ninety (90) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes is required to File a request for a payment of the post-petition taxes and other monies due related to such taxes. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes which does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against

<p style="text-align:center;">15</p>

any of the Estate, the Liquidating Trustee or their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date, and shall receive no distribution under the Plan or otherwise on account of such Claim.

<div align="center">(3)     <strong>Priority Tax Claims.</strong></div>

Except as otherwise agreed to by the parties, or ordered by the Court, as soon as practicable after the Effective Date, each holder of an unpaid Allowed Priority Tax Claim shall receive payment in full in an amount equal to the Allowed Priority Tax Claim.

**C.**     <u>**Classification and Treatment (Classes 1 – 4 Premier Claims and Class 5 Intercompany Claims).**</u>

<u>Class 1:  Other Priority Claims.</u>

a.    Classification:  Class 1 consists of all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, except Priority Tax Claims and Administrative Expenses.

b.    Treatment:  The Liquidating Trustee shall pay all Allowed Claims in this class in full, in Cash, on the later of: (i) 45-days after the Effective Date; and (ii) within ten days of the date on which an order allowing such Claim becomes a Final Order, in each case, or as soon thereafter as is practicable.  Class 1 is not impaired, and the holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

<u>Class 2:  Secured Claims.</u>

a.    Classification:  Class 2 consists of Secured Claims of Jihe Zang, Lange Feng and Haiping Zou.

b.    Treatment:   Holders of Allowed Class 2 Claims shall receive payment in full in Cash in the amount of their respective Allowed Secured Claims.  Distributions to holders of Allowed Class 2 Claims shall occur on the later of (i) ninety (90) days after the Effective Date if such Secured Claim is deemed to be an Allowed Claim, (ii) the closing of the sale by auction of the French Artifacts or the sale of the American Artifacts and (iii) the first Business Day that is at least thirty (30) days from the date the Secured Claim becomes an Allowed

<div align="center">16</div>

Claim, if it is not an Allowed Claim on the Effective Date.  Class 2 is not impaired, and the holders

of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

<u>Class 3:  General Unsecured Claims.</u>

a.    Classification:  Class 3 consists of all General Unsecured Claims

against the Debtors.

b.    Treatment:  Unless a Holder of an Allowed Class 3 Claim agrees to

accept a lesser treatment of such Claim, each Holder of an Allowed Class 3 Claim shall receive,

as soon as practicable in the discretion of the Liquidating Trustee, in full satisfaction thereof, its

Pro Rata Share of the Initial Distribution.  In addition, after the Initial Distribution but prior to the

Final Distribution Date, the Liquidating Trustee may, but is not required to, make one or more

Interim Distributions to the Holders of Allowed Class 3 Claims of such Holders' Pro Rata Share

of Available Cash, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has

sufficient Available Cash to make such Interim Distributions.  Finally, on the Final Distribution

Date, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata Share of the Available

Cash remaining in the Liquidating Trust, until the Allowed Class 3 Claim Amount of such

Allowed Claim is paid in full.  Class 3 is impaired, and the Holders of Allowed Class 3 Claims

are entitled to vote to accept or reject the Plan.

<u>Class 4:  Premier Equity Interests</u>

a.    Classification:  Class 4 consists of the Premier Equity Interests.

b.    Treatment:  Unless a Holder of a Class 4 Premier Equity Interest

agrees to accept a lesser treatment of such Premier Equity Interest, each holder of such Premier

Equity Interest shall receive, as soon as practicable in the discretion of the Liquidating Trustee,

its Pro Rata Share of the Initial Distribution after (i) each Holder of Allowed Class 2 and Class 3

Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital

Distribution.  In addition, after the Initial Distribution but prior to the Final Distribution Date, the

Liquidating Trustee may, but is not required to, make one or more Interim Distributions to the

Holders of Premier Equity Interests of such Holders' Pro Rata Share of Available Cash (after (i)

each Holder of Allowed Class 2 and Class 3 Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital Distribution, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions). Finally, on the Final Distribution Date, each Holder of a Premier Equity Interest shall receive its Pro Rata Share of the Available Cash (after (i) each Holder of Allowed Class 2 and Class 3 Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital Distribution remaining in the Liquidating Trust). Class 4 is impaired, and the Holders of Class 4 Premier Equity Interests are entitled to vote to accept or reject the Plan.

<u>Class 5: Intercompany Claims</u>

   a.     Classification: Class 5 consists of all Intercompany Claims.

   b.     On the Effective Date, all Intercompany Claims shall be cancelled in full and holders of Intercompany Claims shall receive no distribution and retain no Property on account of such Claims. Class 5 is Impaired under this Plan. Holders of Allowed Intercompany Claims in Class 5 are deemed to reject the Plan.

## III.   <u>LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND DISTRIBUTION PURPOSES.</u>

Solely for the purposes of voting on, confirmation of, and Distributions to be made to Holders of Class 4 Premier Equity Interests and Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to the confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of this Plan, its confirmation and Distributions made pursuant to it.

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for the purposes of this Plan, its confirmation and Distributions made pursuant to it, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors for the purposes of this Plan, its confirmation and Distributions made pursuant to it, (iii) any Claims Filed or to be Filed in connection with any such obligations will be

45353971;6

deemed Claims against the consolidated Debtors and all Claims filed against more than one Debtor for the same liability will be deemed to be one Claim against any obligation of the consolidated Debtors, (iv) each Claim Filed in the Chapter 11 Case of any Debtor will be deemed to be Filed against the Debtors in the consolidated Chapter 11 Cases, (v) all transfers, disbursements and Distributions made by any Debtor hereunder on Allowed Claims will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of any Debtors of the obligations of any other Debtor shall be deemed to be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of Property available for Distribution to such Class without regard to which Debtor was originally liable for such Claim.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) any obligations under any contract or lease that was entered into during the Chapter 11 Cases or executory contracts and unexpired leases that have been or will be assumed and assigned pursuant to this Plan, (b) distributions from any insurance policies or proceeds of such policies, or (c) guarantees that are required to be maintained post-Effective Date in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases, or that have been, or will be pursuant to this Plan, assumed and assigned. The limited consolidation proposed herein shall not affect each Debtor's obligations to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

IV.    **ACCEPTANCE OR REJECTION OF THE PLAN**

    A.    **Voting Classes.**

Each Holder of an Allowed Class 3 Claim and each Holder of a Class 4 Premier Equity Interest shall be entitled to vote to accept or reject the Plan.

    B.    **Record Date for Holders of Impaired Class 4 Premier Equity Interests.**

45353971;6

Holders of Premier Equity Interests as of the Record Date may vote Ballots to accept or reject the Plan.

### C.    Voting Rights of Holders of Disputed Claims.

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

### D.    Acceptance by Impaired Classes.

Impaired classes of Claims shall have accepted the Plan if (i) the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) more than one-half in number of the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in each such Class have voted to accept the Plan.

### E.    Acceptance by Impaired Interests.

The impaired class of Premier Equity Interests shall have accepted the Plan if the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Interests actually voting in such Class have voted to accept the Plan.

### F.    Presumed Acceptance of the Plan.

Classes 1 and 2 are unimpaired under the Plan and, therefore, are conclusively presumed by the Bankruptcy Code to accept the Plan.

### G.    Presumed Rejection of the Plan

Holders of Class 5 interests are impaired and will receive nothing under the Plan and, therefore, are conclusively presumed by the Bankruptcy Code to reject the plan.

