THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
Successor in interest to Titanic
Ventures, limited partnership,

      Plaintiff,

v.                                     Civil Action No.:  2:93cv902

The Wrecked and Abandoned
Vessel, . . . believed to be
The RMS TITANIC, <u>in</u> <u>rem</u>,

      Defendant.

## <u>DECLARATION OF JAMES I. MCCLAMMY</u>

1.      My name is James I. McClammy. I am an attorney at the law firm of Davis Polk & Wardwell LLP and represent the Trustees of the National Maritime Museum. I submit this declaration in support of the Motion to Intervene of the Trustees of the National Maritime Museum.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a news article titled, "Titanic artefacts could return to Belfast," as retrieved from https://www.bbc.co.uk/news/uk-northern-ireland-44939389 on August 14, 2018.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a news article titled, "James Cameron: Getting Titanic Artifacts to U.K. Would Be 'a Dream,'" as retrieved from https://www.nationalgeographic.com/science/2018/07/news-titanic-uk-belfast-bankruptcy-cameron/ on August 14, 2018.

Exhibit 3

4.      Attached hereto as Exhibit 3 is a true and correct copy of the transcript of

the status conference held on July 25, 2018 before the United States Bankruptcy Court

for the Middle District of Florida relating to the chapter 11 cases involving RMS Titanic,

Inc.

I declare under penalty of perjury that the forgoing is true and correct.

Signed in New York, New York on the 17 day of August, 2018.

/s/ James I. McClammy
James I. McClammy

2

Exhibit 3

# Exhibit 1

## Titanic artefacts could return to Belfast

By Mark Simpson BBC News NI

24 July 2018

**Artefacts recovered from the shipwreck of the Titanic could soon be returning to Belfast where the liner was built.**

A multimillion-pound campaign began on Tuesday to try to buy the 5,500 artefacts from an American company and bring them to the UK.

If successful, many of the artefacts would go on display at the Titanic Belfast exhibition centre.

The collection includes a piece of the hull and sets of china from the ship which sank in April 1912.

There is no guarantee the bid will succeed but the campaign is being backed by James Cameron, the Oscar-winning filmmaker who made the 1997 movie Titanic.

"The sinking of the Titanic was a heart-breaking moment in history," he said.

"Securing the irreplaceable collection of artefacts, protecting and preserving them for future generations, by placing them in the public trust, is a unique and important opportunity to honour the 1,503 passengers and crew who died."

The current owners of the collection, Premier Exhibitions, have filed for bankruptcy in the United States.

A number of different bidders are trying to buy the artefacts.

Conal Harvey, deputy chairman of Titanic Belfast, said: "We are campaigning to bring these artefacts home, where they will protected and preserved through public ownership and on display for the world to enjoy."

The $20m (£15m) campaign is being backed by Royal Museums Greenwich, National Museums Northern Ireland, Titanic Belfast and Titanic Foundation Limited.

The artefacts were recovered from the seabed over the course of seven deep sea expeditions between 1987 and 2004.

National Geographic has already pledged $500,000 (£380,000) to the campaign.

Dr Robert Ballard, the oceanographer who discovered the Titanic wreck, is supporting the venture.

"This bid is the only viable option to retain the integrity of the Titanic collection," he said.

"The collection deserves to be returned home to where its journey began."

Legal proceedings are continuing in the US over the bankruptcy and are expected to come to a conclusion soon.

The Titanic was the world's largest passenger ship when it entered service.

It sank on its maiden voyage in 1912 with the loss of more than 1,500 lives.

# Exhibit 2

# James Cameron: Getting Titanic Artifacts to U.K. Would Be 'a Dream'

## Museums launch a $19.2 million bid to acquire artifacts salvaged from the wreck site, and National Geographic pledges $500,000 to the cause.

BY MICHAEL GRESHKO

PUBLISHED JULY 24, 2018

In 1912, the *RMS Titanic* crashed into an iceberg and sank into the frigid North Atlantic, killing more than 1,500 people. Soon after the wreckage's 1985 discovery, the private company RMS Titanic Inc. gained exclusive rights to salvage the wreck, eventually recovering some 5,500 artifacts. Many of these objects—from statuettes to the shoes of the victims—have since traveled the world as centerpieces of museum shows and privately run exhibits.

In 2016, RMS Titanic Inc. and its owner Premier Exhibitions filed for bankruptcy, leaving their *Titanic* collection's fate uncertain. Now, on the eve of a major bankruptcy court hearing, a coalition of British and Irish institutions has kicked off a fundraising campaign to bring the entire collection home—back to the islands that built and managed the ill-fated liner.

(Read our in-depth coverage of the museums' bid and the complex history of the salvaged *Titanic* artifacts.)

"These artifacts, which are of great historical significance, are at risk of being spilt up, sold to private collectors and lost as an identifiable collection," Conal Harvey, vice chairman of Titanic Belfast, the museum next to the shipyards that birthed *Titanic*, said in a statement. "Therefore, we are campaigning to bring these artifacts home, where they will be protected and preserved, through public ownership and on display for the world to enjoy."

The campaign aims to raise $19.2 million in support of a bid to acquire the artifacts that the U.K.'s National Maritime Museum and National Museums Northern Ireland recently filed in U.S. bankruptcy court. If their bid is successful, the museums say that they would absorb the artifacts into their permanent collections. Titanic Belfast would display the majority of the artifacts, and the National Maritime Museum will take the lead on conserving them.

At the press conference, the National Geographic Society also made a $500,000 pledge toward the campaign. The announcement comes a year after the Society quietly convened a meeting attended by the bidding institutions, the *Titanic* wreck site's discoverer Robert Ballard, and *Titanic* film director James Cameron that focused on how to keep the salvaged artifacts in the public trust. (National Geographic Partners, the media company that produced this article, is partially owned by the National Geographic Society.)

"The repatriation of the shipwreck's artifacts presents an historic opportunity to honor the *Titanic*'s lasting legacy and the memories of all who perished," says Michael L. Ulica, the National Geographic Society's interim president and CEO, in a statement. "As the first private donor to contribute to this effort, National Geographic is excited to be part of this latest chapter of the *Titanic*'s history and to support the initiative to bring these artifacts home."

"From the moment when we first raised this idea [at the 2017 meeting], it was a dream. But with the bid going in, and actual funds on the table...I wouldn't give it odds, but I think they're very good," says Cameron, a National Geographic explorer-at-large who has dived the *Titanic* wreck site 33 times. "I can't imagine the court not looking on it favorably—there's just too much right about it."

In addition to securing the artifacts, the museums would obtain RMS Titanic, Inc.'s status of "salvor-in-possession," meaning that the museums would have the exclusive rights to salvage the wreck.

The institutions have no plans to further salvage the wreck, however, and say they would maintain the salvage rights only to prevent others from doing so.

As National Geographic has previously reported, two groups of Premier's equity holders have filed competing bids in bankruptcy court for RMS Titanic, Inc. and its artifacts. However, the world's most prominent *Titanic* experts have lined up behind the museums.

"The *Titanic* was always meant to turn around and come back home but never did," said Ballard, a National Geographic explorer-at-large, in a previous interview. "This helps gives closure."

The fundraising campaign begins the day before the museums consortium and the other bidders for RMS Titanic, Inc. have a hearing in U.S. bankruptcy court. The hearing won't provide a final say on the future owners of *Titanic*'s treasures; rather, it will focus on how the three competing plans will be weighed against each other. The museums' lawyers expect that proceedings will continue for several more months.

# Exhibit 3

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


In re:

RMS TITANIC, INC., et al.,    CASE NO:  3:16-bk-02230-PMG

        Debtors.
_____/


TRANSCRIPT OF PROCEEDINGS

DATE TAKEN:        July 25, 2018

TIME:              1:30 p.m. - 3:25 p.m.

PLACE:             United States Courthouse
                   300 North Hogan Street
                   Courtroom 4A
                   Jacksonville, Florida 32202

BEFORE:            The Honorable Paul M. Glenn
                   U.S. Bankruptcy Judge




This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings
were transcribed by:


**Cindy Danese, Notary Public**
**STATEWIDE REPORTING SERVICE**
**233 East Bay Street, Suite 912**
**Jacksonville, Florida  32202**
**(904) 813-9280**

2

1                    A P P E A R A N C E S

2

3        DANIEL F. BLANKS, ESQUIRE
         HARRIS WINSBERG, ESQUIRE
         MATT BROOKS, ESQUIRE
4        BRIAN A. WAINGER, ESQUIRE
         WILLIAM POYNTER, ESQUIRE (via telephone)
5
             Attorneys for Debtors
6

7        JAY BROWN, ESQUIRE
         KATIE FACKLER, ESQUIRE
8        PETER GURFEIN, ESQUIRE

9            Attorneys for the Equity Committee

10

11       TIMOTHY GRAULICH, ESQUIRE
         PATRICIA REDMOND, ESQUIRE
12       JACOB WEINER, ESQUIRE (via telephone)

13           Attorneys for Trustees of the National
             Maritime Museum

14

15       JEFFREY CHUBAK, ESQUIRE
         RICHARD THAMES, ESQUIRE
16       ROBERT A. HEEKIN, JR., ESQUIRE

17           Attorneys for the Unsecured Creditors
             Committee

18

19       JASON BURNETT, ESQUIRE
         ASHLEY EDWARDS, ESQUIRE

20           Attorneys for 417 Fifth Avenue South and Luxor
             Hotel and Casino

21

22

23       JENNIFER FELDSHER, ESQUIRE
         STEVEN BUSEY, ESQUIRE
         DAVID LAWTON, ESQUIRE (via telephone)
24
             Attorneys for Alta Fundamental, Apollo
25           Global

```
 1                    APPEARANCES (CONTINUED)

 2


 3        SCOTT GROSSMAN, ESQUIRE

 4             Attorney for HaiPing Zou, Jihe Zhang and
               Lange Feng, and PacBridge Capital Partners
 5


 6

 7        JOHN ISBELL, ESQUIRE

 8             Attorney for Bay Point Partners


 9

10        MATTHEW TROY, ESQUIRE

11             Attorney for USDOJ and NOAA


12

13        STEVEN FOX, ESQUIRE

14             Attorney for Cedar Bay


15

16        ROBERT CHARBONNEAU, ESQUIRE

17             Attorney for Premier Equity Committee


18

19        HOWARD SIEGEL, ESQUIRE (via telephone)

20             Attorney for Euclid Claims Recovery, LLC


21

22        DAWN MCCARTY, ESQUIRE (via telephone)

23             Attorney for Bloomberg, LP


24

25        MIRIAM SUAREZ, ESQUIRE

               Attorney for the U.S. Trustee
```

4

1           P R O C E E D I N G S

2     July 25, 2018                          1:30 p.m.

3                        - - -

4           THE COURT:  All right.  Court's in session for

5     July 25th, and on the calendar this afternoon is

6     the case of RMS Titanic, Chapter 11 case.

7           We're set this afternoon for a status

8     conference.  Also, an objection to Claim 29-1 and

9     objection to Claim 2 of B.E. Capital Management.

10          There are appearances in the courtroom and by

11    conference telephone.

12          Court will first take appearances of those in

13    the courtroom.

14          MR. BLANKS:  Good afternoon, Your Honor.

15    Daniel Blanks on behalf of the Debtors.  Also at

16    counsel table is my co-counsel, Harris Winsberg and

17    Matt Brooks from Troutman Sanders.  And also other

18    co-counsel, Brian Wainger from Kaleo Legal.  And

19    also, Your Honor, Jessica Sanders who is corporate

20    secretary of the Debtor.

21          THE COURT:  Very good.  Mr. Blanks, gentlemen

22    and ladies, good afternoon.

23          Other appearances.

24          MR. BROWN:  Your Honor, may it please the

25    Court, Jay Brown and Katie Fackler of Ackerman,

5

1    LLP, along with my co-counsel, Peter Gurfein of

2    Landau Gottfried & Berger, appearing on behalf of

3    the Official Committee of Equity Security Holders

4    of Premier Exhibition, Incorporated.

5         THE COURT:  Very good.  Mr. Brown, Ms.

6    Fackler, Mr. Gurfein.

7         MR. CHUBAK:  Good afternoon.  Jeffrey Chubak

8    with Storch Amini, PC on behalf of the Creditors

9    Committee.  With me is Rick Thames and Rob Heekin,

10   Jacksonville counsel.  And Ezra Jones, a member of

11   the Committee is in the courtroom as well.

12        THE COURT:  Very good.  Mr. Chubak, good

13   afternoon, and others.

14        MR. ISBELL:  Good afternoon, Your Honor.  John

15   Isbell on behalf of the debtor-in-possession

16   lender, Bay Point Capital.

