```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   R.M.S. TITANIC, INC.,              )
     SUCCESSOR IN INTEREST TO           )
 6   TITANIC VENTURES, LIMITED          )
     PARTNERSHIP,                       )
 7                                      )    CIVIL ACTION NO.
               Plaintiff,               )    2:93cv902
 8                                      )
     v.                                 )
 9                                      )
     THE WRECKED AND ABANDONED          )
10   VESSEL, ETC.,                      )
                                        )
11             Defendant.               )
     - - - - - - - - - - - - - - - - - -
12

13

14                       TRANSCRIPT OF PROCEEDINGS

15                          Norfolk, Virginia

16                          August 21, 2018

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
              Chief United States District Judge
19

20   APPEARANCES:

21           KALEO LEGAL
             By:  Brian A. Wainger
22                    And
             McGUIRE WOODS LLP
23           By:  Robert W. McFarland
                  Counsel for R.M.S. Titanic
24

25
```

APPEARANCES CONTINUED:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Kent Porter
               Assistant United States Attorney
               Counsel for Amicus United States

          THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
          By:  Jackie Rolleri
                    And
          DEPARTMENT OF JUSTICE
          By:  Matt Troy
               Counsel for NOAA

1           (Hearing commenced at 1:00 p.m.)

2           THE CLERK:  In case 2:93cv902, R.M.S. Titanic,

3    Inc., et cetera, versus The Wrecked and Abandoned Vessel, et

4    cetera.

5           Mr. McFarland, Mr. Wainger, is the plaintiff ready

6    to proceed?

7           MR. McFARLAND:  Good afternoon, Your Honor.  The

8    plaintiff is ready.

9           MR. WAINGER:  Good afternoon, Your Honor.

10           THE COURT:  Good afternoon.

11           THE CLERK:  Mr. Porter, is the defendant ready to

12    proceed?

13           MR. PORTER:  Good afternoon, Your Honor.  We are.

14           THE COURT:  Good morning.

15           Counsel, we are here this afternoon for a status

16    hearing.  Our last status hearing was on May 3rd, 2018, and

17    this hearing has been scheduled.  It was continued for about

18    ten days from the last scheduling due to the number of

19    filings and issues that were coming before the Court.

20           I have reviewed all of the submissions since June

21    2nd, then July and August, and I've reviewed all the

22    submissions that have come in to date through yesterday.

23    It's the Court's opinion that there are four issues that

24    need to be addressed today.  I'll just give them to you in a

25    summary fashion, and then we will proceed:  First, the

4

1    bankruptcy court proceedings generally.  The Court needs to

2    have a report and know exactly where you are in the

3    bankruptcy proceedings.  The second issue are the motions to

4    intervene.  They need to be generally addressed.  I know

5    that counsel for R.M.S.T. contacted the clerk to be sure I

6    was not going to rule on those today, and I'm not going to

7    rule on them, but they are integral to the bankruptcy

8    proceedings, as I read the paperwork in the bankruptcy

9    court's orders, and we are going to generally address the

10   motions to intervene *vis-à-vis* the bankruptcy proceeding.

11        There is also a motion to approve the Asset

12   Purchase Agreement.  I did not receive any amended motion.

13   In one of the reports there was an indication that an

14   amended motion to approve the Asset Purchase Agreement would

15   be filed, but I have not received that amended motion.  I

16   have reviewed the operative pleading there that was filed on

17   June 29th, 2018.

18        Finally, the status report of the United States,

19   which was submitted on July 25, 2018, about two potential

20   expeditions, and we can address that at the end, if that's

21   agreeable to you, Mr. Porter.

22        MR. PORTER:  Fine, Your Honor.  Thank you.

23        THE COURT:  Also, as we start in, I will certainly

24   let you respond to anything on behalf of the United States,

25   Mr. Porter.

1          I've known Mr. Powers, I see him here, and I know

2     that he has filed as a movant to intervene.

3          I don't know Mr. Neary.  Is he here?

4          MR. NEARY:  Yes, Your Honor.

5          THE COURT:  Mr. Neary, I know that you have filed

6     also a motion to intervene, and you're both at this juncture

7     movants in that regard.  I understand that there hasn't been

8     any formal written response to those motions yet.  I will

9     not, as I say, rule on them, but I do need information in

10    regard to them, and I will be asking you certain questions.

11    I may invite Mr. Powers and Mr. Neary to make a statement

12    before the Court.

13          Mr. McFarland, let's start with the first issue, in

14    general, the bankruptcy proceedings, if you could summarize

15    and give us your take on those proceedings.

16          MR. McFARLAND:  Thank you, Your Honor.  May it

17    please the Court.  Robert McFarland.  Let me introduce at

18    counsel table with me Brian Wainger, Jessica Sanders, the

19    corporate secretary who has been before the Court

20    previously.  Harris Winsberg is with us today, Your Honor.

21    He is the company's bankruptcy counsel or debtor's counsel

22    in the bankruptcy proceedings in Jacksonville.

23          THE COURT:  Nice to have you, Mr. Winsberg.

24          MR. WINSBERG:  Thank you.

25          MR. McFARLAND:  Your Honor, as the Court mentioned,

1   we were here on May 3rd for the last status conference, and

2   at that status conference, we asked the Court to essentially

3   set this hearing for another conference in what we hoped

4   would be the Court's opportunity to approve the Stalking

5   Horse Purchaser, the SHP, under the Asset Purchase

6   Agreement, or had there been another successful purchaser

7   buyer, to approve them.  We are not at that proceeding yet.

8           So if I may, Your Honor, I'm happy to address in as

9   much detail as the Court would like, but I think the Court's

10  third point, really, we are not there yet because the

11  bankruptcy court has not yet made a ruling in terms of a

12  purchaser or a qualified purchaser.  So we are not coming

13  before the Court today on that.

14          We would anticipate after, and the next matter in

15  the bankruptcy court will be the hearing on August 30th.

16  There was a hearing on July 25th, Your Honor, which was

17  called a status conference, and then the bankruptcy court

18  issued its ruling of August 3rd.

19          The Court noted in its order of August 3rd one of

20  the points that we made when we were last before Your Honor,

21  time is of the essence for the debtors here in the company

22  in the sense of trying to move things done and get a

23  successful and qualified purchaser for the company's assets,

24  and as it pertains to R.M.S.T., for the company stock.

25          That time of the essence has certainly continued

1  and, in fact, magnified, Your Honor.  As the bankruptcy

2  court noted in its order of August 3rd, the present

3  condition with the administrative expenses being what they

4  are cannot continue.  The company is going to essentially

5  run out of cash and be in a negative cash flow.

