IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
      Plaintiff,

v.                                                      Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL,
ITS ENGINES, TACKLE, APPAREL,
APPURTENANCES, CARGO, ETC., LOCATED
WITHIN ONE (1) NAUTICAL MILE OF A POINT
LOCATED AT 41 43/ 32' NORTH LATITUDE
AND 49 56' 49" WEST LONGITUDE,
BELIEVED TO BE THE R.M.S. TITANIC
<u>in rem</u>,
      Defendant.

<u>**UNITED STATES' RESPONSE TO MOTIONS TO INTERVENE**</u>

**I.     PRELIMINARY STATEMENT.**

On August 17, 2018, motions to intervene were filed by the Official Committee of Equity Security Holders ("Equity Committee"), ECF No. 471, and the Trustees of the National Maritime Museum ("NMM"), ECF No. 474. The Equity Committee and the NMM seek to intervene as of right and permissively, pursuant to Federal Rule of Civil Procedure 24(a) and 24(b), respectively. They believe intervention is required in order to protect their respective positions vis-à-vis RMST's *Titanic* assets in this Court and the Bankruptcy Court in the Middle District of Florida, where RMST and its parent, Premier, are presently in Chapter 11 bankruptcy proceedings.

If permitted to intervene, NMM expects to seek a declaratory judgment that NMM and the National Museums and Galleries of Northern Ireland each constitute a Qualified Institution within the meaning of the Covenants and Conditions ("C&C"). ECF No. 475 at 2. The EC, while not attaching any proposed pleading to its motion, *see* Fed.R.Civ.P. 24(c), indicates that it

will "seek[] approval from this Court for the Equity Committee Plan" it has filed in the Bankruptcy Court.  ECF No. 472 at 10.

This Court has made clear that it will not address matters that lie within the province of the Bankruptcy Court.  Aug. 22, 2018, Hearing Tr. 10 (noting that the Court has "no desire to get into the bankruptcy proceedings and direct any approvals there").  This Court will, however, "have to approve any transfer of all of these assets to be sure that it is following this Court's order of the covenants and conditions to keep everything together and subject to the jurisdiction of this Court."  *Id.*

NOAA is expressly authorized under Sections V, VI and VII of the C&Cs to provide reports to the Court concerning matters within this authority, to include any proposed transfer of the *Titanic* assets.  For the reasons set forth below, NOAA recommends that the motions to intervene by the Equity Committee and NMM be denied.

## II.   DISCUSSION.

### A.  Applicable Law.

Intervention as a matter of right under Rule 24(a)(2), requires a showing that the movant (1) has an interest in the "subject matter of the action;" (2) that this interest "would be impaired by" the action; and (3) the movant's interest in the action is not "adequately represented" by existing parties.  *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th cir. 1991); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 120 (4th Cir. 1981) (same); *Gould v. Alleco*, Inc., 883 F.2d 281, 284 (4th Cir. 1989) ("[I]ntervention of right is dependent on the moving party's fulfillment of three requirements: interest, impairment of interest and inadequate representation.")  "[L]iberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'"  *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (same) (quoting

*Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.Cir.1967)).  However, as this Court has explained, "a general interest in the subject matter of pending litigation does not constitute a protectable interest within the meaning of Rule 24(a)(2). To be protectable, the putative intervenor's claim must bear a close relationship to the dispute between the existing litigants and therefore must be direct, rather than remote or contingent."  *Dairy Maid Dairy, Inc. v. United States*, 147 F.R.D. 109, 111 (E.D. Va. 1993); *Nish and Goodwill Svcs., Inc. v. Cohen*, 191 F.R.D. 94, 96 (E.D. Va. 2000) (same); *see also Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 96–97 (2d Cir. 1990) (that the putative intervenor must have an interest in the proceeding that is "direct, substantial, and legally protectable").

