# EXHIBIT 2

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

---

# AMENDED DISCLOSURE STATEMENT TO ACCOMPANY AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF PREMIER EXHIBITIONS, INC.

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

# **TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................................................1

    A.    Commencement of the Bankruptcy Cases. ...........................................1

    B.    Corporate Structure. .............................................................................1

    C.    The Equity Committee's Liquidating Plan and this Disclosure Statement. ............2

    D.    Purpose of this Document. ....................................................................3

    E.    Voting Classes.......................................................................................3

    F.    Balloting. ..............................................................................................4

    G.    Deadlines for Voting and Objecting to the Plan; Confirmation Hearing Date. ................................................................................................5

    H.    Additional Information..........................................................................5

    I.    Disclaimer. ...........................................................................................6

    J.    Overview of the Plan............................................................................6

    K.    Recommendation..................................................................................8

II.    BACKGROUND...............................................................................................8

    A.    The French Artifacts, the American Artifacts and the Covenants and Conditions. ...........................................................................................8

    B.    NOAA's Objections to Disposition of Artifacts Contrary to the Covenants. .........9

    C.    The Debtors' Motion to Sell the French Artifacts................................13

    D.    Plan Discussions and Proposals. .........................................................14

    E.    Plan Mediation. ..................................................................................16

    F.    Use of Cash Collateral and Debtor-in-Possession Financing...............16

    G.    Debtor-in-Possession Administration. .................................................17

        1.    Retention of Professionals.......................................................17

III.    THE PLAN.......................................................................................................19

    A.    Plan Overview. ...................................................................................19

    B.    Limited Consolidation for Voting, Confirmation, and Distribution Purposes......21

    C.    Implementation of the Plan. ...............................................................21

        1.    Exit Financing. .......................................................................21

i

|   |     |                                                                              |    |
|---|-----|------------------------------------------------------------------------------|----|
|   | 2.  | Employment of the CRO.                                                        | 22 |
|   | 3.  | Sale of French Artifacts.                                                     | 22 |
|   | 4.  | Disposition of the American Artifacts.                                        | 22 |
|   | 5.  | Administration of Liquidating Trust Assets.                                   | 23 |
|   | 6.  | Vesting of Assets                                                             | 23 |
|   | 7.  | Establishment of the Liquidating Trust.                                       | 23 |
|   | 8.  | Liquidating Trustee as Representative of the Debtors' Estates.                | 24 |
|   | 9.  | No Liability of Liquidating Trustee.                                          | 24 |
|   | 10. | Federal Income Tax Compliance Provisions,                                     | 25 |
|   | 11. | Prosecution of Estate Causes of Action by the Liquidating Trustee,           | 25 |
| D. |     | Summary of Certain Other Provisions of the Plan.                            | 26 |
|   | 1.  | Court Approval of Professional Fees Required.                                 | 26 |
|   | 2.  | Deadlines for Filing Claims and Administrative Expenses.                      | 26 |
|   | 3.  | Priority Tax Claims.                                                          | 26 |
| E. |     | Executory Contracts and Unexpired Leases.                                    | 27 |
|   | 1.  | Assumption.                                                                   | 27 |
|   | 2.  | Cure Payments.                                                                | 27 |
|   | 3.  | Rejection.                                                                    | 28 |
|   | 4.  | General.                                                                      | 28 |
|   | 5.  | Insurance Policies.                                                           | 29 |
| F. |     | Claims Allowance Process.                                                    | 29 |
|   | 1.  | Resolution of Disputed Claims.                                               | 29 |
|   | 2.  | Reserve for Disputed Claims.                                                  | 29 |
| G. |     | Distributions.                                                               | 30 |
|   | 1.  | Generally.                                                                    | 30 |
|   | 2.  | Manner of Payment.                                                            | 31 |
|   | 3.  | Distributions of Property Other Than Cash.                                    | 31 |
|   | 4.  | Setoffs.                                                                      | 31 |

|  | 5. | Distribution of Unclaimed Property. | 31 |
|  | 6. | Delivery of Distributions, Address of Holder | 32 |
| H. | | Effectiveness of Plan. | 32 |
|  | 1. | Conditions Precedent. | 32 |
|  | 2. | Waiver of Conditions. | 32 |
|  | 3. | Notice of the Effective Date. | 32 |
| I. | | Retention of Jurisdiction. | 32 |
| J. | | Limitation of Liability, Releases and Injunction. | 34 |
|  | 1. | Exculpation. | 34 |
|  | 2. | Injunction Enjoining Holders of Claims and Equity Interests. | 35 |
|  | 3. | Nondischarge of the Debtors. | 36 |
| K. | | Revocation or Withdrawal of the Plan. | 36 |
| L. | | Modification of the Plan. | 36 |
| M. | | Payment of Statutory Fees. | 37 |
| N. | | Governing Law. | 37 |
| O. | | Withholding, Reporting, and Payment of Taxes. | 37 |
| IV. | | CONFIRMATION PROCEDURE. | 38 |
| A. | | Voting; Acceptance. | 38 |
| B. | | Confirmation Hearing. | 39 |
| C. | | Feasibility. | 41 |
| D. | | Best Interest Test. | 41 |
| V. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN. | 42 |
| VI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES. | 43 |
| A. | | Introduction. | 43 |
| B. | | Consequences to the Debtor. | 44 |
| C. | | Consequences to Holders of Allowed Class 3 Claims and Class 4 Premier Interests. | 44 |
|  | 1. | Recognition of Gain or Loss Generally. | 44 |

46220642;1

| | 2. | Distributions in Payment of Accrued but Unpaid Interest. | 47 |
| | 3. | Tax Treatment of the Liquidating Trust and Holders of Interests Therein. | 47 |
| | 4. | Tax Reporting. | 50 |
| VII. | FEES AND EXPENSES. | | 52 |
| VIII. | SUMMARY OF ADDITIONAL SOURCES OF INFORMATION. | | 52 |
| IX. | RECOMMENDATION AND CONCLUSION. | | 53 |

46220642;1

## I.    INTRODUCTION.

### A.    Commencement of the Bankruptcy Cases.

On June 14, 2016 ("Petition Date")[2], voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, as amended ("Bankruptcy Code"), were filed in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division ("Bankruptcy Court") for each of the following (collectively "Debtors" and each a "Debtor"):  Premier Exhibitions, Inc. (Case No. 3:16-bk-02232-PMG) ("Premier"); RMS Titanic, Inc. (Case No. 3:16-bk-02230-PMG) ("RMST");  Premier Exhibitions Management, LLC (Case No. 3:16-bk-02233-PMG) ("Exhibitions Management"); Arts and Exhibitions International, LLC (Case No. 3:16-bk-02238-PMG) ("AEI"); Premier Exhibitions International, LLC (Case No. 3:16-bk-02234-PMG  ) ("Exhibitions International"); Premier Exhibitions NYC, Inc. (Case No. 3:16-bk-02235-PMG) ("Exhibitions NYC"); Premier Merchandising, LLC (Case No. 3:16-bk-02236-PMG) ("Merchandising"); and Dinosaurs Unearthed Corp. (Case No. 3:16-bk-02237-PMG) ("DUC").

On July 22, 2016, the Bankruptcy Court entered its order that the Debtors' Chapter 11 cases (collectively "Cases" and each a "Case") be jointly administered under RMST's Case, Case No. 3:16-bk-02230-PMG.   The Debtors have operated as debtors-in-possession since the Petition Date. No trustee or examiner has been appointed in the Debtors' Cases.   On August 24, 2016, the Acting United States Trustee for Region 21, acting pursuant to Bankruptcy Code section 1102(a), appointed an Official Committee of Unsecured Creditors ("Creditors Committee") and an Official Committee of Equity Security Holders ("Equity Committee" and, together with the Creditors Committee, the "Committees") to serve in the Debtors' consolidated Cases.

### B.    Corporate Structure.

All of the Debtors are direct or indirect subsidiaries of Premier.  Premier is also the direct or indirect parent of additional entities that did not seek relief under the Bankruptcy Code, specifically: 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood

---

[2] All capitalized terms used but not defined herein shall bear the same meaning as ascribed to them in the Plan.

1

Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd., all of which collectively, together with the Debtors, are referred in this Disclosure Statement and in the Plan as the "Premier Entities." An organizational chart of the Premier Entities is attached hereto as Exhibit 4.

**C. The Equity Committee's Liquidating Plan and this Disclosure Statement.**

This document is the *Equity Committee's Amended Disclosure Statement to Accompany Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders* (the "Disclosure Statement") in the Debtors' Cases. The purpose of the Disclosure Statement is to describe the Equity Committee's concurrently-filed *Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders* (along with any amendments, supplements, or exhibits hereto, collectively, the "Plan").

In its First Day Pleadings, Premier stated that its reason for filing the bankruptcy cases was to sell a handful of the artifacts salvaged from the wreck of the *H.M.S. Titanic* that are the principal assets of the Debtors' Estates, pay off its creditors, and emerge from chapter 11 expeditiously. That has not happened. In nearly two years after the Debtors commenced these Cases, the Debtors have been unable to successfully sell any assets or to successfully propose a Chapter 11 plan, despite extensions of the period in which the Debtors exclusively may propose and solicit acceptances for such a plan and the cooperation and support of the Equity Committee and the Official Committee of General Unsecured Creditors (the "Creditors Committee"). The statutory period of plan exclusivity expired on February 8, 2018. The Equity Committee is proposing its Plan in order to bring these Cases to a conclusion in a manner that the Equity Committee believes is in the best interest of the Debtors, their Estates and all having an interest in them.

The Plan further provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's Assets, including all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein.

46220642;1

As set forth in more detail below, the Equity Committee's Plan provides for continued operation of the Debtors by a Chief Restructuring Officer pending liquidation of the Debtors' estates' assets, marketing and sale of the American Artifacts to a Qualified Institution as defined in, and in a manner consistent with certain Covenants and Conditions described more specifically below, and the marketing and sale by auction[3] of the artifacts salvaged from the wreck of the R.M.S. Titanic that are generally referred to as the "French Artifacts", with such sale processes commencing on the Effective Date of the Plan.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of allowed claims and interests of the proceeds of the sale of the French Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's administration of the assets of the Liquidating Trust, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust assets.

### D.    Purpose of this Document.

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims as a part of the proceedings seeking confirmation of the Plan. It sets forth, among other things, information concerning the Debtors, their Chapter 11 Cases, the events that have taken place during the Cases, and the Plan. Its purpose is to provide the Holders of impaired Claims and Interests adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each Holder of an impaired Claim and Interest should read this Disclosure Statement and the Plan in their entirety and consider them fully. No person has been authorized by the Equity Committee or the Bankruptcy Court to utilize, for purposes of solicitation, any information other than the information contained or referred to herein.

### E.    Voting Classes.

There are two voting Classes under the Plan – Class 3 Claims and Class 4 Premier Equity Interests. The Plan proposes to pay all Allowed Claims in Classes 1 and 2 in full on the Effective

---

[3] Guernsey's, a Division of Barlan Enterprises, Ltd, will be retained as auction house to conduct an auction of the French Artifacts. For further information on Guernsey's, see www.guernseys.com.

Date of the Plan, with the result that the Holders of Claims in those Classes are unimpaired, are conclusively deemed to have accepted the Plan, and are not entitled to vote on the Plan. The Plan proposes to cancel Class 5 Intercompany Claims, and such Claims are conclusively deemed to reject the Plan, and also are not entitled to vote. As a result, only Class 3 Claims and Class 4 Premier Equity Interests are impaired and entitled to vote on the Plan.

The Bankruptcy Code defines "acceptance" (i) with respect to a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class, and (ii) with respect to an impaired class of interests if the Holders of at least two-thirds in dollar amount of the interests actually voting in each such Class have voted to accept the Plan, in each case counting only those holders who cast Ballots (as defined below).

**THE EQUITY COMMITTEE BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE EQUITY COMMITTEE THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS AND INTERESTS VOTE TO ACCEPT THE PLAN.**

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section IV of this Disclosure Statement entitled "Confirmation Procedure."

      F.      **<u>Balloting.</u>**

**TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS WHICH**

**INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.**

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Equity Committee's Ballot Tabulator, Erik Meza, at emeza@lgbfirm.com.

After carefully reviewing this Disclosure Statement and the Equity Committee's Plan, including the respective exhibits, the Holders of Claims in Class 3 and Premier Interests in Class 4 should decide whether to accept or reject the Plan and should indicate that Holder's vote on the enclosed Ballot and return it in a timely manner in the envelope provided.

      **G.**     **Deadlines for Voting and Objecting to the Plan; Confirmation Hearing Date.**

Pursuant to the entered order of the Bankruptcy Court approving this Disclosure Statement (Docket No. ___) (the "Disclosure Statement Order"), in order to be counted, a Ballot must be delivered to and received by the Balloting Agent (as that term is hereinafter defined), in accordance with the procedures set forth therein, on or before 5:00 p.m. Prevailing Eastern Time on _____, 2018. The Disclosure Statement Order sets _____, 2018 as the last day on which written objections to confirmation of the Plan (if any) must be filed. A hearing in the Bankruptcy Court to consider final approval of this Disclosure Statement and confirmation of the Plan has been set for _:__ _.m. on _____ __, 2018.

      **H.**     **Additional Information.**

Attached as Exhibits to this Disclosure Statement are copies of the following:

1.      The Equity Committee Plan (Exhibit 1);

2.      The Term Sheet (Exhibit 2);

3.      Hypothetical Chapter 7 Liquidation Analysis (Exhibit 3);

4.      Premier Exhibitions, Inc., Corporate Organizational Chart (Exhibit 4);

5.      The Declaration of Arlan Ettinger in Support of the Retention of Guernsey's to Sell the French Artifacts (Exhibit 5); and

6.      Guernsey's Proposal (Exhibit 6).

In conjunction with the approval of this Disclosure Statement by the Bankruptcy Court, the Equity Committee will obtain approval to distribute to each Holder of an Allowed Claim and Allowed Interest in the Voting Classes, the form of ballot for casting an acceptance or rejection of the Plan (the "Ballot").

## I. Disclaimer.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN. EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE EQUITY COMMITTEE OR BY ANY OF ITS ADVISORS. NOR HAS THE EQUITY COMMITTEE OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE EQUITY COMMITTEE FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE EQUITY COMMITTEE'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE EQUITY COMMITTEE FOR PURPOSES OF ANY LITIGATION AGAINST THE EQUITY COMMITTEE.

ALTHOUGH THE EQUITY COMMITTEE'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

## J. Overview of the Plan.

**THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A. IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.**

The Plan provides for the marketing and sale by auction, run by Guernsey's, of certain of the French Artifacts, with such sale process commencing on the Effective Date of the Plan. The Plan also provides for the Liquidating Trustee to offer the American Artifacts for sale only to potential bidders that are Qualified Institutions, as defined in the Covenants, to serve as the subsequent trustee and subsequent salvor-in-possession of the American Artifacts under the Covenants. Any transfer of the American Artifacts to a successor trustee and salvor shall be subject to approval of the District Court and shall be made only on notice to NOAA and all other parties entitled to notice in the US Artifacts Litigation. The CRO shall manage and administer the American Artifacts consistent with the Covenants pending disposition of the American Artifacts by the Liquidating Trustee. The CRO will also transfer the Remaining French Artifacts to the purchaser of the American Artifacts.

The Plan further provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein. The Liquidating Trustee also will market and sell the remaining assets of the estate either as going concerns or as individual assets.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of allowed claims and interests of the proceeds of the sale of a specified subset of the French Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's administration of the assets of the Liquidating Trust, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust assets.

K.        **Recommendation.**

The Equity Committee believes that the Plan is in the best interests of all Holders of Claims and Interests.

**ACCORDINGLY, THE EQUITY COMMITTEE RECOMMENDS THAT THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ACCEPT THE PLAN.**

II.    **BACKGROUND.**

A.        **The French Artifacts, the American Artifacts and the Covenants and Conditions.**

The Debtors' predecessor in interest, Titanic Ventures Limited Partnership, a predecessor in interest to RMST (the "Company"), with the assistance of the Institut Francais de Recherche Pour l'Exploitation de la Mer  ("INFREMER"), the French government's oceanographic institute, conducted a joint expedition to the wreck of the RMS Titanic in 1987. Over the course of 32 dives during that expedition, recovered approximately 2,100 artifacts from the Titanic wreck site (the "French Artifacts" or the "French Collection"). The Company took the French Artifacts to France for conservation and restoration. On October 20, 1993, an Administrator in the French Office of Maritime Affairs (Ministry of Equipment, Transportation and Tourism) awarded the Company title to the French Artifacts. See, *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel etc.*, 435 F.3d 521, 524 (4th Cir. 2006).  The Administrator's decision noted assurances made by the Company that it "agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition." *See, id*. at 528.

In 1993, RMST conducted an additional research and recovery expedition to the wreck of the Titanic, and on August 26, 1993, commenced an in rem action in the United States District Court for the Eastern District of Virginia (the "District Court") against the artifacts recovered in the 1993 expedition, and the wreck itself. *Id*.  A few months later, the District Court entered an Order which assumed in rem jurisdiction over the artifacts recovered by the Company in 1993, as well as the

wreck itself, and declared the Company to be the salvor-in-possession of the wreck and wreck site. *Id.* RMST remains salvor-in-possession of the Titanic wreck site today.

RMST conducted further salvage operations at the Titanic wreck site in 1994, 1996, 1998, 2000, and 2004 and recovered over 3000 additional artifacts (the artifacts recovered in 1993, 1994, 1996, 1998, 2000, and 2004 are referred to as the "American Artifacts").

The American Artifacts are held by RMST in trust as salvor-in-possession subject to Covenants and Conditions ("Covenants") as ordered by the District Court in 2010.[4]  The District Court granted RMST a salvage award of $110,859,200, which the Court found to be the appropriate approximate value of the American Artifact Collection.  *Id.*  Any transfer of RMST's rights in the American Artifacts is subject to the Covenants and the approval of the District Court.

However, the Fourth Circuit Court of Appeals has ruled that United States courts, including the District Court, do not have jurisdiction over the French Artifacts.[5]  The District Court has repeatedly stated on the record that it does not have jurisdiction over the French Artifacts.

By contrast, the Bankruptcy Court does have jurisdiction over the French Artifacts as property of the estate under Bankruptcy Code § 541(a), and can authorize their sale under Bankruptcy Code § 363 or the Plan.

### B.    NOAA's Objections to Disposition of Artifacts Contrary to the Covenants.

The United States, on behalf of NOAA, asserts that the Covenants authorize NOAA to provide input and recommendations to the District Court to ensure that the public interest in the Titanic wreck site and its artifacts is forever protected and, in the current circumstances, to aid the District Court in evaluating a proposed subsequent Trustee under the Covenants. *See, e.g.*, Covenants, Arts. V.A., V.C.7., V.C.8, VI.E.4. This authorization extends to RMST's bankruptcy case, id. at Art. VII.D.5. (reciting that NOAA shall have the right to make submissions and represent the public interest in RMST's bankruptcy), in which case, the Covenants remain enforceable, id. at

---

[4]*See RMS Titanic v Wrecked and Abandoned Vessel etc.*, 742 F. Supp. 2d 784 (E.D. Va. 2010).

[5]*See RMS Titanic v Wrecked and Abandoned Vessel etc.,* 435 F. 3d 521 (4th Cir. 2006).

Art. VII.D.1. and provide that RMST's beneficial interests in the American Artifacts "shall not be considered as part of the [Trustee's] bankruptcy estate," *id.* at VII.B.

Part of the public interest protected under the Covenants, NOAA asserts, is that both the American Artifacts and the French Artifacts, (a) "to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together . . . as an integral whole by the Trustee," *id.* at Art. III.A., and (b) "be available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes," *id.* at Art. III.B.

Moreover, NOAA asserts that these obligations and responsibilities continue to run, as a condition of title, in perpetuity, *id.* at Art. VI.B., and a Trustee's failure to conserve and curate the entire collection as an integral whole is assumed to be a Material Default as defined in the Covenants, *id.* at Art. V.E. Hence, NOAA asserts, while the District Court lacks constructive in rem jurisdiction over the French Artifacts, *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 435 F.3d 521, 528 (4th Cir. 2006) ("Titanic 2006"), the Covenants do run in perpetuity, and the District Court retains the jurisdiction to enforce them, including a Trustee's obligations thereunder as it relates to all of the artifacts.

NOAA also asserts that a sale of the French Artifacts without any notice to the District Court could constitute a Material Default under the Covenants if it does not result in the entire Titanic collection being conserved and curated as an integral whole available for public display and exhibition. Such a default under the Covenants could result in the District Court revoking (a) RMST's status as exclusive salvor-in-possession over the Titanic, and/or (b) the in-specie award of the American Artifacts to RMST. *R.M.S. Titanic, Inc.*, 286 F.3d 194, 206 (4th Cir. 2002) (noting that the district court has the power to "dispossess[ ] RMST of [its] role" as exclusive salvor-in-possession). This would thwart any attempt to transfer or sell that status or the American Artifacts, as the Equity Committee's proposed plan contemplates, thereby undermining one of the two mechanisms for implementing the Plan.

Similarly, NOAA asserts that the Disclosure Statement fails to (a) provide for any District Court approval for the initial transfer of the American Artifacts to the Liquidating Trust from RMST,

which is required under the Covenants, Covenants at Art. VI. A. ("The [American Artifacts] may not be . . . transferred . . . except as approved by the District Court."), or (b) describe how the Liquidating Trust, to be administered by a currently unidentified Liquidating Trustee, would be eligible as a Qualified Institution under the Covenants or meet the requirements to conserve, curate, manage, and generally care for the artifacts in accordance with the Covenants. Thus, NOAA concludes that there is substantial and material litigation risk that could impact the plan's success.

Finally, NOAA asserts that American Artifacts transferred to the Liquidating Trust will not vest free and clear of all claims and interests but will remain subject in perpetuity to the obligations imposed under those Covenants.

The Equity Committee acknowledges NOAA's role as delineated in the Covenants but disagrees with NOAA's position in many respects. The Equity Committee agrees that the American Artifacts remain subject to the Covenants and may not be transferred without authority of the District Court, which continues to exercise in rem jurisdiction over them. The Equity Committee asserts that a transfer of RMST stock would not constitute a "transfer" of the American Artifacts. Similarly, a Liquidation Trust assuming control of RMST would not constitute a transfer or RMST's assets, especially considering the express requirement of the Plan that while in the Liquidating Trust the American Artifacts will continue to be conserved and protected as required under the Covenants. However, a transfer of those assets by the Liquidating Trust would clearly implicate the District Court's jurisdiction and would only be sought after notice to and approval by the District Court. So, too, the maintenance of the American and French collections as a joint collection is an aspiration of the Covenants but is not a requirement, among other reasons, because the Fourth Circuit has held, in Titanic 2006, that the District Court does not have jurisdiction over the French Artifacts, and the District Court itself has acknowledged this repeatedly. The Equity Committee notes that the Bankruptcy Court does have jurisdiction over the French Artifacts as property of the estate under Bankruptcy Code § 541(a) and may authorize their sale under the Plan.

Moreover, by its plain language, the Covenants and Conditions only "apply to the present and future disposition, care, conservation, and management of the Subject TITANIC Artifact Collection." Section I.D. The Subject TITANIC Artifact Collection (the "STAC") includes objects

recovered from the wreck site by RMST between 1993 and 2004 and, "that are within the jurisdiction of this Court." § II.G. The STAC does not include the French TITANIC Artifact Collection (the "French Artifacts").

The Covenants and Conditions seek to place the STAC in a trust for the benefit of the public interest. The Court's in specie award of the STAC, "shall be a trust for the benefit of and subject to the beneficial interest of the public ... in the wreck and its artifacts, and the Covenants and Conditions herein expressed." § I.E. See also, VII.A ("Trustees title to and possession and use of the STAC ... is subject to a trust" and "these Covenants and Conditions will continue to apply to the STAC for the benefit of the public interest"). The Covenants and Conditions do not seek to place the French Artifacts in a trust. The Covenants and Conditions seek to ensure only that the artifacts, "within the scope of its terms, are for the benefit of the public interest [and] kept together and intact."§ I.G. (Emphasis added).

By these very specific terms, the Covenants and Conditions only apply to the management of the STAC. This plain language is consistent with the jurisdictional ruling in Titanic 2006. Consistent with this ruling, the Covenants and Conditions themselves, and the intent of RMST when it drafted the Covenants and Conditions, the limited language in the Covenants and Conditions which relates the "TITANIC Collections" (i.e. both the STAC and the 1987 Artifacts") is merely precatory, and aspirational.

In its pleading filed in the District Court to which Premier responded, NOAA indicated that it will seek "assurances" from any entity seeking to acquire the stock of RMST that such entity will continue to comply with the Covenants and Conditions and will require "full access" to the French Artifacts. Similarly, NOAA, "expects to take into account the proposal's treatment, handling and disposition" of the French Artifacts which NOAA claims is permitted by § II.K and which states in pertinent part that NOAA, "represents the public interest" in both the STAC and the French Artifacts. Consistent with § I.E. however, the public interest only extends to the STAC and not to the French Artifacts. Moreover, while § VII.C.1 seeks to permit NOAA to inspect both the STAC and the French Artifacts, such inspection is designed only to monitor, "the conservation, curation, documentation, and other activities in relation to the STAC." (Emphasis added). Because RMST

46220642;1

owns the French Artifacts outright, and because the District Court does not have subject matter jurisdiction over them, NOAA's oversight role under the Covenants and Conditions does not extend to the care and treatment of the French Artifacts.

In this regard, NOAA's position that it will "take into account" the treatment and handling of the French Artifacts in any transactional proposal, is overreaching, outside its scope, and ultra vires. Nevertheless, the Equity Committee will continue to work collaboratively with NOAA to guarantee an easy transition in the event of a transaction which includes a sale of RMST's stock, or which delivers the STAC to a subsequent Trustee and Qualified Institution. As soon as reasonably practicable after direction from the Bankruptcy Court, the Equity Committee intends to provide the District Court and NOAA with the relevant information necessary to consider any proposed transaction.

### C.     The Debtors' Motion to Sell the French Artifacts.

On June 28, 2016, Premier filed the *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests* (the "French Artifacts Sale Motion").

The French Artifact Sale Motion did not identify specific property to be sold, did not state the time and place for the sale, did not state any procedures for potential purchasers to bid for the artifacts, did not state the price for which the assets would be sold, and did not identify any buyers for the assets.  Rather, what Premier filed as a "sale motion" was in effect a request for an advisory opinion that Premier had the authority to sell French artifacts – effectively a quiet title action for declaratory relief.

The Justice Department on behalf of the National Oceanographic and Atmospheric Administration ("NOAA") and the Office of the U.S. Trustee both objected to the French Artifact Sale Motion.  In their objections, each noted, among other things, that Premier had failed to provide France with notice of the sale motion under which the French Artifacts were to be sold in Bankruptcy Court.  NOAA and the U.S. Trustee also argued that the relief requested by Premier was actually

declaratory relief, which could only be granted in an adversary proceeding in which France would have an opportunity to defend any interest it might have in the French artifacts.

The Bankruptcy Court agreed and, by order entered July 21, 2016, denied the French Artifacts Sale Motion with leave to re-file if and when Premier obtained a judgment in an adversary proceeding that France had no interest in the French artifacts. On August 28, 2016, the Debtors filed the adversary proceeding that was required in order to quiet title to the French Artifacts, *RMS Titanic, Inc. v. The French Republic*, Adv. Pro. No. 3:16-ap-00183-PMG ("RMST v France"). It was not until 13 months later, on September 29, 2017, that the Court finally ruled in favor of the Debtors in RMST v. France, holding that France did not have any interest in the French Artifacts. See *RMST v France, Final Default Judgment*, Dkt No. 67].

### D. **Plan Discussions and Proposals.**

In February 2017, the Debtors met with the Equity Committee for the first time to discuss a consensual reorganization plan. At that time, the Debtors' preference remained to sell certain assets and emerge from Chapter 11 as an on-going business. The Debtors drafted and distributed to potential purchasers of the Debtors or their assets solicitation material in which the Debtors stated their intention to obtain exit financing of $22.5 million that would be used to pay approximately $12 million in general unsecured claims and about $3.5 million in prepetition secured claims. Another $3 million to $5 million would be used to pay chapter 11 expenses. After payment of loan fees and interest, including establishment of an interest reserve, approximately $475,000 would have been available for working capital.

The Equity Committee opposed that proposal because, among other reasons, it would leave the Debtor with more debt than when it entered Chapter 11, and also would have converted all of its unsecured prepetition debt to secured debt, encumbering substantially all of the Debtors' assets for a loan of only $22.5 million. GlassRatner Advisory & Capital Group LLC ("GlassRatner"), which is employed as financial advisor to Debtors in their Cases, also projected that the Debtors would not be able to repay the exit facility out of cash flow from operations but would have required a post-confirmation liquidity event to repay the loan. Faced with opposition from both official committees, the Debtors ultimately abandoned their plans for an exit facility.

14

The Debtors and the Committees began negotiating a consensual plan in earnest after the Debtors abandoned their plan for the exit financing facility.   These negotiations resulted in the Committees and the Debtors entering into a Plan Support Agreement (the "PSA") that was approved by Order of the Bankruptcy Court entered on July 6, 2017.  A copy of the PSA is attached as Exhibit 1 to the *Order Authorizing the Debtors, The Official Committee of Unsecured Creditors and The Official Committee of Equity Security Holders to Enter into And Perform Their Obligations Under A Plan Support Agreement*, (Docket No. 642).

Under the PSA, the Debtors and the Committees agreed that the Debtors would conduct a sale process under which they would pursue a sale of (a) the entire company, (b) RMST and/or the artifact collection, or (c) the other operating companies among the Premier Entities.

GlassRatner conducted the sale for the Debtors.  GlassRatner reported that they contacted 126 parties, of which 26 parties entered into non-disclosure agreements with the Debtors (each, an "NDA") and received a solicitation package from GlassRatner.  Ten of those parties who executed NDAs conducted due diligence in a data room maintained by GlassRatner.  By the deadline for submission of proposals, July 31, 2017, only five of these submitted letters of intent. [6]   These finalists were invited to bid for position as stalking horse bidder in a second round of solicitation with bids due in October 2017.   In the end, no proposal was received that qualified as a stalking horse bid.

The Debtors then embarked upon a sale process without a stalking horse and ultimately filed a second sale motion, *Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of  Notice Thereof; (V) Approving Bid Protections; and (VI) Granting Related Relief*, (the "Second Sale Motion") [Dkt. No. 811], under which the Debtors proposed a bulk sale of their assets at a "naked" auction.  At the same time the

---

[6] The proposals, including letters of intent, received from various potential purchasers of estate assets were submitted in confidence.  Accordingly, the Equity Committee is disclosing the results of the Debtors' marketing efforts, but not the specifics of any proposals received by the Debtors.

Debtors filed the *Debtors Joint Plan under Chapter 11 of the Bankruptcy Code (*the "Debtors' Plan")
[Dkt. No. 859] which contemplated completion of the sale proposed by the Second Sale Motion.
Ultimately the Debtors withdrew both the Second Sale Motion and the Debtors' Plan.

On June, 15, 2018, the Debtors filed Debtors' Motion For Entry Of An Order (A) Approving
Competitive Bidding And Sale Procedures; (B) Approving Form And Manner Of Notices; (C)
Approving Form Of Asset Purchase Agreement; (D) Approving  Break Up-Fee And Expense
Reimbursement; (E) Scheduling Auction And Hearing To Consider Final Approval Of Sale,
Including Rejection Or Assumption And Assignment Of Related Executory Contracts And
Unexpired Leases; (F) Authorizing Sale Of The Transferred Assets Free And Clear Of All Liens,
Claims, Encumbrances, And Interests; And (G) Approving Settlement With The PacBridge Parties;
And (H) Granting Related Relief (the "2018 Sale Motion"), Docket 1055.  On August 27, 2018, the
Equity Committee filed its Response in Opposition to the Sale Motion, Docket __.  On August 30,
2018, the Bankruptcy Court heard argument respecting the Equity Committee Disclosure Statement,
the Creditor Committee Disclosure Statement, and the Debtor's sale motion relating to approval of
the proposed Bid Procedures.  The Court ordered [insert Court's order re: the Debtors' Sale Motion,
the Equity Committee Disclosure Statement, and the Creditors Committee Disclosure Statement.]

**E.     Plan Mediation.**

In January 2018, the Debtors and the Committees met and agreed to pursue mediation to
resolve the Debtors' Cases (the "Plan Mediation").   On February 26 and 27, 2018, mediation was
held in Atlanta, Ga, with Edward Dobbs as mediator.  Over two days the parties to the mediation
met but were unable to reach agreement on a consensual Chapter 11 plan or other exit strategy.  The
mediation closed without resolution and the Debtors re-embarked upon a process to sell the Debtors
or their assets.

**F.     Use of Cash Collateral and Debtor-in-Possession Financing.**

Lang Feng, Haiping Zou and Jihe Zhang (collectively, the "Lenders") assert liens on the
assets, including cash collateral, of Debtors Premier, Premier Exhibitions Management, Premier
Merchandising, and RMST in connection with a pre-petition loan in the original principal amount
of $3,000,000 (the "Lenders' Loan").  The Equity Committee disputes whether the Lenders' Loan

is secured and asserts that any security interest that may secure the Lenders' Loan may be avoidable under Chapter 5 of the Bankruptcy Code, but has consented to the Debtors use of the alleged cash collateral of the Lenders pursuant to an Order of the Bankruptcy Court (Docket No. 532) authorizing such use (the "Cash Collateral Order"). Under the terms of the Cash Collateral Order, the Lenders are granted a replacement lien on all alleged cash collateral of the Lenders to the same extent, validity and priority as the security interests asserted by the Lenders as of the Petition Date.

On May 18, 2017, the Debtors filed their *Motion for Entry of Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors* (Docket No. 588) (the "DIP Financing Motion"). The DIP Financing Motion sought authority of the Bankruptcy Court for the Debtors to enter into a post-petition loan agreement with Bay Point Capital Partners LP (the "DIP Lender") to obtain debtor-in-possession financing in an amount of up to $5,000,000 in principal amount (the "DIP Loan") upon terms set forth in the DIP Loan agreements. On July 12, 2017, the Bankruptcy Court entered its order granting the DIP Financing Motion (Docket No. 650).

The DIP Loan, *inter alia,* bears an interest rate of 13% per annum and a default interest rate of 18% per annum. It is secured by first priority liens on all assets of the Debtors' Estates, except for avoidance actions under Chapter 5 of the Bankruptcy Code. As of the date of this Disclosure Statement, the Equity Committee is informed that the DIP Loan has been fully drawn.

G. **Debtor-in-Possession Administration.**

1. Retention of Professionals.

During the course of the Chapter 11 Cases, the Debtors and the Committees sought and obtained orders of the Bankruptcy Court authorizing the employment of various professionals. The identities of such professionals, when each was employed and for what purpose, and the order of the Bankruptcy Court authorizing such employment may be summarized as follows:

a. *Debtors' Professionals*

- Nelson Mullins Reilly & Scarborough LLP – general bankruptcy counsel. Order entered August 11, 2016 (Docket No. 128).

- Kaleo Legal – special litigation counsel.  Order entered August 15, 2016 (Docket No. 132).

- McGuireWoods LLP – special litigation counsel.  Order entered on August 15, 2016 (Docket No. 133).

- GlassRatner – financial advisor.  Order entered on December 8, 2016 (Docket No. 372).

- Troutman Sanders LLP – co-counsel for the Debtors.  Order entered on December 16, 2016 (Docket No. 378).

- Carr, Riggs & Ingram – tax advisor.  Order entered on June 26, 2017 (Docket No. 604).

  b.    *Creditors Committee's Professionals*

- Storch Amini & Munves PC – general bankruptcy counsel.  Order entered on October 3, 2016 (Docket No. 249).

- Thames Markey & Heekin, P.A. – local counsel.  Order entered on October 3, 2016 (Docket No. 248).

  c.    *Equity Committee's Professionals*

- Akerman LLP – general bankruptcy counsel.  Order entered on October 13, 2016 (Docket No. 274).

- Landau Gottfried & Berger LLP – general bankruptcy counsel.  Order entered on October 14, 2016 (Docket No. 277).

- Teneo Securities LLC ("Teneo") – financial advisor.  Order entered on December 8, 2016 (Docket No. 371).[7]

---

[7] Pursuant to the Court's Order authorizing the employment of Teneo and agreement between the Equity Committee, the Creditors Committee and Teneo, Teneo also provides its services to the Creditors Committee, without additional expense to the Debtors' Estates.

46220642;1

- Lincoln Partners Advisors LLC ("Lincoln") – financial advisor.[8]  Order entered on July 13, 2017 (Docket No. 652).

- Agentis PLLC—special litigation counsel.  Order entered on May 29, 2018 (Docket 1038).

## III.  THE PLAN.

THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  THE PLAN IS ATTACHED HERETO AS EXHIBIT 1.

### A.  Plan Overview.

The Plan provides for the establishment of a Liquidating Trust which will be vested, as of the Effective Date, with all of Premier's interest in the Premier Entities, together with all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidating Trustee for the benefit of the Debtors' Estates and all having an interest therein.

The Plan provides for the liquidation of all of the Debtors' estates' assets either as going concerns or as individual asset sales.  The Plan provides for the marketing and sale of the French Artifacts by auction, run by Guernsey's.  The Liquidating Trustee also will market and sell the American Artifacts and rights attendant thereto to a Qualified Institution, as defined in the Covenants. Finally, the Plan provides for the Liquidating Trustee to market and sell, or abandon, all remaining Liquidating Trust Assets.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidating Trust, to holders of Allowed Claims and Interests of the proceeds of the sale of the French Artifacts and to thereafter make one or more interim distributions of the proceeds of the Liquidating Trustee's

---

[8] On April 3, 2017, Brent C. Williams and Brendan J. Murphy, hitherto Managing Directors at Teneo, became Managing Directors at Lincoln.  Teneo and Lincoln now jointly serve as financial advisors to the Committees.

administration of the Liquidating Trust Assets, culminating in a final distribution to be made upon the completion of the Liquidating Trustee's administration of the Liquidating Trust Assets.

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Unclassified claims include Administrative Claims – i.e., claims for costs or expenses of administering the Chapter 11 case which are allowed under section 507(a)(1) of the Bankruptcy Code – and Priority Tax Claims.

The Liquidating Trustee will pay all Allowed Administrative Claims, excluding Allowed Priority Tax Claims , in full in Cash on the Effective Date.

In accordance with the Bankruptcy Code, the Plan also classifies certain Claims separately and provides, separately for each Class, that Holders of Allowed Claims will receive various types of consideration, thereby giving effect to the different rights of the Holders in each Class. The following chart summarizes the proposed classification and treatment of the Holders of Allowed Claims under the Plan:

| Class | Claims | Treatment | Status | Voting Rights |
|---|---|---|---|---|
| Class 1 | Non-Tax Priority Claims | Paid in full on the Effective Date | Unimpaired | Deemed to Accept |
| Class 2 | Secured Creditors | Paid in full on the Effective Date | Unimpaired | Deemed to Accept |
| Class 3 | General Unsecured Claims, other than Class 5 Intercompany Claims | Each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Initial Distribution, the Interim Distribution(s) and the Final Distribution from the Liquidating Trust together with interest at the rate of 10% per annum on any outstanding balance. In addition, each Holder of an Allowed Class 3 Claim will receive a premium of up to an additional 20% of their claim from proceeds of the sale of French Artifacts. | Impaired | Entitled to Vote |

| Class | Claims | Treatment | Status | Voting Rights |
|-------|--------|-----------|--------|---------------|
| Class 4 | Premier Equity Interests | After payment of Allowed Class 3 Claims in full, each Holder of a Class 4 Equity Interest shall receive its Pro Rata share of the Initial Distribution, the Interim Distribution(s) and the Final Distribution from the Liquidating Trust. | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled and Holders of Intercompany Claims shall receive nothing under the Plan. | Impaired | Deemed to Reject |

**B.      Limited Consolidation for Voting, Confirmation, and Distribution Purposes.**

The Plan is predicated on the Court providing in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of this Plan, its confirmation and Distributions made pursuant to it.  *See* Plan, Article III.

**C.      Implementation of the Plan.**

      1.      Exit Financing.

On July 24, 2018, the Equity Committee entered into an Exit Facility Term Sheet (the "Term Sheet") with Bay Point Capital Partners, LP ("Bay Point"), the DIP Loan lender, to provide exit financing in connection with the Plan in the form of a senior secured term loan in an aggregate principal amount of up to $7,000,000, upon the terms and conditions described in the Term Sheet (the "Exit Financing").  A copy of the Term Sheet is attached as Exhibit 2 hereto.

The Exit Financing will be used to pay, on the Effective Date of the Plan, (i) the DIP Loan, which the Equity Committee believes, based on information provided by the Debtors, to be approximately $5,112,000, including interest; (ii); priority claims of the Debtors, which the Equity Committee believes, based on information provided by the Debtor to be in the amount of approximately [$252,000], excluding the allowed administrative claims of professionals employed in the Bankruptcy Case, which will be paid when and to the extent such claims become Allowed Claims pursuant to Section II B of the Plan; and (iii) to fund the Liquidating Trust and Liquidating

Trustee's administration of the estate in accordance with the terms of the Plan and the Liquidating Trust Agreement.

The obligation of Bay Point to fund the Exit Financing is conditioned upon the parties' execution of a final agreement, among other conditions.  The Equity Committee expects that such conditions will be satisfied before the hearing on confirmation of the Plan.

> 2.      Employment of the CRO.

On the Effective Date, or as soon thereafter as practicable, the Liquidating Trustee shall be authorized and instructed to employ the CRO.  The CRO will be selected by the Liquidating Trustee, subject to the approval of the Equity Committee.

> 3.      Sale of French Artifacts.

The Liquidating Trustee shall be authorized and instructed to employ Guernsey's to market and auction such French Artifacts as the Liquidating Trustee determines, in his discretion and the exercise of his sound business judgment, as will generate sufficient proceeds to pay at least all Administrative Claims of professionals employed in the Bankruptcy Case that become Allowed Claims pursuant to the terms of the Plan.

> 4.      Disposition of the American Artifacts.

The CRO shall manage and administer the American Artifacts consistent with the Covenants pending disposition of the American Artifacts by the Liquidating Trustee until the American Artifacts and the Remaining French Artifacts are transferred to a Qualified Institution, as defined in the Covenants. The CRO shall offer to employ all employees of Premier who are involved in the preservation, management, and display of the American Artifacts pending their disposition.

The Liquidating Trustee shall offer the American Artifacts for sale only to potential bidders that are Qualified Institutions, as defined in the Covenants, to serve as the subsequent trustee and subsequent salvor-in-possession of the American Artifacts under the Covenants.  Any transfer of the American Artifacts to a successor trustee and salvor shall be subject to approval of the District Court and shall be made only on notice to NOAA and all other parties entitled to notice in the US Artifacts Litigation.

5.      Administration of Liquidating Trust Assets.

From and after the Effective Date the Liquidating Trustee shall be authorized and instructed to administer the Liquidating Trust Assets including, without limitation, the Estate Causes of Action, in a manner that the Liquidating Trustee determines, in the exercise of his sole discretion, after consultation with the CRO and the Oversight Committee, is in the best interests of the Debtors, their Estates and all parties having an interest therein, including, without limitation, by operating one or more of the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities and/or the French Artifacts when and if the Liquidating Trustee in his sole discretion after consultation with the CRO determines any such sale is in the best interests of the Debtors, their Estates and all parties having an interest therein.

6.      Vesting of Assets

On the Effective Date, the Liquidating Trust Assets – comprising all of Premier's right, title and interest in and to the Premier Entities and their respective Assets, including (without limitation) the French Artifacts, the American Artifacts and the Estate Causes of Action – will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests.  On and after the Effective Date, the transfer of the Liquidating Trust Assets from the Premier Estate (as the case may be) to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.  *See* Plan, Art. VI (E).

7.      Establishment of the Liquidating Trust.

On the Effective Date, the Liquidating Trust Agreement will become effective, and, if not previously signed, the Equity Committee, as Plan Proponent, on behalf of the Estate, and the Liquidating Trustee will execute the Liquidating Trust Agreement.  The Liquidating Trust will be directed by an Oversight Committee appointed by the Equity Committee, provided however that until such time as all Allowed Class 3 Claims have been satisfied in full as provided under the Plan, the Creditors Committee shall be entitled to designate one member of the Oversight Committee.

The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury

23

Regulation Section 301.7701-4(d). In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Class 3 Claims and Class 4 Premier Equity Interests. The Holders of such Allowed Class 3 Claims and Class 4 Premier Equity Interests will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement. The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

> 8.    Liquidating Trustee as Representative of the Debtors' Estates.

The Liquidating Trustee will be appointed as the representative of the Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) object to Claims against (including, without limitation, seeking the subordination and/or reclassification of such Claims); (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iii) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Case. As the representative of the Debtors and their Estates, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to the Liquidating Trust Assets assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all litigation pending or the Estate Causes of Action as of the Effective Date and may bring additional claims as the Liquidating Trustee deems appropriate, including through the use of Federal Rule of Bankruptcy Procedure 2004.

> 9.    No Liability of Liquidating Trustee.

The Plan contains customary provisions that, to the maximum extent permitted by law, the Liquidating Trustee, his employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents") will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation

46220642;1

of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement.  *See* Plan, Art. VI  E 5.

          10.      <u>Federal Income Tax Compliance Provisions,</u>

       The Liquidating Trustee will be appointed as the representative of the  Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) control, manage, and liquidate as appropriate all Litigating Trust Assets, (ii) object to Claims against the Estate (including, without limitation, seeking the subordination and/or reclassification of such Claims); (iii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iv) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims and/or Interests; and (v) take such action as required to administer, wind-down, and close the Chapter 11 Case.  As the representative of the Debtors and their Estates, and the individual in control of the Liquidating Trust Assets, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to Estate Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

          11.      <u>Prosecution of Estate Causes of Action by the Liquidating Trustee,</u>

       The Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan in accordance with the terms of the Plan.  All recoveries derived therefrom will be included within the Liquidating Trust Assets.

       "Estate Causes of Action" is defined in the Plan to mean, with respect to each of the Debtors, any and all manner of causes of action, claims, obligations, suits, debts, judgments, demands, rights of offset or recoupment, damages (actual, compensatory or punitive), counterclaims or affirmative defenses, whatsoever, whether in law or in equity including, but not limited to, the claims arising

under or pursuant to sections 541 through 551, inclusive, and section 553, of the Bankruptcy Code, and objections to Filed proofs of Claim.

**D.    Summary of Certain Other Provisions of the Plan.**

          **1.    Court Approval of Professional Fees Required**

By order entered on August 8, 2016 (Docket No. 118), the Bankruptcy Court granted the Debtors' *Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals* (Docket No. 89), pursuant to which the Debtors are authorized to pay, monthly and upon an interim basis pursuant to monthly statements timely filed by such professionals, up to 80% of the fees and 100% of the expenses of each professional employed in the Debtors' Cases.

These interim payments and any and all other professional claims for compensation and reimbursement of expenses incurred by professionals employed in the Cases must be approved, on a final basis, by the Court.  Such professionals must File and serve properly noticed fee applications and the Bankruptcy Court must rule on the applications.  Only the Allowed amount of fees and costs awarded on a final basis by the Bankruptcy Court will be paid under the Plan.  Objections to applications of professionals or others for compensation or reimbursement of expenses must be Filed and served on the Equity Committee and its counsel, as well as other professionals and others to whose application the objection is addressed, in accordance with the Bankruptcy Code, the Bankruptcy Rules or pursuant to any other procedure set forth by an order of the Bankruptcy Court.

          **2.    Deadlines for Filing Claims and Administrative Expenses.**

All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition obligations incurred through the Effective Date in the ordinary course under section 1930 of title 28 of the United States Code) shall be Filed no later than forty-five (45) days after the Effective Date.

          **3.    Priority Tax Claims.**

The Bankruptcy Code requires that each holder of a Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period ending not later than five years after

the date of the bankruptcy filing (in this case, not later than June 14, 2021). The Debtors' Estates will pay all Allowed Priority Tax Claims in full on the Effective Date.

### E.  Executory Contracts and Unexpired Leases.

#### 1.  Assumption.

Upon the Effective Date, the Debtors shall be deemed to assume those executory contracts and unexpired leases which are listed in the Schedule of Executory Contracts and Unexpired Leases exhibit to the Plan Supplement. Pursuant to this Plan, the Debtors will also assume the executory contracts and unexpired leases that are the subject of any specific order of the Bankruptcy Court. The Equity Committee reserves the right to delete any contract or lease from the Schedule of Executory Contracts and Unexpired Leases, thereby rejecting the contract or lease, up until the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Schedule of Executory Contracts and Unexpired Leases and by giving notice to counsel for the non-debtor party to the contract or lease.

#### 2.  Cure Payments.

The Schedule of Executory Contracts and Unexpired Leases to the Plan Supplement specifies the amount of the Cure Payment, if any, that the Equity Committee believes must be tendered on the Effective Date, in order to provide cure and compensation in accordance with sections 365(b)(1)(A) & (B) of the Bankruptcy Code. The deadline for any objections to the Cure Payment amounts set forth in the Schedule of Executory Contracts and Unexpired Leases shall be the date for filing objections to the Plan, and no other objections to such Cure Payment will be timely. In the event that any party to a listed contract or lease on the Schedule of Executory Contracts and Unexpired Leases contends that the Cure Payment amount so listed is incorrect, such party must timely file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof specifying the amounts allegedly owing under sections 365(b)(1)(A) & (B). Failure to timely file and serve such statement shall result in the determination that the tender of the Cure Payment, as specified in the Schedule of Executory Contracts and Unexpired Leases, on the Effective Date, shall

provide cure and compensation for any and all defaults and unpaid obligations under such assumed executory contract or unexpired lease.

In the event that any party to a listed contract or lease specified in the Schedule of Executory Contracts and Unexpired Leases objects to the proposed assumption by any Debtor, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof no later than the date fixed for filing objections to the confirmation of the Plan. Failure timely to file and serve such statement shall result in the determination that the assumption is appropriate. The Equity Committee has the right to respond to any such objections.

Entry of the Confirmation Order shall constitute approval of the assumptions under the Plan pursuant to section 365 of the Bankruptcy Code. All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code shall be made on the Effective Date or as soon thereafter as is practicable or as may otherwise be agreed by the parties to any particular contracts or leases.

3.    <u>Rejection.</u>

With the exception of those executory contracts and unexpired leases that have been previously assumed, assumed pursuant to the Plan, or rejected by order of the Bankruptcy Court, as of the Effective Date, the Debtors shall reject, pursuant to Bankruptcy Code section 365, all other executory contracts and unexpired leases.

4.    <u>General.</u>

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Bankruptcy Court on or before such date as the Bankruptcy Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day, the first Business Day occurring thereafter. Any such Claims which are not filed within such time will be

46220642;1

forever barred from assertion against the Debtors' Estates and their property, or the Liquidating Agent.

     5.    <u>Insurance Policies.</u>

For the avoidance of doubt, the Debtors' rights with respect to all insurance policies under which the Debtors, and each of them, may be a beneficiary (including all insurance policies that may have expired prior to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies entered into by the Debtors after the Petition Date, and all insurance policies under which any Debtor holds rights to make, amend, prosecute and benefit from claims), are retained and will be transferred or assigned to the Liquidating Trust pursuant to this Plan. Notwithstanding any provision providing for the rejection of executory contracts, any insurance policy that is deemed to be an executory contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a specific motion by the Liquidating Trustee who shall retain the right to assume or reject any such executory contracts pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code following the Effective Date.

    **F.**    **<u>Claims Allowance Process.</u>**

     1.    <u>Resolution of Disputed Claims.</u>

As of the Effective Date, the Liquidating Trustee will have sole authority for investigating, administering, monitoring, implementing, litigating and settling all Disputed Claims. From and after the Effective Date, the Liquidating Trustee will have the sole and exclusive right to make and file, and to prosecute, objections to Claims, including, but not limited to, Administrative Expenses and Priority Tax Claims. All objections shall be filed prior to the Liquidating Trustee Claim Objection Deadline and served upon the Holder of the Claim to which the objection is made.

     2.    <u>Reserve for Disputed Claims.</u>

Under the Plan, Cash which would be issued and distributed on account of holders of Disputed Claims in the event that such Disputed Claims become Allowed Claims, will instead be placed in a Disputed Claims Reserve maintained by the Liquidating Trustee. Such Cash in the Disputed Claims Reserve will be reserved for the benefit of holders of such Disputed Claims, pending determination of their entitlement thereto. Unless the Bankruptcy Court orders otherwise,

the Liquidating Trustee will reserve Pro Rata distributions for such Disputed Claims based upon the full amount of the Disputed Claims or (a) in the case of a Disputed Class 3 Claim, in the full amount of the Allowed Class 3 Claim Amount, and (b) in the case of a Disputed Claim that is an Administrative Claim, Cash in the full amount of such Disputed Claim. No reserve shall be required for any Disputed Claim to the extent of any effective insurance coverage therefore. Such Cash so reserved will be distributed by the Liquidating Trustee to the holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash will be allocated among holders of Allowed Claims in the Class in which the Disputed Claim was classified, as provided in the Plan.

Prior to or on the Final Distribution Date, the Liquidating Trustee will make all distributions on account of any Disputed Claim that has become an Allowed Claim and remains unpaid as of the Final Distribution Date. To the extent that any portion of a Disputed Claim is not disputed, the Liquidating Trustee may establish a reserve in the Disputed Claims Reserve only on account of that portion of the Disputed Claim that is in dispute and may make one or more interim Distributions on account of the portion of such Disputed Claim that is not in dispute.

The Liquidating Trustee may, at the Liquidating Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor liquidating trust. If the election is made, the Liquidating Trustee will comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

    **G.**       **Distributions.**

        1.       <u>Generally.</u>

Distributions to be made on account of Allowed Claims, other than Allowed Class 3 Claims and Class 4 Premier Equity Interests, shall be made on the Effective Date, unless otherwise provided

46220642;1

for in the Plan or ordered by the Bankruptcy Court. The dates for Distributions by the Liquidating Trust on account of Allowed Class 3 Claims and Class 4 Premier Equity Interests will be selected by the Liquidating Trustee. Such Distributions will be made as soon as practicable after the Effective Date, *provided, however*, that the Liquidating Trustee shall cause to be held, commencing as of the Effective Date, the marketing and auction of up to 50 such French Artifacts as the Liquidating Trustee determines, in his discretion and the exercise of his sound business judgment, as will generate sufficient proceeds to pay at least all Administrative Claims that become Allowed Claims pursuant to the terms of the Plan.

2.     Manner of Payment.

Any payment of Cash made by the Liquidating Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

3.     Distributions of Property Other Than Cash.

Any distribution under the Plan of property other than Cash shall be made by the Liquidating Trustee in accordance with the terms of the Plan.

4.     Setoffs.

The Liquidating Trustee may set off against any Claim any claims of any nature whatsoever that the Liquidating Trust may have against the Holder of such Claim. Neither the failure to effect such set off nor the allowance of any Claim that otherwise would be subject to set off, shall constitute a waiver or release by the Liquidating Trust of any such claim the Liquidating Trust may have against such Holder.

5.     Distribution of Unclaimed Property.

Any distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one year following the Effective Date or (ii) ninety (90) days after such distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

46220642;1

6.    Delivery of Distributions, Address of Holder

For purposes of all notices and Distributions under this Plan, the Liquidating Trustee shall be entitled to rely on the name and address of the holder of each Claim as shown on, and Distributions to holders of Allowed Claims shall be made by regular U.S. first class mail to, the following addresses:  (a) the address set forth on in the proofs of Claim Filed by such holders; (b) the address set forth in any written notice of address change delivered by the holder to the Debtor concerned or Liquidating Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on the Schedules if no proof of Claim is Filed and the Debtor concerned or Liquidating Trustee has not received a written notice of a change of address.  The Liquidating Trustee shall be under no duty to attempt to locate holders of Allowed Claims who are entitled to unclaimed Distributions.

**H.    Effectiveness of Plan.**

1.    Conditions Precedent.

The Effective Date shall occur sixty (60) business days after the Bankruptcy Court shall have entered the Confirmation Order, which order shall not have been amended, modified, reversed, vacated, enjoined or stayed, including being stayed pending appeal.

2.    Waiver of Conditions.

Notwithstanding the foregoing, the conditions to confirmation of this Plan and to the Effective Date may be waived by the Equity Committee or the Liquidating Trustee, as the case may be, without notice, leave, or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

3.    Notice of the Effective Date.

As soon as practicable after the Effective Date has occurred, the Liquidating Trustee shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

**I.    Retention of Jurisdiction.**

The Plan provides that the Bankruptcy Court will retain and have exclusive jurisdiction to the fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to the Chapter 11 Case or the Plan, including but not limited to the following:

(i)     To hear and determine pending motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if any are pending as of the Effective Date, the determination of any cure payments related thereto, and the allowance or disallowance of Claims resulting therefrom;

(ii)    To hear and determine pending motions for sale of assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code, if any are pending as of the Effective Date;

(iii)   To determine any and all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Bankruptcy Cases;

(iv)   To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(v)    To hear and determine any objections to Administrative Expenses and to Proofs of Claims filed both before and after the Effective Date, and to allow or disallow any Disputed Claim in whole or in part;

(vi)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vii)  To issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

(viii) To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(ix)   To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(x)  To hear and determine any disputes arising in connection with the interpretation; implementation, execution, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(xi)  To hear or determine any action to recover assets of the Debtors' estates, wherever located, including any and all Estate Causes of Action (including, without limitation, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and all non-avoidance actions owned by the Debtors' estates including, but not limited to, claims of tort, breach of contract and claims lying in law or equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise;

(xii)  To hear or determine any action to recover assets of the Debtors' Estates, wherever located, including any and all Estate Causes of Action;

(xiii)  To hear and determine any actions or matters related to Estate Causes of Action and the Premier Insider Claims, whether or not such actions or matters are pending on the Effective Date;

(xiv)  To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)  To hear any other matter not inconsistent with the Bankruptcy Code; and

(xvi)  To enter a Final Decree closing the Bankruptcy Cases.

**J.**     **Limitation of Liability, Releases and Injunction.**

1.      Exculpation.

Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date, the Debtors, the Equity Committee, the Creditors Committee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case,

46220642;1

including, without limiting the generality of the foregoing, all sales of assets of any Debtor's Estate, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the negotiation, formulation, and/or consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan or any acts or omissions taken with respect to any contract, instrument, release or other agreement or document created in connection with the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code. Notwithstanding the foregoing, this provision of the Plan is not intended to waive or release any cause of action based on prepetition actions or conduct, including but not limited to any Estate Causes of Action.

    2. <u>Injunction Enjoining Holders of Claims and Equity Interests.</u>

    The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests. To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors arising prior to the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtors, their Estates, the Liquidating Trust or its property (other than actions brought to enforce any rights or obligations under the Plan):

    (i) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

    (ii) Enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien, security interest or encumbrance against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets; and

(iv)     proceeding in any manner in any place whatsoever against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets, that does not conform to or comply with the provisions of the Plan.

3.     Nondischarge of the Debtors.

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**K.     Revocation or Withdrawal of the Plan.**

The Equity Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Equity Committee revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or their Estates or any other person or to prejudice in any manner the rights of the Debtors or their Estates or any person in any further proceedings involving the Debtors or any of them.

**L.     Modification of the Plan.**

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Equity Committee.  After the Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

46220642;1

**M.**     **Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code.  The Liquidating Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Bankruptcy Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Disbursing Agent under the Plan.  After the Effective Date and until the Chapter 11 Case is closed, the Liquidating Trustee shall file with the Office of the United States Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

**N.**     **Governing Law.**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

**O.**     **Withholding, Reporting, and Payment of Taxes.**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Liquidating Trustee shall report and pay taxes on the income of the Liquidating Trust Assets, if any, as required by applicable law.  In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

46220642;1

## IV.  **CONFIRMATION PROCEDURE.**

For the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met.  These include, among others, the requirements that the Plan: (i) is accepted by all impaired Classes of Claims and Interests; (ii) is feasible; and (iii) is in the "best interest" of Holders of Claims and Equity Interests in each class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Bankruptcy Court.  A Confirmation Hearing with respect to the Plan is scheduled to commence on_____ __, 2018, at __:__ _.m.  At the confirmation hearing, the Equity Committee will request the Bankruptcy Court to confirm the Plan on the basis that all confirmation requirements have been satisfied.

### A.  **Voting; Acceptance.**

Any Holder of a Claim in an impaired Class is entitled to vote if either (i) such Holder's Claim has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent, unknown, or unliquidated), or (ii) such Holder has filed a proof of Claim on or before the deadline previously fixed by the Bankruptcy Court and such Claim is deemed allowed pursuant to section 502 of the Bankruptcy Code or has been allowed by the Bankruptcy Court, unless such Claim has been disallowed for voting purposes by the Bankruptcy Court, or is disallowed under the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of Class 4 Equity Interests as of the Record Date will be entitled to vote to accept or reject the Plan.

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

46220642;1

Impaired Class 3 Claims will have accepted the Plan if (i) the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in Class 3 have voted to accept the Plan and (ii) more than one-half in number of the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in each such Class have voted to accept the Plan.

Impaired Class 4 Interests shall have accepted the Plan if the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Interests actually voting in Class 4 have voted to accept the Plan (other than any entity designated under section 1126(e) of the Bankruptcy Code).

### B.   <u>Confirmation Hearing.</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Equity Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy Rules and Local Bankruptcy Rules. Objections must be filed and served pursuant to the Confirmation Notice in the manner set forth therein, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.       The Plan complies with the applicable provisions of the Bankruptcy Code.

2.       The Equity Committee, as Plan Proponent, has complied with the applicable provisions of the Bankruptcy Code.

3.       The Plan has been proposed in good faith and not by any means proscribed by law.

4.       Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable

5.       Each Holder of an impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claims, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Estate were liquidated on such date under Chapter 7 of the Bankruptcy Code.

6.       Unless the Equity Committee proposes a nonconsensual plan of liquidation, each class of Claims has either accepted the Plan or is not impaired under the Plan.

7.       Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and such Other Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full on the Effective Date and that holders of Priority Tax Claims will receive on account of such Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

8.       At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

9.       The Plan contemplates the disposition of all of the assets of the Debtors' Estates and the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity Interests in order of priority and as provided for in the Plan.

The Equity Committee believes that the Plan will be accepted by at least one of the Classes entitled to vote to accept or reject the Plan and will satisfy all the statutory requirements of Chapter

46220642;1

11 of the Bankruptcy Code, that the Equity Committee has complied or will have complied with all of the requirements of Chapter 11, and that the Plan is being proposed and submitted in good faith.

     **C.**     **<u>Feasibility.</u>**

     The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless liquidation is contemplated by the Plan. Here, the Exit Financing will be used to pay, on the Effective Date of the Plan, (i) the DIP Loan, which the Equity Committee believes, based on information provided by the Debtors, to be approximately $5,112,000, including interest; (ii); priority claims of the Debtors, which the Equity Committee believes, based on information provided by the Debtor to be in the amount of approximately [$252,000], excluding the allowed administrative claims of professionals employed in the Bankruptcy Case, which will be paid when and to the extent such claims become Allowed Claims pursuant to Section II B of the Plan; and (iii) to fund the Liquidating Trust and Liquidating Trustee's administration of the estate in accordance with the terms of the Plan and the Liquidating Trust Agreement. Further, the Plan contemplates that all of Premier's right, title and interest in the Premier Entities will be vested in the Liquidating Trust on the Effective Date and that the Liquidating Trustee will employ Guernsey's to undertake a process of marketing and selling the French Artifacts to fund the Initial Distribution. It further provides for the retention of the CRO to assist the Liquidating Trustee in his administration of the Liquidating Trust Assets including, without limitation, by operating the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities in the best interests of the Debtors, their Estates and all parties having an interest therein and to make Interim Distribution(s) and a Final Distribution from the Liquidating Trust. As such, the Plan essentially provides for a controlled and orderly administration and liquidation of the assets of the Debtors' Estates, and is not likely to or the need for further financial reorganization of the Debtor.

     **D.**     **<u>Best Interest Test.</u>**

     Confirmation of the Plan requires that each Holder of an impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective

Date, that is not less than the value such Holder would receive or retain if the Debtors' Estates were liquidated under chapter 7 of the Bankruptcy Code.

The Equity Committee has determined that confirmation of the Plan will provide each Holder of a Claim or Class 4 Equity Interest with a recovery that is not less than that which it would receive pursuant to a liquidation of the Debtors' Estates under Chapter 7 of the Bankruptcy Code. This determination is based upon a consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to such Holders. *See* Liquidation Analysis attached hereto as Exhibit 3. *See, also*, Declaration of Arlan Ettinger in support of retention of Guernsey's to sell the French Artifacts, attached hereto as Exhibit 5.

Conversion of the Debtors' Cases to Chapter 7 at this stage would simply add complexity and additional layers of administrative expenses which would only serve to diminish the distributions to all creditors and Interest Holders.

As such, the distributions to creditors will likely be larger under the Plan. Additionally, distributions to creditors contemplated by the terms of the Plan will be made more quickly than any likely distribution that would be made by a Chapter 7 trustee because a Chapter 7 trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Estates.

Based on the foregoing, the Equity Committee believes that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a conversion of the Debtors' Cases to Chapter 7 case and the appointment of a Chapter 7 trustee.

V.      **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.**

The Equity Committee believes that the Plan affords Holders of Claims and Interests the potential for the greatest feasible realization out of the Debtors' Estates, and, therefore, is in the best interest of such Holders. The Equity Committee has considered alternatives to the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code. In the opinion of the Equity Committee, such alternatives would not afford Holders of Claims and Interests a return greater than that achieved under the Plan.

46220642;1

THE EQUITY COMMITTEE BELIEVES THAT CONFIRMATION AND
IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE
ALTERNATIVES DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE
GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND
LOWER ADMINISTRATIVE COSTS.

## VI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES.

### A.  Introduction.

The following discussion summarizes certain federal income tax consequences of the
implementation of the Plan to the Holders of Class 2 and 3 Claims and Class 4 Premier Interests
who receive Distributions under the Plan.  The following summary does not address the federal
income tax consequences to Holders of any other Claims and Claims that are not Impaired by the
Plan.  The following summary is based on the Internal Revenue Code of 1986, as amended ("IRC"),
Treasury regulations promulgated and proposed thereunder, judicial decisions and published
administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the
date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and
could significantly affect the federal income tax consequences described below.  Further, any
discussion of the Liquidating Trust and the powers, obligations and/or actions of the Litigating
Trustee that may be set forth below is subject to the applicable provisions of the Plan and the
Liquidating Trust Agreement; if and to the extent that there is any inconsistency between such
discussion on one hand and the Plan and the Liquidating Trust Agreement on the other hand, the
terms of the latter documents shall control.  Holders of Claims and Premier Equity Interests should
read the Plan and the Liquidating Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant
uncertainties.  The Equity Committee has not requested a ruling from the IRS or an opinion of
counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the
interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not
address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal
income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers,

43

broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Holders that hold Claims or Premier Equity Interests as part of a hedge, straddle or conversion transaction, Holders who acquired their Claims as compensation, and Holders who do not hold their Claims and Premier Equity Interests as capital assets).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR PREMIER EQUITY INTEREST. ALL HOLDERS OF CLAIMS OR PREMIER EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

> **B.**   **Consequences to the Debtor.**

The transfer of the Liquidating Trust Assets to the Liquidating Trust may result in the Debtor recognizing gain or income, depending in part on the value of such assets on the Effective Date and the adjusted basis of such assets on the Effective Date.

> **C.**   **Consequences to Holders of Allowed Class 3 Claims and Class 4 Premier Interests.**

> > **1.**   **Recognition of Gain or Loss Generally.**

Pursuant to the Plan, on the Effective Date, each Holder of an Allowed 3 Claim and Class 4 Premier Equity Interest will receive an interest in the Liquidating Trust, which is a beneficial interest in the Liquidating Trust, entitling the holder thereof to distributions from the Liquidating Trust as provided for in the Plan and in the Liquidating Trust Agreement. Except to the extent that the holder of an Allowed Claim or Premier Equity Interest, or beneficial interest therein, agrees to a different treatment, said Persons will receive on account of their Allowed Claim or Premier Equity Interest, in full and complete satisfaction thereof, from the Liquidating Trust, one or more Pro Rata Distributions based upon the amount of the respective Holder's Allowed Claim or Premier Equity

44

Interest, in accordance with the priorities of the Plan. In general, each holder of such an Allowed Claim or Premier Equity Interest will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including, as discussed below, its undivided interest in the Liquidating Trust Assets) that such Allowed Claim or Premier Equity Interest holder receives in satisfaction of its Claim or Premier Equity Interest (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims), and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest) or Premier Equity Interest, as applicable. For a discussion of the U.S. federal income tax consequences of any Claim for accrued interest, *see* Section 2 below.

Where a Holder recognizes gain or loss in respect of its Allowed Claim or Premier Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim or Premier Equity Interest constitutes a capital asset in the hands of the Holder and how long it has been so held, whether, in the case of an Allowed Claim, the Holder had acquired the Claim at a market discount, and, in the case of an Allowed Claim, whether and to what extent the Holder had previously claimed a bad debt deduction. A Holder that holds its Premier Equity Interest as a capital asset will recognize capital gain or loss. A Holder that purchased its Allowed Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

The Liquidating Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, each holder of an Allowed Claim and Premier Equity Interest receiving a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax

purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidating Trust Assets (*see* Section 3 below). As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee (if reasonably deemed necessary or desirable by the Liquidating Trustee) will make or have caused to be made a good faith valuation of the Liquidating Trust Assets of the Liquidating Trust, and all parties, including the Holders of Allowed Claims and Premier Equity Interests, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidating Trust may receive more than one Distribution subsequent to the Effective Date, the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim or Premier Equity Interest may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders of such Allowed Claims and Premier Equity Interests are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims or Premier Equity Interests.

After the Effective Date, any amount that a Holder receives on account of an Allowed Claim or Premier Equity Interest as a Distribution from the Liquidating Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) generally should not be included for federal income tax purposes in the Holder's amount realized in respect of its Allowed Claim or Premier Equity Interest, but should be separately treated as a distribution received in respect of such Holder's beneficial (ownership) interest in the Liquidating Trust.

In general, a Holder's tax basis in any beneficial interest received (and undivided interest in the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate share of the Liquidating Trust Assets on the Effective Date. The holding period for such assets generally will begin the day following the Effective Date.

2.      Distributions in Payment of Accrued but Unpaid Interest.

Distributions to any Holder of an Allowed Class 2 or 3 Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a Holder of debt receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such Holder generally recognizes taxable interest income in such amount (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

3.      Tax Treatment of the Liquidating Trust and Holders of Interests Therein.

On the Effective Date, the Liquidating Trust will be established for the benefit of Holders of all Allowed Claims and Premier Equity Interests. The Liquidating Trust is intended to qualify and be treated as a "grantor" (i.e., a pass-through tax entity), rather than as a separate taxable entity. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries of the Liquidating Trust) are required for federal income tax purposes to treat the Liquidating Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidating Trust as a grantor

47

trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as a transfer of such Liquidating Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidating Trust Assets to the Liquidating Trust. Consistent therewith, all parties must treat the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidating Trust Assets for all U.S. federal income tax purposes. Each such Person will have a tax basis in its proportionate share of the Liquidating Trust Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidating Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidating Trustee will (if reasonably deemed necessary or desirable by the Liquidating Trustee) make or have caused to be made a good faith valuation of the Liquidating Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim or Class 4 Premier Equity Interest receiving a beneficial interest in the Liquidating Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidating Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a Holder are not dependent upon the Liquidating Trust distributing any Cash or other proceeds. Therefore, a Holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidating Trust

regardless of the fact that the Holder has not received any prior or concurrent Distribution. Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidating Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidating Trust Assets.

The assets set aside or reserved to fund the payment of the Disputed Claims Reserve will be treated and taxed for federal income tax purposes similar to the other assets transferred and held by the Liquidating Trust (i.e. the reserved assets will be treated as transferred to the grantor Liquidating Trust owned by the Holders) unless the Liquidating Trustee files a tax election to treat the Disputed Claim Reserve as a Disputed Ownership Fund. Under the Plan, the Liquidating Trustee is allowed, for federal income tax purposes, to treat the Disputed Claims Reserve as either (a) a part of the assets of the grantor Liquidating Trust owned by the Beneficiaries (i.e., the Beneficiaries, rather than the Liquidating Trust, will pay tax on their share of Tax Items, as that term is defined in the Liquidating Trust, attributable to the Disputed Claims) or (b) a Disputed Ownership Fund ("DOF"), taxable under IRC Section 468B and Treasury Income Tax Regulation Section 1.468B-9 (separate taxable entity). If the Liquidating Trustee fails to file a DOF tax election, the tax consequences with respect to the transfer of assets used to fund the Disputed Claims reserve will be the same as described above for the other assets transferred by the Debtor to the Liquidating Trustee.

If the Liquidating Trustee files a tax election to treat the Disputed Claims reserve accounts as a DOF, then the DOF will be treated as a separate taxable entity for federal income tax purposes (rather than a pass-through tax entity) that is required to file federal income tax returns and pay any federal income tax due with respect to Tax Items that are attributable to the Disputed Claims. All of the federal income tax liability of the DOF will reduce the distributions of all of the Holders, including the Disputed Claimants. The DOF will be taxed for federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the fund by or on behalf of transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of IRC Section 468B and the Treasury Income Tax Regulations thereunder (a "QSF"), if all the assets transferred to the fund are passive investment assets. For purposes of determining the DOF's federal income

tax liability, a DOF is not required to report as income transfers of assets to the DOF, but is required to include in income all income received or accrued from the assets transferred to the DOF. The DOF is not allowed a tax deduction for a distribution of disputed assets or the net after tax income earned by the DOF made to a Holder. The initial tax basis of assets transferred to a DOF is the fair market value of the asset determined on the date of transfer to the DOF, and the DOF's holding period begins on the date of the transfer.

4.  <u>Tax Reporting.</u>

Except to the extent of the Liquidating Trust Assets with respect to which there is a DOF tax election, all parties (including the Debtors, the Liquidating Trustee and the Holders) shall, for all federal income tax purposes, treat the transfer of assets to the Liquidating Trust in accordance with the terms of the Plan as a transfer of such assets directly to the Holders, followed by the transfer thereof by such Holders to the Liquidating Trust. Consistent therewith, for federal income tax purposes, all parties shall treat the Liquidating Trust as a grantor trust of which such Holders are the owners and grantors. Thus, such Holders (and any subsequent Holders) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidating Trust for all federal income tax purposes. The Liquidating Trustee will determine the fair market value of the assets, and all parties, including the Holders, must consistently use such valuation for all federal income tax purposes.

The Liquidating Trustee will file with the Internal Revenue Service tax returns as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidating Trustee will also send to each Holder a separate statement setting forth the Holder's share of the Liquidating Trustee's Tax Items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Each of the Holders will be required to report on his/her federal income tax return(s) the Holder's allocable share of any Tax Items such as income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust and that is set forth on the tax statement provided to the Holder. The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deduction or losses may depend on the particular situation of the Holder.

The federal income tax reporting obligation of the Holders is not dependent upon the Liquidating Trustee's distribution of cash or other proceeds.  Therefore, Holders may receive Tax Items in a taxable year regardless of the fact that the Liquidating Trustee has not made, or will not make, any concurrent or subsequent distributions to the Holders.  If a Holder does not receive distributions from the Liquidating Trustee commensurate with the Tax Items allocated to it, the Holder may be entitled to a subsequent loss or deduction.

If the Liquidating Trustee files a DOF tax election with respect to the Disputed Claims Reserve then, for federal income tax purposes, the Liquidating Trustee will file a tax return for the DOF and pay any federal income tax due.

For federal income tax purposes, Disputed Claimants are not treated as transferring assets to the DOF.  The taxability of distributions to Disputed Claimants is determined by reference to the Disputed Claim in which the distribution is made.

5.      Information Reporting and Backup Withholding.

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain Distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

51

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING UPON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## VII.  FEES AND EXPENSES.

The expenses of seeking acceptances of the Plan and of other aspects of Plan proceedings have been and will be borne by the Debtors' Estates.  The solicitation has been and is being made principally by mail.  Arrangements also have been or will be made with brokerage houses and other custodians, nominees, and fiduciaries to forward this Disclosure Statement, Ballots, and other pertinent materials to the beneficial holders of the Debentures.  The Debtors' Estates have reimbursed and will reimburse such forwarding agents for reasonable out-of-pocket expenses incurred by them, but no compensation has been or will be paid for their services.

In addition to the foregoing, the Debtors' Estates are obligated to pay fees and reimburse expenses for the various professionals employed in connection with the Chapter 11 Cases to the extent such fees and expenses are allowed by the Bankruptcy Court.

## VIII.  SUMMARY OF ADDITIONAL SOURCES OF INFORMATION.

Additional sources of information regarding the Debtors and documents relating to the Plan are available to holders of Claims and Equity Interests.  The following is a summary of certain documents and the places they can be reviewed or obtained:

A.      Both prior to and after the Petition Date, the Debtors filed documents with the Securities and Exchange Commission ("SEC") in accordance with the informational requirements of the 1934 Act.  Copies of such material can be obtained from the Public Reference Section of the

46220642;1

SEC at 450 Fifth Street, NW, Washington, D.C. 20549, at prescribed rates.  Certain of such material

may be accessible via online computer at https://www.sec.gov/cgi-bin/browse-

edgar?company=premier+exhibitions&owner=exclude&action=getcompany .

      B.     Orders of the Bankruptcy Court and related papers pertaining to transactions outside

of the Debtors' ordinary course of business may be inspected at the office of the Clerk of the

Bankruptcy Court located at 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202 or

maybe accessed at the Committee's website, http://www.jndla.com/cases/premiercommittee, under

"Court Docket."

      C.     The Debtors' Schedules of Assets and Liabilities, Statement of Affairs, and

Schedules of Executory Contracts and Unexpired Leases, as amended, may be inspected at the office

of the Clerk of the Bankruptcy Court located at 300 North Hogan Street, Suite 3-150, Jacksonville,

Florida 32202 or maybe accessed at the Committee's website,

http://www.jndla.com/cases/premiercommittee, under "Court Docket".

      D.     Periodic post-petition financial reports as filed with the OUST may be inspected at

the Office of the OUST located at:

      Office of the United States Trustee

      George C. Young Federal Building

      400 West Washington Street, Suite 1100

      Orlando, Florida 32801

      Phone: (407) 648-6301

      Facsimile: (407) 648-6323

      Email: USTP.Region21@usdoj.gov

Or may be accessed at the Committee's website, http://www.jndla.com/cases/premiercommittee,

under "Court Docket."

## IX.    **RECOMMENDATION AND CONCLUSION.**

      The Equity Committee believes that confirmation and implementation of the Plan are

preferable to any of the feasible alternatives because the Plan will provide substantially greater

recoveries for holders of Claims. Accordingly, the Equity Committee urges holders of Claims and Interests in the Voting Classes to accept the Plan.

DATED: 9/28, 2018

OFFICIAL EQUITY SECURITY HOLDERS COMMITTEE.

By:

**SUBMITTED BY:**

By: */s/ Peter J. Gurfein*
Peter J. Gurfein
**LANDAU GOTTFRIED & BERGER LLP**
1801 Century Park East, Suite 700
Los Angeles, California 90067
(310) 557-0050
(310) 557-0056 (Facsimile)
pgurfein@lgbfirm.com

-and-

**AKERMAN LLP**

By: */s/ Jacob A. Brown*
Jacob A. Brown
Florida Bar No. 170038
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (Facsimile)
Jacob.brown@akerman.com

Attorneys for the Official Committee of Equity
Security Holders of Premier Exhibitions, Inc.

46220642;1

# Exhibit 1

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

        Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

# AMENDED CHAPTER 11 PLAN OF
# REORGANIZATION PROPOSED BY THE
# OFFICIAL COMMITTEE OF EQUITY SECURITY
# <u>HOLDERS OF PREMIER EXHIBITIONS, INC.</u>

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

# TABLE OF CONTENTS

I.     DEFINITIONS AND RULES OF CONSTRUCTION ........................................................ 1

     A.    Defined Terms. ............................................................................................................ 1

     B.    Other Terms. ............................................................................................................. 11

     C.    Computation of Time. .............................................................................................. 11

     D.    Exhibits. .................................................................................................................... 12

II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
     INTERESTS .................................................................................................................... 12

     A.    Summary. .................................................................................................................. 12

          Premier and Intercompany Claims ......................................................................... 12

     B.    Unclassified Claims (All Debtors). ......................................................................... 12

          Administrative Expense Claims. ............................................................................. 12

     C.    Classification and Treatment (Classes 1 – 4 Premier Claims and Class 5
          Intercompany Claims). ............................................................................................. 14

          Class 1:  Other Priority Claims. .............................................................................. 14

          Class 2:  Secured Claims. ........................................................................................ 15

          Class 3:  General Unsecured Claims. ...................................................................... 15

          Class 4:  Premier Equity Interests .......................................................................... 16

          Class 5: Intercompany Claims ................................................................................ 17

III.   LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND
     DISTRIBUTION PURPOSES. ...................................................................................... 17

IV.   ACCEPTANCE OR REJECTION OF THE PLAN ...................................................... 18

     A.    Voting Classes. ......................................................................................................... 18

     B.    Record Date for Holders of Impaired Class 4 Premier Equity Interests. .............. 18

     C.    Voting Rights of Holders of Disputed Claims. ...................................................... 18

     D.    Acceptance by Impaired Classes. ............................................................................ 18

     E.    Acceptance by Impaired Interests. .......................................................................... 19

     F.    Presumed Acceptance of the Plan. ......................................................................... 19

G.     Presumed Rejection of the Plan. ........................................................... 19

V.     PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR
UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES. ........................... 19

     A.     Resolution of Disputed Claims. ........................................................... 19

     B.     Reserve for Disputed Claims. ............................................................... 19

VI.     IMPLEMENTATION OF THE PLAN ................................................................... 20

     A.     Employment of the CRO. ..................................................................... 21

     B.     Disposition of the French Artifacts. ..................................................... 21

     C.     Disposition of the American Artifacts .................................................. 21

     D.     Administration of Liquidating Trust Assets. ......................................... 21

     E.     Vesting of Assets. ................................................................................ 22

     F.     Establishment of the Liquidating Trust. ............................................... 22

          1. Beneficiaries. ...................................................................................... 23

          2.     Implementation of Liquidating Trust. ..................................... 23

          3.     Transfer of Liquidating Trust Assets. ...................................... 23

          4.     Representative of the Debtors' Estates. .................................... 24

          5.     No Liability of Liquidating Trustee. ........................................ 24

          6.     Provisions Relating to Federal Income Tax Compliance. ......... 25

     G.     Prosecution of Estate Causes of Action by the Liquidating Trustee. ..... 26

VII.     DISTRIBUTIONS UNDER THE PLAN ................................................................ 26

     A.     In General. ........................................................................................... 26

     B.     Manner of Payment Under the Plan. ..................................................... 27

     C.     Manner of Distribution of Other Property. ............................................ 27

     D.     Setoffs. ................................................................................................ 27

     E.     Distribution of Unclaimed Property. ..................................................... 27

     F.     De Minimus Distributions. ................................................................... 28

     G.     Saturday, Sunday or Legal Holiday. ..................................................... 28

     H.     Delivery of Distributions, Address of Holder. ...................................... 28

VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........................................28

    A.    Assumption..........................................................................................................28

    B.    Assumption and Cure Payment Objection. ........................................................29

    C.    Rejection.............................................................................................................30

    D.    General. ..............................................................................................................30

    E.    Insurance Policies. .............................................................................................31

IX. EFFECTIVENESS OF THE PLAN .....................................................................................31

    A.    Conditions Precedent..........................................................................................31

    B.    Waiver of Conditions. .......................................................................................31

    C.    Notice of Effective Date.....................................................................................32

X. RETENTION OF JURISDICTION .......................................................................................32

XI. LIMITATION OF LIABILITY, RELEASES AND INJUNCTION. ...............................34

    A.    Exculpation.........................................................................................................34

    B.    Injunction Enjoining Holders of Claims Against and Equity Interests in the
              Debtors. .............................................................................................................35

    C.    No Discharge of the Debtors. .............................................................................35

XII. MISCELLANEOUS PROVISIONS ....................................................................................36

    A.    Payment of Statutory Fees. ................................................................................36

    B.    Headings.............................................................................................................36

    C.    Binding Effect. ...................................................................................................36

    D.    Revocation or Withdrawal. ................................................................................36

              Right to Revoke..................................................................................................36

              Effect of Revocation...........................................................................................37

    E.    Governing Law. ..................................................................................................37

    F.    Withholding, Reporting, and Payment of Taxes. ...............................................37

    G.    Other Documents and Actions. ..........................................................................37

    H.    Modification of the Plan.....................................................................................38

    I.    Notices................................................................................................................38

J.  Severability of Plan Provisions. ................................................................. 40

K.  Successors and Assigns. .......................................................................... 40

L.  Post-Effective Date Notice. ....................................................................... 40

The Official Committee of Equity Security Holders (the "Equity Committee") of Premier Exhibitions, Inc. ("Premier"), Chapter 11 Debtor in Case No. 3:16-bk-02232-PMG proposes the following Chapter 11 Plan (along with any amendments, supplements or exhibits hereto, collectively, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code for the resolution of all Claims against and interests in the following jointly administered Chapter 11 debtors (collectively, "Debtors" and each a "Debtor"): Premier; RMS Titanic, Inc. ("RMST") (Case No. 3:16-bk-02230-PMG); Premier Exhibitions Management, LLC ("Exhibitions Management") (Case No. 3:16-bk-02233-PMG); Arts and Exhibitions International, LLC ("AEI") (Case No. 3:16-bk-02238-PMG); Premier Exhibitions International, LLC ("Exhibitions International") (Case No. 3:16-bk-02234-PMG ); Premier Exhibitions NYC, Inc. ("Exhibitions NYC") (Case No. 3:16-bk-02235-PMG); Premier Merchandising, LLC ("Merchandising") (Case No. 3:16-bk-02236-PMG); and Dinosaurs Unearthed Corp. ("DUC") (Case No. 3:16-bk-02237-PMG) and their respective bankruptcy estates.

The Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders ("Disclosure Statement"), which accompanies the Plan, discusses the Debtors' history, business, contracts, leases, results of operations, resolution of material disputes, significant potential litigation, financial projections for the liquidation and distribution of the Debtors' assets, and contains a summary discussion of the Plan. Holders of Claims are encouraged to read the Disclosure Statement before voting to accept or reject the Plan.

Following solicitation of acceptances for the Plan, the Equity Committee, as Plan proponent, will seek the Bankruptcy Court's confirmation of the Plan. No solicitation materials other than the Disclosure Statement and any schedules, exhibits or letters attached thereto or referenced therein have been authorized by the Equity Committee or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

# I.    DEFINITIONS AND RULES OF CONSTRUCTION

## A.    Defined Terms.

1

As used herein, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural, and masculine and feminine forms of the terms defined):

1.      "Administrative Expense" means any cost or expense of administration of the Debtors' jointly administered Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Debtors' Estates, any actual and necessary post-petition expenses of administering and liquidating the Debtors' Estates, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330, 331, or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code.

2.      "AEI" means Arts and Exhibitions International, LLC, debtor and debtor in possession in Case No. 3:16-bk-02238-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

3.       "Allowed Claim" means, except as otherwise allowed or otherwise provided herein, a Claim, proof of which was timely and properly filed or, if no proof of claim was filed, which has been or hereafter is listed on the Debtors' Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which no objection to the allowance thereof has been interposed.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not include interest on such Claim accruing after the Petition Date.

4.      "Allowed Class __ Claim" means an Allowed Claim in the Class specified.

5.      "American Artifacts" means artifacts recovered by RMST from the site of the wreck of RMS Titanic during expeditions held in 1993, 1994, 1996, 1998, 2000 and 2004.

6.      "Artifacts" means the American Artifacts and the French Artifacts and all associated assets and rights including, without limitation, all intellectual property, intangibles, contract rights, cash and receivables.

7.      "Assets" means all assets of the Debtors' Estates including "property of the estate" as described in section 541 of the Bankruptcy Code and shall, without limitation, include Cash,

Estate Causes of Action, any and all claims and causes of action that may be asserted by one or more of the Debtors against any third party or third parties, securities, proceeds of insurance and insurance policies, all rights and interests, all real and personal property, and all files, books and records of the Debtors' Estates.

8.      "Bankruptcy Cases" means the Debtors' jointly administered cases under Chapter 11 of the Bankruptcy Code.

9.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended.

10.     "Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division or, in the event such court ceases to exercise jurisdiction over any of the Debtors' jointly administered Chapter 11 Cases, such other court(s) that may exercise jurisdiction over such Chapter 11 Case(s).

11.     "Bankruptcy Rules" means, collectively, (i) the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, and (ii) the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect or hereafter amended.

12.     "Beneficiary" means beneficiary of the Liquidating Trust.

13.     "Business Day" means any day which is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

14.     "Cash" means cash or cash equivalents.

15.     "Chapter 11 Cases" means the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code, commenced by the Debtors on the Petition Date.

16.     "Claim" means (a) any right to payment from a Debtor's Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from such Debtor's Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3

17.     "Claim Objection Deadline", means the date set in the Confirmation Order as the last date by which objections may be made to the allowance of claims or interests, which date shall not exceed 180 days after the Effective Date.

18.     "Claims Bar Date" means October 24, 2016 or, in the case of a Governmental Entity, 180 days after the Petition Date, as set pursuant to the Bankruptcy Court's Notice of Chapter 11 Bankruptcy Case (Premier Docket No. 14).

19.     "Class" means one of the Classes of Claims or Classes of Equity Interests designated in the Plan.

20.     "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket, provided, however, that if such Confirmation Order is subject to a stay issued by a court of competent jurisdiction, "Confirmation Date" means the date upon which the Confirmation Order is no longer subject to a stay.

21.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

22.     "Covenants" means the Revised Covenants and Conditions set forth in Exhibit A to the August 12, 2010 Opinion of the District Court in the US Artifact Litigation, *R.M.S. Titanic v. Wrecked & Abandoned Vessel, its Engines, Tackle, Apparel, Appurtenances, Cargo, etc*., 742 F. Supp. 2d 784 (E.D. VA, 2010).

23.     "CRO" means the Person selected by the Liquidating Trustee, with the consent of the Equity Committee and in accordance with the terms of this Plan and the Liquidating Trust Agreement, to act as the Chief Reorganization Officer for the Premier Debtors after the Effective Date.

24.     "Debtors" means Premier, RMST, AEI, Exhibitions Management, Exhibitions International, Exhibitions NYC, Merchandising and DUC as debtors and debtors in possession in the Bankruptcy Cases.

25.     "Disbursing Agent" means the Liquidating Trustee or any entity selected by the Liquidating Trustee to act as its agent in conducting the disbursements to Holders of Allowed Claims pursuant to the Liquidating Trust Agreement.

26. "Disclosure Statement" means that certain document entitled "*Amended Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders*" filed in the Chapter 11 Case of Premier, including the exhibits attached thereto and to the Plan Supplement, either in its present form or as it may be amended, modified or supplemented from time to time.

27. "Disputed Claim" means any Claim (i) which is listed in the Schedules as unliquidated, disputed, contingent, and/or unknown and for which no proof of Claim has been filed; (ii) as to which a Proof of Claim has been filed and the dollar amount of such Claim is not specified in a fixed amount; or (iii) as to which a Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan and/or any order of the Bankruptcy Court, which objection or request for estimation has not been withdrawn or determined by a Final Order.

28. "Disputed Claims Reserve" means the Cash to be set aside for, and in an amount sufficient to pay the required distribution under the Plan to, all Disputed Claims which have not been finally adjudicated as of the Effective Date and which may become Allowed Claims prior to the Final Distribution Date.

29. "District Court" means the United States District Court for the Eastern District of Virginia.

30. "DUC" means Dinosaurs Unearthed Corp., debtor and debtor in possession in Case No. 3:16-bk-02237-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

31. "DUC Equity Interests" means any and all equity interest in DUC.

32. "Effective Date" shall have the meaning ascribed to it in Art. IX of this Plan.

33. "Equity Committee" shall have the meaning ascribed to it in the preamble to this Plan.

34. "Equity Interests" means, collectively, the Exhibitions International Equity Interests, the Exhibitions Management Equity Interests, the Exhibitions NYC Equity Interests, the Merchandising Equity Interests and the RMST Equity Interests.

5

35.     "Estate" means, with respect to each Debtor, the estate created by section 541(a) of the Bankruptcy Code upon the Petition Date.

36.     "Estate Causes of Action" means, with respect to each of the Debtors, any and all manner of causes of action, claims, obligations, suits, debts, judgments, demands, rights of offset or recoupment, damages (actual, compensatory or punitive), counterclaims or affirmative defenses, whatsoever, whether in law or in equity including, but not limited to, the claims arising under or pursuant to sections 541 through 551, inclusive, and section 553, of the Bankruptcy Code, and objections to Filed proofs of Claim.

37.     "Exhibitions International Equity Interests" means any and all equity interest in Exhibitions International.

38.     "Exhibitions International" means Premier Exhibitions International, LLC, debtor and debtor in possession in Case No. 3:16-bk-02234-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

39.     "Exhibitions Management" means Premier Exhibitions Management, LLC, debtor and debtor in possession in Case No. 3:16-bk-02233-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

40.     "Exhibitions Management Equity Interests" means any and all equity interest in Exhibitions Management.

41.     "Exhibitions NYC" means Premier Exhibitions NYC, Inc., debtor and debtor in possession in Case No. 3:16-bk-02235-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

42.     "Exhibitions NYC Equity Interests" means any and all equity interest in Exhibitions NYC.

43.     "File," "Filed," "Files," or "Filing" means any document(s) properly and timely filed with the Bankruptcy Court in the Chapter 11 Cases, as reflected on the official docket of the Bankruptcy Court for each of the Chapter 11 Cases, served on Persons, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

6

44. "Final Distribution" means the final distribution made to Holders of Equity Interests and Allowed Claims on the Final Distribution Date.

45. "Final Distribution Date" means the first Business Day on which any and all Disputed Claims have been resolved pursuant to a Final Order and the Liquidating Trust Assets have been liquidated, reduced to Cash, and distributed *pro rata* to holders of Allowed Claims.

46. "Final Order" means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; or as to which any right to appeal, reargue, rehear, or petition for certiorari shall have been waived in writing in form and substance satisfactory to the Equity Committee prior to the Effective Date; or the Liquidating Trustee after the Effective Date, respectively, or, in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed or from which reargument or rehearing was sought, or certiorari shall have been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

47. "French Artifacts" means approximately 2,100 artifacts recovered from the site of the wreck of RMS Titanic by Titanic Ventures Limited Partnership, predecessor in interest to RMST with the assistance of Institut Francaise de Recherche Pour l'Exploitation de la Mer over the course of 32 dives during an expedition in 1987.

48. "General Unsecured Claim" means any Claim that is not a Secured Claim, an Administrative Expense, a Priority Tax Claim, a Class 5 Intercompany Claim, or an Equity Interest.

49. "Governmental Unit" has the meaning ascribed to it in 11 U.S.C. §101(27).

50. "Guernsey's" means Guernsey's, a division of Barlan Enterprises, Ltd.

51. "Holder" means the owner of a Claim or Equity Interest.

52. "Initial Distribution" means a distribution, made as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, to Holders of Allowed Class 2 Claims,

7

Allowed Class 3 Claims and Premier Equity Interests, on account of such Allowed Claims and Premier Equity Interests, their Pro Rata Shares of Available Cash in accordance with the terms of this Plan.

53. "Interim Distributions" means one or more Pro Rata Distributions of Available Cash made in accordance with the Plan and/or any Order of the Bankruptcy Court on account of Allowed Claims before the Final Distribution.

54. "Intercompany Claims" means any and all Claims (if any) held by one of the Debtors against any other Debtor(s), including (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor(s).

55. "Liquidating Trust" means the trust created pursuant to the Plan, Confirmation Order, and the Liquidating Trust Agreement.

56. "Liquidating Trust Agreement" means that certain liquidating trust agreement by and between the Debtor and the Liquidating Trustee to be entered pursuant to the Plan and the Confirmation Order, substantially in the form included in Exhibit "_", as may be amended from time to time.

57. "Liquidating Trust Assets" means all of Premier's Assets and all of Premier's right, title and interest in and to the Premier Entities and all of their respective Assets, including (without limitation) the French Artifacts, the American Artifacts (subject to the Covenants), and the Estate Causes of Action.

58. "Liquidating Trustee" means the Person[2] approved by the Court as Liquidating Trustee, and any successor trustee(s) appointed pursuant to the Liquidating Trust Agreement, that has the powers and responsibilities set forth in the Plan, the Confirmation Order and the Liquidating Trust Agreement. Whenever the Liquidating Trustee is referred to herein, all such

---

[2] The identity of the Liquidating Trustee and a copy of the Liquidating Trustee Agreement will be included in the Plan Supplement.

references are qualified by the Liquidating Trustee's powers, rights and obligations as set forth in the Liquidating Trust Agreement.

59.    "Merchandising" means Premier Merchandising, LLC, debtor and debtor in possession in Case No. 3:16-bk-02236-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code;

60.    "NOAA" means the National Oceanic and Atmospheric Administration.

61.    "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense.

62.    "Oversight Committee" means a committee to oversee and direct the Liquidating Trustee that will be appointed by the Equity Committee promptly after the Effective Date, *provided, however,* that until such time as all Allowed Class 3 Claims have been satisfied in full as provided under the Plan, the Creditors Committee shall be entitled to designate one member of such Oversight Committee.

63.    "Person" means any individual, corporation general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any political subdivision, Governmental Unit, official committee appointed by the Office of the United States Trustee, unofficial committee of creditors, or other entity.

64.    "Petition Date" means June 14, 2016, the date on which the Debtors filed their respective voluntary petitions commencing the Chapter 11 Cases.

65.    "Plan" means this Chapter 11 Plan including all exhibits hereto, either in their present form or as they may be altered, amended, or modified from time to time.

66.    "Plan Supplement" means the compilation of documents and forms of documents, schedules, attachments and exhibits to this Plan, to be filed by the Equity Committee following the filing of this Plan as set forth herein, by no later than (A) ten (10) calendar days prior to any voting deadline set by the Court for casting  ballots to accept or reject this Plan or (B) such later date as may be approved by the Court on notice to parties in interest, as such Plan Supplement documents may be amended, modified, or supplemented from time to time.

46220641;1

67.     "Premier Entities" means the Debtors, 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd. and any and all direct or indirect subsidiaries of Premier in existence on the Effective Date.

68.     "Premier" means Premier Exhibitions, Inc., debtor and debtor in possession in Case No. 3:16-bk-02232-PMG pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

69.     "Premier Operating Capital Distribution", means a distribution to, or retention by the Liquidating Trust on the Effective Date of cash from the estate to be reserved for working capital needs of the Liquidating Trust.

70.     "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

71.     "Professional Person" means for purposes of this Plan, any professional person employed by the Debtor pursuant to sections 327 or 1103 of the Bankruptcy Code.

72.     "Pro Rata," "Pro Rata Share," and "Pro Rata Basis" means, at any time, the proportion that the face amount of a Claim in a particular Class or Classes bears to the aggregate face amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes; and "face amount," as used herein, means (a) when used in reference to a Disputed or disallowed Claim, the full stated liquidated amount claimed by the claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicably bankruptcy law; and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

73.     "Premier Equity Interests" means all the equity interest in Premier represented by the issued and outstanding equity securities of Premier.

74.     "Record Date" means the date set forth in the Order Approving the Disclosure Statement that accompanies this Plan for determination of Allowed Interests for purposes of casting Ballots.

75.     "Remaining French Artifacts" means the French Artifacts that are retained by the Liquidating Trust and are not sold at auction as provided by this Amended Plan.

76.     "RMST" means RMS Titanic, Inc., successor to Titanic Ventures Limited Partnership, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code in Case No. 3:16-bk-02230-PMG pending before the Bankruptcy Court.

77.     "Secured Claim" means a Claim against a Debtor to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Debtor's Estate securing such Claim.

78.     "Taxes" means all income, gaming, franchises, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign governmental authority.

79.     "Titanic Artifacts" means the French Artifacts and the American Artifacts that were property of the Estate of RMST as of the Petition Date.

80.     "US Artifact Litigation", means the admiralty case pending in the District Court, styled *R.M.S. Titanic v. Wrecked & Abandoned Vessel, its Engines, Tackle, Apparel, Appurtenances, Cargo, etc,* Action No. 2:93cv902.

**B.      Other Terms.**

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. Terms defined in the singular shall include the plural and vice versa.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules and shall be construed in accordance with the rules of construction thereunder.

**C.      Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**D.** **Exhibits.**

All exhibits to the Plan and to the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

**II.** **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

**A.** **Summary.**

Premier and Intercompany Claims

The chart below summarizes the classes of Claims and Equity Interests of Premier for all purposes, including voting, confirmation, and distribution pursuant to the Plan:

| CLASS | STATUS |
|---|---|
| Class 1: Other Priority Claims | Unimpaired - not entitled to vote |
| Class 2: Secured Claims | Unimpaired - not entitled to vote |
| Class 3: General Unsecured Claims | Impaired – entitled to vote |
| Class 4: Premier Equity Interests | Impaired – entitled to vote |
| Class 5: Intercompany Claims | Impaired, Deemed to Reject Plan. |

**B.** **Unclassified Claims (All Debtors).**

Administrative Expense Claims.

a. General.

Subject to the allowance procedures and deadlines provided herein, the Liquidating Trustee or, at the discretion of the Liquidating Trustee, the CRO shall pay to each holder of an Allowed Administrative Expense, on account of the Allowed Administrative Expense, and in full satisfaction thereof, Cash equal to the amount of such Allowed Administrative Expense, unless the holder agrees to other treatment. Except as otherwise provided herein or a prior order of the Bankruptcy Court: (i) payment of an Administrative Expense that is an Allowed Claim as of the Effective Date shall be made on the later of forty-five (45) calendar days after the Effective Date or the date such payment would have become due for payment of such Allowed Administrative

Expense in the absence of the Chapter 11 Case, whether pursuant to contract or applicable non-bankruptcy law; and (ii) payment of an Administrative Expense that becomes an Allowed Claim following the Effective Date shall be made on or before (a) the date that is thirty (30) days after an order deeming such Administrative Expense an Allowed Claim becomes a Final Order, or (b) the Final Distribution Date, whichever is earlier.

   b.   Deadlines for Filing Claims for Administrative Expenses.

    **(1)  Pre-Effective Date Claims and Expenses.**

   All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Expenses incurred before the Effective Date pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition obligations incurred through the Effective Date in the ordinary course of Debtor's post-petition business and obligations under section 1930 of title 28 of the United States Code) shall be filed no later than the first Business Day that is not less than forty-five (45) days after the Effective Date (the "Administrative Expense Claims Bar Date").  Professional Persons and others that do not File such requests on or before the Administrative Expense Claims Bar Date shall be barred from asserting such Claims against the Liquidating Trust, the Liquidating Trustee, the Debtors, the Premier Entities or any other Person or entity, or any of their respective property.  Objections to applications of Professional Persons or others for compensation or reimbursement of expenses must be Filed and served on the jointly administered Debtors and their counsel, the Liquidating Trustee and its counsel, as well as the Professional Persons and others to whose application the objection is addressed, in accordance with the Bankruptcy Code, the Bankruptcy Rules or pursuant to any other procedure set forth by an order of the Bankruptcy Court.  From and after the Effective Date, the Liquidating Trustee will comply with such reporting requirements, and payment of quarterly fees to the Office of the United States Trustee as required by applicable law.

    **(2)  Tax Claims.**

   Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, all requests for payment of Claims by a governmental unit (as defined under section

101(27) of the Bankruptcy Code) for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) ninety (90) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes is required to File a request for a payment of the post-petition taxes and other monies due related to such taxes. Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for taxes which does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against any of the Estate, the Liquidating Trustee or their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date, and shall receive no distribution under the Plan or otherwise on account of such Claim.

<div align="center">(3)    Priority Tax Claims.</div>

Except as otherwise agreed to by the parties, or ordered by the Court, as soon as practicable after the Effective Date, each holder of an unpaid Allowed Priority Tax Claim shall receive payment in full in an amount equal to the Allowed Priority Tax Claim.

**C.    Classification and Treatment (Classes 1 – 4 Premier Claims and Class 5 Intercompany Claims).**

Class 1:  Other Priority Claims.

a.    Classification:  Class 1 consists of all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, except Priority Tax Claims and Administrative Expenses.

b.    Treatment:  The Liquidating Trustee shall pay all Allowed Claims in this class in full, in Cash, on the later of: (i) 45-days after the Effective Date; and (ii) within ten days of the date on which an order allowing such Claim becomes a Final Order, in each case, or

<div align="center">14</div>

as soon thereafter as is practicable. Class 1 is not impaired, and the holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

<u>Class 2: Secured Claims.</u>

      a.    Classification: Class 2 consists of Secured Claims of Jihe Zang, Lange Feng and Haiping Zou.

      b.    Treatment: Holders of Allowed Class 2 Claims shall receive payment in full in Cash in the amount of their respective Allowed Secured Claims. Distributions to holders of Allowed Class 2 Claims shall occur on the later of (i) ninety (90) days after the Effective Date if such Secured Claim is deemed to be an Allowed Claim, (ii) the closing of the sale by auction of the French Artifacts or the sale of the American Artifacts and (iii) the first Business Day that is at least thirty (30) days from the date the Secured Claim becomes an Allowed Claim, if it is not an Allowed Claim on the Effective Date. Class 2 is not impaired, and the holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

<u>Class 3: General Unsecured Claims.</u>

      a.    Classification: Class 3 consists of all General Unsecured Claims against the Debtors.

      b.    Treatment: Unless a Holder of an Allowed Class 3 Claim agrees to accept a lesser treatment of such Claim, each Holder of an Allowed Class 3 Claim shall receive, as soon as practicable in the discretion of the Liquidating Trustee, in full satisfaction thereof, its Pro Rata Share of the Initial Distribution. In addition, after the Initial Distribution but prior to the Final Distribution Date, the Liquidating Trustee may, but is not required to, make one or more Interim Distributions to the Holders of Allowed Class 3 Claims of such Holders' Pro Rata Share of Available Cash, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions. Finally, on the Final Distribution Date, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata Share of the Available Cash remaining in the Liquidating Trust, until the Allowed Class 3 Claim Amount of such Allowed Claim is paid in full. Interest shall accrue on Allowed Class 3 Claims at the rate of 10% per annum on the outstanding balance due Holders of Allowed Class 3 Claims commencing on

<div align="center">15</div>

the Effective Date and continuing until payment of the Class 3 Claims as provided hereunder. After payment in full of all Allowed Class 3 Claims, the Liquidating Trustee shall pay Holders of Allowed Class 3 Claims pro rata from the proceeds of the sale of the French Artifacts, until each Holder of an Allowed Class 3 Claims has been paid an additional amount equal to 20% of their Allowed Class 3 Claims. Class 3 is impaired, and the Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

<div align="center">Class 4: Premier Equity Interests</div>

a. Classification: Class 4 consists of the Premier Equity Interests.

b. Treatment: Unless a Holder of a Class 4 Premier Equity Interest agrees to accept a lesser treatment of such Premier Equity Interest, each holder of such Premier Equity Interest shall receive, as soon as practicable in the discretion of the Liquidating Trustee, its Pro Rata Share of the Initial Distribution after (i) each Holder of Allowed Class 2 and Class 3 Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital Distribution. In addition, after the Initial Distribution but prior to the Final Distribution Date, the Liquidating Trustee may, but is not required to, make one or more Interim Distributions to the Holders of Premier Equity Interests of such Holders' Pro Rata Share of Available Cash (after (i) each Holder of Allowed Class 2 and Class 3 Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital Distribution, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions). Finally, on the Final Distribution Date, each Holder of a Premier Equity Interest shall receive its Pro Rata Share of the Available Cash (after (i) each Holder of Allowed Class 2 and Class 3 Claims has been paid in full, and (ii) Premier shall have received the Premier Operating Capital Distribution remaining in the Liquidating Trust). Class 4 is impaired, and the Holders of Class 4 Premier Equity Interests are entitled to vote to accept or reject the Plan.

Class 5: Intercompany Claims

  a.  Classification:  Class 5 consists of all Intercompany Claims.

  b.  On the Effective Date, all Intercompany Claims shall be cancelled in full and holders of Intercompany Claims shall receive no distribution and retain no Property on account of such Claims.  Class 5 is Impaired under this Plan.  Holders of Allowed Intercompany Claims in Class 5 are deemed to reject the Plan.

# III. LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND DISTRIBUTION PURPOSES.

  Solely for the purposes of voting on, confirmation of, and Distributions to be made to Holders of Class 4 Premier Equity Interests and Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to the confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of this Plan, its confirmation and Distributions made pursuant to it.

  Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for the purposes of this Plan, its confirmation and Distributions made pursuant to it, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors for the purposes of this Plan, its confirmation and Distributions made pursuant to it, (iii) any Claims Filed or to be Filed in connection with any such obligations will  be deemed Claims against the consolidated Debtors and all Claims filed against more than one Debtor for the same liability will be deemed to be one Claim against any obligation of the consolidated Debtors, (iv) each Claim Filed in the Chapter 11 Case of any Debtor will be deemed to be Filed against the Debtors in the consolidated Chapter 11 Cases, (v) all transfers, disbursements and Distributions made by any Debtor hereunder on Allowed Claims will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of any Debtors of the obligations of any other Debtor shall be deemed to be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors.  Holders of

46220641;1

Allowed Claims in each Class shall be entitled to their share of Property available for Distribution to such Class without regard to which Debtor was originally liable for such Claim.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) any obligations under any contract or lease that was entered into during the Chapter 11 Cases or executory contracts and unexpired leases that have been or will be assumed and assigned pursuant to this Plan, (b) distributions from any insurance policies or proceeds of such policies, or (c) guarantees that are required to be maintained post-Effective Date in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases, or that have been, or will be pursuant to this Plan, assumed and assigned.  The limited consolidation proposed herein shall not affect each Debtor's obligations to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6).  Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

## IV.  ACCEPTANCE OR REJECTION OF THE PLAN

### A.  Voting Classes.

Each Holder of an Allowed Class 3 Claim and each Holder of a Class 4 Premier Equity Interest shall be entitled to vote to accept or reject the Plan.

### B.  Record Date for Holders of Impaired Class 4 Premier Equity Interests.

Holders of Premier Equity Interests as of the Record Date may vote Ballots to accept or reject the Plan.

### C.  Voting Rights of Holders of Disputed Claims.

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

### D.  Acceptance by Impaired Classes.

Impaired classes of Claims shall have accepted the Plan if (i) the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar

amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) more than one-half in number of the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in each such Class have voted to accept the Plan.

### E. Acceptance by Impaired Interests.

Impaired classes of Interests shall have accepted the Plan if the Holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds of the Interests actually voting in each such Class have voted to accept the Plan.

### F. Presumed Acceptance of the Plan.

Classes 1 and 2 are unimpaired under the Plan and, therefore, are conclusively presumed by the Bankruptcy Code to accept the Plan.

### G. Presumed Rejection of the Plan.

Holders of Class 5 interests are impaired and will receive nothing under the Plan and, therefore, are conclusively presumed by the Bankruptcy Code to reject the plan.

## V. PROVISIONS FOR TREATMENT OF DISPUTED, CONTINGENT, OR UNLIQUIDATED CLAIMS AND ADMINISTRATIVE EXPENSES.

### A. Resolution of Disputed Claims.

As of the Effective Date, and subject to the provisions of this Plan, the Liquidating Trustee shall have sole authority for investigating, administering, monitoring, implementing, litigating and settling all Disputed Claims. From and after the Effective Date, the Liquidating Trustee shall have the sole and exclusive right to make and file, and to prosecute, objections to Claims, including, but not limited to, Administrative Expenses and Priority Tax Claims. All objections shall be filed prior to the Liquidating Trustee Claim Objection Deadline and served upon the Holder of the Claim to which the objection is made.

### B. Reserve for Disputed Claims.

Cash which would be issued and distributed on account of holders of Disputed Claims in the event that such Disputed Claims become Allowed Claims, shall instead be placed in the Disputed Claims Reserve maintained by the Liquidating Trustee. Such Cash in the Disputed

Claims Reserve will be reserved for the benefit of holders of such Disputed Claims pending determination of their entitlement thereto. Unless the Bankruptcy Court orders otherwise, the Liquidating Trustee will reserve Pro Rata distributions for such Disputed Claims based upon the full amount of the Disputed Claims or (a) in the case of a Disputed Class 2 Claim or Class 3 Claim, in the full amount of the Allowed Class 2 Claim amount or Class 3 Claim Amount, as the case may be, and (b) in the case of a Disputed Claim that is an Administrative Claim, Cash in the full amount of such Disputed Claim. No reserve shall be required for any Disputed Claim to the extent of any effective insurance coverage therefore. Such Cash so reserved shall be distributed by the Liquidating Trustee to the holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash shall be allocated among holders of Allowed Claims in the Class in which the Disputed Claim was classified, as provided in the Plan.

Prior to or on the Final Distribution Date, the Liquidating Trustee shall make all distributions on account of any Disputed Claim that has become an Allowed Claim and remains unpaid as of the Final Distribution Date. To the extent that any portion of a Disputed Claim is not disputed, the Liquidating Trustee may establish a reserve in the Disputed Claims Reserve only on account of that portion of the Disputed Claim that is in dispute and may make one or more interim Distributions on account of the portion of such Disputed Claim that is not in dispute.

The Liquidating Trustee may, at the Liquidating Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor liquidating trust. If the election is made, the Liquidating Trustee shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

**VI.    IMPLEMENTATION OF THE PLAN**

20

A.    **Employment of the CRO.**

On the Effective Date the Liquidating Trustee shall be authorized and instructed to employ the CRO.

B.    **Disposition of the French Artifacts.**

On the Effective Date, the Liquidating Trustee shall be authorized and instructed to employ Guernsey's to conduct a sale of the French Artifacts by auction in such manner as the Liquidating Trustee determines, in the exercise of its sole discretion, is in the best interests of the Debtors, their Estates and all parties having an interest therein.  The Liquidating Trustee, with the advice of Guernsey's and approval of the  Oversight Committee, shall identify a sub-set of French Artifacts, not to exceed 50 in number, to be sold at auction by Guernsey's.  The Remaining French Artifacts will be transferred with the American Artifacts to a purchaser that is a Qualified Institution.

C.    **Disposition of the American Artifacts**

The CRO shall manage and administer the American Artifacts consistent with the Covenants pending disposition of the American Artifacts by the Liquidating Trustee until the American Artifacts, together with the Remaining French Artifacts, are transferred to a Qualified Institution, as defined in the Covenants. The CRO shall offer to employ all employees of Premier who are involved in the preservation, management, and display of the American Artifacts pending their disposition.

The Liquidating Trustee shall offer the American Artifacts for sale only to potential bidders that are Qualified Institutions, as defined in the Covenants, to serve as the subsequent trustee and subsequent salvor-in-possession of the American Artifacts under the Covenants.  Any transfer of the American Artifacts to a successor trustee and salvor shall be subject to approval of the District Court and shall be made only on notice to NOAA and all other parties entitled to notice in the US Artifacts Litigation.

D.    **Administration of Liquidating Trust Assets.**

From and after the Effective Date the Liquidating Trustee shall be authorized and instructed to administer the Liquidating Trust Assets in a manner that the Liquidating Trustee determines, in the exercise of his sole discretion, after consultation with the CRO and the

21

Oversight Committee, is in the best interests of the Debtors, their Estates and all parties having an interest therein, including, without limitation, by operating one or more of the Premier Entities, liquidating and winding up one or more of the Premier Entities, entering into an agreement or agreements to sell one or more of the Premier Entities or their Assets and/or the French Artifacts when and if the Liquidating Trustee in his sole discretion after consultation with the CRO determines any such sale is in the best interests of the Debtors, their Estates and all parties having an interest therein.

       **E.**       <u>**Vesting of Assets.**</u>

       Unless otherwise expressly provided under this Plan, on the Effective Date, the Liquidating Trust Assets will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan. On and after the Effective Date, the transfer of the Liquidating Trust Assets from the Debtors' estates to the Liquidating Trust will be deemed final and irrevocable and distributions may be made from the Liquidating Trust.

       In connection with the foregoing

       (i)       On the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of property of the Liquidating Trust free of any restrictions imposed under the Bankruptcy Code.

       (ii)       The Confirmation Order will provide that, upon the Effective Date, the Liquidating Trustee shall have express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate same and to prosecute any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan.

       (iii)       As of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

       **F.**       <u>**Establishment of the Liquidating Trust.**</u>

On the Effective Date, the Liquidating Trust Agreement will become effective, and, if not previously signed, Premier and the Liquidating Trustee will execute the Liquidating Trust Agreement. The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

### 1. Beneficiaries.

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Class 3 Claims and Class 4 Premier Equity Interests. The Holders of such Allowed Class 3 Claims and Class 4 Premier Equity Interests will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement. The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

### 2. Implementation of Liquidating Trust.

On the Effective Date, Premier, on behalf of the Premier Estate and the Premier Entities (including RMST), and the Liquidating Trustee, will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as Exhibit "__" to the Plan Supplement, take all such actions as required to transfer the Liquidating Trust Assets to the Liquidating Trust from Debtors' estates. From and after the Effective Date, the Liquidating Trustee will be authorized to, and will, take all such actions to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims (including, without limitation, seeking the subordination and/or reclassification of Claims), prosecuting or otherwise resolving Estate Causes of Action and causing Distributions from the Liquidating Trust to be made to the Beneficiaries.

### 3. Transfer of Liquidating Trust Assets.

On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee all the right, title and interest of the Debtors in and to

the Liquidating Trust Assets. To the extent required to implement such transfer of the Liquidating Trust Assets to the Liquidating Trust, all Persons will cooperate with and assist Premier and the Liquidating Trustee in implementing said transfers.

### 4.      Representative of the Debtors' Estates.

The Liquidating Trustee will be appointed as the representative of the  Debtors and their Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Plan and the Liquidating Trust Agreement) to *inter alia*: (i) object to Claims against (including, without limitation, seeking the subordination and/or reclassification of such Claims); (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust including through the use of Federal Rule of Bankruptcy Procedure 2004; (iii) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims and Interests; and (iv) take such action as required to administer, wind-down, and close the jointly administered Chapter 11 Cases. As the representative of the Debtors and their Estates, the Liquidating Trustee will be vested with all of the rights and powers of the Debtors and their respective Estates with respect to Estate Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted in place of the Debtors and their respective Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

### 5.      No Liability of Liquidating Trustee.

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members, or representatives, or professionals employed or retained by the Liquidating Trustee (the "Liquidating Trustee's Agents") will not have or incur liability to any Person for an act taken or omission made in good faith in connection with or related to the administration of the Liquidating Trust Assets, the implementation of the Plan and the Distributions made thereunder or Distributions made under the Liquidating Trust Agreement. The Liquidating Trustee, the Liquidating Trustee's Agents, and their respective employees, officers, directors, agents, members, or representatives, or professionals employed or retained will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and

responsibilities under the Plan and the Liquidating Trust Agreement. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Article XI of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or the Liquidating Trust, or their respective property. The Confirmation Order's approval of the Plan will also constitute a res judicata determination of the matters included in the exculpation provisions of the Plan. Notwithstanding the foregoing, nothing herein or in Article XI of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person.

<div align="center">6. Provisions Relating to Federal Income Tax Compliance.</div>

The transfer of the Assets to the Liquidating Trust will be treated for federal income tax purposes as a deemed transfer by the Debtors to the creditors and equity interest holders that are beneficiaries followed by a deemed transfer by the creditors and equity interest holders that are beneficiaries to the Liquidating Trust, in accordance with Revenue Procedure 94-45, 1994-2 C.B. 684. Accordingly, the taxation of the deemed transfers from the Debtors to the creditors and equity interest holders that are beneficiaries and from the creditors and equity interest holders that are beneficiaries to the Liquidating Trust will be governed by provisions of the Internal Revenue Code of 1986, as amended ("IRC") Sections 61(a)(12), 483, 1001, 1012 and 1274. The creditors and equity interest holders that are beneficiaries will be treated as the grantors and deemed owners of the Liquidating Trust's assets. The taxable income or loss of the Liquidating Trust, including the taxable income attributable to the Disputed Claims Reserve, if any, will be allocated to the beneficiaries on an annual basis pro rata in accordance with their respective entitlement to receive distributions from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year (taking into account all prior and concurrent distributions from the Liquidating Trust during such taxable year). The Liquidating Trustee shall not be required to report such tax information to any Beneficiary unless such Beneficiary provides to the Liquidating Trustee a complete form W-9 or acceptable substitute signed under penalty of perjury. In determining each Beneficiary's share of income, gain, loss, deductions and credits, the

<div align="center">25</div>

Liquidating Trustee shall not allocate such items to any Beneficiary who is the holder of a Claim which has no value until such time, if at all, as a value of the Claim arises. The beneficiaries shall be responsible to report and pay the taxes due on their proportionate share of the Liquidating Trust taxable income, whether or not amounts are actually distributed by the Liquidating Trustee to the beneficiaries to pay the taxes. The value of the Assets transferred into the Liquidating Trust shall be the fair market value of such Assets at the time of such transfer, as reasonably determined by the Liquidating Trustee, in consultation with such advisors as the Liquidating Trustee deems appropriate, within a reasonable period of time after the Effective Date. Such valuation shall be binding on all parties including, but not limited to, the Debtors, the Estate, the Liquidating Trustee, and all beneficiaries, and these valuations will be used by such parties for all federal income tax purposes. Notwithstanding anything in this Plan to the contrary, in the event that (i) any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to Treasury Regulation Section 1.468B-1, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation Section 1.468B-9, any federal income tax consequences shall be determined under IRC Section 468B and the Treasury Regulations thereunder.

### G. Prosecution of Estate Causes of Action by the Liquidating Trustee.

Subject to the provisions of Articles X and XI of this Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidating Trust pursuant to this Plan, with all recoveries derived therefrom to be included within the Liquidating Trust Assets.

## VII. DISTRIBUTIONS UNDER THE PLAN

### A. In General.

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court, Distributions to be made on account of Allowed Claims, other than Allowed Class 2 and Class 3 Claims and Class 4 Premier Equity Interests, shall be made on the Effective Date. The dates for Distributions by the Liquidating Trust on account of Allowed Class 3 Claims and Class 4 Premier

Equity Interests shall be selected by the Liquidating Trustee. Such Distributions shall be made as soon as practicable after the Effective Date, *provided, however*, that the Liquidating Trustee shall cause to be held, commencing as of the Effective Date, the marketing and auction of up to 50 of such French Artifacts as the Liquidating Trustee determines, in his discretion and the exercise of his sound business judgment, as will generate sufficient proceeds to pay at least all Administrative Claims of professionals employed in the Bankruptcy Case that become Allowed Claims pursuant to the terms of the Plan.

        **B.**      **Manner of Payment Under the Plan.**

Any payment of Cash made by the Liquidating Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

        **C.**      **Manner of Distribution of Other Property.**

Any distribution under the Plan of property other than Cash shall be made by the Liquidating Trustee in accordance with the terms of the Plan.

        **D.**      **Setoffs.**

The Liquidating Trustee may set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Liquidating Trust may have against the holder of such Claim; provided that neither the failure to effect such set off nor the allowance of any Claim that otherwise would be subject to set off, shall constitute a waiver or release by the Liquidating Trust of any such claim the Liquidating Trust may have against such holder.

        **E.**      **Distribution of Unclaimed Property.**

Except as otherwise provided in the Plan, any distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one year following the Effective Date or (ii) ninety (90) days after such distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

F.    **De Minimus Distributions.**

No cash payment of less than fifty dollars ($50.00) shall be made by the Liquidating Trustee to any holder of a Claim unless a request therefor is made in writing to the Liquidating Agent.

G.    **Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

H.    **Delivery of Distributions, Address of Holder.**

For purposes of all notices and Distributions under this Plan, the Liquidating Trustee shall be entitled to rely on the name and address of the holder of each Claim as shown on, and Distributions to holders of Allowed Claims shall be made by regular U.S. first class mail to, the following addresses:  (a) the address set forth on in the proofs of Claim Filed by such holders; (b) the address set forth in any written notice of address change delivered by the holder to the Debtor concerned or Liquidating Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on the Schedules if no proof of Claim is Filed and the Debtor concerned or Liquidating Trustee has not received a written notice of a change of address.  The Liquidating Trustee shall be under no duty to attempt to locate holders of Allowed Claims who are entitled to unclaimed Distributions.

VIII.   **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    **Assumption.**

Effective upon the Effective Date, the Debtors shall be deemed to assume those executory contracts and unexpired leases which are listed in an exhibit to the Plan Supplement (the "Schedule of Executory Contracts and Unexpired Leases").  Pursuant to this Plan, the Debtors will also assume the executory contracts and unexpired leases that are the subject of any specific order of the Bankruptcy Court.  The Equity Committee reserves the right to delete any contract or lease from the Schedule of Executory Contracts and Unexpired Leases, thereby rejecting the contract or

46220641;1

lease, up until the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Schedule of Executory Contracts and Unexpired Leases to the Plan and by giving notice to counsel for the non-debtor party to the contract or lease.

      **B.**        **<u>Assumption and Cure Payment Objection.</u>**

The Schedule of Executory Contracts and Unexpired Leases to the Plan Supplement specifies the amount (the "Cure Payment"), if any, that the Equity Committee believes must be tendered on the Effective Date, in order to provide cure and compensation in accordance with sections 365(b)(1)(A) & (B) of the Bankruptcy Code.  The deadline for any objections to the Cure Payment amounts set forth in the Schedule of Executory Contracts and Unexpired Leases shall be the date for filing objections to the Plan, and no other objections to such Cure Payment will be timely.  In the event that any party to a listed contract or lease on the Schedule of Executory Contracts and Unexpired Leases contends that the Cure Payment amount so listed is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof specifying the amounts allegedly owing under sections 365(b)(1)(A) & (B) of the Bankruptcy Code no later than the date fixed for filing objections to the confirmation of the Plan. Failure to timely file and serve such statement shall result in the determination that the tender of the Cure Payment, as specified in the Schedule of Executory Contracts and Unexpired Leases on the Effective Date, shall provide cure and compensation for any and all defaults and unpaid obligations under such assumed executory contract or unexpired lease.

In the event that any party to a listed contract or lease specified in the Schedule of Executory Contracts and Unexpired Leases objects to the proposed assumption by any Debtor, such party must file with the Bankruptcy Court and serve upon counsel for the Debtors and counsel for the Equity Committee a written statement and an accompanying declaration in support thereof no later than the date fixed for filing objections to the confirmation of the Plan.  Failure timely to file and serve such statement shall result in the determination that the assumption is appropriate.

46220641;1

The Equity Committee reserves the right to respond to any objection filed by any party to an executory contract or unexpired lease under this paragraph and/or to reject any executory contract or unexpired lease or assume such contract or unexpired lease by complying with section 365(b) of the Bankruptcy Code. To the extent the Equity Committee disagrees with any objection filed by any party to an executory contract or unexpired lease under this paragraph, either may request that the Bankruptcy Court declare that the Cure Payment is as stated in the Schedule of Executory Contracts and Unexpired Leases, and that the proposed assumption is appropriate, and any disputes shall be resolved by the Bankruptcy Court.

Entry of the Confirmation Order shall constitute approval of the assumptions under the Plan pursuant to section 365 of the Bankruptcy Code. All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code shall be made on the Effective Date or as soon thereafter as is practicable or as may otherwise be agreed by the parties to any particular contracts or leases.

### C.       Rejection.

Except for those executory contracts and unexpired leases that have been previously assumed, assumed pursuant to Section VII.A, above, or rejected by order of the Bankruptcy Court pursuant to Bankruptcy Code section 365, as of the Effective Date, the Debtors shall reject, pursuant to Bankruptcy Code section 365, all other executory contracts and unexpired leases.

### D.       General.

Inclusion of a matter in the Schedule of Executory Contracts and Unexpired Leases does not constitute an admission by any Debtor that an executory contract or unexpired lease exists, is valid or is an executory contract or unexpired lease. Entry of the Confirmation Order shall constitute approval of the rejections under the Plan pursuant to section 365(a) of the Bankruptcy Code.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Bankruptcy Court on or before such date as the Bankruptcy Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day, the first Business Day occurring thereafter. Any such Claims which are not filed within such time will be forever barred from assertion against the Debtors' Estates and their property, or the Liquidating Agent.

>	E.	**Insurance Policies.**

For the avoidance of doubt, the Debtors' rights with respect to all insurance policies under which the Debtors, and each of them, may be a beneficiary (including all insurance policies that may have expired prior to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies entered into by the Debtors after the Petition Date, and all insurance policies under which any Debtor holds rights to make, amend, prosecute and benefit from claims), are retained and will be transferred or assigned to the Liquidating Trust pursuant to this Plan. Notwithstanding any provision providing for the rejection of executory contracts, any insurance policy that is deemed to be an executory contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a specific motion by the Liquidating Trustee who shall retain the right to assume or reject any such executory contracts pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code following the Effective Date.

**IX.	EFFECTIVENESS OF THE PLAN**

>	A.	**Conditions Precedent.**

The Effective Date of this Plan shall occur sixty (60) business days after the Bankruptcy Court shall have entered the Confirmation Order, which order shall not have been amended, modified, reversed, vacated, enjoined or stayed, including being stayed pending appeal,.

>	B.	**Waiver of Conditions.**

The conditions to confirmation of this Plan and to the Effective Date set forth in Article XA hereof may be waived by the Equity Committee or the Liquidating Trustee, as the case may

be, without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

### C.    <u>Notice of Effective Date.</u>

As soon as practicable after the Effective Date has occurred, the Liquidating Trustee shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

## X.    <u>RETENTION OF JURISDICTION</u>

This Plan shall not in any way limit the Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. The Bankruptcy Court will retain and have exclusive jurisdiction to the fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to the Chapter 11 Case or the Plan, including but not limited to the following:

(I)    To hear and determine pending motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if any are pending as of the Effective Date, the determination of any cure payments related thereto, and the allowance or disallowance of Claims resulting therefrom;

(II)    To hear and determine pending motions for sale of assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code, if any are pending as of the Effective Date;

(III)    To hear and determine any and all causes of action and rights of the Debtors that arose before or after the Petition Date that are expressly preserved pursuant to, among other things, section 1123(b)(3) of the Bankruptcy Code, are yet to be liquidated and are preserved for prosecution by the Liquidating Trustee or other appropriate party in interest, including any designee or successor, against any Person whatsoever, on account of any and all Estate Causes of Action (including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and all non-avoidance actions owned by the Debtors' Estates including, but not limited to, claims of tort,

32

breach of contract and claims lying in law or in equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise) and Premier Insider Claims;

(IV) To determine any and all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Bankruptcy Cases;

(V) To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(VI) To hear and determine any objections to Administrative Expenses and to Proofs of Claims filed both before and after the Effective Date, and to allow or disallow any Disputed Claim in whole or in part;

(VII) To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of, or subordinate for any purposes pursuant to section 510 of the Bankruptcy Code, any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of all Claims;

(VIII) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(IX) To issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

(X) To consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(XI) To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(XII) To hear and determine any disputes arising in connection with the interpretation; implementation, execution, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(XIII)  To hear or determine any action to recover assets of the Debtors' Estates, wherever located, including any and all Estate Causes of Action;

(XIV)  To hear and determine any actions or matters related to Estate Causes of Action and the Premier Insider Claims, whether or not such actions or matters are pending on the Effective Date;

(XV)  To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(XVI)  To hear any other matter not inconsistent with the Bankruptcy Code; and

(XVII) To enter a Final Decree closing the Bankruptcy Cases.

## XI.  LIMITATION OF LIABILITY, RELEASES AND INJUNCTION.

### A.  Exculpation.

Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date, the Debtors, the Equity Committee, the Creditors Committee, and their respective officers, directors, employees, representatives, counsel, financial advisors or other agents and their successors and assigns shall be deemed released by each of them against the other, and by all Holders of Claims or Equity Interests or any other entity, of and from any Claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case, including, without limiting the generality of the foregoing, all sales of assets of any Debtor's Estate, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the negotiation, formulation, and/or consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan or any acts or omissions taken with respect to any contract, instrument, release or other agreement or document created in connection with the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.  Notwithstanding the foregoing, this provision of the Plan is not intended to waive or release any cause of action based on pre-Petition Date actions or conduct, including but not limited to any Estate Causes of Action.

46220641;1

B.      **Injunction Enjoining Holders of Claims Against and Equity Interests in the Debtors.**

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests.  To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors arising prior to the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtors, their Estates, the Liquidating Trust or its property (other than actions brought to enforce any rights or obligations under the Plan):

(i)      commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

(ii)      Enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets;

(iii)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien, security interest or encumbrance against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets; and

(iv)      proceeding in any manner in any place whatsoever against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee, their successors, or their respective property or assets, that does not conform to or comply with the provisions of the Plan.

C.      **No Discharge of the Debtors.**

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to

be distributed to that Holder pursuant to the Plan. As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

## XII.   MISCELLANEOUS PROVISIONS

### A.   Payment of Statutory Fees.

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code. The Liquidating Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Bankruptcy Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Disbursing Agent under the Plan. After the Effective Date and until the Chapter 11 Case is closed, the Liquidating Trustee shall file with the Office of the United States Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

### B.   Headings.

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

### C.   Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtors' Estates, holders of Claims, holders of Equity Interests, and their respective successors or assigns.

### D.   Revocation or Withdrawal.

#### Right to Revoke.

The Equity Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.

<u>Effect of Revocation.</u>

If the Equity Committee revokes the Plan prior to the Confirmation Date or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or their Estates or any other person or to prejudice in any manner the rights of the Debtors or their Estates or any person in any further proceedings involving the Debtors or any of them.

**E.      Governing Law.**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, this Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

**F.      Withholding, Reporting, and Payment of Taxes.**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall report and pay taxes on the income of the Liquidating Trust Assets, if any, as required by applicable law. In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

**G.      Other Documents and Actions.**

46220641;1

The Debtors on and prior to the Effective Date and the Liquidating Trustee after the Effective Date may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**H.      Modification of the Plan.**

Prior to the Effective Date, the Plan may be altered, amended, or modified pursuant to section 1127 of the Bankruptcy Code by the Equity Committee.  After the Effective Date, the Liquidating Trustee shall have the sole authority and power to alter, amend, or modify the Plan pursuant to section 1127 of the Bankruptcy Code.

**I.       Notices.**

Any notice to the Debtors, Liquidating Trustee, the Equity Committee the Committee or United States Trustee required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

To the Debtors:

RMS Titanic, Inc.

c/o Troutman Sanders LLP

600 Peachtree Street NE, Suite 5200

Atlanta, GA 30308

ATT: Harris Winsberg and Stephen S. Roach

Tel: (404) 885-3000, Fax: (404) 885-3900;

with copies to

Nelson Mullins Riley & Scarborough LLP

50 N. Laura Street, Suite 4100

Jacksonville, FL 32202

Att:  Daniel F. Blanks and Lee D. Wedekind, III

Tel: (904) 665-3656, Fax: (904) 665-3699, and

Kaleo Legal

4456 Corporation Lane, Suite 135

Virginia Beach, VA 23462

46220641;1

Att: Brian A. Wainger

Tel: (757) 965-6804, Fax: (757) 304-6175.

To the Creditors' Committee:

Official Committee of Unsecured Creditors of RMS Titanic, Inc. and its debtor affiliates

c/o Storch Amini & Munves PC

140 East 45th Street, 25th Floor

New York, NY 10017

Att: Jeffrey Chubak and Avery Samet

Tel: (212) 497-8247, Fax: (212) 490-4208

with copies to

Thames Markey & Heekin, P.A.

50 N. Laura Street, Suite 1600

Jacksonville, FL 32202

ATT: Richard R. Thames and Robert A. Heekin, Jr.

Tel: (904) 358-4000, Fax: (904) 358-4001

To the Equity Committee:

Official Committee of Equity Security Holders of Premier Exhibitions, Inc.

c/o Landau Gottfried & Berger LLP

1801 Century Park East, Suite 700

Los Angeles, CA 90067

ATT: Peter J. Gurfein and Jon Dalberg

Tel: (310) 557-0050, Fax: (310) 557-0056

with copies to

Akerman, LLP

50 N. Laura Street, Suite 3100

Jacksonville, FL 32202

ATT: Jacob A. Brown and Katherine C. Fackler

Tel: (904) 798-3700, Fax: (904) 798-3730.

To the DIP Lender:

 Bay Point Capital Partners, LP

 c/o Thompson Hine LLP

 3560 Lenox Road, Suite 1600

 Atlanta, GA 30326

 ATT: Garrett A. Nail and John F. Isbell

 Tel: (404) 541-2900, Fax: (404) 541-2905.

  **J.**   **Severability of Plan Provisions.**

 If, prior to Confirmation, any term or provision of the Plan does not govern the treatment of Claims or Equity Interests, or is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term(s) or provision(s) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

  **K.**   **Successors and Assigns.**

 The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

  **L.**   **Post-Effective Date Notice.**

 From and after the Effective Date, any person who desires notice of any pleading or document filed in the Bankruptcy Court, or any hearing in the Bankruptcy Court, or other matter as to which the Bankruptcy Code requires notice to be provided, shall file a request for post-

Effective Date notice and shall serve the request on the Liquidating Trustee; provided, however, the United States Trustee shall be deemed to have requested post-Effective Date notice.

DATED: August 28, 2018          Respectfully submitted,

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

By: _____

Its: _Chairman of Committee_____

41

# Exhibit 2

**EXIT FACILITY TERM SHEET**

**$7,000,000 Senior Secured Exit Financing Credit Facility**
**("*Exit Facility*")**

**Summary of Principal Terms and Conditions**
**July 24, 2018**

The following is a Summary of Indicative Terms and Conditions ("***Term Sheet***") of a Senior Secured Exit Financing Credit Facility to be made to Premier Exhibitions, Inc. and its affiliated debtors (the "***Debtors***") by Bay Point Capital Partners, LP ("***Lender***"). The proposed terms and conditions are provided for discussion purposes only and do not constitute an agreement or commitment to lend by Lender or a commitment to borrow by Reorganized Debtors under the Proposed Plan of Reorganization (Doc. 1045) (the "the Equity Committee Plan") filed by the Official Committee of Equity Security Holders (the "Equity Committee") of Premier Exhibitions, Inc. ("Premier"), Chapter 11 Debtor in Case No. 3:16-bk-02232-PMG. The actual terms and conditions upon which Lender identified below might extend credit to Debtors are subject to credit approval, satisfactory review and execution of documentation and such other terms and conditions as may be determined by the Debtor, Lender and their respective counsel. Without limiting the foregoing, this Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the Exit Facility described below, but rather is intended to outline certain basic items around which such facility could be structured.

| | |
|---|---|
| **Borrowers:** | The Liquidating Trust (as defined in the Equity Committee Plan) and all Reorganized Debtors under the Equity Committee Plan (collectively, the "*Borrowers*")which the Equity committee seeks to confirm under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Middle District of Florida (the "***Bankruptcy Court***") under case number 16-02230 (the "***Chapter 11 Case***"). |
| **Lender:** | Bay Point Capital Partners, LP ("***Lender***"). |
| **Exit Facility:** | A senior secured term loan (the "***Exit Facility***") in an aggregate principal amount of up to $7,000,000 (the "***Exit Commitments***"). |
| **Financing:** | If the Borrowers obtain any third-party financing other than the Exit Facility for any reason whatsoever, the proceeds of such alternative financing must be used to first repay all outstanding principal (including the Interim Financing Amount), interest, fees and expenses due and owing to the Lender. |
| **Interest:** | Interest on the Exit Financing shall be payable quarterly in cash at a rate equal to 14% per annum. |
| **Origination Fee:** | An 1.5% of the existing balance of the DIP Loan in the Chapter 11 Case on the Closing Date and an origination fee of 2% of the balance of the Exit Facility in excess of the DIP Loan balance on the Closing Date, paid in cash on the Closing Date. |
| **Make-Whole** | In the event that Borrowers should repay the Exit Facility |

45884360;2

| | |
|---|---|
| **Premium:** | prior one year from the Closing Date (the "Initial Maturity Date"), Lender will be due all interest and fees as if the Exit Facility had been repaid on the Initial Maturity Date. |
| **Exit Facility Collateral:** | The obligations of the Borrowers under the Exit Facility shall, at all times, be secured by (subject to "permitted liens" under the Loan Documents and certain customary exceptions to be mutually agreed) (a) first-priority, perfected security interests in, and liens upon, all of the Borrowers' present and future assets and properties (including, without limitation, all of the Liquidating Trust Assets as that term is defined in the Equity Committee Plan) superior to all other liens including the liens and security interests of Lange Feng, Jihe Zhang, and Haiping Zou (the "***Existing Lenders***"). |

For purposes of the Exit Facility, the Exit Collateral will include 100% of the equity in Debtor, RMS Titanic, Inc. and all of the Liquidating Trust Assets as that term is defined in the Equity Committee Plan)

Notwithstanding anything herein to the contrary, the Collateral shall not include avoidance actions under the Bankruptcy Code or the Titanic Assets (as defined below) but in any event the Collateral shall include any and all proceeds of the Titanic Assets and all revenues, contracts and agreements arising out of the Titanic Assets, except with respect to any such proceeds, revenues, contracts and agreements received or entered into in violation of any covenants and conditions relating to the Titanic Assets (such proceeds, revenues, contracts and agreements being referred to as the "***Titanic Proceeds and Agreements***").

For purposes hereof, the following terms have the following meanings:

"***Titanic Assets***" means (a) the Titanic Collections, as defined in the Revised Covenants and Conditions set forth in the 2010 Opinion of the United States District Court for the Eastern District of Virginia (the "***2010 Opinion***"), and related supporting documentation and intellectual property owned by RMS Titanic, Inc., and (b) the Titanic Reserve Account.

"***Titanic Reserve Account***" means that certain trust reserve account established by RMS Titanic, Inc. pursuant to Article V, Section D of the Revised Covenants and Conditions set forth in the 2010 Opinion.

For purposes of the Exit Facility, all of the security interests and liens described herein shall be effective and perfected as of the entry by the Bankruptcy Court of the Order authorizing the secured financing under the Exit Facility on the terms and conditions contemplated by this Term Sheet and otherwise acceptable to the Lender (the "***Financing Order***"), and without

the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements.

**Use of Exit Facility Proceeds:**

The proceeds of the Exit Facility will be used (a) to pay transaction costs, fees and expenses that are incurred in connection with the Exit Facility, (b) to pay the existing indebtedness due and owing from Debtors to Lender under the DIP Credit Facility, and (c) working capital.

**Fees and Expenses:**

Borrowers agree to pay all of Lender's reasonable fees and expenses.

**Closing Date:**

The date on or before the date on which the closing conditions under the Exit Facility are met (the "***Closing Date***"), including, but not limited to confirmation of the Equity Committee Plan.

**Exit Credit Term:**

The Exit Facility shall be for a term ending on the earliest of: (a) the Initial Maturity Date, or (b) the date on which the Loan becomes due and payable in full under the Exit Facility, whether by acceleration or otherwise (such earliest date, the "***Termination Date***").

In the case of a Termination Date occurring as a result of any other reason, the Loan and other obligations shall be repaid in full in cash, and the proceeds from, and recoveries on, the Exit Collateral, if applicable, will be applied to the amounts owing in respect of the Loan (including, without limitation, fees and expense reimbursements).

**Extension Option:**

At Borrowers' option, one initial six-month extension at fee equal to 2% of the Exit Facility and a second six-month extension at fee equal to another 2% of the Exit Facility.

**Documentation:**

The definitive documentation with respect to the Exit Facility (the "***Loan Documents***") shall include a credit agreement, customary security related documentation, and other agreements and documents related to the foregoing, as to all of the foregoing as mutually agreed, each in form and substance reasonably satisfactory to the Lender and the Borrowers. The Loan Documents shall be substantially similar to those for the existing DIP Loan.

**Representations and Warranties:**

Usual and customary representations and warranties for financings of this type (subject to scheduled exceptions and customary qualifications and limitations for materiality to be negotiated).

**Affirmative Covenants:**

Usual and customary affirmative covenants for financings of this type (subject to exceptions and other qualifications and limitations for materiality to be negotiated).

**Financial Reporting:**   Usual and customary reporting requirements for financings of this type (subject to exceptions and other qualifications and limitations for materiality to be negotiated).

**Negative Covenants:**   Usual and customary negative covenants for financings of this type (subject to exceptions and other qualifications and limitations for materiality to be negotiated)

**Financial Covenants:**   Will be substantially similar to those for the existing DIP Loan.

**Events of Default:**   Usual and customary events of default for financings of this type (subject to exceptions and other qualifications and limitations for materiality to be negotiated).

**Conditions Precedent to Closing Date:**   Entry of an Order confirming the Equity Committee Plan in form acceptable to Lender

**Governing Law:**   New York.

**Other:**   This Term Sheet has been produced for discussion and illustrative purposes only and is not intended to be, and does not constitute, a legally binding obligation of any party to enter into the Exit Credit Facility. Any agreement by the Lender to



provide the Exit Credit Facility or any other financing arrangement will be subject to the Lender completion of due diligence and obtaining investment committee approval in their sole and absolute discretion.

DATED: July 24 2018

OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS

By: _____

Andrew Shapiro

Its:     Chairman

DATED: July 24 2018

BAY POINT CAPITAL PARTNERS, LP

By: _____

Name: Charles Andros

Its: Authorized Signatory

# Exhibit 3

SCENARIO:   **DRAFT - SUBJECT TO CHANGE**   STRICTLY PRIVATE AND CONFIDENTIAL
ARTIFACTS SOLD IN TWO PROPOSED TRANSACTIONS   **PRELIMINARY ANALYSIS**
**FOR ILLUSTRATIVE PURPOSES ONLY**

**Liquidation Analysis for Premier Exhibitions, Inc.**
Net Book Values as of July 31, 2018
*Prepared at the Direction of Counsel on August 28, 2018*

| | Note References | Estimated Book Value | Low $ | Low % | Midpoint $ | Midpoint % | High $ | High % |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| *Current* | | | | | | | | |
| Cash and Equivalents | | $1,749,964 | $1,749,964 | 100% | $1,749,964 | 100% | $1,749,964 | 100% |
| Cash Held in Trust / Deposit | 1 | 736,056 | 0 | 0% | 0 | 0% | 0 | 0% |
| Accounts Receivable | 2 | 1,821,003 | 1,092,602 | 60% | 1,274,702 | 70% | 1,456,802 | 80% |
| Inventory and Work-in-Progress | | 598,869 | 149,717 | 25% | 209,604 | 35% | 269,491 | 45% |
| Prepaid Expenses and Deposits | | 417,699 | 41,770 | 10% | 83,540 | 20% | 125,310 | 30% |
| Income Tax Receivable (installments) | | 119,624 | 0 | 0% | 0 | 0% | 0 | 0% |
| Due from Related Parties | | 12,306 | 0 | 0% | 0 | 0% | 0 | 0% |
| Intercompany - Premier & DinoKing Tech | | 0 | 0 | 0% | 0 | 0% | 0 | 0% |
| | | $5,455,521 | $3,034,053 | 56% | $3,317,810 | 61% | $3,601,567 | 66% |
| *Other Assets* | | | | | | | | |
| Lease Investments, net of current deferred income | | $1,084,740 | $0 | 0% | $0 | 0% | $0 | 0% |
| Property and Equipment, net | | 2,997,067 | 449,560 | 15% | 749,267 | 25% | 1,048,973 | 35% |
| Film Intellectual Property, net | 3 | 32,197 | 50,000 | 155% | 100,000 | 311% | 150,000 | 466% |
| Deferred Income Taxes | | 520,071 | 0 | 0% | 0 | 0% | 0 | 0% |
| Trademarks and Other Intangibles | | 35,800 | 10,740 | 30% | 14,320 | 40% | 17,900 | 50% |
| Cost of Salvage | 4 | 251,000 | 0 | 0% | 0 | 0% | 0 | 0% |
| Cost of Artifacts | 4 | 2,826,020 | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total Balance Sheet Assets (Current and Other)** | | **$13,202,416** | **$3,544,353** | **27%** | **$4,181,397** | **32%** | **$4,818,441** | **36%** |
| | | | | | | | | |
| **Select French Artifacts Auction** | | | | | | | | |
| Select French Artifacts (Estimate, via Auction) | 5 | | $40,000,000 | | $50,000,000 | | $60,000,000 | |
| Less: Costs to Prepare and Assemble | 5 | | (4,000,000) | | (3,000,000) | | (2,000,000) | |
| Less: Incremental Legal Fees (e.g. Contested Right to Sell) | 5 | | (1,000,000) | | (750,000) | | (500,000) | |
| Less: Auction House Fees | 5 | | (4,000,000) | 10% | (5,000,000) | 10% | (6,000,000) | 10% |
| Net Recovery from Select French Artifacts | | | **$31,000,000** | | **$41,250,000** | | **$51,500,000** | |
| | | | | | | | | |
| **American Artifacts & French Artifacts (Sale to Qualified Institution)** | | | | | | | | |
| American & French Artifacts (excluding Select French Artifacts) | 6 | | **$5,000,000** | | **$12,100,000** | | **$19,200,000** | |
| | | | | | | | | |
| **Chapter 5 / D&O Claim Recovery** | | | | | | | | |
| Estimated Recoverable Value of Chapter 5 Claims | | | $0 | | $0 | | $0 | |
| Estimated Recoverable Value of D&O Claims (Net of Legal Fees / Expenses) | | | 2,000,000 | | 3,000,000 | | 4,000,000 | |
| Total Chapter 5 / D&O Claim Recoveries | | | **$2,000,000** | | **$3,000,000** | | **$4,000,000** | |
| | | | | | | | | |
| **Total Recoverable Assets / Estate Proceeds** | | | **$41,544,353** | | **$60,531,397** | | **$79,518,441** | |
| | | | | | | | | |
| Less: CRO Fees & Liquidation Trustee Fees | 7 | | (1,246,331) | 3% | (1,815,942) | 3% | (2,385,553) | 3% |
| | | | | | | | | |
| **Total Distribution Value** | | | **$40,298,022** | | **$58,715,455** | | **$77,132,887** | |
| | | | | | | | | |
| *Outstanding Professional Fees / Other Administrative Claims* | | | | | | | | |
| Outstanding Professional Fees | 8 | | $3,413,000 | | $3,188,000 | | $2,963,000 | |
| Transaction / Success Fees (GlassRatner) | 8 | | $460,000 | | $692,000 | | $924,000 | |
| KERP Payments | 9 | | 82,803 | | 82,803 | | 82,803 | |
| Post-Petition Trade Payables | 10 | | 541,704 | | 541,704 | | 541,704 | |
| Claims Arising from Rejected Leases and Contracts, etc. | 11 | | 4,000,000 | | 3,200,000 | | 2,400,000 | |
| **Total Administrative Claims** | | | **$8,497,507** | | **$7,704,507** | | **$6,911,507** | |
| | | | | | | | | |
| *Exit Facility / Superpriority DIP Loan* | | | | | | | | |
| DIP Obligations Rolled into Exit Facility | 12 | | $5,373,167 | | $5,373,167 | | $5,373,167 | |
| Incremental Funding Needs (Estimate, Includes Fees) | 13 | | 1,000,000 | | 750,000 | | 500,000 | |
| Incremental Interest Obligations (Exit Facility, 6 to 12 months) | 13 | | 892,243 | | 642,933 | | 411,122 | |
| **Total Exit Facility Obligations** | | | **$7,265,410** | | **$6,766,099** | | **$6,284,288** | |
| | | | | | | | | |
| *Pre-Petition Secured Loan* | | | | | | | | |
| Principal & Interest | 14 | | $3,800,000 | | $3,800,000 | | $3,800,000 | |
| | | | | | | | | |
| **Total Admin, DIP/Liquidity, and Secured Claims** | | | **$19,562,917** | | **$18,270,606** | | **$16,995,795** | |
| | | | | | | | | |
| *Proceeds Available after Admin, DIP/Liquidity, and Secured Claims* | | | *$20,735,106* | | *$40,444,849* | | *$60,137,092* | |
| | | | | | | | | |
| *General Unsecured Claims* | | | | | | | | |
| Pre-Petition Unsecured Claims & Accrued Settlements | 15 | | $11,235,105 | | $10,735,105 | | $10,235,105 | |
| Claims Arising from Rejected Leases and Contracts, etc. | 11 | | 1,000,000 | | 800,000 | | 600,000 | |
| **Total General Unsecured Claims** | | | **$12,235,105** | | **$11,535,105** | | **$10,835,105** | |
| | | | | | | | | |
| Interest on Pre-Petition Unsecured Claims (6 to 12 months) | 16 | | $1,223,511 | | $865,133 | | $541,755 | |
| Premium on Principal of Pre-Petition Unsecured Claims | 16 | | 2,447,021 | 20% | 2,307,021 | 20% | 2,167,021 | 20% |
| **Total Interest and Premium on General Unsecured Claims** | | | **$3,670,532** | | **$3,172,154** | | **$2,708,776** | |
| | | | | | | | | |
| **Total Unsecured Claims** | | | **$15,905,637** | | **$14,707,259** | | **$13,543,882** | |
| | | | | | | | | |
| *Proceeds Available to Equity Security Holders* | 17 | | *$4,829,469* | | *$25,737,590* | | *$46,593,211* | |
| | | | | | | | | |
| *Implied Distributable Value Per Share* | *Shares Outstanding of 9,373,116* | | *$0.52* | | *$2.75* | | *$4.97* | |

SCENARIO:
ARTIFACTS SOLD IN TWO PROPOSED TRANSACTIONS

DRAFT - SUBJECT TO CHANGE
PRELIMINARY ANALYSIS
FOR ILLUSTRATIVE PURPOSES ONLY

STRICTLY PRIVATE AND CONFIDENTIAL

**Notes:**

1. The Company is required to make quarterly payments of $25,000 into a Trust designated to fund the "conserving and curating" of the artifacts. The payments are to continue until the endowment reaches $5 million. Under the liquidation analysis, these obligations and current balance of the Trust are assumed to accompany the American Artifacts.

2. In recent periods, approximately 75% of the Company's accounts receivables are current or within 30 days over due, and roughly 20% are over 90 days past due.

3. The RMS Titanic Intellectual Property from the expeditions is extensive. There have been 8 dives from 1987 to 2010 where over 1,570 hours of 3D and 2D video footage and over 500,000 digital, raw and acoustic images have been recorded. The value of this media collection is likely above the net book value of $32k. Conservative estimates have been made for this implied value.

4. Under the Liquidation Analysis, the Company is assumed to sell the Artifact Collection accompanied by the salvor-in-possession rights. Whether or not the salvage rights are sold together with the American collection, the Debtors would no longer hold the salvage rights and would not be obligated to protect those rights. Recovery on the Artifacts Collection is treated separately in the Liquidation Analysis.

5. Guernsey's auction house has provided a preliminary estimate of between $50mm and $70mm for the potential value of the Select French Artifacts. Guernsey's fees are calculated based upon a commission of 9% of the gross value obtained at auction. For conservatism, the analysis assumes a range between $40mm and $60mm for the Select French Artifacts and 10% Auction House Fees. We have conservatively estimated the costs to assemble and safely transport all the artifacts from their current potentially dispersed locations at $2mm to $4mm. Additional legal fees are also incorporated in the event that the right to sell certain French Artifacts is challenged.

6. To date, at least two bids for the artifact collection have been received. One at $5.0mm and another at $19.2mm. This analysis assumes these bids are an illustrative low and, correspondingly, high estimate for the sale value of the American Artifacts and substantially all of the French Artifacts, excluding the Select French Artifacts, to a qualified institution.

7. CRO and Trustee fees include those fees associated with the appointment of a CRO and Liquidation Trustee. CRO and Trustee fees are estimated based upon anticipated scope of services and experience in other similar cases and are calculated at 3.0% of the Debtors' total recoverable assets / Estate proceeds.

8. Accrued and unpaid professional fees as of July 31, 2018 were estimated at $1.76mm based on documents filed by the Debtors. This analysis assumes 3 additional months at the Debtors' estimate of $250k per month, as well as 6 to 12 months of professional fees at an estimated $75,000 per month. Transaction / Success Fees calculated based on filed engagement letters.

9. The Debtors provided an estimate for expected payments under the KERP, totaling $82,803.

10. The Debtors provided an estimate for post-petition trade claims, net of accrued professional fees and accrued interest, totaling $541,704.

11. The liquidation analysis assumes certain leases and contracts will be rejected and that the Debtors' cease certain operations. The analysis assumes an estimated $3mm in potential unidentifiable claims including potential damage claims arising from rejected leases and contracts of the Debtors. The analysis assumes 80% of the claims arising from contracts entered into post-petition, therefore having administrative claim status, and 20% arising from contracts or leases entered into pre-petition, as general unsecured claims.

12. The Exit Facility includes a full roll up of the existing Debtor-in-Possession loan obligations assumed to be $5,373,167, including the Debtors' estimate of $5.15mm balance for June 30, 2018 plus straight interest at 13% (per the DIP agreement) for 4 months through the Effective Date.

13. The analysis assumes incremental funding needs of $500K to $1.0mm, including Exit Facility fees, and 6 to 12 months straight interest on the total outstanding balance at a 14% rate of interest per the Exit Facility Term Sheet.

14. There is $3.0mm in prepetition promissory notes secured by substantially all the Debtors assets. The liquidation analysis assumes $800k of accrued interest and fees in addition to the outstanding principal.

15. The Debtors have provided an estimate of approximately $10.7mm in allowed prepetition general unsecured claims and accrued settlements. We used an estimate range of $10.2mm to $11.2mm.

16. The analysis assumes general unsecured claims are paid an additional 6 to 12 months straight interest on the principal at a 10% rate of interest, as well as a 20% premium on the principal allowed claim amount.

17. Proceeds available to Equity Security Holders and Implied Distributable Value Per Share shown are before Lincoln/Teneo fee.

Case 3:16-bk-02290-PMC Doc 1179-4 Filed 08/29/18 Page 1 of 2

# Exhibit 4



Premier Exhibitions, Inc.
Florida
(4922)
1032403 B.C. LTD.
British Columbia
2015
Premier Hollywood Pictures LLC
Nevada
2004
Premier Exhibitions International, LLC
Delaware
2008
(5075)
Premier Exhibitions Management LLC
Florida
2011
(3101)
Premier Merchandising LLC
Delaware
2008
(3867)
RMS Titanic, Inc.
Florida
1996
(3162)
RMS Titanic Trust
2011
DinoKing Tech Inc.
British Columbia
2006
PRXI International Holdings CV
Netherlands
2008
RMS Titanic UK Ltd.
United Kingdom
2004
DinoKing International, Inc.
British Columbia
2014
Dinosaurs Unearthed Corp.
Delaware
2008
(7309)
Premier Exhibitions NYC, Inc.
Nevada
2006
(9246)
Arts & Exhibitions International, LLC
Florida
2012
(3101)
Legend
Debtor Entity
Canadian Non-Debtor Entity
Canadian Inactive Entity
Inactive Entity

# Exhibit 5

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

-------------------------------------------------------x

In re:                                          :       Case No. 3:16-bk-02230-PMG

                                                :

RMS TITANIC, INC., *et al.*, [1]                :       Chapter 11 (Jointly Administered)

                                                :

                              Debtors.          :

-------------------------------------------------------x

## DECLARATION OF ARLAN ETTINGER IN
## FURTHER SUPPORT OF EQUITY COMMITTEE'S APPLICATION FOR AN ORDER
## PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING
## THE RETENTION OF GUERNSEY'S AS AUCTIONEER

I, Arlan Ettinger, hereby declare as follows,

1.      I am the President of Guernsey's auction house.  I, along with Barbara Mintz – now my wife – founded Guernsey's, a Division of Barlan Enterprises, Ltd., in 1975.  I am familiar with the matters set forth herein and make this Declaration in further support of the Equity Committee's Application to Employ Guernsey's as the auction house to sell a certain set of artifacts recovered from the wreck site of the RMS Titanic that are commonly known as the French Artifacts.  If called upon to testify I could and would testify as set forth herein.

2.      On or about May 31, 2018, I executed a declaration in support of the Equity Committee's retention of Guernsey's as auction house to sell the French Artifacts.  I have been asked to make certain assumptions about the sale of the French Artifacts and whether those

---

[1]      The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

45002267;2

assumption would change the opinions and conclusions set forth in my May 31 Declaration.

3.      I was asked to assume that the number of French Artifacts to be sold would be limited to no more than 50 artifacts and that the remaining artifacts, both the remaining French Artifacts and the so-called American Artifacts, would not be offered for auction in the future. Thus, the potential universe of Titanic artifacts that would be available for sale would be limited to those few French Artifacts placed for auction by Guernsey's. First, I believe that the lion's share of the value in the French Artifacts will be found in the top handful of items. Second, it has been my experience running auctions and observing auctions that the fewer the number of Titanic artifacts to be sold, the rarer they are and, therefore, the more valuable they may be perceived by potential bidders at auction. Accordingly, I do not believe that limiting the number of French Artifacts to be sold would alter my conclusions about the potential range of values that could be achieved at an auction the French Artifacts as set forth in my May 31 Declaration.

4.      I also was asked for a projected time frame for selling the French Artifacts. Guernsey's would be prepared to start marketing the auction immediately upon being retained as the auction house to sell the French Artifacts. I estimate that from commencement of the marketing to the conduct of the auction would take about 60 to 90 days. I believe that the auction could be conducted within 90 days after commencement of marketing and proceeds could be received within 30 days or so thereafter.

I declare under penalty of perjury that the foregoing is true and that I have executed this declaration on August 28, 2018, in New York City, New York

_____
                                    Arlan Ettinger

# Exhibit 6



A PROPOSAL

# TITANIC

GUERNSEY·S

# TITANIC

THE AUCTION THE WORLD HAS BEEN WAITING 105 YEARS FOR!

———————————————

A PROPOSAL

———————————————

MARCH 26, 2018

GUERNSEY·S

# CONTENTS

————————

**SECTION 1 INTRODUCTION**

    1.1 Cover Letter .................................................................................................... 3

    1.2 The Artifacts to be Sold.................................................................................. 4

    1.3 Bankruptcy and Court Orders......................................................................... 5

    1.4 Marketing....................................................................................................... 6

    1.5 The Importance of New York City................................................................... 8

    1.6 RMS Titanic/Premiere Exhibitions & Guernsey's Marketing........................... 8

**SECTION 2 APPRAISING THE ARTIFACTS**

    2.1 Method ......................................................................................................... 11

    2.1 Total Appraised Value ................................ .................................................. 11

**SECTION 3 CONSULTANT PROFILE**

    3.1 Location Information...................................................................................... 13

    3.2 Description of Firm/Company History.............................................................. 13

    3.3 Team Personnel............................................................................................. 14

    3.4 Guernsey's Authorized Officers...................................................................... 18

**SECTION 4 SCOPE OF WORK & IMPLEMENTATION OF REQUIRED SERVICES**

    4.1 Process.......................................................................................................... 19

    4.2 Timing and Schedule..................................................................................... 21

    4.3 Fee and Payment Schedule............................................................................ 22

    4.4 Commission................................................................................................... 22

    4.5 Schedule........................................................................................................ 22

    4.6 References...................................................................................................... 23

    4.7 Conclusion..................................................................................................... 25

**APPENDIX A.** Terms & Conditions ..................................................................... 26

**APPENDIX B.** Letter of reference from Ms. Dorothy M. Weber ....................... 30

**APPENDIX C.** Letter of reference from Judge Freddie G. Burton Jr.................... 33

# COVER LETTER

———————

Were there to be an organization, based upon its past accomplishments, ideally suited to maximizing the financial potential of the historic artifacts retrieved from the Titanic, while recognizing the continuing role and future goals of RMS Titanic, Inc. / Premier Exhibitions (RMST/Premier), we strongly believe it to be Guernsey's.

The following Proposal will provide evidence in support of this belief. Separately, we have forwarded a package containing sample Guernsey's catalogues indicative of the caliber of our print work. As you read through this Proposal, please know that over the last two and a half days (since we received the RFP), we have done our best to address the questions you have raised and details you wish to learn about. If we have left anything out, it was not intentional and should you need any additional information from us, you need only ask. When comparing our response to the responses of others, we ask that you keep in mind the fact that indeed we produced this document in only two and a half days. Hopefully, this will help give you the sense that we are fully capable of moving forward swiftly and tackling any matters that may arise.

But before we begin, we think it important to address what transpired five years ago when Guernsey's was selected to conduct the initial Titanic Auction on behalf of Premier Exhibitions.

Although there clearly are auction houses older and larger than Guernsey's, it was this firm that was chosen to represent what certainly must be considered one of the world's greatest collections of artifacts: treasures recovered from the RMS Titanic. Viewing it as one of the most important honors yet bestowed on us during our now more than forty-two-year existence, we proceeded to market the event to a global audience. Multiple clip books – each inches thick – can begin to suggest the enormous media attention our promotion generated. Indeed, our public relations team documented the fact that there was not a leading media network in the world that did not run at least one, if not multiple stories about the upcoming event. The initial kick-off was held on board the U.S.S. Intrepid in New York harbor where hundreds of representatives from CBS, NBC, ABC, Fox, the Associated Press, the BBC, Reuters, AFP, and reporters from China, Russia, Australia and the rest of the world all convened to cover this compelling story. Included in the  parcel with our catalogues is a black/white copy of just one of the many press clippings books that resulted from our effort to sell the entire Titanic Collection.

Despite all this, our efforts proved unsuccessful. Try as we might, and as passionate as we were, we could not overcome the formidable obstacles that arose in our path. These included finding a buyer willing to pay an amount in excess of the $189 million dollar appraised value of the artifacts, having that buyer agree to mounting multiple public exhibitions indefinitely, agree to keeping the collection forever intact, agree to providing funds for the continuing restoration of unrestored artifacts, etc.

As we look back over four decades of record-breaking auction sales (a sampling of which are described later in this document), our 2012 involvement with the Titanic Collection was undoubtedly one of our greatest disappointments. We therefore look at this new opportunity as a chance to prove what was felt back then, that Guernsey's, more than any other auction house, is indeed the firm dedicated to presenting to a global audience the historically significant artifacts from the most fabled liner ever to set sail, the Titanic – and to do so in a manner that will not only maximize the financial potential of those artifacts, but promote RMST/Premier's goals well into the future.

3

**THE ARTIFACTS TO BE SOLD**

In 2012, we fielded countless calls from potential auction bidders hoping to acquire individual items. Despite the fact that our international marketing campaign at the time stressed that what we were offering for sale was the entire Titanic Collection as a single lot, those hopeful of purchasing just a few items nevertheless reached out to us. Though their persistence was admirable, the answer we provided remained the same: the Collection was only being offered in its entirety.

Now, with your willingness to consider alternative offerings, we propose the following. We believe the ideal auction of objects from the Titanic should contain between one and two thousand artifacts, a number that would fit within the parameters you have set forth as an option. (I.e., a selection from the 2,100 artifacts from 1987.) And to be sure, we would be comfortable with any number between that range, should it be a low of 1,000 artifacts or a high consisting of the complete 1987 recovery, 2,100 artifacts.

You have indicated that were the auction limited to fewer than the full 5,500 artifact inventory, then RMST / Premiere would be in a position to continue with its Titanic Exhibitions which, to the best of our knowledge, is the primary business RMST / Premiere is in.

In terms of the auction, the notion that "less is more" is applicable as an overload of items will lead to diminishing returns. And although we don't have access to the complete Titanic inventory at this time, there would certainly be a duplication of items were a larger quantity attempted to be sold. On this matter, Guernsey's has had great experience. Our auction sales of Princess Diana's necklace, a collection of three meteorites from Mars, and our upcoming charitable auction of Jerry Garcia's guitar have each been one-lot sales, while our auction of the contents of the ocean liner SS United States – an event that thirty three years later remains the world's largest auction – contained an estimated (and quite astounding) 500,000 objects.

In 2004, we conducted a limited auction of approximately five hundred objects pertaining to the Titanic. But the items were just that: "pertaining to" the Titanic. No objects were actually from the ship. That event, one of approximately fifteen nautically-themed auctions we have produced over the years, was primarily geared to Titanic collectors. It was, quite frankly, similar to annual events conducted by an English specialty auction house. The number of Titanic-specific collectors who follow such events, as numerous as they may be, pales in comparison to the number of generally interested bidders from around the world who would take part in an auction of the actual artifacts recovered from the ship. Indeed, for every person that has a room in their home devoted to Titanic memorabilia, there are hundreds of thousands – if not millions – of people around the world who have been riveted by the saga of the Titanic, have thrilled to the great motion pictures about the famous ship, and would dearly love to own so little as a single object knowing it once was on board what many would argue was the most historic vessel mankind has ever created. In short, there would be no comparison to an event directed only at the smaller body of collectors known to seek out Titanic-related artifacts. Marketed properly to a global audience, news of this upcoming and unprecedented auction would certainly reach the ears of the many interested people who do not fall into that more specific and confined category. (A discussion of Guernsey's pioneering efforts in auction marketing appears further in this proposal.)

To take advantage of this enormous audience, one thousand artifacts seems just about right to create sufficient frenzy amongst the global audience that, with certainty, would be participating. With that amount as a minimum, we would then be prepared to review the complete 1987 inventory, making our recommendations for the actual artifacts to be chosen for the auction. To this end, we would welcome the chance of working with RMST / Premiere's staff in making selections that at the sale would thrill prospective bidders with the chance of, perhaps only once in their lifetime, the opportunity to acquire an actual historic treasure from the legendary Titanic.

4

One further note about the objects to be sold. Despite our failure to sell the entire collection to a single buyer in the past, it is possible that the marketing of the portion of the collection we will be selling will be compelling enough to interest one or several parties in making an offer to purchase the entire collection – without some of the "baggage" that accompanied our first offering five years ago, such an offer is quite possible. Of course, if such an offer was made, it would be entirely your decision to accept or reject. Acceptance, of course, would cancel the auction – a matter fairly addressed in our consignment agreement. Situations like this have occurred on many occasions, including one just months ago when the core of a Guernsey's auction was withdrawn from the event when it was acquired prior to the sale for a world record amount.

## BANKRUPTCY AND COURT ORDERS

Guernsey's has conducted hundreds of major auctions. Although we have no doubt that some of our competitors have conducted thousands of sales, we think it fair to state that the vast majority of our events are just that – events. They are not "business as usual." They are not simply 200-300 lot auctions of groupings of miscellaneous works of art or antiques. They are themed events that often have been described (by collectors, the public and the media alike) as the most comprehensive events of their type ever produced. And with only on average five to six auctions a year, we try our hardest to make every event special. Compare this to larger firms that produce auctions daily, with some days featuring two or more sales. This assembly line method is simply not for us. No wonder that prestigious Art & Auction Magazine has listed Guernsey's as "one of the world's best auction houses" in every one of its annual issues that have included such listings.

When, for example, we conducted an auction devoted to accomplished hall of fame Jazz musicians, the event included the complete archives of John Coltrane, Charlie Parker, Thelonious Monk and Louis Armstrong. The auction was held live at New York City's Jazz at Lincoln Center where fifteen hundred people crowded into the beautiful Rose Theater for an auction that became front page news in the New York Times. Tens of thousands more bid online. Every conceivable record related to the sales of jazz artifacts was smashed.

Just as some of our events have been produced on behalf of substantial museums and non-profit organizations, so have some been produced at the request of Bankruptcy Courts or under the conditions of bankruptcy. Noteworthy examples of these include our Harrisburg (Pennsylvania) Auction, the Calumet Farm Thoroughbred Trophy Auction, and the Tavern on the Green Auction. In each of these cases, high-profile bankruptcies were involved. Calumet and Tavern were court-ordered sales. And in each of these cases, world record prices resulted.

Harrisburg, Pennsylvania's state capital, was mired in financial problems when it sent out RFP's to twenty five competing auction houses. Available to be sold was a collection of several thousand Old West-themed antiques illegally acquired by a former mayor improperly using City funds.

After being chosen for the assignment, we embarked on the process of cataloguing this completely disorganized collection. A week into the project, it was discovered that another auction house – a large firm based in Texas but with offices in New York and elsewhere – had already conducted two auctions of roughly one thousand items cherry picked from the collection two years earlier. That firm's two auctions grossed $1.5 million. When we realized that we would be selling was the other auction house's leftovers, we were tempted to withdraw. But we had made a commitment to Harrisburg's then current administration and stayed with the project. Our resulting auction, consisting of rejected items, grossed approximately $4.5 million – three times the amount produced for the more desirable items.

5

Calumet and Tavern had similar stories. Tavern on the Green, arguably New York City's most iconic restaurant for several decades, was bankrupt and being forced to leave its beautiful Central Park setting. Guernsey's beat out the two largest auction houses in the world to get that assignment. The results of our auction were ten times the pre-sale estimates produced by our competitors.

Our auction of the Calumet Farm Thoroughbred Trophy Collection (with eight Kentucky Derby trophies) was yet another bankruptcy-driven, court-ordered sale where the results we produced ($6 million) were far higher than the $1 million for which the world's largest auction house appraised the Collection.

It would be virtually impossible to imagine what the results of these events would have been had the sales not been conducted under bankruptcy conditions. One could argue that the bankruptcy status in each case stimulated bidders who believed they would be getting bargains at the respective sales. What did seem clear was that the bankruptcies did not hurt the events. Accordingly, we are prepared to move forward either outside Chapter 11 or under Chapter 11 conditions.

You have requested that we address our ability to abide by a future US Bankruptcy Court Order (should one occur), and above we referred to just such situations. But we think that our long-term work with a Michigan court might be of interest and speak of Guernsey's dedication to a most important project (such as the Titanic).

Not long after Rosa Park's passing, a feud over her Will developed between her family and a small institute Mrs. Parks had created. Respecting her storied life as the "Mother of the Civil Rights Movement," the courts interceded. Before long, Guernsey's was chosen to take an inventory her Mrs. Parks' possessions (her Archive) which counted in the thousands of items. Our efforts resulted in the discovery of important historic items that one of the sides in the feud had attempted to hide. Later, we were again selected by the courts (among many applicants) to take on the marketing of the Archive.

We began what resulted in a multi-year campaign to find a buyer willing to pay a fair price, keep the Archive intact and place it on public exhibition. Although every one of the more than one hundred museums (from Civil Rights museums to the Henry Ford Museum and the Smithsonian) and universities (from Harvard to Howard) that we approached claimed to desperately want the Archive, none were willing to pay a fair price for it.

Ultimately, we felt the need to bring this matter to the public's attention. After all, the Rosa Parks Archive deserved a far better setting than Guernsey's warehouse. Working closely with the media (please refer to our Marketing statement below), the Associated Press responded and addressed the matter. Warren Buffett and his family responded, purchasing the Archive from us, and then requesting that we remain on as its custodian for two years. Six months ago, the Archive was transferred to the United States Library of Congress where it has since been described as "the most important body of material within the Library of Congress' one hundred and twenty million artifacts." Letters from the court are included with this document attesting to the important role Guernsey's played in protecting, marketing and selling this important collection relating to the history of the United States.

## MARKETING

It is rare that an important auction will succeed without a strong marketing campaign. In this regard, there are those who would state that Guernsey's "wrote the book" on auction marketing.

In the mid-1970's when we were a young start-up company, auctions – all auctions – were promoted to the extent that the auctioneer or auction house purchased advertisements. Given the fact that even the largest

6

auction houses had limited budgets available to be applied to an individual sale, very small percentages of the public would actually be notified of an upcoming auction. Today, not much has changed. The vast majority of auctions rely on paid advertisements to attract attention. And for every potential buyer who is exposed to those advertisements, there are thousands of people who miss out. Expanded to a global audience, this equates to tens of millions of potential buyers left out in the cold.

The young start-up team* at Guernsey's believed that if the firm focused on interesting collections and thematic auctions, the media might become interested. (*Two of that original founding team – Arlan Ettinger and Barbara Mintz – remain as president and vice president of the company to this day.) And if the media chose to report on an upcoming sale, unbelievable results could follow. After all, even a full page advertisement in a well-regarded newspaper geared to antiques collectors might attract the attention of a few thousand people. Focused on the same collection promoted in the ad, a five minute segment on NBC's Today Show or ABC's Good Morning, America will get the attention of more than ten million viewers.

Putting the theory to the test, Guernsey's pioneered the concept of auction marketing on network media (broadcast, print and the internet.) Indeed, after nearly one hundred appearances both on the aforementioned Today Show and GMA, there have been days when feature news coverage has not only appeared on those leading programs but on CBS' Morning Show, Fox and Friends, and CNN as well ... all on the same morning. As strong as this media support is, it becomes exponentially stronger when the international press is brought into the picture.

The BBC, Reuters, AFP, and the leading networks from China to Australia, and from Argentina to Russia all have routinely covered Guernsey's events. This reporting has become so powerful that CNN has reported that media coverage of several of Guernsey's popular auctions has topped that news agency's charts as the most widely viewed media story globally on a number of occasions. Hundreds of millions people around the world routinely learn of our upcoming events. And with this vast awareness comes new bidders from all directions, new bidders who often far outbid the known collectors in any given field of interest.

Recognized as a leader in auction marketing, Arlan Ettinger, president of Guernsey's, has recently spoken on the subject at such fine institutions as Princeton University and Columbia University.

Following is an example of the power of marketing through the media.

One of the "barometers" within the auction world for many years has been the baseball. Having little to do with the game itself, auction houses for decades have vied for the right to claim that they hold the record for fetching the most for a single ball.

To the best of anyone's recollection, the first ball to bring a substantial amount at auction occurred around 1980 when a ball sold for the then astounding amount of $5,000. Then, over the next two decades, that record inched up as auction house after auction house succeeded in topping one another. By the turn of the century, the record had reached $120,000; and then the world's largest auction house landed what everyone agreed was the most valuable ball on the planet - Babe Ruth's first home run as a New York Yankee hit on the opening day of the then brand new Yankee Stadium. That ball topped the prior record by $6,000 when it sold for $126,000. Headlines the next day read that this was a record that would never be topped.

Fast forward to Guernsey's Baseball Auction conducted live at NYC's Madison Square Garden (while also being the first auction to utilize online real-time bidding technology). More than a dozen baseballs at our sale bested the $126,000 world record. Indeed, two baseballs brought $1 million each. But the star of the show was yet another ball, a ball that fetched a remarkable $3 million, twenty three times greater than the "untouchable" world record that had been set only months earlier. That record stands to this day. Nothing else has even come close.

7

How did we do it? Marketing through the media. News coverage of that coming sale was everywhere. Today, that $3 million baseball is viewed as far less significant than the $126,000 Babe Ruth ball. But working closely with the press, we were able to successfully promote the auction to fever pitch dimensions. And the results were unprecedented.

## THE IMPORTANCE OF NEW YORK CITY

It is well known that New York City is the "auction capital of the world." Has there ever been a major painting by Picasso sold in Cincinnati? In Dallas? And to be sure, Guernsey's is a born and bred NYC company. Our events are held live in the City (unless, of course, there is good reason to go elsewhere, such as when we took Elvis' Graceland Collection to Las Vegas, where we were awarded the first auction license ever in that unique town.) Of course, as the pioneer developer of real time bidding on the internet, we also take full advantage of the world's leading bidding platforms and will be bringing the very strongest such platforms into the Titanic Auction. Precedent suggests that thousands upon thousands of pre-registered bidders will be taking part in our Titanic Auction without (unfortunately) ever viewing the actual artifacts in person at our preview exhibition that we believe will be nothing short of glorious.

But New York City is far more than the world's best auction venue. NYC is also the network media capital. What this means is that all the American networks have their offices here. Most international networks do too. News stories that begin in otherwise wonderful cities like Chicago, Los Angeles and Houston, stay in Chicago, Los Angeles and Houston. They rarely reach beyond city boundaries. On the other hand, compelling news stories that originate in New York City often attract the media networks and spread across the country and around the world. The difference is powerful.

## RMS TITANIC / PREMIERE EXHIBITIONS & GUERNSEY'S MARKETING

Without question, the main thrust of our marketing campaign to promote the auction of the Titanic Collection will be geared to doing just that – promoting the upcoming auction. But in the same way that we have worked with corporate consignors in the past, we can apply the promotional efforts for the auction to boost interest in the future endeavors of our consignors.

It has been suggested that RMST / Premier may well wish to continue on with Titanic exhibitions featuring the thousands of artifacts not to be included in the auction. Were this to be the case, you can be assured that as a "team player," we are prepared to use to the auction marketing to assist you in any way you wish. After all, it is rare that one has the ability to reach audiences numbering in the hundreds of millions. Why not take advantage of it and promote the future of RMST / Premiere? It would be our pleasure.

# APPRAISING THE ARTIFACTS

––––––––––

When considering appraising artifacts from the Titanic, the following becomes apparent. On the one hand, we can state with virtual certainty that there is no other collection of historic items in the world that would hold as great an interest to collectors and the general public than these objects from the most legendary ship to ever sail the seas. In a worldwide ranking of valuable collections of historic artifacts, we view the Titanic Artifact collection as "number one." We support this position with more than forty years' experience dealing with artifacts and ephemera of countless descriptions.

On the other hand, assessing the worth of these Titanic artifacts must rank as one of the more difficult tasks ever presented to an appraiser.

For decades, Guernsey's has been called upon to appraise both individual objects and substantial collections. We have represented the owners of vast collections just as we have represented state and federal courts, along with many prominent museums including the Metropolitan Museum of Art, the Museum of Fine Arts, Boston, and the Smithsonian, our national museum.When approaching such appraisals, we naturally look for precedents where similar objects have been sold publicly (i.e., at public auction). This is true whether an object is a moderately priced piece of antique furniture, a sought-after Civil War battlefield artifact, or an extremely valuable work of art by an important artist such as Pablo Picasso.

As valuable as many works by Picasso are, for example, they are still relatively easy to appraise based upon the thousands of works by that artist that have been sold in high profile auctions over the decades. Accordingly, if we were asked to appraise a painting by Picasso, we would start by determining the period from within the artist's career, its dimensions, medium, condition, and of course, its subject matter. Once those factors are noted, then a search would begin to find comparable works. But even then, there are additional factors to consider – such as when a comparable work was sold. Was it at a time when the art market was soaring; or might it have been a time when an ailing economy could have had an impact on the value of art? Also to be considered would be where the sale of this work of art had taken place. Was it at a major auction that benefitted from international publicity, or could it possibly have been a rural auction where, against all odds, an important work appeared? In the latter instance, in all likelihood a far smaller body of potential buyers would have become aware of the work than in the case of the higher profile event.

Precedents clearly ease the task of the appraiser. Conversely, an appraiser's job is far more difficult when there are very few, or no direct precedents. Such is the case with the items that are the focus of this report – the historically significant artifacts recovered from the Titanic.

## TAKING THE EASY ROAD

It would be tempting to simply attach ridiculously high numbers to all of Titanic's artifacts and call it a day.  We could apply what might be referred to as "unimaginable" amounts to these artifacts and be confident that in at least some of the cases, our thinking would be justified. By "unimaginable" we mean amounts that no one could have anticipated an object selling for. Below is a short list of prices realized for items sold at auction. Prior to each event, if one was asked about the possibility of any of these items reaching the dollar level they eventually sold for, he or she would have seriously questioned the sanity of the person providing the answer. Simply put, these amounts were unimaginable. And yet, they happened.

9

Take, for example, the third item on the list, a Kennedy family boat. Earlier in the same year this boat was sold, an almost identical Kennedy family boat was sold by Christie's for $250,000. Yet less than six months later, Guernsey's was able to sell the mate to the Christie's boat for twenty four times as much! It was an unimaginable amount achieved through extensive international marketing.

 A single baseball, $3.1 million. (Guernsey's)

 John F. Kennedy's attaché case and wristwatch, $1 million each. (Guernsey's)

 A boat in dilapidated condition that as a vessel, would have been worth no more than $10,000, but was once the property of the Kennedy family, $6 million. (Guernsey's)

 A battered tin farm sign related to the Woodstock Festival, sold to the Rock and Roll Hall of Fame, just under $100,000. (Guernsey's)

 A stainless steel Rolex wristwatch owned by Paul Newman, $17.8 million.

 A guitar once owned by Jerry Garcia, $3.5 million. (Guernsey's)

 Costume jewelry pearl necklace worn by Jacqueline Kennedy, $211,000.

 Four Seasons Restaurant sign, $120,000.

 A small painting by Leonardo da Vinci, $450 million.

None of the above items (with the exception of the Rolex watch) would have been worth anything, simply as objects. (The Rolex, as a used stainless steel watch, would have been worth $2,000 or $3,000). It was their association with prominent people or iconic places that gave them great value.

Interestingly, one of the most significant objects included in the 1987 Titanic recovery effort is a bell from the great ship. Elsewhere in this report, we have mentioned Guernsey's SS United States Auction. Among the many thousands of auction lots in that event was the SS United States' bell. Up until that time (1984), no bell was known to have sold for more than $4,000. The bell from the SS US went for what was then considered quite remarkable, $300,000. Clearly, a bidder viewed the bell as a symbol of that great ship, and paid nearly 100 times the prior world record amount to obtain it.

Guernsey's conducted the sale of the bell from the SS United States more than 33 years ago. Although there is no single percentage that could be used to define the increase in the worth of rare, highly sought-after collectibles and iconic objects over the years, it is quite likely fair to say that such a treasured object worth a certain amount in 1984 might easily be worth anywhere from ten times to several hundred times that amount in 2018. A fine painting by Pablo Picasso in the early 1980s might have been worth $25,000, while a late 1950s Ferrari, $50,000. Today, many Ferraris of that vintage bring from $5 to $30 million, while Picasso's important paintings have been fetching amounts ranging from $10 million to over $100 million. In these, and many other examples we could provide, the worth of these treasured items have increased exponentially.

We state this with the SS United States' bell in mind. What, indeed, would that bell be worth today? It could be argued that, at the very least, it would be $1 million, and that it quite likely could sell for substantially more. Yet, as significant as the bell from the SS US is, it would pale in comparison to the desirability of the bell from the Titanic. Any potential buyer, be he or she a collector, an ocean liner enthusiast, or a historian, would confirm

10

this. Accordingly, if the bell from the SS United States was worth $2 or $3 million today, what would the bell recovered from the Titanic be worth? In the appraisal that follows, we've estimated that bell at $5 million.

As great an amount as $5 million for the bell may seem, consider the following. The last item on the list above is a painting by Leonardo da Vinci. Despite the fact that many thought that that painting would achieve an astounding level of $100 million, it confounded everybody when it brought nearly five times that. And although, to be sure, there is only one Leonardo, there was also only one Titanic. (It might be noted that Guernsey's was tangentially involved with that daVinci.)

**SIMPLY PUT, VIRTUALLY ALL OF THE TITANIC ARTIFACTS HAVE THE POTENTIAL FOR ACHIEVING UNIMAGINABLE RESULTS!**

**HAVING SAID THIS...**

We know that simply stating that it would not be unreasonable to expect any item recovered from the Titanic, no matter how seemingly trivial, to fetch a significant amount at auction doesn't help in answering the question, "OK, but how much do you think a dinner plate will sell for? A coin? The Cherub?" Accordingly, let's look at Titanic-related items that have been sold through the years. Please note that although these items are related to the Titanic, they are not true precedents to artifacts within the collection given the fact that they were not recovered from the ocean floor. The following Titanic-related objects, their hefty prices-realized notwithstanding, would have commanded even greater amounts had they actually been recovered from the ship. (They were found in the possession of survivors.) 1. a cracker from a lifeguard survival kit, $23,000; 2. a handwritten letter, $166,000; 3. a key, $138,000; 4. another letter, $186,000; 5. a coin, $40,000, and 6. a violin, $1.7 million.

In a one-to-one comparison, there is no question that a Titanic coin recovered from the ocean floor will fetch more than a similar coin found in the pocket of a survivor. But what will happen when there are in excess of five hundred coins, as is the case in the French Artifact collection? Will this extensive supply of coins cause their individual prices to plummet?

We think the answer to this question lies in the marketing of our proposed Titanic Auction. The auctions where the above survivor-linked objects were sold were geared to hard-core Titanic collectors. The event we anticipate of recovered items from the ocean floor will reach a vastly larger audience. To place this in perspective, the hard-core collector events attract hundreds of potential buyers. By comparison, the first (and possibly only) auction of actual Titanic Artifacts that went down with the ship will have an appeal to **countless thousands, if not millions** of potential buyers. In the case of the five hundred coins, we believe that these will be the target for many who can afford items at the entry $4,000 - 8,000 level. These buyers recognize that they will not be in contention for the more unique items in the sale but wish to own a single treasured item that actually was on board the Titanic and went down with her. Though insignificant compared to a piece of Titanic jewelry, the bell or the cherub, these coins will nevertheless be treasured. The same could be said about the paper currency and, moving up the dollar ladder, the dinnerware.

When focusing on the sale of the coins, for example, in the French collection, there are several alternatives that might be considered in addition the simple, straight forward sale of these items one by one. For example, we might suggest a pre-auction offering of a percentage of the five hundred and twenty coins that might work something like this. Offer half of the coins prior to the auction for $10,000 each on a first come, first served basis. A bidder contemplating what the coins might sell for at the public auction would have concerns that they might fetch much more than this and hence want to take advantage of the pre-auction purchase. If the coins that were sold at auction did indeed exceed the amount the coins sold for at the auction, those pre-auction purchasers

10

did well. To allay the concerns of the pre-auction buyer who fears the possibility of paying more than the prices realized at the auction, offer a refund of a percentage of the purchase price (perhaps 10%) if indeed auction prices realized are lower than the pre-auction purchase price.

## METHOD

In undertaking the task of appraising approximately 2,358 artifacts recovered from the French 1987 expedition, we started by dividing items into one of five different dollar value groups. (These numbers are imprecise as it would appear that some items have been photographed more than once.)

**Level A.** $4,000-8,000 (median $6,000): The lowest level group, which would apply to partially destroyed paper currency, certain coins, several buttons, and other low-level items.

**Level B.** $8,000-15,000 (median $11,500): Items such as better conditioned paper currency, more distinct coins, and porcelain dinnerware.

**Level C.** $15,000-30,000 (median $22,500): Small decorative objects (i.e., chain necklaces and minor jewelry), vases.

**Level D.** $30,000-50,000 (median $40,000): Notable objects such as a porthole, or a decorative furniture element.

**Level E.** $50,000 and up: This is the category that we applied to the choicest items, a few of which, like the bell, were appraised at multiple millions of dollars. This level includes the best jewelry (i.e., diamond rings), the beautiful cherub, the chandeliers, lovely stained glass windows, and more.

Our opinions as to the worth of the Titanic artifacts were a result of viewing low resolution photographs with only a single view provided for each item. No dimensions or scale were included in any of these photographs, making a determination of the artifact size difficult. Accordingly, for many of the artifacts - particularly ones that exist in quantity (dinnerware, coins, paper currency), no attempts was made to assess individual worth of each artifact.

## TOTAL APPRAISED VALUE

By determining which level each of the 2,358 artifacts fall into, we've been able to come up with a total appraised value for the collection. We are well aware that some categories of items, such as paper currency and coins, exist in great quantity. And generally, as before mentioned, when there are many items of a similar nature offered in a single event, the amount each item brings dips. On the other hand, that is what happens in a typical situation. The Titanic Auction will be anything but typical. Although there are hundreds of items that are fairly similar to each other, we expect that there will be an unprecedented audience of people who would treasure anything that was retrieved from the Titanic. And hence, even the lowest-level items can be expected to bring amounts that fit into our level A evaluation.

Theoretically, if the appraised value of the individual artifacts as we prepared applies, and a low and high auction estimate is attached to each item, the total auction estimate – reflecting the fact that all auction estimates are listed as a range, from low to high – **would be $50 million to $70 million.**

It should be noted that certain marquee items like the cherub are capable of fetching truly extraordinary amounts which would certainly alter the above estimated worth of the collection. In a world where $50 million might buy

11

a very good, but not great, painting by Picasso, would there not be the possibility of a buyer paying that amount for an item as iconic as the cherub from the Titanic?

By transferring the appraised value of each of the artifacts into an auction offering, the tendency is to put an estimated range next to each auction lot. To be clear, if an item has an appraised value of $6,000, that might show up in an auction description as having an estimated worth of $5,000-7,000. As a rule, many auctioneers would opt to underestimate the worth of an object so as not to discourage bidders. In any case, it would be premature at this point to concern ourselves with individual auction estimates. Suffice it to say, an auction strategy can and will be discussed when the actual auction preparations begin.

# CONSULTANT PROFILE

———————

## 1. LOCATION INFORMATION

Guernsey's, A Division of Barlan Enterprises, Ltd.

New York City headquarters:

65 East 93 Street
New York, New York 10128
Phone:  212-794-2280
Fax:     212-744-3638
aettinger@guernseys.com
www.guernseys.com

Connecticut office and warehouse:

Guernsey's P.O. Box 666
Salisbury, Connecticut 06068

New York City warehouse:

401 East 110th Street
New York, New York

## 2. DESCRIPTION OF FIRM / COMPANY HISTORY

Formed in 1975, Guernsey's has been responsible for many of the most successful, large scale auctions in history. Unlike competing firms that focused primarily on art and antiques, the diverse array of Guernsey's events points to the fact that Guernsey's is an auction house like no other. The smallest sampling of our events would include the aforementioned sale of the contents of the ocean liner SS United States, the landmark Cold War auction of artwork from the Soviet Union, and the definitive auctions recognizing the accomplishments of noteworthy individuals including John F. Kennedy, Franklin Roosevelt, Gerald Ford, Princess Diana, Duke Ellington, Jerry Garcia, Elvis Presley, Mickey Mantle and the Beatles. We were the first to present vintage sports cars and racing cars at auction, just as we were first to offer a wide assortment of genre-specific categories of art. Within the last year, Guernsey's concluded the multi-part auction series of the historic Dr. Hans Sachs Poster Collection considered the finest such collection in the world and forever linked to the Holocaust. We also concluded the private treaty sale of the complete archive of Rosa Parks, which is referred to in this proposal.

Guernsey's has been chosen to work with many of our nation's finest museums including the Smithsonian, the Metropolitan Museum of Art and the Henry Ford Museum. We have produced many auctions on behalf of worthy charitable and non-profit organizations ranging from providing support for seriously ill children and returning troops to fighting racism. Perhaps somewhat remarkably, in our four decades' existence, we have never been involved in any legal unpleasantries nor have we have ever been in arrears on payments due. Importantly, in virtually every direction this auction house has taken, it has established world record results, eclipsing all other auctioneers along the way.

One further note on our company's history ... In addition to having previously represented RMST / Premiere in an attempt to sell the Titanic Collection in its entirety, we have been deeply rooted in all things nautical almost since our inception. Of course, we conducted our own 2004 Titanic Auction consisting of more than five

hundred objects relating to the great ship. And along the way, we have been fortunate to have become friends with the descendants of John Jacob Astor, arguably the most recognized passenger to have lost his life in the tragedy. We've referred (perhaps all too often) to our involvement with the SS United States, an involvement that continues to this day. We were the first to offer at auction classic America's Cup sailing yachts, vintage speed boats and countless handsome ship models and beautiful marine paintings. We've conducted events in Newport (Rhode Island) Harbor in conjunction with the Museum of Yachting and sold many artifacts from other sunken ships far less noteworthy than the Titanic. In 2015, we conducted the auction of recovered treasure from Nuestra Senora de Atocha, the Spanish galleon that floundered in the 1600's and was discovered off the coast of Florida in the 1980's. One very relationship that resulted from our initial involvement.

## 3. TEAM PERSONNEL

### Arlan Ettinger – President & Founder

Born in 1944 in Joplin, Missouri, Mr. Ettinger moved to New York City at an early age and has lived the majority of his life there. He is married and has two children; the family lives in New York City while maintaining a farm in northwestern Connecticut.

A graduate of New York University (B.S., Marketing), Mr. Ettinger also attended the University of Illinois as an undergraduate and took graduate courses at CCNY. He has been invited to present many lectures on his unusual career at fine institutions including the Stern Graduate School of Business (NYU), and Princeton, Columbia, and Brandeis Universities. He has additionally assisted Brandeis, as well as Northeastern University, with the development of collections. Interviews with Arlan have appeared in many publications including The New York Times, Wall Street Journal, USA Today, Newsweek, Time, The London Times, Washington Post, and across the internet.  He has also has given literally thousands of broadcast interviews on CBS, NBC, ABC, Fox, CNN, BBC, Reuters and many of the other leading media networks around the globe.

In 1975, following a short stint as an art director / creative director in the world of advertising, Mr. Ettinger – along with his then partner, now wife, Barbara Mintz – formed Guernsey's, the New York City-based auction house.  Now, more than forty years later, Guernsey's has repeatedly been cited as "one of the world's best auction houses."

At the helm of Guernsey's from its inception to the present, Mr. Ettinger has been responsible for creating many of the world's most interesting, high profile auctions. The briefest sampling of these would include the sale of the contents of the ocean liner S.S. United States (the world's largest auction), the landmark Cold War auction of artwork from the Soviet Union and a myriad of auction "firsts" in diverse fields ranging from America's fairgrounds to vintage racing cars, and from Abstract Expressionist, illustrative and comic art to wildly popular objects from the worlds of motion pictures, sports and music. From the Civil War to pre-Castro Cuban cigars, Guernsey's has consistently been credited for forging new paths within the auction world.

With a daughter soon to be graduating Brandeis University and moving onto graduate school and a son at Brewster Academy, Arlan today is very much a family man. His days racing a vintage Maserati have largely been replaced by afternoons spent on his Connecticut farm, driving an old John Deere with Rascal, his faithful four-legged companion, in pursuit.

14

**Barbara Mintz – Executive Vice President**

Barbara, Co-Founder and Vice President of Guernsey's, is a graduate of New York University and an accomplished marketing specialist. At an early age, she became a top executive at a leading advertising agency and then a major marketing firm. In time, she and Arlan joined forces to found Guernsey's where she remains vice-president and is actively involved to this day.

With a special interest in American art and extensive experience with diverse collections, time and again Barbara has shown her expertise in the art and collectibles world. Her many years' experience and marketing know-how bring to the table invaluable insights into the promotion and production of each auction event.

When she is not engaged with Guernsey's projects, Barbara is spending time with her children and involving herself in campaigns to protect the environment, animals, and women's rights.

**Susan Jaffe – Director**

Now in her 17th year as Director, Susan brings to Guernsey's over thirty years' experience in the sale and marketing of fine art and collectibles.

At Guernsey's, Susan is responsible for consignor negotiations and contracts, client and collector relations, and oversees pre-auction preparations (including research, cataloguing, bidder inquiries and registration, and absentee bidding), post-auction billing and accounts receivable.  With her strong sales background, Susan is also responsible for post-auction and private treaty sales.

Through her previous positions as Gallery Director for several galleries, she excelled at cultivating collector clients. As Director of Sales at Marketing for a fine art publisher based in New York, leading both retail and wholesale sales teams, she further honed her keen skills in relationship building and account management which led to a 30% increase in the company's sale volume in her first year.

Should Guernsey's prevail and be selected as the auction house to conduct the auction of the RMS Titanic, Inc. Collection, Susan will be working extensively to contact existing Guernsey's clients – private collectors, museums, and libraries – known to have an interest in Titanic and history. In addition, Susan will be developing a substantial target list of additional collectors and institutions that she will be directly contacting about this event.

Susan earned her Bachelor of Arts degree at Boston University, with a major in Art History and a minor in Music History

**Joanne C. Grant – Auctioneer, Appraiser, Historical Archivist and Cataloguer** who has been continuously engaged in the antiques business since 1971

- Principal auctioneer at Guernsey's, NYC for 30 years
- Principal auctioneer and appraiser as well as owner of Mid-Hudson Auction Galleries since 1976.
- Candidate for membership into the American Appraisers Association
- Has successfully completed the Appraisers Association of America course and passed the required examination in Uniform Standards of Professional Appraisal Practice
- Author of two books, Price Guide to American Victorian Figural Napkin Rings and The Painted

Lamps of Handel. Host of WNEW Radio Talk Show "Let's Talk About Antiques"
- Owner Gold Betta Ltd. Place des Antiquaire, NYC
- Participating Member, Brimfield Antique Center, Brimfield, Mass.; The Fairgrounds Antique Center, Sturbridge, Mass. and The Bijou Gallery, Cold Spring, New York
- Published author in trade journals including The Antique Trader and lecturer on antiques and collectibles

In addition to her role as Guernsey's Chief Auctioneer, as an expert in many fields, Joanne has also often been responsible for supervising the team cataloguing and photographing the collections that Guernsey's has represented at auction including the voluminous Harrisburg Collection which consisted of approximately 10,000 artifacts and documents, the comparably sized Naylor Collection which traced the history of photography, Martignette Collection of more than 5,000 original works of illustration art, and the complete contents of the world-famous Tavern on the Green Restaurant complex.

**Rafael Zegarra – Creative Director/IT Admin**

Rafael is a graduate of New York City College of Technology with a Bachelor's degree in Web Development and Client Server Technology. Rafael completed his internship with Verizon, where he worked as a technology trainer. Shortly after graduation, Rafael started working for companies including but not limited to: MoMA, CUNY, S Clubs Sports Clubs and Pratt Institute. He has also worked as Graphics Designer and has taught as an Adjunct Lecturer at CUNY and Pratt Institute.

With a background in Advertising & Graphics Design (Print & Digital), Rafael brings an additional dimension to the range of design services offered by Guernsey's. Rafael has an eye for detail and brings stylistic flair to every one of his projects.

For the last five years Rafael has been responsible for the design, art direction and production of all Guernsey's marketing solutions, including: brand strategy, advertising design, web marketing and communications, web development & design, email campaigns, catalogue design, magazine ads, photography, photo editing and social marketing.

**Kim Cabrera – Senior Archivist**

Kim holds a Bachelor of Arts degree from the University of Massachusetts, Amherst, where she studied Art History and Literature. Previously she worked for an academic fine arts library database, as well as in photography and image database management.

At Guernsey's, Kim is responsible for cataloguing collection items, gathering information necessary to properly describe the collection and its contents, producing copy for the catalogue, and responding to inquiries from prospective bidders. Should Guernsey's be selected to conduct the RMS Titanic Auction, she would take on these duties to properly record and define the artifacts within the collection, maintain the database containing the details of its contents, and assist in providing potential bidders with all necessary information.

**Rubenstein Public Relations – Public Relations Consultant**

Headed by Richard Rubenstein, Rubenstein Public Relations and Guernsey's have had a long relationship together, spanning nearly two decades.

Rubenstein has, throughout time, and continuing to this day, been considered one of America's – if not the world's – leading public relations firms. Rubenstein's dedicated publicists are vital in obtaining the best and most far-reaching media attention for Guernsey's events.

**Karen Olson – Head Auction Clerk & Cataloguer**

Karen Olson has served as Guernsey's head auction clerk & bookkeeper for more than 20 years. She is largely responsible for the use of the special auction software Guernsey's uses in processing its auctions, and training staff members in its use. During auction previews, Karen oversees bidder registration, and during and directly following each auction is responsible for managing post-auction payment collection and check-out activities.

In addition, Karen has also worked closely with Guernsey's cataloguing team in inventorying collections and preparing them for auction.

**Richard Herzfeld – Attorney**

As partner in the firm, Bahn Herzfeld & Multer, Richard Herzfeld has served as Guernsey's primary legal counsel for over twenty years.

**Steve Klein – Accountant**

Steve Klein has overseen Guernsey's accounting department for the past twenty-two years. When called upon he has often advised Guernsey's clients with regard to their issues relating to their consignments, their proceeds from their sale of property in Guernsey's auctions, and their charitable giving.

**Bradley Kaplan – Shipping Coordinator**

After many years of unsatisfactory dealing with high-cost specialty shippers and art movers, Guernsey's reached out to Brad Kaplan, an owner of multiple UPS locations. Following our direction and to serve our buyer's post-auction shipping needs, Brad Kaplan established a separate division with a dedicated staff to exclusively handle post-auction shipments. In the past 7 years, Brad and his team have shipped everything ranging from rare emeralds and gold coins, fragile documents and photographs, to life-size mannequins, an 8' by 12' antique ceramic clock, and a multi-ton bronze sculpture. His group has shipped expansive intricate chandeliers, hundreds of guitars and rare instruments, thousands of antique posters, and artifacts of every description to Guernsey's clients located in all corners of the globe. In a world where clients are prone to complain about the high cost of art shippers, Brad's team has continued to provide professional service in a timely, cost-effective manner to our clients.

S.S. UNITED STATES
PRESIDENT JOHN F. KENNEDY
MICKEY MANTLE · THE McGWIRE BASEBALL
JAZZ · ARTWORK OF THE SOVIET UNION
THE FRANKLIN ROOSEVELT ARCHIVE
ELVIS PRESLEY · JERRY GARCIA
THE ROSA PARKS ARCHIVE

65 EAST 93RD STREET
NEW YORK, NY 10128

PH: 212.794.2280
FAX: 212.744.3638

AUCTIONS@GUERNSEYS.COM
WWW.GUERNSEYS.COM



# GUERNSEY'S
### AUCTIONEERS & BROKERS SINCE 1975

March 26, 2018


RMS Titanic, Inc.
Premier Exhibitions
#110 – 11188 Featherstone Way
Richmond, BC Canada V6W 1K9



The following individuals are Guernsey's officers and are authorized to sign documents on Guernsey's behalf:


      Arlan Ettinger, President

      Barbara Mintz, Executive Vice President



_____
Arlan Ettinger

March 26, 2018
_____
date


_____
Barbara Mintz

March 26, 2018
_____
date


A DIVISION OF BARLAN ENTERPRISES, LTD.

# RESPONSE TO SCOPE OF WORK &
# IMPLEMENTATION OF REQUIRED SERVICES

———————

**PROCESS**

You have asked about our ability to abide by a future United States Federal Bankruptcy Court order, be it now or in the future. As we've attempted to make clear elsewhere in this Proposal, we have abided by such orders in the past and are completely prepared to work within the guidelines set forth by a court should it so happen. We are adaptable. We are flexible.

If we are awarded with this most important assignment, Guernsey's is prepared to immediately spring into action by first meeting with the decision makers at RMST / Premiere to address essential matters such as precisely defining the collection to be consigned. Would the thinking be to go along with our recommendation for a one thousand lot event or would the number of artifacts be larger? We fully recognize that a precise answer to this question may only come following a complete review of the available 1987 collection (which, it should be noted, we are fully ready to embark upon.) At that time, we can address such matters as the diversity and duplication of artifacts suited to the auction.

Naturally, it would be our intention to present the very finest collection representing the Titanic possible. Accordingly, would we be given carte blanche to choose anything from the inventory we thought appropriate? Or, on the other hand, would RMST / Premiere wish to retain a percentage of the finest, rarest items for use in future exhibitions?  Should this be the case, we would fully understand and work to produce an exceptional auction while still allowing a substantial number of meaningful items to remain in RMST / Premiere's possession for future use.

When Guernsey's represented the collection five years ago, we were allowed to view the inventory, visited one of Premiere's Titanic exhibitions and temporarily had possession of a small number of artifacts for presentation to the media. Yet, despite this exposure, we would be hard pressed to recall to any degree of accuracy what a true cross section of the 1987 inventory contains other than the ten examples provided in the RFP.

In the RFP, competing firms were provided with the opportunity to learn more about the inventory as long as their questions were submitted before February 15th. Inasmuch as we are making this late bid, we have not had such access, hence our questions.

Simultaneous to the process of determining what the auction content will be, we will be reviewing the existing descriptions of the items for accuracy as well as considering their current appraised values. We are certainly prepared to provide our own thinking vis à vis the worth of these items which hopefully would be meaningful in that we are appraisers that have provided many comprehensive appraisals over the years for clients as important as our National Museum, the Smithsonian.

Following the selection of the items and a review of the existing appraisals, auction estimates will be arrived at. Please understand that although Guernsey's is fully capable of generating these numbers independently, we nevertheless would welcome RMST / Premiere's input should you wish to be part of the estimating process. Indeed, we would welcome your input and approval of all aspects of our involvement.

19

When we conducted the 1984 auction of the contents of the ocean liner SS United States, we saw fit to work with Mayflower Van Lines which transported three tractor trailer loads of artifacts from that great ship for short term, pre-auction exhibitions in Los Angeles, Chicago, Dallas and New York prior to that seven day auction which was conducted live, within sight of the ship, in Norfolk, Virginia. But that was long before the digital age and the remarkably easy access the public has to every conceivable type of information.

We mention those 1984 auction preview exhibitions because it would not surprise us that some responding to this RFP would argue in favor of similar exhibitions for this coming event. Although we would strongly agree that a comprehensive, handsome preview exhibition prior to the New York auction absolutely should be held, a national or international tour would have little bearing on the outcome of the auction. Indeed, who better than Premiere would know about producing exhibitions in heavily trafficked venues across the globe? And yet, it is our strong belief that only the smallest percentage of the public that has attended those exhibitions over the years will actually comprise those people vying for Titanic's artifacts. Accordingly, to devote substantial amounts of time and expense towards such pre-auction exhibitions would not be intelligent. Pre-auction energies would best be utilized to maximize the potential of a global audience, marketing to the millions of potential buyers across this nation and around the world as opposed to what may appear to be "feel good" exhibitions geared to a few thousand.

Once decisions regarding timing (see below) and certain other details were made, our marketing effort would begin. In this Proposal, we have pointed to how Guernsey's pioneered the concept of working with the media to spread news of an upcoming auction globally. We went further by pointing to the fact that CNN statistics supported the notion that several of Guernsey's auctions topped that news agency's charts as the number one feature news story in the world at the time the events were happening. With this in mind, we can assure you that our effort for this event will be like no other. Everything that have learned (and instructed others about), every contact that we have developed will all be taken advantage in such a way that the whole world will come to know about the upcoming Titanic Auction.

It has been said that there have been few, if any, auction promotions more powerful than the ones Guernsey's had created for such wildly popular events as our two John F. Kennedy Auctions and our sales focusing on the enormously popular Elvis Presley and the Beatles. As we see it, combining our passion for the Titanic, our unrivaled experience working closely with the world's network broadcast, print and internet media, and today's most up to date technology will result in a marketing "blitz" like no other.

The months leading up to the auction will be filled with broadcast, print and internet news articles appearing across the media. Our dedicated Public Relations team will be focusing on providing new and updated stories as we advance towards the big event. Periodically, we will bring focus to individual artifacts, emphasizing (wherever possible) the background stories behind these artifacts.

Known for regularly producing some of the most complete, comprehensive and handsome catalogues ever created for an auction, our staff of accomplished graphic designers and copywriters will be producing what we are certain will become a book coveted by many. In addition to the massive amount of space earmarked for the artifacts themselves, there will also be a large section devoted to the recovery effort. And to be sure, we would be delighted to provide any number of pages in the book on which to feature future endeavors of RMST / Premiere.

The auction itself will be a glorious affair, beautifully orchestrated live in New York City. Rather than conducting it in our own venue, we anticipate choosing a dramatic and appropriate setting equal to the importance of your artifacts. In the past, Guernsey's has often opted for such dramatic auction settings; earlier we referred to our Jazz Auction held at Jazz at Lincoln Center in the heart of the billion dollar Time Warner complex. Our Elvis Presley

20

Auction was held at the MGM Grand in Las Vegas, while our Mickey Mantle Auction was conducted at NYC's Madison Square Garden.

As mentioned, the Auction will follow an exciting auction preview most likely to be held at the same venue as the Auction. Importantly, every provision will be made to fully accommodate absentee bidders.

Although you may be well familiar with the following, should you not be aware, major auctions today largely are dependent on absentee bidding. Technology is such that anyone around the world with access to the internet need only successfully register as a bidder and then proceed to compete in many of the most important auctions being held daily in nations across the planet. To accommodate such bidding, Guernsey's is one of the original auction partners of the largest internet bidding platforms in the world: liveauctioneers.com and invaluable.com. Occasionally, we also work with proxibid.com. Combined, these sites represent more than ten million bidders who have successfully competed at auctions in the past. Our long and close relationships with these firms have afforded us preferential status such that news of an upcoming Guernsey's auction often dominates these sites' promotional spaces.

When, for example, we produced the highly successful Harrisburg Auction, between one hundred and three hundred people were present in the audience at any moment during that seven day event. On the other hand, at any given moment during that long span of days, over one hundred thousand people were following the event online with roughly ten per cent of those actually bidding. Of course, in addition to the above, we easily accommodate those who wish to bid by telephone and/or submit absentee written bids.

As per our consignment agreement, you will be provided with a full accounting following the auction with prompt payment wired in accordance with whatever instructions you, or the court provide us. As noted in the cover letter, in our more than four decade existence, we have never been in arrears on any payment due anyone including our consignors, nor have we ever had any legal action instituted against us for any reason whatsoever. We hope we have a reputation for being people of integrity and when, on very rare occasions, a matter of concern develops from a consignor or a buyer, we have been able to amicably resolve that matter.

**TIMING AND SCHEDULE**

When considering the schedule for producing the Titanic Auction, we would ask that you consider the following. We have in several places in this document referred to our auction of the contents of the SS United States. The largest ocean liner ever built in the U.S. (third largest in the world), this magnificent ship was perhaps most noted for being the fastest liner ever to sail the seas. She was the ship of choice for American presidents and movie stars who traveled between New York and England. The Duke and Duchess of Windsor have a permanent suite on board.

When word got out that the full contents of the ship – from the linen to the lifeboats – were to be tossed overboard deep in the Atlantic to make way for a total re-fitting, Guernsey's proposed an auction instead. So enthused were the ship's owners that they went directly to the two largest auction houses in the world with the concept. When both of those firms made it clear that "if they had ten years to produce that event, it might not be enough time" due to extremely demanding logistical issues, the owners came back to us.

Allowing us exactly three months to produce the auction (the owners had previously contracted with re-modeling firms, which created hard and fast deadlines) we produced the auction. In the process, we saved the owners many millions (the cost for dumping), while bringing in many millions from the sale. That event today remains the world's largest auction. We have repeated this story because it addresses our ability to move swiftly if necessary, and to accommodate most unusual circumstances.

Our first recommendation would be to conduct the Titanic Auction in the mid-fall of this year; late October, early November seems just right. This would place the event in the heart of the auction season and free from interference with any major holidays. Importantly, it would also give us the proper time to prepare.

On the other hand, and despite a busy schedule, we can produce this event as early as the summer or, for that matter, any time down the road after our mid-fall recommendation. In short, we are prepared to work in a way that works best for RMST / Premiere.

# FEE AND PAYMENT SCHEDULE

## COMMISSION

When Guernsey's set a staggering world record of $3 million for a single baseball, our commission to the seller was 15%. Two years later, a ball was offered to us that had the clear potential of equaling or exceeding that $3 million mark. The owners of the new ball (two young men who knew no better) opted to save two per cent by taking their ball to another firm that was willing to charge them 13%. They did not consider that the other firm had no background in marketing and was known to spend very little in the production of their auctions. That second ball brought $400,000, barely a tenth of its potential. In short, the young fellows failed to realize that "it takes money to make money" and "one gets what one pays for," old adages that proved all too true.

For the sale of the artifacts from the Titanic, Guernsey's is prepared to work for a commission of 9% (nine per cent). This commission is substantially lower than the commissions we have charged for the sale of other large collections, commissions that normally are greater than fifteen per cent due to the amount of work necessary to do a proper job with a voluminous collection.

It is well known that several of the largest auction houses are prepared to drop their commissions to the lowest levels but again we would argue that one gets what one pays for. To a very large auction house, getting the Titanic Collection is about bragging rights. The amount those firms earn on such an event is only a small fraction of their totals derived mostly from the sale of valuable works of art. They will forego the notion of profiting on Titanic just to claim that they were chosen for the task. Those firms can live with the outcomes of their "assembly line" efforts, but can RMST / Premiere?

At 9%, Guernsey's is prepared to give every ounce of its energy, and spend every dollar necessary to produce the very finest event possible: an event that will honor the memory of the fabled Titanic and bring recognition to the efforts of RMST / Premiere.

## SCHEDULE

Normally, our consignment agreement call for us to pay our consignors the amount we have received from buyers (less our seller's commission) within 30 days following the auction. A large auction of this nature typically requires such time even though electronic accounting helps speed the process. We certainly are willing to address the timing of payment to you, the consignor, if and when you wish.

# EXCEPTIONS REQUESTED (TERMS & CONDITIONS)

For Guernsey's Terms & Conditions, please see Appendix A.

---

# REFERENCES

**Dorothy Weber**

For letter of reference from Ms. Weber, please see Appendix B.

Dorothy Weber, a prominent entertainment and music law attorney, represented the family of Mickey Mantle when Guernsey's conducted its Mickey Mantle Auction

Dorothy M. Weber, Esq.
Shukat Arrow Hafer Weber & Herbsman, LLP
494 Eighth Avenue, Suite 600
New York, NY 10001
Phone: (212) 245-4580
Fax: (212) 956-6471

- Guernsey's conducted the Mickey Mantle Auction at Madison Square Garden. Arlan Ettinger, Guernsey's president first met Merlyn Mantle (Mickey Mantle's widow) in 1999 when she enlisted his aid with regard to authentication problem. Years later, after the death of her husband and the death of a 2nd son, she engaged Guernsey's to conduct the auction of the Mickey Mantle artifacts that the family had so closely been guarding. Although reluctant to part with the items, her goal was to establish trusts for her surviving sons and grandchildren.

- Arlan Ettinger, along with Guernsey's staff spent many weeks in Dallas with the family, cataloguing and photographing the collection in preparation for the auction. Guernsey's engaged a prominent sports writer to compose a 19-page essay recounting Mantle's career, that was included in the 200+ page illustrated color catalogue.

- Rubenstein Public Relations, Guernsey's public relations "arm", oversaw the massive media coverage, launched with a Press Preview Day, and resulting in back-to-back television appearances (Today Show, Good Morning America, CNN, etc) and worldwide newspaper coverage, including front page articles in the Daily News and New York Post.

- Guernsey's provided all services related to preparing for an auction (cataloguing, photography, producing the print and online catalogue, advertising and marketing, and processing the results on auction.

23

**Robert Philbin**

Former COO & Chief of Staff, City of Harrisburg, was Guernsey's primary contact when Guernsey's conducted its auction of the Harrisburg Collection (approximately 10,000 items, offered in 5,000 lots over 8 days)

Robert J. Philbin
Director, Public Information & Customer Experience
Capital Area Transit
Cumberland-Dauphin-Harrisburg Transit Authority
901 N. Cameron St.
Harrisburg, PA 17101
(717) 233-5657

• Guernsey's was selected from among the approximately 25 auction houses which had been invited to submit an RFP to conduct the auction of the Harrisburg Collection. The Collection had been assembled years before by a former mayor of Harrisburg with the hopes of establishing a museum focused on the Old West. With the Mayor then out of office, and the City of Harrisburg in financial straits and on the verge of bankruptcy, it was determined to sell the collection. The collection consisted of thousands of artifacts that had languished in dusty warehouses for years.

• Guernsey's staff spent a number of months in Harrisburg, sorting through the disorganized collection, cataloguing and photographing the artifacts, and organizing the auction into an 8-day sale, which took place in Harrisburg in July, 2013.

**Judge Freddie G. Burton Jr.**

For letter of reference from Judge Burton, please see Appendix C.

Judge of Probate
County of Wayne, State of Michigan
1269 Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit, Michigan 48226

• Judge Freddie G. Burton, Jr. Judge of Probate, presided over the Estate of Mrs. Rosa Parks

• Following the death of Mrs. Parks in 2005, Guernsey's was appointed by the Court of Michigan to inventory and appraise the contents of her Estate

• In March of 2007, the Michigan Court appointed Guernsey's as "broker" to "market" the Archive to appropriate institutions that would preserve it.

• In 2014, Guernsey's succeeded in selling the Archive to the Buffett Foundation, which has since donated it to the Library of Congress, with portions of the Archive on loan to the Smithsonian's new Museum of African American History and Culture.

• Judge Burton's letter, herewith attached, acknowledges Guernsey's 7-year effort.

24

# CONCLUSION

This proposal, including the proposed commission and all other details contained herein, shall remain firm and unchanged for a period of three years following the Company's receipt of the proposal and the award of the contract.

We thank you for considering Guernsey's for this significant consignment and wish to make it known that we are ready to fully commit all our energies and resources towards making this the very finest and most successful auction it can possibly be.

Arlan Ettinger
President

March 26, 2018

Barbara Mintz
Executive Vice President

March 26, 2018

**Guernsey's**
65 East 93 Street
New York, New York 10128
Phone:  212-794-2280
Fax:      212-744-3638
aettinger@guernseys.com
www.guernseys.com

25

# APPENDIX A

―――――――

# TERMS & CONDITIONS

**TERMS & CONDITIONS**

This catalogue, as amended by any posted notices during the sale, together with the purchaser's registration statement, is Guernsey's and the Consigner's entire agreement with the purchaser relative to the property listed herein. The following conditions of sale are the only terms and conditions by which all properties are offered for sale. The property will be offered by us as the agent for the Consigner unless the catalogue indicates otherwise. By bidding at auction, whether present in person or by agent, by written bid, telephone, internet or by other means, the buyer agrees to be bound by these Conditions of Sale.

1.  ALL PROPERTIES ARE SOLD AS IS, AND NEITHER WE NOR THE CONSIGNER MAKE ANY WARRANTIES OR REPRESENTATIONS WITH RESPECT TO ANY LOT SOLD INCLUDING BUT NOT LIMITED TO THE CORRECTNESS OF THE CATALOGUE OR OTHER DESCRIPTION OF THE ORIGIN, PHYSICAL CONDITION, SIZE, QUALITY, RARITY, ATTRIBUTION, AUTHORSHIP, IMPORTANCE, MEDIUM, PROVENANCE, EXHIBITIONS, LITERATURE OR HISTORICAL RELEVANCE OF THE PROPERTY, AND NO STATEMENT ANYWHERE, WHETHER ORAL OR WRITTEN, SHALL BE DEEMED SUCH A WARRANTY OR REPRESENTATION. ALL SIZES LISTED ARE APPROXIMATE AND LISTED IN INCHES, UNLESS OTHERWISE SPECIFIED. PROSPECTIVE BIDDERS SHOULD INSPECT THE PROPERTY BEFORE BIDDING TO DETERMINE ITS CONDITION, SIZE, AND WHETHER OR NOT IT HAS BEEN REPAIRED OR RESTORED. WE AND THE CONSIGNOR DISCLAIM ANY AND ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. NO WARRANTIES ARE MADE THAT ANY OF THE MERCHANDISE COMPLIES WITH ANY APPLICABLE GOVERNMENTAL RULES, REGULATIONS OR ORDINANCES OF ANY KIND OR NATURE WHATSOEVER. NEITHER GUERNSEY'S AS AGENT NOR THE CONSIGNER IS RESPONSIBLE FOR ANY FAULTS OR DEFECTS IN ANY LOT OR THE CORRECTNESS OF ANY STATEMENT AS TO ANY ORIGIN, AUTHORSHIP, DATE, AGE, ATTRIBUTION, GENUINENESS, PROVENANCE OR CONDITION OF ANY LOT.

Any description of the items contained in this Auction is for the sole purpose of identifying the items for those Bidders who do not have the opportunity to view the lots prior to bidding, and no description of items has been made part of the basis of the bargain or has created any express warranty that the goods would conform to any description made by Auctioneer. No statement by anyone or in the catalogue, in any advertisement, or which is made at the sale, in the bill of sale or invoice, or elsewhere, shall be deemed such a warranty or representation or an assumption of liability. IN THE EVENT OF ANY CONFLICT BETWEEN A DESCRIPTION AND THESE TERMS AND CONDITIONS, THE TERMS OF CONDITIONS SHALL CONTROL.  NO DESCRIPTION IS INTENDED TO, OR SHALL, NEGATE OR LIMIT THE DISCLAIMERS SET FORTH HEREIN.

In all cases, prospective buyers are responsible for determining the physical condition of lots, as there are no returns based on condition. The printed conditions in the catalog entry are based on opinion only and are provided for guidance only, without legal obligation. The absence of a condition statement does not imply that the lot is in perfect condition or completely free from wear and tear, imperfections or the effects of aging. Information regarding condition can be requested prior to the auction by contacting Guernsey's by email (auctions@guernseys.com) or by telephone (212-794-2280). Any condition statement given, as a courtesy to a client, is only an opinion and should not be treated as a statement of fact.

WITHOUT IN ANY WAY WAIVING THE FOREGOING, ANY COMPLAINT REGARDING AUTHENTICITY, GENUINENESS, ATTRIBUTION OR PROVENANCE SHALL BE MADE WITHIN TWENTY-FIVE (25) DAYS OF THE DAY OF SALE OR SUCH COMPLAINT SHALL BE WAIVED. ALL BIDDERS ACKNOWLEDGE THEIR RIGHT TO HAVE MADE OR REQUESTED FULL INSPECTION OF ANY AND ALL PROPERTIES PRIOR TO SALE AND AGREE TO BE CHARGED WITH ALL MATTERS SUCH INSPECTION MAY HAVE DISCLOSED OR INDICATED.

2.  A buyer's premium will be added to the purchase of all lots in the sale, and is payable by the purchaser as part of the total purchase price.  The buyer's premium for all bidders participating in the auction is (__% - the percentage for the buyer's premium will be consistent with the current industry standard at the time of the auction).  Guernsey's also receives a commission directly from the Consignor.

3.  We reserve the right to withdraw any property before the sale.

4.  Unless otherwise announced by the auctioneer, all bids are per lot as numbered in the catalogue.

5.  All bids placed, and all payments made must be in U.S. dollars drawn on a U.S. Bank.

6.  Payments are due promptly at the conclusion of the auction, and in the case of absentee and internet bidders, within 10 days of receipt of invoice.

7.  We reserve the right to reject any bid. The highest bidder, acknowledged by the auctioneer, will be the purchaser. In the event of a dispute between bidders, or in the event of doubt on our part as to the validity of any bid, the auctioneer will have the final discretion whether to determine the successful bidder or to re-offer and resell the article in dispute. If any dispute arises after the sale, our sale records are conclusive. Although in our discretion, we will execute other order bids or accept telephone bids as a convenience to clients who are not present at auctions, we are not responsible for any errors or omissions in connection therewith.

8.  If the auctioneer decides that any opening bid is below the value of the article offered, he or she may reject the same and withdraw the article from sale, and if having acknowledged on opening bid, he or she decides that any advance thereafter is insufficient, he or she may reject the advance.

9.  Lots may be offered subject to a reserve, which is the confidential minimum price below such a lot will not be sold. We may implement such reserves by bidding on behalf of the Consignor. In certain instances the Consignor may pay us less than the standard commission rate where a lot is "bought in" to protect its reserve. Where the Consignor is indebted to us or has a monetary guarantee from us, and in certain other instances where we or any affiliated companies may have an interest in the offered lots and the proceeds there from other than our commission, we may bid therefore to protect such interests. Guernsey's may act to protect the reserve by bidding through the auctioneer. The auctioneer may open bidding on any lot below the reserve by placing a bid on behalf of the seller. The auctioneer may continue to bid on behalf of the seller up to the amount of the reserve either by placing consecutive bids or by placing bids in response to other bidders.

10.  On the fall of the auctioneer's hammer, title to the offered lot will pass to the highest bidder acknowledged by the auctioneer, subject to fulfillment by such bidder, of all the conditions set forth herein, and such bidder thereupon a) assumes full risk and responsibility thereof, but not limited to, insurance, fire, theft, removal and storage or damage from any and all causes, and b) will pay the full purchase price thereof or such part as we may require. In addition to other remedies available to us by law, we reserve the right to impose a late charge of 1 1/2% per month of the total purchase price if payment is not made in accordance with the conditions set forth herein. REGARDING ANY PURCHASER WHO IS REPRESENTED BY A BIDDER:  BIDDERS ARE PERSONALLY AND INDIVIDUALLY RESPONSIBLE FOR ANY OBLIGATIONS OF THE PURCHASER SET FORTH IN THE TERMS AND CONDITIONS OF SALE. If any applicable conditions herein are not complied with by the purchaser, in addition to other remedies available to us and the Consigner by law, including, without limitation, the right to hold the purchaser liable for the total purchase price, we at our option may either, a) cancel the sale, retaining as liquidated damages all payments made by the purchaser, or b) resell the property at public auction without reserve, and the purchaser will be liable for any deficiency costs including handling charges, the expenses of both sales, our commissions on both sales at our regular rates, reasonable attorney's fees, incidental damages, and all other charges due hereunder. In the event that such a buyer pays a

portion of the purchase price for any or all lots purchased, Guernsey's shall apply the payment received to such lot or lots that Guernsey's, in its sole discretion deems appropriate. In the case of default, purchaser shall be liable for legal fees and expenses. In addition, a defaulting purchaser will be deemed to have granted us a security interest in, and we may retain as collateral security for such purchaser's obligations to us, any property in our possession owned by such purchaser. We shall have the rights afforded a secured party under the New York Uniform Commercial Code with respect to such property and we may apply against such obligations all monies held or received by us for the account of, due from us to, such purchaser. At our option, payment will not be deemed to have been made in full until we have collected funds represented by checks, or, in the case of bank or cashier's checks, we have confirmed their authenticity. Upon collection of funds, purchaser shall receive a bill of sale for the concerned items of merchandise.

11.  Unless exempted by law, the purchaser will be required to pay New York state and local sales tax or any applicable compensating use tax of another state on the total purchase price. Deliveries outside the state may be subject to the compensating use tax of another state. Where duty or collection is imposed on Guernsey's by law, it will require payment of these taxes.

12.  These Terms and Conditions of Sale as well as the purchaser's and our respective rights and obligations thereunder shall be governed by and construed and enforced in accordance with the laws of the State of New York. By bidding at an auction, whether present in person or by agent, order bid, telephone or by other means, the purchaser shall be deemed to have consented to the exclusive jurisdiction of the State of New York, with exclusive venue in the County of New York.

13.  We are not responsible for the act or omissions of carriers or packers of purchased lots, whether or not recommended by us. Packing and handling of purchased lots by us is at the entire risk of the purchaser. In no event will our liability to a purchaser exceed the purchase price actually paid.

14.  Estimates do not represent any opinion or guarantee of actual value or ultimate sale price. Actual prices realized for items can fall below or above this range. They should not be relied upon as a prediction or guarantee of the actual selling price. They are prepared well in advance of the sale and are subject to revision.

15.  Lots with the designation "not pictured" in their description in the printed catalogue can be viewed on our online bidding platforms, liveauctioneers.com and invaluable.com.

16.  Should any disputes arise pertaining to purchases at this auction or any other matters relating to the auction, such disputes shall be brought in the courts of the State of New York. Venue shall be within the County of New York.

17.  Any claim regarding a purchase must be made by the successful bidder to Guernsey's, in writing, certified mail, return receipt requested, within 25 days of the final day of the live auction. Thereafter, all claims shall be time-barred.  It is Guernsey's general policy, and Guernsey's has the right to have the purchaser obtain, at the purchaser's expense, the opinion of two recognized experts in the field, mutually agreeable to Guernsey's and the purchaser.

18.  The copyrights in and to the items depicted in this catalogue, and the rights of publicity to the names, images and likenesses of persons or items depicted in this catalogue, are exclusively owned by the Consignor of the property or third parties. A BUYER OF AN ITEM OFFERED FOR SALE DOES NOT ACQUIRE ANY COPYRIGHT, COMMERCIAL RIGHT, OR SIMILAR RIGHT WHATSOEVER TO THE ITEMS OR THE IMAGES OR LIKENESSES CONTAINED THEREIN AND THE BUYER MAY NOT REPRODUCE ANY ITEM PURCHASED WITHOUT THE EXPRESS WRITTEN PERMISSION OF THE COPYRIGHT HOLDER. No copies or photographs, catalogue descriptions or other written material in this catalogue may be reproduced in any manner without the express written permission of the copyright holder.

# APPENDIX B

―――――――――

LETTER OF REFERENCE FROM MS. DOROTHY M. WEBER

## SHUKAT ARROW HAFER WEBER & HERBSMAN, L.L.P.

ATTORNEYS AT LAW
111 WEST 57TH STREET
NEW YORK, NEW YORK 10019

ALLEN H. ARROW*
PETER S. SHUKAT
J. JEFFREY HAFER
DOROTHY M. WEBER
JONAS E. HERBSMAN

JASON A. FINESTONE
KYLE D.N. FOGDEN

TELEPHONE (212) 245-4580
TELECOPIER (212) 956-6471

*ALSO MEMBER CALIFORNIA BAR
WRITER'S E-MAIL:

Re:     Guernsey's

Gentlemen:

We had the good fortune of meeting Arlan Ettinger, Susan Jaffe and the staff of Guernsey's several years ago when Arlan first approached us with the idea of doing a Mickey Mantle auction. That auction was held in December, 2003.

The auction was held with dignity and respect for the Mantle legacy which was of paramount importance to the Mantle family. The catalog standing alone was a beautiful book on the life of Mickey Mantle. Arlan spent a great deal of time in Dallas working with the family to ensure that the items which were selected for the auction represented Mickey Mantle's life both on the field and off. The financial results of the auction speak for themself: The Mickey Mantle Rawlings Game Used Baseball Glove sold for $195,000; the Mickey Mantle 1956 Batting Champion of the Year Silver Bat sold for $313,500; the Mickey Mantle 1957 MVP Award sold for $319,250; the Mickey Mantle Rookie Year Contract sold for $118,000; the Mickey Mantle 1956 Sultan of Swat Crown sold for $198,500; and the Mickey Mantle 1962 MVP Award sold for $290,500.

In addition, in 2005, on behalf of the Miles Davis family, we participated in Guernsey's Jazz Auction. We consigned several items of artwork created by the late Miles Davis and the pieces were sold for prices above our expectations. One of the works which was sold by Guernsey's is now on display at the Whitney Museum's Biennial, 2006.

SHUKAT ARROW HAFER WEBER & HERBSMAN, L.L.P.

      We can recommend Guerneys as an absolutely first class operation who has always honored it obligations—rare commodities in this day and age.

                Sincerely,

                Dorothy M. Weber

DMW:nh

32

# APPENDIX C

———————

LETTER OF REFERENCE FROM
JUDGE FREDDIE G. BURTON JR



COUNTY OF WAYNE      **DETROIT**      STATE OF MICHIGAN

FREDDIE G. BURTON, Jr.
JUDGE OF PROBATE

January 15, 2015

1269 COLEMAN A. YOUNG MUNICIPAL CENTER
DETROIT, MICHIGAN 48226

Mr. Arlan Ettinger, President
Guernsey's
108 East 73rd Street
New York, NY 10021

       RE: The Estate and Trust of Mrs. Rosa L. Parks

Dear Arlan:

     This letter is long overdue as I have been intending to share with you my heartfelt appreciation for Guernsey's incredibly important work regarding the Rosa Park collection of personal property items ("Property").

     As you may recall, in late 2006, through the efforts of Attorneys John Chase, Jr. and Melvin D. Jefferson, Jr., your firm was asked to come to Detroit to take control of the Property for inventory and transport to your secure storage facility in New York. It was the expectation of all parties participating in the legal matter before the Wayne County Probate Court that maintenance and storage of the Property would be for a short period of time. None of us thought seven (7) years would pass before this very important collection would find a deserving home.

     In the summer of 2014 through the indefatigable efforts of your firm, the Howard G. Buffett Foundation learned of the availability of the Property and presented a proposal that not only placed the collection in the hands of an organization that will allow the public to marvel at the incredible depth of Mrs. Parks commitment to the fair treatment of all people, but also preserves for history the legacy of Mrs. Parks.

     I believe it is fair to say that without the willingness of Guernsey's to maintain its commitment and dedication to preserve the Rosa Parks Property there would be no collection to commemorate her historic efforts.

     Accordingly, I offer a humble "thank you" for Guernsey's incredibly impressive work.

           Warmest regards,

           *Freddie G Burton*

           Freddie G. Burton, Jr.

           Judge of Probate


223

**Guernsey's**
65 East 93 Street
New York, New York 10128
Phone: 212-794-2280
Fax:     212-744-3638
aettinger@guernseys.com
www.guernseys.com