# EXHIBIT 5

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

Debtors.

**Case No. 3:16-bk-02230-PMG**

**Chapter 11**
**(Jointly Administered)**

> **THIS DOES NOT CONSTITUTE A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THE COURT HAS APPROVED THE DISCLOSURE STATEMENT. THE COURT HAS NOT APPROVED THIS DRAFT DISCLOSURE STATEMENT.**

**DISCLOSURE STATEMENT TO ACCOMPANY THE FIRST AMENDED
JOINT CHAPTER 11 PLAN OF ~~REORGANIZATION~~LIQUIDATION PROPOSED BY
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE
NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF
NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND,
AND RUNNING SUBWAY PRODUCTIONS, LLC**

**STORCH AMINI PC**
Jeffrey Chubak (admitted pro hac vice)
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
(212) 490-4208 (Facsimile)
jchubak@storchamini.com

**THAMES MARKEY & HEEKIN, P.A.**
Richard R. Thames
Robert Heekin
Florida Bar No. 0718459
Florida Bar No. 652083
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
rah@tmhlaw.net

---

[1] The Debtors in the ~~Chapter~~chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

*Attorneys for the Official Committee of
Unsecured Creditors*

**DAVIS POLK & WARDWELL LLP**
Timothy Graulich (admitted pro hac vice)
James I. McClammy (admitted pro hac vice)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com

**STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON,
P.A.**
Patricia Ann Redmond
Florida Bar No. 303739
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
predmond@stearnsweaver.com

*Attorneys for the Trustees of the
National Maritime Museum*

Dated: ~~June 29~~August 28, 2018

THE PLAN PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO ACCOMPANY THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC (THE "**DISCLOSURE STATEMENT**") TO HOLDERS OF CLAIMS FOR PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION (THE "**PLAN**") PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC (COLLECTIVELY, THE "**PLAN PROPONENTS**"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII.

THE PLAN PROPONENTS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED BY THE PLAN. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE PLAN PROPONENTS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN, ATTACHED HERETO, OR INCORPORATED HEREIN BY REFERENCE IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS RELIED ON FINANCIAL DATA PROVIDED BY THE DEBTORS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. AS A RESULT, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  THE PLAN PROPONENTS CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE RECOVERY ANALYSIS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE PLAN PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE PLAN PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, INCLUDING THE RECOVERY ANALYSIS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE PLAN PROPONENTS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

IF THE COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................... 5EXECUTIVE SUMMARY ........ 1
A. Commencement of the Bankruptcy Cases ................................. 5
B. Corporate Structure .......................................................... 6
CA. The Plan Proponents' Plan andOverview of this Disclosure Statement6 and the Plan ........ 2
DB. Purpose of this Document ................................7and Effect of the Plan ........ 3
E. Voting Classes .............................................................. 7
FC. Balloting........................8Treatment of Claims and Interests under the Plan ........ 4
GD. Deadlines for Voting and Objecting to the Plan; Confirmation Hearing
Date ...................................................................86
HE. Additional Information ..............................................86
I. Disclaimer .................................................................9
J. Overview of the Plan ......................................................9
KF. Recommendation ......................................................106
II. BACKGROUND ....................................10VOTING ON THE PLAN ........ 7
III. DESCRIPTION OF THE DEBTORS AND THE HISTORY OF THE R.M.S.
TITANIC ARTIFACTS ..........................................................9
A. The Debtors' Businesses ..............................................109
B. Corporate Structure ......................................................9
BC. The Titanic Artifacts and the Covenants and Conditions ........119
IV. THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS............12
CA. The Debtors' Motion to Sell the French Artifacts ................1312
DB. Plan Discussions and Proposals ....................................1413
EC. Plan Mediation ..........................................................1615
FD. Trustee Motion ..........................................................1615
GE. D&O Litigation ..........................................................1615
HF. Equity Committee Plan ................................................1716
IG. The Plan Sponsors' Bid Letter ......................................1716
JH. Debtors' Third Sale Motion ..........................................1716
KI. The Plan Support Agreement and the Sale to the Plan Sponsors ........17
J. Bankruptcy Court Status Conference. ...............................22
LK. Use of Cash Collateral and Debtor-in-Possession Financing ........2123
ML. Debtor-in-Possession Administration ...............................2124
IIIV. SUMMARY OF THE PLAN OF LIQUIDATION ........................2325
A. Plan Overview ....... 23Classification and Treatment of Claims and Interests ........ 26
B. Limited Consolidation for Voting, Confirmation, and Distribution
Purposes .................................................................2526
C. Bar Dates and Claims Filed ..........................................26
CD. Implementation of the Plan ..........................................2527
DE. Summary of Certain Other Provisions of the Plan ................2730
EF. Executory Contracts and Unexpired Leases ........................2831
FG. Claims Allowance Process ............................................2932
GH. Distributions ............................................................3033
HI. Effectiveness of Plan ..................................................3134

IJ.     Retention of Jurisdiction ................................................................3235
JK.     Limitation of Liability, Releases and Injunction ...............................3437
KL.     Revocation or Withdrawal of the Plan ..............................................3639
LM.     Modification of the Plan ....................................................................3739
MN.     Payment of Statutory Fees ................................................................3739
NO.     Governing Law ..................................................................................3740
OP.     Withholding, Reporting, and Payment of Taxes.................................3740
Q.      Comparison of Estimated Recoveries for Unsecured Creditors under the
        Third Sale Motion and the Plan .........................................................40

IVVI.   STATUTORY REQUIREMENTS FOR CONFIRMATION PROCEDURE OF
        THE PLAN .............................................................................................3842
A.      Voting; Acceptance.............................................................................3842
B.      Confirmation Hearing .........................................................................3843
C.      Feasibility ...........................................................................................4044
D.      Best InterestInterests Test ..................................................................4044
E.      Fair and Equitable Requirement .........................................................4146

VII.    CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ................46
VA.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
        THE PLAN ..............................................42Certain Bankruptcy Considerations      47
B.      Certain Considerations Associated with the Sale ...............................49

VIVIII. ...............................CERTAIN FEDERAL INCOME TAX CONSEQUENCES      4250
A.      Introduction ........................................................................................4250
B.      Consequences to the Debtor................................................................4351
C.      Consequences to Holders of Allowed Class 3 Claims.........................4351

VIIIX.  SUMMARY OF ADDITIONAL SOURCES OF INFORMATION................4956
VIIIX.  RECOMMENDATION AND CONCLUSION..............................................4956

#91100595v1
13

## I.     ~~INTRODUCTION~~**EXECUTIVE SUMMARY**

RMS Titanic, Inc. ("**RMST**") and certain of its affiliates, as debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**"), including its parent corporation Premier Exhibitions, Inc. ("**PRXI**"), each filed with the United States Bankruptcy Court for the Middle District of Florida (the "**Court**") a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") on June 14, 2016 (the "**Petition Date**").  The Chapter 11 Cases are jointly administered for procedural purposes only under lead case number 16-02230 (PMG).

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of the ~~above-captioned debtors and debtors in possession~~Debtors, the Trustees of the National Maritime Museum ("**NMM**"), the Board of Trustees of National Museums and Galleries of Northern Ireland ("**NMNI**" and, together with NMM, the "**Museum Plan Sponsors**"), and Running Subway Productions, LLC ("**Running Subway**" and, together with the Museum Plan Sponsors, the "**Plan Sponsors**")~~)~~; the Plan Sponsors, together with the Creditors' Committee, the "**Plan Proponents**") submit this disclosure statement (this "**Disclosure Statement**")~~, pursuant to~~ in accordance with section 1125 of the Bankruptcy Code~~,~~ to ~~holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the~~provide information regarding the *First Amended* Joint Chapter 11 Plan of ~~Reorganization~~Liquidation *Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC* (as amended, supplemented, or modified from time to time, the "**Plan**").[2]  A copy of the Plan is attached hereto as **Exhibit** ~~1~~**A** and incorporated herein by reference.   All capitalized terms used but not defined herein shall bear the same meaning as ascribed to them in the Plan.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Plan and this Disclosure Statement are the culmination of months of discussions among the ~~Creditors' Committee, the Plan Sponsors (together with the Creditors' Committee, the "~~Plan Proponents~~")~~, Titanic Belfast Ltd. ("**Titanic Belfast**"), and certain other parties in interest, as described in more detail herein.  On June 27, 2018, the Plan Proponents and certain holders of Claims against the Debtors ~~signed a~~entered into that certain Plan Support Agreement (~~attached hereto as **Exhibit B** (together with all exhibits thereto, and as may be amended or modified from time to time, the~~ "**PSA**")~~,~~ which contemplates (a) the sale of substantially all of the Debtors' assets to the Plan Sponsors for a purchase price of $19.2 million and (b) the establishment of a Liquidation Trust for the purpose of, among other things, pursuing certain Causes of Action on behalf of the Debtors' ~~Estates~~estates, monetizing the Property of the Debtors not sold to the Plan Sponsors, and making distributions to the Debtors' ~~creditors~~stakeholders.

~~The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.~~

---

[2] ~~All capitalized terms used but not defined herein shall bear the same meaning as ascribed to them in the Plan.~~

**A. Commencement of the Bankruptcy Cases**

On June 14, 2016 ("**Petition Date**"), voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, were filed in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "**Court**") for each of the following (collectively, the "**Debtors**" and each, a "**Debtor**"): Premier Exhibitions, Inc. (Case No. 3:16-bk-02232-PMG) ("**PRXI**"); RMS Titanic, Inc. (Case No. 3:16-bk-02230-PMG) ("**RMST**"); Premier Exhibitions Management, LLC (Case No. 3:16-bk-02233-PMG); Arts and Exhibitions International, LLC (Case No. 3:16-bk-02238- PMG); Premier Exhibitions International, LLC (Case No. 3:16-bk-02234-PMG ); Premier Exhibitions NYC, Inc. (Case No. 3:16-bk-02235-PMG); Premier Merchandising, LLC (Case No. 3:16-bk-02236-PMG); and Dinosaurs Unearthed Corp. (Case No. 3:16-bk-02237-PMG).

On July 22, 2016, the Court entered its order that the Debtors' Chapter 11 cases (collectively, the "**Chapter 11 Cases**") be jointly administered under Case No. 3:16-bk-02230-PMG. The Debtors have operated as debtors-in-possession since the Petition Date. No trustee or examiner has been appointed in the Chapter 11 Cases. On August 24, 2016, the Acting United States Trustee for Region 21 (the "**U.S. Trustee**"), acting pursuant to Bankruptcy Code section 1102(a), appointed the Creditors' Committee and an Official Committee of Equity Security Holders (the "**Equity Committee**" and, together with the Creditors' Committee, the "**Committees**") to serve in the Debtors' consolidated Chapter 11 Cases.

**B. Corporate Structure**

All of the Debtors are direct or indirect subsidiaries of PRXI. PRXI is also the direct or indirect parent of additional entities that did not seek relief under the Bankruptcy Code, specifically: 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd., all of which collectively, together with the Debtors, are referred in this Disclosure Statement as the "**Company**." An organizational chart of the Company is attached hereto as Exhibit 2.

A hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") is scheduled to be held on [●], 2018, at [●], prevailing Eastern Time, before the Honorable Judge Paul M. Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Florida, 300 North Hogan Street, Courtroom 4A (4th Floor), Jacksonville, Florida 32202. Additional information with respect to confirmation of the Plan ("**Confirmation**") is provided in Article V of this Disclosure Statement.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and transactions contemplated by, the Plan. Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing negotiations among the Plan Proponents, the Debtors and various parties, have not been finally agreed upon, and may be modified.

The Plan Proponents believe that the compromises and transactions contemplated by the Plan are fair and equitable, maximize the value of the Debtors' chapter 11 estates (collectively, the "**Estates**"), and provide the best recovery to claimholders. This Disclosure Statement contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of that chapter 11 plan, as it includes information about:

- the Debtors' corporate structure and business (Article III hereof);

- material events in the Chapter 11 Cases (Article IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article V.A hereof);

- releases contemplated by the Plan (Article V.K hereof);

- the implementation of the Liquidation Trust, which will undertake the liquidation of the Estates and administer the distribution of the Debtors' remaining assets and Sale Proceeds (Article IV.D hereof);

- the statutory requirements for confirming the Plan (Article VI hereof);

- certain risk factors holders of Claims should consider before voting to accept or reject the Plan (Article VII hereof); and

- certain United States federal income tax consequences of the Plan (Article IX hereof).

The Plan Proponents believe that the Plan is in the best interest of the Estates and, accordingly, recommend that you vote to accept the Plan.

**THIS EXECUTIVE SUMMARY ONLY PROVIDES A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN. THE EXECUTIVE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN. THE PLAN PROPONENTS STRONGLY RECOMMEND READING THE EXECUTIVE SUMMARY IN CONJUNCTION WITH THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN.**

**A.** ~~**C. The Plan Proponents' Plan and**~~ **Overview of this Disclosure Statement and the Plan**

~~This document is the Plan Proponents' Disclosure Statement. The purpose of the Disclosure Statement is to describe the Plan and provide additional information to enable the Debtors' creditors~~ to make an informed judgment about the Plan.

In the pleadings filed by the Debtors on the Petition Date, PRXI stated that its reason for filing the ~~bankruptcy cases~~Chapter 11 Cases was to sell certain artifacts salvaged from the wreck of the R.M.S. *Titanic* ~~that~~, which artifacts are the ~~principal assets of the~~ Debtors' ~~Estates~~most valuable assets, pay off its creditors, and emerge from ~~Chapter~~chapter 11 expeditiously. ~~A~~Any sale of the artifacts salvaged from the R.M.S. *Titanic* wreck must be approved by the United States District Court for the Eastern District of Virginia (the "**Admiralty Court**") pursuant to the covenants and conditions that apply to the Debtors' ownership of the artifacts. In the two years since the Debtors commenced these Chapter 11 Cases, the Debtors have been unable to successfully sell any assets or to successfully propose a ~~Chapter~~chapter 11 plan~~, and no proposed sale has been submitted to the Admiralty Court for approval~~. The statutory period of plan exclusivity expired on February 8, 2018.

The Plan Proponents propose the Plan, which provides for a sale of substantially all of the Debtors' assets to the Plan Sponsors for a purchase price of $19.2 million, free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to ~~the terms of~~ the Acquisition Agreements~~. The~~ that will be included with the Plan Supplement (such sale transaction, the "**Sale**"). The Plan contemplates that (i) the Museum Plan Sponsors will acquire the ~~Titanic~~ R.M.S. *Titanic* artifacts (each, an "**Artifact**" and, collectively, the "**Artifacts**" or the "**Artifact Collection**"), the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, the Debtors' rights in the RMS Titanic Trust, and certain intellectual property and other assets related to the Artifact Collection and ~~certain other Titanic-related assets of the Debtors, while~~the R.M.S. *Titanic* wreck, and (ii) Running Subway will acquire substantially all of the remaining assets of the Debtors, save claims and causes of action that vest in the Liquidation Trust, as described in more detail below. The transfer of the Artifact Collection and the Debtors' rights as salvor-in-possession to the Museum Plan Sponsors shall be subject to approval of the Admiralty Court and shall be made only on notice to NOAA and all other parties entitled to notice in the Admiralty Court Proceeding. As of the date of this Disclosure Statement, the ~~Creditors' Committee and the~~ Plan ~~Sponsors~~Proponents believe that their Plan (i) represents the proposal with the highest value to the Debtors' Estates and the highest likelihood of approval in the Admiralty Court and, thus, (ii) is in the best interest of the Debtors, the Debtors' Estates, ~~all having an interest in the Debtors' Estates~~ and the public's beneficial interest in the historical, archeological, scientific, and cultural aspects of the artifacts salvaged from the R.M.S. *Titanic* wreck.

The Plan also provides for the establishment of a Liquidation Trust ~~which~~that will be vested, as of the Effective Date, with all Property comprising the Estates of the Debtors not conveyed to the Plan Sponsors under the Acquisition Agreements (the "**Liquidation Trust Assets**"), including all claims and Causes of Action (including Avoidance Actions under ~~Chapter~~chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidation Trustee for the benefit of the Debtors' Estates. The Liquidation Trust will make an initial distribution from the Liquidation Trust to holders of Allowed Claims from the proceeds of the Sale and ~~will~~ thereafter will make one or more interim distributions of the proceeds of the Liquidation Trustee's administration of the Liquidation Trust Assets, culminating in a final distribution to be made upon the completion of the Liquidation Trustee's administration of the Liquidation Trust Assets.

4

**B.**    ~~D.~~ **Purpose** ~~of this Document~~ and Effect of the Plan

~~This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Impaired Claims as a part of the proceedings seeking confirmation of the Plan.  It sets forth, among other things, information concerning the Debtors, their Chapter 11 Cases, the events that have taken place during the Chapter 11 Cases, and the Plan.  Its purpose is to provide the holders of Impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan.  Each holder of an Impaired Claim should read this Disclosure Statement and the Plan in their entirety and consider them fully.  No person has been authorized by the Creditors' Committee or the Court to utilize, for purposes of solicitation, any information other than the information contained or referred to herein.~~

~~E. Voting Classes~~

The Plan is predicated on, among other things, the proposed sale of substantially all of the assets of the Debtors to the Plan Sponsors.

The Plan Proponents are seeking to implement the Plan under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business or sell and liquidate its assets for the benefit of its stakeholders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all legal and equitable interests of the debtors as of the commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  The consummation of a plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth how a debtor will treat claims and equity interests, and a bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.  A chapter 11 plan divides claims and equity interests into "classes" according to their relative priority and other criteria.

**C.**    **Treatment of Claims and Interests under the Plan**

~~There is one voting Class under the Plan—Class 3 Claims.  The Plan proposes to pay all Allowed Claims in Classes 1, 2, and 4 in full on the Effective Date of the Plan or shortly thereafter, with the result that the holders of Claims in those Classes are unimpaired, are conclusively presumed to have accepted the Plan, and are not~~ The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) whether the Class is "Impaired" under the Plan, meaning that each holder of a Claim will receive less than full value on account of its

Claim or Interest or that the rights of holders of Claims under law will be altered in some way (such as receiving stock instead of holding a Claim), (c) the form of consideration (e.g., cash, equity interests, new debt, or a combination thereof), if any, that such holders will receive on account of their respective Claims or Interests, and (d) whether the Class is entitled to vote on the Plan. The Plan proposes to cancel the Claims and Interests in Classes 5 and 6, respectively, and such Claims and Interests are conclusively deemed to reject the Plan and also are not entitled to vote.

The Bankruptcy Code defines "acceptance" (i) with respect to a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class, and (ii) with respect to an impaired class of interests if the holders of at least two-thirds in dollar amount of the interests actually voting in each such Class have voted to accept the Plan, in each case counting only those holders who cast Ballots (as defined below).

THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERSThe table below provides a summary of the classification, treatment, and estimated recoveries of Claims and Interests under the Plan and the voting status of each Class of Claims and Interests. **THE TABLE PROVIDES THIS INFORMATION FOR ILLUSTRATIVE PURPOSES ONLY, IS SUBJECT TO MATERIAL CHANGE BASED ON CONTINGENCIES RELATED TO THE CLAIMS-RECONCILIATION PROCESS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.** THE PLAN PROPONENTS THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS VOTE TO ACCEPT THE PLAN**MAKE NO REPRESENTATIONS OR GUARANTEES AS TO THE ACCURACY OF THIS INFORMATION**.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section IV of this Disclosure Statement entitled "Confirmation Procedure."

| Class | Designation | Treatment | Voting Status | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Class 1 Claim shall receive Cash in the full amount of such Allowed Class 1 Claim. | Unimpaired; Presumed to Accept | 100% |
| 2 | Secured Creditors | Each holder of an Allowed Class 2 Claim shall receive (i) Cash in an amount equal to such Allowed Class 2 Claim, including any non-default interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (ii) the Collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 | Unimpaired; Presumed to Accept | 100% |

#91100595v4

| Class | Designation | Treatment | Voting Status | Estimated Recovery |
|-------|-------------|-----------|---------------|--------------------|
| | | Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iii) treatment in any other manner such that its Allowed Class 2 Claim shall not be Impaired.  To the extent any security interest relating to an Secured Claim is avoided or any portion of the Secured Claim is determined to be unsecured, including due to any deficiency (the **"Secured Lenders' Unsecured Claim"**), the Secured Lenders' Unsecured Claim shall be classified in Class 3 as General Unsecured Claims and receive the same treatment as other Class 3 Claims; provided, however, that any Secured Lenders' Unsecured Claim in respect of the Secured Loans, the Secured Notes, or any other Claim held by an Insider shall be separately classified as a General Unsecured Claim and shall receive its Pro Rata share of Available Cash contemporaneous with the other General Unsecured Claims as if such Secured Lenders' Unsecured Claim been classified in Class 3 until such Secured Lenders' Unsecured Claim is paid in full with interest at the Federal Judgment Rate. | | |
| 3 | General Unsecured Claims | Each holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Initial Distribution and each subsequent Distribution until paid in full with interest at the Federal Judgment Rate. | Impaired; Entitled to Vote | 59-71%[2] |
| 4 | Intercompany Claims | All Class 4 Claims shall be cancelled in full, and holders of Class 4 Claims shall receive no distribution and retain no Property on account of such Claims. | Impaired; Deemed to Reject | 0% |
| 5 | PRXI Interests | Class 5 Interests shall be discharged, cancelled, released, and extinguished and holders of Class 5 Interests shall neither receive any Distributions nor any of the Debtors' Property. | Impaired; Deemed to Reject | 0% |

[2] See Section V.Q for a discussion of risks and considerations relating to the recoveries projected herein.

7

F. Balloting

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please write to the Creditors' Committee's Ballot Tabulator, Jeffrey Chubak, at jchubak@storchamini.com.

After carefully reviewing this Disclosure Statement and the Plan Proponents' Plan, including the respective exhibits, the holders of Claims in Class 3 should decide whether to accept or reject the Plan and should indicate that holder's vote on the enclosed Ballot and return it in a timely manner in the envelope provided.

### D. G. Deadlines for Voting and Objecting to the Plan; Confirmation Hearing Date

Pursuant to the entered order of the Court approving this Disclosure Statement [Docket No. [●]] (the "**Disclosure Statement Order**"), in order to be counted, a Ballot must be delivered to and received by _____, in accordance with the procedures set forth therein, on or before 5:00 p.m. Prevailing Eastern Time on _____, 2018. The Disclosure Statement Order sets _____, 2018 as the last day on which written objections to confirmation of the Plan (if any) must be filed. A hearing in the Court to consider final approval of this Disclosure Statement and confirmation of the Plan has been set for _: ___ _.m. on _____ ___, 2018.

In accordance with section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Court has scheduled the Confirmation Hearing for [●], 2018, at [●], prevailing Eastern Time, before the Honorable Judge Paul M. Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Florida, 300 North Hogan Street, Courtroom 4A (4th Floor), Jacksonville, Florida 32202. The Court may adjourn the Confirmation Hearing from time to time.

In accordance with the Disclosure Statement Order, any objection to Confirmation must be filed with the Court and served so as to be actually received on or before [●] p.m., prevailing Eastern Time, on [●], 2018.

### E. H. Additional Information

Attached as Exhibits to this Disclosure Statement are copies of the following:

1. The Plan (Exhibit 1);

    Exhibit A:    Plan of Liquidation

    Exhibit B:    Plan Support Agreement

    Exhibit C:    Recovery Analysis

    2. Premier Exhibitions, Inc.,Exhibit D:    PRXI    Corporate    Organizational Chart (Exhibit 2); and

    Exhibit E:    Covenants and Conditions

**F.**    3. The Covenants and Conditions (as defined below) (Exhibit 3).**Recommendation**

In conjunction with the approval of this Disclosure Statement by the Court,the opinion of the Plan Proponents, and the Creditors' Committee will obtain approval to distribute to each holder of an Allowed Claim in Class 3 the form of Ballot for casting an acceptance or rejection of the Plan.

    I. in particular, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  ACCORDINGLY, THE PLAN PROPONENTS, AND THE CREDITORS' COMMITTEE IN PARTICULARDisclaimer

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.   EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE PLAN PROPONENTS OR BY ANY OF THEIR RESPECTIVE ADVISORS.   NOR HAVE THE PLAN PROPONENTS OR ANY SUCH ADVISORS INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE PLAN PROPONENTS FOR PURPOSES OF ANY LITIGATION AGAINST THE PLAN PROPONENTS., RECOMMEND THAT HOLDERS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION.

ALTHOUGH THE PLAN PROPONENTS' PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTORS, THEY HAVE NOT

9

INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

**J. Overview of the Plan**

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A. IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the sale of substantially all of the Debtors' assets, including the R.M.S. *Titanic* artifacts (each, an "**Artifact**" and collectively, the "**Artifacts**" or the "**Artifact Collection**"), the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, the Debtors' rights in the RMS Titanic Trust, and certain intellectual property related to the Artifact Collection and the R.M.S. *Titanic* wreck, to the Plan Sponsors for $19,200,000, free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements included with the Plan Supplement (such sale transaction, the "**Sale**"). The transfer of the Artifact Collection to the Museum Plan Sponsors and the Debtors' rights as salvor-in-possession shall be subject to approval of the Admiralty Court and shall be made only on notice to NOAA and all other parties entitled to notice in the Admiralty Court Proceeding.

The Plan further provides for the establishment of a Liquidation Trust which will be vested, as of the Effective Date, with all Property of the Debtors not transferred pursuant to the Sale, including all claims and causes of action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidation Trustee for the benefit of the Debtors' Estates and all having an interest therein. The Liquidation Trustee also will market and sell the remaining assets of the Estate.

The purpose of the Plan is to effectuate an initial distribution, from the Liquidation Trust, to holders of Allowed Claims of the proceeds of the Sale and to thereafter make one or more interim distributions of the proceeds of the Liquidation Trustee's administration of the assets of the Liquidation Trust, culminating in a final distribution to be made upon the completion of the Liquidation Trustee's administration of the Liquidation Trust assets.

**K. Recommendation**

The Plan Proponents believe that the Plan is in the best interests of all holders of Claims. ACCORDINGLY, THE PLAN PROPONENTS RECOMMEND THAT THE HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN.

**II.** ~~BACKGROUND~~**VOTING ON THE PLAN**

This Disclosure Statement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable holders of Claims that are entitled to vote on the Plan to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

By the order of the Court approving this Disclosure Statement (the "**Disclosure Statement Order**"), the Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims that are entitled to vote on the Plan to make informed judgments with respect to acceptance or rejection of the Plan. The Court's approval of this Disclosure Statement does not constitute either a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the Plan by the Court.

All holders of Claims are encouraged to read this Disclosure Statement, its exhibits, and the Plan Supplement filed prior to the Voting Deadline carefully and in their entirety before, if applicable, deciding to vote either to accept or to reject the Plan. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions, and projections that may be materially different from actual and future results. Other events may occur subsequent to the date hereof that may have a material impact on the information contained in this Disclosure Statement. Except as expressly stated, the Plan Proponents do not intend to update the Disclosure Statement, including, without limitation, the Recovery Analysis attached hereto as **Exhibit C**. Thus, neither the Disclosure Statement nor the Recovery Analysis will reflect the impact of any subsequent events, including any not already accounted for in the assumptions underlying the Recovery Analysis. Further, the Plan Proponents do not anticipate that any updates, amendments, or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

In general, a holder of a claim or equity interest may vote to accept or reject a chapter 11 plan if (i) no party in interest has objected to such claim or interest (or the claim or interest has been allowed subsequent to any objection or estimated for voting purposes), (ii) the claim or interest is impaired by the plan, **and** (iii) the holder of such claim or interest will receive or retain property under the plan on account of such claim or interest. Class 3 is the only Class entitled to vote on the Plan.

In general, if a claim is unimpaired under a chapter 11 plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim to have accepted the plan and, thus, the holders of claims in such unimpaired classes are not entitled to vote on the plan. Because Classes 1 and 2 are Unimpaired under the Plan, the holders of Claims in those Classes are conclusively deemed to have accepted the Plan and, therefore, are not entitled to vote.

In general, if the holder of an impaired claim or impaired interest will not receive any distribution or retain any property under a chapter 11 plan in respect of such claim or interest,

section 1126(g) of the Bankruptcy Code deems the holder of such claim or interest to have rejected the plan and, thus, the holders of Claims and Interests in such classes are not entitled to vote on the plan. Since Classes 4 and 5 are impaired and not receiving any distribution or retaining any property under the Plan, the holders of Interests in those Classes are conclusively deemed to have rejected the Plan and, therefore, are not entitled to vote.

If you are entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies with non-original signatures will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in disqualification of your vote on such Ballot. Holders of Claims that fail to vote are not counted as either accepting or rejecting the Plan.

If you have any questions concerning the procedure for voting your Claim, the packet of materials that you have received or the amount of your Claim, or if you did not receive a Ballot, received a damaged Ballot, lost your Ballot, or wish to obtain (at no charge) a printed copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact the Plan Proponents' Ballot Tabulator, Jeffrey Chubak, at jchubak@storchamini.com or (212) 490-4100.

**IN THE CASE OF EACH VOTER, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND THE BALLOT TABULATOR MUST ACTUALLY RECEIVE THE BALLOT ON OR BEFORE [●], 2018, AT [4:00 P.M.], (PREVAILING EASTERN TIME), (THE "VOTING DEADLINE") BY U.S. MAIL OR OTHER HAND-DELIVERY SYSTEM AT THE ADDRESS INDICATED ON THE BALLOT.**

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED. ANY BALLOTS RECEIVED THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS THAT INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.**

## III. DESCRIPTION OF THE DEBTORS AND THE HISTORY OF THE R.M.S. TITANIC ARTIFACTS

### A. The Debtors' Businesses

PRXI is the parent corporation of the Debtors and certain ~~non-Debtor~~non-debtor subsidiaries. *See Chapter 11 Case Management Summary* (Docket No. 8) ("**Case Management Summary**") at ¶ 1. PRXI and its subsidiaries present permanent and touring exhibitions to the public in exhibition centers, museums, and ~~non-traditional~~other venues around the world. *Id.* at ¶ 5. The exhibitions include: "Saturday Night Live: The Experience," "Titanic: The Artifact Exhibition," "Bodies … The Exhibition," "Bodies Revealed," and "The Discovery of King Tut."

The Company also presents exhibitions through its non-debtor subsidiaries, including "Dinosaurs Unearthed," "Extreme Dinosaurs," "Xtreme Bugs," "Dinosaurs Alive!" and "Creatures of the Deep." *Id.*

The Debtors have represented that PRXI first became known for its Titanic exhibitions, which make use of certain artifacts recovered from the R.M.S. *Titanic* wreck site and held in trust by RMST, subject to certain covenants and conditions described in more detail below. *See Case Management Summary at ¶ 6.* The Debtors also state that they have obtained and are in possession of the largest collection of data, information, images and cultural materials associated with the R.M.S. *Titanic* shipwreck. *Id.* at ¶ 7. Moreover, in 1994, a federal district court the Admiralty Court declared RMST "salvor-in-possession" of the R.M.S. *Titanic* wreck and wreck site. *Id.* The Debtors subsequently diversified their exhibition content to include additional exhibitions, including those named above. *Id.* at ¶ 8.

### B.    Corporate Structure

As noted above, all of the Debtors are direct or indirect subsidiaries of PRXI. PRXI is also the direct or indirect parent of additional entities that did not seek relief under the Bankruptcy Code, specifically: 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd., all of which collectively, together with the Debtors, are referred to in this Disclosure Statement as the "**Company**." An organizational chart of the Company is attached hereto as **Exhibit D**.

### C.    B. The Titanic Artifacts and the Covenants and Conditions

On April 15, 1912, the R.M.S. *Titanic*, the luxury liner said to be unsinkable, struck an iceberg and sank on her maiden voyage from Southampton, England to New York, resulting in the loss of more than 1,500 lives. The *Titanic* remained undiscovered for 73 years until a team of American and French researchers, led by Dr. Robert Ballard and financed in part by the National Geographic Society, discovered the wreck site in September 1985. *See* William J. Broad, *WRECKAGE OF TITANIC REPORTED DISCOVERED 12,000 FEET DOWN*, THE NEW YORK TIMES (Sept. 3, 1985), https://www.nytimes.com/1985/09/03/science/wreckage-of-titanic-reported-discovered-12000-feet-down.html. And the *Titanic* remained undisturbed for 75 years until a predecessor of RMST conducted its first salvage expedition in 1987.

RMST and its predecessors in interest conducted several research, recovery, and salvage expeditions to the wreck of the R.M.S. *Titanic* in 1987, 1993, 1994, 1998, 2000, and 2004, recovering approximately 5,500 artifacts. *See id.* at ¶ 4, 7; *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests* (Docket No. 28) ("**Debtors' First Sale Motion**") at ¶ 9. The first several of these expeditions were performed in 1987 with the assistance of the L'Institut Français de Recherche pour l'Exploitation de la Mer, the French government's oceanographic institute. *See Debtors' First Sale Motion at ¶ 7.* Over the course of 32 dives during that expedition, more than

2,100 artifacts were recovered from the R.M.S. *Titanic* wreck site (collectively, the "**French Artifacts**" or the "**French Collection**"). *See id.* In 1993, an Administrator in the French Office of Maritime Affairs (Ministry of Equipment, Transportation and Tourism) awarded RMST title to the French Artifacts. *See R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel etc.*, 435 F.3d 521, 524 (4th Cir. 2006). The Administrator's decision relied upon assurances made by RMST that it "agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition." *Id.* at 528.

On August 26, 1993, RMST commenced an *in rem* action in the Admiralty Court against the artifacts recovered in the 1993 expedition, and the wreck itself. *Id.* A few months later, the Admiralty Court entered an order ~~which~~that assumed *in rem* jurisdiction over the artifacts recovered by RMST in 1993, as well as the wreck itself, and declared RMST to be the salvor-in-possession of the wreck and wreck site. *Id.* RMST recovered more than 3,000 additional artifacts starting in 1993 (collectively, the "**American Artifacts**" or the "**American Collection**"), all of which are subject to the Admiralty Court's *in rem* jurisdiction as well.

In August 2010, the Admiralty Court granted RMST a salvage award for its efforts in recovering and restoring the American Artifacts, and determined the award to be 100% of the fair market value of the American Artifacts~~, which it valued at the time to be approximately $110 million~~. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 809 (E.D. Va. 2010) (the "**2010 Order**"). In the 2010 Order, the Admiralty Court reserved the right to determine the manner in which to pay the award (i.e., by judicial sale of the artifacts~~,~~ or by an *in specie* award of title). *Id.* In keeping with prior orders of the Admiralty Court, RMST and the United States Government, through the United States Attorney, negotiated and drafted *Revised Covenants and Conditions for the Future Disposition of Objects Recovered from the R.M.S. Titanic by R.M.S. Titanic, Inc. pursuant to an in specie salvage award granted by the United States District Court for the Eastern District of Virginia* (the "**Covenants and Conditions**"). The Covenants and Conditions are attached hereto as **Exhibit ~~3~~E**. The Covenants and Conditions are perpetual in duration and are intended to govern the disposition, care, conservation, and management of the American Collection. Covenants and Conditions § I(F). In August 2011, the Admiralty Court granted RMST an *in specie* salvage award in the form of title to the American Artifacts, "fully subject to" the Covenants and Conditions. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011).

Not limited to the American Artifacts, the Covenants and Conditions require RMST and any successors to hold the entire Artifact Collection in trust for the benefit of the public and subject RMST and any successors to oversight by the Admiralty Court. The Covenants and Conditions are intended to ensure that the Artifact Collection is "for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." Covenants and Conditions § I(G). The Admiralty Court has "continuing jurisdiction over the [American] Collection as part of the pending admiralty action." *Id.* § V(F). While not purporting to grant the Admiralty Court *in rem* jurisdiction over the French Artifacts, the Covenants and Conditions require that the American Collection shall "to the maximum extent possible and consistent with

14

reasonable collections management practices, be conserved and curated together with the [French Collection] as an integral whole." *Id*. § III(A).

Moreover, the Covenants and Conditions expressly require the Admiralty Court's approval for any sale, transfer, or assignment of the American Collection and set forth detailed requirements and procedures for such approval, including that the Admiralty Court must determine that the transferee is a "qualified institution." *See id*. § VI(A)-(F). The Covenants and Conditions define a "qualified institution" as an entity demonstrating, in part, the willingness and capacity to ensure that the American Collection "is available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." *Id*. § II(I). Annex A to the Covenants and Conditions provides criteria for evaluating whether an entity meets this definition, and the Covenants and Conditions set forth detailed procedures for how the Admiralty Court may conduct its review. The Admiralty Court may engage experts to conduct a due diligence investigation of potential subsequent trustees and their operations. *See id*. § VI(E)(2). In addition, the National Oceanic and Atmospheric Administration ("**NOAA**") may submit a report and recommendation as to the qualifications of subsequent trustees. *Id*. § VI(E)(4).

The Covenants and Conditions also provide procedures in the event of RMST's bankruptcy. In any bankruptcy proceeding, the beneficial interests of the American Collection, "including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate" and all measures taken by RMST "shall be subject to review by the . . . [Admiralty Court] to protect the unity and integrity of the [American Collection]." *Id*. § VII(B). Under these circumstances, "the [Admiralty] Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions." *Id*. § VII(D)(1).

The Debtors admit that the Covenants and Conditions place substantial requirements on the Artifact Collection that make a traditional sale or auction of the Artifact Collection, including the French Artifacts (individually or collectively), difficult. *See* Third Sale Motion (as defined below) at ¶ 12. The Covenants and Conditions require that the Artifact Collection be made available for public display and exhibition, historical review, and research. Covenants and Conditions § III(B). The Covenants and Conditions also place strict conservation, curation, and management requirements on the Artifact Collection. *Id*. § IV. The Covenants and Conditions appoint NOAA in an oversight role to ensure adherence to the Covenants and Conditions. *Id*. § V. The Covenants and Conditions also place a number of substantive and procedural requirements for the care and transfer of the American Artifacts to any subsequent trustee. *Id*.

## IV.     THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS

On June 14, 2016, each Debtor filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 22, 2016, the Court entered an order that the Chapter 11 Cases be jointly administered for procedural purposes only under lead case number 16-02230 (PMG). The Debtors have continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

On August 24, 2016, the Acting United States Trustee for Region 21 (the "**U.S. Trustee**"), acting pursuant to Bankruptcy Code section 1102(a) of the Bankruptcy Code, appointed the Creditors' Committee and an Official Committee of Equity Security Holders (the "**Equity Committee**" and, together with the Creditors' Committee, the "**Committees**") to serve in the Debtors' consolidated Chapter 11 Cases.

The following comprises a general summary of the Chapter 11 Cases including, without limitation, a discussion of the Debtors' restructuring and sale efforts since the Petition Date.

### **A.**   ~~C.~~ The Debtors' Motion to Sell the French Artifacts

On June 20, 2016, the Debtors filed the *Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105 And 363 And Bankruptcy Rules 6003, 6004, And 9014 Authorizing The Debtors To Market And Sell Certain Titanic Artifacts Free And Clear Of Liens, Claims, And Interests* ~~[~~(Docket No. 28~~]~~) (the "**French Artifacts Sale Motion**").  The French Artifact Sale Motion did not (i) identify specific property to be sold, ~~did not~~(ii) state the time and place for the sale, ~~did not~~(iii) state any procedures for potential purchasers to bid for the artifacts, ~~did not~~(iv) state the price for which the assets would be sold, and ~~did not~~(v) identify any buyers for the assets.  ~~Rather~~Instead, ~~what~~ the Debtors ~~filed as a~~ "sale motion" was, in effect, a request for an advisory opinion that the Debtors had the authority to sell French artifacts—effectively a quiet title action for declaratory relief.

The United States Department of Justice on behalf of NOAA and the U.S. Trustee both objected to the French Artifact Sale Motion.  *See United States Trustee's Objection to Debtors' Motion for Order Authorizing Sale of Titanic Artifacts Free and Clear of All Liens, Claims and Encumbrances Pursuant to 11 U.S.C. §§ 363 and 105 (Docket No. 67); United States' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests (Docket No. 73).*  In their objections, each noted, among other things, that the Debtors had failed to provide France with notice of the sale motion under which the French Artifacts were to be sold in Court.  NOAA and the U.S. Trustee also argued that the relief requested by the Debtors was actually declaratory relief, which could only be granted in an adversary proceeding in which France would have an opportunity to defend any interest it might have in the French artifacts.

The Court agreed and, by order entered July 22, 2016, denied the French Artifacts Sale Motion with leave to re-file if and when ~~PRXI~~the Debtors obtained a judgment in an adversary proceeding that France had no interest in the French artifacts.  ~~On~~*See Order on Motion for Order Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests (Docket No. 102).  On* August 17, 2016, the Debtors filed the adversary proceeding that was required in order to quiet title to the French Artifacts, *RMS Titanic, Inc. v. The French Republic*, Case No. 3:16-ap-00183-PMG (the "**French Artifacts Proceeding**").  On September 29, 2017, because France did not appear in the proceeding, the Court granted a default judgment in favor of the Debtors, holding that France did not have any interest in the French Artifacts.  *See* French Artifacts Proceeding, *Final Default Judgment* ~~[~~(Docket No. 67~~]~~).

Following the ~~resolution of~~entry of the Final Default Judgment in the French Artifacts Proceeding, ~~PRXI did not pursue its plan to sell only the French Artifacts pursuant to the French Artifact Sale Motion.  NOAA maintains~~NOAA maintained that the Covenants and Conditions do not allow a sale of the French Artifacts separately from the American Artifacts, and has repeatedly indicated that it would vigorously challenge any effort to auction any French Artifacts individually or separately from the American Artifact collection.[3]

The Debtors have conceded that the Covenants and Conditions result in significant risks and uncertainty attendant to any sale or disposition of the Artifact Collection, and particularly any sale of individual or small groups of artifacts.  *See* Third Sale Motion at ¶ 13.  Accordingly, the Debtors did not pursue its plan to sell only the French Artifacts pursuant to the French Artifact Sale Motion.

### B.  ~~D.~~Plan Discussions and Proposals

In February 2017, the Debtors met with the Committees to discuss a consensual reorganization plan.  At that time, the Debtors' preference remained to sell certain assets and emerge from the Chapter 11 Cases as an on-going business.  The Debtors drafted and distributed to potential purchasers of the Debtors or their assets solicitation ~~material~~materials in which the Debtors stated their intention to obtain exit financing in the amount of $22.5 million that would be used to pay approximately $12 million in general unsecured claims and about $3.5 million in prepetition secured claims.   Another $3 million to $5 million would be used to pay administrative expenses in the Chapter 11 ~~expenses~~Cases.  After payment of loan fees and interest, including establishment of an interest reserve, approximately $475,000 would have been available for working capital.

The Creditors' Committee supported the repayment of unsecured claims from the proceeds of the exit financing; however, the Equity Committee opposed that proposal ~~because it would effectively convert unsecured prepetition debt to secured debt~~.  GlassRatner Advisory & Capital Group LLC ("**GlassRatner**"), which is employed as financial advisor to Debtors, also projected that the Debtors would not be able to repay the exit facility out of cash flow from operations but would have required a post-confirmation liquidity event to repay the loan.  Faced with opposition from the Equity Committee, the Debtors ultimately abandoned their plans for an exit facility.  *See Disclosure Statement to Accompany Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* ~~[~~(Docket No. 1044~~]~~) at ~~Article~~Art. II.C.

---

[3] NOAA reiterated its position in response to the motion of Euclid Claims Recovery LLC to appoint ~~Chapter~~a chapter 11 trustee.  *See Response of United States of America to Motion of Euclid Claims Recovery LLC for Appointment of a Chapter 11 Trustee* ~~[~~(Docket No. 1041~~]~~) at 2 ("Under the [Covenants and Conditions], RMST has committed, among other things, to conserving and curating, 'to the maximum extent possible and consistent with reasonable collection management practices,' the American Collection of Titanic artifacts together with the French Collection of Titanic artifacts 'as an integral whole' . . . In light of this provision in the [Covenants and Conditions] and the movant's obvious preference for a sale of the French artifacts if the Court appoints a trustee, NOAA expressly reserves its right to object or otherwise respond to any motion filed in this Court seeking authority to sell any of the artifacts recovered from the Titanic.")

The Debtors and the Committees began negotiating a consensual plan after the Debtors abandoned their plan for the exit financing facility. These negotiations resulted in the Committees and the Debtors entering into a Plan Support Agreement (the "**Debtors' PSA**") that was approved by order of the Court entered on July 6, 2017. A copy of the PSA is attached as Exhibit 1 to the *Order Authorizing The Debtors, The Official Committee Of Unsecured Creditors And The Official Committee Of Equity Security Holders To Enter Into And Perform Their Obligations Under A Plan Support Agreement* [(Docket No. 642]).

Under the Debtors' PSA, the Debtors and the Committees agreed that the Debtors would conduct a sale process under which they would pursue a sale of (a̶i) the entire Company, (b̶ii) RMST and/or the ~~artifact collection~~Artifact Collection, or (c̶iii) the other operating companies among the Company. The Debtors' PSA did not contemplate the piecemeal sale of the Artifacts.

GlassRatner conducted the sale for the Debtors. GlassRatner reported that they contacted 126 parties, of which 26 parties entered into non-disclosure agreements with the Debtors (each, an "**NDA**") and received a solicitation package from GlassRatner. Ten of those parties who executed NDAs conducted due diligence in a data room maintained by GlassRatner. By the deadline for submission of proposals, July 31, 2017, only five of these submitted letters of intent.[4] These finalists were invited to bid for position as stalking horse bidder in a second round of solicitation with bids due in October 2017. Around this time, NMM began formal discussions with GlassRatner expressing its interest in putting forward a bid for the Artifact Collection. In the end, the Debtors did not select NMM or any finalist to be the stalking horse bid.

Instead, on November 14, 2017, the Debtors filed a second sale motion, *Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Bid Protections; and (VI) Granting Related Relief*, (Docket No. 811) (the "**Second Sale Motion**") ~~[Docket No. 811]~~, without a stalking horse, under which the Debtors proposed a bulk sale of their assets at a "naked" auction. At the same time, the Debtors filed the *Debtors Joint Plan under Chapter 11 of the Bankruptcy Code* (the "**Debtors' Plan**") [(Docket No. 859]), which contemplated completion of the sale proposed by the Second Sale Motion and the establishment of a liquidation trust tasked with, among other things, pursuing certain causes of action, monetizing the assets of the Debtors remaining after the sale contemplated by the Second Sale Motion, and making distributions.

On December 12, 2017, an ad hoc group of equity holders (the "**Ad Hoc Group**") comprised of funds managed by affiliates of Apollo Global Management, LLC and Alta Fundamental Advisers LLC filed an objection to the proposed naked auction, requesting that they be given time to conduct diligence with respect to the Debtors to formulate a restructuring alternative to the naked auction~~.~~[. *See Objection of the Ad Hoc Group of Equityholders to the*

---

[4] ~~The proposals, including letters of intent, received from various potential purchasers of estate assets were submitted in confidence. Accordingly, the Creditors' Committee is disclosing the results of the Debtors' marketing efforts, but not the specifics of any proposals received by the Debtors.~~

*Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Bid Protections; and (VI) Granting Related Relief* (Docket No. 850]). On December 14, 2017, NMM filed a motion to withdraw the reference with respect to the proposed naked auction motion and transfer it to the Admiralty Court in accordance with the Covenants and Conditions [. *See Motion to Withdraw the Reference and Transfer Venue* (Docket No. 850]).

Because of these objections and other considerations, on December 15, 2017, with the support of the Committees, the Debtors withdrew both the Second Sale Motion [(Docket No. 863]) and the Debtors' Plan [(Docket No. 944]). As of the date of the filing of this Disclosure Statement, the Debtors have not filed a new ~~Chapter~~chapter 11 plan.

### C.   ~~E.~~ Plan Mediation

In January 2018, the Debtors and the Committees met and agreed to pursue mediation to resolve the Chapter 11 Cases (the "**Plan Mediation**"). On February 26 and 27, 2018, ~~mediation~~Plan Mediation was held in Atlanta, Georgia, with Edward Dobbs as mediator. Over two days, the parties to the ~~mediation~~Plan Mediation met but were unable to reach agreement on a consensual ~~Chapter~~chapter 11 plan or other exit strategy. ~~The mediation~~*See Report of Mediator* (Docket No. 970). The Plan Mediation closed without resolution and the Debtors re-embarked upon a process to sell the Debtors or their assets. *Id.*

### D.   ~~F.~~ Trustee Motion

On May 1, 2018, Euclid Claims Recovery LLC ("**Euclid**"), a creditor in the Chapter 11 Cases, filed a *Motion of Euclid Claims Recovery LLC for Appointment of Chapter 11 Trustee* (Docket No. 1013) (the "**Trustee Motion**") ~~[Docket No. 1013]~~, in which Euclid sought appointment of a ~~Chapter~~chapter 11 trustee ~~citing~~. In support of the Trustee Motion, Euclid cited, among other things, (i) multiple failed attempts at selling the assets of the Debtors without ultimately finalizing any sale process, (ii) incurring aggregate fees and expenses of ~~Chapter~~chapter 11 professionals approaching $5 million, and (iii) substantial and continuing loss to and diminution of the ~~estate~~Estates due to postpetition administrative losses. A hearing on the Trustee Motion was held on June 7, 2018. On June 29, 2018, the Court denied the Trustee Motion [. *See Order on Motion of Euclid Claims Recovery LLC for Appointment of Chapter 11 Trustee* (Docket No. 1082]).

### E.   ~~G.~~ D&O Litigation

In May 2018, the Equity Committee moved for derivative standing to prosecute and settle certain claims on behalf of the Debtors' estates [(Docket No. 1015].) and sought to, among other things, employ Robert Charbonneau and Agentis PLLC as special litigation counsel to prosecute ~~the same~~such claims on a contingency basis [(Docket No. 1017]). The Court granted derivative standing to prosecute certain claims, and approved the proposed engagement [(Docket No. 1038]) over the objections of the Debtors and Creditors' Committee [(Docket Nos. 1029, 1036]). On June 4, 2018, the Equity Committee commenced an adversary proceeding asserting breach of

fiduciary duty and gross negligence claims against certain current and former directors and officers (Adv. Pro. No. 18-64). The ~~liquidation~~recovery analysis annexed to the Equity Committee's disclosure statement projects net recoveries of $2 to $4 million from the litigation. The Creditors' Committee believes that the Equity Committee overvalues the causes of action. Significantly, even under the Equity Committee's high estimated net recovery ($4 million), the proceeds from the litigation, together with proceeds from the Sale (assuming no qualified bids are submitted), would be insufficient to pay creditors in full ~~under GlassRatner's projections~~.

**F.** ~~H.~~ **Equity Committee Plan**

On June 1, 2018, the Equity Committee filed ~~its Chapter~~a chapter 11 plan (the "**Equity Committee Plan**") and an accompanying Disclosure Statement~~, proposing to market and sell~~. The Equity Committee Plan contemplates marketing and selling the American Artifacts to a "qualified institution" and ~~to~~separately ~~market and auction~~marketing and auctioning the French Artifacts at Guernsey's auction house. ~~[~~(Docket ~~No~~Nos. 1044, 1045~~]~~). The Equity Committee Plan ~~contains no~~does not describe the funding source with which to (i) fund the litigation that would ensue over the proposed liquidation of the French Artifacts~~, or repayment of~~ [4] or (ii) repay the DIP Loan at maturity, but prior to the sale of any French Artifacts. ~~The hearing on the Equity Committee's disclosure statement will be held on July 25, 2018 [Docket No. 1060].~~At the status conference held by the Bankruptcy Court on July 25, 2018 (the "**Status Conference**"), counsel to the Equity Committee stated that it had sent to the Debtors a term sheet for exit financing. *See* Transcript of Proceedings (the "**Status Conference Transcript**") (Docket No. 1143) at 46. At the Status Conference, the Debtors described the commitment as a "non-binding, not firm commitment" for up to $7 million, which is not sufficient to refinance the current DIP Loan, the administrative claims, the priority claims, and the claims of the Lenders. *See id.* at 67.

**G.** ~~I.~~ **The Plan Sponsors' Bid Letter**

On June 7, 2018, the Museum Plan Sponsors and Running Subway sent GlassRatner a letter indicating their interest in purchasing substantially all of the Debtors' assets for $19.2 million in cash, which would be raised by the Museum Plan Sponsors and Titanic Belfast through a global fundraising campaign. A description of the Museum Plan Sponsors and Running Subway is included in Article IV.I.4.

As described below, eight days later, on June 15, 2018, the Debtors filed a sale motion to pursue a sale to a stalking horse purchaser for $17.5 million.

**H.** ~~J.~~ **Debtors' Third Sale Motion**

On June 15, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (a) Approving Competitive Bidding Procedures and Sale Procedures; (b) Approving Form and*

---

[4] In NOAA's objection to the Equity Committee's disclosure statement, NOAA stated that the separate sale of the French Artifacts "could constitute a Material Default under the Covenants if it does not result in the entire Titanic collection being conserved and curated as an integral whole available for public display and exhibition." *See Objection of United States of America to Disclosure Statement to Accompany Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* (Docket No. 1120) at ¶ 12. NOAA describes this as a "material and substantial litigation risk." *Id.* at ¶ 15.

*Manner of Notices; (c) Approving Form of Asset Purchase Agreement; (d) Approving Break Up-Fee and Expense Reimbursement; (e) Scheduling Auction and Hearing to Consider Final Approval of Sale, Including Rejection or Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (f) Authorizing Sale of the Transferred Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (g) Approving Settlement with the PacBridge Parties; and (h) Granting Related Relief* [(Docket No. 1055]) (the "**Third Sale Motion**").  The Third Sale Motion contemplates the sale of substantially all of the assets of the Debtors to Premier Acquisition Holdings LLC, a Delaware limited liability company (the "**Stalking Horse Purchaser**"), an entity formed by (1) affiliates of members of the Ad Hoc Group, (2) Haiping Zou, Lange Feng, and Jihe Zhang, and (collectively, the "**Lenders**"), each of which extended a $1 million loan to the Debtors prior to the commencement of their chapter 11 cases, and (3) PacBridge Capital Partners (HK) Ltd. ("**PacBridge**"), for $17.5 million, subject to higher and better offers if any qualified bids are submitted by the contemplated bid deadline set forth in the Third Sale Motion (August 8, 2018).  The Museum Plan Sponsors have advised the Debtors and the Creditors' Committee that, due to institutional limitations, they cannot submit a qualified bid under the bid procedures annexed as Exhibit A to the Debtors' Third Sale Motion. The Creditors' Committee does not believe that any other potential purchasers will submit a timely qualified bid under the bid procedures.

The Third Sale Motion also contemplates providing bid protections of up to $1 million to the Stalking Horse Purchaser. if any qualified bids are timely submitted, and seeks approval of a "PacBridge Parties Settlement" under which a potential estate cause of action to avoid the Lenders' security interests under their respective promissory notes would be resolved on the following terms: (a) the Lenders would receive $1 million in cash at the closing of the Sale and $2 million in allowed general unsecured claims, and (b) a $1,195,350.39 claim filed by PacBridge, which the Debtors previously objected to on the ground that it was for services rendered to a non-debtor affiliate of the Debtors (Docket No. 520), shall be allowed in full.

Pursuant to section 7.4 of the Asset Purchase Agreement filed as Exhibit B to the Debtors' Third Sale Motion (the "**Stalking Horse APA**"), the Stalking Horse Purchaser may terminate the Stalking Horse APA if certain milestones are not achieved or if the Bankruptcy Court approves a disclosure statement with respect to a chapter 11 plan filed by any person other than the Debtors, including this Disclosure Statement.  *See* Stalking Horse APA §§ 7.4(b), (d). As of the date hereof, two milestones were not achieved: (i) the Bankruptcy Court did not enter an order approving the bidding procedures associated with the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on July 20, 2018, and (ii) the Bankruptcy Court did not approve the sale substantially all of the Debtors' assets pursuant to the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on August 15, 2018.  As of the date hereof, neither the Creditors' Committee nor the Museum Plan Proponents are aware of a notice of termination having been served by the Stalking Horse Purchaser upon the Debtors.

On June 22, 2018, the Equity Committee filed their own objection to the PacBridge Claim (Docket No. 1070).  The hearing on that objection has been continued.  On July 11, 2018, Euclid objected to the Debtors' Third Sale Motion (Docket No. 1109).

**I.**     ~~K.~~  **The Plan Support Agreement and the Sale to the Plan Sponsors**

Since initially reaching out to GlassRatner in September 2017, NMM, together with Titanic Foundation Ltd., Titanic Belfast, and NMNI, ~~has~~ engaged in months of good faith, substantive discussions with GlassRatner and the Creditors' Committee~~,~~ with respect to its interest in purchasing the Artifact Collection.  More recently, to address creditor concerns that the Museum Plan Sponsors' bid for the Artifact Collection would leave uncertainty with respect to the disposition of the Debtors' remaining assets and the swift and inexpensive resolution of the Chapter 11 Cases, NMM began negotiations with Running Subway to put forward a joint bid for substantially all of the assets of the Debtors.

These months of discussions culminated in the signing of the PSA on June 27, 2018 by the Plan Proponents and certain holders of Claims against the Debtors.  Under the PSA, the Plan ~~Proponents and the supporting~~Sponsors, the Creditors' Committee, and each of the three members of the Creditors' Committee in their capacity as creditors agreed to, among other things, support and take all steps reasonably necessary to support the Sale and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Sale.  Significantly, James Sanna, the CEO of both Running Subway and of TSX Operating Co., LLC (a creditor in the Chapter 11 Cases and a member of the Creditors' Committee), recused himself from, and did not participate in, the Creditors' Committee's deliberations concerning, or vote on the decision to support, the Plan.  Rather, that decision was made by the Creditors' Committee's two other remaining members—B.E. Capital Management Fund LP and Dallian Hoffen Biotechnique Co., Ltd.  In fact, if the Creditors' Committee were presented with a proposal superior to the Sale and Plan, section 6(b) of the PSA authorizes the two other members of the Creditors' Committee to terminate the Creditors' Committee's support for the Plan without Mr. Sanna's involvement.

Following the signing of the PSA and concurrently with the filing of this Disclosure Statement, the Plan Proponents filed the Plan~~, which~~.  The Plan contemplates, among other things, the sale of substantially all of the assets of the Debtors to the Plan Sponsors in accordance with the PSA and the term sheet attached thereto.  The Sale contemplated by the PSA and the Plan further the Plan Proponents' common goals of (i) maximizing the value of the Debtors' Estates for the benefit of all having an interest therein, (ii) providing for ~~a~~the Debtors' prompt emergence ~~of the Debtors~~from these expensive and protracted ~~bankruptcy proceedings~~Chapter 11 Cases, (iii) providing the least expensive and most certain route for approval of the sale of the Artifacts Collection by the Admiralty Court, and (iv) returning the Artifact Collection home to the United Kingdom~~,~~ to be (A) held in perpetual public ownership for the benefit of the public interest and ~~to be~~(B) kept together, intact and available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes.

Against this backdrop, the Plan Proponents negotiated the Sale.  The central elements of the sale are set forth below.

1.     *Purchased Assets*

The Debtors will sell substantially all of their assets to the Plan Sponsors pursuant to the Acquisition Agreements, which will be filed with a Plan Supplement and are substantially

similar to Stalking Horse APA.  The Museum Plan Sponsors will acquire (~~ii~~a) the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, (~~iii~~b) all of the Debtors' legal and beneficial interests in the Artifacts, (~~iii~~c) the Debtors' interests in RMS Titanic Trust, ~~and (iv~~d) all of the Debtors' right, title, and interest in and to photographs, video footage, recreations of the ship, maps, and data related to the R.M.S. *Titanic* vessel, wreck site and debris field and the Artifact Collection, and (e) all intellectual property and certain other assets related to the foregoing (collectively, the "**Museum Purchased Assets**").  If consummated, the Plan will assure the perpetual public ownership of the Artifact Collection as an integral whole.

Running Subway will acquire substantially all of the assets of the Debtors that are not Museum Purchased Assets (collectively, the "**Running Subway Purchased Assets**" and, together with the Museum Purchased Assets, the "**Purchased Assets**")~~.~~ including, but not limited to, all exhibitry from the Debtors' currently operating *Titanic* exhibitions that do not constitute Museum Purchased Assets, the complete Bodies exhibitions, the Dino/Bugs attractions, and the Saturday Night Live exhibition.

2.     *Purchase Price and Source of Funds*

The purchase price ~~shall be~~for the Purchased Assets is $19,200,000 (the "**Purchase Price**").  NMM, NMNI, and Titanic Belfast intend to ~~fundraise~~raise the full amount of the Purchase Price from and with the support and assistance of government sources~~, several key individuals and~~ from the United States, United Kingdom, and Northern Ireland, high net worth individual and corporate donors, and ~~other sources~~a public campaign backed by certain high profile endorsements.

~~3. *No Bid Protections*~~

~~The Acquisition Agreements do not contemplate a break-up fee or expense reimbursement for the professionals of NMM, NMNI, and Running Subway.~~

Over the past year, NMM and Titanic Belfast have conducted a campaign to build support among government officials, certain key individuals connected to the R.M.S. *Titanic*, and high net worth individual and corporate donors for the acquisition of the Artifact Collection.  The support is led by the National Geographic Society, and by Dr. Ballard, who led the 1985 expedition that located the Titanic.  Together, NMM and Titanic Belfast have developed a comprehensive fundraising campaign that launched with a media event on July 24, 2018, in Belfast, Northern Ireland, at which Dr. Ballard was the keynote speaker and at which James Cameron, director of the 1997 *Titanic* film, provided a video address.  Titanic Belfast has secured the support of the National Geographic Society to act as a publicity platform from which to promote the fundraising efforts, as well as the support and assistance of the Ireland Funds, a global philanthropic network that has raised over $600 million to promote and support peace, culture, education and community development throughout Ireland.

In addition to the fundraising efforts, RMG is in advanced discussions with the United Kingdom Department for Digital, Culture, Media and Sport for support of up to £7.5 million

(approximately $9.7 million) in the form of an unsecured loan, repayable by RMG over an extended period.[5]

NMM and Titanic Belfast remain confident that by the Confirmation Hearing, they will have received the remaining contributions to reach the full amount of the Purchase Price.

3.      *Terms of the Proposed Acquisition Agreements*

The Plan Sponsors anticipate that the terms of their Asset Purchase Agreement (the "**Plan Sponsors' APA**") will be substantially similar to the terms of the Stalking Horse APA, including an identical outside date of 70 days from the Admiralty Court Order Entry Date (as defined in the Stalking Horse APA).  Certain terms of the Plan Sponsors' APA are expected to differ from the Stalking Horse APA, however, including in the following respects:

- *Absence of Certain Purchaser Protective Provisions*. Unlike the Stalking Horse APA, the Plan Sponsors' APA will not include (i) any termination fee payable to the Purchasers (as defined in the Stalking Horse APA) or (ii) the reimbursement by Sellers (as defined in the Stalking Horse APA) of the Purchasers' expenses incurred in connection with its due diligence investigation of Sellers and RMST and the negotiation of the Plan Sponsors' APA.  In fact, the attorneys representing NMM are doing so on a pro bono basis.

- *Fully-Refundable Good Faith Deposit*.  To accommodate the Plan Sponsors' institutional limitations, the Plan Sponsors' APA will require the Good Faith Deposit (as defined in the Stalking Horse APA) to be refunded in the event the closing of the acquisition does not occur.

- *Materiality Qualification of Representations and Warranties*.  The Stalking Horse APA requires the representations and warranties of Sellers and RMST contained therein to be true and correct in *all respects* as a condition to Purchasers' obligation to close the acquisition—a standard that substantially detracts from the Debtors' certainty that closing will occur.  In particular, such a condition to closing would mean the Stalking Horse Purchaser would not be required to close the acquisition if any aspect of any of the Debtors' representations or warranties was incorrect.  By contrast, the Plan Sponsors' APA will provide that the Purchasers will not be permitted to invoke a breach of, or inaccuracy in, the Sellers' representations or warranties to avoid closing the acquisition unless, (i) for fundamental representations, such representations and warranties are not true other than in *de minimis* respects and (ii) for non-fundamental representations, such representations and warranties are untrue such that it would cause a Seller Material Adverse Effect (as defined in the Plan Sponsors' APA), which is an extremely high standard.

---

[5] Due to institutional limitations, NMM is unable to obtain loans from banks and other traditional financing sources.

- *Fundraising Condition.* The Plan Sponsors' APA will contain a representation from the relevant Plan Sponsors that they have a fundraising plan designed to raise the full purchase price. In addition, the relevant Plan Sponsors will covenant to use their reasonable best efforts to complete the fundraising plan prior to the closing date. Due to the nature of the Museum Plan Sponsors' business, the successful completion of the fundraising plan will be a condition to the closing, however, the Museum Plan Sponsors are very confident of their ability to raise the necessary funds.

4.    *Museum Plan Sponsors*

The strength of the Plan Proponents' sale proposal is highlighted by the joint bid of NMM and NMNI for the Artifact Collection. NMM and NMNI are uniquely qualified to care for the Artifact Collection, ensure its preservation as a whole, and provide public access to and interpretation of, this important part of the United Kingdom's heritage. The Plan Proponents believe that NMM and NMNI are undoubtedly "qualified institutions" as defined in the Covenants and Conditions and that the sale of the Artifact Collection to NMM and NMNI will be approved by the Admiralty Court.

(a)    The National Maritime Museum

NMM's commitment to protecting and exhibiting the United Kingdom's underwater heritage spans more than 80 years. The National Maritime Museum was created by the Parliament of the United Kingdom's National Maritime Act of 1934. It is the largest and preeminent maritime museum in the world and it includes, among other things, the Queen's House, the Royal Observatory, Greenwich, and the clipper ship *Cutty Sark*. The collective brand name for the four sites, one of which is NMM, is Royal Museums Greenwich. NMM is a statutory corporation and a charity. It is one of a select group of national museums and galleries that receives direct government funding from Parliament.

Based in Greenwich, London, NMM is the leading custodian of the United Kingdom's maritime heritage. NMM's in-house professional conservation experts have significant experience in the preservation and conservation of maritime artifacts for the benefit of the public, now and in the future, and NMM's standards and procedures are externally audited and accredited as such every three years.

NMM exists to advance the public's access to maritime heritage through its exhibitions, displays, and its educational and research programs. In 1994, NMM staged the first major exhibition displaying the Artifacts, which explored the significant historic and cultural legacy of the ship. In February 1995, NMM convened an international conference in Greenwich, London to find ways to protect underwater cultural heritage within the existing framework of international law. And inIn January 1996, the National Maritime Museum convened a follow-up conference to debate and gain support for the International Law Association's draft convention to protect underwater cultural heritage. This convention was subsequently adopted by the United Nations Educational, Scientific and Cultural Organization ("**UNESCO**") and, in 2001, became the UNESCO Convention on Underwater Cultural Heritage. The R.M.S. *Titanic* came within the scope of that convention in 2012.

25

13

NMM has a strong fundraising record, having fundraised for a wide range of projects and acquisitions.  Over the past decade, Royal Museums Greenwich ("**RMG**"), the museum complex of which NMM is a part, has raised £75 million to support capital works projects and major acquisitions to the National Maritime Museum's collections, from individuals, foundations, and the Heritage Lottery Fund, which distributes shares of the United Kingdom's National Lottery funding to support heritage projects across the United Kingdom. In 2008, Mr. Sammy Ofer gave a gift of £20 million to support the construction of a new wing at NMM.  Additionally, after a fire ravaged the *Cutty Sark* in May 2008 in the midst of a restoration project, the Heritage Lottery Fund contributed £23 million and Mr. Ofer contributed the final £3.3 million to the conservation effort.  The Heritage Lottery Fund has been a generous supporter of major capital projects, new gallery construction and nationally important acquisitions, totaling nearly £22 million.

RMG also has recent experience raising funds for specific acquisitions. In 2016, RMG raised £10.3 million to acquire the Armada Portrait of Elizabeth I and simultaneously ran a £26 million capital masterplan project that secured numerous individual donations of greater than £1 million from supporters such as the Sackler Foundation, the Kristian Gerhard Jebsen Foundation, Mr. Mark Pigott, and LIBOR funds administered through the United Kingdom Treasury. Finally, in 2018, NMM acquired a painting by U.S. contemporary artist Kehinde Wiley with approximately £70,000 of support from the RMG American Friends group, which enjoys 501(c)(3) tax status in the United States, and the Art Fund, an independent membership-based British charity which raises funds to aid the acquisition of artwork for the United Kingdom.

(b)      NMM's Partnership with Titanic Belfast and NMNI

In February 2017, Titanic Foundation Ltd. and Titanic Belfast were contacted by NMM to inform both parties that RMST was in bankruptcy and was looking to sell its assets, including the entire Artifact Collection.  Since then, Titanic Belfast and NMM have been working together to pursue a joint bid for the Artifact Collection.  It is the intention of Titanic Belfast and NMM that the Artifact Collection will be jointly owned by NMM and NMNI, which will ensure the Artifact Collection's care, state-of-the-art curation and conservation, and public display in perpetuity.  Joint ownership by NMM and NMNI would move the Artifact Collection into perpetual public ownership and preserve and provide public access to, and interpretation of, this important part of the world's history.

Titanic Belfast is an £87 million project which was funded by £37 million of private donations and £50 million of government contributions.  It was opened in 2012, 100 years after R.M.S. *Titanic*'s fateful maiden voyage.  Titanic Belfast is the world's preeminent R.M.S. *Titanic* exhibition.  It is owned by Titanic Foundation Ltd., a charity set up to educate the public on Belfast's industrial and maritime heritage, and was developed in collaboration with Dr. Robert Ballard, who discovered the R.M.S. *Titanic* wreck in 1985, to present the public with a comprehensive and interactive education about Edwardian Belfast, the Harland and Wolff shipyard, the R.M.S. *Titanic*, its passengers and the scientists who discovered her.  It is NMM's and NMNI's intention that a substantial portion of the Artifact Collection will be displayed at Titanic Belfast, adjacent to the slipway where R.M.S. *Titanic* was built.

Sponsored by the Northern Irish government, NMNI's three museums are home to 20,000 works of art, over a million plant, animal, and geological specimens, and tens of thousands of precious objects, including a small number of Artifacts, that tell the story of the human settlement in Ireland.

(c)    5.    Museum Plan Sponsors' Agreement with Running Subway

In May 2018, NMM and Titanic Belfast began discussions with Running Subway, which sought to acquire certain property from the Debtors that would be difficult to monetize should the Museum Plan Sponsors acquire the Artifact Collection.  Running Subway is a New York-based entertainment production company that specializes in the procurement, development, and production of iconic and innovative live entertainment properties.    The companyRunning Subway was founded in 2004 and since then has presented over 20 unique exhibitions, including King Tut, Dead Sea Scrolls, and Harry Potter, to over five million people.  Running Subway has opened four distinct venues in New York City, including Bodies at the South Street Seaport and the groundbreaking exhibition center, Discovery Times Square, which premiered with the Titanic exhibit in 2009.  The company currently has a roster of global touring exhibitions. Its and senior management team has decades of experience in the entertainment industry and exhibition presenting and touring realm.

On June 7, 2018, NMM and Running Subway agreed to a term sheet for a bid to acquire substantially all of the assets of the Debtors.  Pursuant to that term sheet, the Museum Purchasers will enter into one or more agreements with Running Subway to enable Running Subway to continue to display certain Artifacts in North America in the exhibition spaces that are subject to the Debtors' leases, including the lease at the Luxor Hotel in Las Vegas, and to use certain intellectual property related to the R.M.S. *Titanic* necessary to effectively display such Artifacts.  The Loan and License Agreement will have a duration of five years and will allow for the exhibition of approximately 550 artifacts.  Running Subway intends to hire substantially all of the employees of the Debtors.

**J.    Bankruptcy Court Status Conference**

By orders and notices of hearing dated June 20, 2018, June 21, 2018, and July 9, 2018, the Bankruptcy Court scheduled a joint hearing on July 25, 2018 to consider (i) the bidding procedures associated with the Debtors' Third Sale Motion, (ii) the adequacy of disclosure statement for the Equity Committee Plan and (iii) the adequacy of the disclosure statement for the Museum Plan (Docket Nos. 1058, 1060, 1100).

On July 6, 2018, the Museum Plan Proponents filed a motion with the Bankruptcy Court to abate the hearing scheduled for June 20 and to instead convene a status conference for the purpose of establishing (i) a coordinated process for the concurrent consideration of the Debtors' Third Sale Motion, the Equity Committee Plan, and the Museum Plan by the Bankruptcy Court and by the Debtors' various stakeholders and (ii) a protocol for the concurrent consideration by the Bankruptcy Court and the Admiralty Court of the propriety of the sales of the Artifact Collection contemplated by the Third Sale Motion, the Equity Committee Plan, and the Museum Plan in light of the Covenants and Conditions (Docket No. 1099).  The request for a status conference was joined by the Equity Committee (Docket No. 1103).

On July 13, 2018, the Bankruptcy Court entered an order abating the scheduled hearing and convening the requested status conference (Docket No. 1112).  The Debtors subsequently moved for reconsideration of the order scheduling the Status Conference and sought to restore the substantive hearing on the bidding procedures for its proposed sale (Docket No. 1114), but the Debtors' requested relief was not granted by the Bankruptcy Court.

At the Status Conference, the various parties presented arguments as to how best to proceed in light of, among other things, the Covenants and Conditions and the jurisdiction of the Admiralty Court over the Artifact Collection.  Thereafter, the Bankruptcy Court issued a written order in connection with the Status Conference (the "**Status Conference Order**") (Docket No. 1151).  In the order, the Bankruptcy Court set a joint hearing to consider the adequacy of the disclosure statements for the Museum Plan and the Equity Committee Plan and the bidding procedures associated with the Debtors' Third Sale Motion for August 30, 2018.  In addition, the Bankruptcy Court instructed the Debtors, the Equity Committee, and the Museum Plan Proponents to "take the steps that they believe are necessary for approval of the proposed sales by the [Admiralty] Court."  Status Conference Order at 4.

### **K.** ~~L.~~ Use of Cash Collateral and Debtor-in-Possession Financing

~~Lang Feng, Haiping Zou and Jihe Zhang (collectively, the "~~The Lenders~~") assert~~ asserted liens on the assets, including cash collateral, of Debtors Premier, Premier Exhibitions Management, Premier Merchandising, and RMST in connection with ~~a  pre-petition loan~~prepetition loans in the ~~original~~ principal amount ~~of~~aggregating $3,000,000 (the "**Lenders' ~~Loan~~Loans**").  The Equity Committee disputed whether the Lenders' ~~Loan is~~Loans are secured and asserted that any security interest that may secure the ~~Lenders' Loan~~same may be avoidable under ~~Chapter~~chapter 5 of the Bankruptcy Code~~, but~~.  However, despite such dispute, Lenders consented to the Debtors' use of ~~the~~their cash collateral ~~of the Lenders pursuant to an Order of the Bankruptcy~~by order of the Court ~~[~~(Docket No. 532~~] authorizing such use)~~ (the "**Cash Collateral Order**").  Under the terms of the Cash Collateral Order, the Lenders ~~are~~were granted a replacement lien on all alleged cash collateral of the Lenders to the same extent, validity, and priority as the security interests asserted by the Lenders as of the Petition Date.  ~~The Allowed Secured Claims (if any) of the Lenders with respect to the Lenders' Loan are Unimpaired and classified in Class 2.~~

On May 18, 2017, the Debtors filed their *Motion for Entry of Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors* ~~[~~(Docket No. 588~~])~~ (the "**DIP Financing Motion**").  The DIP Financing Motion sought authority of the Court for the Debtors to enter into a post-petition loan agreement with Bay Point Capital Partners LP (the "**DIP Lender**") to obtain debtor-in-possession financing in an amount of up to $5,000,000 in principal amount (the "**DIP Loan**") upon terms set forth in the DIP Loan agreements.  On July 12, 2017, the Court entered its order granting the DIP Financing Motion ~~[~~.  *See Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, and 364* (Docket No. 650~~])~~.

The DIP Loan, *inter alia,* bears an interest rate of 13% per annum and a default interest rate of 18% per annum.  It is secured by first priority liens on all assets of the Debtors' Estates, except for avoidance actions under ~~Chapter~~chapter 5 of the Bankruptcy Code.  As of the date of this Disclosure Statement, the ~~Creditors' Committee is informed that there remains approximately $400,000 in credit available to the Debtors~~ ~~under the DIP Loan.  The~~ Debtors have advised that the DIP Loan has been fully drawn.  *See* Status Conference Transcript at 12. The maturity of the DIP Loan has been extended to May 2019.

**L.** ~~M.~~ **Debtor-in-Possession Administration**

1.      *Retention of Professionals.*

During the course of the Chapter 11 Cases, the Debtors and the Committees sought and obtained orders of the Court authorizing the employment of various professionals.  The identities of such professionals, when each was employed and for what purpose, and the order of the Court authorizing such employment ~~may be summarized~~are as follows:~~:~~

(a)      *Debtors' Professionals*

- Nelson Mullins Reilly & Scarborough LLP – general bankruptcy counsel.  Order entered August 11, 2016 ~~[~~(Docket No. 128~~]~~).

- Kaleo Legal – special litigation counsel.  Order entered August 15, 2016 ~~[~~(Docket No. 132~~]~~).

- McGuireWoods LLP – special litigation counsel.  Order entered on August 15, 2016 ~~[~~(Docket No. 133~~]~~).

- GlassRatner – financial advisor.  Order entered on December 8, 2016 ~~[~~(Docket No. 372~~]~~).

- Troutman Sanders LLP – co-counsel for the Debtors.  Order entered on December 16, 2016 ~~[~~(Docket No. 378~~]~~).

- Carr, Riggs & Ingram – tax advisor.  Order entered on June 26, 2017 ~~[~~(Docket No. 604~~]~~).

(b)      *Creditors' Committee's Professionals*

- Storch Amini PC – general bankruptcy counsel.  Order entered on October 3, 2016 ~~[~~(Docket No. 249~~]~~).

- Thames Markey & Heekin, P.A. – local counsel.  Order entered on October 3, 2016 ~~[~~(Docket No. 248~~]~~).

(c)     *Equity Committee's Professionals*

- Akerman LLP – general bankruptcy counsel.  Order entered on October 13, 2016 [(Docket No. 274]).

- Landau Gottfried & Berger LLP – general bankruptcy counsel.  Order entered on October 14, 2016 [(Docket No. 277]).

- Teneo Securities LLC – financial advisor.  Order entered on December 8, 2016 [(Docket No. 371]).

- Lincoln Partners Advisors LLC– financial advisor.   Order entered on July 13, 2017 [(Docket No. 652]).

- Agentis PLLC—special litigation counsel.  Order entered on May 29, 2018 [(Docket No. 1038]).


## ~~III. THE PLAN~~

**V.**     ~~THE~~ **SUMMARY OF THE PLAN** ~~SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  THE PLAN IS ATTACHED HERETO AS EXHIBIT 1.~~**OF LIQUIDATION**

The Plan Proponents believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of holders of Allowed Claims.

The Plan is attached to this Disclosure Statement as **Exhibit A** and is incorporated herein by reference.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan, and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that

certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, INCLUDING ANY SUPPLEMENTS AND SCHEDULES THERETO AND DEFINITIONS THEREIN.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

### A.    ~~Plan Overview~~Classification and Treatment of Claims and Interests

Except for the Claims addressed in Article III of the Plan, all Claims and Interests are classified in the Classes set forth in Article IV of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

~~The Plan provides for the sale of substantially all of the Debtors' assets, including the Artifact Collection and the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, to the Plan Sponsors for $19.2 million, free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements included with the Plan Supplement.   The transfer of the Artifact Collection, RMS Titanic Trust, and the Debtors' rights as salvor-in-possession to the Museum Plan Sponsors shall be subject to approval of the Admiralty Court and shall be made only on notice to NOAA and all other parties entitled to notice in the Admiralty Court Proceeding.~~

~~The Plan also provides for the establishment of a Liquidation Trust which will be vested, as of the Effective Date, with all of PRXI's interest in the Debtors, together with all claims and~~

Causes of Action (including avoidance claims under Chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidation Trustee for the benefit of the Debtors' Estates and all having an interest therein.

The Plan provides for the liquidation of all of the Estate's assets. The purpose of the Plan is to effectuate an initial distribution, from the Liquidation Trust, to holders of allowed Claims of the proceeds of the Sale and to thereafter make one or more interim distributions of the proceeds of the Liquidation Trustee's administration of the Liquidation Trust Assets, culminating in a final distribution to be made upon the completion of the Liquidation Trustee's administration of the Liquidation Trust Assets.

Certain types of Claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Unclassified claims include Administrative Claims (i.e., claims for costs or expenses of administering the Chapter 11 case which are allowed under section 507(a)(1) of the Bankruptcy Code), Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims. The Debtors will pay all Allowed Administrative Claims excluding Allowed Priority Tax Claims in full in Cash on the Effective Date.

In accordance with the Bankruptcy Code, the Plan also classifies certain Claims separately and provides, separately for each Class, that holders of Allowed Claims will receive various types of consideration, thereby giving effect to the different rights of the holders in each Class. The following chart summarizes the proposed classification and treatment of the holders of Allowed Claims under the Plan:

| Class | Designation | Treatment | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Class 1 Claim shall receive Cash in the full amount of such Allowed Class 1 Claim. | Unimpaired | Presumed to Accept |
| 2 | Secured Creditors | Each holder of an Allowed Class 2 Claim shall receive (i) Cash in an amount equal to such Allowed Class 2 Claim, including any non-default interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (ii) the Collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iii) treatment in any other manner such that its Allowed Class 2 Claim shall not be Impaired. | Unimpaired | Presumed to Accept |
| 3 | General Unsecured | Each holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Initial | Impaired | Entitled to Vote |

| Class | Designation | Treatment | Status | Voting Rights |
|---|---|---|---|---|
|  | Claims | Distribution and each subsequent Distribution until paid in full with interest at the Federal Judgment Rate. |  |  |
| 4 | Convenience Claims | Each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction of such Claim, Cash in the full amount of such Allowed Class 4 Claim. | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | All Class 5 Claims shall be cancelled in full, and holders of Class 5 Claims shall receive no distribution and retain no Property on account of such Claims. | Impaired | Deemed to Reject |
| 6 | PRXI Interests | Class 6 Interests shall be discharged, cancelled, released, and extinguished and holders of Class 6 Interests shall neither receive any Distributions nor any of the Debtors' Property. | Impaired | Deemed to Reject |

The chart in Section I.C summarizes the proposed classification and treatment of the holders of Allowed Claims under the Plan.

## B.     Limited Consolidation for Voting, Confirmation, and Distribution Purposes

The Plan is predicated on the Court providing in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of the Plan, its confirmation and Distributions made pursuant to it. *See* Plan, Article V.

## C.     Bar Dates and Claims Filed

On July 15, 2016, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "**Schedules and SOFAs**").  Among other things, the Schedules and SOFAs set forth the Claims of known creditors against the Debtors as of the Petition Date based upon the Debtors' books and records.

On July 12, 2016, the Bankruptcy Court entered an order (the "**Bar Date Order**") setting deadlines for filing proofs of claim against the Debtors.  Pursuant to the Bar Date Order, the last date for certain persons and entities to file proofs of claim in the Chapter 11 Cases was October 24, 2016, and the last date for governmental units to file proofs of claim in the Chapter 11 Cases was 180 days after the Petition Date.

As described in detail below, the Plan contemplates the establishment of an Administrative Claims Bar Date.  The projected recoveries set forth in Exhibit C to the Disclosure Statement are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.

**D.** ~~C.~~ **Implementation of the Plan**

1. *Sale ~~of Substantially All of the Debtors' Assets~~to the Plan Sponsors*

~~On~~Subject to the terms of the Acquisition Agreements, on the Effective Date, the Debtors ~~will~~shall be authorized and directed to ~~sell substantially all of the Debtors' assets to~~consummate the Sale and, among other things, the Purchased Assets shall be transferred to and vest in the Plan Sponsors~~,~~ free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities~~,~~ pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order, and the Acquisition Agreements ~~included with the Plan Supplement~~.  On the Effective Date, the Debtors shall consummate the transactions contemplated by the Acquisition Agreements pursuant to the terms thereof so long as the conditions precedent set forth in the Acquisition Agreements have been satisfied or waived in accordance with the terms thereof.  Upon entry of the Confirmation Order by the Court, all matters provided for under the Acquisition Agreements will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors.  The Debtors will be authorized and directed to execute and deliver, and to consummate the transactions contemplated by, the Acquisition Agreements, as well as to execute, deliver, file, record and issue any notes, documents, or agreements in connection therewith, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

Without limiting the generality of the foregoing, except as otherwise expressly provided in the Acquisition Agreements, neither the Plan Sponsors nor any of their Affiliates shall be liable for any claims against the Debtors or any of their predecessors or affiliates, and neither the Plan Sponsors nor any of their affiliates shall have successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor, employment or benefits law, de facto merger or substantial continuity, whether known or unknown as of the closing, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates arising prior to the closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing.

The transactions contemplated by the Acquisition Agreements are undertaken without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the sale contemplated thereunder shall not affect the validity of such sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such sale are duly stayed pending such appeal. The Plan Sponsors are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

2.     *Administration and Sale of Liquidation Trust Assets and the Estate Causes of Action*

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Documents for the purpose of, among other things, (i) prosecuting those Causes of Action for which the Equity Committee was granted derivative standing to pursue, and additional causes of action belonging to the Debtors' Estates, as appropriate, (ii) administering, monetizing and/or liquidating the Property of the Debtors other than the Purchased Assets, (iii) resolving all Disputed Claims, (iv) making all Distributions from the Liquidation Trust, and (v) prosecuting and defending appeals of the Confirmation Order as provided for in the Plan, this Disclosure Statement, and the Liquidation Trust Documents. The Liquidation Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidation Trust and the Plan.

3.     *Vesting of Assets*

On the Effective Date, the ~~Liquidating~~Liquidation Trust Assets shall automatically vest in the Liquidation Trust, free and clear of all claims, liens, encumbrances, charges and other interests. On and after the Effective Date, the transfer of the Liquidation Trust Assets from the Debtors' Estates (as the case may be) to the Liquidation Trust will be deemed final and irrevocable and distributions may be made from the Liquidation Trust. *See* Plan, Art. VII.F.

4.     *Establishment of the Liquidation Trust*

On the Effective Date, the Liquidation Trust Agreement will become effective, and, if not previously signed, the Creditors' Committee, as a Plan Proponent, on behalf of the Estate, and the Liquidation Trustee will execute the Liquidation Trust Agreement.

The Liquidation Trust shall qualify as a liquidation trust within the meaning of Treasury Regulation Section 301.7701-4(d) and shall be treated as a grantor trust for United States federal income tax purposes. In accordance with Treasury Regulation Section 301.7701- 4(d), the beneficiaries of the Liquidation Trust will be the holders of all Allowed Class 3 Claims. The holders of such Allowed Class 3 Claims will receive an allocation of the Liquidation Trust's property as provided for in the Plan and the Liquidation Trust Agreement. The beneficiaries of the Liquidation Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidation Trust.

5.     *General Powers of the Liquidation Trustee*

The entry of the Confirmation Order shall ratify the selection of the Liquidation Trustee. The rights and powers of the Liquidation Trustee are specified in the Liquidation Trust Documents. Except as expressly set forth in the Plan and the Liquidation Trust Agreement, the Liquidation Trustee shall administer the Liquidation Trust and its assets in accordance with the Plan, the Liquidation Trust Agreement, and the other Liquidation Trust Documents and shall be responsible for, among other things, making certain distributions required under the Plan. From and after the Effective Date and continuing through the date of entry of a Final Decree, the Liquidation Trustee shall: (a) possess the rights of a party in interest pursuant to section 1109(b)

of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Court; (b) have the authority to act on behalf of the Debtors' Estates in all adversary proceedings and contested matters pending in the Court and in all actions and proceedings pending elsewhere; and (c) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Court.

6.  *Prosecution of Estate Causes of Action by the Liquidation Trustee*

The Liquidation Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidation Trust pursuant to the Plan in accordance with the terms of the Plan. All recoveries derived therefrom will be included within the Liquidation Trust Assets.

"**Causes of Action**" is defined in the Plan to mean, with respect to each of the Debtors, any and all actions, proceedings, causes of action (including causes of action pursuant to chapter 5 of the Bankruptcy Code, other than those which are released or dismissed as part of and pursuant to the Plan), suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law (whether domestic or foreign), equity, or otherwise, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

For avoidance of doubt, the Liquidation Trustee's right to recover against the former officers and/or directors of the Debtors shall not be limited to the proceeds of any director and officer liability policy.

**E. ~~D.~~ Summary of Certain Other Provisions of the Plan**

1.  *Court Approval of Professional Fees Required*

By order entered on August 17, 2016 [(Docket No. 141]), the Court granted the Debtors' *Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals* [(Docket No. 89]), pursuant to which the Debtors are authorized to pay, monthly and upon an interim basis pursuant to monthly statements timely filed by such professionals, up to 80% of the fees and 100% of the expenses of each professional employed in the Chapter 11 Cases.

These interim payments and any and all other Professional Fee Claims must be approved, on a final basis, by the Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty (20) days following the filing with the Court of any request for compensation or reimbursement of Professional Fee Claims and be served on the Debtors, counsel for the Debtors, counsel to the Creditors' Committee, the Liquidation Trustee, counsel to the Liquidation Trustee, and the holders of Professional Fee Claims requesting payment.

2.   *Deadlines for Filing Claims and Administrative Expenses*

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications or motions for allowance of Administrative Claims (other than Professional Fee Claims and DIP Financing Claims), which date shall be the Administrative Claims Bar Date. **HOLDERS OF ADMINISTRATIVE CLAIMS NOT PAID PRIOR TO THE CONFIRMATION DATE SHALL FILE WITH THE COURT AND SERVE UPON THE DEBTORS OR LIQUIDATION TRUSTEE, AS APPLICABLE, A MOTION REQUESTING PAYMENT OF SUCH ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR FOREVER BE BARRED FROM DOING SO.** The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date. The Liquidation Trustee shall have sixty (60) days (or such longer period as may be allowed by Final Order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims (other than Professional Fee Claims and DIP Financing Claims).

All applications for compensation or reimbursement of Professional Fee Claims pursuant to sections 328, 330, 331, or 503 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Debtors, counsel to the Debtors, the U.S. Trustee, the Liquidation Trustee, counsel to the Liquidation Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date.

3.   *Priority Tax Claims*

The Bankruptcy Code requires that each holder of a Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period ending not later than five years after the date of the bankruptcy filing (in this case, not later than June 14, 2021). Each holder of an Allowed Priority Tax Claim will receive treatment in any manner that is consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

## F.  ~~E.~~ Executory Contracts and Unexpired Leases

### 1.  *Treatment*

All executory contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Court on or prior to the Confirmation Date or (b) is set forth on a Schedule of Assumed Contracts and Leases filed in connection with the Acquisition Agreements.  All or substantially all of the executory contracts and unexpired leases of the Debtors will be assumed and assigned to certain of the Plan Proponents.  The Plan Proponents intend to file, as a Plan Supplement prior to the Confirmation Hearing, a schedule listing certain executory contracts and unexpired leases to be assumed by the Debtors.

The assumption, assumption and assignment, and rejection of executory leases and unexpired contracts under the Plan shall be governed by the terms of the Acquisition Agreements, the Confirmation Order, and other orders of the Court.

### 2.  *Cure Payments*

The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Acquisition Agreements, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be ~~governed by the~~ paid by the assuming party in accordance with the terms and conditions of the Acquisition Agreements, the Confirmation Order, and other orders of the Court.

### 3.  *General*

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Court on or before such date as the Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day, the first Business Day occurring thereafter.  Any such Claims which are not filed within such time will be forever barred from assertion against the Debtors' Estates and their property, or the Liquidation Trust.

## G.  ~~F.~~ Claims Allowance Process

### 1.  *Resolution of Disputed Claims*

As of the Effective Date, the Liquidation Trustee will have sole authority for investigating, administering, monitoring, implementing, litigating, and settling Claims.  From

and after the Effective Date, the Liquidation Trustee will have the right to file objections to Claims (except those specifically Allowed by the Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the applicable Claims Objection Deadline. The Claims Objection Deadline may be extended by order of the Court without notice.

2.      *Reserve for Disputed Claims*

In connection with the Distributions required to be made under the Plan, on the Effective Date or as soon as practicable thereafter (and in accordance with the provisions of the Plan), the Liquidation Trustee shall reserve Cash allocated for distribution on account of each Disputed Claim based on the Face Amount of each such Disputed Claim, plus 10% of the Face Amount on account of interest attributable to any such General Unsecured Claim, or such lesser or greater amount as may be agreed to by the holder of the Claim and the Debtors or Liquidation Trustee (the "**Disputed Claims Reserve**"). All Cash or other property allocable to the relevant Class with respect to the Disputed Claims shall be allocated for records keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve. The Liquidation Trustee shall have no duty to fund, or to set aside any separate account for the Disputed Claims Reserve.

Cash held in the Disputed Claims Reserve shall be held by the Liquidation Trustee in trust for the benefit of holders of Allowed Claims.

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed as soon as practicable after the Claim is Allowed (and consistent with the provisions of the Plan). Distributions shall be made only to the extent of the aggregate distributions that the holder of any Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to the amounts held in the Disputed Claims Reserve). Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior Distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

The Disputed Claims Reserve shall no longer be necessary at the earlier of (i) when all Disputed Claims have been resolved, or (ii) when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan have been made.

The Liquidation Trustee may, at the Liquidation Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("**DOF**") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor Liquidation Trust. If the election is made, the Liquidation Trustee will comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

**H.** ~~G.~~ **Distributions**

1.  *Generally*

Distributions to be made on account of Allowed Claims, other than Allowed Class 3 Claims, shall be made on the Effective Date, unless otherwise provided for in the Plan or ordered by the Court.  The dates for Distributions by the Liquidation Trust on account of Allowed Class 3 Claims after the Initial Distribution shall be the first Business Day after the end of the months of June and December, ~~commencing with the first such date to occur more than ninety (90) days after the Effective Date and~~ continuing until the Final Distribution Date.  The Initial Distribution Date shall occur on the Effective Date or as soon as reasonably practicable after the Effective Date.  A Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur, however, if either (i) the aggregate value of the consideration to be distributed on such Distribution Date is less than $250,000, or (ii) the Liquidation Trustee, with consent from the Liquidation Trust Oversight Board as provided in the Liquidation Trust Agreement, determines that it is in the best interest of the Liquidation Trust that no Distribution Date should occur, which in either case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date.

2.  *Manner of Payment*

Any payment of Cash made by the Liquidation Trustee pursuant to the Plan may be made either by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Liquidation Trustee.

3.  *Distributions of Property Other Than Cash*

Any distribution under the Plan of property other than Cash shall be made by the Liquidation Trustee in accordance with the terms of the Plan.

4.  *Setoffs*

The Liquidation Trustee may ~~set off~~setoff against any Claim any claims of any nature whatsoever that the Liquidation Trust may have against the holder of such Claim.  Neither the failure to effect such ~~set off~~setoff nor the allowance of any Claim that otherwise would be subject to ~~set off~~setoff, shall constitute a waiver or release by the Liquidation Trust of any such claim the Liquidation Trust may have against such holder.

5.  *Unclaimed Distributions*

All Property distributed on account of Allowed Claims must be claimed prior to the date on which the Court enters the Final Decree, or, in the case of a Distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Article VII.I of the Plan.  All Unclaimed Property will be retained by and will vest in the Liquidation Trust to be subsequently distributed in accordance with Articles IV and VII of the Plan.  All full or partial payments made by the Liquidation Trustee and received by the holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtors or the Liquidation Trustee pursuant to the Plan.  Nothing shall require

the Debtors or the Liquidation Trustee to attempt to locate any holder of an Allowed Claim other than by reviewing the records of the Debtors and any Claims filed in the Chapter 11 Cases. All Claims in respect of Unclaimed Property will be deemed Disallowed and the holder of any Claim Disallowed in accordance with Article VII.J of the Plan will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets, the Liquidation Trustee or the Liquidation Trust notwithstanding any federal or state escheat laws to the contrary.

> 6.    *Delivery of Distributions, Address of Holder*

For purposes of all notices and Distributions under the Plan, the Liquidation Trustee shall be entitled to rely on (a) the last known addresses of such holders or (b) the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Liquidation Trustee is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.

**I.**    **II.****Effectiveness of Plan**

> 1.    *Conditions Precedent*

The Plan Proponents intend for the Plan to be effective as soon as reasonably practicable following the entry of the Confirmation Order.  It is a condition to the Effective Date of the Plan that the following provisions, terms and conditions are approved or waived in accordance with the Plan:

> (a)    the Confirmation Order, in form and substance acceptable to the Plan Proponents in their sole discretion, which shall include, among other provisions, (i) an authorization and direction for the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan, and (ii) a reservation of jurisdiction over the Sale post-Effective Date, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, enjoined or stayed pending appeal;

> (b)    an order of the Admiralty Court approving the Sale to the extent required to be approved pursuant to the Covenants and Conditions, in form and substance acceptable to the Plan Sponsors, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated enjoined or stayed pending appeal;

> (c)    all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

> (d)    all transactions contemplated in the Acquisition Agreements shall have been consummated;

<table>
<tr><td>(e)</td><td>the Creditors' Committee shall have appointed the Liquidation Trustee, and the Liquidation Trust Agreement and the other Liquidation Trust Documents shall have been executed and delivered; and</td></tr>
<tr><td>(f)</td><td>no order of a court shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.</td></tr>
</table>

2.    *Notice of the Effective Date*

On or before five (5) Business Days after the occurrence of the Effective Date, the Liquidation Trustee shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the applicable Bar Date, and (iv) such other matters as the Liquidation Trustee deems appropriate.

**J.    1. Retention of Jurisdiction**

The Plan provides that the Court will retain and have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.    to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom;

2.    to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date;

3.    to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

4.    to resolve disputes as to the ownership of any Claim;

5.    to hear and determine timely objections to Claims;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8.    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

9.      to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code;

10.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

11.     to hear and determine disputes arising in connection with the interpretation, implementation or consummation of any transaction in connection with an Acquisition Agreements;

12.     to hear and determine any issue for which the Plan requires a Final Order of the Court;

13.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14.     to hear and determine disputes arising in connection with compensation and reimbursement of expenses of Professionals for the Debtors, Creditors' Committee or Equity Committee for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date;

15.     to hear and determine any Causes of Action preserved under the Plan including under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3);

16.     to hear and determine any matter regarding the existence, nature and scope of any injunction issued hereunder;

17.     to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article X of the Plan;

18.     to hear and determine any matter regarding the Liquidation Trust and Liquidation Trust Documents;

19.     to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection; and

20.     to enter a Final Decree closing the Chapter 11 Cases.

**K.      J. Limitation of Liability, Releases and Injunction**

1.      *Exculpation*

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting the releases described in Articles X.B and X.C of the**

43

~~Plan~~**, and notwithstanding anything** ~~herein~~ **to the contrary** _in the Plan_**, each Released Party** ~~is hereby~~**will be** **released and exculpated from any Claim, obligation, Cause of Action, or liability for** ~~(a)~~ **any** ~~prepetition~~ **action taken or omitted to be taken**_, whether prepetition or postpetition,_ **in connection with,** ~~or related to, formulating, negotiating, or preparing the Plan or the Plan Support Agreement, or (b) any postpetition action taken or omitted to be taken in connection with,~~ **or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Plan Support Agreement), the Disclosure Statement, the Sale and the Acquisition Agreements, and/or the DIP Credit Facility, or any contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Plan Support Agreement and the Plan. Each Released Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the transactions contemplated herein, including the Sale, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, this exculpation shall not release any obligation or liability of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**"Released Parties" is defined in the Plan to mean, in each case solely in its capacity as such, (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Plan Sponsors, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.**

2.      _Injunction Enjoining Holders of Claims and Interests_

44

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Interests. To that end, except as otherwise expressly provided in the Plan, the Plan Supplement, documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including all Governmental Units) shall be permanently enjoined from, on account of such Claims or Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, any Released Party, the Liquidation Trust, the Liquidation Trustee, or any of their respective properties or assets: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, executing, collecting, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (v) enjoining or invalidating any foreclosure or other conveyance of any Property of the Liquidation Trust or of the Debtors; and (vi) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of the Plan. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. This injunction shall not enjoin or prohibit (i) the holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan or (ii) any party in interest from seeking the interpretation or enforcement of any of the obligations of the Debtors, the Liquidation Trustee, or the Liquidation Trust under the Plan. The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any Claim or Interest or cause of action against any Debtor, any Estate, any Released Party, the Liquidation Trustee, the Liquidation Trust, or any of their respective properties or assets, based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under the Plan have been made or are not yet due.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim, as applicable, by accepting, or being eligible to accept, distributions under such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article X.E of the Plan.

3.      *Nondischarge of the Debtors*

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims. However, no holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that holder pursuant to the Plan. As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**L.** ~~K.~~ **Revocation or Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of any Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by any Person.

**M.** ~~L.~~ **Modification of the Plan**

Subject to the limitations contained in the Plan: (1) the Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Creditors' Committee may, upon order of the Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

**N.** ~~M.~~ **Payment of Statutory Fees**

All quarterly fees due and payable to the U.S. Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code. The Liquidation Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Chapter 11 Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Liquidation Trustee under the Plan. After the Effective Date and until the Chapter 11 ~~Case is~~Cases are closed, the Liquidation Trustee shall file with the U.S. Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

**O.** ~~N.~~ **Governing Law**

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

**P.** ~~Q.~~ **Withholding, Reporting, and Payment of Taxes**

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidation Trustee shall report and pay taxes on the income of the Liquidation Trust Assets, if any, as required by applicable law. In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

**Q. Comparison of Estimated Recoveries for Unsecured Creditors under the Third Sale Motion and the Plan**

As described above, the Debtors' Third Sale Motion and the Plan each contemplate the sale of substantially all of the assets of the Debtors, including the Debtors' rights with respect to the Artifact Collection. A recovery analysis comparing the expected returns for unsecured creditors under the Debtors' Third Sale Motion (assuming a sale to the Stalking Horse Purchaser for $17.5 million) to the expected returns under the Plan (based on a purchase price of $19.2 million) is included as Exhibit C. In addition to differences in the purchase price, the following differences between the sale pursuant to the Plan and the sale proposed by the Debtors' Third Sale Motion result in different returns to the unsecured creditors:

- *PacBridge Settlement*. The Third Sale Motion provides that the $1,195,350.39 PacBridge Claim is an allowed unsecured claim and settles approximately $4 million in alleged secured loans and accrued interest owed to the Lenders for $1 million in cash and allowed unsecured claims against the Debtors in total aggregate amount of $2 million. The Plan contemplates paying the Lenders $4 million on account of their claims (unless the security interest relating to those claims is avoided or any portion is determined to be unsecured) and does not allow the PacBridge Claim because the PacBridge Claim is an alleged claim on account of services provided to a non-debtor.

- *Bid Protections*. Any bid at the auction by a third party will trigger the bid protections provided to the Stalking Horse Purchaser of up to $1 million, which will be an administrative expense claim that must be paid in full before unsecured creditors are paid.

The Recovery Analysis does not account for the transfer taxes that the Debtors may be required to pay in connection with a sale to the Stalking Horse Purchasers. *See* Stalking Horse APA § 5.10(b) ("All transfer, documentary, sales or similar Taxes payable solely as a result of the sale and transfer of the Transferred Assets and the Assumed Liabilities pursuant to this Agreement (the 'Transfer Taxes') shall (to the extent not subject to an exemption under the

Bankruptcy Code) be borne by the Sellers when due.").[6] The Plan Proponents expect the Sale pursuant to the Plan to be exempt from transfer taxes under section 1146(a) of the Bankruptcy Code.]

**Based on the Recovery Analysis, the Plan Proponents submit that the Plan provides holders of impaired Claims with more value than would a sale to the Stalking Horse Purchaser for $17.5 million.**

The Plan Proponents note that the Recovery Analysis is speculative and premised on assumptions and estimates of the Debtors as of June 29, 2018. The determination of estimated recoveries is an uncertain process involving the use of estimates and assumptions that are inherently subject to business and economic uncertainties and contingencies beyond the control of the Plan Proponents, Debtors, the Debtors' management, and the Plan Proponents' and Debtors' advisors. Inevitably, some assumptions in the Recovery Analysis may not materialize and unanticipated events and circumstances could affect the ultimate results. Other parties, including the Debtors, may disagree with certain of the assumptions in the Recovery Analysis and may challenge these assumptions and/or that the Plan satisfies the "best interests" test in connection with confirmation of the Plan.[7] Delay in confirmation or consummation of the Plan, including as a result of litigation related to the Debtors' Third Sale Motion, the Plan, or the Equity Committee Plan, may result in reduced recoveries relative to those projected herein due to the continued accrual of interest on the DIP Loan and potentially additional administrative expenses, including professional fees of the Debtors, the Creditors' Committee, and the Equity Committee.[8] Additionally, the Recovery Analysis does not account for any costs associated with solicitation, nor does it account for any savings associated with obviating the need for a follow-on liquidation plan process should the Debtors' Third Sale Motion be approved. No independent appraisals were conducted by the Plan Proponents in preparing the Recovery Analysis. **ACCORDINGLY, NEITHER THE PLAN PROPONENTS NOR THEIR PROFESSIONALS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A SALE OF THE DEBTORS' ASSETS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN; ACTUAL RESULTS COULD VARY, IN SOME CASES MATERIALLY.**

## VI. ~~IV.~~ STATUTORY REQUIREMENTS FOR CONFIRMATION ~~PROCEDURE.~~OF THE PLAN

The following is a brief summary of the Plan Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

---

[6] The Plan Proponents have not assessed the transfer taxes that the Debtors may be required to pay in connection with a sale to the Stalking Horse Purchasers.

[7] The Creditors' Committee sent the Recovery Analysis to the Debtors' advisors on July 10, 2018. Since that date, neither the Debtors nor their advisors have indicated that they disagree with the Recovery Analysis.

[8] Professional fees of the Plan Sponsors are not paid from the Debtors' estates and, as a result, will not result in additional administrative expenses. As mentioned above, the Plan Sponsors are not requesting reimbursement by the Debtors of any professional fees by means of a breakup fee or otherwise.

For the Plan to be confirmed by the Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met.  These include, among others, the requirements that the Plan: (i~a) is accepted by all impaired Classes of Claims and Interests;, (ii~b) is feasible;, and (iii~c) is in the "best interest" of holders of Claims and Interests in each class~Class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Court.  A Confirmation Hearing with respect to the Plan is scheduled to commence on _____ __, 2018, at __:__ __.m.  At the Confirmation Hearing, the ~Creditors' Committee~Plan Proponents will request the Court to confirm the Plan on the basis that all confirmation requirements have been satisfied.

## A.    Voting; Acceptance

Any holder of a Claim in an impaired Class is entitled to vote if either (i) such holder's Claim has been scheduled by the Debtor in the Schedules filed with the Court (provided that such Claim has not been scheduled as disputed, contingent, unknown, or unliquidated), (ii) such holder has filed a Proof of Claim on or before the deadline previously fixed by the Court and such Claim is deemed allowed pursuant to section 502 of the Bankruptcy Code or has been allowed by the Court or by the Plan, unless such Claim has been disallowed for voting purposes by the Court, or is disallowed under the Plan.  A vote may be disregarded if the Court determines, after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good faith or in accordance with the provisions of the Bankruptcy Code.

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

~Impaired Class 3 Claims~As stated above, Class 3 is the only Class entitled to vote on the Plan.  Class 3 will have accepted the Plan if (i) the holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in Class 3 have voted to accept the Plan and (ii) more than one-half in number of the holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in Class 3 have voted to accept the Plan.

## B.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of the Plan ~(the "Confirmation Hearing")~. The Confirmation Hearing may be postponed from time to time by the Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy Rules and Local

Bankruptcy Rules. Objections must be filed and served pursuant to the Confirmation Notice in the manner set forth therein, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED BY THE COURT.

At the Confirmation Hearing, the Court will determine, among other things, whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.  The Plan complies with the applicable provisions of the Bankruptcy Code.

2.  The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

3.  The Plan has been proposed in good faith and not by any means proscribed by law.

4.  Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 ~~Case~~Cases, or in connection with the Plan and incident to the Chapter 11 ~~Case~~Cases, has been disclosed to the Court, and any such payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.

5.  Each holder of ~~an Impaired~~a Class 3 Claim ~~or Interest~~ either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claims, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Estate were liquidated on such date under Chapter 7 of the Bankruptcy Code.

~~6. Unless the Creditors' Committee proposes a nonconsensual plan of liquidation, each class of Claims has either accepted the Plan or is not Impaired under the Plan.~~

6.  ~~7.~~Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that the DIP Loans, Administrative Claims and such Other Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full on the Effective Date and that holders of Priority Tax Claims will receive on account of such Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

7.   8.  At least one ~~Impaired~~impaired class of Claims has accepted the Plan (i.e., Class 3), determined without including any acceptance of the Plan by any insider holding a Claim in such class.

8.   9.  The Plan contemplates the disposition of all of the assets of the Debtors' Estates and the distribution of the proceeds therefrom to holders of Allowed Claims in order of priority and as provided for in the Plan.

The Plan Proponents believe that the Plan will be accepted by Class 3—the only Class entitled to vote to accept or reject the Plan—and will satisfy all the statutory requirements of ~~Chapter~~chapter 11 of the Bankruptcy Code, that the Plan Proponents have complied or will have complied with all of the requirements of ~~Chapter~~chapter 11, and that the Plan is being proposed and submitted in good faith.

## C.   Feasibility

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless liquidation is contemplated by the Plan.  Here, the Plan contemplates the sale of substantially all of the assets of the Debtors to the Plan Sponsors and that all of the Debtors' right, title, and interest in the Company (other than the Purchased Assets) will be vested in the Liquidation Trust on the Effective Date.  The Plan Sponsors and Titanic Belfast intend to ~~fundraise~~raise the full amount of the Purchase Price from government sources, several key individuals and high net worth donors, and other sources.  As such, the Plan essentially provides for a controlled and orderly administration and liquidation of the assets of the Debtors' Estates, and is not likely to result in the need for further financial reorganization of the Debtor.

## D.   Best ~~Interest~~**Interests** Test

~~Confirmation of the Plan requires that each holder of an impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors' Estates were liquidated under Chapter 7 of the Bankruptcy Code.~~

~~The Plan Proponents have determined that confirmation of the Plan will provide each holder of a Claim or Interest with a recovery that is not less than that which it would receive pursuant to a liquidation of the Debtors' Estates under Chapter 7 of the Bankruptcy Code.  This determination is based upon a consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to such holders.~~

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of

a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.[9]  However, the Plan Proponents believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur, and additional claims due to, among other things, the rejection of executory contracts, as a result of liquidating the Estates in a chapter 7 case. Additionally, the Debtors have proposed a sale to the Stalking Horse Purchaser for a purchase price that is $1.7 million less than the Purchase Price proposed under the Plan and, as evidenced in the Recovery Analysis, the sale to the Stalking Horse Purchaser would result in a lower recovery for unsecured creditors.

Conversion of the Chapter 11 Cases to ~~Chapter~~chapter 7 at this stage would likely result in significantly reduced creditor recoveries, relative to the recoveries that would likely be achieved if the Sale contemplated hereby were consummated.  The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee, and additional accrued interest obligations under the DIP Loan. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Appointment of a ~~Chapter~~chapter 7 trustee would result in the abrupt shutdown of the Debtors' exhibition business, as the chapter 7 trustee would be prohibited from operating the same absent Court authorization pursuant to Bankruptcy Code section 721 and would likely lack the experience and expertise to operate said business.  Such a shutdown would likely result in the incurrence of significant additional administrative expenses, such as rent obligations under the Debtors' assumed or postpetition exhibition leases.  A ~~Chapter~~chapter 7 trustee would likely also incur significant costs marshalling the Debtors' assets, from geographically dispersed permanent and traveling exhibition locations, particularly if his or

---

[9] Any effort by the chapter 7 trustee to liquidate the French Collection by auction and to separately sell the American Collection would lead to significant professional fees and expenses (which would be paid from the Debtors' Estates) and delay in distributions to creditors as a result of the litigation that would ensue in the Admiralty Court.  As a result, a chapter 7 trustee would likely seek to sell the Artifact Collection as an integrated whole in a manner similar to the Sale.

her appointment results in key personnel departures. In addition, appointment of a ~~Chapter~~chapter 7 trustee would ~~also~~ likely ~~result in the employment of a new set of professionals (whose fees and expenses would be paid from the Debtors' estates). It would also~~ result in the establishment of a new Claims Bar Date pursuant to Bankruptcy Rule 1019~~,~~ and ~~require the~~ payment of an otherwise avoidable statutory commission to the ~~Chapter~~chapter 7 trustee under ~~Bankruptcy Code~~ section 326 of the Bankruptcy Code.

As such, the distributions to creditors will likely be larger under the Plan. Additionally, distributions to creditors contemplated by the terms of the Plan will be made more quickly than any likely distribution that would be made by a ~~Chapter~~chapter 7 trustee because a ~~Chapter~~chapter 7 trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Estates.

Based on the foregoing, the Plan Proponents believe that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a conversion of the Chapter 11 Cases to Chapter 7 case and the appointment of a Chapter 7 trustee.

### E.    Fair and Equitable Requirement

Section 1129(b) of the Bankruptcy Code permits a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the same have not voted to accept it or if an impaired class is deemed to reject it; provided that the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b), notwithstanding an impaired class's rejection (or deemed rejection) of the plan, such plan may be confirmed, so long as it does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

The Plan Proponents do not believe that the Plan discriminates unfairly against any ~~Impaired~~impaired Class.

The fair and equitable test applies to classes of different priority and status. Section 1129(b)(2)(C) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of interests if (~~1~~i) it provides that each holder of interests of such class receive or retain on account of such interest property of a value, as of the plan effective date, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interests; or (~~2~~ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property. The Plan Proponents believe these requirements are satisfied because, among other things, no holder of interests junior to PRXI Interests is receiving any property under the Plan.

A corollary to the fair and equitable requirement is that no senior class may receive more than full compensation for its claims. The Plan Proponents do not believe that holders of allowed general unsecured claims would receive more than full compensation on their claims under the Plan. GlassRatner has projected that the Debtors' estates would need to receive approximately $24 million in order for creditors to be paid in full, after accounting for repayment of the DIP Loan, additional administrative expenses, and repayment of the Debtors' secured

claims. The principal sources of recovery under the Plan would be proceeds of the Sale and the above-referenced D&O litigation commenced by the Equity Committee. As noted above, even under the Equity Committee's high estimated net recovery ($4 million) from the litigation, the proceeds from the same, together with proceeds from the Sale, would be insufficient to pay creditors in full under GlassRatner's projections.

## ~~V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN~~

## VII.   CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.   Certain Bankruptcy Considerations

#### 1.   *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

#### 2.   *Failure To Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Plan Proponents intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.   *The Plan Proponents May Not Be Able To Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for

further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  The Debtors and/or a non-accepting holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Allowed Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Plan Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from chapter 11.

4. *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Plan Proponents believe that the Plan satisfies these requirements, and the Plan Proponents may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan.

5. *Risk of Non-Occurrence of the Effective Date*

The Plan Proponents ~~believe that the Plan affords holders of Claims the potential for the greatest feasible realization out of the Debtors' Estates, with minimal risk that the contemplated transaction will be rejected by the Admiralty Court, and, therefore, is in the best interest of such holders.  The Plan Proponents have considered alternatives to the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code.  In the opinion of the Plan Proponents, such alternatives would not afford holders of Claims or Interests a return greater than that achieved under the Plan.~~can provide no assurance as to the timing or as to whether the Effective Date will, in fact,

occur.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Article XI.B of the Plan, including, among others, those relating to consummation of the Plan, as well as the successful fundraising of the purchase price by the Museum Plan Sponsors.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT IS EXPECTED TO PROVIDE GREATER RECOVERIES AND INVOLVE LESS DELAY AND UNCERTAINTY AND LOWER ADMINISTRATIVE COSTS.

### 6. *The Actual Recoveries May Differ From the Estimated Recoveries*

The estimated creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual recoveries may significantly differ from the estimates. In preparing these estimates, the Plan Proponents relied on financial data provided by the Debtors and on various assumptions regarding the Debtors' business.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual recoveries may vary from the estimates contained in this Disclosure Statement.  Moreover, the Plan Proponents cannot determine with certainty the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims under the Plan.

### 7. *Release, Injunction, and Exculpation Provisions May Not Be Approved*

Article X of the Plan provides for certain releases, injunctions, and exculpations.  All of the releases,  injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

### 8. *The Chapter 11 Cases May Be Converted Into Chapter 7 Cases*

If no plan of reorganization can be confirmed, or if the Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A conversion of these Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims.

### B.     Certain Considerations Associated with the Sale

#### 1. *The Museum Plan Sponsors May Not Be Able To Raise the Purchase Price*

The Plan Sponsors have agreed to purchase substantially all of the Debtors' assets and assume certain liabilities for $19.2 million.  NMM, NMNI, and Titanic Belfast intend to raise the full amount of the Purchase Price from and with the support and assistance of government sources from the United States, United Kingdom, and Northern Ireland, high net worth

individual and corporate donors, and a public campaign backed by certain high profile endorsements. Although the Plan Proponents are confident, based on the strong fundraising records of NMM, NMNI, and Titanic Belfast and discussions with certain government sources and high net worth individual and corporate donors, that NMM, NMNI, and Titanic Belfast will successfully raise the Purchase Price, there is no guarantee that NMM, NMNI, and Titanic Belfast will be able to raise the full amount. If the fundraising campaign fails to raise the full Purchase Price, then the Sale and consummation of the Plan would not occur.

### 2. *The Sale May Not Close*

The Plan Sponsors have agreed to purchase substantially all of the Debtors' assets and assume certain liabilities through the Sale provided that certain conditions are met, including that the filing and approval of the Plan and this Disclosure Statement, confirmation of the Plan, and, if applicable, the closing of the Sale occur within the respective time periods specified in the Acquisition Agreements and that no event giving rise to termination of the Acquisition Agreements has occurred. To the extent the terms or conditions of the Sale are not satisfied, or to the extent events giving rise to termination of the Acquisition Agreements occur, the Acquisition Agreements may be terminated prior to confirmation or consummation of the Plan. Such termination would adversely affect the Plan Proponents' ability to consummate the Plan.

### 3. *The Admiralty Court May Not Approve the Sale*

The Covenants and Conditions require that the Admiralty Court approve Museum Plan Sponsors, as candidate subsequent trustees of the Artifact Collection. The Covenants and Conditions provide that the Admiralty Court may appoint experts to conduct and complete due diligence investigations of the candidate subsequent trustee. In addition, the Admiralty Court may consider any information and/or report and recommendation submitted by NOAA, as the representative of the public interest in the Artifact Collection, as to whether the candidate subsequent trustee is a qualified institution and whether the transaction may proceed. NOAA has indicated that it may take up to three weeks or longer to evaluate a potential successor trustee, and there is no guarantee that NOAA will recommend that the Admiralty Court approve the museum Plan Sponsors as subsequent trustees. *See United States' Response to RMST's June 29, 2018 Motion to Approve Asset Purchase Agreement* at fn. 4 (Admiralty Court Docket No. 545). Any delay in consummating the Acquisition Agreements due to Admiralty Court approval processes, or the failure to obtain such approvals, could prolong the Chapter 11 Cases (or result in a liquidation of the Debtors), and reduce recoveries available to creditors.

## VIII. ~~VI.~~ CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A. Introduction

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the holders of Class 3 Claims who may receive Distributions under the Plan. The following summary does not address the federal income tax consequences to holders of any other Claims and Claims that are not ~~Impaired~~impaired by the Plan. The following summary is based on the Internal Revenue Code of 1986, as amended ("**IRC**"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published

administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. Further, any discussion of the Liquidation Trust and the powers, obligations and/or actions of the Litigating Trustee that may be set forth below is subject to the applicable provisions of the Plan and the Liquidation Trust Agreement; if and to the extent that there is any inconsistency between such discussion on one hand and the Plan and the Liquidation Trust Agreement on the other hand, the terms of the latter documents shall control. Holders of Claims should read the Plan and the Liquidation Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, holders that hold Claims as part of a hedge, straddle or conversion transaction, holders who acquired their Claims as compensation, and holders who do not hold their Claims as capital assets).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR PRXI INTEREST. ALL HOLDERS OF CLAIMS OR PRXI INTERESTS ARE URGED TO CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### B.     Consequences to the Debtor

The transfer of the Liquidation Trust Assets to the Liquidation Trust may result in the Debtor recognizing gain or income, depending in part on the value of such assets on the Effective Date and the adjusted basis of such assets on the Effective Date.

### C.     Consequences to Holders of Allowed Class 3 Claims

#### 1.     *Recognition of Gain or Loss Generally*

Pursuant to the Plan, on the Effective Date, each holder of an Allowed 3 Claim will receive an interest in the Liquidation Trust, which is a beneficial interest in the Liquidation Trust, entitling the holder thereof to distributions from the Liquidation Trust as provided for in the Plan and in the Liquidation Trust Agreement. Except to the extent that the holder of an Allowed Claim, or beneficial interest therein, agrees to a different treatment, said Persons may receive on account of their Allowed Claim, in full and complete satisfaction thereof, from the Liquidation Trust, one or more Pro Rata Distributions based upon the amount of the respective

holder's Allowed Claim, in accordance with the priorities of the Plan. In general, each holder of such an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including, as discussed below, its undivided interest in the Liquidation Trust Assets) that such Allowed Claim holder receives in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the ~~post-Effective~~ post-Effective Date Distribution of such consideration upon the resolution of Disputed Claims), and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest), as applicable. For a discussion of the U.S. federal income tax consequences of any Claim for accrued interest, *see* Section 2 below.

Where a holder recognizes gain or loss in respect of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder and how long it has been so held, whether, in the case of an Allowed Claim, the holder had acquired the Claim at a market discount, and, in the case of an Allowed Claim, whether and to what extent the holder had previously claimed a bad debt deduction. A holder that purchased its Allowed Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

The Liquidation Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, each holder of an Allowed Claim receiving a beneficial interest in the Liquidation Trust will be treated for U.S. federal income tax purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidation Trust Assets (*see* Section 3 below). As set forth in the Liquidation Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidation Trustee (if reasonably deemed necessary or desirable by the Liquidation Trustee) will make or have caused to be made a good faith valuation of the Liquidation Trust Assets of the Liquidation Trust, and all parties, including the holders of Allowed Claims, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidation Trust may receive more than one Distribution subsequent to the Effective Date, the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a holder in satisfaction of an Allowed Claim may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders of such Allowed Claims are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

After the Effective Date, any amount that a holder receives on account of an Allowed Claim as a Distribution from the Liquidation Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) generally should not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such holder's beneficial (ownership) interest in the Liquidation Trust.

In general, a holder's tax basis in any beneficial interest received (and undivided interest in the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate share of the Liquidation Trust Assets on the Effective Date. The holding period for such assets generally will begin the day following the Effective Date.

2.    *Distributions in Payment of Accrued but Unpaid Interest*

Distributions to any holder of an Allowed Class 1, 2, or 3, or 4 Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a holder of debt receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such holder generally recognizes taxable interest income in such amount (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

3.    *Tax Treatment of the Liquidation Trust and Holders of Interests Therein*

On the Effective Date, the Liquidation Trust will be established for the benefit of holders of all Allowed Claims. The Liquidation Trust is intended to qualify and be treated as a "grantor trust" (i.e., a pass-through tax entity), rather than as a separate taxable entity. However, merely establishing a trust as a Liquidation Trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994- 2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a Liquidation Trust under a ~~Chapter~~chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidation Trustee, and the Beneficiaries of the Liquidation Trust) are required for federal income tax purposes to treat the Liquidation Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidation Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification,

60

the federal income tax consequences to the Liquidation Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidation Trustee, and the Beneficiaries) must treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan and the Liquidation Trust Agreement, as a transfer of such Liquidation Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidation Trust Assets to the Liquidation Trust. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidation Trust Assets for all U.S. federal income tax purposes. Each such Person will have a tax basis in its proportionate share of the Liquidation Trust Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidation Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidation Trustee will (if reasonably deemed necessary or desirable by the Liquidation Trustee) make or have caused to be made a good faith valuation of the Liquidation Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim receiving a beneficial interest in the Liquidation Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidation Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Liquidation Trust distributing any Cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidation Trust regardless of the fact that the holder has not received any prior or concurrent Distribution. Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidation Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidation Trust Assets.

The assets set aside or reserved to fund the payment of the Disputed Claims Reserve will be treated and taxed for federal income tax purposes similar to the other assets transferred and held by the Liquidation Trust (i.e., the reserved assets will be treated as transferred to the grantor Liquidation Trust owned by the holders) unless the Liquidation Trustee files a tax election to treat the Disputed Claim Reserve as a Disputed Ownership Fund. Under the Plan, the Liquidating Trustee is allowed, for federal income tax purposes, to treat the Disputed Claims Reserve as either (a) a part of the assets of the grantor Liquidation Trust owned by the Beneficiaries (i.e., the Beneficiaries, rather than the Liquidation Trust, will pay tax on their share of Tax Items, as that term is defined in the Liquidation Trust, attributable to the Disputed Claims) or (b) a DOF, taxable under IRC Section 468B and Treasury Income Tax Regulation Section 1.468B-9 (separate taxable entity). If the Liquidation Trustee fails to file a DOF tax

election, the tax consequences with respect to the transfer of assets used to fund the Disputed Claims reserve will be the same as described above for the other assets transferred by the Debtor to the Liquidation Trustee.

If the Liquidation Trustee files a tax election to treat the Disputed Claims reserve accounts as a DOF, then the DOF will be treated as a separate taxable entity for federal income tax purposes (rather than a pass-through tax entity) that is required to file federal income tax returns and pay any federal income tax due with respect to Tax Items that are attributable to the Disputed Claims. All of the federal income tax liability of the DOF will reduce the distributions of all of the holders, including the Disputed Claimants. The DOF will be taxed for federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the fund by or on behalf of transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of IRC Section 468B and the Treasury Income Tax Regulations thereunder (a "**QSF**"), if all the assets transferred to the fund are passive investment assets. For purposes of determining the DOF's federal income tax liability, a DOF is not required to report as income transfers of assets to the DOF, but is required to include in income all income received or accrued from the assets transferred to the DOF. The DOF is not allowed a tax deduction for a distribution of disputed assets or the net after tax income earned by the DOF made to a holder. The initial tax basis of assets transferred to a DOF is the fair market value of the asset determined on the date of transfer to the DOF, and the DOF's holding period begins on the date of the transfer.

    4.    *Tax Reporting*

Except to the extent of the Liquidation Trust Assets with respect to which there is a DOF tax election, all parties (including the Debtors, the Liquidation Trustee and the holders) shall, for all federal income tax purposes, treat the transfer of assets to the Liquidation Trust in accordance with the terms of the Plan as a transfer of such assets directly to the holders, followed by the transfer thereof by such holders to the Liquidation Trust. Consistent therewith, for federal income tax purposes, all parties shall treat the Liquidation Trust as a grantor trust of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidation Trust for all federal income tax purposes. The Liquidation Trustee will determine the fair market value of the assets, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes.

The Liquidation Trustee will file with the Internal Revenue Service tax returns as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidation Trustee will also send to each holder a separate statement setting forth the holder's share of the Liquidation Trustee's Tax Items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Each of the holders will be required to report on his/her federal income tax return(s) the holder's allocable share of any Tax Items such as income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust and that is set forth on the tax statement provided to the holder. The character of items of income, deduction and credit to any holder and

the ability of such holder to benefit from any deduction or losses may depend on the particular situation of the holder.

The federal income tax reporting obligation of the holders is not dependent upon the Liquidation Trustee's distribution of cash or other proceeds. Therefore, holders may receive Tax Items in a taxable year regardless of the fact that the Liquidation Trustee has not made, or will not make, any concurrent or subsequent distributions to the holders. If a holder does not receive distributions from the Liquidation Trustee commensurate with the Tax Items allocated to it, the holder may be entitled to a subsequent loss or deduction.

If the Liquidation Trustee files a DOF tax election with respect to the Disputed Claims Reserve then, for federal income tax purposes, the Liquidation Trustee will file a tax return for the DOF and pay any federal income tax due.

For federal income tax purposes, Disputed Claimants are not treated as transferring assets to the DOF. The taxability of distributions to Disputed Claimants is determined by reference to the Disputed Claim in which the distribution is made.

5.      *Information Reporting and Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain Distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING UPON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

**IX. ~~VII.~~ SUMMARY OF ADDITIONAL SOURCES OF INFORMATION**

Additional sources of information regarding the Debtors and documents relating to the Plan are available to holders of Claims and Interests. Copies of the Debtors' securities filings can be viewed at: https://www.sec.gov/cgi-bin/browse-edgar?company=premier+exhibitions&owner=exclude&action=getcompany. All filings with the Court in these Chapter 11 Cases may be viewed at the Committees' website, http://www.jndla.com/cases/premiercommittee, under "Court Docket."

**X. ~~VIII.~~ RECOMMENDATION AND CONCLUSION**

~~The Plan Proponents believe that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for holders of Claims. Accordingly, the Plan Proponents urge holders of Claims in Class 3 to accept the Plan.~~

In the opinion of the Plan Proponents, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Plan Proponents recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

In the opinion of the Plan Proponents, and the Creditors' Committee in particular, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Additionally, the Plan Proponents believe that the Plan affords holders of Claims the potential for the greatest feasible realization out of the Debtors' Estates, with minimal risk that the contemplated transaction will be rejected by the Admiralty Court, and, therefore, is in the best interest of such holders. ACCORDINGLY, THE PLAN PROPONENTS, AND THE CREDITORS' COMMITTEE IN PARTICULAR, RECOMMEND THAT HOLDERS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION.

Dated: ~~June 29~~August 28, 2018          **OFFICIAL COMMITTEE OF UNSECURED
                                           CREDITORS**


By:     _____
        Name: Thomas Braziel
        Title:  Chairman

Dated: ~~June 29~~August 28, 2018

**THE TRUSTEES OF THE NATIONAL
MARITIME MUSEUM**

By: _____

Name: Kevin Fewster
Title: Director

Dated: ~~June 29~~August 28, 2018      **RUNNING SUBWAY PRODUCTIONS, LLC**

By: _____

       Name: James R. Sanna

       Title:  CEO

Dated: ~~June 29~~ August 28, 2018         **THE BOARD OF TRUSTEES OF NATIONAL**
                                           **MUSEUMS AND GALLERIES OF NORTHERN**
                                           **IRELAND**


                                           By:  _____


                                               Name: _____


                                               Title: _____

## Exhibit ~~1~~A
(Plan)

**Exhibit ~~2~~B**

~~(Premier Exhibitions, Inc., Corporate Organizational Chart)~~(Plan Support Agreement)

**Exhibit C**
(Recovery Analysis)

| Recovery Analysis | Plan | Stalking Horse Bid |
|---|---|---|
| Sale Proceeds | $ 19,200,000 | $ 17,500,000 |
| | | |
| DIP Loan | (5,112,000) | (5,112,000) |
| Secured Lender Claim | (4,000,000) | (1,000,000) |
| Administrative Expenses | (3,500,000) | (3,500,000) |
| Priority Claims | (252,698) | (252,698) |
| D&O Tail | - | (380,000) |
| | (12,864,698) | (10,244,698) |
| | | |
| Estimated Distribution to Unsecured Creditors | $ 6,335,302 | $ 7,255,302 |
| | | |
| Unsecured Claim Pool Low Estimate | 8,867,171 | 12,062,521 |
| Recovery Percentage: | 71% | 60% |
| | | |
| Unsecured Claim Pool High Estimate | 10,680,723 | 13,876,073 |
| Recovery Percentage: | 59% | 52% |

**Exhibit D**
(PRXI Corporate Organizational Chart)

**Exhibit ~~3~~E**
(Covenants and Conditions)

| Summary report: Litéra® Change-Pro TDC 10.1.0.320 Document comparison done on 8/28/2018 5:00:56 PM | |
|---|---|
| **Style name:** Color Legislative+Moves+HF | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/91100595/1 | |
| **Modified DMS:** iw://DMS/AmericasActive/91100595/13 | |
| **Changes:** | |
| Add | 715 |
| Delete | 535 |
| Move From | 71 |
| Move To | 71 |
| Table Insert | 3 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1396 |