THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

R.M.S. TITANIC, INC.,
Successor in interest to Titanic
Ventures, limited partnership,

    Plaintiff,

v.                                             Civil Action No.: 2:93cv902

The Wrecked and Abandoned
Vessel, . . . believed to be
The RMS TITANIC, in rem,

    Defendant.

**REPLY OF THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM TO THE RESPONSE AND OPPOSITION TO MOTION TO INTERVENE**

COMES NOW the Trustees of the National Maritime Museum ("NMM"), by and through their undersigned counsel, replying to the *United States' Response to Motions To Intervene* (Docket No. 484) and *Opposition of RMST to the Trustees of the National Maritime Museum's Motion to Intervene* (Docket No. 485).[1] NMM replies as follows:

**PRELIMINARY STATEMENT**

NMM, as a preeminent maritime museum and the leading custodian of the United Kingdom's maritime heritage, and as a potential acquirer of the interests of RMS Titanic, Inc. ("RMST") in the artifacts recovered from the wreck of the R.M.S. *Titanic* (the "Artifact Collection"), has a significant interest in the proceedings before this Court. In fact, NMM's

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Memorandum in Support of the Trustees of the National Maritime Museum Motion to Intervene* (Docket No. 475).

interest extends as far back as 1994, when it founded an International Advisory Committee to "safeguard the future of the Titanic wreck site and objects raised from it and to ensure that they are conserved to the highest standards and saved for future generations in a Titanic Memorial Museum." *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 323 F. Supp. 2d 724, 728 (E.D. Va. 2004) (quoting the affidavit of George Tulloch, the managing partner of Titanic Ventures Limited Partnership, predecessor to RMST). Further to this interest, NMM, with the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Board of Trustees of the National Museums and Galleries of Northern Ireland ("NMNI"), and Running Subway Productions, LLC, filed a chapter 11 plan (the "Museum Plan") and related disclosure statement (the "Museum Disclosure Statement") in the Debtors' bankruptcy proceedings proposing to sell RMST's interest in the Artifact Collection to NMM and NMNI for $19.2 million. The sale contemplated by the Museum Plan would return the Artifact Collection to its historic home in the United Kingdom, to be held in perpetual public ownership for the benefit of the public interest and to be kept together, intact and available for posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes.

Support for the Museum Plan was and is broad; its supporters include Dr. Robert Ballard, James Cameron, the National Geographic Society, and the United Kingdom government. In a little more than a month, NMM obtained committed funds of approximately $10.2 million (more than half of the $19.2 million purchase price), and NMM, with the assistance of Titanic Belfast Ltd., was on pace to obtain the remainder of the purchase price over the following 30 to 45 days and in advance of the likely confirmation hearing. On August 30, 2018, however, at a hearing before the Bankruptcy Court, RMST and the Stalking Horse Purchaser suddenly announced that they had reached a last-minute deal with 417 Fifth Avenue, the Debtors' largest unsecured

creditor by a large measure, which required 417 Fifth Avenue to oppose the Museum Disclosure Statement and vote against the Museum Plan; in exchange, the Stalking Horse Purchaser increased its bid for substantially all of the Debtors' assets, including the stock of RMST, from $17.5 million to $19.5 million; i.e., $300,000 more than the purchase price under the Museum Plan. A negative vote by 417 Fifth Avenue alone may well block the success of the Museum Plan (even if the NMM were to amend the Museum Plan to increase the purchase price). Although not mentioned in the Status Report filed by the United States on September 6, 2018, the Debtors indicated that the Stalking Horse Purchaser's agreement to increase the purchase price was conditioned upon the Bankruptcy Court approving the revised bidding procedures associated with its sale motion that day. The Bankruptcy Court did not approve the bidding procedures at the hearing and the issue remains *sub judice*.

Notwithstanding the foregoing, NMM remains committed to its mission—to eliminate forever the risk that the Artifact Collection will be sold off in pieces, especially since such sales have been alleged at various times by various parties (including the Debtors, the Equity Committee, and members of the Stalking Horse Purchaser) to be consistent with the Covenants and Conditions. As a result, we respectfully request that this Court hold in abeyance its decision with respect to the Motion to Intervene in order to see how the Bankruptcy Court rules with respect to the Museum Disclosure Statement, whether the conditions to the Stalking Horse Purchaser's revised bid (and the related commitment of 417 Fifth Avenue to oppose the Museum Disclosure Statement) are satisfied, and whether the bid of the Stalking Horse Purchaser (or any other prevailing bidder at the auction) is approved by the Bankruptcy Court and this Court.

## BACKGROUND

On June 21, 2016, the Debtors filed a motion (the "First Sale Motion") requesting that the Bankruptcy Court authorize a sale of "a narrow subset of artifacts from the French Collection to

pay the creditors in full, return all equity positions to the Debtors' shareholders, and possibly fund some or all of the Titanic reserve account." (Bankruptcy Docket No. 28 at ¶ 27.) In the motion, the Debtors stated regarding the Artifacts:

> RMST recognizes and appreciates their historic value, and believes that the artifacts should remain together as a collection, made available to future generations. Recognizing, however, the extraordinary monetary value of the individual artifacts, and the Company's current circumstances, RMST believes a sale in bankruptcy of a very specific, limited number of artifacts from the French Collection serves the best interests of the Debtors' creditors, their shareholders, and both artifact collections.

(*Id.* at ¶ 21.) Because the proposed sale would leave the American Artifacts and the "vast majority" of the French Artifacts intact, the Debtors alleged that the sale would "faciliat[e] the Debtors' ongoing obligations under the Covenants [and Conditions]." (*Id.* at ¶ 24.)

On July 6, 2016, the United States, on behalf of the Department of Commerce, objected to the First Sale Motion, arguing, among other things, that the First Sale Motion was really a request for an advisory opinion from the Bankruptcy Court "that RMST may sell unidentified artifacts it holds in trust to fund not only its own bankruptcy case but also the bankruptcy cases of the co-debtors."[2] (Bankruptcy Docket No. 73 at 2.) The Bankruptcy Court agreed and, on July 22, 2016, the Bankruptcy Court denied the First Sale Motion with leave to re-file if and when RMST obtains a judgment in an adversary proceeding making clear the interests of the

---

[2] The RMS Titanic, Inc. Declaration of Trust and Establishment of Reserve Account dated November 9, 2011, states that RMST "hereby declares that it holds in trust the TITANIC Artifacts (as defined in the Covenants and Conditions), together with the other properties received pursuant to the Court award from time to time . . . subject to the Covenants and Conditions." The TITANIC Artifacts, as defined in the Covenants and Conditions, include both the French Artifacts and the American Artifacts.

4

Republic of France in the French Artifacts.[3] (Bankruptcy Docket No. 102.) On August 17, 2016, RMST filed a complaint in an adversary proceeding (the "French Artifacts Proceeding") seeking to quiet title to the French Artifacts, *RMS Titanic, Inc. v. The French Republic*, Case No. 3:16-ap-00183. *See* French Artifacts Proceeding Docket No. 1. On September 29, 2017, because the Republic of France did not appear in the proceeding, the Bankruptcy Court entered a default judgment (the "Default Judgment") in favor of RMST, holding that the Republic of France has no interest in the French Artifacts. *See* French Artifacts Proceeding Docket No. 67.

On November 14, 2017, the Debtors filed a motion (the "Second Sale Motion") seeking to sell substantially all of the assets of the Debtors, including "the common shares in RMST or the entire artifact collection held by RMST." (Bankruptcy Docket No. 811 at ¶ 3.) An ad hoc group of equityholders comprised of funds managed by affiliates of Apollo Global Management, LLC ("Apollo") and Alta Fundamental Advisors LLC ("Alta")—each members of the Stalking Horse Purchaser—objected to the Second Sale Motion (the "Ad Hoc Equity Objection"). (Bankruptcy Docket No. 850.) In the objection, Apollo and Alta stated that the "game changing" Default Judgment "confirm[ed], once and for all, that the Debtors have clear title to convey the French Artifacts." (*Id.* at ¶ 3). Apollo and Alta, citing to a $200 million appraisal of the Artifact

---

[3] On October 18, 1993, the French Ministry for Equipment, Transportation and Tourism confirmed in a letter to Titanic Ventures Limited Partnership ("Titanic Ventures"), predecessor to RMST, that Titanic Ventures:

> agreed to make use of [the French Artifacts] in conformity with the respect due to the memory of their initial owners, and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of exhibition.

RMST's promise to keep the artifacts together was one of the factors this Court considered when it granted salvor-in-possession status to RMST in 1994. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 924 F. Supp. 714, 718 n.10 (E.D. Va. 1996).

5

Collection, opposed the Debtors' proposed expedited sale of the entire Artifact Collection because, among other things:

> a single sale of all the Debtors' assets is unlikely to achieve proceeds anywhere near the Debtors' appraised values . . . . Indeed, the proposed sale will not even be marketed to collectors and cannot, therefore, reach the appropriate market need for unique artifacts of this kind.

(*Id.* at ¶¶ 2, 26). The Debtors subsequently withdrew the Second Sale Motion. *See* Bankruptcy Court Docket No. 863.

On June 1, 2018, the Equity Committee filed a plan and accompanying disclosure statement contemplating the marketing and sale of the American Artifacts to a "qualified institution" and the marketing and auction of certain French Artifacts separately at Guernsey's auction house.

On June 15, 2018, the Debtors filed a third sale motion (the "Third Sale Motion") seeking to sell substantially all of the Debtors' assets, including the stock of RMST, to the Stalking Horse Purchaser for $17.5 million, subject to higher and better offers submitted before the bid deadline set forth in the Third Sale Motion.[4] (Bankruptcy Docket No. 1055.) The Debtors attached a proposed Asset Purchase Agreement (the "Stalking Horse APA") as Exhibit B to the Third Sale Motion. Importantly, the Stalking Horse APA does not affirmatively require the Stalking Horse Purchaser to maintain the French Artifacts and the American Artifacts as an integrated whole;

---

[4] The Creditors' Committee has represented that it does not believe that any other potential purchasers will submit a timely "Qualified Bid" under the Debtors' bidding procedures and that the Stalking Horse Purchaser, which is largely comprised of current equityholders of Premier Exhibitions, Inc., will prevail at the auction. *See* Museum Disclosure Statement (Bankruptcy Docket No. 117), at 17. Additionally, in the Equity Committee's response in opposition to the Debtors' Third Sale Motion, the Equity Committee alleges that the "Debtors' bid procedures are designed to chill bidding, deter outsiders from participating in the auction process, and secure a sale of the Debtors' assets to their preferred buyer"—the Stalking Horse Purchaser. (Bankruptcy Docket No. 1170 at 2.)

rather, the Stalking Horse APA merely requires that the winning bidder assume the Debtors' obligations under the Covenants and Conditions. *See* Stalking Horse APA § 1.1(c)(iii).

On June 29, 2018, RMST filed a motion with this Court requesting entry of an order approving the Stalking Horse APA and authorizing the sale of the stock of RMST to the Stalking Horse Purchaser or such other prevailing qualified bidder as determined by the Bankruptcy Court. (Docket No. 448.) On July 13, 2018, the United States, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"), filed a response to RMST's motion in which it restated the criteria it expects to consider to evaluate any proposal involving the Artifact Collection submitted to this Court for approval. (Docket No. 454.) Among other criteria, the United States stated that it will require "full access" to the French Artifacts and that it will take into account a proposal's "treatment, handling and disposition" of the French Artifacts. (*Id.* at 6.) Although the United States acknowledged that this Court lacks constructive *in rem* jurisdiction over the French Artifacts, the United States recognized that "the public interest that NOAA is charged by the Court with protecting encompasses the Artifact Collections as a whole, meaning 'the total assemblage of the French Titanic Artifact Collection and the Subject Titanic Artifact Collection.'" (*Id.* (citing Covenants and Conditions §§ II(H) and II(K)).)

On July 29, 2018, the Debtors filed a reply asserting the United States' position of requiring full access to the French Artifacts and taking into account the treatment, handling, and disposition of the French Artifacts in evaluating a proposed transaction "is overreaching, outside its scope, and *ultra vires*." (Docket No. 455 at 3.) To that end, the Debtors argued:

> Consistent with [*RMS Titanic, Inc. v. Wrecked and Abandoned Vessel*, ____ (4th Cir. 2006)], the Covenants and Conditions themselves, and the intent of RMST when it drafted the Covenants and Conditions, the limited language in the Covenants and Conditions which relates the "Artifact Collections" (ie. both the

7

> STAC and the 1987 Artifacts") is merely precatory, and aspirational . . . .
>
> Consistent with § I.E . . . the public interest only extends to the STAC and not to the French Artifacts. Moreover, while § VII.C.1 seeks to permit NOAA to inspect both the STAC and the French Artifacts, such inspection is designed only to monitor, "the conservation, curation, documentation, and other activities *in relation to the ST*AC." (Emphasis added). Because RMST owns the French Artifacts outright, and because this Court does not have subject matter jurisdiction over them, NOAA's oversight role under the Covenants and Conditions does not extend to the care and treatment of the French Artifacts.

(*Id.* at 2-3.)

Additionally, at the hearing on August 30, representatives of Stalking Horse Purchaser members Alta and PacBridge Capital Partners (HK) Ltd. ("PacBridge") testified that the members of the Stalking Horse Purchase have not made any decisions about whether the Stalking Horse Purchaser will liquidate the French Artifacts or how the business will otherwise operate and monetize the Artifact Collection, and each admitted that liquidating the French Artifacts was possible. On cross-examination by the Equity Committee, Alta managing partner Mr. Gilbert Li testified:

> Q And has the stalking horse group committed to keeping those collections together in connection with purchase of its assets?
>
> A We are only at the stage of negotiating and finishing completing the Asset Purchase Agreement. We have not even gone towards that much of a business plan.
>
> Q Have you thought about selling the French artifacts off to achieve money or revenues if you're the successful purchaser?
>
> A I have not gone to that point.
>
> Q Is it possible that that's what you would do?
>
> A It's possible I won't, either. So, yes, on both sides.

8

Exhibit A, Transcript of Proceedings (Bankruptcy Docket No. 1196), at 121 (Bankr. M.D. Fl. Aug. 30, 2018). Mr. Giovanni Wong, a representative of PacBridge, also on cross-examination by the Equity Committee, testified:

> Q And are you, as part of the stalking horse group, willing to commit to keep those collections together infinitum?
>
> A I don't think -- just like Mr. Li has said, I don't think we have extensive discussions – enough extensive discussion internally to make that determination.
>
> Q So it's possible that you could vote in favor of splitting those up and trying to sell those artifacts in the future.
>
> A Everything is possible.

(*Id.* at 126.) A transcript of the August 30 hearing in the Bankruptcy Court is attached hereto as Exhibit A.

## ARGUMENT

NMM, in its capacity both as a potential purchaser of RMST's interests in the Artifact Collection and as the leading custodian of the United Kingdom's maritime heritage, has a significant interest in the proceedings before this Court. Through the Museum Plan, NMM seeks to simultaneously provide significant recoveries for RMST's creditors and to return the Artifact Collection to its historic home in the United Kingdom to be held in perpetual public ownership for the benefit of the public interest and kept together, intact and available for posterity. At this time, however, solicitation of the Museum Plan in the Bankruptcy Court may be futile because the Debtors' largest unsecured creditor, 417 Fifth Avenue, has entered into a verbal agreement with the Stalking Horse Purchaser requiring it to vote against the Museum Plan, and NMM is unable to bid in the auction due to institutional limitations (NMM, being a national museum whose bid must be funded by government sources and private donors, cannot, for example, provide a non-refundable deposit, as required by the Debtors' bidding procedures). However,

9

given the contingencies associated with the Stalking Horse Purchaser's bid (and likely any other prevailing bid at an auction), including the need for approval by this Court, it is possible that NMM, through the Museum Plan or otherwise, will be afforded the opportunity to acquire RMST's interests in the Artifact Collection and, as a result, need to intervene in this proceeding quickly.

NMM's motivations for purchasing RMST's interests in the Artifact Collection are non-pecuniary. Dating as far back as 1994 with the establishment of the International Advisory Committee, NMM has been dutifully committed to safeguarding the R.M.S. *Titanic* wreck site and the Artifact Collection. The $10.2 million raised to date is a testament to that commitment. If NMM is able to acquire the Artifact Collection, the entire collection would stay together in perpetuity.

NMM's interest in acquiring the Artifact Collection, ultimately, is an interest in preserving an important part of the United Kingdom's maritime heritage. As a leader in the curation and conservation of marine archeology, NMM is deeply concerned that, if a sale to a private party is consummated, the French Artifacts, in whole or in part, may one day disappear from the public view, be damaged beyond repair, or be lost to the world. As discussed above, the Debtors, Apollo, and Alta interpret the Covenants and Conditions as allowing for the liquidation of the French Artifacts, and the Stalking Horse Purchaser to date has been unwilling to formally commit to maintaining the French Artifacts and the American Artifacts as an integrated whole.[5] *See* Ad Hoc Equity Objection at ¶¶ 2-5; First Sale Motion at ¶ 24. The

---

[5] At the July 25, 2018 status conference at the Bankruptcy Court, counsel to the Equity Committee proposed that a trust be imposed upon the French Artifacts for the benefit of the Debtors' estates if the Stalking Horse Purchaser ultimately acquires the stock of RMST. *See* Transcript of Proceedings (Bankruptcy Docket No. 1143), at 50-51 (Bankr. M.D. Fl. Jul. 25, 2018). The purpose of the trust would be to eliminate any economic incentive of the Stalking

Stalking Horse APA does not expressly require the Stalking Horse Purchaser to maintain the French Artifacts and the American Artifacts as an integrated whole.  Rather, as discussed above, the Stalking Horse APA only requires that the winning bidder assume the Debtors' obligations under the Covenants and Conditions.  Further, at the August 30, 2018 hearing in the Bankruptcy Court, representatives of Alta and PacBridge, when asked if the members of the Stalking Horse Purchaser intend to liquidate certain French Artifacts, each testified that the members of the Stalking Horse Purchaser have not thought about what they plan to do with RMST or the Artifact Collection and called a sale of the French Artifacts "possible."  *See* August 30 Transcript at 121, 126.

The Museum Plan stands in contrast to the Sale Motion in that NMM is willing to commit to keeping the French Artifacts and the American Artifacts together as an integrated whole in perpetuity.  At present, NMM has sufficient funds to set forth a viable bid for the Artifact Collection and remains committed and willing to acquire such interests if given the opportunity.  For these reasons, although NMM cannot at present solicit on the Museum Plan or, for institutional reasons well known to the Debtors, participate in the auction, NMM respectfully requests that this Court hold in abatement its decision with respect to the Motion to Intervene. NMM submits that such relief is in the best interests of the Debtors' estates and furthers the public interest in the historical, archeological, scientific, and cultural aspects of the R.M.S. *Titanic* wreck and its artifacts.

---

Horse Purchaser to liquidate the French Artifacts by requiring that the proceeds of any such liquidation be paid to the Debtors' estates instead of the Stalking Horse Purchaser.  Counsel to Apollo and Alta rejected the proposal.  *See id*. at 60.

11

## **RESERVATION OF RIGHTS**

NMM reserves the right to move to intervene in the above-captioned action pursuant to Fed. R. Civ. P. 24 on grounds other than the grounds stated in the Motion to Intervene.

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that the Motion to Intervene should be held in abeyance until further order of this Court.

TRUSTEES OF THE NATIONAL MARITIME MUSEUM

Dated: September 6, 2018          Respectfully Submitted,

                                            By:    */s/ Edward J. Powers*

| | |
|---|---|
| Neil Quartaro | Edward J. Powers, Esq. (VSB No. 32146) |
| WATSON FARLEY & WILLIAMS LLP | VANDEVENTER BLACK LLP |
| 250 West 55th Street | 101 West Main Street, Suite 500 |
| New York, NY 10019 | Norfolk, VA 23510 |
| (212) 922-2200 | (757) 446-8600 |
| nquartaro@wfw.com | epowers@vanblacklaw.com |

Timothy Graulich
James I. McClammy
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com

*Attorneys for the Trustees of the National Maritime Museum*

13

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing pleading was electronically filed with the Court's ECF system causing ECF notification to be sent to all counsel of record.

/s/ *Edward J. Powers*

Edward J. Powers, Esq. (VSB No. 32146)
Vandeventer Black LLP
101 West Main Street, Suite 500
Norfolk, VA  23510
Telephone:  (757) 446-8600
Facsimile:   (757) 446-8670
epowers@vanblacklaw.com