1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


In re:

RMS TITANIC, INC., et al.,   CASE NO:  3:16-bk-02230-PMG

          Debtors.
_____/


TRANSCRIPT OF PROCEEDINGS

          DATE TAKEN:      August 30, 2018

          TIME:           1:30 p.m. - 5:15 p.m.

          PLACE:          United States Courthouse
                          300 North Hogan Street
                          Courtroom 4A
                          Jacksonville, Florida 32202

          BEFORE:         The Honorable Paul M. Glenn
                          U.S. Bankruptcy Judge




This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings
were transcribed by:


**Cindy Danese, Notary Public**
**STATEWIDE REPORTING SERVICE**
**233 East Bay Street, Suite 912**
**Jacksonville, Florida  32202**
**(904) 813-9280**

Exhibit A

2

1                     A P P E A R A N C E S

2

3          DANIEL F. BLANKS, ESQUIRE
           HARRIS WINSBERG, ESQUIRE
           MATTHEW BROOKS, ESQUIRE
4          BRIAN A. WAINGER, ESQUIRE (via telephone)

5              Attorneys for Debtors

6

7          JAY BROWN, ESQUIRE
           KATIE FACKLER, ESQUIRE
           PETER GURFEIN, ESQUIRE
8          ROBERT CHARBONNEAU, ESQUIRE (via telephone)

9              Attorneys for the Equity Committee

10

11         TIMOTHY GRAULICH, ESQUIRE (via telephone)
           PATRICIA REDMOND, ESQUIRE
           JACOB WEINER, ESQUIRE
12         JAMES I. MCCLAMMY, ESQUIRE
           STEVEN SZANZER, ESQUIRE
13
               Attorneys for Trustees of the National
14             Maritime Museum

15

16         JEFFREY CHUBAK, ESQUIRE
           RICHARD THAMES, ESQUIRE
17         ROBERT A. HEEKIN, JR., ESQUIRE

18             Attorneys for the Unsecured Creditors
               Committee
19

20         JASON BURNETT, ESQUIRE
           ASHLEY EDWARDS, ESQUIRE
21
               Attorneys for 417 Fifth Avenue South and Luxor
22             Hotel and Casino

23

24         JENNIFER FELDSHER, ESQUIRE

               Attorney for Premier Acquisition Holdings,
25             Alta and Apollo

Exhibit A

3

1                        APPEARANCES (CONTINUED)

2


3       SCOTT GROSSMAN, ESQUIRE

4            Attorney for HaiPing Zou, Jihe Zhang and
             Lange Feng, and PacBridge Capital Partners
5


6

7       JOHN ISBELL, ESQUIRE (via telephone)

             Attorney for Bay Point Partners
8


9

10      MATTHEW TROY, ESQUIRE

             Attorney for USDOJ and NOAA
11


12

13      STEVEN FOX, ESQUIRE

             Attorney for Cedar Bay Entertainment
14


15

16      HOWARD SIEGEL, ESQUIRE (via telephone)

             Attorney for Euclid Claims Recovery, LLC
17


18

19      JILL KELSO, ESQUIRE

             Attorney for the United States Trustee
20

21

22

23

24

25

4

1             T A B L E   O F   C O N T E N T S

2    WITNESS                                      PAGE

3

4    MARSHALL GLADE

5      Direct Examination by Mr. Winsberg          23

6      Cross-Examination by Mr. Gurfein            59

7

8    JESSICA LEE SANDERS

9      Direct Examination by Mr. Brooks            87

10     Cross-Examination by Mr. Gurfein           100

11

12   ARLAN ETTINGER

13     Cross-Examination by Mr. Books            108

14     Redirect Examination by Mr. Gurfein       109

15

16   GILBERT LI

17     Direct Examination by Mr. Brown           117

18     Cross-Examination by Ms. Feldsher         122

19

20   GIOVANNI WONG

21     Direct Examination by Mr. Brown           123

22

23

24

25

Exhibit A

5

1            TABLE OF CONTENTS (CONTINUED)

2

3                    E X H I B I T S

4

5    Debtors' Exhibits 1 - 5                    59

6

7    Equity Committee's Exhibits A and B        85

8    Equity Committee's Exhibits C and D        114

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A

6

<u>P R O C E E D I N G S</u>

August 30, 2018                                    1:30 p.m.

                            - - -

          THE COURT:  Court is in session for August 30.

    On the calendar at this time this afternoon is the

    case of RMS Titanic, Inc., Chapter 11 case.

          We're set for this hearing on a disclosure

    statement by unsecured creditors, a disclosure

    statement by Equity and Premier Exhibitions, and a

    motion for approval of competitive bidding and sale

    procedures.

          There are appearances in the courtroom and by

    conference telephone.

          Let me first take appearances of those in the

    courtroom.

          MR. BLANKS:  Good afternoon, Your Honor.

    Daniel Blanks from Nelson Mullins on behalf of

    Debtor.  Also at counsel table with me this

    afternoon is my co-counsel, Harris Winsberg, and

    Mathew Brooks with the law firm of Troutman

    Sanders.  In addition, the corporate secretary of

    the Debtor, Ms. Jessica Sanders.

          THE COURT:  Very good.  Ms. Sanders, Mr.

    Brooks, Mr. Winsberg and Mr. Blanks.

          Other appearances.

Exhibit A

7

1        MR. BROWN:  Thank you, Your Honor.  May it

2   please the Court, Jay Brown of Ackerman LLP

3   appearing on behalf of the Official Committee of

4   Equity Security Holders of Premier Exhibitions,

5   Inc., along with with my co-counsel, Peter Gurfein,

6   of Landau Gottfried & Berger.

7        Thank you.

8        THE COURT:  Mr. Brown, Mr. Gurfein, good

9   afternoon.

10       MR. CHUBAK:  Jeffrey Chubak from Storch Amini,

11   PC.  With me is Rick Thames, Rob Heekin, and Ezra

12   Jones, a member of the Unsecured Creditors

13   Committee.

14       THE COURT:  Mr. Chubak, Mr. Heekin, Mr. Jones.

15       MS. REDMOND:  Good afternoon, Your Honor.

16   Patricia Redmond, together with Steven Szanzer,

17   James McClammy and Jacob Weiner of the Davis Polk

18   Wardwell firm on behalf of the Trustees of the

19   National Maritime Museum.

20       THE COURT:  Very good.  Ms. Redmond and

21   others.

22       Other appearances in the courtroom?

23       MS. FELDCHER:  Good afternoon, Your Honor.

24   Jennifer Feldsher from Bracewell on behalf of

25   Premier Acquisition Holdings, Apollo and Alta.  In

1     the courtroom with me today is Rob Giavone from

2     Apollo, and Gilbert Li and Bretton Hunchak from

3     Alta, Your Honor, as well.

4          THE COURT:  Very good.  Thank you.  Gentlemen.

5          MR. GROSSMAN:  Good afternoon, Your Honor.

6     Scott Grossman of Greenberg Traurig on behalf of

7     Lange Feng, HaiPing Zou, Jihe Zhang, PacBridge

8     Capital Partners, and as co-counsel to Premier

9     Acquisition Holdings.  And also with me in the

10    courtroom today is Mr. Giovanni Wong of PacBridge.

11         THE COURT:  Gentlemen, Mr. Grossman, good

12    afternoon.

13         Other appearances in the courtroom?

14         MR. TROY:  Matthew Troy, Your Honor, United

15    States Department of Justice, Civil Division, on

16    behalf of NOAA.

17         MR. BURNETT:  May it please the Court, Jason

18    Burnett of the firm GrayRobinson appearing on

19    behalf of 417 Fifth Avenue, LLC, and the Lexor

20    Hotel.  Appearing also with me, Your Honor, is my

21    associate, Ms. Ashley Edwards.

22         THE COURT:  Very good.

23         MR. FOX:  Good afternoon, Your Honor.  I'm

24    Steven Fox.  I represent Cedar Bay, a potential

25    buyer of the assets.  With me today is Mr. Paul

Exhibit A

9

1      Burns, who does curate approximately 2,000 TITANIC

2      artifacts separate from the Debtor's artifacts.

3          THE COURT:  Very good.  Thank you, Mr. Fox.

4          MS. KELSO:  Good afternoon, Your Honor.  Jill

5      Kelso on behalf of the United States Trustee.

6          THE COURT:  Ms. Kelso.

7          Others in the courtroom?

8          (No response.)

9          THE COURT:  All right.  And now we have

10     several appearances by conference telephone.

11         First for the Committee of Equity Security

12     Holders.  Mr. Charbonneau.

13         MR. CHARBONNEAU:  Yes.  Good afternoon, Your

14     Honor.  Robert Charbonneau of Agentis.  We're

15     special litigation counsel to the Equity Committee

16     of Premier.

17         THE COURT:  Very good.  Mr. Charbonneau.

18         Appearance by telephone for the U.S.

19     Department of Commerce.  Mr. Craig.

20         MR. CRAIG:  Yes, Your Honor.  Russell Craig

21     for the Commerce Department.  And I have in my

22     office with me Ms. Jackie Rolrey of the National

23     Oceanic & Atmospheric Administration, as well as

24     Mr. Olevarla, also of the National Oceanic &

25     Atmospheric Administration.  We are just on a

Exhibit A

10

1     listen-only status.

2          THE COURT:  Very good.  Thank you, Mr. Craig.

3          Now telephone appearance for Trustees of the

4     National Maritime Museums.  Mr. Graulich.

5          MR. GRAULICH:  Yes.  Good afternoon, Your

6     Honor.  Timothy Graulich of Davis Polk & Wardwell,

7     on behalf of the Trustees of the National Maritime

8     Museum.

9          THE COURT:  Very good.  Thank you.

10         Now telephone appearance for Bay Point Capital

11    Partners.  Mr. Isbell.

12         MR. ISBELL:  Yes.  Good afternoon, Your Honor.

13    John Isbell on behalf of the debtor-in-possession

14    lender, Bay Point Capital Partners.

15         THE COURT:  Very good.  Mr. Isbell.

16         Now telephone appearance for Euclid Claims

17    Recovery.  Mr. Siegel.

18         MR. SIEGEL:  Yes.  Good afternoon, Your Honor.

19    Howard Siegel for Euclid Claims Recovery.

20         THE COURT:  Good afternoon.

21         Now an appearance for the Debtor, RMS Titanic.

22    Mr. Wainger.

23         MR. WAINGER:  Good afternoon, Your Honor.

24    It's Brian Wainger from Kaleo Legal on behalf the

25    Debtors.  I have the Debtor's, Premier Exhibitions'

11

1    president, Daoping Bao, on the line with me as

2    well.

3         Thank you, Judge.

4         THE COURT:  Very good.  Thank you, Mr.

5    Wainger.

6         And last telephone appearance, Trustees of the

7    National Maritime Museum.  Mr. Weiner.

8         MR. WEINER:  Your Honor, I'm present.

9         THE COURT:  Oh, sorry.  I put you up with the

10   others.

11        Any other appearances in the courtroom or by

12   telephone?

13        (No response.)

14        All right.  Well, first on the calendar is the

15   disclosure statement by filed by interested parties

16   and unsecured creditors.

17        MR. WINSBERG:  Your Honor, if I may give the

18   Court an update?

19        THE COURT:  Please.

20        MR. WINSBERG:  For the record, Your Honor,

21   Harris Winsberg from Troutman Sanders on behalf of

22   the Debtors.

23        Your Honor, Your Honor set this over -- had a

24   status conference hearing and entered an order

25   bringing us back today on all three matters:  The

12

1    Debtor's motion to approve pre-bid procedures and

2    the two disclosure statements, one by the Creditors

3    Committee and one by the Equity Committee for

4    today.

5         We do have a material development since the

6    last hearing.  We have reached a resolution with

7    Jason Burnett's client, the 417 landlord, which is

8    the largest unsecured creditor in the case, and has

9    a blocking position in the unsecured class as far

10   as voting.

11        The stalking horse purchaser, which is

12   represented by Ms. Feldsher and Mr. Grossman in the

13   courtroom, has increased.  It's going to increase

14   its purchase price from $17.5 million to $19.5

15   millin.

16        Glass Ratner estimates that -- projects an

17   estimated recovery of unsecureds with that movement

18   to 80 cents for the unsecured class.

19        In light of the fact that the stalking horse

20   purchaser under this agreement is bumping up its

21   purchase price, the Debtors have agreed to increase

22   the cap on the break fee and expense reimbursement,

23   which is proposed at $1 million, to increase it to

24   $1.5 million, to be payable out of an alternative

25   transaction that closes even if that transaction

Exhibit A

13

1    closes not in compliance with the bid procedures

2    that we're proposing with the Court.

3          Part of this deal, Your Honor, and you'll hear

4    testimony today, liquidity is critical.  We touched

5    on it at the last hearing.  Your Honor mentioned it

6    in Your Honor's scheduling order.  This Debtor is

7    on a very short leash.

8          We'd ask, Your Honor, as part of this deal,

9    because the stalking horse purchaser does not want

10   to buy a business that's dead on arrival and does

11   not want to have employees that are disgruntled or

12   have already left, and some already have -- we have

13   Ms. Sanders in the courtroom and will testify to

14   that -- that their bid procedures would be moved

15   up; that we'd ask Your Honor to have the bid

16   deadline moved up to September 17th, the bid

17   procedure deadline; that we have an auction,

18   subject to Your Honor's calendar, for the morning

19   of September 20th, and we can do it in Your Honor's

20   courtroom; and that we have the sale hearing for

21   the prevailing bidder later that day, in the

22   afternoon of September 20, also in Your Honor's

23   courtroom.

24         The conditions for the increase in the

25   purchase price is Your Honor's non-approval of both

Exhibit A

1    disclosure statements moving forward.

2        The landlord, Mr. Burnett's client, has agreed

3    to support the sale motion, has also agreed to

4    withdraw its joinder to Euclid's objection that it

5    filed.

6        The landlord has also agreed to oppose both

7    disclosure statements that are filed, and

8    affirmatively state to this Court that it will not

9    vote in favor of either disclosure statement or

10   both should Your Honor let them move forward today.

11       Your Honor, we believe that that makes these

12   disclosure statements patently unconfirmable for

13   both that they both still lack funding, which we'll

14   put evidence in the record on that, and because

15   there's no way either plan can get an impaired

16   accepting class in this case.

17       And I want to stop as I want to ask that

18   counsel for the stalking horse purchasers to come

19   up and confirm that agreement, as well as Mr.

20   Burnett.

21       THE COURT:  Thank you.

22       MR. BURNETT:  Good afternoon, Your Honor,

23   Jason Burnett.

24       I will confirm exactly what Debtors' counsel

25   just stated.  I believe, Your Honor, this will

1    bring an expeditious conclusion to what has been a

2    case that has gone on for quite some time.

3        This was not an easy process for myself or for

4    any counsel that's in the room.  And, again, I

5    always want to congratulate all counsel and thank

6    them for the hard work that's gone into it.

7        But with the stalking horse moving their

8    purchase price up to 19.5, and that is still an

9    auction process, Your Honor, that guarantees --

10   well, the estimated guarantee, I should say, to

11   unsecured creditors is 80 percent.

12       This does not affect the litigation, the D&O

13   litigation, that's going to hopefully go forward

14   and/or claims objection.  So there still is an

15   excellent opportunity for unsecured creditors to

16   get, in my opinion, close to 100 percent return,

17   maybe even more.

18       But be that as it may, we think this is a good

19   time for a good solution, and we believe that this

20   would wrap this case up rather expeditiously.

21       So we would ask the Court to approve the sale

22   motion as outlined by Debtors' counsel, and we

23   would ask the Court to not approve of any

24   disclosure statements going out or being solicited

25   or being approved at this time.

16

1          Thank you.

2          THE COURT:  Thank you.

3          MS. FELDSHER:  Good afternoon, Your Honor.

4    We'll tag-team this.  In case I say it wrong, Mr.

5    Grossman will correct the record.  Hopefully I will

6    not.

7          Your Honor, we rise to also confirm the

8    Debtors' summary of the deal that we have, and just

9    to add very, very briefly a little bit of color

10   with respect to how we got to that point.

11         Your Honor, the willingness of the stalking

12   horse bidder to come up on its price is not because

13   of anything other than genuine concern for where

14   this business stands today.  And I won't prejudge

15   the evidence that will be put on by the Debtors,

16   but we filed the declaration in advance of this

17   hearing which laid out for the Court just briefly

18   how difficult this process, the negotiations, the

19   extensive time that the stalking horse bidder has

20   put in.

21         These are complicated issues.  These assets

22   are complicated.  They're in multiple countries,

23   with issues involved.  They've got a regulatory

24   overlay which Your Honor has heard about at length.

25   And it was -- it took a significant amount of time,

17

1      many hours, and not an insignificant amount of

2      expenses for the stalking horse bidder to get to a

3      signed APA with the Debtors and to get to this

4      point.

5          But, as we mentioned to Your Honor at the last

6      hearing, our client is the only client that is

7      looking to buy this asset as a going concern at

8      this point.  I don't know who will come to the

9      auction, but right now, of what's before you, we're

10     the only ones that are buying this as a going

11     concern.  We want the employees, we want the

12     business, and the business is really at a very

13     critical time.

14         So the willingness to go up was specifically

15     tied to the timeline, and that was just important

16     for us to say.

17         And obviously that we believe the incentives

18     and the APA are appropriate given that we're the

19     only client that has put up a deposit, as Your

20     Honor knows, and has the financial wherewithal

21     today to do the transaction.  But that will be

22     tested at an auction.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. WINSBERG:  With that, Your Honor, and I

18

1    learned this when I was a baby lawyer when I worked

2    for Judge Williamson when he was still in private

3    practice, what I'd like to suggest, Your Honor, is

4    reserve argument and just lead with our witnesses.

5    We have two witnesses today that can testify as to

6    the arm's-length, good-faith nature of the

7    transactions, that this was bargained in good

8    faith, and that these Debtors need to go forward

9    with this transaction now.

10           The company literally will be out of cash on

11   January 1, 2019.

12           So I'd like to call Marshall Glade to the

13   stand if that's okay, Your Honor.

14           MR. MCCLAMMY:  Your Honor, if I may.  Jim

15   McClammy on behalf of the Trustees of the National

16   Maritime Museum.

17           Given that we've just heard this for the first

18   time, essentially, here in the courtroom, do you

19   mind if I take a minute before we start with

20   witnesses?

21           THE COURT:  Any objection to that?

22           MR. WINSBERG:  I'm trying to understand what

23   their request is.

24           THE COURT:  Not a recess, you just want to

25   discuss things?

Exhibit A

1    MR. MCCLAMMY:  I may, in fact, request a short

2  recess, but there's a couple statements I would

3  like to make also before we continue.

4    I believe our disclosure statement was first

5  on the agenda, but we deferred.  But we've heard

6  this now for the first time.  Just a couple of

7  items I'd like to raise with the Court first.

8    MR. WINSBERG:  So, Your Honor, putting aside

9  the museum does not have standing in this

10  courtroom, it's not a creditor, not a party in

11  interest, it's just a potential bidder, we are very

12  concerned about the Court's time.  It's the

13  afternoon.  We have some witnesses we want to put

14  on.  We just want to get through the hearing today,

15  Your Honor.

16    This company, there's 120-plus jobs, 130 jobs.

17  They just cannot wait any longer for any further

18  delays in this case.

19    THE COURT:  Mr. Gurfein?

20    MR. GURFEIN:  If I may, Your Honor,

21  considering the magnitude of what we've learned

22  today, I would ask for just a few minutes to digest

23  and confer.  It may shorten the proceedings later

24  if we have an opportunity to, again, digest what

25  we've learned.

20

1          THE COURT:  Well, let me ask you this:  I

2     understand your concern.  Should we hear the

3     testimony first and then you can confer?

4          MR. WINSBERG:  We want to proceed, Your Honor.

5     If what they're asking for is literally a five-

6     minute break, I'm okay with that, Your Honor, but

7     we need to move this case.

8          MR. MCCLAMMY:  Your Honor, we're not trying to

9     stand in the way, by any means, of the case moving

10    forward.

11         We've heard this for the time today after

12    seeing the recently filed support for our position

13    by the landlord that it's now withdrawn, and

14    apparently an agreement that the disclosure

15    statements can't go forward.  And it's unclear to

16    us why, especially given that this process would

17    involve approval by the Eastern District of

18    Virginia, we wouldn't have everything go forward,

19    because if one fails to get approval of the

20    district court, we'd be right back here in front of

21    Your Honor.

22         So I think there's some things that we'd like

23    to understand, in addition to our clients being in

24    Europe and having a chance to respond, I'd like to

25    make a couple of quick calls.

21

1        THE COURT:  Five-minute recess till 2:00

2    clock.

3        MR. GURFEIN:  Thank you, Your Honor.

4        MR. WINSBERG:  Thank you, Your Honor.

5        (Short recess.)

6        THE COURT:  All right.  Court continues in

7    session for August 30, and we continue with the

8    hearing on the RMS Titanic.

9        MR. WINSBERG:  Your Honor, two housekeeping

10   notes.  I noted from one of your courtroom deputies

11   that the courtroom is going to be closing at 4:45

12   today.

13       THE COURT:  We have to be out of the building

14   by 5:00.

15       MR. WINSBERG:  So we're going to be mindful

16   and try to move as quickly as we can.

17       The one other housekeeping matter before I

18   call Mr. Glade, I understand, Mr. Chubak, the

19   Creditors Committee, is going to be withdrawing its

20   disclosure statement, but I'll let Mr. Chubak --

21       MR. CHUBAK:  I just want to correct that for a

22   moment.  Jeffrey Chubak from Storch Amini on behalf

23   of the Creditors Committee.

24       I do not have authority from my committee to

25   withdraw support for the disclosure statement.  The

Exhibit A

22

1    announcement was just very recently made.  We found

2    about it not long ago.  However, we'd be hard

3    pressed to move forward with solicitation with the

4    knowledge that the largest unsecured creditor in

5    the case that has a blocking position wouldn't

6    support the same.

7         THE COURT:  Very good.  Thank you, Mr. Chubak.

8         MR. WINSBERG:  With that, Your Honor --

9         MR. GURFEIN:  If I may --

10        MR. WINSBERG: :  -- call Mr. Glade to the

11   stand.

12        THE COURT:  Mr. Gurfein?

13        MR. GURFEIN:  One quick statement in light of

14   that, Your Honor.  Peter Gurfein for the Equity

15   Committee.

16        Just so Your Honor is aware, the Equity

17   Committee will not be withdrawing its plan.  The

18   disclosure statement has a couple of corrections to

19   be made to it, but we intend to go forward with the

20   plan.

21        THE COURT:  Very good.  Thank you, Mr.

22   Gurfein.

23        MR. WINSBERG:  Your Honor, with your

24   permission, I'd like to call Mr. Glade, Marshall

25   Glade from Glass Ratner, to the witness stand.

23

1          THE COURT:  Thank you.

2   WHEREUPON,

3                     MARSHALL GLADE

4   acknowledged having been duly sworn to tell the truth,

5   and testified upon his oath as follows:

6          THE WITNESS:  I do.

7          COURTROOM ADMINISTRATOR:  Please be seated.

8                   DIRECT EXAMINATION

9   BY MR. WINSBERG:

10     Q     Good afternoon, Mr. Glade.  Could you please

11   state your name for the Court?

12     A     Marshall Glade.

13     Q     And can you briefly describe your educational

14   background?

15     A     I have a master's of accountancy from the

16   University of Georgia.

17     Q     And where were you currently employed?

18     A     Glass Ratner.

19     Q     And can you describe for the Court what Glass

20   Ratner does?

21     A     Glass Ratner is a financial advisory firm.  We

22   provide forensic accounting, evaluation and litigation

23   support.  We do bankruptcy and restructuring.  And our

24   final area is sort of corporate finance, due diligence

25   types assignments.

Exhibit A

24

1    Q    And what is your current title with Glass

2  Ratner?

3    A    Managing director.

4    Q    And what are your responsibilities?

5    A    As managing director, I lead and manage our

6  bankruptcy and restructuring cases.

7    Q    Can you describe for the Court your work

8  experience?

9    A    Yes.  I spent -- I've been with Glass Ratner

10  now 11 years.  Before that, for three years I was an

11  auditor with Grant Thornton.

12    Q    And how many companies have you sold or

13  restructured in your experience?

14    A    I've restructured at least 15 companies.  I've

15  sold three companies.

16    Q    And can you please describe for the Court the

17  size of the three companies you've sold?

18    A    They've ranged in size from about $20 million

19  in revenue to $40 million in revenue.

20    Q    And do you know how that compares with the

21  Debtors?

22    A    Yes.  It's in line with the Debtors.  Debtors

23  generate about $20 million in revenue.

24    Q    Now, can you describe for the Court how you're

25  familiar with the Debtors in this case?

Exhibit A

25

1    A    Yes.  Glass Ratner was engaged as financial

2 advisor to the Debtors in about October of 2016.  And

3 then in the spring, early summer of 2017, that role was

4 special expanded to sale advisor.

5    Q    And Glass Ratner's role as financial advisor,

6 were you personally involved with that?

7    A    Yes.

8    Q    And how were you involved?

9    A    I met with management, developed cash flow

10 projections, began to assist in communications with the

11 various parties that arose out of the bankruptcy.

12    Q    And as part of the sale advisor engagement at

13 Glass Ratner, were you personally involved with that?

14    A    Yes.

15    Q    Describe for the Court how you were involved.

16    A    I led and managed the entire process.

17    Q    And as part of your responsibilities, are you

18 familiar with the Debtors' capital structure?

19    A    Yes, I am.

20    Q    Can you please describe for the Court the

21 Debtors' capital structure?

22    A    Yes.  Right now, it has a fully drawn $5-

23 million DIP facility.  There's $3 million of secured

24 debt, with about $1 million in interest.  After that,

25 there's approximately $3 to $3.5 million of a

26

1    combination of accrued and unpaid professional fees and

2    professional fees that will likely be incurred through

3    the end of the case.  And then after that, there's

4    anywhere from $10- to $12 million of unsecured debt.

5        Q    And do you have a view on how much of a

6    recovery it would take for equity to be in the money?

7        A    Yes.  I believe it would range anywhere from

8    $22.5- to about $24.5 million would be required to

9    provide a return for equity.

10       Q    And as part of your responsibilities, are you

11   currently familiar with the Debtor's liquidity

12   position?

13       A    Yes, I am.

14       Q    And how are you familiar with that?

15       A    I've reviewed their financial statements.  I

16   speak with management.  I generally understand their

17   business after working with them for about two years.

18       Q    I want to show you what's been marked as

19   Exhibit 1 in the binder in front of you.

20            MR. WINSBERG:  And, Your Honor, we placed a

21       binder up at your table, and as well for the law

22       clerk.

23   BY MR. WINSBERG:

24       Q    Can you identify tab 1?

25       A    Yes.  Tab 1 is cash flow projections that were

Exhibit A

27

1    generated by the CFO.

2         Q    And can you describe these cash flow

3    projections to the Court?

4         A    Yes.  This analysis in front of the Court

5    today is a weekly cash flow projection from this week

6    until the end of the year.  The cash flow projection is

7    broken down -- and this is just how the Debtor analyzes

8    their business.  It's broken down between Prexhi and

9    Dinoking and Dinosaurs on Earth.  When I say "Prexhi,"

10   that's Premier Exhibitions.  And then there is a

11   consolidated total at the bottom of the two cash flows

12   together.

13        Q    And I would direct you towards the end of

14   December, what the ending cash balance is?

15        A    Yes.  If you look in the bottom right corner

16   of the spreadsheet, you'll see Cash At End is the line

17   in the bottom right-hand corner, says $442,519.

18        Q    Can you explain for the Court the projected

19   cash position at the end of the year based on that

20   number?

21        A    Yes.  Cash will be at a very low level at the

22   end of the year.

23             Additionally, what happens on January 1st is

24   they have about $425,000 of rent and lease payments

25   that come due, so essentially at the end of the year

Exhibit A

28

1    they're out of money.

2        Q    And do you know whether this spreadsheet, this

3    cash flow projection, includes professional fees?

4        A    It does not.  This spreadsheet excludes

5    professional fees, including professional fees.  And

6    I'm just looking at this week, there are accrued and

7    unpaid professional fees of roughly $1.8 million.  And

8    then the projected cash at the end of this week is

9    $1.739 million, which would -- you know, if they

10   honored those obligations today, they would be out of

11   money.

12       Q    Can you describe for the Court, based upon

13   this spreadsheet, what your view of the Debtors'

14   liquidity position is here today?

15       A    Yes.  It is stressed and -- I don't know if

16   "stressed" is a strong enough word.  Maybe they're in

17   dire condition, especially given the amount of capital

18   expenditures that they have not been able to put into

19   the business.

20       Q    Do you know what the average monthly accrual

21   for professional fees has been since January of this

22   year?

23       A    It ranges between $3- and $400,000 a month.

24       Q    And do you know what the current status of the

25   DIP loan is?

Exhibit A

29

1      A      Yes.   The DIP loan is fully funded.   It was

2  recently extended maybe two months ago.

3      Q      And do you know what the monthly interest

4  carried for that DIP loan is?

5      A      It's about $55,000 a month.

6      Q      Now, at some point Glass Ratner began a sale

7  process; right?

8      A      That's correct.

9      Q      And how did that come about?

10     A      There was what's termed as a Plan Support

11  Agreement.   There was a heavily negotiated Plan Support

12  Agreement amongst the two committees and the Debtor.

13  As a part of the Plan Support Agreement, Glass Ratner

14  was engaged to market and sell the -- and have a

15  complete sale of the assets.

16     Q      And why did Glass Ratner engage in the sale

17  process with Debtors and the other professionals in

18  this case?

19     A      Glass Ratner engaged in the sale process as it

20  was stipulated and agreed upon amongst the committees

21  and the Debtor for Glass Ratner to lead the process, at

22  the same time in conjunction with the committees and

23  their advisors, making sure that they were heavily

24  involved through the process.

25     Q      And I'm going to ask you to turn to tab 2 of

Exhibit A

30

1    the exhibit book and ask if you can identify that.

2        A    Yes.  Tab 2 is the Plan Support Agreement.

3        Q    And did you have an understanding of what the

4    Plan Support Agreement provided?

5        A    I do.

6        Q    And what was is that?

7        A    It essentially, from my perspective, from the

8    Glass Ratner perspective, was the plan, the milestones,

9    the timeline to market and sell -- to market and sell

10   for a complete transaction the entire Premier

11   Exhibitions.  And Glass Ratner would be engaged along

12   -- again, along with the committees in running that

13   process.

14       Q    If you would turn -- at the top it has page

15   numbers, like it says page ___ of 37.  If you would

16   turn to page 33 of 37.

17       A    Sure.

18       Q    You see where it says Means of Implementation?

19       A    Yes.

20       Q    Is that where the provision is about having a

21   complete sale of the business versus selling it off

22   piecemeal?

23       A    That's correct.

24       Q    Now, after the Plan Support Agreement was put

25   together, do you know whether a sale strategy was

31

1  formulated?

2      A    Yes.  It was formulated by -- with Glass

3  Ratner, the Debtors and the committees.

4      Q    Do you know whether a list of potential

5  interested parties was created?

6      A    Yes, a list of potential parties was created.

7  This list -- it's very common in a sales process to

8  define targets, the most likely buyers.  So Glass

9  Ratner received input from, again, the committees,

10  their advisors, the company, and we looked at this, the

11  buyer list, and bucketed who we felt were the most

12  likely buyers.  These were museums, other exhibition

13  companies, media companies, your usual sort of

14  bankruptcy distressed hedge funds that may be

15  interested in an asset like this.

16          I mean, we even went out and looked at gaming

17  companies to see if a gaming company might be

18  interested in some of the IP associated with -- you

19  know, that Premier had.

20      Q    And do you know how many parties were on that

21  list when it was finalized?

22      A    Yes.  140 parties were reached out to.

23      Q    And after you -- Glass Ratner reached out to

24  approximately 140 parties?

25      A    That's correct.

1      Q      And what happened after they reached out those

2   parties?

3      A      So the process, in general terms, in reaching

4   out to these parties, was either through an email or

5   through a phone call.

6           Before embarking on the process, we set up a

7   one-page teaser that was reviewed and approved by the

8   committees and their advisors and the Debtors, and that

9   piece would have gone out in an attachment, in an

10  email, or sent after a phone call, gauging interest

11  levels.

12          After the teaser would be sent and we would

13  receive correspondence that there was, you know,

14  additional interest, we would provide a non-disclosure

15  agreement.  After the non-disclosure agreement was

16  signed, we would provide what's called a confidential

17  information memorandum.  The confidential information

18  memorandum was reviewed and approved by the committees,

19  their advisors and the Debtor, and that would go out.

20          And, additionally, we set up a data room, and

21  access to the data room would be granted after an NDA

22  was signed.

23          So after the NDA was signed, we were able to

24  provide material, nonpublic information, which we

25  needed to be sensitive to because Premier is a public

Exhibit A

33

1    company and we needed to make sure that we didn't --

2    that we kept a good lid on that.

3        Q    Do you know whether Glass Ratner provided the

4    teaser to 140 parties on the list?

5        A    Yes.

6        Q    And did it?

7        A    Yes.

8        Q    And how many parties signed non-disclosure

9    agreements?

10       A    About 30.

11       Q    And do you know whether the confidential

12   information memorandum was provided to those parties?

13       A    Yes.

14       Q    And was it?

15       A    Yes.

16       Q    And do you know -- can you describe for the

17   Court how the confidential information memorandum was

18   prepared?

19       A    Yes.  Again, it was prepared by Glass Ratner,

20   with the help of the Debtors, and reviewed and approved

21   by both committees and their advisors.

22       Q    And do you know whether the parties that

23   signed the non-disclosure agreement were provided

24   access to the online data room?

25       A    Yes.

34

1    Q    And are you familiar with the online data

2  room?

3    A    Yes, I am.

4    Q    And how are you familiar?

5    A    I've been on it.  I helped set it up, engaged

6  the company to set up the data room, and facilitated

7  populating the data room with financial statements,

8  legal information, items for buyers to perform --

9  potential buyers to perform more diligence so that they

10 would be able to provide an expression of interest, an

11 educated expression of interest.

12   Q    And do you know whether the online data room

13 was supplemented from time to time?

14   A    Yes, it was.

15   Q    And in connection with the Plan Support

16 Agreement, do you know whether there was a deadline for

17 parties to submit indications of interest?

18   A    Yes.

19   Q    And what was that deadline?

20   A    I believe it was late July.

21   Q    Of 2017?

22   A    Of 2017, yes.

23   Q    And do you know whether the Debtors received

24 any timely indications of interest?

25   A    Yes.  We received, I would say, around five.

1    Q    Do you recall the financial terms of those

2   indications of interest?

3    A    Yes.  There were three that ranged from $5- to

4   $10 million.  There was an offer from -- an indication

5   of interest from PacBridge that ranged from $50- to $65

6   million.  And then there was a very complicated,

7   reverse triangular merger that was extremely difficult

8   to value, and it was -- everybody's guess was as good

9   as mine as to what that true value was.

10    Q    And after you received those indications of

11   interest, what happened next?

12    A    We continued to negotiate with the parties.

13   Glass Ratner continued to pound the pavement to try to

14   get some more interest in the sale.

15         Eventually, in October, the company received a

16   term sheet from PacBridge in the amount of $30 million.

17   I think the implied value was something around

18   $40 million provided a recovery to the equity -- to the

19   equity holders.

20    Q    And do you know what happened to that term

21   sheet?

22    A    Yes.  That term sheet was rescinded after

23   there were allegations from --

24         MR. GURFEIN:  Objection, Your Honor.

25         THE WITNESS:  -- the Equity Committee.

36

1          MR. GURFEIN:  The witness is testifying as to

2     the intent of a third party with respect to a

3     submission to the Debtor.  This is not the witness'

4     testimony.

5          MR. WINSBERG:  I'm just asking for his

6     understanding, Your Honor, putting it into context.

7     I can ask him what the basis of his knowledge for

8     that is.

9          THE COURT:  You can do that.

10   BY MR. WINSBERG:

11     Q     What's the basis for your knowledge of that?

12     A     I don't think I finished.

13     Q     Of your knowledge of the PacBridge rescinding

14   its offer.

15     A     My knowledge of PacBridge rescinding the offer

16   was the Equity Committee made allegations of insider

17   dealings, and then they rescinded the offer.

18     Q     And did you have any discussions with

19   PacBridge about why they rescinded the offer?

20     A     Yes.  They said they did not -- they were

21   concerned about any bad press that they may receive

22   regarding this and were not interested in lengthy

23   litigation.

24     Q     And do you know whether the Equity allegations

25   were founded or unfounded?

37

1          MR. GURFEIN:  Objection, Your Honor.

2          MR. WINSBERG:  I'm not asking a leading

3     question, just asking whether he knows whether the

4     Equity Committee allegations, which he testified he

5     has personal knowledge of --

6          MR. GURFEIN:  Your Honor, there's nothing in

7     the record as to what the allegations were.

8          MR. WINSBERG:  I can ask him the question.  I

9     can ask him what his knowledge is of what the

10    allegations --

11         THE COURT:  You can ask him what his knowledge

12    is about that.

13  BY MR. WINSBERG:

14    Q    What's your knowledge of the Equity

15  Committee's allegations as to the PacBridge term sheet?

16    A    They were accusing the company of insider

17  dealings.

18    Q    And do you know whether those allegations were

19  founded or unfounded?

20    A    They were unfounded.

21    Q    And how do you know that?

22    A    Mr. Cavender ran an internal investigation

23  with the company.

24         Additionally, my personal knowledge of the

25  marketing process and conversations with the potential

38

1    buyer and the company indicated none of those actions

2    existed.

3         MR. GURFEIN:  Your Honor, I would move to

4         strike the testimony of Mr. Cavender through the

5         mouth of Mr. Glade.

6         MR. WINSBERG:  I was asking what his

7         understanding was of the basis for whether they

8         were founded or unfounded, which he already

9         testified he had knowledge, personal knowledge, of

10        the allegations that were made and personal

11        knowledge, because he testified he was personally

12        involved with whether those allegations of insider

13        dealings were true or false.

14        THE COURT:  I will take it as his

15        understanding and not as anyone else's intention.

16        MR. WINSBERG:  Thank you.

17   BY MR. WINSBERG:

18        Q    Now, after that happened -- in connection with

19   the sale process -- that was in October of 2017?

20        A    That's correct.

21        Q    And in connection with the sale process, what

22   happened next?

23        A    After the term sheet was rescinded, we

24   continued to pound the pavement, tried to find buyers,

25   started negotiating with whoever we could to have a

39

1   transaction occur, up to, you know, we had a mediation

2   at the end of February where all the parties got

3   together in Atlanta.

4          And then shortly after the mediation, we

5   received a term sheet from the stalking horse bidder

6   group.

7      Q    And do you recall when you received that term

8   sheet from the stalking horse group?

9      A    Yes.  It was early March.

10     Q    Of 2018?

11     A    Of 2018.

12     Q    And do you recall what the terms of that term

13  sheet were?

14     A    The initial term sheet provided a purchase

15  price of $15.5 million.  There was no deposit.  There

16  was no cap on the expense reimbursements for inside the

17  bid procedures.  The expense -- everything was a little

18  bit higher.  There was an exclusivity provision.

19     Q    And after you received that term sheet, what

20  did you do?

21     A    We immediately sent it to the committees and

22  to management, discussed it, and responded probably

23  within 24 or 48 hours with a redline of the term sheet.

24     Q    And do you recall the negotiations around the

25  term sheet?

40

1      A      Yes, yes, yes.

2      Q      And what do you recall about those

3  discussions?

4      A      They were -- it was a hard negotiation.  You

5  know, it was -- as all of the negotiations with the

6  stalking horse group have been, they were about par for

7  the course.

8      Q      And do you recall discussions around the

9  purchase price?

10     A      Yes.  We told them right away at 15.5 -- that

11 we were not going to be able to proceed at $15.5

12 million level.  Eventually they were able to come up.

13     Q      And do you recall discussions around the bid

14 procedures?

15     A      Yes.  We immediately wrote back:  We need a

16 cap.  We need to make sure that we have a lively

17 auction, and that there's no actions that are taken,

18 you know, or agreed to that would create a dynamic

19 where an auction would not be successful based on the

20 bid procedures.  So there was significant back and

21 forth on that.

22            There was significant back and forth on the

23 exclusivity provision.  They were not wanting to us

24 speak with anybody else within the process.

25            We were able to adjust that so we could, if

41

1    there was an interested party, they could go into the

2    data room, have access to management, but we were not

3    able to negotiate a transaction.  But it didn't prevent

4    any other parties from coming in and doing their work.

5        Q    And do you know whether these discussions led

6    to a revised term sheet from the stalking horse group?

7        A    Yes, they did.

8        Q    And if I could ask you to turn to tab 3 of the

9    exhibit book and ask if you can identify that.

10       A    Yes.  This is the executed term sheet.

11       Q    And what does this term sheet reflect?

12       A    This term sheet reflects a lot of negotiation

13   between the parties: a purchase price of $17.5 million

14   with a 10 percent deposit; identifies the stalking

15   horse purchasers; shows the bid procedures where there

16   is a cap on expense reimbursements; the break-up fee;

17   shows sort of the increments that we're looking at for

18   the auction; provides for milestones; and has the

19   exclusivity provision, which I think --

20       Q    Did you have an understanding of the stalking

21   horse's interest in moving forward with the transaction

22   without bid protections?

23       A    Yes.  They would not move forward without bid

24   protection.

25       Q    And do you know whether this term sheet

Exhibit A

42

1    reflected in Exhibit 3 was presented to the Debtor's

2    board of directors?

3        A    That's correct, it was presented to the board.

4        Q    Did you have a view on that term sheet at that

5    time?

6        A    Yes.

7        Q    And what was that?

8        A    I thought that the board should approve

9    signing the term sheet.

10       Q    And why was that?

11       A    We, at this point in the process, had been

12   marketing these assets for sale for nine months, and

13   this was the most legitimate -- highest and most

14   legitimate offer received by the company.

15       Q    And do you know what the board initially

16   decided?

17       A    The board initially decided, against the

18   advice of the advisors, to not approve the term sheet.

19            There was another potential bidder, Loongs, at

20   a, I think $50 million, $60 million price, and they,

21   the board, asked the company and its advisors to

22   continue to diligence Loongs as a potential buyer.

23       Q    Were there any other potential buyers the

24   Debtors were diligencing as well?

25       A    Yes.

43

1    Q    And who were those?

2    A    I believe the museum was starting to become

3  more involved during that time.  We were still talking

4  with the reverse triangular merger folks.  We were

5  still trying to get a deal.

6    Q    And what happened next?

7    A    Eventually this Loongs company kind of went

8  away.  They stopped responding to emails and they were

9  unable to provide any information regarding their

10  wherewithal.  They disappeared, essentially.

11       So at that point, in my mind, there wasn't

12  another viable deal.

13       We went back to stalking horse bidder group,

14  asked them if they were still interested, and

15  thankfully they were.

16    Q    Do you know whether the stalking horse

17  agreement was brought back to the board?

18    A    Yes, the stalking horse agreement was brought

19  back to the board after diligencing.

20    Q    And do you recall when this term sheet was

21  brought back to the board?

22    A    Yes.  It was May 2018.

23    Q    And do you know when -- do you know whether

24  the board approved?

25    A    Yes.  The board eventually approved proceeding

44

1    with this term sheet.

2         Q    When the board approved this term sheet in

3    Exhibit 3, did you have a view of the proposal?

4         A    Yes.

5         Q    And what was your view?

6         A    I thought that the company should sign the

7    term sheet and proceed.

8         Q    Did you share that view with the board?

9         A    Yes.

10        Q    And after the board approved this term sheet

11   in May 2018, what happened next?

12        A    We began the process of negotiating the APA

13   with the stalking horse bidder group.

14        Q    And were you personally involved in those

15   negotiations?

16        A    Unfortunately, yes.

17        Q    How would you describe the negotiations with

18   the stalking horse group?

19        A    Lively, time consuming, intense.

20        Q    And --

21        A    It was a free-for-all.  If you were breathing,

22   you had time to have a call with someone, so it didn't

23   matter time of day, weekend, weekday.  It was -- it was

24   live.

25        Q    Do you recall what provisions of the Asset

45

1   Purchase Agreement were heavily negotiated?

2       A    I would say, in my opinion, it was probably

3   every provision.  But, you know, the main provisions

4   were surrounding the treatment of Dinoking, which was a

5   non-debtor entity, that took a significant amount of

6   time; the exclusivity provisions; the bid procedures;

7   the proof of funds.  I mean, you name it and it was

8   negotiated.  And diligence, the diligence requirements.

9   I mean, it was -- it was -- it was fun.

10      Q    Based upon your involvement in the

11  negotiations, do you know whether the negotiations over

12  the Asset Purchase Agreement were done at arm's length?

13      A    Most certainly.

14      Q    I'm going to ask you to identify -- turn to

15  Exhibit 4 and ask you to identify this?

16      A    Yes.  This is the Asset Purchase Agreement

17  that was agreed to between Premier and the stalking

18  horse bidder group.

19      Q    Do you recall when it was entered into?

20      A    Yes.  It was entered into in June of 2018.

21      Q    And can you generally describe for the Court

22  the features of the stalking horse agreement?

23      A    Yes.  It's a purchase price -- this one, it's

24  going to change --

25      Q    You can go ahead and --

Exhibit A

46

1     A     It's going to change to 19.5, but this
2  agreement says 17.5.  So it has a purchase price of
3  $17.5 million, defines the bid procedures that would be
4  required for an auction, goes through your typical
5  purchase price closing adjustments, goes through where
6  the deposit is, which assets.  I mean, it's a lengthy
7  document.
8     Q     Do you know whether this stalking horse group
9  provided a deposit?
10    A     Yes, they did.
11    Q     And do you know whether the equity holders in
12 the stalking horse group provided commitment letters to
13 fund the vehicle?
14    A     Yes.
15    Q     Do you believe the Asset Purchase Agreement
16 reflected in Exhibit 4 benefits the Debtors?
17    A     Yes.
18    Q     And how so?
19    A     It provides the Debtors -- it's actually for a
20 couple of reasons.  I think that it does provide the
21 Debtors an opportunity to continue as a going concern.
22 As part of continuing as a going concern, they can
23 continue to be good stewards for these artifacts that
24 are a part of the sale, and it is the highest and most
25 legitimate offer on the table.

47

1          Additionally, it provides for an auction.  If

2   there is anybody out there that has more money, we are

3   happy to -- and assuming they can become a bidder -- to

4   include them in the process.

5          So not only do you have sort of the market

6   test of what Glass Ratner did, you have a market test

7   from an auction.

8      Q    Do you have a view as to the best option for

9   the Debtors in this case going forward?

10     A    Yes, proceed with this transaction.

11     Q    Do you believe this stalking horse transaction

12  is superior to any other current option available to

13  the Debtors?

14     A    Definitely.

15     Q    And why do you say that?

16     A    It's a legitimate offer.  There's real money.

17  They've put up a deposit.  They have shown an ability

18  to actually -- they've increased.  They started off at

19  15.5 and today they're at 19.5.  I think they've shown

20  an unbelievable commitment to continuing the life of

21  this company.

22     Q    Do you know whether the stalking horse

23  agreement reflected in Exhibit 4 was presented to the

24  Debtors' board of directors?

25     A    Yes, it was.

Exhibit A

48

1    Q    And do you recall when that was?

2    A    Yes.  It was in June.

3    Q    Do you know what the board of directors did

4  with respect to the agreement?

5    A    Yes.  They approved the agreement.  And I just

6  want to be clear and clarify.

7         Daoping, who was on the board, for approval of

8  the term sheet and approval of the Asset Purchase

9  Agreement, he was excluded from the vote and excluded

10  from conversation amongst the board and the advisors.

11  And then he came in and provided support for the deal

12  after we were able to have discussions with the board

13  without Daoping.

14    Q    I'm going to ask you to turn to Exhibit 5 and

15  ask you if you can identify this.

16    A    Exhibit 5 will be the competitive bidding sale

17  procedures.  Our bid procedures, essentially.

18    Q    And are these the bid procedures that were

19  attached to the Asset Purchase Agreement subject to the

20  redline behind it?

21    A    That's correct.

22    Q    Now, you heard earlier today the statement in

23  open court with the resolution to increase the stalking

24  horse purchaser's bid; correct?

25    A    That's correct.

Exhibit A

49

1    Q    And the stalking horse now has -- we've asked

2  for a new deadline and timeline for the sale process.

3    A    Yes.

4    Q    Do you believe that sale process is

5  appropriate in this circumstance?

6    A    Definitely.

7    Q    And why do you believe that?

8    A    I believe that this asset has been marketed to

9  such a great degree over the past 12 months that

10 everybody has had an opportunity to do this.

11        Additionally, I think with the liquidity

12 issues and -- you know, the real component of this

13 which sometimes is overlooked, especially from my

14 perspective coming from a financial perspective, is the

15 company and the shape that the company is in from a

16 morale component, from keeping personnel on, that

17 having this process in an efficient manner will allow

18 for any competitive bidding that would be out there and

19 allow really some relief for the company.

20   Q    And are you familiar with the break fee and

21 expense reimbursement as we have modified in open court

22 today?

23   A    Yes.

24   Q    Has Glass Ratner researched the market data in

25 relation to the proposed break-up fee and expense

Exhibit A

50

1    reimbursement?

2        A    Yes.

3        Q    In preparing that analysis, what observations

4    do you have?

5        A    I think that, overall, are they a little bit

6    aggressive?  Maybe.  But, you know, this is a

7    complicated case, with the Admiralty Court involved and

8    those components of it.  Not only is it bankruptcy,

9    which adds an unbelievable component of complexity from

10   a typical M&A deal, you know.

11            And, additionally, Jennifer Feldsher provided,

12   I think, and documented to the Court showing how much

13   in fees they've incurred on negotiating this

14   transaction.  And based on our back and forth on the

15   APA, I mean, it seems like they definitely earned it.

16   But the expenses are definitely -- have been incurred.

17            So it's not like a windfall.  It's not like

18   anybody's making money off of these procedures and the

19   break-up fee.

20       Q    So you believe the break-up fee and expense

21   reimbursement as provided are appropriate in this case?

22       A    That's correct.

23       Q    Do you know whether these bid procedures will

24   chill bidding?

25       A    Most certainly not.  In fact, I believe the

Exhibit A

51

1   harm, the chilling, has actually been done at this

2   point really by the Equity Committee's plan and

3   disclosure statement.

4           Any potential buyers would not want to put

5   time and money into a case that doesn't have specific

6   direction, and the -- having -- you know, you just

7   wouldn't put your time and money into this if you

8   didn't know it could go into a direction that would

9   allow for a purchase through an auction.

10          So, I mean, these are the conversations we've

11  had -- the Glass Ratner team has had with the potential

12  buyers.

13      Q    Since the Asset Purchase Agreement was filed

14  with the Court, can you describe for the Court whether

15  you've received other inquiries of interest for the

16  Debtors' assets?

17      A    Yes.  Yes, we received other inquiries in that

18  time frame.

19      Q    And do you know what happened to those

20  inquiries?

21      A    Yeah.  I mean, they stalled out.  We couldn't

22  provide -- the only updates we could provide was that

23  there's three options.  We don't know which one it's

24  going to be.

25      Q    Do you believe more time would benefit this

52

1    process?

2         A    I think it would harm the process.

3         Q    And are you also familiar with the other terms

4    of the bid procedures, including the qualified bid

5    requirements and auction rules?

6         A    Yes.

7         Q    And do you believe those bid procedures are

8    appropriate in the case?

9         A    Oh, especially in this case.

10        Q    Do you believe it's appropriate for the

11   Debtors to require a non-refundable deposit as part of

12   this bid auction process?

13        A    Yes.

14        Q    And why do you believe that?

15        A    The case up to this point, outside of the

16   stalking horse bidder, has been an exercise, in my

17   opinion, in theory.  No one has come to the table with

18   actual dollars, and that's what I'm interested in.  And

19   I think that that's what the Debtor needs, is actual

20   money.  And they are the only ones that have brought

21   the actual dollars -- the stalking horse bidder are the

22   only ones that have brought the actual dollars to the

23   table.

24             And we have to figure out -- this is -- this

25   is the only way that I can think of that provides for

53

1   someone to put real money into this.

2          And it wouldn't be fair to have the stalking

3   horse bidder, who now has had their money locked up in

4   a deposit for quite some time now, and somebody else

5   comes to the table and they can just come in and say --

6   I just don't think that that would be fair.

7       Q    Do you believe it's appropriate for the

8   Debtors to require financial wherewithal of the

9   purchaser to participate in the auction process?

10      A    Yes.

11      Q    And why do you believe that?

12      A    You have to have dollars at the end of the

13  day.  And anybody can come in and say I'm going to --

14  you know, if you're selling a house, you can walk in

15  the house and you can say:  Yeah, I want to buy this

16  house for a million dollars.  But if you don't have the

17  million dollars, what's it worth?  It's not worth

18  anything.

19          So you need dollars in this case.

20      Q    Now, are you familiar with the exclusivity

21  provision in the bid procedures and in the stalking

22  horse agreement?

23      A    Yes.

24      Q    Can you describe that provision for the Court?

25      A    The exclusivity provision, from signing of the

Exhibit A

54

1    APA to the bid procedures being approved by the Court,

2    prevents the Debtor and its advisors from negotiating a

3    transaction with a third party.

4            However -- and it's important, this is very

5    important -- it does not prevent a party from coming in

6    to diligence the company, even up to management visits.

7            If somebody was interested, you can get a long

8    way on a letter of intent or an understanding of the

9    company through data in the data room, further

10   requests, and meetings with management.

11   Q    Do you know whether doing due diligence --

12   have the Debtors provided due diligence since the

13   execution of the purchase agreement to other interested

14   parties?

15   A    Yes.

16   Q    And have they?

17   A    Yes.

18   Q    And do you know who those parties are they

19   provided diligence to?

20   A    Yes.

21   Q    And who are they?

22   A    Pentwater, Parquet Capital, to name two of

23   them.  And the museum.  But the museum had signed an

24   NDA a year before, and they have had access to the data

25   room for a long time and have been able to -- and had a

55

1   site visit actually, too.  And I think the site visit

2   was in that time frame.  I can't recall the exact date

3   of the site visit, but I think it was after the APA.

4        Q     Do you know what the exclusivity provision

5   provides after this Court should enter the bid

6   procedures order?

7        A     Yeah.  It allows the company to go back out

8   and solicit potential buyers and try to drive an

9   auction.

10       Q     And do you know whether the exclusivity

11  provision has chilled bidding in this case?

12       A     Oh, it has not.

13       Q     And why do you believe that?

14       A     No one -- no party has come to me yet that had

15  an issue with it.  I would say -- let me clarify:  Not

16  no party, but no potential buyer has come to me with an

17  issue.

18       Q     And just to clarify, do you know whether the

19  bid procedures, which we have excerpted from the Asset

20  Purchase Agreement and from the term sheet, were

21  approved by the board of director?

22       A     Were they approved?  Yes.

23       Q     And were they?

24       A     Yes.

25       Q     Now, are you aware that disclosure statements

56

1    have been filed by both the Equity Committee and the

2    Creditors Committee?

3         A    Yes.

4         Q    Are you generally familiar with them?

5         A    Yes.

6         Q    Do you have a view on whether the approval of

7    either or both of the disclosure statements will have

8    an impact on the Debtors' sale process?

9         A    Yes, it would.  A negative impact, but an

10   impact nonetheless.

11        Q    Do you have a view of what will happened to

12   these cases if the Debtors are not able to move forward

13   with the sale process on the time frame we've proposed

14   in open court today?

15        A    Yes.  I think that it's really -- they're

16   really struggling to keep momentum, to continue to

17   market, continue to drive sales.  They can't book new

18   venues because it's unclear as to the direction it's

19   going, and they absolutely have to have that direction.

20        Q    Has Glass Ratner done an analysis of recovery

21   for unsecured creditors in connection with the increase

22   in the stalking horse purchase announced in open court?

23        A    Yes.

24        Q    And what does that analysis reflect?

25        A    Reflects a potential 80 percent recovery for

1    the unsecured creditors.

2        Q    Are you aware of any better result that's

3    currently in front of this Court?

4        A    No.

5        Q    Do you believe the Equity Committee disclosure

6    statement and plan is a superior for these Debtors in

7    this case?

8        A    No.

9        Q    And why do you believe that?

10       A    Well, there's no money there.  First off,

11   there's no money in it to pay creditors right now.

12            Additionally, the litigation that would ensue

13   around that transaction, to me, pretty much makes it

14   impossible to effect in a time frame that would keep

15   the company running.  The company would not run, in my

16   opinion, if that was the path that was chosen, and

17   that's really just from a financial perspective.

18            It's my understanding, just from conversations

19   with counsel, that there are other issues associated

20   with disclosure.

21            A bad attorney -- I'm not an attorney.  If I

22   was one, I'd be a bad one.

23            But I think that there's nothing there.

24   There's no dollars there.  I live in a world of money,

25   I don't live in a world of not real money.

58

1       Q    And as to the disclosure statement that was

2   presented today by the Creditors Committee, do you have

3   a view of whether it's superior or not to the

4   Debtors --

5       A    I mean, just on the surface, it's $19.2

6   million.  This is $19.5 million.  Obviously, that's

7   higher.

8            Not to mention, I have yet to see $19.2

9   million from the museum as a -- we've been in

10  discussions with the museum for a very long time now

11  and have asked them -- I can't tell you -- I mean,

12  we've probably been talking to them for over six months

13  and have reiterated:  Can you show us any money?  And

14  they have yet to show us cash.

15           Additionally, I think that the process, as

16  it's outlined with an auction, does its work.  It

17  provides the information, the data, that everybody

18  needs to say that this was fair, and the plan filed by

19  the Creditors Committee didn't allow for that to

20  happen.

21           MR. WINSBERG:  May have one minute, Your

22      Honor?

23           (Counsel conferring.)

24           MR. WINSBERG:  Your Honor, at this time I'd

25      like to move Exhibits 1, 2, 3, 4 and 5 into

Exhibit A

59

1     evidence.

2          THE COURT:  Any objections?

3          MR. GURFEIN:  No objection.

4          MR. BROWN:  No objection.

5          THE COURT:  No objections?  Exhibits 1 through

6     5 are admitted.

7          (Debtors' Exhibits 1, 2, 3, 4 and 5 were

8     received in evidence.)

9          MR. WINSBERG:  I have no further questions at

10    this time.

11         THE COURT:  Thank you.

12         MR. WINSBERG:  Thank you, Your Honor.

13         MR. GURFEIN:  May I have just a moment, Your

14    Honor?

15         THE COURT:  Certainly, Mr. Gurfein.

16                    CROSS-EXAMINATION

17   BY MR. GURFEIN:

18    Q    Mr. Glade, Peter Gurfein for the Equity

19   Committee.

20    A    Good afternoon.

21    Q    Let me start by directing you to Exhibit 1

22   this afternoon.  I just want to ask if I'm reading this

23   correctly.

24         If you look at the second to the bottom line

25   where it says Cash At Start, the numbers in that row

Exhibit A

60

1   are the cash in hand at the start of that particular

2   week on this schedule?

3       A    I believe so, yes.

4       Q    And then after expenses for the week, it shows

5   Cash At End.  That's after -- that's deducted from the

6   cash you start with that week.

7       A    Uh-huh.

8       Q    So if you look at November 2nd, 2018, your

9   projected Cash At Start is $1,055,667.

10      A    Okay.

11      Q    Is that correct?

12      A    Yes.

13      Q    And at the end of that week, the company would

14  have $729,504.

15      A    $729,604 on my version.

16      Q    I misread that.  $729,604; correct?

17      A    That is correct.

18      Q    The three sales that you were involved in,

19  were those bankruptcy sales?

20      A    No.

21      Q    What kind of sales were those?

22      A    One was a distressed business.  Two of the

23  others were in -- one was a distressed business, one

24  was a corporate carveout, and the other was slightly

25  distressed.

61

1    Q    And what industry were these companies in?

2    A    One was plumbing/heating/air conditioning,

3 another was transportation, and the other was

4 chemicals.

5    Q    So it'd be fair to say that this transaction

6 is the first bankruptcy sale that you've led in your

7 career.

8    A    That's correct.

9    Q    When you opine on the effect of bid

10 protections on the sale, that's not based on your

11 experience in your prior sales, is it?

12   A    That's correct.  It was based on research.

13   Q    Thank you.

14        You mentioned the term sheet received by the

15 Debtors from -- did you describe them as the PacBridge

16 group or from PacBridge in October 2017?

17   A    That's correct.

18   Q    And did that term sheet provide for equity to

19 be provided to Daoping Bao, equity in the purchaser?

20   A    I'd have to look at the term sheet.

21   Q    Do you have it with you?

22   A    I don't have it with me.

23   Q    I'll represent to you --

24        MR. GURFEIN:  And that, Your Honor, is an

25 exhibit --

62

1          MR. WINSBERG:  I'm going to object.  This is

2     an evidentiary hearing.  There's no more

3     representations.

4          This case -- we've heard, in the four months

5     since I've been in it, people talking and

6     representing to the Court.  This is evidence now.

7          MR. GURFEIN:  Your Honor --

8          MR. WINSBERG:  If he has it, he can show it to

9     him, but I object.

10         MR. GURFEIN:  -- the exhibit I'm referring to

11    is attached as an exhibit to the motion of the

12    Creditors Committee for a status conference.  That

13    was the hearing that was held on July 25th, and the

14    October 9, 2017 term sheet is attached to that as

15    an exhibit.

16         Unfortunately, I wasn't aware of Mr. Glade's

17    testimony today and did not bring that with me, but

18    it is part of the Court's docket.

19         THE COURT:  All right, you may refer to it.

20         MR. GURFEIN:  And I ask the Court to take

21    judicial notice of that exhibit.

22         MR. WINSBERG:  No objection.  It is what it

23    is.

24         THE COURT:  Very good.

25    BY MR. GURFEIN:

63

1    Q    You mentioned that Daoping Bao did not

2 participate in the decision of the board with respect

3 to the current transaction; is that correct?

4    A    He was asked to be excused from voting from

5 the board.

6    Q    And who asked him to be excused from voting on

7 the board?

8    A    He was advised by -- I believe he was advised

9 by counsel as to make sure that there was no appearance

10 of impropriety.

11   Q    Are you familiar with the Georgia state law on

12 transactions involving interested board members?

13   A    I'm not an attorney.

14   Q    I'll take that as a no.

15   A    That's correct.  No, I'm not.

16   Q    You referred to five proposals or offers that

17 were received in July 2017?

18   A    Uh-huh.

19   Q    Is that correct?

20   A    Yes, about five.

21   Q    There were three, you said, in the $5- to $10

22 million range?

23   A    I think so.

24   Q    One in the $50- to $65 million range?

25   A    Correct.

Exhibit A

64

1    Q    And then there was reverse merger where the

2  terms were not fully spelled out, but they were rather

3  complicated?  Do I have that correct?

4    A    No.  I mean, the terms were spelled out, but

5  as far as from a valuation perspective, we were -- you

6  know, it was -- it was -- unable to figure out what the

7  value was.

8    Q    You mentioned several times that the

9  committees and the Debtor worked jointly on these

10  transactions or on this sale process; is that correct?

11    A    That is correct.

12    Q    And did you provide a copy of each of these

13  term sheets to the committees upon receipt?

14    A    Yes.  There was one that you brought up in the

15  deposition that was not shared.  But the one that you

16  brought up in the deposition had no financial terms

17  associated with it.

18    Q    I could not hear that.

19    A    The one that you brought up in the deposition

20  that was not provided to you was -- had no financial

21  terms associated with it.

22         Additionally, I believe you and the financial

23  advisor to the committees were made aware that a term

24  sheet was received that contained no financial terms,

25  and we were asked not to provide that to the

65

1    committees.

2        Q    By whom were you asked not to provide that to

3    the Equity Committee?

4        A    By the folks who had the -- who wrote the term

5    sheet.

6        Q    And who wrote the term sheet?

7        A    Alta and Apollo.

8        Q    Alta and Apollo.  So Alta and Apollo directed

9    the Debtor not to provide this term sheet to the Equity

10   Committee.

11       A    Directed a term sheet with no financial terms.

12       Q    We heard you the first time.

13       A    I just wanted to clarify.

14       Q    The Equity Committee was not provided with

15   this term sheet.

16       A    That had no financial terms --

17       Q    Mr. Glade, that's a yes-or-no question.

18       A    That's correct.  Although, I do think

19   eventually you were provided it, if my memory serves me

20   correct.

21           MR. GURFEIN:  Your Honor, I do have with me

22       the term sheet to which we're referring that was

23       marked at Mr. Glade's examination that I'd like to

24       have marked as an exhibit at this hearing.

25           Unfortunately, I only have one copy with me.

Exhibit A

66

1       What would you like me to do?  I'm at your --

2            THE COURT:  Objection?

3            MR. WINSBERG:  I'd like to look at it first

4       just to confirm that it was -- and if it's what we

5       think it is, I have no objection with him just

6       sharing it with the witness.  It's not ideal, Your

7       Honor, but we're trying to get through this

8       hearing.

9            MR. GURFEIN:  I stand corrected, Your Honor.

10      It appears Mr. Brown's office is more efficient

11      than I thought.  I do have copies of that with me,

12      and I would ask if I may approach --

13           THE COURT:  Certainly, please.

14           MR. GURFEIN:  -- and I ask this be marked.

15      Should we make this A, Your Honor?

16           THE COURT:  All right.

17           MR. GURFEIN:  May I approach the witness, Your

18      Honor?

19           THE COURT:  Certainly.

20           (Mr. Gurfein hands document to witness.)

21           THE WITNESS:  Thank you.  (Examining

22      document.)  Excuse me, Mr. Gurfein.  What is this

23      document supposed to be?

24           MR. WINSBERG:  This is, I believe, the

25      initial --

67

1          MR. GURFEIN:  I may have to take back what I

2     said about Mr. Brown's office.

3          MR. WINSBERG:  This is not what --

4          THE WITNESS:  This is not the document that

5     has the term sheet that he's referring to.

6          MR. GURFEIN:  Apologies, Your Honor.

7          (Mr. Gurfein hands document to witness.)

8          THE WITNESS:  Thank you.

9  BY MR. GURFEIN:

10     Q    Mr. Glade, is that the term sheet you're

11  referring to as provided by Alta and Apollo in about

12  January 2018?

13     A    That's correct.

14     Q    I direct your attention to the bottom of page

15  3 of that term sheet.

16     A    Okay.

17     Q    Forgive me.  The top of page 3 first, where it

18  says "Plan Sponsors"?

19     A    Yes.

20     Q    I ask you to read along.  It says, "The

21  members of the ad hoc group of equity holders" --  do

22  you understand that to be Apollo and Alta?

23     A    They were referred to as the ad hoc group of

24  equity holders in their filings with the Court.

25     Q    Apollo and Alta were.

68

1     A     Yes.

2     Q     -- "and related third parties and certain

3  other equity holders."  Do you see that?

4     A     Yes.

5     Q     Did I read that correctly?

6     A     Yes.

7     Q     And it looks like there's a footnote

8  referencing to the bottom?

9     A     Uh-huh.

10     Q     And read along with me.  It says, "In the

11  event insider affiliated equity holders are interested

12  in participating as plan sponsors, the percentage of

13  ownership will be TBD" -- and what do you understand

14  that to mean?

15     A     To be determined.

16     Q     -- "but will be based on a capital

17  contribution from each party that is mutually

18  agreeable."  Did that I read that correctly?

19     A     Yes.

20     Q     So this term sheet refers to a potential

21  transaction involving insider affiliated equity

22  holders; is that correct?

23     A     That's what the document says as you read it.

24     Q     And subsequent to receipt of this term sheet,

25  did you have occasion to put Alta and Apollo in touch

69

1    with any insider affiliated equity holders?

2        A    Yes.

3        Q    And who was that?

4        A    Alta and Apollo, as a part of their

5    diligencing of the engagement, were interested in

6    calling and discussing with many of the parties of this

7    engagement and understanding what their positions were.

8    I believe they spoke with the Creditors Committee, I

9    believe they spoke with you, and I had them -- and they

10   were in touch with PacBridge.

11       Q    Let me rephrase the question.  You seem to be

12   having problems.

13            Did you have occasion to put Alta and Apollo

14   in communication with any insider affiliated equity

15   holders?

16            MR. WINSBERG:  I'm going to object, Your

17       Honor.  This has been asked and answered.  And

18       that's a legal term of art.

19            If he has a question, a layman's question for

20       him, he can ask it, but I don't even know what he

21       means by affiliated insider parties.

22   BY MR. GURFEIN:

23       Q    Who do you understand to be insider affiliated

24   equity holders?

25       A    I would assume shareholders.

70

1    Q    Which shareholders?

2    A    All shareholders.

3    Q    All shareholders are, in your mind, insider
4 affiliated equity holders?

5    A    They're insider equity holders.  I mean --

6    Q    Well, what's your understanding of an insider?

7    A    Give me what the definition is and then I can
8 provide an answer.

9    Q    Tell me what you understand "insider
10 affiliated" to mean.

11    A    I have no idea.  I don't know what it meant.

12    Q    As a result of --

13    A    I didn't --

14    Q    Excuse me.  As a result of reading this, did
15 you have occasion to put Alta and Apollo in touch with
16 PacBridge?

17    A    Alta and Apollo, as a part of their diligence,
18 were -- reached out to many of the parties that were
19 involved.  I had them -- they -- they reached out to
20 PacBridge.  I was -- gave them the phone number.

21    Q    You gave whom the phone number?

22    A    Alta.

23    Q    Whose phone number did you give to Alta?

24    A    Giovanni Wong.

25    Q    And who is Giovanni Wong?

Exhibit A

71

1      A      A PacBridge representative.

2      Q      A PacBridge representative.

3      A      That's correct.

4      Q      And you say you gave that to Gilbert Li?

5      A      Correct.

6      Q      Who is a representative of Alta.

7      A      That's correct.

8      Q      So you gave the phone number of PacBridge to

9  the representative of Alta.

10     A      That's what -- yes.

11     Q      And why did you do that?

12     A      Again, as a part of their diligence, they were

13  speaking with all the stakeholders.  And Giovanni Wong,

14  as a representative of PacBridge, was a stakeholder,

15  has a significant equity interest, is a secured lender,

16  an unsecured creditor, and a major stockholder.

17     Q      And in putting them together, was it with the

18  intention that they make a joint offer for the company?

19     A      I was putting them together -- their intention

20  was to make an offer for the company, so it was no

21  different than getting with and speaking with the

22  Creditors Committee, or you, for example.  If they

23  thought there was a deal with you, they would have

24  partnered with you.

25     Q      Let me see if I can get an answer this way:

Exhibit A

72

1  Was it your intention, your intention, in putting

2  Giovanni Wong and Gilbert Li together, that they and

3  their representative groups make a joint offer for the

4  company?

5       A    It was my intention that a transaction occur,

6  yes.

7       Q    Do you recall being deposed last Friday,

8  August 24?

9       A    That's correct.

10      Q    And do you recall being asked this question

11  and giving this answer:

12           Question:  "Please let me finish the question.

13  Was it your intention, in putting Giovanni Wong and

14  Gilbert Li together, that they and their representative

15  groups make a joint offer for the company?

16           Answer:  "Yes."

17           Do you recall giving that --

18      A    Yes.

19      Q    That's your testimony.

20      A    Yes.

21      Q    And that's your testimony today as well.

22      A    That's what I said.

23      Q    At the time that you did so, you had received

24  a term sheet from Alta and Apollo, the term sheet I

25  showed you that's marked here as Exhibit A; is that

73

1    correct?

2        A    That's correct.

3        Q    And you also had received term sheets from

4    PacBridge in the past; is that correct?

5        A    That's correct.

6        Q    And both PacBridge and Alta and Alta were,

7    respectively, potential purchasers of the company.

8        A    At that point, PacBridge was not a potential

9    purchaser of the company.

10       Q    What makes you say that?

11       A    They had walked away from the deal.

12       Q    And --

13       A    They had not indicated to me prior to that

14   that they were interested.

15       Q    Were you still tracking them, though, as

16   potential purchasers?

17       A    I tracked as many people as I could to be

18   potential purchasers.

19       Q    When did you first see Alta and Apollo as a

20   potential purchaser?

21       A    Well, I think they kind of raised an objection

22   in December, I believe.  Then we engaged in

23   conversations.  Actually, let me rewind.

24            Alta and Apollo actually reached out in the

25   summer of '17, and they were equity holders, too, and

74

1    they would need to restrict trading the stock.  And

2    they weren't -- didn't want to restrict trading the

3    stock, so they didn't sign the non-disclosure

4    agreement.

5         And then I think in December they filed a

6    non-disclosure agreement.

7         I want to say in the first or second week of

8    January, we had a management call.  We had a follow-up

9    management call.

10        Eventually they made their way down for a site

11   visit.  Management made their way up to Apollo's office

12   for a site visit.

13        So, in that time frame, they were considered a

14   potential buyer.

15        MR. GURFEIN:  Your Honor, we have another

16      exhibit from Mr. Glade's deposition that I ask be

17      marked as Exhibit B for the Equity Committee.  May

18      I approach?

19        THE COURT:  Yes.

20        MR. GURFEIN:  And the witness as well?

21        THE COURT:  Yes.

22        (Mr. Gurfein hands document to the Court and

23      the witness.)

24   BY MR. GURFEIN:

25        Q    Now, if I recall correctly, on Friday you

Exhibit A

75

1    testified that this was a tracking sheet; is that

2    correct?

3        A    What I explained in the deposition on Friday

4    was that this was a summary of a much larger tracking

5    sheet file that was provided to your financial advisor

6    on a weekly basis.

7        Q    And directing your attention to Exhibit B,

8    there's a heading Company/Target, and then Notes, and

9    immediately below that is a line with the words "Still

10   Involved."

11           Do you recall how you explained the meaning of

12   the phrase "Still Involved"?

13       A    Yes.  I went through and provided a summary of

14   these categories.

15           "Still Involved" meant they had not indicated

16   whether they had officially passed on the deal, or, in

17   the other case, been unresponsive.  Those were sort of

18   the two other categories that we grouped.

19       Q    So reading from Exhibit B, the second broad

20   category is "Unresponsive Parties" and the third is

21   "Passed" -- P-a-s-s-e-d -- and neither Alta and Apollo

22   nor PacBridge fell into either Unresponsive or Passed;

23   is that correct?

24       A    We had not officially received -- that's

25   correct.

Exhibit A

76

1      Q    Did you have any concerns about putting two

2  still involved potential bidders together at a time

3  when you were soliciting competing bids for the

4  company?

5           MR. WINSBERG:  Objection, Your Honor.  That's

6      assuming facts not in evidence.  That wasn't his

7      testimony.

8           MR. GURFEIN:  Your Honor, the witness has

9      testified that he put them together for the purpose

10     of creating a transaction.

11          MR. WINSBERG:  He testified --

12          MR. GURFEIN:  The witness has testified that

13     both of them were still involved as potential

14     competing bidders.

15          MR. WINSBERG:  He testified that PacBridge at

16     that point in time was no longer involved, was no

17     longer interested, I believe that's what his

18     testimony was, and he's assuming in his question

19     that that was not the case.

20          THE COURT:  Objection's overruled.  He can

21     respond appropriately to the question.

22          THE WITNESS:  What is the question?

23          THE COURT:  Mr. Gurfein.

24  BY MR. GURFEIN:

25     Q    Did you have any concerns about competition in

77

1    the process of putting two still involved potential

2    bidders together as you did with Alta, Apollo and

3    PacBridge?

4        A    Well, you know -- and, first off, I'm not sure

5    what date this was -- we still don't have a date on

6    this, right, Peter -- Mr. Gurfein -- when this was

7    provided?

8        Q    I think we can put a collar on it.  It was

9    sometime after December, but before March; would that

10   be fair to say?

11       A    Okay.  I don't know.  That's fine.

12       Q    Well, I think you indicated that it was in

13   December that you became aware -- oh, I'm sorry.  You

14   said July was when you became aware that Alta and

15   Apollo were in the case, they became interested.

16       A    That they had shown an interest.

17       Q    And when did they start doing due diligence?

18       A    In the December-January time frame.

19       Q    And when would they have been added as

20   potential bidders?  It would have been after the NDA

21   was signed; right?

22       A    Correct.

23       Q    In fact, I think that's what this Exhibit B

24   says at the top, "Target List/Signed NDAs."

25       A    Right.

78

1      Q      So the only way --

2      A      So, yeah, it was January.  Yeah.  So --

3      Q      So the only way to get on this list would be

4   to sign an NDA.

5      A      Yes, that's true.

6      Q      So it was sometime after they signed the NDA,

7   but before the March term sheet that you received.

8      A      Okay.

9      Q      Is that correct?

10     A      That's correct.

11     Q      Now, the question is:  Did you have any

12  concerns about putting two potential bidders together

13  at a time when you were soliciting competing bids?

14     A      Well, my concern at that moment in time was to

15  find a buyer for this transaction.  It had been

16  marketed for seven months, and at that point we did not

17  have a viable buyer involved in a transaction.

18            Number two, in looking at this, it says,

19  "PacBridge Partners."  I -- it says, "Uncertain of

20  current interest level."

21            We had no idea.  They -- we had no idea what

22  their thoughts were, what their thinking was.

23            But they were still a party in this case

24  because they were the secured lender and had an

25  unsecured claim, so, you know -- and had a large equity

Exhibit A

79

1    interest.  So it seemed that Apollo and Alta would need

2    to be in touch with PacBridge at some point.

3        Q    Do you recall at your deposition being asked

4    this question and giving this answer:

5             "Were you at all concerned about putting

6    PacBridge in touch with a potentially competing

7    bidder" --

8             MR. WINSBERG:  I'm sorry.

9    BY MR. GURFEIN:

10       Q    -- "when you made that"?

11            MR. WINSBERG:  Can Mr. Gurfein at least tell

12       us what page he's on in the deposition so we can

13       try to follow along?

14            MR. GURFEIN:  Of course.  My apologies.  Page

15       76 of the transcript.

16   BY MR. GURFEIN:

17       Q    Do you recall being asked this question,

18   starting at line 9, and giving this answer:

19            "Were you at all concerned about putting

20   PacBridge in touch with a potentially competing bidder

21   when you made the introduction?

22            Answer:  "No.

23            Question:  "And why is that?

24            Answer:  "I felt they both had blocking

25   positions and that they -- blocking position to a

Exhibit A

80

1    transaction, and getting them on the same page would

2    affect a transaction faster.

3             Question:  "What do you mean by a blocking --

4    by blocking positions?

5             Answer:  "They could both object to each

6    other's offer.

7             Question:  "In what capacity do you mean they

8    would object to?

9             Answer:  "As equity holders who would have to

10   vote on this transaction."

11            Do you recall being asked that question and

12   giving those answers?

13       A    Yes.

14       Q    And what did you mean by they had a blocking

15   position?

16       A    Well -- and I do appreciate those questions

17   because it allowed me to think, to think about it a

18   little bit more and jog my memory of that time frame.

19            But it's similar to, again, the Unsecured

20   Creditors Committee; right?  I would have had no

21   problems with them getting in touch with the Unsecured

22   Creditors Committee to figure out a transaction.  They

23   were in touch with you, expressing their interest with

24   the transaction.

25            So, you know, you could object, they could

Exhibit A

81

1   object, and I figured PacBridge could also object.

2       Q    Are you familiar with the term "blocking

3   position" in bankruptcy?

4       A    As far as being like a fulcrum security

5   blocking position?  Or is that a defined term?  Is that

6   in the Bankruptcy Code as a --

7       Q    I'm trying to understand what you meant when

8   you said "blocking position."

9       A    Well, you could object.

10      Q    Is there anyone -- strike that.

11      A    That's what I was --

12      Q    So --

13      A    -- more trying to do --

14      Q    So --

15      A    -- is to try and --

16      Q    -- do I understand that the reason you had no

17  problem putting two potential competing bidders

18  together is that each could have objected to a

19  transaction proposed by one of them?

20      A    Was that -- say that again?

21      Q    Would it be fair to say that you thought of

22  this as a blocking position because each of Alta and

23  Apollo on the one hand and PacBridge on the other, if

24  they had proposed a transaction, the other could have

25  objected to it?

82

1     A     It was a component of understanding the

2   situation.

3     Q     Well, what are the other components?

4     A     Other components of figuring this out was that

5   PacBridge was also a secured holder and an unsecured

6   holder.  So, you know, as a pretty significant

7   component of the case, significant party in the case

8   that's throughout the capital stack, seemed like they

9   needed to be in touch with them.

10     Q     When did you first become aware that Apollo,

11   Alta and PacBridge were going to join in a single

12   proposal?

13     A     I'm not sure.  I'd have to go look at it.  It

14   was in and around the mediation time.

15     Q     And prior to the mediation time, you had

16   not -- not the Debtor, but you -- had not disclosed to

17   any representative of either the Creditors Committee or

18   the Equity Committee that Alta and Apollo and PacBridge

19   had been introduced to each other; is that correct?

20     A     That -- yes.  I'm not sure.  Honestly, I'd

21   have to go back.

22     Q     Well, as you sit here today, do you recall

23   whether you informed any representative of the

24   Creditors Committee or the Equity Committee that

25   PacBridge, Alta and Apollo had joined together?

83

1        A     I don't recall whether it was just shown on

2   the term sheet or if it was discussed prior.

3        Q     You referenced the Asset Purchase Agreement as

4   requiring -- and I don't recall the exact testimony,

5   so, please, I'm not telling, I'm asking you -- that

6   they were stewards for the artifacts.  Do you recall

7   that testimony today?

8        A     I think that I said that it would -- that the

9   transaction would be a real positive because they would

10  continue to be stewards for the artifacts.  I believe

11  that's what I said.

12       Q     And have you read through the Asset Purchase

13  Agreement?

14       A     Yes.

15       Q     And is there anything in the Asset Purchase

16  Agreement requiring that the purchasers remain stewards

17  for the artifacts for any period of time?

18       A     I don't recall.  I mean, I'd have to look at

19  it.

20       Q     Is there anything in the Asset Purchase

21  Agreement that would prevent the purchasers from

22  subsequently selling any of the artifacts?

23       A     I would -- I think that there -- there's

24  likely some reference to the covenants and conditions

25  by the Eastern District of Virginia, and so I -- that's

84

1    what I assume, it would take care of that, but I don't

2    know.  I mean, I'm not a --

3        Q    Well, let me ask you --

4        A    My discussions -- what I can testify to is

5    that my discussions with Alta, Apollo and PacBridge

6    have only been surrounding continuing to operate this

7    business as a going concern.

8        Q    Were you in court on July 25th when I

9    suggested that the French artifacts be impressed with

10   the trust?

11       A    July -- was that here, or was that --

12       Q    That was the hearing here on July 25th.

13       A    That was a status conference?

14       Q    That's correct.

15       A    Yes, I was here.

16       Q    And do you recall counsel to Alta and

17   Apollo --

18       A    Yes.

19       Q    -- commenting at that hearing, in words of

20   substance, that that was likely to be the only upside

21   that these purchasers would receive?

22            MR. WINSBERG:  Your Honor, there's a

23       transcript.  And Ms. Feldsher's in the courtroom,

24       she can --

25            MR. GURFEIN:  I'll withdraw the question.

Exhibit A

85

1          MS. FELDSHER:  Your Honor, I can represent to

2     you that Mr. Gurfein completely miscited what I

3     said, and there was no such indication.  And he was

4     the only one in the courtroom that indicated to the

5     Court that that was the only upside.  I didn't say

6     that.

7          MR. GURFEIN:  I'll withdraw the question.

8          THE COURT:  He's withdrawn the question.

9          MR. GURFEIN:  May I have just one moment, Your

10    Honor?

11         THE COURT:  Certainly.

12         MR. GURFEIN:  Your Honor, I ask that Exhibit A

13    and B be moved into evidence.

14         THE COURT:  Any objection?

15         MR. WINSBERG:  No objection.

16         THE COURT:  Exhibits A and B are admitted.

17         (Equity Committee's Exhibits A and B were

18    received in evidence.)

19         MR. GURFEIN:  Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Gurfein.

21         Anyone else wish to examine the witness?

22         (No response.)

23         THE COURT:  Any redirect?

24         MR. WINSBERG:  No, Your Honor.

25         THE COURT:  Thank you very much.  You may step

86

1      down.

2              (Witness excused.)

3              MR. BROOKS:  Good afternoon, Your Honor.

4      Matthew Brooks for the Debtors.

5              Your Honor, in light of the time and our exits

6      from the courtroom in about an hour, rather than

7      call Ms. Jessica Sanders to the witness stand, who

8      is the corporate secretary of the Debtor, I have

9      some testimony that I think would be helpful for

10     the Court, and that, if called, that she would

11     testify to.  I'd like to make a proffer of the

12     testimony in light of the time, unless there are

13     any objections.

14             THE COURT:  Mr. Gurfein.

15             MR. GURFEIN:  Given the hour, I hesitate to do

16     this, Your Honor, but I think it's important that

17     we have testimony and evidence.

18             THE COURT:  That's quite all right.

19             You should call the witness.

20             MR. BROOKS:  Okay.  We're happy to do so, Your

21     Honor.

22   WHEREUPON,

23                        JESSICA SANDERS

24   acknowledged having been duly sworn to tell the truth,

25    and testified upon her oath as follows:

87

1              THE WITNESS:  I do.

2              COURTROOM ADMINISTRATOR:  Please be seated.

3                        DIRECT EXAMINATION

4    BY MR. BROOKS:

5         Q    Good afternoon, Ms. Sanders.

6         A    Good afternoon.

7         Q    Could you please state your full name for the

8    record?

9         A    Jessica Lee Sanders.

10        Q    And where do you currently work?

11        A    Premier Exhibitions, Incorporated.

12        Q    And what position do you hold with Premier?

13        A    I am the corporate secretary and the

14   vice-president of corporate affairs.

15        Q    And how long have you held that position with

16   the company?

17        A    Since August of 2016.

18        Q    And in that position, can you briefly describe

19   for the Court your role with the company?

20        A    Yes.  My primary responsibilities are with the

21   board of directors.  I coordinate and attend all of

22   their meetings.  I draft their agendas.  As part of the

23   executive management team, I help with the corporate

24   planning, as well as overseeing -- or I'm sorry --

25   executing against board initiatives in the day-to-day

Exhibit A

88

1   management of the company.

2          As far as the Chapter 11 case, I helped

3   oversee and direct the legal team.  I also monitor

4   developments in the case both here and in the Eastern

5   District of Virginia and report back to the board.

6       Q    Okay.  And as part of your responsibilities

7   that you described, are you familiar with the Debtor's

8   business?

9       A    Yes, I am.

10      Q    Can you just give us a brief overview of how

11  you're familiar?

12      A    Well, I've been with the company for 11 years,

13  and in that time I've had several positions and I've

14  interacted with just about every department in the

15  company.  And I've also worked side by side with five

16  out of the six CEOs and five iterations of the board.

17  So I'm very familiar with the business.

18         Also, in my adult course work, I used Premier

19  Exhibitions as case study.

20      Q    And as a part of those responsibilities, do

21  you interact with employees of the company on a regular

22  basis?

23      A    I do.  I also manage the Atlanta office.

24      Q    Thank you.

25         And are you familiar with the Debtors' Chapter

Exhibit A

89

1    11 cases?

2        A    Intimately.

3        Q    And you've attended most of the court hearings

4    before this Court.

5        A    The substantive ones, yes.

6        Q    Are you familiar with the Debtors' financial

7    performance post bankruptcy?

8        A    Yes.

9        Q    And how are you familiar?

10       A    As part of the executive management team, we

11   discuss the performance weekly.  We also look at the

12   performance, not just financially, but of our vendors,

13   of our partners, and throughout the organization as

14   well.

15       Q    And do you know whether the bankruptcy has

16   negatively impacted the Debtors' financial performance?

17       A    Yes.

18       Q    And how is that so?

19       A    It has crippled our business.  After filing

20   Chapter 11, some of the vendors changed terms on us.

21   Some of the venues wouldn't book.  They either wanted

22   deposits put in escrow or wanted some kind of assurance

23   that we could actually deliver on future exhibitions.

24   We've had to terminate some contracts as part of

25   settlements and turn content over to competitors, and

Exhibit A

90

1    we've had to work very hard to keep the relationships

2    that we have in place.

3         Q    Okay.  What about employee morale at the

4    company, has the bankruptcy affected that?

5         A    Most certainly.  Just taking a very quick step

6    back, Dinoking merged with Premier Exhibitions in

7    November 2015.  The company was already going through

8    post-merger restructuring and reorganization.

9              Seven months later, we're filing for Chapter

10   11.  Some people -- we had a bunch of layoffs prior to

11   the bankruptcy and then a bunch of people left.

12             Since we've been in Chapter 11, those

13   positions are hard to fill.  It's hard to find talent

14   given the status of the company, especially when you

15   have other competing plans on file and nobody's really

16   clear what the direction is.

17             The second part of that is it's very difficult

18   to cast a vision for the company given the status of

19   the case, and I have been saying "three more months"

20   for two years.

21        Q    And as part of your responsibilities with the

22   company, are you familiar with the sale process that

23   the Debtors and their professionals have run?

24        A    Yes.

25        Q    And how so?

Exhibit A

91

1     A     I've been involved with Glass Ratner since we

2 started the marketing process.  I helped them develop

3 the CIM, the confidential information memorandum, the

4 teaser.  I worked in conjunction with the committees to

5 develop the contact list based on some of the previous

6 transactions the company had.  Also, helped with the PR

7 and the marketing and the advertising, coordinating the

8 news coverage that we got with Kekst, the PR agency.

9          I've also supplied the first wave of diligence

10 that we provided for the data room.  I programmed and

11 designed the splash page for additional people -- for

12 people who wanted information on the sale process.

13     Q     Okay.  And throughout all that process, are

14 you familiar with the term sheet and the APA that's in

15 the exhibit binder before the Court?

16     A     Yes.

17     Q     And do you recall -- first of all, were you

18 directly involved with the negotiations of the APA and

19 the bid procedures?

20     A     Yes, myself and management team and counsel

21 for the company.  There were many phone calls and

22 extensive -- extensive negotiations with a lot of

23 lawyers.

24     Q     And did your advisor report back to you on

25 behalf of the company on the status of negotiations?

1    A    Yes, regularly, and also to the board of

2   directors.

3    Q    And do you know whether the Debtors' board

4   approved the stalking horse agreement, the APA that's

5   before the Court?

6    A    I'm sorry, can you repeat the question?

7    Q    Do you know whether the Debtors' board of

8   directors approved the Asset Purchase Agreement that's

9   before the Court?

10    A    Yes.

11    Q    And how do you know that?

12    A    I recorded the vote.

13    Q    And when did the board do that?

14    A    The Asset Purchase Agreement was approved June

15   14th, 2018.  And I remember that date because it was

16   two years to the day of us filing Chapter 11.

17    Q    And in deciding whether to approve the Asset

18   Purchase Agreement that you just described, did the

19   board discuss the terms of the agreement and the bid

20   procedures?

21    A    Yes, extensively.

22    Q    Did the board consider the APA agreement as a

23   whole?

24    A    Yes, they did.

25    Q    And do you know whether the Debtors exercised

93

1    their business judgment in deciding to enter into the

2    Asset Purchase Agreement and the related bid

3    procedures?

4        A     So if you're asking me if the board acted --

5    if they were informed and they acted in good faith and

6    in honest belief that the decision they were making was

7    in the best interest of the company, then yes.

8        Q     Thank you.

9              Are you familiar with the entities that

10   comprise the stalking horse purchaser, the term that we

11   use a lot, which is Alta, Apollo and PacBridge?

12       A     Yes.

13       Q     And could you describe that makeup for the

14   Court?

15       A     Sure.  Alta is a shareholder that got -- that

16   purchased shares after we got into Chapter 11.  Same

17   with Apollo.

18             And PacBridge was involved with the Dinoking

19   transaction.  Mr. Giovanni Wong was involved with the

20   company after the merger to kind of help settle things

21   and help with the transition.

22             His involvement with the company pretty much

23   stopped once we filed Chapter 11.

24       Q     Based on your understanding of the stalking

25   horse group, do you know whether the stalking horse

94

1    group exercised any undue influence in the sale process

2    that you were personally involved in?

3              MR. GURFEIN:  Objection, Your Honor.  That's

4         rather conclusory.

5              MR. BROOKS:  I'm asking for the witness'

6         personal knowledge, Your Honor.

7              MR. GURFEIN:  What does "undue influence"

8         mean?

9    BY MR. BROOKS:

10        Q    What's your understanding of "undue

11   influence," Ms. Sanders?

12        A    Whether or not they influenced the company or

13   the board in any way.

14        Q    Okay.  Do you know, based on your personal

15   knowledge in the process, whether you thought the

16   stalking horse group exercised any control over

17   management in the negotiation and execution of the

18   Asset Purchase Agreement?

19        A    Do I know?  Yes.  In my personal knowledge, do

20   I know?  Yes.  And the answer is, no, they did not.

21        Q    And how so?

22        A    Well, the process itself started with -- and

23   I'll just walk you through the process.

24             The process itself, Alta and Apollo first

25   contacted the company.  Glass Ratner arranged to have a

95

1  management meeting.  The management team met with -- we

2  had --

3          THE WITNESS:  Sorry, Your Honor.

4          The management team met with them in January

5      and provided the corporate overview, the materials

6      that anybody interested in the company would have

7      had with the management team.

8          We took them through.  We had a conference

9      call.  They had some follow-up questions.  The

10     following week we had another conference call.

11         At the end of January, they sent a term sheet

12     to the company that didn't have a whole lot of

13     information to it, and they sent it to us strictly

14     confidential.  They said it was just to start

15     discussions or whatnot.

16         So they met with -- they came out to the

17     company in February.  They met with the CFO and

18     myself.  They toured our facility.  We walked them

19     through the warehouse.  Again, at this point it was

20     just Alta and Apollo.

21         We took them down to the venue in Atlantic

22     Station.  We made arrangements for them to go visit

23     our venue in Orlando, and also in Chicago to see

24     Saturday Night Live.

25         The company participated in mediation at the

Exhibit A

96

1     end of February, and representatives from Alta and

2     PacBridge were both there.

3          After that two days of mediation, we got a

4     revised term sheet that first week of March with

5     the three parties combined.

6          There was extensive -- and, again, that term

7     sheet went to the board.  The board reviewed it,

8     discussed it with advisors.  It was a very low

9     offer.  The board was -- nobody was pleased with

10    it.  Sorry.

11         There was extensive negotiations that happened

12    from that point.

13         About a month later, first week of April, they

14    sent a revised offer.

15         And then I think we received the final term

16    sheet a couple weeks later in April.

17         The management -- the board met, discussed the

18    term sheet, and it was the recommendation of our

19    advisors and counsel that we go for this term

20    sheet.

21         The company's cash position has been a concern

22    for a long time, looking at what they call the

23    runway, which being the ability of a company to

24    actually consummate a transaction and having enough

25    time.

97

1          So it was the advice of counsel to the board

2      that they execute the term sheet.

3          The board also had in front of it another

4      transaction that looked on paper significantly

5      better, so --

6  BY MR. BROOKS:

7      Q    I'm sorry to interrupt you.  What was the

8  transaction you're referring to?

9      A    The transaction was a company called Loongs

10  who had -- it was an inbound offer, and it was -- I

11  can't quote the numbers, but it was about $30 million

12  for about half the company, I believe, was the

13  construct.

14          The challenge was, Glass Ratner and Troutman

15  Sanders had been trying very hard to get proof of funds

16  from them, something that could indicate -- some kind

17  of a deposit or some kind of proof of funds that they

18  could actually do the transaction.  Up until that

19  point, they hadn't received anything.

20          So the board, looking at the term sheet from

21  Alta, Apollo and PacBridge versus this offer, this

22  indication of interest, they decided instead to not

23  sign the term sheet, to give Loongs an additional two

24  weeks to come up with proof of funds.  They said it was

25  in the best interest of the company because it was a

Exhibit A

98

1    superior deal.

2         That was a very difficult phone call.  Our

3    advisors were not happy, because they had tried so hard

4    to get proof of funds up until that point,

5    unsuccessfully.  But they followed the direction of the

6    board, they went back to Loongs.  They kept trying,

7    they kept trying.

8         Alta and Apollo said:  Okay.  Well, good luck

9    with that.

10        Two and a half weeks passed.  We come back.

11   Counsel had advised that Loongs had basically stopped

12   responding.  They did not come up with proof of funds,

13   and there was an indication that they may have to raise

14   some portion of it, which made the board very nervous.

15        So on I believe it was May 8 -- don't quote me

16   on it -- somewhere in May, the board authorized the

17   company management to execute the term sheet with Alta,

18   Apollo and PacBridge.

19   Q    Thank you very much.

20        Final question, I believe.  Do you have a view

21   of what will happen to the Debtors if they're not able

22   to exit bankruptcy within the next few months?

23   A    Yes, I do have a view.

24   Q    Can you share with the Court what that view

25   is, please?

1     A     Well, throughout this process I've had to keep
2  levelheaded and just look at the facts as the facts
3  are, sit there and listen.
4          The fact is, my reality is and the reality for
5  our company and our employees, if we don't exit, we're
6  done.  We're just done.
7          We have tried to keep the employees motivated
8  for as long as we can.  We've got a good group of
9  people who are doing a good job, but if we can't
10  provide them direction or if the direction that we can
11  tell them is that there is no direction, there's three
12  different things that are going forward, or one thing
13  that's to liquidate and the other one is to break apart
14  the company and intends to keep you employed?  I can't
15  offer that.
16          Our vendors and our partners, we've lost a bit
17  of credibility, because they keep checking back saying:
18  When are you going to exit, and we're not able to have
19  an answer.
20          We have to be able to emerge so that we can
21  start booking the venues going forward and start
22  replenishing our cash.
23          It's been impossible to try to keep this thing
24  moving this long, let alone -- and I hate to say this,
25  but sitting on management team calls on Mondays, our

1    CFO reports what the administrative costs in this case

2    are, so it's very difficult to tell our venues we can't

3    repair the carpet, but we're in the millions of

4    professional fees in this case.

5              MR. BROOKS:  Thank you very much.

6              Just give me one second, Your Honor.

7              THE COURT:  Sure.

8              MR. BROOKS:  That's all I have, Ms. Sanders.

9        Thank you very much.

10             MR. GURFEIN:  May I, Your Honor?

11             THE COURT:  Certainly, Mr. Gurfein.

12                      CROSS-EXAMINATION

13   BY MR. GURFEIN:

14       Q    On the last point you raised, will you

15   continue or have you been offered employment continuing

16   with the Debtor by the new purchaser?

17       A    The new purchaser has put in the Asset

18   Purchase Agreement that it is offering -- I'm sorry.

19   Can you hear me now?

20       Q    Thank you.

21       A    The purchaser has represented in the Asset

22   Purchase Agreement that they will be taking all of the

23   employees, including myself.  Outside of those, there

24   have been no conversations about employment, no

25   conversations about compensation or terms.

101

1    Q    And that includes Daoping Bao also as --

2    A    He is on that list as well.

3    Q    And is there any commitment that's been given

4  to you as to how long you're guaranteed employment with

5  the purchaser?

6    A    Again, there's been no conversations about

7  compensation, employment at all, except for --

8    Q    So --

9    A    -- that list.  So the answer is no.

10   Q    So it's not improbable or it's not impossible

11 that they could turn around right after purchasing and

12 let you go.

13   A    Of course it's possible.

14   Q    And all the employees, for that matter.

15   A    Yes.

16   Q    When did you first learn of the revised terms

17 of the PacBridge, Alta and Apollo transaction that were

18 presented to the Court earlier today?

19   A    The revised terms?

20   Q    Forgive me.  You have a questioning look on

21 your face.

22   A    Yes, could you please explain.

23   Q    Mr. Winsberg began today's session by saying,

24 among other things, that the offer was increased to

25 $19.5 million, and that the break-up fee had been

Exhibit A

102

1    increased, and that the term of the period toward the

2    auction and sale had been decreased.

3           Did you hear that earlier today?

4       A    Well, quite honestly, the company had been in

5    negotiations with PacBridge, Alta and Apollo even

6    surrounding the term sheet and the purchase agreement

7    extensively.

8           Yes, there were discussions.  We'd been trying

9    to get them to increase the offer for a while, for a

10   long time.

11          Those discussions were also this morning, but

12   it wasn't until walking in -- it wasn't until walking

13   in that we knew it was actually done.

14      Q    And has the board approved that new offer?

15      A    No.

16      Q    How do we know that that --

17      A    Has the board approved a higher offer than

18   what we've already filed?  Is that the question?

19      Q    The entire package: the increased break-up

20   fee, the shorter term on the auction, the purchase

21   price, has the board approved all of that?

22      A    The board has not.  But I am confident that

23   getting board approval will not be difficult

24   considering it's a higher and better offer.  But of

25   course I cannot speak for the board.

Exhibit A

103

1      Q     Were you involved in the initial decision of
2   the company when it filed bankruptcy to sell certain of
3   the artifacts?

4      A     Was I involved?  Only to record the board
5   discussion.

6      Q     Okay.  Are you familiar with Giovanni Wong?

7      A     Professionally.

8      Q     And how do you know Giovanni Wong?

9      A     As I represented, he was part of the Dinoking
10  transaction, was part of the merger.  And he worked on
11  and around the company afterwards, getting himself
12  familiar with the company, getting familiar with the
13  operations.  He was made it very -- he was hands on.
14  He made it very clear that their intention for
15  investment was to grow the business.

16     Q     I'm sorry, I couldn't hear that last part.

17     A     Sorry.  He was very hands on after the merger,
18  learning our operations, learning about the business,
19  and he made it very clear that their intention was to
20  grow the business.

21     Q     You said, "right after the merger."  Did Mr.
22  Wong stay active with the company in that capacity at
23  all during the last two years?

24     A     No.  As I represented, his involvement with
25  the company ceased when we filed Chapter 11.

Exhibit A

104

1    Q    Did you say he was involved with the company
2 when you filed Chapter 11?

3    A    I said his -- what I said was that his
4 involvement with the company ceased when we filed
5 Chapter 11.

6    Q    Ceased when you filed Chapter 11.

7    A    Correct.

8    Q    Do you know if he was at all involved in the
9 Saturday Night Live exhibit in Chicago?

10   A    When Saturday Night Live opened, it was pre-
11 merger.  And when I -- and he was involved from the
12 standpoint that they were looking at the exhibition --
13 this is part of something they were just getting ready
14 to be involved with -- and as we were getting ready to
15 open, it was an all-hands-on-deck kind of thing, and
16 Mr. Wong and one of his partners were moving boxes and
17 sweeping and doing whatever else was needed, like our
18 crews were.  They were right side by side with us.

19   Q    During the period of time earlier this year,
20 when Alta and Apollo were visiting the different
21 venues, was Mr. Wong involved in those visits?

22   A    I cannot answer that.  I only made
23 arrangements for tickets for Mr. Li.

24       MR. GURFEIN:  No further questions, Your
25       Honor.

105

1        MR. BROOKS:  No further questions, Your Honor.

2        THE COURT:  Thank you very much.  You may step

3    down.

4        THE WITNESS:  Thank you, Your Honor.

5        (Witness excused.)

6        MR. WINSBERG:  That's our evidence, Your

7    Honor.  We're happy to proceed with our argument,

8    if Your Honor would like.

9        MR. GURFEIN:  Your Honor, in connection with

10    the value of this offer, Mr. Arlan Ettinger of

11    Guernsey's Auction House, the director and

12    president, is here today.  I did want to introduce

13    Your Honor to Mr. Ettinger.

14        We have submitted, in connection with our

15    disclosure statement and the amended disclosure

16    statement, two declarations of Mr. Ettinger.

17        The first is in docket number 1044, starting

18    at page 111 of 120 and ending at page 120 of 120.

19    And the declaration of Mr. Ettinger in further

20    support, which appears at docket 1179-5 at pages 2

21    of 3 and 3 of 3.

22        I have copies of those declarations for Your

23    Honor and for counsel, if I may approach.

24        THE COURT:  Certainly.

25        (Mr. Gurfein hands documents to the Court and

Exhibit A

1    to counsel.)

2        MR. GURFEIN:  In connection with the value of

3    the company and this sale proposal before Your

4    Honor, we move these declarations into evidence.

5        And Mr. Ettinger is here if anyone wants to

6    cross-examine him.

7        MR. WINSBERG:  Give us a moment, Your Honor.

8        THE COURT:  Certainly.

9        MR. WINSBERG:  We're deciding whether we want

10    to put him on the stand, in light of the time that

11    we have left.

12        THE COURT:  Certainly.

13        MR. GURFEIN:  Apologies, Your Honor.  In

14    connection with the last exhibit, the last further

15    support, there's also the -- attached also to that

16    declaration was docket 1179-6, pages 2 of 39

17    through 39 of 39, and we ask that be admitted in

18    evidence for this hearing as well, Your Honor.

19        MR. WINSBERG:  Can we just get a five-minute

20    break --

21        THE COURT:  Certainly.

22        MR. WINSBERG:  -- just so we can --

23        THE COURT:  Certainly.  Take your time.  If we

24    need to continue to some other day, we will.

25        MR. WINSBERG:  The Debtors need to finish the

107

1    case today, Judge.  If we could just come back at

2    -- would you give us till 4:05?

3         THE COURT:  We'll take a five-minute recess.

4         (Short recess.)

5         THE COURT:  All right.  We continue with the

6    Titanic hearing.

7         MR. WINSBERG:  Your Honor, what we've decided

8    to do to streamline is to let the testimony through

9    the declarations come in.  We have two questions

10   for the witness they call on cross.  We have two

11   questions for them.

12        The other thing that I wanted to inform the

13   Court is that the stalking horse purchaser's

14   counsel has agreed -- has informed me that the deal

15   that we introduced today is good through today, and

16   because the company is where the company is, it may

17   not be there tomorrow or the day after.  I just

18   wanted to inform the Court.

19        MR. GURFEIN:  Your Honor, we'll call Mr. Arlan

20   Ettinger to the stand.

21        THE COURT:  Thank you.

22 WHEREUPON,

23                    ARLAN ETTINGER

24 acknowledged having been duly sworn to tell the truth,

25 and testified upon his oath as follows:

108

1          THE WITNESS:  I do.

2          COURTROOM ADMINISTRATOR:  Please be seated.

3                    CROSS-EXAMINATION

4    BY MR. BROOKS:

5     Q    Good afternoon, Mr. Ettinger.

6     A    Thank you.

7     Q    Two questions about your testimony and your

8    prior declaration and the supplement that's been

9    provided to the Court today.

10         Has your employer, Guernsey's, agreed to

11   guarantee any minimum recovery for the auction of the

12   -- the contemplated auction of the French artifacts?

13    A    No.

14    Q    Paragraph 4 of your declaration of August 28th

15   indicates that there is a marketing time frame of 60 to

16   90 days.  Do you see that?

17    A    Yes.

18    Q    Does that 60 and 90 days take into account any

19   potential objection to the liquidation of the French

20   artifacts by NOAA or the Department of Justice?

21    A    The 60 to 90 days would start when we were

22   given the green light to proceed with producing an

23   auction.  If there was an interruption in that process,

24   that timeline would no longer hold.  If it was put on

25   hold, there's nothing we could do about it.

Exhibit A

109

1          But once we had clear sailing, we could

2    produce the event that we proposed in the 60- to 90-day

3    period.

4          Q    So the 60 to 90 days would commence after

5    there was an approval by all necessary courts to

6    liquidate the French artifacts --

7          A    Yes.

8          Q    -- subject to your declaration.

9          A    Yes.

10          MR. BROOKS:  That's all I have.  Thank you

11    very much.

12          MR. GURFEIN:  If I may, one question?

13          THE COURT:  Certainly, Mr. Gurfein.

14                    REDIRECT EXAMINATION

15    BY MR. GURFEIN:

16          Q    In reviewing your declaration, the original

17    one you filed on May 31, in paragraph 13, the last

18    sentence says, "But based upon my years of experience

19    and the sale by auction of rare and historic items in

20    general, I believe these artifacts are certainly

21    capable of this range."

22          May I ask you to tell us what you meant by

23    your years of experience in the sale by auction of rare

24    and historic items, in general?

25          A    I'm the founder of Guernsey's, the New York-

Exhibit A

110

1  based auction house.  I started that in 1975, so that's

2  43 years of experience producing many of the most high

3  profile and successful auctions in history.

4          We are not the largest auction house, Your

5  Honor.  Sotheby's is that, Christy's follows a close

6  second.  But we are routinely ranked as one of the

7  world's leading auction houses by producing auction

8  after auction that have set world record amounts by

9  virtue of receiving global media coverage.  That's been

10  the secret to whatever success we've had.

11          We've conducted the world's largest auction,

12  which was the sale of the contents of the ocean liner

13  SS UNITED STATES.  We did the first auction of artwork

14  from the Soviet Union during the cold war.  We produced

15  all three of the John F. Kennedy auctions; the Franklin

16  Roosevelt auction; the President Ford auction, working

17  directly with Betty Ford.  We did many auctions on

18  behalf of museums, prominent museums.

19          In recent times, we just concluded an auction

20  series of several thousand very rare posters that were

21  thought destroyed during the Holocaust, but found

22  secreted away in a German museum.

23          We held an auction about less than a year ago

24  that brought for a particular guitar $3.5 million, with

25  all the proceeds going to the Southern Poverty Law

111

1    Center, and Morris Dees.  You may be familiar with Mr.

2    Dees, who I had the honor of working with.

3            We did an auction that received a great deal

4    of publicity about four months ago when we sold, on

5    behalf of a homeless man, battered old wooden doors

6    from New York City's somewhat legendary Chelsea Hotel,

7    doors that a sane human being wouldn't think were worth

8    a dollar apiece.  But it was a compelling story, and

9    with proceeds in large part going to an organization

10   called City Harvest that provides food for the

11   homeless, a number of these doors brought more than

12   $100,000 apiece.

13           In short, in virtually every direction

14   Guernsey's has taken, we've been able to establish

15   world record amounts.

16           One that is often looked at is -- in the world

17   of auctions, a baseball has always been a barometer or

18   a gauge of the auction climate.  Sotheby's had set the

19   world record of $126,000 for a single baseball.  That

20   was thought to be a record that would never be

21   eclipsed.  Four months later, we sold a ball for $3

22   million.

23           Again, that's based upon our track record of

24   working with the leading media networks around the

25   world.  In the United States that would certainly

112

1  include the Associated Press, ABC, NBC, CBS, Fox, NPR;

2  abroad it's the BCC, Reuters, AFP in France.

3          And I can assure everyone that is hearing me

4  now that a collection, whether it's 2,000 artifacts or

5  one artifact, recovered from the ocean floor from the

6  TITANIC will be a newsworthy story on a global scale.

7      Q    Mr. Brook asked you whether Guernsey had given

8  a guarantee, and you've got some figures in here about

9  potential auction results.

10          How comfortable do you feel with those numbers

11 you've placed in there?

12     A    There is no certainty at auction, I want to be

13 abundantly clear about that, but yet, for lack of a

14 better term, the phrase "slam dunk" I would think would

15 be well used here in my belief that, were artifacts

16 recovered from the sea floor to be sold from the

17 TITANIC, that it would be hotly contested.  And when

18 something is hotly contested, prices move upwards.

19          We were tangentially involved earlier this

20 year with a painting that was acquired by a close

21 friend of mine who consulted with me about it, acquired

22 for $10,000.  After research, the painting then sold

23 twice, the final time selling for $450 million.

24          The handful of objects that have been sold

25 that have been found as property from survivors have

Exhibit A

113

1  brought astounding amounts.

2          A single one-page menu that never went down

3  with the ship but was certainly connected to the ship,

4  brought, I believe, $150,000 not too long ago.  A

5  cracker, a biscuit, found in the pocket of a survivor,

6  brought close to $50,000.

7          As you may -- as this second document that I

8  signed just a few days ago speaks, we came to the

9  committee with the notion that it might be a

10 recommendation not to present all 2,000-plus items from

11 the French collection, which we were told might be

12 available.  Other items recovered from the ocean were

13 never on the table, so to speak.

14         But it was my opinion that perhaps a very

15 proper resolution would be only to sell a small number

16 of objects, because even a small number, with a smaller

17 body of material available, the prices for those items

18 would be all the greater, and, in a strange way, might

19 conceivably be able to get as much for 20 objects as

20 you could get for 2,000 objects, and then that way let

21 the balance of the items go to a museum where they will

22 be preserved forever.

23         MR. GURFEIN:  No further questions, Your

24    Honor.

25         THE COURT:  Thank you.

Exhibit A

114

1          MR. GURFEIN:  I would now move to have

2     admitted into evidence the two declarations and the

3     attachment of the proposal from Guernsey's.

4          MR. BROOKS:  No objections, Your Honor.

5          We have no further questions for Mr. Ettinger.

6          THE COURT:  Very good.  Those documents are

7     admitted.

8          (Equity Committee's Exhibits C and D were

9     received in evidence.)

10         MR. BROWN:  Your Honor, we're going to call

11    two other witnesses real quick.

12         THE COURT:  Thank you very much, Mr. Ettinger.

13    Thank you very much.

14         (Witness excused.)

15         MR. BROWN:  Your Honor, if we may, the Equity

16    Committee would like to call Gilbert Li to testify.

17    He's the representative of the stalking horse

18    group.

19         MR. WINSBERG:  Your Honor, just noting the

20    objection by the Debtors.  As you heard, the

21    testimony on the company, its dire need to

22    conclude.  I don't know what the Equity Committee

23    is trying to do in this case.  We're trying to move

24    forward to a conclusion, and their disclosure

25    statement cannot be confirmed now.  There is no

Exhibit A

115

1    impaired accepting class that will accept this

2    plan.  It's facially defective.

3        I just want to state that objection on the

4    record.

5        We got 120 jobs at stake.  We need to move

6    forward with the sale as proposed.

7        THE COURT:  Mr. Brown.

8        MR. BROWN:  Your Honor, I'd like to call Mr.

9    Li.  I think it will become clear.  These are

10   matters for argument by Mr. Winsberg.  I think

11   we're still in the evidentiary stage.

12       THE COURT:  Very good.  Mr. Brown.

13       MS. FELDSHER:  Your Honor, I'm going to have

14   to apologize.

15       MR. BROWN:  Your Honor, I would like to call

16   Mr. Gilbert Li of Alta to the witness stand.  He's

17   present in the courtroom.  He's a representative of

18   the stalking horse group.

19       MS. FELDSHER:  Your Honor, we have no idea,

20   other than a sideshow or delay, what's going to be

21   asked.  Our client -- we never offered our client.

22   We didn't submit any declarations from our client.

23       The relevant inquiry on the bidding procedures

24   is the Debtors' business judgment.  It's not

25   relevant to call our client other than

116

1    harassment --

2        MR. BROWN:  They were negotiated -- they spent

3    hours today talking about how extensive the

4    negotiations were, all these other things.  They're

5    saying they're going to walk.  Which, by the way,

6    Your Honor, let them walk.  That makes our plan the

7    best alternative, which provides for more money.

8        THE COURT:  Objection's overruled.  You can

9    call the witness.

10       MR. BROWN:  Thank you.

11       (Ms. Feldsher and Mr. Li conferring.)

12       MR. BROWN:  Your Honor, it's totally

13   inappropriate for her to be coaching a witness

14   before he goes on the witness stand.

15       MS. FELDSHER:  Your Honor, I apologize.  I was

16   not coaching the witness.  My client, as you can

17   imagine, is not prepared, was not prepared to be

18   called up.  I've never seen this happen in all of

19   my years of practicing where a client whose

20   declaration has not been submitted was called up.

21       All I said to him was:  Just be mindful not to

22   disclose advice of counsel --

23       MR. BROWN:  Coaching.

24       MS. FELDSHER:  -- which I think is

25   appropriate.

117

```
 1            THE COURT:  All right.
 2            MR. BROWN:  Exactly what's happened, coaching.
 3            THE COURT:  He may step to the witness stand.
 4   WHEREUPON,
 5                        GILBERT LI
 6   acknowledged having been duly sworn to tell the truth,
 7   and testified upon his oath as follows:
 8            THE WITNESS:  I do.
 9            COURTROOM ADMINISTRATOR:  Please be seated.
10            THE COURT:  Mr. Brown.
11            MR. BROWN:  Thank you, Your Honor.
12                     DIRECT EXAMINATION
13   BY MR. BROWN:
14       Q    Good afternoon, Mr. Li.
15       A    Good afternoon.
16       Q    What is your position with the stalking horse
17   group?
18       A    What is my position?
19       Q    Are you familiar with the term "stalking horse
20   group"?
21       A    Yes.
22       Q    Okay.  And what is your understanding of the
23   meaning of that group?
24       A    It is the group that has provided the company
25   with the stalking horse proposal.
```

Exhibit A

118

1    Q    And your company is a part of that group?

2    A    Yes.

3    Q    And what's the full name of your company?

4    A    Alta Fundamental Advisors.

5    Q    And what's your role with that company?

6    A    Managing partner.

7    Q    And what is Alta Financial Advisors' role with

8    the stalking horse group?

9    A    It is a part of that group.

10   Q    What percentage?

11   A    33 percent.

12   Q    Were you involved directly with negotiating

13   the Asset Purchase Agreement that the Debtors are

14   asking the Court to approve today?

15   A    Yes, I am.

16   Q    Were you involved in negotiating bidding

17   procedures that were part of that Asset Purchase

18   Agreement?

19   A    Yes.

20   Q    Has your company been a part of asset purchase

21   arrangements from bankruptcy sales before?

22   A    Yes.

23   Q    How many have you been involved with?

24   A    I don't recall right now.

25   Q    Have you ever threatened to walk from a deal

119

1   as part of a negotiating tactic?

2       A      Repeat that again?

3       Q      Have you ever threatened to walk from a deal

4   as part of a negotiating tactic?

5       A      Sometimes.

6       Q      Okay.  And so is it true, as represented in

7   court -- I assume you heard Mr. Winsberg -- that the

8   stalking horse group will walk if the Court doesn't

9   approve the sale transaction today?

10          MR. WINSBERG:  That's not what I said.

11  BY MR. BROWN:

12      Q      Let me rephrase it.  Is it true the stalking

13  horse group is going to walk if the Court doesn't

14  approve the bidding procedures that were negotiated

15  today?

16          THE WITNESS:  What did you say?

17          MR. WINSBERG:  That's not what I said.  What I

18      told Your Honor was they had informed me that, if

19      it didn't get approved today, there's the potential

20      they were going to walk.  And they said tomorrow,

21      they may not be here tomorrow.  Time is of the

22      essence.

23          THE WITNESS:  I am not here tomorrow, so it's

24      likely to be terminated in whatever time it is.

25  BY MR. BROWN:

Exhibit A

120

1      Q      Is $50 million from an auction of assets a

2   better proposal for a company than $19.5 million under

3   your sale agreement?

4      A      Repeat that, please?

5      Q      Is $50 million, if achieved from the auction

6   of the assets of the company, a better result than your

7   $19.5 million offer?

8      A      Well, you can ask the same thing if it's $100

9   million --

10     Q      That's not -- I want a yes-or-no answer.

11     A      It's a hypothetical.

12     Q      Is it a better deal for the company or not,

13  yes or no?

14     A      For the company, no.

15     Q      Why?

16     A      The company is a going concern.  If you're

17  auctioning an asset, there is no company.

18     Q      Is it possible --

19     A      There's a 100-plus employees.

20     Q      Is it possible in this case that the assets of

21  the company are worth more than the going-concern

22  value?

23     A      Is it possible?  Sure.

24     Q      Okay.  Has the stalking horse group committed

25  to keeping the American -- let me back up.

Exhibit A

121

1          Are you familiar with the different sections

2    of artifacts recovered from the TITANIC shipwreck?

3       A    I am.

4       Q    So you know there's an American section of

5    artifacts and a French section of artifacts?

6       A    Sure.

7       Q    And has the stalking horse group committed to

8    keeping those collections together in connection with

9    purchase of its assets?

10      A    We are only at the stage of negotiating and

11   finishing completing the Asset Purchase Agreement.  We

12   have not even gone towards that much of a business

13   plan.

14      Q    Have you thought about selling the French

15   artifacts off to achieve money or revenues if you're

16   the successful purchaser?

17      A    I have not gone to that point.

18      Q    Is it possible that that's what you would do?

19      A    It's possible I won't, either.  So, yes, on

20   both sides.

21          MR. BROWN:  One moment, Your Honor.

22          THE COURT:  Certainly.

23          MR. BROWN:  Nothing further for this witness,

24   Your Honor.  I would intend afterwards to call Mr.

25   Giovanni Wong.

Exhibit A

122

1          THE COURT:  Thank you.

2          MS. FELDSHER:  Your Honor, one question?

3          THE COURT:  Certainly.

4                    CROSS-EXAMINATION

5    BY MS. FELDSER:

6      Q     Mr. Li, you're familiar with the Asset

7    Purchase Agreement that the stalking horse group signed

8    in this case?

9      A     Yes.

10     Q     Under that agreement, what does it say about

11   the stalking horse's -- the stalking horse group's and

12   the covenants and conditions, their willingness to

13   comply with the covenants and conditions?

14     A     In the Asset Purchase Agreement, yes, it is --

15   the company or the future purchaser will comply with

16   all covenants and conditions of the (inaudible).

17          MS. FELDSHER:  No further questions, Your

18     Honor.

19          THE COURT:  Thank you.

20          MR. BROWN:  Nothing further from this witness,

21     Your Honor.

22          THE COURT:  Thank you very much.  You may step

23     down.

24          (Witness excused.)

25          THE COURT:  Mr. Brown.

123

```
1          MR. BROWN:  Your Honor, if I could call
2     Giovanni Wong.
3          MR. GROSSMAN:  Your Honor, just for the
4     record, same objection that Ms. Feldsher that to
5     Li's being called.  I have the same objection to
6     Mr. Wong being called.
7          THE COURT:  Thank you.
8          Objection's overruled.  Mr. Wong may testify.
9  WHEREUPON,
10                    GIOVANNI WONG,
11  acknowledged having been duly sworn to tell the truth,
12  and testified upon his oath as follows:
13          THE WITNESS:  Yes.
14          COURTROOM ADMINISTRATOR:  Please be seated.
15          THE COURT:  Mr. Brown.
16          MR. BROWN:  Thank you.
17                    DIRECT EXAMINATION
18  BY MR. BROWN:
19     Q    Good afternoon, Mr. Wong.
20     A    Good afternoon.
21     Q    Can you tell the Court what your role was with
22  the company initially, how you became involved with
23  this Debtor entity?
24     A    I represented Dinoking as their financial
25  advisor as part of the merger with Premier Exhibitions.
```

124

1   So that's how I kind of got involved.

2       Q     Did you also, prior to the bankruptcy, have a

3   role with Premier Exhibitions itself?

4       A     During the bankruptcy?

5       Q     Prior to the bankruptcy.

6       A     Prior to the bankruptcy, not officially -- not

7   officially, because post merger we understand that the

8   -- I stayed on a little bit to help with the

9   integration of the two entities, as well as there was

10  obviously a financial situation of the company, and I

11  was there to help provide any advice or help that I

12  could give.

13      Q     And do you have separate business dealings

14  with Daoping Bao outside of involvement with the Debtor

15  company?

16      A     No, I do not.

17      Q     Did you have prior business dealings prior to

18  your relationship with Dinoking?

19      A     No, I do not.

20      Q     Have you worked with Mr. Bao in any capacity

21  since you have engaged with Dinoking and the Debtor?

22      A     Sorry.  Ask the question again?

23      Q     Have you worked with Mr. Daoping Bao in

24  connection with any other matter other than your

25  relationship with the company since you've become

125

1    involved?

2        A    No.

3        Q    What is your role with the stalking horse

4    group?

5        A    Just like Mr. Li, we are part of the stalking

6    horse group as a --

7        Q    Who makes the calls?  Who makes the decisions?

8    How are decisions made amongst the stalking horse

9    group?

10       A    The stalking horse group?  We talk and

11   deliberate and make a decision as a group.

12       Q    And has the stalking horse group decided that

13   it's going to withdraw its offer if it's not approved

14   here today?

15       A    Have we decided?

16       Q    Yes, sir.

17       A    Not that I'm aware of.

18       Q    Has there been any discussion to that effect,

19   that you'll withdraw the offer that you're asking the

20   Court to approve bidding procedures if it's not

21   approved today?

22       A    I think as part of every business decision we

23   make, we discuss both go and no go and pros and cons of

24   every option.

25       Q    Are you familiar with the artifacts, the

126

1    French versus the American artifacts?

2        A    Yes, I think so, believe so.

3        Q    And are you, as part of the stalking horse

4    group, willing to commit to keep those collections

5    together infinitum?

6        A    I don't think -- just like Mr. Li has said, I

7    don't think we have extensive discussions -- enough

8    extensive discussion internally to make that

9    determination.

10       Q    So it's possible that you could vote in favor

11   of splitting those up and trying to sell those

12   artifacts in the future.

13       A    Everything is possible.

14            MR. BROWN:  One moment, Your Honor.

15            Nothing further.

16            THE COURT:  Thank you.

17            MR. GROSSMAN:  No cross, Your Honor.

18            THE COURT:  Thank you very much.  You may step

19       down.

20            (Witness excused.)

21            THE COURT:  Any further witnesses or any

22       further evidence?

23            MR. BROWN:  Your Honor, the Equity Committee

24       rests the presentation of evidence, but we'll

25       reserve for any rebuttal if there's other evidence

Exhibit A

1    presented.

2        MR. WINSBERG:  I don't believe that we intend

3    -- we are offering no other evidence, Judge, so the

4    record is, from our perspective, closed.

5        THE COURT:  Very good.

6        Any further evidence?

7        MR. MCCLAMMY:  No further evidence, Your

8    Honor.

9        THE COURT:  Very good.

10       Closing arguments?

11       MR. WINSBERG:  I keep looking back at the

12   clock, Your Honor.  I had this long argument

13   presentation, an impassioned plea for Your Honor,

14   but I think, in light of what happened earlier

15   today, Your Honor saw in the courtroom alone that

16   this transaction's at arm's length and in good

17   faith.  The purchaser came in and bumped the price

18   up.

19       This is the only viable transaction.  There

20   are 120-plus jobs at stake if this transaction

21   doesn't go forward.  There is no funded

22   alternative.

23       The Equity Committee, you heard them in court,

24   they're fine with destroying the company.  They're

25   fine with destroying the going concern of the

128

1      company, having it liquidate and selling off some

2      artifacts.

3           We don't believe that's appropriate or the way

4      to go in this case.  We believe preserving the

5      going concern of the company is the right thing to

6      do.

7           And this transaction that we propose will do

8      just that.  The company will emerge from bankruptcy

9      under new ownership, with a better -- with an

10     ability to reinvest in capital expenditures.

11          The purchase agreement makes clear and the

12     sale order makes clear that it's going to be

13     subject to the revised covenants and conditions.

14     It's a stock sale of RMST.

15          And whatever happens in the future, and

16     there's all hypotheticals, the district court judge

17     in that case has made herself very clear about what

18     needs to be approved before anything can happen.

19          I would note, Your Honor, we did appear in

20     front of the district court.  We attached that

21     transcript.  Judge Smith agreed with Your Honor on

22     the jurisdictional analysis that you had put forth

23     in your scheduling order.

24          I would note that when I reviewed your

25     scheduling order, Your Honor, that Your Honor cited

Exhibit A

129

1    two cases, the Michaelson case and the Landmark

2    case in its order, and those decisions make one

3    thing very clear, that disclosure statements

4    matter.

5         Michaelson is a case where confirmation of the

6    plan was revoked based upon inaccurate information

7    in a disclosure statement.  Your Honor cited that.

8         Landmark is even more powerful in this case,

9    Your Honor.  In Landmark, the Court allowed a

10   creditor to file a competing disclosure statement

11   and sale plan to the debtor's plan.  And the

12   debtor, in its plan to sell assets -- the debtor

13   had a plan to sell assets to a third party, and the

14   creditor proposed its own plan to sell that asset

15   to itself, and it filed a motion to go and do that,

16   as Your Honor knows, you cited that decision.  And

17   notably in that decision -- I don't think it's by

18   accident, Your Honor -- to address a risk that the

19   debtor's buyer will withdraw its offer if the Court

20   permitted the creditors' plan to be filed with the

21   court and disclosure statement, the bankruptcy

22   court in that case conditioned the creditors'

23   permission to file on the proviso that, quote,

24   satisfactory evidence of both a contractual duty

25   and financial ability to perform the purchase has

Exhibit A

130

1    been proposed by the plan.

2         Disclosure statements matter.

3         In this case, the Equity Committee has no

4    funding.  It has a non-binding term sheet for up to

5    $7 million.  You heard Mr. Glade testify that's

6    insufficient to refinance the DIP loan; pay off the

7    admin experiences; pay the secured lender, Mr.

8    Grossman's client, $4 million on the effective date

9    and emerge with enough money to litigate.

10        There's just not -- funding is not there to

11   confirm that plan, and we know that now.

12        More importantly, we know now that there's no

13   impaired accepting class that will vote for this --

14   that they can get to vote for this plan.  The

15   largest unsecured creditor is going to vote against

16   the plan.

17        There should be no reason to go forward --

18   putting aside the conditions on the stalking horse

19   settlement agreement, there should be no reason to

20   move forward with that disclosure statement and

21   again distract the Debtors, which are on a short

22   leash.  You heard Mr. Glade's testimony.

23        I could go through the Lionel standard: sound

24   business justification, adequate notice, fair and

25   reasonable price and in good faith.

Exhibit A

131

1          The testimony speaks for itself.  The Debtors

2     have met every prong.  You've heard nothing to the

3     contrary.

4          Mr. Glade testified that the company is

5     literally out of cash.  If you were to add the

6     administrative expenses today, it's out of cash.

7     It drags on through the end of the year if you

8     don't pay the admins.

9          But you heard Ms. Sanders testify as well that

10    the company is hurting.  It can't retain talent, it

11    can't attract talent, employee morale is bad.

12         And the stalking horse group has indicated to

13    us they want to buy a going concern.  And if this

14    company -- if they have to come into the company

15    and the company is gone and all the key employees

16    are gone, they may not close.

17         We need to move now.

18         Adequate notice has been provided.  This

19    motion was filed on June 15th, over two months ago.

20    The Court initially set the bid procedures down for

21    July 25th.  Instead, Your Honor gave additional

22    time, something that, Your Honor, I actually

23    suggested at the hearing, gave additional time to

24    see whether people come up with the funds.  That

25    didn't happen, so we're here today.

132

1        So there's adequate notice of the sale

2    process.  This is not a case where Debtors are

3    filing a motion on day one of the case and seeking

4    to sell their assets within an expedited time

5    frame.

6        The testimony clearly establishes that the APA

7    and bid procedures are negotiated at arm's length

8    and in good faith.  The purchase price jumped from

9    15.5 to 17.5 to 19.5.

10        The declaration of Mr. Glade and -- the

11    testimony of Mr. Glade and Ms. Sanders, as well as

12    the declaration of Ms. Feldsher, also established

13    the parties negotiated in good faith.  The Debtors

14    disclosed all of their known connections with the

15    stalking horse agreement.

16        And I would refer Your Honor to page 32 -- I'm

17    sorry -- paragraph 32, pages 17 and 18 of the

18    Debtors' motion that we filed on June 15th where we

19    disclosed all the known connections with these

20    transactions.

21        The bid procedures, as Mr. Glade testified,

22    are fair and reasonable under the circumstances,

23    and the stalking horse would not go forward without

24    them.

25        Now, one last point that was raised by the

Exhibit A

133

1    Equity Committee in their objection and which got

2    raised again today is that this is an insider

3    transaction, citing the statutory insider provision

4    in 101 of the Bankruptcy Code.

5        Besides disclosing all of their connections,

6    none of the individuals or entities that make up

7    the stalking horse group comprise a statutory

8    insider.

9        But that whole analysis by the Equity

10   Committee misses the mark, because the statutory

11   insider definition really deals with 547 of the

12   Bankruptcy Code, whether it's a 90-day look-back or

13   a year look-back.

14       When you look at the 363 of the Bankruptcy

15   Code -- and I've read it multiple times -- there's

16   nothing in there that talks about an insider deal

17   versus a non-insider deal, and the courts show

18   that.  Instead, in looking at that, at whether a

19   363 sale is whether the shareholders of the

20   stalking horse exercised actual management control

21   over the debtor's business.

22       Is the stalking horse purchaser directing the

23   debtor what to do?  That's the inquiry essentially

24   that the courts look at.  They're not looking at

25   whether there's a statutory insider.

134

1          So not only are we not a statutory insider,

2     the evidence clearly shows that the stalking horse

3     purchaser is not directing the management of the

4     these Debtors.  The Debtors are advised by its

5     professionals and exercise their business judgment,

6     and the disputed testimony establishes that.

7          But even if the Court was to apply a higher

8     standard, which some courts do in looking at

9     whether it's an insider transaction and provided a

10    higher scrutiny, well, the record's not going to

11    change.  The Court still should approve it.  The

12    testimony is clear this was negotiated at arm's

13    length, in good faith, and the price is fair and

14    reasonable.  The analysis doesn't change should the

15    Court even somehow find that heightened scrutiny

16    should apply.

17         The Equity Committee also cited the

18    exclusivity provision as a problem in their papers.

19    Again, the testimony is that hasn't -- not only do

20    they misstate it in their papers, but the testimony

21    is it hasn't impacted or chilled the bidding.  The

22    testimony was also by Mr. Glade that the provisions

23    of the bid procedures don't chill the bidding.

24         Your Honor, time is of the essence.  We

25    respectfully ask Your Honor to approve the bid

1      procedures as I outlined earlier today, that you

2      grant that motion, you deny the Equity Committee's

3      disclosure statement, and allow these cases, which

4      I believe everybody believes need to come to an

5      end, to come to an end, and a good conclusion at

6      that, an 80 cent return to creditors and 120-plus

7      people preserve their jobs.

8            Thank you.

9            THE COURT:  Thank you.

10           Mr. Gurfein.

11           MR. GURFEIN:  Thank you, Your Honor.  If it

12     please the Court.

13           The Equity Committee filed an amended

14     disclosure statement and an amended plan, and we

15     had a lot of moving pieces and a lot of moving

16     people.  Mr. Winsberg and I were in Norfolk before

17     Judge Smith, and then Mr. Brooks and I were in

18     Atlanta for Mr. Glade's deposition, and I'm here

19     today.

20           So I apologize that we were delayed in filing

21     that amended plan and amended disclosure statement,

22     but the reason I apologize also is that there were

23     two inadvertent errors that we put into the amended

24     plan and disclosure statement.

25           First, I want to note on page 26 of 60 in

136

1    docket 1179, we had two numbers wrong.  We

2    increased the amount of the DIP loan that has to be

3    paid off from $5,112,000 to $5,375,000.

4         We also misstated the priority claims that had

5    to be paid on that same page.  We had put down

6    $252,000.  We had meant to increase that to

7    $542,000.

8         But in addition, Your Honor, we changed the

9    plan to provide for post-confirmation interest to

10   be paid to general unsecured creditors and to

11   provide a premium of 20 percent on all claims, so

12   that unsecured creditors would not only be paid in

13   full with interest, but would receive a premium.

14   And so the general unsecured creditors are not

15   impaired under the amended Equity Committee plan.

16        And, in any event, the question of impairment

17   becomes a confirmation issue.  In fact, everything

18   we've heard about the disclosure statement and the

19   plan are confirmation issues.

20        We attached the exit financing term sheet, and

21   between now and confirmation expect to convert that

22   term sheet into a DIP loan.

23        We heard from Mr. Ettinger, both in his

24   declarations and on the stand, that the proposal to

25   sell a handful of French artifacts is a means to

Exhibit A

1    see all creditors paid in full and to see value

2    delivered to equity holders.

3         And it's worth remembering, to put this in

4    context, that in June 2016, the Debtor agreed with

5    that.  And we quoted at length from the June 2016

6    sale motion in which the Debtor proposed to sell

7    artifacts, noting that they had never before sold

8    an artifact and then noting all the value that's

9    locked in those artifacts.

10        And we heard from representatives of the

11   stalking horse bidder that they certainly haven't

12   given up the idea of separating those collections.

13   They may have testified they didn't make that

14   decision yet, but that's a decision that's still

15   available to them that would be considered.

16        In the Debtor's pleadings, they go through

17   each of the proposed bid procedures and bid

18   protections, and for each bid protection, they can

19   cite a case saying another court has approved this.

20        I suggest, however, that in this case, the

21   cumulative effect of all of the bid protections,

22   not just the break-up fee, but the exclusivity

23   period, we had it wrong.  I admit that, I misread

24   it and I apologize.  The period from the signing of

25   the Asset Purchase Agreement until the date of the

138

1   bid procedures was a period of exclusivity, but

2   after that period of exclusivity, with the entry of

3   the bid procedures order, they're free to go

4   solicit.

5        Well, we're told today that that solicitation

6   is now less than three weeks from now.  Just how

7   much competition is going to be generated to drive

8   the price at this auction if we have less than

9   three weeks between now and the sale?

10       We looked at Exhibit 1, Your Honor, and I

11   directed Mr. Glade to the November 2nd date on

12   Exhibit 1.  And I note for Your Honor that, as of

13   the end of that week, the Debtor is projected to

14   have three quarters of a million dollars in cash on

15   hand.

16       For this Court to provide an opportunity to

17   the creditors and equity holders of this case to

18   realize a significant return by putting over to a

19   confirmation hearing, permitting us to solicit

20   acceptances and go to a confirmation hearing before

21   November 2nd would give sufficient statutory time

22   and sufficient competition time for a real

23   opportunity to realize value in this case that is

24   going to be truncated and forever denied if the

25   Court approves the bid procedures as modified

139

1    today.

2        I note that, together with the increased

3    purchase price of $2 million, is an increase in the

4    break-up fee of $500,000.  That's a 25-percent

5    break-up fee on that increased amount, and puts a

6    competing bid under the terms here of no less than

7    $20.5 million.  A hurdle, Your Honor, that chills

8    the bidding.

9        You heard from Mr. Glade and you saw in the

10   documents presented that PacBridge and Apollo set

11   out in January to find insider affiliated equity

12   holders with whom to propose a transaction.  It's

13   not just happenstance that the individuals they

14   sought with whom to perform a transaction were

15   affiliated with insiders or insiders.

16       Your Honor, if you look at Schedule 13D, which

17   now I think has been submitted to the Court three

18   times as exhibits, you'll see that the secured

19   lenders are part of a voting trust.  I'm using the

20   wrong term.

21       They've given their power of attorney to

22   Daoping Bao to vote their shares.  And the power of

23   attorney to vote their shares goes with the power

24   to appoint four members of a seven-member board of

25   directors and to appoint the CEO.  And the

Exhibit A

140

1    provisions of that control agreement provide that

2    they will be required to permit Mr. Bao to vote

3    those shares in that manner to maintain control of

4    the company until they, among other things, until

5    they decide to withdraw from the agreement.  It's

6    five years or until they decide to withdraw from

7    the agreement.

8         They have not withdrawn from that agreement.

9    Withdrawal from that agreement would deprive

10   Daoping Bao of the ability to continue to control

11   the company, and in holding that power to withdraw

12   their votes, they are saying Mr. Bao is doing what

13   they want done with the company.  That is control,

14   Your Honor, and that fits squarely within 101.31 of

15   the Bankruptcy Code.

16        Is this an insider deal?  Is that prohibited

17   by the Code?  Not at all.  Insider deals are done

18   all the time.  They do, however, require greater

19   scrutiny.  And when Your Honor looks at the manner

20   in which the Debtors' financial advisor put

21   together two potentially competing bids, one of

22   whom was an insider affiliate and the other of whom

23   was an equity holder seeking to combine with an

24   insider affiliate, Your Honor, it just doesn't hold

25   up to scrutiny.

Exhibit A

141

1          This is a transaction that seeks to deprive

2     the current parties in interest in the case of the

3     value of the assets of this company.

4          This is, as we've noted before, one of those

5     rare occasions where the going-concern value does

6     not in fact match the liquidation value, which is

7     greater.  And, yes, there's benefits to maintaining

8     a going concern.  There are those jobs.

9          But, Your Honor, two things:  First, as Ms.

10    Sanders told us, there's no guarantee given to any

11    of the employees who are being retained that they

12    will be employed for one day or one month or one

13    year or ten.  There's no obligation on the part of

14    the purchaser to maintain the company as a going

15    concern, and there's significant incentive to do

16    otherwise.

17         The value in this company can be realized and,

18    under the Equity plan, a chief restructuring

19    officer would in fact continue operations of the

20    company and seek to sell it as a going concern.

21    The assets to be sold would be a handful of French

22    artifacts.  The remaining artifacts at the

23    exhibitions in Las Vegas and Orlando can continue

24    operating.

25         The artifacts that are subject to the district

Exhibit A

142

1      court's covenants and conditions would be continued

2      to be preserved and conserved, and the CRO would

3      seek to sell that to a qualified institution.

4          And we have been in front of Judge Smith, and

5      Judge Smith understands.  We have advised Judge

6      Smith through the pleading that Mr. Wainger agreed

7      to file as part of the periodic report that we

8      would seek authority from the district court for

9      those things that the district court must give

10     authority.

11         One last point.  The Debtor in the last couple

12     of weeks filed a pleading in the district court

13     reasserting its position that the artifact

14     collections do not require to be kept together as a

15     single collection under the covenants and

16     conditions, and we readily adopted that pleading in

17     whole cloth, and it appears in our disclosure

18     statement in support of the position of the Equity

19     Committee that you can do both.  You can sell a

20     handful of artifacts, you can conserve and preserve

21     the American artifacts, you can continue to display

22     all of them.  They are not mutually exclusive.

23         The disclosure statement that we filed

24     provides adequate information for creditors to make

25     a determination on voting.  A final revision to the

143

1     disclosure statement would note that, through

2     paying post-confirmation interest and 100-plus

3     cents on the dollar to creditors, they are no

4     longer impaired, and we no longer require the two

5     thirds in amount to have that class vote in favor

6     of the plan.

7         That and all the other matters raised by Mr.

8     Winsberg today are confirmation issues.

9         This estate deserves the opportunity to choose

10    the manner in which the assets are managed, claims

11    are paid, and Equity is satisfied.  The only way

12    that can happen is through a distribution of the

13    disclosure statement, setting of a confirmation

14    hearing, and permitting the Equity Committee to

15    proceed to realize the value that is trapped in

16    these assets that would be lost to the estate

17    forever if the sale were to be approved.

18        We think the bid procedures are egregious.

19    Cumulatively, they chill the bidding.  Shortening

20    the time again will chill the bidding.  This is

21    being designed to deprive that value to the

22    stakeholders in this estate.  We ask the Court not

23    to do that.  We ask the Court to approve our

24    disclosure statement and set this down for a

25    confirmation hearing.

144

1      THE COURT:  Thank you.  Thank you.

2      Anything further by anyone?

3      MR. CHUBAK:  Your Honor, I'll be very brief.

4  I'm mindful of the time.  I just wanted to address

5  a couple of key issues and give the Court a brief

6  update from my committee.

7      During Mr. Gurfein's presentation, he

8  represented to the Court that creditors would not

9  be impaired under the Equity Committee's proposal

10  because they'd be receiving post-confirmation

11  interest at the rate of 10 percent per annum, plus

12  a 20 percent premium from the sale of the French

13  artifacts proceeds.

14      First, I want to make sure that the Court is

15  aware that the Equity Committee's disclosure

16  statement itself describes creditors as impaired

17  under their own plan.

18      We also believe that creditors would be

19  impaired under the Equity Committee's plan because

20  it's not contemplated that they would get paid

21  until roughly a year following the effective date,

22  following the conclusion of any artifact

23  litigation, and following a sale process of the

24  French artifacts if the Debtor's estate, the post-

25  confirmation entity litigating that issue, is

145

1    ultimately successful.

2        In addition, during the break I had the

3    opportunity to confer with another committee

4    member.  As the Court is aware, one of the members

5    of my three-member committee is a plan proponent

6    and the other two are independent.  One of the

7    independent members, Ezra Jones, is in the

8    courtroom today.  He supports the proposal made

9    earlier today.

10       During the break I had the opportunity to

11   confer with my third committee member, who also

12   supports the same proposal.

13       So without the support of the largest

14   creditors and without the support of the Creditors

15   Committee, I think it's extremely difficult to

16   confirm the Equity Committee's plan.

17       1129(a) is clear that, if a class is impaired

18   that, that you need the support of an impaired

19   class of claims.

20       And the last issue that I wanted to raise

21   before the Court is that to date the museums have

22   represented that they would have an issue bidding

23   at auction under the proposed bid procedures, but I

24   thought it worthwhile to raise the issue that there

25   are certain provisions in the bid procedures that

1  would absolutely preclude the museums from bidding,

2  and that's a good-faith deposit and the requirement

3  that there be no material alterations to the Asset

4  Purchase Agreement.

5       I think it worthwhile to hear from Davis Polk

6  about this issue, but we support the proposal made

7  earlier today regarding the -- to resolve the

8  disclosure statement -- to resolve the issues

9  pertaining to the Debtors' objections to the two

10  disclosure statements.

11       THE COURT:  Thank you.  Thank you very much.

12       MR. MCCLAMMY:  Your Honor, if I may, just very

13  briefly?

14       THE COURT:  Certainly.

15       MR. MCCLAMMY:  Again, Jim McClammy on behalf

16  of the Trustees for the National Maritime Museum.

17       Among other things, in the Debtors'

18  presentation today, they mentioned that there was

19  no issue with notice and that adequate notice had

20  been given.

21       I would beg to defer with that, as there's

22  been material changes that have happened just today

23  and just before coming in that I believe the

24  museum's, as an interested member here, who is not

25  only interested in the artifacts but the public

147

1    interest in the TITANIC collection, would say it's

2    depriving even the creditors of the opportunity of

3    allowing us to consider whether or not we would

4    raise the purchase price that's included in our

5    plan of reorganization, which is something that has

6    been under discussion with creditors, but, as you

7    can imagine, given the time difference between here

8    and Europe, was impossible for us to be able to

9    actually respond to during the course of the day

10   today, and I still believe that's very possible.

11        The Debtors have also mentioned that there's

12   one viable plan for going forward, and I also would

13   disagree with that.

14        We've confirmed with the committee and I can

15   confirm with the Court that our fundraising process

16   is well under way.

17        The museum has a history of funding projects

18   and acquisitions that would support our ability to

19   meet the obligations here, and, as of yesterday, we

20   had over half of the amount fully funded, either

21   through financing on an unsecured basis --

22        MR. WINSBERG:  Your Honor, just real briefly.

23   It's late in the day.

24        The museum doesn't have standing.  They're not

25   a creditor or party in interest.  To the extent

Exhibit A

1        this is evidence, I object.

2               MR. MCCLAMMY:  I'm sorry.

3               MR. WINSBERG:  There's no evidence of this.

4        And so, just for the record, this is not evidence

5        and I object to it coming in as evidence.

6               THE COURT:  Thank you.

7               MR. MCCLAMMY:  Your Honor, I'm not presenting

8        it as evidence.  I am presenting it as argument,

9        because I believe that the creditors have been

10       derived of the opportunity to hear that.

11              And after exclusivity has expired and plans

12       have been put forward, to only minutes before a

13       hearing takes place say that we've got something

14       that the Court has to consider, has to consider

15       today that prevents plans from going forward, I

16       believe that's actually improper.

17              But that being said, Your Honor, I do believe

18       we have standing as a plan proponent, and also as

19       someone who may be a potential bidder.

20              I agree completely with what the committee has

21       said.  It's impossible under the current situation

22       for the museum, a public entity, to participate in

23       the bidding process.  We've offered seven-figure

24       deposits, as I believe the Court has been made

25       aware, but cannot do that on a non-refundable basis

149

1       just given our situation.

2            And as I mentioned, our fundraising is well

3       under way.  We believe at time for confirmation,

4       when we need to prove the ability the finance and

5       to be able to consummate the plan, would be the

6       time to have that all addressed.

7            It's also unclear to us why the Debtors would

8       like to proceed with the process when they claim

9       that they have no ability to run past a certain

10      date, when their process is in fact uncertain in

11      front of the district court.

12           Why not have the alternative processes going

13      so that if your stalking horse purchaser, for

14      example, is unable to be confirmed by the district

15      court as the purchaser?  You might have a backup to

16      that here, especially in light of the fact that,

17      although they're stating that the Asset Purchase

18      Agreement calls for abiding by the terms of the

19      covenants and conditions, the witnesses on behalf

20      of the stalking horse purchasers weren't able to

21      say in court today, even though they'd put up

22      additional millions in support of their bid, that

23      they have not made any determination as to whether

24      or not they would in fact seek to try to break up

25      the collection, which we believe is something that

1    the district court is very much interested in.

2         And if you've got a situation in which, either

3    because of lack of approval from the district court

4    or lack of willingness of the ultimate purchaser to

5    abide by conditions that the district court may ask

6    the purchasers to confirm, why it should be that

7    the plan here is already foregone as a result of

8    this process.

9         So we would ask Your Honor to consider that as

10   you're making your determinations.

11        And I do agree with the committee that, if it

12   is the case that our disclosure statement does not

13   go forward, and we do believe it should, if it does

14   not go forward, we would ask the Court to consider

15   modifying the terms of the bidding procedures such

16   that there was no pre-financing requirement and no

17   non-refundable deposit requirement such that the

18   museum and its supporters may be able to consider

19   participating in the bidding procedures.

20        THE COURT:  Thank you.

21        MR. MCCLAMMY:  Thank you, Your Honor.

22        THE COURT:  Anything further?

23        Yes.

24        MR. FOX:  Good afternoon, Your Honor.  I'm

25   Steven Fox.  I represent an interested party, Cedar

151

1    Bay Entertainment, which is actually quite heavily

2    impacted by this Chapter 11 case.  It operates

3    museums that are TITANIC themed in the eastern

4    United States and in the midwest, and the Debtors'

5    operations have had financial and reputational

6    impact on my client.

7         I have two basic comments to make today.

8         One, I was staggered when I listened to the

9    comment made to this Court that you either accept

10   what we, the purchasers of the Debtors' assets, are

11   making, our offer, our deal, you take it today or

12   we're going to walk.

13        Two witnesses walked back from that rather

14   bold statement.  I might make it a stronger

15   statement and call it bold, but it was

16   inappropriate, and it was an idle threat.  They've

17   been here for months, they're going to be here for

18   months.

19        Second comment, Your Honor, the projections.

20   I haven't seen the projections.  They weren't

21   provided to the attorneys sitting in the courtroom.

22   But those are projections reflecting that in four

23   months the Debtor will be out of money.

24        In four months, the plan or the plans can be

25   voted on, they could be considered by the Court,

152

1    and the Debtor still has the ability to go forward.

2    Expenses may be lower, income may be higher.

3        Frankly, I'm not concerned if administrative

4    claims can't be paid for the next month or two or

5    couple of months extra.  It is what it is, and the

6    administrative claimants are big boys, they can

7    take care of their own financial issues.

8        I urge the Court to continue the disclosure

9    statement and plan process, at least for the Equity

10   Committee's plan and disclosure statement, which

11   appears to be feasible at this point.  They do not

12   have the unsecured creditors as impaired anymore.

13   It appears that they are unimpaired, according to

14   the representations that are made.  That takes care

15   of a lot of voting issues and voting problems.

16       And then to the extent that funds are

17   available and that funds are sufficient, that's a

18   confirmation issue.

19       Thank you, Your Honor.

20       THE COURT:  Thank you.

21       Anything further, Mr. Winsberg?

22       MR. WINSBERG:  Your Honor, I would urge Your

23   Honor read the district court's transcript.  I

24   think Mr. Gurfein took some liberties with it.

25       The district court was very -- the Debtors

Exhibit A

153

1   were very clear why they don't believe a stock

2   transfer of RMST requires the district court

3   approval.  We were seeking it anyways, and the

4   district court ruled that her view was NOAA's view,

5   which you still need approval even if it's a stock

6   sale.

7         The district court also said -- and I'll read

8   from page 10 of the transcript where she's agreeing

9   with Your Honor on jurisdiction, that the court

10  does have to approve the transfer of these assets

11  to be sure that following this court's order -- the

12  district court -- the covenants and conditions to

13  keep everything together and subject to the

14  jurisdiction of this court.

15        We're going to have to go back to district

16  court to make that showing.

17        The rest of the stuff that's gone on between

18  the museum and these other interested parties is

19  just noise.  There's no money behind the Creditors

20  Committee plan.  The Creditors Committee counsel

21  all but walked away from it.

22        We'd ask Your Honor -- it's been a long day.

23  We ask Your Honor to deny both disclosure

24  statements, approve the Debtors' bid procedures.

25        Thank you, Your Honor.

Exhibit A

154

1          THE COURT:  Very good.

2          All right.  Thank you all very much.  It's

3     been a long day.  It's after 5:00 now -- I

4     apologize -- the building has to close.

5          But this determination will be made very, very

6     soon.  I will contact you all.  It may be by

7     telephone, it may be in person.  I don't know how

8     it will be.  It needs to be made right away.  We'll

9     do it right away.  And I thank you all very much.

10          (At 5:11 p.m., the hearing was concluded.)

11                         - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A

1                C E R T I F I C A T E

2  STATE OF FLORIDA   )

3  COUNTY OF DUVAL    )

4          I, Cindy Danese, a Notary Public, State of

5  Florida at Large, do hereby certify that the attached

6  represents the proceedings before the United States

7  Bankruptcy Court, Middle District of Florida,

8  Jacksonville Division, before the Honorable Paul M.

9  Glenn, Bankruptcy Judge, in the matter of In Re: RMS

10 Titanic; such transcript is an accurate recordation of

11 the proceedings which took place.  A transcript of this

12 proceeding has been produced on September 6th, 2018.

13

14                      STATEWIDE REPORTING SERVICE

15

16

17                      _____

18                      Cindy Danese

19

20

21

22

23

24

25

Exhibit A