```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - - -
                                        )
 5   R.M.S. TITANIC, INC.,              )
     SUCCESSOR IN INTEREST TO           )
 6   TITANIC VENTURES, LIMITED          )
     PARTNERSHIP,                       )
 7                                      )   CIVIL ACTION NO.
            Plaintiff,                  )   2:93cv902
 8                                      )
     v.                                 )
 9                                      )
     THE WRECKED AND ABANDONED          )
10   VESSEL, ETC.,                      )
                                        )
11          Defendant.                  )
     - - - - - - - - - - - - - - - - - - -
12

13

14                   TRANSCRIPT OF PROCEEDINGS

15                       Norfolk, Virginia

16                      September 18, 2018

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
             Chief United States District Judge

19

20   APPEARANCES:

21           KALEO LEGAL
             By:  Brian A. Wainger
22                     And
             McGUIRE WOODS LLP
23           By:  Robert W. McFarland
                  Counsel for R.M.S. Titanic

24

25
```

```
APPEARANCES CONTINUED:


          UNITED STATES ATTORNEY'S OFFICE
          By:  Kent Porter
               Assistant United States Attorney
               Counsel for Amicus United States

          THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
          By:  Jackie Rolleri
                    And
          DEPARTMENT OF JUSTICE
          By:  Matt Troy
               Counsel for NOAA


          VANDEVENTER BLACK LLP
          By:  Edward J. Powers
               Counsel for potential intervenors

ALSO PRESENT:

          Neil Quartaro
          Jim McClammy
          Harris Winsberg
          Tane Casserly
          David W. Alberg
```

```
 1              (Hearing commenced at 1:00 p.m.)
 2         THE CLERK:  In case 2:93cv902, R.M.S. Titanic,
 3    Inc., et cetera, versus The Wrecked and Abandoned Vessel, et
 4    cetera.
 5         Mr. McFarland, Mr. Wainger, is the plaintiff ready
 6    to proceed?
 7         MR. McFARLAND:  Good afternoon, Your Honor.
 8    Plaintiff R.M.S. Titanic, Inc., is ready.
 9         THE COURT:  Good afternoon.
10         THE CLERK:  Mr. Porter, is the government ready to
11    proceed?
12         MR. PORTER:  Good afternoon, Your Honor.  We are
13    ready.
14         THE COURT:  Good afternoon.  Counsel, we are here
15    today on the continued reporting and status of the ongoing
16    proceedings in the bankruptcy court in Florida and also on
17    the status reports that you've filed since the last hearing.
18    I believe NOAA has filed a status report and R.M.S. Titanic
19    has filed a periodic report.
20         I believe that your report may have come first,
21    Mr. Porter, so we will go forward with you and your report
22    on behalf of the United States.
23         MR. PORTER:  Thank you, Your Honor.  As we noted in
24    the last report, a couple of things have happened:  One,
25    there has been a delegation from the Secretary of Commerce
```

1    to the NOAA administrator for making decisions under Section

2    111.  We attached that delegation to our status report.

3    There is nothing further to report on that particular

4    aspect.

5              THE COURT:  Is it under 111 or 113?

6              MR. PORTER:  I'm sorry, 113, yes, Section 113.

7              THE COURT:  Let me just ask you a question, though,

8    while we are on this.  It's interesting law, and I know that

9    R.M.S. Titanic has raised some questions about it.  Under

10   admiralty law and admiralty jurisdiction, the federal courts

11   are entrusted with certain jurisdiction.  I won't try to

12   review all of that now, but, obviously, part of that

13   jurisdiction is governing salvage operations.  This Court

14   obtained jurisdiction over the salvage operation of the

15   Titanic 20, 30 years ago.

16             MR. PORTER:  Correct.

17             THE COURT:  So, consequently, how can NOAA or any

18   government regulatory agency come in at this point in time

19   and say that anybody that wishes to conduct any research,

20   salvage, other activity, or physically go to the wreck site,

21   is subject to the Secretary of Commerce and the bureaucratic

22   powers that be, the executive branch, when the Courts have

23   traditionally had admiralty jurisdiction?  This Court has

24   jurisdiction over the salvage rights, so does this law

25   contravene the Article III powers?  It's giving Article III

```
 1    powers to an executive agency, so I don't know that that's
 2    appropriate.
 3            MR. PORTER:  We don't believe that they are
 4    incompatible, Your Honor.  I think, as we have said in prior
 5    submissions to the Court, it's always going to be the
 6    intention of NOAA to advise anybody who is seeking an
 7    application, of the Court's authority and the Court's
 8    jurisdiction.  As I move into the EYOS situation in a
 9    moment, I will be able to show you how that that is exactly
10    the case.
11            There are, quite frankly, consistent and
12    overlapping interests of both the Court and NOAA to protect
13    the Titanic wreck site forever from unwarranted intrusions.
14    Some of this, obviously, as you know, goes back to the
15    international agreement, which has not been fully
16    implemented yet.  Still waiting for the U.S. to decide that
17    it will be a proper signatory to that, but also the NOAA
18    guidelines, the 1986 Memorial Act, all those things are all
19    consistent, we believe, with what the Court's objective is,
20    and while I know that R.M.S.T. has expressed concern that it
21    interferes with the jurisdiction, we see it more as being
22    consistent with and compatible with the Court's jurisdiction
23    to protect the wreck site.
24            THE COURT:  All right.  That, obviously, is not an
25    issue before the Court at this juncture.
```

1          MR. PORTER:  Correct.

2          THE COURT:  The main concern of the Court is the

3    sale of the artifacts and the already salvaged items.

4    That's what the Court is looking at primarily now under this

5    Asset Purchase Agreement and the proceedings in the

6    bankruptcy court.

7          Part of the value, I would think, of R.M.S.T. is

8    its salvage rights, in other words, that it is still the

9    salvor-in-possession.  Whether or not someone will

10   ultimately contest that for some reason, because they

11   haven't properly exercised those rights, I'm not getting

12   into today.  At this juncture the Court has jurisdiction

13   over the salvage of the Titanic, as far as it's concerned,

14   and R.M.S.T. remains the salvor-in-possession.

15         I do agree with you, Mr. Porter, that I think

16   ultimately the interest of the United States to keep

17   everything together and to protect the wreck site are not

18   inconsistent with the intent of the Court.  We may be

19   looking at inconsistent ways to go about that protection,

20   one from an Article III jurisdictional standpoint and

21   another from a legislative standpoint, but we can go through

22   that another day.

23         At this juncture I believe that our ultimate goal

24   is consistent, but there could be an issue at some point

25   about the continued salvage of the wreck and whether it can

1    be controlled or overseen by the Court and/or the Secretary

2    of Commerce as opposed to the Court.  I just see that as a

3    potential issue in the case.

4           MR. PORTER:  I understand Your Honor's concern.  I

5    suppose it's potential, but we really do view our role as

6    being compatible with the Court's interest, as well.

7           THE COURT:  Up to this point the Court has viewed

8    it, likewise.  As I've said on a number of occasions, I

9    believe the Court is the entity that brought the United

10   States into this case.

11          MR. PORTER:  That's correct.

12          THE COURT:  Because it was the Court.  The Court's

13   role should not be to try the case.  The Court was

14   continually the only one in here that was asking questions

15   and overseeing anything that was going on.  So,

16   consequently, we are here now, and we can debate the

17   constitutional issues at a later time.

18          MR. PORTER:  Right.  Moving on to the other issue

19   we raised in the status report regarding the EYOS expedition

20   for a little later this month, and EYOS, actually, I've

21   recently learned, stands for Expedition Yacht Operations and

22   Services.  So at least we have now a name to go with the

23   acronym.

24          As of late last night or yesterday evening, NOAA

25   did authorize a permit for them to conduct the expedition

1    consistent with the letter that Mr. McCallum provided to the

2    Court.  As you will recall, and I think we reported earlier

3    in the status report, their objective was to go to the wreck

4    site.  They would drop some ballast.  They would use a man

5    submersible and do standard definition images, photography,

6    but that's all that their plan was at that time.  I do have

7    a copy of that authorization I'd like to tend to the Court

8    as an exhibit today.

9         THE COURT:  All right.  I'll mark that as Amicus

10   United States Exhibit No. 1 for this hearing.

11        (The document was received in evidence as Amicus

12   U.S. Exhibit No. 1.)

13        MR. PORTER:  Your Honor, it's rather lengthy.

14   There are just a couple of highlights I'd make.  I'd draw

15   the Court's attention to the first page of the

16   authorization, the second page of this document, Paragraph 1

17   under "authorized activity" or under "authorized activities"

18   describes the specific things that are authorized by EYOS to

19   conduct at the site.

20        THE COURT:  Let me just ask you a couple of

21   questions, and then you can go through some details.

22        MR. PORTER:  Sure.

23        THE COURT:  At one point there was an individual

24   who was interested, I think it was Ms. Johnston, was it?

25        MR. PORTER:  There is a Lori Johnston who was

1    involved with EYOS, yes.

2          THE COURT:  There was something about they are

3    recovering a small tray with metal and wood samples that had

4    been placed at the site in 2004, to bring that up and to

5    study it for scientific purposes.  I think she was studying

6    bio-deterioration.

7          MR. PORTER:  That's correct.

8          THE COURT:  She wanted to place a new tray.

9          MR. PORTER:  That's correct.

10          THE COURT:  In other words, I'm summarizing it, but

11    that was, in effect, the tray had been placed by, is it

12    Dr. Johnston or Ms. Johnston?

13          MR. PORTER:  I believe it's Ms. Johnston.

14          THE COURT:  Johnston.

15          MS. ROLLERI:  Johnston.

16          MR. PORTER:  Dr. Cullimore.

17          THE COURT:  It was Dr. Cullimore, but there is also

18    a Johnston, and it is a Dr. Lori Johnston.  Is she still

19    planning to retrieve her tray and place another one?

20          MR. PORTER:  I was actually going to get to that

21    next, Your Honor, but, yes, she is involved in this

22    expedition, and that is the plan.

23          THE COURT:  Then the other thing, they were going

24    to collect rusticles?

25          MR. PORTER:  Yes.

```
 1          THE COURT:  The Court has orders regarding rusticle

 2   samples, so you need to go through that with the Court, too.

 3          MR. PORTER:  Right.

 4          THE COURT:  It looks like I disturbed you.  Go back

 5   to what you were doing.

 6          MR. PORTER:  I'll go wherever you'd like me to go,

 7   Your Honor, except out to the wreck site.

 8          THE COURT:  Go back.  I think I interrupted you, so

 9   go back to where you were.

10          MR. PORTER:  Just a few points on this

11   authorization letter.  On the third page of the

12   authorization under "special terms," just pointing out No.

13   2, specifically directs that there is no contact, no

14   excursion within the interior, and nothing can be left.

15   This is the status of this right now.  We will get to this

16   next issue on the tray momentarily.

17          Then on the next page, in Paragraph 9, it refers to

18   NOAA reserves the right to have an observer on board.  To

19   let the Court know, NOAA will have an observer on board.

20   That individual is here.  His name is Tane Casserly.  He is

21   seated next to Mr. Alberg.  He is a marine archaeologist,

22   and so he will be on board during this exhibition as an

23   observer for NOAA.

24          Then the last point is simply what I alluded to

25   earlier, Paragraph 10, which refers to the continuing
```

1    authority of this Court over the wreck site.  That takes

2    care of that authorization, Your Honor.

3            Turning to the trays, if I may, I'd like to provide

4    you another exhibit which is actually photographs of the

5    trays.

6            THE COURT:  We will mark that exhibit as Amicus

7    United States No. 2.

8            (The photographs received in evidence as Amicus U.S.

9    Exhibit No. 2.)

10           MR. PORTER:  So you have two pages here.  The

11   second page is actually the tray that is at the wreck site

12   now.  This is the tray that was placed in 2004.  It was

13   placed on the bow of the Titanic.

14           Based on information they have, it is no longer on

15   the bow.  Some other visit out there, it was removed, and

16   they believe it to be on the seabed near the bow.  So it is

17   not on the bow now.

18           THE COURT:  Was it removed naturally by the

19   currents?

20           MR. PORTER:  No.  I understand it was removed by

21   another site visit to it.  There are, what I understand is

22   various memorials and other people are going out to this

23   site, whether we would like that or not, but they do.

24   Occasionally, they have left memorials of some sort, and

25   another expedition removed all those from the bow, including

 1    this tray.

 2            This tray is, I'm told, is approximately -- it's

 3    difficult to tell -- this is actually a picture of it on the

 4    bow -- is approximately 12 by 18 inches in size and about 12

 5    inches tall.

 6            The picture on the front is the tray that they

 7    would propose to place.  Again, the picture is deceiving

 8    because this one actually looks smaller.  It is 12 by 12 by

 9    12.  It's easier to see in this picture the various pieces

10    of metal that are out there and the various pieces of

11    materials that are out there for them to study, study the

12    deterioration of the wreck.  What they would like to do is

13    place this one back on the bow.

14            This is an ongoing conversation with NOAA.  There

15    has not been a final determination yet.  Quite frankly, we

16    wanted to bring this to the Court's attention to discuss

17    with the Court to see if the Court had any concerns of it

18    impacting its jurisdiction by what they would like to do.

19            I will tell you that NOAA is strongly in favor of

20    this, this research, because it allows them to determine

21    what are steps to be done to preserve the wreck site, to

22    determine how this vessel is deteriorating.

23            Talking to Mr. Alberg this morning, he said he

24    spoke with a member of the park service that oversees the

25    *USS Arizona*.  They would love to have this kind of data, as

1    well, so that they can evaluate how best to preserve that

2    particular site.

3          So that's what they want to do on the trays.  They

4    believe the tray is near the bow.  They would like to

5    recover the tray that's there now, and they would like to

6    place this tray on the bow because they believe that's the

7    best location for it to sort of mimic the deterioration

8    that's happening to the ship itself, as opposed to on the

9    seabed because additional biodeterioration, or whatever, can

10   affect it on the seabed.  So on the bow itself.

11         THE COURT:  How would they do that?  With the arm

12   of the submersible?

13         MR. PORTER:  The submersible has an arm, and they

14   would drop it, I would imagine, very similar to what this

15   picture shows on the first one.  It appears that it's being

16   lowered onto the deck.  That's one of the areas of research

17   that they are very much interested in pursuing, NOAA is very

18   much interested in pursuing, quite frankly, believes that

19   this is the type of thing that 113, the guidelines, the

20   Memorial Act, all of this was designed to aid in the

21   research of this type of activity on the seabed.

22         The other thing that they would like to do involves

23   collecting some rusticle samples.  As Your Honor had pointed

24   out initially in 2000, the Court had issued an order barring

25   any kind of activity that impacted the ship itself, and then

1    later, and I believe it was R.M.S.T. that wanted to collect

2    rusticles that Ms. Johnston was involved with.  But the

3    Court issued an amendment to that order to allow the

4    rusticles to be taken for those kind of testing and samples.

5              That's what they would like to do again.  The way

6    they would do it is, again, using the arm of the

7    submersible, the arm would hold a small can or vessel of

8    some sort that would be placed underneath the rusticle, and

9    because these are very fragile, and I understand that the

10   rusticle itself, especially out the end, is almost like ash.

11   It's not like an icicle.  It's very fragile, that just by

12   touching the canister to it, a part of the rusticle will

13   fall into the canister.

14             That is how they would propose to gather 100 to 300

15   grams of rusticles for analysis.  There would be no scraping

16   of the vessel.  There would be no impact to the vessel

17   itself.  It would simply be by using this robot can and

18   hitting the rusticle and allowing it to fall into the

19   canister.

20             Again, both of these, well, all three if you count

21   picking up the tray and placing the new one, are all

22   activities that NOAA strongly encourages and is strongly

23   interested in to gain this sort of research, gain this sort

24   of information to allow it to understand what impacts are

25   happening at the wreck site.

```
 1              So we would certainly ask the Court's blessing to
 2     allow this.  Again, NOAA hadn't made a final determination,
 3     but we would certainly ask the Court's blessing to allow
 4     NOAA to consider authorizing a permit for this activity, as
 5     well.
 6              I believe that's all I had in the status report,
 7     Your Honor.  I reported on the bankruptcy, but I think
 8     that's fairly well-known now what the status of the
 9     bankruptcy is.  Mr. McFarland has filed a periodic report
10     with the schedules on that.
11              THE COURT:  The first tray was placed during the
12     2004 expedition?
13              MR. PORTER:  That's correct.  The idea is they
14     looked for about a 10-year time frame.  They haven't,
15     obviously, gotten back to get that one yet, but that's the
16     idea; let them sit for about 10 years, and then retrieve
17     them.
18              THE COURT:  Let me hear from Mr. McFarland, and
19     then I'll get back with you on the trays and the rusticles.
20              MR. McFARLAND:  Good afternoon, Your Honor.  Robert
21     McFarland on behalf of plaintiff, R.M.S. Titanic.  With me
22     at counsel table, Brian Wainger and Jessica Sanders, the
23     corporate secretary.  Would the Court like me to address at
24     this point Mr. Porter's report because we have grave
25     concerns over what we just heard.
```

1            THE COURT:  All right.  Well, why don't you express

2       your grave concerns.

3            MR. McFARLAND:  Thank you, Your Honor.  The Court

4       said a few minutes ago that perhaps the jurisdictional issue

5       or that the jurisdictional issue didn't seem to be directly

6       implicated right now.  I think with what I just heard NOAA

7       saying that they have issued at least a preliminary approval

8       under Section 113 for activities that absolutely affect my

9       client's salvage rights, and, from a broader perspective,

10      this Court's jurisdiction.

11           The 2004 expedition where that tray was left was

12      our expedition as salvor-in-possession, and Ms. Johnston and

13      Dr. Cullimore were there as part of the R.M.S. team by

14      permission.  The tray was placed by us, essentially.  The

15      right to remove it does not, at least at this point in time,

16      belong to NOAA.  The idea and the collection of rusticles

17      also is something that this Court granted permission to

18      R.M.S.T. to do as salvor-in-possession.

19           The activities that NOAA is saying here, that they

20      preliminarily approved, are activities that we weren't even

21      consulted about.  When EYOS's president wrote this Court in

22      August and provided a letter, the letter talked about six

23      dives for viewing.  It did not talk about gathering

24      rusticles.  It certainly did not talk about picking up the

25      tray.  It talked about nothing that would be invasive in any

1    sense at all.  We expected that we would be given a fuller

2    opportunity to comment.

3              The first we heard about this, about just the idea

4    that they wanted to pick up rusticles and that they wanted

5    to pick up the sample tray and replace it with a new tray,

6    was in the September 11th report from the government.  We

7    weren't consulted beforehand.  We haven't been consulted

8    since.  The letter that Mr. Porter handed as Exhibit 1, the

9    first time I have seen this is literally five minutes ago

10   when he gave it to me.

11             My client, at a minimum, putting aside for a second

12   the legal and constitutional issues, my client as

13   salvor-in-possession should have been consulted.  We have

14   been in communications with NOAA about all sorts of things,

15   including due diligence for the bankruptcy that I thought

16   that we are going to get to in a little bit.  But the idea

17   that NOAA thinks that they can issue an approval for this

18   operation, I think, impacts this Court's jurisdiction, and

19   it certainly impacts my client's rights as

20   salvor-in-possession.

21             I would ask this Court, to the extent that it's

22   necessary, to enjoin any type of EYOS expedition until we

23   get a whole lot further clarification and set idea of what

24   they are going to do and we are sure that it doesn't impinge

25   our salvage rights.

1          We have no notice of this, Your Honor.  I think it
2    absolutely impinges our salvage rights.  We are in no way
3    saying -- this Court knows, we have always promoted science
4    and education from the wreck site.  But we are the
5    salvor-in-possession, and we have rights, as this Court has
6    long recognized.  This Court is the one who ought to be
7    determining who can and who can't go down there and do
8    things.
9          Mr. Porter has said that the government's interest
10   under Section 113 were aligned with the Court's.  The
11   educational and scientific interest may be aligned, but I
12   don't think the jurisdictional interests are at all aligned,
13   and I think that's something that needs to be reviewed and
14   briefed with the Court.
15         But to come in here today for this status hearing
16   and to say we are issuing preliminary approval and we want
17   this expedition to go forth later this month without having
18   consulted my client, without having given this Court a full
19   opportunity, this should have been brought up to the Court
20   in August.
21         They just didn't come up with this idea last week
22   that they were going to do these things.  But the letter of
23   August 23 to this Court, I don't think, mentions those two
24   activities.  It talks about simply viewings.
25         THE COURT:  I agree.  The letter that the Court had

1    at the last hearing talked about viewings, and I think we

2    briefly discussed that.  I can't give it to you word for

3    word, but I know that we discussed that it was viewing and

4    that there would be submersibles which were going down.

5         I have not had an opportunity to fully review

6    Exhibit 1 that we just saw, the September 17th letter.  I

7    understand your concern about the trays, the retrieval, the

8    research, and the rusticles, but, perhaps, we can determine

9    a way to address it at the end of the hearing.

10        MR. McFARLAND:  We would be happy to, Your Honor,

11   and, perhaps, the Court would like us to provide some

12   briefing on this, at least provide our opinion in writing.

13   I don't fault Mr. Porter, but I've got some issue when this

14   is sprung on us at this hearing for the first time.

15        THE COURT:  I'll let you respond in a minute,

16   Mr. Porter.  I'm not going to make any determinations yet.

17   I have some suggestions and some ideas about how we can

18   proceed on those issues, and I will let you both address

19   them at the appropriate time.

20        So why don't you go ahead with your bankruptcy

21   report.

22        MR. McFARLAND:  Thank you, Your Honor.  Your Honor,

23   we were here last on August 21st, and a great deal has

24   happened in the bankruptcy proceedings and in this Court

25   since then.  So let me update the Court and give a synopsis,

and then I'm happy to address any questions the Court would have.

In terms of, the Court noted that there have been a number of periodic and status reports that have been filed since that August 21st hearing, and then the bankruptcy court held its hearing on August 30th. That was an evidentiary hearing at which it addressed the equity committee's dissolution proposal, the unsecured creditors committee's dissolution proposal, and the debtor's motion for order approving competitive bidding and sale.

At that hearing there were some significant developments, Your Honor. First off, the Stalking Horse Purchaser, PAH, increased its offer to $19 and a half million, and increased the breakup fee from 1 million to $1 and a half million.

At the same hearing, the largest unsecured creditor, 417 5th Avenue Real Estate, LLC, indicated that it would not support either of the other plans of the equity committee or the unsecured creditors.

After that the equity committee withdrew its plan, and on September 6th, the museum and the unsecured creditors committee asked that their plan be held in abeyance. Then the Court issued its order on September 11th, bankruptcy court issued its order on September 11th, which approved, and the majority barred the competitive bidding procedures

1    under the APA, did not approve the equity committee's

2    disclosure plan, and held in abeyance, at its request, the

3    UCC and NMM's plan, and it scheduled a sale hearing, Your

4    Honor, for October 18th of 2018 to approve a purchase of the

5    premier assets and the stock of R.M.S.T.

6            The bankruptcy court issued a supplemental order on

7    September 13th which further set forth the schedule and

8    procedures, and we now have a timeline, Your Honor, which by

9    October 5th, bidders must be qualified.  In other words,

10   anyone who wants to now bid, in addition to the Stalking

11   Horse Purchaser, has to submit their credentials,

12   qualifications, and they will be approved or not approved by

13   October 5th.

14           If there is to be an auction, in other words, if

15   someone else qualifies, that will be held on October 11th,

16   and then the bankruptcy court has scheduled its hearing for

17   approval of the sale on October 18th.  Critically, the

18   Stalking Horse Purchaser has the right, as Your Honor knows,

19   it wants this Court to approve the sale.

20           So it has stated that that approval needs to be

21   done, they would like it to be done by October 31st of 2018.

22   That's a date, Your Honor, that is driven by my client's and

23   the debtor's financial position, which, as we provided the

24   transcript to the Court from the hearing on August 30th, the

25   financial position of the company is, by their own

1    admission, dire.  There is not enough financial resources to

2    go past the first of the year, most likely, and right now,

3    the largest reason the company is proceeding is because

4    professional fees are not being paid.

5         So timing is everything, Your Honor, and we

6    recognize that we come to this Court, and we are asking for

7    a somewhat expedited process in the sense of having a sale

8    approved by the bankruptcy court on October 18th, and then,

9    with the Court's permission and given the Court's schedule,

10   having a hearing before Your Honor for the admiralty, what

11   is called in the bankruptcy proceedings, the admiralty court

12   order approving the sale by October 31st.

13        THE COURT:  What if the sale doesn't go through on

14   October 18th?

15        MR. McFARLAND:  If the sale doesn't go through on

16   the 18th, if the Stalking Horse Purchaser should somehow not

17   be approved, then we would not be coming to Your Honor,

18   obviously, and I think that would mean that things are in a

19   much different situation.

20        THE COURT:  I understand.  I will arrange for a

21   hearing between the 18th and the 31st.  That's something

22   that I will do, and I can certainly fit that into my

23   schedule.

24        MR. McFARLAND:  We appreciate that, Your Honor.

25        THE COURT:  Where does the museum stand in all of

1    this?

2          MR. McFARLAND:  I don't think the museum has any

3    standing anymore, Your Honor.  It was part of the unsecured

4    creditors committee's plan, although I note that the

5    unsecured creditors committee did not officially move to

6    intervene in this action.  But the museum was part of the

7    unsecured creditors committee's plan.  That plan, by their

8    own request, is held in abeyance, meaning that plan is not

9    something for the Court to consider at this point in time.

10         Should the museum want to submit a bid and do the

11   qualifications for a bid so that it could participate in the

12   auction on October 11th, that would be a different story.

13   But so far they haven't shown any inclination for that, and

14   I think they would have to admit, both publicly and

15   privately, that they can't be part of a bid process.  They

16   don't have the financial commitment to do it, and that's not

17   how they are going to participate.

18         But if they change their mind, and they want to

19   qualify as a bidder and go forth in an auction, and they

20   were to be the successful bidder, and assuming they were

21   approved by the bankruptcy court, then we would be before

22   this Court between October 18th and October 31st and

23   presenting that to the Court.

24         I think it highly, highly unlikely, and at this

25   point in time I don't see a standing for the museum, at

1   least in these proceedings.  In that sense, and I don't want

2   to jump if the Court would prefer me to wait, but the equity

3   committee has withdrawn their motion to intervene in this

4   proceeding, and the museum has asked that their motion

5   essentially be held in abeyance.  I don't know why it would

6   be held in abeyance.  I think it should be dismissed without

7   prejudice, and then if something changes and they want to

8   come back in the proceedings, so be it.

9        But at this point in time in this court they have

10  no injury, they have no standing.  I also want to say this,

11  though, Your Honor, to show the Court how seriously we take

12  this in what we are doing, we received from the government

13  and NOAA their, essentially, what it would be, I think fair

14  to call it, due diligence listing of information they would

15  like.  We have reviewed it and begun discussions with NOAA

16  and will respond to them fully, and we are doing everything

17  we can, Your Honor.  I think much of the information that

18  NOAA's requested is information that this Court would want

19  itself, and we would provide to the Court.

20       But I say all this because I think the Court

21  appreciates, but I want to emphasize how serious this is to

22  the debtors.  We are in a difficult, difficult financial

23  situation with approximately 120 employees waiting to see

24  what will happen here.  So, financially, company-wise,

25  morale-wise, if there is going to be a sale approval and an

```
 1    admiralty court approval, it's not just that sooner is
 2    better than later, Your Honor, it's that sooner is required
 3    so that there is a viable company for the purchaser to
 4    proceed with.
 5         THE COURT:  Where are R.M.S.T. and the Stalking
 6    Horse Purchaser in their discussions with NOAA on their
 7    position?  Have you completed those?  Are you still in
 8    discussion on the transaction?
 9         MR. McFARLAND:  There have been back-and-forth
10    communications on the transaction in terms of the documents
11    themselves.  As I say, we got the due diligence list last
12    week, I believe.  It could be off, the 10th or 11th.  We
13    have already, both internally and in communications with
14    NOAA, said, let's talk about this further and work on it,
15    and we will do what we can to satisfy them consistent with
16    our rights and obligations.
17         THE COURT:  All right.  Because the Court is
18    certainly going to listen to NOAA when it comes to any final
19    approval by this Court.  So I would pay close attention to
20    what is required through due diligence here.
21         MR. McFARLAND:  We are, Your Honor.  We appreciate
22    that.  We recognize NOAA's role in that sense under the
23    covenants and conditions.  The first thing that I got up to
24    speak about, I think, is a different role, Your Honor.  I
25    don't want to beat it but so much.
```

```
1          THE COURT:  We are going to come back to that.  I
2   just wanted to be sure, because, obviously, on the
3   rescheduled hearing, the Court is going to listen to what
4   NOAA has to say before giving any approval of this Court for
5   the sale, if that's the juncture that we land at.
6          MR. McFARLAND:  We understand, Your Honor.  That's
7   why we are working with them.  Once we got that letter, we
8   immediately started on the due diligence aspects.  This is a
9   transaction that, with all due speed, is putting it mildly
10  if we can.
11         THE COURT:  Thank you.
12         MR. McFARLAND:  Thank you, Your Honor.
13         THE COURT:  Before we move on or move back to,
14  basically, the rusticles, the trays, and the EYOS activity
15  that is upcoming, Mr. Powers is here, so let me hear from
16  him just in terms of where the museum stands, I'll just call
17  them the museum defendants, museum party, proposed
18  intervener.
19         MR. POWERS:  Yes, Your Honor.  With one point of
20  clarification, I don't think it's accurate necessarily, as
21  Mr. McFarland described the situation, as one where we don't
22  have the means.  I think the big hang-up under the terms is
23  that we have to provide a non-refundable deposit, and that's
24  something that the museum is not prepared to do any more
25  than the Smithsonian Institution would be ready to do
```

 1    something like that, Your Honor.

 2         It's always been our position that we want to be

 3    ready to jump in in the event that the stalking horse sale,

 4    for any number of reasons, may not go through.  It may very

 5    well be that this Court takes it under consideration when

 6    they eventually come here, and there may be concerns that

 7    this Court has.

 8         But what we have always tried to do is be in a

 9    position so that if it does not go through, we are ready to

10    respond immediately, Your Honor.  Your Honor, when we were

11    last here on August 21st, you were gracious enough to allow

12    Mr. Quartaro to speak before the Court.  With the Court's

13    permission, I'd ask that he be allowed to speak right now.

14         THE COURT:  Let me ask you two things:  In other

15    words, you are asking this Court to hold your motion to

16    intervene in abeyance?

17         MR. POWERS:  Yes, Your Honor.  I believe, and I

18    certainly don't speak for the government, but I think the

19    government's position is they really don't have a position

20    on that.

21         THE COURT:  I am going to hold it in abeyance.  I'm

22    not going to put you to the expense of refiling all of this.

23    That's just an inappropriate use of judicial and legal

24    resources.  So everybody has filed their papers with the

25    Court, and I look at the NMM, the National Maritime Museum,

```
1    as a potential intervenor.  You have a fully briefed motion
2    to intervene filed before the Court, and, if appropriate,
3    the Court will grant intervention or not.  I haven't reached
4    that point.  I will hold it in abeyance pending the sale
5    proceedings, and certainly you should be here at whatever
6    proceedings the Court has between, I believe it is October
7    18th and October 31st.
8              MR. POWERS:  Thank you, Your Honor.
9              THE COURT:  Because that will be when this Court is
10   making decisions as to whether it is going to accept the
11   Asset Purchase Agreement and the final sale, and I haven't
12   heard from NOAA on that, and I understand your position; you
13   can't put up a non-refundable deposit, as any museum would
14   not be able to, but that you are still ready, willing, and
15   able to participate in the purchase.
16             MR. POWERS:  Absolutely, Your Honor.
17             THE COURT:  All right.  Who do you want to speak?
18             MR. POWERS:  Mr. Quartaro, you were kind enough to
19   allow him to address the Court.
20             THE COURT:  Very briefly, yes.
21             MR. POWERS:  Very briefly, Your Honor.  Thank you.
22             MR. QUARTARO:  Well, thank you again, Your Honor,
23   for that indulgence and for allowing us to address the Court
24   while our motion is going to be held in abeyance, and we
25   thank you for that as well.
```

1           I did just want to clarify a couple of things.

2     During the bankruptcy hearing, obviously, there was a deal

3     made prior to that hearing.  This wasn't something that

4     appeared to have emerged during the course of the

5     proceedings before Judge Glenn, but was, rather, something,

6     of course, that was agreed prior to that and to merge during

7     the hearing.  So, of course, that didn't put the museum in a

8     position that it could readily respond to that.

9           Also, the National Maritime Museum has not proposed

10    the dissolution plan.  They have proposed the plan of

11    reorganization that would allow them to acquire what the

12    Court has called the STAC or the Titanic collection, and it

13    may well be that that winds up proceeding under a variety of

14    circumstances, which may well include either NOAA's finding

15    that the proposed transaction does not pass muster or this

16    Court's finding in that direction.

17          For that reason, we asked the bankruptcy court to

18    hold our plan off to the side while this process runs

19    because, as Mr. Power has identified, we are a public

20    institution.  We simply can't put a million, a million five,

21    into a non-refundable deposit in a bankruptcy auction.  So

22    while I appreciate R.M.S.T.'s optimism that, perhaps, that

23    structure will change and that the National Maritime Museum

24    will somehow then be able to participate in this auction,

25    structurally that's unlikely.

1          We would be interested, as well, and we are happy,

2     of course, to talk to Mr. Porter and his colleagues about

3     it.  I think we would be very interested in seeing this due

4     diligence list.  I think, as we probably made clear and as

5     the Court has probably surmised, our view is that a transfer

6     of this collection to any other entity is a transfer that

7     probably ought to merit a full review.  Is that new entity a

8     qualified institution?

9          Now, NOAA and R.M.S.T., of course, are going to go

10    back and forth on whether or not the stock sale or the

11    proposed stock sale to the Stalking Horse Purchaser fits

12    within one category of the covenants and conditions or,

13    perhaps, another, but that's our overwhelming concern.

14          What we want to stay in here for and want to stay

15    before the bankruptcy court for, is we want to be there to

16    try and acquire this collection, if for some reason this

17    piece does not go forward.  Moreover, we want to acquire the

18    entire collection to keep it together, which we think really

19    is the overwhelming purpose, not just of the Court's

20    position, of NOAA's involvement, and of the covenants and

21    conditions.

22          So we thank the Court very much for what sounds

23    like the granting of our request to hold our intervention in

24    abeyance.

25          THE COURT:  That's part of what I indicated, and

1    I'm not going to dismiss it without prejudice.  I'm going to

2    hold it in abeyance pending further proceedings of the

3    court.

4           MR. QUARTARO:  Well, thank you, Your Honor.  We are

5    concerned, as Mr. McFarland has identified and his

6    bankruptcy counsel has identified in Florida, that the

7    company's financial prospects are dwindling and dwindling

8    quickly.  So if there is any sort of issue with this

9    proposed transfer, we will all have to move quickly, Your

10   Honor.  Having those papers already before the Court, I

11   think, will facilitate that.  So unless the Court has

12   questions for me, I think those are really the update points

13   that I wanted to make.

14          THE COURT:  Thank you, Mr. Quartaro.

15          MR. QUARTARO:  Thank you, Your Honor.

16          THE COURT:  Then I think where we are now is you've

17   given the Court the full picture of the bankruptcy

18   proceedings and the status thereof.  At the conclusion of

19   the hearing, I'll ask you to meet with the calendar clerk,

20   Ms. Cherry, and set a hearing contingent upon there being an

21   approved sale by the bankruptcy court on October 18th, and,

22   obviously, at the next hearing I will want to hear in detail

23   from NOAA, and if appropriate, from the potential

24   intervenors, and obviously from R.M.S.T. and everyone's

25   position in regard to where the bankruptcy proceedings are

1    at that point in time, which could be quite different than

2    they are today.  Today is September 18th, and that's a month

3    from today, where everything could be in a completely

4    different posture.

5            For right now, I believe there are only two

6    remaining issues for today, unless there is something else

7    you want to bring to the Court's attention.

8            MR. PORTER:  Your Honor, let me just, if I may,

9    there was discussions of the due diligence.  I'd like to go

10   ahead and tender a copy of that letter to the Court, if I

11   may, as an exhibit, since there has been some discussion of

12   that.

13           THE COURT:  That will be your Amicus United States

14   Exhibit No. 3.

15           (The document was received in evidence as Amicus

16   U.S. Exhibit Nos. 3.)

17           MR. PORTER:  Just one thing I want to make very

18   clear on this.  While we are engaging in this discussion

19   with R.M.S.T., the Court should be aware we are not

20   prejudging anything in this matter, even if the museum

21   comes.  Obviously, from NOAA's perspective, as we have said

22   in prior pleadings, the museum presents a very attractive,

23   laudable proposal that's in the public interest, but it

24   needs to be before the Court as something for us to review.

25   If it does come before the Court, we will be happy to

```
 1   exercise the same kind of diligence we are on this one.  We
 2   are just trying to get ahead of this as much as we possibly
 3   can.
 4            THE COURT:  I understand.  In other words, we first
 5   have to see what happens on October 18th, and then we will
 6   have to move from there to see what NOAA's position is, what
 7   the Court's position is.  Then after that, whatever the next
 8   step may be.
 9            MR. PORTER:  That's correct.
10            THE COURT:  I believe the two issues are this issue
11   of the trays and the rusticles.
12            MR. PORTER:  Right.
13            THE COURT:  As I read your report, I think
14   expedition by EYOS is scheduled sometime toward the end of
15   this month into October?
16            MR. PORTER:  I believe the 29th of September, Your
17   Honor, is when that expedition is scheduled, and it's
18   scheduled to last about seven to ten days, I believe.  One
19   thing I would like to clarify, we brought up the EYOS
20   expedition as early as July in status reports.  So this is
21   not a surprise to R.M.S.T.
22            The last time, I believe it was the last time or
23   maybe two times ago at a hearing, we concluded the hearing
24   with the Court directing R.M.S.T. to contact EYOS to provide
25   the letter to the Court.
```

1          In fact, Ms. Rolleri contacted EYOS several days
2   after that and encouraged them to file the letter.  They
3   have had every opportunity to talk to EYOS about what EYOS
4   wanted to do in these expeditions for at least two months.
5   So the idea that this is an absolute surprise, certainly as
6   to the rusticles and trays, the reason that was not in our
7   August status report is because this wasn't raised with us
8   until the first part of September.
9          THE COURT:  Well, it's the first time the Court has
10   heard about it.
11          MR. PORTER:  I agree.
12          THE COURT:  So everyone has known about the EYOS
13   expedition, but the details of it, such as getting the
14   rusticle samples, retrieving a tray, and putting another
15   tray down, were not before the Court.
16          MR. PORTER:  That is absolutely true.  That is
17   information we first learned that they wanted to do in early
18   September.  It is also, just to be clear, that the
19   authorization that is before the Court does not include any
20   of that.  It does not include picking up the old tray or
21   putting down a new tray or removing rusticles.
22          It includes only the very initial letter that they
23   asked, which is to go and do standard definition
24   photographs.  Quite frankly, with respect to the allegation
25   that that interferes with salvage rights, I believe there is

1   an opinion by the Fourth Circuit that the Court can't

2   prevent visits to the wreck site that don't interfere with

3   salvage.

4           THE COURT:  I understand that.  The Court has

5   allowed that.  Visits to the wreck site, photographs of the

6   wreck site.

7           MR. PORTER:  Correct.

8           THE COURT:  That is entirely different from a

9   salvage operation.  When you remove the rusticles, that is

10  salvage, in the Court's opinion.  I understand the

11  scientific value of it.  So not that I view it as a totally

12  negative activity, which I don't, actually, it still does

13  involve salvage.

14          I understand that any entity that's prepared and

15  can afford to and make the arrangements to go down there,

16  can certainly take pictures of the wreck site and look at

17  it.  It's when you start taking parts of it, it's when you

18  start engaging in salvage operations, it's a different

19  matter.

20          MR. PORTER:  I don't disagree with Your Honor, and

21  that's why we wanted to bring it to your attention and why

22  the authorization does not encompass any of those things.

23          THE COURT:  All right.  I'm going to get my

24  calendar so that I can assist with the scheduling of a

25  couple of things.  This gives you not quite 10 days.  I'm

JODY A. STEWART, Official Court Reporter

1    going to direct that R.M.S.T. and NOAA endeavor to prepare

2    an order that you can both agree to in terms of the trays

3    and in terms of the rusticles.

4          In other words, R.M.S.T.'s salvage rights are

5    intact if they, as salvor-in-possession, agree to allow this

6    to go forward and the Court enters an order allowing it to

7    go forward without there being a permit.

8          So I would view the best solution to this

9    situation, without getting into constitutional issues, is to

10   have an agreed order which the Court can issue, or if NOAA

11   doesn't agree to it, then for R.M.S.T. to present it to the

12   Court.  I don't see any potential damage to the wreck site

13   or any salvage operation that is going to have a major

14   interference with R.M.S.T.'s salvage rights, other than in

15   principle.

16         In other words, you allow a little bit of an

17   exception, and that leads to a bigger exception.  That's the

18   only danger that I see at this juncture.  I understand that

19   you're vigorously defending your salvage rights and an order

20   would give you the jurisdiction of this Court to enforce

21   those salvage rights.

22         However, this is not approving a major salvage

23   operation by a competing entity.  It would be an approval of

24   allowing for scientific research, the removal of a tray

25   that's been down there, that you participated in, to come

1    back up and to place a new tray down, with the understanding

2    that you would have access to any of the research

3    conclusions.  You have allowed the tray to go down, it's now

4    being picked up, it's now going to be analyzed, and you're

5    going to let them agree to another tray to go down.

6          I would see that as beneficial to the study of

7    bio-deterioration rates.  That would be beneficial not only

8    to the Titanic salvage operation but to the scientific

9    world, in general, when it comes to these bio-deterioration

10   rates.  So I see it as a positive thing that you would be

11   agreeing to, not a detrimental activity to your salvage

12   operations.

13         Then, secondly, rusticles have been allowed before

14   to be taken, in the amount that they want, which I do not

15   view as a major amount of rusticles from this vessel, you

16   would agree to that, and, likewise, to be privy to any

17   research or conclusions that are drawn from the taking of

18   those rusticles.  If it needs to be under seal, you could

19   come to the Court to have the results of that put under

20   seal.

21         It would seem to me that the best solution at this

22   juncture is to come up with an agreed order so everybody's

23   in agreement, and we are not at issue at this point over who

24   has jurisdiction.  The Court enters it, and there is no

25   question that it can go forward at this juncture, and the

1     other is the photographs that have always been allowed.

2            If for some reason you cannot agree and get an

3     order before the Court, then R.M.S.T. can present its own

4     order.  Whether I decide to enter or not enter it, we will

5     set a tentative hearing for Friday, the 28th of September

6     here.  We will set a hearing on Friday, the 28th, but I'm

7     hoping that you can get an agreed order.

8            It seems to me with everything else you've got

9     going on that an order makes more sense for both sides,

10    because NOAA's got a lot to do to review this sale and the

11    sale agreement, and R.M.S.T. has a lot to do to get this

12    sale through and to protect its employees.  It would seem to

13    me that this is not something that you want to spend a lot

14    of time on at this point, if a proper order can be entered

15    by the Court.

16           The other thing I would say, I have not reviewed

17    your letter that you've presented, and if the Court has any

18    objection to it, I will write and let you know and let

19    everyone know, and likewise, if R.M.S.T. has any objection

20    to it.  In other words, this is the letter of September

21    17th, 2018 -- that's the date stamp on it -- to Mr. McCallum

22    and Dr. Gallaudet, the Assistant Secretary of Commerce for

23    NOAA.

24           So I will review this.  I've admitted it as an

25    exhibit.  If the Court has any objections, I will let you

1    know on or before the 27th.  If you don't hear anything from
2    me, it means that I'm in agreement with the letter.  I will
3    only write you if I'm in disagreement, and I would do that
4    on or before September 27th.
5            Also, on or before September 27th, I would expect
6    you to present an agreed order, and if not, then for
7    R.M.S.T. to present an appropriate order.  If I can't agree
8    to enter the order, then we will have this back-up hearing
9    set.
10           MR. PORTER:  Your Honor, just to clarify one thing
11   on the tray.  I don't know that it matters for today's
12   purposes, but it was not R.M.S.T.'s tray, it belonged to the
13   researchers that were participating.  NOAA was participating
14   in that, as well.
15           THE COURT:  I understand, but it was part of their
16   expedition.
17           MR. PORTER:  That's correct.
18           THE COURT:  They agreed to let it go down.
19           MR. PORTER:  That's correct.
20           THE COURT:  It never came to the Court.  I don't
21   recall anybody asking me about a tray, but there's been a
22   lot that's gone on in this case.  I know about the
23   rusticles, but I don't remember anyone asking me about
24   placing a tray.  So I just assumed it was something you all
25   were able to agree to at the time, and I would think you

1    could agree to it now.

2          On September 28th we can set a hearing tentatively,

3    it will have to be at 1:00 because I have matters that

4    morning.  I have an 11:00 matter that could take a little

5    bit of time, so we will set the continued hearing on the

6    rusticles, the trays and the letter for September 28th at

7    1:00, if necessary.

8          It looks like the Court has free time on October

9    25th and October 26th, and I'll let Ms. Cherry set that

10   hearing date and time with you following the conclusion of

11   this hearing, and that will give you sufficient time to

12   review and take care of whatever negotiations everyone needs

13   to get in place.

14         Mr. Porter, is there anything further for the Court

15   to take up today?

16         MR. PORTER:  Nothing further from us, Your Honor.

17   Thank you.

18         THE COURT:  I also note that Ms. Rolleri is here

19   for NOAA, and that Mr. Troy is here for the Department of

20   Justice.

21         Mr. McFarland, is there anything further that you

22   would like taken up today?

23         MR. McFARLAND:  No, Your Honor.  Thank you.  We

24   appreciate the Court's willingness to schedule a hearing

25   before the 31st.

```
 1            THE COURT:  All right.  Then the Court stands in
 2  recess until tomorrow.
 3            (Hearing adjourned at 2:03 p.m.)
 4                      CERTIFICATION
 5
 6       I certify that the foregoing is a correct transcript
 7  from the record of proceedings in the above-entitled matter.
 8
 9
10            X_____/s/_____x
11                    Jody A. Stewart
12            X_____9-19-2018 _____x
13                      Date
14
15
16
17
18
19
20
21
22
23
24
25
```