## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**R.M.S. TITANIC, INC.,**
**successor-in-interest to**
**Titanic Ventures, limited partnership,**
         **Plaintiff,**

**v.**                                     **Civil Action No. 2:93cv902**

**THE WRECKED AND ABANDONED VESSEL,**
**ITS ENGINES, TACKLE, APPAREL,**
**APPURTENANCES, CARGO, ETC., LOCATED**
**WITHIN ONE (1) NAUTICAL MILE OF A POINT**
**LOCATED AT 41 43' 32'' NORTH LATITUDE**
**AND 49 56' 49'' WEST LONGITUDE,**
**BELIEVED TO BE THE R.M.S. TITANIC**
**in rem,**
         **Defendant.**

## NOAA'S REPORT AND RECOMMENDATION
## REGARDING RMST'S MOTION TO APPROVE ASSET
## PURCHASE AGREEMENT AND TO AUTHORIZE THE SALE OF
## 100% OF RMST'S STOCK TO PREMIER ACQUISITION HOLDINGS LLC.

The United States, as *amicus*, and on behalf of its National Oceanic and Atmospheric

Administration ("NOAA") which represents the public interest in *Titanic*,[1] and pursuant to

Section VI of the Covenants and Conditions ("C&Cs") submits this report with recommendation

to the Court regarding RMST's request to approve the sale of 100% of its stock to Premier

Acquisition Holdings LLC ("PAHL").

---

[1] NOAA is the federal agency that represents the public interest in the Titanic Collections and exercises oversight functions in relation to the C&Cs. C&Cs (II)(K). NOAA's role in representing the public interest in this matter is consistent with NOAA's authority under the 1986 RMS Titanic Maritime Memorial Act, NOAA's 2001 Implementing Guidelines, the Agreement Concerning the Shipwrecked Vessel RMS Titanic, and Section 113 of the Consolidated Appropriations Act, 2017.

## I.      INTRODUCTION

RMST has negotiated an exit from its bankruptcy proceedings in the Middle District of

Florida that includes a sale of 100% of RMST's stock to PAHL, the Stalking Horse Purchaser,

pursuant to an Asset Purchase Agreement ("APA").[2]  RMST asserts that, other than changing the

parent company, nothing about the transaction will change the corporate structure of the

company, its care and management of the artifacts, or its relationship with this Court via the

C&Cs.  ECF No. 448 at 12.  Accordingly, it requests that the transaction be approved, and the

sale to PAHL be authorized.

Pursuant to the C&Cs, the procedures for designating a subsequent Trustee of the

artifacts "do not apply . . . in situations where the corporate identity of the Trustee is changed or

altered by sale, purchase, merger, acquisition, or similar transaction, the form and purpose of

which does not effectuate a change in the management, conservation and curation of the STAC

[Subject *Titanic* Artifact Collection]."  C&Cs VI(E)(1).  For the reasons set forth below, and

contingent upon certain further commitments from RMST and PAHL, NOAA recommends the

Court approve the transaction.[3]

---

[2] No other qualified bidders submitted bids as of the deadline imposed by the bankruptcy court (October 5, 2018), thereby eliminating the need for an auction.  On October 18, 2018, the bankruptcy court approved the sale of the assets to the Stalking Horse Purchaser, consistent with the Asset Purchase Agreement, subject to the further approval by this Court.  The bankruptcy court's order, entered October 19, 2018, was provided to this Court via RMST's October 22, 2018, Periodic Report.

[3] In addition to the undersigned, the following individuals were among those reviewing this matter for purposes of NOAA's recommendation:  Jackie Rolleri, Attorney-Advisor, Oceans and Coasts Section, Office of the General Counsel, NOAA; David W. Alberg, Superintendent, Monitor National Marine Sanctuary, NOAA; and Russell W. Craig, Associate Chief, General Litigation Division, Office of the General Counsel, U.S. Department of Commerce.

## II.    BACKGROUND[4]

If the transaction is approved, RMST will become a wholly owned subsidiary of new

corporate parent Premier Acquisition Holdings LLC ("PAHL"), a Delaware limited liability

company with its principal place of business expected to be in Atlanta, Georgia.  PAHL is owned

by Apollo Credit Strategies Master Fund, Alta Fundamental Advisors SP, LLC, and PacBridge

Partners I Investment Co., Ltd., each of which are 1/3 owners of PAHL.  Apollo and Alta are

New York based companies; PacBridge is based in Hong Kong.  PAHL will have five directors:

Gilbert Li (Alta's Managing Partner) and Robert Givone (Apollo's Managing Director), both of

New York; and Giovanni Wong (PacBridge Principal), a Canadian national living in Hong

Kong.  The remaining two directors of PAHL have not been identified.

Because the transaction is structured as a 100% stock sale, and not an asset purchase,

RMST asserts that it will continue to exist, essentially unchanged, as a separate subsidiary within

the new parent company, and will still be incorporated in Florida with its principal place of

business in Georgia.  The APA supports that assertion.  *See* APA § 3.17(c) (The transaction "will

not change, modify, amend or impair RMST's status as Trustee or Qualified Institution of the

[STAC] and all rights, interests and privileges of RMST in the Revised Covenants and

Conditions shall remain in full force and effect following the Closing.")  The assets of other

companies under the current corporate parent, Premier Exhibitions, Inc. ("PRXI"), including

---

[4] This "Background" section is based upon review and consideration of:  RMST's written and documentary responses to the undersigned's letter dated September 14, 2018 (filed as Exhibit 3 during the September 18, 2018, hearing), and a follow-up letter dated October 12, 2018; conversations between NOAA representatives and counsel for RMST; NOAA's site visit report dated March 7, 2017, and RMST's written response to questions posed therein (Exhibits 1 and 2 to RMST's April 21, 2017 Periodic Report).  The last of the documents and responses were received by NOAA on October 22, 2018.  RMST has stated that it have copies of the documents submitted to NOAA for purposes of its review available for the Court.

Premier Exhibition Management ("PEM"), will be acquired by PAHL, but those companies will no longer exist following the transaction.[5]

The makeup of RMST's Board post-transaction, or whether any members of the current Board will carry over, is not fully settled.[6]  RMST states only that its new Board post-transaction will include "some or all of the members of the PAHL Board."  RMST further indicates that the "expectation" is that its current Senior Management team[7] will also remain in place post-transaction, and that it anticipates making offers to this team, subject to further consideration of "these and similar operations-related considerations" post-transaction.  RMST was not able to state whether any such offers had been made to date.

RMST also represents that it agrees to the following:

-   That, as the Trustee, RMST would continue to be subject to the *in personam* jurisdiction of this Court for oversight and enforcement of the C&Cs;

-   That, "consistent with past practice," RMST would continue to abide by the C&C's provisions concerning the management, conservation and curation of the *Titanic*

---

[5] PRXI is the lessee of the company's Atlanta, Georgia facility, and PEM is the lessee for the location of the permanent exhibitions in Las Vegas (Luxor) and Orlando (International Plaza).  Each of these leases provides for the successor, PAHL, to assume the benefits and burdens of the leases, and the Asset Purchase Agreement provides for PAHL to assume "all obligations and liabilities of the Sellers."  PEM also has an intra-company agreement with RMST for PEM to perform certain services, to include exhibition management services and "all necessary and customary conservation and preservation work on the *Titanic* Artifacts . . . in accordance with any applicable covenants and conditions . . . ."  ECF No. 383 (Ex. C).  The APA contemplates and RMST has confirmed that all existing contractual relationships will continue until closing, at which time the obligations will be assumed by PAHL.  APA §§ 1.1(a)(vi), 5.1(a).  For consistency, this report will refer to RMST as the lessee even though the actual lessee may be PRXI or PEM currently, and PAHL should the transaction be approved.

[6] RMST's current Board consists of Daoping Bao, Executive Chairman; Mark Bains, Audit Chairman; Douglas Banker, Director; Guo Ding, Compensation Committee Chair; Sid Dutchack, Governance and Nominating Committee Chair; and Rick Kraniak, Director.

[7] The current Senior Management Team consists of Daoping Bao, President and Chief Executive Officer; Jerome Henshall, Chief Financial Officer; and Jessica Sanders, Corporate Secretary.

Collections (as defined in the C&Cs)[8] in accordance with internationally recognized

museum standards and practices, and the C&Cs; and

- That, "consistent with past practice," RMST would continue to abide by the

"applicable provisions" of the C&Cs regarding NOAA's oversight of its operations

and continuing access to the *Titanic* Collections.

*See also* APA §§ 3.17(a) and (b) (acknowledging RMST's compliance with the C&Cs and its

status as the Trustee and a Qualified Institution); § 3.17(c) (noting that the transaction "will not

change, modify, amend or impair RMST's status as Trustee or Qualified Institution" and that the

C&Cs "shall remain in full force and effect following the Closing.")  RMST also indicates that

"PAHL acknowledges that it is [] 'on notice of the restrictions contained' in the C&Cs [and]

intends for NOAA to consider this document [RMST's October 22, 2018 due diligence response]

a formal acknowledgment of such notice, and PAHL's intent for RMST to continue to operate in

conformance with the C&C's as they apply."

NOAA asked several questions concerning RMST's commitment to maintaining the

*Titanic* Collections together as an "integral whole for posterity."  RMST indicates that it would

"continue to maintain the *Titanic* Collections in accordance with the C&Cs . . . consistent with

past practice," and that it has no "current plans to sell or disperse the French Artifacts."

RMST continues to maintain its Atlanta-area facility, which was the subject of a site visit

on January 9, 2017.  RMST's current lease extension for the Atlanta facility runs through March

31, 2019.  RMST indicates that it does not expect to relocate from this facility.  Based on

---

[8] The "*Titanic* Collections" is defined to mean "the total assemblage of the French Titanic Artifact Collection and the Subject Titanic Artifact Collection."  C&Cs I(H).

information provided, approximately 3,419 artifacts are located at the Atlanta facility, with an additional 1,006 pieces of coin and paper currency located in a bank vault in Atlanta.

At the time of the January 2017 visit to the Atlanta facility, NOAA concluded that the facility was "stable and in compliance with acceptable museum standards" for artifact storage and conservation.  RMST represents that there have been no changes to the facility since the site visit that would negatively affect its ongoing ability to secure, manage and conserve the artifact collection.  NOAA has not conducted an updated site visit, but has no reason to believe that the facility does not continue to be adequate for its purposes as documented during the 2017 site visit.  RMST indicates that under consideration for the post-bankruptcy period are proposals to update the collections database systems ($100,000) and renovate the storage system at the Atlanta facility ($250,000).  *See* APA § 5.1(b) (imposing limitations on capital expenditures during the "interim" period up to closing).

RMST maintains permanent exhibitions at the Luxor Hotel in Las Vegas, Nevada and the International Plaza in Orlando, Florida.  The Luxor lease, executed in March 2008, has a ten-year initial term, with two sequential five-year option periods.  By amendment, the original Luxor lease has been extended to April 30, 2019.  RMST indicates it expects to continue this lease. Approximately 346 artifacts are located at the Luxor exhibition venue.  The International Plaza lease, executed in September 2016, has a 24-month initial lease period, with a three-year option period, which has been exercised and now ends September 30, 2021.  Approximately 140 artifacts are located at the International Plaza exhibition venue.

RMST states that the responsibility for "overseeing security, operations and appropriate staffing of the [permanent] venue" sites rests with "venue management, and employees of RMST and PEM."  It is not clear whether the venues, the Luxor and International Plaza, have some role

with security, operations and staffing in support of the exhibitions.  The Lease agreements

provided by RMST do not appear to provide for such support and in some respects seem contrary

to such a conclusion.[9]  According to RMST, PEM separately employs "artifact specialists" who

monitor the artifacts on a daily basis and report any issues to the "venue management" and

RMST's collections staff.  Finally, RMST also states that a trained conservator visits the

permanent exhibition sites 3-4 times per year.  RMST, however, did not provide further

information about the security or staffing at the permanent exhibitions (or staff training); the

qualifications or identity of "artifact specialists" or any other staff; the nature of the daily

"monitor[ing]" at the venues; how RMST addresses artifact issues; or any specific criteria by

which oversight and management of the artifacts at the permanent exhibitions is accomplished.

     In addition to the two permanent *Titanic* exhibitions, RMST licenses four "traveling"

exhibitions, and has some artifacts on loan to a museum.  A total of approximately 1,385 artifacts

are housed at these six exhibition venues and the museum.[10]

     RMST's four "traveling" exhibitions are located at:  Baylor University/ Mayborn

Museum, Waco, Texas (approximately 152 artifacts; through January 2019); Yikon

Artspace/Lipont Place Richmond, British Columbia (approximately 132 artifacts; through

January 2019); Wuhan Hangu Art Gallery, Wuhan, China (approximately 301 artifacts; through

May 2019); and, JVS Group for exhibitions in Budapest, Hungary; Brno, Czech Republic;

Krakow and/or Gdansk, Poland (approximately 279 artifacts; end date TBD).  RMST represents

---

[9] *See e.g.* Luxor lease § 8.4(b) (noting that tenant is responsible for all security); § 8.16(A) (requiring that Tenant "shall staff the Premises with such number of Tenant's employees as are reasonably required for the proper and efficient operation thereof.")

[10] Two leather artifacts (a leather suitcase and a leather case) are presently with David Galusha, a textile conservator in Atlanta (see below), presumably for purposes of conservation (but RMST has not confirmed this fact).  In addition, six artifacts are located at McGuire Woods in Norfolk, Virginia to, according to RMST, "ensure the Admiralty Court's continuation of its constructive *in rem* jurisdiction."

that it surveys all venues prior to exhibition, and requires submission of a "Standard Museum Facilities Report" or "Fine Arts Insurance Venue Questionnaire" in order to ensure the venues "meet the necessary standards of exhibition and care required by the C&Cs." RMST provides on-site training at the venue for promoter personnel, and avers that a trained conservator visits the venues to observe the artifacts 1-2 times per year.

Each of the promoter agreements for these traveling exhibition venues includes a "Production Rider" which governs in significant detail the oversight of the artifacts while in the promoter's possession. The Rider includes provisions covering: security of the facility and display cases; environmental and climate specifications; labor and equipment requirements for installation and de-installation; payment for RMST personnel for installation and de-installation; and security and staffing requirements before, during and after the public exhibitions; and staff training. The Rider requires the promoter to identify (among other persons), a Head of Education; Head Curator; Head of Exhibits; Registrar; and Head of Security. The Curator (or curator staff) is required to verify the artifacts at the beginning and end of each operating day against an inventory log, and take and document temperature, humidity and light readings on a daily or weekly basis, which results are provided to RMST on a weekly basis.

Approximately 35 artifacts are held at the Ulster Folk and Transport Museum, Cultra, Northern Ireland, a part of National Museums of Northern Ireland, on a renewable loan agreement. The loan terms require the Museum "to take the same care of objects lent to it, in the matter of security and safe-keeping, as is taken of objects in its own collections."

Current staff at RMST's facility in Atlanta consists of Alexandra Klingelhofer, the Vice President of Collections, and three Registrars.[11] Ms. Klingelhofer is well qualified, and

---

[11] A Registrar typically has many responsibilities, including documentation and record keeping, tracking collections (including those on loan/exhibition), selecting artifacts for loan/exhibition, packing and shipping artifacts that will

possesses appropriate conservation-related credentials.[12]  Ms. Klingelhofer's portfolio of responsibilities is broad, and includes oversight of all conservation, care, curation and management of the *Titanic* Collections,[13] budgeting issues, and staff and contractor training and management.  RMST represents that it expects to continue to employ Ms. Klingelhofer and the other staff identified below.  The APA supports this contention.  *See* APA § 5.5(a) (requiring PAHL to offer employment to RMST's employees).

The Registrars (Laura Pasch, Jeffrey Taylor and Ivy Ying), according to RMST, each possess post-graduate degrees, "at least fifteen years of experience caring for historic artifacts and artistic collections, including metals and paper objects," and have the capability to perform all tasks necessary for artifact care "other than hands-on treatment."  The Registrars perform various tasks, including: managing and maintaining the artifacts and archived images and videos databases; producing high-resolution images of the artifacts; conducting research on artifacts and *Titanic* passengers to add to the knowledge base; assisting with exhibition planning and logistics (documentation, packing, installations and de-installations); and security at the Atlanta facility. Mr. Taylor is also responsible for documenting in writing and by photography the condition of artifacts at the end of exhibitions, and preparing condition reports for the same.

Since the bankruptcy commenced, the Atlanta facility staff has shrunk by one Registrar who performed similar tasks as described above.  RMST indicates the duties of this Registrar could be (and were) assumed by other staff members without issue because, during this time

---

be on loan/exhibition, ensuring security for artifacts in transit, installing and deinstalling exhibitions, and mitigating risk factors to a collection such as vandalism, theft, pests, emergencies, and natural disasters.

[12] Ms. Klingelhofer possesses, *inter alia*, a Masters of Science in Conservation and Archaeological Site Science.

[13] "*Titanic* Collections" has the definition ascribed to it in the C&Cs, namely "the total assemblage of the French Titanic Artifact Collection and the Subject Titanic Artifact Collection."  C&Cs I(H).

period, venues booking exhibitions decreased.  RMST indicates that, post-bankruptcy and in

coordination with PAHL, it will reconsider filling the open Registrar position, as well as filling a

technical position for an upgraded database system.

RMST does not have plans to build out its in-house conservation staff beyond Ms.

Klingelhofer, but rather outsources "the vast majority of its conservation work to qualified

specialized vendors, as the collections department does not have a fully functional laboratory."

It is not unusual in the museum community to use outside resources for conservation work.

RMST provided a listing of the three conservator companies with whom RMST regularly works.

A review of these companies' websites suggests they have appropriate expertise and are well

qualified to perform conservation work in metals, woods, paper and textiles.[14]  RMST also has

two art handlers under contract who assist with installations and de-installations.  A review of

those contractors' public websites suggests that they are also well qualified to perform these

tasks.[15]

RMST represents that its operational capacity to conserve, curate, and maintain the

*Titanic* Collections has not been degraded because of the bankruptcy; that no routine

conservation or maintenance has been foregone because of the bankruptcy; that no artifact had

been damaged because of a lapse in routine care; and that any minor issues with an artifact (such

as spot corrosion) have been treated promptly as soon as the condition was noted.  *See* APA

§ 5.1(a) (requiring RMST to continue to conduct business during the interim period "in the

ordinary course of business consistent with past practice").

---

[14] Conservation Solutions, Inc., Clinton, Maryland (https://conservationsolutionsinc.com/); Northeast Document Conservation Center, Andover, Massachusetts (https://www.nedcc.org/); and, David Galusha/Restoration and Preservation Services, Atlanta, Georgia (http://professionalcleaners.com/main.htm).

[15] RMST identified Andy Rock (http://arockfineart.com/arockfineart.com/Home.html) and Jon Cordova (http://joncordova.ch/).

RMST indicates that it has identified a "wish list" of 50 artifacts that it would like to refer for conservation work.[16]  RMST states it developed this list at the request of PAHL, which has expressed an interest in infusing new money into the company and wanted a list of "future goals."  RMST denies that these artifacts are degraded, but describes them as "stable, but not fully conserved," and that their selection for the "wish list" for conservation was "elective" because the items would "contribute to an exhibition, or . . .  were in a more fragile condition." (NOAA has not verified the condition of these artifacts.)  RMST has not engaged a contractor for this work, but expects to address the issue further with PAHL should the transaction be approved.

For 2018, RMST budgeted $737,000 for conservation, care and management of the artifact collection.[17]  RMST expects 2019 to be similar.  According to the budget provided to NOAA, approximately half of the total budget goes to salaries, with the remainder towards rent, insurance, other expenses, and contributions to the reserve account, but there is no line item expressly for contract conservation work.  RMST explains that "[c]onservation is funded as needed . . . utiliz[ing] excess cash to retain external conservation services," and that an advanced line item was not included in 2018 and 2019 "because the artifacts are now stable and such work is elective."[18]  Quarterly payments to the reserve account are current, and its balance as of

---

[16] The list included a variety of items, including: serving bowls, platters and utensils; compass parts; telephone handles; marble pieces; a leather travel bag and suspender ends; various metal pieces (bolts, clasps, buckles and sconces).  RMST expressly states that the number of artifacts in need of conservation "during and before the bankruptcy has remained relatively stable."  The mere fact that there may be a queue of items at a museum in need of conservation or care is not unusual.

[17] Prior to 2016, the budget was approximately 30% higher than currently ($1,000,000), which RMST attributed to more staff and more exhibition bookings.

[18] RMST has been asked to provide its funding level for artifact conservation and treatment for the three years preceding the bankruptcy filing.

August 31, 2018, was $711,174.  APA § 3.17(b) (acknowledging responsibility to pay $25,000 into the reserve account on a quarterly basis).

### III.    RECOMMENDATION

The transaction at issue (as described in the Asset Purchase Agreement) involves a 100% sale of RMST's stock, whereby RMST becomes a wholly owned subsidiary of PAHL instead of a wholly owned subsidiary of PRXI.  The only issue is whether this transaction, in "form and purpose," "effectuate[s] *a change* in the management, conservation and curation of the STAC [Subject *Titanic* Artifact Collection]" from its current status as a subsidiary of PRXI.  *Id.* (emphasis added).

Based on the above discussion, NOAA believes that, while this process has revealed some questions (which will be addressed in the following section), the transaction does not in form or purpose, or in consequence, effectuate a change that negatively affects the current management, conservation and curation of the artifacts.  Accordingly, NOAA recommends the Court approve the transaction,[19] subject to RMST's and PAHL's commitment[20] on the Court record to the following:

---

[19] RMST avers that it plans to maintain its status as salvor-in-possession.  Although no expedition to *Titanic* has occurred since 2010, and none is currently scheduled, RMST represents that it has had been in discussions to coordinate an expedition for "filming of the wreck site for VR [virtual reality] as well as research initiatives," and also placed an RMST representative on the recent EYOS expedition.

[20] Requiring PAHL's commitment, in addition to RMST's, to these conditions is appropriate and reasonable.  First, RMST expressly indicates that its October 22, 2018, due diligence response to NOAA was intended to reflect *PAHL's* "formal acknowledgement" of *PAHL's* intent for RMST to continue to comply fully with the C&Cs.  Second, PAHL has decided to assume the intracompany agreements formerly between RMST and PEM along with PRXI, under which, *inter alia*, "all necessary and customary conservation and preservation work on the *Titanic* Artifacts . . . in accordance with any applicable covenants and conditions imposed by the federal court" will occur.  Third, PAHL directors are likely to make up a large portion of RMST's Board.  And finally, the C&Cs were expressly entered into "by R.M.S. *Titanic* Inc., *d/b/a/ Premier Exhibitions, Inc.* (hereinafter "RMST")," C&Cs I(A) (emphasis added), and PAHL will now assume all functions of Premier Exhibitions (PRXI).  The Court may also wish to consider whether the C&Cs should be amended to reflect the change in the parent company from PRXI to PAHL.

1.    RMST's and PAHL's consent to the *in personam* jurisdiction of this Court for purposes of their ongoing compliance with the C&Cs.

2.    RMST's and PAHL's commitment to continue to abide by the C&Cs in all respects.

3.    RMST's and PAHL's commitment to providing the Court with copies of all replacement or amended intra-company agreements that pertain to the care, preservation, conservation or curation of the artifact collections

4.    RMST's and PAHL's commitment to promptly advise the Court of any change or alteration to the composition and makeup of RMST's and PAHL's Boards, and RMST's Senior Management team.

3.    RMST's and PAHL's commitment to promptly advise the Court of any RMST staffing changes, alterations and additions at any location (Atlanta, permanent and traveling exhibitions) of any person(s) having responsibility for the care, conservation, curation, management and/or security of the *Titanic* Collections.

4.    RMST's and PAHL's commitment to continue to file Periodic Reports at intervals requested by the Court to advise of all other events impacting the company, and the care, conservation, curation, management and exhibition of the *Titanic* Collections, specifically to include reports that summarize the results of the "trained conservator" visits to the permanent and traveling exhibition sites.

5.    RMST's and PAHL's commitment that they will provide the Court and NOAA at least 60 days notice of, and seek Court approval for, (i) any action that could result in the *Titanic* Collections (as defined in the C&Cs) no longer being maintained

together as an integral whole,[21] and (ii) any action which would pledge or

otherwise use in any way any artifacts as security or collateral for any purposes.

6.     RMST's and PAHL's commitment to provide to the Court advanced notice of any

planned expeditions to the *Titanic* wreck site.

## IV.     ADDITIONAL RECOMMENDATIONS

Consistent with its ongoing oversight responsibilities as set forth in Section V of the

C&Cs, NOAA makes the following additional recommendations.[22]

### A.   Adjustments to the Reserve Account.

NOAA recommends that the Court and RMST consider adjusting the end endowment

value of the reserve account, and/or the quarterly contribution amount, to better reflect current

circumstances and to ensure the long-term protection of the *Titanic* Collections.

The C&Cs established a reserve account pledged as a performance guarantee for the

protection of the *Titanic* Collections.  C&Cs V(D)(2).  The quarterly payment initially

established ($25,000) was intended to ensure that "within twenty-five (25) years from the date

[of the C&Cs execution]" an endowment would exist of $5,000,000 which was believed to be

adequate to generate sufficient annual income to cover the cost and expense of conserving and

curating the *Titanic* Collections for one year.

As of August 31, 2018, the reserve account contains $711,174, an amount less than

RMST's 2018 budget for "conservation-curation" ($737,000).  At the present contribution rate,

---

[21] NOAA and RMST disagree as to whether, if at all, the C&Cs control or limit RMST's conduct with respect to the French Artifacts.  The purpose of this contingency is not to resolve this disagreement now, but to ensure NOAA and the Court have sufficient time to consider the issue at an appropriate time, if needed.  In addition, should a situation ever arise in which a new Qualified Institution and/or Trustee is needed to care for the Titanic Collections, NOAA will be prepared to make recommendations to the Court regarding appropriate entities that may be able to help fulfill such role.

[22] These recommendations are not intended to be conditions for approval of the proposed transaction.

absent significant changes in interest rate returns, it is unlikely that the reserve account will be fully funded for well over twenty years, and even when fully funded will not generate sufficient income to care for the *Titanic* Collections for one year.  Because the Court is permitted to address these issues to accommodate "changes in circumstances and inflation," NOAA recommends that RMST provide a current accounting statement for the reserve account, including how the money is invested, how much interest has been earned, and how the Court can access the reserve account should the need to do so ever arise, and that the Court thereafter consider an adjustment to the amount of the contribution and/or the endowment goal to ensure sufficient funds will be in place to protect the artifacts should the need arise.

### B.  Development of Collections Management Plans and Budgets.

NOAA recommends that RMST prepare a written Plan concerning both its annual and long-term Plan for the management of the *Titanic* Collections, provide for specific line item funding for artifact conservation (beyond staff salaries) in its annual budgeting plans, and provide specific follow up information, as described at the end of this section, concerning two issues raised during NOAA's review.

RMST advised that it does not have a written plan, policy or protocol for ongoing management of the *Titanic* Collections, and does not provide in its 2018 or 2019 budget a dedicated funding line item for ongoing conservation efforts (nor has it provided information concerning its conservation budget/expenditures (exclusive of staffing) prior to the bankruptcy). Even within large, well-funded museums, it is not unusual that conservation needs may outpace conservation resources to accommodate those needs, or that such needs are addressed with outside contractors.  But, artifacts recovered from the marine environment which have been exposed to nearly a century of salt water, such as the *Titanic* artifacts, require ongoing monitoring and conservation even after they have been stabilized (especially when the items are

transported and exhibited in various climates and environmental conditions); these needs are not elective.  Museums, therefore, typically develop a collections management policy or collections plan to actively guide collections stewardship decisions.  Such a policy typically outlines the entity's long-term (multi-year) plan to guide decisions pertaining to, among other things, staffing, storage, acceptable environmental conditions, access, security, disaster preparedness, documentation, deaccessions, conservation, and artifact tracking.  Many museums also have an annual conservation strategy document, either as a stand-alone document or as part of an annual budget.  This document would outline the coming year's plans, priorities and funding for conservation, staffing, facilities or equipment.

NOAA believes that implementing such a collections management plan to guide RMST's decision making and allocation of resources will provide more consistent protection of the *Titanic* Collections, both in the Atlanta facility and on exhibition, and will facilitate NOAA's and the Court's oversight role.  NOAA is available to assist RMST with developing an appropriate collections management policy/plan.

In addition, NOAA also recommends that the Court direct RMST to provide to the Court and NOAA follow up information on two matters:  (1) RMST's and/or PEM's conservation activities and expenditures on the artifacts (exclusive of salaries) for the immediately preceding five years; and (2) specific information concerning the condition, status and conservation needs of the 50 artifacts on RMST's "wish list," that RMST described as "stable, but not fully conserved."

### C. Providing Information Concerning Collections Care, Management and Security at the Permanent Exhibition Sites.

NOAA recommends that, within a reasonable time, RMST provide the Court and NOAA additional detail and information concerning the care, management and security of the artifact

collections at the permanent exhibition sites, the Luxor and the International Plaza, in order to ensure the Collections are subject to appropriate professional care at those venues.

Without reiterating what was described in the background section, there appears to be a contrast between the level of detail provided by RMST with respect to oversight at traveling exhibition venues (as detailed, in part, in the Production Riders), and that described for the permanent exhibitions at the Luxor and International Plaza.  NOAA is not suggesting inappropriate care or management at those exhibits presently exists, but only that it would benefit the Court and NOAA to have specific information to verify that the care and oversight at those venues comport with museum standards.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    _// Kent P. Porter //_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 24rd day of October, 2018, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **Robert William McFarland**<br>McGuireWoods LLP<br>101 W Main St<br>Suite 9000<br>Norfolk, VA 23510-1655<br>Email: rmcfarland@mcguirewoods.com |
| **Edward J. Powers**<br>Vandeventer Black LLP<br>101 West Main Street, Suite 500<br>Norfolk, VA 23510<br>epowers@vanblacklaw.com | **Jeffrey G. Gilmore**<br>**John M. Neary**<br>Ackerman LLP<br>750 Ninth Street, N.W., Suite 750<br>Washington, D.C. 20001<br>Jeff.gilmore@ackerman.com<br>John.neary@ackerman.com |

*// Kent P. Porter //*
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov