```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   R.M.S. TITANIC, INC.,             )
     SUCCESSOR IN INTEREST TO          )
 6   TITANIC VENTURES, LIMITED         )
     PARTNERSHIP,                      )
 7                                     )    CIVIL ACTION NO.
               Plaintiff,              )    2:93cv902
 8                                     )
        v.                             )
 9                                     )
     THE WRECKED AND ABANDONED         )
10   VESSEL, ETC.,                     )
                                       )
11             Defendant.              )
     - - - - - - - - - - - - - - - - - -
12

13

14                  TRANSCRIPT OF PROCEEDINGS

15                    Norfolk, Virginia

16                    October 25, 2018

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
             Chief United States District Judge
19

20   APPEARANCES:

21           KALEO LEGAL
             By:  Brian A. Wainger
22                    And
             McGUIRE WOODS LLP
23           By:  Robert W. McFarland
                  Counsel for R.M.S. Titanic
24

25
```

1

APPEARANCES CONTINUED:

2

3          UNITED STATES ATTORNEY'S OFFICE
           By:  Kent Porter
4               Assistant United States Attorney
                Counsel for Amicus United States
5
           THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
6          By:  Jackie Rolleri

7

           VANDEVENTER BLACK LLP
8          By:  Edward J. Powers
                Counsel for potential intervenors
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Hearing commenced at 1:05 p.m.)

2              THE CLERK:  In case 2:93cv902, R.M.S. Titanic,

3    Inc., et cetera, versus The Wrecked and Abandoned Vessel, et

4    cetera.

5              Mr. McFarland, Mr. Wainger, is the plaintiff ready

6    to proceed?

7              MR. McFARLAND:  Good afternoon, Your Honor.  Yes,

8    the plaintiff is ready to proceed.

9              THE COURT:  Good afternoon.

10             THE CLERK:  Mr. Porter, is the United States of

11   America ready to proceed?

12             MR. PORTER:  Good afternoon, Judge Smith, we are

13   ready to proceed.

14             THE COURT:  Ms. Rolleri is also here as an attorney

15   advisor for NOAA.

16             Counsel, at the last status hearing on September

17   18, 2018, the Court scheduled this follow-up hearing at the

18   request of the parties; namely, R.M.S.T.  There are at least

19   three issues that the Court needs to look at today:  First,

20   the bankruptcy court proceedings generally, and the entry of

21   the various documents and orders in those proceedings;

22   second, R.M.S.T.'s motion to approve the Asset Purchase

23   Agreement; and, third, if we get that far, to the National

24   Maritime Museum's motion to intervene.

25             There is still, obviously, the EYOS expedition, but

1    right now we have these other matters that we need to focus

2    more on today, particularly, the first two issues that the

3    Court mentioned.

4              The relevant filings, and I would note that the

5    Court has literally been bombarded with filings in the last

6    few days, and that there is no way humanly possible for an

7    individual to go through all of these in great detail and

8    take them in in great detail.  So do not expect any final

9    rulings today.

10             I have reviewed everything, but I have not had the

11   opportunity, on some of the latest filings, to actually sit

12   down and take my notes and go through the way I do in a

13   detailed manner.  I will tell you what has been filed all

14   within the last week, some as recently as this morning and

15   yesterday.

16             I would also note that they are coming directly

17   into chambers and will have to address filing these.

18   Everything that's come to the Court will be filed on the

19   public record in this case.  So I would tell you that at a

20   threshold level.

21             First of all, there was R.M.S.T.'s periodic report

22   that was dated October 19th, 2018, and October 22nd, 2018;

23   then the bankruptcy court's order, the sale order,

24   basically, approving the Asset Purchase Agreement the Court

25   received from R.M.S.T. on October 22nd, 2018.  The

1    transcript from the October 18, 2018 bankruptcy court

2    proceedings was not received until yesterday, October 24,

3    2018.  Today letters from Ms. Klingelhofer, Mr. Gallo and

4    Mr. Nargeolet were received this morning.

5           Also, the debtor's notice of filing amendment

6    number 1 to the Asset Purchase Agreement was received from

7    R.M.S.T. this morning.  Also, I believe that the status

8    reports from the United States that have come before the

9    Court have been on September 28, 2018; October 15, 2018; and

10   the latest one was yesterday, October 24, 2018.

11          So it's hardly been humanly possible to read all of

12   this, much less digest it in 24 to 48 hours.  The Court has

13   found a number of matters that it has questions about, and I

14   would apprise you of that at the beginning of these

15   proceedings.

16          So why don't we proceed, I will start out asking

17   just some threshold questions to you, basically,

18   Mr. McFarland, and then we will proceed into some of the

19   details.

20          MR. McFARLAND:  Thank you, Your Honor.  May it

21   please the Court.  Rob McFarland.  Jessica Sanders, the

22   cooperate secretary and vice president, is here with us

23   today on behalf of the company.

24          THE COURT:  My first question to you is what is the

25   magic of the date of October 31st, 2018, that the Court has

1    to approve this Asset Purchase Agreement?  So I'm perceiving

2    a situation where some other entity is making their

3    emergency the Court's emergency unnecessarily.

4         MR. McFARLAND:  No, Your Honor.  I think the

5    urgency, as this Court has heard before, is the need for

6    this Court's approval of the APA and the stock sale so that,

7    if there is nothing else, the transaction can close as soon

8    as possible.

9         THE COURT:  Well, what if this Court does not

10   approve it by October 31, 2018, and the transaction will not

11   close?

12        MR. McFARLAND:  It will not close unless there is

13   an extension, Your Honor, I believe, as the APA and the

14   amendment sets forth this Court's approval by October 31st.

15   That is in the APA.  I don't speak for, obviously, the

16   purchaser, whether that date could be amended by agreement.

17   I don't know and would not be directly involved in that,

18   but, obviously, the Court appreciates the transactions to

19   get everything done will take some time after this Court's

20   approval, and in the meantime the financial situation of

21   R.M.S.T. and its parent company Premier is not getting any

22   better.

23        THE COURT:  Well, that brings me to two other

24   questions.  Who represents the purchaser for the Asset

25   Purchase Agreement?  Who represents the stalking horse

1    purchaser?  Why haven't they made an appearance in this
2    court?  Who represents them?  Do you?
3              MR. McFARLAND:  I do not, Your Honor.
4              THE COURT:  Well, who represents the purchaser
5    here?
6              MR. McFARLAND:  I believe there are at least two
7    counsel, Your Honor:  Mr. Scott Grossman represents -- there
8    are three entities, as the Court is aware, that comprise the
9    stalking horse purchaser.  Mr. Scott Grossman represents one
10   of the entities, and Ms. Jennifer Feldsher represents one of
11   the other entities, and have represented them throughout the
12   negotiation of the APA and then the purchase in the
13   bankruptcy proceedings.
14             But the stalking horse purchaser, Your Honor, is,
15   obviously, not a party to this proceeding.
16             THE COURT:  I understand, but that's what you have
17   referred to throughout, the stalking horse purchaser, and,
18   actually, the stalking horse purchaser is the prevailing
19   purchaser.  Am I not correct?
20             MR. McFARLAND:  Correct, Your Honor.  In keeping
21   with the bankruptcy court's approval and order of last week,
22   October 18th.
23             THE COURT:  Well, why haven't those entities
24   appeared in this court to subject themselves to the
25   jurisdiction of this Court?

1          MR. McFARLAND:  Well, Your Honor, those entities

2     will -- when I say entities, but PAHL or the stalking horse

3     purchaser entity.

4          THE COURT:  We will call them PAHL, then.

5          MR. McFARLAND:  PAHL will be the parent corporation

6     similar to how Premier Exhibitions is the parent corporation

7     of R.M.S.T.  But this proceeding before Your Honor has

8     always involved R.M.S. Titanic and as now as the salvor in

9     possession and owner of the artifacts, subject to the

10    covenants and conditions as they apply.

11         But Premier is a parent company, and in that sense

12    the Court is well aware of its status, and PAHL will be the

13    same.  PAHL will be a parent company, but PAHL would not

14    be -- these are separate, distinct corporate entities, Your

15    Honor, and the Court appreciates the need for that.

16         They have separate boards of directors, employees

17    will be employed by the R.M.S.T. entity, as they were

18    before, curation, conservation done by the R.M.S.T. entity.

19    They are separate, so they are really -- PAHL would not

20    be -- is not a party in this proceeding and would not be an

21    appropriate party to this proceeding, and it's not a party

22    to the covenants and conditions.

23         THE COURT:  Well, I've got some questions about

24    that.  So we will talk about some jurisdictional issues in a

25    moment, but I don't agree with you.  The museum felt it

1   needed to intervene in these proceedings when they were

2   interested in purchasing, and I don't understand why PAHL

3   has not presented itself to the jurisdiction of this court

4   if it wants approval of this Asset Purchase Agreement, which

5   has a number of troubling provisions, which I will go

6   through with you.  So in my mind I question whether this has

7   all really been an arm's length transaction.

8          MR. McFARLAND:  Absolutely, Your Honor.  There is

9   no question about it.  The bankruptcy court has reviewed

10  the transaction.

11         THE COURT:  There were some things in the

12  bankruptcy court transcripts where they were questioning

13  whether you are really at an arm's length transaction here

14  when you look at the different players and the cross

15  pollinization of the players.

16         MR. McFARLAND:  Your Honor, I'm happy to address

17  them more specifically, but the players are different.

18  There are three entities that make up PAHL and then some

19  individuals who are secured investors, but this was a

20  heavily negotiated transaction, and, in fact, my client,

21  R.M.S.T. and Premier Exhibitions, went back and was able to

22  increase the purchase price, and that's why we provided the

23  Court the amendment from September of 2018 so that the

24  purchase price actually increased from, I believe, 17.5

25  million to 19.2, or I may be just a smidgen off, but 17 to

1   19.   So this is absolutely a heavily negotiated transaction

2   between the stalking horse purchaser and Premier Exhibitions

3   and its subsidiary R.M.S.T., in which the purchaser was

4   represented by very able counsel, multiple counsel.

5          I'm here today on behalf of R.M.S.T., and, really,

6   what we are asking this Court to do, having obtained the

7   bankruptcy court's approval, is to look at right now the

8   approval of the APA, pursuant to, I think it's Paragraph 6

9   that the APA provides for, and the stock sale.

10          THE COURT:   In your own words, under this Asset

11   Purchase Agreement, tell the Court the role of PAHL, the

12   role of R.M.S.T., and how it differs in any way from Premier

13   and R.M.S.T.

14          MR. McFARLAND:   I don't think it really will, Your

15   Honor.   That's one of the messages we want to convey to the

16   Court.   Now, just as Premier is the parent corporation and

17   over -- in a sense has some oversight, what R.M.S.T. is a

18   separate corporate entity and has had a separate board of

19   directors and will have a separate board of directors and

20   will continue to operate in that sense.

21          Premier here, R.M.S.T. here, I guess I'm going to

22   move my hands so that the R.M.S.T. is above as the parent

23   corporation, but they are distinct corporate entities and

24   will remain so now with PAHL and R.M.S.T.   That's an

25   important thing, I think, in one sense also for the safety

1     of the artifacts, if you will.  The artifacts were not

2     brought into the -- could not be brought into the bankruptcy

3     proceeding because they are distinct corporate entities and

4     that will remain.

5            I also want to say, Your Honor, that the bankruptcy

6     court in its order filed October 19th, finds in Section K

7     that this is a good faith transaction.  There was no

8     collusion.

9            THE COURT:  I didn't say collusion.  Arm's length

10    and collusion are two different things.

11           MR. McFARLAND:  I think they find, Your Honor, also

12    that the transaction was completed in good faith without

13    collusion, and from arm's length's bargaining positions.

14    This was a heavily -- and I wasn't directly involved in the

15    transactional aspect, but I know it was a heavily

16    negotiated, contested and agreement reached that became the

17    APA and then with the amendment in terms of the purchase

18    price.

19           THE COURT:  Well, let me ask you this.  Assuming,

20    then, and I'm assuming, not finding, assuming that PAHL is

21    simply stepping into the shoes of Premier but is somehow

22    paying R.M.S.T. a little over 19 million for the artifacts,

23    why do they want to purchase the artifacts?  For what

24    reason?

25           MR. McFARLAND:  Well, let's go back for a second,

1    Your Honor.  Because with R.M.S.T., PAHL is purchasing the

2    stock.  They are not purchasing the artifacts.  I know the

3    Court recognizes it is a distinction here because the

4    artifacts will remain under the ownership of R.M.S. Titanic,

5    that is important, and they remain subject to the covenants

6    and conditions.

7            THE COURT:  We will go through some provisions that

8    I've read, and I'm going to go back and read a lot of this

9    again that would not support, in my opinion, at this

10   juncture the last statement that you've made.  Why would

11   somebody pay you 19.1 million for artifacts that you claim

12   you still own?  They are buying the artifacts.  It's an

13   Asset Purchase Agreement.  They are buying the assets of

14   R.M.S.T.

15           MR. McFARLAND:  They are buying the assets of

16   Premier Exhibition, which is distinct from the assets of

17   R.M.S.T., Your Honor.  This Court -- this transaction,

18   recognizing the covenants and conditions and that any

19   trustee is going to be subject to them, and recognizing that

20   situation, this transaction was negotiated specifically in

21   part because so that it would be set up as a stock sale.

22           So there is an overall purchase price, but that

23   includes -- my understanding is includes the assets of

24   Premier, and then as there is a stock sale for R.M.S.T., but

25   very important distinction, Your Honor.

1          THE COURT:  Well, let me go back to this, then.

2     You made some responses, I believe, to NOAA's initial letter

3     to the Court, and it's the September 18th status hearing,

4     Exhibit 3.  The United States submitted a copy of a letter

5     NOAA had sent to R.M.S.T. requesting certain information on

6     the sale to the purchaser, and R.M.S.T. submitted its

7     response to this initial letter.

8          Well, I've got a number of questions about your

9     response, but, first of all, I notice here that you say the

10    responsibilities of R.M.S.T.'s employee Ivy Ying Li,

11    registrar for relics and Chinese literary editor job,

12    includes researching "the Chinese Titanic market."

13         Now, why is somebody researching the Chinese

14    Titanic market?  Is it for a potential sale or is it for

15    acquisition or what?  You made that statement, and I quoted

16    it.

17         MR. McFARLAND:  Understand, Your Honor.  It's for

18    exhibition, Your Honor.  One of the things that PAHL

19    believes can be done is better marketing of the exhibitions,

20    which would include China.  So it's for exhibitions, Your

21    Honor.

22         THE COURT:  You didn't say that, though.  Research

23    into Chinese market is a pretty broad statement.

24         MR. McFARLAND:  Well, and there is a current

25    exhibition in China, Your Honor, and we think that there are

1   more -- I shouldn't say we, PAHL believes there are more

2   opportunities there.  I apologize to the Court if the

3   wording isn't as clear as it could be, but part of what

4   is -- and I think this is very beneficial in terms of the

5   Court's review.  Part of what's happening here is a company,

6   the parent company that is out of money, obviously, as the

7   Court knows, and it affects the subsidiary in terms of

8   certain things.

9          Now we are having a new acquirer of Premier and the

10  stock acquirer of R.M.S.T. who comes in and is better

11  capitalized and can do things and provide opportunities,

12  including for R.M.S.T., including for the exhibition.  So we

13  really think this is a very, very positive development, Your

14  Honor.  And in terms of who's coming in, as the Court no

15  doubt read in the due diligence materials that we've

16  provided, this is going to be a Delaware entity, PAHL, with

17  a principal place of business still in Atlanta, Georgia, and

18  with five-member board of directors, three of whom --

19  assuming that the transaction goes through, three of whom we

20  have identified and will come in the closing and then the

21  other two will be appointed after closing.

22          So I think this is a very positive thing.  I

23  certainly want to address whatever questions the Court has.

24          THE COURT:  Well, I'm trying to get my questions,

25  but you keep trying to convince me -- words are words --

1   this is a very positive thing, but I've got a lot of
2   questions about the positivity of it.
3        MR. McFARLAND:  I will put my advocacy aside as
4   best I can, Your Honor, and I appreciate the Court's
5   patience.
6        THE COURT:  Well, I'm going through your responses
7   right now that I had questions.  So you say in that response
8   that I was just referring to that you will continue to abide
9   by the C&Cs consistent with past practices, but R.M.S.T is
10  no longer the owner.  You're selling the assets.
11       MR. McFARLAND:  Not R.M.S.T., Your Honor.  What is
12  being sold -- and this is in the Asset Purchase Agreement
13  subsection (i)(ii), Article I on Page 3, and I recognize
14  it's a lot of documents for the Court, but Page 3 of the APA
15  specifically provides what is being acquired from R.M.S.T.
16  is its stock, not an Asset Purchase Agreement as to R.M.S.T.
17       THE COURT:  Then why do you call it an Asset
18  Purchase Agreement?  Why don't you call it a stock purchase
19  agreement?
20       MR. McFARLAND:  Because the overall -- remember,
21  it's not just R.M.S.T. that's involved here.  Premier
22  Exhibitions is the parent company and really the larger of
23  the acquirees.  So that's why it's called an Asset Purchase
24  Agreement, but it's specifically provided for that, as to
25  R.M.S.T., this is a stock sale.  And we did this -- I say

1   we, but from the debtor's standpoint, it was recognized of

2   the covenants and conditions, and it was recognized from the

3   acquirer's standpoint, too, which is -- this is my

4   understanding, but it's why in the original APA there is a

5   provision for this Court's approval of the APA.  Remember,

6   we've titled it as a stock sale because it is a stock sale.

7           We would, admittedly, Your Honor, be in a different

8   situation if we were coming to this Court for an entire

9   asset acquisition.

10          THE COURT:  Let me review a few provisions with you

11  in that regard because it appears to this Court that there

12  is quite an endeavor to remove jurisdiction from this Court

13  over the covenants and conditions and the assets.  I'm going

14  to point some things out to you, Mr. McFarland, and let you

15  respond to them.

16          As I say, it's been a lot to go through in a very

17  few days.  Let me just start with the first provision, and

18  then I find that there is a contradiction of it in another

19  part of the agreement.

20          I'll just start it this way:  The APA defines this

21  Court's approval as the admiralty court order.  That's the

22  way it is labeled.  It's the admiralty court order.  Then

23  you have the Asset Purchase Agreement, and you have the sale

24  order.  I'm reading from the APA, and this is a provision,

25  and it says modification of the APA is permitted, and I'm

1    not reading it word for word, but modification of the APA.

2    So you've got the admiralty court order, and all that is, is

3    this Court approving purchasing the assets.  Then you've got

4    the sale order, and you've got the Asset Purchase Agreement.

5    Then you've got the Asset Purchase Agreement, and what it

6    says is, so if I approve the Asset Purchase Agreement, and

7    the bankruptcy court approves it through the sale order,

8    then that Asset Purchase Agreement provides that the APA is

9    permitted, a modification of the APA is permitted without

10   further order of the bankruptcy court provided that any

11   modification does not materially change the terms of the

12   APA.

13          Well, who's going to decide whether it materially

14   changes the provisions of the APA?  That's like the fox

15   guarding the hen house.  So what you're doing is saying,

16   District Court in Norfolk, Virginia, you approve the

17   admiralty court order; and bankruptcy court, you approve the

18   sale order; and then we have our Asset Purchase Agreement,

19   and we can go in and modify it as long as it doesn't

20   materially change the terms.

21          Who decides whether you're materially changing the

22   terms?  You all are.

23          MR. McFARLAND:  I think the intent, Your Honor, is

24   if --

25          THE COURT:  The intent, it has to be the words.

1    The words, and the words say you can change that agreement

2    without any Court approval as long as it doesn't materially

3    alter it, and there's nothing in here that says what a

4    material modification is and who's going to be in charge of

5    it.

6          Now I'll give you all my questions here because

7    then there is another part of it.  Then the bankruptcy

8    court, however, retains exclusive, and I put emphasis on

9    that word jurisdiction, to interpret, enforce and implement

10   as well as adjudicate disputes related to the sale order and

11   the APA.

12         So you are pulling everything away from this Court

13   if there is any dispute over this Asset Purchase Agreement

14   and how the covenants and conditions are being handled.

15   There are a couple more provisions here that are

16   troublesome.  You're saying, bankruptcy court, you have the

17   exclusive jurisdiction over the APA.

18         Now, what if there is a dispute over the transfer

19   of these assets?  What if there is a dispute over whether

20   you're following the covenants and conditions that have been

21   incorporated into the Asset Purchase Agreement?  You're

22   leaving it up to the exclusive jurisdiction of the

23   bankruptcy court to make that determination.

24         I'm going to keep on here because there are so many

25   inconsistencies.  Then in another part of this agreement you

1   have put in there, and I can't find it in my current notes,

2   but there is another place in the agreement that says if

3   disputes arise, New York law governors and the disputes

4   shall be determined in the state and federal courts in New

5   York.

6          So who has jurisdiction?  Does the bankruptcy court

7   have exclusive jurisdiction?  What jurisdiction does this

8   court have and what jurisdiction do the New York courts

9   have?  There are so many pages here, but I know I read that,

10  and I know it's in there.

11         MR. McFARLAND:  I think Your Honor is referring to

12  the order, correct, that was entered by the bankruptcy court

13  as opposed to the APA itself?

14         THE COURT:  I assume that's where it is.  I can

15  tell you there is so much there and there is so much

16  inconsistency, who is doing what, when and where?

17         MR. McFARLAND:  Let me say this, Your Honor.  To

18  the extent we are talking about assets, and there's a

19  disagreement or dispute about assets, that's something

20  that's going to involve the bankruptcy court with respect to

21  the sale.

22         To the extent we are talking about the artifacts

23  and their conservation, curation, preservation, maintenance,

24  or something that is covered by the C&Cs, absolutely, that's

25  this Court.  We don't have any problem with that.  That's

1    why, in part, the transaction is structured as it is.

2          So the bankruptcy court has a role in terms of

3    approving, essentially, the plan that came out for the sale,

4    and that's what they've done.  The bankruptcy court and the

5    purchaser wanted this Court to weigh in on the APA, the

6    agreement and the stock sale, and essentially is that

7    transaction, from this Court's standpoint, going to result

8    in the same care of the artifacts and application of the

9    C&Cs to R.M.S.T. as they were before?

10         I'm here to tell you, absolutely, that's the case.

11   In fact, we have an agreement in a proposed order for the

12   Court.  I realize the Court has tried to wrap its arms

13   around an awful lot of material in a short period of time,

14   but we have a proposed order for the Court that sets forth

15   exactly R.M.S.T.'s commitments, what it is going to continue

16   to do, that it's been doing and continue to do, but it's

17   never -- I want to say this, Your Honor, from R.M.S.T.'s

18   standpoint, it is never the thought that this Court would

19   not retain its jurisdiction over R.M.S.T. as to the

20   covenants and conditions.

21         THE COURT:  But R.M.S.T. doesn't have those assets

22   because the assets belong to stock of R.M.S.T.  I mean,

23   Premier's stock is totally being given to PAHL, and they are

24   the parent company.

25         MR. McFARLAND:  Actually, Premier's assets are

1    being given to PAHL.

2         THE COURT:  What is it?  Is it a stock purchase

3    agreement, an asset purchase agreement?  Make up your mind.

4         MR. McFARLAND:  It's both.  It was termed an Asset

5    Purchase Agreement because there is Premier Exhibitions, and

6    the assets of Premier are being acquired.

7         THE COURT:  What are those assets?

8         MR. McFARLAND:  The intellectual property rights,

9    leased rights.

10        THE COURT:  Intellectual property right to what?

11        MR. McFARLAND:  Remember, Premier does all kinds of

12   exhibitions.

13        THE COURT:  It's body parts and this.

14        MR. McFARLAND:  Dinosaurs and its contracts that

15   it's in existence for those exhibitions.  So there are

16   assets of Premier Exhibitions that PAHL is acquiring.  There

17   are subsidiaries of Premier separate from R.M.S.T.

18        THE COURT:  The main asset of Premier is the

19   Titanic artifacts.

20        MR. McFARLAND:  Certainly.  Well, no, that's not an

21   asset of Premier, though, Your Honor.  That's an asset of

22   R.M.S. Titanic.  That is why this Court has absolute

23   jurisdiction over R.M.S. Titanic and the American artifact

24   collection, and that's not going to change.

25        THE COURT:  Let me go to another provision, then,

1    of the APA, because what you're saying doesn't ring true

2    with this particular provision.  I'm looking at the APA

3    Section 1.1A(ii)(xii), and it says here, as defined in

4    Section 8.5, "Artifacts and exhibitry" includes -- and I'm

5    quoting now from the APA -- "the exclusive salvage rights to

6    recover additional artifacts from the R.M.S. Titanic."

7           You are pulling the jurisdiction over salvage away

8    from this Court if in the APA you have given away your

9    exclusive salvage rights to recover.  Then you're saying

10   that the jurisdiction to interpret the APA and enforce the

11   APA is either with the bankruptcy court or the courts in New

12   York.  You are giving away.  You're trying to just, number

13   one, do something I don't think you can.  I'm not sure that

14   you even have future salvage rights at this point because if

15   another salvor came in to compete, you would have to show

16   that you have taken the necessary steps to maintain your

17   position as salvor in possession.

18          This Court has exclusive jurisdiction over

19   determining who is salvor in possession and the salvage

20   rights.  You don't have, in my opinion, any authority to be

21   giving away the exclusive salvage rights to recover because

22   no future exclusive salvage rights go to R.M.S.T.  So that

23   defies your statement.

24          Also, if R.M.S.T. has the exclusive salvage rights,

25   so how can Premier be giving away those exclusive salvage

1    rights to PAHL if what you say is correct that R.M.S.T. just

2    stays the same?

3              MR. WAINGER:  Judge, if I may try to help explain.

4              THE COURT:  Well, it's difficult for the Court to

5    deal with two and three attorneys like you've been doing in

6    the last few hearings.  I decided when I came in today that

7    it just was not going to be four and five attorneys standing

8    up.  I'll be glad to take a break, and you all can confer.

9    It's very difficult on the Court to have one person talking

10   and another person jumps up.  You certainly may have an

11   opportunity to present later, but right now I'm asking these

12   questions to Mr. McFarland.

13             MR. WAINGER:  Understood.

14             MR. McFARLAND:  I think, Your Honor, in terms of

15   the bankruptcy court order that was entered on October 19th

16   in Paragraph 38, it specifically provides that R.M.S.T. is

17   out of the asset acquisition.  It is strictly a stock sale.

18   This is Paragraph 38 that references, upon the closing,

19   again, assuming that the parties get to that, subject to the

20   conditions set forth in the Asset Purchase Agreement, the

21   Chapter 11 case shall be dismissed without further motion

22   hearing or court order.

23             THE COURT:  I'm pulling the order.  You can tell me

24   again.

25             MR. McFARLAND:  Sure, Your Honor.  This is the

1    order.

2              THE COURT:  What Page?

3              MR. McFARLAND:  Paragraph 38 and Page 35.

4              THE COURT:  I'm there.  That's a dismissal of the

5    bankruptcy.

6              MR. McFARLAND:  Right.  But, in other words,

7    R.M.S.T. is -- that's the title, R.M.S.T.  So it's out.  So

8    R.M.S.T.'s obligations are going to remain with this Court.

9    The bankruptcy court is not going to have any further

10   jurisdiction over R.M.S.T.

11             THE COURT:  It says upon the closing subject to the

12   conditions in the Asset Purchase Agreement.  The Asset

13   Purchase Agreement, and its interpretation, you have left

14   that with the bankruptcy court, and that's what the clause I

15   just finished reading you says, that the bankruptcy court

16   retains exclusive jurisdiction of any disputes regarding the

17   Asset Purchase Agreement and that you all can alter that as

18   long as it's not a material alteration.

19             That's why I was asking the questions about arm's

20   length because it's confusing to the Court why no one from

21   PAHL has made any appearance in this court, and,

22   consequently, again, who's watching the changes in the Asset

23   Purchase Agreement?  This has been the way it's been for

24   years.

25             Right now the two parties would be Premier and

1    PAHL.  So who's going to be monitoring those changes?  All

2    this says is that in the case of R.M.S. Titanic, Inc., and

3    that's the party here that you are dismissed from the

4    bankruptcy.

5              MR. McFARLAND:  Right.  So the Court that would

6    still and has, and we have never said that this Court lost

7    jurisdiction over R.M.S.T., even in the bankruptcy as to the

8    artifacts and the covenants and conditions, this Court

9    retains that jurisdiction.  The bankruptcy court would not

10   have jurisdiction over R.M.S.T., which, remember, R.M.S.T.

11   is the one still owning the artifacts.

12             THE COURT:  How?  How do you still own the

13   artifacts?

14             MR. McFARLAND:  R.M.S.T. is the entity that this

15   Court granted the award to, Your Honor, subject to the

16   covenants and conditions as they apply.  The award that was

17   given in 2011 is for R.M.S.T., who was the salvor,

18   obviously, and remain salvor and is the owner of the

19   artifacts.  That's important.

20             THE COURT:  But Premier is the parent company.

21             MR. McFARLAND:  Correct, Your Honor, but they are

22   distinct corporate entities, and that's very important, and

23   it was very important in this bankruptcy that Premier was a

24   distinct corporate entity, and its assets did not include

25   the artifacts.

1          THE COURT:  The bankruptcy is in the name of R.M.S.

2     Titanic, Inc.

3          MR. McFARLAND:  Right.  R.M.S.T. is a party in the

4     bankruptcy, no question about it.  But R.M.S.T. as the owner

5     of the artifacts, the covenants and conditions apply to

6     R.M.S.T. and to anyone who would become a subsequent

7     trustee, and that was a protection, in a sense, as to the

8     artifacts.  Very important part, Your Honor.  That's why

9     this transaction, in part, was structured as it was, and I

10    appreciate what the Court is saying, but I guess maybe we

11    are moving a little bit past each other because I think it's

12    actually very beneficial that this is strictly a stock sale

13    as to R.M.S.T., and its assets, the assets of R.M.S.T. are

14    the artifacts.

15         THE COURT:  Somebody owns all the stock of

16    R.M.S.T., then they own the artifacts.

17         MR. McFARLAND:  No, Your Honor.  No, they don't.

18    In fact, one of the conditions that we have in discussions

19    with NOAA, and they agree upon, anything that is going to

20    happen to the collection, we are going to give this Court 60

21    days' notice.

22         THE COURT:  You say that.

23         MR. McFARLAND:  We are committed to it.

24         THE COURT:  There are so many different provisions

25    in that Asset Purchase Agreement that somebody can hang

1   their hat on to say, but we were doing this, we didn't have

2   to give you notice.  That provision of the Asset Purchase

3   Agreement was changed.

4           MR. McFARLAND:  Nothing would be changed, Your

5   Honor, or could be changed that would affect this Court's

6   jurisdiction.

7           THE COURT:  Where do you say that?

8           MR. McFARLAND:  Part with the order that we would

9   like the Court to enter, that we've discussed with NOAA,

10  reviewed it.  We have a proposed order for the Court, and

11  it's in the order this Court retains jurisdiction and

12  including a 60-day notice requirement.

13          THE COURT:  Well, how do you explain this provision

14  where you're giving the exclusive future salvage rights?

15          MR. McFARLAND:  I'm sorry, Your Honor.  I did not

16  follow.  Which provision are we at?

17          THE COURT:  It's Section 8.5, "Artifacts and

18  Exhibitry" of the APA.

19          MR. McFARLAND:  So, yeah, it's under the

20  definitions, Your Honor, but I think that's just defining

21  what artifacts and exhibitry are.  Now, what would happen in

22  the future with respect to future exhibitions would be, in

23  part, governed by the covenants and conditions and this

24  Court's established admiralty law, et cetera.

25          I think this is just a definition, is what it's

1    intended to do.  It doesn't really reference back to other

2    sections of the APA, but I think this is all part of the

3    definitions, just setting forth -- I think, in part, Your

4    Honor, what may help the Court is when you look at Article

5    I, which talks about the actual purchase and sale of assets,

6    and specifically 1.1(a)(ii), it emphasizes the purchaser is

7    acquiring the shares.

8            THE COURT:  Somehow, maybe you need to connect a

9    road map for the Court because I still do not understand

10   when you say that you are not selling the artifacts,

11   R.M.S.T. went into bankruptcy, and you've got an asset.

12   What are your assets?  Well, your artifacts and your

13   exhibitry, and you're selling those.  That's your assets.

14   You own them.  It says here that what artifacts and

15   exhibitry means, "The artifacts recovered from the R.M.S.

16   Titanic, along with the photos, videos, digital archives,

17   sonar maps and other tangible and intangible property

18   related thereto together with the exclusive salvage rights

19   to recover additional artifacts from the R.M.S. Titanic."

20           You don't have the ability to sell future exclusive

21   rights because a salvor can lose those rights.  You have no

22   ability whatsoever to transfer any exclusive future salvage

23   rights.  You have the ability to transfer your current

24   salvor-in-possession status for what that means.  But you do

25   not have any ability to transfer exclusive future salvage

1    rights.  This Court has jurisdiction over the Titanic.  It

2    has been determined all the way up to the Supreme Court, and

3    this Court determines who has the salvage rights to the

4    Titanic.

5           Right now all you have, you are the current salvor

6    in possession, but that doesn't mean that you can't lose

7    that.  You can have competing salvors come in and say, well,

8    wait just a minute.  They haven't exercised those salvage

9    rights since so and so, and we've got this operation set up,

10   and the Court could declare a new salvor in possession.

11          So you're giving away something, in my opinion, you

12   cannot give away, and I would not approve an agreement that

13   says something that is legally incorrect.  You cannot

14   transfer, you cannot do anything with exclusive salvage

15   rights into the future.

16          MR. McFARLAND:  I think, Your Honor, this is just a

17   definition section.

18          THE COURT:  What does it define?  It defines what's

19   in the agreement when that's mentioned.

20          MR. McFARLAND:  Well, it's just defining for

21   purposes of the agreement what is possessed by R.M.S.T.

22          THE COURT:  You don't possess it.  You possess the

23   current salvor-in-possession rights.  You do not possess the

24   exclusive salvage rights into the future.  That, you do not

25   have.  The only thing you could transfer would be your

1    current salvor-in-possession status.  You could not transfer

2    exclusive salvage rights into the future.  That's a basic

3    problem I have because that implication is throughout this

4    agreement.

5           If PAHL thinks they are getting that, they are

6    being misled.  They're not a party to this proceeding, but

7    PAHL needs to understand that that is not an asset that it

8    can legally purchase, nor would this Court approve of it

9    purchasing because, in my opinion, it divests this Court.

10   It's saying, I don't know.  It's not even a legally correct

11   statement because no salvor in possession can give away

12   exclusive rights into the future because you can always lose

13   that right.

14          MR. McFARLAND:  I appreciate what the Court is

15   saying.  I think that can be dealt with in the order that

16   this Court would enter.

17          THE COURT:  I wouldn't approve this agreement with

18   it in there.  When I approve this agreement, and then I'm

19   letting an agreement go that you then said you can alter it,

20   as long as it's not a material alteration, and, by the way,

21   this Court doesn't have any jurisdiction of that to look at

22   your alterations or what you're doing with the Asset

23   Purchase Agreement because the exclusive jurisdiction rests

24   with the bankruptcy court and then in somewhere it talks

25   about the New York courts.

```
 1            This was a lot of quick reading on that, but I was
 2   looking for jurisdictional issues.  I'm concerned about it.
 3   I think there is a lot in here that would give a Court that
 4   has for decades, over 25 years been managing the salvage of
 5   probably one of the most important historic sites in the
 6   world, and certainly ships wrecks in the world, to then
 7   approve an agreement that somehow you think you can give
 8   away the future exclusive salvage rights when you can't.
 9            MR. McFARLAND:  That is, Your Honor, and I think
10   when we get to it, we can show the Court in the order that
11   it's proposed, that is agreed upon with the United States
12   and NOAA, there is not an intention, and it is not provided
13   for in terms of giving away future exclusive salvage rights.
14            My client is not in any way attempting to undermine
15   or take away this Court's jurisdiction as to the salvage
16   action in the covenants and conditions.
17            THE COURT:  I've got to be convinced of that.  I've
18   got to be convinced that there is no end run around this
19   Court to take away, to manipulate the salvage rights, who
20   determines the salvage rights and these artifacts that are
21   to be kept as a full collection.
22            This is an extremely complicated agreement, and,
23   also, I haven't seen, if I have, I don't believe I've seen
24   any agreed order.
25            MR. McFARLAND:  No.
```

1          THE COURT:  I've read a lot.

2          MR. McFARLAND:  That has not been presented.

3          THE COURT:  I know what I've read.  I know the

4    pieces of paper I've read, but I haven't seen any agreed

5    order that you're referring to.  Of course, I'll be glad to

6    look at it and listen to your argument on it.

7          MR. McFARLAND:  Would it be helpful maybe Your

8    Honor just take a short five-minute break?

9          THE COURT:  We will, but let me go through my

10   initial questions, trying to let you know everything on my

11   mind so that you can respond and maybe then when you give me

12   the order, you can explain where it's covered in the order.

13         I found it.  It's Section 8.11 where the APA is to

14   be governed by New York law and any disputes related to it

15   are to be resolved in a New York state or federal court.

16         MR. McFARLAND:  That would be for the APA, Your

17   Honor, recognizing that the APA was the negotiated agreement

18   between the stalking horse purchaser and Premier Exhibitions

19   while Premier was in Chapter 11 bankruptcy proceedings and

20   for ultimate review and approval of the sale by the

21   bankruptcy court.

22         THE COURT:  How did that mesh with the bankruptcy

23   court retaining exclusive jurisdiction to interpret, endorse

24   and implement, as well as adjudicate disputes related to the

25   sale, order and the APA?  In other words, that's my

1    confusion there.  In one place you're saying that New York

2    law and New York courts, and in another you're saying the

3    bankruptcy court.  That's under the sale order.

4              MR. McFARLAND:  Right.

5              THE COURT:  The sale order says that.  So who is

6    going to adjudicate the disputes under the APA?  I can't

7    imagine there will be none, given the intricacy of this

8    agreement.

9              MR. McFARLAND:  Well, I think it depends on when

10   the dispute arises, Your Honor.  If there is a transaction

11   that closes and PAHL becomes the purchaser in the new

12   entity, then that means that the bankruptcy court, the

13   proceedings would be done in the bankruptcy court; they are

14   going to end.

15             So that's why I think the APA is providing for in

16   the future what would happen.  I read this as this is a

17   choice of law question that the parties agree that would be

18   governed by the New York law, future disputes.

19             THE COURT:  The future disputes would be governed

20   but not just a choice of law.  It's also a choice of forum.

21   Choice of law is deciding what law.  Forum is deciding what

22   court.

23             Let me just mention my last concern.  You came

24   before this Court a couple of times, and you put the rush on

25   this because you kept saying the employees need to be paid,

1    the employees need to be paid, and in the Asset Purchase

2    Agreement you say that R.M.S.T. hasn't had any employees

3    since 2015.  I'm quite confused about that.  It's in Section

4    3.11 under labor and employee benefits, and it represents

5    that R.M.S.T. hasn't had any employees since 2015.  You all

6    were coming in here telling me that your employees weren't

7    going to get paid and you had all of these employee

8    problems.

9         MR. McFARLAND:  Your Honor, remember, now, the

10   parent corporation is Premier Exhibitions, and Premier has

11   altogether about 150 employees.  As it's structured now, I

12   believe the R.M.S.T. folks who work on the artifacts, for

13   example, Ms. Klingelhofer, she is technically a Premier

14   employee.  But Premier is in bankruptcy as well, Your Honor.

15   The parent corporation is in the same financial

16   circumstances as R.M.S.T.

17        THE COURT:  So you all are like one entity?

18        MR. McFARLAND:  They are distinct entities, Your

19   Honor.  It's just that Ms. Klingelhofer is technically

20   employed by -- her check comes from Premier Exhibitions,

21   Inc.

22        THE COURT:  But you've been in here as an R.M.S.T.

23   attorney, and it's been represented to me on numerous

24   occasions that this thing had to go through and this Court

25   had to move mountains to get it through because there were

1    all these employees that weren't going to be paid as of the

2    end of the year.  Then you make the representations in the

3    Asset Purchase Agreement that you haven't had any employees

4    since 2015.

5              MR. McFARLAND:  Well, the representation, Your

6    Honor, was for all the debtors, in other words, the debtors'

7    employees have -- the debtors, plural, have financial

8    issues.  The employees of the debtors are obviously affected

9    by the company's -- and by that I'm using the plural

10   again -- financial situation.

11             So how they technically get their paycheck, but the

12   point that's always been made to this Court, or at least was

13   always intend to be made, is the debtors', plural, financial

14   situation is dire.  There is no two doubts about it.  That's

15   why there is -- and we appreciate the Court making itself

16   available and hearing this matter and the prior matters

17   because of the urgency.

18             THE COURT:  I don't have any objection to making

19   the Court or myself available, but, as I say, you can't let

20   an emergency that's not -- you're trying to make somebody

21   else's emergency -- it's that old maxim of you're trying to

22   make your emergency my emergency, and this is a serious

23   situation.  This Court has been involved in this case for

24   decades and supervising and protecting the artifacts.

25             To then say you've got to approve this -- I hold up

1    the stack, and we are still filing -- I'm looking, this is

2    the submission from October 22nd, and you've got to get this

3    done by October 31.  Frankly, I know that it's reverse where

4    somebody says to the Court, you're not being fair, I say to

5    you all, you're not being fair to the Court, and the

6    importance, in my opinion, is of the preservation of the

7    Titanic.  It's not something that necessarily can be done in

8    a few days.  Look at how long your bankruptcy went on.  It's

9    taken all of this time to get a bankruptcy order.  These are

10   voluminous orders.  They have the force of law.

11           The Court has to be mindful of its duty to protect,

12   as it's referred to it many times, as the graveyard in the

13   sea.  It's very important.  I'm just saying that you're

14   asking a lot of the Court in less than a week when the case

15   has been pending for 30 years.

16           MR. McFARLAND:  Sure.  We appreciate, Your Honor,

17   that there has been a lot submitted.  We filed the motion

18   for approval back in June.

19           THE COURT:  I understand that.

20           MR. McFARLAND:  And provided the APA at that time.

21   Then this Court has had the status hearings, and we've

22   apprised the Court of what's been going on in the bankruptcy

23   court.  What we wanted to do, Your Honor, is come to this

24   Court as soon as possible once the bankruptcy court issued

25   its ruling of last week.  So we appreciate the Court making

1 | itself available today.

2 | THE COURT:  I'm not criticizing you at all.  You

3 | have sent me things as quickly as you've gotten them.  I'm

4 | not saying there is a delay on anyone's part because you all

5 | have been very efficient in getting things to the Court.

6 | It's just that the expectation now that something

7 | has to be done in a few days.  It's the 25th of October, and

8 | the materials were still coming in this morning.  So all I'm

9 | saying is that the expectation that something of this

10 | magnitude can be done in under a week is expecting a lot.

11 | You all have exercised your due diligence in terms of

12 | timeliness in getting things to the Court.  There is no

13 | criticism or fault there.

14 | I'm just trying to say you're putting a tremendous

15 | burden on the Court to do something in under a week of this

16 | magnitude and importance not only for today but for

17 | posterity.  I'm not trying to be dramatic, but that's the

18 | way I feel about it.

19 | MR. McFARLAND:  We appreciate that, Your Honor.

20 | That's why I do want to answer whatever questions the Court

21 | has, and even if we need to submit something further because

22 | the overall message -- and I think the government will agree

23 | with me -- is that if the Court approves the APA and the

24 | stock sale of R.M.S.T. and then the transaction closes, as

25 | to this Court and R.M.S.T.'s operations, it's going to

1    remain business as usual.  We are going to be filing

2    periodic reports.  We are going to be updating the Court.

3    We have received some recommendations from NOAA that we'll

4    certainly talk with them post-closing.  I appreciate what

5    the Court is saying.  That is why I say I really do want to

6    assuage the Court's concerns because we view this -- this is

7    a positive situation.  A purchaser is coming in with much,

8    much more significant financial resources so that the

9    company should not be facing quite the circumstances as it

10   is now.

11          It comes out of bankruptcy after, admittedly, long

12   period, and I'm not a bankruptcy attorney, as Your Honor

13   knows, but even I know two years, it has been a difficult

14   time.

15          THE COURT:  It's a major case, and the bankruptcy

16   court needed to spend that kind of time on it.  Again, I'm

17   not faulting the bankruptcy court because we have

18   bankruptcies in the court that go on for quite a few years

19   when you're involved in a case of this magnitude and

20   importance.

21          MR. McFARLAND:  Right.  My point was I think the

22   bankruptcy court has done an excellent job.  It took awhile

23   to get to a situation, and that is now the sale, that was

24   acceptable, that would be accepted by the bankruptcy court.

25   And let me say this, the order that the bankruptcy court

1   entered, obviously, carries the bankruptcy court's approval

2   but also carries the approval of all of the major creditors,

3   of the debtor's landlord, and of a majority of the

4   shareholders.  That's very important.

5          So when we come to this Court, and I appreciate, we

6   are asking this Court to review quite a bit and to give us

7   full consideration, but we are coming in here with a

8   situation where six months ago or less, we didn't know what

9   was going to happen with R.M.S.T.

10         Now we have a bankruptcy court order and a plan

11  going forward, assuming that the transaction closes, and we

12  obviously need this Court's blessing as to certain elements

13  of that.

14         THE COURT:  Well, why don't we take a 15-minute

15  recess.  Then you can actually argue and not have to just

16  respond to the Court's inquiries and present your order, and

17  then, of course, I'll hear from the United States, and we

18  will continue.

19         MR. McFARLAND:  Thank you, Your Honor.

20         (Recess from 2:07 p.m. to 2:25 p.m.)

21         THE COURT:  Mr. McFarland.

22         MR. McFARLAND:  Thank you, Your Honor.  Your Honor,

23  I did want to say, when we were talking about the urgency,

24  and this Court will recall when we were here in September

25  and there was evidence presented about the debtors and I'm,

```
1    again, using the plural, financial situation, that,

2    essentially, by the end of the year they will be out of

3    cash.  So the urgency is, if this transaction is going to

4    close, to get it done so that the purchaser can come in and

5    take over and run the operations, pay the employees, keep

6    the business, and in that sense what the bankruptcy court

7    has approved is the one plan that was ever presented that

8    provides to continue the company or companies, including

9    R.M.S.T. as a going concern.

10          So we certainly appreciate the Court's having to

11   dive in and look at a lot of things on short notice, but

12   there is an urgency.  If this transaction doesn't go

13   through, the next thing that is going to happen is a Chapter

14   7 liquidation.

15          THE COURT:  Let me ask you, quick question.

16   R.M.S.T. filed the bankruptcy, right?

17          MR. McFARLAND:  Well, the debtors, plural, which

18   includes Premier and its other subsidiary, PEM.  So there

19   were at least three entities.  I think I may be short

20   counting, but there is at least three or four entities that

21   filed the bankruptcy.  It's not just R.M.S.T.  The point

22   there is Premier is the parent company.  There are separate

23   corporation entities with the corporate formalities, et

24   cetera, but they are all in the bankruptcy.

25          Your Honor, perhaps, what might be good is to see
```

1    if I can and help address the Court's concerns, we have

2    spent a lot of time with NOAA, in respect, and we appreciate

3    NOAA and the government's efforts.  We had a lot of

4    communications.  They sent us questions, which we endeavored

5    to answer as fully as possible.  Then they sent some

6    supplemental questions, which we've also answered.  We

7    provided the Court copies of our responses to NOAA's

8    questions.

9           We then have gotten together and worked on a draft

10   order for the Court that presents, summarizes the situation,

11   but also, and certainly we will go through them and make

12   them on the record, the commitments that my client R.M.S.T.

13   is willing to make with respect to, and will make with

14   respect to this transaction.

15          So if I may, Your Honor, what may be helpful is to

16   hand up a draft order, and we've even -- recognizing one of

17   the Court's stated concerns about the APA, if the Court will

18   apologize, the handwritten aspect into it.  We will

19   certainly work on and modify this further.  But I thought it

20   would be very helpful for the Court to see the framework

21   that we believe this transaction presents consistent with

22   our efforts with the government to reach a solution that we

23   can present to the Court that will satisfy the Court's

24   needs.  I've got a copy for Your Honor's law clerk, too.

25   Thank you, Your Honor.

1              So what we've got, Your Honor, and I'll give the

2     Court time to follow along, beginning paragraphs are

3     essentially a summary of where the proceedings are.  We note

4     that, and, of course, much of this evidentiary-wise is

5     reflected in the responses that we provided to the

6     government and NOAA that have been submitted to the Court.

7     But in Paragraph 3 we note the sale is contemplated by the

8     APA, is not intended to change the corporate identity of the

9     trustee or the management, conservation, and curation of the

10    STAC.

11             THE COURT:  Well, how is PAHL, Premier Acquisition

12    Holdings, LLC, different from Premier Exhibitions, Inc., and

13    Premier Exhibition Management, LLC, and Premier Exhibitions

14    International, LLC and all the different parties that were

15    parties to the bankruptcy proceedings?

16             MR. McFARLAND:  So Premier Acquisition Holdings,

17    LLC, is the new entity.  That is the purchasing entity.

18    That is composed of three members, Apollo, Alta and

19    PacBridge, and that's a brand-new entity, Your Honor, with

20    different members, different directors, officers, et cetera.

21             There is no overlap between Premier Exhibitions,

22    Inc., and its subsidiaries, PEM, et cetera, that are

23    selling -- those entities selling their assets to the

24    stalking horse purchaser, PALH.  Different entity.  That's

25    why I say this was a very negotiated transaction in which my

1    client -- and there I will say clients, plural, Premier

2    Exhibitions because we represent them in capacities,

3    negotiated with PAHL.  PAHL happens to have a name that uses

4    the Premier name there, but it's a wholly distinct entity

5    that is going to be a Delaware entity with a principal place

6    of business in Atlanta but different members in that LLC,

7    different, et cetera.

8            So we continue, Your Honor.  We set forth the

9    proceedings, including the government's role as amicus, and

10   it's filed its report and recommendation, which I don't know

11   if the Court's had a chance to read the entire, but it does

12   recommend the approval of the transaction.

13           Then here is where Your Honor, I think we want to

14   go through it, and let me say I'm turning now to Paragraph

15   6.  This was drafted, Your Honor, before we came in and the

16   Court expressed certain of the concerns it has.  But it was

17   drafted then to try and make sure we addressed the Court's

18   concerns and its role in this transaction.

19           So let me say, in addition to having the order

20   entered, we state on the record, R.M.S.T. will continue to

21   "consent to the in personam jurisdiction of this Court for

22   purposes of its ongoing compliance with the covenants and

23   conditions."  We will "commit to continue to abide by the

24   covenants and conditions."

25           Of course, there has never been any assertion that

1   we haven't.  We will "commit to providing the Court with

2   copies of all" -- this is (c), "replacement or amended

3   intra-company agreements that pertain to the care,

4   preservation, conservation or curation of the artifacts."

5   In that respect, as we've provided to the Court previously

6   but also provided to the government very recently, we were

7   providing them the intra-company agreements that are in

8   place and going forward.

9           (d), we "commit to promptly advise the Court of any

10  change or alteration to the composition and makeup of both

11  R.M.S.T.'s and PAHL's board of directors."  So just as we've

12  done, Your Honor knows in the periodic reports where we

13  advise who is on the board and the management, that we will

14  do the same and keep the Court informed as to R.M.S.T. and

15  PAHL.

16          NOAA and the government want to know that the same

17  fine collection staff that is in place now, whether those

18  folks are going to still be there and who is going to be

19  involved in the permanent collection, so we will advise the

20  Court of that, and as well as in changes in senior

21  management as it pertains to the permanent exhibitions, the

22  permanent exhibitions being the one of the Luxor Hotel, and

23  I believe in New York -- I'm sorry, Orlando.  We will

24  continue to file periodic reports at regular intervals as

25  directed by the Court.

1          The Court knows we've been doing that, in fact,

2    kind of inundating the Court, but there were significant

3    developments that we needed to make the Court aware of.  I

4    think here, Your Honor, this is (g), very important to the

5    Court's concerns that it had with respect to certain

6    language of the APA.  So my client will "commit that it will

7    provide the Court at least 60 days' notice" as to "any

8    action that results in the Titanic collections no longer

9    being maintained together as an integral whole.  And any

10   action which pledges or otherwise uses in any way any

11   artifacts as security or collateral for any purposes."

12         We also "commit to provide the Court advanced

13   notice," obviously, "of any expeditions to the wreck site"

14   or pass to salvor.  Then, Your Honor, this is where the --

15   it was written in in hand, and I hope the Court can read the

16   handwriting, but to address certain of the Court's concerns

17   today, we would agree and state in the order,

18   "notwithstanding anything in the APA to the contrary, we

19   shall not amend the APA in any manner contrary to these

20   confirmations."

21         So we state these conditions, Your Honor, because

22   to say we recognize this Court's role.  R.M.S.T., as always,

23   recognized this Court's role, its longstanding history in

24   this proceedings, and that is not in any way intended to

25   change.

1          THE COURT:  Mr. McFarland, what will be PAHL's

2    relationship to R.M.S.T.?

3          MR. McFARLAND:  It will be a parent entity, Your

4    Honor, that provides certain funding overseas, R.M.S.T.'s

5    operations, but they're distinct entities.

6          THE COURT:  What keeps the parent company from

7    dissolving this subsidiary?

8          MR. McFARLAND:  Dissolution, Your Honor, would have

9    to be by the R.M.S.T. board of directors, would have to be

10   voted on by the R.M.S.T. board of directors, and there are

11   separate boards.

12         THE COURT:  You are saying the parent company can't

13   dissolve the subsidiary company or merge it or do something

14   to that effect with it?

15         MR. McFARLAND:  Well, I think under those

16   circumstances, Your Honor, the covenants and conditions

17   would be implicated and we would be before this Court.

18   Number one, we could be informing the Court of that; and,

19   number two, we would be before the Court.

20         THE COURT:  PAHL isn't before the Court.  Why

21   haven't they made an appearance before me?

22         MR. McFARLAND:  R.M.S.T. is, Your Honor.  The

23   artifacts are owned by R.M.S.T., and R.M.S.T. is the party

24   to the covenants and conditions, as it's always been.

25   Premier Exhibitions is not a party to the covenants and

1   conditions and wasn't even in existence at the time that

2   these salvage proceedings started and R.M.S.T. was granted

3   salvor in possession.  So there is a substitution, if you

4   will, of PAHL for Premier Exhibitions, but there's not a

5   change in this Court's role or in the operations of R.M.S.T.

6   in how things are going to be in this.

7          THE COURT:  At the moment.

8          MR. McFARLAND:  But if there were a change such as

9   Your Honor's saying, that would come to the Court's

10  attention.

11         THE COURT:  What responsibility does PAHL have to

12  this Court?

13         MR. McFARLAND:  I think, Your Honor, the key is --

14  and I'm not really not trying -- I think the key is what is

15  R.M.S.T.'s responsibility given that its only assets are the

16  artifact collection and, to a certain extent, the exhibitry.

17  So, I mean, the party that this Court wants to make sure it

18  has jurisdiction over, it does, and that's going to remain.

19         If there is an issue, should there be an issue in

20  the future with curation, conservation, care, this Court has

21  the party it needs to bring before it and say what's going

22  on here, Mr. McFarland?  We are hearing that you're not

23  caring for the artifacts, or we are hearing that this

24  Court -- you've got the party.

25         THE COURT:  But if PAHL owns 100 percent of your

1    stock, they control your company.  I'm not a sophisticated

2    corporate business lawyer.  I did some business law in my

3    day, but it's kind of hornbook law when you read that

4    somebody has bought -- you keep talking about stock and

5    assets, but R.M.S.T. is selling 100 percent of its stock to

6    PAHL, which means PAHL owns it.

7            MR. McFARLAND:  PAHL will own the stock of the

8    company, that's correct.  It is the parent corporation.

9            THE COURT:  They make the decisions.  Come on,

10   Mr. McFarland.  You know good and well that you sell 100

11   percent of your stock to an entity, that entity controls

12   that corporate company.

13           MR. McFARLAND:  It certainly makes it a subsidiary,

14   and I agree, but we also must recognize there are

15   distinctions.

16           THE COURT:  They are 100 percent stockholder.  If I

17   own 100 percent of the company, I control it.  If you own

18   100 percent of the stock in a company, you own the company,

19   you control the company, and PAHL is not a party in this

20   proceeding.  It has not made an appearance in this court.

21   You're asking this Court to approve a sale of the party

22   before this Court, which is R.M.S.T., to an entity that is

23   not before this Court.

24           You can't get around that I'm authorizing the sale

25   of 100 percent of R.M.S.T.'s stock.  So call it a stock

JODY A. STEWART, Official Court Reporter

1  purchase if that's what you want to do.  It's a stock

2  purchase, but a hundred percent of the stock means you're

3  the owner of the company, and you can do what you want with

4  that company.  You can disband it.  You can expand it.  You

5  own the stock.  You vote.  You make the decisions for the

6  company.

7  　　　　MR. McFARLAND:  With respect to the shareholders,

8  that's correct, Your Honor.  But the key is that the

9  covenants and conditions, and this Court's jurisdiction as

10  to the artifacts, remain in place.  That doesn't change.

11  　　　　THE COURT:  At the moment they remain in place, but

12  R.M.S.T. is the entity before this Court, not PAHL.

13  R.M.S.T. is asking this Court to approve a 100 percent sale

14  of all of their stock to PAHL.  That's the bottom line.

15  　　　　MR. McFARLAND:  Right.

16  　　　　THE COURT:  PAHL isn't before this Court.

17  　　　　MR. McFARLAND:  That stock sale will not change

18  this Court's authority over the collection, the American

19  collection, and the covenants and conditions and the salvage

20  rights.  That doesn't change.  So if there were a

21  dissolution, they can't do something with the artifacts

22  without this Court's approval.

23  　　　　THE COURT:  You just finished telling me that PAHL

24  didn't sign on to the covenants and conditions.  The only

25  party advised is R.M.S.T.  So if R.M.S.T. is no more, how is

1    there a bound party?  How can you buy an entity that no

2    longer exists?

3            MR. McFARLAND:  No one is going to enter into any

4    kind of transaction or with those artifacts knowing that the

5    covenants and conditions and this Court's authority over the

6    artifact, the American collection of the artifacts, is still

7    in place, Your Honor.  It's really not different from what

8    the situation is now with Premier.  Premier Exhibitions

9    didn't come into being until, I think it's 2003 or 2004, and

10   it's not a party to the covenants and conditions, and it's

11   not a party to these proceedings.  It's a parent

12   corporation.

13           THE COURT:  But it doesn't have 100 percent of the

14   stock.

15           MR. McFARLAND:  It's got the ownership rights, Your

16   Honor.

17           THE COURT:  Those were things that didn't make the

18   Court happy at the time.  We won't go back through all the

19   years of litigation as to things that have occurred and have

20   not occurred in this case, and the Court's need to bring in

21   the United States as amicus because the Court, back with

22   Judge Clarke, it was the Court *vis-à-vis* you, not you,

23   Mr. McFarland, but R.M.S. Titanic.

24           There was no advocate for the citizens of the

25   United States and their interest and the other citizens of

1   other countries and their interests, and the upholding of

2   the salvage laws.  I don't want to go back through this case

3   because it has been here for a long time, and it's a lot

4   that occurred and going back to Mr. Tulloch and all of that.

5   I have the whole history.  But I'm concerned when I sign an

6   order that approves a hundred percent of your stock to

7   Premier Acquisitions Holdings, LLC, which is an entity that

8   is not before this Court, and they completely own and

9   control you.

10          MR. McFARLAND:  But that really is no different

11  from the current situation, Your Honor, with Premier.  Right

12  now what we are doing is we are substituting a new purchaser

13  for Premier Exhibitions, who is in bankruptcy, who had to

14  file Chapter 11.  We are substituting a new purchaser.

15  Otherwise, they are the same.  It's the same situation

16  except it's a better situation that we are bringing in a new

17  parent entity that has capital and has certain abilities and

18  can go forward.

19          We are not changing this Court's role or this

20  Court's oversight.  This Court will have the same

21  relationship with R.M.S.T. that it's always had, and really,

22  in a sense, the same relationship with Premier Exhibitions

23  that it's had with PAHL.

24          THE COURT:  Is there anything else you want to tell

25  me about the order?

1          MR. McFARLAND:  No, I don't think as to the order,

2     Your Honor.

3          THE COURT:  I have a couple of questions about this

4     Asset Purchase Agreement.  I note that R.M.S. Titanic, Inc.,

5     is solely for the purposes of Article III, Article V,

6     Article VII and Article VIII.  So tell me why that was

7     carved out and go through each of those articles with the

8     Court, please.

9          MR. McFARLAND:  So, Your Honor, I turn to, you said

10    Article III, correct?

11         THE COURT:  Yes.  It says on the front of the Asset

12    Purchase Agreement, "By and between," and it specifically

13    names different entities.  Then it says, "R.M.S. Titanic,

14    Inc. (solely for purposes of," and it gives "Article III, V,

15    VII and VIII)."

16         MR. McFARLAND:  That's consistent with the way the

17    transaction is structured, Your Honor, again, that this is

18    what is being acquired of R.M.S. Titanic, is its stock, not

19    its assets so that those assets, i.e., the artifacts and the

20    exhibitry, will remain under the R.M.S. Titanic corporate

21    entity and remain under the covenants and conditions.  There

22    is not a change in trustee.

23         This transaction was set up to address what I think

24    the Court is saying, in large part, to keep it that way so

25    that R.M.S. Titanic, Inc., the entity, that there is no

1   question this Court has *in personam* jurisdiction over,

2   remains the entity, that is, A, ownership and control,

3   curation of the artifacts; and, B, remains before this

4   Court.

5          THE COURT:  I just didn't understand why it was

6   certain articles.

7          MR. McFARLAND:  I think it's where they're trying

8   to make sure that there are certain articles or provisions

9   that are going to apply to R.M.S.T., and I think that's why

10  they're trying to define those.

11         THE COURT:  It says, "Solely for purposes."  So

12  that tells me that it's excluding R.M.S. Titanic, Inc., from

13  the other articles.  It says that you're in here solely for

14  purposes of those articles, and I didn't know why, if you

15  weren't party to the whole agreement, maybe somebody else on

16  the team can explain it to me at some point when they have

17  an opportunity to talk.

18         I note that on the front of the agreement that it

19  says "solely for purposes."  So to me, as a judge

20  interpreting that, if I were called upon to do it, I would

21  say that they have entered this agreement, and then only

22  portions of this agreement that apply to R.M.S. Titanic,

23  Inc., would be III, V, VII and VIII.

24         MR. McFARLAND:  I think that's intended to be

25  consistent with what the nature of the transaction is so

1   that we are not, given that it's a stock sale, as to

2   R.M.S.T.

3           THE COURT:  Mr. Wainger, are you ready to address

4   the Court?

5           MR. WAINGER:  If it please, Your Honor.  Thank you

6   for the opportunity, Judge.  What I'd like to do is to try

7   to simplify this for Your Honor.  There is, obviously, a lot

8   to this.  I think it's important to understand the corporate

9   structure of Premier.  So you have Premier Exhibitions,

10  which is just a holding company, and it has several

11  subsidiaries, including PEM, which is its operating entity,

12  and R.M.S.T.  R.M.S.T. is a bucket in and of itself, and the

13  only thing that R.M.S.T. has is the artifacts, the salvage

14  rights, and what we call the IP associated with the

15  artifacts; the archives, the photographs, the digital and

16  video archive.  That is all it has, okay, and it doesn't, at

17  this stage, operate very much.

18          What it does is it licenses its rights to PEM, the

19  operating company, and in some respects to PRXI so that they

20  can operate these entities.  Right.  So we are in

21  bankruptcy, and we are trying to structure a deal with the

22  stalking horse purchaser, PAHL, Premier Acquisition

23  Holdings, that will allow for the transfer of assets but

24  maintains this Court's jurisdiction over the artifacts.

25          So what we agreed to do was for PAHL to acquire all

1    Premier's and PEM's other assets but just the stock of this

2    company.  That's all we are trying to accomplish, Your

3    Honor, is make it very, very simple.  The questions are

4    numerous, Your Honor, as to why this appears to be

5    complicated.  It was a massive undertaking for the stalking

6    horse purchaser and all of the debtors to find an exit out

7    of the bankruptcy, and these are the only folks that

8    presented that opportunity to provide that exit.

9         So the APA was a massive undertaking, but they came

10   to me and Mr. McFarland and said, how do we simplify this

11   for Judge Smith so that Judge Smith understands that nothing

12   changes about R.M.S.T.?  The relationship between Premier

13   and R.M.S.T. is no different than the relationship that is

14   to be between PAHL and R.M.S.T.  R.M.S.T. is a wholly-owned

15   subsidiary of Premier.

16        I remember being in here with Your Honor in 2004

17   talking about whether this Court does have or should have

18   jurisdiction over Premier Exhibitions.  We went back and

19   forth, and what we agreed to was, because of the separate

20   corporate formalities, R.M.S.T. was the only part to this

21   action, and this Court has complete and utter control over

22   the salvage rights and over the artifacts by having complete

23   control over R.M.S.T.

24        Nothing changes now except PAHL is the different

25   parent company of R.M.S.T., and we structured it this way on

1    purpose.  Nothing changes about the operation of R.M.S.T. or

2    about its relationship with its parent company.  Just as

3    this Court has no jurisdiction over Premier, this Court

4    should have no jurisdiction over PAHL because it's

5    unnecessary.  Anything happens with these artifacts,

6    R.M.S.T., the company that Mr. McFarland and I represent, we

7    are back here, and the same way we have been for 15 years.

8    Nothing changes except we are not struggling with an

9    unfunded company.  We now have folks that have stepped up

10   and have made it their priority to take on these historical

11   assets and build a broader company around it with greater

12   resources.

13        That's the only thing that changes, Judge, is that

14   there is a different parent company.  So why isn't PAHL here

15   submitting to the *in personam* jurisdiction of the Court?

16   It's not appropriate under corporate formalities.  It's not

17   necessary because this Court has a hundred percent control

18   over these assets, period.  That's why PAHL hasn't come

19   forward.  It's not necessary.  It's not appropriate, and

20   that's the critical issue.  That's an issue that we have

21   talked about with NOAA over and over again.

22        That's why we were certain, when we negotiated this

23   draft order with NOAA, to be sure that this Court -- that

24   there was no space, there is no open space for this company

25   to try to circumvent these Court's orders.  That's the goal.

1   That was the goal when we drafted this APA, when we carved

2   out, when we converted it from a complete asset sale to a

3   stock sale of R.M.S.T.  That was the goal here, Judge; keep

4   it simple and nothing more.  Don't change anything.  Okay.

5           So the reason we made it as a stock sale was

6   because we wanted to simplify this for Your Honor.  We

7   didn't want this Court to have to analyze the APA in the

8   detail that the Court is doing when we felt that that was

9   happening in Florida.  We wanted to simplify it, and we

10  decided -- and NOAA now agrees with us in their report and

11  recommendation -- that under Section VI of the covenants and

12  conditions, this Court's formal approval, as required by the

13  covenants and conditions, distinguished from as required by

14  the Asset Purchase Agreement, is not even necessary.

15          NOAA agrees with us there, and that's because under

16  Section VI(E) -- well, it's under Section VI(A) and (E),

17  there is no Court approval necessary.

18          THE COURT:  What page are you on?

19          MR. WAINGER:  Page 13 of the covenants and

20  conditions, Your Honor.  They didn't agree to it.  We took

21  it out of the order, but it is in the report and

22  recommendation, I thought?  No.  Be that as it may, it

23  certainly is my position that the Court approval is not

24  necessary under Section VI because "procedures outlined in

25  this section...do not apply, however, in situations where

1    the corporate identity of the trustee is changed or altered

2    by sale, purchase, merger, acquisition, or similar

3    transaction, the form and purpose of which does not

4    effectuate a change in the management, conservation and

5    curation of the STAC."

6           So when the acquisition of R.M.S.T. is planned, we

7    took great care to make sure that the stalking horse

8    purchaser doesn't change a thing about the management,

9    conservation, and curation of the STAC in any sort of

10   negative way.

11          We have a lot of expectations to apply more

12   resources and do good things, but so what do I mean by that?

13   Ms. Klingelhofer's staff all remains the same.   The

14   artifacts all remain in the same place.   The policies and

15   procedures and archives, nothing changes, right.

16          With respect to the salvage rights, we continue to

17   keep Mr. Nargeolet in charge and Mr. Gallo in charge of

18   future expeditions so that there is continuity, a hundred

19   percent continuity between that R.M.S.T. and the future

20   R.M.S.T.   That's the way this was designed.

21          These people have taken extraordinary care to make

22   this as easy on Your Honor as possible so that Mr. McFarland

23   and I could come in here and say, and NOAA could look at

24   tons and tons of diligence responses and come to the

25   conclusion that it did to recommend this transaction.

1          This is not a game of -- what do they call it --
2    it's not a shell game.  This is an opportunity for Your
3    Honor, for this collection to be in much better hands in
4    terms of resources with the same safeguards that you have
5    built in place from day one.  This company, the stalking
6    horse purchaser, should be embraced because they have
7    stepped up with the money, and they're the only entity to
8    step up with the money to save these artifacts; and, B, from
9    day one, as evidenced by the Asset Purchase Agreement, to
10   say we want to do everything by the book in conjunction with
11   the covenants and conditions.  That was never a controversy,
12   and that's why we laid it out the way we did.
13          So that, I think, is the big picture, Your Honor.
14   You asked a bunch of specific questions, is this an arm's
15   length transaction?  Well, as Mr. McFarland pointed out in
16   the order, Judge Glenn finds it's an arm's length
17   transaction, and he found that in the order after we had
18   various entities with their own agendas trying to challenge
19   that very issue without any real proof.  So Judge Glenn took
20   care of this, and it absolutely is an arm's length
21   transaction.
22          There is extensive testimony, by the way, Your
23   Honor, on that very issue in the transcript we presented to
24   Your Honor.  I've already explained how and why PAHL did not
25   come in here to submit itself to the jurisdiction of the

1    Court and why that is not necessary.  We've talked about how

2    this is a stock sale where everything else is an asset sale.

3           This is not, Your Honor, an endeavor to remove

4    jurisdiction of this Court, which Your Honor was concerned

5    about in the question.  This is a commitment, as we say in

6    the order, to continue to abide by the covenants and

7    conditions and to the *in personam* jurisdiction of this

8    Court.  We have to understand right now, PAHL is merely an

9    acquisition vehicle.  It's a shell vehicle right now to

10   acquire the assets of PEM, taking it out of bankruptcy, and

11   acquire R.M.S.T.

12          The managers of PAHL have employees who will be, in

13   fact, the board of directors, the initial board of directors

14   of R.M.S.T.  So the reality is, Judge, there is no way for

15   any of these players to get around this Court's

16   jurisdiction, and that was never the intention.  I would

17   hate to represent R.M.S.T. and come in under those

18   circumstances before Your Honor, having been a part of this

19   since 2001.

20          THE COURT:  Wouldn't you just say I'm just an

21   attorney, there is nothing I could do?  Nothing I can do.

22   I'm the attorney.  I did my best, because I could, with

23   advocacy, and I didn't have any control over what they did.

24          MR. WAINGER:  If I say that, that's great, but I

25   wouldn't want to be here saying that.  Let me promise Your

1    Honor that.

2             THE COURT:  What could the Court do?  Nothing.

3             MR. WAINGER:  The Court is in the same position

4    after this transaction that it's in right now.

5             THE COURT:  Well, I'm not convinced of that yet.

6    You tell me why do they want to purchase the assets?  For

7    what reason?

8             MR. WAINGER:  They want to purchase the assets

9    because they believe that they can develop incredible assets

10   into a productive, profitable company.

11            THE COURT:  How?

12            MR. WAINGER:  By building up the exhibitions, by

13   putting more money into it and developing an operating

14   company that makes money.  The prior company has been

15   dragged down because its parent was a public company, and

16   they were distracted with a variety of different operating

17   assets.

18            These folks have access to extraordinary resources

19   and an incredible track record of operation.  So they see an

20   opportunity.  This was a distressed asset that some valued

21   at 200 million.  They saw this as an opportunity to come in.

22   They were the only folks willing to make that commitment, to

23   put their money on the line, and they want to make money off

24   of it, Your Honor.

25            THE COURT:  So how are they going to do it?  How

```
1    are you going to make money off of this?  Premier
2    Exhibitions for years has tried to exhibit and do, and they
3    haven't been able to make money.
4            MR. WAINGER:  I would disagree, Your Honor.  The
5    one asset that they made money on was R.M.S. Titanic.  It
6    was the other assets that dragged them down, and the burden
7    and costs associated with operating a public company that
8    dragged them down.  So now they have key components.  They
9    have shed the burden, or they're about to shed the burden of
10   the operating company and the other assets, and they can
11   focus on the core.  That exhibition in Vegas makes great
12   money.  They want to expand IP rights.
13           THE COURT:  The Titanic exhibition in Vegas?
14           MR. WAINGER:  In Vegas.
15           THE COURT:  Where is the body parts?  It was making
16   a lot for a while or so I was told.
17           MR. WAINGER:  For a few years, it was, and that has
18   changed dramatically over time, Your Honor.
19           THE COURT:  All right.
20           MR. WAINGER:  We did talk about the urgency of the
21   necessity of this happening.  Your Honor, I have great
22   concerns about the timing of this, Judge.  I appreciate that
23   Your Honor is saying right off the bat, this is not an
24   emergency.
25           THE COURT:  No, I didn't say it wasn't an
```

1    emergency.

2          MR. WAINGER:  I apologize.

3          THE COURT:  It may be an emergency to you and your

4    client.  I did not say it wasn't an emergency.  I said that

5    sometimes you can't make your emergency someone else's

6    emergency at the expense of doing the right thing, and

7    that's what I've got to be careful of.  I'm not saying it's

8    not an emergency.  To you it is and to Mr. McFarland and, I

9    guess, to PAHL.  That's an emergency not created by this

10   Court.  This Court did not create the emergency.  The

11   emergency was being created by whatever you all have done.

12   Now I can't let your emergency push the Court into doing

13   something that's not right.

14         MR. WAINGER:  I understand precisely what Your

15   Honor is saying now.  This Court did not create this, we

16   absolutely agree.  In fact, I think I can speak for a number

17   of people in this courtroom, Your Honor has bent over

18   backwards to accommodate our schedule, to schedule this

19   hearing.  So we recognize that.  I am truly concerned about

20   what happens if there is an order entered beyond a certain

21   time frame or an order is entered that adds on conditions

22   that causes the stalking horse purchaser concern.

23         The APA states that the stalking horse purchaser

24   can terminate it if we don't have the approval of the

25   admiralty court.

1          THE COURT:  I know what it says.  That is what I

2     asked in the beginning.

3          MR. WAINGER:  Right, or there is a Court order that

4     is not sufficient in its discretion.  If that were to

5     happen, my concern is we would be doing a disservice to the

6     collection of artifacts themselves because at that point --

7     and Mr. McFarland mentioned it -- we now have a true

8     disaster going on in Florida, and what will also become a

9     liquidation by a trustee.

10         With this order in place, I think the Court has all

11    it needs to control the assets.  We save the 120 or 130 some

12    odd jobs, and, truthfully, nothing changes about the

13    operation of R.M.S.T. or about the interactions between

14    R.M.S.T. and this Court and vice versa, or the interactions

15    between R.M.S.T. and NOAA.  Nothing changes, and that's by

16    design.  We didn't stumble into this.

17         This is hours and hours and hours of drafting and

18    the reflection of the covenants and conditions and Your

19    Honor's prior hearings so that this Court could simply take

20    a look at the order, look at our diligence responses, and

21    say, let's keep it going, let's keep it going with a

22    different parent, and then, as we can talk about now or

23    later, NOAA has some additional oversight suggestions that I

24    think we can all discuss later.

25         That is it in a nutshell, Judge.  I appreciate the

1    indulgence.  Does the Court have any other questions for me

2    at this time?

3              THE COURT:  No, I don't.  I'll hear from Mr. Porter

4    now.

5              MR. PORTER:  Thank you, Your Honor.  I want to

6    start with expressing that I think, as the Court knows, the

7    Court's concern about the artifacts is NOAA's concern.  We

8    have always had the concerns about the proper management and

9    care and what happens with them.  We have the flip side

10   concern, however, of what happens in the breach if there is

11   not an ongoing operation.

12             What we would, perhaps, desire ultimately in a

13   longer term situation or a permanent situation, for the

14   artifact collections permanently together, undoubtedly

15   permanently together, in a particular location, is something

16   that NOAA would love to see.

17             We have, however, a transaction before us -- we

18   have just one transaction before us to address that we have

19   tried to address diligently in our report.  I would say a

20   couple of things on that.  We first began receiving

21   information materials less than two weeks ago.  The last of

22   the materials we received on Monday.

23             I'm not offering that as an excuse.  I'm just

24   suggesting that we have all been on a short time frame, and

25   we have worked as hard as we can over the last several weeks

1    to try to produce for the Court our honest assessment of

2    this situation, our honest assessment of what is presented,

3    and how to address it.

4            The way that we have done that in our

5    recommendation is to include contingencies.  We have

6    separated them into two parts.  The recommendations we can

7    address later that we don't suggest are contingencies for

8    any approval but certain things that we think are

9    contingencies that should be required for any approval if

10   the Court is so inclined to go that route with our

11   recommendation.

12           These contingencies attempt to address, we think, a

13   number of things that the Court has raised today.  We

14   certainly, as Ms. Rolleri and I have listened to the

15   exchange over the last hour or so, Your Honor certainly

16   brought some very important considerations.  We, too, are

17   concerned about that situation of the relationship with PAHL

18   and R.M.S.T., and as I think you can see in our report, as

19   well as the questions that we asked, we were very concerned

20   to ask about questions, what happens with these

21   intra-company agreements, what happens with these

22   relationships between the two?

23           It really informed the basis of why in our initial

24   recommendation to the Court that we suggest that R.M.S.T.

25   and PAHL both be bound by certain conditions.  You will see

1    in the order that Mr. McFarland discussed, I just want it to

2    be clear that we have had ongoing conversations, but the

3    first time we discussed this order was this morning, and we

4    discussed some of the language.  We discussed the inclusion

5    of PAHL in the recommendations.  I certainly appreciate the

6    position that they have articulated that PAHL as a separate

7    legal entity has never been a party to this Court, never

8    been a party in this matter, and is not before the Court.

9            I understand that legal construct, and that is why

10   we discussed some potential edits to the language that took

11   PAHL out.  However, there is another part of this, and we

12   indicated when we met this morning -- and it was a

13   productive meeting.  I don't want to suggest otherwise.

14           But when we met this morning, we did indicate we

15   would want to hear what the Court's concerns, if any, were.

16   But we also said a few other things about the whole

17   situation with PAHL.  Number one, is that we would require

18   that there be a restatement on the record here today

19   consistent with what they term the formal acknowledgement

20   that was in their written response to us that was provided

21   as part of the October 22nd periodic report.  That would be

22   the second one.  They framed it as a formal acknowledgement,

23   and that acknowledgement essentially was that PAHL

24   acknowledged --

25           THE COURT:  Where is it?

1           MR. PORTER:  I'm sorry?

2           THE COURT:  You talk about they framed, was that

3    this morning?

4           MR. PORTER:  That was our conversation this

5    morning.

6           THE COURT:  Because I haven't seen any formal

7    order.

8           MR. PORTER:  You have not.  I just want to clarify

9    the context of the order, that the reason that our

10   recommendation that PAHL is not in there, is for a couple of

11   things:  One, is that there would be this formal

12   acknowledgement that they made to us in the response.  We,

13   like the Court, would like that formal acknowledgement to

14   the Court.

15          So we wanted a formal acknowledgement to the Court

16   both that they recognize they were on notice to the

17   requirements of the C&Cs, and that their intent as the

18   corporate parent was that R.M.S.T. would continue to be

19   bound by the C&Cs.  That would actually be on the first page

20   of that second response that they gave us, that was part of

21   the periodic report.

22          THE COURT:  While you are there, there has been a

23   lot of material, as I indicated, coming to the Court.  I've

24   got to go through it in the next couple of days.  I'm going

25   to put everything on record.  You all have been sending

1    transcripts and agreements and everything, and I see nothing

2    there that shouldn't be in the public record.  The only

3    reason it's not is because it's been coming into me the last

4    couple of days, and I've been reading it.  The status report

5    and everything needs to be part of the record.

6          I think the Asset Purchase Agreement, at least the

7    draft, was part of the initial record, but I'm going to go

8    back and check everything from June.  These are records.

9    The bankruptcy transcript will be on record with the

10    bankruptcy court, and the bankruptcy order would be on

11    record with the bankruptcy court.  But I also want to be

12    sure that they are on record with this Court, too, and I

13    need to go through.

14          MR. McFARLAND:  We have a binder, Your Honor, that

15    I was going to, at the end of the hearing, move those in as

16    actual exhibits.  We will present to the Court the same that

17    have been submitted in the last couple of weeks, recognizing

18    that things have been coming in fast and furious.

19          THE COURT:  Then we will check it.  It's basically

20    just what I was reciting at the beginning of the hearing.

21    No copies went to the clerk, but just came to me.  I want to

22    be sure everything is on the public record.

23          MR. PORTER:  I understand this binder is the same

24    documents that they have already provided to us starting

25    approximately two weeks ago.

1          THE COURT:  A lot is already on a public record.

2          MR. PORTER:  That is correct.

3          THE COURT:  It's just in Florida, and it's not part

4     of this record.  I want to be sure that the transcripts and

5     orders that we are referring to here get into this record

6     also.

7          MR. PORTER:  So I mentioned the first aspect of the

8     PAHL situation, which is a restatement on the record.

9     Again, let me back up just a second.  This was under the

10    belief that, perhaps, today, although there is a lot of

11    material, that the Court was considering whether to enter an

12    order authorizing the sale.  We would want that commitment

13    on the record.

14         THE COURT:  I'm not going to enter an order today

15    authorizing the sale.  I've got a suggested order with

16    handwritten interlineations in it, and after hearing

17    everything I've heard, you all need to get back together and

18    see if you can present an order.

19         MR. PORTER:  I think that would be appropriate.

20         THE COURT:  From what you said, you need to go back

21    through the order, and you need to have this restatement

22    from PAHL on the record.

23         MR. PORTER:  That's correct.  The second part of

24    the PAHL issue was we had asked that we receive, and it be

25    provided to the Court, a separate letter from PAHL, so this

1    would not just be from R.M.S.T.'s attorneys but a separate

2    letter from PAHL to the Court to be provided in the record

3    that acknowledges those same formal acknowledgements plus

4    acknowledging that R.M.S.T. was subject to any order that

5    the Court issued that would approve this transaction.

6         The last thing, and after we left Mr. McFarland's

7    office, we had some further conversations with some of our

8    NOAA personnel that have been involved in this transaction.

9    We felt comfortable enough to remove PAHL from an order at

10   this point, but we would want to revisit the issue later

11   whether PAHL should be, and, of course, this is just our

12   recommendation.

13        The Court can decide PAHL needs to be, but from our

14   perspective, we would want to revisit later because, as Your

15   Honor knows, there were the intra-company agreements between

16   PEM, Premier Exhibition Management, and R.M.S.T. about some

17   of the things that were going on.  All of those things, as

18   we've put in our recommendation, our report, all those

19   obligations have been assumed by PAHL.

20        Based on our conversations this morning, we

21   understand that should this transaction be approved and

22   should this transaction go to closing, that there will need

23   to be some arrangements of how those activities, as they

24   relate to the artifacts, are actually undertaken.

25        For example, it may be that R.M.S.T., the ongoing

1    company, takes over all of those activities, and that might

2    be one thing.  To the extent that PAHL is retaining

3    authority over some of those activities, it has direct

4    involvement in the artifacts, then that may mean something

5    different about whether the Court wants to require them to

6    be subjecting themselves to the *in personam* jurisdiction and

7    subject to the C&Cs.  So that was the issue on PAHL.

8            There is one other thing that I simply want to

9    point out on the order.  All of us were trying to work

10   quickly this morning, and I mean by that R.M.S.T. as well as

11   NOAA.  There is, in Paragraph 6 of this proposed order that

12   Mr. McFarland presented to you, letter (g), 6(g), I would

13   just point out that in our recommendation, that our

14   recommendation provides that R.M.S.T. and PAHL's commitment,

15   they will provide the Court and NOAA at least 60 days'

16   notice of and seek approval for.  So that additional

17   language of "and seek approval for" would be very important

18   from NOAA's perspective to remain in this.

19           The idea, again, with these contingencies is we

20   have a transaction in front of us.  This might not be ideal

21   that anybody thinks is the best for the artifacts long term,

22   but it is the transaction we have in front of us, and the

23   vision, the other side, of a potential Chapter 7.  We have

24   had a number of conversations with Mr. Troy from the

25   department who has been here before before Your Honor, who

1    has been handling the bankruptcy proceedings down in

2    Florida.   It would not be a desirable situation to get

3    there.

4            We have not made our recommendation simply because

5    the consequences would be bad.  We do think, given the

6    language of the C&Cs, we do think that the form and purpose

7    of this transaction, with additional protections and

8    conditions that we have provided for and R.M.S.T. has, for

9    the most part agreed to, would not change the current

10   management in a negative way.

11           There is the hope that it gets better, but it would

12   not change it in a negative way.  We have added those

13   additional recommendations because, quite frankly, during

14   part of the review, we see areas where there can be

15   improvement, and that is why we've included the additional

16   recommendations.  I can either go into those, and I don't

17   think from R.M.S.T.'s standpoint there is an intent to

18   simply say, no, we are not going to do that.  They have

19   expressed to us a desire to get past the immediacy of the

20   transaction and, in a sense, let the dust settle and then

21   revisit this with NOAA and the Court to address these

22   additional recommendations that we think are important.

23           We had three of them, and I'll just touch on one of

24   them that I think is the most important and the most

25   critical, is the idea that there needs to be a collections

1    management plan in place for this company that controls how

2    the artifacts are maintained in all these locations,

3    precisely for part of that reason because artifacts are not

4    just in a museum in one place.  Artifacts are in a number of

5    locations.  That's the business model.  We all know that.

6    That's what it is.

7            But because of that, it is particularly important

8    that there be a defined plan, we think.  All of that said,

9    Your Honor, I mean, again, I would just reiterate, we have a

10   lot of the concerns the Court has.  We have heard your

11   comments about the agreement, the Asset Purchase Agreement,

12   and what consequences.

13           We think that these contingencies do build in some

14   protections because they have the commitments, they would be

15   in, they would specifically be in a court order that would

16   bind them to this.  Perfect situation, no, but it is still a

17   situation that, under all the circumstances, we would

18   continue to recommend with those appropriate conditions.

19           THE COURT:  You still aren't there yet, as far as

20   I'm concerned, because their representations you just made

21   to the Court, Mr. Porter, indicate that you, Mr. McFarland

22   and Mr. Wainger, at least, need to sit down and talk, and

23   you mentioned a couple of details in the order that aren't

24   there:  You've mentioned this PAHL statement on the record.

25   You've mentioned a couple of matters that clearly aren't

1    there that could be there.

2          So at a threshold level, you're not there yet to

3    recommend it, in my opinion, until you have covered these,

4    as you call them, other issues.  They may not create a

5    perfect world, but you create at least a better world at the

6    moment.  You certainly need to do that.  We are not ready to

7    enter an order today, that's clear.

8          You all need to get together and go through these

9    and present, if you can, an order to the Court, and we may

10   need to get back together.  From what you've said, it's

11   clear to me that you're not quite there yet.

12         MR. PORTER:  I think that's a fair criticism, and

13   actually during the break we were speaking of the need to

14   make some adjustments to the order to address some of the

15   Court's concerns.

16         THE COURT:  Let's go to a couple of things in the

17   covenants and conditions, Mr. Porter.  First of all, have

18   you assured yourself that the company PAHL is not

19   constituting some kind of overseas entity?

20         MR. PORTER:  I'm sorry, Your Honor?

21         THE COURT:  On Page 14 of the covenants and

22   conditions, there are special provisions in the event of a

23   transaction with an overseas entity.  Have you looked at who

24   are the controlling parties of PAHL and who controls those

25   parties?  Because if this is a transaction with an overseas

1    entity, it's not prohibited by the covenants and conditions,

2    but there are certain things that need to be met.  I don't

3    know if anyone has looked at that.

4         The Court would have to be assured that this is not

5    an overseas entity, and that if it is in any way, these

6    conditions have been met.  That hasn't been presented to the

7    Court yet.

8         MR. PORTER:  What we have included in our reports,

9    Your Honor, we've indicated, based on the documents they

10   have provided, that this is a Delaware company, that its

11   business operation will be in Atlanta.  We have identified

12   the three owners, the one-third owners each, two of which

13   are based in New York.  The third is based in Hong Kong.

14        THE COURT:  In terms of these entities, who

15   controls these three entities?

16        MR. PORTER:  Wait just a moment, Your Honor.

17        THE COURT:  One of the entities is an overseas

18   entity.  If it is based in Hong Kong, one of the entities is

19   an overseas entity.

20        MR. PORTER:  Mr. McFarland may be able to address

21   this, but PacBridge is based in Hong Kong but he's relating

22   to me it's a --

23        MR. McFARLAND:  I don't mean to interrupt.

24        THE COURT:  I'm going to finish going through with

25   Mr. Porter, and then you can respond.  So that's something

1   that I would like for you to review because the Court is

2   comfortable with its jurisdiction here, but, obviously, not

3   comfortable with trying to exercise overseas jurisdiction,

4   and if it was going to relinquish it, it would be sure that

5   it was with an overseas entity that would respond to the

6   Court.

7          MR. PORTER:  Fair enough, Your Honor.  We will

8   certainly address that issue.

9          THE COURT:  The other half of it is, there is a

10  section here in your covenants and conditions that, and it's

11  also this portion in the annex, "Considerations for any

12  evaluation of whether an entity is a qualified institution."

13  I assume that you have reviewed all of that?

14         MR. PORTER:  Your Honor, we have not addressed the

15  issue of whether they continue to be a qualified

16  institution.  We are addressing the transaction itself since

17  it is characterized as a stock sale.  The representations in

18  the APA and to us and to this Court are that R.M.S.T.

19  continues to operate as a qualified institution.  We have

20  indicated that, based on our last site visit, we don't have

21  any indications that it's changed, that they continue to

22  operate appropriately there.

23         We have asked the additional follow-up questions,

24  as you are aware, concerning some of the care at the

25  permanent exhibitions so we can be satisfied that those

1    things are being done appropriately.

2         THE COURT:  All right.  Then with regard to what

3    you're saying, I'm not saying that I agree or disagree with

4    you.  You've basically said, Mr. Porter, this may not be the

5    optimum or the best choice but it's all we have.  I guess I

6    never approach the law, and, perhaps, it's one of my

7    thoughts, that anything I do I always want to try to give it

8    my all and the best that I have.  For instance, say you or

9    one of your children are going to college, and they have

10   been accepted at a lesser university, and everybody knows

11   it's a lesser university, and you're still waiting to hear

12   from the premier university, no pun intended on Premier, you

13   might not say to that person who has asked for your opinion,

14   whether it be a friend or a spouse or a child or you, let's

15   just settle for the lesser because we don't want to wait for

16   the better.

17        There is nothing in the covenants and conditions or

18   anywhere that says, well, if it's all we have, we have to go

19   with it.  I'm not saying that that's not true but there is a

20   provision for bankruptcy in here.  There is a bankruptcy

21   provision in these covenants and conditions.  It allows the

22   Court to take certain action.  If the trustee is bankrupt or

23   insolvent, and that's what has occurred here, the Court may

24   take appropriate action within its jurisdiction to enforce

25   these covenants and conditions.

1          So there are things that can be looked at.  I'm not

2     saying that it's necessary at this point, because, again,

3     there is still a lot I have to go through and check.  One of

4     my main concerns is that PAHL is not before this Court and

5     that Premier wasn't, gave the Court grave concern at the

6     time.  Perhaps now is the opportunity to correct the

7     situation that has bothered the Court for some time.  The

8     Court has always been concerned about Premier not being

9     here.

10          So I'm not comfortable entertaining the argument,

11     well, Premier wasn't here, because, frankly, I think there

12     was a shell game going on there.  So as far as I'm

13     concerned, that Premier wasn't here doesn't mean that the

14     Court shouldn't require PAHL, if they are going to take over

15     the operations.

16          So I'm not sure I'm comfortable with just something

17     on the record, unless they have made an appearance and bound

18     themselves to the jurisdiction of this Court because the

19     situation with R.M.S. Titanic and Premier has never been one

20     that the Court was particularly comfortable with.

21          The record will reflect that, as Mr. Wainger can

22     remember.  So, consequently, I'm still not comfortable, and

23     I just found it very interesting that I'm approving an Asset

24     Purchase Agreement and the purchaser is not before the

25     Court.  I've got a seller before the Court, and I don't have

1    the purchaser before the Court.  So I don't know that I

2    should be approving that agreement.  I'm just thinking out

3    loud right now.  I'm not making any rulings.

4         MR. PORTER:  Your Honor, I hope my choice of words

5    isn't construed as being that we have in some way just let

6    this go as the easiest solution.  I can tell you that we

7    have not coordinated with R.M.S.T. on any of this, including

8    our recommendation till it was finalized and ready to come

9    to the Court, and then we provided them a copy mainly just

10   to make sure there wasn't issues with confidential

11   information.

12        THE COURT:  I understand.  I hope that following

13   this hearing, Mr. Porter, you will resume conversations with

14   Mr. McFarland and Mr. Wainger in regard to clearing up some

15   of the aspects of this order and talking about and having

16   been talked to PAHL or you about their position on making an

17   appearance before the Court.

18        MR. PORTER:  We will certainly do so, Your Honor.

19        THE COURT:  All right.  Is there anything else that

20   the Court needs to take care of today, Mr. McFarland,

21   Mr. Wainger?

22        MR. McFARLAND:  I just wanted to clarify, Your

23   Honor.  PAHL is a Delaware entity.  The purchaser in this,

24   prospective purchaser, the bidding entity, PAHL, is a

25   Delaware limited liability corporation.  It is made up of

1    certain members, the three main members, Alta, Apollo and

2    PacBridge.  One of those three members is a Hong Kong

3    entity, but PAHL itself is a Delaware corporation.

4           THE COURT:  I understand.  You can go and corporate

5    in Delaware.  You can corporate in Virginia.  Being an

6    entity, a corporation chooses its place of incorporation and

7    its place of doing business.

8           MR. McFARLAND:  Right.

9           THE COURT:  Again, let's look at the substance of

10   what's going on, not just the appearance.  In other words,

11   you can incorporate in any state in the United States and

12   you can incorporate, you can do McFarland Services, LLC, and

13   open up a business and a corporation and have an agent and

14   have your headquarters where you want it.  Individuals do

15   that all the time.

16          MR. McFARLAND:  But you've got a corporation, Your

17   Honor, that is a United States, i.e., Delaware, should be a

18   limited liability corporation that is in the United States.

19   I thought that was the Court's -- wasn't saying it was

20   dispositive, but at least the Court was considering that as

21   a factor.  So it is a Delaware entity.  It is not uncommon

22   that LLC, as Your Honor knows, often is composed of many,

23   many members, some of whom may be overseas.

24          THE COURT:  An LLC can dissolve very easily.

25          MR. McFARLAND:  It can.

1          THE COURT:  I mean, I've had an LLC with my spouse,

2     and all you do is you open Holly Holdings LLC, and you hold

3     an asset there, and then you file corporate returns, and

4     when you decide you don't want to do it anymore, you

5     dissolve.  You could have it today and it's gone tomorrow.

6     It just depends on what it's holding and whether you want to

7     keep holding it.

8          MR. McFARLAND:  Exactly, Your Honor.  But in that

9     sense what remains before this Court are the artifacts in

10    this Court's jurisdiction over R.M.S.T. and the American

11    collection with the covenants and conditions in places to

12    that.  So, yes, the corporate entity could potentially

13    dissolve.  But the American collection cannot be disposed of

14    without this Court's authorization.

15          In essence, I want to correct something else.  Part

16    of the reason that this transaction is structured as it is,

17    is because the qualified institution, i.e., the trustee,

18    does not change.  This is the same trustee, R.M.S.T., that

19    has been the trustee before this Court for, geez, I think we

20    are getting out about a decade now.  We are very close in

21    terms of when the C&Cs were put into place.  I think it's

22    2011, we are 2018 now.

23          Of course, R.M.S.T. as salvor, has been the salvor,

24    as the Court noted earlier at this hearing, for I think '94

25    to 2008, so for just, give or take, 25 years.  So that's

1     critical, Your Honor.  The trustee and the qualified

2     institution is not changing, and it remains before this

3     Court jurisdictionally-wise as well.

4          The other point I just want to say, Your Honor,

5     certainly we want the best options possible.  What we are

6     presenting the Court is not just a last-minute

7     throw-together.  This is the not just option but the Court

8     approved by the bankruptcy court result of a heavily

9     negotiated transaction that has been blessed by the Court.

10         THE COURT:  It might be the best bankruptcy

11    outcome, but the bankruptcy court is different from this

12    Court sitting in admiralty jurisdiction.

13         MR. McFARLAND:  Certainly.

14         THE COURT:  The best outcome for this admiralty

15    court, sitting in admiralty jurisdiction, may not be the

16    best outcome that a bankruptcy court considers.  They are

17    two entirely separate considerations with two different sets

18    of laws.  I'm operating under the federal jurisdiction of

19    admiralty law, and the bankruptcy court is operating on a

20    different set of considerations.  So that they determined

21    it's the best outcome in bankruptcy does not dictate that

22    this Court has to determine is the best outcome in salvage

23    law and admiralty law.

24         MR. McFARLAND:  Right, Your Honor.  But what this

25    Court is reviewing now is should it approve the Asset

1   Purchase Agreement and the stock sale of R.M.S.T. consistent

2   with retaining R.M.S.T. as the trustee qualified

3   institution.  That's the issue before the Court, as I think

4   the government recognizes.

5         I appreciate what the Court is saying, so much

6   material has come in recently, and the Court needs to review

7   everything.  It's our job to make sure the Court does

8   appreciate and does agree with us that it is the best

9   outcome for this Court's role in terms of admiralty

10  jurisdiction and in terms of this Court's role with respect

11  to the covenants and conditions.

12        I understand the Court still needs to review it,

13  and we need to provide some further things, and we will do

14  that.  But we agree with the Court is saying, but the

15  solution that is being brought to this Court for this

16  Court's approval on those is, we think, and the evidence

17  shows, the appropriate outcome from all the way around, not

18  just the bankruptcy court.

19        I may do one other thing, Your Honor.  I would like

20  to move into evidence the exhibits that we have submitted to

21  the Court over the past two weeks.

22        THE COURT:  I will let you give those to the clerk,

23  and we will resume.  I'll give the museum a quick chance to

24  represent anything that it wants, and I'll hear about the

25  EYOS expedition.

1          The Court will be in recess until 4:00 p.m.

2          (Recess from 3:42 p.m. to 4:03 p.m.)

3          THE COURT:  Mr. Powers, is there anything you want

4     to represent to the Court today?

5          MR. POWERS:  Briefly, Your Honor.  May it please

6     the Court.  Your Honor correctly pointed out that there is a

7     significant public interest in the preservation of this

8     collection.  The public interest, Your Honor, is expressed

9     on Page 5 of the covenants and conditions, Section III,

10    Paragraph A, "The subject Titanic artifact collection shall,

11    to the maximum extent possible and consistent with

12    reasonable collections management practices, be conserved

13    and curated together with the French Titanic artifact

14    collection as an integral whole by the trustee."

15         Your Honor, it is in the public interest, it is in

16    the public interest that the collection be kept together and

17    not sold off piecemeal.  I believe that is what the Court

18    wants, I'm confident that is what NOAA wants, and I'm

19    certain that is what the museum wants.

20         But to be clear, Your Honor, that is not what the

21    stalking horse purchaser wants.  The stalking horse

22    purchaser, Your Honor, is made up of Chinese investors and

23    hedge funds.  There is only one reason in the world why they

24    want this collection, Your Honor, and it is not altruistic.

25    It is not for the public interest.  It is to make money.

1   The only way they are going to make money on this

2   depreciating asset is not by putting on exhibitions, it is

3   by selling the French collection.  That's where the money

4   is.  That is why you have hedge fund and Chinese investors

5   after this.

6          Your Honor, this Court has rightfully pointed out

7   its concerns that the stalking horse purchasers don't seem

8   anxious to be before the Court.  They don't want to commit

9   to the jurisdiction of the Court.  The reason, Your Honor,

10  is very simple.  They have said, in no uncertain words, that

11  this Court has no jurisdiction over the French collection.

12  They've referred to the covenants and conditions as

13  precatory, merely aspirational, and they've made no really a

14  secret that as soon as the ink is dry on the order, they are

15  going to go back, whether it's 60 days from now, whether

16  it's six months from now, whether it's two years from now,

17  but they are going to be back and they are going to want to

18  sell the French collection.  That's what this is all about,

19  Your Honor.

20         Your Honor does have the ability to rectify the

21  concerns that you had a decade ago with Premier

22  Acquisitions, or whatever their name is.  You can put

23  conditions now on the stalking horse purchaser that they, as

24  part of the sale, approval of this deal, they commit to

25  keeping the collection together, they commit to the

1  jurisdiction of this Court, not some hollow Delaware entity,

2  but the officers and directors.

3       Do what the museum was willing to do.  Subject

4  itself to the jurisdiction of this Court for the good of the

5  public interest in keeping the collection together, and

6  there will not be Armageddon, there will not be a doomsday

7  scenario if this deal doesn't go through.  There would not

8  necessarily even be a liquidation, because the museum is

9  still here.  We are still ready.  To the extent that this

10  Court rejects this deal, it will go back to the bankruptcy

11  court.

12       This Court can put whatever terms and conditions on

13  it, and the best thing for the public interest, if it has to

14  be in private hands and not in a public institution where we

15  know it will be preserved, put terms on them.  Make them

16  commit.  Make them promise to this Court that they shall not

17  break up the collection, not what we keep hearing is, our

18  current intention is to abide as best as we can.  Forget

19  about current intentions.

20       What are they going to do once this Court, if this

21  Court approves it?  Therein lies the riddle.  They want to

22  make money by selling the French collection, and you have

23  the ability to get them before the Court, to have them

24  subject themselves to the jurisdiction of this Court and to

25  have them promise that they will keep the collection

1 together as the museum would do.  That's all we ask, Your

2 Honor, and we stand by ready, if for whatever reason the

3 Court does not approve this deal, our plan is still being

4 held in abeyance in the bankruptcy court.  That is why we

5 are here, Your Honor.  Thank you for hearing us.

6         MR. WAINGER:  Your Honor, that was extraordinarily

7 bold for an entity that has no stake in these proceedings.

8         THE COURT:  Well, number one, they have filed as a

9 movant, and they have filed a motion to intervene.  I just

10 have not granted that yet.  I invited Mr. Powers to speak.

11 He was here.  He has filed papers in this court in regard to

12 this, and they are involved, and they have been involved in

13 the bankruptcy proceedings.

14         So go to the substance.  I can decide whether they

15 are bold or not bold.  If you want to address the substance

16 of what he said, do so.

17         MR. WAINGER:  There is no basis in fact, that I am

18 aware of, that the stalking horse purchaser, that R.M.S.T

19 wants to break up this collection.  Okay.  That is creative

20 fiction.  I can tell you today that if R.M.S.T. is acquired

21 under this transaction, it will submit to this Court's

22 orders, okay.

23         Now, we have been through many chapters with

24 respect to the French artifacts, okay.  When counsel talks

25 about this Court ordering that the company not break up the

1    collection, we are disregarding the order of January 30th,

2    2006 from the Fourth Circuit that very clearly talked about

3    the jurisdiction of this Court with respect to the STAC and

4    with respect to the French artifacts.

5            If Your Honor remembers, we came to this court in

6    June of 2016, and we said, Premier Exhibitions, in an effort

7    to get out of this bankruptcy, is looking to sell some

8    French artifacts, a limited number of French artifacts.

9            THE COURT:  I'm very aware of the status of the

10   French artifacts, and the covenants and conditions say to

11   the maximum extent possible, consistent with reasonable

12   collections management practices, that the Titanic artifact

13   collection be conserved and curated with the French

14   artifacts.  That's what it says.  The Court is well aware of

15   all of the rulings on this matter.

16           MR. WAINGER:  So the point is, I guess, Your Honor,

17   is if these companies are ever to decide that that's where

18   they want to go, and I have no reason to believe that, I

19   have already told the Court that they intend to operate

20   these companies.  If they make that decision, we are in

21   here.

22           THE COURT:  How?

23           MR. WAINGER:  How are we in here?

24           THE COURT:  Yes.  Why doesn't PAHL appear and

25   subject itself to the jurisdiction of this Court?

1      MR. WAINGER:  Well, I think that as a matter of

2 corporate law, there is no reason -- they are not a party to

3 this matter, Judge.  Premier wasn't a party.  That is why we

4 ultimately decided that Premier didn't need to because we

5 are following black law corporate law.

6      THE COURT:  I never agreed with you on that, and

7 I'm not going to revisit all of that.  The bottom line is

8 I'm being asked to approve an Asset Purchase Agreement to

9 which they are the purchaser.  So as far as I'm concerned,

10 they want me to approve an agreement, why don't they get

11 before this Court and have somebody argue why I should do

12 it?  Have them represent to me.  Why shouldn't somebody from

13 PAHL be here, an attorney, or one of the corporate officers,

14 somebody representing to this Court, either under oath as a

15 corporate officer, as an attorney, as an officer of this

16 Court, that when I approve the Asset Purchase Agreement, and

17 they are the purchaser, that they will abide by certain

18 things, and they will subject themselves to the jurisdiction

19 of this Court.  If there is no subterfuge and no ulterior

20 plans, what's the problem with that?

21      MR. WAINGER:  We understand the Court's position.

22 I will say this.  I think that we are, on that point,

23 arguing about something that really doesn't make any

24 difference.  If we consider that two of the three members of

25 PAHL are U.S. corporations headquartered in New York and

1    that the initial directors of R.M.S.T., should the

2    transaction go forward, are employees of those entities,

3    living in New York, it really doesn't make a difference.   I

4    think everybody hears the Court's issue on that point.

5           I would simply say that it's a distinction that

6    doesn't make a difference in terms of the Court's ability to

7    control the artifacts and make its decisions.   But we

8    understand the Court's position, and as we talked about with

9    NOAA, NOAA's suggestion that PAHL make formal

10   acknowledgement of the covenants and conditions, those are

11   the kinds of things that we will talk about in very short

12   order with my friends from the government to try to get the

13   Court the comfort it needs.

14          When the museum spoke just now, Your Honor, we went

15   back, and their suggestion is we are here so think about us.

16   Putting aside that they have no real value or stake in this,

17   harken back to Mr. Porter's comments that the stalking horse

18   purchaser might not be the perfect entity here, that was the

19   general comment.   That kind of stuck in my side because,

20   Your Honor, that may be the government's position that they

21   want, in an ideal world, a knight in shining armor to

22   purchase a collection out of bankruptcy and donate it to a

23   museum, but that's not the reality.

24          So I think that we should all be extraordinarily

25   pleased that we had one group of folks willing to make this

1   commitment, because the alternative is such a disaster, and

2   I disagree that the museum thinks everything is fine, I

3   think this goes straight into liquidation, and then we are

4   litigating with a trustee for extended periods of time over

5   what really happens with these artifacts.

6          So I think we need to be thrilled that we have an

7   entity that still submits to this Court's jurisdiction, that

8   this Court will continue to keep its thumb over the

9   operation, that the operation will not change and will have

10  the same people involved.  I think that is a wonderful

11  solution.  I want to state for the record that we strongly

12  disagree, and the reason that PAHL is not here today in a

13  formal capacity, Your Honor, is because they are only one

14  party to this case.  The parties are R.M.S.T.  It is

15  R.M.S.T. who is asking the Court to approve its transaction.

16  It's not PAHL asking the Court.  It's R.M.S.T.  If we look

17  at the covenants and conditions, Your Honor.

18          THE COURT:  Well, if you're going to talk about the

19  covenant and conditions, the covenants and conditions are

20  about a lot more than money.

21          MR. WAINGER:  Absolutely.

22          THE COURT:  What you all keep saying is, well, this

23  was the best deal.  Now, a bankruptcy court is going to look

24  at it differently than this Court.  I've said it over and

25  over.  The covenants and conditions, if everybody agrees

1    they are bound by these, and the covenants and conditions

2    are there, there is the goal to preserve these artifacts as

3    a collection.  There is a public interest goal.  There are a

4    lot of goals here that transcend money.

5           So, consequently, I'm telling you that if everybody

6    is bound by these covenants and conditions, and you look to

7    what Mr. Powers referred to, and you look at them in

8    totality and even in segments, this is not just about money.

9    It's about preserving a historic collection.  You're giving

10   me words, but nobody has given me the assurance that I want

11   to hear and pointed out to it.  I can read agreements.  I

12   know what 100 percent of buying shares is.  It's almost a

13   bit insulting to the Court, frankly, when you say, well,

14   it's going to be this, Judge, it's going to be this.

15          I know what occurs when you sell 100 percent of

16   your stock to an entity.  That entity owns 100 percent of

17   whatever you have, and it can do with it under the law

18   certain things.  They're not before the Court to obligate

19   themselves to these covenants and conditions; yet, I'm being

20   asked to approve an Asset Purchase Agreement with that

21   entity as the purchaser of 100 percent of the stock of

22   R.M.S.T., the party that is before the Court.

23          MR. WAINGER:  So, Your Honor, it is NOAA's

24   suggestion that we put on the record the formal

25   acknowledgement to be filed with the Court that PAHL is on

1    notice of the covenants and conditions and intends for

2    R.M.S.T. to continue to operate in conformance with them.

3            Is that what the Court wants?  Would that satisfy

4    the Court's concern?

5            THE COURT:  No.

6            MR. WAINGER:  What precisely would satisfy the

7    Court's concern?

8            THE COURT:  I have a little notepad here.  It's a

9    little bit messy looking, but I only wrote down two or three

10   things before I came in here.  The first one was the magic

11   of October 31.  The second was, is who represents stalking

12   horse purchaser PAHL?  Why have they not appeared before the

13   Court?  That was my second question.

14           If you go back and look at the record, it was what

15   I said from the beginning.  You are asking me to approve an

16   Asset Purchase Agreement with the purchaser not before this

17   Court.

18           R.M.S.T. is saying we want to sell 100 percent of

19   our shares to this purchaser, which in my mind is that

20   R.M.S.T. is, for all intents and purposes, it could be gone.

21           MR. WAINGER:  No, no, I want to tell the Court very

22   candidly that it was my advice, not to a client, but in

23   conversation, that PAHL need not formally appear in this

24   Court because they are not a party and the corporate

25   formalities requires separation.  So I personally am

1   responsible for that decision.

2           THE COURT:  I thought they had their own attorneys.

3           MR. PORTER:  They do.  I'm not their counsel, but

4   in discussion, the issue is, as a matter of law, what should

5   R.M.S.T. do and should PAHL take a role here?  We have taken

6   the position that the museum has no formal right to be here,

7   and it would be disingenuous to suggest that PAHL, who is

8   not also a party, should have a formal role in these

9   proceedings.

10          It is R.M.S.T., pursuant to the APA, that is asking

11  for that.  So that's on me, Your Honor, and 100 percent

12  candid to the Court.  We have all heard the Court say it

13  would have chosen instead to have seen papers from PAHL, and

14  we have heard the Court say that it thinks that PAHL's

15  submission to the end percent of jurisdiction would make the

16  Court --

17          THE COURT:  I want them to appear before the Court.

18  Make an appearance.  Subject yourself to the jurisdiction of

19  this Court.  If you're saying to this Court that you want

20  this Court, and the bankruptcy court has recognized, this

21  Court has to approve that Asset Purchase Agreement.

22          MR. WAINGER:  Okay.

23          THE COURT:  You're coming and you're saying we want

24  you to approve our agreement, but we're not going to come

25  before the Court.  We are going to leave it all up to

1  R.M.S.T., we are going to fully own it, as soon as you put

2  the ink on that Asset Purchase Agreement.

3       MR. WAINGER:  We understand, Your Honor.  As I

4  said, it was my recommendation based on my understanding of

5  the law and that the law of this case that PAHL should not

6  be here today formally.  We hear the Court, and that will be

7  a decision for PAHL to make.  The one thing that I think is

8  critical, Your Honor, is if the Court decides to enter an

9  approval order, that order must be -- PAHL has the option to

10  walk away.

11       THE COURT:  Then that's their option.  They're not

12  before the Court.  If that's what they choose to do, then

13  that's their legal advice.  I am not responsible for PAHL

14  walking or not walking from this agreement.  I am

15  responsible, as the Federal Court sitting in admiralty

16  jurisdiction, to approve or not approve this Asset Purchase

17  Agreement pursuant to this Court's jurisdiction and the

18  covenants and conditions.

19       So if PAHL wants to walk, that's a decision they'll

20  have to make.

21       MR. WAINGER:  I understand.  I want everybody to

22  understand the big picture here, and as an officer of the

23  Court, Mr. McFarland and I have an obligation, both counsel

24  of record in the bankruptcy, as well, and so we have an

25  obligation to pursue a solution in the bankruptcy court that

1    is to the benefit of all the debtors, and we have the dual

2    responsibilities as officers of this Court to make sure that

3    whatever solution happens down there is good for this Court.

4         THE COURT:  You had more than an obligation than

5    just to pursue the best for the bankruptcy court.

6         MR. WAINGER:  I agree.

7         THE COURT:  You had an obligation before this Court

8    to be sure that this Court's jurisdiction was not breached

9    and that this Court's covenants and conditions can and will

10   stay in effect, and one of the covenants and conditions is

11   that that collection stay as one collection.  So you have

12   two duties.  You not only have a duty in bankruptcy, as I

13   say, it's not all about money.

14        MR. WAINGER:  I agree.

15        THE COURT:  When R.M.S.T. was incorporated, and

16   they sold their stock, whatever people thought, whatever

17   reason they bought the stock, doesn't change the public

18   interest here, and it doesn't change the public interest of

19   salvage law.

20        MR. WAINGER:  We are in violent agreement on that

21   point, Your Honor.  We have dual obligation, and we worked

22   extraordinarily hard to create a transaction that honored

23   both obligations.  That's the point I'm trying to make.

24        THE COURT:  I don't think that you didn't work

25   extremely hard to get a transaction.  But still I have to

 1   approve it.

 2         MR. WAINGER:  Understood.

 3         THE COURT:  Perhaps, you've worked hard, but maybe,

 4   perhaps, you haven't got an agreement that this Court is

 5   going to approve because this Court feels like, for a number

 6   of reasons, and I haven't pointed all of them out yet, that

 7   there are a lot of jurisdictional loopholes in this

 8   agreement.

 9         You put a clause in there about exclusive salvage

10   rights into the future, and you leave it up to other courts

11   to determine whether the Asset Purchase Agreement has been

12   followed, and then you convey something, and I have approved

13   it, somebody could easily say, well, that Court approved an

14   Asset Purchase Agreement that transferred the salvage rights

15   to the buying entity.

16         MR. WAINGER:  Let's be clear, Your Honor.  That

17   Asset Purchase Agreement does not transfer.

18         THE COURT:  I disagree with you.  I disagree with

19   you.  I went through those provisions with you, and at some

20   point, I'll go through them in, perhaps, more detail, I'm

21   sure I will, at our next hearing or whenever we convene and

22   try to work this out.  I see provisions in there that are

23   contrary to this Court's jurisdiction.  I went through them

24   with you earlier.

25         MR. WAINGER:  I understand, Your Honor.  The

1  salvage rights are one of the three types of assets held by

2  R.M.S.T., just the salvage rights, the artifacts, and the

3  IP.  Those are all with R.M.S.T.

4       THE COURT:  But you can't contract away the

5  exclusive salvage rights because you don't have them.  You

6  are the salvor in possession currently.  As I told you, and

7  I'm not going to go through it again, you don't have

8  permanent salvage rights.  No entity does.  That is the law.

9       MR. WAINGER:  We agree with that.

10       THE COURT:  You are a salvor in possession, and all

11  you can transfer is your current salvor-in-possession

12  rights.

13       MR. WAINGER:  Agreed.

14       THE COURT:  You cannot do it in perpetuity.  The

15  only person who can give exclusive salvage rights is this

16  Court, and the only thing you can do is give your current,

17  whatever it is, your current salvor in possession.

18       MR. WAINGER:  We agree.

19       THE COURT:  That is one clause I can assure you I

20  will never approve.

21       MR. WAINGER:  The word "exclusive" was simply part

22  of the order.  It is not permanent.  It is transient.  We

23  agree.  Again, there is no disagreement there, Your Honor.

24  I don't want to tread over again over anything that Your

25  Honor has already covered.

1          That's all I have.  Your Honor had made a mention

2     of talking about the EYOS expedition.  I'm happy to do that

3     very quickly or not.

4          THE COURT:  Tell me what the status of it is.

5          MR. WAINGER:  It took place.  There were large

6     swells associated with a hurricane.  They didn't conduct any

7     dives from the Titanic.

8          THE COURT:  Okay.  Have you all put that in a

9     report at all?

10          MR. PORTER:  Your Honor, I believe I submitted a

11     status report with Mr. McCallum's report.

12          THE COURT:  Because it wasn't a major issue today,

13     I didn't even bring that in.

14          Then the way I think we need to proceed is,

15     Mr. Porter, you need to continue -- I won't say go back to

16     the drawing boards because you all have done a lot of work,

17     I recognize that, but continue at the drawing boards, and if

18     you have something that you think is acceptable to present

19     to the Court, do so.

20          In the meantime, I'm going to go back through

21     everything that you've submitted, and I will reconvene as

22     appropriate to ask further questions, and you all work on an

23     order to present to me.

24          MR. PORTER:  We will do that, Your Honor.

25          MR. McFARLAND:  Your Honor, we would move into

1    evidence officially the materials that we have submitted to

2    Your Honor by letter over the last few days and certain

3    reports.  We put them in a binder, and they are tabbed as

4    Exhibits A through L.

5         THE COURT:  Can I see it for a minute, please?

6    Just so the record is clear, A is the order with the APA and

7    amendment to the APA.  That's Exhibit A dated 10-19-18.

8         Exhibit B is the transcript of the bankruptcy

9    proceedings that occurred on 10-18-10.

10        MR. McFARLAND:  If I just may clarify, I think what

11   the date is the date it was submitted to the Court.

12        THE COURT:  Excuse me.

13        MR. McFARLAND:  So the order with the APA goes back

14   to 10-18.

15        THE COURT:  They will be filed.  I'm just going to

16   go through them and say what it is.  A is the order with the

17   APA and amendment to the APA submitted to the Court on

18   10-19-18.  I'm reading from a list so that the record

19   doesn't look like I'm jumbling through papers.

20        Exhibit B in your index is the transcript of the

21   bankruptcy proceedings, if it's the transcript I received.

22        MR. McFARLAND:  Correct, Your Honor.

23        THE COURT:  It was received on 10-18-18.

24        C is the Gallo letter received 10-24-18.  Is that

25   the date of the letter?

1          MR. McFARLAND:  That is the date of the letter.

2          THE COURT:  Because I didn't get that until today.

3          MR. McFARLAND:  Right.  Maybe, Your Honor, we can

4    give the Court a revised listing of the exhibits.  They

5    don't change in terms of their substance, obviously.

6          THE COURT:  That's okay.  I just want it on the

7    record what we have.  I will restate.  C is the Gallo

8    letter.  D is the Klingelhofer letter.  E is the Nargeolet

9    letter.  F is one of the status reports.  That, I think, is

10   the date of the status report.

11         MR. McFARLAND:  That is, Your Honor.  That actually

12   is in the Court record in the sense it was filed.

13         THE COURT:  10-15 status report.  There is H, which

14   is the periodic report of R.M.S. Titanic.

15         I is a periodic report of R.M.S. Titanic.

16         J is NOAA's report and recommendation.

17         K is a letter enclosure with a periodic report.

18         L is a letter enclosure with a periodic report.  I

19   will check these exhibits against the ones that I have and

20   be sure that they match, and I will admit all of them with

21   that understanding that we'll check that and be sure

22   everything is ready to go into the record.

23         (The documents were received in evidence and marked

24   as Exhibits A through L.)

25         MR. McFARLAND:  The other thing we would like to

1    provide to the Court, Your Honor, is when we did our due

2    diligence or our responses to NOAA's two requests for

3    information, we gave them certain exhibits.  Those have

4    confidential and proprietary information, so we would follow

5    the Court's sealing procedures and submit those to the Court

6    either redacted to or under seal, and we will get those in

7    promptly.

8              THE COURT:  I would tell you that that question was

9    raised to me by the clerk, and I did say that I would not

10   accept anything that was not going to be made public unless

11   the sealing procedures were followed where you file a motion

12   to seal, which is public, a memorandum in support of that

13   motion to seal, which is public, and you submit a redacted

14   copy for the public, and a redacted copy that would be under

15   seal if the Court grants your motion.

16             MR. McFARLAND:  Right.

17             THE COURT:  I would also tell you that someone

18   indicated that the status reports that had been filed

19   through the years were not of record but they all are of

20   record.

21             The clerk has been entering the status report, and

22   they are all kept in paper, but they all correspond to that

23   docket number.  I'm going to have the clerk go back and

24   electronically enter all of those status reports.  But if

25   anybody wants to see them, all you've got to do is say I

1    want to see the status report docket entry number whatever

2    filed such and such a date, and the clerk has it.

3            So I want that to be clear on the record.  Someone

4    said, well, no status reports have been filed, only the

5    cover letters.  I said there is not any way that something

6    sent to the clerk of our court hasn't been filed if it's

7    docketed there, and they have been.  I want to make that

8    clear to everybody, that all you do is go, and it says

9    status report and docket number, and you walk into the

10   clerk's office, and they can pull that status report.

11           I'm going to make it easier for everybody, it may

12   take us awhile, but I'm going to have them all

13   electronically entered so you can go back and see them.

14           All right.  Is there anything else?

15           MR. PORTER:  Nothing further, Your Honor.  Thank

16   you.

17           THE COURT:  We will stand in recess until further

18   notice, and please get something to the Court for me to

19   consider as soon as possible.

20           MR. McFARLAND:  Will do, Your Honor.

21           (Hearing adjourned at 4:33 p.m.)

22

23

24

25

1                        <u>CERTIFICATION</u>

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6

7              X_____/s/_____x

8                       Jody A. Stewart

9                   X_____10-29-2018 _____x

10                          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter