THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

R.M.S. TITANIC, INC.,
Successor in interest to Titanic
Ventures, limited partnership,

       Plaintiff,

v.                                  Civil Action No.:  2:93cv902

The Wrecked and Abandoned
Vessel, . . . believed to be
The RMS TITANIC, in rem,

       Defendant.

**REPLY OF THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM TO THE
OPPOSITION TO THE AMENDED MOTION TO INTERVENE**

COMES NOW the Trustees of the National Maritime Museum ("NMM"), by and

through its undersigned counsel, replying to the *Opposition of RMST to the Trustees of the*

*National Maritime Museum's Amended Motion to Intervene* (Docket No. 532) (the

"Opposition").[1]  NMM replies as follows:

**PRELIMINARY STATEMENT**

On November 12, 2018, NMM submitted to RMST a revised letter (the "Letter of

Intent") outlining a proposed alternative sale transaction to assure RMST that if, for any reason,

the sale of RMST to the Stalking Horse Purchaser is not consummated, RMST could avoid a

liquidation by consummating a sale of substantially all of its assets to NMM, NMNI, and

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in
the *Memorandum in Support of the Trustees of the National Maritime Museum Motion to
Intervene* (Docket No. 475).

Running Subway Productions, LLC.  Indeed, as described in the Letter of Intent and other filings with this Court, the proposed transaction solves the various issues that RMST has repeatedly alleged make NMM's proposal not viable, as the proposed transaction (i) includes a commitment to provide a loan to RMST and its affiliates of up to $500,000 if necessary to fund their operations until the proposed transaction can be consummated, (ii) includes committed financing of approximately $14.8 million to be paid to creditors of RMST and its debtor-affiliates, and (iii) most importantly, ensures that the Artifact Collection is kept together as an integral whole in perpetuity at an institution with the resources and expertise to guarantee that it remains available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes.  The Opposition makes it clear, however, that RMST finds no comfort in having this option available and, in the process, makes a number of inaccurate and materially misleading statements about the proposed transaction and about NMM's interests in the Artifact Collection.  All the while, RMST, the Stalking Horse Purchaser, and NOAA negotiated a proposed order approving the sale of RMST to the Stalking Horse Purchaser that, in the opinion of NMM, is completely devoid of protections sufficient to protect the public interest in the Artifact Collection.

## BACKGROUND

As this Court is aware, on October 24, 2018, NOAA recommended that this Court approve the sale of RMST to the Stalking Horse Purchaser.  *See* Docket No. 502.  NOAA's recommendation was subject to RMST's and the Stalking Horse Purchaser's commitment to, among other things:

> provide the Court and NOAA at least 60 days notice of, and seek
> Court approval for, . . . any action that could result in the Titanic
> Collections (as defined in the [Covenants and Conditions]) no
> longer being maintained together as an integral whole . . . .

*Id.* at 13-14.

On November 6, in order to address the issues raised by this Court at the hearing held on October 25, NOAA submitted a proposed order (the "Proposed Order") approving the sale of RMST to the Stalking Horse Purchaser.  *See* Docket No. 517-1.  The Proposed Order includes the same requirement that RMST and the Stalking Horse Purchaser provide the Court and NOAA with at least sixty days' notice of, and seek Court approval for, any action that could result in the Artifact Collection no longer being maintained together as an integral whole.  *See id.* at ¶ H.  Additionally, the Proposed Order states that NOAA's recommendation is conditioned on RMST and the Stalking Horse Purchaser agreeing to "certain additional conditions intended to protect the *Titanic* Collections as an integral whole, and to protect the *Titanic* wreck site in the public interest."  *Id.* at ¶ 6.

On November 7, RMST stated that the Proposed Order "presents significant challenges" because, among other things, the Proposed Order "mandates time lines that RMST and PAHL cannot currently meet, and ignores binding 4th Circuit authority."  Docket No. 518 at 2.

On November 16, the Stalking Horse Purchaser filed a revised proposed order (the "Revised Proposed Order").  *See* Docket No. 527-1.  A comparison of the Revised Proposed Order against the Proposed Order is attached hereto as Exhibit A.  Notably, the Revised Proposed Order does not require that this Court approve any action that would result in the breakup of the Artifact Collection; rather, it merely provides that any such action "shall be subject to prior approval of this Court *to the extent required by applicable law, including orders by this Court (including the [Covenants and Conditions] and the United States Court of Appeals*

*for the Fourth Circuit.*"[2]  *Id.* at ¶ G (emphasis added).  The Revised Proposed Order also

indicates that NOAA's recommendation is no longer conditioned on RMST and the Stalking

Horse Purchaser agreeing to additional conditions intended to protect the Artifact Collection as

an integral whole.

On November 21, NOAA stated that it believes the Revised Proposed Order addresses

the issues raised by this Court at the hearing held on October 25 and that the requirement that

RMST and the Stalking Horse Purchaser provide this Court and NOAA with sixty days' notice

of an action that would result in a breakup of the Artifact Collection is sufficient to protect the

collection:

> Because the Court and NOAA will have advance notice of any
> such proposed action, the Court will have the opportunity to bring
> the parties before the Court, if necessary, in order to evaluate
> whether any such proposed action would prevent RMST from
> fulfilling those promises as to the French artifacts, and thereafter
> issue any orders it deems appropriate under the circumstances and
> consistent with its jurisdiction.

Docket No. 530 at 3.

## ARGUMENT

I.   **NMM's proposed transaction minimizes the risk that RMST will liquidate if the sale
     of RMST to the Stalking Horse Purchaser is not consummated.**

The Opposition alleges that NMM's "continued brinkmanship brings the Debtors closer

to liquidation" when in fact NMM's continued efforts to set forth a viable alternative sale

transaction mitigates the risk that RMST and its debtor-affiliates will be forced to liquidate.

Opposition at 12.  At various points in the Opposition RMST alleges that, if the sale of RMST to

the Stalking Horse Purchaser is not consummated, RMST will be forced to liquidate its assets

---

[2]  RMST and the Stalking Horse Purchaser have previously stated that they believe the
Covenants and Conditions and Fourth Circuit precedent do not prevent the sale of individual
artifacts in the French Collection.  *See* Docket No. 489 at 3-9 (collecting statements).

under chapter 7 of the Bankruptcy Code.  *See*, *e.g.*, *id.* at 6 ("A sale to the Museum . . . is virtually impossible before the Debtors are liquidated . . . ."); 7 (stating that a chapter 7 trustee would be appointed if the Court does not approve the sale to the Stalking Horse Purchaser); 12 ("If the proposed sale to PAHL does not close before the end of next month, the Debtors will run out of cash and likely suffer a conversion to chapter 7 of the Bankruptcy Code.").  These doomsday predictions are hyperbolic and ignore the content of the Letter of Intent.  As described in the Letter of Intent, NMM has obtained approximately $14.8 million to finance an acquisition of the Artifact Collection and a commitment to provide a loan to RMST and its affiliates of up to $500,000 to fund their operations until the acquisition can be consummated.  Without such financing and loan commitments, if the sale to the Stalking Horse Purchaser were, for any number of reasons, not consummated, RMST and its affiliates would almost surely liquidate.  Fortunately, NMM has continued to work diligently, apparently against RMST's wishes but undoubtedly in RMST's interests, to obtain financing and loan commitments to ensure that a viable "Plan B" transaction exists should the sale to the Stalking Horse Purchaser fail.  As a result, NMM's efforts have significantly *reduced* the risk of liquidation—not, as RMST claims, *increased* the risk of liquidation.

Of course, NMM agrees with RMST that a sale to NMM will require a willing seller and further action in the Bankruptcy Court.  *See id.* at 6 ("A sale to the Museum . . . would require both a willing seller and significant action in the Bankruptcy Case by other parties . . . .").  However, NMM is confident that, should the sale to the Stalking Horse Purchaser fail, RMST's advisors and other fiduciaries would work quickly and diligently with other potential purchasers, including NMM, to pursue a transaction that avoids a liquidation of RMST and that is in the best interests of the public and RMST's stakeholders.

#91510323v4

II.     **The interests of NMM, as a premier maritime museum and the leading custodian of the United Kingdom's maritime heritage, in the Artifact Collection are consistent with the public interest in the Artifact Collection.**

NMM has represented on numerous occasions that its interests in these proceedings are twofold: *first*, as a premier maritime museum that exists to advance the public's access to its maritime heritage; and *second*, as a potential acquirer of the Artifact Collection.  NMM's interests as a potential acquirer are borne out of its interests as a premier maritime museum and dates as far back as 1994, when NMM's then-director acknowledged that, if RMST were to become bankrupt, NMM would have a responsibility to lead a rescue of the Artifact Collection in order for the collection to remain intact forever.  As such, NMM's interests in these proceedings are consistent with the public interest as described in the Covenants and Conditions: for this historic collection to be kept together and intact and available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes.

The Opposition, strangely, attributes nefarious intentions to NMM, accusing NMM of seeking to "usurp NOAA's role as advisor to the Court" and of being "more concerned with acquiring the Titanic Artifacts at a fire-sale price than it is with protecting the public interest in keeping the Titanic Artifacts together."  Although NMM disagrees with NOAA's position that the Revised Proposed Order will protect the public interest in the Artifact Collection, NMM has no intention of, nor interest in, usurping NOAA's role as advisor to the Court.  And although NMM believes that a sale of RMST to a holding company operated by investment vehicles that refuse to commit to keep the Artifact Collection together as an integral whole is not in the public interest, NMM does not seek to push RMST toward a liquidation, and would not push RMST toward a liquidation as a mere negotiation tactic.  To the contrary, NMM does not believe that a liquidation is in the public interest and, as discussed herein and in the Letter of Intent, for that

6

reason, NMM has worked tirelessly to minimize the possibility that RMST is pushed toward a liquidation.

At the October 25 hearing, this Court stated that it does not approach the law, or anything else, with a mindset of "let's just settle for the lesser because we don't want to wait for the better."  *See* Transcript of Proceedings (Docket No. 505) at 78.  The "lesser" in this case is a sale of RMST to a private entity that disagrees with NOAA "whether, if at all, the [Covenants and Conditions] control or limit RMST's conduct with respect to the French Artifacts" without including protections sufficient to ensure that the French Artifacts are not separately sold outside the scrutiny of highly publicized bankruptcy proceedings.  *See* Docket No. 52 at 14 n. 21.  A sixty day head start in a litigation with no certain outcome is no substitute for this Court using its powers under the Covenants and Conditions, including under section VII(d)(1) of the Covenants and Conditions, to ensure today that the public interest in this historic collection is protected for posterity.

NMM fears that, without a commitment to keep the Artifact Collection together as an integral whole, we will one day discover that parts of the ship or worse, that the belongings of those who perished on that cold April night in 1912, have been sold to private collectors.[3]  The Artifact Collection does not belong to RMST—it is held in trust by RMST for the public.  This

---

[3]  This fear is shared by other museums, charities, institutions and professionals in the maritime community.  Attached hereto as Exhibits B, C, D, E, F, and G are letters to this Court expressing concern that a sale to a private entity may result in the permanent loss of the Artifact Collection as an identifiable assemblage submitted by, respectively, (i) Dr. Robert Ballard, the discoverer of the R.M.S. *Titanic* wreck, (ii) Christopher T.C. Dobbs and Dr. Frederick Hocker on behalf of the Maritime Archaeology Committee of the International Congress of Maritime Museums, (iii) Robert A. Yorke on behalf of the Joint Nautical Archaeology Policy Committee, (iv) Helen Bosner-Wilton, Chief Executive of the Mary Rose Trust, (v) Stephen C. White, President of the International Congress of Maritime Museums and President and CEO of the Mystic Seaport Museum located in Mystic, Connecticut, and (vi) Dr. Antony Firth, Director of Fjordr Limited.

#91510323v4

Court should not approve a transaction that does not ensure that the entire Artifact Collection—

the French Collection and the American Collection—remains together in trust and available for

posterity.

## RESERVATION OF RIGHTS

NMM reserves the right to move to intervene in the above-captioned action pursuant to

Fed. R. Civ. P. 24 on grounds other than the grounds stated in the Amended Motion to Intervene.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Amended Motion to

Intervene should continue to be held in abeyance until further order of this Court.

#91510323v4

TRUSTEES OF THE NATIONAL MARITIME MUSEUM

Dated:     November 30, 2018                    Respectfully Submitted,

                                       By:    */s/ Edward J. Powers*

Neil Quartaro                                  Edward J. Powers, Esq. (VSB No. 32146)
WATSON FARLEY & WILLIAMS LLP       VANDEVENTER BLACK LLP
250 West 55th Street                           101 West Main Street, Suite 500
New York, NY 10019                             Norfolk, VA  23510
(212) 922-2200                                 (757) 446-8600
nquartaro@wfw.com                              epowers@vanblacklaw.com


Timothy Graulich
James I. McClammy
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com


*Attorneys for the Trustees of the National Maritime Museum*

#91510323v4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing pleading was electronically filed with the Court's ECF system causing ECF notification to be sent to all counsel of record.


/s/ *Edward J. Powers*

Edward J. Powers, Esq. (VSB No. 32146)
Vandeventer Black LLP
101 West Main Street, Suite 500
Norfolk, VA  23510
Telephone:  (757) 446-8600
Facsimile:   (757) 446-8670
epowers@vanblacklaw.com

#91510323v4