<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                        )
 5   R.M.S. TITANIC, INC.,              )
     SUCCESSOR IN INTEREST TO           )
 6   TITANIC VENTURES, LIMITED          )
     PARTNERSHIP,                       )
 7                                      )   CIVIL ACTION NO.
              Plaintiff,                )   2:93cv902
 8                                      )
     v.                                 )
 9                                      )
     THE WRECKED AND ABANDONED          )
10   VESSEL, ETC.,                      )
                                        )
11            Defendant.                )
    - - - - - - - - - - - - - - - - - -
12

13
                     TRANSCRIPT OF PROCEEDINGS
14
                        Norfolk, Virginia
15
                        December 17, 2018
16

17

18  BEFORE:  THE HONORABLE REBECCA BEACH SMITH
             United States District Judge
19

20  APPEARANCES:

21          KALEO LEGAL
            By:  Brian A. Wainger
22                    And
            McGUIRE WOODS LLP
23          By:  Robert W. McFarland
                 Counsel for R.M.S. Titanic
24

25
</pre>

```
 1
      APPEARANCES CONTINUED:
 2

 3            UNITED STATES ATTORNEY'S OFFICE
              By:  Kent Porter
 4                 Assistant United States Attorney
                   Counsel for Amicus United States
 5
              THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
 6            By:  Jackie Rolleri
                   Counsel for NOAA
 7

 8            GREENBERG TRAURIG LLP
              By:  David G. Barger
 9                 Counsel for PAHL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced at 2:07 p.m.)

 2              THE CLERK:  In case 2:93cv902, R.M.S. Titanic,

 3   Inc., et cetera, versus The Wrecked and Abandoned Vessel, et

 4   cetera.

 5              Mr. McFarland, Mr. Wainger, is the plaintiff ready

 6   to proceed?

 7              MR. McFARLAND:  Good afternoon, Your Honor.

 8   Plaintiff is ready.

 9              THE COURT:  Good afternoon.

10              THE CLERK:  Mr. Barger, is Intervenor Premier

11   Acquisitions Holdings, LLC, ready to proceed?

12              MR. BARGER:  We are.  Good afternoon, Your Honor.

13              THE COURT:  Good afternoon, Mr. Barger.

14              THE CLERK:  Mr. Porter, is amicus United States of

15   America ready to proceed?

16              MR. PORTER:  We are.  Good afternoon, Judge Smith.

17              THE COURT:  All right.  Counsel, I will briefly

18   review where we are so that we can proceed on the

19   outstanding matters before the Court in an appropriate

20   order.  Just to summarize for now, on November 16th, 2018,

21   Premier Acquisition Holdings, LLC, PAHL, filed a proposed

22   order and a declaration of Gilbert Li.  That was ECF number

23   527.

24              The proposed order, which is the proposed order to

25   approve the Asset Purchase Agreement, was attached as
```

1  Exhibit A, and the declaration of Mr. Li was attached as

2  Exhibit B.

3          On November 21, the United States as *amicus*, and on

4  behalf of the National Oceanic and Atmospheric

5  Administration, NOAA, filed a second supplemental report

6  recommending that the Court approve R.M.S.T.'s motion to

7  approve the Asset Purchase Agreement in accordance with

8  PAHL's proposed order, and that was ECF number 530.

9          On November 22nd, 2018, the museum filed an amended

10  motion to intervene.  That's ECF numbers 519 and 520.  On

11  November 26, 2018, R.M.S.T. filed a memorandum in opposition

12  ECF 532.

13          On November 30th, 2018 the museum filed a reply,

14  ECF number 533.  On November 19, 2018, this Court set a

15  hearing for today, December 17th, at 2:00 p.m. on the

16  outstanding motion to approve and the amended motion to

17  intervene.  Those are basically the filings.  There have

18  been voluminous filings, obviously, going back and forth in

19  support of those major filings that I mentioned.

20          I have made a listing of all of the documents that

21  have been filed since October 31, 2018; the document title

22  and the parties that filed it.  It's about a page and a half

23  single spaced, and it does involve thousands of documents.

24  I've also reviewed, going back into June, all of the

25  documents in regard to approval of the APA; and going back

1    into August, all the documents related to the motion to

2    intervene by the museum.

3           In any event, the listing of filings here is about

4    five or six pages.  So if we need to get to a specific

5    document, if you give me the ECF number, I have the document

6    referenced by date and ECF number.  That's why I'm letting

7    you know that, if we need to go to a document that I haven't

8    determined to be of immediate need to the Court, unless it

9    comes up during argument.  So if you have a document and you

10   want the Court to look at it, you do need to give me the

11   date of the filing, the ECF number, the title of the

12   document, and I'll be able to go right to it, I hope.

13          With that, if you want to make any type of

14   preliminary statement, I have reviewed all of your filings,

15   and I do have a number of questions that I will ask the

16   parties and also the *amicus* NOAA.  If there are any

17   preliminary statements you want to make, Mr. McFarland,

18   Mr. Wainger or Mr. Barger, you're free to do so.

19          Likewise, I would also note that Ms. Rolleri is

20   here as is Matthew Troy.  Both are here today on both of the

21   *amicus*.  If there is any statement you want to make

22   preliminarily, go ahead.

23          MR. McFARLAND:  Thank you, Your Honor.  May it

24   please the Court.  Your Honor, when we were last here on

25   October 25th, the Court expressed its position and certain

1    concerns as to the APA and the stock sale of R.M.S.T. and

2    directed the parties to talk further and proceed in that

3    vein if further submissions to the Court.

4          I can say, Your Honor, that the parties took the

5    Court's words to heart, and there were extensive meetings

6    and conferences with R.M.S.T. and the United States and

7    NOAA, and between, as the Court has mentioned, PAHL filed a

8    motion to intervene on November 5th, which the Court

9    granted, and PAHL has had extensive discussions with the

10   Court, as well.

11         We were happy to be able to submit, Your Honor, to

12   the Court, as part of PAHL'S motion on November 16th, a

13   fully endorsed order by all the parties in this action that

14   asked the Court to approve the Asset Purchase Agreement and

15   the stock sale of 100 percent of R.M.S.T.'s stock.

16   Recognizing that the Court may have some questions, happy to

17   address those.

18         But I think, Your Honor, what I guess my theme

19   would be on that sense is, we understood what the Court was

20   saying on October 25th.  I think that the order that is

21   presented, hopefully, it addresses the Court's concerns,

22   both on behalf of my client, and I won't speak for PAHL,

23   Mr. Barger, but I know, obviously, he has been involved, and

24   I think PAHL has certainly expressed its willingness to do

25   certain things that the Court wanted done.

1              Of course, the United States and NOAA have

2    indicated in writing that they support the plan.

3              THE COURT:  Mr. Wainger, is there anything you want

4    to add?

5              MR. WAINGER:  Nothing to add at this point, thank

6    you, Judge.

7              THE COURT:  Mr. Barger.

8              MR. BARGER:  Certainly, Your Honor.  A minute or

9    two, maybe even less.  Good afternoon, Your Honor.

10              THE COURT:  Good afternoon.

11              MR. BARGER:  Thank you for the opportunity to speak

12    with you.  Beyond the filings that the Court identified, the

13    only thing additional I would add is, we have with us today

14    Gilbert Li and Giovanni Wang who are speaking on behalf of

15    PAHL, and specifically Mr. Li works with PacBridge and --

16    I'm sorry.  I have it backwards.  Mr. Wong works with

17    PacBridge, and Mr. Li works with Alta and Apollo.  We are

18    prepared, should the Court decide it wants to go there, to

19    talk about some factual aspects of their involvement and the

20    anticipated future involvement of PAHL and some of the work

21    that they already know needs to be done should the Court

22    ultimately approve the proposed sale order.  So they are

23    here to show the Court some additional factual information

24    should the Court need to go into those areas.

25              THE COURT:  Well, while you're there.

```
 1            MR. BARGER:  Yes, ma'am.

 2            THE COURT:  Is it Barger or Barjer (ph.)?

 3            MR. BARGER:  The short answer is I say Barjer

 4    (ph.).

 5            THE COURT:  The way you say it is the way it should

 6    be said, the way they you it pronounced.

 7            MR. BARGER:  If you will indulge me a second, when

 8    I was sworn in in 1989 in front of Judge Bryan, he asked me

 9    the same question exactly, and my grandfather, who died in

10    '99 always said Barger Hargie.  So Judge Bryan said, well,

11    he thought -- I usually can do the imitation, but I won't,

12    that he thought my grandfather knew best, so the entire time

13    I practiced in front of Judge Bryan, he always said

14    Mr. Barger.  But I go by Barjer (ph.), Your Honor.

15            THE COURT:  Well, I'm actually -- Judge Bryan is

16    one of my heroes, along with Judges Hoffman, Kellam,

17    McKenzie and Clarke.

18            MR. BARGER:  Absolutely, yes.

19            THE COURT:  I'm going to not please Judge Bryan and

20    I'm going to call you Mr. Barger (ph.).

21            MR. BARGER:  Thank you, Judge.

22            THE COURT:  I do have some questions for you.

23            MR. BARGER:  Sorry.  Thank you.  I thought I was

24    off the hook.  Sorry.

25            THE COURT:  I don't think so.
```

1        MR. BARGER:  No, I know.  I'm teasing.

2        THE COURT:  I'll just start right in.  I was

3   looking at PAHL's proposed order that is ECF Number 527-1.

4   Paragraph 4 notes that PAHL has submitted a company

5   resolution consent consistent with its LLC agreement that

6   demonstrates that Mr. Li is authorized and powered and

7   directed to file documents on behalf of PAHL consistent with

8   the written consent, and that's at ECF number 527-1 at 2.

9        I cannot find any resolution or consent that has

10  been submitted to the Court, and if it has, could you please

11  let me know and give me the ECF number.

12       MR. BARGER:  Yes, Your Honor.  May I retrieve my

13  notes?

14       THE COURT:  Yes.

15       MR. BARGER:  Sorry, Your Honor.  Thank you.  I do

16  have a copy.  My co-counsel, Mr. Grossman, provided me a

17  copy of the unanimous written consent.  Off the top of my

18  head, I can't tell you if it was filed with the Court.  I

19  want to say I thought it might be in Docket 514, but I don't

20  want to say that because I'm not positive.  I'm happy to

21  hand up a copy, if I can show it to Mr. Porter first.  I'm

22  sure we've already provided him a copy.

23       THE COURT:  Have you seen this resolution,

24  Mr. Porter?

25       MR. PORTER:  We have, Your Honor.  This is one of

1    the things that we requested that they provide to us.

2         THE COURT:  I know that.  I realize that you

3    requested it and the provided it to you, but when I went

4    through this, and I've been going through these filings for

5    a month now, and I could have overlooked it, but I did not

6    see any resolution that you requested that ever came to the

7    Court.

8         MR. PORTER:  We did request it, and it did come to

9    us.  We had a number of tracks working at the time we were

10   working on this order.  It's possible that, perhaps, I did

11   not submit it, but we did request it.  We did receive it.

12        THE COURT:  Is that the same one?

13        MR. PORTER:  Yes, it is.

14        MR. BARGER:  We can file it, Your Honor, with the

15   Court's permission.

16        THE COURT:  We will file that as PAHL Exhibit 1 for

17   purposes of this hearing and the agreement.

18        MR. BARGER:  Thank you, Your Honor, my apologies

19   that I did not submit it with the prior declarations.

20        THE COURT:  This is the unanimous written consent

21   of the members of PAHL on November 1, 2018.  So this is the

22   company resolution.  Now, my next question would be, is

23   there a resolution from each of the entities, each of the

24   LLCs authorizing that individual to be appointed for them?

25   In other words, you have PAHL that consists of three

1   entities.

2            MR. BARGER:  Yes, Your Honor.

3            THE COURT:  I can pull the clause up in the PAHL

4   LLC agreement that requires a resolution and the consent of

5   all members.  I can give you that if you need it.

6            MR. BARGER:  No, I recall it.

7            THE COURT:  So this would be the resolution from

8   PAHL that would be called for by their LLC.  However, Apollo

9   Credit Strategies Master Fund Limited, Alta Fundamental

10  Advisors LLC and PacBridge Partners Investment Company

11  Limited would each also have to have a resolution

12  authorizing these individuals to act on their behalf to

13  sign, and I haven't seen those resolutions.

14           MR. BARGER:  Your Honor, I haven't looked at it,

15  but I accept the Court's premise.  I don't believe we have

16  those resolutions, but we will provide those promptly.  I

17  believe the two individuals here are authorized to speak on

18  behalf of the three entities, but in addition to whatever

19  verbal statements they would make, will provide the Court

20  the necessary resolutions.

21           THE COURT:  Because under the law, in other words,

22  they may sign on behalf of their LLC, and you've got

23  something signed for PAHL, but then an LLC can't act through

24  a person for them to sign unless they have their resolution.

25           MR. BARGER:  Understood, Your Honor.  I agree.  We

JODY A. STEWART, Official Court Reporter

1    will close that loop and solve that problem.

2         THE COURT:  That was the first question I had.

3    Madam clerk, if you would mark this PAHL Exhibit 1 for this

4    proceeding.

5         (The document was received in evidence as PAHL

6    Exhibit No. 1.)

7         MR. BARGER:  Your Honor, may I confer for just a

8    second?

9         THE COURT:  Yes.

10        MR. BARGER:  Thank you, Judge.  Nothing further on

11   that.

12        THE COURT:  All right.

13        MR. BARGER:  It's easy to solve that problem, and

14   we will do that.

15        THE COURT:  Now, this resolution, what does it

16   authorize Mr. Li to do, in your opinion?

17        MR. BARGER:  In my opinion, Your Honor, it

18   authorizes Mr. Li to speak on behalf of PAHL specifically

19   for purposes of signing the declaration or the declarations

20   that he has signed and filed with the Court showing the

21   Court PAHL's intention to enter into the agreement and to be

22   bound by the various provisions of the APA, the Court's

23   orders, and the proposed order that the parties have

24   submitted to the Court.  That's my interpretation of the

25   declaration that PAHL has submitted.

1    THE COURT:  You produced the resolution, but I want

2  to be sure that this resolution, then, authorizes Mr. Li not

3  only to file documents but to make representations on behalf

4  of PAHL in this proceeding.

5    MR. BARGER:  Yes, Your Honor.

6    THE COURT:  I think it does.

7    MR. BARGER:  Yes.  Sorry.

8    THE COURT:  It was just handed up to me, but I

9  believe that it does that.  That was a concern that I had

10  because I hadn't seen any resolution.

11    MR. BARGER:  Again, I apologize for that.  We were

12  moving fast.  I take responsibility for not getting that

13  filed to the Court.

14    THE COURT:  Let me ask you another question, Mr.

15  Badger, about the agreement.

16    MR. BARGER:  Yes, Your Honor.

17    THE COURT:  This has been a concern about the *in*

18  *personam* jurisdiction.  Reading Paragraphs B and C together

19  of the proposed order, Paragraph B says that PAHL submits,

20  "to the *in personam* jurisdiction of this Court for purposes

21  of ensuring R.M.S.T. complies with the Court's orders

22  relating to Titanic, including this order and the C&Cs..."

23  that would stand for the covenants and conditions.

24    MR. BARGER:  Yes, Your Honor.

25    THE COURT:  "...and to ensure PAHL's commitments

1    and obligations under this order."

2              MR. BARGER:  Yes, Your Honor.

3              THE COURT:  Paragraph C then outlines one of PAHL's

4    commitments as follows:  "PAHL shall take no action, nor

5    shall it refrain from taking any action, or direct or

6    authorize R.M.S.T. to take any action or refrain from taking

7    any action, that will result in or cause R.M.S.T.'s

8    inability to comply fully with this Court's orders relating

9    to Titanic, including this order and the C&Cs.  Any such

10   action by PAHL as described in this paragraph shall serve as

11   PAHL's consent to the *in personam* jurisdiction of this Court

12   for purposes of enforcing and adjudicating this Court's

13   orders relating to Titanic, including this order and the

14   C&Cs."  It's a lot of words.

15             MR. BARGER:  Yes.

16             THE COURT:  What I would ask you, why didn't you

17   simply submit a paragraph that says PAHL submits to the *in*

18   *personam* jurisdiction of this Court for all purposes

19   relating to this case, and then if you wanted to add

20   including but not limited to?  What are you trying to limit

21   out of this?

22             MR. BARGER:  Your Honor, I don't think we are

23   trying to limit anything out of it.  In fact, as I listened

24   to the Court read the C&C and, from my personal perspective,

25   C is a little bit superfluous because I do think B is very

1  broad, where we say we are subjected to *in personam*

2  jurisdiction for the purposes of ensuring R.M.S.T.'s

3  compliance and ensure PAHL's commitments and obligations

4  under this order.  The order, of course, speaks for itself,

5  but there are a number of provisions in the order that

6  broadly provide jurisdiction and power to the Court and

7  supervision by the Court.

8          So there wasn't an intent to carve anything out to

9  somehow limit the Court's jurisdiction, but you had a number

10 of lawyers lawyering the document, and at least from my

11 perspective -- and I was personally involved in some of that

12 or in much of that -- I don't think B should be read as

13 trying to carve something out away from the Court.

14         In fact, so B and C together, to me, generally

15 reaffirm PAHL and R.M.S.T.'s commitments.  R.M.S.T. already

16 had the commitment from the prior history of the filings,

17 but by PAHL coming in and signing the documents and agreeing

18 to this, it provides an additional protection for the

19 business, for the artifacts for the Court's jurisdiction.

20 So I don't read it as limiting, at least that's Bargeron

21 interpreting the Court order.

22         THE COURT:  Well, you were part of the drafting.

23         MR. BARGER:  Yes.

24         THE COURT:  You are the counsel representing PAHL.

25         MR. BARGER:  Yes, Your Honor.

1          THE COURT:  So you're representing to the Court

2     that, to your knowledge, there is no intent or effort to

3     limit the *in personam* jurisdiction of the Court over PAHL?

4          MR. BARGER:  No, Your Honor.

5          THE COURT:  Now, let me ask you a couple of

6     questions about *in rem* jurisdictions.

7          MR. BARGER:  I'm out of my element already, but,

8     yes, Your Honor.

9          THE COURT:  Well, the *in rem* jurisdiction of the

10    Court would be over the wreck.

11         MR. BARGER:  The res, right -- or the wreck, right,

12    correct.

13         THE COURT:  Paragraph "I" of PAHL's proposed order

14    revises a provision in NOAA's proposed order, and I want to

15    go through the revision.  My ultimate question will be why

16    was the change made?  In the provision, in NOAA's proposed

17    order that forbid R.M.S.T. and PAHL from taking any action,

18    underlines, that would remove, circumvent, or diminish the

19    Court's admiralty jurisdiction over the wreck site and

20    artifacts, and in your proposed order, that was changed to

21    only forbidding R.M.S.T. and PAHL from amending the APA or

22    their organizational documents or entering into any

23    contracts that affect or which would be to remove,

24    circumvent or diminish the Court's admiralty jurisdiction in

25    this case.

1          Do you know why that change was made?  I'm not
2     saying it's a bad change.  I'm just asking.
3          MR. BARGER:  I understand.
4          THE COURT:  I went through and looked at all the
5     changes.  I'm just trying to see if there is any reason.  I
6     didn't look at it necessarily as a detrimental change.  I
7     just was asking if you know why it was made?  Was there any
8     specific reason that you can recall?
9          MR. BARGER:  Your Honor, there is none that I
10    specifically recall.  I would have to get the redline
11    versions of the various documents to go back and look at
12    exactly what the proposed language was.  I can tell you
13    generally, again, as the attorney of record, in looking at
14    "I," and there were also, as I recollect, there were a
15    couple of other paragraphs where we reaffirmed essentially
16    that we weren't doing anything, when I say "we," meaning
17    PAHL, to do anything to try to circumvent or interfere with
18    or limit this Court's admiralty jurisdiction because the
19    reality is, we couldn't.  But at least I don't believe we
20    could.
21         THE COURT:  I would put that statement on the
22    record, and at least the two bankruptcy judges of this court
23    are in agreement, admiralty law clearly takes precedence
24    over bankruptcy law.  Admiralty law is international law,
25    too.  It takes precedence worldwide.  So I would tell you

1    that.  I'm not trying to show muscle over the bankruptcy

2    court.  It's just a fact of jurisdiction and the law.

3    Admiralty jurisdiction and the jurisdiction here would take

4    precedence over any type of bankruptcy jurisdiction.

5          MR. BARGER:  Your Honor, and I understand.  By way

6    of fleshing this out a little bit, hypothetically there

7    might arise something that is purely a bankruptcy court

8    question where the parties might have to go back to the

9    bankruptcy court.

10          THE COURT:  I think you're going to have to, but

11    I'm going to ask some bankruptcy questions of Mr. McFarland

12    and Mr. Wainger in a minute, and then you can add to them.

13    I don't know if you're a bankruptcy practitioner or if you

14    have been involved in those proceedings at all.

15          MR. BARGER:  I have not.  I practice on rare

16    occasion in bankruptcy court.  I would say my knowledge of

17    *in rem* is a little bit better than my knowledge of

18    bankruptcy.

19          THE COURT:  I will accept that, and for right now

20    I'm not looking at this unless NOAA, and you might want to

21    address if you've discussed that at all, Mr. Porter, because

22    this was a change to your language, whether this change is

23    creating any kind of loophole or substantive matter as

24    opposed to what NOAA suggests, because it was a change to

25    NOAA.  You can address that.  I'm going to call on you in a

1    moment.

2          Next question, Mr. Barger.

3          MR. BARGER:  Yes, Your Honor.

4          THE COURT:  I note that, and this may be for

5    actually R.M.S.T. because I think this was their filing.

6    I'll give the question, and then if they have an answer,

7    then the next time they come up, they can address it.  On

8    November 15th, 2018, R.M.S.T. filed three exhibits:  A

9    reserve account bank information, a safe deposit bank box

10   information, and contact information for exhibition venues.

11   Those are ECF Numbers 521, 524 and 525.  These documents

12   appear to have been filed in response to the request for

13   these in Paragraph L of NOAA's proposed order, which was

14   ECF Number 517-1.

15         However, I note that the information for the

16   exhibition venue in China is missing from Exhibit C, the

17   contact information for R.M.S.T.'s exhibit venues.  That's

18   521-3, ECF Number 521-3, according to your exhibition

19   agreement, and that is what was included in the due

20   diligence documents.  I'm going back to Exhibit G, which was

21   ECF 510-7.  That exhibition continues into 2019.

22         In other words, when you put the documents

23   together, or R.M.S. Titanic files ECF Number 521-3, and the

24   exhibition venue and information, contact information is

25   missing in that filing.  According to the exhibition

1    agreement that was given in response to due diligence, the

2    due diligence document, which is 510-7, that exhibition goes

3    into next year.  So my question would be more appropriate,

4    Mr. Barger, for Mr. Wainger and Mr. McFarland when they get

5    to address the Court next.

6              MR. BARGER:  All right, Your Honor.

7              THE COURT:  Unless there is something you want to

8    flag on behalf of PAHL.

9              MR. BARGER:  Yes, Your Honor.  If I could just ask

10   the Court.  I've got 521-3 in front of me, which lists the

11   certain venues, temporary venues and permanent venues.  I

12   just want to make sure I understood the Court's concern.

13   What's missing, you said something, that their contact

14   information is missing?  Sorry, Your Honor.  I just didn't

15   understand.

16             THE COURT:  They gave three exhibits:  A reserve

17   bank account, a safety deposit box bank information, and the

18   contact information for exhibit venues, and that was 521,

19   524 and 525.  They were filed in response to the request for

20   these documents from NOAA, in Paragraph L of NOAA's exhibit,

21   which is ECF Number 517-1.

22             MR. BARGER:  Yes, Your Honor.

23             THE COURT:  However, the information on exhibit

24   venue in China is missing from Exhibit C.

25             MR. BARGER:  I understand the Court's question.

1        THE COURT:  521-3, is that what you're looking at?

2        MR. BARGER:  I am, and I see there is no venue

3    listed for China.  I know Mr. Li and Mr. Wong can both

4    identify, they can at least state their understanding of

5    whether there is an exhibition in China and when the lease

6    expires.  I think there is one, but it will be their

7    understanding, and I'm confident R.M.S.T., as the debtor and

8    their secretary, can tell the Court more accurately than I

9    can.  It's a long way of saying you're right.

10       THE COURT:  These are just some *in rem* questions.

11   I'm not trying to put you on the spot because I do think

12   that Mr. McFarland, Mr. Wainger or Mr. Porter can better

13   respond to that since there were actually documents that

14   were produced basically from NOAA's due diligence.

15       MR. BARGER:  I apologize I didn't have the answer

16   for you, but I'll check.

17       THE COURT:  I may have some more questions for you

18   later as the hearing progresses, Mr. Barger, but I think

19   that that's all that I had for the moment.

20       MR. BARGER:  All right.  Thank you, Judge.

21       THE COURT:  Mr. Porter.  Let me ask you a threshold

22   question before we proceed any further, that is, NOAA has,

23   as Mr. McFarland said, signed on to the Asset Purchase

24   Agreement, and you have signed it under, it says "seen."

25       When you sign something seen, you also agree to it.

1   Under the law there are three ways to sign proposed orders

2   for a Court.  It's we ask for this, we want it, another is

3   seen and agreed, and the other is seen and objected to.

4   Before I enter it, I would require NOAA to add to that "seen

5   and agreed."  Are you willing to do that?

6          MR. PORTER:  Absolutely, Your Honor.  The reason it

7   is as it is, is because we are in position of an *amicus*.  I

8   have talked to a number of people whether we even need to be

9   on the order or not, but I wanted to be at least on the

10  orders as seen, but I can tell you, Your Honor, that myself

11  and Ms. Rolleri were actively involved in drafting this

12  order, and I have no difficulty whatsoever with an agreed.

13         THE COURT:  You're *amicus* because it was only the

14  Court in here for many years, and that's not a proper way to

15  proceed in a court when the United States has an interest in

16  the action.  I directed the United States Attorney to enter

17  this case a number of years ago because the Court should not

18  have to be put in the position of being an adversary or

19  advocating.

20         The Court's role is to protect the artifacts and

21  the wreck site under the admiralty jurisdiction and salvage

22  law of the United States.  I just wanted to be sure.  I know

23  the "seen" means you agree, but I'd feel better if you also

24  put "and agreed."

25         MR. PORTER:  I have no difficulty with that, Your

1    Honor.

2          THE COURT:  The United States is on that order if

3    something happens to these artifacts.

4          MR. PORTER:  Understood, Your Honor.

5          Your Honor, to address the two questions about some

6    of the provisions in the order, you raised the question

7    about the language in Paragraphs B and C.  I can certainly

8    represent to the Court that there is no intention there to

9    try, with Paragraph C, to carve out any provision.

10          On the contrary, in an effort to try to carve in as

11   much as possible, I wanted to make sure that it was clear

12   that it was not only affirmative action on PAHL's behalf

13   that would make it culpable, but inaction, simply standing

14   on the sidelines that if some way caused R.M.S.T. to fail to

15   comply.

16          So that was the intent of that, Your Honor,

17   certainly not to carve out but to make clear that action and

18   inaction could make PAHL culpable and ensure that PAHL is

19   before the Court personally.  That was the purpose of that

20   one.

21          The second, in the *in rem* provisions in Paragraph

22   "I," I would also reference the Court to Paragraph L, which

23   indicates that, "Except as expressly authorized herein,

24   nothing in this order shall be construed to alter, affect or

25   limit R.M.S.T.'s current salvor-in-possession status, this

1    Court's *in rem* jurisdiction over the Titanic wreck."

2           Again, as Mr. Barger indicates, you have a number

3    of lawyers working on this, and all have particular

4    interests, and one of the reasons that "I" is worded as it

5    is, is because the Court expressed particular concern about

6    the APA, the Asset Purchase Agreement, and whether the Asset

7    Purchase Agreement in some form or fashion pulled back on

8    the Court's jurisdiction.

9           We wanted to make absolutely sure that it did not

10   do that, or that they amended any of their documents,

11   organizational documents for that to happen.  So that's the

12   reason.

13          THE COURT:  Thank you.

14          MR. PORTER:  All right.

15          THE COURT:  Give me a moment before I bring you

16   back up here so that we can cover all the questions that I

17   might have.

18          All right, Mr. McFarland.

19          MR. McFARLAND:  Thank you, Your Honor.

20          THE COURT:  Let me start with some questions about

21   the bankruptcy court proceedings.  The bankruptcy court has

22   approved the sale subject to this Court's approval of the

23   Asset Purchase Agreement; is that correct?

24          MR. McFARLAND:  Correct, Your Honor.

25          THE COURT:  Has a plan been confirmed?

1          MR. McFARLAND:  Not at this point in time, Your
2    Honor.
3          THE COURT:  So the sale is pursuant to Section 363
4    of the bankruptcy code?
5          MR. McFARLAND:  I believe that's correct, Your
6    Honor.
7          THE COURT:  Not a Chapter 11 plan?
8          MR. McFARLAND:  What was filed is a Chapter -- but
9    I think the confirmation would be 363.  I believe that is
10   correct, Your Honor.  Between Mr. Barger and I, I'm not sure
11   whose bankruptcy knowledge is -- but that is correct.
12         THE COURT:  Well, that would be my reading of the
13   documents, that the bankruptcy court approved the sale, but
14   their plan has not been confirmed, so the sale would be
15   approval pursuant to Section 363 of the bankruptcy code.
16         MR. McFARLAND:  That is correct, Your Honor.
17         THE COURT:  Not a Chapter 11 plan at this juncture?
18         MR. McFARLAND:  Right.
19         THE COURT:  The next is, if for some reason this
20   sale fails to close, couldn't a plan then still be confirmed
21   by the bankruptcy court?
22         MR. McFARLAND:  I don't think what's before the
23   Court at this point could be confirmed, Your Honor.  In
24   fact, I think, as we have indicated to the Court, if the
25   sale is not approved and the stock purchase not approved, I

1    think we are going to be surely looking at a different

2    bankruptcy proceeding, a Chapter 7 with a trustee directly

3    involved.

4              THE COURT:  But if no Chapter 11 plan has been

5    confirmed, and the museum's plan was held in abeyance by the

6    bankruptcy court, right?

7              MR. McFARLAND:  I don't think the museum's plan is

8    actually held in abeyance by the bankruptcy court.  The

9    museum had the opportunity to participate.  They chose not

10   to.  The museum has nothing left before the bankruptcy

11   court, is my understanding.

12             THE COURT:  I'm not sure that I agree with you on

13   that from what I have read.  Are there any other plans?

14   Let's just call it held in abeyance rather than a legal

15   term, just a term of art we all know, held in abeyance not

16   acted upon.

17             Are there any other plans that have been held in

18   abeyance or not acted upon or that otherwise were presented

19   to the bankruptcy court that have been rejected?  Because I

20   don't see the museum's plan as rejected, I just saw what you

21   proposed as approved over what they proposed.

22             MR. McFARLAND:  I think, Your Honor, and I will

23   certainly defer to any of the folks who are here, I think

24   the museum put something out but they never officially put

25   it out before the bankruptcy court so that it didn't need to

```
 1    be rejected.  There was only one viable plan for the
 2    bankruptcy court to approve, which it did, on October 18th
 3    of 2018.
 4              THE COURT:  They didn't approve a plan.
 5              MR. McFARLAND:  I'm sorry, one sale, approval of
 6    sale plan.
 7              THE COURT:  There has been, and I spent a lot of
 8    time looking into this, and that's why I wanted to ask the
 9    question, because what I see in the papers that have been
10    filed with the Court is the bankruptcy court approved a sale
11    subject to this Court's approval of an Asset Purchase
12    Agreement.
13              MR. McFARLAND:  Correct.
14              THE COURT:  But there's been no Chapter 11 plan
15    confirmed.  This would be a Section 363 sale under the
16    bankruptcy code.
17              MR. McFARLAND:  Yes, Your Honor.  The Court's
18    recitation is, as I understand it, correct, and we also have
19    Mr. Brooks here, bankruptcy counsel for the company, should
20    the Court have further questions in that that are beyond my
21    akin.
22              THE COURT:  I understand.  You may want to consult
23    with him.  I can take a recess.  I just want to get my
24    questions out so that if you all need to confer, you can get
25    answers, and these are just things that I want to be clear
```

1    on the record here and clear to me, as I proceed.

2         That question that I have, if for some reason the

3    sale fails to close, there could be any number of reasons,

4    say the Court approved the asset purchase plan but makes

5    some small changes to it, subject to changes.  As I

6    understand, as I've read the documents, any closing is

7    contingent upon my order approving the asset purchase plan

8    being satisfactory to PAHL.

9         MR. McFARLAND:  Right.

10        THE COURT:  I may make some small changes to it, so

11   PAHL may decide they don't like my changes, or they might

12   want to file something.  I don't know.  I'm not saying I'm

13   going to.  I'm just proposing some of these out as

14   possibilities and hypothetical questions, or however you

15   want to phrase that.

16        If for some reason, whatever reason, maybe it is

17   one little line that the Court adds into the Asset Purchase

18   Agreement and PAHL says that's a deal breaker, we are not

19   going to do this, and if for some reason the sale fails to

20   close, what I'm trying to understand is, could a plan still

21   be confirmed under the bankruptcy code under Chapter 11?

22        MR. McFARLAND:  I don't think so, Your Honor,

23   particularly at this point in time.

24        THE COURT:  I'm putting aside R.M.S.T.'s cash flow

25   problems.  I'm talking just strictly legal questions now.

1  But setting aside the cash flow problems, is there any legal

2  authority that would prevent that possibility?

3        MR. McFARLAND:  Then we would be back to a

4  situation where looking at what other options would come

5  forward.

6        THE COURT:  That's why I was referring to the

7  museum's plan because as I understand it, it was before the

8  bankruptcy court.  They didn't proceed on it.

9        MR. WAINGER:  Judge, if I may just on this one

10  specific point.  It was not the museum's plan, it was the

11  creditors' committee's plan, and they allowed the museum to

12  join it.  The creditors' committee was a party in interest.

13  They withdrew the plan.

14        THE COURT:  They withdrew what plan?

15        MR. WAINGER:  The plan that they had proposed, the

16  creditors' committee, they withdrew it.  They no longer

17  support that plan.  So that doesn't exist.  There is no

18  support for that plan.  It could not be passed, and so that

19  is not a reality down in Florida.

20        I understand the Court had set aside the concept of

21  cash flow, but I do think it's important to understand that

22  the cash flow situation is integral to the larger picture,

23  and that is the debtor will have to convert -- that's the

24  only option at this point should PAHL -- should the Court

25  not approve the transactions and/or should PAHL walk away

1  from any changes, if any, made by the Court.

2       THE COURT:  Well, you would still have to get

3  approval of the bankruptcy court to convert to Chapter 7,

4  wouldn't you?

5       MR. WAINGER:  We would have to obtain approval, but

6  at this stage there would be no other option whatsoever

7  given all the circumstances.  We have been struggling, and I

8  say "we" the collective, to keep that case, our collective

9  heads above water to try to get this taken care of.

10      THE COURT:  Basically, what you're talking about is

11 between the creditors and the debtors, there is no other

12 option?

13      MR. WAINGER:  Between all of constituents to the

14 bankruptcy, of which there are now many, there are no other

15 options.  We did ask Mr. Troy to be able to speak to that,

16 as well, should the Court seek other perspectives, and we do

17 have Mr. Brooks from Troutman Sanders who is a bankruptcy

18 expert.  So we have plenty of ammunition for the Court if we

19 want to speak further on that.

20      THE COURT:  Thank you.  Let me see if I have any

21 more questions in that area, Mr. McFarland.

22      We can go back now to the information on the venue

23 in China, the exhibition venue in China.  Why don't you

24 speak about that.

25      MR. McFARLAND:  Yes, Your Honor.  That exhibition

1    in China closed October 31st of 2018.  It was not a

2    permanent exhibition.  What the government and NOAA had

3    requested was to provide the addresses and contact

4    information for permanent exhibitions, which we did, and

5    then we also just -- I'm going to use this term -- for belt

6    and suspenders, which I think also goes to Paragraphs B and

7    C that Your Honor was going on, is applicable there, but we

8    provided the contact information addresses for temporary

9    venues, as well.

10          But by the time we filed that on November, I

11   believe it was the 15th.

12          THE COURT:  So, in other words, you didn't omit it.

13   It's just that things had changed, and it wasn't going into

14   2019?

15          MR. McFARLAND:  Exactly, Your Honor.  And, in fact,

16   the artifacts that were in that exhibition have been

17   returned to the United States.

18          THE COURT:  I just wanted to be sure that wasn't an

19   omission.  It was an omission but it was intentionally

20   omitted because it was over?

21          MR. McFARLAND:  Didn't fall under either category

22   temporary or permanent, Your Honor, that's right.

23          THE COURT:  Let me go through my notes one more

24   time while you are still up there.

25          MR. McFARLAND:  I would say, Your Honor, and I

1   would apologize because I was a little slow on the take on

2   one of Your Honor's bankruptcy questions.  But the

3   creditors' committee, with whom the museum was originally

4   teamed, actually supported the sale plan that the bankruptcy

5   court approved on October 18th.

6           THE COURT:  All right.  From your perspective, in

7   what form, assuming the Court approves this Asset Purchase

8   Agreement, will R.M.S.T. still exist?

9           MR. McFARLAND:  Yes, Your Honor.

10          THE COURT:  In what form?

11          MR. McFARLAND:  In the same corporate entity that

12   it is now.  It will have a different board of directors, but

13   it will still exist as an independent corporation.  It will

14   still continue to, among its duties, conserve, curate,

15   preserve, and be involved in the exhibition of the

16   artifacts, and the education aspect, and will still have the

17   salvage rights and be the salvor in possession for the wreck

18   site.

19          THE COURT:  All right.  In that regard, then, the

20   reason I'm looking at that proposed order, and I'm looking

21   at Section D of that order, and I'm looking at the red and

22   the blue lined versions, I notice that this was changed from

23   R.M.S.T. and PAHL shall promptly inform the Court and NOAA

24   of any change to the composition and makeup of R.M.S.T.

25   board's, officers and senior management team or any change

JODY A. STEWART, Official Court Reporter

1   of control of R.M.S.T.  Why was PAHL omitted from that?

2          MR. McFARLAND:  I think it's important to maintain

3   the corporate formalities, Your Honor.  If we are talking

4   about the R.M.S.T., the party that is before this Court

5   right now, and of course, PAHL has agreed it will also.

6          THE COURT:  PAHL is now going to be before the

7   Court.

8          MR. McFARLAND:  They will be, Your Honor.  But in

9   terms of maintaining corporate formalities, if it's a change

10  in R.M.S.T., then that ought to come to the Court from

11  R.M.S.T.

12         THE COURT:  But if PAHL is the parent company,

13  could it also come from the parent company.

14         MR. McFARLAND:  It could, Your Honor.

15         THE COURT:  So why not add both?

16         MR. McFARLAND:  I think, Your Honor, we thought

17  that having been before this Court for 20 plus years that we

18  ought to be the entity that would report those things.

19         THE COURT:  It didn't please the Court when your

20  acquisition was before the Court.  You had been before the

21  Court for 20 some years, but maybe the Court wanted more

22  than you before the Court.  We have gone through that one

23  before.

24         MR. McFARLAND:  Or, Your Honor, what I'm saying is

25  to the extent that PAHL is going to report things, then PAHL

1    would do that.  But I think for clarity purposes and for

2    maintaining the corporate identities, information about

3    R.M.S.T. itself ought to come from R.M.S.T.

4         THE COURT:  Why can't it come from both?

5         MR. McFARLAND:  Well, I think, Your Honor, it does.

6    If we look at J, and part of this is, again, what I will

7    call the belt and suspenders.  J references PAHL's

8    obligations.  You will note that in J we don't list R.M.S.T.

9         THE COURT:  I'm looking at the redlined and green

10   and blue versions.  So I've got to find the J in that

11   version.  You are talking about in the current version that

12   is now J?

13        MR. McFARLAND:  Exactly, Your Honor.

14        THE COURT:  I'm on that.  I've got the current

15   version of J.

16        MR. McFARLAND:  So J indicates that PAHL is

17   undertaking and will undertake certain obligations to the

18   Court.  At least I guess I'll say from our perspective, and

19   by "our" I mean the debtor's perspective and R.M.S.T., it is

20   always important to keep these entities so there is no

21   problems to make some separation.

22        So J references PAHL and D references R.M.S.T.

23   Now, as a practical matter, it may not have a great effect

24   as to the report of Your Honor, but we thought for purposes

25   of the order, it was good to break them down.

1          THE COURT:  Don't you already have an executed

2    membership agreement for PAHL?  So why is within 60 days of

3    the transaction closing?  Are you planning to change all

4    this around after you close?  This says, "Within 60 days of

5    the transaction closing, PAHL shall:  Provide to the Court

6    and NOAA a copy of the executed membership agreement for

7    PAHL with all amendments thereto."

8          So I can't count on the membership agreement that's

9    before the Court now?  This is giving authority to

10   re-execute a membership agreement and make amendments to it,

11   and then, "Inform the Court and NOAA of the appointment of

12   any manager or managing member for PAHL."  I thought I

13   already had the membership agreement for PAHL.

14         MR. McFARLAND:  I think you do, Your Honor.  What

15   the final versions look after the closing, that's not -- we

16   are not directly involved in what PAHL may be submitting on

17   that, but I think this is just referencing that.  There

18   still has to be a closing.

19         THE COURT:  I understand there's got to be a

20   closing, but why isn't it being a closing based upon PAHL as

21   it stands before the Court today?  This says that within 60

22   days of closing, that was going to be a question later, but

23   now that you've brought it up, I don't see this relating to

24   what I just asked you because this says to the Court that,

25   actually, within 60 days after this closes, PAHL can come in

1    and give the Court and NOAA a copy of an executed membership

2    agreement with all amendments thereto.  I thought we had a

3    copy of an executed membership agreement.  Are new members

4    going to be added?

5         What kind of amendments are going to made?  "Inform

6    the Court and NOAA of the appointment of any manager or

7    managing member for PAHL" -- so are they going to change --

8    "and identify those officials of PAHL that have authority to

9    bind PAHL with respect to..."  So this is backing off of

10   PAHL being bound by this Court's admiralty jurisdiction.

11        Then you're going to tell the Court, well, we've

12   designated this person or we couldn't agree.  So these

13   resolutions I'm asking for, this is a back-off provision, in

14   my opinion, that allows you to go in and say we have 60 days

15   after this closes to give you a membership agreement, any

16   amendments we make to it, name officials who have authority

17   to bind us with respect to the Court's admiralty

18   jurisdiction and the STAC and authority of this Court.

19        That is backing off to enforce or adjudicate

20   compliance.  PAHL is PAHL.  Once they sign on here and

21   they've appeared before the Court, why should the Court then

22   give them 60 days to go in and change their membership

23   agreement and amend it and appoint different managers and

24   appoint different people to bind before this Court?  Why is

25   that provision there?

1        MR. McFARLAND:  Your Honor, I'm not trying to

2   dodge, but I think in some respects that's really a question

3   for PAHL.  But I am speaking for R.M.S.T.  I'm not aware of

4   any effort.

5        THE COURT:  The reason I got to that before I got

6   back to PAHL was because you referenced it.  I asked you

7   what form R.M.S.T. would exist in.

8        MR. McFARLAND:  Right.

9        THE COURT:  Then I'm asking the question about why

10  it's not, and PAHL promptly informed, why wasn't both of

11  them?  Why they both couldn't have the duty to the Court as

12  the parent and the subsidiary, or there could be one filing

13  on behalf of both of them doing that?

14       MR. McFARLAND:  My point there, Your Honor, I was

15  referencing Paragraph J just to show the distinction that is

16  made when there are separate filings or separate, if you

17  will, obligations.  It may be that you could do a joint

18  filing in that sense, but we wanted to, particularly at this

19  point in time, for the transaction to make sure that the

20  corporate formalities.  R.M.S.T. is a separate corporate

21  entity, as we have said to the Court, and it will remain a

22  separate corporate entity with its own board of directors,

23  retaining the assets that it presently has.

24       Now, PAHL is going to acquire a hundred percent of

25  its stock, if this is approved by this Court and then the

 1    final closing occurs.  But I was referencing and trying to
 2    show that there is in this agreement, when it is something
 3    that's R.M.S.T.'s, it is broken out that way.  When it is
 4    something that's PAHL's, it is broken out that way.  And
 5    then I think there are certain provisions, for example,
 6    Paragraph G which references that certain things are going
 7    to be done by both of them, and there you've got PAHL acting
 8    in its oversight capacity in a sense because that's one of
 9    the obligations it undertook before this Court, acting in
10    its oversight capacity with R.M.S.T. to provide, for
11    example, 60 days' notice as to the collection.
12              There is a later provision, as well, on the C&C's,
13    et cetera.  If there's going to be an exhibition -- excuse
14    me, an expedition, as in Paragraph H, that's an R.M.S.T.
15    function, an R.M.S.T. duty.
16              THE COURT:  I agree.
17              MR. McFARLAND:  So that is why you will see just
18    R.M.S.T. there.  I don't think, Your Honor, there is any
19    intention to backtrack in any way what is before the Court.
20              THE COURT:  I'll ask this of Mr. Barger, but what's
21    being contemplated within 60 days of this transaction in
22    regard to a new executed membership agreement with
23    amendments thereto?  Somebody's contemplating something or
24    they wouldn't put this provision in.
25              MR. McFARLAND:  I think, Your Honor, and, again, I

1  don't want to speak too far, but I think this is the

2  transactional attorneys weighing in with the admiralty

3  attorneys.

4        THE COURT:  Then maybe the admiralty attorneys

5  ought to prevail.  This is just an aside.  When I was

6  practicing law, transactional attorneys, there were deal

7  makers and deal breakers.  That's the old saying in the law.

8  Some transactional attorneys are deal makers and some are

9  deal breakers.  When you insist upon too much minutia

10 because you're scared or protecting yourself or whatever,

11 you can be a deal breaker.

12       MR. McFARLAND:  And I can say to the Court,

13 speaking on behalf of my clients, the debtors, there has not

14 been anything but an attempt to, A, try and address the

15 Court's concerns from the October 25th hearing; and, B, make

16 it so there is a transaction that works.  That's what I

17 think is intended here.

18       THE COURT:  I'm not disagreeing with you,

19 Mr. McFarland.  I'm not disagreeing with R.M.S.T.  I asked

20 you a question about whether you knew why PAHL had been

21 removed from that provision and only R.M.S.T. left in.  You

22 are the one that took the Court over to J, and I have not

23 gotten to my yellow tabs in the red, green, blue and black

24 inked order.  So you took me over to another tab, which is

25 why I asked you that question.

1              I think that is all, Mr. McFarland, for now.

2              MR. McFARLAND:  Thank you, Your Honor.

3              THE COURT:  We will take a 15-minute recess, and,

4    Mr. Barger, you, obviously, know the next question that I'm

5    going to ask you in regard to section J of the proposed

6    order.  If anyone wants to make any further statement on the

7    bankruptcy proceedings, you can do that.

8              MR. BARGER:  Yes, Your Honor.

9              THE COURT:  I'll hear one more time from you,

10   Mr. Porter, on some of the things that have been raised.

11             MR. PORTER:  Your Honor, I would certainly invite

12   you to hear from Mr. Troy, if you would like, on the

13   bankruptcy aspect.

14             THE COURT:  That will be fine.  We will first hear

15   on the bankruptcy issue since that was raised before, then

16   we will go to Mr. Barger on the provision that I asked

17   about, and then I'd like to hear what you have to say on

18   that provision, too, Mr. Porter.

19             MR. PORTER:  Certainly.

20             THE COURT:  What you know about provision J.

21             MR. PORTER:  I'm prepared to speak to that, Your

22   Honor.

23             THE COURT:  You both can speak to J, and Mr. Troy

24   and whoever you want to have speak, as long as we don't have

25   a bankruptcy dissertation as we did at one of our hearings

1   that went on for a long time.  My manners didn't allow me to

2   stop the speaker.  I'm asking what time it is, not how to

3   make the clock.

4           Okay.  The Court stands in recess for 15 minutes.

5           (Recess from 3:13 p.m. to 3:27 p.m.)

6           THE COURT:  I think we were going to address the

7   bankruptcy matters first.

8           MR. McFARLAND:  We were, Your Honor.  In light of

9   the Court's questions, which I answered as best I could, but

10  admittedly a little out of my normal bailiwick, we have Nat

11  Brooks here, Your Honor, who represents the company, the

12  debtors in the bankruptcy.  I thought he may be able to

13  answer the Court's questions and give just a slight overview

14  on some things.

15          THE COURT:  Mr. Brooks is with Troutman Sanders?

16          MR. McFARLAND:  He is.  I will say this to the

17  Court.  He has not been admitted *pro hac vice*.

18          THE COURT:  I'll listen.

19          MR. McFARLAND:  Thank you, Your Honor.

20          MR. BROOKS:  Thank you, Your Honor, for letting me

21  speak.

22          THE COURT:  Good afternoon, Mr. Brooks.

23          MR. BROOKS:  Hesitant being introduced as the

24  bankruptcy expert, but I can just give the Court -- to

25  answer the question about the proposed transaction before

1    this Court, in the alternative, if that transaction is

2    consummated, the debtors, if the deal with PAHL, Your Honor,

3    is not consummated, would be forced to return to the

4    bankruptcy court and liquidate.  There is no time or

5    creditor support for any other deal in the case.  This is

6    the deal that the creditors have signed off on.  If that

7    deal doesn't close, the only option for the debtors would be

8    to convert the case and liquidate.

9         THE COURT:  Mr. Brooks, let me just ask you, what

10   is the status?  I just call it the museum plan because we

11   decided early on it would be easy to just refer to it

12   collectively as the museum plan.  But what is the status of

13   that, if any, in the bankruptcy court?

14        MR. BROOKS:  The creditors' committee in the case,

15   Your Honor, proposed that plan jointly with the museum, and

16   the creditors' committee was the party in interest to

17   propose that plan under the bankruptcy code.  The committee

18   withdrew support of that plan.  So there is no party with

19   standing currently before the bankruptcy court to push that

20   plan forward, and that's the status.

21        THE COURT:  Let me see if there is anything else.

22   Is there any other plan?  You're saying there is no other.

23   The only two I have ever been aware of, have been brought to

24   this Court's attention, were the two plans, were PAHL and

25   the museum.

1          MR. BROOKS:  That's correct, Your Honor.  The

2     equity committee's plan, their disclosure statement was

3     denied, so that will not be going forward.

4          THE COURT:  Then, thank you.

5          MR. BROOKS:  Thank you, Your Honor.

6          THE COURT:  Mr. Troy, do you want to make any

7     statement?

8          MR. TROY:  Thank you, Your Honor.  Matthew Troy,

9     United States Department of Justice, Civil Division, on

10    behalf of NOAA.  No, I think Mr. Brooks covered what I was

11    going to tell you.  And hearing it from the debtor is

12    probably hearing it better than from me.

13         THE COURT:  I just wanted to make sure because we

14    hear bankruptcy appeals, but the day-to-day operations of

15    bankruptcy, I just want to be sure that I understood what

16    was going on and that I had the right understanding of the

17    bankruptcy proceedings.

18         MR. TROY:  I think you do.  If you have any doubts,

19    I'm here for questions.

20         THE COURT:  Thank you, Mr. Troy.

21         I don't have any further questions about the

22    bankruptcy at this juncture.

23         Mr. Barger, if you can answer the questions that I

24    asked about J.

25         MR. BARGER:  I can, Your Honor.  Before I start, I

1   just want to say, if, with the Court's permission, may I use

2   the time, don't tell me how to make the clock analogy in the

3   future, because if I have heard it, I forgot it.  I really

4   want to use that again, not in front of you, but can I take

5   that with me?

6          THE COURT:  You can certainly use it.  I don't own

7   that expression, I don't think.

8          MR. BARGER:  It's a great teaching tool for my

9   colleagues.  Give me the time, not how to make the clock.

10  Tell me about the case, not the whole case.  I apologize for

11  trying to be a little funny.  J is largely the product of

12  discussion with the government and their desire to make sure

13  that NOAA, and ultimately the Court, are given more fulsome

14  information.  It wasn't an effort to reduce information.

15         So it really was the product of, at least as I

16  understand it at the time, if we were able to go to closing,

17  if the Court approves the agreement, the LLC agreement as it

18  exists, is relatively vanilla.  It has three members, two of

19  whom that are here, and the third one who is a part of it

20  had committed to remaining in the LLC.

21         But it is anticipated that the number of board

22  members would expand and that, perhaps, some aspects of the

23  agreement would be amended.  None of that would have any

24  impact whatsoever on PAHL's commitment and being bound to

25  this order and the Court's jurisdiction.

1         So at least as I understood it, the desire of the

2    government was to make sure they are getting more fulsome

3    information as the business through PAHL gets off the ground

4    and changes with the idea of being there is going to be an

5    infusion of money, the expansion of the business, and my

6    clients could speak better to this if the Court needs, but

7    that was the desire in J.

8         If the Court looks at the last sentence of J, that

9    is sort of the catchall, that not only do we have to give

10   the information within 60 days at closing, but PAHL shall

11   provide updates to the Court if there are any material

12   changes.  So those two in combination give the Court and

13   NOAA immediate information and then periodic information if

14   that changes.  But the core members remain the same.

15             THE COURT:  Thank you.

16             MR. BARGER:  Yes, ma'am.

17             THE COURT:  I think that was the only question I

18   had.  I'm going to make a final review before we adjourn of

19   all of my notes, but I think that was the only outstanding

20   question at the moment.

21             MR. BARGER:  Thank you, Judge.

22             THE COURT:  Thank you.

23             Mr. Porter, I think you can address that provision,

24   J.

25             MR. PORTER:  Yes, ma'am.  Mr. Barger has said it

1   correctly, the evolution from D and adding J does have its

2   origins in the corporate separateness and the maintaining

3   the separateness of the corporate structure of R.M.S.T.   As

4   this process began, NOAA wanted a great deal of information

5   to be included and a great deal of commitments.

6          The whole issue of the potential for piercing the

7   corporate veil has aspects that come back to haunt the

8   government potentially, as well, if something were to happen

9   to PAHL and someone looks at an agreement and it's so

10  intertwined that someone goes after PAHL and R.M.S.T. to the

11  artifacts.

12         So we understand that argument.   That's why D

13  changed slightly to remove PAHL and why J then comes into

14  the picture, to ensure that the Court is getting the

15  information it needs to know what PAHL's structure is and

16  who is involved.

17         As Mr. Barger says, initially the agreement that is

18  in the due diligence materials refers to a managing member,

19  but we asked the question, and there is not a managing

20  member.   They were acting in unison, all three of them.   All

21  three act together on behalf of PAHL to make decisions.

22         So we asked if that's changing, then that's the

23  information we want.   But that's where J comes from, and

24  even the addition, it was actually a late addition at the

25  very end of that, that there would be updates continually to

1   that so that the Court would always have information about

2   PAHL and R.M.S.T.

3           THE COURT:  Thank you.  Let me look through my

4   hearing file.  The one outstanding matter I understand is

5   that you're going to get the Court ASAP the resolutions from

6   the three, basically, entities in the membership of PAHL?

7           MR. BARGER:  Yes, Your Honor.  Apollo, Alta and

8   PacBridge to confirm that they authorized.

9           THE COURT:  Those three individuals to sign?

10          MR. BARGER:  Yes, Your Honor.

11          THE COURT:  I think it's Mr. Li, Mr. Glatt and

12   Mr. Trainor.

13          Mr. Porter, I'm going to pass over to you the

14   original of the order that you want the Court to order.  I'm

15   not entering it at the moment, not to say I won't, but

16   that's not why I'm passing it to you.  I'm passing it so

17   that you put on here where it says "seen," you put in your

18   own handwriting "and agreed" with your initials beside it.

19          MR. PORTER:  I will do that, Your Honor.

20          THE COURT:  This is the original signature page

21   that was given to the Court, submitted on the 16th.  If you

22   will pass this to Mr. Porter to put "and agreed" with his

23   initials.

24          MR. PORTER:  Your Honor, just to be clear, we, of

25   course, fully agree with this order.  We were directly

1    involved in it.  We are not a party.  We are still the

2    *amicus* but we fully agree with the terms of this order.

3            THE COURT:  That is all that I'm asking.  You

4    didn't say we asked for this.  They said we ask for this.

5    You put seen and agreed.  I think the full record of the

6    case will be clear of NOAA's involvement and why you're here

7    and why you were a party to the order, and you did the due

8    diligence.

9            While I am here, I was going to do this in the end,

10   but I wanted to thank you and Ms. Rolleri and all of the

11   individuals that you've been involved with for your due

12   diligence and what you've done to assist the Court and all

13   of the parties in getting this proposed order to approve the

14   Asset Purchase Agreement.  I know you all have worked very

15   hard.  The Court is very appreciative.

16           MR. PORTER:  Thank you, Your Honor.

17           THE COURT:  There is one change that I'm definitely

18   going to make to the order, so I will tell you now, and if

19   there is a problem, you will know about it.  It's on Page 4

20   of the order.  It's provision G:  "R.M.S.T. and PAHL shall

21   provide the Court and NOAA at least..."  I'm changing that

22   to 90 days because with the complexities of certain matters,

23   60 days can go by pretty quickly, as we all know.  So I'm

24   going to change that deadline there to 90 days.  Is there

25   any opposition to it?

 1          MR. PORTER:  Not from the United States, Your

 2    Honor.

 3          MR. McFARLAND:  Not from R.M.S.T., Your Honor.

 4          THE COURT:  Mr. Barger?

 5          MR. BARGER:  No opposition, Your Honor.  Thank you.

 6          THE COURT:  I have made that change, and I have put

 7    my initials by it.

 8          Then is there anything further that anyone wants to

 9    offer in regard to the first motion that we were on, which

10    is to approve the Asset Purchase Agreement?  Hearing

11    nothing, we will move on to the amended motion to intervene.

12          Mr. Powers, I said I would give you an opportunity,

13    and you've heard some matters represented today, and you can

14    certainly address the Court now.  Again, I will hear

15    everything you have to say within reason.

16          MR. POWERS:  Thank you, Your Honor.  May it please

17    the Court.  Your Honor, I think it is important to recall

18    how we came to be here, how it is that R.M.S.T. came to

19    acquire title to the French collection.

20          Your Honor, to be clear, the museum, the concern

21    that we have had all along, and I know it's a concern the

22    Court shares, is that there is a very significant, I would

23    say, clear and present risk that as soon as this order is

24    approved, the French collection will be sold off into

25    oblivion.

```
 1          THE COURT:  Before you go any further with that,

 2   though, hasn't the Fourth Circuit said that this Court lacks

 3   jurisdiction over the French collection and artifacts?

 4          MR. POWERS:  Your Honor, specifically the Court

 5   said this Court lacks in rem jurisdiction over the French

 6   artifacts.  But the Fourth Circuit also said some other

 7   things in its opinion that I think is worth noting.  As Your

 8   Honor well knows, in the 2000 -- I believe it was the 2006

 9   opinion from the Fourth Circuit, 435 F.3d 521, the Fourth

10   Circuit emphasized how it came to be that R.M.S.T., or the

11   predecessor in interest to R.M.S.T., which I believe was

12   Titanic Ventures, came to acquire title of the French

13   collection.

14          On Page 527 of the Fourth Circuit's decision, they

15   emphasize that, "Titanic Ventures also made a commitment" --

16   that's the Fourth Circuit's word is "commitment," that's not

17   my word.  And what they refer to is the letter of September

18   22nd, 1993, 25 years ago, Your Honor, in which Titanic

19   Ventures petitioned the French government for title to the

20   French artifacts.

21          And in that letter, Your Honor, which the Fourth

22   Circuit recites in its decision, I quote, "Titanic Ventures

23   also made a commitment in the letter that 'the artifacts

24   will only be used [for] a cultural purpose and will not,

25   therefore, be part of any operations which would lead to
```

1    their dispersion, but to the exception of exhibition

2    purposes, and none of the artifacts will be sold.'"

3          The Fourth Circuit went on, on Page 528, and I

4    think it's critical because the Fourth Circuit recognized

5    that implicit in the French government's grant of title was

6    a recognition that, and they, indeed, incorporated that

7    letter into their decision, that the French artifacts would

8    not be sold.

9          I'm continuing, Your Honor, by quoting the Fourth

10   Circuit:  "The administrator's decision" -- the French

11   administrator's decision -- "also incorporated Titanic

12   Ventures' assurances made in its September 22nd, 1993 letter

13   stating that, '[Titanic Ventures] agreed to make use of such

14   objects in conformity with the respect due the memory of

15   their initial owners and to not carry out any commercial

16   transaction concerning such objects nor any sale of any one

17   of them nor any transaction entailing their dispersion, if

18   not for the purposes of an exhibition.'"

19         THE COURT:  Excuse me just one minute.  Go ahead,

20   Mr. Powers.

21         MR. POWERS:  I believe it's clear from the Fourth

22   Circuit's language they would not have recited that

23   commitment, that guarantee by -- and I'll use the term

24   R.M.S.T. because they were essentially the successor in

25   interest to Titanic Ventures.  The Fourth Circuit made a

1    point of explaining this commitment to keep the collection

2    together in its 2006 decision, which I've been citing to,

3    holding that this Court lacked jurisdiction over the *in rem*

4    collection, but that's all they said.

5           They did not in any way limit this Court's ability

6    to -- let's skip forward just one year.  Right after this

7    decision in 2006, as Your Honor well knows, there are

8    covenants and conditions in which R.M.S.T. again came

9    forward and represented to this Court, in exchange for

10   asking this Court, as a condition precedent for receiving an

11   *in species* salvage award, and again they reiterate, "The

12   subject Titanic artifact collection shall, to the maximum

13   extent possible and consistent with reasonable collections,

14   management, practices, be conserved and curated together

15   with the French Titanic artifact collection as an integral

16   whole by the trustee."

17          THE COURT:  Let me stop you there because I think

18   these are important points, and I will certainly hear a

19   response as appropriate from Mr. McFarland, Mr. Barger, and

20   Mr. Porter.  It seems to me that this Asset Purchase

21   Agreement would cover if they try to sell the French

22   artifacts because it would be part of the Titanic

23   Collection, and they have to notify the Court within 60 days

24   or 90 days.

25          So it would seem to me that, at minimum, if the

1    Court does have jurisdiction or decides that the Fourth

2    Circuit has, and, of course, that would all have to be

3    briefed.  But it would seem to me now the Asset Purchase

4    Agreement would require, in a number of provisions,

5    notification to this Court if they were going to try to

6    separate or sell the artifacts, for two reasons:  First,

7    it's in the Asset Purchase Agreement; and, second, it's in

8    the covenants and conditions that they have to make every

9    effort to keep the artifacts together.

10            If they are going to do anything that involves the

11   covenants and conditions or the Asset Purchase Agreement,

12   they have to notify the Court.

13            MR. POWERS:  I don't read it that way,

14   respectfully, Your Honor.  To be clear, they have

15   continuously referenced the covenants and conditions as

16   precatory language only.  It is just aspirational as it

17   regards the French collection.  I want to emphasize that the

18   only way that the public's interest is going to be protected

19   is either the purchaser agrees, as the museum has done, to

20   commit that they will never break up the collection, or not

21   nearly as good, but I guess a second best option would be

22   that they will never break up the collection without this

23   Court's prior approval.

24            The order doesn't do either.  The order simply says

25   if they want to sell the French collection, they can do it.

1    Frankly, there is nothing stopping them.

2         THE COURT:  Let's go to that in the order because I

3    think that's important.  Let's look at the actual wording of

4    the order.  I have it in front of me.

5         MR. POWERS:  I don't have it in front of me, Your

6    Honor, if I could maybe get a copy.

7         THE COURT:  You can.  If not, I'm sure we can get a

8    copy.

9         MR. POWERS:  Thank you, Your Honor.  I would refer

10   to Paragraph G, Page 5, in which when we were here last

11   time, and Your Honor had concerns, the original language

12   said that they had to provide 60 days' notice and seek Court

13   approval.  Well, seeking Court approval has been stricken

14   out.

15        THE COURT:  I noted that when I was going through

16   this, but it is in here the Court approval.  Wait just a

17   minute.  I have to go back to my marked up copy.  It says

18   here, "And shall be subject to."

19        MR. POWERS:  I'm sorry.  Where are we looking, Your

20   Honor?

21        THE COURT:  I'm looking at G.  It says, "Any such

22   action as described in G(i) and (ii) shall be subject to

23   prior approval of this Court..."

24        MR. POWERS:  "...to the extent required by

25   applicable law, including orders by this Court (including

1    the C&Cs) and the United States Court of Appeals for the

2    Fourth Circuit."  I believe what this is saying, Your Honor,

3    and this is speculation on my part, but I believe what that

4    language is intended to say is, we didn't -- the Fourth

5    Circuit, in their interpretation, R.M.S.T. and PAHL's

6    interpretation, is the Fourth Circuit has said, you, Your

7    Honor, have no *in rem* jurisdiction over the French

8    collection, which, by extension, means you have no right to

9    tell us what we can and cannot do *vis-à-vis* the French

10   collection.

11        I believe that is absolutely incorrect.  They were

12   the ones who -- let's put it this way.  The only way they

13   were able to gain title to the French collection was to

14   represent to the French government that they would never,

15   ever sell it.  Then they agreed again with this Court to the

16   extent possible.  But this wordsmithing, to me, is

17   indication that they are going to sell the French

18   collection, and what they are going to say is, Your Honor,

19   we didn't have to seek approval to sell the French

20   collection because the Fourth Circuit, or at least their

21   interpretation of the Fourth Circuit, is that we didn't have

22   to because you don't have *in rem* jurisdiction.

23        If your only hammer to enforce it is *in personam*

24   jurisdiction over an empty box, which is the stalking horse.

25             THE COURT:  But let me ask you this.  The first

1    part of this says they've still got to give "90 days advance
2    notice of any action that will result in the Titanic
3    Collection (as defined in the C&Cs)..." and isn't it defined
4    in the C&Cs involving the French artifacts?
5         MR. POWERS:  To the extent -- I think what you are
6    going to hear, the argument will be conserved and curated
7    together with French Titanic Artifact Collection to the
8    extent possible.
9         THE COURT:  The Titanic Collection is different.
10   That's keeping it together to the extent possible.  It's
11   defined in the Titanic Collection, and I'll go back and look
12   at it, but the Titanic Collection is defined.  I'm not
13   talking about what they have agreed to do with it in the
14   C&Cs, but the Titanic Collection is defined in the C&Cs as
15   including the French artifacts.
16        Ms. Rolleri, you are shaking your head yes.  Have
17   you read it recently, or Mr. Porter?
18        MR. PORTER:  Yes, Your Honor.  That Section II
19   Paragraph H of the C&C:  "Titanic Collection refers to the
20   total assemblage of the French Titanic Artifact Collection
21   and the subject Titanic Artifact Collection."
22        MR. POWERS:  Your Honor, if that's the
23   interpretation, then I guess our concerns are somewhat
24   alleviated.  But, again, the other issue is if they're going
25   to put NOAA and the Court on notice that this is what's

1    going to -- let's assume that the Court approves the sale,

2    it goes through, it has been consummated, it's closed, and

3    now they decide they want to sell the French collection

4    because they think they can, and apparently they are going

5    to give 90 days' notice to the Court and to NOAA, but then

6    what if nobody challenges it?

7            THE COURT:  Well, as soon as they give 90 days'

8    notice, I can assure you what this Court will do.  This

9    Court is going to issue them an order that they can take no

10   further action whatsoever until they come before this Court

11   and we brief this provision.  It's not up to them to

12   interpret what the United States Court of Appeals for the

13   Fourth Circuit said.  It's up to me at a threshold level as

14   the judge of this Court, and then it's up to the Fourth

15   Circuit judges, if for some reason someone doesn't agree

16   with my interpretation of it.

17           As far as I'm concerned, I don't like the language

18   "to the extent required by applicable law."  That may come

19   out of here.  I don't know why that's there.  Before they

20   sell anything, it's going to be subject to the approval of

21   this Court, including its orders and the United States Court

22   of Appeals for the Fourth Circuit.

23           The reason I would leave the United States Court of

24   Appeals for the Fourth Circuit there is not necessarily

25   because I agree with their interpretation of that case, but

1   it gives them the legal option that they would have to

2   appeal what this Court could decide if this Court decided

3   not to let them do something that they thought they legally

4   could.

5          MR. POWERS:  That's all we can ask, Your Honor.  We

6   share the Court's concerns about keeping the collection

7   together.  That's the only reason we are here to begin with,

8   and to be clear, our plan is still in abeyance in the

9   bankruptcy court.  It has not been rejected by the judge.

10  It's still sitting on his desk.  Yes, the creditors'

11  committee withdrew approval for several reasons, largely

12  because the landlord switched sides and likes this deal

13  better, for various reasons.  It gets more money.

14         But let's be clear.  We couldn't participate

15  originally because of this 1 million non-refundable deposit

16  which kept us from actually formally submitting the plan.  I

17  certainly don't profess to be a bankruptcy expert, and the

18  bankruptcy lawyers are here if the Court would like any

19  further questions to ask of them.

20         THE COURT:  I agree with what you say.  I think

21  it's been held in abeyance.  That's the way I read

22  everything.  Whether I'm using a technical bankruptcy term,

23  and I think this is a Section 323 sale, and that's the way

24  I'm proceeding.

25         MR. POWERS:  To be clear, if for whatever reason

```
 1    the sale were not to go through, I think the doomsday
 2    predictions of liquidation are somewhat overblown because at
 3    the end of the day, it's ultimately up to them.  If they
 4    want to liquidate, they can liquidate.  But If they really
 5    want to sell, we are here and ready to go if for whatever
 6    reason the deal falls through.  I thank Your Honor for
 7    allowing me to speak.
 8              THE COURT:  All right.  Mr. McFarland.
 9              MR. McFARLAND:  Thank you, Your Honor.  Your Honor,
10    we are, ostensibly, here on a motion to intervene that was
11    filed by the museum months ago.
12              THE COURT:  They asked for the Court to hold it in
13    abeyance.  I have given them a say here out of an abundance
14    of caution and so that everything is fully on the record.
15              MR. McFARLAND:  I understand, Your Honor.
16              THE COURT:  I'm not calling technicalities on them.
17    They have not intervened yet because they have a motion in
18    abeyance, which I am granting.
19              MR. McFARLAND:  They have asked this Court to hold
20    their motion in abeyance, is what I understand.
21              THE COURT:  What if this doesn't go through?
22    Because even if I enter this, it's still got to be approved
23    by PAHL.
24              MR. McFARLAND:  But what the museum is asking this
25    Court to do is to let them sit on the sidelines when they
```

1    have no legal standing.  They didn't participate -- they

2    participated to a certain extent in the bankruptcy court,

3    then the plan that was offered by the creditors' committee,

4    of which they were a part, and the only reason they got to

5    put that before the bankruptcy court is because they joined

6    with the creditors' committee.  They are not a creditor of

7    my client.  This Court well knows they don't have any legal

8    ownership in the artifacts.

9          THE COURT:  All I'm doing is approving, if I do, an

10   Asset Purchase Agreement, and this has not yet been

11   approved.  There is a provision here that then it has to go

12   back to PAHL and get approval.  Maybe the whole transaction

13   falls through.  It's not over till it's over.

14         MR. McFARLAND:  I agree, Your Honor.  But here is

15   what doesn't happen if it falls through.  It doesn't mean

16   that automatically the museums', to the extent it's, quote,

17   in abeyance, offer gets accepted by the bankruptcy court.

18   We have to go through a whole another process.

19         THE COURT:  What difference does it make if this

20   Court holds the museum, that the Court hasn't let them

21   intervene?  All it is, is saying I'm not ruling on your

22   motion to intervene.  I'm holding it in abeyance.  It

23   doesn't have anything to do with the bankruptcy court at

24   this juncture if this goes through.

25         MR. McFARLAND:  Well, Your Honor, I think there is

1  an issue.

2         THE COURT:  I think you should check with your

3  bankruptcy lawyer.

4         MR. McFARLAND:  I will, Your Honor.  I think what

5  the bankruptcy folks will tell this Court, and we did in

6  your pleading is, what the museum is doing is in violation

7  of the automatic stay and the bankruptcy court's order.

8         THE COURT:  Then take that up with the bankruptcy

9  court.  If you want to go down to the bankruptcy court and

10  extend your legal fees even more and extend this even more,

11  why don't you go before the bankruptcy court and file a

12  motion for sanctions because they violated the stay.

13         MR. McFARLAND:  We don't want to do that, Your

14  Honor, unless we absolutely have to.

15         THE COURT:  You just said by filing the motion to

16  intervene here, they violated the stay.  That's not for me

17  to rule on.  That's a bankruptcy court issue.  If they

18  violated the stay and the bankruptcy court thinks they have,

19  then that's up to the bankruptcy court.

20         MR. McFARLAND:  Right.  But what we don't want is,

21  we do want this transaction to close as soon as possible.

22         THE COURT:  We are talking about holding it in

23  abeyance.  I think Mr. Wainger might have written you a

24  note.

25         MR. McFARLAND:  He did, Your Honor.  That's fine.

1   What we don't want is something to interrupt the closing.

2        THE COURT:  Maybe you are doing it right now.  The

3   bottom line is that by granting the museum's motion to hold

4   in abeyance intervention is exactly what it says.  The Court

5   has not let them intervene here.  It said this is an ongoing

6   case.  I'm holding your motion in abeyance.  I'm holding

7   your intervention in abeyance.  I'm granting that.  In the

8   meantime, if your position is they are violating the

9   bankruptcy stay, take it up with the bankruptcy court.

10        MR. McFARLAND:  Understood, Your Honor.  That's

11   fine.  We can live with that.  Our intention is, Your

12   Honor -- I want to emphasize, our intention is, assuming

13   this Court will enter the order approving the sale of the

14   stock purchase, we want to then proceed to a closing and

15   then final approvals.

16        We appreciate the Court's assistance and the

17   Court's moving things along so that that can be done and

18   your attention.

19        THE COURT:  Okay.  Mr. Porter, if you want to

20   address this position about final approval and the French

21   artifacts.

22        MR. PORTER:  I will if Your Honor would like me to.

23   Certainly, as Your Honor knows, except for Mr. Barger, I

24   have been involved in this case the least amount of time a

25   couple of years, maybe close to three now.  The issue of the

1    French artifacts and the jurisdiction and whether the Court

2    can approve has been a back and forth between NOAA and

3    R.M.S.T. on a number of occasions, and it has come before

4    this Court at least on one occasion, perhaps more.

5         The issue, though, has always been at that time is

6    there wasn't particularly a live case or controversy to

7    actually address that particular issue, and so it's always

8    been suggested, at least I believe we have suggested, that

9    we sort of kick this can down the road till a time that we

10   actually have a live case or controversy for the Court to

11   decide.

12        This provision in here about the 60, now 90 days,

13   is really intended to do just that.  There is, obviously, a

14   disagreement, and as we have relayed in our filing as well,

15   we personally think that the covenants and conditions

16   contain any number of provisions -- I think we have listed

17   out six or eight of them -- that directly impose on R.M.S.T.

18   responsibilities *vis-à-vis* the French artifacts, directly

19   impose on them, and the C&Cs obviously impose *in personam*

20   jurisdiction on R.M.S.T. to comply with all provisions.

21        So the implication of that, should there be some

22   action to sell the French artifacts, is a question for when

23   that comes up, and we will be prepared to address what the

24   Court's role is, what we believe the Court can do and what

25   consequences may befall a request to dispose of any of the

1    French artifacts.

2              THE COURT:  All right.

3              MR. PORTER:  Thank you.

4              THE COURT:  Then is there anything that anyone else

5    wants to add in regard to the matters before the Court?

6              MR. PORTER:  Not from the United States, Your

7    Honor.

8              MR. McFARLAND:  Not from R.M.S.T., Your Honor.  We

9    appreciate the Court's attention and assistance.

10             MR. BARGER:  Nothing from PAHL.

11             THE COURT:  Then when do you plan to have these

12   resolutions to me, Mr. Barger?

13             MR. BARGER:  This week.

14             THE COURT:  Well, you want this Asset Purchase

15   Agreement, it is called a condition precedent to me putting

16   my signature on it.

17             MR. BARGER:  Yes, Your Honor.

18             THE COURT:  I'm still going to go back and read

19   this, and I will make any changes I deem appropriate based

20   upon all your filings, the hearing today, and everything

21   that's been said to determine its entry.  But that's a

22   threshold requirement, in my mind, because I know those

23   resolutions are required under the law.

24             MR. BARGER:  Yes, Your Honor.  Could I go back

25   just, like, 10 seconds?  I did want to add one other thing.

```
 1              THE COURT:  Sure.  You can come up to the podium.
 2              MR. BARGER:  I know my partners will question my
 3    sanity on this.  I think I'm right.  I just wanted to
 4    reiterate where we started today -- when I started -- that
 5    our clients are committed to making this exhibition business
 6    work and putting in time, effort, money, to make the
 7    business work, and they think it is a viable business, one
 8    that satisfies the public's interest in not only the Titanic
 9    artifacts but the other artifacts, and they see this as an
10    opportunity not only to have a viable business but to serve
11    the public's interest in having access to these artifacts,
12    not only in fixed locations but around the world.
13              So I just wanted to emphasize that.  As counsel for
14    my clients, I say that as an officer of the Court that they
15    are committed to making this business work and not only --
16    they think it's viable now given some of the bad business
17    decisions and the cost of bankruptcy previously, but they
18    believe with a good business plan, they can make this an
19    even bigger success.  I know they are committed actually to
20    going to Atlanta after this hearing to meet with Alex
21    Klingelhofer.  They have had conversations.  They know about
22    certain needs that the business has immediately that they
23    plan to address, such as an HVAC system to make sure the
24    artifacts are properly cared for, to hire additional
25    personnel.  So I proffer that to the Court so that the Court
```

1    has some assurances, to the extent my reputation matters,

2    that my clients are committed to making this a successful

3    venture with all those artifacts.  Thank you for the Court's

4    time.

5             THE COURT:  I think under this the business plan

6    has to be submitted, does it not, Mr. Porter, under the

7    Asset Purchase Agreement?

8             MR. PORTER:  Yes, Your Honor.  We did request that

9    that was part of Mr. Li's declaration that he indicated that

10   that would be done.  We would anticipate that would probably

11   be done as part of a periodic report.

12            THE COURT:  If it's not done, you will clearly

13   notify the Court?

14            MR. PORTER:  Absolutely, Your Honor.  There were

15   four items in Mr. Li's declaration that were of concern --

16   well, concern of interest to NOAA be done, and, certainly,

17   we will be monitoring that.

18            THE COURT:  You said that Mr. Li is here today?

19            MR. BARGER:  Yes, Your Honor.  Both Mr. Li and

20   Mr. Wong are here.  Mr. Li, of course, was the one that

21   signed the two declarations, and we have reaffirmed the

22   accuracy of those.

23            THE COURT:  Well, why don't we put him under oath

24   and have him re-affirm them here today.  Since he is here,

25   he can come up to the podium.

```
 1              MR. BARGER:  May I stand next to him?
 2              THE COURT:  Yes, you may.
 3              (Witness was sworn.)
 4               GILBERT LI, having been first duly sworn, was
 5      examined and testified as follows:
 6                               EXAMINATION
 7      BY THE COURT:
 8      Q.  Sir, for the record, could you just please state your
 9      name?
10      A.  Gilbert Li.
11      Q.  And could you spell it for the court reporter.
12      A.  Sure.  First name is G-i-l-b-e-r-t.  Last name is L-i.
13      Q.  Mr. Li, you presented a declaration before this Court.
14      Do you recall that?
15      A.  Yes, I do.
16      Q.  Let me go to that.  I had it in front of me at the
17      beginning of the hearing.
18              MR. BARGER:  It is 527-2, I believe.
19              THE COURT:  I do.  I have it right here, 527-2.
20      BY THE COURT:
21      Q.  Mr. Li, I'm going to have this document, which is 527-2,
22      it was Exhibit B to a filing, presented to you to look at.
23              MR. BARGER:  Your Honor, we have a copy in front of
24      us.
25              THE COURT:  I want you to see this one because I'm
```

```
 1   going to make it a court exhibit.
 2           MR. BARGER:  All right.
 3   BY THE COURT:
 4   Q.  If you would look at that and verify for the Court that
 5   that is the declaration that you signed?
 6   A.  Yes, Your Honor, this is the one.
 7   Q.  Did you have the authority that you've represented to
 8   sign that declaration?
 9   A.  Yes, I do.
10   Q.  Do you reaffirm under oath that everything you've said in
11   there is true and correct, to the best of your knowledge,
12   information, and belief?
13   A.  Yes, I do.
14           THE COURT:  You can pass it back up to the Court,
15   and we will have this marked as PAHL Exhibit Number 2.  I
16   believe we have a number 1.  We will make that number 2.
17           (The document was received in evidence as PAHL
18   Exhibit No. 2.)
19           THE COURT:  Is there anything else anybody wants me
20   to ask of Mr. Li?
21           MR. PORTER:  No, Your Honor.
22           MR. McFARLAND:  No, Your Honor.  Thank you.
23           THE COURT:  Thank you, Mr. Li.
24           THE WITNESS:  Thank you, Your Honor.
25           (Witness excused.)
```

```
1            THE COURT:  Mr. Barger, is there anything further
2    you want the other individual, I believe that you have here
3    is -- who were the two?  You had Mr. Li.
4            MR. BARGER:  And Mr. Wong.
5            THE COURT:  Mr. Giovanni Wong?
6            MR. BARGER:  Correct.
7            THE COURT:  Any representations you want Mr. Wong
8    to make to the Court?
9            MR. BARGER:  Well, I covered them in my proffer,
10   but in specific, if the Court needs to hear his testimony
11   under oath, he could essentially talk about the business
12   plan and their belief that there is an opportunity to grow
13   the exhibitions and make sure that even more people have
14   access to the Titanic exhibits and the other exhibits in
15   R.M.S.T.  That would be the extent really.
16           THE COURT:  I think we have covered that.  It's
17   going to be presented, and we will have all of that
18   presented to the Court.  I would take your representation as
19   an officer of the Court that that will be done.
20           MR. BARGER:  Thank you, Your Honor.  Nothing
21   further from me.
22           THE COURT:  Thank you.  Counsel, if there is
23   nothing further, the Court stands in recess until tomorrow
24   morning at 9:00 a.m.
25           (Hearing adjourned at 4:15 p.m.)
```

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


X_____/s/_____x
                Jody A. Stewart
            X_____12-18-2018 _____x
                        Date