# EXHIBIT 2

*Execution Version*

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**PREMIER ACQUISITION HOLDINGS LLC**

**a Delaware Limited Liability Company**

**Dated as of February 12, 2019**

THE LIMITED LIABILITY COMPANY INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THE LIMITED LIABILITY COMPANY INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE OR OTHER SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE LIMITED LIABILITY COMPANY INTERESTS IS FURTHER RESTRICTED AS PROVIDED IN THIS AGREEMENT. PURCHASERS OF THE LIMITED LIABILITY COMPANY INTERESTS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

#5735059.10

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND REFERENCES ....................................................1

    Section 1.1     Definitions......................................................................1
    Section 1.2     References and Construction............................................8

ARTICLE II     FORMATION .......................................................................9

    Section 2.1     Formation ......................................................................9
    Section 2.2     Name .............................................................................9
    Section 2.3     Purpose........................................................................10
    Section 2.4     Registered Office and Registered Agent; Principal Place of
                Business ......................................................................10
    Section 2.5     Foreign Qualification ..................................................10
    Section 2.6     Term ............................................................................10
    Section 2.7     No State-Law Partnership; Tax Classification....................10

ARTICLE III    MEMBERS; MEMBERSHIP INTERESTS ........................................11

    Section 3.1     Members.......................................................................11
    Section 3.2     Unit Designations.........................................................11
    Section 3.3     Management Incentive Units .........................................11
    Section 3.4     Unit Certificates...........................................................12
    Section 3.5     Representations and Warranties....................................12
    Section 3.6     Voting...........................................................................12
    Section 3.7     Liability to Third Parties ..............................................12
    Section 3.8     Withdrawal ...................................................................12
    Section 3.9     Members Have No Agency Authority .............................13

ARTICLE IV    CAPITALIZATION...........................................................13

    Section 4.1     Capital Contributions ...................................................13
    Section 4.2     Interest on and Return of Capital Contributions ..................15

ARTICLE V     DISTRIBUTIONS AND WITHHOLDING ........................................15

    Section 5.1     Distributions.................................................................15
    Section 5.2     Withholding .................................................................16

ARTICLE VI    MANAGEMENT/GOVERNANCE PROVISIONS.........................16

    Section 6.1     Management under Direction of the Board.....................16
    Section 6.2     Actions Requiring Supermajority Approval ...................17
    Section 6.3     Board of Managers.......................................................19
    Section 6.4     Voting Proxies; Quorum; Meetings of Board .................19
    Section 6.5     Officers........................................................................20

ARTICLE VII   ACCOUNTING AND BANKING MATTERS; TAX MATTERS .................20

    Section 7.1     Books and Records; Reports .........................................20
    Section 7.2     Fiscal Year ...................................................................21

-i-

#5735059.10

# TABLE OF CONTENTS
## (continued)

Page

Section 7.3      Bank Accounts ..........................................................................21
Section 7.4      Tax Classification .....................................................................21
Section 7.5      Tax Elections ............................................................................21
Section 7.6      Tax Returns ..............................................................................22

ARTICLE VIII    EXCULPATION AND INDEMNIFICATION; STANDARDS OF
                CONDUCT ................................................................................22

Section 8.1      Exculpation and Indemnification .............................................22
Section 8.2      Insurance ..................................................................................26
Section 8.3      Severability ..............................................................................26

ARTICLE IX      DISPOSITION; INVESTOR RIGHTS........................................26

Section 9.1      Dispositions; Exception to Application of this Article IX ..........26
Section 9.2      Substitution ..............................................................................27
Section 9.3      Right of First Offer ...................................................................27
Section 9.4      Drag-Along ..............................................................................29
Section 9.5      Tag-Along Right .......................................................................31
Section 9.6      Preemptive Right ......................................................................33
Section 9.7      No Appraisal Rights ..................................................................34

ARTICLE X       DISSOLUTION, LIQUIDATION, AND TERMINATION............34

Section 10.1     Dissolution ...............................................................................34
Section 10.2     Liquidation and Termination......................................................34
Section 10.3     Certificate of Cancellation ........................................................35

ARTICLE XI      GOVERNING LAW, DISPUTE RESOLUTION, DEADLOCKS.................35

Section 11.1     Governing Law..........................................................................35
Section 11.2     Dispute Resolution....................................................................35
Section 11.3     Deadlocks ................................................................................38

ARTICLE XII     GENERAL PROVISIONS ........................................................39

Section 12.1     Notices ......................................................................................39
Section 12.2     Amendment or Modification......................................................40
Section 12.3     Entire Agreement ......................................................................40
Section 12.4     Effect of Waiver or Consent .....................................................40
Section 12.5     Successors and Assigns.............................................................40
Section 12.6     Severability ..............................................................................40
Section 12.7     Further Assurances...................................................................41
Section 12.8     Title to Company Property.........................................................41
Section 12.9     Access to Information ................................................................41
Section 12.10    Public Announcements..............................................................41
Section 12.11    No Third Party Beneficiaries .....................................................41
Section 12.12    Confidentiality ..........................................................................41
Section 12.13    Expenses...................................................................................42

#5735059.10

**TABLE OF CONTENTS**
**(continued)**

Page

Section 12.14     Counterparts ............................................................................43
Section 12.15     No Finder's Fees ......................................................................43

<u>EXHIBITS</u>:

Exhibit A:          Member Information; Membership Interests; Capital

Exhibit B:          Representations and Warranties of Members

Exhibit C:          Initial Board of Managers

#5735059.10

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

## PREMIER ACQUISITION HOLDINGS LLC

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "**Agreement**") of Premier Acquisition Holdings LLC, a Delaware limited liability company (the "**Company**"), is dated as of February 12, 2019 (the "**Effective Date**"), and is by and among (i) Alta Fundamental Advisers SP LLC, a Delaware limited liability company ("**Alta Fundamental**"), and Star V Partners LLC, a Tennessee limited liability company ("**Star V**", and collectively with Alta Fundamental, "**Alta**"), (ii) Apollo Credit Strategies Master Fund Ltd., a company organized under the laws of the Cayman Islands ("**Apollo**"), and (iii) PacBridge Partners I Investment Co. Ltd., a company organized under the law of the British Virgin Islands ("**PacBridge**" and, together with Alta and Apollo, the "**Members**" and each, individually, a "**Member**"), and any other person admitted as a Member after the Effective Date.

**WHEREAS**, the Company was formed on June 6, 2018 by filing a Certificate of Formation with the Secretary of State of the State of Delaware;

**WHEREAS**, effective as of June 6, 2018, the Members entered into the Limited Liability Company Agreement of the Company (the "**Original Agreement**") to provide for the regulation and management of the Company; and

**WHEREAS**, the Members desire to amend and restate the Original Agreement in its entirety such that this Agreement shall govern their respective rights, powers, authorities and obligations in connection with the Company from and after the Effective Date.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND REFERENCES

Section 1.1     **Definitions**.  When used in this Agreement, the following terms shall have the respective meanings assigned to them in this <u>Section 1.1</u> or in the sections or other subdivisions referred to below:

"**Accredited Investor**" has the meaning set forth for such term in Rule 501 of Regulation D under the Securities Act (but excluding for such purposes Rule 501(a)(4) thereunder), as such rule may be amended, modified or superseded from time to time.

"**Act**" means the Delaware Limited Liability Company Act or any successor statute, as amended from time to time.

"**Actions**" has the meaning assigned to such term in <u>Section 8.1(d)</u>.

"**Affiliate**" means, with respect to any person, (a) any person directly or indirectly Controlling, Controlled by or under common Control with such person or (b) any person who, from time to time, is (i) an officer, director, manager or employee of such person or (ii) a spouse, a parent, a sibling (including an adopted sibling) or a lineal descendant (including an adopted lineal descendant) of such person.  Notwithstanding the foregoing, the Company shall not be deemed to be an Affiliate of any Member.

"**Agreement**" has the meaning assigned to such term in the preamble to this Agreement.

"**Allocable Share**" has the meaning assigned to such term in Section 9.6(c).

"**Alta**" has the meaning assigned to such term in the preamble to this Agreement.

"**Apollo**" has the meaning assigned to such term in the preamble to this Agreement.

"**Arbitration Notice**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Arbitrator**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Arbitration Panel**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of June 14, 2018 (as amended, restated, supplemented or otherwise modified from time to time), by and among (i) Premier Exhibitions, Inc., a Florida corporation, (ii) Arts and Exhibitions International, LLC, a Florida limited liability company, (iii) Premier Exhibition Management LLC, a Florida limited liability company, (iv) Premier Exhibitions NYC, Inc., a Nevada Corporation, (v) Premier Merchandising, LLC, a Delaware limited liability company, (vi) Premier Exhibitions International, LLC, a Delaware limited liability company, (vii) Dinosaurs Unearthed Corp., a Delaware Corporation, (viii) DinoKing Tech Inc. d/b/a Dinosaurs Unearthed, a company formed under the laws of British Columbia, (ix) solely for certain limited purposes set forth therein, RMS Titanic, Inc., a Florida corporation, and (x) the Company.

"**Available Cash**" means the amount of cash on hand (including cash equivalents and temporary investments of Company cash) from time to time in excess of amounts determined by the Board to be required to pay or provide for payment of existing and projected obligations (including any Indebtedness), capital expenditures and acquisitions approved by the Board in accordance with this Agreement and to provide a reasonable reserve for working capital and contingencies.

"**Board**" has the meaning assigned to such term in Section 6.1.

"**Business Day**" means a day other than a Saturday, Sunday or a day on which commercial banks in the State of New York are authorized or required to be closed for business.

"**Capital Call**" the meaning assigned to such term in Section 4.1(c)(i).

"**Capital Contribution**" means, with respect to any Member, an amount that such Member has contributed or is deemed to have contributed to the Company in accordance with the provisions

#5735059.10

of this Agreement.  Any reference to the Capital Contributions of a Member will include the Capital Contributions made by a predecessor holder of such Member's Units to the extent the Capital Contribution was made in respect of Units Transferred to such Member.

"**Certificate**" has the meaning assigned to such term in <u>Section 2.1</u>.

"**Claim**" means any claim, demand, suit, action, investigation, proceeding (whether civil, criminal, arbitrative, investigative, or administrative), governmental action, cause of action, and expenses and costs associated therewith (including attorneys' fees and court costs), whether now existing or hereafter arising, whether known or unknown, including such items involving or sounding in the nature of breach of contract, tort, statutory liability, strict liability, products liability, liens, contribution, indemnification, fines, penalties, malpractice, professional liability, design liability, premises liability, environmental liability, safety liabilities, deceptive trade practices, malfeasance, nonfeasance, negligence, misrepresentation, breach of warranty, tortious interference with contractual relations, slander or libel.

"**Company**" has the meaning assigned to such term in the preamble to this Agreement.

"**Company Ledger**" means the ledger of Membership Interests of the Company, maintained by the Company, setting forth the Member names and addresses, Capital Commitments (if any), Capital Contributions (if any), amount and classes of Membership Interests held, and other information that the Company deems necessary or appropriate to include therein, from time to time.

"**Confidential Information**" means any proprietary or confidential information of (a) the Company relating to the Company, or its businesses, operations, assets or liabilities, or (b) a Member relating to that Member or its Affiliates, or their respective businesses, operations, assets or liabilities, including the fact that the Member is a member of the Company; *provided*, *however*, that "**Confidential Information**" does not include any information that (i) is generally available and known to the public (other than through a breach by a party to this Agreement of its obligations under this Agreement), (ii) is rightfully received by a party to this Agreement or any of its representatives or Affiliates from any third person if the information so received is not, to the knowledge of the recipient, subject to any duty or obligation of confidentiality or non-disclosure owing to the Company or the Members by such third person, or (iii) is developed by a party without the use of any proprietary or confidential information provided by the Company or the other Members.

"**Contributing Member(s)**" has the meaning assigned to such term in <u>Section 4.1(c)(ii)(A)</u>.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.

"**Controlled Affiliate**" means with respect to any Member, any entity directly or indirectly Controlled by such Member.

"**Co-Seller**" and "**Co-Sellers**" have the meanings assigned to such terms in <u>Section 9.4(a)</u>.

"**Covered Person**" means (a) any current or former Member and any Affiliate of such Member (other than the Board, acting in its capacity as such) or (b) any current or former officer, employee, director, stockholder, member, partner or agent of a Member or its Affiliates.

"**CPR**" has the meaning assigned to such term in Section 11.2(e)(i).

"**CPR Rules**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Designated Person**" means a person that appears on any list issued by the United States or the United Nations with respect to money laundering, terrorism financing, drug trafficking, or economic or arms embargoes.

"**Drag-Along Transaction**" means any of the following:  (a) any consolidation, conversion, merger or other business combination involving the Company in which Membership Interests are exchanged for or converted into cash, securities of a corporation or other business organization or other property; (b) a sale or transfer of all or substantially all of the assets of the Company to be followed promptly by a liquidation of the Company or a distribution to the Members of all or substantially all of the net proceeds of such disposition after payment or other satisfaction of liabilities and other obligations of the Company; or (c) the disposition of all or substantially all of the outstanding Membership Interests in a single transaction or a series of related transactions, excluding any dispositions made pursuant to Section 9.1 and Section 9.5.

"**Effective Date**" has the meaning assigned to such term in the preamble.

"**Electing Party**" has the meaning assigned to such term in Section 9.6(b).

"**Equity Interests**" means Membership Interests (including Units), any security or other interest convertible into or exchangeable for Membership Interests and any right (contingent or otherwise) to acquire any of the foregoing.

"**Exempt Offering**" means (i) the issuance of Units as of the Effective Date or in consideration of the Initial Capital Contributions or any additional Capital Contribution by the Members, (ii) the issuance of MIUs or the issuance of Units upon the vesting of any such MIUs or otherwise under the terms of the MIP (at no time to exceed 5% of the aggregate issued and outstanding Equity Interests), (iii) Equity Interests issued in connection with any split, distribution, subdivision or recapitalization of the Company, (iv) Equity Interests issued to any person that is not a Member or an Affiliate thereof in consideration of a *bona fide* acquisition by the Company or any of its subsidiaries of any person, business or assets, joint venture or other strategic transaction that was approved in accordance with this Agreement and (v) any Equity Interests issued by the Company in an underwritten public offering pursuant to a registration statement filed under the Securities Act (or other applicable foreign securities laws governing such issuance) and approved in accordance with this Agreement.

"**Fiscal Quarter**" has the meaning assigned to such term in Section 7.1(b)(i).

"**Fiscal Year**" has the meaning assigned to such term in Section 7.1(b)(ii).

"**GAAP**" means generally accepted accounting principles and practices in the United States, consistently applied.

"**Governmental Authority**" shall mean any federal, state, local, municipal, tribal or other government; and any governmental, regulatory or administrative agency, commission, body or other authority of any country exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory power, and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"**Indebtedness**" means, with respect to any person at any date, without duplication, all (a) indebtedness of such person for borrowed money; (b) obligations of such person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such person's business); (c) obligations of such person evidenced by notes, bonds, debentures or other similar instruments; (d) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); and (e) capital lease obligations of such person.

"**Indemnitee**" has the meaning assigned to such term in <u>Section 8.1(d)</u>.

"**Initial Capital Contribution**" has the meaning set forth in <u>Section 4.1(b)</u>.

"**Initial Governance Period**" means the period commencing on the Effective Date and ending on June 30, 2020.

"**Initial Notice**" has the meaning assigned to such term in <u>Section 9.6(b)</u>.

"**Initial Sharing Percentage**" means a Member's Sharing Percentage immediately following the execution of this Agreement.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

"**Lower Offer**" has the meaning assigned to such term in <u>Section 9.3(g)</u>.

"**Liabilities**" has the meaning assigned to such term in <u>Section 8.1(d)</u>.

"**Lien**" means any of the following: mortgage; lien (statutory or other); other security agreement, arrangement or interest; hypothecation, pledge or other deposit arrangement; assignment; charge; levy; executory seizure; attachment; garnishment; encumbrance (including any easement, exception, reservation or limitation, right of way, and the like); conditional sale, title retention, voting agreement or other similar agreement, arrangement, device or restriction; preemptive or similar right; the filing of any financial statement under the Uniform Commercial Code or comparable law of any jurisdiction; restriction on Transfer; or any option, equity, claim or right of or obligation to any other person of whatever kind and character; *provided*, *however*, that the term "**Lien**" shall not include any of the foregoing to the extent created by this Agreement.

"**Liquidation Period**" means the period commencing on the immediately preceding January 1, and ending on the date on which all property and assets of the Company are distributed to the Members under Article X.

"**Manager**" has the meaning assigned to such term in Section 6.1(a).

"**Malfeasance**" means, with respect to any person, any act or omission which constitutes (a) fraud, (b) willful misconduct or (c) gross negligence.

"**Member**" means any person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, each in its capacity as a member of the Company, but such term does not include any person who has ceased to be a member.

"**Member Contribution**" has the meaning assigned to such term in Section 4.1(c)(i).

"**Member Appointed Arbitrators**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Member Transfer**" has the meaning assigned to such term in Section 9.1(a).

"**Membership Interest**" means a limited liability company interest (as defined in the Act) in the Company, which may be evidenced by Units or other interests.

"**MIP**" has the meaning assigned to such term in Section 3.3.

"**MIU**" has the meaning assigned to such term in Section 3.3.

"**Non-Contributing Member**" has the meaning assigned to such term in Section 4.1(c)(ii).

"**Original Agreement**" has the meaning assigned to such term in the recitals.

"**PacBridge**" has the meaning assigned to such term in the preamble.

"**Permitted Transfer**" has the meaning assigned to such term in Section 9.1(a).

"**person**" has the meaning assigned to such term in Section 18-101(12) of the Act.

"**Prohibited Transaction**" shall mean:

(a)     Receiving, transferring, transporting, retaining, using, structuring, diverting, or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud, and bribery of a government official;

(b)     Engaging or becoming involved in, financing, or supporting financially or otherwise, sponsoring, facilitating, or giving aid to any terrorist person, activity or organization; or

(c)     Participating in any transaction or otherwise conducting business with a Designated Person.

"**Proportionate Contribution**" has the meaning assigned to such term in Section 4.1(c)(ii).

"**Released Persons**" has the meaning assigned to such term in Section 8.1(n).

"**Remaining Member**" has the meaning assigned to such term in Section 9.3(a).

"**Remaining Member(s) Offer**" has the meaning assigned to such term in Section 9.3(b).

"**Sale Notice**" has the meaning assigned to such term in Section 9.3(a).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Selling Member**" has the meaning assigned to such term in Section 9.4(a).

"**Senior Executives**" means senior executives designated by the chief executive officer or equivalent fund executive of the ultimate parent company of a Member or, if not a Member, the applicable Person involved in a Dispute or a Deadlock, and who are at a higher level of management than the Persons with direct responsibility for administration of this Agreement or the matter in Dispute or that has led to a Deadlock, as applicable.

"**Sharing Percentage**" means, with respect to any Member, a fraction (expressed as a percentage), the numerator of which is the number of Units held by such Member as of such date, and the denominator of which is the aggregate number of Units issued and outstanding as of such date.

"**Subject Businesses**" has the meaning assigned to such term in Section 12.12(c).

"**Subject Dispute**" has the meaning assigned to such term in Section 11.2(e)(i).

"**Subject Membership Interest**" has the meaning assigned to such term in Section 9.3(a).

"**Subsequent Governance Period**" means the period from and after July 1, 2020.

"**Subsequent Purchase**" has the meaning assigned to such term in Section 9.6(b).

"**Supermajority Approval**" means (a) during the Initial Governance Period, the approval of Members holding at least 75% of the outstanding Units, and (b) during Subsequent Governance Period, the approval of Members holding at least 66-2/3% of the outstanding Units.

"**Tag-Along Notice**" has the meaning assigned to such term in Section 9.5(a).

"**Tag-Along Notice Period**" has the meaning assigned to such term in Section 9.5(c).

"**Tag-Along Response Notice**" has the meaning assigned to such term in Section 9.5(c).

"**Tag-Along Right**" has the meaning assigned to such term in Section 9.5(c).

"**Tag-Along Sale**" has the meaning assigned to such term in Section 9.5(a).

"**Tag-Along Seller**" has the meaning assigned to such term in Section 9.5(a).

"**Tagging Member**" has the meaning assigned to such term in Section 9.5(c).

"**Transaction Expenses**" has the meaning assigned to such term in Section 4.1(b)(ii).

"**Transferred Assets**" has the meaning assigned to such term in the Asset Purchase Agreement.

"**Transfer**" means any sale, lease, assignment, transfer, conveyance, gift, pledge, distribution, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law, whether effected directly or indirectly, which shall include the sale, assignment, transfer, conveyance, gift, pledge, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law of stock, limited liability company interests, partnership interest, or other equity interests in or from a person who holds of record Membership Interests of the Company.

"**Transferring Member**" has the meaning assigned to such term in Section 9.3(a).

"**Treasury Regulations**" (or any abbreviation thereof used herein) means temporary or final regulations promulgated under the Internal Revenue Code.

"**Unanimous Approval**" means the approval of Members holding 100% of the outstanding Units.

"**Units**" has the meaning assigned to such term in Section 3.2.

"**Withdraw**" or "**Withdrawal**" means the resignation of a Member from the Company as a Member.  Such terms shall not include any disposition governed by Article IX, even though the Member making such disposition may cease to be a Member as a result of such disposition.

Section 1.2    **References and Construction**.

(a)    All references in this Agreement to Articles, Sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)    Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

(c)    The words "this Agreement," "this instrument," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

-8-

(d)     Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(e)     Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(f)     The word "or" is not exclusive and the word "includes" and its derivatives shall mean "includes, but is not limited to" and corresponding derivative expressions.

(g)     No consideration shall be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

(h)     Any pronoun shall include the corresponding masculine, feminine and neuter forms.

(i)     All references herein to "**$**" or "**dollars**" shall refer to U.S. Dollars.

(j)     If the last day for the giving of any Notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such Notice or the performance of such action shall be extended to the next succeeding Business Day.

(k)     Unless the context otherwise requires or unless otherwise provided herein, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document; *provided*, that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

(l)     Each Exhibit attached hereto is incorporated herein by reference and made a part hereof for all purposes and references to this Agreement shall include each such Exhibit unless the context shall otherwise require.

**ARTICLE II**
**FORMATION**

Section 2.1    **Formation**.  The Company was organized as a Delaware limited liability company by the filing of a Certificate of Formation (the "**Certificate**") in the office of the Secretary of State of the State of Delaware under and pursuant to the Act.  The Members hereby agree that during the term of the Company, the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and provisions of this Agreement and the Act (and in the event of an inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, this Agreement shall control). Notwithstanding anything herein to the contrary, Section 18-210 of the Act (entitled "Contractual Appraisal Rights") shall not apply or be incorporated into this Agreement.

Section 2.2    **Name**.  The name of the Company is "Premier Acquisition Holdings LLC." The business of the Company shall be conducted in the name of the Company.  If the applicable

-9-

law of a jurisdiction where the Company does business requires the Company to do business under a different name, the Board shall choose another name to do business in such jurisdiction.  In such a case, the business of the Company in such jurisdiction may be conducted under such other name or names as the Board may select.

Section 2.3    **Purpose**.   Subject to the terms of this Agreement, the purpose of the Company shall be: (a) to acquire, own, hold, manage, operate, develop, sell and dispose of the Transferred Assets and all rights, title and interests therein and thereto, (b) to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Transferred Assets held or owned by the Company and (c) to engage in all lawful activities and transactions and to enter into, exercise the rights and enjoy the benefits under, and discharge the obligations of the Company pursuant to, all contracts, agreements, and other instruments which the Board determines to be necessary or suitable for or incidental to the accomplishment and conduct of the purposes in the foregoing clauses (a) and (b) above.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by any law applicable to a limited liability company organized under the laws of the State of Delaware.

Section 2.4    **Registered Office and Registered Agent; Principal Place of Business**.

(a)    The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate or such other office in the State of Delaware (which need not be a place of business of the Company) as the Board may designate pursuant to an amendment of the Certificate.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other person or persons in the State of Delaware as the Board may designate from time to time pursuant to an amendment of the Certificate.

(b)    The principal place of business of the Company shall be at such location as designated by the Board.

Section 2.5    **Foreign Qualification**.   Prior to the Company conducting business in any jurisdiction other than Delaware, the Company shall comply, to the extent procedures are reasonably available, with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction.  At the request of the Board or an authorized officer of the Company, each Member agrees to execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Section 2.6    **Term**.   The Company commenced on the date the Certificate was filed and shall continue in existence until it is dissolved and terminated in accordance with the terms hereof.

Section 2.7    **No State-Law Partnership; Tax Classification**.   In no event shall this Agreement be held or construed to imply the existence of a partnership (including a limited partnership) or joint venture among the Members, and no Member shall be held or construed to be a partner or joint venturer of any other Member for any purpose.  The Company has made an

election effective as of its date of formation to be treated as an association taxable as a corporation for federal tax purposes.

## ARTICLE III
## MEMBERS; MEMBERSHIP INTERESTS

Section 3.1 **Members**. The name and address of each Member of the Company, as well as the number of Units, percentage of the total outstanding Membership Interests held by such Member and Capital Contributions made by such Member, if any, as of the Effective Date are set forth in Exhibit A, which information shall be included in the Company Ledger. The Company shall be authorized, without the requirement of consent by any Member, to provide such revisions or amendments to Exhibit A and the Company Ledger as may be necessary from time to time to reflect changes effected in accordance with this Agreement in the membership of the Company, addresses for notices, or amount and class or series of outstanding Membership Interests. Each such Member shall be admitted to the Company as a Member upon such person's execution and delivery to the Company of this Agreement. Any person to whom Membership Interests are Transferred as permitted by Article IX shall be admitted to the Company as a Member on the date upon which such Transfer has been effected and the requirements set forth in Section 9.2 have been satisfied. Notwithstanding any other provision of this Agreement, subject to Section 6.2 and Section 9.6, the Board shall have the power and right to cause the Company to authorize and issue additional Membership Interests or any other Equity Interests of the Company, including additional classes or series of Membership Interests whether junior or senior in rights to existing Membership Interests, and to admit the purchasers thereof as Members of the Company pursuant to this Section 3.1, on such terms as the Board shall determine, and may amend this Agreement as necessary for such authorization and issuance, subject to the provisions of Section 12.2.

Section 3.2 **Unit Designations**. All Membership Interests in the Company shall initially be represented by units ("**Units**"). The Units may be issued in whole Units or any fraction of a Unit, with any such fractional Unit rounded down to the fourth decimal place. As of the Effective Date, there shall be a single class of Units. The Units shall have the rights, privileges, preferences, and obligations specifically provided for in this Agreement. Except as specifically provided in this Agreement to the contrary, Units will be entitled to share in distributions only if and to the extent set forth in Article V and Article X.

Section 3.3 **Management Incentive Units**. In addition to the Units, the Company shall establish a management incentive plan on terms and conditions to be approved and adopted by the Board and the Members by Supermajority Approval (the "**MIP**"), pursuant to which employees and other service providers of the Company or its subsidiaries as determined by the Board and approved by the Members by Supermajority Approval will be eligible to receive management incentive units ("**MIUs**") equal up to 5% of the aggregate Membership Interests in the Company. MIUs will be subject to vesting, forfeiture and other customary restrictions as determined by the Board and approved by the Members by Supermajority Approval and set forth in the MIP. All MIUs shall be non-voting. For all purposes of this Agreement, none of the MIUs shall be considered, deemed or counted as Units except to the extent expressly provided in the MIP and the applicable terms of the MIUs, in each case, as determined by the Board and approved by the Members by Supermajority Approval. After such determination and approval, any MIUs that are so determined by the terms and conditions of the MIP and the applicable terms of the MIUs (as a

-11-

#5735059.10

result of vesting or otherwise) to be treated as Units shall be treated as Units solely for purposes of <u>Section 5.1</u> and determining the Members' (including the holders' of such MIUs) Sharing Percentages.

Section 3.4     **Unit Certificates**.   The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member. In the event that the Board shall issue certificates representing Units in accordance with this <u>Section 3.4</u>, then in addition to any other legend required by applicable law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

> THE UNITS REPRESENTED BY THIS CERTIFICATE (THE "**UNITS**") HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.   THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE OR OTHER SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE UNITS IS FURTHER RESTRICTED AS PROVIDED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY. PURCHASERS OF THE UNITS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

Section 3.5     **Representations and Warranties**.   Each Member hereby severally represents and warrants to the Company and the other Members as of the date hereof and the date such Member is admitted to the Company, and each date upon which it acquires any additional Membership Interest, that the representations and warranties set forth in Part I of <u>Exhibit B</u> hereto are true and correct with respect to such Member as of such date.

Section 3.6     **Voting**.   Units shall be entitled to vote on any matter required or requested by the Board, this Agreement or the Act to be submitted to the Members for approval, including the matters requiring Supermajority Approval.

Section 3.7     **Liability to Third Parties**.   To the fullest extent permitted by law, no Member, Manager or any officer, director, manager, or partner of such Member or Manager, solely by reason of being a Member or Manager, as applicable, shall be liable for the debts, obligations, liabilities or losses of the Company, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, including under a judgment, decree or order of a court.

Section 3.8     **Withdrawal**.   No Member shall have the right to Withdraw from the Company as a Member without the consent of the Board.

Section 3.9    **Members Have No Agency Authority**.  Except as expressly provided in this Agreement or delegated by the Manager, no Member (in its capacity as a member of the Company) shall have any authority to act on behalf of the Company or otherwise bind the Company.

## ARTICLE IV
## CAPITALIZATION

Section 4.1    **Capital Contributions**.

(a)    General.  Each Member's interest in the Company shall be represented by Units issued by the Company to such Member. The Board may, subject to Section 6.2 and Section 9.6, create additional series or classes of Units through subdivision or by issuance of Units of such class or series as the Board shall determine from time to time.

(b)    Initial Capital Contributions.

(i)    On or prior to the Effective Date, each of Alta, Apollo and PacBridge contributed an amount in cash set forth on Exhibit A opposite the name of each Member (the "**Initial Capital Contribution**"), and in exchange for the Initial Capital Contribution, each such Member shall be issued and own the number of Units as of the Effective Date as set forth opposite its name on Exhibit A.

(ii)    All of the Initial Capital Contributions will be used by the Company to: (A) acquire the Transferred Assets, (B) fund transaction fees and expenses incurred from and after May 17, 2018, including due diligence expenses, attorneys' fees and other professional expenses incurred in connection with the negotiation of the Asset Purchase Agreement and other agreements and documents related to the Company's acquisition of the Transferred Assets (collectively, the "**Transaction Expenses**") and (C) establish and maintain reasonable reserves for anticipated operating costs and expenses of the Company. Any excess cash from the Initial Capital Contributions shall be recorded on the Company's balance sheet.

(c)    Additional Capital Contributions.

(i)    Following each Member's Initial Capital Contribution, no Member shall be obligated to make any additional contributions to the capital of the Company. The Company may from time to time request additional Capital Contributions from the Members to the extent the Members by Supermajority Approval determine such contributions are reasonably necessary for a permitted purpose of the Company. All such additional Capital Contributions shall be requested in a written notice from the Company (a "**Capital Call**"). Each Capital Call shall be apportioned ratably among all Members based on the number of Units then held by such Member. Each Capital Call shall be submitted by the Company to the Members and shall set forth therein (i) the date by which the Capital Contributions being called for are due and payable for Members (which date may not be sooner than twelve (12) Business Days after the date such notice is sent to the Members), (ii) the aggregate amount of the Capital Contributions being called for of the Members, (iii) the Capital Contribution requested to be made by each Member to which

-13-

the Capital Call is directed (the "**Member Contribution**"), (iv) the Company account to which such Capital Contribution is to be paid, including wiring information and (v) such other information as deemed necessary or appropriate by the Company.   Except as otherwise set forth in Section 4.1(c)(ii), each Member shall be issued Units in accordance with Section 4.1(c)(iii) in respect of any additional Capital Contribution made by such Member pursuant to this Section 4.1(c).

(ii)     In the event that each Member makes a Capital Contribution as set forth in the applicable Capital Call to such Member (a "**Proportionate Contribution**"), no additional Units shall be issued to the Members in respect of such Capital Contributions made by the Members, and the Members' respective Sharing Percentages will remain unchanged.

(iii)     In the event that a Member (a "**Non-Contributing Member**") does not make its Member Contribution in accordance with the provisions of this Agreement and as set forth in the applicable Capital Call to such Member:

(A)     the Company shall issue to each of the remaining Members (the "**Contributing Member(s)**") a number of Units equal to (A) the amount of the Member Contribution made by such Contributing Member *divided by* (2) the purchase price per Unit, which shall be equal to the fair market value determined by the Board in good faith.   Upon such issuance, the Company shall promptly cause Exhibit A and the Company Ledger to be revised to reflect any such additional Units; and

(B)     the Contributing Member(s) shall have the right (but not the obligation) to:

(1)     contribute their respective proportionate share (calculated as the number of Units held by such Contributing Member divided by the aggregate Units held by all Contributing Members) of the Non-Contributing Member's unfunded Capital Contribution (prior to giving effect to Section 4.1(c)(iii)(A)).   In consideration for such contribution by the applicable Contributing Member, the Company shall issue to such Contributing Member a number of Units equal to (A) 120% of the amount of such additional Capital Contribution made by such Contributing Member *divided by* (2) the purchase price per Unit, which shall be equal to the fair market value determined by the Board in good faith.   Upon such issuance, the Company shall promptly cause Exhibit A and the Company Ledger to be revised to reflect any such additional Units; or, alternatively,

(2)     subject to the unanimous agreement of the Contributing Members (excluding any holders of MIUs), to make a loan to the Company in a principal amount equal to their respective proportionate share (calculated as the number of Units held by such Contributing Member divided by the aggregate Units held all Contributing Members), or in such other proportion as agreed by the Contributing Members, of the Non-Contributing Member's

#5735059.10

unfunded Capital Contribution (prior to giving effect to Section 4.1(c)(iii)(A)) indicated in the applicable Capital Call on terms and conditions agreed by the Company and such Contributing Members; *provided* that such loans by a Member, or an Affiliate of a Member, to the Company will not be treated as Capital Contributions but will be treated as debt obligations having such terms as are approved by the Company and such Contributing Members.

(iv)    Except as otherwise expressly provided in this Agreement, all Capital Contributions to the Company by the Members shall be made by check or by wire transfer of immediately available funds to the account designated by the Company in the Capital Call relating to such Capital Contribution.

Section 4.2    **Interest on and Return of Capital Contributions**.   No interest shall accrue on Capital Contributions, if any, and no Member shall have the right to demand or require the return of its Capital Contributions, if any, except to the extent that any distributions made pursuant to the express terms of this Agreement may be considered as such by law, or upon dissolution and liquidation of the Company, and then only to the extent expressly provided for in this Agreement and as permitted by law.

# ARTICLE V
## DISTRIBUTIONS AND WITHHOLDING

Section 5.1    **Distributions**.

(a)    Within fifteen (15) days of the approval of the Members pursuant to Section 6.2(b), the Company shall make cash distributions of Available Cash to the Members in accordance with the Members' respective Sharing Percentages.

(b)    Any distribution by the Company to the person shown on the Company's records as a Member or to such person's legal representatives, or to the transferee of such person's right to receive such distributions as provided herein, shall constitute a release of the Company and any Covered Person of all liability to any other person that may have an interest in such distribution by reason of any Transfer of such person's Membership Interest for any reason (including a Transfer of such Membership Interest by reason of the dissolution, bankruptcy or liquidation of such person).

(c)    In the event of liquidation of the Company, assets of the Company shall be applied and distributed in the manner specified in Section 10.2.

(d)    Except as authorized by Supermajority Approval of the Members in accordance with Section 6.2(b) or in connection with the dissolution of the Company in accordance with Article X, the Company shall not make any distribution of securities or other assets in kind.

(e)    For the avoidance of doubt, distributions from the Company shall be governed by Sections 301, 302, and 316 of the Code.  Without limiting the generality of the foregoing, distributions pursuant to this Section 5.1 shall be treated as a dividend for federal income tax

purposes to the extent the Company is treated as having current or accumulated earnings and profits for such purposes.

(f)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to any Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law.

Section 5.2     **Withholding**.  To the extent that the Company is required by the Internal Revenue Code or other applicable law (including, but not limited to, Sections 1441, 1442, 1445, 1471 and 1472 of the Internal Revenue Code) to withhold or to make tax payments on behalf of or with respect to any Member, the Company may withhold such amounts and make such tax payments as so required.  All tax payments made on behalf of a Member shall, at the Company's option, be accomplished by either or a combination of the following: (i) be promptly paid to the Company by the Member on whose behalf such payments were made, or (ii) be repaid by reducing the amount of current or future distributions which would otherwise have been made to such Member, or if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member.  Whenever the Company selects option (ii) pursuant to the preceding sentence for repayment of a tax payment by the Company, for all other purposes of this Agreement, such Member shall be treated as having received all distributions unreduced by the amount of such tax payment.  Each Member shall furnish to the Company from time to time all such information as is required by applicable law or otherwise reasonably requested by the Company (including certificates in the form prescribed by the Internal Revenue Code and applicable Treasury Regulations or applicable state, local, or foreign law, and any such additional documentation certifying that a Member has complied with its reporting obligations under the Financial Account Tax Compliance Act (FATCA)) to permit the Company to ascertain whether and in what amount any such withholding is required of such Member.  Notwithstanding the foregoing, (i) the Company shall have no liability to any Member for failure to request or obtain such information from a Member or for withholding or failing to withhold in respect of any Member who has not furnished such information to the Company, and (ii) no Member shall be required to disclose its tax returns or any other information that such Member has determined in its sole discretion is confidential.  The Company shall notify each Member of any taxes paid or withheld by the Company from amounts otherwise distributable to such Member as soon as reasonably practicable after such taxes are paid or withheld.

**ARTICLE VI**
**MANAGEMENT/GOVERNANCE PROVISIONS**

Section 6.1     **Management under Direction of the Board**.

(a)     Except as otherwise expressly provided in this Agreement, including Section 6.2, or required under the Delaware Act, the business and affairs of the Company shall be managed and controlled by a board of managers (the "**Board**" and each member of the Board, a "**Manager**"), and the Board shall have full and exclusive authority, power and discretion to manage, control and conduct the business and affairs of the Company and to make all decisions and establish policies regarding those matters and to perform any and all other acts or activities customary or incidental to the management of the Company and the Business.

-16-

(b)     Except for the actions requiring Supermajority Approval pursuant to Section 6.2, without limiting the generality of Section 6.1(a), the following actions of the Company shall require the approval of the Board:

(i)     hiring, termination or appointment of any officers or employees of the Company or its subsidiaries;

(ii)     setting or approving compensation and benefits of officers or employees of the Company or its subsidiaries, including, subject to approval by the Members by Supermajority Approval, setting the terms and conditions of the MIP and determining any employees or other service providers of the Company or its subsidiaries eligible to receive MIUs under the MIP;

(iii)     initiating, commencing or settling any litigation involving the Company or any of its subsidiaries;

(iv)     appointing or terminating the independent certified public accountants of the Company;

(v)     designating up to three (3) Managers (other than the Managers designated by the Initial Members pursuant to Section 6.3(a)); or

(vi)     entering into any agreement to effect any of the foregoing.

Section 6.2     **Actions Requiring Supermajority Approval**.  Notwithstanding anything in this Agreement to the contrary, the Company (and the officers and agents acting on its behalf), on its own behalf or on behalf of any of its subsidiaries, shall not take any of the following actions without having first received Supermajority Approval in accordance with this Agreement:

(a)     the approval of the initial and annual consolidated operating budget and consolidated maintenance capex budget and any variances from the previously approved operating budget or maintenance capex budget in excess of ten percent (10%) (it being understood that in such event, if Supermajority Approval is not timely obtained, the Company and its subsidiaries shall continue to operate under the prior year's budget adjusted for the rate of inflation until such time as approval is obtained), *provided* that the Company and its subsidiaries may incur reasonable capex necessary to comply with law or regulatory requirements or for emergency repairs;

(b)     the approval of any distributions by the Company or any of its subsidiaries;

(c)     the approval of any capital calls by the Company or any of its subsidiaries;

(d)     authorizing or issuing any additional Units or other Equity Interests of the Company or any of its subsidiaries;

(e)     cause the redemption or repurchase by the Company of any Units, Membership Interests or Equity Interests;

(f)     the approval of the MIP or any other management incentive compensation plan or benefits;

(g)     the acquisition, disposition, encumbrance or transfer of assets by the Company or its subsidiaries with a value in excess of $3,000,000;

(h)     make or approve any material amendment of this Agreement or of the organizational documents of any of the Company's subsidiaries, except as provided in <u>Section 12.2</u>;

(i)     make or effect any change in the size of the Board;

(j)     the removal or appointment of mutually appointed Managers;

(k)     enter into or conduct of new lines of business by the Company or its subsidiaries;

(l)     the incurrence, assumption, repayment, voluntary prepayment, or redemption of Indebtedness or the entering into of finance or operating leases by the Company or its subsidiaries in excess of $1,000,000;

(m)     enter into any partnership, joint venture or similar arrangements;

(n)     enter into (i) any new transactions with any Member or its Affiliates requiring expenditures of over $1,000,000 in the aggregate per annum and (ii) any new transactions with any Member or its Affiliates having terms and conditions other than substantially as favorable as would be obtainable in a comparable arms-length transaction with a person other than a Member or its Affiliate, excluding asset dispositions (it being understood that all Affiliate arrangements and transactions between the Company, on the one hand, and any Member or its Affiliate, on the other hand, that exist as of the Effective Date are deemed approved);

(o)     the consolidation or merger of the Company or its subsidiaries with third parties;

(p)     the liquidation, dissolution, wind-up or commencement of any case, proceeding or other action relating to bankruptcy, insolvency, reorganization, relief of debtors or other case or proceeding under, or obtain relief under, any federal or state bankruptcy or insolvency law, or appoint or consent to the appointment of a receiver, liquidator, assignee, custodian, or trustee for the purpose of winding up the affairs of the Company;

(q)     any conversion or other corporate reorganization of the Company or its subsidiaries or exchange of interests in the Company with any other entity;

(r)     make an election or change in any election to cause (i) EMG Experiential Media Group (Canada) Corp., a wholly owned subsidiary of the Company, to be classified as other than a corporation for federal income tax purposes, or (ii) Experiential Media Group 'EMG' LLC, a wholly owned subsidiary of the Company, to be classified as other than a disregarded entity for federal income tax purposes;

(s)     approve a Drag-Along Transaction;

(t)      during the Initial Governance Period, permit or approve any Transfer of Membership Interests by any Member other than a Permitted Transfer; or

(u)      enter into any agreement to effect any of the foregoing.

The provisions of this Section 6.2 may not be amended or waived without Supermajority Approval in accordance with Section 12.2.

Section 6.3      **Board of Managers**.

(a)      The Board initially shall consist of at least three (3) Managers.  Each of Alta, Apollo and PacBridge (each, an "**Initial Member**") shall be entitled to appoint one (1) person to serve on the Board as a Manager.  From and after the Effective Date, the Initial Members shall have the right to appoint by mutual agreement up to three (3) additional Managers, at which point the Board shall be automatically increased by the number of such additional Managers so appointed, up to a maximum number of six (6) Managers.  The initial Managers appointed to the Board as of the Effective Date are set forth on Exhibit C.  If any additional Managers are appointed to the Board following the Effective Date pursuant to this Section 6.3(a), the Company shall update Exhibit C to reflect the full Board, and such updated Exhibit C shall automatically amend and restate Exhibit C attached hereto.

(b)      Each Initial Member, and solely such Initial Member, shall have the right to remove or replace its appointed Manager at any time by giving notice of such change to the Company and each other Initial Member.  The mutually appointed Managers may be removed or replaced subject to the Supermajority Approval.

(c)      The Managers need not be residents of the State of Delaware.  Each Manager appointed by a Member pursuant to Section 6.3(a) shall be an employee of the Member or an Affiliate of the Member that appointed such Manager and shall hold office until such Manager's successor shall be duly appointed or until the earlier of such Manager's death, removal or resignation.

(d)      A Person that serves as a Manager shall not be required to be a Manager as his sole and exclusive occupation, and Managers may have other business interests and may engage in other investments, occupations and activities in addition to those relating to the Company and its subsidiaries.

Section 6.4      **Voting Proxies; Quorum; Meetings of Board.**

(a)      The attendance of a majority in number of the Managers shall constitute a quorum of the Board for the transaction of business; *provided* that the presence of two Managers designated by the Initial Members shall be required for a quorum to be present.

(b)      Each Manager shall be entitled to cast one (1) vote on each matter on which such Manager is entitled to vote.  In all matters requiring the vote or consent of the Board pursuant to this Agreement, the affirmative vote of a majority in number of the Board at a meeting at which a quorum is present constitutes the act of the Board.

-19-

(c)     Any action required or permitted to be taken at any meeting of the may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, are signed by Managers required by this Agreement to authorize such action.  Each written consent shall bear the date and signature of each Managers who signs the consent and a copy of such consent shall be promptly given to any Manager who has not signed such consent.

Section 6.5     **Officers**.

(a)     The Board may, from time to time, designate one or more persons to be officers of the Company.  No officer need be a resident of the State of Delaware or a Member.  Any officers so designated shall have such authority and perform such duties as the Board may delegate to them from time to time.  Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until he shall resign or shall have been removed in the manner provided in <u>Section 6.3(b)</u>.  Any number of offices may be held by the same person.  Subject to the terms of any employment or other agreement between the Company or any of its subsidiaries and any such officer or agent, the salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.

(b)     Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Board; *provided*, *however*, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Designation of an officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company may be filled by the Board.

## ARTICLE VII
## ACCOUNTING AND BANKING MATTERS; TAX MATTERS

Section 7.1     **Books and Records; Reports**.

(a)     The Company shall keep and maintain full and accurate books of account for the Company in accordance with GAAP consistently applied in accordance with the terms of this Agreement.  Such books shall be maintained at the principal United States office of the Company or offsite so long as they are easily accessible.  To the extent reasonably requested, each of the Members and their respective Affiliates and designated representatives shall have full and complete access at all reasonable times to review, inspect and copy the books and records of the Company for a purpose reasonably related to their interest in the Company.

(b)     The Board shall send or cause to be sent to each Member of the Company the following information:

(i)     Within sixty (60) days, or as soon as reasonably practicable, after the end of each fiscal quarter ending March 31, June 30, September 30 and December 31 of each year (each, a "**Fiscal Quarter**"), unaudited copies of (A) the balance sheet of the Company and its subsidiaries as of the end of such Fiscal Quarter, (B) an income statement of the

-20-

Company and its subsidiaries for such Fiscal Quarter, (C) a statement of cash flows for such Fiscal Quarter and (D) a statement of Members' Equity Interests for such Fiscal Quarter, all prepared in accordance with GAAP (subject to the absence of footnotes thereto and a report thereon from the independent certified public accountants, and other than items that are typically prepared only on an annual basis); and

(ii)     Within ninety (90) days, or as soon as reasonably practicable, after the end of each fiscal year ending December 31 of each year (each, a "**Fiscal Year**"), audited copies of (A) the balance sheet of the Company and its subsidiaries as of the end of such Fiscal Year, (B) an income statement of the Company and its subsidiaries for such Fiscal Year, (C) a statement of cash flows for such Fiscal Year and (D) a statement of Members' Equity Interests for such Fiscal Year, all prepared in accordance with GAAP, consistently applied, and a signed audit later from the Company's auditors who shall be an accounting firm approved by the Board.

Section 7.2     **Fiscal Year**.   The calendar year shall be the accounting year of the Company and the books of account shall be maintained on an accrual basis.

Section 7.3     **Bank Accounts**.  The Company shall maintain one or more bank accounts in the name of the Company in such bank or banks as may be determined by the Board, which accounts shall be used for the payment of expenditures incurred by the Company in connection with the business of the Company and in which shall be deposited any and all receipts of the Company.  All such receipts shall be and remain the properties of the Company and shall not be commingled in any way with funds of any other person.

Section 7.4     **Tax Classification**.   The Members agree to classify the Company as a corporation for federal tax purposes and acknowledge that the Company has made an election to be so treated for federal tax purposes under Treasury regulation section 301.7701-3, effective as of the date of formation (as further set forth in Section 2.7) and shall make any such elections as may be necessary under any corresponding provision of state or local law.  None of the Company, the Board, any Member or any officer or other representative of any of the foregoing shall file an election to classify the Company as other than an association taxable as a corporation for federal or any applicable state or local tax purposes or otherwise take any action inconsistent with the treatment of the Company as a corporation for such tax purposes.   Without eliminating the generality of the foregoing, the Company and each Member will file all tax returns consistent with such treatment as a corporation for all such tax purposes.

Section 7.5     **Tax Elections**.  The Board shall make the following elections with respect to the Company:

(a)     to elect the calendar year as the Company's fiscal year if permitted by applicable law;

(b)     to elect to deduct the start-up expenditures of the Company as permitted by Internal Revenue Code Section 195(b); and

(c)     to elect with respect to such other federal, state and local tax matters as the Board shall approve.

-21-

Section 7.6    **Tax Returns**.

(a)     The Board shall cause to be prepared and timely filed, all tax returns and reports required to be filed by or on behalf of the Company.

(b)     With respect to each fiscal year of the Company, the Company shall prepare and deliver to each Member (i) within forty-five (45) days of the end of such fiscal year, a Form 1099 with respect to such Member, and (ii) as soon as practicable, all additional information reasonably requested by such Member for purposes of preparing and filing such Member's federal and applicable state income tax returns with respect to such Member's ownership in the Company.

## ARTICLE VIII
## EXCULPATION AND INDEMNIFICATION; STANDARDS OF CONDUCT

Section 8.1    **Exculpation and Indemnification**.

(a)     No Manager or officer appointed by the Board pursuant to Section 6.5 shall be liable to the Company or to any Member for any losses sustained or liabilities incurred as a result of any act or omission taken or suffered by such Manager or officer unless the conduct of such Manager or officer constitutes Malfeasance.

(b)     Notwithstanding anything in this Agreement to the contrary or any duties (including fiduciary duties) otherwise existing at law or in equity:  (i) in the exercise of rights and performance of duties under this Agreement, each Covered Person will, to the fullest extent permitted by applicable law, have no duties (including fiduciary duties) to the Company or to any Member; and (ii) whenever under this Agreement any Member is permitted or required to take any action, each Member will be entitled to consider only such interests and factors as such Member desires and will, to the fullest extent permitted by applicable law, have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company or any other Member.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace, to the fullest extent permitted by applicable law, such other duties and liabilities of such Covered Person.

(c)     Subject to its obligations and duties as set forth in Article VI, the Board may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Board shall not be responsible or liable to the Company or any Member for any mistake, action, inaction, misconduct, negligence, fraud or bad faith on the part of any such agent appointed by the Board, *provided, that* such agent was selected, retained and supervised by the Board with reasonable care.  To the extent that, at law or in equity, the Board has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, the Board acting under this Agreement so long as such action does not constitute Malfeasance will not be liable to the Company or to any Member.  The provisions of this Agreement, to the extent they expand or restrict the duties and liabilities of the Board otherwise existing at law or in equity, are agreed by the Members to modify to that extent such duties and liabilities of the Board.

#5735059.10

(d)     The Company shall indemnify and hold harmless, and the Members shall release, the Board, its then current and any former Managers, and all officers appointed by the Board pursuant to <u>Section 6.5</u> (each, an "**Indemnitee**") to the full extent permitted by law from and against any and all losses, claims, demands, costs, damages, liabilities, reasonable expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, and other amounts, of any nature whatever, known or unknown, liquid or illiquid (collectively, "**Liabilities**") arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative (collectively, "**Actions**"), in which the Indemnitee may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act concerning the activities of the Company, if the Indemnitee's conduct did not constitute Malfeasance.  The termination of an action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent, shall not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee acted in a manner contrary to that specified in the preceding sentence.

(e)     Notwithstanding anything to the contrary under this Agreement or pursuant to any duty (fiduciary or otherwise) or otherwise applicable provision of law or equity, a Member may enter into voting agreements or arrangements with one or more other Members regarding, among other things, the voting by such Member; *provided, however,* that any such agreement or arrangement shall be disclosed and provided to the other Members.  Without limiting the scope of any such voting agreement or arrangement permitted hereunder, a voting agreement or arrangement may provide that Members may act in concert.

(f)     Any Indemnitee or Covered Person acting for, on behalf of or in relation to, the Company in respect of any transaction, any investment or any business decision or action, or otherwise shall be entitled to rely on the provisions of this Agreement and on the advice of counsel, accountants and other professionals that is provided to the Company or such Indemnitee or Covered Person, and such Indemnitee or Covered Person shall not be liable to the Company or to any Member for such Indemnitee's or Covered Person's reliance on this Agreement or such advice, *provided* that, (i) there has not been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, and taking into account the acknowledgments and agreements set forth in this Agreement, such Covered Person engaged in fraud, gross negligence or willful misconduct or, in the case of a criminal matter, acted with knowledge that such Covered Person's conduct was unlawful and (ii) in the case of the Board, the Board has used reasonable care in retaining and monitoring such counsel, accountants and other professionals.

(g)     Each Covered Person may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by such Covered Person to be genuine, and may rely on a certificate signed by an officer, agent or representative of any person in order to ascertain any fact with respect to such person or within such person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Covered Person engaged in fraud, gross negligence or willful misconduct or, in the case of a criminal matter, acted with knowledge that such Covered Person's conduct was unlawful.

-23-

#5735059.10

(h)     No Covered Person shall be liable to the Company or to any Member under this Agreement, at law or in equity for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of contract or breach of duties including fiduciary duties) taken or omitted by a Covered Person in connection with the activities of the Company or its subsidiaries, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such Covered Person acted engaged in fraud, gross negligence or willful misconduct or, in the case of a criminal matter, acted with knowledge that such Covered Person's conduct was unlawful.

(i)     Each Covered Person (regardless of such person's capacity and regardless of whether another Covered Person is entitled to indemnification) shall be indemnified and held harmless by the Company (but only to the extent of the Company's assets, including any benefits paid to the Company from insurance policies), to the fullest extent permitted by applicable law, from and against any and all loss, liability and expense (including taxes; penalties; judgments; fines; amounts paid or to be paid in settlement; costs of investigation and preparations; and fees, expenses and disbursements of attorneys, whether or not the dispute or proceeding involves the Company or the Board or any Member) reasonably incurred or suffered by any such Covered Person in connection with the activities of the Company or its subsidiaries; *provided*, that such Covered Person shall not be so indemnified and held harmless if there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter for which such Covered Person is seeking indemnification or seeking to be held harmless hereunder, and taking into account the acknowledgments and agreements set forth in this Agreement, such Covered Person engaged in fraud, gross negligence or willful misconduct or, in the case of a criminal matter, acted with knowledge that such Covered Person's conduct was unlawful.

(j)     The indemnification provided by this Section 8.1 shall be in addition to any other rights to which an Indemnitee or Covered Person may be entitled under any agreement, as a matter of law or otherwise, both as to actions in such Covered Person's or Indemnitee's capacity as a Covered Person or Indemnitee, as applicable, hereunder and as to actions in any other capacity, and shall continue as to a Covered Person or Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person and Indemnitee. A Covered Person or Indemnitee shall not be denied indemnification in whole or in part under this Section 8.1 because such Covered Person or Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(k)     Reasonable, documented expenses incurred by an Indemnitee or a Covered Person in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding; *provided, however*, that any such advance shall only be made if the Indemnitee or Covered Person delivers a written affirmation by such Indemnitee or Covered Person of its good faith belief that it is entitled to indemnification hereunder and agrees to repay all amounts so advanced if it shall ultimately be determined that such Indemnitee or Covered Person is not entitled to be indemnified hereunder.

-24-

(l)     NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, TO THE FULLEST EXTENT PERMITTED BY LAW, NO COVERED PERSON SHALL BE LIABLE TO THE COMPANY, TO ANY MEMBER OR TO ANY OTHER PERSON MAKING CLAIMS ON BEHALF OF THE FOREGOING FOR CONSEQUENTIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING DAMAGES FOR LOSS OF PROFITS, LOSS OF USE OR REVENUE OR LOSSES BY REASON OF COST OF CAPITAL, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE GRANTING OR WITHHOLDING OF ANY APPROVAL REQUIRED HEREUNDER REGARDLESS OF WHETHER BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, VIOLATION OF ANY APPLICABLE DECEPTIVE TRADE PRACTICES ACT OR SIMILAR LAW OR ANY OTHER LEGAL OR EQUITABLE DUTY OR PRINCIPLE, AND THE COMPANY AND EACH COVERED PERSON RELEASE EACH OF THE OTHER SUCH PERSONS FROM LIABILITY FOR ANY SUCH DAMAGES.

(m)     The obligations of the Company to the Covered Persons and Indemnitees provided in this Agreement or arising under law are solely the obligations of the Company, and no personal liability whatsoever shall attach to, or be incurred by, any Indemnitee or any Member or other Covered Person for such obligations, to the fullest extent permitted by law.  The obligations of the Members provided in this Agreement or arising under law are solely the obligations of such Member, and no personal liability whatsoever shall attach to, or be incurred by, any other Covered Person or Indemnitee for such obligations, to the fullest extent permitted by law.  Where the foregoing provides that no personal liability shall attach to or be incurred by a Covered Person or Indemnitee, any claims against or recourse to such Covered Person or Indemnitee for or in connection with such liability, whether arising in common law or equity or created by rule of law, statute, constitution, contract or otherwise, are expressly released and waived under this Agreement, to the fullest extent permitted by law, as a condition of, and as part of the consideration for, the execution of this Agreement and any related agreement, and the incurring by the Company or such Member of the obligations provided in such agreements.

(n)     Nothing in this Section 8.1 shall be deemed to apply to any proceeding or dispute with respect to a Covered Person's employment agreement, if any, or employment relationship with the Company or its Affiliates; *provided*, *however*, that each Member acknowledges that it is not relying upon any other Member or any of such other Member's Affiliates, or any of such other Member's or such other Member's Affiliates' respective stockholders, partners, members, directors, officers or employees, in making its investment or decision to invest in the Company or in monitoring such investment, and each Member hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against any other Member and such other Member's Affiliates and any of such other Member's or such other Member's Affiliates' respective stockholders, partners, members, directors, officers, managers, liquidators and employees (collectively, the "**Released Persons**") for or in connection with any breach by any Released Person of the terms of this Agreement (other than a breach by a Released Person of its obligations under Section 9.3, Section 9.4 or Section 9.5) are expressly released and waived by each Member, in each case to the fullest extent permitted by law and *provided further*, *however*, that nothing contained herein shall release or otherwise prevent any Member from asserting a claim against another Member with respect to a violation of the implied contractual covenant of

-25-

good faith and fair dealing implied by applicable law.  For purposes of this <u>Section 8.1(n)</u>, the Company and its subsidiaries shall be deemed to not be an Affiliate of any Released Person.

(o)     Any amendment, modification or repeal of this <u>Section 8.1</u> or any provision hereof shall be prospective only and shall not in any way affect the limitations on liability of the Indemnitees or the Covered Persons, or terminate, reduce or impair the right of any past, present or future Indemnitee or Covered Person, under and in accordance with the provisions of this <u>Section 8.1</u> as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

Section 8.2    **Insurance**.  The Company shall maintain insurance (including directors' and officers' insurance) at levels that are consistent with industry practice, at its expense, to protect the Board and each officer of the Company, and the Company may maintain such insurance to protect itself, any Indemnitee and any Covered Person or other Member of the Company, in each case against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

Section 8.3    **Severability**.  The provisions of this <u>Article VIII</u> are intended to comply with applicable law.  To the extent that any provision of this <u>Article VIII</u> authorizes or requires indemnification or the advancement of expenses contrary to applicable law, the Company's power to indemnify or advance expenses under such provision shall be limited to that permitted by applicable law and any limitation required by applicable law shall not affect the validity of any other provision of this <u>Article VIII</u>.

**ARTICLE IX**
**DISPOSITION; INVESTOR RIGHTS**

Section 9.1    **Dispositions; Exception to Application of this Article IX**.

(a)     During the Initial Governance Period, unless approved by Supermajority Approval, no Member nor any Affiliate of a Member may Transfer Membership Interests, in whole or in part, except for any Transfer, directly or indirectly, to such Member's Affiliates or any funds or accounts managed by any of the foregoing, or to another Member (a "**Permitted Transfer**"). During the Subsequent Governance Period, no Member nor any Affiliate of a Member may Transfer Membership Interests, in whole or in part, except for (i) any Permitted Transfer or (ii) Transfers made in accordance with the applicable provisions of <u>Section 9.3</u> through <u>Section 9.5</u>. The foregoing notwithstanding, a Transfer of Membership Interests by a Member shall, to the fullest extent permitted by law, be null and void ab initio if (x) the transferee fails to deliver to the Company the representations set forth in Part II of <u>Exhibit B</u> hereto and all documents required pursuant to <u>Section 9.2</u>, (y) such Transfer would result in the violation of any applicable federal or state securities laws or (z) unless otherwise approved by the Board, such Transfer would result in material and adverse tax consequences to the Company or the Members.  Any costs incurred by the Company in connection with any Transfer by a Member of all or a part of its Membership Interests shall be borne by such Member.  For the avoidance of doubt, all Permitted Transfers and other Transfers pursuant to this <u>Article IX</u> shall comply with <u>Section 9.2(c)</u>.

-26-

(b)     Notwithstanding any provision herein to the contrary, in no event shall any provision of this Article IX be applicable in connection with any exchange, reclassification, or other conversion of debt securities or Equity Interests of the Company into any cash, securities, or other property pursuant to a conversion, merger or consolidation of the Company approved in accordance with Section 6.2.

Section 9.2     **Substitution**.

(a)     Unless an assignee of Membership Interests becomes a Member in accordance with the provisions of Section 9.2(b), such assignee shall not be entitled to any of the rights granted to a Member hereunder in respect of such Membership Interests, other than the right to receive distributions to which the assignor would otherwise be entitled, to the extent such items are assigned.

(b)     An assignee of Membership Interests of a Member, or any portion thereof, shall become a Member entitled to all of the rights of a Member in respect of such Membership Interests if, and only if (i) the assignment to such person was a Permitted Transfer or a Transfer made in compliance with this Article IX and such person complies with the provisions of Section 9.2(c), or (ii) (A) the assignor gives the assignee such right, (B) the Members consent to such substitution by Supermajority Approval, and (C) the assignee executes and delivers such instruments, in form and substance reasonably satisfactory to the Members, to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

(c)     The transferee of Membership Interests pursuant to a Permitted Transfer or any Transfer pursuant to this Article IX shall be admitted to the Company as a Member upon the execution by the transferee of a joinder agreement in a form satisfactory to the Board, pursuant to which (i) the transferee agrees to be bound by all of the provisions of this Agreement, (ii) the transferee makes the representations and warranties to the Company and the Members set forth in Exhibit B and (iii) the transferee is admitted as a Member of the Company.

Section 9.3     **Right of First Offer**.

(a)     If any Member or any Affiliate of such Member (such Member in such capacity, the "**Transferring Member**") intends to Transfer all or a portion of its Membership Interests (the "**Subject Membership Interest**"), then the Transferring Member shall deliver written notice (the "**Sale Notice**") to each other Member (in such capacity, each a "**Remaining Member**"); *provided*, *however*, that this Section 9.3 shall not apply to Permitted Transfers or Transfers pursuant to Section 9.4.

(b)     Within twenty (20) Business Days of the receipt of the Sale Notice by the Remaining Members, such Remaining Members shall have the right, but not the obligation, to make a first offer (the "**Remaining Member Offer**") to purchase all, but not less than all, of the Subject Membership Interest.  If more than one Member is a Remaining Member, then the Remaining Members shall be entitled to purchase the Subject Membership Interest under this Section 9.3 in such proportions as they may agree; *provided that*, if they are unable to timely agree, the Remaining Members shall be entitled to purchase the Subject Membership Interest pro rata, based upon Sharing Percentages.  Any such Remaining Member Offer shall be in writing

and shall contain the cash price and material terms for the Transfer pursuant to which such Remaining Member or Members propose to purchase the Subject Membership Interest.

(c)     If the Transferring Member does not receive an offer to purchase 100% of the Subject Membership Interest from any Remaining Member(s) within the twenty (20) Business Day period provided in <u>Section 9.3(b)</u>, then the Transferring Member shall be free to direct the Transfer of the Subject Membership Interest to a third party for cash at a price and on terms and conditions acceptable to such Transferring Member during the one hundred eighty (180) day period immediately following the expiration of such twenty (20) Business Day period.

(d)     If the Transferring Member receives a Remaining Member Offer to purchase 100% of the Subject Membership Interest within the twenty (20) Business Day period provided in <u>Section 9.3(b)</u>, the Transferring Member shall have thirty (30) days following such receipt to determine whether to accept or reject such Remaining Member Offer.

(e)     If the Remaining Member Offer is accepted by the Transferring Member, then the Remaining Member(s) will have sixty (60) days from such acceptance within which to close its purchase of the Subject Membership Interest, subject to extension to the extent necessary to satisfy applicable regulatory approvals.

(f)     If the Transferring Member rejects all Remaining Member Offers, then the Transferring Member may only Transfer the Subject Membership Interest to a third party for cash at a price, and on terms and conditions which, when taken as a whole, are no less beneficial to the Transferring Member (as determined by the Board in good faith) than the highest price and the best terms and conditions offered by any Remaining Member in its Remaining Member Offer, and then only during the one hundred eighty (180) day period following such rejection, subject to extension to the extent necessary to satisfy applicable regulatory approvals.  Under such circumstances, the Transferring Member shall have the right in connection with a prospective Transfer pursuant to this <u>Section 9.3</u> (or in connection with the investigation or consideration of any such Transfer) to require the Company to cooperate fully with potential acquirers in such prospective transaction by taking all customary and other actions reasonably requested by such holders or such potential acquirers, including making the Company's properties, books and records (other than the Company Ledger), and other assets reasonably available for inspection by such potential acquirers, establishing a physical or electronic data room including materials customarily made available to potential acquirers in connection with such processes and making its employees reasonably available for presentations, interviews and other diligence activities, in each case subject to reasonable and customary confidentiality provisions. After such one hundred eighty (180) day period (as extended, to the extent applicable), any proposed Transfer shall once again be subject to the terms and conditions of this <u>Section 9.3</u> to the extent provided herein.

(g)     If the Transferring Member receives an offer from a third party for the Subject Membership Interest at a lower cash price or, when taken as a whole, on terms and conditions less beneficial (as determined by the Board in good faith) to such Transferring Member than those set forth in any Remaining Member Offer (a "**Lower Offer**"), before accepting such Lower Offer, such Transferring Member must provide written notice to all Remaining Members of its intent to accept the Lower Offer, specifying the cash price and material terms and conditions of such Lower Offer. Each Remaining Member will then have twenty (20) days to notify the Transferring

Member in writing that it intends to exercise its right to purchase the Subject Member Interest for the same price and on other terms substantially identical to the Lower Offer.   If more than one Remaining Member makes such election, then the Remaining Members shall be entitled to purchase such Subject Membership Interest in such proportions as they may agree; *provided that*, if they are unable to timely agree, the Remaining Members shall be entitled to purchase such Subject Membership Interests pro rata, based upon Sharing Percentages.  Any such Remaining Member Offer shall be in writing and shall contain the cash price and material terms of the transaction pursuant to which such Remaining Member or Members propose to purchase such Subject Membership Interest.  After such twenty (20) day period, the Transferring Member shall be free to direct the Transfer of the Subject Membership Interest to a third party for the cash price and on the terms and conditions set forth in the Lower Offer.  If no Transfer to a third party has been consummated within one hundred eighty (180) days of the Lower Offer (as extended, to the extent applicable), any proposed Transfer shall once again be subject to the terms and conditions of this <u>Section 9.3</u> to the extent provided herein.

Section 9.4     **<u>Drag-Along</u>**.

(a)     If the Members approve a Drag-Along Transaction by Supermajority Approval, the Member proposing to Transfer Membership Interests pursuant to such Drag-Along Transaction (the "**Selling Member**") may require all holders of Membership Interests (each such holder referred to herein as a "**Co-Seller**" and collectively as "**Co-Sellers**") to Transfer all their Membership Interests in such Drag-Along Transaction or otherwise take actions and cooperate in good faith with the Selling Member as described in this <u>Section 9.4</u>.  Any Membership Interests of the Co-Sellers shall be Transferred free and clear of all Liens (excluding those arising under applicable securities laws).

(b)     Each Co-Seller Transferring Membership Interests pursuant to this <u>Section 9.4</u>, shall be entitled to receive the same form of consideration as all other transferors in such Drag-Along Transaction, including the Selling Member; *provided*, *however*, that (i) any Co-Seller who is not an Accredited Investor may be required to receive such consideration in cash and (ii) the aggregate consideration to be paid shall be allocated as provided in <u>Section 9.4(c)</u>.

(c)     In any Drag-Along Transaction pursuant to this <u>Section 9.4</u>, the Selling Member and each Co-Seller shall receive the same proportion of the aggregate consideration paid by the acquiring party for the Membership Interests directly or indirectly Transferred pursuant to this <u>Section 9.4</u> that such Selling Member and Co-Seller would have received if the aggregate consideration to be paid by the acquiring party had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in <u>Section 10.2</u> as in effect immediately prior to such sale (giving effect to all distributions actually made pursuant to <u>Section 5.1</u> through the date of the consummation of the Drag-Along Transaction).

(d)     The Selling Member shall give each Co-Seller at least twenty (20) days' prior written notice of any Drag-Along Transaction.  Each Co-Seller and the officers of the Company (if any) shall take such actions as may be reasonably required and otherwise cooperate in good faith with the Selling Member in connection with such Drag-Along Transaction.  The Selling Member shall have the right in connection with a Drag-Along Transaction (or in connection with the investigation or consideration of any such Drag-Along Transaction) to require the Company

to cooperate fully with potential acquirers in such prospective transaction by taking all customary and other actions reasonably requested by such holders or such potential acquirers, including making the Company's properties, books and records, and other assets reasonably available for inspection by such potential acquirers, establishing a physical or electronic data room including materials customarily made available to potential acquirers in connection with such processes and making its employees reasonably available for presentations, interviews and other diligence activities, in each case subject to reasonable and customary confidentiality provisions.   In addition, the Selling Member shall have the right in connection with a prospective Drag-Along Transaction pursuant to this <u>Section 9.4</u> to take all steps reasonably necessary to carry out an auction of the Company, including selecting an investment bank, providing confidential information (pursuant to confidentiality agreements), selecting the winning bidder and negotiating the requisite documentation.   Notwithstanding anything to the contrary in this Agreement, no consent or approval of the Co-Sellers or any other Member shall be required in connection with any action taken by the Selling Member or the Company pursuant to and in compliance with this <u>Section 9.4</u>.  Subject to the Selling Member's election to exercise the rights under this <u>Section 9.4</u> and compliance with the terms and conditions of this <u>Section 9.4</u>, each Co-Seller agrees to vote for, consent to and otherwise raise no objection to such transaction or series of related transactions and shall waive any dissenter's rights, appraisal rights or similar rights in connection with such transaction or series of related transactions.

(e)   No Co-Seller shall be required to provide any representations or warranties in connection with any Drag-Along Transaction, other than customary several (and not joint) representations or warranties (i) with respect to which such Co-Seller's liability is limited to the aggregate consideration received by such Co-Seller in such Drag-Along Transaction (subject to an exception for fraud, if any, as may be contained and defined in a definitive agreement with respect to such Drag-Along Transaction) and (ii) concerning (A) such Co-Seller's valid title to and ownership of its Membership Interests, free and clear of all liens, claims and encumbrances (excluding those arising under applicable securities laws), (B) such Co-Seller's legal existence and authority, power and right to enter into and consummate such Drag-Along Transaction, (C) the absence of any violation, default or acceleration of any agreement to which such Co-Seller is subject or by which its assets are bound as a result of the Drag-Along Transaction, and (D) the absence of, or compliance with (as the case may be), any governmental or third party consents, approvals, filings or notifications required to be obtained or made by such Co-Seller in connection with the Drag-Along Transaction. No Co-Seller (x) shall have any liability under the definitive agreements related to such Drag-Along Transaction in excess of the aggregate consideration received by such Co-Seller in such Drag-Along Transaction or (y) shall be required to enter into any noncompetition, nonsolicitation or other similar obligation in connection with such Drag-Along Transaction.

(f)   Notwithstanding anything to the contrary contained in this <u>Section 9.4</u>, any Member(s) that did not vote in favor of a Drag-Along Transaction in connection with the Company's obtaining Supermajority Approval with respect thereto shall have the right, within five (5) Business Days of such vote or approval, to notify the Company in writing that such Member(s) agree(s) to purchase, individually or jointly, the Membership Interests proposed to be Transferred in such Drag-Along Transaction for the same price and on other terms substantially identical to the terms applicable to the proposed Drag-Along Transaction.

#5735059.10

Section 9.5     **Tag-Along Right**.

(a)     Subject to first complying with Section 9.3, if any Member (a "**Tag-Along Seller**") desires to effect a Transfer to a third party (the "**Tag-Along Transferee**") of any portion of such Member's Membership Interests that results in such Member owning less than 60% of its Initial Sharing Percentage, the Tag-Along Seller shall provide each Member notice (the "**Tag-Along Notice**") of the terms and conditions of such proposed Transfer (a "**Tag-Along Sale**") and offer each Member the opportunity to participate in such Tag-Along Sale in accordance with this Section 9.5 and each such Member may elect, at its option, to participate in the Tag-Along Sale in accordance with this Section 9.5. Notwithstanding the foregoing, this Section 9.5 shall not be applicable to, and a Tag-Along Seller may Transfer Membership Interests without complying with any of the provisions of this Section 9.5 in connection with, any (i) Permitted Transfer, (ii) Transfer made pursuant to a Drag-Along Transaction pursuant to Section 9.4 or (iii) any other Transfer that does not result in such Tag-Along Seller owning less than 60% of its Initial Sharing Percentage.

(b)     The Tag-Along Notice shall contain a true and complete copy of any and all available documents constituting the agreement to Transfer and, to the extent not set forth in the accompanying documents, shall identify the Membership Interests proposed to be Transferred, the price offered therefor, all information reasonably available to the Tag-Along Seller regarding the person or persons to whom such interests are proposed to be Transferred, all other material terms and conditions of the proposed Transfer and, in the case of a proposed Transfer in which the consideration payable for such interests consists in whole or in part of consideration other than cash, such information relating to such other consideration as is reasonably available to the Tag-Along Seller.

(c)     From the date of its receipt of the Tag-Along Notice, each Member shall have the right (a "**Tag-Along Right**"), exercisable by notice (the "**Tag-Along Response Notice**") given to the Tag-Along Seller within ten (10) Business Days after its receipt of the Tag-Along Notice (the "**Tag-Along Notice Period**"), to request that the Tag-Along Seller include in the proposed Transfer up to the Pro Rata Share (as defined in this Section 9.5(c)) of Units held by such Member (each such electing Member, a "**Tagging Member**").  For purposes of this Section 9.5(c), "**Pro Rata Share**" means with respect to the Units that are included in a Tag-Along Sale, a percentage represented by the Units to be transferred by the Tag-Along Seller as a percentage of the total Units held by the Tag-Along Seller.

If the aggregate number of Membership Interests proposed to be transferred by the Tag-Along Seller and Tagging Members exceeds the number of Membership Interests to be sold in such transaction or transactions subject to the Tag-Along Sale (or such number of Units the person to whom such Units are to be Transferred otherwise desires to acquire), then the number of Units to be Transferred by each of the Tag-Along Seller and each Tagging Member shall be reduced on a pro rata basis based on the number of Units proposed to be transferred by each of the Tag-Along Seller and each Tagging Member relative to the aggregate Units proposed to be transferred by all Tagging Members and the Tag-Along Seller. In no event shall any Member have the right to include more than its Pro Rata Share in any Tag-Along Sale.

#5735059.10

(d)     Each Tag-Along Response Notice shall include wire transfer instructions for payment of the purchase price for the Membership Interests to be sold in such Tag-Along Sale. Each Tagging Member that exercises its Tag-Along Rights hereunder shall deliver to the Tag-Along Seller, with its Tag-Along Response Notice, all documents required to be executed in connection with such Tag-Along Sale.  Each Tagging Member hereby makes, constitutes and appoints the Board, in its official capacity, as its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member in this Section 9.5.  Each Tagging Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as a Tagging Member as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall lawfully do or cause to be done by virtue of the power of attorney granted hereby.  The power of attorney granted pursuant hereto is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

(e)     If, at the end of the ninety (90) day period after delivery of the Tag-Along Response Notice (which ninety (90) day period shall be extended if any of the transactions contemplated by the Tag-Along Sale are subject to regulatory approval until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than one hundred twenty (120) days following receipt by the Tag-Along Seller of the Tag-Along Response Notice), the Tag-Along Seller has not completed the Transfer of the Membership Interests for the same price and on substantially the same terms and conditions set forth in the Tag-Along Notice, the Tag-Along Seller shall (i) return to each Tagging Member all documents in the possession of the Tag-Along Seller executed by the Tagging Members in connection with the proposed Tag-Along Sale, and (ii) not conduct any Transfer of their Membership Interests without again complying with this Section 9.5.

(f)     Concurrently with the consummation of the Tag-Along Sale, the Tag-Along Seller shall (i) notify the Tagging Member thereof, (ii) remit to the Tagging Member the total consideration for the Membership Interests of the Tagging Member Transferred pursuant thereto, and (iii) promptly after the consummation of the Tag-Along Sale, furnish such other evidence of the completion and the date of completion of such Transfer and the terms thereof as may be reasonably requested by the Tagging Member.

(g)     If at the termination of the Tag-Along Notice Period any other Member shall not have elected to participate in the Tag-Along Sale, such other Member shall be deemed to have waived its rights under this Section 9.5 with respect to the Transfer of its Membership Interests pursuant to such Tag-Along Sale.

(h)     Notwithstanding anything contained in this Section 9.5, there shall be no liability on the part of the Tag-Along Seller to the Tagging Member or the Tagging Member to the Tag-Along Seller if the Tag-Along Sale pursuant to this Section 9.5 is not consummated for whatever reason.  Whether to effect a Transfer of Membership Interests by the Tag-Along Seller is in the sole and absolute discretion of the Tag-Along Seller.

(i)     Each Tagging Member Transferring Membership Interests pursuant to this <u>Section 9.5</u> shall be entitled to receive the same form of consideration as all other Members in such Tag-Along Sale, including the Tag-Along Seller; *provided*, *however*, that (i) any Tagging Member who is not an Accredited Investor may be required to receive such consideration in cash and (ii) the aggregate consideration to be paid shall be allocated as provided in <u>Section 9.5(j)</u>.

(j)     The Tag-Along Seller and each Tagging Member shall receive a pro rata share of the aggregate consideration paid by the Tag-Along Transferee for the Units sold in such Tag-Along Sale based on the proportion that such Tag-Along Seller and each Tagging Member would have received if the aggregate consideration paid by the Tag-Along Transferee had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in <u>Section 10.2</u> as in effect immediately prior to such sale (giving effect to all distributions actually made pursuant to <u>Section 5.1</u> through the date of the consummation of the Tag-Along Sale).

Section 9.6     **Preemptive Right**.

(a)     Except for Exempt Offerings, if the Company proposes to sell or issue any Equity Interests in the Company to any person in a transaction or transactions, each Member shall have the right to purchase directly or through any Affiliate, a number of such Equity Interests up to its Allocable Share (as defined below) of such Equity Interests.

(b)     Any participation pursuant to this <u>Section 9.6</u> shall be on the same terms and conditions as applied to all offerees in the respective offering.  In the event of a proposed transaction or transactions, as the case may be, that would give rise to preemptive rights of the Members pursuant to <u>Section 9.6(a)</u>, the Company shall provide notice (the "**Initial Notice**") to such parties no later than fifteen (15) Business Days prior to the expected consummation of such transaction or transactions.  Each party electing to exercise preemptive rights hereunder shall provide notice of its election to exercise such rights within ten (10) Business Days after delivery of such Initial Notice from the Company (each party electing to exercise its preemptive right in such instance is referred to as an "**Electing Party**").  The failure of a Member to timely respond to the Initial Notice and affirmatively exercise its preemptive right in accordance with the terms of this Agreement shall be deemed an election not to exercise its preemptive right in connection with such proposed transaction or transactions.  If a Member shall elect not to exercise its respective preemptive right to purchase up to its entire Allocable Share, then each Electing Party shall have the right to purchase additional Equity Interests of the same class or series that are the subject of the proposed transaction or transactions (a "**Subsequent Purchase**"), from the securities as to which no such right was exercised, on a pro rata basis based on each such Electing Party's Allocable Share relative to the sum of the Allocable Shares of all those Electing Parties desiring to purchase additional Equity Interests, insofar as more than one such Electing Party desires to so purchase additional securities.

(c)     As used in this <u>Section 9.6</u>, "**Allocable Share**" shall mean, with respect to Equity Interests offered pursuant to this <u>Section 9.6</u>, a percentage amount of Equity Interests that is equal to such Member's Sharing Percentage.

-33-

Section 9.7     **No Appraisal Rights**.  No Member shall be entitled to any appraisal rights with respect to such Member's Membership Interests, whether individually or as part of any class, series or group of Members, in the event of a merger, consolidation, sale of the Company or other transaction involving the Company or its securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

## ARTICLE X
## DISSOLUTION, LIQUIDATION, AND TERMINATION

Section 10.1   **Dissolution**.

(a)     The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)     the Supermajority Approval of the Members to dissolve the Company;

(ii)     entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(iii)     any time there are no Members of the Company unless the Company is continued without dissolution in accordance with the Act.

(b)     The Members hereby waive any right to petition for judicial dissolution of the Company under Section 18-802 of the Act.

Section 10.2   **Liquidation and Termination**.   On dissolution of the Company, the liquidator shall be a person selected by the Board.  The liquidator shall proceed diligently to wind up the affairs of the Company at the direction of the Board and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  The steps to be accomplished by the liquidator are subject to the Act, as follows:

(a)     As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)     The liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts owing to any Member), liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent, conditional or unmatured liabilities in such amount and for such term as the liquidator may reasonably determine).

(c)     All remaining proceeds and any remaining assets shall be distributed to the Members in accordance with Section 5.1.

(d)     Any distribution to the Members in liquidation of the Company shall, to the extent reasonably practicable, be made by the later of the end of the calendar year in which the liquidation occurs or ninety (90) days after the date of such liquidation.  The distribution of cash and/or property to a Member in accordance with the provisions of this <u>Section 10.2</u> constitutes a complete return to the Member of its Capital Contribution and a complete distribution to the Member in respect of its Membership Interest and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

Section 10.3   **Certificate of Cancellation**.   On completion of the winding up and distribution of Company assets as provided herein, the Members shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to <u>Section 2.5</u>, and take such other actions as may be necessary to terminate the Company.

### ARTICLE XI
### GOVERNING LAW, DISPUTE RESOLUTION, DEADLOCKS

Section 11.1   **Governing Law**.  THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.   IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY FEDERAL OR STATE COURT LOCATED WITHIN THE STATE OF DELAWARE, AND WAIVES ANY OBJECTION TO JURISDICTION OR VENUE OF, AND WAIVES ANY MOTION TO TRANSFER VENUE FROM, ANY OF THE AFORESAID COURTS.   EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE.

Section 11.2   **Dispute Resolution**.   Claims and controversies between or among the Members and/or the Company, in each case, arising out of or relating to this Agreement, shall be determined and resolved in accordance with the following procedures:

(a)     <u>Covered Disputes</u>.  Any Claim (i) among the Members or their respective Affiliates arising out of or relating to this Agreement, including the meaning of its provisions, or the proper performance of any of its terms, its breach, termination or invalidity or (ii) between the Company and any Member (each, a "**Dispute**"), shall, in each case, be resolved in accordance with the procedures specified in this <u>Section 11.2</u>, which shall be the sole and exclusive procedure for the resolution of any such Dispute.

(b)     <u>Initiation of Procedures</u>.   Any party wishing to initiate the dispute resolution procedures set forth in this <u>Section 11.2</u> with respect to a Dispute not resolved in the ordinary course of business must give written notice of the Dispute to the other parties (a "**Dispute Notice**").  The Dispute Notice shall include (i) a statement of that party's position and a summary

-35-

of arguments supporting that position and (ii) the name and title of the Senior Executive who will represent that party and of any other Person who will accompany such Senior Executive, in the negotiations under Section 11.2(c).

(c)     Negotiation Between Senior Executives.  Within fifteen (15) days after delivery of the Dispute Notice by a party, such receiving party shall submit to the other a written response (the "**Dispute Response**").  Any Dispute Response shall include (i) a statement of such party's position and a summary of arguments supporting that position (and associated Board vote, if applicable), and (ii) the name and title of the Senior Executive who will represent that party and of any other Person who will accompany such Senior Executive.  The parties shall then attempt in good faith to resolve the Dispute, as applicable, within thirty (30) Business Days of the delivery of the Dispute Response (such period, the "**Dispute Negotiation Period**") by negotiations between them.  During the Dispute Negotiation Period, such executives of the parties shall meet at least weekly, at a mutually acceptable time and place, and thereafter during the Dispute Negotiation Period as more often as they reasonably deem necessary, to attempt to resolve the Dispute during the Dispute Negotiation Period.

(d)     Tolling and Performance.  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in Section 11.2(c) are pending.  The parties shall take any action required to effectuate that tolling.  Each party is required to continue to perform its obligations under this Agreement pending completion of the procedures set forth in Section 11.2(c), unless to do so would be impossible or impracticable under the circumstances.

(e)     Binding Arbitration.

(i)     Any Dispute that cannot be resolved during the Dispute Negotiation Period shall be settled by arbitration in accordance with the then current International Institute for Conflict Prevention and Resolution ("**CPR**") Rules for Non-Administered Arbitration (the "**CPR Rules**") and this Section 11.2(e).  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 to the exclusion of any provision of Law inconsistent therewith or which would produce a different result, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction. Any dispute to which this Section 11.2(e) applies is referred to herein as a "**Subject Dispute**." The provisions of this Section 11.2(e) shall be the exclusive method of resolving Subject Disputes.  Nothing in this Agreement shall preclude a Member from seeking temporary or preliminary injunctive relief from a court of competent jurisdiction to prevent irreparable harm or injury before the matter can be heard in arbitration.

(ii)     The Member submitting the Subject Dispute to arbitration pursuant to Section 11.2(e)(i) shall provide written notice to the other Member (an "**Arbitration Notice**").  At the same time that the Initiating Member sends an Arbitration Notice to the other Member, it shall also send an Arbitration Notice to the regional office of the CPR Institute covering New York, New York containing the information required by the CPR Rules and as set forth herein. The Arbitration Notice shall contain a brief description of the nature of the Subject Dispute. Unless the Members agree to a sole arbitrator within ten (10) days after the Arbitration Notice is provided to the applicable regional office of the CRP

-36-

Institute, any arbitration conducted under this Section 11.2(e) shall be heard by three (3) arbitrators, of whom each Member shall select and designate one (the "**Member Appointed Arbitrators**") and the third will be selected and designated by the Member Appointed Arbitrators (each of the three selected and designated arbitrators, an "**Arbitrator**" and, collectively, "**Arbitration Panel**").   The Member Appointed Arbitrators must ensure that the third Arbitrator is qualified with the requisite experience in the matters at issue in the Subject Dispute.  To the extent the Member Appointed Arbitrators cannot agree on the final arbitrator within the time provide by the CPR Rules, the final arbitrator shall be designated by CPR pursuant to the CPR rules and qualified with the requisite experience in the matters at issue in the Subject Dispute and shall be selected in accordance with this Section 11.2(e).  The final arbitrator (whether selected by the Member Appointed Arbitrators or the CPR) shall be the chair of the Arbitration Panel and have the role of administrating the proceeding as required by the CPR Rules.  Each Member and each proposed Arbitrator shall disclose to the other Member any business, personal or other relationship or affiliation that may exist between such Member and such proposed Arbitrator within ten (10) Business Days following selection as a proposed Arbitrator.

(iii)    The Initiating Member shall designate a proposed Arbitrator in its Arbitration Notice.  The other Member shall designate a proposed Arbitrator within twenty (20) days after receipt of the Arbitration Notice.   Qualifications, challenges and replacement of all Arbitrators shall be governed by the CPR Rules.

(iv)    Any arbitration hearing shall be held in New York, New York.   The Arbitration Panel shall fix a reasonable time and place for the hearing and shall determine the matters submitted to them pursuant to the provisions of this Agreement in a timely manner.

(v)    Except as expressly provided to the contrary in this Agreement, the Arbitration Panel shall have the power (i) to gather such materials, information, testimony and evidence as it deems relevant to the Subject Dispute before it (and each Member will provide such materials, information, testimony and evidence requested by the Arbitration Panel, except to the extent any information so requested is subject to an attorney-client or other privilege); (ii) to grant injunctive relief and enforce specific performance; (iii) to issue or cause to be issued subpoenas (including subpoenas directed to third parties) for the attendance of witnesses and for the production of books, records, documents and other evidence. Subpoenas so issued shall be served, and upon application to a court having jurisdiction by a Member or the Arbitration Panel, enforced, in the manner provided by Law for the service and enforcement of subpoenas in a civil action; and (iv) to administer oaths.

(vi)    In advance of the arbitration hearing, the Members may conduct discovery in accordance with the Federal Rules of Civil Procedure as such rules may be modified herein or as otherwise agreed by the Members. Such discovery may include (i) the taking of oral and videotaped depositions and depositions on written questions; (ii) serving interrogatories, document requests and requests for admission; and (iii) any other form and/or method of discovery provided for under the Federal Rules of Civil Procedure.  The Arbitration Panel shall order the Members to promptly exchange copies of all exhibits and

-37-

witness lists, and, if requested by a Member, to produce other relevant documents, to answer interrogatories, to respond to admissions (which shall be deemed admitted if not denied) and to produce for deposition and, if requested, at the hearing all witnesses that such Member has listed and up to four other Persons within such Member's control. Any additional discovery shall occur by agreement of the Members or as ordered by the Arbitration Panel. Any objections and/or responses to such discovery shall be due on or before fifteen (15) days after service. The Members shall attempt in good faith to resolve any discovery disputes that may arise. If the Members are unable to resolve any such disputes, the Members may present their objections to the Arbitration Panel who shall resolve the objections in accordance with the Federal Rules of Civil Procedure. The Arbitration Panel may, if requested by a Member, order that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way.

(vii)    The Members may also retain one or more experts to assist the Arbitration Panel in resolving the Subject Dispute. The Members shall identify and produce a report from any experts who will give testimony and/or evidence at the arbitration hearing. Any testifying experts identified shall be made available for deposition in advance of any arbitration hearing.

(viii)    The Arbitration Panel shall render its reasoned decision in writing within fifteen (15) days of the conclusion of the hearing. The Arbitration Panel shall have jurisdiction and authority to interpret and apply the provisions of this Agreement only insofar as shall be necessary in the determination of the Subject Dispute before it, but it shall not have jurisdiction or authority to add to or alter in any way the provisions of this Agreement. The Arbitration Panel's decision shall govern and shall be final, non-appealable (except to the extent provided in the Federal Arbitration Act) and binding on the Members and its written decision may be entered in any court having appropriate jurisdiction. Pending resolution of any Subject Dispute, performance by the Members shall continue so as to maintain the status quo prior to notice of such Subject Dispute and service of an Arbitration Notice by any Member shall not divest a court of competent jurisdiction of the right and power to grant a decree compelling specific performance or injunctive relief in an Action brought by the Members.

(ix)    The responsibility for paying the costs and expenses of the arbitration, including compensation to the Arbitrators, shall be allocated among the Members in a manner determined by the Arbitration Panel to be fair and reasonable under the circumstances. Each Member shall be responsible for the fees and expenses of its respective counsel, consultants and witnesses, unless the Arbitration Panel determines that compelling reasons exist for allocating all or a portion of such costs and expenses to one Member.

(f)    Notwithstanding anything contained herein to the contrary, the procedure set forth in this Section 11.2 shall not apply to a Deadlock, which is governed by Section 11.3.

Section 11.3    **Deadlocks**.  Deadlocks of the Board arising out of or relating to Section 6.1 shall be determined and resolved in accordance with the following procedures:

-38-

(a)     Covered Deadlocks.  Any deadlock of the Board with respect to any action or omission that requires Board approval under Section 6.1 (each, a "**Deadlock**") shall, in each case, be resolved in accordance with the procedures specified in this Section 11.3, which shall be the sole and exclusive procedure for the resolution of any such Deadlock.

(b)     Initiation of Procedures.  Any party wishing to initiate the deadlock resolution procedures set forth in this Section 11.3 with respect to a Deadlock not resolved in the ordinary course of business must give written notice of the Deadlock, as applicable, to the other parties (a "**Deadlock Notice**").  The Deadlock Notice shall include (i) a statement of that party's position and a summary of arguments supporting that position (and associated Board vote, if applicable), and (ii) the name and title of the Senior Executive who will represent that party and of any other Person who will accompany such Senior Executive, in the negotiations under Section 11.3(c).

(c)     Negotiation Between Senior Executives.  Within fifteen (15) days after delivery of the Deadlock Notice by a party, such receiving party shall submit to the other a written response (the "**Deadlock Response**").  Any Deadlock Response shall include (i) a statement of such party's position and a summary of arguments supporting that position (and associated Board vote, if applicable), and (ii) the name and title of the Senior Executive who will represent that party and of any other Person who will accompany such Senior Executive.  The parties shall then attempt in good faith to resolve the Deadlock, as applicable, within twenty (20) days of the delivery of the Deadlock Response (such period, the "**Deadlock Negotiation Period**") by negotiations between the parties' Senior Executives.  During the Deadlock Negotiation Period, the Senior Executives of the parties shall meet at least weekly, at a mutually acceptable time and place, and thereafter during the Deadlock Negotiation Period as more often as they reasonably deem necessary, to attempt to resolve the Dispute or Deadlock, as applicable, during the Deadlock Negotiation Period.

(d)     Failure to Resolve Deadlock.  Should any Deadlock fail to be resolved during the Deadlock Negotiation Period, the parties may mutually agree to submit such Deadlock to non-binding mediation in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**Mediation**").  If after Mediation such Deadlock is not resolved, neither any Member or the Company as a whole shall be required to take any further action with respect to such Deadlock.

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1   **Notices**.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by overnight courier, or by facsimile or other electronic transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person to receive it or, if sent by electronic transmission, upon when receipt is acknowledged by non-automated response.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  All notices, requests,

#5735059.10

and consents to be sent to the Company must be sent to or made at the address of the Company's principal place of business or as the Company may specify by notice to the Members.  All notices, requests, or consents sent to or given by any Member may be by electronic transmission in addition to any other method permitted by this Section 12.1.

Section 12.2   **Amendment or Modification**.

(a)   Subject to this Section 12.2(a), and except as set forth in Section 12.2(b), the Members by Supermajority Approval shall have the right to amend, restate or otherwise modify this Agreement.  Notwithstanding the foregoing, (x) any amendments that (i) increase the limited liability of any Member, (ii) adversely affect the interest of any Member in income, losses or distributions of the Company, (iii) require any Member to make any capital contributions, other than the Initial Capital Contributions, or (iv) adversely and disproportionately affect any Member as compared to the other Members holding the same class of Units, shall require the consent of such affected Member, and (y) for purposes of any amendments that amend (i) the Supermajority Approval percentage or any provisions of this Agreement requiring Supermajority Approval, (ii) Article IX or (iii) this Section 12.2, Supermajority Approval shall mean the approval of Members holding at least 75% of the outstanding Units.

(b)   Notwithstanding Section 12.2(a), the Board, without the requirement to obtain Supermajority Approval, may authorize (x) amendments to this Agreement to reflect Transfers of Membership Interests that have been approved in accordance with the terms of this Agreement or (y) immaterial amendments to correct clerical or typographical errors in this Agreement.

Section 12.3   **Entire Agreement**.  This Agreement, along with the Exhibits attached hereto, constitute the full and complete agreement of the parties hereto with respect to the subject matter hereof.

Section 12.4   **Effect of Waiver or Consent**.  The failure of any person to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such person's right to demand strict compliance in the future.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

Section 12.5   **Successors and Assigns**.  Subject to Article IX, this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  For the avoidance of doubt, subject to compliance with the terms of this Agreement in connection with any Transfer, the rights of any Member hereunder (including in respect of Article VI and Article IX hereof) shall inure to the benefit of such Member's transferees.

Section 12.6   **Severability**.  If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; *provided*, *however*, that if any provision may be made enforceable

#5735059.10

by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

Section 12.7 **Further Assurances**.   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 12.8 **Title to Company Property**.   All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member, individually, shall have any ownership of such property.   The Company shall hold all of its property in its own name.

Section 12.9 **Access to Information**.   Except as otherwise set forth in this Agreement, each Member shall have access to the information set forth in § 18-305(a) of the Act.

Section 12.10 **Public Announcements**.   The Company or any Member may issue a press release or other public statement with respect to this Agreement or the transactions contemplated hereby only after having provided reasonable advance notice of same to the other Members; *provided*, that in no event shall the identity of any Member, the economic terms of this Agreement or the transactions contemplated hereby be disclosed by any person, unless each Member has consented in advance to such disclosure or such disclosure is required pursuant to applicable law, regulation or national stock exchange rule, or by order of a court of applicable jurisdiction.

Section 12.11 **No Third Party Beneficiaries**.   Except as otherwise provided in Article VIII, it is the intent of the parties hereto that no third-party beneficiary rights be created or deemed to exist in favor of any person not a party to this Agreement, unless otherwise expressly agreed to in writing by the parties.

Section 12.12 **Confidentiality**.

(a)   The Company and each Member acknowledges the proprietary and confidential nature of the Confidential Information and agrees that it shall, and shall direct its Affiliates and its and their respective managers, directors, officers, constituent partners, employees, attorneys, accountants, fiduciaries, advisers and representatives that have received Confidential Information to, keep confidential and not use, publish, disseminate, distribute or otherwise disclose any Confidential Information of or provided by the Company or any other Member or any Affiliate of a Member, to any other person without (i) with respect to Confidential Information of the Company, consent of the Board, and (ii) with respect to a Member, the express written consent of that Member.

(b)   If the Company or any Member receives either a request to disclose any Confidential Information of the Company or another Member under the terms of a subpoena or order issued by a Governmental Authority of competent jurisdiction or advice of legal counsel that disclosure is required by applicable law, the Company or that Member, as applicable, agrees that, prior to disclosing any Confidential Information of the Company or another Member, it shall, to the fullest extent permitted by law, (i) (A) with respect to Confidential Information of the Company, promptly notify the Board of the existence and terms of, and the circumstances

-41-

attendant to, such request or advice, and (B) with respect to Confidential Information of another Member, promptly notify that Member of the existence and terms of, and the circumstances attendant to, such request or advice, (ii) consult with the Board or that Member, as applicable, as to the advisability of taking legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure and (iii) if disclosure is required, use its reasonable best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as is required to be disclosed.  Notwithstanding the foregoing, the Company or a Member, as applicable, may disclose Confidential Information of the Company or another Member (1) to the extent the disclosure is necessary by the Company in the ordinary course of business as a result of the due and proper performance of the duties and responsibilities to the Company of the Board or an officer pursuant to this Agreement, including in connection with combinations, acquisitions or dispositions of assets or businesses and financing transactions, or by a Member to a potential transferee in connection with a Permitted Transfer; *provided* that, in each case, such disclosure is pursuant to a customary confidentiality agreement in favor of the Company and any applicable Member and, to the extent involving Confidential Information of another Member, such Member consents in writing, (2) to the extent necessary to enforce rights hereunder (*provided*, *however*, that the party seeking to enforce its rights shall take commercially reasonable steps to preserve the confidential nature of the Confidential Information and to limit the harm to the Company or the other Members from the disclosure thereof), (3) in connection with disclosures of a general nature regarding general financial information, return on investment and similar information, including in connection with communications to direct and indirect beneficial owners of Membership Interests or (4) to comply with applicable law or the rules and regulations of any governmental, regulatory or self-regulatory organization.

(c)     The Company and each Member acknowledges and agrees that Members and their Affiliates are engaged in ongoing businesses or may become engaged in businesses that are the same as or similar to the current or prospective businesses of the Company or other Members (the "**Subject Businesses**"), including in the area of the businesses and assets of the Company or other Members.  As such, a Member may be or may become in possession of information, in oral, written or electronic form as well as in the form of mental impressions, related to the Subject Businesses (including customers, competitors, assets and businesses), and certain of its representatives that will be involved in the businesses of the Company may be or may become involved in a business for the Member that is similar and/or competing with the business of the Company.  Except as may otherwise be expressly provided in this Agreement, the Company and each Member agree that nothing in this Agreement is intended to restrict the Board's or any Member's or any of their respective Affiliates' ability to conduct its or their respective businesses, including the Subject Businesses of that Member; *provided*, that the Member does not violate the confidentiality and use obligations set forth in this Agreement.

(d)     The agreement contained in this <u>Section 12.12</u> shall survive the Withdrawal of any Member or any termination or dissolution of the Company.

Section 12.13  **Expenses**.  Each of the Members shall be responsible for their own fees, costs and expenses incurred by them or their respective Affiliates in negotiating this Agreement or in consummating the transactions contemplated by this Agreement; *provided*, that the Transaction Expenses shall be funded as part of each Member's Initial Capital Contribution.

Section 12.14 **Counterparts**.   This Agreement may be executed in any number of counterparts, with each such counterpart constituting an original and all of such counterparts constituting but one and the same instrument.

Section 12.15 **No Finder's Fees**.  Each Member represents that it has not and will not cause to be incurred any finder's or broker's fee or commission for which the Company is or will be liable in connection with this Agreement.  Each Member agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' or broker's fee (and any asserted liability) for which the Member or any of its officers, partners, employees, or representatives is responsible.  The Company agrees to indemnify and hold harmless each Member from any liability for any commission or compensation in the nature of a finder's or broker's fee (and any asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

#5735059.10

**IN WITNESS WHEREOF**, the undersigned Members have executed this Agreement as of the date first written above.

ALTA FUNDAMENTAL ADVISERS SP LLC

Name: Gilbert Li
Title: Managing Partner

**STAR V PARTNERS LLC**

By: Alta Fundamental Advisers LLC, its investment manager

Name: Gilbert Li
Title:   Authority Signatory

**APOLLO CREDIT STRATEGIES MASTER FUND LTD.**
By: Apollo ST Fund Management LLC, its investment manager

Name:   Joseph D. Glatt
Title:   Vice President

**PACBRIDGE PARTNERS I INVESTMENT CO. LTD.**

Name:  Sheldon Trainor
Title:    Director

**EXHIBIT A**

**MEMBER INFORMATION; MEMBERSHIP INTERESTS; CAPITAL**

As of the Effective Date:

| Member Name and Address | No. of Units | Sharing Percentage | Capital Contributions |
|---|---|---|---|
| Alta Fundamental Advisers SP LLC<br>777 Third Avenue 19A<br>New York, New York 10017 | 610 | 31.15% | $6,100,000.00 |
| Star V Partners LLC<br>2100 West End Ave, Suite 1000<br>Nashville, Tennessee 37203-5240 | 190 | 9.70% | $1,900,000.00 |
| Apollo Credit Strategies Master Fund Ltd.<br>c/o Apollo Capital Management, L.P.<br>9 West 57th Street<br>New York, New York 10019 | 800 | 40.85% | $8,000,000.00 |
| PacBridge Partners I Investment Co. Ltd.<br>Unit 1401, 14th Floor,<br>The Chinese Bank Building,<br>61-65 Des Voeux Road,<br>Central Hong Kong | 358 | 18.30% | $3,583,333.33 |
| Total: | 1,958 | 100.00% | $19,583,333.33 |

A-1

## <u>EXHIBIT B</u>

## REPRESENTATIONS AND WARRANTIES OF MEMBERS

Capitalized terms used but not defined in this <u>Exhibit B</u> shall have the meanings given to them in the foregoing Amended and Restated Limited Liability Company Agreement of Premier Acquisition Holdings LLC, dated as of February 12, 2019 (the "**Agreement**").

<u>Part I:  Representations and Warranties of All Members</u>

(a)  Such person acknowledges and understands that the Membership Interests have not been and will not be registered with the U.S. Securities and Exchange Commission under the Securities Act, and have not been and will not be registered or qualified under any other applicable U.S. or non-U.S. securities laws.

(b)  Such person understands that the offering and sale of the Membership Interests is intended to be exempt from registration under the Securities Act and the applicable state or foreign securities laws.  Such person understands that the availability of the exemptions from registration under the Securities Act relied upon by the Company is based in part on the representations and warranties of such person set forth in this <u>Exhibit B</u>.

(c)  Such person is an Accredited Investor.

(d)  Such person has such knowledge and experience in business, financial and investment matters that it is capable of evaluating the merits and risks of an investment in the Membership Interests.  To the extent necessary, such person has retained, at such person's own expense, and relied upon, appropriate professional advice regarding the investment, tax and legal merits and consequences of investing in the Membership Interests and the Company.

(e)  Such person is acquiring the Membership Interests solely for such person's own account, for investment purposes, and not with a view to, or for resale in connection with, any subdivision, fractionalization, resale or distribution of the Membership Interests.  Such person is not participating, directly or indirectly, in an underwriting of the Membership Interests, and will not take, or cause to be taken, any action that would cause such person to be deemed an "underwriter" of the Membership Interests as defined in Section 2(11) of the Securities Act.

(f)  Such person has not offered or sold, nor has it entered into any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or pledge to such person or anyone else, all or any portion of the Membership Interests and has no current intention of dividing any Membership Interests with others or of reselling or otherwise disposing of all or any portion of any Membership Interests either currently or after the passage of a fixed or determinable period of time.

(g)  Such person understands that there are substantial restrictions on the transferability of the Membership Interests, and that the Membership Interests may not be sold, exchanged, assigned, or transferred unless all of the applicable conditions set forth in Article IX of the Agreement are satisfied or waived.

B-1

(h)     Such person is aware and acknowledges that (i) the Company has limited financial and operating history; (ii) an investment in Membership Interests in the Company involves a substantial degree of risk of loss of its entire investment and there is no assurance of any income from such investment; and (iii) it may not be possible for it to liquidate its investment readily in case of need.

(i)     Such person hereby acknowledges that (i) any federal, state or foreign income tax benefits which may be available to it in connection with an investment in the Membership Interests may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or changes in the interpretation of existing laws and regulations; and (ii) in making its investment, it is relying solely upon the advice of its tax adviser with respect to the tax aspects of an investment in the Company.

(j)     Such person has reviewed all information provided to it in connection with its decision to purchase Membership Interests.

(k)     Such person has full right, power and authority to execute and deliver the Agreement, to become a Member of the Company, to acquire and hold Membership Interests, to make all Capital Contributions that may be required under the Agreement and to perform its other obligations under the Agreement.  The person signing this Agreement on behalf of such person has been duly authorized by such person to do so.

(l)     The obligations of such person in the Agreement are legal, valid and binding obligations of such person enforceable against such person in accordance with the terms of the Agreement, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(m)     Such person is not acting as a trustee or otherwise on behalf of any employee benefit plan or plans ("**Plans**") subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended, and, except with respect to the Initial Capital Contributions to be made by Gothic ERP LLC, is not purchasing its Membership Interest with assets that are or are deemed to be assets of one or more Plans.

(n)     Such person has not (a) taken any action (i) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of anything of value, directly or indirectly through any of its Controlled Affiliates, to any government official (including any officer or employee of a government or government-owned or controlled entity, agency or instrumentality, or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage; or (ii) that would otherwise violate (1) any applicable anti-corruption, anti-money laundering, anti-terrorism and economic sanction and anti-boycott laws of the United States, including the United States Foreign Corrupt Practices Act or (2) the principles described in the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, signed in Paris on December 17, 1997, which entered into force on February 15, 1999, and the Convention's Commentaries, and

B-2

such person and each of its Controlled Affiliates have adequate internal controls in place to identify any such violations, or (b) engaged in any Prohibited Transaction.

<u>Part II:  Representations and Warranties of Transferees of any Membership Interest.</u>

(a)     Such transferee is the sole beneficial owner of the Membership Interest in the Company to be registered in its name;

(b)     Such transferee did not acquire, and will not transfer, its Membership Interest through (i) a national, non-U.S., regional, local or other securities exchange or (ii) over-the-counter market (including an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers by electronic means or otherwise);

(c)     Such transferee did not acquire, and will not transfer, its Membership Interest from, to or through (i) a person, such as a broker or dealer, that makes a market in, or regularly quotes prices for, the Membership Interest or (ii) a person that regularly makes available to the public (including customers or subscribers) bid or offer quotes with respect to the Membership Interest and stands ready to effect, buy or sell transactions at the quoted prices for itself or on behalf of others; and

(d)     Such transferee will only transfer its Membership Interest to a buyer who provides representations similar to these.

#5735059.10

## <u>EXHIBIT C</u>

### INITIAL BOARD OF MANAGERS

Gilbert Li

Giovanni Wong

Robert Givone

C-1