```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - - -
                                        )
 5    R.M.S. TITANIC, INC.,             )
      SUCCESSOR IN INTEREST TO          )
 6    TITANIC VENTURES, LIMITED         )
      PARTNERSHIP,                      )
 7                                      )    CIVIL ACTION NO.
              Plaintiff,                )    2:93cv902
 8                                      )
      v.                                )
 9                                      )
      THE WRECKED AND ABANDONED         )
10    VESSEL, ETC.,                     )
                                        )
11            Defendant.                )
      - - - - - - - - - - - - - - - - - - -
12

13

14                   TRANSCRIPT OF PROCEEDINGS

15                      Norfolk, Virginia

16                       July 3, 2019

17

18    BEFORE:  THE HONORABLE REBECCA BEACH SMITH
              United States District Judge

19

20    APPEARANCES:

21            KALEO LEGAL
              By:  Brian A. Wainger
22                    And
              McGUIRE WOODS LLP
23            By:  Robert W. McFarland
                    And
24            GREENBERG TRAURIG
              By:  David G. Barger
25                  Counsel for R.M.S. Titanic
```

JODY A. STEWART, Official Court Reporter

1

2

3   APPEARANCES CONTINUED:

4

5              UNITED STATES ATTORNEY'S OFFICE
           By:  Kent Porter
6                 Assistant United States Attorney
                  Counsel for Amicus United States

7           THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
           By:  Jackie Rolleri
8                 Counsel for NOAA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Hearing commenced at 2:00 p.m.)
 2              THE CLERK:  In case 2:93cv902, R.M.S. Titanic,
 3   Inc., et cetera, versus The Wrecked and Abandoned Vessel, et
 4   cetera.
 5              Are counsel ready to proceed?
 6              MR. McFARLAND:  Good afternoon, Your Honor.
 7   Plaintiff is ready to proceed.
 8              THE COURT:  Good afternoon.
 9              MR. BARGER:  Good afternoon, yes.
10              MR. PORTER:  Good afternoon, Your Honor.  We are
11   ready.  If I may, Jackie Rolleri, who has been here before,
12   with the Office of General Counsel, is here with me today.
13   Also from NOAA, Mr. Alberg, who I believe you have met
14   before.
15              THE COURT:  Yes.
16              MR. PORTER:  She is from the modern National
17   Maritime Marine Sanctuary, and Mr. Tane Casserley, who would
18   be an observer on the EYOS expedition, as well.
19              THE COURT:  Nice to see you again and nice to meet
20   you.
21              MR. McFARLAND:  From RMST, Your Honor, Jessica
22   Sanders, the corporate secretary, is here.  She has been
23   before the Court on several occasions, and my co-counsel,
24   Brian Wainger, and then moving counsel for substitution and
25   counsel for Premier Acquisition Holdings, LLC, Mr. Barger.
```

1        MR. BARGER:  Good afternoon.

2        THE COURT:  Yes.  Nice to see all of you again.

3        Counsel, we are here this afternoon for a status

4   hearing, and the Court has four matters that it would like

5   to address during the status hearing or mention in some way.

6   One would be to address the updates that had been provided

7   by PAHL and RMST since our last meeting and the Court's

8   December 2018 order, RMST's motion to substitute counsel,

9   the 2019 Titanic expeditions that have been planned by

10  OceanGate, EYOS and RMST, and as I understand one of those

11  may not be going forward but we'll address that when we get

12  to that portion of the hearing.  I do want to mention in the

13  end two telephonic conversations that have come through

14  about this matter to the clerk's office that were then

15  relayed to the Court.

16       So, consequently, I'll briefly review the updates

17  and any questions and anything that anyone wants to offer to

18  the Court.  We'll go through that first, the updates that

19  had been provided to the Court, and I will try to do it

20  chronologically.

21       On February 13, 2019, it's the Court's

22  understanding that PAHL closed on the purchase of the 100

23  percent interest of RMST's stock, and on April 12, 2019,

24  PAHL filed a notice to provide the Court with the documents

25  and the information required by paragraph J of the Court's

1    order of December 21, 2018.

2         Paragraph J required PAHL within 60 days of the

3    transaction to provide the Court with a copy of the executed

4    membership agreement for PAHL with all amendments thereto;

5    second, to inform the Court of the appointment of any

6    manager or managing member of PAHL; and, three, to identify

7    those officials of PAHL that have the authority to bind PAHL

8    with respect to this Court's admiralty jurisdiction over the

9    Titanic wreck, wreck site, the STAC and the authority of

10   this Court to enforce and adjudicate the compliance with the

11   C&Cs.

12        On May 14th, 2019, PAHL and RMST filed a

13   supplemental report providing the Court with the information

14   required by paragraph O of the Court's December 21, 2018

15   order, and that requirement was, "Within 90 days of the

16   closing under the APA, RMST shall file a supplemental report

17   with the Court and NOAA, detailing PAHL's financial

18   resources to be used to enhance RMST's ability to conserve,

19   curate, care for, manage and exhibit the Titanic

20   Collections."

21        On May 23rd, 2019, RMST filed a periodic report

22   further updating the Court on its operations following the

23   closing of the transaction contemplated under the Asset

24   Purchase Agreement and providing the information promised in

25   Mr. Li's declaration.  I would note that Mr. Li committed to

```
1    provide the Court with the following information:  "One, an
2    updated business plan for the management and operation of
3    the Titanic Collections; two, a list of any artifacts in
4    need of conservation work (including the 50 "wish list"
5    artifacts), an explanation of any conservation work needed
6    as determined by RMST's curation staff, and an estimated
7    time frame for completing such conservation work; three, a
8    collections management plan that complies with the covenants
9    and conditions (C&Cs); and, four, an analysis of any
10   necessary changes to the reserve account and the quarterly
11   monthly payments."
12        I would note that, further, on July 1, 2019, RMST
13   filed a periodic report providing some additional updates,
14   and these updates did raise three issues that the Court
15   wished to address.  I will go through those in a moment.
16   But before I do, Mr. Porter, is NOAA satisfied?  I know that
17   you had primarily focused on the upcoming expeditions or the
18   proposed upcoming expeditions and what activity is proposed,
19   but are you satisfied with the filings before we talk about
20   the July 1, 2019?
21        MR. PORTER:  We are generally satisfied with them,
22   Your Honor.  Just point out on the collection management
23   plan, Mr. Alberg reviewed that in some detail.  He believes
24   it does satisfy at least the minimum requirements for such a
25   plan.  We will, and I mentioned this to Mr. Barger, we will
```

1  be addressing with him some recommendations that can always

2  improve the plan, but at this juncture we believe that plan

3  is adequate.

4          THE COURT:  I have some questions when it comes to

5  Mr. Li's declaration and the wish list items, but other than

6  that, the Court at this juncture is pretty much satisfied.

7          MR. PORTER:  All right.  Thank you, Your Honor.

8          THE COURT:  The questions that I would raise as a

9  result of the July 1 filing, the first question that I raise

10  is in regard to the reserve account.  That filing reported

11  that there was $790,420.32 in the reserve account.  I'm

12  quoting from the filing.  This would be ECF No. 550, as

13  promised from Mr. Li's declaration at ECF No. 527-2.  This

14  is a quote from page 7 in that declaration.  "RMST does not

15  believe that any changes to the reserve account or the

16  quarterly monthly payments are appropriate or necessary."

17  The Court would point out, however, that under V(D)(2) of

18  the covenants and conditions, the quarterly payments to the

19  reserve account, and this is a quote from that provision,

20  "The payments shall be adequate so that within 25 years from

21  the date hereof, and based upon reasonably anticipated rates

22  of return, there shall be an endowment, the annual income of

23  which (based on reasonable rates of return) would be

24  sufficient to cover the estimated annual costs and expenses

25  of conserving and curating the Titanic Collections for that

1    year.  For these purposes the amount of an adequate

2    endowment will be deemed equal to $5 million (US), which may

3    be adjusted from time to time to address changes in

4    circumstances and inflation."

5           As I indicated in the filing of July 1, which is

6    ECF No. 552, it's represented that as of June 26, 2019, the

7    balance was almost 800, $790,000, and I just want to inquire

8    if RMST and NOAA anticipate that this provision of the C&C

9    will be met given the amount of the quarterly payment and

10   current rate of interest on the account?

11          I have some concern about that reserve account.  I

12   don't know if NOAA wants to address it first or RMST, but it

13   does not matter to the Court who speaks first on it.

14          MR. PORTER:  Your Honor, just in terms of meeting

15   the endowment level, I believe we put in one of our periodic

16   reports some time ago that at the current rate, given what

17   the interest rates are, it wouldn't meet that endowment

18   level.

19          At the level that at least the corpus of the

20   account is right now, that would be based on what their

21   budgeting numbers would be sufficient for one year of

22   operations of the company.  That is an issue.  I mentioned

23   that to Mr. Barger when we spoke.  That is an ongoing issue.

24          The company is continuing to move from its prior

25   state to, hopefully, a more vigorous state.  I don't think

1    that this is an issue that should be discounted or put off.

2    I think from our perspective, at least at this point, to the

3    extent that there are additional funds that are going --

4    that are either generated from operations or going into the

5    company, we would like them dedicated to the present.

6        Obviously, we want to protect the future if

7    something were to happen, but we would prefer to see those

8    funds go into the present on conservation efforts now.

9        THE COURT:  Mr. Barger, Mr. McFarland, Mr. Wainger,

10   who wants to address this point?

11       MR. BARGER:  Your Honor, I can address part of it,

12   and then I don't know if the Court will allow more than one

13   of us to speak, but Mr. Wainger, because of his long

14   involvement with the case and his historical knowledge of

15   the drafting of the C&Cs, if necessary, he can also address

16   part of the C&Cs that I think describes the required payment

17   of $25,000 per quarter that I think is also part of the

18   C&Cs.

19       But the straightforward answer to the Court's

20   question is, we had not had discussions about whether that

21   amount is adequate and what, if any, additional discussion

22   there should be.  I would like an opportunity to be able to

23   talk to the client about that issue.  I do think there are

24   arguments about the language in the C&Cs in terms of the

25   quarterly payments that should be made as opposed to just

1   simply, you know, coming up with some estimate of what the

2   increased quarterly payment ought to be to reach this goal.

3          But I really haven't talked with NOAA about it, but

4   I would want the opportunity to talk to the client to see if

5   the client has a position on whether an additional payment

6   is required.  We believe additional quarterly payments at

7   this time are not required.

8          THE COURT:  I will give you an opportunity,

9   Mr. Barger.  I will hear from any of the other counsel that

10  want to speak, but I will give you an opportunity to speak

11  with your client and with Mr. Porter and NOAA about this

12  matter, and if you would then file your position in writing

13  with the Court on or before August 1.

14         MR. BARGER:  Yes, Your Honor.  And to be precise,

15  and Mr. Porter is accurate, we did talk briefly about the

16  topic of the endowment and the government's view of the

17  application of current operating profits toward

18  conservation.  He is accurate.  I didn't want to be

19  inaccurate in saying we haven't talked about it.

20         THE COURT:  I understand.  Mr. Porter, if you would

21  file any response, in other words, if you disagree with any

22  representations or you have a different response, you would

23  need to file that by August 8.

24         MR. PORTER:  We will do that, Your Honor.

25         THE COURT:  Then I will await the follow-up on that

1    item.

2            Is there anything else from the other attorneys?

3            MR. WAINGER:  No, Your Honor.

4            THE COURT:  Thank you.  The next matter that the

5    Court would like to inquire into as a result of the July 1,

6    2019 periodic report concerns any intercompany agreements,

7    Experiential Media Group, which you referred to as EMG (US)

8    in that report, as I understand it, is a wholly owned

9    subsidiary of PAHL and is now the counter-party to RMST with

10   respect to the Restated Intercompany Services and Exhibition

11   Touring Rights License Agreement between Premier Exhibition

12   Management, LLC and RMST dated March 1, 2012, and the

13   Intercompany Agreement between Premier Exhibitions,

14   Incorporated, and RMST dated March 1, 2012.

15           References to that are in, again, Mr. Li's

16   declaration, would be a quick reference for you at page 3 of

17   that declaration.  Pursuant to the Court's order of December

18   21, 2018, RMST and PAHL are required to file, "Inter- or

19   intra-company contracts and/or agreements regarding,

20   relating to, or affecting the conservation, curation, care

21   or management of the Titanic Collections with the Court."

22   That's found at ECF No. 540, Paragraph F of my order.

23           The Court needs to know if there have been any

24   material changes to these intercompany agreements now

25   between EMG (US) and RMST, and all of those agreements

1    should be filed with the Court.  So who wants to make the

2    representation to the Court whether there are additional

3    agreements, and if there are, they will need to be filed

4    with the Court.

5            MR. BARGER:  I think it's me, Judge.

6            THE COURT:  I understand if a portion of something

7    needed to be filed under seal, you'd have to follow the

8    sealing requirements.  I don't know if there are agreements.

9    I can't know what I don't know that you all haven't told me.

10   So if there are such agreements, you do have to file them.

11           Also, if there is something that needs to be under

12   seal, you'd have to follow the procedures for sealing

13   documents with the Court.

14           MR. BARGER:  Yes, Your Honor.  My understanding,

15   not being a corporate attorney but having talked with

16   Mr. Grossman from our firm, who was heavily involved in the

17   acquisition through the bankruptcy process and is a

18   bankruptcy attorney, EMG, as the Court properly

19   characterized, it took over the intercompany management

20   agreement of RMST, and, at least as I understand it -- and

21   we have this organizational picture in the exhibits that are

22   filed with the reports.

23           You have PAHL at the top.  PAHL has three entities

24   that it 100 percent owns:  EMG Canada, EMG (US) and then

25   RMST.  EMG (US) simply manages RMST, and EMG (US) consists

1    of four individuals, and there is overlap with RMST.  What I

2    mean specifically is Brett Hunchak, he is the chief

3    executive officer for EMG group, and if the Court recalls,

4    he replaced Daopng Bao as president of RMST.

5           Jessica Sanders, who is here, is the corporate

6    secretary for RMST but is also the chief administrative

7    officer and corporate secretary for EMG (US), which is

8    simply an entity that's taken over the intercompany

9    agreement to manage RMST.  So I don't believe that that

10   structure creates any substantive or material change to the

11   management of RMST and shouldn't cause the Court any

12   concerns.

13          Having said that, I will go back and review those

14   intercompany agreements to see if there were any material

15   changes by EMG simply taking over that agreement, and if

16   there were, we will file those agreements, and if there are

17   portions that need to be under seal, we will do that.  If

18   the Court will give me to the same date of August 1st, I

19   should be able to accomplish both of those.  But I don't

20   believe this taking over the intercompany agreement

21   management resulted in any material change.

22          THE COURT:  Out of an abundance of caution, you may

23   want to file those agreements with the Court because a lot

24   of times there is fine print in agreements and fine print

25   can, if not read finely, can create problems, and we have

1    the corporate secretary here so you can probably consult

2    with Ms. Sanders who would be aware, I would assume, as

3    corporate secretary of any agreements and can get you to

4    those pretty quickly.

5         MR. BARGER:  Yes, Your Honor.  I'm sure she can.

6         THE COURT:  I will give you until August 1st, and,

7    again, Mr. Porter, if there is anything you want to say now

8    do so, and also you have until the 8th to respond to any

9    submission.

10        MR. PORTER:  We will do that, Your Honor.

11        THE COURT:  Thank you, Mr. Barger.

12        MR. BARGER:  Yes, Your Honor.

13        THE COURT:  The final matter from the July 1st

14   report is that RMST has not provided, "A list of any

15   artifacts in need of conservation work (including what we

16   have called or what we will call the 50 "wish list"

17   artifacts), an explanation of any conservation work needed

18   as determined by RMST's curation staff, and an estimated

19   time frame for completing such conservation work," as

20   promised by Mr. Li in his declaration, and that is at ECF

21   No. 527-2.

22        I do note what RMST has provided or has informed

23   the Court that Mrs. Klingelhofer, Mrs. Alex Klingelhofer,

24   who the Court is familiar with and who has testified and

25   been before the Court, and as I understand she's vice

```
 1   president of collections.  I assume that's who she still is,
 2   the head curator.
 3          MR. BARGER:  Your Honor, you're correct, she just
 4   has a title change that is somewhat of a promotion.  She is
 5   now the executive director of collections as opposed to vice
 6   president, but she is still the one in charge.
 7          THE COURT:  In charge of the artifacts?
 8          MR. BARGER:  Yes, Your Honor, and attest to that
 9   firsthand.  I was lucky enough to make a visit to Atlanta to
10   the office and was given the grand tour by Mrs. Klingelhofer
11   and her colleagues, including Ms. Sanders.
12          THE COURT:  Mrs. Klingelhofer, the Court is, as I
13   say, well familiar, having been basically head curator or
14   the curation of the artifacts for a number of years.  What I
15   understand, and, again, I'm quoting now from ECF 550 at 6
16   "Mrs. Klingelhofer estimates that the collection includes up
17   to approximately 500 artifacts that RMST may consider for
18   further conservation work in the future."
19          That's the only update that the Court has had on
20   this, and I would note that she further goes on to say that
21   there are a variety of factors that determine which
22   artifacts need further conservation work and when the work
23   will occur.
24          She has expressed reticence, as you all have told
25   the Court, in producing a "wish list" of artifacts as her
```

1    future decisions as to conservation must be based on current

2    circumstances and her judgment, not by external pressures,

3    and that's from the same filing ECF No. 550 at 6, and that

4    was a quote.

5         I think we need to discuss whether RMST should or

6    would produce a wish list of artifacts for further

7    conservation.  You have indicated you're willing to do that

8    for an *in camera* review.  I think that might be a good idea

9    to present it for *in camera* review.  Obviously, it would be

10   under seal, and unless I hear something contrary from NOAA,

11   but I do understand the sensitivity of identifying artifacts

12   and I don't know how Mr. Li came up with his 50 wish list,

13   but in any event, that may be something from a corporate

14   standpoint he might have wanted to do.  I don't know.  But

15   it would seem that the Court should have some awareness of

16   the plans going forward in this regard given the various

17   agreements.

18        If you could do that for *in camera* review, do that

19   again by August 1st.

20        MR. BARGER:  Yes, Your Honor.  Because I was new to

21   the relationship, I'm not sure if it was 50, the number 50

22   just seemed like a good round number as a show of good faith

23   to the government and to the Court, or whether it really had

24   a significant basis, but we will get the Court the list as

25   we indicated we would.  We wanted it and we will put it

1    under seal.

2         THE COURT:  One argument could be that it was a

3    typographical error.  Zero was left off.

4         MR. BARGER:  I'll stop while I'm at 50.

5         THE COURT:  Because Mr. Li says 50 and

6    Mrs. Klingelhofer seems to want to go more with 500.  So you

7    can always place the blame, but you don't need to.

8         MR. BARGER:  No, Your Honor.  She will,

9    unfortunately, have to do the work, but she is willing to,

10   and we will start with the 50.

11        THE COURT:  I have great respect for

12   Mrs. Klingelhofer, having been aware of her and her work

13   over the years.  I just want the Court to be apprised and to

14   keep some information about how you're proceeding forward

15   because that's all part of the process, is not only bringing

16   up the artifacts but also continuing the conservation and

17   salvage or conservation of the salvaged artifacts.

18        MR. BARGER:  Of course, Your Honor.

19        THE COURT:  Is there anything more that you want to

20   say or do in this regard, Mr. Porter?

21        MR. PORTER:  No, Your Honor.  We are fine with that

22   approach.  NOAA's concern is simply the aspect of

23   conservation to all the artifacts, whether they are

24   so-called glamorous artifacts for exhibition or not.  All of

25   them need to be treated appropriately, that is the objective

1    there.

2         THE COURT:  I know that NOAA representatives have

3    been to see the artifacts.  Have you been down there at all,

4    Mr. Porter?

5         MR. PORTER:  I was down there the one time when the

6    Court was down there.  I have not been since that time.

7         THE COURT:  As you know, just from that limited

8    visit, the conservation is down to postcards and menus and

9    paper money and so forth so that it's not just some of the

10   sparkling jewels, the emeralds and the diamonds.

11        MR. PORTER:  Yes.

12        THE COURT:  I'm going to give you all a chance to

13   address the Court on anything that you wish, but what I'm

14   trying to do is go through what I perceive to be the

15   outstanding matters before the Court, and the first was

16   the updates that you had provided and being sure that we

17   were current in that regard.

18        The next matter is the one of substitution of

19   counsel.  On April 18th, 2019, Mr. Barger, through his firm,

20   his firm Greenberg Traurig, LLP filed an entry of

21   appearance, which the Court accepts on behalf of RMST,

22   Incorporated, and a consent motion.  However, the

23   appearance, you can make an appearance, but there was also a

24   motion to substitute Greenberg Traurig for McGuire Woods,

25   and McGuire Woods has obviously been in this case, I

1   believe, since the inception, going back to, I think, with

2   Judge Stillman, who is now retired, and now Judge Davis and

3   then Carr and Porter and Ridgely Porter.  I don't know if he

4   is still practicing, but in any event, Mr. McFarland has

5   been appearing before the Court for years.

6         Obviously, there is concern here from the Court,

7   with the historical knowledge and the responsibility that

8   McGuire Woods and its attorneys, in particular at this

9   juncture Mr. McFarland would have to the Court and to the

10  Titanic itself as officers of the Court and of their roles

11  that they've played to date, that is why the Court has not

12  entered any type of consent order.

13        I'm not saying that I won't and that I'm not

14  inclined to, but I didn't want it to just be with the stroke

15  of a pen and enter that without there being some explanation

16  because, again, there is always not only the historical

17  knowledge that you referred to earlier, Mr. Barger, but also

18  all those attorneys have continued obligations to the Court

19  for whatever they put their name on or their firm at the

20  time and to the Titanic and its importance to history and

21  being a graveyard in the sea.

22        So I did want to hear Mr. McFarland on it and also

23  anything that you want to add, Mr. Barger.

24        MR. BARGER:  Yes, Your Honor.

25        MR. McFARLAND:  Thank you, Your Honor.  May it

```
 1    please the Court, and as you have noted, my firm has been
 2    involved with this case since its inception going back over
 3    25 years with Judge Stillman and now Chief Judge Davis.
 4            THE COURT:  I clarify they were never involved as
 5    judges in this court, but as private attorneys.
 6            MR. McFARLAND:  No, I understand.
 7            THE COURT:  The conflict.
 8            MR. McFARLAND:  Yes.  But it has been, Your Honor,
 9    one of the most seminal cases and the most rewarding matters
10    that our firm has handled, and personally it's been a
11    tremendous honor for me to represent R.M.S. Titanic, Inc.,
12    and Premier Exhibitions and numerous cases before this Court
13    but particularly in this action.
14            This case has had a full panoply of legal issues
15    and areas of the law that, perhaps, no other case has had
16    everything from obviously the salvage trial, in which I was
17    very honored to be co-counsel for the company with
18    Mr. Wainger, my colleague, and the Court will recall Jeremy
19    Bederman, one of the preeminent admiralty lawyers in the
20    country, who, unfortunately, is no longer with us.
21            But in addition to the salvage aspects, we had
22    intellectual property contracts, international law,
23    treaties, et cetera, and it has really been an honor for me
24    to be part of that history, and it's with a little tinge
25    that I would say to the Court that I think it is -- and I
```

1    looked at this issue carefully and discussed with

2    Mr. Barger, and I will work with he and his firm for the

3    transition.

4           But I think that Greenberg Traurig has had an

5    association with the new ownership of the stock of the

6    company, and I think part of it is that, and this Court

7    noted a way back, in looking at the resources for RMST,

8    there comes a time when, perhaps, too many lawyers are not

9    beneficial in that sense as well.

10          But I'm mindful of our obligations and will work

11   with Mr. Barger, with the Court's approval, for the

12   transition from my firm to his firm as the counsel, lead

13   counsel for RMS Titanic, Inc., but it's really been an honor

14   for me to be a part of this and to appear before this Court

15   in this action.

16          THE COURT:  One question I would have,

17   Mr. McFarland.  I remember that you have some, and I think

18   it's been in a recent filing to ensure the admiralty court's

19   jurisdiction, you continue to have, I believe, some of the

20   artifacts in your offices.  Is it in Richmond or is it here?

21          MR. McFARLAND:  No, it's here, Your Honor, and they

22   are in a safe-deposit box, and we will work with the

23   transition of that.  In fact, we just renewed the payment

24   for the safety-deposit box for those artifacts, and they are

25   here.  Since it's a public record, I won't disclose exactly

1   where, but they are here in the City of Norfolk, rather

2   close, in fact, to the courthouse.

3           THE COURT:  Well, you would need to file, and let's

4   just say an affidavit of some type that would indicate that

5   the artifacts have been transferred, possession of the

6   artifacts remain in the Eastern District of Virginia, and

7   that the possession of those artifacts have been transferred

8   to Greenberg Traurig.  Is it under McGuire Woods now?  I'm

9   digging back in my mind.

10          MR. McFARLAND:  It is, Your Honor.

11          THE COURT:  You can transfer it to their custody

12  and control and will remain so in the Eastern District of

13  Virginia absent further order of the Court.  In fact, if you

14  will give that affidavit and then I will draft an order

15  approving the transfer.  If you do an affidavit, I'll let

16  you go ahead and do that.  Then I will issue an order that

17  says they shall remain absent further order of the Court.

18          So an affidavit basically that says the transfer

19  has occurred to their possession, that the artifacts are

20  here in the Eastern District of Virginia, and then also,

21  Mr. Barger, I think that you need to do an affidavit that

22  says you've received them, and you and your firm have

23  received them, and that they will remain in your custody and

24  control here in the Eastern District of Virginia.  Then I'll

25  enter some type of order that says I have approved the

```
 1    transfer and that no further transfers shall occur without
 2    further order of the Court.
 3            Let me think if there is anything else.  You're
 4    going to leave them in the same safety-deposit box?
 5            MR. McFARLAND:  That would be my recommendation,
 6    Your Honor, that we will just transfer the account
 7    essentially from McGuire Woods to Greenberg Traurig.
 8            MR. BARGER:  If we can do that, that's our
 9    preference, so they just simply remain, in essence, we get
10    the key.  But if it's required to move it from one
11    safety-deposit box at the same financial institution to
12    another box and open a new account, we are comfortable with
13    that too, but if we can just simply transfer.
14            THE COURT:  I think you can just transfer, if you
15    file the appropriate paperwork.  If you need an order from
16    the Court, I will give you that order, too.
17            MR. BARGER:  That was our preference.  We have had
18    prior discussions about that exact thing, leaving them in
19    the same financial institution in a safety-deposit box.
20            THE COURT:  I'm sorry.  I pronounced the firm name
21    wrong.  I left out the first "R."
22            MR. BARGER:  I have been there awhile and
23    occasionally I do it, too.  So not a problem, Your Honor.
24            THE COURT:  Let me think, Mr. McFarland, if there
25    is anything else.  Then once I receive the indication of
```

1    that transfer, I will enter an assurance in writing,

2    Mr. McFarland, that you and your firm will coordinate past

3    legal filings with the new firm.  I'll then enter an order

4    that allows McGuire Woods to withdraw as counsel from the

5    case effective, and it will probably be some date in August

6    because you still need to effect this transfer.

7              Mr. Barger is in the case, and so you can effect

8    the transfer to him and an assurance that you have worked

9    with him, his firm, to move all the information that is

10   necessary to him, and then I will, with regret, enter the

11   order allowing you and McGuire Woods to withdraw.  I commend

12   you, and I commend your firm for the work that you've done

13   on the case through the years, and I thank you.

14             MR. McFARLAND:  Thank you, Your Honor.  It's been a

15   pleasure.

16             THE COURT:  Is there anything further now?  Of

17   course, I've done this with the complete understanding that

18   Mr. Wainger and Kaleo Legal are still in this case.

19             MR. BARGER:  That's correct.

20             THE COURT:  I'm not going to let them out.

21             MR. BARGER:  That's good, Your Honor.  We support

22   that.

23             THE COURT:  Mr. Wainger is the last of my

24   historical institutional memories, so he's got to stay

25   around longer than I, which will probably be pretty easy for

1   him given his youth.

2          MR. BARGER:  Obviously, that is extremely valuable

3   to us as well, that historical knowledge.  Let me just

4   simply add, I know the client specifically appreciates the

5   long and dedicated work that Mr. McFarland and McGuire Woods

6   have done in the case both to the Court and to the client,

7   and they are very appreciative, and we did want to add that.

8   Our work has been collaborative and collegial, and I

9   appreciate having the opportunity to work with him and to a

10  lesser extent Mr. Wainger.

11         THE COURT:  I'll make no comment.  Before I

12  finalize that ruling, I'm sorry, Mr. Porter, I should have

13  asked you if you had any objection to that withdrawal?

14         MR. PORTER:  No, we don't, Your Honor.

15         THE COURT:  I think that brings us to the next

16  matter, which were the 2019 expeditions, and I do see that

17  you're here, Mr. Tata, and I will address you at the

18  appropriate time or let you address the Court.

19         MR. TATA:  Yes, ma'am.  Bob Tata here representing

20  EYOS.  We were requesting a slight modification of the order

21  that you entered last year.  Last year's dive didn't take

22  place because of her case, Michael and Leslie, the changes

23  to the order, which Mr. Porter has here and everybody's

24  reviewed and agreed is very similar to the last one.  But

25  there is authorization to pick up four trays instead of one.

1   I think last year's order mentioned one tray because that's

2   what everybody thought was down there.  But we are told by

3   Lori Johnston, I believe, that there are probably four trays

4   down there.  They may have moved slightly.  She's given us

5   approximate locations of them, and we are doing this

6   expedition with the same leader, Rob McCallum, the same

7   vessel, the same submersibles.  It's all the same plan, and

8   it's essentially the same order except we've added my name

9   to it, and we've indicated that we may pick up four trays

10  and very slight other modifications.

11          I understand NOAA has no objection.  I understand

12  that RMST supports the motion, and we would ask that -- I

13  don't know that it's a motion, it's just a letter, but we'd

14  ask that you enter the order that's going to be proffered by

15  Mr. Porter so I can tell my folks that they are on, and they

16  should go by there, I think it's July 30th to August 3rd is

17  the planned window this year, Your Honor.

18          THE COURT:  I've read everything you've submitted,

19  and I'll check with counsel and be sure.  As I understand

20  it, the only change is that one tray has been changed to

21  four.

22          MR. TATA:  Of course, the dates.

23          THE COURT:  The dates, yes.

24          MR. TATA:  My name is added to the order.

25          MR. PORTER:  Your Honor, I do have a copy of the

```
 1   order I can hand up for the Court to review.
 2           THE COURT:  Mr. Barger, are you all in agreement?
 3           MR. BARGER:  We are in agreement.
 4           MR. PORTER:  This is not signed yet but just for
 5   the Court to read it.
 6           MR. BARGER:  We support.
 7           THE COURT:  What you need to do is if everyone is
 8   in agreement, you need to sign the order and present it up
 9   to the Court.  I'll let you give that back.  Do you have the
10   original?
11           MR. PORTER:  I have another copy of it, Your Honor.
12   Your Honor, I'll just mention, as in last year, the Section
13   113 authorization process is ongoing.  We expect, just like
14   last year, that there will be an authorization, and we are
15   doing all that consistent with the Court's jurisdiction
16   here.  That is why we are presenting this order.
17           MR. TATA:  Thank you, Your Honor, for allowing me
18   to join, if only briefly.
19           THE COURT:  Thank you, Mr. Tata.
20           Counsel, I will review the order when we conclude
21   the hearing, and if it meets with the Court's approval, I
22   will enter it and try to get it filed today by close of
23   business.
24           The next matter that the Court had, the other
25   potential expedition was OceanGate, and in your July 1
```

1    periodic report there was a footnote, as I call, that said

2    OceanGate has canceled the expedition due to withdrawal by

3    the expedition vessel operator.  Is that the case,

4    Mr. Barger?

5              MR. BARGER:  Your Honor, I don't know.  Sorry.

6              THE COURT:  I'm sorry.  Mr. Wainger and

7    Mr. McFarland signed this one.

8              MR. WAINGER:  Good afternoon, Your Honor.  I can

9    report that that's what they have reported on their website.

10   We know that it's been canceled, and in terms of the actual

11   detail, that's the detail they provided on their website.

12             THE COURT:  Well, you need to monitor it.

13             Mr. Porter, you and NOAA need to monitor it because

14   they have, obviously, not been communicative with the Court.

15             MR. WAINGER:  Understood, Your Honor.  I am happy

16   to report that they have been communicating now with our

17   client, which is a positive change, from my perspective, and

18   so I am comforted that I can tell you that they're not going

19   out this year.  Just the detail is what I obtained from the

20   website.

21             THE COURT:  The only thing I believe the Court has

22   was a letter that said they were going out for a few weeks

23   in August of 2019, and NOAA had sent them a letter saying

24   that they had to have Section 113 authorization.  Obviously,

25   if they're not going out, then we will leave it there for

1     now and await any further information from OceanGate.

2             MR. WAINGER:  Thank you, Judge.

3             THE COURT:  Mr. Porter, do you have any additional

4     information in that regard?

5             MR. PORTER:  Not on OceanGate, Your Honor.  As you

6     mentioned, NOAA has been communicating with them, and that's

7     sort of gone off the radar, so to speak.

8             THE COURT:  In your July 1, 2019 periodic report

9     you informed the Court that RMST, EYOS and Caladan Oceanic,

10    LLC had entered an expedition observation agreement, and the

11    Court needs to know about that.

12            MR. BARGER:  With the Court's permission, even

13    though it was filed by Mr. Wainger, it was in collaboration

14    with me as well.  That agreement is referenced, there is

15    also attached as an exhibit, Your Honor, to the filing to

16    let the Court know exactly what the parties have agreed to,

17    and it's obviously related to the order that EYOS seeks to

18    have entered that the parties have all signed this

19    afternoon.

20            The observation agreement really is simply that

21    RMST has been allowed to ride along on the expedition ship

22    by EYOS along with, as I understand it, a representative

23    from NOAA for observation purposes, and really the sum and

24    substance of the relationship and the obligations are set

25    out in the agreement which was carefully negotiated.

```
 1          THE COURT:  Who will be RMST's representative?
 2          MR. BARGER:  I believe it's Mr. -- I may butcher
 3   the pronunciation -- Nargellet.
 4          THE COURT:  Mr. Nargellet.
 5          MR. McFARLAND:  Who the Court knows from prior
 6   testimony appearances.
 7          THE COURT:  Yes.  Let me just check something for a
 8   moment here.  Caladan Oceanic, LLC is what?
 9          MR. BARGER:  I'm sorry, Your Honor?  I apologize.
10          THE COURT:  Who is Caladan Oceanic, LLC?
11          MR. TATA:  Caladan actually owns the vessel, Your
12   Honor.  EYOS is doing the operation, and Caladan owns the
13   vessel.  That's why they were just included in the
14   agreement, the vessel that EYOS is on, and the submersible.
15          THE COURT:  Do you agree with that, Mr. Barger?
16          MR. BARGER:  Yes, Your Honor, that's accurate.
17          THE COURT:  I want it all on the record.  What I'm
18   doing is creating a record here.
19          MR. BARGER:  Yes, Your Honor, we agree.
20          THE COURT:  You agree with that, Mr. Porter, that
21   that is who Caladan Oceanic, LLC is?
22          MR. PORTER:  That is what Mr. Tata has indicated,
23   yes, we do agree with that.
24          THE COURT:  Has anybody looked into it?
25   Mr. Wainger?
```

1          MR. WAINGER:  Your Honor, I have used the Google

2    machine, and it does appear that, in fact, that's who

3    Caladan is and that they are presenting the expedition on

4    behalf of EYOS using their vessel, yes, Your Honor.

5          THE COURT:  Mr. Wainger, so EYOS is conducting the

6    expedition, so to speak.  Caladan Oceanic is the vessel that

7    is being used for the expedition, and Mr. Nargellet is the

8    individual from RMST that is going to be the observer?

9          MR. WAINGER:  Correct, and a technical consultant,

10   Your Honor.  If it pleases the Court, we will also include

11   in our pre-August 1 filing some background information on

12   Caladan so that it's in the Court's record.

13         THE COURT:  So I just want it on the record who we

14   are aware of.

15         MR. TATA:  So you know the background of this, when

16   we did the expedition agreement, I asked the client, you

17   know -- there was some indemnity obligation in there.  I

18   said, well, who should be indemnifying who, and they said,

19   well, the vessel is owned by Caladan, and the submersibles

20   are owned by Caladan but EYOS is conducting the operation.

21         THE COURT:  Thank you.

22         MR. TATA:  So that's why you have a new name in

23   there.

24         THE COURT:  So EYOS is conducting it, and then

25   Caladan is the vessel owner, and Mr. Nargellet is the

1    Titanic observer, and what else?

2         MR. WAINGER:  And technical consultant, as well,

3    Your Honor.  If I may add just a couple of quick things,

4    Judge.  We are thrilled that EYOS has agreed to allow RMST

5    to participate.  This furthers the company's obligations as

6    salvor-in-possession.

7         THE COURT:  That's up to the Court to decide.  I

8    could easily figure that one out.  You put Mr. P.H.

9    Nargellet on the vessel, and then you say he's our

10   representative, and then you say, Judge, we did conduct an

11   operation out to the vessel.  I'm not saying you're wrong

12   but I'm not necessarily agreeing to that.

13        MR. WAINGER:  I understand.  I would say that this

14   is an illustration of the company's commitment to maintain a

15   presence over the wreck.

16        THE COURT:  Frankly, from the Court's standpoint, I

17   approve and am pleased that Mr. Nargellet is going.  He is

18   very knowledgeable, and he is committed to the wreck of the

19   Titanic and proper salvage operations thereof.  So I have

20   great recall of him as a witness before the Court.

21        MR. WAINGER:  Thank you, Judge.  I would also say,

22   and we have included in some filings, the company has really

23   explored the opportunities to go out to the wreck site as

24   soon as possible.  I think they made the prudent decision

25   not to do it with haste this summer, but this is a great

1    opportunity for the company, and I do know that they have

2    intentions in the near future of doing just that.

3            THE COURT:  While you're there, Mr. Wainger, the

4    third potential expedition that has been mentioned was by

5    RMST.  I assume at this point it would be for next year to

6    test, I think you mentioned, a new virtual reality camera

7    system, and, obviously, and to create a baseline of the

8    Titanic's bow area, and I assume that if you do plan to do

9    that, you will notify the Court.  You indicated that you

10   would potentially recover, I believe, an artifact or some

11   artifacts from the debris field.  That was in your filings

12   at ECF No. 549-5 and ECF No. 550 at 8.

13           I do want to remind everyone that pursuant to the

14   Court's December 21, 2018 order, RMST is required to

15   "provide the Court and NOAA at least 90 days advance notice

16   of any planned expeditions to the Titanic wreck and wreck

17   site, to include a description of any planned dive or

18   salvage activities at Titanic."  That's in the Court's order

19   at paragraph H, ECF No. 540 at paragraph H.

20           If that is planned, for the Court to approve it,

21   there has to be 90 days' notice to the Court and to NOAA.

22   None of this in June we are going out in August.  So if

23   you're going to do that, make advanced plans.

24           MR. WAINGER:  Understood, Your Honor.  Thank you.

25           THE COURT:  Is there anything further?  I do want

1    to mention just briefly two telephone calls that occurred.

2    I don't mention them for any reason other than to inform you

3    of them.  On April 4, 2019, the clerk's office received a

4    voicemail from an individual named Steven Rogers, who was an

5    expert witness and testified in this case.  He called to let

6    the Court know that the Titanic artifacts, according to him,

7    are going to be disbursed and sold in violation of the

8    Court's order in connection with the bankruptcy case.

9            I don't have any indication that that's the case,

10   and if it is, obviously, you need to let the Court know

11   about that.  But I would inform you, this call did not come

12   into my chambers but it was a call that was made to the

13   clerk's office, and it was relayed, I believe, by Ms. Farlow

14   in the clerk's office to my chambers.

15           The other phone call did come in on April 16th,

16   2019, to my chambers.  It was not a call that I received

17   directly.  I believe it may have been something left on

18   voicemail.  It was a call from a Katherine Long who

19   represented herself to be a graduate student at Columbia

20   Journalism School, and she said that she had seen a post on

21   the Internet message boards that the Court would be issuing

22   a big decision that week regarding the Titanic, and she

23   called to inquire about the decision.  There was, to my

24   knowledge, no response to Ms. Long's call.

25           I did have my law clerk look to see if there was

1    such a person as Ms. Long, and the only thing that my law

2    clerk could determine is that there was someone by that name

3    who was a graduate student who would have graduated, I

4    believe, this May or June and that she had done some type of

5    post.  It did have some unsealed portions of the due

6    diligence documents, and it's not clear to me, but a blog or

7    something about the sale of artifacts involving the coal.

8             But as you all know, the reason that you've spent

9    time and effort on the coal was because that's an artifact

10   that you were allowed to sell.  So there was nothing

11   untoward about it, that I know about, selling the coal, and

12   there was something else on there about selling artifacts

13   from survivors.  There's nothing untoward, that neither the

14   Court nor RMST has jurisdiction over someone who survived

15   and passed down a letter or a piece of jewelry or whatever.

16             So I don't know what is being referred to, but I

17   wanted you to know that the individual had called.  My only

18   concern was that you need to monitor that in some way

19   because if any of those sealed portions come up, then that's

20   of concern to the Court.  I have, obviously, put our clerk's

21   office on notice of the importance, which they are very well

22   aware of, the sealing of documents and the importance of

23   keeping any document sealed until they are unsealed.  That's

24   the only reason I mention it.

25             To my knowledge no one has spoken to her.  If they

```
1   have, I'm not aware of it.  The only thing my law clerk
2   could turn up was some type of blog that posted unsealed
3   portions of the due diligence documents and something about
4   the coal being sold and some survivor artifacts.  I have not
5   read any of it.  I trust my law clerk but I really don't
6   know what's there, and from what was told to me, there is
7   nothing to be concerned about, but I wanted all of you to
8   know about the two calls.
9           Is there anything else today, Mr. Barger, that you
10  want to take up with the Court?
11          MR. BARGER:  No, Your Honor.  I did have one
12  question in light of the first phone call.  I hope the clerk
13  kept the actual message.
14          THE COURT:  I doubt it.
15          MR. BARGER:  I'm very troubled by the allegation.
16          THE COURT:  I doubt that the clerk kept the
17  telephone call.  It certainly didn't come to me.  There is
18  no transcript or anything.  The only thing I got was a phone
19  message that said this person called and said that.  So, no,
20  I doubt seriously that the clerk kept it.
21          MR. BARGER:  Understood.  Well, prosecutor hat was
22  coming back on.
23          THE COURT:  This isn't a criminal case yet.
24          MR. BARGER:  I understand.  I understand.  That's
25  all I had, Your Honor.  We have nothing further.  Thank you.
```

```
 1          THE COURT:  Mr. McFarland, is there anything else
 2   you want to represent to the Court today?
 3          MR. McFARLAND:  No, Your Honor.  Been a pleasure to
 4   be part of this case for quite some time and part of the
 5   salvage trial.  We appreciate the Court's actions
 6   throughout, and thank you.
 7          THE COURT:  Well, I'll miss you here,
 8   Mr. McFarland, but I'm sure I'll see you in other cases.
 9          MR. McFARLAND:  You will, Your Honor, that is for
10   sure.  But I say this with all sincerity, I don't know that
11   I will ever be involved in another case like this one.
12   There are certain cases that are seminal in your career, and
13   this is one of them.
14          THE COURT:  I agree with you, Mr. McFarland.
15          MR. McFARLAND:  Been an honor.  Thank you.
16          THE COURT:  Mr. Wainger, is there anything else?
17          MR. WAINGER:  No.  Thanks, Judge.  Have a good
18   week.
19          THE COURT:  Is there anything else, Mr. Porter or
20   Ms. Rolleri?
21          MR. PORTER:  The only thing further, Your Honor, is
22   we would like to extend again an offer to the Court and, of
23   course, counsel to visit the Mariner's Museum with
24   Mr. Alberg so that he can demonstrate to the Court some of
25   the conservation techniques firsthand, and it may be
```

```
 1    beneficial, given some of the issues we discussed in this
 2    case.
 3              THE COURT:  I will certainly look at my schedule.
 4    I think that would be a good thing for the Court to do, and,
 5    obviously, I would do it with counsel or all parties that
 6    wanted to be there.  So I will certainly look at that and
 7    think about it for the fall.
 8              MR. PORTER:  Very good.  Thank you, Your Honor.
 9    Nothing further.
10              THE COURT:  Mr. Tata?
11              MR. TATA:  Your Honor, may I make one final point?
12              THE COURT:  Yes.
13              MR. TATA:  I believe I represented the order that
14    was presented to the Court regarding the expedition was the
15    same, I think more accurately it's materially the same.  It
16    was based on the prior order, and it was circulated, and I
17    think it might have been updated regarding a site or two.
18    Mr. Porter might know about that.  But I'm hopeful, of
19    course, that Your Honor is going to be satisfied with the
20    order.  There might be some very minor changes in it.
21              THE COURT:  Well, I will read it line by line to
22    the other order, A; and, B, if I do make any changes, I'll
23    just make them and initial them, unless they would be
24    something that would change the whole tenor of the order,
25    but I feel satisfied that you all have worked out an order
```

JODY A. STEWART, Official Court Reporter

```
 1   that's agreeable to the Court.
 2          Then, thank you for being here this afternoon, and
 3   I wish you a wonderful Independence Day, and the Court will
 4   be in recess until Friday morning.
 5          (Hearing adjourned at 3:07 p.m.)
 6                        CERTIFICATION
 7
 8      I certify that the foregoing is a correct transcript
 9   from the record of proceedings in the above-entitled matter.
10
11
12          X_____/s/_____x
13                    Jody A. Stewart
14          X_____7-18-2019 _____x
15                        Date
16
17
18
19
20
21
22
23
24
25
```