IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
   Plaintiff,

v.               Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL,
ITS ENGINES, TACKLE, APPAREL,
APPURTENANCES, CARGO, ETC., LOCATED
WITHIN ONE (1) NAUTICAL MILE OF A POINT
LOCATED AT 41 43' 32' NORTH LATITUDE
AND 49 56' 49" WEST LONGITUDE,
BELIEVED TO BE THE R.M.S. TITANIC
<u>in rem</u>,
   Defendant.

**NOAA'S RESPONSE TO RMST'S JANUARY 20, 2020,
AND JANUARY 27, 2020, PERIODIC REPORTS**

   The United States, as *amicus*, and on behalf of its National Oceanic and Atmospheric Administration ("NOAA"), provides the following response to RMST's Periodic Reports filed January 20, 2020, and January 27, 2020. *See* ECF Nos. 585 and 586.

**I.  JANUARY 20, 2020, PERIODIC REPORT (ECF No. 585)**

   **A. Corporate Updates**

   NOAA acknowledges RMST's efforts to expand public access to the existing *Titanic* Collections of over 5,000 artifacts, and increase public accessibility to its research of the *Titanic*. NOAA requests that RMST certify to the Court that all new exhibition sites have been or will be properly evaluated by September 1, 2020, to ensure that the exhibition of artifacts will be handled in accordance with RMST's Standard Operating Procedures. *See* ECF No. 540-4 at 11-13.

1

An outstanding question concerns the sufficiency of the Reserve Account. The Covenants and Conditions ("C&Cs") provided for the establishment of a Reserve Account into which RMST would make quarterly payments ($25,000) such that, after 25 years, there would be sufficient funds to generate annual income to "cover the estimated annual costs and expenses of conserving and curating the Titanic Collections" for one year. ECF No. 565 at 3. The Reserve Account will not reach the agreed upon endowment level of $5M within the 25-year period.[1] *Id.*

RMST concludes that no change in the Account or its contributions thereto are warranted for two reasons. RMST contends that the quarterly payments are fixed at $25,000 and cannot be altered pursuant to the terms of the C&Cs. ECF No. 557 at 4. The C&Cs do not support this interpretation. Section V.D.2. provides that "[t]he payments *shall be adequate* so that within twenty-five (25) years from the date hereof, and based upon reasonably anticipated rates of return, there shall be an endowment, the annual income of which (based on reasonable rates of return) would be sufficient to cover the estimated annual costs and expenses of conserving and curating the TITANIC Collections for that year." C&Cs V.D.2 (emphasis added). The very next sentence of Section V.D.2 establishes the endowment level at $5M, but expressly notes that the amount of the reserve "may be adjusted from time to time to address changes in circumstances and inflation." *Id*. This necessarily implies the Court has the flexibility to adjust the quarterly payment amount to make the endowment provision meaningful.

In any event, RMST believes that no change is warranted because the endowment level will be at a "reasonable" level after 25 years, and "reasonably likely to be adequate to cover the costs of curation and conservation." ECF No. 557 at 3-7. NOAA believes there is insufficient information concerning RMST's budget for conservation to enable the Court or NOAA to

---

[1] As of May 23, 2019, the Reserve Account held $789,930.12. ECF No. 550 at 7.

evaluate whether RMST's stated belief is reasonable. ECF No. 565 at 5. RMST has, for example, indicated that, for 2020, it expects to allocate approximately $800,000 "to be funded from operations;" however, this amount covers not just conservation and curation, but also "trust fund contributions, and management and exhibition of the *Titanic* Collections." ECF No. 557 at 6. In light of the fact that RMST has over 5,500 artifacts, including as many as 500 with potential outstanding conservation needs, ECF No. 550 at 6, appears to be poised to expand exhibitions, and seeks to recover additional artifacts, the Court should ensure RMST has and is devoting sufficient resources now and in perpetuity for conservation, and for the protection of the artifacts in the event of future contingencies.[2]

### B. 2020 Expedition

In its Periodic Report, RMST states that, during the upcoming expedition, RMST desires to collect still and video imagery of the interior and exterior of the wreck, and recover the Marconi Wireless Telegraph and related equipment (and possibly other artifacts) from inside the wreck. ECF No. 585 at 3-8. The proposed project would require cutting into and removing a portion of the *Titanic's* deckhouse, entry of a ROV inside the wreck, and detaching and extracting the equipment. *See* ECF Nos. 585-1, -2 and -3. RMST contends that this would be an important recovery and aid its ability to "shar[e] the legacy of the ship." ECF No. 585 at 5. At the February 20, 2020, hearing, RMST states it will present testimony from Parks Stephenson, P.H. Nargeolet, John Broadwater Ph.D., the former manager of NOAA's Maritime Heritage

---

[2] The Court may wish to consider appointing an outside expert for such evaluation to ensure that any recommendation is viewed as independent in light of RMST's ongoing challenge to NOAA's stewardship.

Program, and David Alberg, Superintendent of Monitor National Marine Sanctuary, in support of its plans.[3] *Id.* at 8.

It is not disputed that this Court possesses admiralty jurisdiction over this matter or that RMST has been designated as the exclusive salvor-in-possession ("SIP"). It is also clear that RMST's SIP status and its "right" to salvage are subject to scrutiny by the Court and oversight by NOAA. *See R.M.S. Titanic v. Wrecked and Abandoned Vessel,* 435 F.3d 521, 536, 538 (4th Cir. 1996) (a court will "more readily supervise the salvage operation in the public interest" when a historic wreck is involved); *R.M.S. Titanic v. Wrecked and Abandoned Vessel,* 742 F.Supp. 2d 784, 791 (E.D.V.A. 2010) (noting that United States is entrusted "to continue reviewing RMST's operations as salvor-in-possession . . . ."); *R.M.S. Titanic v. Wrecked and Abandoned Vessel¸* 724 F.Supp. 714, 723 (E.D.Va. 1996) ("This case deals with one of the most famous shipwrecks in history, and thus, the archaeological preservation of the wreck itself as well as the recovered artifacts is of extreme importance to this Court."). To evaluate RMST's proposed project, NOAA respectfully suggests the Court should consider the following:

*First*, the Court must determine what standards should apply to evaluate RMST's proposed activity. In the C&Cs, RMST agreed to provisions regarding management and care of the *Titanic* Collections which drew on such sources as the *R.M.S. Titanic* Maritime Memorial Act of 1986, 16 U.S.C. § 450rr *et seq.* (the "1986 Act"); NOAA's "Guidelines for Research, Exploration and Salvage of *RMS Titanic*," 66 Fed. Reg. 18912, 18913 (Apr. 12, 2001) ("NOAA Guidelines"); the "Agreement Concerning the Shipwrecked Vessel RMST *Titanic*" (the

---

[3] Absent compliance with the Department of Commerce's *Touhy* regulations, 15 C.F.R. Part 15, RMST has no ability to demand any NOAA witness testify and in no event could it seek expert testimony from such witnesses, 15 C.F.R. § 15.16(a).

"International Agreement");[4] Archaeology Guidelines of the Department of the Interior and other independent professional organizations; and even proposed, but not enacted, legislation concerning the *Titanic*. C&Cs, Part II – V. These sources also provide guidance for the protection and management (including salvage) of underwater cultural heritage sites. *See* Ex. 1 (International Agreement, Annex); NOAA Guidelines, 66 F.R. at 18912-18913. They also mirror the Annex to the United Nations Educational, Scientific and Cultural Organization's ("UNESCO") 2001 Convention ("UNESCO Annex"),[5] and the Guidelines to the Annex, the "Manual for Activities directed at Underwater Cultural Heritage."[6] Each of these sources set forth widely accepted standards for the protection and recovery (if appropriate) of underwater cultural heritage. *See R.M.S. Titanic v. Haver*¸ 171 F.3d 943, 968 (4th Cir. 1999) (noting that the law of salvage is "shared by nations as part of the *jus gentium*"). Notably, in its most recent filing, RMST proffered a report from John Broadwater, a maritime archaeologist, in which he indicated the UNESCO guidelines were broadly accepted in the international community and expressed his hope that the Court would utilize these resources "in determining what is in the best interest of the *Titanic*." ECF No. 590-1 at 3-4. NOAA agrees.

Accordingly, based on these sources, intrusive recovery activity must be evaluated based on whether, *inter alia*, the action is "justified by educational, scientific, or cultural interests," NOAA Guidelines, 66 Fed. Reg. at 18912; International Agreement (Preamble and Annex), is for "the purpose of scientific studies or for the ultimate protection of the" *Titanic*, and does not

---

[4] A copy of the International Agreement can be found at https://www.gc.noaa.gov/gcil_titanic-intl.html (last visited Feb. 12, 2020).

[5] *See* http://www.unesco.org/new/en/culture/themes/underwater-cultural-heritage/2001-convention/official-text/ (last visited Feb. 13, 2020).

[6] *See* http://www.unesco.org/culture/en/underwater/pdf/UCH-Manual.pdf (last visited Feb. 6, 2020).

"adversely affect" the wreck "more than is necessary for the objectives of the project," UNESCO Annex, Rules 3 and 4. Additional considerations include whether the activity may disturb human remains; involves destructive techniques; has adverse impacts on the wreck; serves to ameliorate a "significant threat" to the artifact; and whether the results of the activity will be publically disseminated. *Id.* (NOAA Guidelines, Ex. 1 and UNESCO Annex). These same sources set forth the standards by which plans for proposed activity should be measured, and what requirements for such plans are necessary. For example, these sources describe how plans should comport with certain general principles; set forth a detailed project design; identify funding and a timetable for the project; set forth the objectives, methods and techniques to be used and the qualifications of those involved; include preliminary work about the vulnerability of the wreck; describes how any artifacts will be conserved and curated; and sets forth documenting, reporting and dissemination guidelines. International Agreement (Annex); NOAA Guidelines, 66 Fed. Reg. at 18912-18913; UNESCO Annex, Rule 9.

*Second*, in addition to establishing the merits of its proposed recovery operation vis-à-vis widely accepted principles and methods described above, RMST must demonstrate that its proposed action aligns with the public's interest in *Titanic*. *R.M.S. Titanic,* 435 F.3d at 536, 538. In the ordinary salvage case, a salvor obtains a maritime lien in the salved property "to secure payment of compensation and award due *from the property owner*," and exclusive salvage rights are given "for purposes of enforcing [that] maritime lien . . . ." *R.M.S. Titanic v. Haver*, 171 F.3d 943, 963, 968 (4th Cir. 1999) (emphasis added).

Here, there is no salved property currently before the Court for which RMST has not been rewarded through the Court's prior *in specie* award. Moreover, "this is not the ordinary salvage case," *R.M.S. Titanic v. Wrecked and Abandoned Vessel,* 9 F.Supp. 2d 624, 636

(E.D.V.A. 1998), and this is not an ordinary shipwreck. International Agreement (Art. 2: The *Titanic* is "a memorial to those men, women and children who perished and whose remains should be given appropriate respect . . . ."). When salvage is applied to historic wrecks such at the *Titanic*, the salvor enters into "a trust relationship between salvor and the court on behalf of the public interest," and a court supervises such operations to ensure that objective is met, *R.M.S. Titanic*, 435 F.3d at 536, 538.

It is beyond dispute that the public has substantial interest in *Titanic* as reflected by this Court's prior orders and, *inter alia*, the 1986 Act, 16 U.S.C. § 450rr *et seq.*, NOAA's Guidelines, the International Agreement, and Sec. 113, Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat. 135, 192 (2017).[7] Further, the C&Cs expressly point to the 1986 Act and NOAA's Guidelines as the basis for NOAA's responsibility to "represent the public interest," and expressly reference these sources plus the International Agreement as authority for the standards, principles, policies and guidance governing RMST's handling of the *Titanic's* artifacts. *See* C&Cs, Part II.K, and Parts III, IV and V.

RMST's agreement with the terms and conditions of the C&Cs presumably reflect RMST's acknowledgment that its actions with respect to the *Titanic* must be tied to and comport with the interests of the public more broadly. There are divergent views on what the public thinks of RMST's plans to penetrate the hull to recover artifacts.[8] In the past, RMST has sought

---

[7] Section 113 provides that "no person shall conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS Titanic unless authorized by the Secretary of Commerce per the provisions of the Agreement Concerning the Shipwrecked Vessel RMS Titanic [i.e., the International Agreement]." NOAA and the United States are obligated to comply with their responsibilities under Sec. 113 and the International Agreement.

[8] *See e.g.* London Telegraph Article, Jan. 21, 2020 (In discussing RMST's plan to recover the Marconi, noting RMST's President's view that it is "elitist and wrong" to not recover artifacts for the public to see, versus the contrary view that RMST's plans "will raise fierce objections from campaigners and families who say the wreck is a mass grave and should be left in peace."), https://www.telegraph.co.uk/news/2020/01/21/plan-take-serious-treasures-inside-titanic-angers-mps/ (last visited Jan. 29, 2020); London Telegraph Opinion Piece (Jan. 21, 2020)

out the views of a broad array of stakeholders in the past, *see* July 2, 2004, Order at 6-7, 31 (noting that RMST had created an International Advisory Committee with various stakeholders outside of RMST (including the National Maritime Museum) to provide advice and "to safeguard the future of the Titanic wreck site . . . ."), and it does no injustice to RMST to require it to do so here, given the consequential and permanent nature of its request.

NOAA respectfully requests the Court to consider the public views of a variety of stakeholders having interests in the *Titanic*. To that end, on February 11, 2020, NOAA received correspondence on behalf of the Joint Nautical Archaeology Policy Committee ("JNPAC"). Ex. 1. JNPAC is an organization in the United Kingdom representing over 75 institutions and individuals devoted to the protection of the United Kingdom's underwater cultural heritage. *Id.* at 1 and Appendix. The letter speaks for itself, but generally JNPAC contends that, based on the standards discussed above, RMST "has failed to provide an adequate justification for the proposed recovery." *Id.* at 4. JNAPC offers its further assistance to the Court. *Id.*

***Third***, also separate from whether RMST's proposal salvage activity passes muster under accepted archaeological, scientific, and cultural principles and is consistent with the public interest, the Court must consider whether RMST has provided a sufficient basis to reverse this Court's prior orders. For twenty years, this Court's orders have precluded cutting into, cutting off, or detaching of, any part of the *Titanic*. Jul. 28, 2000, Order at 3. RMST's salvor-in-possession status was "continued . . . with the understanding that [RMST] would not damage or cut into or cut off any part of the wreck." *Id.* at 2. This prohibition has been reiterated in orders

---

(noting that families of survivors note the "important distinction between artifacts recovered from the debris bed and inside the wreck itself."), https://www.telegraph.co.uk/news/2020/01/21/titanic-watery-grave-1500-people-should-left-peace/ (last visited Jan. 29, 2020). The United States will have copies of these articles for the Court at the February 20, 2020, hearing, should the Court desire copies.

since 2000.  *See e.g* Apr. 30, 2010, Order at 1; *R.M.S. Titanic v. Wrecked and Abandoned Vessel,* 742 F.Supp. 2d 784, 790 n. 6 (E.D.V.A. 2010).  The one exception to the July 28, 2000, Order permitted limited actions to further scientific research of the vessel, such as rusticle removal or research tray retrieval; otherwise, the Court has maintained the prohibition against "cutting into or detaching any part of the wreck."  ECF No. 554 at 2; ECF No. 497 at 2; *see also* Apr. 30, 2010, Order at 3 ("The 2000 Order was intended to prevent wrongful destruction of the wreck site and not to prevent scientific research into the wreck's biodeterioration.").

RMST indicates that it anticipates conducting research activities during its upcoming expedition, ECF No. 585 at 4, but its proposed action to recover the Marconi Wireless Telegraph (and other artifacts) runs contrary to this Court's prior orders, which prohibit RMST from cutting holes into and detaching items from the wreck.  It seems clear that this is not simply a "one-off" proposal for the Marconi Wireless Telegraph, but a placeholder for future requests to take similar actions in order to recover other artifacts from inside the wreck deemed by RMST to be at risk.  *See e.g.*  ECF No. 585-1 at 4-5 (Positing "how long should we wait for retrieval from the wreck when historically-significant artefacts are at risk of being lost forever," and suggesting that a "rigorous approval process" would ensure granting this request would not establish a "dangerous precedent.")  Accordingly, RMST should demonstrate why the principles that first informed the Court's initial decision to bar cutting into the ship and detaching parts of the wreck are no longer applicable.

## II.   JANUARY 27, 2020, PERIODIC REPORT (ECF No. 585)

On July 3, 2019, this Court issued an order permitting EYOS to conduct limited research activities at the *Titanic* during a scheduled expedition.  ECF No. 554.  The Order, which RMST

agreed to, provided: "EYOS shall provide to NOAA, RMST and this Court a copy of the expedition report . . . prepared by EYOS . . . ." *Id.* at 3. No date-specific was given for when EYOS was required to file its report with the Court.[9] On January 8, 2020, EYOS provided a copy of its report, dated August 11, 2019, to the Court. ECF No. 584. Separate from its obligation to the Court, EYOS also was required to provide a report to NOAA by January 30, 2020, as a condition of its Sec. 113 authorization. *See* ECF No. 564-1 at 2, 4. It did so by providing a copy of the subject report to David Alberg, the Superintendent of the Monitor National Marine Sanctuary, on August 15, 2019. *Id.*

Among other things, the EYOS report states that, due to "intense and highly unpredictable currents during the dive," its submersible made "accidental" contact with the seafloor "occasionally," and with the wreck once. ECF No. 584 at 4. Based on its investigation, EYOS concluded that "these interactions were of a minor nature and not material events." *Id.* After NOAA received EYOS's report, NOAA reviewed and evaluated it in the framework of the Sec. 113 authorization to ensure that EYOS had provided the information required under the authorization. NOAA then reminded EYOS that the Court's July 3, 2019, Order required EYOS to "provide to NOAA, RMST, and this Court a copy of the expedition report . . . prepared by EYOS." ECF No. 554 at 3.

In its January 27, 2020, Periodic Report, RMST expresses concern regarding the EYOS expedition and its report. ECF No. 586 at 2-5. RMST asks the Court to order NOAA employees Tane Casserley and David Alberg, and "representatives of EYOS," to "explain the specific events described in the Letter Report, the reasons why the Court and RMST were not informed

---

[9] RMST separately negotiated an "Expedition Observation Agreement" with EYOS. ECF No. 586-1. That Agreement did not require EYOS to produce reports to RMST.

sooner, and the cause and effect of the collisions."[10] ECF No. 586 at 4. RMST further demands that EYOS disclose *all* videos for *all* dives conducted by EYOS, and not just that portion of the video showing contact with the wreck. ECF No. 586 at 5.

On or about February 7, 2020, EYOS, through counsel, submitted a letter to the Court addressing these issues. *See* ECF No. 587 (Feb. 7, 2020, Letter from Robert Tata to the Court). EYOS noted that its submersible pilot is one of the most experienced in the world, and reiterated that the contact, while regrettable, occurred only "over a few seconds" and was "very minor." *Id.* at 2-3. EYOS offered to have the submersible pilot testify and expressed its willingness to show the Court, *in camera*, a 30-second segment of video – which Atlantic Productions, its owner, authorized EYOS to use – to demonstrate the minor nature of the incident. *Id.* The Court has expressed an interest in reviewing the video; NOAA is also interested in reviewing the video. ECF No. 588. Finally, EYOS explained why the delivery of its report to the Court had been delayed. *Id.* at 1. EYOS denies any "nefarious motive" and notes that RMST's chosen observer (P.H.Nargeolet) was on board, but apparently chose not to tell his employer about the incident.[11] *Id.* at 3.

Like EYOS, NOAA denies there are any nefarious motives at play here. NOAA also rejects any suggestion that EYOS' inadvertence implicates NOAA's "stewardship" in this matter. NOAA's role in this case is to provide oversight, at the Court's request, of RMST's salvage activities and RMST's care and handling of the artifact collections to ensure RMST is

---

[10] EYOS *did* explain that the "cause" – "intense and highly unpredictable currents during the dive" – and the "effects" – "accidental" contact with the seafloor "occasionally," and once with the wreck that "were of a minor nature and not material events." ECF No. 584 at 4.

[11] RMST has provided only an incomplete and partial explanation for why its employee chose to not reveal this incident to RMST, and has produced no documents showing what the employee did report and when, particularly about this incident.

acting in the public interest and in accordance with accepted archaeological standards.[12]  RMST knew, through Mr. Nargeolet, of this incident, and nothing prevented RMST from inquiring about the expedition report and when it would be forthcoming, as the Court required of EYOS, so that RMST could gain further details or information about the expedition and the incident. Although earlier delivery of the EYOS report to the Court may have been preferable, NOAA respectfully contends that nothing about this incident implicates NOAA's "stewardship" role for purposes of this admiralty matter.

                                            Respectfully submitted,

                                            G. Zachary Terwilliger
                                            United States Attorney

By:   /s/ *Kent P. Porter*
        Kent P. Porter, VSB No. 22853
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        8000 World Trade Center
        101 West Main Street
        Norfolk, VA 23510
        757-441-6331
        Fax:  757-441-6689
        kent.porter@usdoj.gov

---

[12] NOAA's role in this case is distinct from its responsibility under Sec. 113 to review and provide authorizations to persons seeking to conduct activities at the *Titanic*.  The Sec. 113 process, as it is being implemented, *see* ECF No. 564-2 ("Notice of Partial Delegation"), effectively funnels information to the Court about persons proposing activity at the wreck (information the Court may otherwise not have), as NOAA did with the proposed EYOS expedition. The two roles and functions, however, remain distinct.

## CERTIFICATE OF SERVICE

  I hereby certify that on the 14th day of February, 2020, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **David G. Barger, VSB #21652**<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Boulevard, Suite 1200<br>McLean, Virginia 22102<br>Tel: (703) 749-1300<br>Fax: (703) 749-1301<br>E-Mail: Bargerd@gtlaw.com |
| **David G. Concannon**<br>Concannon & Charles<br>100 Sun Valley Road, No. 329<br>Sun Valley, Idaho 83353<br>Email: david@davidconcannon.com | |

  /s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov