```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3
   - - - - - - - - - - - - - - - - - -
 4                                      )
      R.M.S. TITANIC, INC.,             )
 5    SUCCESSOR IN INTEREST TO          )
      TITANIC VENTURES, LIMITED         )
 6    PARTNERSHIP,                      )
                                        )  CIVIL ACTION NO.
 7          Plaintiff,                  )  2:93cv902
                                        )
 8    v.                                )
                                        )
 9    THE WRECKED AND ABANDONED         )
      VESSEL, ETC.,                     )
10                                      )
            Defendant.                  )
11 - - - - - - - - - - - - - - - - - -

12
                     TRANSCRIPT OF PROCEEDINGS
13
                      Norfolk, Virginia
14
                     February 20, 2020
15

16
   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
17          United States District Judge

18

19 APPEARANCES:

20          KALEO LEGAL
            By:  Brian A. Wainger
21               William R. Poynter
                    And
22          GREENBERG TRAURIG LLP
            By:  David G. Barger
23                  And
            CONCANNON & CHARLES
24          By:  David G. Concannon
                 Matthew T. Charles
25               Counsel for R.M.S. Titanic
```

APPEARANCES CONTINUED:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Kent Porter
               Assistant United States Attorney
               Counsel for Amicus United States

          THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
          By:  Jackie Rolleri
               Counsel for NOAA

          HUNTON ANDREWS KURTH LLP
          By:  Robert M. Tata
               Counsel for EYOS Expeditions

        GRAY REED
         By:  Chris Davis
               Counsel for Caladan Oceanic

```
 1                            I N D E X

 2    CALADAN OCEANIC
        WITNESSES                                          PAGE
 3
        VICTOR VESCOVO
 4          Direct Examination By Mr. Davis                  18
            Cross-Examination By Mr. Concannon               36
 5          Cross-Examination By Mr. Porter                  45

 6    R.M.S.T.
        WITNESSES                                          PAGE
 7
        PAUL HENRY NARGEOLET
 8          Direct Examination By Mr. Wainger                59
            Cross-Examination By Mr. Porter                  68
 9      JOHN BROADWATER
            Direct Examination By Mr. Concannon              85
10          Cross-Examination By Mr. Porter                  94
        DAVID GALLO
11          Direct Examination By Mr. Barger               103
            Cross-Examination By Mr. Porter                112
12

13

14                         E X H I B I T S

15    EYOS
        NO.           DESCRIPTION                          PAGE
16

17
        1             Photograph                             36
18      2             Photograph                             36
        3             Photograph                             36
19      4             Photograph                             36
        5             Video (Conditionally admitted)         38
20

21    R.M.S.T.
        NO.           DESCRIPTION                          PAGE
22
        10            Photographs                            68
23      11            Photographs                            68
        12            Photographs                            68
24

25
```

```
 1              (Hearing commenced at 2:02 p.m.)

 2              THE CLERK:  In case 2:93cv902, R.M.S. Titanic,

 3  Inc., et cetera, versus The Wrecked and Abandoned Vessel, et

 4  cetera.

 5              Mr. Barger, Mr. Concannon, Mr. Wainger, is

 6  plaintiff ready to proceed?

 7              MR. BARGER:  We are.  Good afternoon, Your Honor.

 8              THE COURT:  Good afternoon, gentlemen.

 9              MR. CONCANNON:  Good afternoon.

10              THE CLERK:  Mr. Porter, is Amicus United States of

11  America ready to proceed?

12              MR. PORTER:  We are.  Good afternoon, Your Honor.

13              THE COURT:  Good afternoon.

14              MS. ROLLERI:  Good afternoon.

15              THE COURT:  Good afternoon, Ms. Rolleri.

16              Counsel, we are here today for a status hearing,

17  but there are a number of issues that the Court needs to

18  address.  I will briefly review those, and then we will take

19  them one at a time so that we can be clear on the resolution

20  or if there are any matters to which we need to follow up

21  after the hearing.

22              The first matter, and I'm taking them in

23  chronological order from the earliest matter, other than

24  some miscellaneous issues that we had pending from our last

25  hearing, I believe that was on July 3rd, 2019, there were
```

1    some open items, and I will go through those with you.  But

2    the first matter that we need to clear the record on and be

3    sure that there is not a problem, was the August 2019 eBay

4    listing of a remnant from the "big piece."

5         The second is the "bump" incident that occurred

6    during the July/August 2019 EYOS expedition.  The third is

7    R.M.S.T.'s expedition plans in 2020.  Then there were a

8    number of open items, if we get to those today, and if we

9    don't, we will have to follow through, perhaps, with another

10   hearing.

11        I won't go through all the open items at this

12   point, but just for a summary.  One of these is part of a

13   concern, I believe, that NOAA has re-expressed, which we

14   will address, is the reserve account and conservation

15   funding.  That is something that was left over.  We left

16   some of that open from the last July 3rd hearing.

17        The next matter was at the hearing the Court had

18   been concerned about the conservation budget and whether

19   there had been any analysis of the reserve account.  The

20   second item was R.M.S.T.'s expanded operations concerning

21   exhibits in France, I believe, and Las Vegas.

22        Another miscellaneous item was R.M.S.T.'s wish list

23   of conservation and curatorial priorities.  The Court has

24   inquired about that.  The last, I believe, was the

25   safety-deposit box transfer, and I want to be sure that that

```
 1    is complete.
 2            So those are lesser items, as I've called them,
 3    that we've addressed previously, but there still would be
 4    some questions regarding them.  Therefore, we will start
 5    this particular hearing with any report from R.M.S.T. on the
 6    eBay listing of a remnant from the "big piece."
 7            Before the Court could take any action, that
 8    posting was removed from eBay, and I don't know if you
 9    followed up on that or if you could inform the Court as to
10    whether that was a, quote, actual listing that someone had,
11    that item, or I won't say fake, but they didn't have the
12    item and they were listing it to see what it would elicit?
13            Mr. Barger.
14            MR. BARGER:  Yes, Your Honor, if I could, briefly.
15    Mr. Wainger handled that because our firm does some work
16    with eBay so I actually didn't sign that particular
17    pleading.  I know he dealt with that issue.  I am familiar
18    with the factual scenario that the Court summarized, that it
19    ultimately, the advertisement was withdrawn.
20            But with the Court's permission, if Mr. Wainger
21    could simply address that.
22            THE COURT:  That would be fine.
23            MR. BARGER:  Thank you, Judge.
24            MR. WAINGER:  Good afternoon, Your Honor.
25            THE COURT:  Good afternoon.
```

```
 1            MR. WAINGER:  I don't have much more information on

 2      that.  Happily, it was removed, the listing was taken down,

 3      presumably because of the efforts that we made.  We were

 4      never able to confirm the origin of the piece.  What we had

 5      found, and I know the Court remembers this, is that there

 6      have been some remnants, some, essentially, dust that when

 7      these pieces got moved years and years ago, people claim as

 8      authentic artifacts.

 9            But I was unable to get at the actual owner without

10      Court order.  EBay makes it -- they have substantial hurdles

11      to get the identities of their sellers.  So I was pleased

12      that it was taken off the site, but I don't have any further

13      information beyond that.

14            THE COURT:  Well, I assume that you or someone from

15      R.M.S.T. monitors periodically eBay and sites such as that

16      so if there is any further posting or listing of that item

17      or any other item, that you would immediately make the Court

18      aware of it?

19            MR. WAINGER:  Yes, Your Honor.

20            THE COURT:  Thank you.  Then hearing nothing

21      further, I will assume that the eBay matter is resolved, and

22      we will move on to the contact incident that occurred during

23      the 2019 expedition.  I don't know if Mr. Barger or anyone

24      from R.M.S.T. wants to make any comments about it first or

25      if anyone from NOAA wants to make any comments about it
```

1    first, and then we will hear from the representatives of
2    EYOS and the witnesses that we are expecting to have today.
3            MR. BARGER:  Yes, Your Honor.  I apologize.  I feel
4    a little bit like the master of ceremonies for our team in
5    that Mr. Concannon's *pro hac vice* motion was granted, was
6    given the leader -- or maybe given is the wrong word, but we
7    have hoisted on him the lead on the bump topic.  So if the
8    Court will allow, he will address that.
9            THE COURT:  That is fine.  Mr. Concannon can come
10   forward to address the Court on that matter.
11           MR. CONCANNON:  Good afternoon, Your Honor.  Thank
12   you for allowing me to appear before you.  I appreciate
13   that.
14           THE COURT:  Good afternoon.
15           MR. CONCANNON:  My understanding is that Victor
16   Vescovo, who was piloting the submersible, owns the
17   submersible, is here today with his counsel, and that he is
18   prepared to show a video and to answer questions.  We would
19   prefer that he be given the opportunity to do that.  We do
20   have some questions that we would like to ask later.
21           I'm certain the Court has some questions, as well,
22   and we will try to shorten that and limit that because the
23   bulk of our presentation today is on the potential salvage
24   expedition.
25           THE COURT:  If for some reason we can't finish

1    today, we will certainly continue this within a short period

2    of time.

3            MR. CONCANNON:  Yes.  I appreciate that.  I also

4    understand that Mr. Vescovo and Mr. Nargeolet have to catch

5    a flight earlier this evening, and so we are mindful of

6    their time, but I don't want to curtail any questioning.

7            THE COURT:  Mr. Nargeolet and Mr. Vescovo?

8            MR. CONCANNON:  Vescovo.

9            THE COURT:  I've got the list.  Mr. Vescovo.

10           MR. CONCANNON:  With that, unless the United States

11   Attorney's office wants to lead this, I don't prefer to lead

12   this questioning.

13           THE COURT:  I do have a question of you, though,

14   Mr. Concannon.  Who was the R.M.S.T. representative on the

15   EYOS expedition?

16           MR. CONCANNON:  That was Mr. Nargeolet.

17           THE COURT:  So Mr. Nargeolet is the person you have

18   designated as your representative?  I'm saying your

19   representative on that particular expedition?

20           MR. CONCANNON:  That's my understanding, yes.

21           THE COURT:  That was the Court's understanding, and

22   I wanted that to be clear for this record.

23           MR. CONCANNON:  Certainly.

24           THE COURT:  Thank you.

25           MR. CONCANNON:  You're welcome.

```
 1            THE COURT:  Mr. Porter or Ms. Rolleri.
 2            MR. PORTER:  Your Honor, nothing more to add at
 3   this point.  I believe we hear for Mr. Vescovo, it will
 4   outline the relatively minor nature of this incident.  I
 5   will say that Mr. Casterly, Todd Casterly was the NOAA
 6   observer on board, but he had no knowledge of this incident
 7   until the report came in.  That was the first that NOAA
 8   became aware of it.  So there was no realtime knowledge at
 9   the time.
10            THE COURT:  I know that R.M.S.T. made a request to
11   have Mr. Casterly here today, and I did not direct that he
12   be here, the reasoning being that we could get him here if
13   we needed to.  We needed to find out and lay a foundation
14   for what occurred during this expedition, and then if
15   Mr. Casterly's testimony was needed, he certainly would be
16   available.  It's Tane?
17            MR. PORTER:  It's pronounced Tane, T-a-n-e, yes.
18            THE COURT:  Tane Casterly.  I will direct or issue
19   an order that he be present if things aren't resolved today
20   or if any party feels that he would add something to the
21   testimony and what occurred.
22            MR. PORTER:  Your Honor, he is here today.
23            THE COURT:  All right.
24            MR. PORTER:  To the extent the Court has questions,
25   I think as we mentioned in our report, we do want the whole
```

1    to the *Touhy* regulation aspect, that R.M.S.T. just can't

2    willy-nilly, so to speak, request NOAA witnesses, but he is

3    here.  If the Court has further questions on this issue,

4    we'd be happy to put him on.

5         THE COURT:  Well, they can't willy-nilly request

6    them, but the Court can order them, if the Court feels it is

7    not a willy-nilly request.

8         MR. PORTER:  I would not put the Court in the

9    willy-nilly category, Your Honor.

10        THE COURT:  One matter that I did want to raise

11   with the parties and also with EYOS, if it comes up, I did

12   enter the order on the 3rd of July 2019, and I didn't see

13   anywhere in that order where there was approval for

14   videotaping, and I didn't see anything in that order that

15   approved just a report coming to the Court.

16        On Page 3 of that order, Paragraph 4, it says,

17   "EYOS shall -- " and that's a mandatory term, and this was

18   an order that was requested and agreed to by all the

19   parties -- "provide to NOAA, R.M.S.T., and this Court a copy

20   of the expedition report."  It didn't say do a report.  It

21   said a copy of whatever report you make, which would be your

22   internal report, including the documentation required.

23        I note in a response from EYOS that they could not

24   produce the complete video because it had been sent to a

25   British production company for some type of documentary

1    production.  So I would call your attention to three things:

2    Number one, the order said that you could document the

3    location of recovered trays and photograph their location.

4    I see nothing in here about videotape.  That was in

5    Paragraphs 1, 2 and 3 for the trays.

6           Then if there had been videotape, I assumed that

7    your report, and no report had been given to the Court, the

8    exact report from the expedition.  You gave a report, and

9    it, certainly, was not a timely report as has been noted by

10   the parties.  It came, I believe, in January after an

11   expedition that finished, I believe, in August or sometime

12   in that time frame.

13          So I question that there is a report that has not

14   been seen by the Court or the parties, and that whatever was

15   part of that report has been sent off to a British

16   production company.  I'm not saying that that wouldn't have

17   been approved or not approved, but the Court doesn't know

18   what that is.  It's been sent off to a British production

19   company, apparently, to make a documentary, I think someone

20   said, for National Geographic.

21          But the point being that if you read this order

22   closely, it does not say you shall provide a report.  If

23   that was the case, then the Court would have said a report

24   on or before.  The order says a copy of "the" expedition

25   report.  There is a big difference between "a" report and

1   "the" report.

2          So I believe that there could be some question

3   about whether the Court has received a full and proper

4   report, whatever the company's report was, whatever "the"

5   report was, with the documentation.

6          So, in any event, we will proceed to hear about the

7   expedition, and we will proceed to hear about the bump that

8   occurred during the expedition.

9          Mr. Tata, are you going to lead that?  I believe

10  that you are on record as the attorney for EYOS.

11         MR. TATA:  Your Honor, may it please the Court.

12  Bob Tata on behalf of EYOS.  As we indicated in our letter

13  report to you not long ago, we offered to have with us Chris

14  Davis from Texas, who is an attorney from Texas, who is here

15  with Victor Vescovo.  Mr. Davis represents Caladan, which

16  owned the ship and the submersible, and Mr. Vescovo was the

17  operator of the submersible at the time of the contact, and

18  they had offered to come and address whatever questions Your

19  Honor may have.  They are here and ready to address those

20  questions.  So I would introduce to you Mr. Davis, unless

21  you have more questions for me.

22         THE COURT:  No.  I think that it's your role to

23  elicit from them what occurred.  I don't think you should

24  put the Court in the role of being the examiner.  You got

25  permission from the Court, there has been a question raised,

1   and that's your role as the attorney to present to the Court

2   what occurred and the clip of the video.

3           Then it's up to the other attorneys to ask any

4   questions they have on behalf of R.M.S.T. and NOAA, and then

5   if the Court has questions, it will ask.  But I'm not going

6   to take the lead role of conducting the hearing with your

7   witnesses.

8           MR. TATA:  I'm sorry, ma'am.  I didn't hear that

9   last statement.

10          THE COURT:  I said I'm not going to take the lead

11  role with conducting the examination of your witnesses.

12          MR. TATA:  Yes, ma'am.  Thank you.  Would you like

13  the -- the proposal had been that the 30-second snippet of

14  video that is available showing the contact be displayed to

15  appropriate people in chambers.  Is that something that Your

16  Honor is comfortable with?

17          THE COURT:  No.  You've got to give me a reason why

18  it can't be displayed publicly.  If you've sent off a clip

19  for a documentary that's coming out, why can't this be

20  displaced publicly?

21          MR. TATA:  Well, it's not the property of EYOS, my

22  client, or the property of Caladan, and Caladan got

23  permission from Atlantic in order to display it.  I'm not

24  certain that there is a terrific concern about showing it to

25  you, however you want to see it, but the proposal had been

1  that it be done in chambers.  If Your Honor is uncomfortable

2  with that, we can show it not in chambers as well.

3          THE COURT:  I think it's an important part of the

4  public domain.  I think the Titanic, the wreck of the

5  Titanic, is an important part of the public domain.  When I

6  say the public domain, I mean in many respects the worldwide

7  public domain, and that I don't see any reason, unless there

8  is some type of sensitive, proprietary information here that

9  has not been represented to the Court, why it can't be seen

10  in court.

11          MR. TATA:  I don't think that there is any

12  proprietary need to not show it in open court if that's Your

13  Honor's desire.  What I would ask is that Mr. Davis assist

14  me in presenting Mr. Vescovo because he had prepared to do

15  that.

16          THE COURT:  That's fine.

17          MR. TATA:  Thank you, Your Honor.

18          THE COURT:  Mr. Davis is an attorney, as I

19  understand it?

20          MR. DAVIS:  I am, Your Honor.

21          THE COURT:  Could you just put on the record,

22  Mr. Davis, your credentials and who you practice with, and I

23  can admit you *pro hac vice* for purposes of this hearing.

24          MR. DAVIS:  Thank you, Your Honor.  My name is

25  Chris Davis.  I'm an attorney with Gray Reed, and I'm out of

1    our Dallas, Texas office, and I'm licensed in the State of

2    Texas, all the District Courts in Texas as well.

3              THE COURT:  You mean the Federal District Court?

4              MR. DAVIS:  Yes, ma'am.  Yes, Your Honor.

5              THE COURT:  Mr. Tata, I assume that you vouch for

6    his credentials as an officer of this court?

7              MR. TATA:  Yes, Your Honor.  We offer Mr. Davis *pro*

8    *hac vice* to the Court.  We had offered to prepare the

9    paperwork ahead of time, but we were advised that would not

10   be necessary because you had specifically invited him.  But

11   I would offer him as a *pro hac vice* member of the Court.

12             THE COURT:  You are so accepted for the purposes of

13   this hearing.  It's nice to have you, Mr. Davis.

14             MR. DAVIS:  Thank you, Your Honor.  Thank you for

15   having me.  Thank you for admitting me.  So here is what I

16   would suggest.  The most pertinent piece of information, of

17   course, is the video itself because it shows what it shows,

18   and that is why Mr. Vescovo obtained it from Atlantic, and

19   that is why we brought it today.  I have it on a thumb

20   drive, and it is prepared to be shown.  I'm going to need

21   some technical assistance with that since I couldn't bring

22   my own laptop in.  We are happy to go.

23             Let me add this, too, for the sake of clarity.

24   There are four different camera angles that were available.

25   Three of them show the contact with the wreck.  The fourth

```
 1   does not because it was on the opposite side of the sub
 2   where the camera was placed.  So this has been spliced
 3   together into one video.  As Mr. Tata mentioned, and as I
 4   mentioned in his letter, the entirety of the kind of
 5   pre-imposed contact is about 30 seconds, but when these are
 6   all spliced together, it is about a six-minute video.
 7           So I've got time stamps if we want to go straight
 8   to the contact and save a little bit of our time.  But we
 9   can do it however you would like to do it, Your Honor.
10           THE COURT:  I believe Mr. Vescovo was the pilot of
11   the submersible.
12           MR. DAVIS:  Correct.
13           THE COURT:  You can call him, he can be sworn as a
14   witness, and he can take the witness stand.  I believe there
15   is a screen in front of him, and then you can walk him
16   through the video and explain this is occurring at this time
17   stamped area of time.  I cannot give you the technical
18   assistance, but I assume there is someone here who can.
19           MR. DAVIS:  That sounds perfect, Your Honor.
20           THE COURT:  Mr. Concannon is volunteering to do
21   that.
22           MR. CONCANNON:  Yes.
23           MR. DAVIS:  That will work.  Let me ask this, too,
24   because, really, whatever the Court would prefer, I would
25   like Mr. Vescovo, because I'm a lawyer from Texas, I've
```

Vescovo, V. - Direct                                    18

1    never been down in a submarine, he does a good job of

2    explaining the setup of the submarine and, you know, what is

3    going on down there.  I don't know if you would like to hear

4    that, if it would be helpful to have that context before we

5    see the video or not, but I think we can present it either

6    way, if you don't have a preference.

7             THE COURT:  You can examine him and let him lay the

8    foundation for the video.  Why don't you call him as a

9    witness.

10            Mr. Vescovo.

11            MR. VESCOVO:  Good afternoon, Your Honor.  Victor

12   Vescovo, president of Caladan Oceanic.

13            (Witness was sworn.)

14            MR. DAVIS:  So the record is clear, this is my

15   partner, Matt Charles.  He is here to provide technical

16   support.

17            MR. CHARLES:  Good afternoon, Your Honor.

18            MR. WAINGER:  Mr. Nargeolet stepped up so he can

19   hear better.

20            THE COURT:  That is fine.

21            VICTOR VESCOVO, called by Caladan Oceanic, having

22   been first duly sworn, was examined and testified as

23   follows:

24                      DIRECT EXAMINATION

25   BY MR. DAVIS:

Vescovo, V. - Direct                                                    19

1    Q.  Mr. Vescovo, so we are not wasting time, because I think
2    it would be helpful to the Court, could you give us a brief
3    overview of the setup of the submarine and what you're seeing
4    when you're in the submarine so that we will have that
5    context when we watch the video?
6    A.  Of course.  This was the -- this contact occurred on the
7    fourth of five dives at the Titanic last year.  The
8    submersible is a two-person titanium hold submersible of 12
9    tons.  If it please the Court, I've just a couple of pictures
10   of the submersible to help to understand the visibility of
11   the sub, and, therefore, the difficulty in piloting around
12   any wreck.
13           Should I give them directly to you?
14           THE COURT:  Give them to the court security
15   officer.
16           MR. CONCANNON:  I haven't seen them.
17           THE COURT:  You can use the projector system.
18           MR. DAVIS:  That would be helpful.
19           THE WITNESS:  That would be helpful if we can go
20   slide by slide, I can describe the major points.  It won't
21   take very long, Your Honor.
22           THE COURT:  All right.
23   BY MR. DAVIS:
24   Q.  I apologize.  It's been awhile since I have used an Elmo.
25   I'm a little rusty.

Vescovo, V. - Direct                                              20

```
 1          Mr. Vescovo, what do we see here?
 2   A.  What you're seeing is the front view of the submersible
 3   limiting factor.  You can see three acrylic view ports.  The
 4   pilot sits on the one to the observer's right, the observe on
 5   the left.  And for this mission, where the contact occurred,
 6   Parks Stephenson, the noted Titanic historian, was actually
 7   seated in the seat that's on the left portal, and the one on
 8   the center down is actually looking down.
 9          There are cameras on the outside of the submersible,
10   but it only gives standard definition television video into
11   the capsule on the screen.  Sometime it's not even displayed
12   because you are looking for navigational or sonar
13   information.  So the major point of this slide is to show
14   that we can see in some respects the black area because the
15   portals are designed to give it a full ocean depth or 11,000
16   meters.  So the outside of the portal is very wide, but what
17   you can see out of it is quite narrow.  You can also see the
18   thrusters on the two sides of the submersible, which you will
19   hear in the video that can steer the submersible.
20          THE COURT:  Where was Mr. Stephenson?
21          THE WITNESS:  Mr. Stephenson, he was seated in
22   the -- in this picture on the left side of the submarine.
23          THE COURT:  Would have been the right?
24          THE WITNESS:  Correct.  That's absolutely correct.
25   The pilot is always seated on the other side.
```

Vescovo, V. - Direct                                                  21

```
1              THE COURT:  All right.
2              MR. DAVIS:  Why don't we mark this as Exhibit 1 for
3    identification.
4              THE COURT:  This will be Exhibit 1 and the next
5    will be 2.  You can just put a number on them, and if we
6    admit them, the clerk will put the exhibit stickers on them.
7              THE WITNESS:  The next slide we can go through
8    briefly.  It just shows what the right-hand side and the
9    left-hand side of the submersible look like.  Those are the
10   thrusters you see in the middle.  They are used to guide the
11   submersible.  You can see that there is no view port.  There
12   is lighting at the very bottom that's a light complex, but
13   we can't directly see to the right or left or up.
14   BY MR. DAVIS:
15   Q.  We will mark this as 2.
16   A.  This exhibit actually shows a camera at the very back of
17   the two-person capsule.  So Mr. Stephenson would have been to
18   my right in this photograph.  You can see how the submersible
19   is actually manipulated.  All control is in one hand; up,
20   down, left, right, forward, backward.  And you can see to the
21   far right what it actually looks like from inside the
22   submersible looking out of one of the portals.  You can see
23   that it's about the size of a small dinner plate.  You can't
24   really see what I'm looking at from the left but it's similar
25   in size.
```

1            Then there is one that's looking down of the similar

2       size.  So what this is meant to show is that we have computer

3       screens, as you see, but it is really showing heavy

4       information, life support information.  But we have quite

5       limited visibility, which is common to all deep diving

6       submersibles, even those that are more shallow like the

7       Natier or the Meers.

8       Q.  So to be clear on that point, because we are about to

9       watch the video, what you are seeing in the sub is not what

10      we are going to see on the video?

11      A.  That's correct.  That's a very important point because

12      the cameras are mounted outside the submersible, and they are

13      high definition cameras.  What the cameras see is not fed

14      into the cockpit.  We can't see that.  What happens is that

15      the cameras are simply turned on, and then they capture

16      everything that happens on the dive, unless they break, which

17      has happened, and then we download the video afterwards, and

18      that's what you will see on this clip.

19            THE COURT:  These pictures are taken before you've

20      made the dive?

21            THE WITNESS:  These actually -- this was taken

22      probably during the dive, Your Honor.

23      BY MR. DAVIS:

24      Q.  When you said during the dive, do you mean during this

25      particular dive?

1   A.  I don't know.  I believe this is actually from a

2   different dive.  I just printed this one because this was a

3   photograph that I had that showed what it is like inside the

4   submersible when you are trying to pilot it.

5   Q.  To be clear, though, whether it was this dive or another

6   dive, it is going to look like this on every dive?

7   A.  Correct.

8   Q.  This is 3.  We have some more pictures, but I don't think

9   it will be useful to show those until after we've watched the

10  video.  So you want to add something, Mr. Vescovo?

11  A.  Yes.  Actually, it will be helpful to show one of the

12  pictures because it shows where the contact occurred on the

13  wreck, which I think is helpful context.

14  Q.  Yes.  So this -- tell us what this is, Mr. Vescovo, and

15  where you got it.

16  A.  I got this picture off the Internet.  I believe it is a

17  computer-generated view of the wreck of the Titanic.  This is

18  not an actual photograph of the submersible or land or

19  anything of that nature.  But I wanted to show this so it

20  shows the contact that occurred.  I don't know how to easily

21  show that from up here.

22       MR. DAVIS:  Why don't we do this.  Tell me -- I know

23  where it was, Your Honor, so if I could.

24       THE COURT:  Pass the photograph to him.  He can put

25  an X on it, and then you can put it back under the

 1   projector.

 2           MR. DAVIS:  Yes.  Mark this 4.

 3           THE WITNESS:  (Complied.)  I made two notations,

 4   Your Honor.  The circle indicates the point where the

 5   contact occurred, and then there is an arrow on the top of

 6   the wreck that shows where the Marconi wireless station is

 7   located, which is, I think, helpful context.

 8   BY MR. DAVIS:

 9   Q.  It's still kind of hard to see on the screen, so if you

10   don't mind, Your Honor, I will go ahead and point out the

11   circle where my finger is, which you will certainly be able

12   to see on the exhibit itself, is where Mr. Vescovo has

13   indicated he was diving when the contact occurred.

14   A.  So the submarine was moving from the bow towards the

15   stern, and we were trying to get 4K camera video for R.M.S.T.

16   and Atlantic Productions.  So we were going along the edge of

17   the bow going kind of laterally and a little bit backwards.

18   You can see where the contact occurred.  Right after that

19   there is a dip.  It's where the forward cargo hold area is.

20   So the nature of the wreck and the ship is that there is a

21   big opening.  The way the currents work here, and they were

22   actually quite strong on the day of our dive, and they were

23   all of our dives, is that they come from the south to the

24   north.  So the water is coming from the back part of this

25   picture towards the front, and they can actually start to

1    come up along the sides of the vessel.

2            So it's a relatively unstable situation.  Then as

3    the water came up, it actually deviated into that open area

4    to the -- where the sub's left portion was.  So as we were

5    going backwards along the bow, as it got right to that point,

6    the water came up and started moving in an asymmetric

7    fashion, which started tilting the submarine to the left.

8            The submarine is 12 tons so has quite a bit of

9    momentum.  You can actually hear me trying to use the

10   thrusters to actually get back away from the wreck when,

11   actually, contact occurred with the left side of the

12   submersible to the railing that is circled.

13           That is the one time I actually felt definite

14   contact with the wreck, and I immediately tried to move back

15   away from the wreck, and it took a couple of seconds before

16   it was away.  But I am happy that we spent over 15 hours on

17   the wreck across the five dives, and the contact that you

18   will see was about five seconds.  We did our best to avoid

19   it.

20           THE COURT:  So, Mr. Vescovo, what you were doing,

21   then, is you were going along the bow, and then when you hit

22   the indentation area, the cargo area, that's when the

23   current came through?

24           THE WITNESS:  That's correct, Your Honor, became

25   much more unstable, and before I could restabilize the

Vescovo, V. - Direct                                          26

```
 1    vessel, the left side of the submersible contacted the
 2    railing, which I couldn't even see.  I can only see it after
 3    contact had been made at -- the forward part was actually
 4    starting to shake, and that's when I knew -- and I could
 5    feel it, that we had to back up.
 6              THE COURT:  Where is the Marconi device?
 7              THE WITNESS:  I'm sorry?  The Marconi device, if
 8    you see the upper left.
 9    BY MR. DAVIS:
10    Q.  It's hard to see because of the blue backdrop, Your
11    Honor, but there is a downward pointing arrow near the top of
12    the wreck.
13    A.  It may not be exactly right.  Mr. Nargeolet, a member of
14    R.M.S.T., can be more precise, but that is generally where it
15    was.  So the area of contact was not near the Marconi room.
16    Q.  Something you mentioned in passing a minute ago that I
17    wanted to make sure is clear.  I think I heard you say that
18    you were filming on behalf of R.M.S.T.  It was your
19    understanding that they knew that you were filming the wreck
20    as part of the expedition?
21    A.  Yes.  I mean, that was widely discussed.  We had the film
22    crew in mission control the entire time, and on all of our
23    dives, we had always been videotaping our dives, even on our
24    test dives that Mr. Nargeolet was a part of.  So that was
25    something that was well-known.
```

Vescovo, V. - Direct                                              27

1    Q.  You mentioned also that you felt the contact when it

2    occurred; is that right?

3    A.  Yes.  That's the only time I definitely felt contact

4    between the Titanic and my submersible.

5    Q.  Is that why you made sure it was included in the report?

6    A.  That's correct.  I thought for just this circumstance

7    that it would be of interest if it ever came up of what

8    exactly happened.  So I asked Titanic -- I mean, excuse me, I

9    asked Atlantic for that piece of video so I would have that.

10   Q.  That's why it's here today, correct?

11   A.  That is correct.

12   Q.  Without further ado, I think we probably would want to

13   see the video.  I would suggest, because it's six minutes

14   long, and there is a lot of dead time, if it would be okay

15   with the Court and with other counsel, I can get to the time

16   stamps in the videos that will show the entire occurrence,

17   both before and after from three different angles.

18          MR. CONCANNON:  We would prefer to see the whole

19   six minutes.  It's helpful to us.

20          THE COURT:  Well, we will watch the whole six

21   minutes.

22          MR. DAVIS:  Thank you, Your Honor.

23          THE COURT:  Mr. Vescovo, if there is something you

24   need to point out to us during the six minutes, feel free to

25   do so, and we can make arrangements to pause and restart.

Vescovo, V. - Direct                                                    28

```
1    It may be somewhat difficult, but we will make those
2    arrangements.  So if there is something that you need to say
3    to us to help us understand, do so.
4              THE WITNESS:  Thank you, Your Honor.
5              MR. DAVIS:  If it's okay with the Court, I might do
6    a little bit of that myself because I have watched it with
7    Mr. Vescovo, and I think he may be able the explain in
8    realtime what's happening as you're seeing the video.
9              THE COURT:  That's fine.
10             THE WITNESS:  The only note I would make, if you
11   hear something in the background, I don't know if there is
12   sound available for this, it's the thrusters moving, and
13   that's just our -- us trying to actually maintain proximity
14   to the wreck but not actually contact it.
15   BY MR. DAVIS:
16   Q.  Here we are.  Just to set the stage on the sound, a word
17   that we are going to hear, tell us what that is going to be.
18   A.  Those are more of the ten thrusters that are used to move
19   the submarine and to keep it where it needs to go.  I would
20   note that there are, I think, three different cameras, how
21   many angles do we have, so you will see different views of
22   the incident.
23   BY MR. DAVIS:
24   Q.  So Mr. Concannon wanted to ask, and I'll ask on his
25   behalf, in the view that we are seeing, do you know the
```

Vescovo, V. - Direct                                              29

```
 1    orientation of the sub?  Can you tell which camera angle it
 2    was?
 3    A.  I believe it's the downward angle, which would be the
 4    least useful one.
 5            MR. CONCANNON:  This is unorthodox, but would it be
 6    okay if I ask a brief question?
 7            THE COURT:  No.  I think that if you want to ask
 8    questions, it will just be way too confusing for the record
 9    and for everyone to have different people asking questions,
10    different attorneys during the presentation.  If you want to
11    ask on cross-examination, you can, the same as you can,
12    Mr. Porter, and you can go back to that place in the video.
13    BY MR. DAVIS:
14    Q.  I'm going to proceed.
15    A.  This appears to be the submersible actually going up away
16    from the wreck.
17            THE COURT:  What is this shadow?
18    BY MR. DAVIS:
19    Q.  We are at 1:24, and the Judge asked, is the shadow the
20    wreck?
21    A.  The upper portion of this display is actually the wreck,
22    Your Honor, yes, ma'am.  I would like to point out that this
23    is camera in high definition outside the submersible.  This
24    is not what we could see from inside the submersible.
25    Q.  Let me say for the record, Your Honor, 1:37 in the video,
```

1   the view has changed.  Tell me what we are seeing here,

2   Mr. Vescovo.

3   A.  We are now doing a transient along the starboard side of

4   the bow moving backwards to film the front portion of the

5   wreck.

6   Q.  And, generally speaking, that's what you pointed out on,

7   I believe it was Exhibit 4 a second ago?

8   A.  Yes.  We are slightly afore that incident area.  Trying

9   to back the sub away from the thrusters.

10  Q.  That is at 1:51 in the video.  I'm sorry this is going to

11  be annoying, but for the record I'm going to temper these in

12  so we know where we are.

13  A.  Understood.  There is where the contact occurred.  So you

14  can see that the left side of the submarine actually caught

15  the back of the area and caused three cross-beams to actually

16  not detach but actually come down and lower.

17          I would notice that the large white area to the

18  left, that was already there.  We did not do any of that.

19  You can also see the area to the left where the hull comes

20  down into the forward cargo area that caused the water

21  disturbance that caused the left part of the submersible to

22  evidently catch what probably was part of the railing jutting

23  out, which was not observed.

24  Q.  And so to tie this into your earlier testimony we see,

25  let me say, we are right around 2:00 minutes time stamp in

Vescovo, V. - Direct                                                    31

1   the video, the gap that we see, as we move forward, the 2:10

2   is the gap that you pointed out in Exhibit 4 where the

3   currents flow through over the open part of the hull; is that

4   right?

5   A.  Correct.

6           THE COURT:  Stop just a minute.  The gap being, as

7   we are viewing the picture, to the far left?

8           THE WITNESS:  Yes, ma'am, Your Honor.

9   BY MR. DAVIS:

10  Q.  I'm stopping it here because we are at 3:07 in the video.

11  We noticed that the view has just changed.  Tell me what view

12  we are looking at now.

13  A.  This is now the view of the camera that's actually

14  looking at the pilot's side portal so you can see just how

15  small the portal is in our view port area, and you can see

16  how the submersible is slightly tilted towards the left,

17  which is why the left part of the submersible contacted

18  first, and, yeah, and you can see us moving backwards.

19  Q.  And this could be helpful context on the portals.  What

20  we are seeing is essentially the outside view of what you

21  were seeing from the inside of the cockpit in the pictures

22  that we looked at earlier, I believe it was Exhibit 3,

23  correct?

24  A.  That's correct.  This, of course, is not what would be

25  seen from within the submersible.

JODY A. STEWART, Official Court Reporter

Vescovo, V. - Direct                                                32

1   Q.  Right.  And why are the portals cone shaped with the

2   glass being much wider as you go out further and much

3   narrower as you get into the cockpit?

4   A.  The submersible is designed to go down to 11,000 meters

5   or 16,000 pounds per square inch.  So the acrylic view ports

6   have to be extremely conical in shape, being very wide at the

7   outside and very small on the inside to withstand the

8   pressure.

9   Q.  And on that point, when you talked about the depth the

10  sub is designed to go to, is this a sub that is designed --

11  what is it designed for?

12  A.  This is a submersible that is designed to go to any point

13  in the ocean.  It's specifically designed to the sea floor,

14  to the bottom of the Mariana trench, to any depth for

15  scientific or other research.  I did want to make one comment

16  about the acrylic view ports since you pointed it out.

17  Because of their conical shape, they also have a bit of a

18  fisheye lens effect, where depth perception is actually quite

19  difficult because you can imagine with the lens being of this

20  shape, it's somewhat difficult to ascertain exactly how far

21  away you are from things.

22  Q.  I just want to be clear, but because I understand it, but

23  everybody here may not because we've talked about this

24  before, when you say go to any point in the ocean, you mean

25  any depth in the ocean; is that right?

Vescovo, V. - Direct                                              33

1   A.   That's correct.

2   Q.   So this is a sub that's designed to go deep, not

3   necessarily designed for maximum maneuverability?

4   A.   That is correct.   This submarine is designed to go up and

5   down in the water.   It can be used, as we have shown at the

6   Titanic, to survey wrecks or any other points of scientific

7   interest, but it is different than other vessels like the

8   Meers that have a little bit more of a bullet shape or are a

9   little bit more maneuverable.

10  Q.   Thank you.   I'm stopping it at 3:29.   What did we just

11  see?

12  A.   You saw the left-hand side of the submersible making

13  contact with one section of the forward railing and part of

14  that railing slightly detaching and coming down a bit, maybe

15  about 18 inches.

16  Q.   So this is the same contact we saw earlier but from a

17  different angle?

18  A.   That is correct.

19  Q.   So the timestamp, now the video is 4:38, and I note that

20  the view has just changed.   Do you know which camera we are

21  looking from now?

22  A.   No, I do not.   But I suspect it's a forward-looking

23  camera, and from the altitude above the wreck, it appears to

24  be much later after the incident, but I can't be sure.

25  Q.   Let's watch it, and then I may ask a follow-up question

Vescovo, V. - Direct                                          34

 1   about that.

 2           THE COURT:  You're above the wreck?

 3           THE WITNESS:  Yes.  It appears that the submersible

 4   is definitely above the wreck, above the starboard side of

 5   the bow.  Actually, this does appear to be a top-mounted

 6   camera, and it was actually filming from the very top of the

 7   submarine when the incident occurred, as you can tell from

 8   the bottom left where there is the debris moving as the

 9   portion of the railing fell down a bit.

10   BY MR. DAVIS:

11   Q.  For the record, we are at 4:51 in the video.

12           I'm pausing again at 5:01 because the sub has moved

13   back a little, and we've got a wider view.  I see in the

14   bottom left of the video some debris.  Can you tell me what's

15   happened at this point in the video?

16   A.  Yeah.  At this point in the video it looks like three

17   portions of one section of the bow railing have moved down

18   about 18 inches, and the rusticles that were on them

19   collapsed, and that's what the debris you see.  It's that

20   large white piece to the very left, that was there.  That was

21   not a result of any of our activity.

22   Q.  And that's the same piece you referred to earlier, again,

23   but we are looking at this from a different angle?

24   A.  That is correct.

25   Q.  Same contact?

Vescovo, V. - Direct                                          35

```
 1    A.  Same contact, different angle.

 2          THE COURT:  This may be a scientific question

 3    beyond your expertise.  What causes the yellow color?

 4          THE WITNESS:  I believe that's caused by the color

 5    of the bacteria, but I'm not a microbiologist, but they are

 6    often slightly reddish or orange or yellow.  It was a whole

 7    different set of colors depending on the exact type of

 8    bacteria that was eating the metal.

 9          THE COURT:  This would be something, I assume, that

10    the rusticle, the study may be able to show.  One of the

11    reasons for the EYOS expedition was to collect the rusticles

12    so that you could tell the types of bacteria, the rate of

13    deterioration.  So I assume that's tied in with the

14    rusticles?

15          THE WITNESS:  Yes, Your Honor.

16          MR. DAVIS:  I would have to defer that question to

17    somebody else.

18          THE COURT:  That's all right.  Just keep on with

19    the video.

20          MR. DAVIS:  Thank you, Your Honor.  That's the end

21    of the video, Your Honor.

22          THE COURT:  Is there anything else that you want to

23    ask Mr. Vescovo?

24          MR. DAVIS:  I don't have any further questions for

25    Mr. Vescovo, Your Honor.
```

Vescovo, V. - Cross                                                    36

```
 1                THE COURT:  We will admit 1, 2 and 3.
 2                MR. DAVIS:  1 through 4, I believe, Your Honor.
 3                THE COURT:  Four pictures?
 4                MR. DAVIS:  Yes.  We have two different views of
 5     the subs, and then we have the view from the cockpit, and
 6     then we have the view of the wreck itself.
 7                THE COURT:  We will admit 1, 2, 3 and 4 of the
 8     photographs.
 9                (The photographs were received in evidence as
10     Exhibit Nos. 1, 2, 3 & 4.)
11                MR. DAVIS:  No further questions, Your Honor.
12                THE COURT:  Thank you.
13                Mr. Concannon, do you wish to examine Mr. Vescovo?
14                MR. CONCANNON:  Yes, I do.  Thank you, Your Honor.
15                THE COURT:  All right.
16                          CROSS-EXAMINATION
17     BY MR. CONCANNON:
18     Q.  With the Court's permission, we would offer the video as
19     Exhibit 5.
20                THE COURT:  Any objection?
21                MR. DAVIS:  Mr. Tata addressed earlier Atlantic's
22     concerns.  I don't have a problem leaving it in the Court's
23     custody.  In fact, that's probably appropriate since we have
24     all seen it.  We do want to ensure on their behalf, that we
25     are trying to be transparent for today's purposes, of
```

Vescovo, V. - Cross                                              37

 1    course, we don't want this on the Internet.

 2          There is really no need for it.  It's for the Court

 3    to have full transparency into what happened.  Mr. Vescovo

 4    voluntarily offered to be here today.  He went to some

 5    lengths to procure the video.  So I would only ask that -- I

 6    don't know if the right way to treat this is to hold it

 7    under seal or what the proper way to do it is, but we would

 8    just ask that the video be protected.

 9          THE COURT:  Well, I will conditionally admit it and

10    take your proposals.  It is proprietary information that

11    everyone agreed that EYOS would be able to make this

12    expedition, the parameters surrounding it, and the

13    representatives that could be available.  It is their

14    proprietary information.

15          So I will conditionally admit it, and I'll take

16    proposals on how.  It could be conditionally admitted as an

17    exhibit that accompanies Mr. Vescovo's testimony but not

18    available for reproduction, in other words, you can't

19    reproduce the video and put it on the Internet.  I imagine

20    part of it is going to come out anyway when the documentary

21    comes out.

22          In any event, that is your proprietary information,

23    and I recognize that.  So we will decide how to deal with it

24    in the end.  It's been available for the testimony, and the

25    testimony about it is on the public record, and we will

Vescovo, V. - Cross                                                    38

```
 1    determine what to do with the video later.

 2          MR. DAVIS:  With that being the case, would it be

 3    okay -- maybe we need motion practice on this, maybe we

 4    don't, but would it be okay for once we have finished using

 5    this today that I take the video with me, and we'd certainly

 6    be happy to make arrangements later, depending upon where

 7    you ultimately come out on this, Your Honor.

 8          THE COURT:  We will conditionally file it with the

 9    clerk.  We take videos all the time in criminal cases, and

10    they are under seal, they are not under seal, or they are

11    with Grand Jury testimony.  The clerk will take custody of

12    it, and it won't be reproduced, and we will decide how it is

13    to be admitted.

14          MR. DAVIS:  That works.  Thank you.

15          THE COURT:  We will conditionally, we will admit 1,

16    2, 3, 4 and conditionally admit number 5.  Certainly, if it

17    is viewed, it wouldn't be able to be copied or anything.  It

18    may be available for a view but not for any type of

19    reproduction because it does belong to your expedition.

20          MR. DAVIS:  Thank you.

21          (The video was conditionally marked as Exhibit No.

22    5.)

23    BY MR. CONCANNON:

24    Q.  Mr. Vescovo, my name is David Concannon.  I represent

25    R.M.S. Titanic.  I want to thank you for coming today.  We.
```

Vescovo, V. - Cross                                                    39

```
 1            Appreciate it, and we appreciate you being able to
 2   share this video with us and answer questions?
 3   A.   Thank you.
 4   Q.   I want to clarify something that you said first and that
 5   you were -- that is, that your expedition was out filming for
 6   R.M.S.T., is that what you said?
 7   A.   No.  We were on the expedition to produce a documentary
 8   that Atlantic Productions was filming, and to also get
 9   information for the wreck.  R.M.S.T. requested to be on the
10   expedition, to my knowledge, to help them continue their
11   representation in terms of investigating the wreck and
12   understand the condition of the wreck, and that was something
13   that I agreed to do without any compensation from R.M.S.T.
14            I thought it was in the best interest of the wreck
15   and the overall scientific community to allow R.M.S.T. and
16   NOAA to be on the ship.
17   Q.   Thank you.  And the reason I want to clarify this is that
18   Mr. Tata has made a representation to the Court in document
19   ECF Number 587, and I'll read it to you, and I want to ask if
20   this is your understanding.  "Atlantic entered into a
21   contract with Caladan giving Atlantic the right to film the
22   Titanic dives and to produce programming using that film."
23            THE COURT:  What are you reading from?
24            MR. CONCANNON:  ECF 587, Page 4.
25            THE COURT:  Well, let me get to ECF 587, Page 4, so
```

Vescovo, V. - Cross                                                      40

```
 1   we can all be on the same page.  What was it a part of?  In
 2   other words, it was an attachment, was it not?
 3          MR. CONCANNON:  My understanding is that ECF 587
 4   was filed with the Court.
 5          THE COURT:  Well, I'm looking at the docket sheet,
 6   but the docket sheet, obviously, is very lengthy.
 7          MR. CONCANNON:  It was filed on February 10th,
 8   2020.  I can provide a copy.
 9          THE COURT:  I probably have it right here in my
10   notebook, but I want to go to it.
11          MR. CONCANNON:  Would it be helpful if I put it on
12   the Elmo?
13          THE COURT:  First let me locate it, please.
14          MR. CONCANNON:  Sure.
15          THE COURT:  The 587 is a letter to the Court.
16          MR. CONCANNON:  Yes.
17          THE COURT:  Can you hand it up to me first, please.
18          MR. CONCANNON:  Certainly.  Your Honor, we did
19   provide an exhibit book, but I will hand it.
20          THE COURT:  Well, if it's in an exhibit book, then
21   tell me where it is in the exhibit book.  That is fairly
22   simple.
23          MR. CONCANNON:  I was looking for it while you were
24   looking.  It is tab number 8.
25          THE COURT:  I'm familiar with the letter.  You can
```

 1   give this back.

 2   BY MR. CONCANNON:

 3   Q.  Middle paragraph, Mr. Vescovo, last line in the first

 4   paragraph, it says, "Atlantic entered into a contract with

 5   Caladan giving Atlantic the right to film the Titanic dives

 6   and to produce programming using that film.  Neither EYOS nor

 7   R.M.S.T. is a party to that contract."

 8          THE COURT:  I want to just interject something.

 9   Number one, I think you've referred to it as an affidavit.

10   There is no affidavit here.  This is a letter to the Court

11   from an attorney.  This goes outside of the examination of

12   this witness.  He's not up here to be deposed or examined on

13   the contract.  He was here to talk about the bump.  You're

14   now getting into a letter written by Mr. Tata.

15          MR. CONCANNON:  Your Honor, my apologies if I

16   misspoke.  I did not mean to refer to this as an affidavit.

17          THE COURT:  I thought you did.  Maybe I'm wrong.

18          MR. CONCANNON:  I didn't mean to if I did.  My only

19   question is was R.M.S.T. Titanic -- were you filming for

20   R.M.S.T. Titanic or not?

21          MR. DAVIS:  Your Honor, I object.  I believe this

22   misstates the prior question.  I believe I asked Mr. Vescovo

23   if R.M.S.T. was aware that he was filming.  I believe the

24   answer was yes.  If I didn't, that's what I should have

25   asked.

Vescovo, V. - Cross                                                          42

```
 1            THE COURT:  Well, I understand it.  I think
 2    everybody understands it.  The Court agreed.  The Court
 3    entered an order, and the Court agreed to this expedition by
 4    EYOS, and everybody agreed to it and signed off on the
 5    order, including, I believe, Mr. Barger.
 6            In any event, the order itself said that R.M.S.T.
 7    could have a representative, and they did.  What are you
 8    getting at?  Trying to turn this into a contract turmoil of
 9    some kind?
10            MR. CONCANNON:  Absolutely not.  I'm simply trying
11    to understand.  This video we've seen for the first time
12    this afternoon, at the same time as the Court, and I'm
13    trying to understand why that is.  If you look at the NOAA
14    authorization, it says that if there is any harm to an
15    artifact, the video has to be included in the report, and it
16    wasn't.  There was no timely reporting of this to anyone.
17            THE COURT:  You can argue all that.  You can argue
18    all that to the Court.  That's all a timeline of record.  My
19    order is of record.  Their expedition was of record.  It was
20    an agreed-to expedition by NOAA.
21            In fact, I believe that NOAA encouraged it because
22    they thought it would add information about the wreck.
23    R.M.S.T. was in favor of it.  R.M.S.T. had a representative.
24    NOAA had a representative.  So let's don't turn this into
25    some type of antagonistic who said what, when, and where
```

Vescovo, V. - Cross                                          43

```
 1    when that's not the issue before the Court.
 2              MR. CONCANNON:  Okay.
 3    BY MR. CONCANNON:
 4    Q.  Mr. Vescovo, going back to the actual incident that
 5    happened, in the photographs of the sub, are there portholes
 6    in the rear as well as in the front?
 7    A.  No, there are no portholes to the rear.
 8    Q.  And am I correct that the sub was traveling backwards
 9    into the current or on its side with the rear facing into the
10    current?
11    A.  It was moving 50 percent aft and 50 percent left, if that
12    makes sense.
13    Q.  Yes.  Okay.  Did you have eyes on the wreck, you,
14    personally, as you were moving toward the rear of the wreck?
15    A.  I don't recall what I was doing at the exact moment of
16    the contact.  I could have been looking at sonar.  I could
17    have been looking at one of my instruments.  I don't recall.
18    What I do recall was feeling the contact.  That was the first
19    evidence I had that there was something not correct.
20    Q.  When you came up from the dive, who did you tell about
21    the contact with the wreck?
22    A.  I don't recall proactively telling anyone -- it could
23    have happened.  I could have mentioned that I bumped it.
24    Park Stephenson was in the submersible, as well.  But I don't
25    recall, in my own mind, it being a major event.  I was
```

1    extremely disappointed that we had actually made contact, but

2    that was the only time I actually distinctly felt contact

3    across, you know, 15 hours of diving.

4    Q.  Do you recall if you told Mr. Nargeolet?

5    A.  I don't recall if I did.

6    Q.  Okay.  Do you know if Mr. Nargeolet saw the video of the

7    contact with the wreck?

8    A.  I do not know.

9    Q.  Do you know if Mr. McCallum, your expedition leader, saw

10   the contact with the wreck, the video?

11   A.  I do not.

12   Q.  And the reason I ask is I'm just trying to get to what

13   has been reported and what we know and what we don't know.

14   So do you know if when Mr. McCallum submitted his report to

15   NOAA, he had seen the video of the contact with the wreck?

16   A.  I do not know.

17   Q.  And do you know if at any time prior to today's showing

18   of the video NOAA has seen a video of the contact with the

19   wreck?

20   A.  I do not know if they did.

21   Q.  I guess my final question is, do you know how these

22   characterizations of the contact being minimal or not minimal

23   were made by Mr. McCallum or NOAA if they hadn't seen the

24   video?

25   A.  I'm not party to the discussions that occurred between

Vescovo, V. - Cross                                                45

1    McCallum and NOAA.

2              MR. CONCANNON:  Okay.  Fair enough.  Thank you.  No

3    further questions.

4              THE COURT:  Mr. Porter.

5              MR. PORTER:  Just a few questions, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. PORTER:

8    Q.  Good afternoon, Mr. Vescovo.  How are you, sir?

9    A.  I'm good.  Thank you.

10   Q.  During the time that this incident occurred, were you

11   maintaining the buffer that you were required to maintain

12   pursuant to the authorization from NOAA?

13   A.  Well, obviously, since I made contact with the wreck, it

14   appears that at some point I did not.

15   Q.  That was at the time that the currents moved the

16   submersible; is that correct?

17   A.  That is correct.  I would note that Mr. Nargeolet, I

18   believe, after the first dive on the wreck, when he saw some

19   portion of the video that Atlantic was showing, because

20   everyone was curious to see what the cameras were showing, he

21   noticed that the currents were as strong or stronger than any

22   he had seen of the Titanic across all of his dives.

23   Q.  What from within the submersible, you said you felt the

24   contact.  Did you see anything through the portholes?

25   A.  Before the contact, I did not.  The evidence of the

Vescovo, V. - Cross                                                    46

1    contact, I believe, came first from Mr. Stephenson, who is

2    sitting to my right who could see out of the right-hand

3    portal, and he was, I believe, crouching forward.  So he had

4    better visibility than I did who was just sitting normally in

5    the pilot seat.  So I actually did not see the contact.  I

6    saw the evidence of the contact when I backed the submersible

7    away from the wreck and saw the rusticle debris.

8    Q.  What else did you see besides the rusticle debris?

9    A.  I saw the railing and the other area of the ship.

10   Q.  You indicated the railing, the three cross pieces dropped

11   about 18 inches?

12   A.  That's correct.  But I did not see them actually drop.  I

13   didn't know if they had been moved or not.  I didn't notice

14   that until after I actually saw the video.

15   Q.  Were they connected to something on the starboard side

16   where they dropped -- excuse me, on the stern side where they

17   dropped?

18   A.  I believe from the video that I witnessed they appear to

19   have been connected to one of the vertical posts, and they

20   remained attached after the incident.

21   Q.  And when did you view the videos?

22   A.  I viewed the video later that night.  After a long dive

23   like that, you're very tired and very hungry so immediately

24   after the dive I went down and got something to eat, and then

25   I was resting in my cabin when, I don't know what time,

Vescovo, V. - Cross                                                47

1    Atlantic actually advised me that they said, Victor, you
2    probably should see this, that you made contact with the
3    vessel.  And I came down, and I was surprised and somewhat
4    late, and then at that point I said, well, that's not good.
5    And I think I requested at that point if I could actually
6    have the video that showed that contact because I thought it
7    would be important later.
8    Q.  Who else was with you when you were watching that video?
9    A.  The director from Atlantic, her name was -- first name
10   was Lena.  I've forgotten her last name.
11   Q.  The letter that came to the Court with EYOS's report
12   described the incident as not particularly significant or not
13   particularly material.  Those aren't the exact words.  How
14   would you describe it after seeing the video and being
15   actually the pilot of the sub?
16   A.  I actually viewed the contact as minimal.  There was
17   quite a bit of discussion on the expedition given the level
18   of expertise that was on the ship, particularly by
19   Mr. Nargeolet and others, that other expeditions had made
20   significant contact, actually landing on the Titanic or
21   filming inside of it.  And that, by comparison, I believe
22   that Mr. Stephenson has actually told me that our expedition
23   across five dives did less or the least amount of damage to
24   the wreck than any he has ever studied.
25   Q.  And Mr. Nargeolet was involved in this conversation?

Vescovo, V. - Cross                                                48

```
 1   A.   No.   That was a different conversation I had with Parks
 2   Stephenson.   Although Mr. Nargeolet, I believe he and I have
 3   had conversations about other expeditions with Titanic when
 4   they were doing retrievals where the level of contact or even
 5   damage to the vessel was significantly higher than this.
 6   Q.   Did you talk to Mr. Nargeolet about this contact?
 7   A.   I don't believe I have -- we've really discussed this
 8   contact other than -- now I can't distinctly remember a
 9   conversation about this contact.
10   Q.   So, now, before the currents -- this section of rail was
11   right before the gap where you said the currents created some
12   extra turmoil, correct?
13   A.   That's correct.
14   Q.   Before you got to that point, were you maintaining a
15   buffer, the buffer that you were required to make?
16   A.   I believe I was.
17           MR. PORTER:   That's all I have.   Thank you, Your
18   Honor.
19           THE COURT:   Is there anything else, Mr. Davis?
20           MR. DAVIS:   No, Your Honor.
21           THE COURT:   Is there anything else for Mr. Vescovo?
22           MR. PORTER:   Not from us, Your Honor.   Thank you.
23           MR. CONCANNON:   No, Your Honor.
24           THE COURT:   Thank you, Mr. Vescovo.   You're excused
25   for now.
```

```
 1              THE WITNESS:  Thank you, Your Honor.
 2              (Witness excused.)
 3              THE COURT:  Mr. Davis, do you have anyone else that
 4    you wish to call?
 5              MR. DAVIS:  Are you asking Mr. Tata, Your Honor?
 6              THE COURT:  Mr. Tata.
 7              MR. TATA:  I'm sorry, Your Honor.  I didn't hear
 8    your last question.
 9              THE COURT:  Are there any further witnesses?
10              MR. TATA:  Not on our behalf, Your Honor.
11              THE COURT:  Thank you.
12              Mr. Davis.
13              MR. DAVIS:  I just wanted to confirm that
14    Mr. Vescovo is excused?
15              THE COURT:  As far as the Court is concerned, he's
16    excused.  He's given his testimony.  Does he have a plane to
17    catch?
18              MR. DAVIS:  Yes, he does, Your Honor.
19              THE COURT:  That's fine.  He's excused, as far as
20    the Court is concerned, and the Court thanks Mr. Vescovo for
21    coming and for testifying and explaining things the way he
22    did.
23              MR. DAVIS:  Thank you, Your Honor.  I'll be
24    departing with him.  Is it okay if I get the video to the
25    Court before we leave?
```

```
 1              THE COURT:  Yes.
 2              MR. DAVIS:  Thank you, Your Honor.
 3              THE COURT:  It's all on the thumb drive?
 4              MR. DAVIS:  That's right, Your Honor.  The video
 5    that we watched is the compilation that is called -- all
 6    these that are before, something like that.  But I'm happy
 7    to -- I know there is going to be some further discussion
 8    about how to handle that.  When we do that, I can make note
 9    of that for the Court, whenever we file what we need to
10    file.
11              THE COURT:  Let me ask you a question.  You just
12    handed a thumb drive to the clerk.
13              MR. DAVIS:  Yes, Your Honor.
14              THE COURT:  Is there anything else on that thumb
15    drive other than the six-minute video?
16              MR. DAVIS:  It is exclusively the video.
17              THE COURT:  That is all I wanted to clarify for the
18    record, three things:  Number one, that what's been handed
19    to the clerk, is a thumb drive, it's not a disc or any type
20    of hard copy video, so to speak.  It's a thumb drive, and
21    the only thing on that thumb drive is what we have watched?
22              MR. DAVIS:  The only thing on the thumb drive is
23    the compilation that we watched and then four additional
24    subfolders that contains separately the different views.
25    You recall the compilation had multiple views that were
```

```
 1   brought together into a single video.  So when we were
 2   talking about the time stamps during the video, I just
 3   wanted to be clear that it's not that compilation video that
 4   we watched, not the subfolder videos that have the different
 5   views by themselves.
 6          THE COURT:  But the different views by themselves,
 7   is it any more than what we saw on the video?
 8          MR. DAVIS:  Not as it relates to the contact.  You
 9   would just see a longer period of time before and after the
10   contact.
11          THE COURT:  Okay.  So I want to be sure we know
12   what's on the video.  What's on the video, then, is what we
13   saw?
14          MR. DAVIS:  Correct.
15          THE COURT:  The four sub folders?
16          MR. DAVIS:  Correct.  What we saw is in the main
17   folder.
18          THE COURT:  Do the subfolders contain more than
19   what we saw?
20          MR. DAVIS:  They do, so if you'd like me to get you
21   a different thumb drive that only has that, we could do
22   that.  I'll need to overnight it to the Court or something
23   like that.
24          THE COURT:  Yes.  I don't think we need all the
25   subfolders.
```

1           MR. DAVIS:  I think that's right.  In fact, I can

2    do this, if it's okay.  I can use the laptop so that all we

3    have left is that.  I have the original under lock and key

4    in our office because it is proprietary so if nobody has an

5    objection, I can just make sure that thumb drive only

6    contains that.

7           THE COURT:  That's all that should come in the

8    Court.  We don't need subfolders and whatever.

9           MR. DAVIS:  I agree.  So why don't I do that real

10   quick.

11          THE COURT:  It's what he testified to and what was

12   shown in court.

13          MR. DAVIS:  If I could get the thumb drive back, it

14   will take me maybe 30 seconds to do that.  Sorry.

15          THE COURT:  Do you need a recess?

16          MR. DAVIS:  Short recess might not hurt so

17   everybody is not sitting around.

18          THE COURT:  Is it a lawyer's 30 seconds or a real

19   30 seconds?

20          MR. DAVIS:  Let's be honest, it's probably a

21   lawyer's 30 seconds.

22          THE COURT:  We will take a 10-minute recess.

23          (Recess from 3:17 p.m. to 3:30 p.m.)

24          THE COURT:  Is Mr. Davis gone?

25          MR. WAINGER:  It appears so.

1          THE COURT:  He took care of it and gave it to the

2     clerk?

3          THE CLERK:  Yes.

4          THE COURT:  That's fine.  I think we are now moving

5     on to R.M.S.T.

6          Mr. Wainger.

7          MR. WAINGER:  Thank you, Judge.  We have

8     Mr. Nargeolet here.  He is actually on Mr. Vescovo's flight.

9     They are traveling for the next venture together.  I'm happy

10    to put him on if the Court would like to hear from him.  I'm

11    also happy, for the sake of time, to proffer what I

12    understood he would tell the Court about his role in what we

13    have just heard.

14         THE COURT:  I don't know if Mr. Porter would like

15    to cross-examine him in any way.

16         MR. PORTER:  Just about this incident, we just

17    heard?  May I have just one moment.  I think based on what

18    we have talked about earlier, the proffer may be sufficient

19    for us.

20         THE COURT:  Mr. Nargeolet is here, and if he would

21    pay close attention to the proffer, Mr. Nargeolet, so then

22    you can verify it under oath if appropriate.

23         MR. WAINGER:  Your Honor, Paul Henry Nargeolet is

24    here, and I'm proffering that if he were asked to testify

25    under oath, he would testify that he did participate in the

1    EYOS expedition in 2019.  He has extensive history with the

2    Titanic, having conducted more than 30 dives down to the

3    Titanic.  He would testify that he and Mr. Vescovo did not

4    speak about this incident.  He would testify that he did see

5    a video of the incident while on the ship, and he would

6    testify that he did not believe that it was a significant

7    event and it did not trigger him to notify R.M.S.T.

8            He would say that over the years diving is an

9    imperfect process, and that there have been other times when

10   the sub has made contact with the ship.  That is why he did

11   not tell R.M.S.T.  He believed his primary role on behalf of

12   R.M.S.T. was to be sure that no artifacts were recovered in

13   violation of the Court order.  Certainly, that didn't

14   happen.

15           When we came back, he was asked by Mr. Hunchak, the

16   company's president, who is also here, about the trip, and

17   he did not raise this issue because he did not think of it

18   as a big issue.  He was also believed he was under NDAs.

19           THE COURT:  Believed he was under what?

20           MR. WAINGER:  Under a non-disclosure agreement with

21   various parties on the dive.  It was a combination of the

22   NDA, and he didn't think it was a big event, and so he

23   didn't tell R.M.S.T.  The first he realized that it was an

24   event that the Court needed to hear about was when he saw

25   the report that EYOS had filed.  Shortly thereafter,

```
 1   Mr. Hunchak asked him if it happened, and he explained to
 2   Mr. Hunchak, yes, that it happened and why he hadn't
 3   reported it.  That's what Mr. Nargeolet, I believe, would
 4   testify to.
 5           THE COURT:  Do you have any questions about the
 6   proffer, Mr. Porter?
 7           MR. PORTER:  The only thing we would like to see is
 8   the non-disclosure agreement, if that's available.
 9           THE COURT:  It's always just easier to put a
10   witness on.  It's just always easier than to do a proffer,
11   just put him on and ask him the questions, and if somebody
12   objects to the questions, you can object, and then you can
13   ask him if he had a non-disclosure agreement.  It's just the
14   easiest, quickest way always to proceed.
15           MR. PORTER:  We are fine with the proffer, Your
16   Honor.
17           THE COURT:  You're fine with the proffer?
18           MR. PORTER:  Yes, we are.
19           THE COURT:  Then just let's just quickly place
20   Mr. Nargeolet under oath.  You can just stand right there,
21   Mr. Nargeolet.
22           (Witness was sworn.)
23           THE COURT:  Mr. Nargeolet, you heard Mr. Wainger,
24   and he made a proffer of what you would testify to if called
25   as a witness.  Do you agree with that proffer?
```

```
1              THE WITNESS:  Absolutely, Your Honor.

2              THE COURT:  Is there anything you want to add to it

3     or take away from it?

4              THE WITNESS:  I just -- I wanted to tell you a

5     small detail about this event that was not said before, is

6     that, you know, a little detail that supposed Mr. Vescovo

7     was talking, you know, that the last post or the focus --

8     that's the name of this deck on starboard side -- this post

9     was already bent at 90 degrees, that's for the beginning in

10    '87 I saw that because, probably, the first funnel of the

11    ship was falling down in this area.  That's why you can see

12    green pipe, which is a steam pipe for the whistle, you know,

13    on the top of the funnel.

14             That's why, you know, this post was outside of the

15    hull like that, and the few bar, if you look carefully at

16    the footage, you can see that the bar, the horizontal bars,

17    they were already detached for the next -- from the next

18    post.

19             I mean, when he touched just a little, this two top

20    horizontal bar, they were going down a little bit.  That is

21    it.  Of course, you have a little bit of cloud of rusticle

22    because it is made with different kind of bacteria, because,

23    you know, we -- the biologists, they found that there were,

24    like, six or seven different kind of bacteria on the

25    Titanic.  I mean, you have different corral, and all the
```

1    time when we touch a little bit, or we are close to some

2    part of the Titanic, and we touch a rusticle, or something

3    like that, that make a big cloud for -- and there is nothing

4    because this rusticle, they are just a powder.  That is why

5    when you look at the picture, you see a little cloud, but

6    that's why, from my point of view, it was even not an event.

7            That is why Mr. Vescovo, we didn't talk about that,

8    and I saw the video because I was above the shoulder of the

9    guy who was editing the video.  I was watching the video at

10   the same time, and I saw that, and said, okay, and I

11   understand what it was.  Later when I heard that it was an

12   event, it was a -- like a collision called the report, you

13   know, I say, well, okay, I watched all the video, and I saw

14   that the post was already down.

15           Then you can see that alongside all the -- the

16   portside of the bow section that most -- a lot of the bar or

17   this railway was already down, you know.  That's why --

18   everything is very, very fragile, and that's why if we were

19   touching a little bit -- and I remember very well that I

20   was -- after the dive, we always look at the sub, and we

21   didn't see any scratch or anything on the sub.  And it is

22   like a car, if you touch something, you will have a mark on

23   it.  It's very -- I won't say the skin of this sub is very

24   fragile, the sub itself is very strong, because, you know,

25   we can dive with the sub at 36,000 feet.

58

1          But the shape, you know, and the skin is very

2     fragile, and there was absolutely nothing.  That is why, you

3     know -- and even I cannot say for 100 percent that it was

4     really touching this stuff but just to be close enough to

5     move it a little bit and make the bar -- the top bar falling

6     down.  That's it.

7          THE COURT:  Well, thank you.  That was good

8     clarification about the pipe.  I think that many of us have

9     seen that before, the dust particles and, more importantly,

10    that there wasn't a scrape on the submersible in any way or

11    any evidence that there had been a hit.

12          Is there anything else that anyone wants to offer

13    or ask of Mr. Nargeolet before I excuse him?

14          MR. PORTER:  Not from us, Your Honor.  Thank you.

15          MR. WAINGER:  Judge, actually, we are going to call

16    Mr. Nargeolet for two different reasons, and that was the

17    first.  The second was with respect to the 2020 dive to talk

18    about his views of the deterioration of the wreck, and that

19    would be relevant in determining -- ultimate issue for Your

20    Honor as to whether or not from an archaeological

21    perspective we are justified in pursuing the Marconi.  That

22    would have been the second reason that he testified.  It's

23    unrelated to EYOS, but for that we have some photographs

24    that I could show you.  We could put him on the stand for

25    that.

 1          THE COURT:  I understand what you are saying.
 2    First of all, everyone accepts the proffer and accepts his
 3    addition to the proffer, and that's for purposes of the EYOS
 4    expedition and the "bump."
 5          In terms of the 2020 expedition that R.M.S.T. wants
 6    to undertake, you wish to offer his testimony out of order
 7    because you said that he has a plane to catch.  What time is
 8    the plane?
 9          THE WITNESS:  5:43 tonight.
10          THE COURT:  Well, I'll let you call him out of
11    order.
12          MR. WAINGER:  Thank you, Judge.
13          THE COURT:  You're still under oath, Mr. Nargeolet,
14    if you would take the stand.
15          THE WITNESS:  I understand.
16          PAUL HENRY NARGEOLET, called by R.M.S.T., having
17    been first duly sworn, was examined and testified as
18    follows:
19                      DIRECT EXAMINATION
20    BY MR. WAINGER:
21    Q.  Mr. Nargeolet, just to recap, how many times have you
22    been to the Titanic driving or piloting the submersible?
23    A.  About 30 times.
24    Q.  Over how many hours have you spent piloting submersibles
25    at the Titanic?

1   A.  About an average was five to six hours on each dive, on

2   the bottom.

3   Q.  Five to six hours for each, that would be approximately

4   30?

5   A.  Yes, 120, 130, something like that.

6   Q.  And when was the first time you went down the submersible

7   to the Titanic?

8   A.  It was on -- I think it was something like July 27, 1987.

9   Q.  1987.  Okay.  And how many times have you been since, if

10  you can recall?

11  A.  About eight times.

12  Q.  Between 1987 and --

13  A.  The last time was in -- in the manned submersible, I was

14  in 1998.

15  Q.  And so in 2019 you were on the ship but you didn't go in

16  the submersible?

17  A.  No, I didn't.

18  Q.  But have you been able to, as we discussed, view the

19  video from the submersible, the high def video?

20  A.  Yes.  Most of them, yes.

21  Q.  Did you see the high def video that was shown earlier as

22  Exhibit Number 5?

23  A.  Absolutely.

24  Q.  And is that clarity of the other video that you have seen

25  with respect to the dive?

1    A.   Yes.

2    Q.   Have you been able to witness the deterioration or any

3    deterioration of the wreck of the Titanic in the 30-some

4    years that you have been diving down?

5    A.   Yes.  I show a lot of difference and already -- I already

6    talk about that before.  But especially in 2010, when we were

7    on the Titanic, and we were using -- or -- and out of the

8    robot, we saw a lot of difference.  And I can give you an

9    example, because I know very well the '20s from the

10   gymnasium.  The gymnasium is a room which just back on the

11   grand staircase, and on the gym side of the grand

12   staircase it shows the, yes, close to the grand staircase,

13   you know, and on the other side it's where is the Marconi

14   room.

15          What I saw the difference at 1987, the roof on the

16   gymnasium was there.  In '93 the roof collapsed on the

17   inside, and on and on.  I will say in -- or in 1998 I saw,

18   for example, one -- the bicycle, you know, who has for

19   training the people in the gymnasium, I can see very well

20   through one of the window, pedal of this bicycle, and I was

21   thinking it could be good artifacts to recover, but,

22   unfortunately, in 2010, the deck of the ship close to this

23   gymnasium, there was a hole growing and growing, and it was

24   so big that the side of the gymnasium was starting to

25   collapse, and it was about back to like 60 degree from the

Nargeolet, P. - Direct                                          62

1    vertical, and last year everything collapsed inside, you

2    know.

3          The deck was collapsed to each other, and for me

4    that is evidence that a big deterioration now is a little of

5    the grand staircase.  And even the high between the deck,

6    which is normally more than 10 feet, is now about five to six

7    feet.  The next step will be the Marconi room.

8          THE COURT:  Which room would be the next step?

9          THE WITNESS:  The next step, you know, will be --

10   I'm sorry.  I don't understand.

11   BY MR. WAINGER:

12   Q.  The Marconi?

13   A.  Yes, the Marconi room where is the radio and everything,

14   and already, just between the grand staircase and the Marconi

15   room, that is what we call the elevator gear, is where all

16   the engine for the elevator, and the roof of the elevator are

17   already gone now, most of them.  I mean, the next big

18   deterioration will be the Marconi room, you know.  That's why

19   we are thinking that if we want to recover and to save this

20   artifacts, which is an iconic artifacts from the Titanic

21   because it's because of this radio equipment, that the people

22   were safe.

23          I think something very important, and it's not --

24   even some people tell me, oh, but, you know, we can see this.

25   It's the same kind of radio in other museum.  I say no,

Nargeolet, P. - Direct                                                        63

1    because one of the Titanic was a new one, much powerful than
2    the other one.  And I think that if we don't recover that, I
3    will say, I cannot swear that it will be in 2020, but very
4    soon it will disappear, and it will go down, and it would be
5    probably impossible to recover later.
6            That's why if we want to save something, and that is
7    my position, you know, about -- I will say it will be again
8    NOAA against NOAA.  I like NOAA very much, but she is a very
9    good, you know, government agency, but I disagree with some
10   of their stuff about the Titanic, like the conservation *in
11   situ*, I call that the deterioration *in situ*, because if we do
12   nothing, everything would be deteriorating.
13           That's why I'm thinking that if we want to save this
14   radio, we have to do that now in a hurry, because, really,
15   the next step will be the Marconi room.  I'm not sure even
16   that if we go into 2020 the roof will not be already
17   collapsed on everything, which makes this stuff very more
18   difficult, you know, to recover.  Like a little bit forward
19   of the Marconi room, we have the captain's suite room, and
20   I'm sure you saw some picture of the captain's suite room who
21   was already open at the beginning in '87, and step by step
22   everything collapse.
23           And now I heard people say, oh, the bath -- the turn
24   of the captain's suite disappear now.  It doesn't disappear.
25   It is full of debris coming from the roof and everything, and

Nargeolet, P. - Direct                                              64

```
 1    everything now is completely buried, you know.  And if we
 2    want to recover something there, we have to remove all this
 3    stuff.
 4              Actually, if we are still lucky, if we go to the
 5    Marconi room, we have a chance to find the equipment in -- we
 6    have a picture of this stuff because we earlier we were
 7    taking picture inside, and we can see pretty well this radio
 8    equipment, and it would be something very interesting to
 9    recover, if we could, is what we want to do on the R.M.S.
10    Titanic.
11              THE COURT:  The Marconi equipment in the Marconi
12    room is adjacent to the gymnasium?
13              THE WITNESS:  It's on the side of the grand
14    staircase, because that would be the next to be destroyed.
15              THE COURT:  All right.
16    BY MR. WAINGER:
17    Q.  Mr. Nargeolet, I'd like to show you what we have as tab
18    10 in our exhibit book.
19              Your Honor, it may be better for you to look at
20    these.  This might be easier for you to see.
21              THE COURT:  Does Mr. Nargeolet have one?
22              MR. WAINGER:  He will have these in the books.
23              THE WITNESS:  I have them in my mind, too.
24    BY MR. WAINGER:
25    Q.  Showing you, Mr. Nargeolet, tab 10 in our exhibit book,
```

1   it's a picture that says 1986.

2   A.  Yes.  You can see the little, you know --

3   Q.  Mr. Nargeolet, I'm going to just ask specific questions,

4   and then whatever else the Court needs.  What specifically

5   are we looking at here?

6   A.  We are looking at, you know, is the vertical bar facing

7   all the picture, that's what we call the expansion joint.

8   And on the right of the expansion, you have a little

9   rectangular, black, that's the skylight of the Marconi room.

10          On more to the right, you have like a little room

11  stuff, that is -- we call that the Mersh (ph.) room, is for

12  the ventilation of the elevator gear.  And to the right,

13  again, when we don't see that, that is where is the grand

14  staircase.  And the starboard side is on the top of the

15  picture, and portside, of course, on the other side.

16  Q.  So the room with the Marconi radio would be where on this

17  photograph?

18  A.  On each side of this little black square, that is the

19  skylight of the Marconi room.

20  Q.  Perfect.  Now, flipping to tab 11 of our book, there is a

21  picture that says 2004.  Is this picture of the same spot

22  that we were just looking at?

23  A.  Yes.  Absolutely.  The rectangular part is the skylight

24  of the Marconi room.

25  Q.  So it's a closer-up view?

Nargeolet, P. - Direct                                              66

```
1   A.   Yes.
2   Q.   Okay.  But this is the same skylight, and the Marconi
3   would be underneath this?
4   A.   Absolutely.
5   Q.   Now, this has more clarity, but you were able to see both
6   times, correct?
7   A.   Uh-huh.
8   Q.   Describe the deterioration that occurred between '86 and
9   2004 to this very location.
10  A.   Yeah.  Well, you know, for example, around the skylight
11  was the border in wood.  By the time, just with the current,
12  this frame of the skylight was moving away, and step by step
13  it disappear, you know.  And even in 2010, it was totally
14  out, and they disappear completely.  That's one of the
15  examples.
16        And on the right side of this little -- of the
17  skylight, you can see a black, some black spot.  That's the
18  beginning of the deterioration of the roof of the Marconi
19  room itself.  You know, the Marconi room, you have three
20  room, in fact, because you have one in the bedroom of the
21  radio guys, another one is where they were sending all the --
22  you know, the Morse and stuff like that, and there is another
23  one where you have some of the equipment, we call that the
24  silent room, you know, because it is where they were
25  listening everything and they are sending the message from
```

JODY A. STEWART, Official Court Reporter

Nargeolet, P. - Direct                                              67

1    other ship.

2            But the wall between these three pieces are in wood,

3    and that was all gone, actually, because of all the wood --

4    under -- most of the part of the wood of the ship disappear

5    already, I mean, it's already one piece, you know.

6    Q.  Mr. Nargeolet, now flipping to tab 12 in our exhibit

7    book, the photo that shows 2010.  Is this photo the same, a

8    photo of the same spot that we have looked at in 2004, 1986?

9    A.  Yes.  It's the same orientation.  And you can see on the

10   right of the rectangular of the skylights, you know, that you

11   have a lot of hull on this part, which is the part where I

12   was saying before, it's the elevator gear, and you can see

13   the deterioration is coming very -- more and more on this

14   spot, and just for -- you remember on the right side was the

15   grand staircase.

16   Q.  Mr. Nargeolet, you were able to see high def video of

17   this particular spot from the 2019 dive?

18   A.  Yes, I did, and, you know, just down of the skylight you

19   can see little black spot.  That's some hole, but now they

20   are not bigger, but, if you look that closer, you can see

21   that they are full of kind of dust.  I mean, I think if we

22   touched that, the roof will be gone.  But you will have still

23   some bar, which is some reinforcement for the roof.

24           But now we know the big hole you can see on the

25   side, on the right side, now is are coming to just around the

 1   skylight.  That's why we are sure that the main deterioration

 2   now is going forward.  Like, it's -- it's from '87 we saw

 3   that, that from the back of the bow section, all the

 4   deterioration was coming step by step to the bow.

 5          Of course, for the bow, it would take a lot of time

 6   because the bow, is, you know, is bigger than the rest of the

 7   ship, is the same kind of constriction, that being much

 8   stronger than the rest.  But over on the bridge and on this

 9   spot, everything is starting to collapse.

10          MR. WAINGER:  Mr. Nargeolet, that's all the

11   questions I have.  I'd like to offer into evidence, Your

12   Honor, the first photograph, it says 1986, which is Number 10

13   in the exhibit book, as our next in line.

14          THE COURT:  '86 is admitted, one of 2004 and 2010.

15          MR. WAINGER:  Correct, all three of them.

16          THE COURT:  All three are admitted.

17          MR. WAINGER:  Thank you, Judge.  I have no further

18   questions for Mr. Nargeolet.

19          THE COURT:  Mr. Porter.

20          (The photographs were received in evidence as

21   Exhibit Nos. 1, 2, 3 & 4.)

22          THE COURT:  Mr. Porter.

23                          CROSS-EXAMINATION

24   BY MR. PORTER:

25   Q.  Mr. Nargeolet, did you document your findings of the

1    deterioration of the wreck in any papers of any sort or any

2    memorandum?

3    A.   No.

4    Q.   Are you aware of any current research in the last 10

5    years that has documented or defined what the rate of

6    deterioration is of the wreck site?

7    A.   I read some document.  That's why I didn't -- my people,

8    they were not on the site, you know, that you have a big

9    literate of the Titanic made by peoples, I guess, a lot of

10   thing, but they don't have any real evidence of what

11   happened.  But I don't remember that -- I'm not very good at

12   what -- writing report because I prefer to be at sea and to

13   work at sea than to make report.

14           But I remember pretty well what I saw, but I didn't

15   see any specific -- the deterioration, of course, is -- you

16   know, it will continue, and I can't say at which speed

17   because nobody know.  Everybody is guessing what will happen.

18   But, again, to give you an example, Your Honor, since 1987, I

19   heard that the Titanic will disappear in 20 years, and now it

20   is 25 -- 35 years later, and I still heard in 20 years.

21           But for me, it will be for a very, very long time

22   that we will still have some part of the ship, like the

23   engine, like the bow section, you know, and stuff there are

24   very strong, even the stern of the ship where are the

25   propellers are very strong part of the ship, and they will be

Nargeolet, P. - Cross                                             70

```
 1    here, like, for maybe 200 years, 20 years.  Who knows?
 2    Nobody -- everybody will tell you something is guessing.
 3    Q.  How big is the ROV that would be needed for this
 4    operation?
 5    A.  It's much smaller than the Marconi room itself because we
 6    have some drawing of this room and drawing of this area, and
 7    we know that it will fit inside, and we'll have some spare on
 8    each side.  And we are very -- we are thinking we can do that
 9    very properly, very nicely, you know, and we will do that, of
10    course, as much we can.
11            And I think we have a big chance to succeed.  But I
12    can tell you is there is already one equipment we was between
13    the silent room and the -- there was a room where there is a
14    skylight, which -- the wall, the wood disappear, and if we
15    find the stuff, it would be on the bottom of this room.
16    Q.  How big would the hole need to be to get the ROV into
17    this room?
18    A.  I will say, because you know there are different kind of
19    equipment, and there is, like, three equipment, and very
20    interesting, and we have to cut, you know, the rest of the
21    roof, if it's still there.  But maybe it will be already
22    collapsed, but maybe there is some -- I think we have a
23    chance to see some bar, some reinforcement, you know, like
24    some beam across, and maybe we will have to cut this beam,
25    and it will be not hard to do that because they are very
```

1    fragile for -- I guess, because nobody can say that for sure,

2    but I think it will -- we can do that very properly, and we

3    have to remove some of this pieces to go inside and to work,

4    you know, on the equipment itself.

5    Q.  But how big is the hole?

6    A.  I will say roughly will be 4 meter by 3.

7    Q.  Now let me show you a portion of an exhibit.  This was

8    Exhibit 3 to the periodic report, Your Honor, R.M.S.T. filed

9    on January 20th.  This is docket number 585-3 at Page 5.

10   Have you seen this document, sir?

11   A.  I don't see this one, but I have my own document about

12   the same one.

13          THE COURT:  Let me go to that report.  Which date

14   is the report?

15          MR. PORTER:  This is January 20th, Your Honor.

16   This is Exhibit 3, docket number 585-3, and this is at Page

17   5 of that report.

18          THE COURT:  Let me go to 585.  I have it all here.

19   I just need to get to it.  I have all of the attachments.

20   Which attachment is it?

21          MR. PORTER:  It is Exhibit 3.  It's 585-3.

22          THE COURT:  585-3.

23          MR. PORTER:  I'm at Page 5 right now.

24          THE COURT:  I've got it.

25   BY MR. PORTER:

Nargeolet, P. - Cross                                          72

```
 1   Q.  Mr. Nargeolet, looking at this diagram, first looking at
 2   the diagram to the left.
 3   A.  That's the starboard side of the ship.
 4   Q.  And the three rooms that include the silent room where
 5   the equipment are, are those three that are right here --
 6   A.  Yes.  Exactly.
 7   Q.  -- in the middle, correct?
 8   A.  Yes, correct.
 9   Q.  And the silent room, the silent cabinet where they put it
10   is on the top of the picture?
11   A.  Absolutely.
12   Q.  Surrounding this are quarters, right?
13   A.  On the left side, it's the elevator gear.  On near the
14   side you actually have -- in front of first, you know, on the
15   bottom, that's some bedroom for some officers, and there is a
16   hallway in between.  And after you have the first room is the
17   one -- is the bedroom of the radio people.
18          The second one you can see, you know, is between
19   the -- is not really a name on the one in the middle, like I
20   can't remember, is the top one like you were seeing the
21   silent room.  That's what we want to do.  We want to open the
22   roof of the side, which is exactly, you know -- I was saying
23   3 meter, but it is 2 .9, and then we don't need 2.9.  Maybe
24   it would be 2.5 or such like that, by the length of this
25   three room, which is 2.4 -- I will say now, looking at the
```

1  dimension, I will say it's probably 2.5 by 4 or 5 meter.

2  Q.  Now, just for perspective, and I think my pen, yes, is on

3  there, this part is forward towards the bow, correct?

4  A.  Yes, exactly.

5  Q.  The portside up here?

6  A.  Yes.

7  Q.  And these are all officers' quarters?

8  A.  Yes, that's some -- and, you know, where is the hallway

9  in the middle is almost where is expansion joint, which is

10  opening and opening more and more.  From now from the

11  expansion joint, we can see some stuff in the middle, like,

12  you know, on the top, you have the smallest room.  It's a

13  bathroom of one of the officer bedroom, and we can see

14  everything from the expansion joint because it's open more

15  and more.

16  Q.  And then to the starboard side, that is also officers'

17  quarters?

18  A.  Yes, absolutely.

19  Q.  And wouldn't you expect there to be artifacts from those

20  officers in those spaces?

21  A.  We -- we don't expect to recover any artifacts from the

22  other part on the Marconi room.

23  Q.  I'm not asking if you expect to recover any.  Do you

24  expect that there could be artifacts in those spaces of

25  officers?

1   A.   Absolutely.  Probably, yes.  You know, like I can tell

2   you, I was on the sub when we recover one little artifacts on

3   the roof of the Marconi roof, which was an hourglass, a small

4   one.  It was almost intact, and it was there for a long time.

5   I think I recover it in maybe 1988 because before anyone saw

6   it, one time we were -- enough close, you know, to see it,

7   and I say, okay, that is good artifacts, one of the only

8   artifacts we recover from the wreck, but from the top of the

9   wreck.

10  Q.   Sir, I have turned over a few more pages in this same

11  exhibit.

12       Your Honor, I'm now at Page 11 of the same exhibit.

13  A.   Yeah, the -- I'm sorry.

14  Q.   And so now you have the submersible inside the space,

15  right?

16  A.   Yes.  Correct.

17  Q.   This is the ROV?

18  A.   This is the ROV.

19  Q.   Isn't the ROV actually within the space of some of the

20  officers' quarters?

21  A.   Yes.  Even it doesn't have to be -- I think just the

22  drawing show it on one of the bedroom of the official, and we

23  don't have to go there.  We just have to go enough on where

24  there is a door, just because it is where are the equipment,

25  that mean the ROV fit in the -- you know, in the bottom of

Nargeolet, P. - Cross                                          75

1    this three room, and, you know, we don't have to do anything
2    on the bedroom or on starboard side.
3    Q.  You heard the testimony of Mr. Vescovo about this recent
4    incident where there was a bump of the starboard rail,
5    correct?
6    A.  Yes.
7    Q.  And you would agree that, in fact, the currents and the
8    turbulence down at the wreck is significant, is it not?
9    A.  Yes.  You know, because --
10   Q.  Wouldn't you agree that also currents and funnels come up
11   through the ship through other holes in the ship, correct?
12   A.  Yes.  Especially, I saw that one time when the current
13   was coming from the portside of the wreck, and I saw --
14   because the current was 90 degree from where it is normally,
15   and I saw it through the grand staircase a lot of sediment
16   going out, and we were -- as a joke, we were saying, oh, the
17   Titanic is leaving, because it was like it was from the
18   internal, and it was smoking, you know, and we were -- it was
19   really an unbelievable view, but that happened a lot, you
20   know.
21   Q.  It's your testimony that you can control the ROV with
22   enough precision within a foot so it doesn't intrude into the
23   officer s' quarters?
24   A.  Yes.  That's our goal, and I'm pretty confident that we
25   can do that.  No, even I'm totally confident that we can do

Nargeolet, P. - Cross                                                76

1   that.

2   Q.  Now, as the holes you've described in the documents you

3   were shown earlier, as they grow larger, the process

4   accelerates, correct?

5   A.  Uh-huh.

6   Q.  So what's going to happen when you cut a 3-by-4 meter

7   hole in the deckhouse?  Isn't that going to accelerate even

8   further the deterioration and the collapse?

9   A.  I will say we will remove some pieces of metal, which are

10  already deteriorated, but we have to cut them.  Maybe I will

11  say the center of the steel could be still something, you

12  know, strong.  I don't know.  You know, it is impossible to

13  say exactly if everything is like the railway, you know, so

14  bad or if it still will be strong.  We don't know, but we

15  have circle -- so we can dial into the circle so, and we can

16  cut that very nicely and very properly.

17           THE COURT:  It seems like what you're saying is

18  that there really is no choice.  To get to the existing

19  artifacts, you have to get inside?

20           THE WITNESS:  Absolutely.

21           THE COURT:  If you don't get inside, it's going to

22  collapse, and then you won't have any artifacts?

23           THE WITNESS:  Exactly.  But from my point of view

24  is the last -- one of the last -- I'd say is the last

25  chance.  I cannot swear that everything will be still good

JODY A. STEWART, Official Court Reporter

1    in a year.  I don't know.  But the main deterioration is so

2    close from the Marconi room, it's time to do that.  If not,

3    I'm pretty sure we will have one chance now, and even I

4    cannot guarantee that each year the roof will not be

5    collapse already.  But it's time to do something.  If not,

6    it will be -- all these artifacts will be lost forever.

7           THE COURT:  So it's the choice between having to do

8    something and hoping for a good result or doing nothing and

9    knowing that there will be no result?

10          THE WITNESS:  Exactly.

11   BY MR. PORTER:

12   Q.  Will cutting a roof impact the structural integrity of

13   the roof?

14   A.  No, because this part of the ship is not a part of the

15   structure of the ship, is a light structure compared to the

16   hull itself, because, you know, the upper part of the ship

17   is already in -- and that was on the one of the roles so of

18   the expansion joint, and it was something light like that,

19   the weight of the ship is the top weight is less than the

20   rest of the ship.

21   Q.  Turning over two more pages to Page 13 of the same

22   exhibit.  This shows the ROV approaching the silent room,

23   correct?

24   A.  Correct.

25   Q.  Now, do you know that the wall is gone?

1    A.  You can see the wall because -- you can see on the

2    drawing on the upper right part of this, this picture, that

3    you have some -- is in wood.  You can see it because you can

4    see the -- not the stern but the piece of wood.  And we know

5    that this wall isn't -- where there is a door is in wood and

6    is probably gone already.  I mean, the equipment will, on the

7    wall of this part, is probably already down on the floor.

8    Q.  I'm reading from Mr. Stephenson's report that was filed

9    at document number 585-1 at Page 4 of the docket number, and

10   it says, "In 2019 Stephenson noted the first holes opening up

11   over the silent cabin in the immediate vicinity of the

12   surviving wall upon which are mounted the intact switchboards

13   and regulators."

14   A.  You know, it was that, and I like -- you know, Steve is a

15   good writer, and he like to write a lot of thing, but I don't

16   know how he can see that.  It's impossible to see that from

17   the skylight, you know.

18   Q.  If there are walls there between the ROV and this first

19   set of equipment, those walls are going to have to be torn

20   down, aren't they?

21   A.  If we want to recover more artifacts from the silent

22   room, we have to do that.

23   Q.  There were secondary targets identified if the first

24   targets could not be recovered, and I'll turn over two more

25   pages to Page 15, and that identifies where the secondary

1    targets are, correct?

2    A.   Yes.

3    Q.   If the first targets can't be recovered --

4    A.   I think you could -- it's an easy one.  But even we were

5    thinking it would be good to recover this secondary recovery,

6    too, which are also these pieces.

7    Q.   Let's assume the wall is gone.  The generator is actually

8    bolted to the steel deck, correct?

9    A.   Uh-huh.

10   Q.   How is that going to be recovered?

11   A.   If there is some wire or something like that?

12   Q.   Isn't it still bolted to the steel deck?

13   A.   But it was bolt -- you know, the generator was bolt on

14   the wall, but the -- if it is on the floor, it is not bolted

15   anymore, and this one, you know this little square one on the

16   part of the green part -- tell me what exactly your question,

17   you know.

18   Q.   Let's back up to 13.

19   A.   Yes.

20   Q.   The item on the floor --

21   A.   Yes.

22   Q.   -- this is the regulator up on the wall, correct?

23   A.   Yes, correct.

24   Q.   These are the generators on the floor?

25   A.   Yes.

Nargeolet, P. - Cross                                              80

1   Q.  They are bolted to the steel deck, are they not?

2   A.  Yes.  If it is easy to remove it, we can remove it,

3   because even with a -- not a -- I don't know, like a wrench,

4   you know, we are -- a hydraulic wrench, it could be easy.  If

5   it's not easy, we will not recover it, and we will go to

6   recover the next one.

7   Q.  And moving to the secondary targets, they are surrounded

8   by items that are described as, in essence, no-go items

9   because they could be environmentally hazard, correct?

10  A.  Yes.  You know, it's -- it's -- from my -- you know,

11  in -- I don't remember which year, we went with the smaller

12  ROV inside the Marconi room, and I have to say it's a big

13  mess in that because you are already some desk and stuff like

14  that they collapse in there on the floor, you have a lot of

15  thing.  I mean, we have to clean a little bit this part of

16  the ship before to recover nicely some of the artifacts, and

17  we will do that.

18          We can have like a kind of vacuum, you know, and

19  cleaning this area and removing the stuff because a lot of

20  stuff and rusticle and particles, they are, you know, hanging

21  from the roof.  And when the rusticles are the certain size,

22  they collapse, and a new one is growing, you know, on the

23  floor, we will find a lot of things, you know, the rusticle

24  step by step.

25  Q.  Mr. Nargeolet, what standards do you believe that

Nargeolet, P. - Cross                                                  81

1    R.M.S.T. should apply to this recovery?  Do you accept that
2    the UNESCO annex standards or the international agreement
3    annex standards apply to a recovery plan?
4          MR. WAINGER:  I'm going to object.  I think this is
5    outside.  This is asking for a legal conclusion.  This is
6    outside of the scope.
7          THE COURT:  Sustain the objection.
8    BY MR. PORTER:
9    Q.  Do you accept a distinction between recovering artifacts
10   within the wreck and recovering artifacts in the debris
11   field?
12   A.  I think so.  You know --
13         MR. WAINGER:  Same objection.  I don't think is
14   within his province.
15         MR. PORTER:  Your Honor, I would actually say since
16   he is advocating for going into the wreck, I think it's
17   reasonable to ask him what he thinks about recovery from the
18   debris field versus going into the wreck.
19         THE COURT:  He has expertise in these recovery
20   missions.  He has been before the Court for 30 years.
21         MR. PORTER:  Yes, ma'am.
22         THE COURT:  He has expertise in operating the
23   submersibles and in salvage operations, and his
24   documentation is in his mind, and the way it is in many
25   people's minds, with 30 plus years' experience with the

```
 1    Titanic plus many others.  You can ask him, but he's
 2    explained how he would go in and get to the Marconi room, if
 3    there is even anything there that you can recover.  But I
 4    know there is a difference between going in and recovering
 5    from the debris field.  I'm not exactly sure where you are
 6    going, but I'll let you ask the question.
 7    BY MR. PORTER:
 8    Q.  Mr. Nargeolet, you indicated that you would need to clear
 9    or clean some things out of the area.  What did you mean by
10    that?
11    A.  Actually, you know what, if we find on the bottom some
12    rusticle almost intact but falling down for the -- it would
13    be easy to, you know, step -- sweep down a little bit, like
14    that we will see more, and we can see if there is bolts we
15    can use for, you know, removing the -- how you call that, the
16    generator from the floor or not.  If it's too hard, we will
17    give up, and that's it.
18    Q.  Would that include removing any artifacts that are in the
19    area as well?
20    A.  The chance to find other artifacts, we can find very
21    little stuff but not a lot because we know we have the
22    picture.  You can see the picture on the right side bottom on
23    the -- it's -- you know, we need to recover the bigger one
24    but not everything, you know.  But if there are some things
25    we can save, I think it would be good to do it before it
```

Nargeolet, P. - Cross                                              83

1    would be destroyed.

2    Q.  And the piece that is removed from the deckhouse roof,

3    what happens to that?

4    A.  That -- you are thinking about --

5    Q.  When you cut into the deckhouse roof to --

6    A.  We will -- it's depending, you know.  There is two

7    possibility or is one piece.  If it is one piece, we can try

8    to put it back where it was, if it's possible.  I don't --

9    then we can put it -- you know, it will be on the side like

10   that.  It will be in balance, and it will not -- but if not,

11   we will put it in a place where it is safe for a while.  But,

12   you know, if it is on the ship itself, sooner or later it

13   will disappear, like, and it will be collapse with the deck.

14   That is -- there is no question about that.

15         You know, Your Honor, between all these spots, there

16   are some wood wall.  Originally, they were a part of the

17   structure, but as the wood disappear, the roof is heavier and

18   heavier for the structure.  That is why it collapse, you

19   know, and that will happen step by step.  That's why we are

20   sure that in a short time everything will collapse, and it

21   would be the end of this artifacts.

22         That's why, you know -- and it is bad that I cannot

23   say what I'm thinking about the agreement because I like the

24   agreement by itself.  But say for myself, the agreement says

25   that we should not take anything.  I think that you are in

Nargeolet, P. - Cross                                          84

1    charge of the Titanic, and you control that, you know.  And

2    I'm happy with that because you remember in originally when I

3    was in the courts, we were asking to the Court to help us to

4    protect the Titanic for R.M.S.T., and I remember at the time

5    of the Judge Clark.  You know, we were happy about that.

6              THE COURT:  He's right up there.

7              THE WITNESS:  Yes.  I remember him, and we will not

8    again start at all.  Even the agreement in this court,

9    agreement, you know, is in agreement.  I say from my point

10   of view, I'm afraid of -- you know, if you -- you know, how

11   we to say that, I will say I'm afraid that NOAA is trying to

12   take over your job, Judge, you know, which I disagree with

13   that.  That is my really my point of view.  I don't sit

14   between you and me because there is a lot of people here.

15             But is what I'm thinking, you know, because for me

16   there is the slow, it would be able to exist for something

17   like 3,000 year, or something like that, and we don't have

18   to put something above the law.  That's my point of view.

19             MR. PORTER:  I have no further questions, Your

20   Honor.

21             THE COURT:  Anything further?

22             MR. WAINGER:  No.

23             THE COURT:  Thank you very much, Mr. Nargeolet.

24   It's nice to see you again, and you are excused for now.

25             THE WITNESS:  Thank you, Your Honor.

Broadwater, J. - Direct                                          85

1              (Witness excused.)

2              THE COURT:  Does R.M.S.T. have any other witnesses?

3              MR. CONCANNON:  Yes, we do, Your Honor.  Your

4    Honor, R.M.S.T. calls Dr. John Broadwater.

5              THE COURT:  Dr. Broadwater.

6              (Witness was sworn.)

7              JOHN BROADWATER, called by R.M.S.T., having been

8    first duly sworn, was examined and testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. CONCANNON:

11   Q.  Thank you, Your Honor.  We have already submitted an

12   expert report from Dr. Broadwater with some of his

13   qualifications.  In the interest of time we will simply ask

14   Dr. Broadwater to briefly state who you are and what your

15   qualifications are for the record, not go into the detail we

16   did in the report.

17   A.  Okay.  I'm John Broadwater.  I've done a number of

18   underwater archaeology projects and worked for different

19   organizations.  I was the state underwater archaeologist in

20   Virginia from 1978 to 1989, and then I went to work for NOAA

21   in the marine sanctuary program where I was in charge of the

22   MONITOR from '92 until around 2002, when I was offered the

23   opportunity to create a maritime heritage program within the

24   office of National Marine Sanctuaries.  I'm currently back

25   working part time in my little state job, as the state

Broadwater, J. - Direct                                              86

1  underwater archaeologist here, but I'm here today

2  representing myself.

3  Q.  Are you being paid anything for your testimony today,

4  Doctor?

5  A.  No, I'm not.

6  Q.  Have you been offered payment for your testimony?

7  A.  Yes.  But I felt like it was appropriate for me to be as

8  neutral and objective as possible, and so I rejected the

9  offer.

10  Q.  Have you reviewed the plans that R.M.S. Titanic has

11  proposed to the Court?

12  A.  Yes, I have.

13  Q.  And is it fair to say that those plans are not the only

14  plans that are in development but they're in flux?

15  A.  Yes.  It's my understanding that -- well, I think it's

16  evident from the exhibit that the preliminary plan for an

17  operation of this extent, you would want a much more detailed

18  plan.  And among the discussions that I've been a part of are

19  to look for ways -- if you look at the UNESCO agreement or

20  the Titanic agreement, it says that you should always

21  attempt, and I certainly subscribe to the tenet of trying to

22  do things as minimally invasive as possible.

23          So we have been looking at other options that I

24  think offer a real promise of being able to meet the goals of

25  recovering some of the Marconi equipment but maybe without

Broadwater, J. - Direct                                          87

1   having to do as much intrusive damage to the wreck as is

2   presented in the original plan.

3   Q.  Let me ask you first, Dr. Broadwater, do you support the

4   plan to recover what is possible to recover from the Marconi

5   room?

6   A.  At this point I can't really say that I support the plan

7   because it's not really developed to the point that I could

8   commit one way or the other.  But I do think Mr. Nargeolet

9   and some other people are presenting more and more evidence

10  that we are seeing an increased rate of deterioration and

11  deck collapse.

12          So I think for most of us, in fact -- may just kind

13  of digress slightly, I think most of us in the archaeological

14  community wear several hats.  One is always, if we are

15  archaeologists, we dig.  That's what archaeologists do.  But

16  that's tempered by the fact that most of us also have a hat

17  that says historic preservation.

18          So we are always trying to balance the idea of

19  leaving a site untouched, leaving it *in situ* versus the

20  benefits that can accrue from excavation, either partial or

21  complete, and those can include things like the site being in

22  peril, as there seems to be a lot of evidence the Titanic is,

23  or that by excavating and recovering artifacts and

24  information from the site, you gather scientific and

25  educational information that make the recovery a more

Broadwater, J. - Direct                                      88

1    attractive operation rather than *in situ* by itself.

2    Q.  I forgot to ask you, sir, have you been to the Titanic?

3    A.  I have.  I made a dive in 2001, and so I did get to see

4    the site up close.  It's very difficult from, you know, what

5    we know now, as several people have already remarked, to make

6    any predictions on what's its current peril?  Is it going to

7    fall apart this year, next year, a hundred years from now,

8    but certainly there is certain clear signs of deterioration.

9    Q.  The 2001 expedition that you participated in, was that

10   the James Cameron expedition where he filmed inside the

11   wreck?

12   A.  Yes.  Using two very small ROVs, and those are so small

13   that they are able to get into places that I think gave us a

14   lot of information that was helpful in trying to determine

15   what the interior structure, the surviving interior structure

16   of the wreck was like.  So I consider that to have been a

17   very low impact and high reward in terms of data.

18   Q.  Would you support a proposal to go inside and film inside

19   and do a pre-disturbing survey and gain more information

20   about the rate of deterioration since 2001?

21   A.  I think -- assuming we can come up with a plan that

22   pretty much guarantees that any impact would be minimal,

23   because of the ROV's size and mass, would be so slight that

24   if you did have an occasional bump, as we were using the

25   term, that the damage would, unlikely -- be unlikely to cause

Broadwater, J. - Direct                                    89

1   any serious damage.

2          I think the additional information, especially these

3   days, we have such good quality cameras.  We have good

4   positioning systems that can navigate these corridors within

5   the ship.  I think the data that you would get might

6   contribute to making these predictions about what the rate of

7   collapse is and how desperate the situation is for the

8   Titanic.

9   Q.  If there was a circumstance where a filming inside the

10  Marconi room, for instance, showed easily accessible

11  artifacts that could be retrieved by reaching through the

12  existing holes, would that be something that you would

13  support?

14  A.  I think at this point I would really want to see a more

15  detailed plan.  But I will say that one of the other hats

16  that I think archaeologists wear or should wear is we are

17  storytellers.  If we recover artifacts from a shipwreck, and

18  we keep it all to ourselves, or we file it in some tome in a

19  journal someplace, we haven't really completed our

20  responsibility.

21         So I'm always intrigued by the idea of looking at

22  that aspect, what are the public benefits that might accrue

23  from recovering artifacts.  And as I mentioned, I was

24  involved at NOAA with the MONITOR, and the MONITOR had many

25  similarities to the Titanic in that the wreck was in peril.

Broadwater, J. - Direct                                          90

1    It sits above the seabed.  It is not imbedded, and so it's

2    not protected against currents and corrosion and all the

3    human effects.

4           So we made the decision that we needed to intervene

5    at the site.  I'm so glad we did because if you take a trip

6    across the Hampton Roads Bridge/Tunnel and you go to the

7    Mariner's Museum, you can visit the MONITOR's center, and you

8    can see the objects that we recovered, interpret it in a way

9    that the public can really enjoy and be excited about what

10   the ship represented to the American Naval history.  It was

11   the first modern warship.

12          So are there parallels to the Titanic there?  I

13   think one of the things I read in the R.M.S.T. brief that

14   caught my attention is just how important the Marconi is, and

15   I guess I've sort of forgotten that.  It was one of the first

16   of the new types of Marconi.  It had such a distinctive sound

17   that any radio operator that heard the Titanic calling a

18   signal, they knew it was the Titanic.

19          It was also, I'm fairly certain it was the first

20   time that the new distress code SOS was ever used in a marine

21   disaster.  Before that it was a CQ signal that radio

22   operators are familiar with.

23          But the international, by international agreement,

24   the SOS signal had been adopted, but I believe it had not

25   been used, at least not in a major disaster.  So all of those

Broadwater, J. - Direct                                                    91

1    are stories that I think could be well told, and having the

2    physical object there, the physical Marconi, or at least part

3    of the whole apparatus, would bring it to life.  That's what

4    archaeology is.  I mean, if you look at the dictionary

5    definition of archaeology, it's learning about interpreting

6    our past based on the physical evidence that past people have

7    left behind.

8            So without artifacts, archaeologists can't be

9    archaeologists.  So, again, it's back to the balance, and so

10   to get back to would I support a plan?  I would really want

11   to see the details on how non-invasive could the plan be

12   developed to be?  But in that case, I see a lot of advantages

13   in bringing up an object that's so important to the Titanic

14   story and could be told so well in a museum setting.

15   Q.  Doctor, isn't it true that you were more than just a

16   participant in the recovery effort for the MONITOR, that you

17   actually held a leadership role?

18   A.  Yes.  I had a fairly unique situation with the MONITOR.

19   We didn't have the money at NOAA to do what we felt needed to

20   be done to do these major recoveries.  But I was able to work

21   through the NOAA hierarchy and develop a partnership with the

22   U.S. Navy.  We started with the Naval mobile diving and

23   salvage unit out of Little Creek, Virginia, not far from

24   here, and it expanded to operations that recovered the

25   MONITOR's propeller and engine and gun turret and guns, all

Broadwater, J. - Direct                                          92

1   done through Navy divers.

2          So I was in a unique situation of being responsible

3   for recovery operations or being done by Naval salvage

4   divers, and just the term salvage kind of scares

5   archaeologists, but we had an agreement that the Navy would

6   call the shots as far as what equipment they used and how

7   they would go about it.

8          But if at any point I felt like the damage was going

9   to be too excessive, in other words, we are past minimally

10  invasive, I could put a halt to the operation, and so that

11  was a situation that brought us to some crisis from time to

12  time but it actually worked out very well in the final

13  analysis.

14  Q.  And isn't it true that R.M.S.T. has done more than just

15  seek out your opinion for testimony today, but you have been

16  offered a significant role in this expedition going forward?

17  A.  Yes.  And I appreciate that.  I am very interested.  If a

18  plan can be worked out that I feel meets the standards of the

19  UNESCO convention, and, by the way, I think even though it

20  doesn't have force of law in the U.S., as you well know, but

21  a lot of the societies and even some governmental agencies

22  and several states have adopted the UNESCO convention

23  informally as the best practices, the best example of best

24  practices we have for maritime archaeology.

25         So I, too, subscribe to those, and I'd certainly

1    like to work towards a plan that would qualify.  If I may, I

2    just -- one of the things I think I may have said but I want

3    to clarify, and that is that neither the UNESCO convention

4    nor the Titanic Memorial Act and the rules that followed seem

5    to in any way prohibit recovery from sites.

6           Both documents are very similar and both say that

7    the first option for any archaeological site being considered

8    is to leave it in place, *in situ* preservation, but it quickly

9    then adds that there may be circumstances where that is not

10   the best option.  And so it provides for various levels, and

11   that's another thing we to try to do, is we look at do you do

12   complete excavation, do you do partial excavation, do you

13   target specific iconic artifacts that you think will tell the

14   story to the public?  So I think it looks like there is a

15   very good chance a plan could be developed that would meet

16   those qualifications, and in that case I would be interested

17   in participating.

18   Q.  Isn't it also true, sir, that your input has been sought

19   into formulating the best plan, the most -- the least

20   intrusive option for this recovery?

21   A.  Yes.  R.M.S.T. has asked me for my input, and I've done

22   that with a number of other projects over the years.  I have

23   an undergraduate degree in engineering, which I think has

24   really helped a lot over the years because -- and I have been

25   on other expeditions.  So when Mr. Nargeolet says we are

```
 1    going to take this big ROV, and we are going to take it out
 2    to the site, and we are not going to damage the Titanic, I
 3    have seen people operate these vehicles, and it's absolutely
 4    amazing how precisely they can maneuver them and how
 5    noninvasive they can be.
 6              So I'm not sure a large size that -- like the one he
 7    was describing, and like that's in the preliminary plan, is
 8    necessarily the best way to go.  But I am confident there are
 9    ways to do things relatively noninvasively that can result in
10    additional recovery, if that is what's eventually decided.
11              MR. CONCANNON:  Thank you.
12              THE COURT:  Mr. Porter.
13                        CROSS-EXAMINATION
14    BY MR. PORTER:
15    Q.  Good afternoon, Mr. Broadwater.  You mentioned the UNESCO
16    standards.  Are those the standards that you have advised
17    R.M.S.T. that they should apply in any plan?
18    A.  Yes, they are.
19    Q.  And that's the kind of plan you were looking for when you
20    say you would want a more detailed plan that followed that?
21    A.  Yes, that's correct.
22    Q.  You agree that the UNESCO guidelines or the annex also
23    closely mimic or mirror the international guideline annex?
24    A.  Yes.
25    Q.  As well as the NOAA guidelines?
```

1   A.   Yes.

2   Q.   Do you agree that R.M.S.T.'s responsibility here is also

3   to act in the public interest?

4   A.   Yes, I definitely do.

5   Q.   Who would you consider to be the public?

6   A.   I think there are several levels, really.  I like to

7   think that the archaeological community benefits from this

8   because the work we did on the MONITOR involved 20 years of

9   gathering data on the MONITOR's deterioration and documenting

10  its state of preservation at various levels.

11         That information has been used by a number of other

12  projects, including the Titanic, over the years as techniques

13  that were developed to help determine the deterioration of

14  vessels and also doing deep water recovery.  The MONITOR is

15  not deep compared to Titanic.  It is 71 meters down, but it's

16  deep enough that it mimics some of the techniques that have

17  to be used.  We did a lot of remote sensing.

18  Q.   Would you consider the UK's interest to be appropriately

19  considered in this?

20  A.   Well, I assume that they seem to have an interest.  That

21  is sort of outside my wheelhouse, if I may use that term.  So

22  I just as soon not address that.

23  Q.   Now, you reference the MONITOR.  I want to go to,

24  actually, your report for a moment.  At the very end of it

25  you referred to a number of preliminary steps that must be

Broadwater, J. - Cross                                          96

1    taken.  Is that consistent with the UNESCO guidelines and the
2    international agreement contract --
3    A.  I believe it.
4    Q.  -- preliminary work?  What type of work is required for
5    that?
6    A.  Well, the one thing is I haven't had a chance to look to
7    see what is available.  The question earlier about are there
8    documents available that show the deterioration of the
9    Titanic and a specific documentation on the area where the
10   Marconi equipment lies, I don't know how much is done, but
11   that's kind of what I'm thinking we need to do, is we need to
12   gather the available information from previous expeditions.
13   And the engineering has already been done.  As you saw from
14   those drawings, those are precisely accurate renditions of
15   the wreck in the area of the Marconi, at least from the plans
16   which are available.
17   Q.  Would it include the interior videoing of the wreck as
18   you described a moment ago?
19   A.  That would be my suggestion.  I think that's the best way
20   to get the data that's needed to decide what the next step
21   would be.  I think that that's something that can easily be
22   done as part of the same expedition.
23          In other words, you can be ready for recovery, but
24   if that initial video survey, the pre-disturbance survey
25   shows that there is some obstacle that we can't overcome,

Broadwater, J. - Cross                                          97

```
 1    then, you know, I think the plan would have some kind of a
 2    clause in there that if it's not feasible, then we'd stop.
 3            I think Mr. Nargeolet mentioned that, too, that if
 4    we can't unbolt something, then it stays, and so that seems
 5    reasonable.
 6    Q.  The MONITOR was vetted by a large number of public and
 7    private stakeholders, was it not?
 8    A.  Yes.
 9    Q.  Over multiple years, correct?
10    A.  Yes.
11    Q.  It involved environmental impact statement, correct?
12    A.  Yes, it did.
13    Q.  And what is that?
14    A.  Basically, any kind of government undertaking, federal
15    undertaking involves a whole range of documents and vetting.
16    But the environmental impact statement has a number of
17    questions that you must answer, will affect the environment
18    is obviously one.  But it also, for a project like the
19    MONITOR, it also asks questions about the current state of
20    the wreck and how much damage would be done to the wreck.
21            So you're talking about a really important resource
22    with the MONITOR.  It's a national historic landmark, and so
23    it probably caused us to have to jump through a few extra
24    hoops.  But that document is one that was widely vetted on
25    all counts.  I don't know if you need more detail.
```

Broadwater, J. - Cross                                                  98

```
 1   Q.  No.  That's fine.
 2            THE COURT:  Let me ask you a couple of follow-up
 3   questions.  What waters was the MONITOR located in?
 4            THE WITNESS:  The MONITOR is 16 miles
 5   south-southeast of Cape Hatteras lighthouse.  So it's
 6   outside state and federal waters, as we knew them then back
 7   when the MONITOR was discovered in 1973.  It was sort of in
 8   the unknown zone.  That's really why the State of North
 9   Carolina, the Governor of North Carolina nominated the
10   MONITOR to become the first National Marine Sanctuary.  The
11   Sanctuary Act had recently passed, and so it was important
12   to find a way to protect the wreck.  So that was the
13   mechanism.
14            THE COURT:  The depth of the MONITOR, vis-à-vis the
15   depth of the Titanic, you mentioned that, there is quite a
16   difference?
17            THE WITNESS:  Quite a difference.  So there are
18   quite a few differences in the environmental considerations.
19            THE COURT:  Also, the difficulty in the expense of
20   getting to the Titanic far exceeds that of getting to the
21   wreck of the MONITOR?
22            THE WITNESS:  Yes, indeed.
23            THE COURT:  So, consequently, if you go with what
24   you were saying, you can go down and you can video to see
25   the feasibility of getting to an artifact without doing
```

Broadwater, J. - Cross                                          99

```
 1   destruction or disturbance to the vessel itself or the site.
 2   Let's put it this way, it's more cost-effective than making
 3   two more expeditions down there?
 4            THE WITNESS:  Very definitely, yes.
 5            THE COURT:  Moreover, the currents and the water,
 6   there is only a very small window that one can do any type
 7   of dive or salvation operation to the Titanic?
 8            THE WITNESS:  Yes.
 9            THE COURT:  So you are dealing with different
10   environmental and different economic conditions, quite
11   different than the MONITOR?
12            THE WITNESS:  Very different.
13            THE COURT:  The MONITOR was a United States vessel?
14            THE WITNESS:  Yes.
15            THE COURT:  Go ahead.
16            MR. PORTER:  Thank you, Your Honor.
17   BY MR. PORTER:
18   Q.  The MONITOR involved -- back up just a second to the
19   environmental impact statement.  R.M.S.T. would not
20   necessarily need to do an environmental impact statement, but
21   have they done, to your knowledge, any kind of broad-reaching
22   evaluation like that at this time?
23   A.  I'm not aware of that.
24   Q.  The MONITOR included plans to stabilize the wreck after
25   certain things were recovered; is that right?
```

1  A.  It was -- actually, the stabilization took place before

2  the recovery, because we looked at the options, and we

3  decided that if we tried recovering the engine and the

4  turret, that we were very likely to cause the collapse of the

5  rest of the hull.

6          You have to understand the MONITOR is in a unique

7  situation in that the wreck is upside-down, and it was lying

8  propped up on one side by the turret itself, and so it was a

9  very unstable situation from the time it sank.  So what we

10  did is, as the first step, would be -- had the Navy divers go

11  in and shore up the underside of the deck and the side that

12  was suspended above the bottom by the turret and then that

13  kind of held everything in place for the recovery.

14  Q.  Were you aware of any plans to stabilize any portion of

15  the Titanic should this type of expedition be approved?

16  A.  I'm not aware of any, but I don't even know how you would

17  do it.  The MONITOR was such -- a much more manageable site.

18  It's only 160 feet long.  It's lying proud of the seabed.

19  The area that needed to be supported was very easily

20  accessible, very easily identifiable and then accessible.

21  But with the Titanic you are talking about such a huge

22  structure, or, you know, order of magnitude, more structure,

23  a lot of more internal bulk heading and bracing.  I don't

24  know even -- I can't even imagine how you would do that.

25  Q.  The MONITOR, before any recovery took place, the MONITOR

Broadwater, J. - Cross                                    101

1    had sufficient private and public funding already in place to

2    ensure that the recovery and the conservation and care of

3    those things could occur?

4            THE COURT:  Can I ask why we are going through all

5    of this about the MONITOR?  I don't think that you've

6    established that the MONITOR and the Titanic are in the same

7    category.  The only thing that was offered about the MONITOR

8    was his experience and background, not that he thinks the

9    two are comparable because I believe he's testified they are

10   not comparable.

11           So whatever was done with the MONITOR, we are way

12   past that here.  We are 30-some years down the road with the

13   Titanic, the various salvage operations, and the

14   stabilization.  It requires different stabilization along

15   the way, which has been required throughout the different

16   salvage operations.

17           So I don't find it relevant for you to be going

18   through all of this testimony about the MONITOR and what was

19   done because it's, frankly, not apples and apples.

20           MR. PORTER:  Your Honor, Mr. Broadwater said there

21   were similarities, both in his report and his testimony.  So

22   I thought it was important to address the extent of the

23   outward reach to stakeholders in the MONITOR that we believe

24   has not fully occurred here, but I'll move on to another

25   question.

1            THE COURT:  Well, I think that the reach-out to the

2    stakeholders through the years has been very thorough.   In

3    the Court's opinion, starting back in the 1980s, where this

4    is a salvage operation under admiralty law, it's been all

5    the way up to the Supreme Court and back.  It's been fully

6    vetted as a proper salvage operation with this Court having

7    jurisdiction over the salvage operations under admiralty

8    law, and R.M.S.T. has been and remains the

9    salvor-in-possession.  That is a distinct legal entity that

10   I don't think it's appropriate that we are going into now.

11           What we are looking at is whether or not there

12   should be an approved salvage operation by the

13   salvor-in-possession at this time.

14           MR. PORTER:  Right.

15   BY MR. PORTER:

16   Q.  Mr. Broadwater, have you reviewed or been provided copies

17   of any funding plans that would address the Marconi if it

18   were recovered?

19   A.  I have not.

20   Q.  Have you reviewed or considered Mr. Stephenson's report

21   regarding the Marconi and re-outfitting it with modern pieces

22   to make it functional?

23   A.  I believe I did see that mentioned.

24   Q.  Did any of that occur in any of your prior work, that old

25   equipment restored -- was restored with new pieces?

```
1   A.  It's typically not done in archaeology.  We make
2   replicas.  We have done that on several of the MONITOR
3   artifacts, but, generally, you don't do a hybrid like that.
4   As far as I know, that was just one of the suggestions that
5   could be attempted.
6           MR. PORTER:  That's all the questions, Your Honor.
7   Thank you.
8           MR. CONCANNON:  No further questions.
9           THE COURT:  Then, thank you very much,
10  Dr. Broadwater.
11          THE WITNESS:  Thank you, Your Honor.
12          MR. WAINGER:  May he be excused, Your Honor?
13          THE COURT:  Yes.
14          (Witness excused.)
15          MR. BARGER:  Judge, we have one last witness, and I
16  will try to be brief, if the Court permits us to call one
17  last witness.
18          THE COURT:  All right.
19          MR. BARGER:  We call David Gallo.
20          (Witness was sworn.)
21          DAVID GALLO, called by R.M.S.T., having been first
22  duly sworn, was examined and testified as follows:
23                      DIRECT EXAMINATION
24  BY MR. BARGER:
25  Q.  Good afternoon.
```

Gallo, D. - Direct                                                     104

1   A.   Good afternoon.

2   Q.   Please state your name for the record.

3   A.   David Gallo.

4   Q.   And, Mr. Gallo, have you, over the course of your

5   career -- I'm trying to lead just a little bit here to speed

6   things along -- had involvement with and knowledge about the

7   Titanic?

8   A.   Yes.  I came to a Woods Hole at the request of

9   Dr. Ballard, hired me from grad school, and I arrived a year

10  after the Titanic was discovered, so from that time on I was

11  hand-in-hand with the work on the Titanic from the first

12  expeditions.  Then in 2010 with P.H. Nargeolet, the mapping

13  expedition funded by R.M.S. Titanic, Inc.

14  Q.   And have you been asked by R.M.S.T. to review some of the

15  materials that were filed with the Court in this matter and

16  had discussions with them about the potential for recovering

17  the Marconi radio equipment?

18  A.   Yes.  I have been involved in some or maybe even most of

19  those discussions about the technology techniques.

20  Q.   And I know we could talk about it a lengthy period of

21  time, but if you could summarize in general for the Court

22  your analysis and conclusions, and then we can see, depending

23  on time, if we have more opportunity to expand.

24  A.   The plan that's been forwarded that we looked at?

25  Q.   Well, the plan and your evaluation of the merits or lack

Gallo, D. - Direct                                                      105

1    thereof in attempting to recover the Marconi?

2    A.   Sure.  Let me take a step back from my own opinion.

3    Q.   Yes, sir.

4    A.   To me, first time, mostly because of my upbringing about

5    children and in general, I mean, general public, I was very

6    fortunate to have the career I had.  So I want to give back.

7    So I'm actually retired but came out of retirement to do

8    this.  I see this as a four-prong, four-leg stool.  One is

9    the ship itself, and I think R.M.S.T. has got every reason to

10   want that ship to be as intact as possible because the ship

11   provides the mystical object in the bottom of the ocean that

12   gets the imagination going.

13          Second part is the technology of -- or, I'm sorry,

14   the stories, James Cameron's stories about Ballard's book

15   because that helps people understand what happened all

16   through that night, and it also intrigues people.  The third

17   thing was the artifacts.  For many, many years at Woods Hole

18   we were almost -- we were really forbidden to visit the

19   artifact exhibits.  It was told because, again, I was Bob's

20   assistant director for five years.

21   Q.   Let me interrupt for a second.  When you say you were

22   forbidden, you mean your employer, as a matter of policy or

23   philosophy, felt that it wasn't appropriate for you to --

24   A.   Yeah.  I had my job threatened more than once about

25   Titanic.  In fact, after the 2010 exhibit, some of that --

1   those emotions still lingered, and it wasn't Bob directly.

2   It was the administration, too, at the time.  They just

3   didn't want to see the institution on the same sentence in

4   the media or paragraph with the Titanic.

5   Q.  And over the course of time did you come to -- can you

6   tell us whether or not you came to a conclusion about whether

7   you saw value in the Titanic?

8   A.  Sure.  Yeah, and I spoke out against R.M.S.T. in the

9   early days because I thought, okay, it is grave robbery, and

10  it's very easy to sell that argument because it's very

11  emotional.  So if you tell the general public, they are

12  robbing the grave, they are taking jewels off the old gray

13  lady, they are taking a shoal.  Of course, people are going

14  to react to that.

15          So it wasn't until I wandered into one of the

16  exhibits with a friend of mine, we wandered in, and it just

17  transformed my feeling about the whole episode, the whole

18  Titanic issue.  I was able to watch families, children, and

19  approach these artifacts from the front door.

20          What I saw was that they were getting -- this is the

21  other leg of the stool -- it was an experience for them.  It

22  was experiential.  It wasn't looking over Bob Ballard's

23  shoulder.  It wasn't looking over Jim Cameron's shoulder.  It

24  wasn't pictures in a book or the thought of Titanic.  It was

25  actually one-on-one experience with that thing that was

Gallo, D. - Direct                                                    107

```
 1    actually part of that ship, done in a very positive way.
 2              So I began to see that as a very important element
 3    of that ship and honoring -- strengthening the legacy and
 4    honoring the people that were on board that ship.  This is a
 5    very important piece of it, the artifacts.  Of course, the
 6    fourth leg of that stool are things like the policy, who then
 7    decides all these issues about how much goes into recovery,
 8    et cetera, et cetera.
 9    Q.  And I know I'm the one that sort of prompted to try to
10    summarize quickly, and I think I caused you to speed up more.
11    Take your time.  So far we are still okay.  So over the
12    course of time, can you tell us whether or not you came to a
13    different conclusion about what you saw as R.M.S.T.'s role
14    and whether it was legitimate or not?
15    A.  I think it's very legitimate, I mean, because of
16    admiralty law, for starters.  It makes it -- I think that
17    makes it legitimate right there, but, you know, I have never
18    once in my -- been associated with the company.  And by the
19    way, I am a paid consultant to the company.
20    Q.  The company being R.M.S.T.?
21    A.  R.M.S.T.  I've never once heard or seen anything having
22    to do with let's get out to collect more artifacts, let's
23    think about breaking up the collection, let's think about
24    selling artifacts, even going -- we used the word willy-nilly
25    before, or willy-nilly into that wreck site and collecting
```

Gallo, D. - Direct                                              108

```
 1    things and doing damage to the hull, never once has that come

 2    up.

 3            We've always had the opposite approach, and, in

 4    fact, there are teams of people working on that, the idea of

 5    the ship, about how do we get into that Marconi room with --

 6    in the least invasive manner possible.  What do we need

 7    actually to recover from that room?  Do we need to recover?

 8    And I think what we've established, at least for the Marconi,

 9    and Pete's hit on this, is an iterative, almost nested

10    approach that if we get out there, and it looks like that's

11    the last thing to do with Marconi, one thing to say we can

12    walk away and come back maybe next year.  But, realistically,

13    we probably wouldn't be able to get back because the funding

14    and other things, five years, six years, something like that.

15            So, you know, to me, the approach we have is that,

16    how quickly do we need to act?  Begins here with the Court,

17    of course, about do we have permission to go down that road.

18    But even with permission, it doesn't mean that we would

19    actually try something if we thought it was at all risky.

20    Q.  If I can interrupt just a second.  When you indicated you

21    were paid, just wanted to make clear, I don't believe it has

22    any impact, but can you tell us whether or not the fact

23    you're a paid consultant in any way affects your objectivity

24    and the opinion you're offering now?

25    A.  Not at all.  My reputation to me, I have worked hard for
```

JODY A. STEWART, Official Court Reporter

Gallo, D. - Direct                                                       109

1    30 years to get where I am, and, no, it's -- nothing is worth
2    jeopardizing that.
3    Q.  And I think from what you were testifying to earlier, the
4    answer to this is going to be yes, but can you tell me
5    whether or not you've reached a conclusion or have an opinion
6    on whether it would be appropriate, if it's feasible, to
7    recovering the Marconi, in other words, can you tell us
8    whether you think it's important to recover that?
9    A.  It's one of those iconic artifacts, like the signal
10   flares that are out there, maybe the binoculars that are out
11   there that I know would intrigue the public, and to me the
12   Titanic has become a portal.  We have a lot of issues with
13   the ocean.  We have the climate change issue.  Titanic,
14   because it attracts so much attention, becomes a portal then
15   because every time we go to Titanic, we are actually visiting
16   an unfamiliar planet.
17           So when you have things like that, the Marconi that
18   you can build these stories, you heard John Broadwater talk
19   about the stories, that's fascinating to me, and if it's in
20   jeopardy, that actually doubles the, you know -- you know,
21   starts with that as in jeopardy, then it goes to, you know,
22   the stories that you can tell if we can recover it.  And we
23   do need to use many pieces to that, to the Marconi, which
24   pieces do we really need.
25   Q.  And so from your perspective, I think you were covering

JODY A. STEWART, Official Court Reporter

Gallo, D. - Direct                                                    110

1    this, and I may have cut you off there.  I wanted to make

2    sure we adequately provided your explanation of how do you

3    see the process unfolding?  What I mean is, do you have an

4    opinion on whether you make the expedition, you go out, you

5    assess, you take video, and then depending on what you find,

6    whether or not at that point you should have the flexibility,

7    if it's feasible, to recover some of the artifacts?

8    A.  It would be wonderful to have the trust of the Court to

9    be able to make a decision on site to do a pre-recovery

10   survey of the site.  We can do volumetric mapping so you can

11   have a really good look at what's there, to do the operation

12   with minimal invasiveness on the site, and then to do the

13   post-survey afterwards to show what's been -- what we

14   actually did.  That's ideal, because, otherwise, again, if

15   you get out to the site, look at it, and I must admit, I am

16   staggered when I saw that when we looked at the latest photos

17   of the rooftop above the Marconi, I wasn't expecting that,

18   how perforated it is.

19        It does look like it's about -- it's only a quarter

20   inch think to begin with.  There are places where you can

21   stick your finger through that rooftop.  But so, ideally, you

22   would have that flexibility to be able to do something on the

23   spot.

24   Q.  I think the last topic I have is I want to -- you and I

25   were preparing or talking earlier today.  You talked about,

1    and over the course of your career in oceanography, you've

2    had opportunities to give numbers of lectures --

3    A.  Yes.

4    Q.  -- or presentations or speeches to various groups --

5    A.  Yes.

6    Q.  -- including kids.  Can you relate to us how, if at all,

7    that speech -- when you do those speeches, can you tell me

8    whether or not the Titanic ever comes up?

9    A.  Always.

10   Q.  What's the significance of that to you?

11   A.  I begin because my -- part of my life now is dedicated to

12   giving back to the opportunity.  I've had the privilege, and

13   I do -- you know, the goal -- I just gave a talk in the

14   middle of Michigan, Owosso, Michigan, and initially the

15   people didn't want to mention Titanic.  So I said, well --

16   and then the attendance level was very low.  I mean, I think

17   they could have 400 people, they might have gotten 50 people

18   that signed up.

19        I said, okay, if you put Titanic in the title, it's

20   going to boost it.  So they put "beyond Titanic," which meant

21   I'm going to show you a little bit of Titanic, but, guess

22   what, we are going right to climate change.  It was

23   fantastic.  And after this talks, the kids that come up, they

24   come up -- I just got it back in Cape Cod drawings that kids

25   did of Titanic that they wanted me to have.  You know, it

Gallo, D. - Cross                                              112

```
 1    actually chokes me up a little.  It's incredible the kind of
 2    attention it gets.  I can't explain why.  I asked them if it
 3    is because of the movie?  It's little kids.  It's not because
 4    of the movie?  Why?  Why is that?  But it's very touching to
 5    see that kind of --
 6    Q.  How, if at all, does that impact your opinion about
 7    whether R.M.S.T., if the Court were to permit, to --
 8    A.  Oh, I was thinking -- I think about that all the time
 9    when we sit in the meetings at R.M.S.T., how important that
10    is, that this is not just something, a project that we happen
11    to have or what's going on today in this courtroom, how
12    important that is to the legacy of that ship and to the
13    future of the legacy of Titanic and the honor of the people
14    that sailed on board.  That's pretty amazing to me.
15              MR. BARGER:  Court's indulgence.  I think I'm done.
16              I have no further questions.  Thank you, Judge.
17              THE COURT:  Mr. Porter.
18              MR. PORTER:  Just a few questions, Your Honor.
19                          CROSS-EXAMINATION
20    BY MR. PORTER:
21    Q.  Mr. Gallo, one of the submissions by R.M.S.T. describing
22    this plan and describing this potential expedition suggested
23    that there were serious challenges that would be faced by the
24    crew trying to conduct this.  What are those challenges?
25    A.  Well, you have to -- well, first is -- the things you
```

Gallo, D. - Cross                                                                113

1    need for success, you need the right technology.  You need

2    the right team.  You need the right technique.  And almost

3    like an orchestra, if you were trying to put an orchestra

4    together, that you need the best musicians, you want the best

5    equipment, and they've got to be on the page of music.

6              So you've got that to worry about.  You've got to

7    worry about the ship.  The ocean is difficult to work with as

8    it ever has been, you know.  It's rough at sea.  You've got

9    to depend on the weather.  Last time we were at Titanic, we

10   had to run two or three times from hurricanes.  You've got to

11   worry about that stuff.  But operating an ROV on the bottom

12   two miles below the ship, especially when you get that

13   detailed, is difficult to do, unless that's something you do

14   for a living, and you're very familiar with it, because we've

15   got the navigation now.  You've got the right kinds of pilots

16   now that can get that job done.  Not only that, but built

17   into that we've got the ability to say no, stop, at any given

18   time to do that.

19   Q.  At what risks?  What is it that you see when you can stop

20   at any time?  What types of things are you talking about that

21   the risk --

22   A.  Well, you wouldn't want the --

23   Q.  -- no longer becomes worth the reward?

24   A.  Well, I wouldn't want to do damage to the hull, and I

25   don't want some gaping hole in Titanic, hole Dave Gallo left

1    in the Titanic.  No, thanks.  To me, nudging the Titanic, I

2    don't want that -- I don't like that whole idea, you know.

3    Don't touch it if you don't have to touch.

4            So when I listen to the operators, was it -- the ROV

5    pilot saying -- that's what I have to count on, these guys

6    and their record.  Can these guys really get this job done?

7    And I'm glad to say it's not something that we just take at

8    face value.  We've got them working, come up with another

9    plan and another plan and pushing them hard to keep reducing

10   the size of the ROV.  If we've got to look at picking up

11   smaller things, we will think about picking up smaller

12   things, but everything is geared at minimizing any kind of

13   impact we might have.

14           So I err -- if I err, I err on the side mostly of

15   not doing anything.  But also it's not just the one-person

16   decision.  We've got the company management, but also John

17   Broadwater, Pete Nargeolet, they are on board the ship, too.

18   So I feel pretty confident, confident that we will have a

19   plan, and that to -- you can't guarantee things at sea, but

20   you can minimize them as much as you can, and I think we've

21   got the best team going.

22   Q.  When do you think that plan will be together?

23   A.  It's an iterative process, and, you know, I think it's

24   basically going to be -- it's based on the plan we have now,

25   so I'm not really sure.  I mean, it could go -- we are going

1    to always keep thinking -- rethinking the techniques.  So

2    hard to say when we are satisfied.

3            MR. PORTER:  That is all.

4            MR. BARGER:  Nothing further, Your Honor.  We have

5    no other witnesses.

6            THE COURT:  Thank you, Mr. Gallo.

7            THE WITNESS:  Thank you, Your Honor.

8            (Witness excused.)

9            THE COURT:  Counsel, we will do a couple of things.

10   First of all, I would just say in response to Mr. Gallo's

11   testimony that the Titanic has the significance that it does

12   because it is a sacred site and a graveyard in the sea.  It

13   has significance even where, I will just tell you, a couple

14   of months ago, this is just a personal story, but a couple

15   of months ago I had a friend who is an architect that was

16   studying architecture, and he was going around and sent back

17   pictures of some stained glass windows in some cathedrals

18   and churches and religious sites that had memorials, too,

19   which I'm sure some of you have seen, the Macy's Memorial

20   and the Grace Church in New York City, but others where

21   around the world there has been memorial notations to the

22   people who gave their lives for others, and who gave their

23   lives at the bottom of the sea, not expecting to do so.

24           So, perhaps, that's one of the reasons.  It's a

25   rare occasion where humankind, in its own way, came

1    together.  That's just an aside.  That doesn't really have

2    to do with many of the issues that we are dealing with here

3    other than to preserve the Titanic for future generations

4    and the in perpetuity as long as we can.  The Court has

5    striven to do that for the past 30-some years in managing

6    and approving these salvage operations.

7            That all aside, I want to mention three things:

8    First, there are some e-mails that I've received in the last

9    couple of days, and, as you know, my practice is to put

10   everything on the record that I get.  That's why I think the

11   docket sheet is however many pages that it is.  I did

12   receive the following.  I will say what they are, and then

13   I'll direct the clerk to enter them as article to the Court

14   or letter to the Court.

15           The Court received from Michael Kingston, who is an

16   Irish maritime lawyer, Mr. Kingston's e-mail with a number

17   of attachments.  He opposes the expedition.  I think that he

18   might have sent that to a number of individuals.  I know

19   Mr. Porter got a copy of it.  This was sent, at least to me,

20   on Monday, February 27th, 2020 at 10:48 a.m.  I wanted to

21   put that on the record with the attachments and the letter

22   that Mr. Kingston wrote.  He is from, at least his address

23   on the letter, is from County Cork, Ireland.  So I wanted to

24   put that on the record so that you would have the benefit of

25   Mr. Kingston's thoughts and attachments.

1          So, Madam Clerk, I would give you this to enter as

2    correspondence with the Court from Michael Kingston and the

3    date.

4          The second is from Rory Golden, who expresses

5    support for the expedition.  This was from Rory Golden on

6    Tuesday, February 18th, 2020 at 1:08 p.m.  I received this,

7    Mr. Porter received this, Mr. Wainger, Mr. Barger, and

8    Concannon.  In any event, it should be on the public record.

9    So I've put Mr. Golden's e-mail, and it should just read,

10   again, correspondence with the Court from Rory Golden and

11   the date.

12         Then here are some others.  Mr. Kingston had a

13   number of matters that he annexed.  Can you hand me back

14   Mr. Kingston's.  In other words, he's given the letter, and

15   then he's listed his annex 1, 2, 3, 4 and 5, and I will give

16   those so that they all can be entered.  So this is the

17   entire package.  It's not only an e-mail and a letter but it

18   has five annexes.  I will put that on the record to be

19   entered.

20         The next matter that I received is an e-mail from

21   Mary Rowland, and it's a signed support letter from the

22   Addergoole Titanic Society, County Mayo, Ireland, and that

23   came to me, and it is signed by a Toss Gibbons, a Mary

24   Rowland and a Frank Gibbons.  This is an e-mail to me,

25   Wednesday, February 19, 2020 at 11:25 a.m., and I believe

1    Mr. Porter, Mr. Wainger and Mr. Concannon also got that

2    support letter from this particular Titanic society.  I

3    would again give that to the clerk to be put on the public

4    record as communication or correspondence, however the clerk

5    enters it, to the Court from that particular Addergoole

6    Titanic Society, Mary Rowland.

7            I believe other than the filings before the Court,

8    those are the only e-mails or letters that had been brought

9    to my attention, other than all the attachments that you all

10   have filed and put on record.

11           There are a number of just loose ends.  I think we

12   have covered the three basics today that we needed to cover:

13   The eBay listing, which appears to be moot at this point,

14   and the bump incident that occurred during the July/August

15   2019 expedition.  I don't know if anyone wants to pursue

16   that further.  I am satisfied that there was nothing, A,

17   that there was no intention; B, that there was no

18   significant, if any, damage; and, C, that it was a very

19   slight incident in a very long dive.  I didn't see anything

20   that would concern the Court, and, as you know, the court

21   has been extremely concerned and strict on any type of

22   activity that would be invasive and harmful that would be

23   unnecessary.

24           Unless someone wants the Court to pursue "the bump"

25   further, I don't plan to pursue it any further.

```
1              Mr. Barger.

2              MR. BARGER:  No, Your Honor.  We were satisfied,

3       and we don't intend to pursue it any further.

4              THE COURT:  Mr. Porter.

5              MR. PORTER:  Nothing, Your Honor.

6              THE COURT:  Then, lastly, we are still working on

7       this expedition.  I don't know if you want to do anything on

8       this hearing or wait until you're further along with your

9       plans.  Then I have still all the miscellaneous matters,

10      none of which are very important except I think that we do

11      need to always stay abreast of some of the matters that we

12      were talking about before, such as the conservation funds.

13             I will take your guidance.  I know we are going to

14      need another hearing, but whether we set it forthwith or we

15      give it some time, I will be guided by your directives.

16             MR. BARGER:  Mr. Wainger is prepared to address

17      that, Your Honor, with the Court's permission.

18             THE COURT:  All right.

19             MR. WAINGER:  Thank you, Judge.  Specifically, with

20      respect to expedition 2020, I want to take a step back for

21      just a moment, if I can.  I know we have all been here a

22      long time, and it is after 5:00.  There have been a lot of

23      chapters to the story, many written before I got involved in

24      2001 and 2002.  But I have been involved with the Court in a

25      number of chapters.
```

1           I have never been more proud to represent R.M.S.

2    Titanic, Inc., than I am today.  I'm proud for several

3    reasons, Judge.  It was just over a year ago when virtual

4    strangers to me were making representations to the Court

5    about how they would protect the wreck site.  I represented

6    R.M.S.T. then.  I represent R.M.S.T. now.  But I didn't know

7    the owners, the future would-be owners of the company.  I

8    watched representation after representation about what they

9    intended to do, while I listened to people attack their

10   credibility and what their real plans were.

11          I'm proud because what I have seen, for the people

12   that I now represent, have done exactly what they said they

13   would do.  They have taken enormous steps to further the

14   Titanic.  They have entered into long-term collaborative

15   agreements with Cherbourg, which we talked about in our

16   periodic report.  Artifact arrangements with a variety of

17   people.  They have worked with institutions in Belfast about

18   returning artifacts as their primary goal.  They have worked

19   with the Addergoole Society, a letter of which you've just

20   put into evidence, and the Irish National Museum to share

21   artifacts, research and collaborate.

22          Brenton Hunchak, who is here, president of the

23   company, has gone to schools in New York City and Atlanta to

24   share artifacts, stories, videos.  He's working with the

25   National Teachers Association to bring Titanic into the

1    national curriculum.

2            They are making progress on the wreck report that

3    we've talked about.  They have engaged dozens of

4    contributors in the community for feedback on the best way

5    to do things.  I'm extraordinarily proud at what they have

6    done.

7            I'm also extraordinarily proud to see people like

8    Dr. Gallo, P.H. Nargeolet, and Dr. Broadwater.  It is not

9    easy for them to come in here, Judge.  If it's not easy for

10   Dr. Gallo to go see an exhibition because he gets so much

11   pressure, imagine what a man who has devoted his entire

12   career to at Woods Hole and Oceaneering, imagine the

13   pressure he would be not to come sit here and tell Your

14   Honor what he thinks is truly in the best interest of the

15   public.

16           Imagine the pressure that Dr. Broadwater has from

17   serving decades at NOAA, to come up here and say, I truly

18   believe that if this can be done the right way, that's what

19   should happen.  Of course, P.H. Nargeolet we know.  I'm

20   proud not just that they came up to do this but I'm proud

21   because they believe in these people enough to come up and

22   do this.

23           Because for decades that man has heard people talk

24   about R.M.S.T.  I have, and Your Honor has, and you know

25   what, he's gotten to meet them.  He has gotten to meet the

122

1    new people that own this company, and he feels strongly

2    enough to come in here and do this, and so does Dr.

3    Broadwater, and Mr. Nargeolet still believes in it.  So I'm

4    extraordinarily proud that they are here and that they are

5    representing this company.  I think that that's important.

6          So when the Court, for years, we have seen a

7    healthy and understandable skepticism about the motives of

8    my client, there have been a lot of chapters and a lot of

9    people.  I am proud that people like this now are past that,

10   and they know that the people that are running this company

11   are trying to make the right decisions.  That's what really

12   makes me proud.  That the right decisions, whatever they

13   are, will be made.

14         So as we talk about how we move forward, we have to

15   recognize that in order for the company to do this, and the

16   Court's questions and comments were right on, the company's

17   got to commit resources.  The company's got to charter

18   boats.  The company's got to make tremendous commitments

19   that it can't do at the last second if we are going to do

20   this right.

21         So we have a chicken and egg situation here, Judge.

22   Do we wait?  As I think Mr. Porter would like to see a final

23   plan, to get it approved, what does this company do from a

24   financial standpoint, from a planning standpoint if we have

25   to wait until the very end?  It's understandable.  I think

JODY A. STEWART, Official Court Reporter

1    Dr. Broadwater would expect to see a plan that meets his

2    expectations, as would Dr. Gallo, as would everybody.

3            But what I really think is important, Judge, is

4    that we listen to what Dr. Gallo said.  He said it doesn't

5    mean that we would try something that is risky.  P.H. said,

6    if we can't do it, we are not going to do it.

7            Mr. Broadwater said, we can go out there and

8    evaluate.  So what I'm asking, Judge, and I would have never

9    felt comfortable historically doing this, is, Judge, trust

10   the people that are running this company, trust the

11   worldwide experts that are going to be on the ship, and if

12   it's in the best interest and it meets the UNESCO

13   guidelines, and they all agree, give them the flexibility to

14   do it and allow them to go.  I recognize that we may have to

15   come back for final approval, but my point is, time matters,

16   and we have seen over and over again where this company has

17   planned things at the last minute, hasn't gone off well.

18   They have been in a hurry.  They haven't done the right

19   planning.  They haven't spent, you know, the right financial

20   commitments.  Here they are doing it all the right way.  I

21   just don't want this part of the process to interfere with

22   their ability to actually accomplish what they want to

23   accomplish.  So that's really what I wanted to share with

24   the Court.

25           THE COURT:  I don't understand what you're asking

1    me to do.  I certainly can't approve anything at this

2    juncture.  It's not far enough along.  I have to do my job

3    and exercise my role as the Judge over this admiralty

4    salvage case.  I have to have more detail.  You've got to be

5    sure you have your window.  You've got to have the money to

6    do it.  These submersibles going out there, this is a very

7    costly operation.  I've been with it long enough to know.

8            Even that mapping project, which I believe actually

9    was a great contribution because it does show the debris

10   field, and I think you can learn a lot about the wreck by

11   looking at the debris field, the movement of the currents,

12   and how far things are moving away from the vessel itself.

13   So I think that the mapping project in many ways was a great

14   environmental contribution to this study.  But I don't know

15   what you're asking me to do.

16           MR. WAINGER:  Here is what I'm asking for, Judge.

17   First, I wanted the Court to understand how the process has

18   to play itself out, and as Dr. Gallo said, it's an iterative

19   process.  What I would like is to schedule another hearing

20   with Your Honor, and I think we should circle up as to the

21   proper time to make it early enough so that we can make the

22   commitments we need but far enough in the future to make

23   sure that we can come present a cohesive plan that we hope

24   the Court would sign off on and that the various experts

25   would sign off on.

1          So we would need another hearing.  I would like a

2     few minutes to chat with my colleagues.

3          THE COURT:  You don't need to do it now.  You can

4     get with your colleagues, and you can contact the courtroom

5     deputy and set a hearing.  You can do that in conjunction

6     with Mr. Porter and Ms. Rolleri and their schedules.

7          MR. WAINGER:  Perfect.  Thank you, Judge.

8          THE COURT:  Does that meet with your approval,

9     Mr. Porter, that we will, obviously, not make any definitive

10    decision, that is any decisions, binding decisions today,

11    but the decision we'll make is to have another hearing when

12    things are further along in the planning process?

13         MR. PORTER:  That's great.  The more detailed plan.

14    That is what we would need here in this court.  Quite

15    frankly, that is what we would also need in the Section 113

16    process.

17         THE COURT:  I didn't say all right to the process.

18         MR. PORTER:  I understand that, Your Honor.

19         THE COURT:  I understand what you think you need,

20    and I know what I think the Court needs.

21         MR. WAINGER:  Judge, a slight wrinkle.  The company

22    has to charter the vessel very, very soon.  So I'm

23    not asking the Court to make any decisions as to Marconi

24    today, for all the reasons we've discussed.  What would be

25    wonderful is if they could have the comfort to know that the

1    Court would allow them to go out to an expedition in 2020,

2    at a minimum, without referring to the Marconi or any

3    invasive work that we've focused on today but that they

4    could be permitted to go do that, and, if necessary, develop

5    plans to recover artifacts from the debris field, but at a

6    minimum, to be able to go and take video, another scientific

7    trip so that they know that they can commit to the charter.

8         We are not asking for a commitment on the Marconi

9    or any of the stuff we talked about today other than about

10   they need the flexibility, the commercial flexibility to

11   charter the vessel and so that if there is any way that we

12   could figure that out today, that would be wonderful for the

13   company.

14        THE COURT:  I don't know that I can figure that out

15   for you today because I think that's something that you have

16   to deal with the company.  I'm not big trite, but like you

17   buy travel insurance or contingency insurance.  There has to

18   be some type of contingencies in a contract, and if you feel

19   sure enough of your ability to mount the money for a salvage

20   operation, and you have the proper plans, the Court isn't

21   going to oppose a salvage operation, but it's not going to

22   approve one without the proper plans in place.

23        I understand the importance.  I don't disagree with

24   the importance of the Marconi room.  I don't know about

25   putting it back together.  Maybe you ought to make a model

```
1   of it, but I don't know about pulling it apart and inserting

2   new pieces in it.  But I understand the importance of the

3   Marconi room.  I understand the rapid deterioration.

4           I have been, myself, with this case for over 20

5   years.  So I understand all of those things.  I'm not going

6   to approve something and then you say, Judge, we expended X

7   amount of money because you said we could do it.  Those are

8   business decisions, not legal decisions.

9           MR. WAINGER:  We understand.  Thank you, Judge.

10          THE COURT:  Then I'll give you direction about

11  proceeding with the conditionally admitted Exhibit Number 5.

12  It's late in the day now, and I will issue some directions

13  in that regard and seek your positions on it.  For right now

14  it remains just conditionally admitted, and then I will seek

15  any input that you have, and you'll be able to respond in

16  writing in terms of whether it is ultimately admitted as an

17  exhibit.

18          MR. BARGER:  Judge, I was going to say if you want

19  the government and Mr. Tata and I to confer on a proposal on

20  how to treat these, we will do that, too.

21          THE COURT:  That will be fine.

22          MR. BARGER:  Thank you, Judge.

23          THE COURT:  Then, can Court stands in recess until

24  9:00 a.m. tomorrow morning.

25          (Hearing adjourned at 5:26 p.m.)
```

1                        <u>CERTIFICATION</u>

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6

7              X_____/s/_____x

8                      Jody A. Stewart

9                      X_____3-11-2020 _____x

10                          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25