IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
       Plaintiff,

v.                                              Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL, et al
       Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
R.M.S. TITANIC, INC.'S MOTION TO AMEND OR MODIFY
THE COURT'S JULY 28, 2000 ORDER**

Plaintiff, R.M.S. Titanic, Inc. ("RMST" or the "Company"), by counsel, hereby submits its Memorandum of Law in support of its Motion, pursuant to Federal Rule of Civil Procedure 54(b), to Amend or Modify the Court's July 28, 2000 Order forbidding RMST, its employees, agents, or subcontractors "to in any way cut into the wreck or detach any part of the wreck" (Dkt No. 164). RMST seeks entry of an Order amending or modifying the Court's July 28, 2000 Order to permit the Company its employees, agents, or subcontractors to perform limited cutting into sections of the ceiling over the Marconi Suite and detachment of artifacts, as specified herein, to accomplish the recovery, conservation and public display of the R.M.S. *Titanic*'s Marconi wireless apparatus and associated artifacts.

I.     **BACKGROUND**

A.     **Factual History**

It has been nearly one hundred years since the R.M.S. *Titanic* ("*Titanic*") sank in the waters of the North Atlantic in the early hours of April 15, 1912, killing more than 1,500 of the 2,228 people onboard.

For over half a century, the *Titanic* lay undetected, 12,500 feet below the surface, in international waters four hundred nautical miles southeast of Newfoundland, until a joint American-French expedition discovered the wreck in 1985.

Since 1987, RMST has engaged in eight expeditions to the *Titanic* and recovered more than 5,000 artifacts.  The artifacts have been publicly displayed to millions of people around the world, RMST's expeditions to the *Titanic* have been the subject of numerous television shows in a variety of countries, and the company has funded science and exploration of the wreck and wreck site by scores of individuals and organizations that otherwise would never have had the resources to venture into the deep ocean.

Following the 2019 acquisition of the stock of RMST by Premier Acquisition Holdings, LLC ("PAHL"), RMST's new owners committed to improving both the quality of the company's artifact exhibitions and ensuring that the company's long-term viability is secure.  To this end, the new owners of RMST have engaged in a process to fully assess not only the assets they acquired, including the artifacts, their status as salvor-in-possession, certain intellectual property, relationships and good will, but also the history of the Company's operational successes and failures.  As a result of this assessment, the new owners of RMST have freshened artifact exhibits in Las Vegas, Orlando and other venues; opened new exhibits in Cherbourg, France and Cobh, Ireland; and cataloged a vast library of images, film and scientific research.  Externally, the new owners of RMST have re-engaged with old partners; worked to established or repaired relationships with some of the most qualified individuals and organizations in a variety of fields, including exhibitions, science, marine archaeology, deep sea exploration, education, entertainment and law; and they have reached out to *Titanic* commemorative societies and victims' families in

the United States, Ireland and the United Kingdom to engage in dialog, assist them in their activities, and understand their perspectives on this unique historical phenomenon that is *Titanic*.

The learning curve has been steep, but positive results have come quickly, although not easily. The new owners of RMST have learned that the only way to legitimately and effectively protect the *Titanic* is through this admiralty court proceeding; and the only way to effectively preserve the legacy of the *Titanic* is by keeping it in the public eye, through a combination of improved exhibitions, enhanced intellectual property experiences that can virtually take ordinary people to the *Titanic*, and superior storytelling that highlights the important experiences of the less well-known passengers, crew and explorers who have been part of the *Titanic* legacy.

One of these important stories is the heroism of the *Titanic*'s radio operators, Jack Phillips and Harold Bride, and the role these two men played in saving at least one-third of the *Titanic*'s passengers and crew. When *Titanic* struck the iceberg late on the night of April 14, 1912, it happened to be within contact range of at least twelve other vessels. The brief transmissions sent among those ships' wireless operators, staccato bursts of information and emotion, tell the story of *Titanic*'s desperate fate that night: the confusion, chaos, panic, futility and fear.

From 12.15 a.m. on April 15, 1912, when Bride and Phillips broadcast "R.M.S. *Titanic* to Any Ship: CQD *Titanic* 41.44 N 50.24 W," until sometime near 2:15 a.m., when they sent the final complete wireless message to the R.M.S. *Carpathia*: "SOS SOS CQD CQD *Titanic*. We are sinking fast. Passengers are being put into boats. *Titanic*," the two men worked tirelessly to summon help. The radio operators stayed at their station long after they had been relieved of duty by Captain Smith, fighting to maintain power to the Marconi radio and keep its signal alive, until sea water was literally lapping at their feet. Finally, at 2:17 a.m., *Titanic* sent its last incomplete call: "CQ" (call to all ships). Phillips had intended to send "CQD DE MGY," the final distress

3

signal using *Titanic*'s call sign, but the Marconi's signal ended abruptly as the ship's power suddenly switched off.[1]

The operators left their station moments before the *Titanic*'s sinking.  Bride climbed to the roof of the officer's quarters and assisted with launching collapsible Lifeboat B, while Phillips disappeared aft, never to be seen alive again.  Bride survived, although badly injured, and later helped the *Carpathia*'s wireless operator send out a large number of personal messages from *Titanic*'s survivors.

To properly tell this and other stories, and to maintain its salvor-in-possession status and ensure protection of the *Titanic*, RMST has made preparations to return to the wreck site in late summer 2020, to conduct targeted salvage operations in the debris field surrounding *Titanic*, film the interior and exterior of the Titanic, and, if circumstances permit, attempt a minimally invasive recovery of artifacts associated with the Marconi apparatus.  (Doc. Nos. 585-1, 585-2, 585-3, 590-1 and 599, which are incorporated herein by reference.)  RMST is not proposing to engage in "wrongful destruction of the wreck site."  To the contrary, the company is busy developing new tooling to minimize or eliminate the damage to the ceiling of the Marconi Suite while gaining access to the artifacts below.  The expedition will proceed in a logical step-by-step fashion, with flexibility in place so the schedule for specific tasks and activities may be altered (or canceled) due to factors such as weather conditions, equipment availability, or unexpected situations, as determined by the most qualified group of experts to ever visit the wreck site.  *See, e.g.,* Project Research Design, attached hereto as Exhibit A.  All tasks are planned to be minimally invasive for

---

[1] For a complete, and fascinating, audio and text transcript of *Titanic*'s Marconi radio transmissions on April 15, 1912, see "Titanic Text Messages - A Streaming Log of Distress Transmissions," available at https://www.youtube.com/watch?v=FxRN2nP_9dA (accessed Mar. 17, 2020).

each goal.  *Id*.  The initial video survey will be carefully reviewed, and the plan will be altered, if necessary, to adjust for actual observed site conditions.  *Id*.

As the Court heard at the February 20, 2020 hearing, the ceiling above and areas surrounding the rooms containing the Marconi apparatus are collapsing, and RMST believes it is critical to recover these artifacts now before they are lost forever.  (ECF No. 599 at 61:7-62:7, 62:12-63:22, 76:17-77:10, 87:8-89:8, 89:15-91:9, 109:17-24 and 110:3-23.)  However, to do so, RMST needs the Court's permission.  Accordingly, RMST has filed this motion seeking to amend or modify the Court's July 28, 2000 Order stating: "RMS TITANIC, INC. and all of its employees, agents, or subcontractors are forbidden to in any way cut into the wreck or detach any part of the wreck."  (Dkt No. 164.)

### B.    Procedural History

RMST enjoyed unfettered access to the *Titanic* for salvage operations between 1987 and 1998.  The Court did not restrict company's access to any part of the ship or the methodology it employed to recover artifacts, and some artifacts were recovered from inside and outside the hull, as well as from the debris field.

In November 1999, the management of RMST changed, and the new management articulated a new business plan designed "to maximize shareholder value while still protecting the archeological and historical value of the wreck."  While the financial strategy of RMST's previous management had focused on generating earnings through the exhibition of artifacts, RMST's new management expanded this strategic plan to include "the possible disposition of artifacts to increase revenues" and thereby to maintain its status as salvor-in-possession.  *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 197-200 (4th Cir. 2002).  But these plans were

undeveloped, and during a hearing in March 2000, the new president of RMST testified before the district court that RMST had "no plans to sell any portion of the collection."  (Dkt No. 149.)

During that same hearing, RMST's new Chief Executive Officer, Arnie Geller, outlined plans for the company's upcoming expedition to the wreck site in the summer of 2000, including plans to use remotely operated vehicles to make "surgical incisions" into the side of the hull, where the superstructure meets the ocean bottom on the starboard side, to gain access to the *Titanic*'s First Class Cargo Hold, First Class Baggage Room and Mail Room, to recover valuable artifacts. (*Id*.)  *See also* "Salvage Company Says Titanic Artifacts Not For Sale," *The Virginian-Pilot*, Apr. 9, 2000, available at https://www.dailypress.com/news/dp-xpm-20000409-2000-04-09-0004080032-story.html (accessed Mar. 18, 2020).  Significantly, the Court expressed no serious reservations about the proposed salvage plan as outlined by Mr. Geller.  (*Id*.)

As the spring of 2000 progressed, it became apparent that the tooling necessary to make Mr. Geller's "surgical incisions" would not be ready in time for the July-August expedition. Accordingly, RMST advised the Court in its July 5, 2000 Periodic Report that it would not cut into the wreck.  (Dkt No. 161.)

However, on July 22, 2000, RMST's Chief Executive Officer, G. Michael Harris, who was leading the 2000 expedition, gave an interview to BBC Radio in which he contradicted the recently filed Periodic Report, stating:  "We will hopefully be able to recover some of the first-class luggage out of the cargo hold as well as the registered mail."  "*Titanic* Diamond Salvagers Race Against Time," Reuters News Service, July 23, 2000, available at https://www.iol.co.za/business-report/technology/titanic-diamond-salvagers-race-against-time-44315 (accessed Mar. 18, 2020). Mr. Harris was quoted saying that RMST, using manned submersibles and a remotely operated vehicle ("ROV"), planned to search for a $300 million shipment of diamonds along with

passengers' jewelry, gather artifacts left behind in the front cargo hold, and peer into adjacent rooms. *Id*.

Six days later, on July 28, 2000, Judge Calvitt Clarke, *sua sponte*, entered an Order stating:

This court has continued RMS TITANIC, Inc. as salvor in possession of the wreck of the TITANIC from year to year on the understanding that RMS TITANIC, Inc. would treat and preserve all artifacts recovered and would exhibit them to the public and would not sell or dispose of any of said artifacts. The court also continued RMS TITANIC, Inc. as the salvor in possession with the understanding that RMS TITANIC, Inc. would not damage or cut into or cut off any part of the wreck.

It has come to the attention of the court that has been a change of management in RMS TITANIC, Inc. and that there is a concern held by some persons and organizations that RMS TITANIC, Inc. is considering disposal of some artifacts recovered and entering the wreckage of the TITANIC by creating holes or slits or other openings in the wreck.

It is FURTHER ORDERED that RMS TITANIC, Inc. and all of its employees, agents, or subcontractors are forbidden to in any way cut into the wreck or detach any part of the wreck.

(Dkt No. 164.)

The Court did not indicate the source of the information that had come to its intention, nor was any material placed in the court record. On the day the Order was entered and mailed to counsel, RMST's massive expedition – consisting of three ships, two submersibles, two ROVs, RMST's entire management and nearly 100 personnel – had arrived at the *Titanic* site for a seven-week expedition and the team was preparing to make its first dives to the wreck site on Saturday, July 29, 2000. The Order was received by facsimile on the lead expedition vessel on Monday, July 31, 2000, and RMST complied with the court's Order for the rest of the expedition and to this day.

In its Periodic Report to the court filed on September 5, 2000, RMST acknowledged the Court's July 28, 2000 order, stating: "RMST notes that since it had never sold any artifacts or objects recovered from the *Titanic* without first advising the Court (i.e., sales of coal and

encumbrance of coins and currencies), and since it had advised the Court earlier in its July 5, 2000 periodic report that it would not cut into the wreck, the only new effect of the [July 28] order was the prohibition on detaching any part of the wreck." (Dkt No. 165.)  Consistent with this position, and because Mr. Geller had no plans for RMST to return to the wreck site, RMST did not appeal this aspect of the Court's July 28, 2000 Order.

RMST has sought and received modification of the July 28, 2000 Order on two prior occasions.  First, in April 2001, RMST sought a clarification of the July 28, 2000 Order to permit it to sell the coal it had recovered from the wreck site, which it was already doing. (Dkt No. 165.) On April 30, 2001, the Court signed an Order modifying the July 28, 2000 Order "to reflect the fact that the Salvor remains free to sell or encumber any coal that it has recovered or that it might recover in the future from the TITANIC wreck site." (Dkt No. 175.)

Second, in April 2010, RMST filed a motion to amend the July 28, 2000 Order to permit the removal of rusticles for scientific study. (Dkt No. 336.)  On April 30, 2010, this Court entered a new order granting the motion, stating:  "The 2000 Order was intended to prevent wrongful destruction of the wreck site and not to prevent scientific research into the wreck's biodeterioration." (Dkt No. 338 at 3.)  The Court's order further stated:

> The court Amends the 2000 Order to allow RMST to conduct a limited removal of rusticles from the R.M.S. *Titanic* on the 2010 Expedition, in an amount reasonably necessary for the bio-deterioration research of Dr. Cullimore, and in a manner consistent with scientific best practices. All other provision of the 2000 Order remain in full force and effect.

(*Id*.)

RMST now seeks to further amend or modify the Court's July 28, 2000 Order to permit:

(1) the removal of overburden (debris from fallen rusticles, deteriorated wood and silt) from inside the three rooms comprising the Marconi Suite (the Sleeping Accommodations, an Operator's Room and a Silent Room). (ECF No. 585-2 at 1.)

(2) the retrieval and, if necessary, detachment, of artifacts from within the Marconi Suite.  (*Id.*)

(3) if necessary, the limited cutting into and removal of deteriorated sections of the ceiling over the Marconi Suite to permit access to the artifacts underneath.

To be clear, RMST is *not* requesting the Court's permission to cut into the *hull* or *superstructure* of the ship.  RMST fears this could lead to weakening of the hull and accelerate its collapse.  RMST is merely requesting the Court's permission to cut into the ¼ inch-thick *ceiling* of the Marconi Suite, on a very limited basis and only if necessary to gain access to the components of the Marconi apparatus located below.  According to P.H. Nargeolet, the ceiling is not part of the hull itself, or the overall structure of the ship; rather, it sits on top of the wreck, it is already rapidly deteriorating, and it is immediately adjacent to areas of the ship where the ceiling and superstructure have already collapsed.  (ECF No. 599 at 77:11-20.)

Modification of the Court's July 28, 2000 Order is necessary to accomplish the recovery, conservation and public display of the *Titanic*'s iconic Marconi wireless apparatus and associated artifacts.  The pre-disturbance filming and survey of the Marconi Suite and other interior areas of *Titanic*, and the comparison of new imagery from 2020 to imagery captured on prior expeditions, will permit further research into the deterioration of *Titanic*.  The entire operation will be conducted in a manner consistent with scientific best practices, under the guidance of a qualified maritime archaeologist, and the imagery and science will be shared with academics, historians and the public.

## II.    LEGAL ARGUMENT

### A.    Standard for Amendment or Modification

Federal Rule of Civil Procedure 54(b) allows a court to revise an order "at any time before the entry of a judgment adjudicating all the claims."  Fed. R. Civ. P. 54(b).  Courts retain broad

flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–16 (4th Cir. 2003); *Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015). A court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) "a subsequent trial produc[ing] substantially different evidence"; (2) a change in applicable law; or (3) clear error causing "manifest injustice." *Canoe Ass'n*, 326 F.3d at 515 (quoting *Sejman*, 845 F.2d at 69). This standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Federal Rule of Civil Procedure 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of "new evidence not available at trial." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (providing "three grounds for amending an earlier [final] judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice"). There is no judicial consensus regarding the meaning of the term "manifestly unjust" as it pertains to a Rule 59(e) motion, but several courts have applied the Black's Law Dictionary definition, which states that "manifest injustice" is "an error in the trial court that is direct, obvious, and observable." *See*, *e.g.*, *Conway v. A.I. Dupont Hosp. for Children*, No. 04-4862, 2009 WL 1492178, at *6, n.8 (E.D. Pa. May 26, 2009); *accord Brown v. Zickefoose*, 2011 WL 5007829, at *2 n. 3 (D.N.J. Oct. 18, 2011); *Tri–State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, 2011 WL 4691933, at *3 (D. Kan. Oct. 6, 2011).

### B.   Twenty Years Later, There is Ample Basis for the Court to Amend or Modify its July 28, 2000 Order

This is not a case where the new owners of RMST are asking the Court to simply to "'reevaluate the basis upon which it made a prior ruling' or 'merely seeks to reargue a previous

claim.'" *See Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014) (*quoting United States v. Smithfield Foods, Inc.*, 969 F. Supp. 975, 977 (E.D. Va. 1997)).  Frankly, it is not clear why Judge Clarke entered the July 28, 2000 Order.  The Court did not reveal the source of the information that had come to its intention, nor was any material placed in the court record.  The July 28, 2000 Order was entered without any notice to the parties, without an evidentiary hearing, after RMST's CEO had testified under oath that the company did not intend to sell artifacts, and after RMST had recently advised the Court in its July 5, 2000 Periodic Report that it would not cut into the wreck.  (Doc. Nos. 149 and 161.)

Because the Court entered the July 28, 2000 Order *sua sponte,* the new owners of RMST can only speculate at to its purpose. It may have been that the Honorable J. Calvitt Clarke doubted the credibility of Mr. Geller's testimony, including because of apparent inconsistent statements made by Mr. Harris to the media from the deck of a salvage vessel as it was about to leave Norfolk? It may have been that Judge Clarke had suspicions about the new management team put in place after George Tulloch was deposed in a hostile takeover in November 1999 and P.H. Nargeolet was no longer working with the new management?  It may have been that Judge Clarke had reservations about the motivations of a group on a quixotic hunt for $300 million in undocumented diamonds? Or, it may have been what this Court explained ten years later:  "The 2000 Order was intended to prevent wrongful destruction of the wreck site and not to prevent scientific research into the wreck's biodeterioration."  (Dkt No. 338 at 3.)  Regardless, none of these factors are present now, and it would be manifestly unjust for the new owners of RMST to be punished for the sins of the past owners, particularly when this expedition, if successful, will capture and retell an important *Titanic* story for generations to come.

11

Furthermore, new evidence that was not available in 2000 makes it abundantly clear that *Titanic* is deteriorating rapidly, areas above and around the Marconi Suite are collapsing, and the Marconi radio components are in danger of being lost forever if they are not recovered soon.

There is almost universal agreement among scientists that *Titanic* is deteriorating through galvanic corrosion.  McCarty and Foecke state:  "The main causes degrading the wreck today are corrosion and gravity."  McCarty, Jennifer and Tim Foecke, *What Really Sank the Titanic*: New Forensic Discoveries. Citadel Press (2008), at 188.  They add: "Even at *Titanic*'s depth the water still contains about 40 percent of the dissolved oxygen of that at the surface, more than enough to facilitate corrosion."  *Id*. at 191.  A new book states similarly, "Hundreds of reasons have been proposed [for why *Titanic* collapsed], but the main reason seems to be bimetallic corrosion, also known as galvanic corrosion."  Rajendran, Susai and Gurmeet Singh, *Titanic Corrosion*. Jenny Stanford Publishing (2019).

Numerous researchers also attribute a portion of *Titanic*'s degradation to microbial action, including:

- DNA analysis of rusticles (the icicle-like masses of bacterial waste hanging from *Titanic*'s hull) from the 1991 *Titanic* expedition by Canadian and Spanish researchers showed that the rusticles were formed by a combination of 27 different strains of bacteria, including a previously unknown variety, quickly named *Halomonas titanicae*.  DNews, "Titanic Being Eaten by Destructive Bacteria: Discovery News." *Seeker* (Feb. 11, 2013), available at https://www.seeker.com/titanic-being-eaten-by-destructive-bacteria-discovery-news-1766492771.html (accessed Mar. 7, 2020).

- Tim Foecke stated in 2012: "We have been studying the steel recovered from the wreck extensively.  The bacterial colonies, called 'rusticles,' are changing the environment on the hull…."  Murray, Louise, "Scanning *Titanic* for the future." *Engineering and Technology News* (Mar. 26, 2012), available at https://eandt.theiet.org/content/articles/2012/03/scanning-titanic-for-the-future/ (accessed Mar. 5, 2020).

- Clare Fitzsimmons of Newcastle University, studied rusticle samples and concluded: "There are microbes on the shipwreck that are eating away the iron

12

of the wreck itself, creating 'rusticle' structures, which is a much weaker form of the metal…."  Daley, Jason, "The *Titanic* Is Being Reclaimed by the Sea." *Smithsonian Magazine* (Aug. 22, 2019) available at https://www.smithsonianmag.com/smart-news/titanic-being-reclaimed-sea-180972963/ (accessed Mar. 4, 2020).

RMST is not prepared to speculate about the mechanisms or extent of damage to *Titanic*, but two things are clear:  (1) *Titanic* is in an active state of deterioration, a condition that is predicted to continue; (2) RMST would like to provide a research platform for scientists, including Lori Johnston and others, to further their bio-deterioration research of *Titanic*'s interior and exterior, and in a manner consistent with scientific best practices.

The question, "When will *Titanic* collapse?" is important because everyone agrees that the recovery of artifacts in danger is appropriate when "justified by either educational, scientific or cultural interests, including for mitigatory, protection or preservation purposes."  *See*, *e.g.*, National Oceanic and Atmospheric Administration ("NOAA"), "NOAA Guidelines for Research, Exploration and Salvage of R.M.S. *Titanic*," 66 Fed. Reg. 18905-13 (Apr. 12, 2001).  There is no definitive answer to this question; however, researchers have offered several dire predictions:

- In 2001, NOAA stated: "Based on the available information on the rate of deterioration, NOAA understands that the wreckage of the RMS *Titanic* is in a state of decay and expects that the hull and structure of the ship may collapse to the ocean floor within the next 50 years, perhaps sooner."  *See* NOAA Guidelines, 66 Fed. Reg. at 18908.

- Rubinstein commented, "Because [bacteria] eat about 180kg (400lbs) [of iron] a day, scientists have given the ship a waning life expectancy."  Rubinstein, Peter, "Is this the last chance to see the *Titanic*?" BBC (Oct. 2, 2018), available at https://www.bbc.com/future/article/20181001-is-this-the-last-chance-to-see-the-titanic (accessed Mar. 6, 2020).

- Lori Johnston, a biological researcher who has made six trips to the *Titanic* to study rusticles, has concluded, "If it's going faster, which we hypothesize, it's going to be less and less of a timeframe."  Rubinstein 2018.

- After reviewing an extensive series of expert opinions, Ed Coghlan, chairman of the Irish *Titanic* Historical Society, said:  "This research backs up what divers

13

who have been down to the wreck have seen; that the ship is falling apart." Smith, Graham, "Rust-eating species 'will destroy wreck of *Titanic* within 20 years.'" *Daily Mail* (Jan. 12, 2011), available at https://www.dailymail.co.uk/sciencetech/article-1346446/Titanic-wreck-completely-destroyed-20-years-new-rust-eating-bacteria.html (accessed Mar. 5, 2020).

- In 2019, Henrietta Mann, Ph.D., a retired Dalhousie University civil engineering professor, predicted the *Titanic* will only be around for another 25 years "before it disintegrates into the ocean floor." Patil, Anjuli, "'It's sentimental': *Titanic* slowly disintegrates into ocean floor," *CBC News* (Aug 24, 2019), available at https://www.cbc.ca/news/canada/nova-scotia/titanic-slowly-returning-to-nature-1.5258893 (accessed Mar. 19, 2020).

To quantify the above observations and predictions, we can examine some of the specific

areas where noticeable changes to the hull have taken place in recent years:

- Daley reported in 2019, "Since the last time the ship was surveyed by people some 14 years ago, many recognizable features have disappeared into the abyss. The officer's quarters, including the captain's rooms, have vanished and the hull is beginning to collapse, taking the state rooms with it." Daley continued, "In early August, crews aboard Triton submarine's two-man submersible *Limiting Factor*, … found is that the mass of metal is quickly deteriorating due to rust, salt, colonies of sea creatures and the constant flow of ocean currents." Daley 2019.

- *Titanic* historian Parks Stephenson, a member of the 2019 expedition science team, recently remarked: "The most shocking area of deterioration was the starboard side of the officer's quarters, where the captain's quarters were…. The Captain's bathtub is a favorite image among the *Titanic* enthusiasts, and that's now gone." While onboard the research vessel in 2019, looking at the 2019 photomosaic model showing the new deterioration of the Marconi room area, he lamented: "We are definitely in a race against time here." National Geographic Channel, "Back to the *Titanic*" (aired on Feb. 23, 2020).

It is evident that the researchers most familiar with the *Titanic* wreck site are aware of

significant deterioration of the ship since 1985, and additional catastrophic deck and bulkhead

collapses will continue to occur.   Reportedly, most of the interior bulkheads, which were

constructed of wood, have already disintegrated.   Significantly, video from the National

Geographic special that aired on February 23, 2020 clearly shows gaping holes in the deck above

14

a corridor adjacent to the Marconi Suite, along with other holes forming in the ¼-inch thick ceiling directly above the Marconi Room.  *See* Figures 1 and 2.



*Figure 1. Deteriorated openings in the ceiling above the Marconi & Elevator Rooms in 2019.*



*Figure 2. Closeup of the skylight opening above the Marconi Suite in 2019, showing holes opening through the one-quarter inch thick ceiling due to either microbial action or galvanic corrosion.*

Given the level of uncertainty, it would seem to be prudent to assume the worst and seek to identify high risk artifacts that might be recovered before it is too late, including the components of the Marconi radio.  As P.H. Nargeolet, RMST's Director of Underwater Research, testified on February 20, 2020:

> Q. Have you been able to witness the deterioration or any deterioration of the wreck of the Titanic in the 30-some years that you have been diving down?
>
> A. Yes. I show a lot of difference and already -- I already talk about that before. But especially in 2010, when we were on the Titanic, and we were using -- or -- and out of the robot, we saw a lot of difference. And I can give you an example, because I know very well the '20s from the gymnasium. The gymnasium is a room which just back on the grand staircase, and on the gym side of the grand staircase it shows the, yes, close to the grand staircase, you know, and on the other side it's where is the Marconi room.
>
> What I saw the difference at 1987, the roof on the gymnasium was there. In '93 the roof collapsed on the inside, and on and on. I will say in -- or in 1998 I saw, for example, one -- the bicycle, you know, who has for training the people in the gymnasium, I can see very well through one of the window, pedal of this bicycle, and I was thinking it could be good artifacts to recover, but, unfortunately, in 2010, the deck of the ship close to this gymnasium, there was a hole growing and growing, and it was so big that the side of the gymnasium was starting to collapse, and it was about back to like 60 degree from the vertical, and last year everything collapsed inside, you know.
>
> The deck was collapsed to each other, and for me that is evidence that a big deterioration now is a little of the grand staircase. And even the high between the deck, which is normally more than 10 feet, is now about five to six feet. The next step will be the Marconi room.
>
> …
>
> Q. The Marconi?
>
> A. Yes, the Marconi room where is the radio and everything, and already, just between the grand staircase and the Marconi room, that is what we call the elevator gear, is where all the engine for the elevator, and the roof of the elevator are already gone now, most of them. I mean, the next big deterioration will be the Marconi room, you know. That's why we are thinking that if we want to recover and to save these artifacts, which is an iconic artifacts from the Titanic because it's because of this radio equipment, that the people were safe.

I think something very important, and it's not --even some people tell me, oh, but, you know, we can see this. It's the same kind of radio in another museum. I say no, because one of the Titanic was a new one, much powerful than the other one. And I think that if we don't recover that, I will say, I cannot swear that it will be in 2020, but very soon it will disappear, and it will go down, and it would be probably impossible to recover later.

That's why if we want to save something, and that is my position, you know, about -- I will say it will be again NOAA against NOAA. I like NOAA very much, but she is a very good, you know, government agency, but I disagree with some of their stuff about the Titanic, like the conservation *in situ*, I call that the deterioration *in situ*, because if we do nothing, everything would be deteriorating.

That's why I'm thinking that if we want to save this radio, we have to do that now in a hurry, because, really, the next step will be the Marconi room. I'm not sure even that if we go into 2020 the roof will not be already collapsed on everything, which makes this stuff very more difficult, you know, to recover. Like a little bit forward of the Marconi room, we have the captain's suite room, and I'm sure you saw some picture of the captain's suite room who was already open at the beginning in '87, and step by step everything [will] collapse.

…

THE COURT: It seems like what you're saying is that there really is no choice. To get to the existing artifacts, you have to get inside?

THE WITNESS: Absolutely.

THE COURT: If you don't get inside, it's going to collapse, and then you won't have any artifacts?

THE WITNESS: Exactly. But from my point of view is the last -- one of the last -- I'd say is the last chance. I cannot swear that everything will be still good in a year. I don't know. But the main deterioration is so close from the Marconi room, it's time to do that. If not, I'm pretty sure we will have one chance now, and even I cannot guarantee that each year the roof will not be collapse already. But it's time to do something. If not, it will be -- all these artifacts will be lost forever.

THE COURT: So, it's the choice between having to do something and hoping for a good result or doing nothing and knowing that there will be no result?

THE WITNESS: Exactly.

(ECF No. 599 at 61:7-62:7, 62:12-63:22 and 76:17-77:10)

Mr. Nargeolet refuted the suggestion that removing small sections of thin ceiling above the

Marconi Suite would accelerate the collapse of the *Titanic*:

> BY MR. PORTER:
> Q. Will cutting a roof impact the structural integrity of the roof?
>
> A. No, because this part of the ship is not a part of the structure of the ship, is a light structure compared to the hull itself, because, you know, the upper part of the ship is already in -- and that was on the one of the roles so of the expansion joint, and it was something light like that, the weight of the ship is the top weight is less than the rest of the ship.

(*Id.* at 77:11-20.)

Marine archaeologist John Broadwater, Ph.D., R.P.A., who has more than fifty years'

experience in underwater archaeology, including serving as NOAA's Chief Archaeologist and

managing the Monitor National Marine Sanctuary (ECF No. 590-1 at 2-3), also testified there

were clear signs of deterioration, evidence that *Titanic* is in peril, and recovering artifacts is the

preferred option versus over so-called "*in situ* preservation."  Specifically, Dr. Broadwater

testified:

> [] I do think Mr. Nargeolet and some other people are presenting more and more evidence that we are seeing an increased rate of deterioration and deck collapse.
>
> So, I think for most of us, in fact -- may just kind of digress slightly, I think most of us in the archaeological community wear several hats. One is always, if we are archaeologists, we dig. That's what archaeologists do. But that's tempered by the fact that most of us also have a hat that says historic preservation.
>
> So we are always trying to balance the idea of leaving a site untouched, leaving it *in situ* versus the benefits that can accrue from excavation, either partial or complete, and those can include things like the site being in peril, as there seems to be a lot of evidence the *Titanic* is, or that by excavating and recovering artifacts and information from the site, you gather scientific and educational information that make the recovery a more attractive operation rather than *in situ* by itself.
>
> Q. I forgot to ask you, sir, have you been to the *Titanic*?
>
> A. I have. I made a dive in 2001, and so I did get to see the site up close. It's very difficult from, you know, what we know now, as several people have already

18

remarked, to make any predictions on what's its current peril? Is it going to fall apart this year, next year, a hundred years from now, but certainly there is certain clear signs of deterioration.

Q. The 2001 expedition that you participated in, was that the James Cameron expedition where he filmed inside the wreck?

A. Yes. Using two very small ROVs, and those are so small that they are able to get into places that I think gave us a lot of information that was helpful in trying to determine what the interior structure, the surviving interior structure of the wreck was like. So I consider that to have been a very low impact and high reward in terms of data.

Q. Would you support a proposal to go inside and film inside and do a pre-disturbing survey and gain more information about the rate of deterioration since 2001?

A. I think -- assuming we can come up with a plan that pretty much guarantees that any impact would be minimal, because of the ROV's size and mass, would be so slight that if you did have an occasional bump, as we were using the term, that the damage would, unlikely -- be unlikely to cause any serious damage.

I think the additional information, especially these days, we have such good quality cameras. We have good positioning systems that can navigate these corridors within the ship. I think the data that you would get might contribute to making these predictions about what the rate of collapse is and how desperate the situation is for the *Titanic*.

(*Id.* at 87:8-89:8). Dr. Broadwater also testified about the public benefits and storytelling aspect of recovering the Titanic's Marconi radio, and he made comparisons between the *U.S.S. Monitor* and *Titanic*:

I will say that one of the other hats that I think archaeologists wear or should wear is we are storytellers. If we recover artifacts from a shipwreck, and we keep it all to ourselves, or we file it in some tome in a journal someplace, we haven't really completed our responsibility.

So, I'm always intrigued by the idea of looking at that aspect, what are the public benefits that might accrue from recovering artifacts.

I was involved at NOAA with the MONITOR, and the MONITOR had many similarities to the *Titanic* in that the wreck was in peril. It sits above the seabed. It is not imbedded, and so it's not protected against currents and corrosion and all the human effects.

19

So, we made the decision that we needed to intervene at the site. I'm so glad we did because if you take a trip across the Hampton Roads Bridge/Tunnel and you go to the Mariner's Museum, you can visit the MONITOR's center, and you can see the objects that we recovered, interpret it in a way that the public can really enjoy and be excited about what the ship represented to the American Naval history. It was the first modern warship.

So, are there parallels to the *Titanic* there? I think one of the things I read in the R.M.S.T. brief that caught my attention is just how important the Marconi is, and I guess I've sort of forgotten that. It was one of the first of the new types of Marconi. It had such a distinctive sound that any radio operator that heard the Titanic calling a signal, they knew it was the *Titanic*.

It was also, I'm fairly certain it was the first time that the new distress code SOS was ever used in a marine disaster.  Before that it was a CQ signal that radio operators are familiar with. But the international, by international agreement, the SOS signal had been adopted, but I believe it had not been used, at least not in a major disaster. So all of those are stories that I think could be well told, and having the physical object there, the physical Marconi, or at least part of the whole apparatus, would bring it to life. That's what archaeology is. I mean, if you look at the dictionary definition of archaeology, it's learning about interpreting our past based on the physical evidence that past people have left behind.

So, without artifacts, archaeologists can't be archaeologists.

(ECF No. 599 at 89:15-91:9.)

Oceanographer David Gallo, Ph.D., RMST Senior Advisor for Strategic Initiatives, has been directly involved in numerous *Titanic* expeditions, including as co-leader of RMST's 2010 expedition.  He testified about the importance of recovering artifacts for public display and storytelling, including the Marconi radio, and the feasibility of recovering these artifacts:

So when you have things like that, the Marconi, that you can build these stories, you heard John Broadwater talk about the stories, that's fascinating to me, and if it's in jeopardy, that actually doubles the, you know -- you know, starts with that as in jeopardy, then it goes to, you know, the stories that you can tell if we can recover it. And we do need to use many pieces to that, to the Marconi, which pieces do we really need.

…

20

Q. What I mean is, do you have an opinion on whether you make the expedition, you go out, you assess, you take video, and then depending on what you find, whether or not at that point you should have the flexibility, if it's feasible, to recover some of the artifacts?

A. It would be wonderful to have the trust of the Court to be able to make a decision on site to do a pre-recovery survey of the site. We can do volumetric mapping so you can have a really good look at what's there, to do the operation with minimal invasiveness on the site, and then to do the post-survey afterwards to show what's been -- what we actually did. That's ideal, because, otherwise, again, if you get out to the site, look at it, and I must admit, I am staggered when I saw that when we looked at the latest photos of the rooftop above the Marconi, I wasn't expecting that, how perforated it is.

It does look like it's about -- it's only a quarter inch think to begin with. There are places where you can stick your finger through that rooftop. But so, ideally, you would have that flexibility to be able to do something on the spot.

(*Id.* at 109:17-24, 110:3-23.)

Based on the new and significant evidence of *Titanic*'s deteriorating condition, particularly in and around the Marconi Suite, and the cultural and historical importance of the Marconi radio, there is ample basis for the Court to reconsider, amend or modify its July 28, 2000 Order. This new evidence was not available to the Court in 2000 or 2010, and the importance of studying *Titanic*'s deterioration is greater than ever.

### C.    Phased Approach for the *Titanic* 2020 Expedition

RMST is not proposing to engage in "wrongful destruction of the wreck site." To the contrary, the company is busy developing new tooling to minimize or eliminate the damage to the ceiling of the Marconi Suite while gaining access to the artifacts below. The expedition will proceed in a logical step-by-step fashion, with flexibility in place so the schedule for specific tasks and activities may be altered due to factors such as weather conditions, equipment availability, or unexpected situations, as determined by the most qualified group of experts to ever visit the wreck site. *See, e.g.,* Project Research Design,

attached hereto as Exhibit A.  All tasks are planned to be minimally invasive for each goal.

*Id*.  The initial video survey will be carefully reviewed, and the plan will be altered, if

necessary, to adjust for actual observed site conditions.  *Id*.  The expedition phases are:

### Phase 1: Initial Pre-Disturbance Video Survey

a.  ROVs equipped with 4k camera packages and high intensity lights will conduct a high definition video survey of portions of the interior and exterior of the bow, with the extent of coverage to be determined by site and equipment conditions and time constraints.

b.  A priority for the video survey will be close up imagery of the deck area over the Marconi equipment rooms, plus imagery inside the Marconi equipment rooms to the extent that task can be accomplished with minimal disturbance.

c.  Additional interior and exterior video will be recorded as time and conditions permit.

### Phase 2: Selective Artifact Recovery in the Debris Field

a.  An ROV will be used to recover artifacts from the debris field based on information generated on previous expeditions, suitability for storytelling opportunities, and if they meet the criteria in the Conservation Plan.

b.  Artifacts will be placed in pre-positioned recovery baskets.

c.  All recovery operations in the debris field will be recorded on high definition video along with positioning information.

d.  A task log will be maintained during all recovery operations.

e.  Recovered artifacts will be immediately placed into stabilization and conservation.

### Phase 3: Selective Recovery of Marconi Telegraph Components

a.  Based on the video survey, team leaders will decide if recovery of one or more components of the Marconi telegraph system can be accomplished with minimal adverse effects on *Titanic*'s hull and contents.

b.  If recovery is determined to be feasible, the recovery plan will be refined based on information obtained during the video survey.

c.  An ROV-mounted suction dredge will be employed to remove overburden, expose components of the Marconi system, investigate the condition of the Marconi Suite spaces, and recover of loose artifacts.

d.  Select artifacts will be recovered in accordance with "Proposed Object Recovery, RMS *Titanic* 2020: Marconi (Radio) Equipment," (ECF No. 585-2.)

e.  Once recovery operations begin, the situation will be closely monitored by the expedition archaeologist and other senior team members.  If there is a threat of excessive wreck or artifact damage, operations will be halted and the senior team will confer about the situation.  Operations will resume only if the senior team is in agreement that they can proceed in a minimally-invasive manner.

f.  Recovered artifacts will be immediately placed into stabilization and conservation.

As the Court can see from the highly-detailed Project Research Design, which is incorporated herein by reference, RMST has made every effort to comply with best scientific practices and the recommendations set forth in the "NOAA Guidelines for Research, Exploration and Salvage of R.M.S. *Titanic*," 66 Fed. Reg. 18905-13 (Apr. 12, 2001).  All of this effort has been, and will be, conducted to avoid wrongful destruction of the wreck site and to preserve and enhance the historical value of *Titanic*.  *See Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 468 (4th Cir. 1992), *cert. denied*, 507 U.S. 1000 (1993) ("salvors who seek to preserve and enhance the historical value of ancient shipwrecks should be justly rewarded").

### D.     NOAA's Opposition to RMST's Titanic 2020 Expedition is Unfounded

RMST regrets that its relationship with NOAA has become increasingly adversarial in recent years.  RMST believes the current relationship between the parties reflects, at least in part, NOAA's decade long transition in this matter from *amicus curiae* with oversight function, to adverse party, with its own political agenda to usurp the Article III jurisdiction of this Court while assailing centuries of American salvage law.

23

For example, NOAA appears to seek to expand its role in this admiralty proceeding to place NOAA on an equal footing with the Court:

> It is not disputed that this Court possesses admiralty jurisdiction over this matter or that RMST has been designated as the exclusive salvor-in-possession ("SIP").  It is also clear that RMST's SIP status and its "right" to salvage are subject to scrutiny by the Court and *oversight* by NOAA.  *See … R.M.S. Titanic v. Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784, 791 (E.D.V.A. 2010) (noting that United States is entrusted "to continue *reviewing* RMST's operations as salvor-in-possession . . . .")

*See* ECF No. 591 at 4.

The privilege of reviewing RMST's plans and providing oversight to the Court, come at the invitation of the Court because of the Court's jurisdiction over this matter.  This Court – and only this Court – has the Constitutional jurisdiction to provide oversight over RMST.

Second, the word "right" does not belong in quotations.  Salvors are entitled to provide recovery services to a vessel in distress and perfect a maritime lien against the vessel and the property saved.  *See* 46 U.S.C. § 80107(a) ("A salvor of human life, who gave aid following an accident giving rise to salvage, is entitled to a fair share of the payment awarded to the salvor for salvaging the vessel or other property or preventing or minimizing damage to the environment[.]"); *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 793 (E.D. Va. 2010) ("Principles of salvage law emerged over three thousand years ago, in the days of Rhodian civilization, and have since become an important part of the maritime law of nations. The purpose of salvage law is 'to encourage persons to render prompt, voluntary, and effective service to ships at peril or in distress by assuring them compensation and reward for their salvage efforts.'"); *The "Sabine"*, 101 U.S. 384, 386 (1880) ("Power is vested in the Supreme Court to regulate the practice to be used in suits in equity or admiralty by the circuit or district courts as conferred by an act of Congress, which has been in force for many years. . . . Salvors, under the maritime law,

24

have a lien upon the property saved, which enables them to maintain a suit in rem against the ship

or cargo, or both where both are saved in whole or in part.").

Furthermore,  NOAA also attempts to expand the "standards" it believes should apply to

RMST's activities well beyond the law of the United States and the law of the case.  For example,

NOAA asks the Court to apply:

- the C&Cs, which, by their terms, apply only to the management and care of *Titanic* artifacts and nowhere do they state that they apply to future salvage activities at the *Titanic* wreck site;

- the R.M.S. *Titanic* Maritime Memorial Act of 1986, 16 U.S.C. § 450rr et seq. (the "Act"), which NOAA seems to think the Court has overlooked but, in fact, it has always carefully considered since the beginning of these proceedings in 1993;

- NOAA's "Guidelines for Research, Exploration and Salvage of RMS *Titanic*," 66 Fed. Reg. 18905-13 (Apr. 12, 2001) ("NOAA Guidelines"), which are permissive – not mandatory – but nevertheless RMST has always looked to for guidance since their publication in 2001;

- the "Agreement Concerning the Shipwrecked Vessel RMS *Titanic*" (the "International Agreement"), which has never been adopted by the United States Congress, despite two failed attempts in 2009 and 2012;

- the Archaeology Guidelines of the Department of the Interior, which apply only to lands under the jurisdiction of the Department of the Interior and nowhere else;

- [guidelines of] "other independent professional organizations," which are not specified but presumably refer to the British Joint Nautical Archaeology Policy Committee ("JNPAC"), which is openly opposed to commercial salvage operations like RMST's activities at *Titanic*:  "The JNAPC's position is that historic wrecks in international waters should not be salvaged or excavated for commercial gain[;]" *see* https://www.jnapc.org.uk/ (accessed Mar. 23, 2020); and

- proposed, but not enacted, legislation concerning the *Titanic*, presumably the International Agreement, which NOAA is trying to bootstrap into force by circumventing Congress and seeking to have the Court apply here.

NOAA's insistence on the Court applying the United Nations Educational, Scientific and

Cultural Organization's ("UNESCO") Convention on the Protection of the Underwater Cultural

Heritage (the "Convention") is another example of the agency's overreaching. The Convention, which was set in motion specifically to stop the application of centuries of traditional salvage law to the *Titanic* and other shipwrecks, was adopted by UNESCO in 2001, and entered into force in 2009 upon ratification by the required 20 countries. The Convention has never been ratified by the United States, or even Canada or Great Britain for that matter. (UNESCO 2020, http://www.unesco.org/eri/la/convention.asp?KO=13520&language=E&order=alpha, (accessed March 10, 2020)). Although the Convention has been officially ratified by such countries as The Islamic Republic of Iran, Niue and Slovakia, *id*., the Convention has no force of law in the United States, and a U.S. Government agency has no business advocating for its application here. Indeed, when given the opportunity to endorse the application of the UNESCO Convention to the NOAA Guidelines, NOAA refused to do so. *See* 66 Fed. Reg. at 18909.

Similarly, it is disappointing, but not surprising, that NOAA would advance the interests of, and offer the Court the assistance of, the JNAPC. The JNAPC's sole reason for existence is to advocate for the United Kingdom's official acceptance of the UNESCO Convention and eradicate commercial salvage like RMST is performing at *Titanic*. *See*, *e.g.*, "Welcome to the Joint Nautical Archaeology Policy Committee," https://www.jnapc.org.uk/ (accessed Mar. 23, 2020). Asking the JNAPC for its opinion on RMST's plans to salvage the *Titanic* is like asking the Taliban if it is acceptable to serve wine at a Catholic wedding. NOAA is offering the JNAPC as a proxy to fight an ideological battle against the application of salvage, so the agency does not have to do so itself.

The same could be said for NOAA's suggestion that the Court should require RMST to create "an International Advisory Committee with various stakeholders outside of RMST (including the National Maritime Museum) to provide advice and 'to safeguard the future of the *Titanic* wreck site.'" (ECF No. 591 at 8.)

26

First, RMST is already doing this without a mandate from the Court.  The new owners of RMST have re-engaged with old partners; established or repaired relationships with some of the most qualified individuals and organizations in a variety of fields, including exhibitions, science, marine archaeology, deep sea exploration, education, entertainment and law; and they have reached out to *Titanic* commemorative societies and victims' families in the United States, Ireland and the United Kingdom to engage in dialog, assist them in their activities, and understand their perspectives on this unique historical phenomenon that is *Titanic*.  As part of this outreach process, RMST recently traveled to the United Kingdom and Ireland to meet with representatives of, among others: *Titanic* Belfast, the National Museum of Ireland, the Belfast *Titanic* Society, the Addergoole *Titanic* Society, Mayo County Council, The National Museum of Ireland – Country Life, and various science museums and educators.

Second, RMST – and this Court – maintain an open-door policy.  NOAA and the National Maritime Museum are welcome to provide their input to the admiralty proceedings, and they have in the past.  Indeed, any member of the public is welcome to provide input into these proceedings, and they have in the past.

Finally, despite NOAA solemnly declaring that "NOAA and the United States are obligated to comply with their responsibilities under Sec. 113 and the International Agreement," ECF No. 591 at 7, NOAA itself has never formed an Advisory Council in the three years since it slipped Section 113 into a spending bill, like it has with so many other existing and proposed national marine sanctuaries in NOAA's portfolio.  *See* "Marine sanctuary advisory council named," *Oswego County News Now*, Feb. 27, 2020, available at

http://www.oswegocountynewsnow.com/news/marine-sanctuary-advisory-council-named/article_8b33a2a0-58e6-11ea-9712-effc059f0638.html (accessed Mar. 24, 2020).

NOAA's focus on controlling all forms of access to *Titanic* has marginalized its original, contemplated role as true "friend of the court."  For years, it has been pursuing its own agenda at the expense of RMST, and this Court's jurisdiction.  And to be sure, with respect to the current motion, this agenda ignores a very real public interest in the recovery of the Marconi::

> While the public has an interest in protecting the *Titanic* wreck site from being pillaged for private gain, and in guarding the remains of those who perished in the 1912 tragedy, a way should be found to carefully retrieve the ship's wireless communicator before it is destroyed.
>
> The public has an interest in the history that device represents, and what it can tell us about the final efforts to save the ship and the thousands of people on board. The voice of the *Titanic* should not be lost because of a drawn-out court fight.

*See* "Voice of the *Titanic*: A historic device from the famed ship is at risk. A court fight to determine the fate of the ship's telegraph machine must be handled carefully and quickly," *Pittsburgh Post-Gazette*, Mar. 4, 2020, available at https://www.post-gazette.com/opinion/editorials/2020/03/04/Voice-of-the-Titanic-A-historic-device-from-the-famed-ship-is-at-risk/stories/202003040028 (accessed Mar. 26, 2020).  RMST respectfully submits that the *Pittsburgh Post-Gazette*'s view of its request more correctly focus on the merit's than NOAA's ideological opposition to RMST's continued salvage of *Titanic*.

Despite the current adversarial posture of RMST and NOAA, RMST agrees with two suggestions of NOAA:  (1) RMST's request for permission to remove sections of the ceiling to recover the Marconi apparatus should be evaluated based on whether the action is "justified by educational, scientific, or cultural interests," pursuant to the recommendations in the NOAA Guidelines, 66 Fed. Reg. at 18912; and (2) the Court should  consider whether RMST has provided a sufficient basis to modify or amend its prior orders precluding cutting into, or detaching of, any part of *Titanic*.  For the reasons set forth in Sections I and II, *infra*, RMST respectfully submits that it has provided overwhelming evidence to show that recovering the Marconi apparatus is

"justified by educational, scientific, or cultural interests;" and there is more than a sufficient basis for the Court to modify or amend its prior orders precluding cutting into, or detaching of, any part of *Titanic* to allow for this recovery.  RMST believes it has found a way to carefully retrieve the ship's wireless communicator before it is destroyed, and it respectfully moves this Court for permission to do so.

## III.    CONCLUSION

The *Titanic* 2020 Expedition is an opportunity for RMST to add to the growing body of knowledge about the *Titanic* wreck site.  The company desires to conduct meaningful and responsible research at the site and to make the resulting data freely available to all segments of society, from scientists and engineers to all the world's citizens.  RMST believes that the public benefits from this research, directly or indirectly; by the same token RMST believes that telling *Titanic*'s story through the use of actual artifacts from the site heightens the level of interest and excitement that the ship generates, and this benefits the public and the legacy of *Titanic*. Accordingly, RMST respectfully requests that the Court enter an order granting its motion to reconsider, modify or amend its prior orders precluding cutting into, or detaching of, any part of *Titanic* to allow RMST to recover the Marconi apparatus and associated artifacts.

Respectfully submitted,

**RMS TITANIC, INC.**

By Counsel:

/s/ *Brian Wainger*
Brian A. Wainger, VSB #38476
Attorney for Plaintiff RMS Titanic, Inc.
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175

E-Mail: bwainger@kaleolegal.com

/s/ *David G. Barger*
David G. Barger, VSB #21652
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1300
Fax: (703) 749-1301
Email: Bargerd@gtlaw.com

/s/ *David G. Concannon*
David Concannon, *Pro Hac Vice* (Doc. 583)
Concannon & Charles
100 Sun Valley Road, No. 329
Sun Valley, Idaho 83353
Tel: (610) 293-8084
Fax: (877) 736-2434
Email: david@davidconcannon.com

*Counsel for R.M.S. Titanic, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2020, a copy of the foregoing has been electronically

filed with the Clerk of the Court using the CM/ECF system, which will send electronic

notification of such filing to all counsel of record.


<u>/s/ David G. Barger</u>
David G. Barger, VSB #21652 GREENBERG
TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1300
Fax: (703) 749-1301
Email: Bargerd@gtlaw.com

*Counsel for R.M.S. Titanic, Inc.*


<u>/s/ Brian Wainger</u>

Brian A. Wainger, VSB #38476
Attorney for Plaintiff RMS Titanic, Inc.
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175
E-Mail: bwainger@kaleolegal.com

*Counsel for R.M.S. Titanic, Inc.*

31