**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**R.M.S. TITANIC, INC.,**
**successor-in-interest to**
**Titanic Ventures, limited partnership,**
                **Plaintiff,**

**v.**                                                    **Civil Action No. 2:93cv902**

**THE WRECKED AND ABANDONED VESSEL,**
**ITS ENGINES, TACKLE, APPAREL,**
**APPURTENANCES, CARGO, ETC., LOCATED**
**WITHIN ONE (1) NAUTICAL MILE OF A POINT**
**LOCATED AT 41 43' 32" NORTH LATITUDE**
**AND 49 56' 49" WEST LONGITUDE,**
**BELIEVED TO BE THE R.M.S. TITANIC**
<u>**in rem**</u>**,**
                **Defendant.**

**NOAA'S REPORT AND RECOMMENDATION**
<u>**IN RE: RMST'S RMS *TITANIC* EXPEDITION 2020 RESEARCH DESIGN**</u>

The United States, and on behalf of its National Oceanic and Atmospheric

Administration ("NOAA"), provides this report and recommendation relating to RMST's RMS

*Titanic* Expedition 2020 Research Design ("Research Design").  ECF Nos. 600 and 601.

Due to the coronavirus pandemic and its impact on Court operations, NOAA agrees with

RMST's suggestion to submit this matter to the Court for consideration on the written filings.

**I.      INTRODUCTION**

RMST's Research Design contains three primary objectives:  (1) video surveillance

mapping of portions of the interior and exterior of the wreck; (2) artifact recovery from the

debris field; and (3) artifact recovery from within the hull of the ship.  Objective 3 conflicts with

this Court's July 28, 2000, Order (the "2000 Order") prohibiting cutting into, cutting off, or

detaching any part of *Titanic*.  ECF No. 164.  Thus, RMST moves to modify the 2000 Order to

1

permit penetration of the ship's hull, related disruptive activities, and to extract artifacts.  ECF Nos. 600 and 601.

As an historic shipwreck and maritime memorial to the roughly 1,500 persons who perished when *Titanic* sank, any proposed activity at the wreck site *must* be approved in advance by the Court, be found by the Court to be in the public interest, and serve to enhance educational, scientific or cultural interests.  *See e.g.* ECF No. 591 at 4, 6-7.  NOAA is the federal agency that represents the public interest in *Titanic* and has a role in evaluating the merits of any such proposed activity for the Court.[1]  *See e.g.* ECF No. 580 at 2.

In this submission, NOAA will first review the legal and analytical framework by which RMST's Research Design should be evaluated.  Second, NOAA will address its concerns over the lack of information concerning funding for the Research Design and, in particular, funding for the care and conservation of any recovered artifacts in accordance with applicable legal and archaeological standards.  Finally, NOAA will assess and provide a recommendation for the three specific objectives of the Research Design.[2]

## II.     LEGAL AND ANALYTICAL FRAMEWORK

### A.  Motions to amend and modify, and law of the case doctrine.

NOAA concurs with RMST that Federal Rule of Civil Procedure 54(b) governs RMST's request to modify the 2000 Order.  *See* Fed. R. Cv. P. 54(b); *see also Am. Canoe Ass'n v.*

---

[1] NOAA's role to represent the public interest is consistent with NOAA's authority under the 1986 RMS Titanic Maritime Memorial Act (16 U.S.C. 450rr *et seq.*), NOAA's Guidelines for Research, Exploration and Salvage of RMS Titanic (66 Fed. Reg. 18912 (Apr. 12, 2001)), the Agreement Concerning the Shipwrecked Vessel RMS Titanic, and Section 113 of the Consolidated Appropriations Act, 2017 (Pub. L. No. 115-31, 131 Stat. 135, 192 (May 5, 2017)).

[2] To assist in this assessment, NOAA has utilized the services of: (1) Paul F. Johnston, Ph.D., Curator of Maritime History at the Smithsonian's National Museum of American History; (2) David L. Conlin, Ph.D., Chief of the Submerged Resources Center for the United States National Park Service; and (3) David Lovavlo, Founder, President, and CEO of the Global Foundation for Ocean Exploration.  A declaration, with attached resume, of each of these individuals is submitted with this memorandum.

2

*Murphy Farms, Inc.,* 326 F.3d 505, 514–515 (4th Cir. 2003).  Such motions "are not subject to the strict standards applicable to motions for reconsideration of a final judgment," but are left to the sound discretion of the Court, using such doctrines as "law of the case" to guide that discretion.  *Am. Canoe Ass'n,* 326 F.3d at 514–515.

Under the law of the case, a prior decision must be followed in subsequent proceedings in the same case unless: (1) substantially different evidence is developed; (2) controlling authority has changed; or (3) the prior decision was clearly erroneous and would work a manifest injustice. *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988); *TomTom, Inc. v. AOT Sys. GmbH*, 17 F. Supp. 3d 545, 546 (E.D. Va. 2014) (Rule 54(b) does not permit a party to ask a court to "rethink" a prior decision).  A moving party bears a "high burden," *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009), to demonstrate that one of these "exceptional circumstances" exists, *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999).

**B.  <u>Analyzing the Research Design.</u>**

RMST's Research Design should be judged against legal and professional standards that are applicable to *Titanic* and are accepted in the archeological community.  *See* ECF No. 591 at 4-5.  NOAA will first address the relevant legal and archaeological standards, and then discuss the components of a proper research design.

**1.  The relevant legal framework and archaeological standards.**

*This Court's Orders.*  For over 25 years, a principle objective of the Court has been to "preserve and protect the *R.M.S. Titanic* and its artifacts as an international treasure for posterity."  *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2010).  This principle recognizes that RMST does not own *Titanic* to do with it as it pleases, but instead RMST is in a trust relationship with the Court "on behalf of the public interest."

3

*R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 536-37 (4th Cir. 2006).
Of particular relevance now is the Court's July 28, 2000, Order which states, "RMS *TITANIC*,
Inc. and all of its employees, agents, or subcontractors are forbidden to in any way cut into the
wreck or detach any part of the wreck."  ECF No. 164 at 3.  The Court has reiterated the
prohibition several times since the 2000 Order, including on April 30, 2010, when it explained
that the prohibition "was intended to prevent wrongful destruction of the wreck site and not to
prevent scientific research into the wreck's bio-deterioration."  ECF No. 338 at 3 (approving a
"limited removal of rusticles . . . [for] analyzing the condition of the R.M.S. *Titanic* and to assist
in future preservation of the wreck site").

NOAA's "Guidelines for Research, Exploration and Salvage of RMS Titanic," 66 Fed.
Reg. 18912-18913 (Apr. 12, 2001) ("NOAA Guidelines").[3]  "RMST has always looked to [the
Guidelines] for guidance since their publication in 2001."  ECF No. 601 at 25.  And RMST
concedes that its Research Design "should be evaluated based on whether the action is 'justified
by educational, scientific, or cultural interests,' pursuant to the [NOAA Guidelines]
recommendations."  *Id.* at 28.

The International Agreement and its Annex entitled "Rules Concerning Activities Aimed
at the RMS Titanic and/or its Artifacts" ("Annex Rules"), as incorporated by reference into Sec.
113 of the Department of Commerce Appropriations Act, 2017.[4]  Pursuant to Sec. 113, activities

---

[3] NOAA developed the NOAA Guidelines as directed by the 1986 RMS Titanic Maritime Memorial Act ("1986
Act"). Section 7 of the 1986 Act provides: "pending adoption of the international agreement described in section
6(a) or implementation of the international guidelines described in section 5, no person should conduct any such
research or exploration activity which would physically alter, disturb, or salvage the R.M.S. Titanic."

[4] Sec. 113 was signed into law on May 5, 2017.  Department of Commerce Appropriations Act, 2017, Pub. L. 115-
31, 131 Stat. 135, 192 (May 5, 2017).  The International Agreement, along with its Annex Rules, entered into force
on November 18, 2019.  See ECF Nos. 581 and 581-1.  The International Agreement created legal obligations on the
international level.  Congress implemented the International Agreement through Sec. 113.  The International
Agreement can be found at http://www.gc.noaa.gov/gcil_titanic-intl.html.

at *Titanic* involving "research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site" are prohibited unless authorized by the Secretary of Commerce "per the provisions of the" International Agreement and its Annex Rules.[5]  NOAA's Guidelines are consistent with the Annex Rules, which form an integral part of the International Agreement.  Int'l Agr. Art. 1(c).

*The UNESCO standards contained in the Annex to the 2001 UNESCO Convention for the Protection of the Underwater Cultural Heritage ("UNESCO Annex").*[6]  These standards relate to activities concerning Underwater Cultural Heritage ("UCH"), which includes *Titanic* and its artifacts.[7]  ECF No. 591 at 5.  These standards are similar to both the International Agreement's Annex Rules and the NOAA Guidelines and, while RMST correctly notes that the United States has not ratified the 2001 UNESCO Convention, ECF No. 601 at 26, reference to the 2001 UNESCO Annex standards for guidance is encouraged by John Broadwater, RMST's Senior Marine Archeologist for this project.  ECF No. 590-1 at 3-4; Feb. 20, 2020, Tr. at 94.

### 2.  Key components of a project design.[8]

For activities aimed at *Titanic* and/or its artifacts, a well-developed project design typically includes fourteen distinct components. NOAA Guidelines ¶ 6; Annex Rules ¶ 6. Generally, the project design should describe in detail all the activities directed at *Titanic* and its

---

[5] The Secretary of Commerce has delegated this authority to the Administrator of NOAA.  ECF No. 564-2.

[6] The UNESCO Annex can be found at  http://www.unesco.org/new/en/culture/themes/underwater-cultural-heritage/2001-convention/official-text/ (last visited Feb. 13, 2020).  Also pertinent is the "Manual for Activities directed at Underwater Cultural Heritage," which expounds on and explains the UNESCO Annex Rules.  *See* http://www.unesco.org/culture/en/underwater/pdf/UCH-Manual.pdf (last visited Feb. 6, 2020).

[7] Article 1 of the UNESCO Convention defines "underwater cultural heritage" as "all traces of human existence having a cultural, historical or archaeological character which have been partially or totally under water, periodically or continuously, for at least 100 years." 2001 UNESCO Convention, art. 1(a).

[8] NOAA's analysis in the following sections will focus on specific, key areas of these standards, but is not intended to be a comprehensive critique of all 14 components of a proper research design.

artifacts, and the objectives of the project.  NOAA Guidelines ¶¶ 6, 15; Annex Rules ¶¶ 6(a), 15; *see also* UNESCO Annex ¶¶ 14-15.  The objectives of a project include the research questions that the project purports to answer.  UNESCO Manual at 112; *see also id.* at 124 ("[I]t is irresponsible to excavate without knowing what research questions are asked").  A project design should include contingency plans to address unexpected occurrences, and what deviations from the project design could occur.  UNESCO Manual at 147.

The project design should describe how the project will be conducted, and the methods and techniques to be employed (including the equipment to be used).  NOAA Guidelines ¶ 15; Annex Rules. ¶ 15; UNESCO Manual at 116.  The project's conduct must comport "with the general principles."  NOAA Guidelines ¶ 16 ("should comply"); Annex Rules ¶ 15 ("shall comply"); *see also* UNESCO Annex ¶¶ 1, 3-5.  Thus, among other things, RMST's Research Design must justify:  (i) why *in situ* preservation should not continue; (ii) how the project will avoid disturbing artifacts and human remains; (iii) why the proposed activity and recovery of artifacts, especially within *Titanic's* hull, is preferred over non-destructive and non-intrusive techniques; (iv) how the proposed activity has "the minimum adverse impact on RMS Titanic and its artifacts;" and (v) how the historical, cultural, and archaeological information derived from the project will be documented and disseminated to the public.  NOAA Guidelines ¶¶ 1-5; Int'l. Agr. Art. 4(1)(a); Annex Rules ¶¶ 1-5.

A project must have sufficient funding in place "in advance to complete all stages of the project, including curation [and] conservation . . . of any recovered artifacts" and the completion of all reports.  NOAA Guidelines ¶¶ 9, 11; Annex Rules ¶¶ 9, 11; *see also* UNESCO Manual at 127.  Contingency plans must be in place to ensure uninterrupted funding.  NOAA Guidelines ¶ 10; Annex Rules ¶ 10; *see also* UNESCO Annex ¶¶ 17-19; UNESCO Manual at 130.

The project design must identify the provisional timetable and contingency plan for completing the project, including adequate time "to complete all stages of the project, including the curation, conservation and documentation of any recovered artifacts, and the preparation and dissemination of the report."  NOAA Guidelines ¶¶ 13-14; Annex Rules ¶¶ 13-14.  In addition, the project must be conducted "in the presence of qualified technical and/or professional experts with experience appropriate to the objectives."  NOAA Guidelines ¶¶ 17-18; Int'l. Agr. ¶ 17; *see also* UNESCO Annex ¶¶ 22-23; UNESCO Manual at 164, 168 (participants must have the requisite "skills, knowledge, capacity, ability and formal training" for the project). In addition, the project design must include a safety policy prepared according to professional and legal requirements. NOAA Guidelines ¶25; Annex Rules ¶25.

The project design's preliminary work is critical, for "[i]t is on the basis of this preliminary work that irreversible decisions on the future of the site will be taken."  UNESCO Manual at 89.  This work includes an assessment of the vulnerability of *Titanic* and its artifacts, the environmental consequences of the project, and whether the "benefits of the project outweigh the potential risk of damage."  NOAA Guidelines ¶¶ 19-20; Annex Rules ¶¶ 19-20; *see also* UNESCO Annex ¶¶ 14-15.  This cost-benefit analysis considers such factors as the significance of the wreck site as a historical and cultural site; its status as a maritime memorial; how *Titanic's* significance would be "enhanced by the intended project;" the views of other stakeholders; and the "loss of future research potential."  UNESCO Manual at 83-90.

The project design must include post-field work plans, to include appropriate conservation and curation plans (i.e., in accordance with professional standards) for any recovered artifacts from the moment of recovery and for the long-term.  NOAA Guidelines ¶¶ 6, 23-24; Annex Rules ¶¶ 6, 23-24; *see also* UNESCO Manual at 129 ("Conservation should be

catered for from the beginning.")  Curation plans should ensure public access to the project results for educational, scientific, cultural and other public purposes.  NOAA Guidelines ¶¶ 28-30; Annex Rules ¶¶ 28-30; *see also* UNESCO Annex ¶¶ 24-25, 32-34.

The project design must identify how the results of the project will be documented in accordance with professional archaeological standards, reported on in an interim and final basis, and disseminated to the public "as soon as possible."  NOAA Guidelines ¶¶ 21-22, 26-27, 31-32; Annex Rules ¶¶ 21-22, 26-27, 31-32; *see also* UNESCO Annex ¶¶ 30-31, 35-36; UNESCO Manual at 225, 302, 305.  If applicable, the project design should include a plan for publishing the project's results.  NOAA Guidelines ¶6; Annex Rules ¶6. In addition, the project design should document any arrangements that have been made for collaborating with museums and other institutions. NOAA Guidelines ¶6; Annex Rules ¶6. Finally, the project collection, including artifacts recovered and supporting documentation, "shall be kept together and intact in a manner that provides for public access, curation and its availability for educational, scientific, cultural and other public purposes." NOAA Guidelines ¶6; Annex Rules ¶6.

## III.     THE RESEARCH DESIGN FAILS TO ADEQUATELY ADDRESS FUNDING

A research design should "demonstrate an ability" to "ensure adequate funding in advance to complete all stages of the project including the curation, conservation and documentation of any recovered artifacts . . . ."  NOAA Guidelines ¶¶ 9, 11; Annex Rules ¶¶ 9, 11; *see also* Johnston Decl. ¶ 5 ("RMST should have in place a clear, realistic and transparent budget, with appropriate contingency mechanisms, and make that available for professional audit.").  RMST's assertion "that it possesses the financial resources" to conduct the expedition and care for any recovered artifacts,[9] ECF No. 601-1 at 34, does not meet that standard.

---

[9] RMST assumes it will be granted an *in specie* award for any recovered artifacts.

Conservation is "neither inexpensive nor quick," and it can involve multiple techniques for a single artifact depending on the artifact's composition.  Johnston Decl. ¶¶ 6-7.  Beyond the twelve artifacts RMST proposes to recover from the Marconi Suite, RMST does not identify how many or what other artifacts it wants to recover; necessarily, the targeted artifacts' condition, composition and conservation needs also are unknown.  In the absence of information concerning "how much RMST has budgeted for such things as field salvage, follow-up objects documentation, recordation, processing, stabilization, conservation, curation, and exhibition, it is not possible to ascertain RMST's ability to complete the outlined research, salvage and consequent activities involving the [unknown number of] artifacts."  Johnston Decl. ¶ 6.  Likewise, the timetable for conservation and curation of any recovered artifacts is unclear.  NOAA Guidelines ¶¶ 13-14; Annex Rules ¶¶ 13-14.

NOAA's concern is informed by existing questions regarding RMST's budget for conservation and its reserve account.  *See e.g.* ECF No. 585 at 3-5; Feb. 20, 2020, Hearing Tr. at 5 (Stating that "the Court had been concerned about the conservation budget and whether there had been any analysis of the reserve account.").  In addition, roughly 10% of RMST's artifact collection, while purportedly stable, could be "consider[ed for] further conservation work."  ECF No. 550 at 6.  RMST's promise to provide "an estimated time frame for completing such conservation work," ECF No. 527-2 at 3, remains unfulfilled a year later.  *See also* Johnston Decl. ¶ 8 (noting that there has been ample time to properly conserve all the artifacts in RMST's possession since the last recovery in 2004).  Further, RMST's annual budget for *all* operations, and not just conservation and curation of the artifacts, is approximately $800,000, and is entirely "funded from operations."  ECF No. 557 at 6.  Especially now, during the worldwide coronavirus pandemic when many museums, exhibitions, and public events have been closed or

9

cancelled (including those with *Titanic* exhibitions), a budget dependent on revenues generated by public ticket sales is far from dependable or guaranteed to cover the costs associated with the recovery of new artifacts.  Given these concerns, and the unknown conservation needs (and costs) for an unspecified number of artifacts RMST proposes to recover, NOAA believes that reliance on a "proprietary" information claim to shield how RMST will fund the recovery, conservation and care of these artifacts is not acceptable.  *See* Johnston Decl. ¶ 8 ("I would not be comfortable approving more artifact salvage without (a) some verifiable evidence and assurance of solvency; (b) an assured, dedicated funding source; and (c) conservation completion of all the *Titanic* artifacts already in RMST's possession.").

## IV.    OBJECTIVE 1:  INTERIOR AND EXTERIOR VIDEO SURVEILLANCE

Objective 1 proposes to conduct high definition, minimally invasive, video surveillance of the interior and exterior of the bow section of *Titanic* using a remotely-operated vehicle ("ROV").  ECF No. 601-1 at 26-27; *see also* ECF No. 601 at 8-9.  The "priority" or "emphasis [of the video surveillance is] on the area in the vicinity of the Marconi Room" and "the deck area over the Marconi equipment rooms," with any other video surveillance to be conducted only "as time and conditions permit."  ECF No. 601-1 at 26-27, 41.

Provided that RMST provides sufficient information to the Court to resolve the funding concerns set forth above and the additional questions raised below, NOAA is prepared to recommend the Court authorize this objective.[10]

---

[10] For any activities authorized, RMST should be required to provide interim and final reports to the Court and NOAA regarding such activities, providing the information set forth in the NOAA Guidelines at ¶¶ 26-27, and the Annex Rules at ¶¶ 26-27. RMST should also provide more specific information regarding public dissemination of the video and imagery collected. NOAA Guidelines at ¶¶ 31-32, and the Annex Rules at ¶¶ 31-32.

Video surveillance of *Titanic* either within or outside the hull, which is non-destructive and conducted in a manner that avoids disturbance of artifacts, can provide valuable information for researchers.  NOAA Guidelines ¶ 2; Int'l Agr. Art. 4; 66 Fed. Reg. at 18908 (Noting that the NOAA Guidelines "do not discourage the use of [ROVs] within the hull of the ship;" and that "[v]ideos and photographs taken from ROVs are as valuable as artifact recovery, if not more so, in exposing the public to the wreckage and educating them about it."); Johnston Decl. ¶ 20 ("[E]xtensive video mapping of the ship's exterior and interior could provide valuable information to researchers and academics, such as comparatively evaluating deterioration or preservation in and outside the wreck."); Conlin Decl. ¶¶ 4, 13(1) (describing his work with the USS *Arizona* and the value of interior video surveillance).  Here, the Research Design states that the "priority" or "emphasis" for video surveillance is for the Marconi Suite.  ECF No. 601-1 at 26-27, 41.  If limited to these areas, the video surveillance, while still of some value, would certainly have less academic or scientific justification than a more comprehensive review of the wreck's interior.  Johnston Decl. ¶ 20; *see e.g.* Conlin Decl. ¶ 4(3) (Describing how *Arizona* video showed "preserved uniforms still on hangers in closets, uniform hats, blankets and even paper in books."); *id.* ¶ 13(3) (Explaining that extensive video surveillance could "include scientific payloads or sensors that would provide objective data germane to assessing the processes of preservation or decay at work on *Titanic*.").

To ensure that the video surveillance will be conducted in a manner that is non-destructive and minimizes disturbance to artifacts and other wreck features, RMST should explain the full scope of *where* the ROV will and may go (if "time and conditions permit"), and *how* the video surveillance will be conducted (to include the specific equipment to be used), so that a reasoned assessment of the potential for damage can be made.  *See* NOAA Guidelines

11

¶ 19(a) (a project design must "evaluate[] the vulnerability of RMS *Titanic* and artifacts to damage by the proposed activities").  This is important because different methods and equipment may be more or less likely to cause collateral damage to other artifacts, the context in which those artifacts rest, and other wreck features, Johnston Decl. ¶ 14, especially with the strong currents that run around and through the wreck, *see e.g.* Feb. 20, 2020, Hearing Tr. at 75 (Nargeolet Testimony).

The wreck is recognized as a grave site for the roughly 1,500 persons who were on board when the ship sank.  The Research Design does not, however, account for the possibility of "finding and managing human remains so that they remain undisturbed or undamaged." Johnston Decl. ¶ 18; Lovalvo Decl. ¶ 13.  RMST contends that *Titanic's* "site environment *appears* to have consumed all human remains" associated with *Titanic*.  ECF No. 601-1 at 22 (emphasis added).  Even if that possibility is slight or remote, RMST should account for that contingency.

## V.       OBJECTIVE 2:  ARTIFACT RECOVERY FROM THE DEBRIS FIELD

Objective 2 proposes to "[m]ap and recover select artifacts from the debris field."  ECF No. 601-1 at 26-27, 42-44; *see also* ECF No. 601 at 8-9.  The target artifacts include items "preselected from information generated on previous expeditions" as well as other "objects of opportunity," if they meet RMST's criteria for recovery.[11]  ECF No. 601-1 at 27, 42, 58. Recovery will occur "with an ROV manipulator fitted with a tool suitable for the type of object being recovered," with the artifact placed in a recovery basket and brought to the surface.  *Id.* at 43.  A video record will be created both before and during the recovery of the artifacts.  *Id.*

---

[11] RMST's criteria for recovery include (1) uniqueness of the item; (2) contribution to the understanding of the ship, passengers or life on board; (3) technical considerations; (4) this Court's requirements.  ECF No. 601-1 at 58.

Provided that RMST provides sufficient information to the Court to resolve the funding concerns set forth above and the additional questions raised below, NOAA is prepared to recommend the Court authorize this objective.

As a general matter, *in situ* preservation is the preferred management technique; however, NOAA does not oppose non-destructive and minimally invasive recovery of selected artifacts from the debris field *if* "justified by educational, scientific, or cultural interests, including the need to protect the integrity of RMS *Titanic* and/or its artifacts from a significant threat." *See* Int'l Agr. at Art. 4.2; NOAA Guidelines ¶ 1. Despite saying it would ask "to recover *certain* artifacts," ECF No. 585 at 4 (emphasis added), the Research Design does not identify any specific artifacts RMST has targeted for recovery from the debris field, even though RMST has a prepared list of "preselected" artifacts and likely has some idea of the "objects of opportunity" it wants to recover. ECF No. 601-1 at 27, 42, 58.

Knowing which artifacts RMST wants to recover permits assessment of their educational, scientific or cultural significance, and whether recovery can be accomplished without damage to other artifacts, the context of the recovered artifacts, or the wreck itself. *See* Johnston Decl. ¶ 21 ("[B]ecause the number and characteristics of the items RMST wants to salvage is not known, it cannot be known if the items have scientific, educational or cultural value, or if RMST is merely browsing for interesting exhibitable things to freshen their exhibitions."); *see also* NOAA Guidelines ¶¶ 1, 19(a). RMST's selection criteria are not sufficient and are too vague to make that assessment. [12] Johnston Decl. ¶ 21; *see also* ECF No. 601-1 at 24 (noting RMST's goal of

---

[12] Dr. Johnston questions whether any recovery should be permitted when existing artifacts in the collection have not been fully conserved, and when there are outstanding questions on whether RMST has sufficient control over the artifact collection. Johnston Decl. ¶¶ 8-9 (referencing an August 2019 eBay listing for a fragment from the "Big Piece"). Just recently, an eBay listing has appeared offering *Titanic* rusticles for sale with a certification from "D.M. Barton, Former Director of Operations" for RMST. *See shorturl.at/yBLS8* (last viewed Apr. 26, 2020). An internet search reveals several references to a Dik Barton as a Vice President for Operations at RMST.

providing the public with "new and exciting artifacts from the site").  In addition, RMST should

provide additional detail on the recovery baskets and the retrieval process to ensure minimal

damage to the artifacts or the wreck during recovery.  Lovalvo Decl. ¶ 7.

## VI.    OBJECTIVE 3:  ARTIFACT RECOVERY FROM THE MARCONI SUITE

Objective 3 proposes that RMST be permitted to access the Marconi Suite through

*Titanic's* deck to recover the Marconi Wireless and related artifacts from within the wreck's

interior.  ECF No. 601-1 at 27, 44-55.  The Marconi Suite consists of three rooms (from port to

starboard): the Silent Room (the location of technical equipment); the Marconi Room (where the

operators performed their duties); and the Sleeping Room (the operators' living quarters).  *See*

ECF No. 601-1 at 26, 44-45, 48.  The Research Design contemplates recovery of artifacts from

the Marconi Room and the Silent Room, but not the Sleeping Room.

From the Marconi Room, RMST proposes to recover a wall clock; a spark coil and

adjuster; hollow brass cylinders; a telegraph key; and a framed wall chart showing codes for

ships at sea.[13]  ECF No. 601-1 at 53-54.  And from the Silent Room, RMST proposes to recover:

switchboards and regulators and the motor-generator set (the "primary" target artifacts); and,

potentially a spiral inductance, tuning lamp and low frequency inductor (the "secondary" target

artifacts).  *Id.* at 50-51, 55.  The Research Design contemplates the use of "[a]n ROV-mounted

suction dredge . . . for exposing components of the Marconi system or for investigating the

condition of the Marconi spaces."  *Id.* at 27, 53; *see also id.* at 53 (noting that target artifacts and

"other pieces of equipment" in these rooms are "probably among silt and debris.").  The targeted

---

[13] It seems contradictory to claim that all the wooden walls in the Marconi Suite have deteriorated, but a framed chart, presumably made of wood and paper, has resisted similar deterioration.

artifacts are among several pieces of "hazardous" equipment that contain "large amounts of oil" which must not be disturbed to avoid "creating a source of potential pollution." *Id.* at 52.

A single skylight opening straddles the wall above the Marconi Room and the Sleeping Room. ECF No. 601-1 at 46. Under the primary plan,[14] ECF No. 601-1 at 44-55, RMST states that, "[b]ecause the skylight lies partially over the Marconi Room, it may provide sufficient access to permit recovery of objects within this room [the Marconi Room] with no need to remove deck plating," specifically "by reaching down with the ROV's manipulator arms into the room through the skylight opening." ECF No. 601-1 at 53. If it does not provide sufficient access, and for the target artifacts located in the Silent Room which are not under the skylight, RMST proposes to "remove small sections of the badly corroded 1/4 inch (6.35mm) thick deck that is also the ceiling of the Marconi Suite . . . if necessary to gain access to components of the Marconi apparatus located below." ECF No. 601-1 at 25. The Research Design recognizes that all of the primary target artifacts "present serious challenges to recovery;" for example, the motor-generator set is heavy and bolted to the deck, and "it may not be possible to free and lift it." *Id.* at 55. Decisions as to whether to go forward with recovery will be made on site. The Research Design does not explain how the artifacts from the Marconi Suite, once removed will be handled and transferred to the surface and, unlike the debris field recovery, ECF No. 601-1 at 43, RMST does not propose to conduct video of the Marconi Wireless components recovery.

Objective 3 is the most physically destructive and invasive of the Research Design. It would penetrate the ship's exterior; physically alter the exterior and interior of *Titanic*; detach

---

[14] RMST includes an optional plan at ECF No. 601-1 at 55-56. The optional plan foregoes removing any intact decking, in lieu of recovery through existing holes but only if "excessive physical impact to the hull" can be avoided. *Id.* The Research Design does not advocate for the optional plan, nor identify the criteria that would be applied to determine whether it, versus the primary plan, would be used. All observations set forth in this report apply equally to the optional plan except for the discussion of removing sections of the deck.

target artifacts from the interior of the structure; and likely disturb and destroy artifacts, and the context for other artifacts, now within the Marconi Suite and the surrounding areas.  NOAA recommends the Court deny RMST's motion and not allow the company to conduct Objective 3.

As noted above, Sec. 113 incorporates the provisions of the International Agreement and its Annex Rules as the standards for the NOAA Administrator to evaluate requests for authorizations by U.S. nationals seeking to "conduct research, exploration, salvage, or other activity that would physically alter or disturb the [*Titanic*] wreck or wreck site."  Article 4 of the International Agreement provides that a project authorization system should "regulate . . . entry into the hull sections of RMS *Titanic* so that they [the hull sections], other artifacts and any human remains are not disturbed."  Int'l Agr., Art. 4, ¶ 1(a).  By any ordinary definition of the word "disturb," cutting holes in *Titanic* and physically changing its appearance; forcibly detaching artifacts for recovery and altering the appearance of the Marconi Suite; and, displacing or destroying other artifacts that may be in or near the Marconi Suite (*see infra*), would irreversibly "disturb" the hull sections and other nearby artifacts.[15]  Because Objective 3 is contrary to Article 4 of the International Agreement, the actions are prohibited under Sec. 113.[16]

Even if entry into the hull for purposes of recovery was not legally prohibited by Sec. 113, RMST's proposal for Objective 3 plainly fails on its merits for three fundamental reasons. First, the proposed conduct is contrary to the 2000 Order prohibiting any action to "cut into the

---

[15] Merriam-Webster defines "disturb" to include: to interfere with; to alter the position or arrangement of; to upset the natural and especially the ecological balance or relations of;  to destroy the tranquility or composure of; to throw into disorder.  *See* https://www.merriam-webster.com/dictionary/disturb (last viewed Apr. 26, 2020).

[16] RMST has not yet complied with the Sec. 113 requirement to seek a project authorization from NOAA.  In the absence of a Sec. 113 authorization from the NOAA Administrator, RMST is unable to lawfully conduct activities at *Titanic* that are otherwise prohibited by Sec. 113. The balance of the analysis in this report should not be construed as a waiver by NOAA of RMST's obligation under federal law to seek and obtain a Sec. 113 authorization, nor of the Secretary of Commerce's obligations (delegated to the NOAA Administrator) to implement Section 113.

wreck or detach any part of the wreck," ECF No. 164 at 3, and RMST has failed to establish a

basis to modify that Order.  Second, RMST's justifications for the recovery are not substantiated

and fail to demonstrate the recovery would enhance educational, scientific or cultural interests.

Third, the lack of detail in the report concerning *how* the recoveries would be accomplished gloss

over the significant damage that is likely to occur to other artifacts, the context in which those

artifacts exist and the wreck itself.

### A. **RMST fails to establish a basis to amend the 2000 Order pursuant to Rule 54(b).**

RMST acknowledges the 2000 Order is the "law of the case," but contends it meets two

of the grounds for Rule 54(b) relief to modify it:  manifest injustice, ECF No. 601 at 10-11, and

new evidence, *id.* at 12-21.  NOAA disagrees.

### 1. **The 2000 Order is not clearly erroneous and has not caused RMST a manifest injustice.**

This ground of the law of the case doctrine requires the moving party to establish that

"the prior decision was clearly erroneous ***and*** would work manifest injustice."  *Sejman*, 845 F.2d

at 69 (emphasis added); *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999).  RMST's

reliance on this law of the case ground is misplaced.  *See* ECF No. 601 at 10-11.

RMST concedes that its written position with the Court prior to the 2000 Order was that

it would not cut into the wreck.  Further, it takes no issue with the Court's statements in the 2000

Order that its salvor in possession status was premised on "the understanding that RMS

TITANIC, Inc. would not damage or cut into or cut off any part of the wreck," or the definitive

prohibition against cutting into the wreck.  ECF No. 164 at 2.  If RMST was, in July 2000,

speaking with two voices – we will penetrate the hull, we won't penetrate the hull – the Court

was not required to guess RMST's intentions in order to issue an order to memorialize the prior

understanding between RMST and the Court, and to ensure compliance with that understanding.

But if RMST disagreed with that understanding, it could have and should have taken action in 2000 to correct or clarify it, especially if it believed the Court purportedly "expressed no serious reservations" about proposed salvage within the wreck's interior.  ECF No. 601 at 5.  *See Produce All. v. Let-Us Produce*, No. 2:10CV198, 2012 WL 13028293, at *3 (E.D. Va. Jan. 24, 2012) ("[I]t is hard to conclude that a manifest injustice occurs when a party chooses not to raise an argument at the appointed time."); *see also Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 326 (4th Cir. 2017) ("We have consistently affirmed denials of motions to reconsider summary judgment rulings where the motion is merely a vessel for the very evidence that was initially lacking in opposition to summary judgment.").  In fact, RMST did seek clarification of the 2000 Order, but only with respect to the provisions about selling artifacts and not about the prohibition against cutting into, or detaching, any part of the ship.  Apr. 1, 2001, Hearing Tr. at 10-12.

"A prior decision does not qualify for this third [law of the case] exception by being just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. . . .  It must be dead wrong."  *TFWS, Inc.*, 572 F.3d at 194 (internal citations and quotation marks omitted); *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (same).  The 2000 Order was not dead wrong, but was based on facts RMST acknowledges are true.

RMST's claim of manifest injustice also lacks merit.  RMST states that it is manifestly unjust for RMST "to be punished for the sins of the past owners."  ECF No. 601 at 11.  On the contrary, RMST should be held to its "calculated and deliberate . . . free choice" to obtain a desirable benefit – exclusive salvor in possession status – in exchange for not penetrating the hull and detaching items from within, and it should not be relieved of that decision when it is no longer convenient.  *See Ackermann v. United States*, 340 U.S. 193, 198 (1950) ("Petitioner

cannot be relieved of such a choice because hindsight seems to indicate to him that his decision

not to appeal was probably wrong . . . .").  Moreover, RMST provides no authority that the law

of the case doctrine should *not* apply just because RMST's new owners have a different business

plan than its former owners.  *See Aramony*, 166 F.3d at 661 (precluding a co-defendant from re-

litigating a matter raised by a co-defendant based on law of the case).  To allow otherwise means

that every new owner with a new business plan entitles RMST to revisit a prior ruling or decision

so as to avoid the consequences of its prior "sins."  *See e.g.* ECF No. 601-1 at 9.

### 2.   RMST's "new evidence" is not new.

RMST contends that "new evidence that was not available in 2000 makes it abundantly

clear that *Titanic* is deteriorating rapidly, areas above and around the Marconi Suite are

collapsing, and the Marconi radio components are in danger of being lost forever if they are not

recovered soon."  ECF No. 601 at 12.  NOAA agrees with RMST that "*Titanic* is in an active

state of deterioration, a condition that is predicted to continue," ECF No. 601 at 13, but disagrees

that RMST's evidence is new within the meaning of the law of the case doctrine.

To be "new," the evidence must actually be new and not available at the time of the

decision.  *In re Antrobus*, 563 F.3d 1092, 1098 (10th Cir. 2009).  *Titanic* began deteriorating

when it landed on the seabed 2.5 miles below the surface of the North Atlantic over 100 years

ago; it was deteriorating when it was discovered in 1985; and it continues to deteriorate today.

*See* Conlin Decl. ¶¶ 6, 8.  Before the 2000 Order, RMST was "aware of significant deterioration

of the hull since 1985;" of roof collapse in the vicinity of the Marconi Suite as early as 1998; and

of openings over Captain Smith's suite "beginning in '87."  ECF No. 601 at 17; ECF No. 601-1

at 18-19.  Moreover, because RMST admits "[t]here is no reliable answer to this question"

regarding when the hull will collapse, and that "it is impossible to predict when additional

catastrophic deck and bulkhead collapses will occur," ECF No. 601-1 at 19, 21-22, RMST's claims are not based on "new" evidence at all. *Titanic* is deteriorating and this natural process will lead at some point to more consequential outcomes. The subjective opinions of some who believe that will happen "soon" are speculation and not new evidence.

"New" evidence also must be "so different and so central to the decision of the case" such that a Court is "left with substantial doubt as to the correctness of the prior decision." *In re Antrobus*, 563 F.3d at 1098 (internal quotation marks omitted; citing, *inter alia*, *Weidner v. Thieret,* 932 F.2d 626, 630 (7th Cir. 1991); *Baumer v. United States*, 685 F.2d 1318, 1321 (11th Cir. 1982); and *White v. Murtha*, 377 F.2d 428, 432 (5th Cir. 1967)). Thus, evidence is "new" if it calls into question the foundations of the order and whether the prior decision was right.

After 35 years since its discovery – almost one-third of its life at the bottom of the sea – it is not surprising that *Titanic* has exhibited deterioration. Conlin Decl. ¶ 6. But the question of deterioration, or the pace of deterioration, was not central to or the foundation of the 2000 Order. The foundation of the 2000 Order were: (i) RMST's promises to not penetrate the hull; (ii) the Court's reliance on those promises to grant salvor in possession status; and (iii) public statements from an RMST executive and concerns from interested parties that RMST was preparing to violate (i) and (ii), necessitating a memorializing order to ensure RMST understood its responsibilities. None of RMST's purportedly new evidence calls into question these premises.

### B.  The Research Design lacks justification to enter the hull to conduct salvage.

The primary justification for recovery of the Marconi components is that they will be damaged or lost "due to a deck collapse in the not too distant future." ECF No. 601-1 at 25; *see also id.* at 20 ("it could happen soon"), 25 ("additional deck and bulkhead collapses could occur at any time"), 66 ("In the next few years, the overhead for the Silent Cabin is expected to

collapse."). Despite these statements, RMST concedes it has "no reliable answer" as to when the collapse will occur. *Id.* at 19, 21-22 ("impossible to predict when additional catastrophic deck and bulkhead collapses will occur"). And in fact, there is no "scientific data or peer reviewed publication" supporting the contention of imminent collapse within the next year or two. Conlin Decl. ¶ 8 (noting that "several of the quotes supporting this assertion are incomplete, given undue weight, are subjective, or do not address the totality of the long-term structural decay of *Titanic*"). Deterioration is variable and "generally proceeds in fits and starts, progressing quickly shortly after sinking and then more slowly over time." *Id.* ¶ 6 (There is no "uniform process of corrosion and collapse that accelerates over time.") Low oxygen levels in interior compartments "lead[]to overall better preservation and lower levels of corrosion." *Id.* ¶ 6(3).

But it is true that "all shipwrecks disintegrate into the bottom eventually." Johnston Decl. ¶ 22. "If ship disintegration is the only criterion, then there is no criterion. No salvage is off limits and no amount of destruction is too great as long as the item to be salvaged can be characterized as 'new and exciting.' . . . There will be always be another space that is soon to collapse or deteriorate." *Id. Titanic's* ongoing natural deterioration will always permit RMST to offer up predictions of some imminent catastrophic event or another. The real question, that claims of imminent collapse muddy, is whether the *Titanic* wreck should be allowed to rest undisturbed where it lies, without interior salvage, as a perpetual memorial to those lost. NOAA believes that it should, and that such a result is required.

The second justification RMST provides for its proposal to recover the Marconi components is that the Marconi is unique, represents a "technological advancement" as compared to other ship communication systems of the era, and "can help bring to life one of the most dramatic stories in the *Titanic* saga." ECF No. 601-1 at 25, 64. The Marconi wireless

system was *not* unique, but consisted of standard off-the-shelf Marconi components, Johnston

Decl. ¶¶ 23-25, a fact acknowledged by Parks Stephenson, RMST's consultant and *Titanic*

historian, *id.* ¶ 23 ("[t]he components were standard Marconi").  Examples of contemporary (to

*Titanic*) Marconi systems can be found in collections around the world, including at the

Smithsonian which holds components of the Marconi from *Carpathia*, *Titanic's* rescue ship.  *Id.*

¶¶ 23-25.  That the installation is purportedly "tailored" to the ship, ECF No. 601-1 at 65, does

not change the fact that the equipment itself is not unique nor does it justify recovery.  The

"installation" will not be recovered; only pieces of the Marconi will be recovered.  Johnston

Decl. ¶ 23; Conlin Decl. 9 ("RMST is not proposing to recover the entirety of the Marconi

wireless apparatus, only select portions of it.").  This action "effectively dismember[s] it and

cheapen[s] the value of both the recovered elements and those that are left behind."  Conlin Decl.

¶ 9(4).

    The fact that Mr. Stephenson was able to "reconstruct from period documentation a

virtual model" of the Marconi wireless, ECF No. 601-1 at 65-66, further counsels against

recovery as it suggests that much information is already known about *Titanic's* Marconi *and* its

installation.  *See e.g.* http://www.oceanliner.org/titanic_radio.htm.  Other than it being "new and

exciting," ECF No. 601-1 at 24, the Research Design sets forth no scientific research or study

questions the recovery of the Marconi would purport to answer.  *See id.* at 28 ("Research and

Management Questions to be Addressed"); *see also* ECF No. 338 at 3 (authorizing rusticle

collection for scientific research concerning *Titanic's* deterioration); UNESCO Manual at 112,

124 ("[I]t is irresponsible to excavate without knowing what research questions are asked").

    A "justification" is only useful when stacked up against the costs it purports to justify.

Here, it must be remembered that the wreck is an "iconic grave site" and a maritime memorial to

those aboard the ship who perished when it sank; it is not simply a receptacle to hold potential treasures for future recovery, but is itself an artifact, a piece of underwater cultural heritage. Johnston Decl. ¶ 10.  As such, it is deserving of protection no less than that of any one artifact that may be "new and exciting."  *See R.M.S. Titanic, Inc*, 531 F. Supp. 2d at 693 (requiring oversight to "preserve and protect the *R.M.S. Titanic* and its artifacts as an international treasure for posterity").  Yet, as the next section shows, RMST has barely touched on the consequences of its proposed actions, focusing instead only on what it wants to recover.  RMST's actions to retrieve the Marconi equipment will result in irreversible changes to *Titanic's* exterior and interior structure; loss or damage to other artifacts; dismemberment of the Marconi system; and damage to other wreck features.  The action of cutting into the deck will likely hasten the very action (collapse of the deck) RMST says compels it to action now.  These changes will impair future research, exploration and discovery in those spaces.  Conlin Decl. ¶ 14(8) ("By invasively intervening into *Titanic* now RMST will degrade the quality of the resource and rob those who will come in future years the opportunity to experience the site as it lays, largely undisturbed, on the floor of the Atlantic Ocean."); *see also* UNESCO Manual at 23 (noting that minimal intervention preserves the ability for future research when more innovative and advanced techniques are available).  Is it worth it?

> Currently the entirety of the Marconi radio apparatus sits complete as it was when the ship sank, in the location of its use as the final voice for *Titanic*.  As such it evinces "the power of place" where its power as a touchstone to history is drawn as much from *where* it is as it does from *what* it is.  It is currently surrounded by the structure of *Titanic* and, almost certainly, by the mortal remains of more than 1500 people who died during the sinking.  Just like a lion is much better appreciated in the wilds of the African savannahs than it is stuffed in a museum, so too does the Marconi apparatus best tell its story and share its value where it is.

Conlin Decl. ¶ 9(3).

The importance of this decision cannot be understated.  If RMST leaves the dock with authority to retrieve the Marconi constrained only by its own opaque decision-making process, RMST will likely return with the Marconi.  *See* Conlin Decl. ¶ 12(3).  With all due respect, NOAA believes a hard stop needs to be in place to prevent that from happening because the purported benefit of cutting open *Titanic* to recover the Marconi equipment is simply not worth the cost to the resource and is not in the public interest.

    C.  **<u>The Research Design lacks sufficient detail concerning how the Marconi equipment will be recovered, and the likely damage the actions will cause.</u>**

RMST acknowledges that its actions should be guided by the principles of being minimally invasive, minimally destructive and involve minimal disturbance to *Titanic* and its artifacts.  ECF No. 601-1 at 26; *see also id.* at 56.  These concepts – avoiding destructive techniques, avoiding disturbance of the hull and artifacts, avoiding activities that have more than minimal adverse impact on *Titanic* and its artifacts – are contained throughout the standards NOAA has identified.  *See e.g.* NOAA Guidelines at ¶¶ 1-5; Int'l Agr. at Art. 4.1; Annex Rules ¶¶ 1-5.  Thus, a proper project design includes "an assessment that evaluates the vulnerability of RMS *Titanic* and artifacts to damage by the proposed activities."  NOAA Guidelines ¶ 19; Annex Rules ¶ 19; Johnston Decl. ¶ 10.

RMST's Research Design, however, reveals little or nothing about the potential damage its actions may cause, nor is there any assessment of whether the damage it will inflict is worth its claimed benefits.  Moreover, it is not possible to make that assessment independently because the Research Design is thin on details as to *how* RMST expects to recover the Marconi components, and it avoids serious discussion of "what will drive the decision making process of the team" to decide whether to move forward with recovery.  *See* Conlin Decl. ¶ 12(1) and (2)

(explaining that the lack of transparency renders phrases such as "minimally invasive" "too subjective to evaluate in advance of the proposed efforts").  For example:

The Research Design proposes that an ROV will land on the deck and conduct operations through the open skylight.  ECF No. 601-1 at 53.  RMST implies that this will involve no damage because the ROV is neutrally buoyant in the water and will be fitted with "padded" skids.  ECF No. 601-1 at 41.  But with zero buoyancy, the ROV "would have no leverage to conduct meaningful work.  In this regard, it resembles the weightless conditions of working in outer space."  Johnston Decl. ¶ 13.  To conduct work, the ROV *will require* leverage and thrust *against* what RMST contends is a fragile, corroded deck that will collapse "soon."[17]  *See* Lovavlo Decl. ¶ 6 (simply stabilizing on the deck could cause damage); *id.* ¶ 11 (thrust needed to conduct work "could possibly transmit enough force to the ROV as it sits on the upper decking to cause a collapse"); *id.* ¶ 12 ("Although the air weight in water is not a factor, the power these types of vehicles can generate through downward thrust could inflict some level of undesirable loading on the already deteriorating upper deck of the Marconi Suite[,]" especially when attempting to stabilize the vehicle during recovery of the motor generator.); Johnston Decl. ¶ 13 ("If they attempt to rest or land on the ceiling/roof of the Marconi Suite, described as being fragile, they are likely to break through the entire structure and crush the contents.").

Further, with no description of the skylight's dimensions (through which significant amounts of work will occur), or the size, description or working space needs of the equipment expected to work through that opening, Conlin Decl. ¶ 10; Johnston Decl. ¶ 15, the feasibility of conducting work through the opening without causing extensive damage to the wreck's structure

---

[17] The need for downward force to conduct work is in addition to the "downward force to maintain position" RMST acknowledges it must also have.  ECF No. 601-1 at 41.

cannot be assessed.  *See* Lovalvo Decl. ¶ 8 (noting the importance of having the specifications of

the ROVs and their manipulators: "The dexterity of the arm, number of functions, type of

hydraulic control, and force feedback potential (if any) are important attributes for recovering

sensitive artifacts when thinking about these artifacts as "archaeological" in nature.")  It is not

sufficient for RMST to rely on an opaque decision-making process, Conlin Decl. ¶ 12(1)-(2), and

simply promise to conduct operations only if "*excessive* physical impact" to the hull, ECF No.

601-1 at 56 (emphasis added), can be avoided.

To gain access to the Silent Room, RMST plans to remove "sections" of the decking.

ECF No. 601-1 at 25, 44-55.  The Research Design does not state how many sections of decking

will be removed, their size,[18] ECF No. 601-1 at 25, 44-55, how the decking will be removed, nor

does it mention the likely presence of underlying steel beams that support the deck, or what

happens to the removed materials.  Conlin Decl. ¶ 10(5)-(7); Feb. 20, 2020, Hearing Tr. at 70-71

(Nargeolet Testimony).  These sections (much like the "Big Piece") are part of the wreck; they

are *Titanic* artifacts and constitute underwater cultural heritage.  ECF No. 338 at 2 (noting that

rusticles are part of the wreck).  They should be treated as such, and decisions informed by what

is in the best interests of the resource, and not just RMST.

The Research Design also omits any discussion of how this action will impact the

structural integrity of the wreck and the contents left behind.  *See* Conlin Decl. ¶ 10(6) ("Absent

any particulars, we can say with certainty that cutting roof support beams would diminish the

overall integrity of the structure that surrounds the Marconi Suite.  This would almost certainly

lead to more rapid decay and collapse."); *id.* ¶ 10(8) ("[I]ntroduction of more oxygenated water

to interior spaces of a shipwreck will result in more rapid degradation of metals and artifacts as a

---

[18] In prior testimony, Mr. Nargeolet stated that a hole of approximately 3x4 meters would be required, Feb. 20, 2020, Hearing Tr. at 71 (Nargeolet Testimony), about one-third the size of the Marconi Suite.

general rule."); Johnston Decl. ¶ 12 ("[I]t can be argued convincingly that cutting sections or a section of the Marconi room ceiling away will destabilize the surrounding fabric and cause it to collapse immediately or sooner than it would have, if it had been left alone.  Removal of part or all of the ceiling also will likely enhance the movement of currents and other deleterious environmental effects in the confined spaces.").  It is likely that RMST's action will hasten the very event it claims to be racing against, and leave remaining artifacts vulnerable.

The Research Design's most significant omissions relate to the mechanics of how work will be accomplished inside the Marconi Suite in minimally destructive ways to ensure the hull, its artifacts and other wreck features are not disturbed.  Int'l Agr. Art. 4; NOAA Guidelines ¶ 2. The Marconi Suite is not a repository for artifacts waiting to be recovered, and "[i]t is highly unlikely that one will be able to reach in and gently remove artifacts."  Lovavlo Decl. ¶ 11.  The space contains the Marconi Operators' living quarters and is bound on at least two sides by officers' living quarters.  Feb. 20, 2020, Hearing Tr. 73-74 (Nargeolet Testimony).  It is nearly certain that the space – mostly open in RMST's view – will contain other artifacts, evidence and mementos of these individuals' lives and work aboard *Titanic*.  Feb. 20. 2020, Hearing Tr. 73-74 (Nargeolet Testimony) (responding, "Absolutely.  Probably yes" when asked whether he would expect other artifacts in those areas).  Moreover, RMST describes the space as containing "silt and debris."  ECF No. 601-1 at 53.  Mr. Nargeolet describes the space as a "big mess in that because you are already some desk and stuff like that they collapse in there on the floor, you have a lot of thing. . . . [A] lot of stuff and rusticle and particles, they are, you know, hanging from the roof. And when the rusticles are the certain size, they collapse, and a new one is growing, you know, on the floor."  Feb. 20, 2020, Hearing Tr. at 80 (Nargeolet Testimony).

In response to this "big mess," RMST proposes to use "[a]n ROV-mounted suction dredge . . . [to] expos[e] components of the Marconi system or for investigating the condition of the Marconi spaces."  ECF No. 601-1 at 27, 53.  "A suction dredge uses water flow to suck up loose sediment that covers archeological materials like an underwater vacuum cleaner."  Conlin Decl. ¶ 10(9).  No technical information is provided about this dredge.  Johnston Decl. ¶ 16; Lovalvo Decl. ¶ 11.  But when Mr. Nargeolet describes how "we have to clean a little bit this part of the ship before to recover nicely some of the artifacts, and we will do that," Feb. 20, 2020, Hearing Tr. at 80 (Nargeolet Testimony), the Court should be clear what this means for other artifacts and wreck features in the space.  When suction dredging is used, "[t]he possibility of damaging or losing valuable and delicate artifacts that one might not see when removal is effected is very real."  Lovalvo Decl. ¶ 11; Johnston Decl. ¶ 16 ("[H]ow will the operators of the ROV/AUV keep from damaging small finds that are sucked up, and into what sort of filtering device will the dredge spoil be directed, to ensure the retention of small finds or pieces of the radio apparatus that break off during salvage?")  The risk to other artifacts because their protective cover of sediment and silt is removed is real.  Conlin Decl. ¶ 10(9) ("Sediment and silt cover typically preserve organic and inorganic remains—materials that are uncovered and not recovered for conservation would be expected to decay more rapidly after their uncovering" by a suction dredge.)

There is also little information on how the recoveries will occur in order to minimize damage inside the wreck, especially if there is diminished visibility.  *See* Lovalvo Decl. ¶ 11 ("It is highly unlikely that one will be able to reach in and gently remove artifacts."); Johnston Decl. ¶ 15 ("There is no discussion of the mechanical means by which the ROV(s) would salvage the radio objects off the wall(s) and deck. Would they cut, burn, pry or saw them off?"); *id.* ¶ 17

(noting that activity in the space will result in diminished visibility, due to silt and rusticle debris in the water column, a "silt out").  Other artifacts and their context will be disturbed to make the targeted recovery.  Lovavlo Decl. ¶ 11 ("I suspect that gaining access to these artifacts will require a fair amount of debris to be moved around and/or broken up in order to gain the access they need.")  And any artifacts still attached to the walls and floors,[19] will have to be torn out (including the walls), Feb. 20, 2020, Hearing Tr. 78 (Nargeolet Testimony), also resulting in damage to the structure and other nearby structures or artifacts.  *See* Lovalvo Decl. ¶ 9 ("If I were attempting this project, the first thing my engineers would do is model the artifact recovery operations using CAD [a computer-aided drawing], which would show not only the geometry of how the manipulators could reach in and recover artifacts from different entry points, but also show the loads imposed on the upper deck as recovery was being performed.")

Finally, the Research Design identifies oil-filled "hazardous artifacts <u>not</u> to be recovered" due to environmental concerns, ECF No. 601-1 at 52, but does not explain how they can be avoided.  These artifacts are in a space of approximately 8 x 9.5 feet, with a nominal ceiling height of less than 8 feet, ECF No. 601-1 at 48, and are positioned "within feet, perhaps inches, of other targeted artifacts," Johnston Decl. ¶ 11.  Even the best ROV pilots are limited by the technical capabilities of the equipment.  Conlin Decl. ¶ 10(10).  Coupled with the unpredictable currents that run through the wreck and the diminished visibility the pilots are likely to face, RMST's promise to act with "careful attention" and only after "study and discuss[ion]" by its team on site before acting, ECF No. 601-1 at 55, does not constitute the vigorous pre-review and assessment required by the standards.  *See e.g.* NOAA Guidelines ¶ 19(a)-(b).

---

[19] RMST assumes that most of the walls in this area are gone, but its own consultant reports to have seen the "surviving wall" upon which the target equipment is attached during the 2019 expedition.  ECF No. 601-1 at 45; *id.* at 65 (Report of Parks Stephenson).  Likewise, RMST does not know if the additional articles of interest remain tethered to walls, although it knows the motor-generator remains bolted to the deck.  ECF No. 601-1 at 50, 55.

## VII.   SUMMARY

Based on the foregoing, NOAA recommends the Court:

1.      Condition any approval of Objectives 1 and 2 on RMST:  providing sufficient

information concerning its expedition funding, and making that information available for

independent review and audit, to ensure sufficient funds are allocated for the recovery, care,

conservation and curation of any recovered artifacts in accordance with professional standards;

and, providing the Court with satisfactory information to resolve the additional questions

concerning Objectives 1 and 2 set forth above.

2.      Deny RMST's motion to amend the 2000 Order, and deny it permission to

undertake Objective 3.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:      /s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2020, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **David G. Barger, VSB #21652**<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Boulevard, Suite 1200<br>McLean, Virginia 22102<br>Tel: (703) 749-1300<br>Fax: (703) 749-1301<br>E-Mail: Bargerd@gtlaw.com |
| **David G. Concannon**<br>Concannon & Charles<br>100 Sun Valley Road, No. 329<br>Sun Valley, Idaho 83353<br>Email: david@davidconcannon.com | |

 /s/ *Kent P. Porter*
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov