IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
   Plaintiff,

v.                     Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL, et al
   Defendant.

**R.M.S. TITANIC, INC.'S RESPONSE IN OPPOSITION TO THE REPORT AND RECOMMENDATION OF NOAA REGARDING THE MOTION TO AMEND OR MODIFY THE COURT'S JULY 28, 2000 ORDER**

   Plaintiff, R.M.S. Titanic, Inc. ("RMST" or the "Company"), by counsel, hereby submits its Response in Opposition to the Report and Recommendation of the United States (ECF No. 602), on behalf of the National Oceanic and Atmospheric Administration ("NOAA"), relating to RMST's R.M.S. *Titanic* Expedition 2020 Research Design ("Research Design") (ECF No. 600), and in further support of its Motion to Amend or Modify the Court's July 28, 2000 Order forbidding RMST, its employees, agents, or subcontractors "to in any way cut into the wreck or detach any part of the wreck" (ECF No. 600).

   In its Report and Recommendation, NOAA endeavors to lay a procedural gauntlet making the Expedition scientifically unreasonable, commercially impracticable, and even illegal. In doing so, NOAA seals its transition from friend of the court to would-be litigant, pushing its own political agendas, even while refusing to intervene in the matter to finally resolve threshold constitutional and jurisdictional matters that it raises, in a footnote of all things. NOAA's Report and Recommendation lays bare the agency's fundamental bias against RMST's lawful salvage of artifacts from *Titanic*, its lack of objectivity in evaluating RMST's motion and plans, and its belief

that NOAA's authority supplants the sole Constitutional jurisdiction of this Court over matters relating to salvage of *Titanic*.

I.    DISCUSSION

In its Report and Recommendation, NOAA makes three primary arguments:  (a) it ***might*** recommend allowing RMST to film the exterior and interior of *Titanic* and the recovery of artifacts from the debris field ***if*** it receives, "sufficient information concerning its expedition funding, and making that information available for independent review and audit, to ensure sufficient funds are allocated for the recovery, care, conservation and curation of any recovered artifacts in accordance with professional standards," (b) it objects under ***any*** circumstances to RMST recovering artifacts from the interior of the Marconi Suite; and (c) it objects on a myriad of technical reasons to RMST's plans, personnel and equipment.  RMST will briefly address each section in turn.

    A.    **NOAA should not have access to the proprietary finances and sources of funding for RMST, a private company.**

RMST is not aware of any expedition project where full funding would be documented, independently reviewed and audited before the project took place.  By way of contrast, when NOAA recovered artifacts from the remains of U.S.S. *Monitor*, funding was often allocated on a year-by-year basis.  At no point in the recovery process (1998-2002) was full funding available for recovery and no advance funds were available for conservation or curation.  In fact, NOAA's internal documents reveal that the conservation of artifacts recovered from the Monitor was perpetually underfunded – so much so that NOAA's counsel, Ole Varmer (with whom this Court is familiar), came up with  a plan where conservation of artifacts recovered from the *Monitor* would be paid for with fines from people visiting the *Titanic* without NOAA's authorization.  *See* Minutes of *Monitor* National Marine Sanctuary (MNMS), Sanctuary Advisory Council Meeting, June 24, 2010, attached hereto as Exhibit A.  These documents also reveal that, the first time

NOAA tried and failed to put implementing legislation for the International Agreement before Congress, Varmer appeared before the MNMS Sanctuary Advisory Council to:

> discuss[] the history of the *Titanic*'s discovery and its transference from the company that found the wreck site to today. He detailed how they are working to better understand the cultural significance of the wreck. He also explained that any fees received from people paying fines for breaking the laws governing the wreck would go back to the conservation of the *Monitor*.

See Ex. A. "Transference" of the wreck likely means transference of the *Titanic* to NOAA's control. Regardless, NOAA's intent to use its new-found authority to bar exploration of the *Titanic* as a fundraising mechanism for conservation is clear.

Moreover, Minutes of MNMS Sanctuary Advisory Council Meeting on November 29, 2011, during the second time NOAA tried and failed to have Congress pass implementing legislation, paint an accurate picture of NOAA's inability to budget for conservation:

> MNMS's budget is about $675 K and labor costs have gone up, so we are starting out over budget. It is only through grants that we have been able to do as much as we have done. Bob [Neyland] asked if we program budget for out years. Dave [Alberg] said that the magic number agreed to by NOAA and TMM of $300K ($150K from NOAA and $150K from TMM) for conservation is not enough to support conservation. The amount is more like $600K a year.[1]

*See* Minutes, MNMS Sanctuary Advisory Council Meeting, Nov. 29, 2011, attached hereto as Exhibit B.

Indeed, The Mariners' Museum recently shut down all *Monitor* conservation activities due to lack of federal funding to continue the process. The U.S. Government, several states and private organizations have all conducted excavations without a firm commitment of funding for all phases of a project. Furthermore, in most instances, federal funding is only appropriated one year in

---

[1] Not surprisingly, NOAA does not cite to the affidavit of David Conlin, Ph.D. to support its "adequate funding" arguments. The Court will note that Dr. Conlin sits on the MNMS Sanctuary Advisory Council, and therefore he is likely aware of the difficulties in meeting the funding and transparency requirements Paul Johnston, Ph.D. espouses. Moreover, Dr. Johnston, unlike Dr. Conlin, has little field experience, and almost none in underwater archaeology.

advance and even in those cases, funding may be rescinded or redirected. *See*, *e.g.*, Ex. A. Given these realities, it is not credible for NOAA to suggest that RMST should be held to a higher standard.

This is not to say that RMST does not have the funding in place, or access to other forms of funding like sponsorship and licensing of intellectual property rights, to undertake its proposed 2020 expedition. RMST is opposed to sharing this information with NOAA. NOAA's demand is wholly unnecessary and NOAA should not have access to this confidential and proprietary information. Moreover, contractors, media partners, sponsors and other vendors of RMST will be reticent to share their proprietary financial information (including pricing) with NOAA or its "independent auditors," nor should they be required to do so as a pre-condition to participating in this expedition and proposed recovery.

On January 7, 2016, the United States Department of Commerce and RMST entered into a Non-Disclosure Agreement ("NDA") to foster a free exchange of information involving the Company's most sensitive proprietary and confidential financial information. Government documents obtained by the Company pursuant to a Rule 45 subpoena revealed that NOAA breached the NDA as part of its calculated, covert scheme to prevent the Company from selling artifacts from the French *Titanic* Artifact Collection. *See, Periodic Report dated January 3, 2017* (ECF No. 424). In doing so, NOAA abdicated its duties to the Company, the public interest as required under the Covenants and Conditions, and to this Court.

Even without NOAA's conduct, RMST, as a private company, should be entitled to maintain the confidentiality of its financials, in the same fashion as other private companies. The sources of its funding and the nature of its purchase orders are proprietary and deserve protection. Moreover, much of the information that NOAA seeks consists of trade secrets and other

confidential information of RMST's vendors, including their proprietary pricing, not RMST itself, and about which RMST is subject to confidentiality agreements. Under these circumstances, NOAA should not gain access to RMST's proprietary information concerning its finances and sources of funding, expedition costs, and sponsorship, nor its trade secrets or the trade secrets of its vendors, particularly where it involves potential salvage operations, to which NOAA has demonstrated a staunch political objection.[2]

Having successfully conducted eight prior expeditions to the wreck, RMST has demonstrated its ability to properly finance and plan expeditions to the *Titanic.* And, to be sure, RMST has always complied with its obligations under the Covenants and Conditions to care for and protect the artifacts, with self-funded conservation and collections management which exceed museum standards.

RMST also remains mindful of its obligations as salvor-in-possession. Indeed, nearly all of the seven factors this Court must consider in determining a salvage award are implicated by RMST's ability to "ensure sufficient funds are allocated for the recovery, care, conservation and curation of any recovered artifacts in accordance with professional standards." *See R.M.S Titanic, Inc. v. The Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784, 794-95 (E.D. Va. 2010) (citing *The Blackwall*, 77 U.S. (10 Wall) 1, 14 (1869); *Columbus-America Discovery Group v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 468 (4th Cir. 1992)). It would be a fool's errand for RMST to embark on a multi-million dollar salvage expedition with insufficient funding, when any salvage award for the recovered artifacts would be subject to: "the degree to which the salvors have worked to protect

---

[2] Much of the information NOAA seeks to review is the confidential information and trade secrets of RMST's partners and vendors, not the property of RMST. For example, information about sponsorship, pricing, and technology development, which are all part of the cost of an expedition, belongs to third-parties, and RMST had to sign NDAs to have access to it.

the historical and archeological value of the wreck and the items salved." *See Columbus-America*, 974 F.2d at 468.

For nearly twenty years, this Court has managed RMST and the *Titanic* site, placing reasonable restrictions on RMST which have properly protected the wreck while still allowing RMST to conduct research and recovery. Accordingly, given this successful track record, applicable salvage law, and NOAA's abuse of its authority in the past with respect to RMST financial information, RMST respectfully requests that the Court reject NOAA's request for "independent review and audit" as a pre-condition to exercising its rights as salvor-in-possession.

  **B. NOAA's objections to the Company's efforts to recover the Marconi radio are without merit.**

    **1. NOAA cites an incorrect legal standard.**

NOAA incorrectly states that RMST relies on the "law of the case" doctrine. (ECF No. 602 at 17-19.) Moreover, throughout its entire recitation if the "law of the case" doctrine, NOAA has managed to ignore the law of *this* case concerning *this* order at issue. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194 (4th Cir. 2002) ("*Titanic* 2002").

In *Titanic* 2002, the Fourth Circuit characterized this Court's July 28, 2000 Order as an "injunction," which RMST could seek to change "by filing in the district court a motion to vacate or modify the July 28, 2000 injunction, based on the new factual developments." *Id*., 286 F.3d at 200-01. The Fourth Circuit's characterization of this Court's July 28, 2000 Order is the real law of the case. Significantly, the standard for modifying an injunction is more relaxed than the "clearly erroneous" standard espoused by NOAA in its Report and Recommendation.

A district court may reconsider, modify, or vacate a preliminary injunction when "changed circumstances ha[ve] rendered continued enforcement of the preliminary injunction . . . contrary to the public interest." *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571

(D.C. Cir. 2011); *see also Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012) ("To obtain modification or dissolution of an injunction, a movant must demonstrate significant 'changes in fact, law, or circumstances since the previous ruling.'") (*quoting Gill v. Monroe Cty. Dep't of Soc. Servs.*, 873 F.2d 647, 648-49 (2nd Cir. 1989)); *Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (plurality op.) ("Because injunctive relief 'is drafted in light of what the court believes will be the future course of events, . . . a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'") (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Prac. & Proc., § 2961 (2d ed. 1996)).

> 2. **RMST has shown significant changes in the circumstances underlying the July 28, 2000 injunction to justify modification.**

NOAA concludes its legal arguments by stating:

> NOAA agrees with RMST that "*Titanic* is in an active state of deterioration, a condition that is predicted to continue," ECF No. 601 at 13, but disagrees that RMST's evidence is new within the meaning of the law of the case doctrine.

(ECF No. 602 at 19.)

However, using the correct legal standard under Rule 54(b) to modify an injunction, RMST has made a sufficient showing to demonstrate that there has been a substantial change of circumstances between entry of the July 28, 2000 injunction to prevent cutting into the hull of *Titanic* to search for diamonds, and the filing of this motion 20 years later to permit the recovery of the Marconi radio before the Marconi Suite succumbs to the same collapses that other areas of immediately adjacent to the Marconi Suite have experienced since 2000. (*See, e.g.,* ECF Nos. 601 and 601-1.) Consequently, maintaining the July 28, 2000 injunction would render the continuance of the injunction in its original form inequitable, and it would lead to certain destruction of an irreplaceable artifact that is in danger of being lost forever. *See Salazar*, 559 U.S. at 714-15; *Fox*

*Television Stations, Inc. v. FilmOn X LLC*, 968 F. Supp. 2d 134, 140 (D.D.C. 2013) (*citing Favia v. Indiana Univ. of Pa.*, 7 F.3d 332, 337 (3rd Cir. 1993); *Credit Suisse First Boston Corp. v. Frunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005)).

NOAA's arguments to the contrary reveal the intractability of its position. For example, while Dr. Conlin challenges each study to which RMST has cited, he has not cited to a single scientific study in rebuttal. Significantly, Dr. Conlin omits any reference to ***NOAA's own*** internal studies on the rate of deterioration of *Titanic*, conducted during three expeditions to wreck site, which studies NOAA has never published and on which Dr. Conlin himself worked. (*See*, *e.g.*, ECF No. 602 ¶ 2.) The results of those studies likely explain why Dr. Conlin agrees with RMST and the post-2000 evidence it has presented, acknowledging progressive deterioration at the wreck. (*Id.* at ¶¶ 6, 8, 9 and 14.) While Dr. Conlin apparently subscribes to the ideological mantra of "*in situ* degradation" over the time-honored legal definition of "saving property in marine peril", RMST, and numerous others respected in the scientific marine community, do not. *See, The Akaba*, 54 F. 197, 200 (4th Cir.1893)*; R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 962 (4th Cir.), *cert. denied*, 528 U.S. 825 (1999); *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 546 F. Supp. 919, 929 (S.D. Fla.1981); *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 501-08 (1998).

Perhaps most revealing of Dr. Conlin's bias is his effort to marginalize the testimony and first-hand observations of Dr. David Gallo and P.H. Nargeolet, as "subjective impressions and anecdotal instances," and by enlarging their testimony to cover deterioration of the entire ship instead of just the area around the Marconi Suite. (ECF No. 602 at ¶ 8(10). Dr. Gallo and Mr. Nargeolet are true giants in their respective fields, whose knowledge, experience and credibility

evidenced through years of participation in this litigation lies unchallenged. Their first-hand observations deserve more weight than Dr. Conlin provides with his unwarranted criticism.

NOAA and its experts ignore RMST's careful, measured approach to the recovery of artifacts from within the Marconi Suite (i.e., limited intrusion into the ceiling of the Marconi Suite, if necessary, ***not*** the hull or support beams). Indeed, in conjunction with its expedition partners, RMST has developed new state-of-the-art tooling in an effort to avoid cutting the ceiling of the Marconi Suite, which tooling would permit RMST to reach with an extended arm and/or suction drudge, through the open skylight. *See* Tooling Schematic, attached hereto as Exhibit C.

NOAA summarily claims that the removal of the motor-generator set from the Silent Room will require cutting, damaging the interior of the ship and destroying the "context" of surrounding artifacts. (*See* ECF No. 602 at 14-16.) However, in reaching this conclusion, NOAA ignores RMST's Research Design, which states in pertinent part:

> Recoveries from the Silent Room should only be attempted if it can be accessed through the skylight opening or through existing holes in the overhead deck. If recovery would require removal of intact decking, it should not be attempted.

ECF No. 601-1 at 54. Based on the information available today, RMST predicts it will not attempt to recover the motor-generator set from the Silent Room because it will be inaccessible and too risky. However, because RMST does not know the current condition of the ceiling over the Marconi Suite, and contents of the Silent Room already may be exposed to the outside, no final decision has been made yet.

NOAA's categorical opposition to recovery of the motor-generator set reveals two critical flaws in its positions. First, to truly achieve successful recovery of important historical artifacts, this Court must vest with RMST the discretion and authority to make recovery decisions based on actual conditions at the site, using the collective judgment of the world's greatest *Titanic* experts,

who will be on the expedition vessel.  Actual conditions and circumstances should override theory and hypothetical projections.  Second, NOAA's general policy against artifact recovery has trumped a true risk/reward analysis as it relates to the recovery of certain artifacts. NOAA points to the risks associated with the recovery of the motor-generator set – the single target artifact whose possible recovery carries with it the most peril -- as justification for its blanket policy that *no* artifacts from inside the wreckage of the ship should be recovered.  RMST welcomes intellectually honest discussions about the risks and benefits involved in the recovery of certain artifacts, and of broad policy-based discussions about whether salvage operations are appropriate in general; but RMST rejects the conflation of the two concepts in the name of advocacy and policy.  Indeed, RMST will explore every reasonable opportunity to recover target artifacts without causing any damage to the wreck, and will forego certain efforts if appropriate.

In an effort to briefly address some of the myriad science-based objections advanced by NOAA and its experts, RMST offers the following:

> **NOAA OBJECTION:  RMST did not cite a single peer-reviewed publication that supports the claim that *Titanic* is rapidly deteriorating.**
>
> a.  RMST's Research Design (ECF No. 601-1 at 15-17) cited a book by Drs. Jennifer Hooper McCarty and Tim Foecke, internationally recognized materials scientists at the National Institute of Standards and Technology, who conducted an extensive forensic analysis of the destructive forces acting on *Titanic*'s hull (*What Really Sank the Titanic*, Citadel Press, 2008).  Dr. Foecke has an international reputation for studies of such important sites as the USS *Arizona*, USS *Monitor*, CSS *Hunley* and the World Trade Center collapse.  In addition, he worked closely with the National Park Service on the study of the USS *Arizona* which topic is discussed by Dr. Conlin in his affidavit.  To the best of RMST's knowledge, this is the only comprehensive published report on the topic.
>
> b.  RMST also cited a new book by Rajendran and Singh, corrosion scientists from the Corrosion Research Centre, St. Anthony's College, entitled *Titanic Corrosion* (Jenny Stanford Publishing, 2019)
>
> c.  RMST also cited comments by researchers concerning the deterioration being caused by the action of microbes that form "rusticles" on *Titanic*'s hull. Although RMST could not locate published reports, our Research Design provided expert opinions taken from

      other publications or online sources, all discussing the deterioration of *Titanic*'s hull. (ECF No. 601-1 at 15-18.) Among the experts quoted are Dr. Henrietta Mann, Dalhousie University, who is credited with discovering the microbes in *Titanic*'s rusticles; Clare Fitzsimmons, Newcastle University, who participated in the 2019 *Titanic* Expedition; Dr. Lori Johnston, expert on *Titanic* rusticles; and RMST quoted several *Titanic* experts who have studied the wreck on numerous expeditions to the site.

   d. RMST has been unable to obtain NOAA's reports on its *Titanic* research. NOAA's website claims that a final archaeological report on the 2010 expedition will be published by 2013, yet there is no indication that such a report exists. *See* "The information you requested was not found," available at https://sanctuaries.noaa.gov/maritime/titanic/2010_expedition.html (accessed April 30, 2020).

   e. By contrast, NOAA failed to provide a single source claiming *Titanic*'s hull is stable. The experts agree that *Titanic* is deteriorating due to galvanic and microbial action, but no one can predict with any reasonable degree of certainty when and where the next catastrophic collapses will occur.

**NOAA OBJECTION: RMST has offered no proof the *Titanic* is collapsing, and, in fact, the wreck may have reached a relatively stable condition.**

   a. As stated above, several acknowledged *Titanic* experts have testified that the *Titanic* is deteriorating but none can predict when major collapses will occur. However, RMST could not locate a single expert who believes that *Titanic* has reached a state of relative stability.

   b. In the last chapter of McCarty and Foecke (cited above), "As the Metal Rusts: What is Happening to the Wreck of the *Titanic* Now?", the authors conclude: "By chance, [*Titanic*'s] discovery in 1985 seems to have roughly corresponded to the time in the life of the wreck when the changes were beginning to ***accelerate*** [emphasis added]. As things continue to rust into thinner and thinner dimensions, eventually all the decks will fall in, and finally the hull plates will fold in (or out)."

   c. NOAA's experts fail to address the certainty that, from a mechanical and metallurgical point of view, the wreck is going to slowly collapse as metal thins and the self-loading and current forces cause things to fail, collapse or shift.

   d. While it is true that no conclusive proof exists that significant collapses are imminent, RMST believes that a proactive plan is superior to the NOAA position of "wait and see." NOAA's position guarantees that many valuable artifacts will eventually be destroyed instead of being available for study and public exhibit.

**NOAA OBJECTION: RMST has not justified their request for the Court Order to be modified to allow artifacts to be recovered from inside *Titanic*'s hull.**

   a. RMST has presented ample evidence to indicate the potential threat of damage or destruction of objects in the Marconi Suite and elsewhere within the hull (see above).

    b. RMST has presented compelling justifications for recovery to further scientific and educational goals. Although *Titanic*'s Marconi equipment was not unique in the sense of being different from other Marconi sets at the time, the equipment is historically unique and significant because it belongs to the most famous shipwreck in the world. Display of those components will create a new wave of excitement and enthusiasm among museum visitors and those who will have access to the artifacts through the internet. Scientific analysis of the recovered artifacts will provide useful and important information on the condition of the objects—information that will prove valuable in developing and refining predictive models for the deterioration of other objects at the site.

    c. Few organizations conduct large-scale deep ocean recover operations because they do not have the resources to do so. RMST is offering to conduct an important scientific documentation and recovery expedition with no expenditure of public funds.

**NOAA OBJECTION: RMST cannot guarantee the Marconi equipment can be recovered without substantial damage to the artifacts and *Titanic*'s hull.**

    a. No one can make such guarantees with absolute certainty. Decisions about recovery are made based on numerous parameters and considerations, but ultimately the decisions involve weighing the benefits versus costs (risks) and designing a recovery plan that maximizes the first while minimizing the second. RMST's final recovery plan will be based on those considerations, and implemented to avoid any significant damage (if at all) to the ship.

    b. RMST has assembled a team of experts with many years of experience in deep ocean technology, recovery and archaeology, and that team is well-equipped to develop and execute an effective recovery plan.

RMST shares NOAA's desire to protect and preserve *Titanic* for future generations; however, it believes that of the two philosophical and managerial policies—*in situ* preservation or limited recovery based on best available information—limited recovery is the more sensible and provides the best chances of positive results for scientific and educational benefits. RMST's Research Design makes an effective argument for limited, controlled excavation within the Marconi Suite and provides a recovery plan that will result in the recovery of significant artifacts that will be valuable for both scientific and educational purposes.

    **3.    NOAA has finally made its play to supplant the Court.**

Sixteen pages into the Report and Recommendation, NOAA finally states: "[b]ecause Objective 3 is contrary to Article 4 of the International Agreement, the actions are prohibited under Sec. 113." (ECF No. 602 at 16.). With a footnote that more properly belongs in its introductory paragraph, NOAA adds, "RMST has not yet complied with the Sec. 113 requirement to seek a project authorization from NOAA. In the absence of a Sec. 113 authorization from the NOAA Administrator, RMST is unable to lawfully conduct activities at *Titanic* that are otherwise prohibited by Sec. 113." (*Id*. at 16, n. 16.) Of course, this euphemistic footnote confirms NOAAs belief that it, and not this Court, now controls *Titanic* wreck.

At long last, NOAA finally invites the Court to abdicate its Constitutional authority and relinquish its jurisdiction to NOAA. In doing so, NOAA seeks to jettison the law of the sea, developed over centuries, for the tenets of the International Agreement that has not been legally implemented by Congress. NOAA has offered no legal justification for doing so, other than its *ipse dixit* that Section 113 applies, apparently rendering the Court's role superfluous.

Consistent with the law of this case established over the last two decades, RMST will take it orders from this Court, not from NOAA. For reasons already set forth on the record RMST (*see* ECF No. 154), RMST believes that Section 113 and the International Agreement are unconstitutional and have no application to this admiralty proceeding or the Court's exclusive jurisdiction to oversee salvage activities at the *Titanic*.[3] In this respect, RMST reserves all rights.

Moreover, the Court has made it abundantly clear that it will consider NOAA's objections within the bounds of this admiralty proceeding:

> Collaboration and trust aside, if you decide to do a salvage operation, then you make the call. You go do the salvage operation, and if they don't like it, they can

---

[3] Its dancing on the head of a pin notwithstanding, NOAA's argument that RMST may not "lawfully" conduct activities at the wreck site, even if permitted by this Court, "[i]n the absence of a Sec. 113 authorization from the NOAA Administrator" suggest that RMST's earlier motion for declaratory judgment (Dkt No. 154) would now be judicially ripe. (*See* Dkt. Nos. 167 and 168.)

> come to this Court and litigate it…. That's the way to proceed. You say this law is contrary to the orders of the Court, and we want to conduct a salvage operation, and you go about it. If they object to it, they can come and object to the Court, the Court will litigate it…. So what you'd have to do is decide, if you wanted to do salvage operations, that you wanted to conduct them, that in your opinion you were still the salvor-in-possession under the jurisdiction of this Court, proceed, and under the auspices of this Court, and if there is an objection, as there have been through many salvors and entities in the years, they have to come before this Court. They have to file them, and they have to object. They may or may not. If they don't, they don't, and you're not litigating. If they do, we do, and we litigate it. No different as it's been through the years in that regard.

(*See* ECF No. 432 at 28-29.)

Until such time as NOAA seeks to intervene in this matter, it is not party and has no legal standing to direct the actions of RMST. Accordingly, the Court should consider the instant motion in accordance with federal admiralty law.

    **C.    NOAA's technical and operational objections.**

NOAA has proffered the expert report of David Lovalvo, President and CEO of Global Foundation for Ocean Exploration (a NOAA-funded entity) to assess RMST's salvage plans and its preliminary project research design. (ECF No. 602-3.) Mr. Lovalvo's Declaration is among the best evidence we have seen to date of the double-standard NOAA applies to RMST versus everyone else, including itself. It begs the questions: Where was Mr. Lovalvo in 2018 and 2019, and why didn't NOAA use him to evaluate EYOS' application to the Court for permission to recover test beds from the deck of *Titanic*.

Consider, for example, Mr. Lovalvo's detailed questions for evaluating the feasibility of RMST conducting work on or near the *Titanic*'s superstructure without causing extensive damage to the wreck, which NOAA opposes. (*See* ECF No. 602 at 20-29, and ECF No. 602-3 ¶ 8 (noting the importance of having the specifications of the deep submergence vehicle's manipulators: "The dexterity of the arm, number of functions, type of hydraulic control, and force feedback potential

(if any) are important attributes for recovering sensitive artifacts when thinking about these artifacts as 'archaeological' in nature.")).  Yet, no such questions were asked by NOAA on or before August 23, 2108 and September 23, 2018, when NOAA submitted letters to the Court from Robert McCallum, founder of EYOS Expeditions and the purported leader of an upcoming deep submersible expedition to the *Titanic*, requesting permission to explore in and around the *Titanic* and to recover test stands from the deck of *Titanic*.  (ECF Nos. 479 and 496-1.)

Mr. McCallum's August 23, 2018 letter expressly states:  "I have been in considerable correspondence with Mr. David Alberg and Ms. Jackie Rolleri of NOAA…," but it makes no mention of correspondence or discussions with Mr. Lovalvo.  (ECF No. 479.)  In his letter, Mr. McCallum notably fails to mention Caladan Oceanic, the owner of the ship and submersible; Triton Submarines, the designer and builder of the submersible; and Victor Vescovo, the funder of the expedition and the intended pilot for the upcoming expedition.  (*Id*.)  Did NOAA have this information and reveal it to Mr. Lovalvo, RMST or the Court?  Indeed, Mr. McCallum's letter contains very little information about the submersible *Limiting Factor*, which is not named but is described as "fully classed;" or the submersible's equipment, capabilities or manipulator arms.  (*Id*.)  Most importantly, Mr. McCallum's letter fails to mention that the *Limiting Factor* made its first dive *ever* just 13 days earlier, that this was Mr. Vescovo's first time in the submersible, that he went as a passenger (because he was not a licensed submersible pilot), and the expedition filmed the dive and published the video on YouTube.  *See* "Deep Planet:  The Test Dives," available at https://youtu.be/7_mCcvYEaxo (accessed April 30, 2020).

Contrary to the representations that Mr. McCallum made via NOAA to this Court regarding the competence and experience of his team, he admits in the video:  "We're bringing together a submersible that's a prototype, a group of people that have never worked together before, to do

something that's never been done before." *Id*. at 00:55.  Shortly thereafter, Mr. Vescovo, unable to contain his enthusiasm at the submersible completing its first ever dive, exclaims: "I am extremely excited.  That's the first time I have gone in the submarine and dived in it.  It does dive!" *Id*. at 02:36.

We all know what happened to the *Titanic* a few months later, and how NOAA failed to bring the seemingly inevitable results of the EYOS expedition to the Court's attention.[4]  RMST is left to wonder why has NOAA gone to such great lengths to raise scores of questions about the competency, plans and equipment of a team that has actually led or participated in numerous successful expeditions to the *Titanic*, and the recovery of thousands of artifacts from the ship since 1987, when it does not ask the same questions of other rookie expeditioners with no such track record.  Is it because NOAA will eagerly support and "authorize" an expedition that fulfills its internal objectives, but it will vigorously oppose any expedition that does not fit NOAA's plan to control all access to the *Titanic* for any purpose?

RMST believes that its research design makes an effective argument for limited, controlled excavation within the Marconi Suite and provides a comprehensive plan that will result in the recovery of significant artifacts that will be valuable for both scientific and educational purposes.  However, if the Court has any concerns about the technical or operational aspects of RMST's plans, personnel and/or equipment, RMST has no objection to Mr. Lovalvo conferring with RMST's expedition personnel to obtain answers to his questions, so long as Mr. Lovalvo is subject to a protective order entered by the Court forbidding the disclosure of the proprietary information

---

[4] It is ironic, but not the least bit surprising, that NOAA announced on April 7, 2020 that it was entering into a partnership with Caladan.  *See* "NOAA teams with pioneering explorer to understand and map the deepest parts of the ocean," available at https://www.noaa.gov/media-release/noaa-teams-with-pioneering-explorer-to-understand-and-map-deepest-parts-of-ocean (accessed April 30, 2020).  Meanwhile, NOAA still has not provided the internal reports and documentation from the 2019 expedition that the Court ordered it to file on February 20, 2020.  (*See* ECF 599 at 11-13.)

Mr. Lovalvo will be shown to anyone other than the Court and the Assistant U.S. Attorney for the Eastern District of Virginia. For reasons set forth in Section I.A, *supra*, RMST will not voluntarily provide NOAA access to this information.[5]

## II.     CONCLUSION

For the foregoing reason, and those previously advanced in its earlier filings, RMST respectfully requests that the Court enter an order granting its motion to reconsider, modify or amend its July 28, 2000 Order precluding cutting into, or detaching of, any part of *Titanic* to allow RMST to recover the Marconi apparatus and associated artifacts.

---

[5] Certain contractors of RMST who are not subject to this Court's jurisdiction may also require Mr. Lovalvo to execute non-disclosure agreements.

Respectfully submitted,

**RMS TITANIC, INC.**

By Counsel:

/s/ *Brian Wainger*
Brian A. Wainger, VSB #38476
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175
E-Mail: bwainger@kaleolegal.com

David G. Barger, VSB #21652
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1300
Fax: (703) 749-1301
Email: Bargerd@gtlaw.com

David Concannon, *Pro Hac Vice* (Doc. 583)
Concannon & Charles
100 Sun Valley Road, No. 329
Sun Valley, Idaho 83353
Tel: (610) 293-8084
Fax: (877) 736-2434
Email: david@davidconcannon.com

*Counsel for R.M.S. Titanic, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2020, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

        */s/ Brian Wainger*

Brian A. Wainger, VSB #38476
Attorney for Plaintiff RMS Titanic, Inc.
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175
E-Mail: bwainger@kaleolegal.com

*Counsel for R.M.S. Titanic, Inc.*