IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
        Plaintiff,

v.                                    Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL,
ITS ENGINES, TACKLE, APPAREL,
APPURTENANCES, CARGO, ETC., LOCATED
WITHIN ONE (1) NAUTICAL MILE OF A POINT
LOCATED AT 41 43' 32" NORTH LATITUDE
AND 49 56' 49" WEST LONGITUDE,
BELIEVED TO BE THE R.M.S. TITANIC
in rem,
        Defendant.

NOAA'S SUPPLEMENT TO ITS
REPORT AND RECOMMENDATION (ECF NO. 602)

      The United States, as *amicus*, and on behalf of its National Oceanic and Atmospheric

Administration ("NOAA"), provides this supplement to its Report and Recommendation, ECF

No. 602, in response to RMST's "Response in Opposition to the Report and Recommendation of

NOAA Regarding the Motion to Amend or Modify the Court's July 28, 2000 Order," ECF No.

605, and RMST's recent filing concerning Dr. John Broadwater, ECF No. 609.  *See* ECF No.

608 (granting the United States leave to respond to RMST's filing).

      **1.**    **Standard to modify or amend the 2000 Order.**

      Citing Federal Rule of Civil Procedure 54(b), RMST initially referred to the law of the

case doctrine, and advocated within that framework.  ECF No. 601 at 9-23.  RMST now states

the applicable standard is for modification of an injunction, and suggests that the only relevant

factor is whether there has been a change in circumstances justifying a modification.  ECF No.

605 at 6-7.  Even under that standard, RMST misstates and misapplies the law to this case.

"[M]odification or dissolution of a permanent injunction is extraordinary relief and, as

such, requires a showing of extraordinary circumstances."  *Crutchfield v. U.S. Army Corps of*

*Engineers*, 175 F. Supp. 2d 835, 844 (E.D. Va. 2001).

> Relevant decisional law has identified a number of factors that serve to focus the
> inquiry whether to modify or dissolve an injunction. Among these are the
> following: (1) the circumstances leading to entry of the injunction and the nature
> of the conduct sought to be prevented; (2) the length of time since entry of the
> injunction; (3) whether the party subject to its terms has complied or attempted to
> comply in good faith with the injunction; (4) the likelihood that the conduct or
> conditions sought to be prevented will recur absent the injunction; (5) whether the
> moving party can demonstrate a significant, unforeseen change in the facts or law
> and whether such changed circumstances have made compliance substantially
> more onerous or have made the decree unworkable; and (6) whether the objective
> of the decree has been achieved and whether continued enforcement would be
> detrimental to the public interest.

*Id.* (citing, *inter alia*, *Alexander v. Britt,* 89 F.3d 194, 197 (4th Cir.1996)); *MicroStrategy, Inc. v.*

*Bus. Objects, S.A.*, 661 F. Supp. 2d 548, 553 (E.D. Va. 2009).[1]

Here, the circumstances leading to the 2000 Order were based on the Court's belief that

RMST intended to violate a premise of its salvor-in-possession status by wrongly damaging,

cutting into or cutting off part of the wreck (Factor 1).  *See* ECF No. 602 at 17-18.  The 2000

Order has been in place for two decades (Factor 2), and while RMST has complied with the

prohibition to date (Factor 3), if the prohibition is removed, RMST will in fact damage, cut into

and cut off parts of the wreck (Factor 4).  There is no change in the law the now supports

---

[1] RMST's reliance on *Salazar v. Buono*, 559 U.S. 700 (2010), is misplaced.  There, a litigant sought to enforce an earlier injunction barring maintenance of a cross that had been on federal land as violating the Establishment Clause. The "change" in circumstances – passage of a federal statute that allowed transfer of the land to private parties – was central to the case; however, the Court also noted that, in addition to "change," the lower court erred by not evaluating the request for a modification "in light of the objectives of the 2002 injunction." *Id.* at 720.  In short, in *Salazar*, the Supreme Court focused on the particular factors that were pertinent to that case; it did not define a single factor by which such decisions were to be analyzed.

RMST's position, and no "significant, unforeseen change" in the facts; *Titanic* is deteriorating as it has been since it sank (Factor 5). The purpose of the 2000 Order will be thwarted and RMST's bargain for its salvor-in-possession status set aside if RMST is permitted to salvage within the wreck; such action against a maritime memorial is not in the public interest (Factor 6). In short, there is nothing extraordinary that justifies modifying the 2000 Order.

 2. **Funding issues relating to conservation of recovered artifacts.**

 RMST states that its past history of conducting expeditions provides the support necessary to accept its representations of having sufficient funding for the 2020 Expedition. ECF No. 605 at 5-6 (stating that it would be a "fool's errand" to embark on this expedition without sufficient funding). However, RMST's current owners do not have a track record of success. The prior ownership, which RMST has sought to distance themselves from, ECF No. 601 at 11, caused the company's bankruptcy. It is difficult, therefore, to see how this past supports RMST's allegations for its future financial stability, and, in particular, its ability to care for and conserve any recovered artifacts in perpetuity.

 RMST contends NOAA is ill-suited to have information about its funding for the expedition because recovery and conservation of the *USS Monitor* was perpetually underfunded. ECF No. 605 at 2-4. NOAA cannot of course unilaterally commit taxpayer money, but this in fact is precisely the point. No entity, government or private, is immune from budgetary or funding issues; RMST's recent bankruptcy is a case in point. Similarly, RMST states that NOAA cannot be trusted with RMST's proprietary financial information. ECF No. 605 at 4. While NOAA disagrees with this assertion, it is irrelevant because NOAA's recommendation was that the Court require that RMST's funding information "be available for *independent* review and audit, to ensure sufficient funds are allocated for the recovery, care, conservation and

curation of any recovered artifacts."  ECF No. 602 at 30 (emphasis added).  Funding concerns

with respect to the protection of underwater cultural heritage, especially the conservation of

*Titanic's* artifacts, are matters of paramount importance.

> Securing funding is a recurrent problem for underwater archaeological projects. It
> is a stumbling block over which naïvely planned operations come to grief. The
> result may be major damage to the heritage affected, without this being offset by
> project results. In view of the fragile nature of underwater cultural heritage and its
> nature as a public resource, this is indefensible. An adequate funding base should
> be assured in advance of any activity. No less than three *Rules* of the Annex
> address this issue.

UNESCO Manual at 127.  Based on RMST's response, the Court is required to trust RMST's un-

vetted representations because RMST does not trust NOAA.  The standards by which a project

design are evaluated mean nothing, if the requesting entity can just claim it complies.

 RMST asserts that it cannot disclose its funding information because "much of the

information . . . consists of trade secrets and other confidential information of RMST's vendors,

including their proprietary pricing, not RMST itself."[2]  ECF No. 605 at 4-5.  How much RMST

expects to *budget* for conservation and curation or pay for it is distinct from how outside vendors

might price their services.  In any event, the answer is to file the information under seal, or

submit it for independent review with strict oversight by the Court.  RMST should not be able to

hide behind non-disclosure agreements it has with vendors to avoid demonstrating its ability to

conserve the artifacts it wants to recover in accordance with professional standards.

 **3. <u>Justifications for salvage inside the wreck and of the Marconi.</u>**

 In response to NOAA's contention that there is little scientific basis to conclude that

*Titanic's* Marconi Suite will collapse "soon," ECF No. 602 at 20-21 (citing the declaration of Dr.

David Conlin), RMST challenges Dr. Conlin's statements as the product of bias and an

---

[2] RMST previously said the information, even about its own budget, was proprietary, and asserted that "it possesses the financial resources" necessary for conducting the expedition and future conservation.  ECF No. 601-1 at 34.

ideological bent.  ECF No. 605 at 8-9.  This personal attack cannot be reconciled with the fact

that, one week before Dr. Conlin's declaration was filed, RMST's counsel asked Dr. Conlin if he

was interested in continuing his work on *Titanic* during the 2020 Expedition.

> On a wholly unrelated note, I may be reaching out to you in the near future to see
> if you want any follow up done with your work out at the *Titanic* later this
> year.  John Broadwater has put together a project research design, but it is still a
> work in progress.  NOAA will have no role in the project, except to comment on
> documents after they are filed in the admiralty court.  However, I know you were
> out at *Titanic* on behalf of the [National Park Service] in 2010, and I was out with
> Larry Murphy in 2003, so this would be an opportunity to continue the [National
> Park Service's] work if there is a willingness to do so.

Exhibit 1 (Apr. 20, 2020, email from Concannon to Conlin).

RMST also cites to purportedly supporting literature, especially that of Dr. Timothy

Foecke, an expert with an "international reputation" who has "conducted an extensive forensic

analysis of the destructive forces acting on *Titanic's* hull."  ECF No. 605 at 10-11.  On April 29,

2020, RMST's then Senior Archeologist, Dr. John Broadwater, contacted Dr. Foecke to get his

support for RMST's position, only to find that Dr. Foecke would not concede to Dr.

Broadwater's request to present an out-of-context quote on RMST's behalf.  Exhibit 2 (Email

chain between John Broadwater and Tim Foecke).  Among Dr. Foecke's statements that RMST

wanted to omit:

> Unfortunately, if you pointed to any feature of the wreck and asked me how long
> it will last, professionally I would have to say "anywhere between 5 minutes and
> 5 decades, depending."

> All I can tell you definitively is that the wreck of the RMS *Titanic* will be a pile of
> iron ore in about 150-200 years. How the pile forms over time is anyone's guess,
> and anyone who says they know with certainty is lying or delusional.

Exhibit. 2.

RMST dismisses what it contends is NOAA's "blanket policy" against recovery inside

the wreck based on potential consequences from recovery of the motor-generator set, when

RMST "predicts" that such recovery will not even happen (although it immediately says that "no final decision [on recovery] has been made yet"). ECF No. 605 at 9-10. This assertion misstates NOAA's position in multiple ways. NOAA's concerns regarding salvage and other activity within the wreck are far broader than *just* the consequences attending the recovery of the motor-generator set. *Any* salvage or activity that penetrates the wreck, and disturbs or damages the wreck structure, artifacts or human remains (if any) inside the wreck is expressly prohibited by the 2000 Order, ECF No. 602 at 17-24, and/or by Article 4 of the International Agreement, as incorporated by Sec. 113, *id.* at 16. Moreover, NOAA's concerns are *not* limited only to consequences from recovery of the motor-generator set. For example, NOAA expressed concern regarding: damage to the "no-go" items that could cause environmental hazards; damage to wreck structures from recovery of items still attached to walls; damage to other artifacts in the Marconi Suite that RMST acknowledges are there; damage or loss of artifacts from use of a suction dredge; damage from excessive loading on the decking above to conduct work below the deck; and consequences to the structural integrity of the wreck and other artifacts from the actions, including if portions of the decking are removed and the wreck is left more exposed than it is now.[3] ECF No. 602 at 24-29. None of this potential damage is addressed or discussed in the March 27, 2020, Research Design. *See* Exhibit 1 (describing the Research Design as of April 20,

---

[3] RMST states in its Research Design that "intact decking" would not be removed to access the Silent Room. ECF No. 605 at 9; *see also* ECF No. 601-1 at 56. RMST's reference, however, is to an *optional* plan that it never explains when or if it would be operational. Relatedly, RMST criticizes why NOAA did not utilize Dave Lovalvo to analyze the EYOS expedition. ECF No. 605 at 14-17. This *non sequitur* that does not help justify RMST's failure to explain how it would conduct this recovery. In any event, the scope and scale of the two projects are dramatically different and multiple NOAA employees were involved in reviewing the EYOS expedition proposal. The EYOS expedition, which RMST approved and endorsed, did not involve entering the wreck, cutting holes in the wreck, damaging the wreck, recovering artifacts from the wreck or the debris field. Any damage to the wreck, which was slight, was unintentional; RMST deliberately will damage the wreck. Finally, EYOS willingly participated in the Sec. 113 process, allowing NOAA to vet the proposal; RMST has refused to do so and rejects any role by NOAA.

2020, as a "work in progress"); Exhibit 2 (Dr. Broadwater describing the Research Design as of April 29, 2020, as still being prepared).

Regarding why the Marconi should be recovered, RMST now acknowledges that the Marconi is not "different" than other Marconi sets of the time, nor does it disagree that examples of the Marconi already exist today;[4] instead RMST contends that the Marconi is historically unique, even in a dismembered state, *see* ECF No. 602-2 at ¶ 9 (Conlin Decl.), because it "belongs to the most famous shipwreck in the world."  ECF No. 605 at 12.  These two justifications – it comes from a "famous shipwreck" and the wreck is deteriorating – are all encompassing; there is no recovery and no collateral damage that cannot be justified using these two reasons.

Finally, RMST claims it must be vested with making decisions on site with its "world's greatest *Titanic* experts," and says it welcomes "intellectually honest discussions" about the fate of *Titanic* from their actions.  ECF No. 605 at 9-10.  When RMST attacks those with whom they disagree (Dr. Conlin); attempts to manipulate opinions of admitted experts to fit their narrative (Dr. Foecke); and construes disagreement in the broader archeological and preservation community over their plans as a "campaign against a witness" (Dr. Broadwater), ECF No. 609 at 3-4, there would appear to be little room for dissenting opinions.  It is difficult to envision that, once out in the North Atlantic, contrary voices advocating caution (if any are allowed to be present) will be heeded or heard.  NOAA strongly believes a hard stop needs to be in place to bar any salvage or other activity within the wreck that will disturb the wreck, other artifacts or human remains (if any).

---

[4] *See* ECF No. 601-1 at 64-66 (previously representing that recovery of the Marconi is justified because it is a unique piece of equipment and the "sole surviving" example of its kind:  *Titanic* was "the only ship afloat with the newly-developed rotary spark converter, a technological advancement that gave *Titanic's* spark a character unlike any other").

### 4.  **Purported constitutional conflict.**

RMST states that, by citing to the requirements of Sec. 113, NOAA "invites the Court to abdicate its constitutional authority and relinquish its jurisdiction to NOAA."  ECF No. 605 at 12-14.  It is indeed correct that NOAA's position is that Article 4 of the International Agreement, as incorporated by Sec. 113, precludes penetrating the wreck for salvage purposes, or if any activity would physically disturb the hull, artifacts or human remains.[5]  ECF No. 602 at 16.  That has been NOAA's position since the NOAA Guidelines were issued in 2001.  66 F.R. 18912 (April 12, 2001) at ¶ 2.  However, NOAA also has "acknowledge[d] this Court's continuing *in rem* jurisdiction over *Titanic*," and its intent to coordinate any administrative actions required under federal law with this Court.  ECF No. 564 at 2.  NOAA strongly believes that the processes set forth in Sec. 113 *do not* impermissibly infringe on this Court's admiralty jurisdiction, but instead serve as an additional means by which to achieve the same goals as the Court's – protection of *Titanic* as an maritime memorial for posterity.

Here, NOAA has articulated three distinct and separate reasons why RMST should be prohibited from salvaging within the wreck:  (i) it is contrary to the 2000 Order; (ii) its proposed benefits do not outweigh the costs to the resource; and (iii) it is contrary to Sec. 113 and federal law.  ECF No. 602 at 14-29.  It is a "fundamental rule of judicial restraint" that "[p]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."  *Jean v. Nelson*, 472 U.S. 846, 854 (1985).  Thus, the Court need not address the alleged constitutional issue in (iii) if it decides either (i) or (ii) bars RMST's proposed activity.[6]

---

[5] It is also NOAA's position that, in the absence of a Sec. 113 authorization, RMST cannot lawfully conduct any activities at *Titanic* that would physically alter or disturb the wreck or wreck site.  *See* ECF No. 602 at 16.

[6] In addition, when the constitutionality of an Act of Congress is in question, there is a process to follow by which the court "shall certify such fact to the Attorney General, and shall permit the United States to intervene for the presentation of evidence . . .  and for argument on the question of constitutionality."  28 U.S.C. § 2403(a).  That process has not yet been triggered.

## 5. **Dr. Broadwater's departure from RMST.**

As of May 3, 2020, Dr. Broadwater had advised RMST's president and one of its counsel that he would "no longer support RMST's proposal," because he concluded there was "no doubt that recovery or disturbance inside the hull is not allowed;" Dr. Broadwater requested RMST to notify the Court that he was "no longer associated with the company or the project."  ECF No. 609 at 4-5.  RMST's May 6, 2020, filing, ECF No. 605, did not disclose that fact.[7]  On May 8, 2020, Dr. Broadwater notified David Alberg with NOAA to advise that he was no longer associated with RMST.  Exhibit 3 (May 8, 2020, email Broadwater to Alberg).  Specifically, Dr. Broadwater stated "I withdrew *before* their most recent filing (this week) [May 6, 2020], and *I'm not sure if that fact was conveyed to the court*."  *Id.* (emphasis added).  NOAA so advised the Court on May 11, 2020.  ECF No. 607.  The same day, RMST filed a response.  ECF No. 609. NOAA responds *only* to address RMST's implication that NOAA has somehow improperly interfered with Dr. Broadwater's relationship with RMST by prohibiting NOAA personnel from communicating with Dr. Broadwater and having some unspecified role in an "outside pressure" campaign (with the broader archeological and preservation community) to force Dr. Broadwater to leave RMST.  ECF No. 609 at 3, 9.

Dr. Broadwater was not part of the RMST team as of February 20, 2020.  Feb. 20, 2020, Hearing Tr. at 85-86; ECF No. 609 at 5.  Sometime in mid-March 2020, Dr. Broadwater contacted several NOAA employees to get information about *Titanic*.  Counsel for NOAA promptly called RMST's counsel to clarify Dr. Broadwater's relationship with RMST.  Exhibit 4

---

[7] RMST states that, because NOAA did not criticize Dr. Broadwater's participation in the expedition, "there was nothing on this topic to reply to."  ECF No. 609 at 5.  Suffice it to say that, as of April 27, 2020, when NOAA filed its report, it had no reason to know that Dr. Broadwater had developed serious reservations about participating in the 2020 Expedition, and was considering stepping down.

(Email chain between NOAA Counsel and RMST Counsel).  In light of RMST's lawyer's statements, NOAA employees were advised to include legal counsel on any communications with Dr. Broadwater about *Titanic*.  *Id.*; ECF No. 609-1 at 2 ("John, I've been informed that any discussions with you (or others working with RMST) pertaining to *Titanic* need to involve our legal counsel.").  At no time in the nearly two-months since, has RMST raised any concern until NOAA disagreed with its Research Design.

In short, when Dr. Broadwater reached out to NOAA personnel to discuss *Titanic*, NOAA promptly took steps to clarify his role with RMST and, based on RMST counsel's statements, to ensure that any communications between NOAA personnel and Dr. Broadwater pertaining to *Titanic* involved legal counsel.  This was done to avoid risking the very type of accusations RMST is asserting.  *See* Exhibit 4 (NOAA's counsel seeking clarification from RMST's counsel on Broadwater's role "so that our folks can be responsive without risking any accusations from RMST.")

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:   /s/ *Kent P. Porter* _____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of May, 2020, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **David G. Barger, VSB #21652**<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Boulevard, Suite 1200<br>McLean, Virginia 22102<br>Tel: (703) 749-1300<br>Fax: (703) 749-1301<br>E-Mail: Bargerd@gtlaw.com |
| **David G. Concannon**<br>Concannon & Charles<br>100 Sun Valley Road, No. 329<br>Sun Valley, Idaho 83353<br>Email: david@davidconcannon.com | |

_/s/ Kent P. Porter_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov