**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**R.M.S. TITANIC, INC.,**
**successor-in-interest to**
**Titanic Ventures, limited partnership,**
      **Plaintiff,**

**v.**                                                                              **Civil Action No. 2:93cv902**

**THE WRECKED AND ABANDONED VESSEL,**
**ITS ENGINES, TACKLE, APPAREL,**
**APPURTENANCES, CARGO, ETC., LOCATED**
**WITHIN ONE (1) NAUTICAL MILE OF A POINT**
**LOCATED AT 41 43' 32'' NORTH LATITUDE**
**AND 49 56' 49'' WEST LONGITUDE,**
**BELIEVED TO BE THE R.M.S. TITANIC**
**in rem,**
      **Defendant.**

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION TO**
**INTERVENE AND, IF GRANTED, FOR EXTENSION OF TIME TO FILE AN APPEAL**

## I.    INTRODUCTION

Section 113 of Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 (May 5, 2017) ("Sec. 113") requires any person or entity subject to the jurisdiction of the United States seeking to "conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic*" to obtain an authorization for such activities from the Secretary of Commerce.  *Id.*  Sec. 113 incorporates the Agreement Concerning the Shipwrecked Vessel *R.M.S. Titanic* and its Annex Rules (collectively, the "International Agreement"), an international agreement that proscribes certain salvage activities at the *Titanic*.  Those governing legal authorities modify the general maritime law as it pertains to *Titanic*.  *See Detroit Trust Co. v. Barlum S. S. Co.,* 293 U.S.  21, 42 (1934) ("The framers of the Constitution did not contemplate that the maritime law should remain unalterable."); *Sea*

*Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 641 (4th Cir. 2000)

(observing that "the common law of admiralty must be developed consonant with federal

statutes").  RMST, however, does not acknowledge that Sec. 113 or the incorporated

International Agreement are applicable to its activities, contending that any action or regulation

of its conduct vis-à-vis *Titanic* by NOAA or the United States is impermissible.  Because RMST

has not engaged in the Sec. 113 process, the Secretary of Commerce has been prevented from

taking appropriate actions, as directed by Congress, to carry out the obligations of the United

States under Sec. 113 and under the International Agreement.

　　　RMST has advised this Court of a planned Expedition to *Titanic* this summer that

involves activities encompassed by Sec. 113, including to cut into *Titanic* and extract pieces of

the Marconi Wireless Telegraph and related artifacts from inside the wreck.  Recognizing that its

plan to cut into *Titanic* and extract artifacts from inside the wreck conflicts with a prior order of

this Court from July 28, 2000 (the "2000 Order"), RMST moved to modify or amend that order

pursuant to Federal Rule of Civil Procedure 54(b).  RMST did not and has not sought an

authorization from the Secretary of Commerce for this or any of the other activity set forth in its

Research Design.

　　　On May 18, 2020, this Court granted RMST's motion and authorized it to "minimally . . .

cut into the [*Titanic*] wreck only as necessary to access the Marconi Suite, and to detach from the

wreck the Marconi wireless device and associated artifacts" from inside the *Titanic*.[1]  ECF No.

612 at 14.  The Court construed its decision as a narrow one, and focused only on whether to

amend the 2000 Order.  Whether Sec. 113 applied to bar the activity, or whether RMST was

---

[1] The order was conditioned on RMST filing with the Court and NOAA by June 18, 2020, a funding plan explaining its funding for the expedition and for the conservation and care for any recovered artifacts.  *Id.*

required to comply with Sec. 113, were not, in the Court's view, before the Court for consideration.  *Id.* at 10-11.

To ensure that RMST's activities at *Titanic* are consistent with federal law, to protect the United States' interest in the proper implementation of federal law and RMST's compliance therewith, to provide *Titanic* the protections Congress granted it, and to ensure the United States' obligations under the International Agreement are not substantially impaired, the United States moves to intervene as of right, or alternatively, with the Court's permission.  The United States seeks to intervene for all purposes necessary to protect its interests in the proper application of Sec. 113 in this admiralty case and its obligations under the International Agreement including:

1. To move the district court to reconsider its May 18, 2020, Opinion pursuant to Federal Rules of Civil Procedure 54(b) and 59(e);

2. To seek a declaratory judgment that Sec. 113 modified general maritime law as pertains to *Titanic* and that RMST is required to comply with Sec. 113, and obtain an authorization from the Secretary of Commerce before conducting "any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic*;"

3. To enjoin RMST from conducting "any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic*" until it has obtained a Section 113 authorization for such activity from the Secretary of Commerce; and

4. To move for an extension of time pursuant to Federal Rule of Appellate Procedure 4(a)(5) to appeal the district court's May 18, 2020, Opinion, so that this Court will have sufficient time to rule on the declaratory and injunctive relief sought by the United States,

and to ensure the United States remains able to protect its interests through appeal, if necessary.

Pursuant to Federal Rule of Civil Procedure 24(c), a Verified Complaint for Declaratory and Injunctive Relief is attached with this submission.

The United States respectfully requests the Court consider this motion to intervene, and if intervention is granted, a request for an extension of time to file an appeal, on an emergency basis in light of the rapidly approaching deadline for noticing an appeal (June 17, 2020),[2] Fed. R. App. P. 4(a)(1)(A), as well as the deadline for filing a motion pursuant to Rule 59(e) (June 15, 2020), Fed. R. Civ. P. 59(e).  The United States further respectfully requests that the Court grant the motion to intervene *nunc pro tunc* to the date of this motion.  *See* Part III.C *infra*.

## II.     BACKGROUND

On April 15, 1912, the *Titanic* struck an iceberg roughly 400 miles off the coast of Newfoundland in international waters.  Within three hours, *Titanic* broke in two and sank to the ocean floor approximately 2.5 miles below, scattering thousands of artifacts in a debris field between the two pieces of the hull and sending 1,500 passengers and crew to their death. *Titanic's* location remained a mystery until 1985 when it was discovered by a joint United States-French expedition.

Salvage operations commenced by RMST's predecessor in 1987.  The first tranche of artifacts, about 1,800 items, was taken to France.  In 1993, RMST brought additional recovered artifacts to the Eastern District of Virginia and commenced this admiralty action.  Dkt. No. 1. The district court assumed constructive *in rem* jurisdiction over the wreck and wreck site, and

---

[2] Because the May 18, 2020, Opinion is conditioned on RMST filing information on its funding plans on or before June 18, 2020, the appeal clock may not run until that date or some further date at which time the Court approves the funding plan.

awarded RMST exclusive salvage rights in June 1994.  Dkt No. 37; *see also R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 951-53 (4th Cir. 1999).  Over the next ten years, until 2004, RMST conducted additional expeditions and recovered, in total, approximately 5,500 artifacts.

In July 2000, the district court learned that, during an expedition then ongoing, RMST planned to penetrate the hull to access the cargo hold in search of first-class luggage, mail, and an alleged diamond stash.  Dkt No. 601 at 6-7.  In response, on July 28, 2000, the district court issued an order stating, "RMS *TITANIC*, Inc. and all of its employees, agents, or subcontractors are forbidden to in any way cut into the wreck or detach any part of the wreck."  Dkt. No. 164 at 3 ("2000 Order").  The district court stated that the premise of its order was that it had always "continued RMS TITANIC, Inc. as the salvor in possession with the understanding that RMS TITANIC, Inc. would not damage or cut into or cut off any part of the wreck."  *Id.* at 2.

In 1986, shortly after *Titanic's* discovery, Congress enacted the RMS *Titanic* Maritime Memorial Act of 1986 (the "1986 Memorial Act").  16 U.S.C. §§ 450rr *et seq*.  The purpose of the 1986 Memorial Act was to "encourage international efforts to designate the R.M.S. *Titanic* as an international maritime memorial to those who lost their lives aboard her in 1912," and, to that end, called on the NOAA Administrator to consult with the United Kingdom, France, Canada, and other interested nations to develop international guidelines for research on, exploration of, and if appropriate, salvage of the *Titanic*.  *Id.* at § 450rr-5.  The 1986 Memorial Act also called on the United States Secretary of State to enter into negotiations with such nations to develop an international agreement:  (1) to designate the *Titanic* as an international maritime memorial; and, (2) to provide for research on, exploration of, and, if appropriate, salvage of *Titanic* consistent with international guidelines.  *Id.* at 450rr-6.  In directing negotiations of guidelines and an agreement, Congress clearly understood the importance of coordinated and concerted action to

achieve its objectives, recognizing that U.S. action alone would not be sufficient to protect the *Titanic*.

Congress would be notified once an agreement was negotiated for purposes of passing legislation to implement the agreement. *Id.* at § 450rr-6(d).  "[P]ending adoption of the international agreement," it was the sense of Congress that "no person should conduct any such research or exploration activity which would physically alter, disturb, or salvage the R.M.S. *Titanic*."  16 U.S.C. § 450rr-5.

In early 2000, subsequent to negotiations concluding on the text of the International Agreement, and unhappy with what it viewed as an unconstitutional infringement of its rights, RMST filed a declaratory judgment action against the Secretary of State, the Secretary of Commerce and the NOAA Administrator,[3] seeking a declaration that their actions to implement the 1986 Act "unlawfully interfere[ed]" with RMST's salvage rights.  Dkt. No. 154.  The district court dismissed the action as not ripe, stating that RMST could renew its motion at such time as the International Agreement had been implemented.  *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2000 WL 1946826 (E.D.Va. Sep. 15, 2000).

In 2001, after a public notice and comment period, the NOAA Administrator issued "Guidelines for Research, Exploration and Salvage of RMS *Titanic*."  66 Fed. Reg. 18905 (Apr. 12, 2001) ("NOAA Guidelines").  The NOAA Guidelines articulated NOAA's position that "entry into the hull sections of *RMS Titanic* should be avoided so that they, other artifacts and any human remains are not disturbed."  *Id.* at 18912.

The NOAA Guidelines were negotiated in concert with the International Agreement and its Annex Rules and, thus, by 2000, the text of the International Agreement also had been

---

[3] The action began as an action against a NOAA and State Department official.  Dkt. No. 152.

negotiated.  The United Kingdom signed and accepted the Agreement in 2003.  The United

States signed the International Agreement in 2004, but did not provide its acceptance to the

International Agreement at this time due to the need for further implementing legislation.[4]  The

International Agreement required the United States to have a system of project authorizations for

United States' nationals and vessels flying the U.S. flag for *Titanic*-directed activities; to take

into account the views of the United Kingdom before deciding on approvals or denials; and to

consult to resolve disputes concerning the interpretation or application of the Agreement.  Int'l

Agr., Arts. 4, 5, and 8.  And of particular relevance here, Article 4 of the International

Agreement provided that Parties "shall . . . regulate . . . entry into the hull sections of RMS

*Titanic* so that they [the hull sections], other artifacts and any human remains are not disturbed."

Int'l Agr., Art. 4, ¶ 1(a).

In 2007, this Court requested that the United States become involved in the case, as

*amicus*, in order to review RMST's actions.  The court ruled that:

> The court further entrusts the United States, through the United States Attorney
> for the Eastern District of Virginia, to review RMST's continuing actions as salvor
> and the periodic status reports thereof filed with the court, as well as any salvage
> award motion which RMST chooses to submit. The court finds that this additional
> oversight is necessary in order to preserve and protect the *R.M.S. Titanic* and its
> artifacts as an international treasure for posterity, and the United States' efforts
> and interests in this regard, and to ensure compliance with this court's rulings and
> final orders.

*R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007)

(footnote omitted).  This Court thus recognized that the United States had "interests" in

"preserv[ing] and protect[ing] the *R.M.S. Titanic* and its artifacts as an international treasure for

posterity."  *Id.*  In like fashion, when the Court granted RMST an *in specie* award of the artifacts

subject to Covenants and Conditions, the Court recognized NOAA's public interest in *Titanic*

---

[4] The International Agreement can be found at https://www.state.gov/multilateral-19-1118.

and the artifacts and specifically tasked NOAA with an oversight responsibility to ensure

RMST's compliance with the Covenants.  *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*,

804 F. Supp. 2d 508 (E.D. Va. 2011).  NOAA has served in an oversight capacity ever since.

On May 5, 2017, the President signed the Consolidated Appropriations Act, 2017, Pub.

L. No. 115-31 (May 5, 2017), which included appropriations for the Department of Commerce,

*id.* at Div. B, Title 1.  Section 113 of that Act ("Sec. 113") provides:

> For fiscal year 2017 and each fiscal year thereafter, no person shall conduct any
> research, exploration, salvage, or other activity that would physically alter or
> disturb the wreck or wreck site of the RMS Titanic unless authorized by the
> Secretary of Commerce per the provisions of the Agreement Concerning the
> Shipwrecked Vessel RMS Titanic [i.e., the International Agreement].  The
> Secretary of Commerce shall take appropriate actions to carry out this section
> consistent with the Agreement.

Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat 135, 192 (2017).[5]

The import of Sec. 113's enactment is threefold.  First, it provided the legislation

necessary for the United States to implement and, therefore, become a party to the International

Agreement.[6]  ECF Nos. 581 and 581-1.  Second, it modified general maritime law as it pertains

to *Titanic* to require any person subject to United States jurisdiction wanting to "conduct any

research, exploration, salvage, or other activity that would physically alter or disturb the wreck

or wreck site of the RMS *Titanic*" to seek an authorization from the Secretary of Commerce

before conducting such activity.  And third, because Sec. 113 incorporates the provisions of the

International Agreement (including its Annex Rules), any entry into the hull sections of RMS

---

[5] The authority to issue authorizations was delegated by the Secretary of Commerce to the NOAA Administrator. ECF No. 491.
[6] The United States Department of State deposited the United States' instrument of acceptance with the United Kingdom on November 18, 2019, thereby triggering the International Agreement's entry into force.  *See* ECF No. 581. The instrument of "acceptance" has the same legal effect as ratification and consequently expresses the consent of a state to be bound by a treaty.  In the practice of the United States, acceptance may be used instead of ratification when, at a national level, constitutional law does not require the treaty to be ratified by the Senate.  Arts.2 (1) (b) and 14 (2), Vienna Convention on the Law of Treaties (1969).

*Titanic* that "disturb[s]" the hull sections, other artifacts or any human remains is expressly prohibited as a matter of federal and general maritime law.

On June 22, 2017, NOAA notified RMST and the district court of the enactment of Sec. 113. ECF No. 430. But before it did, RMST had already filed a Periodic Report contending that NOAA engaged in a "deliberate end-run around this Court's . . . jurisdiction" through the enactment of Sec. 113. ECF No. 429. RMST asserted that it would address the issue in a future filing. *Id.* NOAA subsequently notified RMST and the district court, on August 6, 2019, that NOAA had issued a federal register notice outlining how NOAA intended to implement Sec. 113 and coordinate its actions with the district court. ECF Nos. 564 and 564-2.

On April 5, 2019, RMST contacted NOAA to indicate its intent to conduct an expedition to *Titanic* that summer. ECF No. 549-5. NOAA advised RMST in writing that RMST was obligated to comply with the requirements of Sec. 113. *Id.* RMST subsequently cancelled its expedition plans for 2019. ECF No. 549-6.

On November 22, 2019, RMST advised the Court and NOAA that it intended to conduct an expedition to the wreck during the summer of 2020, during which it would conduct scientific research and unspecified salvage. ECF No. 580. Supplemental filings concerning the expedition occurred on January 21, 2020, and February 13, 2020, ECF Nos. 585 and 590, and on February 20, 2020, the district court held a hearing where RMST presented documents and witnesses to support its expedition plans.

On March 27, 2020, RMST filed a Research Design detailing the expedition's three objectives: (1) video surveillance mapping of the interior and exterior of the wreck; (2) artifact recovery from the debris field; and (3) artifact recovery from an area known as the Marconi

Suite.[7]  ECF No. 601-1.  Because the third objective conflicts with the 2000 Order prohibiting

cutting into, cutting off, or detaching of any part of *Titanic*, RMST moved to amend/modify the

2000 Order, pursuant to Federal Rule of Civil Procedure 54(b), to permit penetration of the

ship's exterior, related disruptive activities and to extract the target Marconi equipment.  ECF

Nos. 600 and 601.

     NOAA was amenable to the first two objectives (subject to certain additional

information), but opposed to the third as the "most physically destructive and invasive" activity

ever to occur at *Titanic*.  *See* ECF No. 602.  In addition to arguing that RMST had not

established a basis to amend or modify the 2000 Order, and that the proposal failed on the merits

as measured against accepted archeological standards, NOAA also stated that the third objective

> would penetrate the ship's exterior; physically alter the exterior and interior of
> *Titanic*; detach target artifacts from the interior of the structure; and likely disturb
> and destroy artifacts, and the context for other artifacts, now within the Marconi
> Suite and the surrounding areas. . . .
>
> As noted above, Sec. 113 incorporates the provisions of the International
> Agreement and its Annex Rules as the standards for the NOAA Administrator to
> evaluate requests for authorizations by U.S. nationals seeking to "conduct
> research, exploration, salvage, or other activity that would physically alter or
> disturb the [*Titanic*] wreck or wreck site."  Article 4 of the International
> Agreement provides that a project authorization system should "regulate . . . entry
> into the hull sections of RMS *Titanic* so that they [the hull sections], other
> artifacts and any human remains are not disturbed."  Int'l Agr., Art. 4, ¶ 1(a).  By
> any ordinary definition of the word "disturb," cutting holes in *Titanic* and
> physically changing its appearance; forcibly detaching artifacts for recovery and
> altering the appearance of the Marconi Suite; and, displacing or destroying other
> artifacts that may be in or near the Marconi Suite . . . , irreversibly "disturbs" the
> hull sections and other nearby artifacts.  Because Objective 3 is contrary to Article
> 4 of the International Agreement, the actions are prohibited under Sec. 113.

ECF No. 602 at 16.  A footnote to this narrative added the following:

---

[7] The Marconi Suite contains, as the name implies, the Marconi Wireless Telegraph system and components that are
the primary artifacts RMST proposes to recover.  The Suite consists of three rooms (from port to starboard): the
Silent Room (the location of technical equipment); the Marconi Room (where the operators performed their duties);
and the Sleeping Room (the operators' living quarters).  *See* ECF No. 601-1 at 26, 44-45, 48.

> RMST has not yet complied with the Sec. 113 requirement to seek a project
> authorization from NOAA.  In the absence of a Sec. 113 authorization from the
> NOAA Administrator, RMST is unable to lawfully conduct activities at *Titanic*
> that are otherwise prohibited by Sec. 113. The balance of the analysis in this
> report should not be construed as a waiver by NOAA of RMST's obligation under
> federal law to seek and obtain a Sec. 113 authorization, nor of the Secretary of
> Commerce's obligations (delegated to the NOAA Administrator) to implement
> Section 113.

*Id.* at n. 16.

In a response, RMST stated that, by citing to the requirements of Sec. 113, NOAA

"invites the Court to abdicate its constitutional authority and relinquish its jurisdiction to

NOAA." ECF No. 605 at 12-14.  NOAA reiterated that its position was "that Article 4 of the

International Agreement, as incorporated by Sec. 113, precludes penetrating the wreck for

salvage purposes, or if any activity would physically disturb the hull, artifacts or human

remains."  ECF No. 610 at 8.  NOAA also explained that it did not believe Sec. 113 infringed on

the district court's admiralty jurisdiction, but noted that "the Court need not address the alleged

constitutional issue [posed by Sec. 113] if it decides [one of the other reasons asserted by

NOAA] bars RMST's proposed activity."  *Id.*

On May 18, 2020, this Court issued an opinion granting RMST's motion to amend or

modify the 2000 Order, stating

> RMST's Motion is GRANTED, insofar as it seeks to amend the [2000 Order] to
> permit RMST minimally to cut into the wreck only as necessary to access the
> Marconi Suite, and to detach from the wreck the Marconi wireless device and
> associated artifacts . . . .   The court's granting of the motion is conditioned on
> RMST filing with the court and NOAA by June 18, 2020 . . . a funding plan
> detailing the costs and funding sources of the recovery operation and the
> conservation of any recovered artifacts.

ECF No. 612 at 14.

The Court described as "subsequent legal developments" the enactment of Sec. 113 and

the entry into force of the International Agreement, and expressly noted the Art. 4 prohibition

against entry into the hull where the hull or other artifacts would be disturbed.  ECF No. 612 at 7-9.  However, the Court considered its opinion a narrow one.  Thus, it did not consider the impact of Sec. 113 on RMST's proposed activities, holding that "the only matter before the court is whether to amend the [2000 Order] to lift that Order's prohibitions on cutting into or detaching from the wreck."  *Id.* at 10.

> The court does not address any need for RMST to obtain additional authorizations required by law, such as under Section 113 of the Department of Commerce Appropriations Act of 2017, because such authorizations are beyond the scope of the Rule 54(b) modification.  Likewise, the court does not address the constitutionality of NOAA's claimed authority to wield approval power and control over salvage operations in the Article III courts of the United States exercising their admiralty jurisdiction, because there is no ripe constitutional issue before the court. [footnote omitted]  At this point, NOAA appears as an amicus, not as a formal party at issue in this case, and it has not sought to enforce its approval power or otherwise block this expedition.  The Court cannot adjudicate NOAA's rights in this respect or the constitutionality of Section 113 until they are at issue in this case.

*Id.* at 10-11.  In a footnote the Court added, "The point here is that the court, not NOAA determines the salvage rights of the salvor-in-possession under United States admiralty law and the record of this case."  *Id.* at n. 7.

On May 28, 2020, NOAA communicated with RMST that, notwithstanding the district court's order, RMST was still required to seek and obtain an authorization consistent with Sec. 113 before engaging in the activities set forth in the Research Design.  *See* Exhibit A to "Intervenor's Verified Complaint for Declaratory and Injunctive Relief."

## III.   DISCUSSION

A district court is "'entitled to the full range of reasonable discretion'" in evaluating whether Rule 24 intervention should be allowed.  *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (quoting *Rios v. Enterprise Ass'n Steamfitters Local U. # 638 of U. S.*, 520 F.2d 352, 355 (2d Cir. 1975)).  However, "liberal intervention is desirable to dispose of

as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (same) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.Cir.1967)).  By narrowly focusing on RMST's "new evidence," the district court's May 18, 2020, Opinion did not consider the impact of Sec. 113.  In fact, Sec. 113 modified general maritime law as it pertains to *Titanic*, and it applies to much of the conduct set out in RMST's Research Design, including the conduct the court authorized RMST to conduct in the May 18, 2020, Opinion.  Absent intervention to clarify the application of Sec. 113 in this matter, RMST will be able to avoid the review and approval process Sec. 113 requires; *Titanic* will be deprived of the protections Congress granted it; the Secretary of Commerce will be prevented from fulfilling his responsibilities under Sec. 113, as directed by Congress; and the United States will be unable to satisfy its obligations under the International Agreement.

## A.  <u>The United States is entitled to intervene as of right.</u>

Upon "timely motion," a court must allow *intervention of right* if the movant "[c]laims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  Intervention of right under Rule 24(a)(2), requires a showing that: (1) the motion is timely; (2) the movant has an interest in the "subject matter of the action;" (3) the movant's interest "would be impaired by" the action; and (4) the movant's interest in the action is not "adequately represented" by existing parties.  *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th cir. 1991); *Gould v. Alleco*, Inc., 883 F.2d 281, 284 (4th Cir. 1989); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders'Ass'n*, 646 F.2d 117, 120 (4th Cir. 1981).

1.  *The United States' motion to intervene is timely.*

"Timeliness is to be determined from all the circumstances."  *Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365–66 (1973); *Atkins v. State Bd. of Ed. of N. C.*, 418 F.2d 874, 876 (4th Cir. 1969) ("Intervention, of course, must be timely, but timeliness is not an absolute. It should be evaluated in light of all the circumstances.").  Three factors are considered:  "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion."  *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014) (citing *Gould,* 883 F.2d at 286).  However, timeliness is not as rigorously enforced when intervention of right is at issue, *Brink v. DaLesio*, 667 F.2d 420, 428 (4th Cir. 1981), *opinion modified and superseded on denial of reh'g,* (4th Cir. Jan. 19, 1982); *Scardelletti v. Debarr*, 265 F.3d 195, 203 (4th Cir. 2001), and an "untimely" motion for intervention can still be considered if it could be treated as a separate action, *Atkins*, 418 F.2d at 876 ("Ordinarily intervention cannot be used to revive a law suit, but a court may treat intervention as a separate action, especially when the intervenor has an independent basis for jurisdiction.")

Since 2007, the United States has been a participant in these proceedings as *amicus* to protect the public's interest in *Titanic*, protect the *Titanic*'s interests, and provide oversight of RMST's activities for the Court.  The United States has thus participated for well over a decade under the understanding that it could assert interests and arguments consonant with those of the *Titanic* as a historic wreck, and it has done so.  With regard to Sec. 113, the United States has put RMST on notice of its requirements since its enactment in 2017.  *See* ECF Nos. 430, 564, 602. RMST has acknowledged that notice, asserted its belief that Sec. 113 was unconstitutional, and

stated its intent to address the issue in a future filing.  But because it never did so, RMST never created a necessity for the United States to intervene.

When this Court issued an order that allowed RMST to move forward with activity in contravention of Sec. 113's legal requirements, only then did intervention become necessary. The United States promptly moved to intervene after that May 17, 2020, Opinion.  Accordingly, the timeliness element is satisfied.

> 2.  *The United States has an interest in this litigation.*

The requisite interest means "a significantly protectable interest" in the litigation. *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States,* 400 U.S. 517, 531 (1971).  An interest is significantly protectable if the movant "stand[s] to gain or lose by the direct legal operation of the district court's judgment."  *Id.*; *Dairy Maid Dairy, Inc. v. United States* 147 F.R.D. 109 (E.D.Va.1993) ("To be protectable, the putative intervener's claim must bear a close relationship to the dispute between the existing litigants and therefore must be direct, rather than remote or contingent.")

The United States' interest on behalf of the public and on behalf of the *Titanic* and its artifacts has long been recognized by the Court.  This Court has recognized that the United States has direct "interests" in "preserv[ing] and protect[ing] the *R.M.S. Titanic* and its artifacts as an international treasure for posterity."  *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007); Covenants and Conditions, Part II.K (appended to *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 742 F.Supp.2d 784 (E.D.Va. 2010)).  This Court's prior decisions thus fully resolve this component of Rule 24(a) inquiry.

 The United States further has a protectable interest in the *Titanic* wreck and its artifacts that arises by virtue of the 1986 Memorial Act, the NOAA Guidelines, Sec. 113, and the

International Agreement.  Those governing legal instruments "established … a limited trust relationship to serve a narrow purpose" to protect the *Titanic*.  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (finding that statutes can establish a trust relationship).  And the United States therefore has a fiduciary interest in the *Titanic*, among its own statutory interests.

The United States "stand[s] to gain or lose by the direct legal operation of the district court's" May 18, 2020, Opinion, *Teague*, 931 F.2d at 261, because it has authorized activity that is encompassed by, and at odds with, the requirements of Sec. 113 and the International Agreement.  Accordingly, the interest element is satisfied.

> 3.  *The United States' interests would be impaired, absent intervention.*

 "The impairment prong of FRCP 24(a)(2) is met when the disposition of the case would, as a practical matter, impair an intervention applicant's ability to protect his interest in the subject matter of the litigation."  *Nish & Goodwill Servs., Inc. v. Cohen*, 191 F.R.D. 94, 97 (E.D. Va. 2000); *see also Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 515 (E.D. Va. 2007) (An interest is impaired if the " 'the action in which intervention is sought will prevent any future attempts by the applicant to pursue its interest.' ").  As noted above, this Court and Congress have recognized that the United States has a significant interest on behalf of the public in protecting the *Titanic* as an international maritime memorial to those who perished.  The May 18, 2020, Opinion has the potential effect of excepting RMST from compliance with federal law, but importantly, interferes with NOAA's implementation of that law, and impairs the United States' ability to comply with its obligations under Articles 4, 5 and 8 under the International Agreement.  Accordingly, the impairment of interest element is satisfied.

4.   *The United States' interests are not adequately represented by RMST or* Titanic.

The burden to show "inadequacy of representation is minimal." *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 (1971)).  In most cases, the applicant is the best judge of whether its interests are adequately represented by existing parties.  *Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 515 (E.D. Va. 2007) (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane; Federal Practice & Procedure: Civil § 1909 (2d ed.1986)).  And where "resolution of [the existing party's] claims might leave some of the [movant's] grievances unaddressed," inadequacy of representation is established.  *Aziz v. Trump*, 231 F. Supp. 3d 23, 29 (E.D. Va. 2017); *see alos R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 196, 200 (4th Cir. 2002) (Where there was "no party in opposition" to counter RMST's "fundamental misunderstanding of its role as salvor-in-possession," appointing *amicus* to defend the district court's decision.)

RMST and the United States do not hold "precisely the same goal," *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013), regarding whether Sec. 113 applies to its activities and bars the activities approved in the May 18, 2020, Opinion.  On the contrary, RMST is plainly adverse and hostile to the government's interest in the implementation of Sec. 113 (and believes Sec. 113 does not apply), and has no interest to ensure the United States' obligations under the International Agreement can be met.  *See* ECF Nos 605 at 13-14; 612 at 9 n. 7.  Moreover, with no voice in opposition to speak for the interests of *Titanic*, *R.M.S. Titanic, Inc.*, 286 F.3d at 196, the inadequacy of interest element is satisfied.

### B.  **Alternatively, the United States should be permitted to intervene.**

Upon "timely motion," a court *may permissively* allow intervention if the party seeking to intervene "has a claim or defense that shares with the main action a common question of law or fact.'"  Fed.R.Civ.P. 24(b)(1)(B); *see also In re Rivada Networks*, 230 F. Supp. 3d 467, 472 (E.D. Va. 2017).  The government may also intervene if the *Titanic*'s "claim or defense is based on … a statute" or "any regulation, order, requirement, or agreement issued or made under the statute."  Fed.R.Civ.P. 24(b)(2).  In deciding, in its discretion, whether to grant permissive intervention, a court should consider whether doing so would "unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3), as well as considerations of judicial economy, the need for judicial guidance, the benefit to the judicial process and whether intervention may help avoid inconsistent rulings.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018); *see also In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) ("concerns of judicial economy and need for [judicial] guidance  . . . have a place in motions for permissive intervention"); *see Lee v. Virginia Bd. of Elections*, No. 3:15CV357-HEH, 2015 WL 5178993, at *4 (E.D. Va. Sept. 4, 2015) (a request to intervene should be accompanied by "a corresponding benefit to the process").

The Court identified the following issues that were either beyond the scope of the Rule 54(b) modification, or not then at issue before the Court:

- Whether there is "any need for RMST to obtain additional authorizations required by law, such as under Section 113 of the Department of Commerce Appropriations Act of 2017;"

- Whether NOAA has "authority to wield approval power and control over salvage operations;" and,

ECF No. 612 at 10-11.  The Court continued, stating that "NOAA appears as an *amicus*, not as a formal party . . ., and it has not sought to enforce its approval power or otherwise block this

expedition." *Id.*  Accordingly, the Court determined it could not "adjudicate NOAA's rights in this respect or the constitutionality of Section 113 until they are at issue in this case." *Id.* at 12.

The United States' claims share common elements with the *Titanic*'s claims or defenses in this action.  For example, the United States has a role to protect the interests of the *Titanic* and ensure that RMST's activities do not extend to conduct that contravenes Sec. 113, and that claim overlaps with any claim or defense that the *Titanic* may have in that same regard.  The United States further has claims that RMST's current expedition would violate Sec. 113 and that RMST must obtain authorization under Sec. 113.  Because the requirements and prohibitions of Sec. 113 involve the same subject matter decided by the Court in the May 18, 2020, Opinion (i.e., whether RMST should be permitted to cut into the wreck and conduct salvage from within), the claims by the United States in general share common issues of fact and law with the core issue before the Court in the May 18, 2020, Opinion.

Permitting the United States to intervene will not prejudice RMST, but will address important and critical issues and provide judicial guidance concerning RMST's salvage activities now and in the future, including any potential consequences should RMST engage in salvage activity without going through the Sec. 113 process.  RMST has been on notice of what it believes to be a conflict presented by Sec. 113 for at least three years, yet has never followed through with their assertions that they would address the issue in future filings.  At no time has RMST provided a notice pursuant to Federal Rule of Civil Procedure 5.1(a) that it formally questioned the constitutionality of Sec. 113 after it was enacted.  RMST cannot claim prejudice from delay when it has avoided the issue it believes critically infringes on its rights.  *See Hill v. W. Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982) (Filing of initial class complaint put employer on notice of potential class liability and was, therefore, not prejudiced by motions to intervene by

other persons denied employment.)  Conversely, the United States had no responsibility under the circumstances of this case to intervene to protect the implementation of Sec. 113 until the Court issued an opinion that potentially conflicts with Sec. 113.  *Id.* (Intervenors were under no obligation to move to intervene in class action until the Supreme Court denied certiorari on whether the named class members were adequately representing their interests).   Finally, for the same reasons discussed above, this motion to intervene is timely. *See supra* at III.A.1.

### C.  **This Court should grant intervention *nunc pro tunc* to the filing of this motion.**

This Court should also grant intervention *nunc pro tunc* to the date of the government's intervention motion. The government has been reasonably diligent in preparing an intervention motion, memorandum in support of that motion, and pleading setting forth its claims. Those filings have involved extensive coordination on a short timeframe with multiple agencies across the federal government as well as multiple components of the U.S. Department of Justice.

The Court has the authority to grant intervention *nunc pro tunc*. *See In re Grand Jury Subpoena*, 831 F.2d 290 (4th Cir. 1987) (*per curiam*) (directing district court to enter intervention *nunc pro tunc*).  That is especially so when, as here, the other parties and this Court have in many regards "consistently treated" the United States "as if [it] were a party to this litigation, even though [it] ha[d] not formally moved to intervene," in requiring the United States to review status reports, submit filings in response to RMST's motions, and otherwise superintending its interests in these proceedings.  *Id.*  Moreover, should the Court not grant intervention *nunc pro tunc*, and in the event that this Court does not act on the intervention motion with dispatch, then the United States' ability to request relief in this Court from the May 18, 2020 Opinion could be severely prejudiced. *See, e.g.*, Fed. R. Civ. P. 59(e) (requiring reconsideration motion by a party within 28 days).

**D.  Is permitted to intervene, the United States should be granted an extension of time to appeal.**

Federal Rule of Appellate Procedure 4(a)(5) permits a district court to extend the time to appeal by 30 days for good cause shown or for 14 days after the court grants the motion, whichever is later, if the motion is brought before the original appeal period has run.  Rule 4(a)(5) requires an extension motion to be filed by a "party"; thus, the United States files this motion conditional on this Court first accepting the government's intervention.

Because Rule 4(a)(1)(A) provides 30 days to appeal when the United States is not a party, rather than 60 days when the government is a party, the government does not have the usual time afforded to consider whether to request relief from this Court's May 18, 2020 Opinion in the court of appeals. That process generally requires extensive coordination among multiple federal agencies and authorization by the Solicitor General, 21 C.F.R. 0.163.

The United States therefore requests an extension of time to appeal in order to provide the United States sufficient time to determine whether any appeal is warranted, and to facilitate an orderly schedule to litigate significant issues regarding whether RMST's expedition is authorized under the general maritime law and Sec. 113.

## IV.  CONCLUSION

For the foregoing reasons, the Court should authorize the United States' intervention in this matter *nunc pro tunc* to the date of the filing of the intervention motion, and grant the United States' extension of time to file an appeal.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:  _/s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney

Attorney for the Intervenor United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of June, 2020, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Email: bwainger@kaleolegal.com | **David G. Barger, VSB #21652**<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Boulevard, Suite 1200<br>McLean, Virginia 22102<br>Tel: (703) 749-1300<br>Fax: (703) 749-1301<br>E-Mail: Bargerd@gtlaw.com |
| **David G. Concannon**<br>Concannon & Charles<br>100 Sun Valley Road, No. 329<br>Sun Valley, Idaho 83353<br>Email: david@davidconcannon.com | |

 /s/ *Kent P. Porter*_____
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the Intervenor United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov