**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
        Plaintiff,

v.                                              Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL, et al
        Defendant.


**PLAINTIFF R.M.S. TITANIC, INC.'S MEMORANDUM IN OPPOSITION TO
THE UNITED STATES' MOTION TO INTERVENE AND, IF GRANTED,
FOR EXTENSION OF TIME TO FILE AN APPEAL**

      Plaintiff R.M.S. Titanic, Inc. ("RMST"), by counsel, hereby submits its Memorandum in

Opposition to the United States' Motion to Intervene and, if Granted, For Extension of Time to

File an Appeal (the "Motion to Intervene").  ECF No. 615.  For the reasons stated below, the

United States' Motion to Intervene should be denied.

**I.      INTRODUCTION**

      Disappointed by the Court's recent decision concerning RMST's Motion to Amend or

Modify the Court's July 28, 2000 Order, the United States has moved to do what it could have

done years ago, attempt to formally intervene in this nearly thirty-year old lawsuit.  Startlingly, the

United States admits that this was its strategy all along: despite being an *amicus curiae* for years,

despite the alleged implementation of the International Agreement by an appropriations bill in

2017, and despite being aware of and participating in the briefing on the Motion to Amend, it

decided to wait until this advanced stage to intervene.  Such litigation tactics are not only

disfavored, but also – more importantly – untimely under Rule 24.  This factor alone warrants

denial of the United States' Motion to Intervene.

In addition to being untimely, the United States' attempt to enforce a few lines of statutory text from an appropriations bill through a request for declaratory and injunctive relief against RMST – not the wreck – is out of place in *this case*.[1]   The United States' proposed claims as intervenor do not demonstrate a sufficient interest in the subject matter of this *in rem* case.  To the contrary, its court-appointed role as an *amicus* is more appropriate in this salvage context and consistent with other courts' handling of misplaced motions to intervene.

Finally, the United States should not be allowed to intervene, because its strategic decision to wait until the last possible moment to formally attempt to insert itself into this case has prejudiced RMST.  As an initial matter, it has prejudiced RMST because the United States is seeking to relitigate issues it possibly could have participated in as a party, thus causing unnecessary delay and legal expense.  It has further prejudiced RMST's business by injecting substantial uncertainty into RMST's ability to conduct an important expedition that this Court, pending submission of appropriate funding information, agreed could move forward.

The United States should not be able to intervene at this advanced stage of the litigation with claims that are irrelevant to the property and salvage rights at issue in this *in rem* action.  Accordingly, the United States' Motion to Intervene should be denied.

## II.    BACKGROUND

On August 26, 1993, Titanic Ventures Limited Partnership, a predecessor in interest to RMS Titanic, Inc. The next day, on August 27, 1993, this Court entered an Order for Issuance of Warrant of Arrest, taking constructive possession of the defendant wreck and directing that all claims be filed with the Court.  On June 7, 1994, this Court entered an Order declaring RMST to

---

[1] NOAA could have filed in the past or even at the time it sought to intervene, a separate cause of action and avoided the effort to intervene.  One must assume that if the motion to intervene is denied, NOAA will only then file a separate action and again seek to delay implementation of this Court's May 18, 2020 Order.

be the salvor-in-possession of the wreck and wreck site of the R.M.S. Titanic, entitling it to all salvage rights afforded under Admiralty Law. *RMS Titanic, Inc. v Wrecked and Abandoned Vessel,* 742 F. Supp. 2d 784, 789 (E.D. Va. 2010). This Court remains in constructive possession of the wreck, and RMST remains salvor-in-possession.

In 1986, Congress passed the Titanic Maritime Memorial Act of 1986, 16 U.S.C. § 450rr *et seq*. (the "Act"). The Act was intended "to direct the United States to enter into negotiations with other interested nations to establish an international agreement which will provide for the designation of the R.M.S. Titanic as an international maritime memorial, and protect the scientific, cultural, and historical significance of the R.M.S. Titanic" and "to express the sense of the United States Congress that, pending such international agreement or guidelines, no person should physically alter, disturb, or salvage the R.M.S. Titanic in any research or exploratory activities which are conducted." *Id.* To that end, the Act directed NOAA "to enter into consultations with the United Kingdom, France, Canada, and other interested nations to develop international guidelines for research on, exploration of, and if appropriate, salvage of the R.M.S. Titanic" that are "consistent with its national and international scientific, cultural, and historical significance and the purposes" of the Act and promote the safety of people involved with researching/exploring the Titanic site. *Id.*

Pursuant to the Act, the US, together with France, Canada and the UK, negotiated the "Agreement Concerning the Shipwrecked Vessel R.M.S. Titanic" (the "International Agreement") to address activities in and around Titanic. For the International Agreement to take effect, at least two countries had to properly ratify it. The United Kingdom ratified the Agreement on November 6, 2003. The United States signed it on June 18, 2004, which would enter into force in this country only after the passage of necessary and proper implementing legislation and formal acceptance.

3

For many years after the United States signed the International Agreement, the United States pursued Congressional enactment of legislation to implement the International Agreement. For nearly as long, the Company opposed the passage of the Administration's proposed implementing legislation due to concerns that it failed to recognize and respect (i) the private property rights of RMST, with respect to both the artifacts already recovered and awarded to RMST, and those from future expeditions, and (ii) the continuing jurisdiction of this Court to enforce RMST's rights as the salvor-in-possession.

On June 9, 2006, well after RMST's rights were established and recognized, the Department of State, with the assistance of NOAA, proposed legislation to implement the International Agreement. *See* Exhibit A, attached hereto; R.M.S. Titanic, Inc. Periodic Report (July 17, 2006) [ECF No. 259]. The draft legislation sought to designate the wreck as an international memorial by limiting disturbance at the site through the establishment of a permit system managed by NOAA governing future research, exploration, recovery, and salvage at the wreck. It also proposed a number of enforcement options to deter noncompliance, including civil penalties, criminal fines, and imprisonment.

The draft legislation deliberately excluded any rights that RMST acquired by virtue of the French maritime administrator's October 20, 1993 *note verbal* awarding to the Company title to the artifacts recovered by the Company in 1987. It intentionally failed to acknowledge this Court's express power under admiralty law to authorize RMST to conduct any activities on the wreck, disregarded RMST's unique role in conserving the wreck and conserving the artifacts, and even sought to treat the French Artifacts as contraband, to be forfeited to the government, while subjecting RMST to criminal and civil penalties. Although the legislation never passed, it provides

4

a unique window into the motivations and intentions of NOAA to dispossess this Court of its admiralty jurisdiction and to deny RMST any rights under the law of salvage.

In 2007,  NOAA once again submitted new draft implementing legislation to Congress, to be cited as "R.M.S. Titanic Maritime Memorial Preservation Act of 2007." *See* Exhibit B, attached hereto.  This version included technical fixes to the 2006 draft, for example, by recognizing the French Maritime Tribunal's in specie salvage award.  But the new draft again failed to fully recognize both RMST's unique status as salvor-in-possession and this Court's exclusive jurisdiction.  The 2007 draft also included a comprehensive set of permitting rules, and extensive enforcement mechanisms, and importantly, actually sought to expressly implement the International Agreement.  *Id.*, § 4 ("Implementation of the International Agreement").

This bill, like its predecessor, never became law.  RMST attempted to  work with NOAA to  prepare and present to Congress revised drafts that would reflect the jurisdiction of this Court and RMST in the management of the wreck.  *See, e.g.*, Dkt. No. [August 10, 2010 Periodic Report]. These drafts  never passed into law.

On January 3, 2017, the Company filed a Periodic Report informing this Court of certain actions taken by NOAA, in violation of a non-disclosure agreement, to undermine the Company's efforts at the time to sell certain of the French artifacts.  R.M.S. Titanic, Inc. Periodic Report (Jan. 3, 2017) [ECF No. 424].  After NOAA extracted confidential and proprietary information from the Company, purportedly in furtherance of its oversight role under the Covenants and Conditions, and without the Company's permission, NOAA secretly provided that confidential and proprietary information to France, in an effort to obstruct future Company efforts to sell the French artifacts. At the time, NOAA deliberately misled the Company, and breached its duties to the Company and to the Court.  The Company deferred requesting any specific relief in that Periodic Report, but

raised questions about NOAA's conduct and tactics, and questioned whether NOAA should continue to act in an oversight capacity for the Court vis-a-vis the Covenants and Conditions.

Just a few months later, NOAA similarly concealed from the Company and this Court its efforts to slip Section 113 into the massive Appropriations Act, despite full knowledge of the Company's judicially awarded property interests in the wreck site as its salvor-in-possession and the award of title to the artifacts by the Court, and despite the longstanding collaborative relationship between NOAA and the Company, as required by this Court and the Covenants and Conditions.

On May 5, 2017, President Trump signed the Department of Commerce Appropriations Act, 2017. It contains the following short provision regarding RMS Titanic:

> SEC. 113. For fiscal year 2017 and each fiscal year thereafter, no person shall conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS Titanic unless authorized by the Secretary of Commerce per the provisions of the Agreement Concerning the Shipwrecked Vessel RMS Titanic.  The Secretary of Commerce shall take appropriate actions to carry out this section consistent with the Agreement. This title may be cited as the ''Department of Commerce Appropriations Act, 2017.''

Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat 135, 192 (2017).

NOAA never informed RMST or this Court of its efforts to draft and pass into law Section 113 of the Appropriations Act at any time before it was signed by the President.  NOAA now contends that these six lines in Section 113 actually (i) implement the International Agreement and (ii) modify the fundamental admiralty jurisdiction of this Court as it pertains to the wreck site of Titanic.

On April 5, 2019, RMST informed NOAA that it intended to conduct an expedition to Titanic that summer.  ECF No. 549-5.  Though RMST had repeatedly stated on the record its position that Sec. 113 was unconstitutional, NOAA did not move to intervene in this case at that

time.  *See, e.g.* Response to NOAA Diligence Requests attached as Exhibit C, at No. 6(e); Transcript of May 3, 2018 proceedings, attached hereto as Exhibit D, at p. 30 (noting, "RMST doesn't believe that 113 is enforceable or constitutional").  RMST subsequently canceled its expedition plans for 2019.  ECF No. 549-6.

On November 22, 2019, RMST advised the Court and NOAA that it intended to conduct an expedition to the wreck during the summer of 2020, during which it would conduct scientific research and salvage.  ECF No. 580.  Supplemental filings concerning the expedition occurred on January 21, 2020, and February 13, 2020 (ECF Nos. 585, 590), and on February 20, 2020, the district court held an evidentiary hearing on these matters.

On March 27, 2020 RMST filed a Motion to Amend or Modify the Court's July 28, 2000 Order, to permit the Company to perform limited cutting into sections of the ceiling over the Marconi Suite and the detachment of artifacts.  ECF Nos. 600, 601 (the "Motion to Amend).  On April 27, 2020, NOAA, acting as *amicus*, filed a Report and Recommendation In Re: RMST's *Titanic* Expedition 2020 Research Design, effectively opposing the Company's Motion to Amend. ECF No. 602.  On May 8, 2020, NOAA filed a Status Report informing the Court that Dr. John D. Broadwater had terminated his association with RMST.  ECF No. 607.  On May 14, 2020, NOAA filed a Supplement to its Report and Recommendation.  ECF No. 610.  On May, 18, 2020, this Court entered an Order permitting RMST to "minimally…cut into the wreck, only as necessary to access the Marconi Suite, and to detach from the wreck the Marconi wireless device and associated artifacts, during an expedition to take place in August and September, 2020."  ECF No. 612 ("Order").  Ten days later, on May 28, 2020, NOAA sent RMST a letter, "regarding RMST's obligations under Section 113."  *See*, Exhibit E, attached hereto.

On June 8, 2020, thirteen years after first appearing in this case as *amicus,* three years after the passage of Section 113, over two years since RMST stated on the record its position that Section 113 was unconstitutional and unenforceable (*see, e.g.*, Exhibits C, D), and over six months after learning of RMST's plans to recover the Marconi telegraph, NOAA filed the Motion to Intervene.  ECF No. 614.

## III.    STANDARD OF REVIEW

A party who seeks to intervene in a case has two options available under the Federal Rules of Civil Procedure: intervention as of right and permissive intervention.  FED. R. CIV. P. 24.

### A.    Intervention as of Right

For intervention as of right under Rule 24(a)(2), a court must grant an applicant's motion to intervene if it complies with each of the following elements: (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties.  *Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc.,* 314 F.R.D. 180, 183 (E.D. Va. 2016) (internal citations omitted).  The party seeking to intervene bears the burden of proving that intervention is appropriate.  *Matter of Richman*, 104 F.3d 654, 658 (4th Cir. 1997).  Whether a movant has satisfied the requirements for intervention of right under Rule 24(a)(2) is committed to the sound discretion of the trial court.  *Stuart v. Huff*, 706 F.3d 345, 349-50 (4th Cir. 2013); *see also League of Women Voters of Virginia v. Virginia State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2090679, at *2 (W.D. Va. Apr. 30, 2020).

Additionally, a party seeking to intervene as of right must demonstrate that it has standing to intervene in the case.[2]  According to the Supreme Court, "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017).

### B.    Permissive Intervention

Permissive intervention is governed by Federal Rule of Civil Procedure 24(b).  Whether to allow a party to intervene under this provision of the Federal Rules is likewise committed to the discretion of the trial court.  *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003).  Permissive intervention may be granted, upon a timely motion, based on either a conditional right to intervene by federal statute, or a claim that shares with the main action a common question of law or fact.  *Id*.  Moreover, a federal governmental officer of agency may intervene, on a timely motion, if a party's claim or defense is based on "a statute or executive order administered by the officer or agency; or…any regulation, order, requirement, or agreement issued or made under the statute or executive order."  FED R. CIV. P. 24(b)(2).  On a motion for permissive intervention, the Court *must* consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  FED. R. CIV. P. 24(b)(3).

## IV.    ARGUMENT

### A.    The United States' Motion to Intervene is untimely under both Rule 24(a) and 24(b).

As the United States acknowledges in its Memorandum, this Court concluded *thirteen years ago* that the United States "has direct 'interests' in 'preserv[ing] and protect[ing] the *R.M.S.*

---

[2] The burden is on the plaintiff to demonstrate that it has standing to sue.  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).  Notably, the United States has not even addressed that it bears this burden, much less asserted that it can satisfy it.  This omission is all the more significant given the lack of any cause of action under Section 113.

*Titanic* and its artifacts as an international treasure for posterity.'"  United States' Memorandum in Support of Motion to Intervene, at \*15 (ECF No. 615) [hereinafter "U.S. Memo"] (quoting *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007)); Covenants and Conditions, Part II.K (appended to *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784 (E.D. Va. 2010)).   Despite this acknowledgement—and active involvement in the case during this period—the United States strategically waited on the sidelines until after the Court issued what the United States considered to be an unfavorable ruling to try to join this suit as a party.  This delay is unreasonable and impermissible under any standard and, accordingly, the Motion to Intervene should be denied.

Whether a motion to intervene is timely under Rule 24 is within the trial court's sound discretion.  *Alt. v. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014).  When evaluating whether a motion is timely, the court should evaluate three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion."  *Id*.  The United States cannot satisfy any of these three factors, much less all three.

First, as the Court is well aware, this case is in an advanced stage, which counsels against granting the Motion to Intervene.  In *Alt*, the Court concluded that the intervenor had waited too long, because seven other parties had already commenced, the case had been stayed once, and summary judgment briefing had already commenced.  *Id*. at 591.  Indeed, even though the case had not yet reached an ultimate decision, the Fourth Circuit agreed that the intervenor had sat on his hands for too long.  The intervenor's delay in *Alt*, however, pales in comparison to the United States' delay in this case.  While the case itself has been pending for nearly thirty years, the United

States has been formally involved in the case as *amicus* for at least thirteen years.  For this entire time, the United States has chosen to be a bystander.

The United States asserts that its motion is timely because it waited until *after* the Court issued a decision with which it disagreed, to move to intervene.  U.S. Memo, at *15.  The United States overlooks these years of case history and instead focuses on the enactment of Section 113 in 2017, and the Court's recent decision concerning RMST's request for an expedition to recover the Marconi Artifacts.  *Id.* at 14-15.  But, even under the United States' theory, its Motion to Intervene still comes too late.  As an initial matter, the United States admits that it declined to intervene until after the Court issued a decision that it arguably could have litigated as a party: "When this Court issued an order that allowed RMST to move forward with activity in contravention of Sec. 113's legal requirements, only then did intervention become *necessary*."  *Id.* at *15.  The United States does not cite to a single case suggesting that an intervenor can wait until the case is in such an advanced stage to inject itself into the case.  Additionally, there is nothing in the caselaw to suggest that a party must wait until it is *necessary* for it to intervene in order to make its motion.  Indeed, under this theory, any intervenor could simply wait until the court issues an unfavorable judgment and avoid the cost and inconvenience of actually litigating the merits of a matter until an appeal, which is exactly what the United States has done here.

The United States' delay is even more inexcusable here, because it has been clear for *years* that RMST has contested both the enforceability and constitutionality of Section 113.  *See* Exhibits C, D.  But any meaningful challenge to the statute was hindered by the fact that the United States decided to stay on the sidelines of the litigation.  Indeed, as the Court recently noted in its May 17, 2020 Opinion: "At this point, NOAA appears as an amicus, not as a formal party at issue in this case, and it has not sought to enforce its approval power or otherwise block the expedition."  Order,

11

at *10.  Despite being aware of the applicability of Section 113 to these proceedings, and despite being on notice of another potential expedition to recover the artifacts since 2019, the United States has attempted to sidestep any constitutional review of Section 113 or the International Agreement by this Court by waiting until an order issued that it could appeal and address for the first time before the Fourth Circuit.  The United States' voluntary decision to wait until the case was in such an advanced stage weighs heavily against granting its motion to intervene.

Second, in addition to the prejudice to RMST's business described in Section III.C, *infra*, the United States' delay has more acutely prejudiced RMST—in addition to causing delay and wasting judicial resources—as a practical matter in this litigation.  In *Alt*, the Fourth Circuit noted that causing delay in the proceedings and forcing the parties to expend "extra effort" are sufficient to show prejudice.  *Alt*, 758 F.3d at 591.  As the United States' recent Motion for Reconsideration (ECF No. 616) makes plain, it is effectively asking for an opportunity to relitigate a matter that it could have sought to litigate as a party several years ago.  This not only wastes RMST's resources, but the Court's time and resources as well.

Third, the Motion to Intervene fails to explain why the United States waited until the last possible second to file its Motion to Intervene, despite recognizing that the United States has been on notice for *years*.  Indeed, the United States' candor on the reason for its delay is surprising, because it is fatal to its Motion to Intervene.  Specifically, the United States asserts that "[w]hen this Court issued an order that allowed RMST to move forward with activity in contravention of Sec. 113's legal requirements, only then did intervention become necessary."  U.S. Memo, at *15. The United States thus admits that it willingly waited on the sidelines of a motion in which it asserts it had an interest, and only decided to enter the fray because the Court issued a ruling it did not like.  This is exactly the type of litigation strategy that the Fourth Circuit has concluded

12

warrants *denying* a motion to intervene.  In *Alt*, the intervenor made the strategic decision to wait and hope that the district court would grant the defendant's motion to dismiss and then waited until the parties had begun briefing on summary judgment to intervene.  *Alt*, 758 F.3d at 591-92. According to the Fourth Circuit, "[s]uch deliberate forbearance understandably engenders little sympathy."  *Id*. at 591.

The United States has not pointed to a single case that excuses its delay.  Indeed, the United States' excessive delay distinguishes it from other cases in this District in which the Court allowed the intervenor to enter the suit.  *See, e.g.*, *Penn-America Insurance Co. v. White Pines, Inc.*, No. 3:18-cv-650, 2019 WL 418859, at *3 (E.D. Va. Feb. 1, 2019) (granting motion to intervene filed three months after complaint was filed); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 560-61 (E.D. Va. 2018) (concluding motion to intervene was timely when filed within two months of discovering that litigation may implicate interests); *Lumber Liquidators*, 314 F.R.D. at 184 (allowing intervention during initial pleading phase); *United States v. Virginia*, 282 F.R.D. 403, 405 (E.D. Va. 2012) (granting motion to intervene before parties had filed initial pleadings); *Cooper Technologies, Co. v. Dudas*, 247 F.R.D. 510, 516 (E.D. Va. 2007) (granting motion to intervene filed by intervenor "as soon as they were aware of the existence of this matter"); *United States v. Henry*, 519 F. Supp. 2d 618, 621-22 (E.D. Va. 2007) (granting motion to intervene filed less than two months after complaint was filed); *Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.*, 117 F. Supp. 2d 508, 510, 514-15 (E.D. Va. 2000) (granting motion to intervene four months after complaint was filed).

The United States has failed to establish that its intervention – either as of right or permissive – is timely under Rule 24 as applied by the Fourth Circuit or this Court.  Accordingly, its Motion to Intervene should be denied.

13

**B.**     **The United States' Motion to Intervene should also be denied, because it does not have a legally protectable interest in the *res*.**

The United States' proposed Intervenor's Verified Complaint for Declaratory and Injunctive Relief (the "Intervenor's Complaint") (ECF No. 614-1) demonstrates that the United States' asserted causes of action against RMST—to the extent any exist at all—are not suited for an *in rem* admiralty proceeding, because the terms of Section 113 are directed towards entities, not the salvaged property.  Specifically, the Intervenor's Complaint alleges a claim for declaratory relief and a claim for injunctive relief, both of which are *in personam* actions against RMST.

To demonstrate that a party has sufficient interest to intervene as of right under Rule 24(a), the intervenor must show that it "stand[s] to gain or lose by the direct legal operation of the district court's judgment on [the plaintiff's] complaint."  *Teague v. Baker*, 931 F.2d 259, 261 (4th Cir. 1991).  How this plays out in the unique context of an *in rem* salvage proceeding was the subject of a recent Eleventh Circuit Case, in which a proposed intervenor was permitted to intervene concerning its claims to the *res* as of right, but not necessarily for supplemental *in personam* claims.  *Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1296 (11th Cir. 2017) ("Gold Hound should have been allowed to intervene in this *in rem* proceeding. However, that a would-be intervenor has a sufficient interest for some issues in a case does not necessarily mean that it has an interest in all of the issues.").  Thus, the substance of both the action that the intervenor seeks to join and the claims that the intervenor seeks to raise should be considered by the Court.

The Declaratory Judgement Act only expanded the range of remedies that a court may issue; it did not create a cause of action where none would otherwise exist.  *Elec. Motor & Contracting Co., Inc. v. Travelers Indem. Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017) ("The DJA provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an

independent cause of action."); *Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.,* 86 F. Supp. 3d 464, 471 (E.D. Va. 2015), *aff'd sub nom. Campbell v. Am. Int'l Grp., Inc.*, 616 F. App'x 74 (4th Cir. 2015) ("[T]o be eligible for a declaratory judgment, [Plaintiff] must first identify an underlying right for which she seeks a declaration."); *see also Duke Energy Progress, LLC v. Roanoke River Basin Ass'n,* No. 4:17-CV-00032, 2017 WL 3326970, at *3 (W.D. Va. Aug. 3, 2017) ("The Declaratory Judgment Act, however, does not create an independent cause of action." (citing *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011))). A party's invocation of the Declaratory Judgment Act alone does not *create* a claim for relief, if there is no underlying cause of action.

Typically, Congress creates a right of action—be it public (enforceable by a governmental actor) or private (enforceable by a private citizen)—when it enacts a statute. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."); *Nat'l R. R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453, 457 (1974) ("In light of the language and legislative history of s 307(a), we read it as creating a public cause of action, maintainable by the Attorney General, to enforce the duties and responsibilities imposed by the Act."). Courts are hesitant to create causes of action where Congress was silent. *Sandoval*, 532 U.S. at 286-87; *Campbell*, 86 F. Supp. 3d at 471 ("When a plaintiff alleges that a private party violated a federal regulation, the right to sue based on that violation must come from either explicit or implied Congressional authorization for a private right of action.").

Here, the sum total of the entire statutory scheme, from the 2017 Department of Commerce Appropriations Act, that the United States seeks to enforce via the Declaratory Judgement Act, states:

> For fiscal year 2017 and each fiscal year thereafter, no person shall conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic* unless authorized by the Secretary of Commerce per the provisions of the Agreement Concerning the Shipwrecked Vessel RMS *Titanic*. The Secretary of Commerce shall take appropriate actions to carry out this section consistent with the Agreement.

Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat 135, 192 (2017).

Conspicuously absent from this brief statutory text is any authorization to enforce either this statute or any provision of the International Agreement. The United States' Verified Complaint, however, unilaterally seeks an end run around this lack of Congressional action by filing a declaratory judgment action. Neither Section 113 itself nor the Declaratory Judgment Act expressly authorizes the United States to take such an action.

Even if the United States could use the Declaratory Judgment Act as a substitute for its lack of statutory enforcement authority, it would be misplaced in this *in rem* salvage case. The purpose of salvage case, like any *in rem* action is to enforce a right to *things*, as opposed rights of people. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir. 1999). Likewise, the law of salvage is uniquely positioned to "protect[] the public interest in the historical and cultural value of the shipwreck sites," as this Court has done for years. Historic Shipwrecks and "Treasure" Salvage, 2 ADMIRALTY & MAR. LAW § 16:7 (6th ed.) (citing *Yukon Recover, L.L.C. v. Certain Abandoned Property*, 205 F.3d 1189, 1196-97 (9th Cir. 2000)). Section 113, however, makes clear that it is directed towards the regulation of *persons* who take certain actions concerning the *Titanic* wreck site. Indeed, it could not be otherwise, because the wreck site is in international waters closer to the Canadian province of Newfoundland than any United States territorial waters. Thus, to the extent the United States believes that it needs to exercise its enforcement powers regarding the potential expedition, those are best used in an adversarial, *in personam*, action against RMST.

In this *in rem* case, the United States' interests are appropriately represented through its status as an *amicus curiae*. Indeed, in cases where intervention was not considered appropriate, the district court has permitted parties to participate as *amici*. *Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013) (stating that intervenors retain ability to participate in case as *amici* and that this avenue provides a more efficient means for an entity to contribute to a case); *McHenry v. Comm'r of Internal Revenue*, 677 F.3d 214, 227 (4th Cir. 2012) ("Numerous cases support the proposition that allowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention."); *see also N.C. State Conf. of NAACP v. Cooper*, 332 F.R.D. 161, 168 n.5 (M.D.N.C. 2019); *United States v. Bayer Cropscience LP*, No. 2:15-cv-13331, 2018 WL 3553413, at *10 (S.D. W. Va. July 24, 2018). Here, as the United States as demonstrated and the Court has witnessed over several years, the United States has actively participated in this case as an *amicus*, just as the Court originally envisioned. *R.M.S. Titanic, Inc.*, 531 F. Supp. 2d at 693. That this Court ultimately issued an opinion with which the United States disagrees is no basis to change that status, especially where the United States intentionally waited on the sidelines for years.

Accordingly, the United States has not demonstrated a sufficient interest in the subject matter of this *in rem* proceeding to warrant a change to its status quo as an *amicus* and elevate it to the status of a party.

### C.    The United States Motion to Intervene under Rule 24(b)(3) should be denied because it would unduly delay and prejudice RMST's rights.

The "Emergency" motion that NOAA now pursues is not the result of neglect or oversight on its part, but rather the product of careful strategy employed by NOAA to undermine the operational viability of the expedition. The cumulative effect of NOAA's behind-the-scenes activity as documented in the supporting materials filed in RMST's recent Motion for Extension

17

of Time, ECF No. 620-1, in conjunction with this last "emergency" Motion to Intervene, has threatened RMST's ability to proceed with the expedition.

By design, the pendency of this last-minute Motion to Intervene has created legal uncertainty for RMST following the Court's ruling on May 18, 2020.  The United States' instant motion has forced RMST to entertain last minute changes to its already complex expedition plan to avoid any potential issues resulting from the  Motion to Intervene.  The logistics involved in preparing an expedition like this are enormous and unsuitable to last-minute planning.  The delay by NOAA in filing the instant motion has caused actual and concrete prejudice to RMST.  Until the Court resolves the Motion to Intervene, RMST will continue to be prejudiced, persisting in a state of operational purgatory.   This remains true for whenever RMST may embark on the expedition.

The prejudice caused by the delay has also created a significant hardship for RMST, and its affiliates, as they struggle during the COVID-19 pandemic. The companies' exhibitions have been closed to the public for the last three months, and the expedition, if it takes place, would offer the company a unique commercial opportunity with unparalleled corporate visibility during this unprecedented time.  Moreover, as delays persist, the integrity of the wreck site (and specifically the ceiling above the silent room where the Marconi sits) continues to deteriorate.  For so long as the United States remains adverse to RMST in these proceedings, the business and operational viability of the expedition will be threatened and RMST will continue to endure prejudice.

## V.      CONCLUSION

WHEREFORE, RMST respectfully requests that the United States' Motion to Intervene be denied.

Respectfully submitted,

**RMS TITANIC, INC.**

By Counsel:

_____/s/_____
Ryan V.P. Dougherty, VSB # 78444
Brian A. Wainger, VSB #38476
William R. Poynter, VSB #48672
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175
E-mail: rdougherty@kaleolegal.com
E-Mail: bwainger@kaleolegal.com
E-mail: wpoynter@kaleolegal.com

David G. Barger, VSB #21652
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1300
Fax: (703) 749-1301
Email: Bargerd@gtlaw.com

*Counsel for R.M.S. Titanic, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2020, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

_____/s/_____
Ryan V.P. Dougherty, VSB # 78444
Brian A. Wainger, VSB #38476
William R. Poynter, VSB #48672
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Tel: (757) 965-6804
Fax: (757) 304-6175
E-mail: rdougherty@kaleolegal.com
E-Mail: bwainger@kaleolegal.com
E-mail: wpoynter@kaleolegal.com

*Counsel for R.M.S. Titanic, Inc.*

20