**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**R.M.S. TITANIC, INC.,**
**successor-in-interest to**
**Titanic Ventures, limited partnership,**
          **Plaintiff,**

**v.**                                                   **Civil Action No. 2:93cv902**

**THE WRECKED AND ABANDONED VESSEL,**
**ITS ENGINES, TACKLE, APPAREL,**
**APPURTENANCES, CARGO, ETC., LOCATED**
**WITHIN ONE (1) NAUTICAL MILE OF A POINT**
**LOCATED AT 41 43' 32'' NORTH LATITUDE**
**AND 49 56' 49'' WEST LONGITUDE,**
**BELIEVED TO BE THE R.M.S. TITANIC**
**in rem,**
          **Defendant.**

**UNITED STATES' MEMORANDUM IN SUPPORT OF UNOPPOSED**
**MOTION TO INTERVENE**

### I.      INTRODUCTION

Section 113 of the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 (May 5, 2017) ("Sec. 113"), "prescribe[s] specific rules," *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2278 (2019), that "speak directly to a question," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 28, 31 (1990), concerning the scope of permissible activities at *Titanic*, a wreck of unquestioned historic and cultural significance.  Specifically, Sec. 113 requires persons or entities subject to the United States' jurisdiction that seek to "conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic*" to obtain an authorization for such activities from the Secretary of Commerce.  *Id.*  Sec. 113 authorizations are issued by the NOAA Administrator "per the provisions" of and "consistent with" the Agreement Concerning the Shipwrecked Vessel R.M.S. Titanic and its Annex Rules

("International Agreement" or "Agreement"). 19 T.I.A.S. 1118; ECF No. 491 (delegation of authority). Those governing legal authorities modify the general maritime law of salvage as it pertains to *Titanic*. *See Detroit Trust Co. v. Barlum S. S. Co.,* 293 U.S.  21, 42 (1934) ("The framers of the Constitution did not contemplate that the maritime law should remain unalterable."); *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 641 (4th Cir. 2000) (observing that "the common law of admiralty must be developed consonant with federal statutes").

RMST is not free to disregard this validly enacted federal law, yet that is its stated intent. In a Periodic Report filed June 13, 2023, RMST advised the Court that it will undertake a *Titanic* expedition in 2024 ("2024 Expedition"), during which it will conduct "research and recovery" activities that fall within the scope of conduct that Sec. 113 regulates. ECF No. 686 at 2.  RMST states that it will "work collaboratively" with NOAA on its plans for the 2024 Expedition, but it does "not intend to seek a permit under Section 113," *id.* at 3, because (as it has stated in previous filings with this Court) it believes Sec. 113 is not "enforceable or constitutional." ECF No. 625-4 at 3.

Congress possesses the "paramount power" to determine the maritime law, *The Thomas Barlum*, 293 U.S. 21, 43 (1934), and when it legislates in that area, as it has with Sec. 113, courts must "look primarily to these legislative enactments for policy guidance" and keep within the limits and boundaries Congress has established. *Miles*, 498 U.S. at 27. To ensure that RMST's activities at *Titanic* are consistent with federal law, to protect the United States' interest in the proper implementation of and RMST's compliance with that law, to provide *Titanic* the protections Congress granted it, and to ensure the United States' obligations under the

International Agreement are not impaired, the United States moves to intervene as of right, or alternatively, with the Court's permission.

The United States seeks to intervene in this action for all purposes necessary to protect its interests in the lawful application of Sec. 113 and its legally binding obligations under the International Agreement, including:

1. To seek a declaratory judgment that Sec. 113 modifies general maritime law as it pertains to *Titanic* and establishes the applicable substantive rules of decision for salvage operations at *Titanic* and its wreck site; and that RMST is required to comply with Sec. 113 and obtain an authorization from the Secretary of Commerce before conducting "any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the *RMS* Titanic;" and,

2. To enjoin RMST from conducting "any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic*," including the 2024 Expedition, absent the issuance of an authorization from the Secretary of Commerce pursuant to Sec. 113.

## II.       BACKGROUND

**A.**       On April 15, 1912, *Titanic* struck an iceberg roughly 400 miles off the coast of Newfoundland in international waters.  Within three hours, *Titanic* broke in two and sank to the ocean floor approximately 2.5 miles below, scattering thousands of artifacts in a debris field between the two pieces of the hull and sending more than 1,500 passengers and crew to their death.  *Titanic's* location remained a mystery until 1985, when it was discovered by a joint United States-French expedition.

Salvage operations by RMST's predecessor began in 1987.  The first tranche of artifacts, about 1,800 items, was taken to France.  In 1993, RMST brought additional recovered artifacts to the Eastern District of Virginia and commenced this admiralty action.  ECF No. 1.  The district court assumed constructive *in rem* jurisdiction over the wreck and wreck site, and awarded RMST exclusive salvage rights in June 1994.  ECF No. 37; *see also R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 951-53 (4th Cir. 1999).  Over the next ten years, until 2004, RMST conducted additional expeditions and recovered, in total, approximately 5,500 artifacts.

B.     In 1986, shortly after *Titanic's* discovery, Congress enacted the RMS Titanic Maritime Memorial Act of 1986 (the "1986 Memorial Act"), 16 U.S.C. §§ 450rr *et seq.*, to, among other purposes, "encourage international efforts to designate the R.M.S. Titanic as an international maritime memorial to those who lost their lives aboard her in 1912."  *Id.* § 450rr(b)(1).  Congress expressly found that *Titanic* "is of major national and international cultural and historical significance, and merit[ed] appropriate international protection," *id.* § 450rr(a)(3), and it was Congress' sense that "no person should conduct any such research or exploratory activities which would physically alter, disturb, or salvage the R.M.S. Titanic" pending adoption of an international agreement or implementation of international guidelines that address activities aimed at *Titanic*, *id.* § 450rr-5.

To further Congress' express finding that *Titanic* should be "designated as an international maritime memorial," *id.* § 450rr(a)(1), the 1986 Memorial Act directed the NOAA Administrator to consult with interested nations to develop international guidelines for research on, exploration of, and if appropriate, salvage of the *Titanic*, and directed the Secretary of State to enter into negotiations with such nations to develop an international agreement for that same

purpose and for *Titanic's* protection.  *Id.* at §§ 450rr-3, 450rr-4.  Both of these objectives were achieved.

In 2001, after a public notice and comment period, and in consultation with the United Kingdom, France, and Canada, the NOAA Administrator issued "Guidelines for Research, Exploration and Salvage of RMS *Titanic*" to "guide the planning and conduct" of research, exploration and, if appropriate, salvage of *Titanic*.  66 Fed. Reg. 18905 (Apr. 12, 2001) ("NOAA Guidelines").  The NOAA Guidelines concluded that "it [was] appropriate to treat RMS Titanic as a gravesite," and that activities at the wreck must have the "minimum adverse impact" on *Titanic* and its artifacts.  66 Fed. Reg. at 18907, 18912.  To that end, the NOAA Guidelines favor non-destructive and non-intrusive methods directed at the wreck and wreck site, discourage entry into the hull, and set forth a "preferred policy" and "first option" for the protection of the wreck and wreck site as "*in situ* preservation" unless "justified by educational, scientific, or cultural interests."  *Id.*

Negotiation of the International Agreement paralleled development of the NOAA Guidelines and concluded in 2000.  19 T.I.A.S. 1118.  The United Kingdom signed and accepted the Agreement in 2003. The United States signed the Agreement in 2004.

In 2017, Congress enacted Sec. 113, which provides:

> For fiscal year 2017 and each fiscal year thereafter, no person shall conduct any research, exploration, salvage, or other activity that would physically alter or disturb the wreck or wreck site of the RMS *Titanic* unless authorized by the Secretary of Commerce per the provisions of the Agreement Concerning the Shipwrecked Vessel RMS *Titanic* [the International Agreement].  The Secretary of Commerce shall take appropriate actions to carry out this section consistent with the Agreement.

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 113 (May 5, 2017). Sec. 113 provided the necessary implementing legislation to enable the United States to deposit its

instrument of acceptance with the United Kingdom, which triggered the International

Agreement's entry into force on November 18, 2019. *See* ECF Nos. 581, 581-1.

  As contemplated by Congress in the 1986 Memorial Act, the International Agreement

recognizes *Titanic* as a memorial to those lost and "an underwater historical wreck of exceptional

international importance having a unique symbolic value."  Int'l Agr. Art. 2. Noting that further

dives to the wreck site, "if not properly regulated," create a risk of disturbing the "final resting

place" of those lost "and the integrity of the wreck and its remaining artifacts," *id.*, Preamble, the

Agreement imposes a number of obligations on Parties to the Agreement.  Among them is a

requirement that Parties regulate activity at *Titanic* by their nationals and vessels "through a

system of project authorizations" and in accordance with the "Rules Concerning Activities

Aimed at the RMS Titanic and/or Its Artifacts" ("Annex Rules").  Int'l Agr., Art. 1(c), Art. 3,

Art. 4, and Annex Rules. The Agreement also imposes consulting obligations on Parties. *Id.* Art.

5, Art. 8.  For example, Parties are obligated to timely inform, consult with, and consider the

views of other Parties with respect to any request for a project authorization to conduct activity at

*Titanic*.  Int'l Agr., Art. 5.

  Sec. 113 accomplishes what the International Agreement obligates the United States to

do, fulfills Congress's wishes as stated in the 1986 Memorial Act, and provides the wreck and

wreck site (as well as recovered artifacts) an additional layer of protection, in addition to that

provided by the Court in this salvage case.  *See* 84 Fed. Reg. 38,012 (Aug. 5, 2019) (describing

how NOAA intends to implement Sec. 113 and coordinate its actions with the district court);

ECF Nos. 564 and 564-2; *see also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F.

Supp. 2d 691 (E.D. Va. 2007) (the district court noting that the International Agreement "will

lead to increased protection of the *R.M.S Titanic*").

Sec. 113 charges the NOAA Administrator with responsibility over a "system of project authorizations" that regulate activity at *Titanic* "that would physically alter or disturb the wreck or wreck site of the RMS Titanic," and requires that such authorizations be reviewed and acted on "consistent with" and "per the provisions" of the International Agreement and the Annex Rules.  Thus, Sec. 113 "regulate[s]" "entry into the hull sections of RMS *Titanic* so that they [the hull sections], other artifacts and any human remains are not disturbed," and "regulate[s]" activities aimed at artifacts "found outside the hull of the wreck," "so that all such activities are, to the maximum extent practicable, conducted in accordance with the [Annex] Rules."  Int'l Agr., Art. 4, ¶¶ 1(a) and (b).  Further, Sec. 113, through incorporation of the International Agreement's Annex Rules, sets forth a "preferred policy" for activity at the wreck of "*in situ* preservation" unless justified by "educational, scientific or cultural interests," encourages non-destructive and non-intrusive methods over those involving "recovery or excavation," and requires that any contemplated activities should have the "minimum adverse impact" on *Titanic* and its artifacts.  Annex Rules, Sec. I.

**C.**     Prior orders and rulings in this case have recognized the United States' independent interest in the protection of *Titanic*.  For example, in 2007, this Court requested that the United States become involved in the case, as *amicus*, to review RMST's actions as salvor. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007). In doing so, this Court found that, in addition to ensuring RMST complied with the Court's orders, "additional oversight [by the United States] is necessary in order to preserve and protect the R.M.S. Titanic and its artifacts as an international treasure for posterity, and the United States' efforts and interests in this regard."  *Id.*

Similarly, in 2010 the Court granted RMST an *in specie* award of the artifacts subject to Revised Covenants and Conditions. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011). The Court directed RMST to develop these covenants and "with regard to [their] content" required (among other things) that they "must ensure . . . reasonable oversight by NOAA . . . to protect the United States' interests in the *Titanic* wreck site and the artifacts recovered therefrom." *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784, 792 (E.D.Va. 2010). To that end, the covenants expressly acknowledge that NOAA is "the federal agency that represents the public interest in TITANIC [artifact] Collections" and that "NOAA's authority to represent the public interest in this matter is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines." *Id.* at 809-824.

**D.** RMST has been advised of Sec. 113's requirements on multiple occasions, including as recently as April 24, 2023. ECF No. 690-1; *see also* ECF Nos. 430, 549-5, 602 (at 16 & n.16). RMST has also been advised that if it intended to "draw into question the constitutionality of a federal statute," Fed. R. Civ. P. 5.1(a), then it was required to formally notify the Attorney General as set forth in Federal Rule of Civil Procedure 5.1(c). ECF No. 690; *see also* 28 U.S.C. § 2403(a).

RMST does not, however, acknowledge that Sec. 113 applies to its activities at *Titanic*, and has long objected to any effort to regulate activity aimed at *Titanic*. *See e.g.* ECF No. 154 (In a 2000 lawsuit, RMST sought a declaration that efforts to implement the 1986 Memorial Act, as Congress directed, "unlawfully interfere[ed]" with RMST's salvage rights.);[1] ECF No. 429 at

---

[1] The Court dismissed the action as not ripe, stating that RMST could renew its motion at such time as the International Agreement had been implemented. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2000 WL 1946826 (E.D.Va. Sep. 15, 2000).

5 (In 2017, after Sec. 113 became law, stating RMST would address in a "separate proceeding . . . the legal implications [of Sec. 113] . . . on RMST and this Court's continuing jurisdiction over the wreck and wreck site. "); ECF No. 625-4 at 3 (In 2018, stating "For the record, R.M.S.T. doesn't believe that 113 is enforceable or constitutional."); ECF No. 605 at 13 (In 2020, stating that reference to Sec. 113's requirements "invites the Court to abdicate its constitutional authority and relinquish its jurisdiction to NOAA," and that it would "take its orders from this Court, not from NOAA.").[2]  At no time has RMST invoked the procedures set forth in Federal Rule of Civil Procedure 5.1(a) for calling into question the constitutionality of a federal statute.

On June 13, 2023, RMST filed its Periodic Report stating that it expects to conduct a "research and recovery expedition" in or around May 2024. ECF No. 686 at 2.  The expedition's objectives include: (i) imaging of the exterior and interior of the wreck, with interior imaging to occur using a remotely operated vehicle (ROV) via "penetrat[ion] of the hull" through openings caused by previous deterioration; (ii) "targeted artifact recovery of items in the debris field;" and (iii) potential recovery of "free-standing objects inside the wreck . . . but only if such objects are not affixed to the wreck."  *Id.*  RMST asserts that "at this time [it] does not intend to cut into the wreck or detach any part of the wreck," and would only do so with further approval of the Court. *Id.*  RMST has not filed "detailed plans" with the Court or NOAA regarding the 2024

---

[2] In 2020, RMST sought authority for a 2020 Expedition that entailed cutting into the wreck and detaching artifacts from within (the Marconi Wireless). ECF Nos. 580, 585, 590, 601-1. On May 18, 2020, the Court conditionally authorized the conduct over NOAA's opposition, but did not condition its order on RMST's compliance with Sec. 113, nor consider whether Sec. 113 was applicable. ECF No. 612 at 10-11. The matter subsequently found its way to the Fourth Circuit, *see* ECF No. 614 (motion to intervene); ECF Nos. 616 (motion for reconsideration); ECF No. 618 (appeal), which vacated the Court's order, and remanded the matter to the district court explaining that it was doing so "[b]ecause the district court's orders were conditional and the condition was not satisfied and because the court did not, in issuing its orders, resolve the United States' motion to intervene and address its argument for requiring approval under § 113." *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, No. 20-1936 (4th Cir. Mar. 5, 2021).

Expedition, ECF No. 686 at 3, nor is it obligated to do so under this Court's order any sooner than at least 90-days prior to the expedition.  ECF No. 540 at 4.

The activities RMST describes in its Periodic Report are likely to "physically alter or disturb" the wreck or wreck site, will involve "entry into the hull sections," are "aimed at artifacts . . . found outside the hull," and are contrary to the "preferred management technique" for *Titanic* of "*in* situ preservation."  As such, the activities squarely fall within the scope of activities regulated by Sec. 113 and the incorporated International Agreement and its Annex Rules.  While RMST states that it will "work collaboratively" with NOAA on its plans, it does "not intend to seek a permit under Section 113."  ECF No. 686 at 3.

## III.    DISCUSSION

A district court is "'entitled to the full range of reasonable discretion'" in evaluating whether Rule 24 intervention should be allowed.  *Com. of Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (quoting *Rios v. Enterprise Ass'n Steamfitters Local U. # 638 of U. S.*, 520 F.2d 352, 355 (2d Cir. 1975)).  However, "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process."  *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (cleaned up).  Sec. 113 modified maritime law as it pertains to activities aimed at *Titanic*, and it applies to the conduct set out in RMST's June 13, 2023, Periodic Report.  Absent intervention by the United States to clarify the application of Sec. 113 in this matter, RMST will be able to avoid the review and approval process Sec. 113 requires; *Titanic* will be deprived of the protections Congress granted it; the Secretary of Commerce will be prevented from fulfilling her responsibilities under Sec. 113, as directed by Congress; and the United States may be unable to satisfy its obligations under the International Agreement.

A.  **The United States is entitled to intervene as of right.**

Upon "timely motion," a court "must permit" intervention if the movant "is given an unconditional right to intervene by a federal statute," Fed. R. Civ. P. 24(a)(1), or "[c]laims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest," Fed. R. Civ. P. 24(a)(2).  Intervention of right under Rule 24(a)(2) thus requires a showing that: (1) the motion is timely; (2) the movant has an interest in the "subject matter of the action;" (3) the movant's interest "would be impaired by" the action; and (4) the movant's interest in the action is not "adequately represented" by existing parties.  *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991); *Gould v. Alleco*, Inc., 883 F.2d 281, 284 (4th Cir. 1989); *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 120 (4th Cir. 1981).

   1. *The United States has a right to intervene under Rule 24(a)(1).*

Federal law provides the United States an unconditional right to intervene under these circumstances.  *See* Fed. R. Civ. P. 24(a)(1).  Under 28 U.S.C. § 2403(a), in "any action, suit or proceeding in a court of the United States … wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question," the court "shall permit the United States to intervene."  The statute also provides that the United States "shall, subject to the applicable provisions of law, have all the rights of a party" and must be permitted to "present[] evidence, if evidence is otherwise admissible in the case, and … argument on the question of constitutionality."  *Id.*  The Federal Rules, in turn, provide that the United States "may intervene within 60 days after" the court provides a mandatory notice to the Attorney General that "a statute has been questioned."  Fed. R. Civ. P. 5.1(b), (c).

Since Sec. 113's enactment, RMST has questioned its constitutionality. *See* ECF Nos. 429 at 5, 625-4 at 3, 605 at 12-14.  Further, RMST's recent Periodic Report unambiguously reveals its intent to conduct an expedition in the near future involving activity regulated by Sec. 113, but that it will not abide by this statute.  ECF No. 686.  This creates a ripe controversy regarding Sec. 113's constitutionality which triggers the United States' right to intervene under Rule 5.1(c) and 28 U.S.C. § 2403(a).[3]  Further, because RMST has not provided a Rule 5.1 notice that it questions the constitutionality of Sec. 113, and the Attorney General has not been served the mandatory certification under Rule 5.1 or § 2403(a), the 60-day period in which intervention is permitted under Rule 5.1 has not yet commenced.  The United States' motion must be considered timely. *Cf., e.g.*, Order, *R.M.S. Titanic, Inc. v. United States*, No. 20-1684 (4th Cir.), ECF No. 28 (explaining that RMST's "motion for modification may … be considered by the court under circumstances then presented by RMST and after considering the United States' pending motion to intervene and its argument for requiring approval under § 113.").

2. *The United States is entitled to intervene under Rule 24(a)(2).*

The United States independently satisfies the requirements to intervene as of right under Rule 24(a)(2).

**a.**  To begin, the government's motion under Rule 24(a)(2) is timely in its own right. "Timeliness is to be determined from all the circumstances." *Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365–66 (1973); *Atkins v. State Bd. of Ed. of N. C.*, 418 F.2d 874, 876 (4th Cir. 1969) ("[T]imeliness is not an absolute. It should be evaluated in

---

[3] This controversy is ripe even though RMST has not yet submitted a detailed research plan for the 2024 Expedition, *see* ECF No. 686 at 3 (noting its plans to "provide this Court with detailed plans for its Expedition 2024"). An interest is still a protectable interest even if it is "contingent on the outcome of other litigation." *Teague*, 931 F.2d at 261.  The contingency of a yet-to-be-produced, or court-approved, expedition plan does not take away from RMSTs express statement that it will ***not*** comply with Sec. 113 for any expedition, and its repeated contentions that Sec. 113 is unconstitutional and cannot dictate its actions at the wreck. *E.g.* ECF Nos 605 at 13-14.

light of all the circumstances.").  Relevant considerations under Rule 24(a)(2) are the stage of the proceedings, whether prejudice would result, and the reasons for any delay in filing the motion. *Gould,* 883 F.2d at 286.  Timeliness is not as rigorously enforced when intervention of right is at issue. *Scardelletti v. Debarr*, 265 F.3d 195, 203 (4th Cir. 2001).

On June 13, 2023, RMST advised the Court of its intent to conduct the 2024 Expedition, possibly as early as May 2024.  ECF No. 686 at 2-3.  RMST has not submitted "detailed plans" to apprise the Court or NOAA of the precise activities it seeks to conduct during the 2024 Expedition, *id.*, nor is it even obligated to do so under the district court's standing order any sooner than at least 90-days prior to the commencement of the expedition, ECF No. 540 at 4. This motion is being filed approximately eight months before the earliest possible time for the 2024 Expedition, ample time to address the legal questions presented and to resolve the live dispute regarding Sec 113's application to RMST's planned activities.  Moreover, RMST does not object to intervention and, therefore, presumably recognizes that it is not prejudiced by intervention at this time.

In addition, as discussed above, although RMST has long questioned Sec. 113's and the International Agreement's constitutionality, it has never provided a Rule 5.1(a) notice formally stating its intent to question the constitutionality of Sec. 113, nor has a certification been served on the Attorney General under Rule 5.1(b) or 28 U.S.C. § 2403(a), triggering a 60-day period in which to intervene. Thus, even setting aside § 2403(a) and Rule 5.1's independent grant of intervention rights, they underscore that the United States motion should not be found untimely under Rule 24(a)(2).

Finally, on May 21, 2021, this Court issued an Order stating that the United States' prior "Emergency Motion to Intervene and, if Granted, an Extension of Time to File an Appeal" was

moot as a result of the Fourth Circuit's ruling in *R.M.S. Titanic, Inc. v. United States*, No. 20-1684, E.C.F. No. 39 (4th Cir. Mar. 5, 2021), but that "pursuant to the Circuit Court's directive, should the United States wish to pursue intervention in this case at this time or at a later time, if and when RMST seeks to pursue a future salvage operation, it may file a renewed motion to that effect based on the current posture of the case at the time."  ECF No. 662 at 2-3.  RMST only recently announced its intent to pursue a future salvage operation, and the United States is timely seeking to intervene based on the current posture of the case.

 **b.**  The United States likewise has "a significantly protectable interest" in the subject matter of the litigation.  *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States,* 400 U.S. 517, 531 (1971)).  An interest is significantly protectable if it "bear[s] a close relationship" to the underlying claims, *Dairy Maid Dairy, Inc. v. United States*, 147 F.R.D. 109, 111 (E. D. Va. 1993), and the movant "stand[s] to gain or lose by the direct legal operation" of action the district court may take.  *Teague*, 931 F.2d at 261.

 As discussed above, the United States has a protectable interest in the *Titanic* wreck, wreck site and its artifacts that arises by virtue of the 1986 Memorial Act, the NOAA Guidelines, the International Agreement, the Revised Covenants and Conditions, and Sec. 113.  The 1986 Memorial Act, the International Agreement and Sec. 113, in particular, "establish[] … a limited trust relationship to serve a narrow purpose" – to protect *Titanic* in the public interest from activities that would "physically alter or disturb the wreck or wreck site."  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (finding that statutes can establish a trust relationship).  By virtue of these legal authorities, the United States has a direct interest in *Titanic* on behalf of the public interest, to oversee and regulate how this unique and historic wreck is managed.

In addition, as also discussed above, this Court's prior rulings have recognized that the United States has direct "interests" in "preserv[ing] and protect[ing] the *R.M.S. Titanic* and its artifacts as an international treasure for posterity," *R.M.S. Titanic, Inc.*, 531 F. Supp. 2d at 693, an interest that is derived from and consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines," *R.M.S. Titanic, Inc.*, 742 F. Supp. 2d at 809-24.

And finally, the United States has a sovereign interest in ensuring and coordinating the proper enforcement of its laws. *See Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (explaining that the United States suffers a cognizable "injury to its sovereignty arising from violation of its laws"); *Hollingsworth v. Perry*, 570 U.S. 693, 709–10 (2013) ("No one doubts that a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional.") (quoting *Maine v. Taylor,* 477 U.S. 131, 137 (1986)).  Similarly, the United States also has a well-recognized interest in protecting "its treaty obligations." *Tachiona v. United States*, 386 F.3d 205, 212 (2d Cir. 2004) (collecting cases). Each interest is present here: The United States seeks to intervene to protect the enforceability of a duly enacted law, Sec. 113, that is applicable to RMST and the activities RMST wants to conduct, but which RMST intends to ignore.  And because Sec. 113 implements the International Agreement, permitting RMST to circumvent the statute could impair the government's binding legal obligations to the treaties' signatories. *See United States v. County of Arlington*, 669 F.2d 925, 929 (4th Cir. 1982) (recognizing suit "to enable the United States to honor its treaty obligations to a foreign state").

The interests of the United States in *Titanic* itself, in resolving the proper reach of Sec. 113 and the government's responsibility for implementing the statute, and in carrying out its

obligations under the International Agreement, are implicated by RMST's actions and are sufficient to support intervention.  The enforcement of Sec. 113 bears a "close relationship," *Dairy Maid Dairy*, 147 F.R.D. at 111, to this underlying salvage action, and the United States "stand[s] to gain or lose," *Teague*, 931 F.2d at 261, should RMST be permitted to engage in activity aimed at *Titanic* that is encompassed by and at odds with the requirements of Sec. 113 and the International Agreement.

      **c.**  In addition, the United States' interests would be impaired absent intervention.  "The impairment prong of FRCP 24(a)(2) is met when the disposition of the case would, as a practical matter, impair an intervention applicant's ability to protect his interest in the subject matter of the litigation."  *Nish & Goodwill Servs., Inc. v. Cohen*, 191 F.R.D. 94, 97 (E.D. Va. 2000); *see also Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 515 (E.D. Va. 2007) (An interest is impaired if the "'the action in which intervention is sought will prevent any future attempts by the applicant to pursue its interest.'").  That is the case here.

      RMST's Periodic Report identifies activities that are regulated by Sec. 113 but unambiguously states that RMST does "not intend" to comply with Sec. 113.  ECF No. 686 at 3; *see supra* p. 9.  Should RMST persist in pursuing these activities, and should the Court subsequently permit RMST to conduct these activities without requiring RMST to comply with Sec. 113, the United States will be impaired in its ability to ensure the enforcement of its laws, and, in particular, the responsibility to fully implement Sec. 113 and to provide the protections to *Titanic* that Congress thought necessary and appropriate.  The United States may further be hindered in its ability to comply with its binding obligations under Articles 4, 5 and 8 of the International Agreement.

**d.** Finally, the United States' interests are not adequately represented by RMST or *Titanic* in this litigation.  Inadequacy of representation exists where "resolution of [the existing party's] claims might leave some of the [movant's] grievances unaddressed."  *Aziz v. Trump*, 231 F. Supp. 3d 23, 29 (E.D. Va. 2017).

RMST and the United States do not hold the "same ultimate objective" as to the conduct and scope of activities at *Titanic*.  *Westinghouse Elec. Corp.*, 542 F.2d at 216.  While it may be so that RMST and the United States are both charged with acting on behalf of the public interest with regard to *Titanic*, RMST and the United States plainly have "different approaches," *Cooper Techs.*, 247 F.R.D. at 515, as to what that means and how activity at the wreck and wreck site should be managed.

The United States' objectives are to uniformly apply Sec. 113, to regulate (in accordance with Sec. 113 and the International Agreement) all activities aimed at *Titanic* for *Titanic*'s and its artifacts' protection, and to fulfill the United States' obligations under the International Agreement to respect *Titanic* as an international maritime memorial.  Among other things, those objectives favor non-destructive and non-intrusive methods over activities involving "recovery or excavation," and require that any contemplated activities should have the "minimum adverse impact" on *Titanic* and its artifacts.  Annex Rules, Sec. I.  RMST's objectives are inconsistent with, if not directly adverse to, the United States' interests.  RMST seeks to conduct activities during the 2024 Expedition that are likely to "physically alter or disturb" the wreck or wreck site in that, at a minimum, they involve penetration of the hull and recovery of artifacts, both within the wreck and outside the wreck.  ECF No. 686 at 2.

As mandated by Congress, RMST requires a Sec. 113 authorization from the Secretary of Commerce (as delegated to the NOAA Administrator), issued "consistent with" and "per the

provisions" of the International Agreement and the Annex Rules, before these activities can

occur.  RMST's disregard of this requirement means there is no voice in opposition to speak for

the United States' and the public's interests in the protection of *Titanic* that Sec. 113 and the

International Agreement are intended to provide.  *See R.M.S. Titanic, Inc. v. Wrecked &*

*Abandoned Vessel*, 286 F.3d 194, 196, 200 (4th Cir. 2002) (appointing *amicus* to defend the

district court's decision where there was "no party in opposition" to counter RMST's challenge).

The United States' interests in the application of Sec. 113 and the International Agreement will

go unaddressed unless it intervenes.

      **B.**  **<u>Alternatively, the United States should be permitted to intervene.</u>**

     Upon "timely motion," a court *may permissively* allow intervention if the party seeking to

intervene "has a claim or defense that shares with the main action a common question of law or

fact.'"  Fed. R. Civ. P. 24(b)(1)(B); *see also In re Rivada Networks*, 230 F. Supp. 3d 467, 472

(E.D. Va. 2017).  The government may also intervene if the *Titanic*'s "claim or defense is based

on … a statute" or "any regulation, order, requirement, or agreement issued or made under the

statute."  Fed. R. Civ. P. 24(b)(2).  In deciding, in its discretion, whether to grant permissive

intervention a court should consider whether doing so would "unduly delay or prejudice the

adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3), as well as considerations of

judicial economy, the need for judicial guidance, the benefit to the judicial process and whether

intervention may help avoid inconsistent rulings.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323

F.R.D. 553, 561 (E.D. Va. 2018); *see also In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991)

("concerns of judicial economy and need for [judicial] guidance  . . . have a place in motions for

permissive intervention"); *Lee v. Virginia Bd. of Elections*, No. 3:15CV357-HEH, 2015 WL

5178993, at *4 (E.D. Va. Sept. 4, 2015) (a request to intervene should be accompanied by "a corresponding benefit to the process").

Here, "the nexus between the underlying [salvage] claims and [Sec. 113's requirements the United States seeks to enforce] is irrefutable." *Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc.*, 314 F.R.D. 180, 187 (E.D. Va. 2016).  The United States' claims share common elements with the *Titanic*'s claims or defenses in this action.  For example, the United States has a role to protect the interests of *Titanic* and ensure that RMST's activities do not contravene Sec. 113, and that claim overlaps with any claim or defense that the *Titanic* may have in that same regard.  The United States further has claims that RMST's 2024 Expedition would violate Sec. 113 and that RMST must obtain authorization under Sec. 113 before undertaking that expedition.  Because the requirements and prohibitions of Sec. 113 involve the same subject matter inherent in RMST's request to the Court to conduct salvage activities, the claims and defenses by the United States in general share common issues of fact and law with the core issue before the Court with respect to the 2024 Expedition.

Permitting the United States to intervene will not prejudice RMST, but will address important and critical issues and provide judicial guidance concerning RMST's salvage activities now and in the future, including any potential consequences should RMST engage in salvage activity without going through the Sec. 113 process.  RMST has been on notice of what it believes to be a constitutional conflict presented by Sec. 113 for at least six years yet has never squarely put that concern before the Court for a resolution, and (until now) has resisted the United States' efforts to do so.  *See* ECF No. 625.  At no time has RMST provided a notice pursuant to Federal Rule of Civil Procedure 5.1(a) that it formally questioned the constitutionality of Sec. 113 after it was enacted, even though it repeatedly voiced that concern.

RMST cannot claim prejudice from delay when it has avoided squarely addressing the issue it

believes infringes on its rights.  *See Hill v. W. Elec. Co.*, 672 F.2d 381, 386 (4th Cir. 1982)

(Filing of initial class complaint put employer on notice of potential class liability and was,

therefore, not prejudiced by motions to intervene by other persons denied employment.).

Conversely, the United States had no responsibility under the circumstances of this case to

intervene to protect the implementation of Sec. 113 until RMST stated its intent to conduct

activities encompassed by Sec. 113, and expressly stated its intent to disregard Sec. 113.  *Id.*

(Intervenors were under no obligation to move to intervene in class action until the Supreme

Court denied certiorari on whether the named class members were adequately representing their

interests).   Finally, for the same reasons discussed above, this motion to intervene is timely. *See*

*supra* at III.A.1.

## IV.   CONCLUSION

For the foregoing reasons, the Court should authorize the United States' intervention in

this matter, and authorize the filing of its Verified Complaint.

> Respectfully submitted,
>
> Jessica D. Aber
> United States Attorney
>
> By:    _/s/ Kent P. Porter_____
> Kent P. Porter, VSB No. 22853
> Assistant United States Attorney
> Attorney for the Intervenor United States
> United States Attorney's Office
> 8000 World Trade Center
> 101 West Main Street
> Norfolk, VA 23510
> 757-441-6331
> Fax:  757-441-6689
> kent.porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of August, 2023, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

| | |
|---|---|
| **Brian Andrew Wainger, VSB #38476**<br>**William R. Poynter, VSB #48672**<br>Kaleo Legal<br>4456 Corporation Lane<br>Suite 135<br>Virginia Beach, VA 23462<br>Tel: (757) 96506804<br>Fax: (757) 304-6175<br>Email: bwainger@kaleolegal.com<br>Email: wpoynter@kaleolegal.com | **David G. Barger, VSB #21652**<br>GREENBERG TRAURIG, LLP<br>1750 Tysons Boulevard, Suite 1200<br>McLean, Virginia 22102<br>Tel: (703) 749-1300<br>Fax: (703) 749-1301<br>E-Mail: Bargerd@gtlaw.com |

　/s/ *Kent P. Porter*　　　　　　　
Kent P. Porter, VSB No. 22853
Assistant United States Attorney
Attorney for the Intervenor United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
757-441-6331
Fax:  757-441-6689
kent.porter@usdoj.gov