IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

R.M.S. TITANIC, INC.,
successor-in-interest to
Titanic Ventures, limited partnership,
        Plaintiff,

v.                                                                        Civil Action No. 2:93cv902

THE WRECKED AND ABANDONED VESSEL,
ITS ENGINES, TACKLE, APPAREL,
APPURTENANCES, CARGO, ETC., LOCATED
WITHIN ONE (1) NAUTICAL MILE OF A POINT
LOCATED AT 41 43' 32" NORTH LATITUDE
AND 49 56' 49" WEST LONGITUDE,
BELIEVED TO BE THE R.M.S. TITANIC
__in rem__,
        Defendant.

## UNITED STATES' RESPONSE TO RMST'S NOTICE OF INTENT TO SELL FRENCH ARTIFACTS (ECF NO. 790)

The United States, as *amicus*, on behalf of The Department of Commerce, National

Oceanic and Atmospheric Administration ("NOAA"), and pursuant to its responsibilities under

the Covenants and Conditions ("C&Cs"),[1] provides the following response, with

recommendations, to the Periodic Report filed by RMST indicating RMST's intent to sell

artifacts from the French TITANIC Artifact Collection. ECF No. 790.

**I.      INTRODUCTION**

On March 6, 2026, RMST advised the Court of its intent to sell at a public auction certain

of the French Artifacts. *See* ECF No. 790, 790-1 (Exhibit A). RMST asserts that, beyond

---

[1] NOAA is submitting this response with recommendations consistent with express authority set forth in the C&Cs. *See* C&Cs, Sections II.K, V.B, V.C, and V.E.2. The United States reserves the right to move to intervene should that become necessary.

providing the Court notice, *see* ECF No. 540 at 4 (¶ G), it does not need to obtain the Court's authorization prior to selling any individual French Artifacts.

NOAA contends, however, the proposed sale of French Artifacts would violate and constitute a material default of the C&Cs. The sale would also violate this Court's August 15, 2011, order, ECF No. 351, which made RMST's *in specie* award of the Subject TITANIC Artifact Collect "fully subject" to the C&Cs. Maintaining the entirety of the TITANIC Collections is in the public interest, and unless and until RMST has satisfied the Court that the August 15, 2011, order should be modified, and that RMST should be excused from its obligations under the C&Cs, this Court should prohibit RMST from selling any individual French Artifacts as it has described in its March 6, 2026, Periodic Report. The Court should also take any other action necessary to remediate the potential default from the proposed sale.

## II.    BACKGROUND

*Discovery of TITANIC and Recognition as a Maritime Memorial*

On April 15, 1912, the RMS *Titanic*, on its maiden voyage from Southampton to New York, struck an iceberg roughly 400 miles off the coast of Newfoundland in international waters. The ship sank in less than three hours, taking with her approximately 1,500 passengers and crew. The ship broke in two pieces, the bow section being the larger of the two, and came to rest on the ocean floor 2.5 miles below. A large "debris field" on the seabed between the two sections holds thousands of items that fell from the ship as it broke apart and sank. The wreck's location was unknown until it was discovered in 1985.

In 1986, shortly after the *Titanic* was discovered, Congress enacted the RMS *Titanic* Maritime Memorial Act of 1986 (the "1986 Act"). 16 U.S.C. §§ 450rr *et seq*. The purpose of the 1986 Act was to "encourage international efforts to designate the *R.M.S. Titanic* as an

2

international maritime memorial to those who lost their lives aboard her in 1912," and, to that end, called on the NOAA Administrator to consult with the United Kingdom, France, Canada, and other interested nations to develop international guidelines for research on, exploration of, and, if appropriate, salvage of the *Titanic*. *Id*. at § 450rr-5. *See also R.M.S. Titanic* Inc. v. *The Wrecked & Abandoned Vessel*, No. 2:93cv902, "Order of Amendment," at 2 (E.D. Va. Oct. 19, 2001) ("October 19, 2001, Order") ("Congress has recognized the special nature of the wreck and the respect due the sunken vessel."). The 1986 Act also called on the United States Secretary of State to enter into negotiations with such nations to develop an international agreement to (1) designate the *Titanic* as an international maritime memorial, and (2) provide for research on, exploration of, and, if appropriate, salvage of *Titanic* consistent with international guidelines. *Id*. at § 450rr-6.

In 2001, NOAA issued the "Guidelines for Research, Exploration and Salvage of RMS *Titanic*."  66 Fed. Reg. 18905 (Apr. 12, 2001) ("NOAA Guidelines"). As relevant here, the NOAA Guidelines state as a general principle that "[a]ll artifacts recovered from *RMS Titanic* should be . . .  kept together and intact as project collections." *Id.* at 18912.

Shortly thereafter, the United States, United Kingdom, France, and Canada negotiated the International Agreement,[2] which the United Kingdom ratified in 2003 and the United States signed, subject to acceptance, in 2004.  The parties recognized the "unique historic significance and symbolic value of, and international interest in, RMS Titanic," and, to that end, provided (in part) that after the Agreement went into effect, all reasonable measures should be taken to ensure that "all artifacts recovered from RMST Titanic . . . are kept together and intact as project collections." Int'l Agr., Art. 3. The International Agreement entered into effect on November 18,

---

[2] *See* http://www.gc.noaa.gov/documents/titanic-agreement.pdf (last visited Mar. 18, 2026).

2019, when the United States deposited its instrument of acceptance following the enactment of necessary implementing legislation on May 5, 2017. *See* Department of Commerce Appropriations Act, 2017, Pub. L. 115-31, 131 Stat. 135, 192 (2017).

*Salvage Operations and the Admiralty Litigation*

Salvage operations started in 1987 by RMST's predecessor-in-interest, Titanic Ventures Limited Partnership (Titanic Ventures), in conjunction with the French government (the Institut Francais de Recherche pour l'Exploitation de la Mer). From 1987 to 2004, RMST recovered approximately 5,500 artifacts from the debris field. The first collection of recovered artifacts (approximately 2,100) – the French Artifacts – was taken to France in 1987. In 1993, RMST's predecessor sought an award of title to the French Artifacts from the French Ministry of Equipment, Transportation, and Tourism, making an express commitment that it would not take action "'which would lead to their dispersion . . . and none of the artifacts will be sold.'" *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 527–28 (4th Cir. 2006); *see also* Exhibit 1 (Sep. 22, 1993, Letter from Titanic Ventures to France's Ministry of Equipment, Transportation and Tourism); October 19, 2001, Order, at 7-8 (noting the testimony of RMST's president, who stated that "RMST had agreed that all artifacts recovered would be kept together as a collection and made available to the public; if ever sold, the artifacts would be sold as a collection to an entity that agreed to make the objects available for public exhibition."). The decision granting RMST's predecessor title incorporated RMST's predecessor's assurances. *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d at 527–28; *see also* Exhibit 1 (October 12, 1993, Letter from France's Ministry of Equipment, Transportation and Tourism to Titanic Ventures, noting Titanic Ventures' "intention, entered in the letter of 9/22/93, by which [Titanic Ventures] agreed to make use of such objects in conformity with the respect due to the

4

memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition."); *id.* (October 20, 1993, Minutes of Delivery from France's Ministry of Equipment, Transportation and Tourism to Titanic Ventures, documenting the "delivery of the artifacts recovered from the Titanic wreck in 1987 . . . to Titanic Ventures" and referencing as an exhibit the September 22, 1993, letter of intent from Titanic Ventures).[3]

In 1993 and through 2004, additional artifacts (3,000+) were recovered – the Subject Titanic Artifact Collection ("STAC") – some of which were brought to the EDVA where RMST commenced this admiralty action. The district court assumed constructive *in rem* jurisdiction over the wreck, wreck site and the STAC, and awarded RMST exclusive salvage rights. *See R.M.S. Titanic, Inc. v. Haver ("Haver")*, 171 F.3d 943, 951-53 (4th Cir. 1999). The award of salvage rights by this Court was based, in part, on RMST's statement of mission to "keep[] its artifacts recovered from the wreck site together as a collection." *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d at 536; *see also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 197 (4th Cir. 2002) (recognizing that, in connection with the effort to obtain exclusive salvage rights from this Court in 1994, RMST represented to this Court

---

[3] In 2016, RMST and its parent company filed for bankruptcy in the Middle District of Florida *See In re: RMS Titanic Inc., et al.,* Case No. 16-bk-02230-BAJ ("MDFL Bankruptcy Proceeding"). As part of that proceeding RMST sought to sell French Artifacts and, to that end, RMST instituted an adversary proceeding against France. *RMST Titanic, Inc. v. French Republic a/k/a/ Republic of France*, Case No. 16-ap-00183-PMG ("MDFL Adversary Proceeding"). France did not respond and was found in default. ECF No. 790-2. The bankruptcy proceeding resolved without selling any artifacts. ECF No. 540 (approving the sale of 100% of RMST's stock to PAHL. Each of the documents contained in Exhibit 1 were also filed as exhibits in these proceedings. *See e.g.* MDFL Adversary Proceeding, at ECF No. 28-5, Exhibit E. RMST's initial Charter Agreement resulting in the recovery of the French Artifacts also included RMST's predecessor's commitment "to not sell the objects collected" but to "use them only for exhibition purposes." *Id.* at ECF No. 1-1.

that it was "the position of the salvors in this case, that the 1987 artifacts and the 1993 artifacts will not be sold, but rather will be exhibited."); October 19, 2001, Order, at 4 ("Most importantly, the Court relied on RMST's assurances [to exhibit and not sell the artifacts] when it granted RMST salvor in possession status in July, 1994."). The Fourth Circuit upheld the district court's exercise of constructive *in rem* jurisdiction, *Haver*, 171 F.3d at 951-53, but later noted that because the French Artifacts "were not named as the *in rem* defendants," this Court's *in rem* jurisdiction did not extend to them. *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d at 528-29.

In 2007, the district court asked the United States to become involved in the case, as *amicus*, in order to review RMST's actions, finding that "additional oversight is necessary in order to preserve and protect the *R.M.S. Titanic* and its artifacts as an international treasure for posterity . . . and to ensure compliance with this court's rulings and final orders." *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007).

*RMST's Salvage Award*

Also in 2007, RMST filed a motion (ECF No. 280) for a salvage award. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 792 (E.D. Va. 2010). RMST contended that "an *in specie* award, coupled with appropriate restrictions is the most appropriate method of rewarding RMST for its salvage efforts." *R.M.S. Titanic Inc. v. The Wrecked & Abandoned Vessel*, No. 2:93cv902, ECF No. 293, "Order," at 2 (E.D. Va. Apr. 15, 2008) ("April 15, 2008, Order"); ECF No. 281 at 53-54 (RMST pointing to the conditions it had agreed to as part of France's award of the 1987 artifacts and that RMST was "propos[ing] a similar set of covenants for the 1993-2004 expedition Artifacts.")

6

Upon determining that an *in specie* award "with restrictions" may be appropriate in lieu of a monetary award, this Court directed RMST "to submit proposed covenants specifying conditions or limitations to be included in an *in specie* award, should the court determine that one is appropriate[.]" April 15, 2008, Order at 6. The Court specified that the conditions, *inter alia*, "must ensure . . . that the collection is maintained as an intact collect that joins those artifacts from the *R.M.S. Titanic* awarded to RMST by a French maritime tribunal," and that also ensure "reasonable, ongoing oversight by NOAA . . . to protect the United States' interest in the *Titanic* wreck site and the artifacts recovered therefrom." *Id.* at 4-5; *see also id.* at 4, n.6 ("In addition to the significant federal interests at stake, the court notes that restrictive covenants are proper based on RMST's extensive representations to this court and to the Fourth Circuit that it would keep the artifacts together as a collection.").

RMST submitted to the Court its proposed C&Cs which underwent multiple revisions after extensive consultation with the United States. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d at 793. Following a November 2008 hearing in which the Court "oversaw further revisions," a final version of the C&Cs was incorporated into the Court's opinion granting RMST a salvage award of the full value of the STAC. *Id.* at 793, 809-24. On August 15, 2011, the district court granted RMST title to the STAC as its *in specie* salvage award but noted that "such title is fully subject to the covenants and conditions that the United States . . . negotiated and finalized with RMST and the court." *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011). The district court recognized NOAA's representation of the public interest in *Titanic* and its artifacts, and specifically tasked NOAA with oversight responsibility to ensure RMST's compliance with the C&Cs. *Id.*

7

*The Covenants and Conditions*

The C&Cs were a "condition precedent for [RMST] receiving an *in specie* salvage award" from the district court of the STAC,[4] C&C, Section I.A, and they "govern the disposition, care, conservation and management of the" STAC, *id.*, Section I.F. However, consistent with the district court's directive that conditions for an *in specie* award must ensure that the entire collection, French Artifacts and STAC, were "maintained as an intact collection," *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d at 792, the C&Cs also included numerous substantive obligations on RMST to ensure that *all* recovered artifacts, including the French Artifacts and the STAC, remained and were conserved together. For example,

- A stated purpose of the C&Cs is "to ensure that TITANIC artifacts within the scope of its terms are, for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." Section I.G. "TITANIC Artifacts" are defined to include "all . . . property recovered from the wreck site since September 1, 1985," Section II.B, which necessarily includes the French Artifacts.

- The C&Cs are intended to "ensur[e] the unity and integrity of the TITANIC Collections." Section III. "TITANIC Collections" is defined as the "total assemblage of the French TITANIC Artifact Collection and the Subject TITANIC Artifact Collection." Section II.H.

- The C&Cs provide that the STAC "shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the [French Artifacts] as an integral whole." Section III.A.

---

[4] "A 'condition precedent calls for the performance of some act, or the happening of some event after the terms of the contract have been agreed upon, before the contract shall take effect.'" *Amalgamated Cas. Ins. Co. v. Legynd Transportation, LLC*, No. 4:22-CV-122, 2024 WL 2922398, at *4 (E.D. Va. June 10, 2024) (quoting *Hammond v. Pac. Mut. Life Ins. Co.*, 159 F. Supp. 2d 249, 254 (E.D. Va. 2001)). Satisfaction of the condition precedent – here, RMST's agreement with the C&Cs – is the event by which "'the existence or extent of an obligation or liability depends' or . . . [which] triggers or negates a duty to render a promised performance.'" *Rastek Const. & Dev. Corp.*, 294 Va. 416, 429 (Va. 2017) (quoting Black's Law Dictionary 354 (10th ed. 2014)). RMST's agreement to enter into the C&Cs triggered the duty to comply with its terms.

8

- The C&Cs impose multiple conservation and curation obligations on RMST with respect to the entire TITANIC Collections.[5] *See also* ECF No. 790-4 (RMST's agreement with the auction house acknowledging that the artifacts offered for sale "are currently subject to certain covenants intended to govern the maintenance of such Artifacts" pursuant to the C&Cs.).

- The C&Cs provide that any action that would "seriously compromise and jeopardize the TITANIC Collections and the objective of ensuring that it is available to posterity" would constitute a "material default" of the Covenants and Conditions. Section V.E.1.

- Among the actions "normally . . . assumed" to be a material default are the failure to maintain the TITANIC Collections together "as an integral whole" (III.A); the failure to maintain the TITANIC Collections in accordance with recognized standards (IV.B); and the failure "to protect the physical security" of the TITANIC Collections (IV.D). Section V.E.1

The C&Cs also expressly define NOAA's role, vis-à-vis the C&Cs. For example,

- NOAA is described as "the federal agency that represents the public interest in TITANIC Collections and exercises oversight functions in relation to" the C&Cs. II.K. *See also id.* ("NOAA's authority to represent the public interest in this matter is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines.").

- While NOAA is not "a formal party" to the C&Cs, it "shall, however, be an intended beneficiary" of the C&Cs, "with the authority to enforce their terms as appropriate on behalf of the public interest." *Id.*

- The C&Cs provide that "NOAA's authority [under the C&Cs] shall be exercised within the terms of these Covenants and Conditions," Section V.B, and detail the kinds of actions NOAA can take in the exercise of its oversight authority, V.E.[6]

---

[5] For example: that RMST "manag[e] and preserv[e]" the TITANIC Collections "for posterity (*id.*, Section II.L and II.M); that RMST ensur[e] that the TITANIC Collections are available "to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes" (*id.*, Section III.B); that RMST ensure that the TITANIC Collections are "maintained in accordance with current internationally recognized . . . standards and practices" under the guidance and presence of "qualified . . . experts" (*id.*, Section IV); and that RMST permit NOAA access to the TITANIC Collections in order to fulfill its oversight role to ensure RMST's compliance with the Covenants and Conditions (*id.*, Section V). In addition, the C&C's provisions for evaluation of whether a successor entity is a "qualified institution" is framed in terms of the TITANIC Collections as a whole. C&Cs, Annex A.

[6] For example, NOAA is authorized to make reports to the Court regarding the TITANIC Collections and to that end is authorized to inspect the TITANIC Collections and the Trustee's operations; to make recommendations to the Court as to the Trustee's compliance with the

Finally, the C&Cs provide the means by which this Court can ensure RMST's compliance with the C&Cs. For example,

- The Trustee – RMST – and any subsequent Trustee "shall submit itself to *in personam* to the jurisdiction of the Court, for the purpose of oversight of compliance with these Covenants and Conditions," Section V.F.

- "Any controversy or claim arising out of or relating to these Covenants and Conditions shall be within the primary competence of the Court exercising jurisdiction in the pending admiralty action." Section VIII.B.

*The Current Dispute*

On December 16, 2025, the district court issued an order, with RMST's consent, requiring that RMST provide (*inter alia*) . . .

Assurances and supporting information that RMST's long-term ability to appropriately care for the TITANIC Collections, including maintaining the collections together as an integral whole, as set forth in the Covenants and Conditions (see Covenants and Conditions, Section III), is not significantly impaired by any events or actions described in the above-described Periodic Reports.

ECF No. 769 at 2-3; *see also* ECF No. 765. RMST's response committed to maintaining the STAC as a single collection but did not offer the same commitment for the TITANIC Collections as a whole. ECF No. 778.

On March 6, 2026, RMST filed an under-seal Periodic Report in which it gave notice of its intent to sell 100 "lots" of French Artifacts through a public auction. ECF No. 790. RMST does not seek the Court's approval, does not believe that approval is required, and asserts that it is not restricted in its ability to sell the French Artifacts.

---

C&Cs; to recommend the Court appoint experts to offer opinions regarding the Trustee's compliance with the C&Cs; and make recommendations to the Court in the event of an occurring or imminent material default, Sections V.C, V.E.2.

10

## III.    DISCUSSION

The public interest strongly favors maintaining all artifacts recovered from TITANIC – the TITANIC Collections – together as an intact collection that is available to posterity for public purposes. It is also indisputable that, over several decades, RMST has repeatedly made committed to do just that: to this Court to obtain salvage rights; to French authorities to obtain title to the French Artifacts; and finally, to this Court once again, through the C&Cs, to obtain an *in specie* award of the STAC. *See* October 19, 2001, Order at 4 ("The record is rife with . . . representations" made by RMST to not sell salvaged artifacts.). There can be no question that RMST has consented to *in personam* jurisdiction to ensure its compliance with the C&Cs, or that the Court possesses the authority to ensure that compliance. C&Cs, Sections V.F., VIII.B; ECF No. 540 at 3 (¶ B).

RMST has now decided it can absolve itself of its commitments to the TITANIC Collections as a whole, by selling off individual French Artifacts. Should it be allowed to do so, RMST will have violated its covenant to maintain the TITANIC Collections together as an integral whole ("to the maximum extent possible and consistent with reasonable collections management practices") (Section III.A); to make the TITANIC Collections available for the benefit of the public interest and kept together, intact, and available to posterity for public exhibition, historical review, scientific and scholarly research, and educational purposes (Section I.G); to ensure <u>all</u> of the artifacts are maintained and cared for in accordance with recognized, professional standards (Section IV); and to ensure NOAA's oversight role through access to the TITANIC Collections (Section V). The violations of Section III.A and IV.B and IV.D would "normally be assumed to be a material default" of the C&Cs which this Court has the express authority to remedy. *See* Section V.E.1 and V.E.2.

RMST suggests several reasons why, without this Court's approval, it is able to sell French Artifacts contrary to the C&Cs and the Court's order granting it an *in specie* award.

*First*, RMST contends that the C&Cs distinguish between the French Artifacts and the STAC and that the C&Cs do not "restrict the sale of French Artifacts." ECF No. 790 at 3-4. However, the plain language of the C&Cs command that the STAC "shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the [French Artifacts] as an integral whole." Section III.A. The C&Cs also charge RMST with the responsibility: to ensure that *all* the artifacts, including the French Artifacts, remain available to the public for public purposes in posterity (Section I.G); to ensure that *all* of the artifacts, including the French Artifacts, are maintained and cared for in accordance with recognized, professional standards (Section IV); and to ensure NOAA's unimpeded oversight role through access to *all* of the artifacts, including the French Artifacts (Section V). RMST cannot do any of this if it sells any French Artifacts.

This Court expressly directed that the to-be-developed covenants and conditions that would attach to an *in specie* award must ensure that the entire collection, French Artifacts and STAC, were "maintained as an intact collection," *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d at 792. Thus, a stated purposes of the C&Cs was to ensure that "TITANIC artifacts within the scope of its terms, are for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." Section I.G. "TITANIC artifacts" are expressly defined to include "all . . . property recovered from the wreck site since September 1, 1985," Section II.B, which necessarily includes the French Artifacts. Even if the C&Cs do not expressly say the French Artifacts cannot be sold, the C&Cs unambiguously

12

impose a substantial limitation on RMST that prevents it from breaking up the TITANIC Collections, a limitation that RMST agreed could be enforced against it in this proceeding *in personam*. *See Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 586 (E.D. Va. 2014) (under ordinary contract interpretation principles, a contract must be read as a whole, with words given their ordinary and usual meaning). RMST's agreement with the auction house acknowledges such limitations, at least partly. See also ECF No. 790-4 (noting that the artifacts offered for sale "are currently subject to certain covenants intended to govern the maintenance of such Artifacts" pursuant to the C&Cs.).

*Second*, and relatedly, RMST contends that this Court does not have *in rem* subject matter jurisdiction over the French Artifacts and, therefore, cannot prevent RMST from selling them. ECF No. 790 at 3 (citing *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d at 529-30). NOAA acknowledges that this Court does not have *in rem* jurisdiction over the French Artifacts, but that fact does not preclude this Court from enforcing the C&Cs' limiting language, and its own order, regarding the integrity of the entirety of TITANIC Collections.

In *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, RMST had sought in the district court a declaration recognizing its ownership of the French Artifacts, by virtue of the 1993 decision of the French Ministry of Equipment, Transportation, and Tourism. *Id.* at 524. This Court declined to do so and RMST appealed. *Id.* The Fourth Circuit affirmed, holding that "the district court did not have *in rem* jurisdiction over the 1987 artifacts or, absent *in rem* jurisdiction, any other jurisdictional basis upon which to issue a declaratory judgment" concerning ownership of the French Artifacts. *Id.* at 528. Here, the Court possesses *in personam* jurisdiction over RMST to ensure its compliance with the terms of the C&Cs, including provisions that constrain RMST's actions as to the entirety of the TITANIC Collections. C&Cs,

13

Sections V.F., VIII.B; ECF No. 540 at 3 (¶ B). This Court would not be "declar[ing] the rights" to the French Artifacts, *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d at 530, but rather enforcing the terms of RMST's independent agreement it willingly entered into as a condition of its receipt of an *in specie* award of the STAC, and as codified in the Court's order.

The Fourth Circuit also addressed the unique nature of salvage involving an historical wreck, noting that the traditional salvage case "does not have as its object the recovery of historical wrecks for historical, archeological, and cultural purposes," where the public interest comes into play. 435 F.3d at 535-38. To that end, the Fourth Circuit observed that a district court may "more readily supervise the salvage operation in the public interest," *id.* at 538, and to ensure the public interest is met . . .

> The court may, in addition to the traditional salvage remedies, also enter such orders **as to the title and use of the property retrieved as will promote the historical, archeological, and cultural purposes of the salvage operation**. . . . Finally, the court must include in its remedies a design to provide the salvor with an appropriate reward, which may include awards *in specie*, **full or restricted ownership of artifacts, limitations on use of the artifacts**, rights to income from display and shared research, and future rights to salvage.

*Id.* (emphasis added). That is what happened here.

Whether to grant an *in specie* award lies solely within the discretion of the district court. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 804 F. Supp. 2d at 509. This Court exercised its discretion and concluded that the public interest required conditions be placed on that award in light of the historical significance of and strong public interest in the TITANIC, and those conditions were incorporated into a court order. RMST contended that "an *in specie* award, coupled with appropriate restrictions [was] the most appropriate method of rewarding RMST for its salvage efforts," April 15, 2008, Order, at 2, and agreed to be subject to *in personam* jurisdiction in order to enforce those restrictions and conditions. *See* ECF No. 540 at 3

14

(¶ B) (RMST is "subject to the *in personam* jurisdiction of this Court for purposes of ensuring RMST complies with the Court's orders relating to *Titanic*, including . . . the C&Cs"); *id.* at 3-4 (¶ C) (Premier Acquisition Holdings, LLC ("PAHL") "shall take no action, nor shall it refrain from taking any action, or direct or authorize RMST to take an action or refrain from taking any action, that will result in or cause RMST's inability to comply fully with this Court's orders relating to *Titanic*, including . . . the C&Cs. Any such action by PAHL . . . shall serve as PAHL's consent to the *in personam* jurisdiction of this Court for purposes of enforcing and adjudicating this Court's orders relating to *Titanic*, including . . . the C&Cs."). RMST has set forth no grounds to support it being excused from the Court's order that it was subject to the C&Cs. Accordingly, this Court is entitled to enforce them.

*Finally*, RMST contends that it can dispose of the French Artifacts because the Middle District of Florida bankruptcy court found, after France did not respond in an adversary proceeding, that France had "no interest in the French Artifacts." ECF No. 790 at 2-3. NOAA does not concede that France has no interest in the French Artifacts,[7] but France's interest, or lack thereof, in the French Artifacts does not speak to whether RMST can avoid its agreed responsibilities to this Court as set forth in the C&Cs as incorporated into the Court's order.

---

[7] Given the repeated commitments RMST has made regarding the French Artifacts, NOAA believes that France should be notified of the planned sale and given an opportunity to represent its own interest. *See* Exhibit 2, "Verbal Note from the Ambassador of France to the United States," No. 2016-506130 (July 8, 2016), also filed in MDFL Adversary Proceeding, at ECF No. 1-4). In the "Verbal Note," France expressed concern with RMST's intent to seek approval by the Middle District of Florida in the bankruptcy litigation "to sell and disperse French artifacts, in violation of the aforementioned Proces-Verbal and the covenants and conditions of the Eastern District of Virginia Court and under the erroneous assumption that France has no interest in the French artifacts." France also reminded RMST "that [France's] interest in the fate of the artifacts is high, and that not only would the dispersion or sale of the artifacts infringe upon the due respect to the memory of its initial owners but also violate the principle of sovereign immunity."

Based on the foregoing, NOAA respectfully asserts that RMST is incorrect that it can unilaterally abandon its commitments under the C&Cs and the Court's order and sell French Artifacts without this Court's approval. This Court would appear to agree. *See* Transcript of Dec. 17, 2018, Motions Hearing, at 57 ("Before they sell anything, it's going to be subject to the approval of this Court, including its orders and the United States Court of Appeals for the Fourth Circuit.").

* * * * *

In sum, NOAA opposes RMST's intended course of action and respectfully asserts that any sale of the French Artifacts as proposed by RMST would constitute a material default of the C&Cs, and violate this Court's August 15, 2011, order which expressly incorporated the C&Cs as a condition of RMST's *in specie* award of the STAC. RMST has not set forth any basis by which it may be excused from its obligations under the C&Cs and may act unilaterally to sell French Artifacts without this Court's authorization and approval.

[*continued on following page*]

16

## IV.  RECOMMENDATIONS

In light of the foregoing, NOAA makes the following recommendations:

RMST should be prohibited from advertising for sale, or conducting any sale, of any French Artifacts absent approval of this Court.

The French Government should be notified of RMST's intent to sell and disburse French Artifacts, provided a copy of the Periodic Report and Exhibit A thereto, and given the opportunity to set forth its position on the intended sale, if it chooses.

NOAA respectfully reserves the right to submit additional reports, responses or recommendations, as necessary, as this matter evolves.

Respectfully submitted,

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

By:     /s/ *Kent P. Porter*
KENT P. PORTER, VSB No. 22853
Supervisory Assistant U.S. Attorney
Office of the United States Attorney
8000 World Trade Center
101 W. Main Street
Norfolk, Virginia 23505
Tel:    (757) 441-6331
Fax:    (757) 441-6689
Email: kent.porter@usdoj.gov
*Counsel for the United States*

17