# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - - - -
                                        )
R.M.S. TITANIC, INC.,                   )
SUCCESSOR IN INTEREST TO                )
TITANIC VENTURES, LIMITED               )
PARTNERSHIP,                            )
                                        )   CIVIL ACTION NO.
          Plaintiff,                    )   2:93cv902
                                        )
     v.                                 )
                                        )
THE WRECKED AND ABANDONED               )
VESSEL, ETC.,                           )
                                        )
          Defendant.                    )
- - - - - - - - - - - - - - - - - - - - -


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

June 21, 2016


BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          Chief United States District Judge


APPEARANCES:

          KALEO LEGAL
          By:  Brian A. Wainger
                    And
          McGUIRE WOODS LLP
          By:  Robert W. McFarland
               Counsel for R.M.S. Titanic


JODY A. STEWART, Official Court Reporter

APPEARANCES CONTINUED:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Kent Porter
               Assistant United States Attorney
               Counsel for Amicus United States

          THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
          By:  Jackie Rolleri
               Counsel for NOAA

3

(Hearing commenced at 11:31 a.m.)

THE CLERK: In case 2:93cv902, R.M.S. Titanic, Inc., Successor in Interest to Titanic Ventures, Limited Partnership, versus The Wrecked and Abandoned Vessel, et cetera.

Mr. McFarland, Mr. Wainger, is the plaintiff ready to proceed?

MR. McFARLAND: Good morning, Your Honor. The plaintiff is ready.

THE COURT: Good morning, counsel.

THE CLERK: Mr. Porter, Ms. Rolleri, is Amicus United States of America ready to proceed?

MR. PORTER: Good morning, Your Honor. We are ready to proceed.

THE COURT: Good morning, counsel. I believe that we began this hearing, when it was originally scheduled, Mr. McFarland, to catch up on the various status reports that you have filed, your most recent one, and then there was one received in April and another in February, and so I believe you've got some catch-up to do with the status reports.

You filed one on November 4, 2015, February 23rd, 2016, and then April 10th, 2015. Then just recently, I believe it was around June 15, 2016, an additional report was received. So why don't we start the hearing with you summarizing or going through -- I certainly reviewed the

JODY A. STEWART, Official Court Reporter

reports -- to advise the Court, in a summary fashion, where the status of the matter is at this juncture.

MR. McFARLAND: Thank you, Your Honor. We appreciate the opportunity to be before the Court today, Your Honor, and certainly there have been a number of developments since the first status report that Your Honor made, including the status report that we filed last week on June 15th.

Going back to February 23rd of this year, we submitted a confidential periodic report which outlined the company's financial condition and status at that period in time, as well as advising the Court on the status of the collection and the exhibitions that were going on.

We filed a supplemental or next report in April, and then this Court scheduled this status conference. Then since that scheduling, the company has filed a petition for reorganization under Chapter 11 of the U.S. Code in the Middle District of Florida, Jacksonville Division.

To fully inform the Court about that Chapter 11 proceeding and filing, we filed a supplemental periodic report on June 15th last week, Your Honor. We then filed, that same day, a suggestion in bankruptcy in this court on June 15th, 2016, under 11 U.S.C. 362, which we believe provides an automatic stay of all litigation/judicial proceedings.

THE COURT: Well, I don't agree with you on that in

regard to this proceeding, but we'll get to that. It does not stay this proceeding, and I will tell you the legal reasons why.

MR. McFARLAND: Very well, Your Honor. It is the Titanic's position that pursuant to the Chapter 11 reorganization filing that there is an automatic stay of all judicial proceedings, including this one. That would apply such that while we are certainly here to provide information to the Court, we do not believe that any further litigation or adversarial proceedings could go forth at this point in time.

THE COURT: Well, adversarial proceedings are one thing, but staying this action is another, because an automatic stay is meant to protect debtors from judgments, collection activities, foreclosures and repossessions against them. It is not meant to operate in an action which they have initiated, and that's been before the Court, and we have our covenants and conditions.

I have the law on that, and the automatic stay does not operate to relieve you from this salvage action in this court and any proceedings thereon, but I'll go through the law with you so you don't need to get to that yet. What I'm asking you to do is to bring the Court up to date particularly with this merger with Dinoking. Is that the way it is pronounced?

JODY A. STEWART, Official Court Reporter

MR. McFARLAND: Yes, Your Honor. That went through in, I believe, late 2015. Mr. Daoping Bao is now the Chairman and CEO of the company, and there is a board of directors that he is head of. Other members are Mr. Mingcheng Tao, Mr. Sid Dutchak, Mr. Rick Kraniak, Doug Banker, who the Court may remember is a longstanding member of the Premier Board of Directors, and Jerry Henschel.

THE COURT: It is my understanding that you have indicated to the Court that R.M.S.T. remains the holder of the rights on the Titanic artifacts, and although it may be a wholly owned subsidiary of Premier, the two transactions, in terms of the merges, did not affect the ownership of the Titanic artifacts. That is what has been represented to the Court.

MR. McFARLAND: Did not affect the ownership of the artifacts, that's correct, Your Honor, absolutely. In that sense let me say that even with the Chapter 11 filing, the company recognizes its obligations under the covenants and conditions and fully intends to adhere to those throughout the Chapter 11 reorganization proceeding.

THE COURT: All right. So basically what I'm doing is going through each report. I'm going back to the November 15, 2015 report when you first reported that R.M.S.T.'s parent company closed on November 1, 2015, and it was a way of surviving as an entity in the merger, and what I'm trying

JODY A. STEWART, Official Court Reporter

to do is go back and trace for the record now where the Court is. As I understood it from your submission, the documents governing the transactions recognized R.M.S.T. as the sole owner of the artifacts and warranted that R.M.S.T. is in compliance with all of the Court's orders, and pursuant to its terms, the promissory note was converted to Premier common stock on October 30, 2015, thus terminating the debt held by the investor in the group.

MR. McFARLAND: Correct, Your Honor.

THE COURT: All right. Then you had something in that report about the corporate structure. As I understood the structure, the primary shareholders, you had an executive chairman of the board, a president, a chief executive officer, and so forth. If you can go through all of those positions and tell the Court if they are still current.

MR. McFARLAND: Certainly, Your Honor. Daoping Bao, spelled B-a-o, pronounced Bao, is the Chairman and CEO. Michael Little is the Chief Financial Officer. Ms. Alex Klingelhoffer, who the Court may recall from testimony previously, is the Vice President for collections. The board of directors is, as I mentioned a few minutes ago, composed of, I believe, five gentlemen.

THE COURT: Have you given those names to the Court?

MR. McFARLAND: I believe we provided the names of the board, but we can certainly update that, Your Honor.

JODY A. STEWART, Official Court Reporter

THE COURT:  All right.  As I understand, on November 5, 2015, Mr. Sellers resigned from the board of directors?

MR. McFARLAND:  That is correct, Your Honor, Mr. Sellers who had been an investor.  I guess we do need to provide Mr. Henschel, who we will update.  He is a very recent addition to the board of directors following Mr. Evans' resignation as a director last month, I believe.

THE COURT:  Then what you need to do is just file with the Court for the record any changes in the corporate structure in terms of who's running the company, who's on the board, and when you file that with the Court, you need to show, for instance, that somebody was there, and then they resigned on such and such a date, and then whoever took their place.  So it's just a simple snapshot for the Court to have.

MR. McFARLAND:  Certainly, Your Honor.  I'm happy to do that.

The company continued to operate, Your Honor, throughout late 2015/early 2016.  We have had extensive discussions with the Government representatives of NOAA, Department of Justice, about the company's operations, keeping them fully informed, largely under a nondisclosure agreement.

But as we advised the Court of the company's financial situation going back to last year and continuing into this year, it was not strong, largely due to a

JODY A. STEWART, Official Court Reporter

transaction in New York City where the company entered into a long-term lease for space on 5th Avenue between 38th and 39th Streets that was hosting the "Saturday Night Live" exhibition. That exhibition has not proven to be financially successful. We have the obligations under the lease, and those have been choking or make it difficult for the company to operate financially.

THE COURT: This is Premier?

MR. McFARLAND: Yes, Your Honor. The lease is under Premier's name.

THE COURT: All right.

MR. McFARLAND: The space was to hold the "Saturday Night Live" exhibition and also Titanic exhibition. We continued to analyze our financial situation into 2016, looking at the picture, analyzing it carefully with the hope of financial advisors what could be done, and very recently, Your Honor, as we've advised the Court last week, the company filed a Chapter 11 proceeding in Florida. The company is incorporated in Florida, as the Court will recall, filing in the Middle District of Florida, Jacksonville.

In keeping with that proceeding, I've advised the Court through the supplemental periodic report.

THE COURT: One thing, before you go forward with that, in your February periodic report you also explained that the NASDAQ stock market had delisted Premier on February

JODY A. STEWART, Official Court Reporter

10, 2016, and it was because the merger with DK was a change in control, which then required the post-merger entity to file a listing application, and Premier did not meet the minimum required stock price, so the stock was then being traded through an over-the-counter marketplace called OTCQB? So is it still in the same situation?

MR. McFARLAND: It's my understanding that is correct, Your Honor. We have not been listed again.

(Conferring with co-counsel.)

MR. McFARLAND: I'm advised, Your Honor, it's still an Over-the-Counter Pink Sheets trading, is what the stock's current listing is.

THE COURT: All right. You can go ahead.

MR. McFARLAND: Thank you, Your Honor. With the filing of the Chapter 11 petition, Your Honor, it is the company's hope that it can emerge from a Chapter 11 through a reorganization with the ability to pay off its creditors in full, continue to employ the folks who have been at the company, keep the shareholders' equity stakes in the company and also continue to preserve, what we certainly have been doing all along, and continue to preserve and curate the collection, both pursuant to the covenants and conditions and our recognized efforts all along in this matter.

Yesterday, Your Honor, the Court and the Court in Florida, we filed a motion for order seeking Court approval

11

of the sale of a limited number of the French artifacts.

THE COURT: My understanding that it's only the French artifacts that are involved in this sale, and those were excepted in the covenants and conditions that protected the artifacts that were before this Court?

MR. McFARLAND: Yes, Your Honor, that is correct. The French artifacts, no question they are part of the estate, the bankruptcy estate. So we have filed there a motion for seeking the Court's approval for a potential sale of certain of those French artifacts, the idea being, although we didn't come to this motion and decision lightly, but given the company's financial circumstances, a limited sale of certain of the French artifacts, if it were to occur, could provide the revenue necessary for the company to pay off its creditors, including ending its lease obligations in New York City, provide the company working capital going forward, and allow the shareholders to maintain their equity stakes in the company. All the shareholders would maintain their positions, and we would be able to operate the company profitably, we believe, going forward coming out of the Chapter 11 proceeding.

THE COURT: All right. Well, I would remind you, Mr. McFarland, and anyone else involved in this bankruptcy, that this Court's order on the covenants and conditions takes precedent. It was entered a few years ago, and the covenants

JODY A. STEWART, Official Court Reporter

12

and conditions specifically exclude the Titanic artifacts -- I'm not talking about the French artifact collection -- from the bankruptcy estate of the trustee, and that's your covenant and conditions Section 7(d). They also give this Court the right to take all appropriate action to enforce the covenants and conditions and to hold any hearing necessary to determine if any insolvency bond should even be forfeited and any funds applied to protect the Titanic collection.

So I would encourage everyone to go back and read the covenants and conditions that govern the Titanic artifacts before this Court. That's in Section 7(d). So I would encourage everyone to go back and read that. That is an order that takes precedent for the Titanic artifacts, which are before this Court.

The Fourth Circuit up to the Supreme Court have made it clear about what the status of being a salvor-in-possession is. This Court has made it clear about the ownership of any assets, and the covenants and conditions make it very clear that they are not part of the bankruptcy estate. So if anybody is beginning to think that, they better dissuade that notion from their paperwork and their minds.

MR. McFARLAND: We appreciate what the Court is saying, Your Honor, and let me say to the Court that throughout all the proceedings going back since we have been

13

before this Court, the company has always recognized and taken most seriously its obligations to preserve the collection, curate the collection.  The Court will recall the testimony, and that has continued to be done.  Even with the financial difficulties that the company has experienced, we have continued to maintain the collection in A1 condition. We are working with NOAA to set up a mutually convenient time for them to come see the collection again.  We would welcome the Court.  We have asked Your Honor before, I know with your schedule it is difficult, but we would love to have you come to Atlanta and see the collection.

THE COURT:  You need to give me some type of notice. I don't know if I can do it, but you would need to give me some type of notice.  You obviously don't need any scheduling pursuant to my schedule, but if you give me notice, and I'm available and determine that it's something that should be done in the case, I will see to your request.  But you would need to let me know well in advance.

MR. McFARLAND:  Very good, Your Honor.  Be happy to set that up.  In addition to taking care of the preservation and curation of the artifacts, we have continued to fund the reserve account.

THE COURT:  That was my next question.

MR. McFARLAND:  Well, I thought it might be.  I wanted to fully inform the Court.  We have continued to fund

JODY A. STEWART, Official Court Reporter

14

the reserve account. There is at this point in time approximately between $450 and $500,000 in it, and that is in, if I could use the term that was used, and I guess it was the last presidential election, we consider it a lockbox, Your Honor. It is not part of the estate, and it is secure, and it will continue to be funded.

THE COURT: The reason I was asking, the February 23rd report indicated that you had continued to fund it, and at that time it totaled about $433,000, but in the most recent report, the June 15th, 2016, there was no mention of the reserve account and its current total. So I would appreciate if you would, in this supplemental filing, advise the Court, and obviously copy Mr. Porter and the United States on anything that you file with the Court, stating the account balance. You can either do it June 15th or July 1, whatever date you choose, but I need some current date to operate from since February.

MR. McFARLAND: Certainly, Your Honor. I don't have the exact figure but it is between 450 and 500. So it's $500,000, so it has increased since the February report, and we apologize for the oversight in the June report for not including the figure but we will get that.

Your Honor mentioned informing the Government and Mr. Porter, and we have done that throughout this, Your Honor.

JODY A. STEWART, Official Court Reporter

15

THE COURT: I know. I'm not saying you haven't. I'm just reinforcing it for the record.

MR. McFARLAND: Right. But I wanted to advise the Court that for the past eight months, Your Honor, give or take -- I could be off a little bit -- but we have been meeting with representatives of the Government and NOAA to discuss any concerns they might have to apprise them of the company status to work out. The Court may recall the mapping project was discussed. We've talked with them about that, about giving them certain access to the collection online so that they can see for themselves the artifacts and the conditions and the reports on them, and then also, as I said, to have them come down and actually see the artifacts in person.

So we have been working hand in hand with NOAA. It isn't to say we agree on everything a hundred percent all the time, but they have been productive meetings, and we certainly will continue those going forward even after the filing of the Chapter 11.

As I mentioned, Your Honor, we've had the management change with Mr. Bao as the chairman and CEO now, and our goal, Your Honor, is to come out of the Chapter 11 proceeding in a financially sound condition that we think will not only address the needs of our creditors, shareholders and employees, but also, frankly, provide further protection for

16

the collection.

Our goal is to always maintain and preserve the collection, and with the revenue that may be gained from the limited sale from the French artifacts, we think that can be done and to continue to preserve and curate the collection in a stronger position.

THE COURT: All right. Anything else that you would have to add, Mr. Wainger?

MR. WAINGER: No, Judge. Nice to see you again.

THE COURT: Let me see if Mr. Porter has anything that he wants to add today.

MR. PORTER: Good morning, Your Honor.

THE COURT: Good morning.

MR. PORTER: Nothing really. I would reiterate what Mr. McFarland has said. There has been communications about continuing NOAA's oversight role. There is discussions to set up the site visit. Some information was provided as of yesterday with some of the information about the artifacts, and I confirmed with Mr. Wainger just this morning that a conversation we had about a week or so ago to get further information is still on board, and so in terms of NOAA's oversight role, I think we are on the right track. There is information we still need to get, but I think we're on the right track with that.

THE COURT: All right. There are a number of

JODY A. STEWART, Official Court Reporter

individuals in the courtroom, and I don't know if you would like to introduce them, Mr. McFarland, or you'd prefer that they introduce themselves?

MR. McFARLAND:  I'm happy to introduce them, Your Honor.  I apologize.  I should have done that at the outset.

THE COURT:  And, what their role is in this.

MR. McFARLAND:  Absolutely, Your Honor.  Let me say that I can introduce the individuals on my left side.  I'm going to leave to Mr. Porter the individuals to my right.

To my immediate left, Billy Poynter, Your Honor, who is with Kaleo Legal, Mr. Wainger's partner, and assists with legal issues for Premier.  Next, Michael Little, who is the Chief Financial Officer for the company, Your Honor.

To Mike's left is Alex Klingelhoffer, our Vice President of collections, who is in charge of curating and preserving the collection.  Then Tina Bingham, who is Billy and Brian Wainger's partner, Your Honor, at Kaleo Legal and corporate counsel for Premier.

THE COURT:  All right.  Thank you.  Mr. Porter, if you would like to introduce the individuals or have them introduce themselves and counsel at the table.

MR. PORTER:  I'll be happy to introduce them.  This is Jack Rolleri.  She is counsel with NOAA.  She has been my primary contact since I became involved in the case about three weeks ago or a month ago.

JODY A. STEWART, Official Court Reporter

THE COURT: Nice to have you, Ms. Rolleri.

MR. PORTER: Ole Varmer, who I believe has appeared before you before. He's also counsel with NOAA. Next to him is Jim Delgado. He is the director of NOAA's Maritime Heritage Program. Next to him, I believe you know Mr. Stefan. He has been assisting me when the bankruptcy was filed to give me some advice on that.

Next to him is Russ Craig, senior counsel, Department of Commerce. Next to him, Alicia Rector is an intern with NOAA this summer working with Ms. Rolleri. Brittney McGail is an intern in our office, a third-year practice at William & Mary in our office this summer.

Next to her is Mike Cannon, also with the Department of Commerce counsel. In the last row is Dave Alberg, who is the superintendent of the Monitor National Maritime Sanctuary.

THE COURT: Nice to have all of you.

MR. PORTER: Thank you, Your Honor.

THE COURT: Before we adjourn today, I do want to put on the record the Court's position in regard to any bankruptcy that has been filed by R.M.S.T., or Premier, and I will put that on the record so that there is no question where the Court stands in this matter.

R.M.S.T. filed a Suggestion of Bankruptcy which, quote, "Suggests that this action has been stayed by the

19

operation of 11 U.S.C. Section 362," and that's in their Suggestion of Bankruptcy at 1. However, that particular provision protects debtors, as I indicated earlier, from judgments, collection activities, foreclosures or repossessions of property on debts or claims arising before the bankruptcy petition was filed.

In other words, it protects debtors who are or who could be defendants in actions. Section 362 provides an automatic stay that, "Stops actions against the debtor, not actions originally brought by the debtor, the trustee or the debtor-in-possession." I selected that case because the quote is right on point. It is from *In re KTMA Acquisition Corp.* It's 153 B.R. 238 at 260. It's an opinion in 1993 out of the District of Minnesota, which is still good law throughout the bankruptcy community.

I would also invite you to see *Overnite Transport Company v. Ryder/P-I-E Nationwide, Inc.*, which is at 137 B.R. 766, 768. That's out of the Eastern District of Missouri in 1992 stating that the Eighth Circuit had not specifically addressed the issue at that time but other circuits in all the district courts had concluded that the automatic stay -- there is a long line of cases -- does not apply to actions originally commenced by the bankrupt party. So that is important.

Moreover, a number of other district courts

JODY A. STEWART, Official Court Reporter

traditionally retain jurisdiction to determine the applicability of the automatic stay of a bankruptcy court to litigation pending before them.  So even at a threshold level, this Court would have jurisdiction to even determine whether the automatic stay had any applicability, and based upon the law that I have reviewed, it would not have applicability, and it's even more strengthened by, rather than the general rules that I've just stated, by the covenants and conditions, which I will go through in a moment.

You have the case out of the Fifth Circuit, *Picco v. Global Marine Drilling Company*, 900 F.2d 846 at 850, and based upon the review of the law that I've read, I would conclude that the automatic stay does not apply to this proceeding because this is a type of proceeding that basically was commenced by R.M.S.T. many, many years ago, to be salvor-in-possession, and I think that R.M.S.T. recognizes this, too, whether they want to openly admit it, because they do state that they will continue to work with NOAA under the framework set in the covenants and conditions.

The covenants and conditions are very specific in how they relate to any bankruptcy proceeding because, obviously, it was certainly on NOAA's mind and concern, and certainly on the Court's, when you start down the road and you don't want anyone making an end run around Court rulings

JODY A. STEWART, Official Court Reporter

21

by using other proceedings and mechanisms.

The covenants and conditions, I'll just review those very briefly. I'm not going to sit here and read all of those to you, but the covenants and conditions contain provisions that protect the Titanic artifact collection in the event of the trustee's bankruptcy, and you can go back and look at those, but in particular I'm reading from covenant and condition VIII, Subsection B. This is the quote: "To the extent allowed by federal law, the beneficial interest to the Titanic artifact collection shall not be considered as part of the bankruptcy estate of the trustee in the event of bankruptcy, insolvency, dissolution, winding up or similar event. Further, all measures taken by a trustee, debtor-in-possession, or similar agent of the trustee," are subject to review by this Court, meaning this United States District Court for the Eastern District of Virginia.

That is, "To protect the unity and integrity of the Titanic artifacts." The covenants and conditions then provide specific procedures in the event of the trustee's bankruptcy. They are found in Subsection 7(d) in the covenants and conditions. They are, number one, this Court may take all appropriate action within its jurisdiction to enforce the covenants and conditions. This Court may request information from the trustee and/or conduct a hearing to ascertain whether the trustee's insolvency bond would be

JODY A. STEWART, Official Court Reporter

forfeited and recommend the modalities under which the funds will be applied to protect the Titanic collections.  NOAA has the right to make submissions in these proceedings and represent the public interest.  If another bankruptcy court attempts to exercise jurisdiction over the Titanic artifact collection, this district court, or that district court in which the bankruptcy case is pending, may have the reference withdrawn under 28 United States Code Section 157 or transfer venue to this Court under 28 United States Code Section 1412. That's in the covenants and conditions at Section 7(d).

So I would remind everyone of all of those covenants and conditions upon which this Court has issued an order, and any violation of that order would be subject to appropriate action from this Court, and everyone, I think, knows what that potential action would be.

As I understand it, at this juncture Mr. McFarland can just clarify for the Court on the record that the only artifacts that are looking to be liquidated are those which have been referred to as the French artifacts which are not subject to the covenants and conditions?

MR. McFARLAND:  That is correct, Your Honor.  That is correct.  As the Court noted in 7(a) through (c) that was read there, those are the conditions applying to the stack, yes.

THE COURT:  The only other matter I want to state

23

for the record, it is the Court's understanding, through all of these reports, that Ms. Klingelhoffer, who has managed and cared for the collection and has testified before the Court, she's been managing it since October of 2008, continues to serve as the caretaker of the artifacts, and that you maintain the same standards of conservation, curation, collection, and management that you have since she joined R.M.S.T. because she's the one I think who pushed things in the proper direction, as I recall.

MR. McFARLAND:  She did, Your Honor, and we have continued to do that.  That is one of the things I wanted to assure the Court, that that has continued throughout, since her joining us in 2008, and even given the company's financial circumstances, we have always made sure that we have maintained and preserved the collection and followed the highest standards.

THE COURT:  All right.  The only thing left, then, if you could file with the Court by July 15th the corporate structure and any changes and also the status of the reserve fund.  If you want to file it earlier, you can.  Just be sure, Mr. Porter, as I said, gets a copy.  Then also I'm going to direct you to continue to file the periodic reports. I think at this juncture you need to increase that.  You're filing them what, every three months now?

MR. McFARLAND:  Yes, Your Honor.  They have been

JODY A. STEWART, Official Court Reporter

24

quarterly.

THE COURT: You have been filing them quarterly. I think that we are going to have to increase that to six. So your last one was June, so your next one will be due by August 15th.

MR. McFARLAND: Absolutely, Your Honor.

THE COURT: In the meantime, you can always obviously file a supplemental report if something else is going on.

MR. McFARLAND: Exactly, Your Honor. I was going to say more information, I know, is better than less, and in that sense we will also keep the Court advised of significant proceedings in the Middle District of Florida action, the bankruptcy Chapter 11 action.

THE COURT: Please do, and in the meantime at minimum file the reports now every two months, obviously with a copy to Mr. Porter, and if at any point any party feels they need a hearing before this Court, just please notify the Court, and that includes you also, Mr. Porter.

MR. PORTER: Yes, Your Honor.

THE COURT: If NOAA feels that they need some advice or some guidance from the Court or something's occurring that needs to come before the Court, so please advise if you need any further hearing. Otherwise, I will continue as I have, reading your periodic reports and periodically having you

25

come to court.  I would note that this hearing was scheduled before your bankruptcy.

MR. McFARLAND:  Yes.

THE COURT:  It was just to catch-up.  I felt like we hadn't had a catch-up on the reports.

MR. PORTER:  Your Honor, one point.  In their periodic report, the most recent one, they indicated that they would be providing courtesy copies of the filings in the bankruptcy court to this court.  I don't know if the Court needs all of the filings.  I would appreciate, though, if they would be providing us all the filings.

THE COURT:  I would like all of the filings.  You don't have to do it necessarily in the report but I do want copies of all of the filings.

MR. PORTER:  That would be the same day, counsel.

That is fine.  Thank you, Your Honor.

THE COURT:  They can do the filings because then I can also follow it on the docket sheet, and so forth.

All right.  Is there anything else we need to take up today?

MR. McFARLAND:  Not from Titanic standpoint, Your Honor.

MR. PORTER:  No, Your Honor.

THE COURT:  All right.  Then the Court stands in recess until 2:00.

JODY A. STEWART, Official Court Reporter

26

(Hearing adjourned at 12:09 p.m.)                    12:09:1

CERTIFICATION


     I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.



          X_____/s/_____x

                    Jody A. Stewart

               X_____6-21-2016 _____x

                         Date

JODY A. STEWART, Official Court Reporter