# V. PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES.

### A. Resolution of Disputed Claims.

As of the Effective Date, and subject to the provisions of this Plan, the Liquidating Trustee shall have sole authority for investigating, administering, monitoring, implementing, litigating and settling all Disputed Claims. From and after the Effective Date, the Liquidating Trustee shall have the sole and exclusive right to make and file, and to prosecute, objections to Claims, including, but not limited to, Administrative Expenses and Priority Tax Claims. All objections shall be filed prior to the Liquidating Trustee Claim Objection Deadline and served upon the Holder of the Claim to which the objection is made.

### B. Reserve for Disputed Claims.

Cash which would be issued and distributed on account of holders of Disputed Claims in the event that such Disputed Claims become Allowed Claims, shall instead be placed in the Disputed Claims Reserve maintained by the Liquidating Trustee. Such Cash in the Disputed Claims Reserve will be reserved for the benefit of holders of such Disputed Claims pending determination of their entitlement thereto. Unless the Bankruptcy Court orders otherwise, the Liquidating Trustee will reserve Pro Rata distributions for such Disputed Claims based upon the full amount of the Disputed Claims or (a) in the case of a Disputed Class 2 Claim or Class 3 Claim, in the full amount of the Allowed Class 2 Claim amount or Class 3 Claim Amount, as the case may be, and (b) in the case of a Disputed Claim that is an Administrative Claim, Cash in the full amount of such Disputed Claim. No reserve shall be required for any Disputed Claim to the extent of any effective insurance coverage therefore. Such Cash so reserved shall be distributed by the Liquidating Trustee to the holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash shall be allocated among

45353971;6

holders of Allowed Claims in the Class in which the Disputed Claim was classified, as provided in the Plan.

Prior to or on the Final Distribution Date, the Liquidating Trustee shall make all distributions on account of any Disputed Claim that has become an Allowed Claim and remains unpaid as of the Final Distribution Date. To the extent that any portion of a Disputed Claim is not disputed, the Liquidating Trustee may establish a reserve in the Disputed Claims Reserve only on account of that portion of the Disputed Claim that is in dispute and may make one or more interim Distributions on account of the portion of such Disputed Claim that is not in dispute.

The Liquidating Trustee may, at the Liquidating Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor liquidating trust. If the election is made, the Liquidating Trustee shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

## VI.     IMPLEMENTATION OF THE PLAN

### A.     Employment of the CRO.

On the Effective Date the Liquidating Trustee shall be authorized and instructed to employ the CRO.

### B.     Disposition of the French Artifacts.

On the Effective Date, the Liquidating Trustee shall be authorized and instructed to employ Guernsey's to conduct a sale of the French Artifacts by auction in such manner as the Liquidating Trustee determines, in the exercise of its sole discretion, is in the best interests of the Debtors, their Estates and all parties having an interest therein.

### C.     Disposition of the American Artifacts

The CRO shall manage and administer the American Artifacts consistent with the Covenants pending disposition of the American Artifacts by the Liquidating Trustee until the

45353971;6

American Artifacts are transferred to a Qualified Institution, as defined in the Covenants. The CRO shall offer to employ all employees of Premier who are involved in the preservation, management, and display of the American Artifacts pending their disposition.

The Liquidating Trustee shall offer the American Artifacts for sale only to potential bidders that are Qualified Institutions, as defined in the Covenants, to serve as the subsequent trustee and subsequent salvor-in-possession of the American Artifacts under the Covenants. Any transfer of the American Artifacts to a successor trustee and salvor shall be subject to approval of the District Court and shall be made only on notice to the United States Department of Commerce, National Oceanic and Atmospheric Administration and all other parties entitled to notice in the US Artifacts Litigation.

**D.** **Administration and Sale of Liquidating Trust Assets Other than the French Artifacts.**

From and after the Effective Date the Liquidating Trustee shall be authorized and instructed to administer the Liquidating Trust Assets, other than the American Artifacts, including, without limitation, the French Artifacts and the Estate Causes of Action, in a manner that the Liquidating Trustee determines, in the exercise of his sole discretion after consultation with the CRO is in the best interests of the Debtors, their Estates and all parties having an interest therein, including, without limitation, by operating one or more of the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities or their Assets and/or the French Artifacts when and if the Liquidating Trustee in his sole discretion after consultation with the CRO determines any such sale is in the best interests of the Debtors, their Estates and all parties having an interest therein.

**E.** **Vesting of Assets.**

Unless otherwise expressly provided under this Plan, on the Effective Date, the Liquidating Trust Assets will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan. On and after the Effective Date,

the transfer of the Liquidating Trust Assets from the Debtors' Estates to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.

In connection with the foregoing

(i)     On the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property of the Liquidating Trust free of any restrictions imposed under the Bankruptcy Code.

(ii)    The Confirmation Order will provide that, upon the Effective Date, the Liquidating Trustee shall have express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan.

(iii)   As of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

**F.      Establishment of the Liquidating Trust.**

On the Effective Date, the Liquidating Trust Agreement will become effective, and, if not previously signed, Premier and the Liquidating Trustee will execute the Liquidating Trust Agreement.  The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

1. Beneficiaries.

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Class 3 Claims and Class 4 Premier Equity Interests.  The Holders of such Allowed Class 3 Claims and Class 4 Premier Equity Interests will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

24

2.      Implementation of Liquidating Trust.

On the Effective Date, Premier, on behalf of the Premier Estate and the Premier Entities (including RMST), and the Liquidating Trustee, will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as an exhibit to the Plan Supplement, take all such actions as required to transfer the Liquidating Trust Assets to the Liquidating Trust from Debtors' Estates.  From and after the Effective Date, the Liquidating Trustee will be authorized to, and will, take all such actions to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims (including, without limitation, seeking the subordination and/or reclassification of Claims), prosecuting or otherwise resolving Estate Causes of Action and causing Distributions from the Liquidating Trust to be made to the Beneficiaries.

3.      Transfer of Liquidating Trust Assets.

On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee all of the right, title and interest of Debtors in and to the Liquidating Trust Assets.  To the extent required to implement such transfer of the Liquidating Trust Assets to the Liquidating Trust, all Persons will cooperate with and assist Premier and the Liquidating Trustee in implementing said transfers.

4.      Representative of the Debtors' Estates.

The Liquidating Trustee will be appointed as the representative of the  Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) object to Claims against (including, without limitation, seeking the subordination and/or reclassification of such Claims); (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust including through the use of Federal Rule of Bankruptcy Procedure 2004; (iii) make Distributions provided for in the

45353971;6

Plan, including, but not limited to, on account of Allowed Claims and Interests; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Cases. As the representative of the Debtors and their Estates, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to Estate Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

<p style="text-align:center;">5.      No Liability of Liquidating Trustee.</p>

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents") will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. The Liquidating Trustee, the Liquidating Trustee's Agents, and their respective employees, officers, directors, agents, members, or representatives, or professionals employed or retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Article XI of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or the Liquidating Trust, or their respective property. The Confirmation Order's approval of the Plan will also constitute a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing herein or in Article XI of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person.

<p style="text-align:center;">26</p>

6.      Provisions Relating to Federal Income Tax Compliance.

The transfer of the Assets to the Liquidating Trust will be treated for federal income tax purposes as a deemed transfer by the Debtors to the creditors and equity interest holders that are beneficiaries followed by a deemed transfer by the creditors and equity interest holders that are beneficiaries to the Liquidating Trust, in accordance with Revenue Procedure 94-45, 1994-2 C.B. 684. Accordingly, the taxation of the deemed transfers from the Debtors to the creditors and equity interest holders that are beneficiaries and from the creditors and equity interest holders that are beneficiaries to the Liquidating Trust will be governed by provisions of the Internal Revenue Code of 1986, as amended ("IRC") Sections 61(a)(12), 483, 1001, 1012 and 1274. The creditors and equity interest holders that are beneficiaries will be treated as the grantors and deemed owners of the Liquidating Trust's assets. The taxable income or loss of the Liquidating Trust, including the taxable income attributable to the Disputed Claims Reserve, if any, will be allocated to the beneficiaries on an annual basis pro rata in accordance with their respective entitlement to receive distributions from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year (taking into account all prior and concurrent distributions from the Liquidating Trust during such taxable year). The Liquidating Trustee shall not be required to report such tax information to any Beneficiary unless such Beneficiary provides to the Liquidating Trustee a complete form W-9 or acceptable substitute signed under penalty of perjury. In determining each Beneficiary's share of income, gain, loss, deductions and credits, the Liquidating Trustee shall not allocate such items to any Beneficiary who is the holder of a Claim which has no value until such time, if at all, as a value of the Claim arises. The beneficiaries shall be responsible to report and pay the taxes due on their proportionate share of the Liquidating Trust taxable income, whether or not amounts are actually distributed by the Liquidating Trustee to the beneficiaries to pay the taxes. The value of the Assets transferred into the Liquidating Trust shall

27

be the fair market value of such Assets at the time of such transfer, as reasonably determined by the Liquidating Trustee, in consultation with such advisors as the Liquidating Trustee deems appropriate, within a reasonable period of time after the Effective Date. Such valuation shall be binding on all parties including, but not limited to, the Debtors, the Estate, the Liquidating Trustee, and all beneficiaries, and these valuations will be used by such parties for all federal income tax purposes. Notwithstanding anything in this Plan to the contrary, in the event that (i) any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to Treasury Regulation Section 1.468B-1, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation Section 1.468B-9, any federal income tax consequences shall be determined under IRC Section 468B and the Treasury Regulations thereunder.

### G.   Prosecution of Estate Causes of Action by the Liquidating Trustee.

Subject to the provisions of Articles X and XI of this Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan, with all recoveries derived therefrom to be included within the Liquidating Trust Assets.

## VII.   DISTRIBUTIONS UNDER THE PLAN

### A.   In General.

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court, Distributions to be made on account of Allowed Claims, other than Allowed Class 2 and Class 3 Claims and Class 4 Premier Equity Interests, shall be made on the Effective Date. The dates for Distributions by the Liquidating Trust on account of Allowed Class 3 Claims and Class 4 Premier Equity Interests shall be selected by the Liquidating Trustee. Such Distributions shall be made as soon as practicable after the Effective Date.

### B.     <u>Manner of Payment Under the Plan.</u>

Any payment of Cash made by the Liquidating Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

### C.     <u>Manner of Distribution of Other Property.</u>

Any distribution under the Plan of property other than Cash shall be made by the Liquidating Trustee in accordance with the terms of the Plan.

### D.     <u>Setoffs.</u>

The Liquidating Trustee may set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Liquidating Trust may have against the holder of such Claim; provided that neither the failure to effect such set off nor the allowance of any Claim that otherwise would be subject to set off, shall constitute a waiver or release by the Liquidating Trust of any such claim the Liquidating Trust may have against such holder.

### E.     <u>Distribution of Unclaimed Property.</u>

Except as otherwise provided in the Plan, any distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one year following the Effective Date or (ii) ninety (90) days after such distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

### F.     <u>De Minimus Distributions.</u>

No cash payment of less than fifty dollars ($50.00) shall be made by the Liquidating Trustee to any holder of a Claim unless a request therefor is made in writing to the Liquidating Agent.

### G.     <u>Saturday, Sunday or Legal Holiday.</u>

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be

completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

    **H.**    **Delivery of Distributions, Address of Holder.**

For purposes of all notices and Distributions under this Plan, the Liquidating Trustee shall be entitled to rely on the name and address of the holder of each Claim as shown on, and Distributions to holders of Allowed Claims shall be made by regular U.S. first class mail to, the following addresses: (a) the address set forth on in the proofs of Claim Filed by such holders; (b) the address set forth in any written notice of address change delivered by the holder to the Debtor concerned or Liquidating Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on the Schedules if no proof of Claim is Filed and the Debtor concerned or Liquidating Trustee has not received a written notice of a change of address. The Liquidating Trustee shall be under no duty to attempt to locate holders of Allowed Claims who are entitled to unclaimed Distributions.

## VIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

    **A.**    **Assumption.**

Effective upon the Effective Date, the Debtors shall be deemed to assume those executory contracts and unexpired leases which are listed in an exhibit to the Plan Supplement (the "Schedule of Executory Contracts and Unexpired Leases"). Pursuant to this Plan, the Debtors will also assume the executory contracts and unexpired leases that are the subject of any specific order of the Bankruptcy Court. The Equity Committee reserves the right to delete any contract or lease from the Schedule of Executory Contracts and Unexpired Leases to the Plan Supplement, thereby rejecting the contract or lease, up until the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Schedule of Executory Contracts and Unexpired Leases to the Plan and by giving notice to counsel for the non-debtor party to the contract or lease.

    **B.**    **Assumption and Cure Payment Objection.**

The Schedule of Executory Contracts and Unexpired Leases to the Plan Supplement will specify the amount (the "Cure Payment"), if any, that the Equity Committee believes must be

tendered on the Effective Date, in order to provide cure and compensation in accordance with sections 365(b)(1)(A) & (B) of the Bankruptcy Code. The deadline for any objections to the Cure Payment amounts set forth in the Schedule of Executory Contracts and Unexpired Leases shall be the date for filing objections to the Plan, and no other objections to such Cure Payment will be timely. In the event that any party to a listed contract or lease on the Schedule of Executory Contracts and Unexpired Leases contends that the Cure Payment amount so listed is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof specifying the amounts allegedly owing under sections 365(b)(1)(A) & (B) of the Bankruptcy Code no later than the date fixed for filing objections to the confirmation of the Plan. Failure to timely file and serve such statement shall result in the determination that the tender of the Cure Payment, as specified in the Schedule of Executory Contracts and Unexpired Leases on the Effective Date, shall provide cure and compensation for any and all defaults and unpaid obligations under such assumed executory contract or unexpired lease.

In the event that any party to a listed contract or lease specified in the Schedule of Executory Contracts and Unexpired Leases objects to the proposed assumption by any Debtor, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof no later than the date fixed for filing objections to the confirmation of the Plan. Failure to timely file and serve such statement shall result in the determination that the assumption is appropriate.

The Equity Committee reserves the right to respond to any objection filed by any party to an executory contract or unexpired lease under this paragraph and/or to reject any executory contract or unexpired lease or assume such contract or unexpired lease by complying with section 365(b) of the Bankruptcy Code. To the extent the Equity Committee disagrees with any objection filed by any party to an executory contract or unexpired lease under this paragraph, either may request that the Bankruptcy Court declare that the Cure Payment is as stated in the Schedule of

45353971;6

Executory Contracts and Unexpired Leases, and that the proposed assumption is appropriate, and any disputes shall be resolved by the Bankruptcy Court.

Entry of the Confirmation Order shall constitute approval of the assumptions under the Plan pursuant to section 365 of the Bankruptcy Code. All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code shall be made on the Effective Date or as soon thereafter as is practicable or as may otherwise be agreed by the parties to any particular contracts or leases.

### C. <u>Rejection.</u>

With the exception of those executory contracts and unexpired leases that have been previously assumed, assumed pursuant to Section VII.A, above, or rejected by order of the Bankruptcy Court pursuant to Bankruptcy Code section 365, as of the Effective Date, the Debtors shall reject, pursuant to Bankruptcy Code section 365, all other executory contracts and unexpired leases.

### D. <u>General.</u>

Inclusion of a matter in  the Schedule of Executory Contracts and Unexpired Leases does not constitute an admission by any Debtor that an executory contract or unexpired lease exists, is valid or is an executory contract or unexpired lease.  Entry of the Confirmation Order shall constitute approval of the rejections under the Plan pursuant to section 365(a) of the Bankruptcy Code.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Bankruptcy Court on or before such date as the Bankruptcy Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day,

the first Business Day occurring thereafter. Any such Claims which are not filed within such time will be forever barred from assertion against the Debtors' Estates and their property, or the Liquidating Agent.

       **E.**      **Insurance Policies.**

For the avoidance of doubt, the Debtors' rights with respect to all insurance policies under which the Debtors, and each of them, may be a beneficiary (including all insurance policies that may have expired prior to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies entered into by the Debtors after the Petition Date, and all insurance policies under which any Debtor holds rights to make, amend, prosecute and benefit from claims), are retained and will be transferred or assigned to the Liquidating Trust pursuant to this Plan. Notwithstanding any provision providing for the rejection of executory contracts, any insurance policy that is deemed to be an executory contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a specific motion by the Liquidating Trustee who shall retain the right to assume or reject any such executory contracts pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code following the Effective Date.

**IX.**      **EFFECTIVENESS OF THE PLAN**

       **A.**      **Conditions Precedent.**

It shall be a condition to the Effective Date of this Plan that the following provisions, terms and conditions are approved or waived pursuant to this Article IX:

       (i)      The Bankruptcy Court shall have entered the Confirmation Order, which order shall not have been amended, modified, reversed, vacated, enjoined or stayed pending appeal;

       (ii)      All authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained;

       (iii)      The District Court shall have entered an order approving any Sale transaction of the American artifacts;

45353971;6

(iv)     The Equity Committee shall have appointed the Liquidation Trustee, and the Liquidating Trust Agreement and the other Liquidating Trust Documents shall have been executed and delivered; and

(v)     No order of a court shall have been entered and shall remain in effect restraining the Equity Committee from consummating the Plan.

B.     Waiver of Conditions.

The conditions to confirmation of this Plan and to the Effective Date set forth in Article IX., hereof may be waived by the Equity Committee without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

**B.     Notice of Effective Date.**

As soon as practicable after the Effective Date has occurred, the Liquidating Trustee shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

**X.     RETENTION OF JURISDICTION**

This Plan shall not in any way limit the Court's post-confirmation jurisdiction as provided under the Bankruptcy Code.  The Bankruptcy Court will retain and have exclusive jurisdiction to the fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to the Chapter 11 Case or the Plan, including but not limited to the following:

(I)     To hear and determine pending motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases to which any of the Debtors are a party, including, but, not limited to, the determination of any cure payments related thereto, the allowance, disallowance or liquidation of Claims resulting therefrom and whether such contract or lease is executory or unexpired, respectively, pursuant to Section 365 of the Bankruptcy Code;

(II)     To hear and determine pending motions for sale of assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code, if any are pending as of the Effective Date;

45353971;6

(III)    To hear and determine any and all causes of action and rights of the Debtors that arose before or after the Petition Date that are expressly preserved pursuant to, among other things, section 1123(b)(3) of the Bankruptcy Code, are yet to be liquidated and are preserved for prosecution by the Liquidating Trustee or other appropriate party in interest, including any designee or successor, against any Person whatsoever, on account of any and all Estate Causes of Action (including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and all non-avoidance actions owned by the Debtors' Estates including, but not limited to, claims of tort, breach of contract and claims lying in law or in equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise) and Premier Insider Claims;

(IV)    To grant or deny any applications for allowance of compensation for any Professional Person authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(V)    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be instituted prior to the closing of the Bankruptcy Cases;

(VI)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(VII)    To hear and determine any objections to requests for Administrative Expenses and to Proofs of Claims filed both before and after the Effective Date, and to allow or disallow any Disputed Claim in whole or in part;

(VIII)    To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of, or subordinate for any purposes pursuant to section 510 of the Bankruptcy Code, any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of all Claims;

(IX)    To enter orders approving the Liquidating Trust's post-Confirmation sale, transfer, or other disposition of Trust Assets pursuant to sections 363 and 1146(c) of the Bankruptcy Code or otherwise, free and clear of all Liens, Claims and encumbrances;

(X)    To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(XI)    To hear and determine any disputes arising in connection with the interpretation; implementation, execution, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, including, but not limited to, enforcement of the provisions of Article 11 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

(XII)    To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(XIII)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Liquidating Trust Agreement, this Plan or the Confirmation Order;

(XIV)    To permit the Liquidating Trustee to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify this Plan or any agreement or document created in connection with this Plan or remedy any defect or omission or reconcile any inconsistency in this Plan or any agreement or document created in connection with this Plan;

(XV)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Liquidating Trust Agreement, this Plan or the Confirmation Order;

(XVI)    To enforce any injunctions entered in connection with Chapter 11 Cases, or relating to this Plan or the Confirmation Order;

(XVII) To enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Liquidating Trust Agreement or this Plan are enjoined or stayed;

(XVIII)     To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Liquidating Trust Agreement, this Plan and the Confirmation Order;

(XIX)  To order the complete or partial substantive consolidation of any non-Debtor with or into the Liquidating Trust *nunc pro tunc* to the Petition Date or otherwise;

(XX)   To enter any orders in aid or in extension of prior orders of the Bankruptcy Court in the Bankruptcy Cases;

(XXI)  To determine any matter that may arise in connection with or relating to this Plan or any agreement or the Confirmation Order

(XXII) To hear any other matter not inconsistent with the Bankruptcy Code; and

(XXIII)     To enter a Final Decree closing the Bankruptcy Cases.

## XI.   LIMITATION OF LIABILITY, RELEASES AND INJUNCTION.

### A.   Exculpation.

Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date, the Debtors, the Equity Committee, the Creditors Committee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case, including, without limiting the generality of the foregoing, all sales of assets of any Debtor's Estate, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the negotiation, formulation, and/or consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan or any acts or omissions taken with respect to any contract, instrument, release or other

agreement or document created in connection with the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code. Notwithstanding the foregoing, this provision of the Plan is not intended to waive or release any cause of action based on pre-Petition Date actions or conduct, including but not limited to any Estate Causes of Action.

### B.     Injunction Enjoining Holders of Claims Against and Equity Interests in the Debtors.

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests. To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors arising prior to the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtors, their Estates, the Liquidating Trust or its property (other than actions brought to enforce any rights or obligations under the Plan):

(i)      commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

(ii)      Enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets;

(iii)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien, security interest or encumbrance against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets; and

45353971;6

(iv)      proceeding in any manner in any place whatsoever against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets, that does not conform to or comply with the provisions of the Plan.

**C.      No Discharge of the Debtors.**

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

## XII.    MISCELLANEOUS PROVISIONS

**A.      Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code.  The Liquidating Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Bankruptcy Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Disbursing Agent under the Plan.  After the Effective Date and until the Chapter 11 Case is closed, the Liquidating Trustee shall file with the Office of the United States Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

**B.      Headings.**

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

45353971;6

C.    **Binding Effect.**

The Plan shall be binding upon and inure to the benefit of the Debtors' Estates, holders of Claims, holders of Equity Interests, and their respective successors or assigns.

D.    **Revocation or Withdrawal.**

Right to Revoke.

The Equity Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.

Effect of Revocation.

If the Equity Committee revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or their Estates or any other person or to prejudice in any manner the rights of the Debtors or their Estates or any person in any further proceedings involving the Debtors or any of them.

E.    **Governing Law.**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, this Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

F.    **Withholding, Reporting, and Payment of Taxes.**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating

45353971;6

Trustee shall report and pay taxes on the income of the Liquidating Trust Assets, if any, as required by applicable law. In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

### G. **Other Documents and Actions.**

The Debtors on and prior to the Effective Date and the Liquidating Trustee after the Effective Date may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

### H. **Modification of the Plan.**

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Equity Committee. After the Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

### I. **Notices.**

Any notice to the Debtors, Liquidating Trustee, the Equity Committee, the Creditors Committee, or United States Trustee required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

To the Equity Committee:

> Official Committee of Equity Security Holders of Premier Exhibitions, Inc.
> c/o Landau Gottfried & Berger LLP
> 1801 Century Park East, Suite 700
> Los Angeles, CA 90067
> ATT: Peter J. Gurfein and Jon Dalberg
> Tel: (310) 557-0050, Fax: (310) 557-0056

> with copies to

45353971;6

Akerman, LLP
50 N. Laura Street, Suite 3100
Jacksonville, FL 32202
ATT: Jacob A. Brown and Katherine C. Fackler
Tel: (904) 798-3700, Fax: (904) 798-3730.

To the Debtors:

RMS Titanic, Inc.
c/o Troutman Sanders LLP
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
ATT: Harris Winsberg and Stephen S. Roach
Tel: (404) 885-3000, Fax: (404) 885-3900;

with copies to

Nelson Mullins Riley & Scarborough LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
Att:  Daniel F. Blanks and Lee D. Wedekind, III
Tel: (904) 665-3656, Fax: (904) 665-3699, and

Kaleo Legal
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Att: Brian A. Wainger
Tel: (757) 965-6804, Fax: (757) 304-6175.

To the Creditors' Committee:

Official Committee of Unsecured Creditors of RMS Titanic, Inc. and its debtor affiliates
c/o Storch Amini & Munves PC
140 East 45th Street, 25th Floor
New York, NY 10017
Att: Jeffrey Chubak and Avery Samet
Tel: (212) 497-8247, Fax: (212) 490-4208

with copies to

Thames Markey & Heekin, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, FL 32202
ATT: Richard R. Thames and Robert A. Heekin, Jr.
Tel: (904) 358-4000, Fax: (904) 358-4001

45353971;6

To the DIP Lender:

     Bay Point Capital Partners, LP
     c/o Thompson Hine LLP
     3560 Lenox Road, Suite 1600
     Atlanta, GA 30326
     ATT: Garrett A. Nail and John F. Isbell
     Tel: (404) 541-2900, Fax: (404) 541-2905.

To the Liquidating Trustee:

     TBD

To the United States Trustee:

     Miriam G. Suarez
     Office of the United States Trustee
     George C. Young Federal Building
     400 West Washington Street, Suite 1100
     Orlando, FL 32801
     Tel: (407) 648-6301, Ext. 126, Fax: (407) 648-6323.

     **J.**      **Severability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan does not govern the treatment of Claims or Equity Interests, or is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term(s) or provision(s) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.** **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**L.** **Post-Effective Date Notice.**

From and after the Effective Date, any person who desires notice of any pleading or document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as to which the Bankruptcy Code requires notice to be provided, shall file a request for post-Effective Date notice and shall serve the request on the Liquidating Trustee; provided, however, the United States Trustee shall be deemed to have requested post-Effective Date notice.

DATED: June 1, 2018                                 Respectfully submitted,

OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS

By: _____
Andrew Shapiro

Its:   Chairman

45353971;6

# Exhibit 2

DRAFT - SUBJECT TO CHANGE
PRELIMINARY ANALYSIS
FOR ILLUSTRATIVE PURPOSES ONLY

STRICTLY PRIVATE AND CONFIDENTIAL

**Liquidation Analysis for Premier Exhibitions, Inc.**
**Net Book Values as of April 30, 2018**
*Prepared at the Direction of Counsel on May 21, 2018*

| | Note References | Estimated Book Value | Estimated Recovery (Value) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **Low** | | **Midpoint** | | **High** | |
| | | | **$** | **%** | **$** | **%** | **$** | **%** |
| **Assets** | | | | | | | | |
| **Current** | | | | | | | | |
| Cash and Equivalents | | $1,200,584 | $1,200,584 | 100% | $1,200,584 | 100% | $1,200,584 | 100% |
| Cash Held in Trust / Deposit | 1 | 710,713 | 0 | 0% | 0 | 0% | 0 | 0% |
| Accounts Receivable | 2 | 2,251,935 | 1,351,161 | 60% | 1,576,355 | 70% | 1,801,548 | 80% |
| Inventory and Work-in-Progress | | 602,262 | 150,566 | 25% | 210,792 | 35% | 271,018 | 45% |
| Prepaid Expenses and Deposits | | 418,569 | 41,857 | 10% | 83,714 | 20% | 125,571 | 30% |
| Income Tax Receivable (installments) | | 113,159 | 0 | 0% | 0 | 0% | 0 | 0% |
| Due from Related Parties | | 12,058 | 0 | 0% | 0 | 0% | 0 | 0% |
| Intercompany - Premier & DinoKing Tech | | 0 | 0 | 0% | 0 | 0% | 0 | 0% |
| | | $5,309,280 | $2,744,167 | 52% | $3,071,444 | 58% | $3,398,721 | 64% |
| **Other Assets** | | | | | | | | |
| Lease Investments, net of current deferred income | | $1,414,874 | $0 | 0% | $0 | 0% | $0 | 0% |
| Property and Equipment, net | | 3,282,329 | 492,349 | 15% | 820,582 | 25% | 1,148,815 | 35% |
| Film Intellectual Property, net | 3 | 32,197 | 50,000 | 155% | 100,000 | 311% | 150,000 | 466% |
| Deferred Income Taxes | | 527,451 | 0 | 0% | 0 | 0% | 0 | 0% |
| Trademarks and Other Intangibles | | 36,152 | 10,846 | 30% | 14,461 | 40% | 18,076 | 50% |
| Cost of Salvage | 4 | 251,000 | 0 | 0% | 0 | 0% | 0 | 0% |
| Cost of Artifacts | 4 | 2,829,630 | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Balance Sheet Assets (Current and Other)** | | $13,682,913 | $3,297,362 | 24% | $4,006,487 | 29% | $4,715,612 | 34% |
| **French Artifacts Auction** | | | | | | | | |
| French Artifacts (Estimate, via Auction) | 5 | | $40,000,000 | | $50,000,000 | | $60,000,000 | |
| Less: Costs to Prepare and Assemble | 5 | | (4,000,000) | | (3,000,000) | | (2,000,000) | |
| Less: Incremental Legal Fees (e.g. Contested Right to Sell) | 5 | | (1,000,000) | | (750,000) | | (500,000) | |
| Less: Auction House Fees | 6 | | (4,000,000) | 10% | (5,000,000) | 10% | (6,000,000) | 10% |
| Net Recovery from French Artifacts | | | $31,000,000 | | $41,250,000 | | $51,500,000 | |
| **American Artifacts Auction to Qualified Institution** | | | | | | | | |
| American Artifacts (via Auction) | | | TBD | | TBD | | TBD | |
| Less: Auction House Fees | 6 | | TBD | 10% | TBD | 10% | TBD | 10% |
| Net Recovery from American Artifacts | | | TBD | | TBD | | TBD | |
| **Chapter 5 / D&O Claim Recovery** | | | | | | | | |
| Estimated Recoverable Value of Chapter 5 Claims | | | $0 | | $0 | | $0 | |
| Estimated Recoverable Value of D&O Claims (Net of Legal Fees / Expenses) | | | 2,000,000 | | 3,000,000 | | 4,000,000 | |
| Total Chapter 5 / D&O Claim Recoveries | | | $2,000,000 | | $3,000,000 | | $4,000,000 | |
| **Total Recoverable Assets / Estate Proceeds** | | | **$36,297,362** | | **$48,256,487** | | **$60,215,612** | |
| Less: Chapter 7 Trustee / Liquidation Trustee Fees | 6 | | (1,088,921) | 3% | (1,447,695) | 3% | (1,806,468) | 3% |
| **Total Distribution Value** | | | **$35,208,441** | | **$46,808,792** | | **$58,409,143** | |
| **Outstanding Professional Fees / Other Administrative Claims** | | | | | | | | |
| Outstanding Professional Fees | 7 | | $1,750,000 | | $1,500,000 | | $1,250,000 | |
| KERP Payments | 8 | | 82,803 | | 82,803 | | 82,803 | |
| Post-Petition Trade Payables | 9 | | 205,740 | | 205,740 | | 205,740 | |
| **Total Administrative Claims** | | | **$2,038,543** | | **$1,788,543** | | **$1,538,543** | |
| **Superpriority DIP Loan** | | | | | | | | |
| Incremental Funding Needs (Estimate, Includes Interest) | 10 | | $1,000,000 | | $750,000 | | $500,000 | |
| DIP Fully Funded / Drawn | | | 5,000,000 | | 5,000,000 | | 5,000,000 | |
| Incremental Interest Obligations (Initial DIP; 6 to 12 months) | | | 650,000 | | 487,500 | | 325,000 | |
| Total DIP Funding (Initial), Plus Incremental Liquidity Needs | | | **$6,650,000** | | **$6,237,500** | | **$5,825,000** | |
| **Pre-Petition Secured Loan** | | | | | | | | |
| Principal & Interest | 11 | | $3,800,000 | | $3,800,000 | | $3,800,000 | |
| **Total Admin, DIP/Liquidity, and Secured Claims** | | | **$12,488,543** | | **$11,826,043** | | **$11,163,543** | |
| *Proceeds Available after Admin, DIP/Liquidity, and Secured Claims* | | | *$22,719,898* | | *$34,982,749* | | *$47,245,600* | |
| **General Unsecured Claims** | | | | | | | | |
| Pre-Petition Unsecured Claims & Accrued Settlements | 12 | | $11,235,105 | | $10,735,105 | | $10,235,105 | |
| **Unidentifiable Unsecured Claims (Other)** | | | | | | | | |
| Claims Arising from Rejected Leases and Contracts, etc. | 13 | | $6,000,000 | | $5,000,000 | | $4,000,000 | |
| **Total Unsecured Claims** | | | **$17,235,105** | | **$15,735,105** | | **$14,235,105** | |
| *Proceeds Available to Equity Security Holders* | | | *$5,484,793* | | *$19,247,644* | | *$33,010,495* | |
| *Implied Distributable Value Per Share* | *Shares Outstanding of 9,373,116* | | *$0.59* | | *$2.05* | | *$3.52* | |

DRAFT - SUBJECT TO CHANGE
PRELIMINARY ANALYSIS
FOR ILLUSTRATIVE PURPOSES ONLY

STRICTLY PRIVATE AND CONFIDENTIAL

**Notes:**

1. The Company is required to make quarterly payments of $25,000 into a Trust designated to fund the "conserving and curating" of the artifacts. The payments are to continue until the endowment reaches $5 million. Under the liquidation analysis, these obligations and current balance of the Trust are assumed to accompany the American Artifacts.

2. In recent periods, approximately 75% of the Company's accounts receivables are current or within 30 days over due, and roughly 20% over 90 days past due.

3. The RMS Titanic Intellectual Property from the expeditions is extensive. There have been 8 dives from 1987 to 2010 where over 1,570 hours of 3D and 2D video footage and over 500,000 digital, raw and acoustic images have been recorded. The value of this media collection is likely above the net book value of $32k. Conservative estimates have been made for this implied value.

4. Under this Liquidation Analysis, the Company is assumed to sell the American Artifact Collection accompanied by the salvor-in-possession rights. Whether or not the salvage rights are sold together with the American collection, the Debtors would no longer hold the salvage rights and would not be obligated to protect those rights. Both the American Artifacts collection and the French Artifacts collection are treated separately in this analysis.

5. For the French Artifacts, various auction houses have provided preliminary estimates as to their potential value at auction, with conservative ranges between $40mm and $60mm. We estimate the costs to assemble and safely transport all the artifacts for auction from their current potentially dispersed locations conservatively at $2mm to $4mm. We also added additional legal fees in the event that the right to sell the French Artifacts is challenged.

6. Trustee fees include those fees associated with the appointment of a Chapter 7 trustee or liquidation trustee in accordance with Section 326 of the Bankruptcy Code. Trustee fees are estimated based upon requirements of the Bankruptcy Code and experience in other similar cases and are calculated at 3.0% of the Debtors' total liquidation value. Auction House fees are calculated based on a commission estimate of 10% of the gross value of the French Artifacts at auction.

7. We used a range of $1.25mm to $1.75mm for estimated accrued and unpaid professional fees.

8. The Debtors provided an estimate for expected payments under the KERP, totaling $82,803.

9. The Debtors provided an estimate for post-petition trade claims, net of accrued professional fees and accrued interest, totaling $205,740.

10. The Debtor-in-Possession loan is assumed to be fully drawn at $5.0mm. The analysis also assumes an additional 6 to 12 months accrued interest at 13% per the DIP loan agreement. It also includes incremental funding needs of $500K to $1,0mm.

11. There is $3.0mm in prepetition promissory notes secured by substantially all the Debtors assets. The liquidation analysis assumes $800k of accrued interest and fees in addition to the outstanding principal.

12. The Debtors have provided an estimate of approximately $10.7mm in allowed prepetition general unsecured claims and accrued settlements. We used an estimate range of $10.2mm to $11.2mm.

13. The liquidation analysis assumes all leases and contracts are rejected and that the Debtors' cease operations. The analysis assumes an estimated $4mm to $6mm in potential unidentifiable claims including potential damage claims arising from rejected leases and contracts of the Debtors.

# Exhibit 3



Premier Exhibitions, Inc.
Florida
(4922)
1032403 B.C. LTD.
British Columbia
2015
Premier Hollywood Pictures LLC
Nevada
2004
Premier Exhibitions International, LLC
Delaware
2008
(5075)
Premier Exhibitions Management LLC
Florida
2011
(3101)
Premier Merchandising LLC
Delaware
2008
(3867)
RMS Titanic, Inc.
Florida
1996
(3162)
RMS Titanic Trust
2011
DinoKing Tech Inc.
British Columbia
2006
PRXI International Holdings CV
Netherlands
2008
RMS Titanic UK Ltd.
United Kingdom
2004
DinoKing International, Inc.
British Columbia
2014
Dinosaurs Unearthed Corp.
Delaware
2008
(7309)
Premier Exhibitions NYC, Inc.
Nevada
2006
(9246)
Arts & Exhibitions International, LLC
Florida
2012
(3101)
Legend
Debtor Entity
Canadian Non-Debtor Entity
Canadian Inactive Entity
Inactive Entity

# Exhibit 4

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

-------------------------------------------------------x

In re:                                            :        Case No. 3:16-bk-02230-PMG
                                                  :
RMS TITANIC, INC., *et al.*, [1]                  :        Chapter 11 (Jointly Administered)
                                                  :
                      Debtors.                    :

-------------------------------------------------------x

## DECLARATION OF ARLAN ETTINGER IN
## SUPPORT OF EQUITY COMMITTEE'S APPLICATION FOR AN ORDER
## PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING
## THE RETENTION OF GUERNSEY'S AS AUCTIONEER

I, Arlan Ettinger, hereby declare as follows,

1.      I am the President of Guernsey's auction house.  I, along with Barbara Mintz –
now my wife – founded Guernsey's, a Division of Barlan Enterprises, Ltd., in 1975.  I am
familiar with the matters set forth herein and make this Declaration in support of the Equity
Committee's Application to Employ Guernsey's as the auction house to sell a certain set of
artifacts recovered from the wreck site of the RMS Titanic that are commonly known as the
French Artifacts, described more fully below.  If called upon to testify I could and would testify
as set forth herein.

2.      Guernsey's is widely considered one of the world's leading auction houses for
having consistently produced world-record-setting auction events, often of the most interesting

---

[1]      The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions
Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC
(5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed
Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

45002267;2

types – historic objects, collectibles, antiques, and art. Many credit this firm for having pioneered the practice of working with the media – in the United States and around the world – to spread word of an upcoming auction event to a global audience. Guernsey's has been privileged to represent many prominent museums, and in virtually every direction our auctions have taken us, we have produced results far higher than all competitors.

3.      The smallest sampling of Guernsey's events would include having conducted the world's largest auction (the contents of the ocean liner SS United States), the landmark Cold War auction of artwork from the Soviet Union, and the definitive auctions focused on such iconic individuals as John F. Kennedy, Franklin Roosevelt, Princess Diana, Elvis Presley, Duke Ellington, and many others. Within recent times, this auction house concluded a multi-part auction series devoted to a historic, Holocaust-related collection of several thousand rare posters, and sold the complete Archive of Rosa Parks, which is now a permanent part of the United States Library of Congress.

4.      In March 2018, the Equity Committee approached Guernsey's to obtain a proposal to conduct the auction of approximately 2,358 artifacts held by Premier Expeditions, Inc. ("Premier"), a Chapter 11 Debtor in the above-captioned bankruptcy case.  These artifacts were recovered from the wreck site of the RMS Titanic during expeditions in 1987. The artifacts were landed in France and are commonly referred to as the "French Artifacts."  Prior to being approached by the Equity Committee for a sale of the French Artifacts, Guernsey's was already familiar with the Titanic Artifacts.  In 2012, Premier consigned its entire body of Titanic Artifacts to Guernsey's for what was to have been a one-lot auction. Among the steps this auction house took to spread word of the coming event to a global audience was a press

conference conducted on board the USS Intrepid, where more than a hundred members of the media were present. While preparing for the 2012 auction I had the opportunity to personally inspect many of the Titanic Artifacts placed with Guernsey's for that auction.

5.      Despite receiving substantial offers for the entire collection, our efforts did not produce the amount that Premier insisted upon as the reserve, or required minimum bid, of just under $200 million.  Additionally, the consignment included all of Premier's Titanic Artifact collection, including objects referred to as the American Artifacts, which were governed by Covenants and Conditions which, among other things, required that the buyer forever keep that collection intact, forever make it available for the public, to have an ongoing restoration program, and forever safeguard (from poaching) the Titanic underwater wreck site.   These requirements certainly impacted buyers' willingness to meet Premier's financial objective.

6.      While promoting the sale of the Titanic Collection in its entirety, Guernsey's fielded many inquiries from individuals, institutions, and corporations that were interested in acquiring singular or small numbers of Titanic artifacts. Obviously, at that time, those requests could not be accommodated because Premier insisted that the Artifacts be sold as a whole collection.

7.      In response to their inquiry, I told the Equity Committee that we would market the consigned items from the French Collection to a global audience. Since there is not a place in the world where the Titanic's fame has not reached, our objective – one we are convinced is quite achievable – would be to make sure that news coverage of the coming Titanic Auction reaches virtually every conceivable buyer, no matter where he or she may be. Of course, our message now would be significantly different than what was being promoted in 2012, when it was only

the Collection in its entirety that could be had. This time, in addition to iconic artifacts such as the Cherub from the main dining room and the ship's Bell, a person of average means can participate with the hope of acquiring even just a single object from the legendary Titanic. And the fact that some items may appear less than visually stunning (such as a bent coin, damaged paper currency, or chipped dinner plate) does not matter, as these objects will still be highly sought after and treasured, as genuine remnants from one of the most fabled incidents in human history.

8.     Auction prices are generated from competitive bidding and it is our belief that record numbers of bidders will participate in the Titanic Auction. Modern online auction technology will facilitate potential bidders' participation in this event worldwide. This could easily result in hundreds, if not thousands, of bidders going after even the seemingly least significant items in the French Collection. With this volume of competition, it is not far-fetched to imagine that even the least valuable item might achieve significant results.

9.     By definition, an auction is an unpredictable event. No one knows, with any degree of certainty, what will result from a given auction, whether it is a collection of paintings by Picasso or the Victorian contents from a house on Main Street. Still, if there was ever a body of material that will excite collectors, historians, and the general public, it has to be the actual artifacts recovered from the storied Titanic.

10.     We have made a preliminary analysis of the level which we feel each of the 2,358 artifacts would fall into. Using that analysis, we have come up with an estimated value for the collection. It should be understood that estimates are just that, and, particularly when dealing with auctions where lots are often unique unto themselves, there is no science to an estimate.

We can look at what other auctions have generated and apply those results, but there are always differences and variables and so our estimates should be taken only as a prediction, based on our past experience, and not as a guarantee. We are well aware that some categories of items, such as paper currency and coins, exist in great quantity. And generally, when there are many items of a similar nature offered in a single event, the amount each item brings dips. On the other hand, that is what happens in a typical situation. The Titanic Auction will be anything but typical. Although there are hundreds of items that are fairly similar to each other, we expect that there will be an unprecedented audience of people who would treasure anything that was retrieved from the Titanic. And hence, even the lowest-level items can be expected to bring amounts that fit into our level A evaluation.

11.     By transferring the estimated value of each of the artifacts into an auction offering, the tendency is to put an estimated range next to each auction lot. To be clear, if an item has an estimated value of $6,000, that might show up in an auction description as having an estimated worth of $5,000-7,000. As a rule, many auctioneers would opt to underestimate the worth of an object so as not to discourage bidders. In any case, it would be premature at this point to concern ourselves with individual auction item estimates. Suffice it to say, an auction strategy can and will be discussed when the actual auction preparations begin. Theoretically, if the estimated value of the individual artifacts as we prepared applies, and a low and high auction estimate is attached to each item, the total of these figures– reflecting the fact that all auction estimates are listed as a range, from low to high – might well be $50 million to $70 million. (Our early estimates of course were based on the approximately 2,358 artifacts in the French Collection. Should fewer items be consigned, this would naturally have bearing on this estimate.)

The above amount is of course an estimate only, and as indicated, has been generated using auction results which we feel would be comparable (as can be seen below in Paragraph 12). However, many of the Titanic lots are unique and as such, there is no direct comparison available. For instance, certain marquee items like the Cherub are capable of fetching truly extraordinary amounts, but as there is no track history, we look to other items, in other auctions, to reach our estimate. My experience tells me there is no doubt a possibility of a buyer paying an extraordinary amount for an item as iconic as the Cherub from the Titanic, which is just one of the many French Artifacts.

12.     Comparable results achieved at auction (including lots sold by Guernsey's):

| ITEM | PRICE REALIZED | AUCTION DATE |
|---|---|---|
| Cracker from a lifeboat survival kit | $23,000 | Oct, 2015 |
| Key on brass fob | $28,000 | Sept, 2016 |
| Key to lifejacket locker | $119,000 | Oct, 2016 |
| Key to binocular cabinet | $137,000 | April, 2010 |
| ½'' x ¼'' fragment of wood from a door on the Titanic | $13,000 | April, 2012 |
| Menu | $88,500 | June, 2004 |
| Dinner menu | $64,000 | July, 2012 |
| Lunch menu | $88,000 | Sept, 2015 |
| Lunch menu | $118,000 | Nov, 2015 |
| Lunch menu | $140,000 | April, 2018 |
| A letter | $186,000 | April, 2012 |
| A violin | $1.7 million | Oct, 2013 |
| A coin | $21,000 | April, 2012 |
| Sextant used on Carpathia to navigate to wreckage of Titanic | $92,000 | April, 2016 |
| Fur coat worn by a stewardess who escaped Titanic | $250,000 | April, 2017 |
| Gold collar stud | $15,000 | April, 2012 |
| Pocket watch | $181,000 | April, 2008 |

| A silver dollar certificate (paper currency) | $44,000 | April, 2012 |
| Lifeboat plaque | $44,500 | June, 2004 |
| Book of Titanic postcards | $16,000 | April, 2017 |
| Unique photo of the Titanic | $21,000 | April, 2017 |

12a.    Non-Titanic related items that have achieved significant results at auction, due to their connection to a significant person, place, or event (the majority of these items sold by Guernsey's):

| ITEM | PRICE REALIZED | AUCTION DATE |
|---|---|---|
| Rock-era guitar | $3.5 million | May, 2017 |
| Battered wooden Chelsea Hotel door | $125,000 | April, 2018 |
| A baseball | $3 million | Dec, 2003 |
| Dilapidated Kennedy family boat | $6 million | March, 1998 |
| Jacqueline Kennedy's costume jewelry necklace | $211,000 | April, 1996 |
| Paul Newman wristwatch | $17.8 million | Oct, 2017 |
| Leonardo da Vinci 25'' x 18" painting | $450 million | Nov, 2017 |

13.    As indicated, based upon these estimates, the collection could in theory fetch as much as $50 million to $70 million, or more. However, when comparing the results of other auctions (as cited in the examples provided in Paragraph 12), there are clearly a great many variables which would make it impossible to predict with any certainty that similar items would perform in the same fashion.  But based upon my years of experience in the sale by auction of rare and historic items in general, I believe these artifacts are certainly capable of this range.

14.    In that timing is always a factor to be considered, it is my recommendation that were there to be a Titanic Auction, it should be conducted in the near future. Today, virtually every adult around the world is well-aware of the compelling Titanic saga.  In the years ahead,

this may not be the case.  Accordingly, the time to maximize the financial potential of this absolutely extraordinary body of material is now.  Guernsey's is ready, willing, and able to produce this event and would be honored to do so.

15.     Neither Guernsey's nor I represent any interest adverse to the Debtors, their creditors, the known equity security holders, the known parties in interest, or the Estate more generally, and we are "disinterested persons" as required by 11 U.S.C. § 327(a) and as defined by 11 U.S.C. § 101(14).

16.     Guernsey's has no doubt worked with other professionals and persons involved in these cases in other unrelated matters.

17.     To the best of my knowledge, except as set forth herein, (a) Guernsey's has no connections with the Debtors, creditors, any other party in interest, or their respective attorneys and financial advisors, and (b) Guernsey's professionals working on this matter are not relatives of the United States Trustee of the Middle District of Florida or of any known employee in the office thereof, or any United States Bankruptcy Judge for the Middle District of Florida as required by Fed. R. Bank. P. 2014.

18.     Based on the foregoing, Guernsey's does not represent any entity having an adverse interest in connection with these cases, and does not hold or represent an interest adverse to the estate with respect to the matters on which Guernsey's will be employed in accordance with Section 327(a) of the Bankruptcy Code.

19.     Guernsey's has agreed to be compensated and reimbursed as fully set forth in the Engagement Letter attached hereto as **Exhibit A**.

20.     No promises have been received by Guernsey's, nor any member, or associate thereof, as to the compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code and the attached Engagement Agreement.

I declare under penalty of perjury that the foregoing is true and that I have executed this declaration on May __31__, 2018, in New York City, New York

_____
Arlan Ettinger

S.S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
MICKEY MANTLE • THE McGWIRE BASEBALL
JAZZ • ARTWORK OF THE SOVIET UNION
THE FRANKLIN ROOSEVELT ARCHIVE
ELVIS PRESLEY • JERRY GARCIA
THE ROSA PARKS ARCHIVE

65 EAST 93RD STREET
NEW YORK, NY 10128

PH: 212.794.2280
FAX: 212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM



# GUERNSEY'S

AUCTIONEERS & BROKERS SINCE 1975

May 31, 2018

Mr. Peter Gurfein
Landau Gottfried & Berger LLP
1801 Century Park East
Suite 700
Los Angeles, California 90067

RE: The 1987 French Expedition Artifacts Recovered from the RMS Titanic

Dear Mr. Gurfein:

Thank you for the considering Guernsey's to be the firm to conduct the auction of artifacts recovered from the RMS Titanic by the 1987 French Expedition.

This letter is to confirm that Guernsey's is committed to devoting its full energy and complete attention to producing an auction that will honor the memory of the fabled Titanic while maximizing the financial potential of these historic artifacts. We are prepared to work for a reduced seller's commission of 9% (nine percent) which Guernsey's would retain from the proceeds of the sale of the artifacts.

Specific details regarding timing, location, manner in which the auction would be conducted, and other aspects of the event, will be mutually agreed upon and subject to the approval of the Bankruptcy Court.

Please know that we are truly honored to be considered for this most important assignment and thank you for this opportunity.

Sincerely,

Arlan Ettinger
President

A DIVISION OF BARLAN ENTERPRISES, LTD.

**Exhibit A**