17        THE COURT:  Mr. Isbell.

18        MS. REDMOND:  Good afternoon, Your Honor.

19   Patricia Redmond appearing on behalf of the

20   National Maritime Museum.  Your Honor, I'm joined

21   by Timothy Graulich and Jacob Weiner from the Davis

22   Polk law firm.

23        THE COURT:  Ms. Redmond, Mr. Graulick, Mr.

24   Weiner.

25        Other appearances.

6

1          MR. GROSSMAN:  Good afternoon, Your Honor.

2     Scott Grossman of Greenberg Traurig on behalf of

3     Lange Feng, Jihe Zhang, HaiPing, PacBridge Capital

4     Partners, and as cocounsel to Premiere Acquisition

5     Holdings, LLC.  And with me in the court whom I'd

6     like to introduce to Your Honor is Mr. Giovanni

7     Wong of PacBridge Capital Partners who is here from

8     Hong Kong.

9          THE COURT:  Very good.  Mr. Wong, Mr.

10    Grossman, good afternoon.

11         MS. FELDSHER:  Good afternoon, Your Honor.

12    Jennifer Feldsher from Bracewell on behalf of Alta

13    and Apollo.  With me in the courtroom is Mr. Busey

14    from the Smith Hulsey & Busey firm, and on the

15    phone I believe we have several of our clients as

16    well listening in.

17         THE COURT:  Very good.  Thank you.  We'll take

18    telephone appearances in a minute.

19         Any other appearances in the courtroom?

20         MR. TROY:  Good afternoon, Your Honor.

21    Matthew Troy, United States Department of Justice,

22    civil division, on behalf of NOAA.

23         THE COURT:  Very good.  Mr. Troy.

24         Others in the courtroom?

25         MS. SUAREZ:  Good afternoon, Your Honor.

7

1    Miriam Suarez on behalf of the United States

2    Trustee.

3            THE COURT:  Ms. Suarez.

4            Any other appearances in the courtroom?

5            MR. FOX:  Yes, Your Honor.  Good afternoon.

6    I'm Steven Fox.  I represent Cedar Bay and related

7    companies.  Present in the courtroom today with me

8    is Mr. Paul Burns, spelled B-u-r-n-s.  He is the

9    curator of Cedar Bay's artifact collection of

10   Titanic artifacts.  He's also the curator of the

11   largest privately owned Titanic collection in the

12   United States.

13           THE COURT:  Very good.  Mr. Burns, good

14   afternoon, and Mr. Fox.

15           MR. BURNETT:  May it please the Court, Jason

16   Burnett of the law firm Gray Robinson appearing on

17   behalf of 417 LLC and the Luxor Hotel.  Also

18   appearing with me, Your Honor, is Ms. Ashley

19   Edwards, my associate, and Ms. Ashley England, our

20   summer law clerk, who is here with us from

21   Tallahassee today.

22           THE COURT:  Very good.  Ms. Edwards, Ms.

23   England and Mr. Burnett, good afternoon.

24           Any other appearances in the courtroom?  Are

25   there any rows left back there?

8

1          (Laughter.)

2          THE COURT:  Now there are several appearances

3     by conference telephone.

4          First for the Committee of Equity Security

5     Holders, telephone appearance for that.

6          MR. CHARBONNEAU:  Good afternoon, Your Honor.

7     Robert Charbonneau appearing as special litigation

8     counsel for the Premier Equity Committee.

9          THE COURT:  Mr. Charbonneau, good afternoon.

10          MR. CHARBONNEAU:  Good afternoon, Your Honor.

11          THE COURT:  Telephone appearance for Ad Hoc

12     Equity Group.  Mr. Lawton?

13          MR. LAWTON:  Good afternoon, Your Honor.  It's

14     David Lawton appearing for the Ad Hoc Equity Group

15     of Alta and Apollo.  My colleague, Jennifer

16     Feldsher.

17          THE COURT:  Very good, Mr. Lawton.

18          Now telephone appearance for interested party

19     Bloomberg, LP, Ms. McCarty.

20          MS. MCCARTY:  Yes, Your Honor, I'm on.

21          THE COURT:  All right.  And telephone

22     appearance for the Debtor, Mr. Poynter.

23          MR. POYNTER:  Good afternoon, Your Honor.

24     This is William Poynter for the Debtor.  And with

25     me on the phone I have the CEO of the Debtor, Mr.

1      Mr. Daoping Bao.

2          THE COURT:  Very good.  Mr. Poynter, Mr. Bao,

3      good afternoon.

4          MR. BAO:  Good afternoon, Your Honor.

5          THE COURT:  Telephone appearance for Euclid

6      Claims Recovery.

7          MR. SIEGEL:  Yes.  Good afternoon, Your Honor.

8      Howard Siegel for Euclid Claims Recovery.

9          THE COURT:  Very good.

10         And telephone appearance for trustees of the

11     National Maritime Museum.

12         (No response.)

13         THE COURT:  Mr. Weiner?  Yes, no?

14         MR. GRAULICH:  Your Honor, Mr. Weiner's in the

15     courtroom.

16         THE COURT:  Oh, sorry.  Thank you.

17         All right.  Any other appearances?

18         (No response.)

19         THE COURT:  No?  Very good.

20         Well, we're set for a status conference.  Mr.

21     Blanks or Mr. Winsberg.

22         MR. WINSBERG:  Good afternoon, Your Honor.

23     Harris Winsberg from Troutman Sanders on behalf of

24     the Debtors.

25         As you can see, we have a full courtroom for a

10

1    status conference.  Today is a very important day

2    for the course of this case.

3         If Your Honor would permit, what I'd like to

4    do is give the Court a case update.  Then I'd like

5    to review for Your Honor the capital structure of

6    the company and the cash flow of the company --

7         THE COURT:  Yes.

8         MR. WINSBERG:  -- talk about the different

9    proposals and the Debtors' proposed path forward,

10   if that would be fine with Your Honor.

11        THE COURT:  Yes, thank you.

12        MR. WINSBERG:  Thank you, Your Honor.

13        Since the Court had the hearing on June 7th on

14   the trustee motion, the Debtors have worked

15   continuously around the clock to paper the term

16   sheet that we had filed with the Court on June 5th

17   prior to the hearing.

18        And the Debtors were successful in that

19   endeavor, and on June -- as Your Honor is aware, on

20   June 15th, the Debtors filed their motion to

21   approve the bid procedures and ultimately a sale

22   pursuant to the Asset Purchase Agreement entered

23   into with the stalking horse purchaser.

24        The negotiations were extensive in connection

25   with the APA process.

1           Your Honor is aware the stalking horse

2       purchaser has provided a 10-percent deposit with

3       SunTrust Bank as escrow agent, so $1.75 million.

4       And Apollo, Alta and PacBridge have each provided

5       equity commitment letters to agree to fund the

6       acquisition vehicle, the remainder of the purchase

7       price.

8           At the last hearing in front of Your Honor,

9       one of the issues why it took us a little longer

10      than we wanted to get the APA on file was there

11      were significant discussions with the buyer,

12      primarily around the appropriate way to transaction

13      the sale of the Canadian entities.

14          As Your Honor will recall, Dinoking is an

15      non-debtor entity.  It operates, but it is not

16      subject to this Court's Chapter 11 jurisdiction.

17          That issue, Your Honor, I'm pleased to report,

18      was resolved in the Asset Purchase Agreement, and

19      in particular on page 43 in section 5.18.  In

20      short, what was structured was there was a

21      possibility that the Debtors were going to have to

22      file Dinoking as a Chapter 11 debtor to effectuate

23      the sale.

24          And I'm pleased to report that, since we filed

25      the Asset Purchase Agreement, the stalking horse

12

1    purchaser has been satisfied with the due diligence

2    that it conducted and it's no longer going to

3    require the Debtors to file Dinoking as a Chapter

4    11 debtor and make it a part of the sale process to

5    effectuate a sale.

6          And that's significant, Your Honor, and that's

7    going to avoid hundreds of thousands of dollars in

8    administrative expense costs, so that is a very

9    good result.

10         I'm also pleased to report the Debtors have

11   been in contact with counsel for NOAA, who's in the

12   courtroom, and we have resolved NOAA's informal

13   objections to the bid procedures and sale order,

14   with some modifications that we've agreed upon with

15   their counsel that we would submit to the Court at

16   the appropriate time.

17         As to the capital structure and cash flow,

18   Your Honor, just by background, I think it would be

19   helpful and we can provide the Court with a

20   supplemental documentation with this.

21         We have -- as Your Honor is aware, we have a

22   DIP loan that's got $5 million that's fully drawn.

23   It's accruing interest roughly at $55,000 a month.

24         We have Mr. Grossman's clients, the secured

25   lenders, that are owed roughly $4 million in

1   principal and interest.

2       We have projected unpaid and accrued

3   professional fees through the end of September of

4   $3.5 million in administrative claims.  And based

5   upon the accrual since January of this year, we're

6   tracking roughly $270,000 a month in admin expenses

7   that are being accrued.

8       There's unsecured priority claims of $250,000.

9       And there's an unsecured creditor pool, which

10  just by rough numbers ranges anywhere from $11- to

11  $13 million, depending on how claim objections were

12  to be resolved and also depending on whether Your

13  Honor would approve the PacBridge settlement which

14  is part of the APA which we'll get to, but those

15  are just rough numbers.

16      So the current monthly burn rate for the DIP

17  loan with the interest and the professional fees,

18  it's roughly just say $325,000 a month, that every

19  month we go along we don't have an exit, that's the

20  burn rate for admins and interest.

21      And based upon our review of the capital

22  structure, Your Honor, a transaction would have to

23  clear $24 million before there would be any money

24  for equity in this case.

25      And finally, Your Honor, from a cash flow

14

1      perspective -- and Mr. Glade's in the courtroom

2      from Glass Ratner -- and this is a status

3      conference, and we can put to prove that we add to

4      Your Honor all of these issues.

5           From a cash flow perspective, even if the

6      company -- the company right now is deferring

7      capital expenditures.  It's not reinvesting in

8      itself right now to preserve cash.  Even if the

9      company doesn't pay any cap ex and foregoes paying

10     any additional professional fees, which at this

11     point is a moot point, Your Honor.  With the DIP

12     loan fully drawn, there's not money sufficient to

13     pay the professional fees under the monthly orders.

14     But even if we don't pay the cap ex and they don't

15     pay any more professional fees and just accrue

16     them, the company runs out of cash at the end of

17     December.  It's cash flow negative in January and

18     February.

19          If the company were to defer cap ex and pay

20     professional fees, what it could pay, it would run

21     out of money at the end of September.

22          So either way, under the current structure,

23     Your Honor, this case is on a short leash.

24          Now, turning to the transactions with that

25     overview, I'd like to discuss the Debtors' proposed

1    transactions in front of Your Honor, as well as the

2    Equity Committee and Creditors Committee disclosure

3    statements.

4         As to the Equity Committee and Creditors

5    Committee disclosure statements and plans, Your

6    Honor, we respectfully submit that these plans are

7    highly speculative and unconfirmable on their face.

8         As Your Honor is aware, 1129(a)(11) requires

9    that a plan be feasible.  And as Judge Funk said in

10   the JRV Industries case, 344 BR 679, a bankruptcy

11   court decision from 2006, the feasibility test is

12   designed, quote, primarily to prevent confirmation

13   of a visionary scheme that promises a greater

14   distribution than the debtor's plan components

15   could ever attain.

16        And what we have here are two plans by the

17   Equity Committee and the Creditors Committee that

18   on their face are simply visionary schemes.

19   They're not appropriate to go out for solicitation.

20        I'll turn to the Creditors Committee proposal

21   first.

22        The Creditors Committee disclosure and plan

23   was filed almost a month ago on June 29th.  It

24   contemplates a private sale.  In other words, there

25   would be no auction process.

16

1          One of the plan proponents, as a member of the

2     Creditors Committee -- and we put those in our

3     papers -- I don't think it's contested that Mr.

4     Sanna, as the CEO of Running Subway, which is a

5     buyer, proposed buyer in the transaction, and he's

6     also the CEO of TSX, which is a member of the

7     Creditors Committee.

8          More importantly, the Disclosure Statement

9     fails to do four key things.

10          One, it doesn't have a signed purchase

11     agreement, or a list of contracts to assume or

12     reject, and, frankly, who is responsible for any

13     cure claims.

14          Two, it doesn't have a timeline to prepare,

15     file, and ultimately close on a signed purchase

16     agreement, which is significant because of the burn

17     rate in this case and the pending liquidation of

18     these Debtors.

19          Three, they have not and will not post a

20     deposit, and certainly not a deposit that could be

21     forfeited to the bankruptcy estate if they breach

22     or fail to obtain the funding, at least to date.

23          And, four, they don't have the money to pay

24     the purchase price or even a firm timeline to

25     obtain the financing.

17

1          So even in the event that the plan and

2     disclosure statement were to go out to solicitation

3     to get the votes necessary, Your Honor still

4     couldn't approve it under 1129(a)(11) because it's

5     not feasible.

6          But, more important, even if Your Honor did

7     approve the plan, what happens if the plan

8     proponents fail to secure their financing?  The

9     estates are left with significant fees and costs,

10    and yet there's still no exit, and the company is

11    facing liquidation and the loss of approximately

12    150 jobs.

13         The same is true for the Equity Committee

14    disclosure statement and plan.  It was filed almost

15    two months ago on June 1st.  The Equity Committee

16    plan, it too is not feasible and doesn't have the

17    support of any -- certainly doesn't have the

18    support of the Creditors Committee in this case,

19    either.  It has shortcomings, five that are

20    notable, Your Honor.

21         There's no identified purchaser for the

22    artifacts, and certainly not any signed purchase

23    agreements.

24         There's no timeline to prepare, file, and

25    ultimately sell the artifacts as contemplated in

18

1    the disclosure statement and plan.

2         There's no deposit from any third party, or

3    even a firm commitment or a backstop from a party

4    guaranteeing a minimum purchase price for the

5    artifacts that would go to the estate.

6         It, too, lacks financing, which is needed to

7    -- they'd have to pay off or refinance the DIP

8    loan.  They'd have to pay in full the

9    administrative claims, pay the secured claims, the

10   unsecured priority claims in full on an effective

11   date, which may occur months from now, if at all,

12   and they don't have the money sufficient to run the

13   company for that period of time to get to auction,

14   which we estimate to be a year or longer.

15        And, most importantly, as we noted at the last

16   hearing, as NOAA stated in its Equity Committee

17   disclosure statement objection, the Equity

18   Committee can't sell the artifacts, at least off

19   the bat, even if Your Honor were to confirm a plan,

20   without litigating with the Department of Justice

21   for some unspecified period of time, possibly

22   years.

23        So similar to the Creditors Committee

24   disclosure, even in the unlikely event the Equity

25   Committee got the votes, the Court could not

19

1    confirm the plan because it's not feasible.

2         And even if Your Honor did confirm the plan,

3    just like with the Creditors Committee, what

4    happens when they -- if they fail to secure other

5    financing, which is over $10 million, and/or fails

6    to get the authority by a final order to sell the

7    artifacts?  Again, the estates are left holding the

8    bag with additional fees and costs, and yet there's

9    no exit.

10        I'd like to talk about the merits of our

11   proposed transaction with the stalking horse, Your

12   Honor, if I may.

13        The stalking horse purchaser has the money and

14   they're ready to close on the transaction in the

15   time frame we set forth.

16        Contrary to some stuff that we've read in the

17   press, RMST and the people that currently manage

18   the collection will remain in place and continue to

19   comply with the revised covenants and conditions,

20   meaning that the collection will not be broken up

21   and will be available for all people to see, not

22   just people that happen to visit the United

23   Kingdom.

24        The transaction avoids liquidation and

25   preserves 150 jobs.

20

1        And while the Creditors Committee plan has a

2    nominally higher price, $1.7 million, as noted, the

3    Creditors Committee plan has no funding and no

4    timeline.  And with a burn rate of roughly $325,000

5    a month in professional fees and interest alone,

6    any potential increase in recovery is going to

7    quickly evaporate.

8        Simply put, the $17.5 million that we propose

9    now, subject to an open bidding process and

10    hopefully more, is better than $19.2 million, which

11    is not subject to better and higher offers in

12    whatever time period is required to raise the

13    money, if they ever can.

14        And, finally, the Debtors' proposal, should

15    Your Honor move forward with the bid procedures and

16    ultimately the sale hearing we hope Your Honor

17    does, it has what we call the PacBridge settlement

18    in our proposal.

19        As you recall, there's $4 million in secured

20    claims owed to Mr. Grossman's clients.  Under what

21    we're calling the PacBridge settlement, they would

22    agree to take a $1 million secured claim.  They'd

23    waive $1 million, which is essentially their

24    postpetition interest.  They would take the other

25    $2 million of the principal and treat it as an

1    unsecured claim subject to pro rata distribution,

2    and then PacBridge would be allowed to file a proof

3    of claim for $1.1 million, approximately, and they

4    would have an allowed claim against the estate.

5         That claim was originally objected to by the

6    Debtors.  We never served process on it.  That's

7    all before my time in this case, Your Honor.

8         We understand the Equity Committee, for

9    whatever reason, filed its own objection to that

10   claim.  But even under the museum and Running

11   Subway proposal, the Creditors Committee plan, if

12   they want to buy the company as a whole, you have

13   to buy the Dinoking subsidiary.  So if you're

14   buying that subsidiary, you have to deal with the

15   PacBridge claim in any event, even if it was

16   disallowed against the estate, because the primary

17   argument is that it's not a claim against the

18   Debtor, it's a claim against a non-debtor entity.

19   You still have to deal with it because you couldn't

20   -- nobody could buy the Dinoking assets and make a

21   distribution from Dinoking to Premier without

22   dealing with and paying that claim in full in any

23   event.  So the claim has to be addressed.

24        Briefly, there was in the papers, on the

25   motion for a status conference, there was a lot of

22

1    discussion about this Court's jurisdiction.  If I

2    may, Your Honor, I'd like to spend a couple of

3    minutes on that, if that's okay.

4         THE COURT:  Uh-huh.

5         MR. WINSBERG:  Your Honor, we believe the

6    process we put in place is the best and most

7    efficient manner to deal with this case.

8         This Court is in the best position to decide

9    whether to approve the bid procedures and

10   ultimately decide which purchaser is providing the

11   highest and otherwise best offer for the company.

12        Once this Court makes those decisions, the

13   district court in Virginia, which people are

14   calling the admiralty court, it can decide whether

15   the transaction complies with the revised covenants

16   and conditions, and that district court is going to

17   get the benefit of the input from NOAA and

18   Department of Justice, which is in the courtroom.

19        As we told Your Honor at the last hearing,

20   RMST did file a motion in the admiralty court

21   seeking approval of the stalking horse purchaser or

22   whatever prevailing bidder Your Honor decides at

23   the conclusion of the sale hearing to go forward

24   with.

25        So we have a two-step process that we believe

23

1    satisfies the jurisdiction of the bankruptcy court

2    and ensures that the admiralty court gets an

3    appropriate say on whether the revised covenants

4    and conditions are being complied with.

5        Your Honor, a couple of final points.

6        There is chapter -- someone mentioned there is

7    Chapter 11 fatigue in this case.  And if I asked

8    everyone to raise their hand that's worked -- I've

9    worked in it four months.  If I asked everyone to

10    raise their hand if they've got fatigue in the

11    Chapter 11 case, I'm pretty sure everybody would

12    raise their hand.

13        The Debtors have spent too long in Chapter 11.

14    We don't have the funds to pay the professional

15    fees under the Court's orders, and we're already

16    deferring capital expenditures necessary to

17    preserve the going concern, which is hurting the

18    business.

19        The company's going to run out of cash even if

20    it doesn't pay the professionals by the end of

21    December, and negative cash flows in January and

22    February.

23        We respectfully request Your Honor allow us to

24    go forward and set the bid procedures down for

25    hearing to sell the assets under 363.  We believe

24

1    this case meets the Lionel standard, if there ever

2    was a case that met the Lionel standard at this

3    point to sell it.  It's an open and fair process.

4    People can come in and qualify and bid, and we can

5    move this case to a conclusion.

6         That being said, Your Honor, we did note Your

7    Honor did move the bid procedures off hearing today

8    and wanted a status conference.  Should Your Honor

9    be inclined to give parties more time, here's what

10   we would propose.

11        The Court -- one, the Court should propose,

12   provide, a firm deadline of not more than 30 days

13   from today for the Creditors Committee plan

14   proponents to come up with a -- actually come up

15   with the money for the $19.2 million purchase

16   price.

17        If the plan -- if the Creditors Committee plan

18   proponents cannot come up with the actual money

19   within that 30-day time period, the Court should

20   move forward only with the bid procedures that you

21   set down for hearing that the Debtors have set

22   forth in their sale motion.

23        If the Creditors Committee plan proponents can

24   come up with the actual funds within the next 30

25   days, the Court can take up the Creditors Committee

25

1    disclosure statement in connection with the

2    Debtors' bid procedures at that hearing.

3          Frankly, at that point, Your Honor, if they've

4    got the money, they should just participate in the

5    auction, because, even under our bid procedures, if

6    they're fully funded and put up a refundable

7    deposit, they're a topping bid under our bid

8    procedures.  They just need to put up a refundable

9    deposit and show the money.

10         And finally, one last point here, Your Honor,

11   because the Debtors' transaction and the Creditors

12   Committee's transaction both -- both offers fall

13   well short of $24 million, which is the minimum

14   amount needed for return on equity, this Court --

15   we propose this Court put the Equity Committee's

16   disclosure statement and plan on ice and stay any

17   further action by the Equity Committee until

18   further order of the Court.

19         The professional fee burn is intolerable in

20   this case, Your Honor.  We are facing -- we got

21   served with 10 subpoenas.  It's like they swatted a

22   gnat with a baseball bat or a Howitzer.  And at

23   this point, Your Honor, with Equity clearly out of

24   the money, I would like -- we'd like, if Your Honor

25   wants to go with that proposal, give the Creditors

26

1    Committee a chance to come up with the money, stay

2    the Equity Committee because they're hopelessly out

3    of the money, put our bid procedures on so we can

4    put up our offer of proof, we can show Your Honor

5    we meet the standards, an open and fair process,

6    and we believe, Your Honor, that is going to

7    provide the highest likelihood of a successful

8    outcome and exit from this bankruptcy case.

9        And, most importantly, what's getting lost,

10    preserve the going concern of this business which

11    educates.  This company educates, Your Honor.  It's

12    an exhibition company.  Most of the people that

13    come are students that are -- education on the

14    Titanic artifacts, education on dinosaurs, on

15    bodies exhibits.  Preservation of this important

16    critical public role is critical.  And the

17    preservation of 150 jobs should not be lost either,

18    Your Honor.

19        So, in sum, Your Honor, we respectfully submit

20    that Your Honor set the bid procedures down for

21    hearing as quickly as Your Honor can.

22        If Your Honor is inclined, give the Creditors

23    Committee a little bit more time -- not much -- to

24    come up with the monies.  And with the Equity

25    Committee, you should stay it, Your Honor.

27

1          THE COURT:  Thank you very much, Mr. Winsberg.

2          MR. WINSBERG:  Thank you, Your Honor.

3          THE COURT:  Thank you very much.

4          MR. GRAULICH:  Good afternoon, Your Honor.

5     Timothy Graulich of Davis Polk & Wardwell on behalf

6     of the National Maritime Museum.

7          Your Honor, I want to just put a few things

8     that counsel said in context.  And, frankly, some

9     of the framework suggested by counsel may actually

10    not be too far off of something that might work,

11    but let me just -- let me just start.

12         The National Maritime Museum, just by way of

13    background, is a public museum in the UK.  It's

14    sponsored by the UK's Department of Culture, Media

15    and Sport just like, for example, the British

16    museum.  So it and its sister museums are the types

17    of museums that have cared for such artifacts as

18    like the Rosetta Stone for hundreds of years.

19         Our partners in this, particularly with

20    respect to the acquisition of the Titanic

21    artifacts, are Titanic Belfast and the National

22    Museums and Galleries of Northern Ireland, and that

23    geography is important.  I know counsel indicated

24    these artifacts may be taken to the UK and maybe

25    only folks in the UK would be able to see them.

28

1      There is a very important historical

2   significance to the UK and Northern Ireland.  The

3   ship was built in Northern Ireland.  Titanic

4   Belfast is located on the very site of the

5   manufacturing of the ship.  The UK is where the

6   ship departed from, and the UK is where the ship

7   was supposed to return to after the voyage.

8      It's for those reasons that very

9   significant -- maybe every significant Titanic

10   expert that has expressed an opinion at this point

11   is strongly in favor of this proposal.

12      This proposal has the backing of Dr. Robert

13   Ballard, as the Court well knows, but for the

14   benefit of the record, the individual who

15   discovered the artifacts in 1985.

16      It has the backing of National Geographic.  It

17   has the backing of James Cameron, who, among other

18   things, in addition to being a philanthropist and a

19   deep-sea ocean explorer, was also the director of

20   the movie Titanic.

21      And those names, just to give it some context

22   also, the fundraising for our proposal has

23   commenced as of yesterday.

24      Now, you may ask yourself why is it, if this

25   has been going on for so long, has fundraising just

29

1     started now.  And this is a discussion that we've

2     had for many months with the Debtors and their

3     professionals.

4          The issue is, we are not a hedge fund.  We are

5     not here to get a return on investment in the

6     traditional sense.  We are what we believe to be a

7     permanent home for these artifacts, a permanent

8     home in the sense of fully breathing life into the

9     conditions that encumber the artifacts, that they

10    would remain in perpetuity in public ownership and

11    remain as an integrated whole, and be cared for and

12    curated by the best and the brightest in the world,

13    frankly, at the museums.

14         And being a -- so there's obviously lots of

15    virtues to being this type of an institution.  For

16    example, we believe we would be the best successor

17    trustee for the collection.  But the flip side is

18    we don't have the ability to just go and write

19    checks.

20         Where does our funding sources come from?

21    Government sources and the donor community.  Not

22    surprisingly, those sources are not going to say:

23    Let me give you a few million dollars so that you

24    can put it at risk, and if you don't get the rest

25    of the money, we lose it, right?  The UK government

1      doesn't work any different than any other

2      government; that's not going to happen.

3           We were able to and we proposed to the company

4      to put an amount in deposit to show our earnestness

5      and good faith, but it couldn't be -- it couldn't

6      be forfeited, and that was a -- and I don't want to

7      say an unreasonable issue, but it was an issue for

8      the Debtor.

9           And also the fundraising -- starting a

10     fundraising to say:  You know what, it would be

11     great if I could get a war chest together, but I

12     don't really have an actionable transaction with

13     the Debtors, is not something that really works in

14     the donor community either.

15          So it was important before -- and as sort of a

16     condition to be able to start the fundraising to be

17     able to show that we actually have a transaction,

18     that we have an opportunity to present that

19     transaction in the judicial system, and that we

20     have a -- that we're going to get our day in court,

21     right?  And that is why we were able to start the

22     fundraising yesterday.

23          And to speak to the question of -- I think

24     counsel indicated -- I think fatigue was the word

25     that he used.  I'm actually feeling personally a

31

1       little fatigued because I came here last night via

2       Miami and I don't know that I've actually been

3       inside of a bed yet.

4           But fatigue is not -- these are such unique,

5       important artifacts.  As Dr. Ballard has repeatedly

6       indicated, these artifacts are like, for example,

7       going -- this is almost like a cemetery where 1,500

8       people are buried.  It is extraordinarily -- not

9       just the uniqueness of it, but the solemnity of

10      these artifacts are so important that things like

11      fatigue, while we're all feeling it, is something

12      that I think we're going to need to just power

13      through.

14          So let me just talk about the proposal for a

15      moment.  So, again, as counsel indicated, the

16      purchase price would be $19.2 million cash, which

17      is facially higher than the stalking-horse bid.  It

18      has -- there's no denying it.  It has the issues

19      that counsel indicated, which is that it's not

20      fully funded yet and we're in the process of

21      fundraising it.

22          But this bid would place the collection into

23      perpetual public ownership, and we think it is

24      precisely the type of transaction contemplated by

25      the conditions.

32

1          And so then let's talk then a bit about the --

2     we were among the moving parties that asked for

3     this hearing today, and basically what we're

4     looking for -- and this is key to our fundraising

5     -- is fairness.  And there's three things I think

6     that come out of fairness.

7          One is with respect to the process and timing.

8     We, fortunately, are not looking for such a

9     significant period of time.  I think the Debtors

10    were talking about potentially running out of cash

11    at the end of December.  We're talking about trying

12    to have a confirmation hearing perhaps in the

13    latter part of September.  We're not looking for --

14    we're not looking to push this back an incredible

15    amount of time.  Frankly, given where we are right

16    now, it's possible that a plan process is perhaps

17    only a few weeks longer than a sale process would

18    be.

19         And then once you talk about a process -- so

20    basically we would be very supportive of a process

21    that allowed -- obviously I'm talking from my own

22    proprio views -- like to see our being treated at

23    least as well as the other proposals such that

24    nobody's on a faster timeline, those types of

25    things.

1          Secondly, with respect to fairness, and this

2      also I think dovetails a bit with costs.  And I

3      would agree with counsel, there is a favor in this

4      case a bit of litigate first and then talk about it

5      later.  What we would hope to -- that was part of

6      the request for this hearing today, was to maybe

7      get away from that a little bit.

8          If there are issues with respect to our

9      disclosure statement, we're very happy to talk

10     about them.  I would note that some of the issues

11     that have been raised with respect to the

12     disclosure statement, not all but some of them,

13     actually stem from the fact that we don't have --

14     well, we have imperfect engagement with the

15     Debtors, we'll put it that way, without being sort

16     of over the top about it.

17         So the fact of the matter is, is that certain

18     things like getting us under an NDA so that we can

19     talk with other parties in the case and that other

20     parties in the case can show us a list of the

21     contracts that are going to be rejected or assumed

22     would be important.  If there are issues about

23     claims calculations, I assume the Debtor has

24     already done that.  And so I wouldn't ask the

25     stalking horse to sort of work cooperatively

34

1    necessarily with us on our end, but the Debtor's

2    sort of the fiduciary and the debtor-in-possession

3    here.  There are certain things that may be

4    shortcomings in the disclosure statement that are

5    fixable and may be fixable with the assistance of

6    the Debtor.

7        To be clear, by the time of the disclosure

8    statement hearing, we probably won't have the money

9    in hand yet.  The money is starting to come in, but

10   we'd be very happy to give the most fulsome update

11   that we could at the time of the disclosure

12   statement so that creditors are able to make an

13   informed decision as to the likelihood of whether

14   or not the money is going to be there.

15       Frequently -- not that multiple plans are a

16   frequent occurrence, but frequently when there are

17   multiple plans being voted on, creditors are given

18   a choice and a priority.  You know:  I think Plan C

19   I like the best, but I also like Plan B, but I like

20   that second best, so I could prioritize it.

21       We anticipate by confirmation we'll either

22   have the money or we'll be able to give a very

23   specific update about the near term of what it

24   would take to get the money such that the Court

25   would be aware in order to make a feasibility

35

1    finding.

2         I know frequently counsel has done what

3    frequently you see in a disclosure statement

4    hearing, and frequently judges say those are

5    confirmation issues, they're not disclosure

6    statement issues.  We're not even at the disclosure

7    statement issue -- at the hearing yet.  To sort of

8    hold us to a feasibility standard before the

9    process has even started, I think, is a bit high,

10   but we understand come confirmation we're going to

11   need to demonstrate feasibility.

12        This is not a visionary scheme.  We are

13   engaged with some of the most important people in

14   this space.  Again, lots of public support.  You

15   know, not to name drop, but Liam Neeson has

16   narrated a piece for the fundraising.  Again, James

17   Cameron -- all the types of folks -- Bob Ballard --

18   all the types of folks that you -- that have -- who

19   are concerned about how creditors are treated, but

20   are more concerned about the unique nature of these

21   artifacts and how they're being treated are

22   supportive of this transaction.

23        The third thing with respect to fairness that

24   I would just like to discuss for a second is the

25   interaction with the district court.  And the

36

1       reason I say that is -- is that, again, without

2       trying to, you know, try to resolve these cases in

3       the most litigated manner, try to do it in the

4       least litigated manner, the conditions here are

5       replete with provisions that talk about the

6       district court having jurisdiction over these

7       artifacts, and if there's going to be a

8       transaction, having jurisdiction over that.

9            I understand what the Debtors are talking

10      about, about:  Well, Judge, you should figure out

11      which one is best and then submit that to the

12      district court.

13           Maybe that's right, maybe that's the right way

14      to proceed.  But maybe it's not, in the sense that,

15      if there are going to be multiple transactions that

16      go forward, you open the possibility of multiple

17      approvable transactions.  Certainly, with competing

18      plans, you do end up with -- and there's case law

19      about this as to how the Court is supposed to look

20      at competing plans.

21           I don't know if there's any case law about a

22      competing plan with a sale motion, but, even if

23      there were, if we do the sequence that the district

24      court goes second, I think in your -- I think we're

25      going to be asking Your Honor to make

1    determinations about which one is most likely to be

2    approved by the district court, or whether or not a

3    particular transaction is likely to be approved by

4    the district court.  I don't know that that's

5    something Your Honor wants to do.

6         And so a modest proposal, just like we had

7    with today's hearing, I don't know that it would be

8    the end of the world to file a request with the

9    district court and perhaps have a joint status

10   conference involving Your Honor and the district

11   court and just find out what the answer is.

12        If Your Honor and the district court work out

13   how to sequence it, that's great.  But from a

14   perspective of trying to keep professional fees

15   down -- and I think everybody else in the courtroom

16   knows, I will indicate we're here pro bono.  I

17   recognize no one else is, or very few people may

18   be.

19        So we recognize the more court process there

20   is, the higher the administrative burn.  Having a

21   quick conference with the district court and Your

22   Honor to make sure everybody's on side as to how to

23   proceed about the interaction, I think would be

24   helpful in that regard.

25        And then, finally, I just want to address a

1   few additional points.  I think that the comments

2   about the Creditors Committee disclosure statement

3   being potentially a visionary scheme, all of that,

4   with the -- I think all of that is, frankly,

5   curable, with one exception.  And the way that I

6   see it is the Debtors are concerned that there's no

7   signed purchase agreement and the contracts to

8   assume or reject.

9       There's a draft purchase agreement that's been

10   circulated amongst the purchasers.  It's based upon

11   the purchase agreement that the Debtors have used

12   with the stalking horse.  We can share that in due

13   course.  And, frankly, my experience is that that's

14   the kind of thing that is submitted as a plan

15   supplement and is not as part of a disclosure

16   statement.  But, in any event, we can get the

17   Debtors comfortable with that.

18       The contracts to assume and reject, frankly

19   there's an issue that we need the Debtors'

20   assistance in in order to be able to give them that

21   issue, and that has to do with the fact that we're

22   not under NDA.

23       A timeline -- we can disclose the timeline,

24   and I know the suggestion was give us 30 days, and

25   within 30 days if we don't have the money, we're

39

1    out of luck.

2         30 days is too short, Your Honor.  We've told

3    the Debtors before that we needed something like 60

4    days.  We also asked -- and please don't make those

5    60 days be the summer, because it's very difficult

6    to reach some of these high network people at that

7    time.  It is what it is.  We understand that 30 of

8    those days is going to turn out to be August.  But

9    30 days is too short.  Something like 60 days would

10   be potentially achievable and we're happy to work

11   with the company about that.

12        And the one thing that I don't think we can

13   fix is that -- and this isn't a disclosure problem,

14   this is just life -- that we're not able to post a

15   deposit that will be forfeited.  Even if we had the

16   money, we couldn't do that.  Even if I had $19.2

17   million right now, none of that would be

18   contributed to me or to the project under the idea

19   that some of it could be forfeited if we don't

20   obtain the objects.  It's for the objects.

21        I think that's it, Your Honor.  Again, I

22   appreciate the Court's time.

23        We're looking for a fair process.  We're not

24   looking for an overly long process.  This is not a

25   visionary scheme.  It's backed by very appropriate

40

1    people.  And we'll know in fairly short order

2    whether or not it's successful or not.

3         Thank you, Your Honor.

4         THE COURT:  Thank you very much.  Thank you.

5         MR. CHUBAK:  Jeffrey Chubak for the Creditors

6    Committee.

7         THE COURT:  Mr. Chubak.

8         MR. CHUBAK:  I'd like to just address a few

9    quick points omitted by Mr. Graulich, and to

10   address several points raised by Mr. Winsberg.

11        The first is the notion that this plan has

12   been proposed by the Creditors Committee for the

13   benefit of the James Sanna.  That couldn't be

14   further from the truth.  James Sanna is the

15   principal of both Running Subway, a proposed

16   purchaser, and committee member, TSX Operating

17   Company.  However, he wasn't party to the

18   deliberations and didn't vote on the decision to

19   propose this plan.

20        The plan and disclosure statement are signed

21   by the committee chair, Thomas Braziel.  The third

22   member of the committee, Ezra Jones, on behalf of

23   is Dalian Hoffen Bio-Technique, is present, and if

24   asked to testify, would testify that he supports

25   the plan as well.

41

1          In addition, we wouldn't have proposed the

2     plan if we didn't believe it provided superior

3     recoveries to creditors.

4          Now, formulating a detailed analysis is a

5     little complicated because we're not getting the

6     cooperation that we need from the Debtors to do so.

7     However, based upon the numbers the Debtors have

8     provided, if you take those numbers, adjust the

9     purchase price and unwind the PacBridge settlement,

10    we believe that the recoveries under our plan are

11    up to 11 percent higher than that provided under

12    the Debtors' proposal.

13         We wouldn't have proposed this plan if we

14    didn't believe it was in creditors' best interest.

15         We've shared our analysis with the Debtors and

16    they haven't responded to it, to dispute it or

17    otherwise respond to it.

18         Now, we recognize this isn't intended to be a

19    disclosure statement hearing, but the Debtors have

20    raised issues with the disclosure statement that

21    has been filed, and we agree that the vast majority

22    of the issues raised are disclosure issues that

23    could be easily addressed if the Debtors were to

24    cooperate and allow the museum to come under NDA

25    and formulate an APA.

42

1          The Debtors shouldn't be rewarded for ignoring

2     requests by myself and the museum to come under NDA

3     so that we can fulfill our obligation as estate

4     fiduciary to put forth what we believe is the best

5     result for creditors.

6          Now, we recognize that this is a status

7     hearing and, given where we are now, we don't think

8     it's appropriate to hold the museum's feet to the

9     fire and say you have 30 days to raise the money.

10         The museum's ability to raise money is a

11     feasibility issue, but a feasibility issue should

12     not be decided based on the museum's ability to

13     raise money within 30 days.  The fundraising

14     process has commenced, and that's not what the

15     feasibility requirement of 1129 requires.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.  Thank you, Mr. Chubak.

18         Mr. Gurfein.

19         MR. GURFEIN:  Thank you, Your Honor.  If it

20     please the Court.

21         I think it's worth noting that it was private

22     capital that first discovered the wreck and

23     salvaged the artifacts from the Titanic.  It was

24     private capital that funded the company that

25     displays and conserves the artifacts.

1          And we're dealing here with one of those rare

2     cases where the liquidation value of the estate far

3     exceeds its going concern value, and that's the

4     value that we expect to preserve for equity

5     holders, for the benefit of creditors as well.

6          We did submit a disclosure statement with the

7     liquidation analysis based on numbers provided by

8     the Debtor that shows 100-cent distribution to

9     creditors.

10         I was struck also by the suggestion that this

11     is a litigate first type of case.  I think Your

12     Honor can bear witness we're in excess of 1,100

13     docket entries on this Court's docket, and you'll

14     find six entries where the Equity Committee opposed

15     a motion by the Debtor.

16         On the other hand, you'll find, if you recall,

17     in January 2017, after the Debtors had refused to

18     talk to either committee for six months, we said we

19     hope to have a consensual plan, and within three

20     months we had a plan support agreement.  We had

21     support for the Debtor with respect to extensions

22     of exclusivity.  We had support and joinder in a

23     sale motion, but unfortunately that sale did not

24     succeed.

25         So to suggest that this was not -- that this

44

1    is a case that has been driven by litigation, I

2    think, is a misstatement.

3        What we heard today is a suggestion that the

4    plan proposed by the Equity and the disclosure

5    statement, well, they're unfeasible and cannot be

6    confirmed.

7        And I found it interesting, Your Honor -- and

8    this is a point raised by the museum's counsel --

9    that in the district court all we ask also is for

10   fairness, that we be put on a level track.  And I

11   noted that the Department of Justice, on behalf of

12   NOAA, filed a reply to a response to the Debtors'

13   approval motion in which they note that the Debtor

14   has filed a periodic report, dated July 9th, in

15   which the Debtor informed the district court that

16   the Creditors Committee plan is infeasible, legal

17   and factually deficient, and that the Creditors

18   Committee plan is legally and factually deficient.

19   And I am quoting that correctly from the periodic

20   report.

21       Your Honor, we haven't even filed a pleading

22   in the district court, and the Debtor's already

23   litigating against us.  That's the fairness that

24   we're looking to bring back to this case.

25       The bid procedures -- I think it'd be a fine

45

1       idea if we had the bid procedures heard and the

2       sale motion heard.  What we ask is that they all be

3       heard on a single track.

4            The bid procedures have a lot of problems with

5       them, and if this were a big procedures hearing

6       instead of a status conference, we would have filed

7       objections, noting, for example, that the bid

8       procedures are set forth in the Debtors' Asset

9       Purchase Agreement, there's another set of bid

10      procedures that's set forth in a summary in the

11      sale motion, and there's a third set of bid

12      procedures that's set forth as an exhibit to the

13      proposed form of order.  And those bid procedures

14      are inconsistent, so we don't know which bid

15      procedure is actually the one that's being

16      contemplated.

17           If you look at the bid procedures, you'll see

18      that potential bidders are those that are invited

19      by the Debtors' financial advisor to bid, and

20      rather than doing due diligence and then submitting

21      a bid, they're required to approve financial

22      wherewithal before they're even entitled to do due

23      diligence.

24           I don't want to go into all of the objections,

25      Your Honor -- there will be time for that -- but

46

1    the procedures that are before Your Honor are rife

2    with provisions that will chill the bidding and

3    tilt the process toward the chosen stalking horse

4    bidder.

5        I note also that one of the objections made by

6    the Debtors today was that the Equity Committee

7    plan lacks funding, and yet earlier today we sent

8    over to Debtors' counsel a term sheet for exit

9    financing that has been entered by the Equity

10   Committee with the funding source.

11       The ability of the Equity Committee to fund

12   its plan is something subject to an evidentiary

13   hearing.  That's not for today, but, Your Honor,

14   we're capable of demonstrating that.

15       What we would propose, Your Honor, you have

16   three liquidation scenarios before you, and we ask

17   that they run on a single track, and there's no

18   reason that track could not terminate before

19   December.  October, I think, would be a stretch,

20   but there's certainly no reason it could not be

21   completed within 90 to 120 days.

22       I would suggest that there be a single

23   disclosure statement.  The Debtor has the benefit

24   of seeing the disclosure statements prepared by the

25   Equity Committee and the Creditors Committee.  The

47

1    Debtors have control of the information flow.  It

2    would not take the Debtors very long to review the

3    disclosure statement, input those sections that

4    they disagree with based on the financial

5    information that the Debtors have, and then permit

6    the Creditors Committee, the Equity Committee and

7    the Debtors to submit different sections supporting

8    their respective proposals.

9        A single ballot, as noted by counsel to the

10   museum, would be a good idea, too.  We have three

11   proposals.  Let the stakeholders of the estate

12   indicate their preference.

13       And it's important to note also that, while

14   balloting is important and the determination as to

15   which, if any, plan the different classes of

16   creditors and equity holders support, that is a

17   consideration for the Court.  It is the Court that

18   ultimately will determine which is the best plan,

19   using the votes of creditors and equity holders as

20   one of the elements for Your Honor's consideration.

21       A single plan, confirmation and sale hearing

22   could be conducted, at which Your Honor determines

23   whether to approve the sale or to confirm a plan.

24       And we would respectfully suggest that the

25   admiralty court or the district court and Your

48

1      Honor confer.  We would have absolutely no

2      objection to Your Honor conferring with Judge Smith

3      with respect to all of those items.

4          We would suggest that, rather than litigating

5      twice in two different courts, we simply combine

6      pleadings so that each pleading filed before Your

7      Honor is filed before Judge Smith at the same time.

8          It seems to us that coordinating a hearing

9      with Your Honor's determination in advance with

10     respect to the bankruptcy estate and the bankruptcy

11     issues would make sense, followed by Judge Smith's

12     determination.  But if Your Honor and Judge Smith

13     confer, you may determine otherwise, or you may

14     determine that a single hearing be held.  With

15     video or telephonic appearances, we could hold one

16     hearing, Your Honor, and the Equity Committee would

17     not oppose that as well.

18         I think we also have to come out of here with

19     a proposed timeline for when these hearings would

20     be held so that whatever discovery is required

21     could be conducted in a reasonable period of time.

22         Although the Debtors suggest that they

23     complied with the Lionel criteria, we respectfully

24     disagree.  I noted, among other things, that in the

25     approval motion filed before Judge Smith, the

49

1      Debtors indicated that once the bankruptcy court

2      has approved the sale, they will then disclose to

3      Judge Smith who the management and board of

4      directors would be of the purchasing entity.  If

5      this were conducted with appropriate disclosures as

6      a plan and disclosure statement, we would know in

7      advance of the confirmation hearing who the

8      directors would be.

9          And I raise that, Your Honor, because in the

10     term sheet that originally was proposed, there was

11     an indication that the stalking horse bidder was

12     free to negotiate with management and employees

13     over a management incentive plan.

14         We've asked about that, but the last we've

15     heard was the notation in the term sheet that there

16     was going to be negotiation over a management

17     incentive plan.  We don't know where that went.  We

18     don't know what's happening with that.  A

19     disclosure statement would require that to be

20     disclosed.

21         Another pleading that I read with interest

22     from the district court was the Debtors' reply to

23     the United States.  The United States filed a

24     response to the approval motion, noting among other

25     things that NOAA was taking the position that the

50

1    covenants and conditions required all of the

2    artifacts to remain in one collection.  And the

3    Debtor filed a pleading in which, frankly, was a

4    pleading that I thought could have been filed by

5    the Equity Committee, noting that in fact the

6    language in the covenants with respect to a single

7    collection were predatory and aspirational, but

8    that the French artifacts are clearly not within

9    the jurisdiction of the district court.

10        And you have to wonder why, if the Debtor is

11   selling to a third party and will no longer be

12   involved in the artifacts, why the Debtor is

13   concerned about shoring up the identity of the

14   French artifacts as not being within the

15   jurisdiction of the district court.

16        If the proposed purchasers have an intention

17   to sell the French artifacts in the future, they

18   would be realizing upon the value that the Equity

19   Committee believes should be realized upon now

20   while the assets are before Your Honor.  And if

21   they have no intention of selling the French

22   artifacts separately, perhaps we can talk about

23   impressing a trust upon those artifacts, so if at

24   some time in the future they are sold, creditors

25   who are not made whole, and Equity, who is not in a

51

1    position to realize on that value, will be able to

2    realize upon those values in the future.

3         These are all things that we can talk to the

4    Debtors about, talk to the Creditors Committee

5    about, talk over the next 30 days or so.

6         It would be our request, Your Honor, coming

7    out of this status conference, that we do set a

8    timeline.  We believe that the Debtor should be

9    operating under a plan at this late date in the

10   case disposing of all of the assets so that

11   stakeholders will have a direct opportunity to have

12   a voice in that decision.

13        The Debtors already have a plan on file that

14   they withdrew that could be modified readily, and

15   they have two disclosure statements from which to

16   work to shore that up.

17        Within two weeks, three weeks, we should be

18   able to have a disclosure statement that we all can

19   agree upon and have a hearing some 30 days out, 40

20   days out, to determine whether the disclosures are

21   appropriate, adequate and sufficient.  Let a ballot

22   be created that can go out to all of the stake-

23   holders for their vote so that Your Honor will have

24   the benefit, at least, of their views.  30 to 45

25   days past that, we're into late September, early

1    October, maybe even late October.

2         That is a very feasible timeline.  It permits

3    all of the interested parties to have their views

4    known.  It permits an opportunity for evidence to

5    be presented to Your Honor and not just argument.

6    And it gives all of the parties the opportunity to

7    realize upon the value that we believe exists in

8    this case.

9         Unless Your Honor has any questions, I'll sit

10   down at this point.

11        THE COURT:  Thank you very much.  I appreciate

12   your thoughts and your explanations.  Thank you

13   very much, Mr. Gurfein.

14        MR. GURFEIN:  Thank you, Your Honor.

15        THE COURT:  Would anyone else in the courtroom

16   like to be heard?

17        MR. BURNETT:  Thank you, Your Honor.  Jason

18   Burnett appearing on behalf of 417 Fifth Avenue and

19   Luxor.

20        Your Honor, first, I'd like to compliment all

21   counsel.  I agree with all of them and I disagree

22   with all of them.  I've had the opportunity to

23   speak to all of them.  I do represent approximately

24   40 percent, by some calculation, of the unsecured

25   claims, and I find that has rendered me funnier and

53

1       physically more attractive than I've ever been

2       before in my life, and they -- they're not laughing

3       because they've heard that joke, Judge, six times

4       already.

5            The truth of this is we find ourselves in a

6       bit of a hash with this case.

7            I do like Mr. Gurfein's idea of extending time

8       for all parties in trying to get all three options

9       put together.  Obviously my client loves the idea

10      of an auction.  We love the idea of the National

11      Maritime Museum bringing more money to the table.

12      And we really love the idea of being paid 100 cents

13      on the dollar as contemplated by the Equity

14      Committee.

15           We realize that -- well, I would like to

16      encourage counsel that those are not all mutually

17      exclusive ideas, and I believe that there is enough

18      brain power in this room, and certainly the talent

19      is truly astounding, that there has to be a way

20      out, and that I think we do need more time.  And I

21      understand that that risks the loss of the sale

22      contemplated by the Debtor at this time.

23           And certainly speaking on behalf of my

24      unsecured creditor client, we're willing to run

25      that risk, with the options -- with the other

54

1    options that are on the table.  And that's with no

2    disrespect to the Debtor and their counsel and/or

3    the proposed buyer, the stalking horse bidder, but

4    we do believe that more time is appropriate.

5         We find ourselves two years into this case,

6    and I would be remiss if I didn't say that I'm a

7    little dissatisfied with the fact that the Debtor's

8    not filed a plan and disclosure statement, and that

9    would make it easier to compare apples to oranges.

10        I don't think the disclosure statement has to

11   be that complicated in this case.  And I do believe

12   that the Debtor has the information that would be

13   useful and helpful to this Court to move the case

14   along.

15        I stood here two years ago, Your Honor, and

16   believed 100 percent exactly what the Debtor said,

17   that this case was -- there was tremendous value

18   here, that the French artifacts could be sold, and

19   that creditors would be paid 100 cents on the

20   dollar.  And, again, my apologies to everybody

21   that's heard me tell the story, the reason I

22   believed that was because of a New York Times

23   article from 2015 that a single packet of Saltines

24   from a lifeboat had sold at auction in England for

25   $23,000, so for 15,000 pounds.

55

1          So we have 5,500 artifacts here, and I'm just

2     stunned that the value would render a result of

3     only approximately right now 50 to 60 percent to

4     the unsecured creditors.  If the stalking horse

5     bidder is the successful bidder, that's where we

6     end up.

7          I'm also mindful, Your Honor, that we have

8     approximately $12 million of unsecured claims and

9     we have $6 million of professional fees in this

10    case.  And I did ask some of the counsel from New

11    York, and they say this is unusual even in New

12    York.

13         So I am hopeful that the Court will fashion an

14    order that gives all the parties more time to

15    hopefully come to a consensual resolution, but, if

16    not, to provide alternatives that can be reviewed

17    upon evidence and proper objection by all the

18    parties and an order made by the Court.

19         Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Burnett.  Thank you

21    very much.  Thank you.

22         MS. FELDSHER:  Thank you, Your Honor.

23    Jennifer Feldsher from Bracewell on behalf of Alta

24    and Apollo.

25         Your Honor, I rise only briefly -- I'm sure

56

1    the Debtors will address many of the arguments that

2    have been made by the National Museum and the

3    Equity Committee, and I will try very hard not to

4    steal their thunder.

5        I rise only to talk about this notion that's

6    been thrown around here of fairness.  And Mr.

7    Burnett talked about New York fees.  I will also

8    tell you that this notion of fairness being thrown

9    around here is also very different where I come

10   from as well, and I think it's different in this

11   Court as well.

12       So let's talk about fairness.  Our client, my

13   clients, have been working with the Debtors since

14   late last year to try to get to a transaction.  Mr.

15   Grossman's client has been working even longer.

16       During that time, the Debtors have

17   consistently delayed, delayed, delayed, hoping for

18   a better transaction, have taken what we would call

19   extraordinary efforts in spacing out negotiations

20   in order to give every single potential opportunity

21   more time.  So we have effectively been out there

22   trying to get to a transaction since late last

23   year.

24       We are the only party in this courtroom that

25   has posted a deposit.  We're the only ones with

1    money at risk today in an escrow if we do not close

2    our transaction.

3         The National Museum -- Mr. Graulich got up and

4    said:  We can't post a deposit.

5         Well, I would say that was a bit tongue in

6    cheek.  It's possible that the National Museum

7    which doesn't have the funds can't post a deposit,

8    but Running Subway, their partner, who's a

9    competitor of the Debtors, who's a normal

10   corporation, can certainly post that deposit.  They

11   are choosing not to, and they are asking the Court

12   to not create a level playing field for all bidders

13   which an open auction would do, but rather to

14   provide special procedures just for them so that

15   they can make a bid, have no money at risk, and try

16   to get -- what you heard Mr. Graulich tell you is:

17   We'll try our best.

18        And that's not fair.  That's very different

19   than where my clients find themselves, which is

20   with a deposit in the bank and at risk if they

21   choose not to close.

22        Now, the transaction, once again, just to

23   compare the fairness, we're the only party that's

24   interested in this courtroom today in buying this

25   asset as a going concern.  We are interested in

58

1    buying the business, preserving the assets and the

2    jobs of the employees at the company today.

3         Both the Equity Committee and the Creditors

4    Committee are fine pushing the Debtors to the brink

5    financially, because what they want are the

6    artifacts, which, by the way, you've heard the

7    Debtors tell you aren't being preserved in the way

8    that they're supposed to be preserved.

9         But we, the stalking horse bidder in the case

10   at this point, is also being pushed to the brink,

11   because it is very likely that, while we wait for

12   the National Museum to raise money from, I don't

13   know, some donors that have put in support but no

14   cash, and while we wait for the Equity Committee to

15   conduct an auction that we have personally looked

16   into and will take months, if not years, of

17   litigation, this business is not going survive and

18   we're not going to be able to buy it as a going

19   concern.

20        So the process should be fair, Your Honor, and

21   I agree with Mr. Graulich saying that.  But in

22   order to make it fair, we need to have the same

23   rules for participation for every party, and we

24   need to engage in a process where every party is

25   bound by exactly the same obligations and risks.

59

1    And if you push this business to the brink, you

2    should have a financial penalty for doing that.

3        Your Honor, our clients have finalized an APA.

4    We've disclosed our group fully, and the financing

5    that we have that is committed financing, and we're

6    being required right now to bid against

7    aspirational plans.

8        Mr. Graulich was very candid here, and I

9    appreciate that.  He said to the Court:  We hope to

10   get the financing, we might get it before

11   confirmation.  And I believe I noted that he said:

12   We might actually get to confirmation and still not

13   have the funding necessary, but we think we'll give

14   you, Your Honor, enough on the record to establish

15   feasibility at some time in the future.

16       That's inherently unfair for us to have to bid

17   against something like that.  They can put any

18   dollar amount out there, Your Honor.  Even if we

19   came back and said:  Okay, we'll match that dollar

20   amount, they can just put a higher dollar amount.

21   It doesn't matter they have no money at risk and

22   they don't have any funds committed today for any

23   transaction.

24       So, finally, Your Honor, one last note on

25   fairness to Mr. Gurfein's presentation.  Nobody

1     wants to take the financial risk of these assets,

2     Your Honor.  This company has been in bankruptcy

3     for two years.  It's been shopped for essentially

4     all two years.  Nobody has stood up and put their

5     money where their mouth is.

6          And now Mr. Gurfein suggests that they'd be

7     happy to take a free ride on any upside that the

8     only party who's willing to put any money at risk

9     is going to ever see from the transaction.  That's

10    the definition of unfairness, and I don't care what

11    state you're from.

12         So, Your Honor, I believe everybody's had

13    ample time.  I believe this Debtor has had ample

14    time.  I believe that the Debtor is telling you

15    they are out of time, and we see that as well from

16    our diligence into the Debtors, and we are very

17    concerned that we will not be able to buy this

18    asset as a going concern, which is what we want to

19    do.

20         We understand the lure for the Debtors of

21    giving the parties and the museum a little more

22    time to raise their money.  We don't agree with it,

23    obviously, but some of that is a bit self-serving

24    for us, but we understand that lure.

25         But we ask Your Honor to set a hearing for the

61

1    bidding procedures so that we can preserve the

2    value of this business and we have a chance to buy

3    it as a going concern.  We think that's only fair

4    after all of the time that we have expended and the

5    resources.  And Your Honor knows -- I've been

6    before the Court several times -- getting to this

7    point and getting to a signed APA, it was not easy.

8         When Mr. Winsberg tells you about fatigue,

9    that isn't a reason to do one thing or another, but

10   there was a call that he recalled to me where I got

11   on the call and I said:  I surrender.  I cannot do

12   this anymore.  This is taking too long.

13        And I don't say that lightly, Your Honor, and

14   hopefully you've gotten a feel for my personality a

15   bit in the times I've been before you.

16        So, Your Honor, we ask for you to set the

17   bidding procedures hearing and to approve a fair

18   and open process for everybody, where we can

19   participate and other parties can participate, but

20   on a level playing field.

21        THE COURT:  Thank you.  Thank you very much.

22        MR. GROSSMAN:  Good afternoon, Your Honor.

23   Scott Grossman of Greenberg Traurig.  As Ms.

24   Feldsher said, we're co-counsel to the stalking

25   horse purchaser.

62

1        I obviously adopt everything Ms. Feldsher

2    said.

3        I just wanted to come up and raise one other

4    point that was addressed by other parties, and that

5    is dealing with what we call the admiralty court or

6    the district court for the Eastern District of

7    Virginia.

8        Your Honor, we have thoroughly studied the

9    covenants and conditions and the requirements, and

10   negotiated extensively with the Debtors to come up

11   with the transaction structure we came up with in a

12   manner that we think provides the easiest path

13   toward approval.

14       I think what's being suggested by other

15   parties is unworkable, unnecessarily complicated,

16   and just not necessary.

17       Your Honor, the approval process here is not

18   unlike the approval process Your Honor has

19   encountered in other regulated industries, airline

20   cases, health care cases, the like.  You have run

21   the full process in the bankruptcy court.  The

22   Court determines who is the winning bidder, and

23   then the parties go and get their regulatory

24   approval.

25       This is no different.  We would run the

63

1     process here, you would determine the winning

2     bidder, and then you go before the admiralty court

3     and seek the admiralty court's approval of

4     everything that Your Honor has done and approved

5     the winning bidder.

6          We think that's a very straightforward,

7     efficient and streamlined process, and anything

8     else proposed would really be unnecessarily

9     complicated.

10          And obviously Mr. Wainger, the expert on the

11    admiralty court issues I'm sure can weigh in, but

12    bottom line, Your Honor, we ask you to set our bid

13    procedures down for hearing promptly and in short

14    order.

15          Thank you, Your Honor.

16          THE COURT:  Very good.  Thank you.  Thank you.

17          Yes.

18          Let me first ask if anyone else in the

19    courtroom would like to be heard.

20          (No response.)

21          THE COURT:  No?

22          Would anyone by conference telephone like to

23    be heard?

24          (No response.)

25          THE COURT:  No?  Thank you very much.  All

64

1    right.

2         MR. GRAULICH:  Your Honor, for one moment,

3    when you say "to be heard," I'm happy to go after

4    the Debtors, but I do have like 45 seconds of

5    response to --

6         THE COURT:  Yes.  I'm assuming that you'll

7    respond to some of the comments that are made, and

8    then you're welcome to respond to that.

9         MR. GRAULICH:  Thank you.

10        MR. WINSBERG:  Thank you, Your Honor.  For the

11   record --

12        THE COURT:  Thank you.

13        MR. WINSBERG:  -- Harris Winsberg for the

14   Debtors.

15        I'll be brief, Your Honor.  And then Mr.

16   Wainger's in the courtroom.  We understood these

17   issues were going to come up today, and he may

18   address the Court on specific admiralty issues for

19   Your Honor real briefly.

20        From the Debtors' perspective, just a couple

21   of points.  The Debtors, in the four months that

22   I've been in the case and before that time, Your

23   Honor, the Debtors worked every potential bidder to

24   find the best price for these assets, and we waited

25   as long as we humanly possibly could before we

65

1    signed a purchase agreement with Apollo, Alta and

2    PacBridge.

3        Would we have liked the purchase agreement to

4    have been more money?  Yes.  Would we have liked

5    there to be a better recovery for the creditors and

6    equity?  Yes.  But this is what the market has

7    borne, and by evidence by that is not just the

8    stalking horse offer, but the offer put in by the

9    Maritime Museum.

10       The companies just can't -- we can't sustain

11   any further delays on this point, Your Honor.

12   They're out of money.  They're out of time.

13       This idea that we would do a joint disclosure

14   statement -- I heard Mr. Gurfein say that it would

15   take weeks.  Well, Your Honor, it's a complete

16   waste of estate resources to put the Debtors in a

17   position where working on doing a joint disclosure

18   statement with two disclosure statements that are

19   unfeasible.  Neither party currently has two

20   nickels to rub together.

21       So it makes no sense to waste further -- we're

22   talking about attorneys' fees and costs and

23   administrative expenses, and it makes no sense to

24   continue to run that meter for a process.  And if

25   the plan support agreement, which was before my

66

1    time, but I've talked to Mr. Cavender, now Judge

2    Cavender, and if the subpoena negotiations -- and

3    Mr. Brooks is in the courtroom -- is any

4    indication, it's not going to get done in two

5    weeks.  If we get there, it will be months from

6    now.

7         We have no confidence -- and you've seen the

8    dysfunction in this courtroom -- that we'd be able

9    to negotiate, even if we believed it made sense,

10   that we'd be able to negotiate a joint disclosure

11   statement and plan.

12        Mr. Dobbs, who is probably the most well

13   respected mediator in the country, in my humble

14   opinion, could not settle this case, Your Honor.

15        So the notion the parties are going to break

16   away for a couple of weeks and try to negotiate a

17   disclosure statement, all the while risking the

18   only deal on the table that has the money that

19   actually will close and preserve the company,

20   preserve the artifact collection and save 150 jobs,

21   is just -- it's just ludicrous, and we respectfully

22   submit that's not a good path forward.

23        A couple of other points, Your Honor, just to

24   put the record straight.  There is no management

25   incentive plan that's in place between Mr. Daoping,

1    the CEO, and the stalking horse purchaser.  The

2    Debtors represented that in their motion to

3    reconsider that we filed with the Court, I believe

4    it was last Monday, and Ms. Feldsher and Mr.

5    Grossman can stand up and they are willing to put

6    declarations from their clients that there is no

7    deal.  There is no side arrangement.  I don't know

8    why that keeps getting brought up.

9         As to the Equity Committee on their financing,

10   they have a non-binding, not firm commitment --

11   what I saw was a non-binding term sheet for up to

12   $7 million.  That's sufficient to refi the current

13   DIP loan of $5 million, provide a little bit of

14   runway for the company, but won't confirm a plan

15   because it doesn't provide -- that's not enough

16   money to pay the secured lender, which is owed $4

17   million, the admin claims, whatever Your Honor

18   finally approves, along with the priority claims.

19        So they don't have -- even if you were to

20   consider what they have right now, it's not

21   sufficient to confirm a plan.

22        And, finally, Your Honor, as to the Creditors

23   Committee, there was a discussion about not being

24   cooperative.

25        We've provided every piece of paper in

68

1      connection with the Debtors' Asset Purchase

2      Agreement to the Creditors Committee.  What Mr.

3      Chubak is talking about as part of the Asset

4      Purchase Agreement is a seller disclosure letter, a

5      voluminous due diligence document that we provided

6      to both committees, the Equity Committee and

7      Creditors Committee, but we haven't provided to the

8      museum.  Should the museum come up with the money,

9      we'll provide it to them.  It's as simple as that.

10          And the last point, Your Honor, if we do a

11     joint disclosure statement hearing, the idea -- and

12     the New York landlord mentioned an auction.  The

13     idea that anyone in their right mind would

14     participate in an auction process when they know,

15     even if they would win, that some other party could

16     still win the assets through some other disclosure

17     statement and plan, is just pure fantasy.

18          Doing joint disclosure statements that go out

19     the door like that, you'd ensure that basically

20     you're going to be looking at two private sales.

21     There will be no auction.

22          So for those reasons, Your Honor, we

23     respectfully submit that you set the bid procedures

24     down for hearing.  If Your Honor wants to give a

25     very short time frame for the Creditors Committee

69

1    plan proponents to come up with the actual money,

2    the Debtors are certainly willing to entertain

3    that, as well as to ice the Equity Committee

4    because they're out of the money.

5         With that, Your Honor, with respect to Mr.

6    Wainger, he wanted to address a couple of admiralty

7    court issues, if that was okay with Your Honor.

8         THE COURT:  Very good.  Thank you.

9         MR. WAINGER:  I'm happy to defer to Mr.

10   Graulich, if he would like to respond again.  He

11   said he had a few words.  I would prefer to respond

12   to all of the issues being raised.

13        THE COURT:  Very good.

14        Mr. Graulich?

15        MR. GRAULICH:  Sure.  Just very briefly, Your

16   Honor, again for the record, Timothy Graulich of

17   Davis Polk on behalf of the National Maritime

18   Museum.  Just a few points.

19        The first point is that Ms. Feldsher indicated

20   that -- well, I guess suggested that I had

21   indicated that the Debtors -- that the museums

22   could not post a deposit and that she assumed that

23   that was, quote, tongue in cheek.

24        Quite the contrary, Your Honor.  We indicated

25   that we in fact were able to post a deposit, and we

70

1    offered to post a seven-figure deposit in

2    connection with negotiations with the company to do

3    a transaction.

4        The issue is not about the size of the

5    deposit.  The issue is about the nonrefundability

6    of the deposit.  If this was just about posting a

7    deposit, we'd be able to do that by the end of

8    today or at the end of close of business tomorrow.

9        Similarly, in the same vein, counsel had

10   indicated that the two committee plans, quote,

11   didn't have two nickels to rub together.  That's

12   patently false.

13       We don't have the entire amount, but we

14   certainly -- we are not just, you know, somebody

15   with a hope and a dream here.  This is a

16   well-known, well-established, series of museums who

17   have a long history that we have shared with the

18   Debtors and their professionals of fundraising,

19   successful fundraising.

20       We are dealing with important government

21   sources that, frankly, the Creditors Committee has

22   had discussions with because it didn't seem of

23   interest to the Debtors as to -- if we didn't -- if

24   we weren't able to fit within their rubric, it

25   wasn't going to work for the Debtors.

71

1          So the fact of the matter is, there is money

2     behind this offer even now, it's just that it's not

3     fully committed yet.

4          The third point is, there was an argument

5     that, you know, this is very straightforward

6     because this is no different than any other

7     regulated business, and I'm sure counsel will be

8     more expert on this, but I do think it's -- I'm not

9     convinced that it's not different than other

10    regulated businesses.

11         For example, there are numerous provisions in

12    the conditions that talk about "the court," being

13    the district court, "shall be deemed to have

14    continuing jurisdiction over the subject Titanic

15    artifact collection."

16         That's different than the fact that there is

17    -- that you're involved in a regulated business.

18    There's discussions in here about whether or not

19    certain parts of the collection would be deemed to

20    be property of the estate in the event of a Chapter

21    11 filing.

22         As Your Honor is aware because we previously

23    filed, there's a provision in here that says in the

24    event that there's going to be some type of a

25    transaction with respect to the -- at least with

72

1     respect to the American collection, perhaps it

2     would be appropriate the district court may remove

3     the reference.

4          So there is a more fundamental jurisdictional

5     question here than I think that you normally see.

6          And, frankly, our solution, I think, is a

7     pretty modest proposal.  It's for a status

8     conference in the first instance, so that we could

9     have a discussion with Your Honor, with the

10    district court, to figure out what the most

11    efficient path forward is.

12         Two more points.  I'm sure I misheard counsel,

13    but I thought that I had heard that once we raise

14    $19.2 million, they'd be happy to give us due

15    diligence.  I'm sure that's not what was meant, but

16    we're not so sure that that's an appropriate way of

17    dealing with somebody who is -- and it's not just

18    the museum.  We're partnered with the -- with a

19    statutory committee.  It's appropriate that we get

20    as much -- we're not even talking about discovery

21    -- as much due diligence as appropriate to put

22    together this bid.

23         I'm sorry.  I said two more points.  Just,

24    again, two more points.

25         I agree with Ms. Feldsher when she indicated

73

1    that we should be all on the same -- fairness

2    dictates that we should be all on the same terms.

3    But I think her complaints are not about our plan

4    or the Equity Committee plan.  I think it's with

5    the Bankruptcy Code.

6         Nothing in the Bankruptcy Code requires a plan

7    to have a nonrefundable deposit.  Nothing in the

8    Bankruptcy Code requires a sale to be conducted

9    outside of a plan.

10        So the fact of the matter is -- and, frankly,

11   nothing -- the fact that we said that we would

12   comply with 1129 with respect to feasibility,

13   that's what the Code provides.  So the fact that we

14   are not agreeing because for the reasons we

15   indicated earlier year we're just not in a position

16   to, agreeing to not the Bankruptcy Code but a

17   private agreement negotiated with the Debtor, that

18   shouldn't be held against us or, frankly, the other

19   plan.

20        And then, finally, I think there was a

21   statement that indicated that the Debtors and NOAA

22   have resolved their differences as to -- as to at

23   least as between the two of them what they think is

24   going to happen with the district court.  I think

25   just in the interest of transparency it would be

74

1      great if that could be -- if that resolution could

2      be put on the record so as least we understand it.

3           MR. WINSBERG:  On that point, Your Honor, just

4      to be clear, NOAA sent us an email about language

5      they would want to resolve their bid procedures and

6      sale objections in the court, and that's what we

7      resolved.  It's simple language that just confirms

8      -- and Mr. Troy is in the courtroom -- just

9      confirms that the Debtors are complying with the

10     revised covenants and conditions.  There's no --

11     it's nothing more than that.  And he's here in the

12     courtroom and he can stand up and speak for

13     himself.

14          THE COURT:  Thank you.

15          And thank you very much.  Thank you.

16          MR. CHUBAK:  I'll be very brief, Your Honor.

17     I just wanted to respond very briefly to the remark

18     by Mr. Winsberg, which is that if the parties are

19     directed to solicit a single disclosure statement,

20     we're going to necessarily result -- it will

21     necessarily chill bidding and it will virtually

22     guarantee an option between two private sales.

23          We don't believe that anyone -- the Debtors'

24     assets have been marketed for over a year, and the

25     stalking horse purchaser -- there's a dispute as to

75

1       whether the PacBridge parties are an insider or

2       not, notwithstanding the fact that the Debtor has

3       scheduled them as such, but we don't believe that

4       anyone is going to bid at auction.  All we want is

5       that creditors be given the -- stakeholders be

6       given the opportunity to select which private sale

7       should be consummated.

8            Ms. Feldsher proposed that Running Subway put

9       the deposit down on behalf of the National Maritime

10      Museum.  It shouldn't come as a surprise that an

11      exhibition operator that is partnered with the

12      Debtors -- I wonder why the Debtors describe them

13      as competitors when they've worked together in the

14      past -- should be expected to provide a deposit

15      when it's not the financial power behind this bid.

16           Running Subway is there to pick up the

17      exhibition business because the museum isn't in a

18      position to do so.  The bid procedures appear to be

19      designed to exclude the museum from bidding by

20      structuring the deal as such.

21           Further, the Debtors have said that the

22      Creditors Committee plan will yield materially

23      worse recovery because it would delay payments --

24      delay the receipt of consideration for the

25      contemplated transaction relative to their

76

1    proposal.  But distributions to creditors would be

2    delayed under the Debtors' proposal as well since a

3    plan, a liquidating plan, would need to be

4    submitted post consummation -- following

5    consummation of the contemplated 363 sale.

6         As stated in the moving papers filed

7    requesting the status conference, we think the

8    appropriate course is to direct the filing of a

9    joint disclosure statement and have that solicited.

10   We don't think it would take an inordinate amount

11   of time and money.  The Debtors just filed a

12   monthly operating report reflecting nearly $1.5

13   million in the bank.  We think there's enough money

14   to give stakeholders the opportunity to choose how

15   these cases should be brought to a conclusion.

16        Thank you.

17        THE COURT:  Very good.  Thank you.  Thank you.

18        Yes.

19        MR. WAINGER:  Good afternoon, Your Honor.  It

20   has been several months since I've been in front of

21   Your Honor.  It's always a pleasure to be here.

22        I note that I'm the 11th lawyer to speak

23   today, and it seems that this is very, very

24   complicated, but it shouldn't be.  In fact, I'm

25   here to simplify this for Your Honor.

77

1           As I was listening to Mr. Graulich speak very

2      candidly about the museum's plan, I've been

3      thinking about why the museum filed a motion to

4      withdraw the reference and take the jurisdiction of

5      this Court and transfer it to Norfolk, which Your

6      Honor will recall happened last year.

7           I thought about that a lot since when it was

8      filed, and as I've listened today to the various

9      lawyers, it became clear to me why they did that,

10     and why they more recently filed an attempted

11     notice to appear in Norfolk, and why the Creditors

12     Committee lawyers and the Equity Committee lawyers

13     would like joint status conferences and a bilateral

14     jurisdiction.

15          It's because the more complicated they make

16     this case, the longer it takes.  And the longer it

17     takes, the more likely they are to run out the

18     clock and obtain the remedy they want.

19          In reality, Judge, this is very, very simple.

20     It's just like every other bankruptcy case.

21          The history of the Titanic, the famous

22     people's interest in Titanic, none of that matters.

23     It doesn't matter because there already is a

24     jurisdictional regime in place to ensure that the

25     public interest is taken care of, if in fact there

78

1    is a public interest.

2         Your Honor, this Court's obligation is simply

3    to apply the Bankruptcy Code.  Admittedly, I

4    probably know that less than anybody else in this

5    courtroom.  But that's all this is, Judge, apply

6    the Bankruptcy Code.  And if we apply the

7    Bankruptcy Code, we understand why we have to talk

8    about the history of the Titanic and the pleadings

9    filed in Norfolk, because it's simple:  The estate

10   benefits from the sale process.  It's got the

11   money, it's financed, it's ready to go.

12        And you have to excuse that considering these

13   other irrelevant alternatives to appeal to Your

14   Honor why we should overlook the fact that the

15   Equity Committee is out of the money, and we should

16   overlook the fact that the Creditors Committee

17   doesn't have any finance money because these other

18   things matter.

19        And you know what, Judge?  They may matter.

20   They may matter to people that care about the

21   Titanic.  They may matter to this Court when Your

22   Honor goes and sits and reads the news.  But it

23   doesn't matter to this Court's decision, which is

24   governed solely by the Bankruptcy Code.

25        And if we put all this other noise aside and

79

1       we looked at each other and said:  Judge, which is

2       better for the estate?  Is it the Creditors

3       Committee plan, the museum's plan that may come up

4       with money or may not, and proposes to never

5       provide a refundable -- a nonrefundable deposit so

6       they can walk away if they're unsuccessful?  Of

7       course not.

8           Does the Equity Committee's plan matter when

9       they're out of the money and have been for a long,

10      long time?  Of course not.  Let's not

11      overcomplicate this.

12          And ironically -- ironically -- it's the

13      covenants and conditions that me and my co-counsel

14      drafted many, many years ago that ensures that this

15      Court can make a simple decision.  And it ensures

16      that that court, of which I have been counsel of

17      record for 15 years, has an equally simple

18      decision.  Your Honor decides what's in the best

19      interest of the estate, and we go to Chief Judge

20      Smith and we ask for approval if necessary.

21          They are trying to create a problem that

22      doesn't exist, or trying to solve a problem that

23      doesn't exist.

24          For two years, Chief Judge Smith has been

25      aware of this case and virtually every material

80

1    development in it.  And for 15 years, I know that

2    when Chief Judge Smith has a question, I'm hauled

3    down to Granby Street.  So if there is an issue, we

4    will know about it.

5         And when I stood in Chief Judge Smith's

6    courtroom in June and said:  Judge, time is of the

7    essence, I'm certain the Court understood.

8         Why is time of the essence?  Because, Your

9    Honor, 150 people stand to lose their jobs.  Time

10   in this case matters.  It matters to the Debtors.

11   It does not matter to any other constituent.  In

12   fact, we heard that from counsel to the landlord:

13   We need more time.  We need more time.

14        We don't have more time.

15        And so that is why we prepared the Norfolk

16   Court to consider whatever ruling this Court makes

17   and to do it on an expedited basis.

18        Judge, at the end of the day, the covenants

19   and conditions makes this Court's job easier.  It's

20   no bigger or smaller than any other case.  We

21   consider the same statutes and apply the facts to

22   those rules of law.  And that's what I'd ask the

23   Court to do and recognize that time matters for

24   these people.

25        THE COURT:  Thank you very much.  Thank you

81

1     very much.

2              MR. GURFEIN:  May I?

3              THE COURT:  Yes, Mr. Gurfein.

4              MR. GURFEIN:  Thank you, Your Honor.  I, too,

5     will seek to be brief.

6              I just rise to note that all of the issues

7     Your Honor is hearing today are confirmation

8     issues, that these are matters that will either be

9     proven through evidence or not and will be argued

10    at the appropriate time.

11             The value that the Equity Committee sees in

12    this case is not perceived in a clouded crystal

13    ball, but was presented to Your Honor on the very

14    first day of this case by the Debtors themselves

15    when they noted the extraordinary value some of

16    these artifacts had.

17             Your Honor, there are other issues that have

18    been raised that I would defer.  I think the Court

19    has heard enough.

20             Thank you, Your Honor.

21             THE COURT:  Thank you.  Thank you very much.

22             MR. GRAULICH:  Your Honor, if I just may --

23             THE COURT:  Certainly.

24             MR. GRAULICH:  -- briefly respond to the two

25    statements specifically about my client?

82

1         THE COURT:  Certainly, Mr. Graulich.

2         MR. GRAULICH:  Your Honor, there was just a

3    very impassioned suggestion that somehow my

4    client's behavior in the district court has been

5    motivated by some attempt to delay.

6         Let me just make the record very clear.  The

7    actual words of the conditions says, as set forth

8    in section V(f)(1):  Jurisdiction of this matter

9    shall remain in the United States District Court

10   for the Eastern District of Virginia.  If, however,

11   another bankruptcy court attempts to exercise

12   jurisdiction over the STAC artifacts, the district

13   court in which the bankruptcy case is pending may

14   have the reference withdrawn under -- and then the

15   reference is to 28 USC 157 -- or transfer venue to

16   this court.  And, again, "this court" is the

17   district court under 28 USC 1412.

18        That's why it was done.  It wasn't done for

19   some -- it was exactly what was contemplated by --

20   by the conditions themselves.

21        And, secondly, we filed a one-page -- or

22   however many pages it is -- notice of appearance so

23   that we would -- we didn't file any substantive

24   document at all in the district court, and that was

25   met with a tremendous lengthy response about how we

83

1    have no standing.  This is despite the fact that

2    things are being filed in the district court that

3    says that our plan is completely frivolous and

4    lacking in factual and legal merit.

5         We're either going to have an appropriate

6    litigation here or we're not.  We aren't interested

7    in filing lots of papers, and that's why we're

8    actually looking for a very simple conference with

9    the district court to make sure that everybody is

10   on the same page.

11        But if we can't appear or be heard in a case

12   where there are factual statements made about us,

13   that's not necessarily a fair way to proceed,

14   either.

15        Thank you, Your Honor.

16        THE COURT:  Thank you.  Thank you.

17        Would anyone else in the courtroom like to be

18   heard on the status conference?

19        (No response.)

20        THE COURT:  No?

21        Would anyone by conference telephone like to

22   be heard on the status conference?

23        (No response.)

24        THE COURT:  No?  All right.

25        Yes.

84

1          MR. SIEGEL:  Your Honor, this is Howard Siegel

2     on behalf of Euclid Claims Recovery.

3          THE COURT:  Yes, Mr. Siegel.

4          MR. SIEGEL:  I would just like to follow up on

5     a point made by attorney Burnett in recognizing

6     this is a Chapter 11 case and the primary

7     stakeholders here are creditors.  Creditors, who

8     under the proposals, with the exception of the

9     Equity Committee plan, are not being paid 100

10    cents.

11         And under general principle of the bankruptcy

12    law, those creditors should have a right to vote as

13    the primary stakeholders in this plan, and whatever

14    the Court adopts by way of procedures should

15    provide for an orderly process that would allow the

16    stakeholders' voice to be heard.

17         And I'm concerned that, while there are two

18    plans, proposals, there is also a 363 sale proposal

19    that does not involve stakeholder vote, and they

20    have what has been referred to as a level playing

21    field.  That would seem to me to be a requirement.

22         And certainly I join with the numerous parties

23    who expressed the sentiment this case needs to come

24    to an end.  There certainly doesn't need to be any

25    extended time for the sale proposal, the 363 sale

85

1    proposal, be made into a plan and it could maintain

2    the same time frame.

3         There's no reason this case can't be promptly

4    concluded, with creditors having the right to

5    express their preference among the different

6    proposals in a matter of several months.  And

7    whatever procedures the Court adopts, I would urge

8    that that be part of it.

9         THE COURT:  Very good.  Thank you very much.

10   Thank you very much.

11        Would anyone else like to be heard, anyone in

12   the court or anyone by conference telephone?

13        (No response.)

14        THE COURT:  No?

15        Well, I thank you all very much.  I appreciate

16   your positions.  I appreciate your arguments.

17        I will consider those as well as I can, and I

18   will not take a long time, because I think we need

19   to get this determination made and the case needs

20   to move.  I think that certainly has been pointed

21   out well today.

22        So, once again, I will consider this, make a

23   determination as quickly as I can, and then we can

24   move from there.

25        So I thank you very much.  And that concludes

86

1      the status conference.

2           On the calendar we also have an objection to

3      Claim 29-1 and objection to Claim 2.

4           Would you like to argue those now, or take a

5      brief recess and let people who are not interested

6      in those leave?

7           MR. BROWN:  Your Honor --

8           MR. GROSSMAN:  We've got a better solution.

9           MR. BROWN:  -- we've got another solution.

10          THE COURT:  Very good.

11          MR. BROWN:  Your Honor, Jay Brown appearing on

12     behalf of the Equity Committee.

13          We have confirmed with Mr. Grossman regarding

14     the Equity Committee's objection to the PacBridge

15     claim, and what we would ask the Court to do is to

16     set that as an evidentiary matter to track with the

17     sale hearing, as I think that there could be

18     evidence that crosses over there.  And I understand

19     that Mr. Grossman is agreeable to that.

20          THE COURT:  With the sale hearing?

21          MR. BROWN:  Yes, Your Honor, that they would

22     track -- we would want that to be the confirmation

23     hearing, too, as the Equity Committee, but it makes

24     sense to be, whatever the ultimate final

25     evidentiary process in the case, they should all

87

1    run together.

2        MR. GROSSMAN:  That's acceptable to PacBridge,

3    Your Honor.

4        THE COURT:  All right.  Thank you very much.

5    Then we will do that.  We will do that.

6        MR. WINSBERG:  Yes, Your Honor.  That proof of

7    claim, just to close the loop, that's part of the

8    PacBridge settlement that I discussed earlier in

9    the hearing --

10       THE COURT:  Right.

11       MR. WINSBERG:  -- as part of the Asset

12   Purchase Agreement.  So it's subject to a 919

13   motion, which is why the parties would want to roll

14   with that.

15       THE COURT:  Very good.  Then we will do that,

16   and I thank you for that.

17       There's also an objection to Claim Number 2 of

18   B.E. Capital Management Fund and various other

19   certain improperly asserted claims.

20       MR. BROOKS:  Good afternoon, Your Honor.

21   Matthew Brooks on behalf of the Debtors.

22       The wrong debtor claim objections, as I

23   believe what the Court is referring to --

24       THE COURT:  Uh-huh.

25       MR. BROOKS:  -- those are claims of RMST,

88

1    Judge, that were classified, that were filed, but

2    were filed against the wrong debtors in the case,

3    Judge.

4         THE COURT:  Yes.

5         MR. BROOKS:  And the claim objection simply

6    asks that those be reclassified against the

7    appropriate debtors, as set forth in the proposed

8    order.

9         THE COURT:  Very good.

10        Would anyone else like to be heard on that

11   objection?

12        (No response.)

13        THE COURT:  No?

14        That makes sense.  You have the proposed order

15   attached?

16        MR. BROOKS:  There is one attached, Judge.

17        THE COURT:  Yes, there is.

18        MR. BROOKS:  If the Court has any questions,

19   we're happy to address it.

20        THE COURT:  Very good.

21        MR. BROOKS:  Okay.

22        THE COURT:  All right.

23        MR. BROOKS:  Thank you, Judge.

24        THE COURT:  I thank you all very much.  I

25   appreciate your time, I appreciate your arguments.

89

1     Welcome to Florida for those of you who came from
2     out of state.
3          And, once again, I appreciate your positions.
4     I'll consider them as well as I can and I'll try
5     not to take a long time to do it.  So thank you.
6          (At 3:25 p.m., the hearing was concluded.)
7                      - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

90

1                   C E R T I F I C A T E

2    STATE OF FLORIDA   )

3    COUNTY OF DUVAL    )

4            I, Cindy Danese, a Notary Public, State of

5    Florida at Large, do hereby certify that the attached

6    represents the proceedings before the United States

7    Bankruptcy Court, Middle District of Florida,

8    Jacksonville Division, before the Honorable Paul M.

9    Glenn, Bankruptcy Judge, in the matter of In Re: RMS

10   Titanic; such transcript is an accurate recordation of

11   the proceedings which took place.  A transcript of this

12   proceeding has been produced on July 30th, 2018.

13

14                        STATEWIDE REPORTING SERVICE

15

16

17                        _____

18                        Cindy Danese

19

20

21

22

23

24

25