6          THE COURT:  Because of all your legal fees?

7          MR. McFARLAND:  Debtors, Your Honor, that are the

8  real problem, quite frankly.  I know it's not really for

9  this Court but there are some issues, and we may get to

10  them, Your Honor, but there are administrative expenses

11  which are, as the Court noted, draining, and the situation

12  as a whole cannot continue.  In fact, in that sense, Your

13  Honor, the professional fees right now are not being paid;

14  they are being deferred.

15          So it is, from our client's standpoint, the

16  debtor's standpoint and the bankruptcy and R.M.S.T.'s

17  standpoint here, we appreciate the Court hearing us, and we

18  appreciate the Court's expediency because after the

19  bankruptcy hearing on August 30th, at which time the

20  bankruptcy court there will, we hope, Your Honor, schedule

21  an auction and make rulings on the adequacy of the plans

22  that are before it and rule on the motion for the approval

23  of the Asset Purchase Agreement, and we would hope that it

24  will at that point in time confirm the Stalking Horse

25  Purchaser.

1          THE COURT:  As I understand what's coming up on

2     August 30th, from my reading of the orders and the

3     materials, is the Court is going to, first of all, consider

4     the competitive bidding procedures.  That's something that

5     the Court is going to look at that had been proposed by the

6     debtors.

7          MR. McFARLAND:  Correct.

8          THE COURT:  Then the Court is going to look at the

9     disclosure statement that's been filed by the equity

10    committee regarding their proposed plan?

11         MR. McFARLAND:  Correct.

12         THE COURT:  The disclosure statements filed by the

13    museum regarding their proposed plan?

14         MR. McFARLAND:  As part of the unsecured creditors,

15    yes, Your Honor, that's correct.  So two other plans will be

16    reviewed and the bidding procedures.

17         THE COURT:  That is what is supposed to occur on

18    August 30th before the bankruptcy court?

19         MR. McFARLAND:  Correct.

20         THE COURT:  This may be getting ahead a bit, but

21    the bankruptcy court invited or ordered the other two

22    entities, the equity committee, and I'll just call them the

23    museum, to intervene in this action?

24         MR. McFARLAND:  We don't read the bankruptcy's

25    Court order as inviting them to.  What the bankruptcy court

1    did there is it, number one, set forth that it was going to

2    follow the Chapter 11 procedures and policies set forth in

3    the bankruptcy code.

4            THE COURT:  I understand that, as well it should,

5    and it will, I feel positive of that.

6            MR. McFARLAND:  Right.  Then it rejected the idea

7    of a joint jurisdictional plan, essentially, that had been

8    offered by the equity committee, and this Court ruling

9    piecemeal or earlier than the bankruptcy court on the key

10   rulings, and what it said is, parties should go to the

11   District Court, to the extent necessary, for the approvals

12   necessary.

13           But we don't read the bankruptcy court's order at

14   all, Your Honor, as directing or mandating intervention by

15   these other parties.  In fact, and I don't want to get the

16   cart too much in front of the horse here, but in terms of

17   that, we believe it would be premature for either the

18   museum/unsecured creditors or the equity committee to move

19   in this case at this point in time.

20           THE COURT:  Well, I'm quoting from the bankruptcy

21   court's August 3rd order where the bankruptcy court directed

22   the parties to, "Move in the District Court for any

23   approvals or determinations required by the District Court

24   to complete the proposed transactions."  I think both courts

25   are in agreement that there are respective jurisdictions.

1    Obviously, the bankruptcy court has its jurisdiction.

2    Regardless of any approval of any sale of the assets, you

3    are subject to the covenants and conditions and the order of

4    this Court.  So, ultimately, there is going to have to be

5    some approval from this Court of something.  You can't just

6    move these assets out to another entity without following a

7    previous order of the Court.

8            This Court had jurisdiction and entered that order,

9    and that's a final order of this Court.  It's going to have

10   to be followed.  I think both the bankruptcy court and this

11   Court recognize that.  This Court has no desire to get into

12   the bankruptcy proceedings and direct any approvals there.

13   That's up to the bankruptcy court in their Chapter 11

14   proceedings.

15           On the other hand, this Court does have to approve

16   any transfer of all of these assets to be sure that it is

17   following this Court's order of the covenants and conditions

18   to keep everything together and subject to the jurisdiction

19   of this Court.

20           MR. McFARLAND:  We agree, Your Honor.  To the

21   extent there would be another purchaser other than the

22   Stalking Horse Purchaser, where there would be a transfer of

23   assets of R.M.S.T., we agreed, under the covenants and

24   conditions, that would be required.  Under the Asset

25   Purchase Agreement that has presently been presented to the

1    bankruptcy court, this will be, as to R.M.S.T., a stock of

2    acquisition, a hundred percent of the stock of R.M.S.T.

3         So I don't think that directly implicates the

4    covenants and conditions, as we set forth in our motion and

5    memorandum.  What we do know and state to the Court that the

6    prospective purchaser in the Asset Purchase Agreement

7    directed and mandated that this Court have approval of that,

8    and that's under the Asset Purchase Agreement.  So we agree

9    with that aspect, Your Honor.

10        THE COURT:  Your position is that the Court really

11   doesn't need to approve your Asset Purchase Agreement

12   because it's a transfer of stock.  On the other hand, you've

13   asked for this Court to approve it because the purchaser is

14   requiring it.  So, in effect, this Court would have to

15   approve it.

16        MR. McFARLAND:  Absolutely, Your Honor.  We would

17   come to this Court for that approval after the bankruptcy

18   court's proceeding on August 30th and then when the other

19   proceedings proceed.  So, for example, if the bankruptcy

20   court sets the bidding procedures, and there is an auction

21   scheduled, the other option would be a private sale, but we

22   would prefer an auction because we think that will bring a

23   higher return.

24        Then there is an auction set with a date, a public

25   auction is held, et cetera, then the winning bidder at the

JODY A. STEWART, Official Court Reporter

1    auction, we would then have to come to the Court and say

2    here's what is the auction qualified bidder and ask for the

3    Court's approval at that point time.

4         But at this point in time, we don't know.  It is

5    the company's position that we think the best and really

6    only viable option that's out there right now is the Asset

7    Purchase Agreement with the Stalking Horse Bidder.  That is

8    the only thing that we see as viable right now.  But things

9    may change between now and when the auction is scheduled.

10        At this point, Your Honor, it would be premature,

11   and we wouldn't ask the Court and couldn't ask the Court to

12   approve anyone today because there is really no one at this

13   juncture for this Court to approve.  But we do hope to come

14   back before the Court, and we would, if the timetable goes a

15   little quicker than it did, which brings us here today, we

16   are hoping to be back before the Court, obviously with the

17   Court's permission and schedule, in mid-October or so.

18        THE COURT:  There is something in here about a

19   September date.

20        MR. McFARLAND:  Your Honor, in the original Asset

21   Purchase Agreement, that is going to have to be amended.

22   There is no way we are going to get before Your Honor by

23   September 7th.  We acknowledge that.  They didn't move as

24   quickly in the bankruptcy court as we would have hoped.

25   That's just sometimes, as the Court is well aware, that

1  happens in judicial proceedings.

2          So the Asset Purchase Agreement will have to be

3  amended to give this Court a later date for approval.  But

4  we hope that it would be mid- to late October that we could

5  be back before Your Honor and then say, here is the

6  qualified bidder that has come out of the proceedings, and

7  here is who -- we would be presenting them, regardless of

8  who it is.

9          As I say, it would be our preference, given what we

10  know right now, and what is the only really viable

11  transaction that is there, we believe it would be the

12  Stalking Horse Purchaser, which is their actual name, Your

13  Honor, Premier Acquisition Holdings, LLC, sometimes known by

14  the acronym PAHL, P-A-H-L.  But we would hope and believe

15  right now that that would be the best party to present to

16  the Court, but if it is someone else, then so be it, and we

17  would present them to the Court, and, obviously, the Court

18  would review their status, et cetera.

19          THE COURT:  That is what you called them, as you

20  explained in your June 12th report, consists of Apollo

21  Global Management, LLC.  Who are they?

22          MR. McFARLAND:  That is an equity fund, as I

23  understand it, Your Honor, of some individuals, some of whom

24  are the majority shareholders in the company.  So PAHL is

25  largely comprised of folks who already have a direct

1    interest in R.M.S.T. and Premier Exhibitions and have a very

2    vested interest in making sure it succeeds.

3         THE COURT:  Apollo?

4         MR. McFARLAND:  Some of the members of Apollo, yes,

5    Your Honor.

6         THE COURT:  Who would they be?

7         MR. McFARLAND:  Daoping, Your Honor.

8         THE COURT:  Then you've got also Fundamental

9    Advisors, LLC.  Who are they?

10        MR. McFARLAND:  I think that's another equity fund,

11   Your Honor.

12        THE COURT:  You've got PacBridge Capital Partners,

13   Limited.

14        MR. McFARLAND:  Another equity fund.  And the point

15   there is that unlike what has been discussed with the other

16   proposals, if you would, are out there, the funding is

17   there.  There is no question.  They have already made the

18   required deposit, and the funding is there on that side for

19   them to carry out this transaction.

20        THE COURT:  Then you have some secured lenders; you

21   have Haiping Zhou, Jihe Zhang and Lang Feng.  Are they all

22   Chinese citizens or are they American citizens?  Are they

23   Great Britain?  What is their citizenship?

24        MR. McFARLAND:  I think their citizenship is

25   Chinese, Your Honor.  Mr. Wainger can give the further

1    details if I miss.  They are Chinese but they are based out

2    of Canada or have operations in Canada.

3             THE COURT:  Those are the ones that we discussed

4    before out of Canada at another hearing?

5             MR. McFARLAND:  Yes, Your Honor.  Some of them are

6    current board members and directors of Premier Exhibitions,

7    Inc.  The company that would be set up, Your Honor, as the

8    new owner, would be an American company.  It would not be a

9    foreign company.  It would be an American company.

10            THE COURT:  Do you think it would be Delaware, is

11   that what I read?

12            MR. McFARLAND:  I think that's correct, Your Honor.

13            THE COURT:  So this company that would be set up,

14   then what are they going to do with the artifacts?

15            MR. McFARLAND:  Nothing different from what they

16   are doing now, Your Honor.  That is one of the other

17   benefits of our plan that I wanted to get into.  R.M.S.T.

18   would still be the trustee.  The same folks who are curating

19   and conserving the artifacts would remain the same team as

20   Klingelhofer, who Your Honor knows, and her crew would

21   remain in place, and, most particularly, the collection

22   stays intact under that plan and remains in the United

23   States.

24            THE COURT:  In this agreement, a document this

25   long, drafted by attorneys, 184 pages, there is no legal

```
 1    loophole in here, you are telling me?
 2              MR. McFARLAND:  I don't know about legal loopholes.
 3              THE COURT:  Have you read every word of this?
 4              MR. McFARLAND:  I cannot say I've read every word,
 5    but I've read it, Your Honor.
 6              THE COURT:  I have.
 7              MR. McFARLAND:  The plan and the process would be,
 8    R.M.S.T. is going to still be the owner of the artifacts,
 9    and will still do the conservation, curation.  The
10    collection remains intact.  It's not going overseas to
11    somewhere that may or may not be within the Court's
12    jurisdiction, and it most certainly is not going to get
13    broken up like another plan that has been proposed to the
14    bankruptcy court would do.
15              THE COURT:  That is your argument, and I accept
16    that as your argument.  What I'm saying is you've got to
17    back it up with showing the Court where it is in this
18    agreement.  You stand there and say that.  Then something is
19    approved and you say, but, Judge, that was approved.  Then
20    you approve this Asset Purchase Agreement, and, by the way,
21    in clause 8,986, there is this line that says, if such and
22    such occurs as a contingency, the following occurs, and the
23    collection leaves the country or is broken up into pieces.
24              I'm not saying that it's there, but I want to be
25    sure, and I want everyone to be sure -- this is a very
```

```
 1    detailed agreement -- that there isn't a contingency or a
 2    loophole in there that, yes, as a general premise, what you
 3    say is correct.  Lawyers, that's what they are paid to do,
 4    is to lawyer it up and put in all of the detailed contract
 5    contingencies.  The covenants and conditions was a fairly
 6    straightforward document.
 7            MR. McFARLAND:  True, Your Honor.  But, again, and
 8    I don't want to get the cart in front of the horse, we are
 9    not asking the Court today to approve Premier Acquisition
10    Holdings LLC as the qualified bidder and for the Court's
11    ruling.
12            THE COURT:  I understand.
13            MR. McFARLAND:  That will come at a later time.
14    Again, I hope it will be in mid- to late October after the
15    process goes through.  I hear the Court's concerns, and I
16    personally feel pretty good about the Asset Purchase
17    Agreement and what will remain before this Court and what
18    will be done with the artifacts.
19            We certainly can take that up earlier, and I think
20    the government and NOAA have a position, but I know that
21    they filed their papers.  I know we have continued to work
22    with them.  My understanding is that they agree with the
23    bidding procedures now that would be in place if the
24    bankruptcy court adopts and approved those, and they agree
25    with the procedural program to proceed here.
```

```
 1          In other words, first this has to go back to the
 2   bankruptcy court for the hearing on August 30th and to see
 3   what comes out of that hearing, and whom, if anyone, emerges
 4   as a qualified bidder, et cetera.  Then we go through it.
 5   Then, certainly, folks will have the chance to comment on
 6   the adequacy and abilities of who comes out of the process.
 7   But today, Your Honor, we did want to educate the Court on
 8   what's going on in the bankruptcy court and sort of set
 9   forth what we think is the procedural framework.
10          So, as I mentioned, I think the Court's third
11   point, in terms of the motion to approve the asset, there
12   will be a supplementation to that, Your Honor, but I think
13   it would have been most definitely premature to try and do
14   that now until we see what the bankruptcy court does on
15   August 30th.
16          THE COURT:  Although, the bankruptcy court has
17   recognized, and I understand the recognition, that assets
18   can be sold before a plan is finalized.  The way I viewed
19   that is the bankruptcy court was obviously doing its job by
20   saying, I'm going to look at bidding procedures, I'm going
21   to look at approvals, but the District Court might approve a
22   sale that would then result in the conclusion of the
23   bankruptcy.  When I say approved, approve it under the
24   covenants and conditions.  It's not my role to approve it
25   for Chapter 11 purposes, and I recognize that, and I repeat
```

1    that yet again.

2           MR. McFARLAND:  That was going to be my final point

3    in terms of the bankruptcy court's order of August 3rd, Your

4    Honor.  The Court did note that ability under the Chapter 11

5    proceedings, and so that is, in part, why we are here.

6           THE COURT:  Let me see if there is anything

7    Mr. Porter wants to say in response.

8           MR. McFARLAND:  Thank you, Your Honor.

9           THE COURT:  Is there anything you have to add,

10   Mr. Wainger?

11          MR. WAINGER:  I could add something now or I can

12   wait till Mr. Porter speaks, whichever is more convenient.

13          THE COURT:  Go ahead, Mr. Porter.  If he wants to

14   respond to you, I'll let him do that.

15          MR. WAINGER:  Thank you, Judge.

16          MR. PORTER:  Your Honor, just on the procedural

17   posture, we would agree with Mr. McFarland that -- I think

18   we said that in our responses before -- this really needs to

19   route through the bankruptcy court to present to you

20   somebody to decide whether they qualify under the covenants

21   and conditions.

22          Obviously, R.M.S.T. has agreed to bring to this

23   Court any proposed sale.  We think in the covenants and

24   conditions there actually is language that would require

25   that even for the stock sale, and that would be in Section

1   VI(E)(1) because any proposed stock sale cannot effectuate a

2   change in the management, conservation, and curation of the

3   STAC.

4         We have addressed that in our filings, too, as to

5   what we are looking for in that and what we believe the

6   Court would be looking for.  So we think there is certainly

7   room in there for the Court to address that particular

8   issue.  That's really all I have on that process, Your

9   Honor.

10         THE COURT:  I agree with you on that last point.

11         MR. PORTER:  Right.

12         THE COURT:  Mr. Wainger.

13         MR. WAINGER:  Thank you, Judge.  Good afternoon,

14   Your Honor.

15         THE COURT:  Good afternoon.

16         MR. WAINGER:  The issue, as I see it, is, as to

17   approval, is just one of timing, Your Honor.  Regardless of

18   whether it's the Asset Purchase Agreement or elsewhere, the

19   issue is simply when do we come to this Court to get this

20   Court's approval?

21         I think R.M.S.T. and NOAA agree, and that's

22   consistent with Judge Glenn's order, that once Judge Glenn

23   makes an approval, be it of the Asset Purchase Agreement or

24   one of the other plans, then and only then do we come here

25   and ask for this Court's approval of the covenants and

1    conditions or compliance with the transaction with the

2    covenants and conditions.  That is all that we are

3    suggesting.

4           We don't want this Court to be concerned with a

5    variety of hypotheticals or require this Court to issue an

6    advisory opinion about whether or not this transaction is

7    compliant with the covenants or this transaction determines

8    a qualified institution.

9           So we want to make this as efficient as possible;

10   let Judge Glenn make his determination, and then with that

11   we come in here and let Your Honor decide whether or not it

12   complies with the covenants and conditions.

13          With respect to the Asset Purchase Agreement, I

14   have read every word, like Your Honor.

15          THE COURT:  I didn't say I understood every word.

16          MR. WAINGER:  Me either, Your Honor.

17          THE COURT:  I'm not a bankruptcy lawyer or

18   bankruptcy judge, although we do have jurisdiction over

19   bankruptcy appeals.

20          MR. WAINGER:  Yes, Your Honor.  We have taken every

21   step possible to ensure that the Stalking Horse Purchaser

22   steps into the shoes of R.M.S.T., that R.M.S.T. that exists

23   today will be the same R.M.S.T. that exists if this

24   transaction takes place.  Because it's a stock purchase, it

25   will be the same transaction.

1          There will be similar steps to ensure that those

2     artifacts remain where they are under the care of

3     Ms. Klingelhofer and her team, with a U.S. entity, as you

4     say, a Delaware entity, and that has been very, very

5     important to the company.

6          Finally, Judge, I disagree, a coordinated

7     process -- let's see.  So, we have here, Judge, with respect

8     to the intervention motions -- I apologize, Your Honor.  The

9     Court seems to agree with the equity committee and a

10    creditor's committee that Judge Glenn's order --

11         THE COURT:  No, I haven't said I agree or disagree.

12    I was just reading the language from the order.

13         MR. WAINGER:  Understood.

14         THE COURT:  Be careful how you characterize what's

15    said because I'm reading an order, and I didn't say that I

16    agreed that it required a motion to intervene, and I'm not

17    going to rule on those today.  But there is a direction to

18    those parties to contact this Court in some way.

19         MR. WAINGER:  I understand.  I will say this.  I

20    disagree with the committee's interpretation that that

21    language in the order is an invitation to intervene.  To

22    understand the context of that order, Judge, we have to back

23    up just a bit.  The equity committee and the creditor's

24    committee moved in Florida, ahead of the July 25th hearing,

25    for a coordinated process for the concurrent consideration

1    of the creditor's committee and the equity committee, and

2    the debtor's sale motion and the debtor's stake horse, they

3    sought a protocol for the concurrent consideration by that

4    Court and this Court of the propriety of the sale of the

5    artifact collection.

6         We argued that this tortured inter-Court protocol

7    was completely and totally unnecessary and that they were

8    trying to complicate a matter that was very simple.  The

9    bankruptcy court handled Chapter 11, and this Court

10   determines compliance with the covenants and continues.

11        At the end of the day, Judge, we read Judge Glenn's

12   order to agree with us.  My role, is the way I read this

13   from Judge Glenn, is to file Chapter 11, and Chief Judge

14   Smith's role is to determine compliance with the covenants

15   and conditions.  If any party here wants to take up

16   compliance with the covenants and conditions, go to Judge

17   Smith to do it.

18        THE COURT:  I understand your reading and the

19   direction is to any of the parties, and it may be after the

20   approval of the bidding process by the bankruptcy court.

21   Judge Glenn may well be stating in the order that before

22   anything occurs finally, you have to move in the District

23   Court for any determinations required by that Court.  That's

24   your reading of the order.

25        I'm not saying that it's incorrect.  The judge

1    says, "Move in the District Court for any approvals or

2    determinations required by the District Court to complete

3    the proposed transactions."  So your reading of it is, is

4    once there is a bidding process determined, and once there

5    is a purchaser or purchase agreement, the auction or bidding

6    goes through, that before anything further goes through, you

7    have to come to this Court to be sure that it complies with

8    the covenants and conditions.  That's certainly one reading

9    of that order.

10          MR. WAINGER:  Precisely.  That is the way we read

11   it.  Thank you, Judge.

12          THE COURT:  Mr. Winsberg, since you've come all the

13   way up to Virginia, is there anything you want to add to any

14   of these comments so far?

15          MR. WINSBERG:  Your Honor, I am not *pro hac'd* in.

16   I'm happy to do so.  I just want to make your Court aware.

17          THE COURT:  I understand that.  I'm just asking,

18   you're sitting there, and you're the bankruptcy counsel, and

19   if you want to add something, I'll give you permission to do

20   it.

21          MR. WINSBERG:  Thank you, Your Honor.  Just real

22   brief, I think Your Honor, you hit it on the head on the

23   issues that are before the Court.  The language, and we are

24   going to submit a revised bid procedure order for Judge

25   Glenn that is going to include language that NOAA had asked

1    for that we agreed to.  It's going to make it clear that the
2    the bankruptcy court is not going to sell the assets free
3    and clear of the covenants and conditions.  The bid
4    procedures and the sale order are going to make that clear,
5    and then whoever we decide to do, so if the bankruptcy court
6    decided to approve the bid procedures, and somebody becomes
7    qualified, there would be an auction.  If not, it would just
8    be the Stalking Horse Group would be the winning bid.

9         But whoever that may be, or if it's one of the
10   disclosure statement and plans that would go forward for a
11   sale, whoever that may be, the contemplation under our
12   process was that after that we would come back in front of
13   Your Honor to make sure Your Honor was comfortable and that
14   whoever that purchaser is, is going to have to comply with
15   the covenants and conditions.

16        The last thing the debtors want to do is get into a
17   lengthy jurisdictional fight, that the estate is running low
18   on cash, Your Honor, and we are running out of time.  So we
19   just really want to move this forward in the most
20   expeditious way possible to preserve the going-concern
21   assets.

22        There are 150 jobs at stake in this process, as
23   well as making sure that the collection stays together, and
24   that's what the debtors are trying to do.  I'm happy to
25   answer any bankruptcy questions, Your Honor, but I just

1   wanted to say that.

2       THE COURT:  I'm not going to ask any bankruptcy

3   questions.  I'm going to let the bankruptcy court handle

4   that at that level, and I think both the bankruptcy court

5   and this Court are in agreement that we each have respective

6   jurisdictions, and we will abide by those jurisdictions.

7       MR. WINSBERG:  Thank you.

8       THE COURT:  Now that you have appeared before me

9   and you have made statements on the record, and you are a

10  member of a bar of a court, I can hold you to it.

11      MR. WINSBERG:  You can, Your Honor.  I will be back

12  up.  I would presume I'll be back up for the final sale

13  hearing, if we are lucky enough to get a sale approved by

14  the bankruptcy court and come back to the District Court.

15  I'll be at the hearing, because, presumably, we are going to

16  have to make a showing in front of Your Honor, and if Your

17  Honor wants evidence, and if NOAA, I'm sure, is going to

18  want some evidence to make sure that the purchasers coming

19  in and taking it are subject to the covenants and

20  conditions.

21      THE COURT:  Thank you, Mr. Winsberg.

22      Is there anything else you want to add here,

23  Mr. Porter, at all?

24      MR. PORTER:  No, Your Honor.  I would just point

25  out that Matt Troy is hear from the department.  He is

1    representing NOAA in the bankruptcy proceeding if you have
2    any particular questions for him.
3              THE COURT:  All right.  Is there anything,
4    Mr. Troy, that you want to add?
5              MR. TROY:  No, Your Honor.  Only to answer your
6    questions if you have any.  If you have none, then I have
7    nothing to add.
8              THE COURT:  Ms. Rolleri, is there anything you'd
9    like to add?
10             MS. ROLLERI:  No, Your Honor.
11             THE COURT:  Thank you.
12             Then that covers two of the Court's points for
13   today's hearing.  One scheduling matter that I would suggest
14   to you, and if it's necessary that we move the next status
15   hearing before this Court, continue it due to the bankruptcy
16   schedule, we can.  The bankruptcy court is going to hold a
17   very important hearing on August 30th.
18             I think that this Court will need some type of
19   report back as to the results of that hearing, and,
20   Mr. Porter, maybe you would be the person to get
21   clarification for this Court in regard to Judge Glenn's
22   directive, desire and position on whether the two parties
23   need to intervene at this juncture or not, if he so elects
24   to clarify that.
25             Certainly, not going to require it because one

1   Court is not going to require something of another in that

2   regard, but if you're at the August 30th hearing, and the

3   question comes up that Judge Glenn might want to address,

4   whether he would like or his preference on the creditors and

5   the museum intervening in this proceeding here prior to his

6   approval of anything, any auction, bid, or so forth.

7           Before we move into the intervention, I know I may

8   be skipping around a bit, but, Mr. Porter, I know you've had

9   some knee surgery.  If you don't want to stand, I don't mind

10  that you sit at the table.

11          MR. PORTER:  That is fine, Your Honor.  Thank you.

12          THE COURT:  Can you tell the Court about your

13  status report of July 25, 2018.

14          MR. PORTER:  Yes.  Regarding the potential

15  expeditions to the wreck site?

16          THE COURT:  Yes.

17          MR. PORTER:  As Your Honor knows, there's actually

18  three potential ones out there:  The Woods Hole

19  Oceanographic expedition; I believe it's pronounced EYOS

20  Expeditions, which was in the status report; and then

21  previously we had discussed OceanGate.

22          THE COURT:  Yes.

23          MR. PORTER:  At this juncture both OceanGate and

24  Woods Hole are no longer going to be doing any expeditions

25  this year.  They are pushed off until next year.

1          THE COURT:  The window is closing, too.

2          MR. PORTER:  Well, the window, certainly.  They are

3    not doing anything for this year.  So for next year, there

4    will have to be additional information submitted to NOAA for

5    them to vet that proposal to determine whether or if a

6    permit is required.  So at this point they have moved down

7    the road.

8          The only one that is still in place is the EYOS

9    Expeditions, and that is planning to go forward.  Between

10   the dates of September 15th and 17th is when they will be

11   conducting the dives.  As we pointed out in the status

12   report, their purpose, really, is to conduct dives to test

13   their equipment and not so much to explore and do things at

14   the Titanic.

15         So they have not suggested any kind of expedition

16   that would interfere with or disturb the wreck site.  There

17   are some questions about some ballast weights that are

18   dropped, and Ms. Rolleri can touch on those a little bit.

19   But at this point right now NOAA has reviewed their

20   proposal.  It is still required to be approved or not

21   approved by the Department of Commerce, the Secretary of

22   Commerce.  As you recall, there was the overlaying issue of

23   whether that decision would be delegated to NOAA.  It is not

24   at this time.  So that decision is still out there and has

25   not been made.

```
 1              THE COURT:  Who or what is EYOS?
 2              MR. PORTER:  Could I call Ms. Rolleri up because
 3   she has dealt extensively, she and Mr. Alberg, who are here,
 4   have dealt extensively with them?
 5              THE COURT:  I'm concerned about, number one, who or
 6   what they are; and, number two, that you have impressed upon
 7   them that this Court has the in rem jurisdiction.  There can
 8   be no salvage whatsoever of the wreck site.  What assurances
 9   do you have that all they are doing is checking dive
10   equipment?  Why do they need to check it there?  There are a
11   lot of places you can check dive equipment.
12              MR. PORTER:  Two points on that:  When they first
13   contacted us, they were advised about the Court's in rem
14   jurisdictions and R.M.S.T.'s involvement in the case.  My
15   understanding is they have actually reached out to R.M.S.T.
16   to Mr. Wainger.
17              MR. WAINGER:  Yes.
18              MR. PORTER:  They have discussed that.  My
19   understanding is R.M.S.T. has expressed no concern with what
20   their plans are out at the Titanic wreck site.
21              THE COURT:  Let me hear from Ms. Rolleri first.
22              MS. ROLLERI:  Your Honor, Mr. Alberg and I have
23   both been communicating with EYOS, and their primary
24   expedition leader is Robert McCallum.  Our understanding is
25   that EYOS is a company that's actually incorporated in the
```

```
1    Ise of Man.  It's this expedition company, and my
2    understanding is that, essentially, individuals can work
3    with them to go on various expeditions.  My understanding
4    also, in this particular instance, is that it's an American
5    who is funding the expedition.  It's a submersible that this
6    American individual is having or has had constructed, and so
7    we've been communicating primarily with the expedition
8    leader who is organizing everything.
9              He has reassured us and been very responsive to our
10   questions or reassured us that there is no interest in doing
11   anything that would interfere with the artifacts or the
12   actual wreck.  We have repeatedly reminded them, we have
13   recommended that they come or at least notify the Court,
14   given the Court's jurisdiction.  They did, as Mr. Porter
15   said, reach out to Mr. Wainger and informed R.M.S.T. of what
16   their expedition plans are.
17             THE COURT:  What does EYOS stand for?
18             MS. ROLLERI:  Actually, it's unclear.  None of the
19   materials I have seen in their website also does not
20   indicate that it actually stands for something.  Certainly,
21   something I could find out.
22             THE COURT:  Just an unusual name.
23             MS. ROLLERI:  Sure.  Throughout all of our
24   interactions with EYOS and the others that are interested in
25   conducting expeditions, we have emphasized, obviously, this
```

```
1    Court's jurisdiction and the need, you know, in how Section

2    113 gets implemented, to do so in a manner that is

3    consistent with this Court's orders and jurisdiction, as

4    well as R.M.S.T.'s salvage rights.

5              THE COURT:  Thank you, Ms. Rolleri.

6              MS. ROLLERI:  Thank you.

7              THE COURT:  Mr. Wainger, have you had

8    communications with EYOS?

9              MR. WAINGER:  I have spoken with the expedition

10   leader, Rob McCallum.  He has confirmed the same things that

11   Ms. Rolleri conveyed to the Court.  I can ask them to send

12   the Court a letter, Your Honor.

13             THE COURT:  Well, that would be helpful if they

14   would send a letter and put in writing to the Court on

15   record what it is that they plan to do, the dates and what

16   they're plans are, because they're going down to the wreck

17   site, and if you all aren't going to be there, when I say

18   you all, either the United States, NOAA or R.M.S.T., what do

19   you know what they bring up?

20             MR. WAINGER:  Sure.

21             THE COURT:  They are testing the submersible, it is

22   going down, and that is what you send the submersible for,

23   is to see how well it not only survives the trip but if it

24   has robotic arms that reach out from it and how the controls

25   work and how far those arms can reach, what they can grasp,
```

```
 1    what they can bring up.
 2            So testing equipment can involve a lot of aspects
 3    that could also overlap with salvage operations.
 4            MR. WAINGER:  Yes, Your Honor.  I will ask them to
 5    provide all that factual detail to the Court in a letter.
 6            THE COURT:  While you're there, one question that I
 7    had, as I went through these materials, what value are you
 8    putting on being the salvor-in-possession that is an asset
 9    together with the artifacts?
10            MR. WAINGER:  The salvage rights are, as the Court
11    knows, are owned by R.M.S.T.
12            THE COURT:  As long as they meet the requirements
13    of admiralty law to maintain their status as
14    salvor-in-possession.
15            MR. WAINGER:  Absolutely.  Your Honor has the
16    authority under the Joslin case to remove the salvage
17    rights, and I think, certainly, everyone at R.M.S.T.
18    understands that at this stage.
19            THE COURT:  Thank you.  The only other matter, and,
20    again, I haven't done the calculation, and I can look at the
21    docket sheet, on when your responses are due to the motions
22    to intervene.  There was one motion filed 8-17.  That was by
23    the official committee of equity security holders, and,
24    again, on the same day, the motion to intervene by the
25    trustees of the National Maritime Museum.
```

1          MR. McFARLAND:  Yes, Your Honor.  I think both were

2     filed Friday afternoon, I believe our response would be, to

3     our opposition would be due August 31st, and we certainly

4     will submit our positions on both motions before then.

5          I know the Court said maybe generally discuss.  I

6     don't want to put the cart in front of the horse on this

7     issue, either, because the Court doesn't have our actual

8     responses.

9          THE COURT:  No pun intended, but I did say to my

10     law clerks, in discussing this, that I thought that by

11     asking the Court to approve your Asset Purchase Agreement

12     for the Stalking Horse Purchaser at this juncture that you

13     had put the cart before the horse, not trying to be cute or

14     funny, but that is something that pretty aptly described

15     what I thought you all were trying to do.

16          MR. McFARLAND:  We need to file that, Your Honor.

17          THE COURT:  We don't need to go back into that.

18          MR. McFARLAND:  Right.  With respect to the motions

19     that are before the Court on intervention finally brought

20     pursuant to Rule 24, it may be that the bankruptcy court

21     proceedings -- I'm not assuring the Court of this -- but it

22     may be that the bankruptcy court proceedings really address

23     those as a matter as well.

24          THE COURT:  Again, I don't plan to make any ruling.

25     I've heard basically the position on the intervention from

```
 1    R.M.S.T., and since local counsel is here for the two
 2    prospective intervenors, I'll let you make a statement to
 3    the Court, if you so desire.
 4              Mr. Neary, you are here.  Do you want to make any
 5    statement before the Court?
 6              MR. NEARY:  Your Honor, we can wait until we
 7    receive the opposition of R.M.S.T.  We stand by the
 8    pleadings we filed on the 17th.  Your Honor would permit me,
 9    Mr. Gurfein is here with me.  He is pro hac vice attending.
10              MR. GURFEIN:  Excuse me, Your Honor.  Peter
11    Gurfein.  I really have nothing to add to what Mr. Neary
12    said.  Your Honor indicated that you will be reviewing the
13    motion.  We stated our position in the motion.  We will wait
14    for the opposition.
15              THE COURT:  Thank you.  Mr. Powers.
16              MR. POWERS:  May it please the Court, Your Honor.
17    Thank you, Judge.  If I may make some introductions.
18              THE COURT:  That's fine.
19              MR. POWERS:  Today we have Dr. Kevin Fewster.  He
20    is the director of the Maritime Museum.  He has come from
21    England to be here.  We also have Neil Quartaro.  He is with
22    the law firm of Watson, Farley & Williams in New York.
23    James McClammy with the law firm of Davis Polk & Wardell in
24    New York, and Tim Graulich who is also with Mr. McClammy's
25    firm.  He's the bankruptcy lawyer, by the way, Your Honor.
```

1          THE COURT:  Who is the other individual?

2          MR. POWERS:  I'm sorry.  This is the most important

3    one who does all the research.

4          MR. WEINER:  Jacob Wiener, Your Honor.

5          MR. POWERS:  Jacob Wiener, Your Honor.

6          THE COURT:  I have been there before so I know the

7    position that you're in.  I was where you are, I don't want

8    to say the number of years ago, but I know that you're doing

9    the work, a lot.

10          MR. WEINER:  Thank you, Your Honor.

11          MR. POWERS:  Your Honor, lest there be appearances

12   are somewhat deceptive, we are all here free of charge.  We

13   are representing the museum essentially pro bono.  We feel

14   strongly about their position, and that's why we are here.

15   Whether it's an invitation, whether it's a directive,

16   whether it was a suggestion, we interpreted the bankruptcy

17   court's order as coming here to basically seek approval to

18   get a seat at the table.

19          Before we can participate, really, in any sort of

20   bidding, we have to be deemed qualified institution.  Your

21   Honor, I don't profess to know all there is to know about

22   this case.  With the Court's indulgence, if Mr. Quartaro

23   could speak a few words, I'd appreciate it, Your Honor.

24   Just to be clear, he had previously been accepted *pro hac*,

25   and then Your Honor, as you know, we did not have our

 1    filings appropriate and so it was since rescinded.  He has

 2    once already been approved.

 3         THE COURT:  I'll let him speak the same as I did

 4    Mr. Winsberg, but very briefly because I'm not going to rule

 5    on any intervention.

 6         MR. POWERS:  Very briefly, Your Honor.  Thank you.

 7         MR. QUARTARO:  Thank you, Mr. Powers.  Of course,

 8    we will keep it very short, Your Honor.  Just a couple of

 9    sentences.  First thank you to Your Honor, to the Court for

10    allowing us to speak today while these motions are pending.

11    We appreciate it.

12         I did just want to note that Dr. Fewster traveled

13    here from the United Kingdom, not, of course, to testify,

14    but really to demonstrate partially, at least to the Court,

15    how serious the National Maritime Museum is about this

16    matter and how dedicated they are to acquiring the STAC, if

17    they are able to do so.

18         I just wanted to make a couple of very, very brief

19    points.  Our motion before the bankruptcy court was for a

20    status conference, and it wasn't, in our view, quite

21    correctly described to Your Honor.  We just made some

22    suggestions about a protocol under which the bankruptcy

23    court and Your Honor might exchange information and views.

24         We very much view the bankruptcy court's order in

25    what we believe is its most natural reading, which is

1    directing the entities that may succeed in the bankruptcy.
2    There are only three.  It's not a large universe of
3    potential acquirers of the STAC.  We read that order as
4    directing us to reach out to the Court, to appear in the
5    Court and, specifically, with respect to the National
6    Maritime Museum and the proposed acquirers under that
7    umbrella, to seek a process under which they can be deemed a
8    qualified institution.

9            Absent that finding, of course, no successful
10   bidder at the bankruptcy court is going to be able to bring
11   a plan or the bidding procedures, or whichever vehicle is
12   involved, to fruition.

13           Frankly, we're quite concerned, and Your Honor has
14   heard today, and in the bankruptcy court this representation
15   has been made, as well, of the clock is ticking.  But I note
16   that this is a bankruptcy that is almost two years old.

17           So we are quite concerned that what Your Honor is
18   going to be confronted with, certainly, to the detriment of
19   the other entities that may be interested in acquiring this
20   collection with some approval that is essentially *fait
21   accompli*.  We are out of money.  This is the plan that we
22   think will work and, essentially, trying to relegate the
23   Court almost to a rubber stamp status.  That's really the
24   reason that we are here.

25           We view that bankruptcy court order, and I note

1    that prior to that, the stay would have probably precluded
2    us from taking any action before Your Honor, as directing us
3    to appear.  With respect to the statements that have been
4    made about this somehow actually being an order that directs
5    parties to appear after the August 30 hearing, we have a
6    little bit of difficulty with reading it that way, because,
7    of course, the order issued well in advance of that hearing.
8    I think if that was what the bankruptcy court was driving
9    at, that might be something that came up at the August 30
10   hearing.
11          So I think we will take Your Honor's admonition to
12   keep things brief and leave it at that, unless, of course,
13   you have any questions for us.
14          THE COURT:  I don't find anything improper about
15   your motion to intervene.  Whether or not it's granted is
16   another matter, but I don't find any impropriety, other than
17   the procedural one that was, as I understand, more of a
18   glitch than anything else in our CM/ECF filing.  I don't
19   view this to be any impropriety by your filing the motions
20   and, certainly, would await the responses.
21          Then, of course, under our rules, I think you have
22   a few days to make a reply, if you so choose.  Then we will
23   proceed from there.
24          MR. QUARTARO:  Excellent.  Thank you very much,
25   Your Honor.  Thank you again for allowing us to speak today.

1          THE COURT:  Counsel, obviously, you need to file a
2    status report with the Court within seven days of the
3    bankruptcy hearing.  I'm going to direct both Mr. Porter and
4    you, Mr. McFarland and Mr. Wainger, to file a status report
5    from your perspective within seven days, from Thursday, the
6    30th, on or before September 6th with the Court.  I'll make
7    that September 7th because I know you've got a holiday
8    weekend intervening.  So file your status report on or
9    before September 7th, and then your response is due on
10   August 31st to the motions to intervene and any replies,
11   just whatever the rules say.
12          I don't know whether you want to set a continued
13   hearing now or whether you would rather wait until after the
14   bankruptcy court has proceeded on August 30th.
15          MR. McFARLAND:  I think our pleasure, Your Honor,
16   would be to set it now, if possible.  Knowing the Court's
17   schedule and attorneys' calendars and schedules, I think it
18   would be good to try and set it now.
19          THE COURT:  We can set it, and also when we set it,
20   we will hear the motions to intervene on that same date, so
21   all of the attorneys are here, and that will be good to set
22   a hearing date now.  I'm going to look at it now.
23          MR. McFARLAND:  We were looking, Your Honor, in
24   light of the bankruptcy court, if they issue, there is a
25   28-day period.  I understand it's a minimum, so that would

```
 1    put us essentially at the end of September.  So we were
 2    thinking mid- to late October.
 3             THE COURT:  The Court has Thursday, October 18th
 4    and Friday, October 19th.
 5             MR. McFARLAND:  That is good for the plaintiff,
 6    Your Honor, for R.M.S.T.
 7             MR. POWERS:  Your Honor, I believe the confirmation
 8    hearing is going to occur before that.  So take us
 9    backwards, we probably ought to have it before the
10    confirmation hearing.
11             THE COURT:  The August 30th hearing, why do we have
12    to wait 30 days or 28 days after that?
13             MR. WINSBERG:  There is a couple different
14    permutations, Your Honor.  So if Judge Glenn approves the
15    bid procedures on August the 30th, the debtor would go out
16    and have a three-week period, roughly three- or four-week
17    period, where we would try to re-solicit to get an offer so
18    we could have an auction.
19             So the way the schedule was working from the bid
20    procedures is there would be a hearing to approve the bid
21    procedures.  Then the debtor would go back out with its
22    investment banker and re-dial the phones again to see if
23    anybody wanted to participate in the auction.  If anybody
24    wanted to participate, that auction, typically, that period
25    of time is about three weeks to give people a chance.
```

```
 1        THE COURT:  I don't understand how that would

 2  affect this hearing.  The bankruptcy court will have had its

 3  hearing on August 30th and made whatever rulings it's going

 4  to make, and then the motions to intervene would be ripe

 5  before this Court.  I don't know why this Court, for a

 6  status hearing, needs to wait all of that time.

 7        MR. WINSBERG:  So the question, Your Honor, then --

 8  I guess we are looking at two different things.  What I was

 9  thinking about, Your Honor, was at some point the debtors

10  are going to have to go back in front of Judge Glenn,

11  irrespective of what happens on August 30th, whether it's

12  the debtor's transaction or it's one of the disclosure

13  statements that go forward.

14        There will be an additional hearing in front of

15  Judge Glenn on confirmation of a plan or an actual approval

16  of a sale, and that is going to likely happen, just give or

17  take, it's going to have to happen at some point in late

18  September, at the latest, or early October.

19        So I was thinking, Your Honor, that from the

20  debtor's perspective, we would have the bid procedures and

21  then there would be an ultimate sale hearing scheduled in

22  front of Judge Glenn towards the end of September, and

23  whatever the results of that when we come back to Your Honor

24  for this Court's approval in mid-October.

25        THE COURT:  I'm not looking at that.  This is going
```

```
1   far afield.  I'm going to set a hearing, and that hearing is
2   going to be a status hearing so that I can have a report
3   back on what's going on in the bankruptcy court, whatever
4   status it is, on the motions to intervene here, and any
5   other matters.
6           The bankruptcy court is operating on its schedule,
7   and I respect that.  This Court is trying to stay abreast of
8   the status of what's going on.  So we are going to set a
9   date, and I'm not going to be maneuvering around anything
10  other than the August 30th hearing of the bankruptcy court
11  and the deadlines for responding to the motion to intervene.
12  Said, done, we are going to set the hearing.
13          The Court has Tuesday, September 18th at 1:00.  Is
14  that available, Mr. Porter?
15          MR. PORTER:  The 18th?
16          THE COURT:  Tuesday, September 18th at 1:00.
17          MR. PORTER:  Your Honor, that would be available to
18  me.  I just want to point out, just chatting with Mr. Troy,
19  he expressed some question whether the judge would actually
20  rule after the August 30th hearing.
21          THE COURT:  If the judge doesn't rule, the judge
22  doesn't rule.  You can so inform me.
23          MR. PORTER:  I have 1:00 on the 18th, Your Honor.
24          THE COURT:  All right.  Mr. McFarland, Mr. Wainger?
25          MR. McFARLAND:  We will make it work, Your Honor.
```

1          THE COURT:  Mr. Powers?

2          MR. POWERS:  Yes, Your Honor.

3          THE COURT:  Mr. Neary?

4          MR. NEARY:  Yes, Your Honor, that is fine.  Thank

5  you.

6          THE COURT:  We will set, we will call it a

7  continued status hearing on this matter for Tuesday,

8  September 18, at 1:00 p.m.

9          MR. WAINGER:  Thank you, Your Honor.  May I give

10  Your Honor one data point, just for your information?  This

11  is just so that the Court is aware, Your Honor, right now

12  the company will be out of money in December.  So when we

13  say we are working on a tight time frame, we are.

14          THE COURT:  Mr. Wainger, those are issues, as far

15  as I'm concerned, for the bankruptcy court.  This Court's

16  jurisdiction is the preservation of those artifacts under

17  the covenants and conditions.  That's the issue before this

18  Court, and that there's been a long bankruptcy proceeding,

19  this Court has nothing to do with it.  That it's been

20  delayed, this Court has nothing to do with it.

21          The concern of this Court is that those artifacts

22  be maintained under the covenants and conditions that this

23  Court has ordered.  R.M.S.T. must make whatever arrangements

24  you need to pay or not pay your staff, to pay or not pay

25  your attorneys, because it is not an issue before this

```
 1   Court.
 2            MR. WAINGER:  The only reason I raise it is because
 3   I'm concerned that if we enter a liquidation and a trustee
 4   takes over, what happens to those artifacts, and that's the
 5   only reason I bring it up.
 6            THE COURT:  We are going to have a hearing on
 7   September 18th at 1:00.
 8            MR. WAINGER:  Yes, Your Honor.
 9            THE COURT:  Is there anything else that anybody
10   wants to bring to the Court's attention?
11            MR. PORTER:  No, Your Honor.
12            THE COURT:  The Court stands in recess until
13   tomorrow.
14            (Hearing adjourned at 2:07 p.m.)
15                        CERTIFICATION
16
17       I certify that the foregoing is a correct transcript
18   from the record of proceedings in the above-entitled matter.
19
20         X_____/s/_____x
21                     Jody A. Stewart
22              X_____8-22-2018 _____x
23                        Date
24
25
```