Permissive intervention under Rule 24(b) may be granted "if the party seeking to intervene has filed a timely motion and 'has a claim or defense that shares with the main action a common question of law or fact.'"  *In re Rivada Networks*, 230 F. Supp. 3d 467, 472 (E.D. Va. 2017) (quoting Fed.R.Civ.P. 24(b)(1)(B)).  In deciding, in its discretion, whether to grant permissive intervention a court should consider whether doing so would "unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3), concerns of judicial economy, the need for judicial guidance, the benefit to the judicial process and whether intervention may help avoid inconsistent rulings.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018); *see also In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) ("concerns of judicial economy and need for [judicial] guidance . . . have a place in motions for permissive intervention"); *Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 223 F.R.D. 386, 387 (D. Md. 2004) (citing standards for permissive intervention); *see Lee v. Virginia Bd. of Elections*, No. 3:15CV357-HEH, 2015 WL 5178993, at *4 (E.D. Va. Sept. 4, 2015) (a request to intervene should be accompanied by "a corresponding benefit to the process").

A district court is "'entitled to the full range of reasonable discretion'" in evaluating whether Rule 24 intervention should be allowed. *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (quoting *Rios v. Enterprise Ass'n Steamfitters Local U. # 638 of U. S.*, 520 F.2d 352, 355 (2d Cir. 1975)).

B.  **The Equity Committee's Motion to Intervene.**

The Equity Committee asserts it was appointed as a fiduciary in the Bankruptcy Court to represent the equity holders' interests. ECF No. 472 at 10. Its Chapter 11 Plan ("EC Plan") calls for all of RMST's assets to be transferred to a Liquidating Trust and Liquidating Trustee "free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan." EC Plan at 10, 24-25 (ECF No. 472-3). The Liquidating Trust Assets expressly include "the French Artifacts [and] the American Artifacts (subject to the Covenants)." *Id.* at 10. At the hearing before the Bankruptcy Court on August 30, 2018, the Equity Committee asked the Bankruptcy Court to rule on the sufficiency of its Disclosure Statement for its Chapter 11 Plan and permit the Plan to go forward for a vote among creditors and equity holders. The Bankruptcy Court has not yet ruled on the motion.

With regard to the American Artifacts, the EC Plan calls for a Chief Reorganization Officer ("CRO") to "manage and administer the American Artifacts consistent with the Covenants pending disposition . . . to a Qualified Institution, as defined in the Covenants." EC Plan at 4-5, 10, 22-23 (ECF No. 472-3). In the interim, the CRO "shall offer to employ" any RMST employees involved in the "preservation, management and display of the American Artifacts" until they are sold. *Id.* at 23. Any sale of the American Artifacts must be to a Qualified Institution as defined by the C&Cs, and must be approved by this Court. *Id.* With regard to the French Artifacts, the EC Plan calls for the Liquidating Trustee to employ an auction house "to conduct a sale of the French Artifacts . . . in such manner as the Liquidating Trustee

determines, in the exercise of its sole discretion, is in the best interests of the Debtors, their Estates and all parties having an interest therein." EC Plan at 22.

The Equity Committee seeks to intervene to obtain "approval from this Court for the Equity Committee Plan," to include asking the Court to determine that the French Artifacts are "property of the [bankruptcy] estate." ECF No. 472 at 10-11. These are not questions this Court should entertain. Aug. 22, 2018, Hearing Tr. 10, 18-19 ("It's not my role to approve [any proposal] for Chapter 11 purposes"). Put differently, these are not questions that are within the subject matter of this action, or present a common question of law or fact with this matter.

Even if construed more narrowly as seeking this Court's blessing that it *would* approve the transactions involving the *Titanic* assets contemplated in its Plan as consistent with the C&Cs, *if* it came out the victor in the Bankruptcy Court, the motion still fails. While the Fourth Circuit has recognized that a contingent interest in other litigation *may* be a sufficient interest to warrant intervention in separate litigation, what controls is whether that interest translates into a "significantly protectable interest" in **this** litigation, which would be impaired if not allowed to intervene.[1] *Teague*, 931 F.2d at 261. However, "a general interest in the subject matter of pending litigation does not constitute a protectable interest" to warrant intervention; the claimed interest "must bear a close relationship to the dispute," and be "direct, rather than remote or contingent." *Dairy Maid Dairy*, 147 F.R.D. at 111.

That close, direct relationship does not exist here. The C&Cs set out a procedure for naming a new Trustee, whereby the current Trustee, RMST, proposes a subsequent

---

[1] In *Teague*, the intervenors were successful class action plaintiffs who had obtained a judgment against their defendants. *Teague*, 931 F.2d at 261. In a separate declaratory judgment action an insurance company sought to declare that they were not obligated to the insureds – the defendants in the class action lawsuit – under their policy. *Id.* A ruling in favor of the insurance company in its declaratory judgment action would remove a significant asset from which the class action plaintiffs could satisfy their judgment. Thus, because the class action plaintiffs "stand to gain or lose by the direct legal operation of the district court's judgment" in the declaratory action, *id.*, they had a significantly protectable interest in the insurance company's declaratory judgment action.

Trustee/Qualified Institution, and the proposed Trustee is vetted by this Court and NOAA to determine whether the Trustee satisfies the C&Cs. *See* C&C § VI(E). This Court has recognized that role. *See* Aug. 22, 2018, Hearing Tr. 10 (noting that the Court will "have to approve any transfer of all of these assets to be sure that it is following this Court's order of the covenants and conditions to keep everything together and subject to the jurisdiction of this Court.") RMST has filed a motion for this Court to approve an Asset Purchase Agreement ("APA") that includes a sale of RMST's stock, and hopes to have the Bankruptcy Court ultimately approve the transaction as well. But, while RMST believes its proposal is "the best and really only viable option," it recognizes that it may not be the eventual prevailing party who would acquire the *Titanic* assets, and "if it is someone else, then so be it, and *we would present them to the Court*." Aug. 22, 2018, Hearing Tr. at 12-13 (emphasis added.) Because the prevailing party out of the Bankruptcy Court could be someone other than the Stalking Horse Bidder, including a transaction consistent with the Equity Committee Plan, RMST is not asking for approval of the APA transaction by this Court until after the bankruptcy "process goes through." *Id.* at 17; *see also* Periodic Report (August 7, 2018) at 2 (noting that this Court would consider a proposed transaction "after such sale is approved by the Bankruptcy Court").

In sum, it is an inefficient use of judicial resources to have this Court vet the *bona fides* of the Equity Committee's Plan when that Plan not only does not identify a proposed Qualified Institution, but may not be successful, rendering the entire exercise moot. Similarly, if its Plan is successful in the Bankruptcy Court and a disposition of the *Titanic* assets consistent with that Plan is developed, the C&Cs require that such transaction then be presented to this Court by RMST to ensure the transaction is consistent with the C&Cs and this Court's *in rem* jurisdiction. The Equity Committee has simply failed to show that it currently has an interest in the issues

now before the Court or that its interest would be impaired should intervention not be granted at this time.

### C. The NMM's Motion to Intervene.

The NMM asserts an interest in "the Subject TITANIC Artifact Collection and . . . all other rights and interest of RMST with respect to the TITANIC Collections," and states its ultimate goal is to acquire and maintain them under perpetual public ownership and as an integral whole within its museums in the United Kingdom. ECF No. 475 at 3-4. In the Bankruptcy Court, NMM joined with the Unsecured Creditors Committee to propose a Chapter 11 Plan ("UCC/NMM Plan") which "contemplates the sale of substantially all of the assets of the Debtors to the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC," collectively identified as the "Plan Sponsors." UCC/NMM Plan at 1, 8 (attached as Ex. 2 to RMST's July 9, 2018, Periodic Report). The UCC/NMM Plan also establishes a Liquidating Trust and Liquidating Trustee; however, unlike the EC Plan, confirmation of the UCC/NMM Plan operates directly as an approval for, and authorization and direction to, the Debtors to consummate the sale of the assets to the Plan Sponsors. *Id.* at 17-18.

As pertinent to the *Titanic* assets, the UCC/NMM Disclosure Statement states that the "Artifact Collection, RMS Titanic Trust, and the Debtors' rights as salvor-in-possession" will be transferred to the "Museum Plan Sponsors," and "shall be subject to approval of the Admiralty Court." UCC/NMM Disclosure Statement at 9-10, 23 (attached as Ex. 3 to RMST's July 9, 2018, Periodic Report); *see also* UCC/NMM Plan at 36 (noting that this Court's approval of the sale is a condition precedent for the Plan to become effective). NMM contends its Plan should be approved by the Bankruptcy Court because it is preferable to all other alternatives, and has the

potential "for the greatest feasible realization out of the Debtors' Estates, with minimal risk that the contemplated transaction will be rejected by the Admiralty Court." *Id.* at 42.

NMM seeks to intervene in this matter because it is concerned that, without this Court's advanced blessing that it constitutes a Qualified Institution within the meaning of the C&Cs, it will be precluded from a meaningful opportunity to establish the merits of its Plan in the Bankruptcy Court. ECF No. 475 at 7-8. NMM asserts that the *possibility* it may come out the victor in the Bankruptcy Court constitutes a contingent interest that gives rise to an interest in this proceeding supporting intervention. *See e.g.* ECF No. 475 at 7 (citing *Teague v. Bakker* for the proposition that "intervention under Rule 24(a) is permissible where the interest asserted is contingent on other pending litigation."); *see also id.* at 9 ("It is only equitable to allow those who would be prejudiced by [RMST's proposal to sell to a Stalking Horse Purchaser] to appear and advance their own plans for disposition of the TITANIC Collection" in this Court.).

However, for the same reasons as set forth above, NOAA does not believe that intervention under Rule 24(a) or (b) is appropriate at this time. While NMM's concerns are understandable, and its goals for the *Titanic* assets laudable and in the public interest, NMM's dispute is one that currently rests squarely in the Bankruptcy Court. Should it prevail there, RMST has committed to present it to this Court for approval under the C&Cs.

Moreover, NOAA understands that several developments at the Bankruptcy Court hearing on August 30, 2018, may create additional hurdles for NMM's position. The undersigned has been advised that at that hearing the Stalking Horse Bidder under RMST's APA raised its offer from $17.5 million to $19.5 million, eclipsing the UCC/NMM's Plan offer of $19.2 million. The undersigned is further advised that, in light of this revised offer, the UCC has now offered its support to the debtors' bidding and sale procedures motion. These developments

have rendered the future status of the UCC/NMM Plan unclear, both in the Bankruptcy Court and as a predicate for NMM's motion in this Court. The Bankruptcy Court has not yet ruled as to the implication of these developments on the UCC/NMM Plan.

### III. CONCLUSION.

For the foregoing reasons, NOAA recommends that the motions to intervene by the Equity Committee and NMM be denied at this time. Should circumstances change, the movants are free to seek leave to renew their requests. *See Lee v. Virginia Bd. of Elections*, No. 3:15CV357-HEH, 2015 WL 5178993, at *5 (E.D. Va. Sept. 4, 2015) (stating that if later events show the interests of the movants were not being protected that the court would "grant leave to renew the Motion to Intervene.").

        Respectfully submitted,

        G. Zachary Terwilliger
        United States Attorney

By:   /s/ *Kent P. Porter*_____
        Kent P. Porter, VSB No. 22853
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        8000 World Trade Center
        101 West Main Street
        Norfolk, VA 23510
        757-441-6331
        Fax:  757-441-6689
        kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on the 31st day of August, 2018, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **Robert William McFarland**<br>McGuireWoods LLP<br>101 W Main St<br>Suite 9000<br>Norfolk, VA 23510-1655<br>Email: rmcfarland@mcguirewoods.com |
| **Edward J. Powers**<br>Vandeventer Black LLP<br>101 West Main Street, Suite 500<br>Norfolk, VA 23510<br>epowers@vanblacklaw.com | **Jeffrey G. Gilmore**<br>**John M. Neary**<br>Ackerman LLP<br>750 Nith Street, N.W., Suite 750<br>Washington, D.C. 20001<br>Jeff.gilmore@ackerman.com<br>John.neary@ackerman.com |

      /s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov