**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**R.M.S. TITANIC, INC., successor-in-interest to Titanic Ventures, limited partnership,**

**Plaintiff,**

**v.** **CIVIL NO. 2:93-cv-902**

**THE WRECKED AND ABANDONED VESSEL, ITS ENGINES, TACKLE, APPAREL, APPURTENANCES, CARGO, ETC., LOCATED WITHIN ONE (1) NAUTICAL MILE OF A POINT LOCATED AT 41 43′ 32″ NORTH LATITUDE AND 49 56′ 49″ WEST LONGITUDE, BELIEVED TO BE THE R.M.S. TITANIC, IN REM,**

**Defendant.**

**OPINION AND ORDER**

This matter comes before the court upon R.M.S. Titanic, Inc.'s ("RMST") March 6, 2026, Periodic Report, ECF No. 790 ("March Periodic Report"), and the United States' Response to RMST's Notice of Intent to Sell French Artifacts, ECF No. 797 ("Response"). RMST has notified the court that it intends to auction one hundred (100) "lots" of artifacts,[1] purportedly belonging to the

[1] RMST provided the court with a list of one hundred (100) "Artifacts from the French Collection" that it intends to auction. ECF No. 790-1. The United States describes the list as one hundred (100) "lots" of artifacts, encompassing "approximately 360 items in total." ECF No. 830 at 3 (United States' Supplemental Brief Regarding RMST's Notice of Intent to Sell French Collection Artifacts). RMST has since clarified that its planned auction implicates one hundred (100) "groups or lots," encompassing "361

French TITANIC Artifact Collection, as defined by the final Revised Covenants and Conditions entered by this court in August 2010 as a condition precedent for RMST's receipt of an in specie salvage award in this action. ECF No. 790; see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 742 F. Supp. 2d 784, 811 (E.D. Va. 2010).[2] The United States opposes the auction, which it deems unlawful under the Covenants and Conditions and injurious to the public interest. See ECF Nos. 797, 830. For the reasons explained in this Opinion and Order, RMST remains **ENJOINED** from auctioning French Collection Artifacts recovered from the R.M.S. Titanic, as set forth in its March Periodic Report, pending further proceedings before this court as set forth in this Opinion and Order.

**I. CASE HISTORY**

This matter concerns salvage of the wreck of the R.M.S. Titanic. The case has proceeded in this court for over three (3) decades and has resulted in numerous opinions by this court and the United States Court of Appeals for the Fourth Circuit, with

---

artifacts." ECF No. 849 at 2 (Corrected Periodic Report). This Opinion and Order accordingly refers as appropriate to the auction as implicating one hundred (100) "lots" of "French Artifacts."

[2] The final Revised Covenants and Conditions are attached to the court's August 12, 2010, Opinion as Exhibit A. ECF No. 340 Ex. A; see R.M.S. Titanic, Inc., 742 F. Supp. 2d at 809-24. The court will hereinafter refer and cite to these as the "Covenants and Conditions."

the Supreme Court's denial of certiorari on two (2) occasions.[3] These opinions thoroughly review much of the factual and procedural history relevant to this continuing salvage litigation, and this Opinion and Order only repeats that history as necessary.

The R.M.S. Titanic ("Titanic") was a British White Star Line luxury passenger ship that foundered on her maiden voyage, after colliding with an iceberg on her way to New York City, New York, from Southhampton, England, in the early morning hours of April 15, 1912. Titanic's sinking marked one of the worst maritime disasters in history; approximately one thousand five hundred (1,500) passengers and crew perished in the frigid waters of the North Atlantic. Today, more than one hundred (100) years after the sinking, Titanic continues to hold a special cultural significance. The ship, the drama of its demise, and the discovery of its wreckage feature in countless films, books, exhibits, memorials, and articles.

Titanic split apart upon sinking. The bow and stern sections came to rest on the ocean floor over twelve thousand (12,000) feet below sea level and roughly four hundred (400) nautical miles from Newfoundland, Canada. There, the wreck remained undisturbed for nearly seventy-five (75) years until it was discovered in 1985 by

[3] See R.M.S. Titanic, Inc. v. Haver, 528 U.S. 825 (1999); R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 537 U.S. 885 (2002).

a joint United States-French expedition. Shortly thereafter, Congress passed the R.M.S. Titanic Maritime Memorial Act of 1986, 16 U.S.C. § 450rr et seq. ("Memorial Act"). The Memorial Act found that the wreckage "merits appropriate international protection," as Titanic "is of major national and international cultural and historical significance." 16 U.S.C. § 450rr(a)(3). Further, the Memorial Act authorized the National Oceanic and Atmospheric Administration ("NOAA") to consult with interested nations to "develop an international agreement," id. § 450rr-4(a), and to "develop international guidelines for research on, exploration of, and if appropriate, salvage of the R.M.S. Titanic," id. § 450rr-3(a).

**A. Recovery and Acquisition of the French TITANIC Artifact Collection ("French Collection" or "1987 Artifacts")**

In 1987, before the United States and other interested nations had entered into an international agreement or developed guidelines pursuant to the Memorial Act, RMST's predecessor-in-interest, Titanic Ventures Limited Partnership ("TVLP"), participated in a joint expedition with the Institut français de recherche pour l'exploitation de la mer ("IFREMER") to salvage artifacts from the Titanic wreck. R.M.S. Titanic, Inc., 742 F. Supp. 2d at 788. TVLP and IFREMER recovered approximately one thousand, eight hundred (1,800) artifacts from Titanic over thirty-two (32) dives. Id. TVLP took these artifacts to France,

"where they underwent conservation and restoration processes at the government-owned laboratories of Electricité de France, and at LP3, a privately-owned conservation laboratory in Semur-en-Auxois." R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 323 F. Supp. 2d 724, 727 (E.D. Va. 2004), aff'd in part, vacated in part, 435 F.3d 521 (4th Cir. 2006).

On September 22, 1993, TVLP General Partner George Tulloch sent a letter to the Head of the Headquarter of Maritime Affairs in Lorient, France. See ECF No. 797-1 at 1-5. In that letter, Tulloch stated that TVLP, "as salvor, wishe[d] to own the artifacts." Id. at 2. Tulloch stated that TVLP intended "to make a respectfull [sic] use of the artifacts recovered from the Titanic in 1987 in memory of their initial owners." Id. Accordingly, Tulloch wrote that "the artifacts will only be used on a cultural purpose and will not, therefore, be part of any operations which would lead to their dispersion, but to the exception of exhibition purposes, and none of the artifacts will be sold." Id. at 2-3.

On October 20, 1993, Tulloch and a French Maritime Affairs Administrator, M. Chapalain, executed a Procès-Verbal,[4] which provided the following:

> In accordance with its decision dated October 12, 1993, taken pursuant to the provisions of the decree N° 61-1547

---

[4] A "procès-verbal" is a "detailed, authenticated written report of a proceeding, esp[ecially] of an international conference." Procès-Verbal, Black's Law Dictionary (12th ed. 2024).

> dated December 26, 1961 determining the regime of the wreck at Sea, M. Chapalain, representing the Head of the Headquarter of Maritime Affairs of Lorient, has carried out this day the delivery of the artifacts recovered from the Titanic wreck in 1987 and whose legal owners or heirs have not been identified pursuant to the publicity measures implemented by the French Authorities, to Titanic Ventures Limited Partnership, in its capacity of salvagor.

Id. at 12-17.

The "decision dated October 12, 1993," referenced by the Procès-Verbal, consisted of a Letter signed by M. Tricot, the "Chief Administrator 2nd class for Maritime Matters." Id. at 6-11. That Letter stated that "ownership" of artifacts recovered by TVLP and IFREMER would be "delivered" to TVLP. Id. at 7. Further, the letter stated:

> Concerning this delivery of ownership, I have duly noted your intention, entered in the letter of 9/22/93, by which you agreed to make use of such objects in conformity with the respect due to the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition.

Id. at 8.

### B. Commencement of *In Rem* Action in Norfolk

On May 4, 1993, RMST acquired all the assets and liabilities of TVLP. That summer, RMST and IFREMER conducted additional salvage operations at the wreck of *Titanic*, but this time, they brought approximately eight hundred (800) newly recovered artifacts to the Eastern District of Virginia and commenced the instant *in rem*

action, with Titanic and its cargo named the Defendant. ECF No. 1 (Verified Complaint).[5] RMST requested, inter alia, that a warrant for maritime arrest issue and that the court grant RMST a salvage award and the exclusive right to recover artifacts from Titanic. Id. at 6-7.

On August 27, 1993, the court ordered that a warrant of maritime arrest be issued. ECF No. 7 (Order for Issuance of Warrant of Arrest). The court further ordered that upon execution of the warrant, the court would assume constructive possession of the Titanic wreck, and the United States Marshal ("Marshal") would "receive and take into his possession and control any and all items that have or will come up from the wreck in question . . . until a determination of ownership is made or a further order of this court is issued." Id. at 2. Finally, because care of the artifacts posed great technical difficulty, the court ordered that the Marshal, upon seizure of salvage from Titanic, would surrender possession thereof to RMST as substitute custodian. ECF No. 8 at 3 (Order Appointing Substitute Custodian). Notice of the court's actions was published in The Virginian-Pilot, The Wall Street Journal, and The Journal of Commerce. See ECF Nos. 11, 12, 13.

[5] RMST presented the court with a wine decanter salvaged from Titanic, and it stated that other Titanic artifacts were physically present within the Eastern District of Virginia. R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 952 (4th Cir. 1999); see ECF Nos. 1 at 2 (Verified Complaint), 38 at 2 (Order).

Only one (1) claimant appeared asserting an interest in the Titanic artifacts. Liverpool and London Steamship Protection and Indemnity Association Limited ("Liverpool & London") filed a Verified Claim and Answer on October 7, 1993. ECF Nos. 14 (Verified Claim), 15 (Answer). On June 7, 1994, after RMST and Liverpool & London entered into a settlement agreement, the court dismissed Liverpool & London's claim with prejudice. ECF No. 36 (Dismissal Order).

With Liverpool & London's claim dismissed, the court found and ordered that RMST is the salvor-in-possession of the Titanic wreck and wreck site. ECF No. 37 at 2 (Judgment Order). Accordingly, the court declared that RMST "is the true, sole and exclusive owner of any items salvaged from the wreck of the defendant vessel in the past and, so long as [RMST] remains salvor in possession, items salvaged in the future, and is entitled to all salvage rights." Id. At a hearing leading to issuance of the Judgment Order, the court stated its understanding that RMST intended "to display these artifacts and to try to get [its] money back out of admissions to the display rather than selling them off." See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 286 F.3d 194, 197 (4th Cir. 2002) (alteration in original), cert. denied, 537 U.S. 885 (2002) ("Titanic 2002"). Counsel for RMST affirmed that understanding, explaining "that the process [of] going forward with the exhibition of the artifacts and not sell[ing

them] continues and . . . that is the position of the salvors in this case, that the 1987 artifacts and the 1993 artifacts will not be sold, but rather will be exhibited." See id. (alterations in original).

RMST and IFREMER conducted an additional salvage operation at the Titanic wreck the summer of 1994, recovering over one thousand (1,000) artifacts. See R.M.S. Titanic, Inc., 742 F. Supp. 2d at 789.[6] Two (2) years later, John A. Joslyn moved under Federal Rule of Civil Procedure 60(b) for the court to rescind its June 7, 1994, Judgment Order. ECF No. 40. Joslyn requested that RMST's status as salvor-in-possession "be rescinded because it ha[d] failed to diligently salvage the TITANIC, ha[d] evidenced no intention to salvage it in the future, and, at th[at] time, [wa]s financially incapable of utilizing its rights." ECF No. 69 (Memorandum Opinion and Order); see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 924 F. Supp. 714, 716 (E.D. Va. 1996). On May 10, 1996, the court denied Joslyn's motion because RMST had demonstrated due diligence, salvage operations at Titanic were ongoing, and those operations and future operations were "clothed with a prospect of success." R.M.S. Titanic, Inc., 924 F. Supp. at 721-24. The court explicitly factored into its analysis the fact that "RMST promised the Court that it would keep the artifacts

[6] The court took one (1) Titanic artifact from the 1994 expedition into its actual possession. See ECF No. 38 at 2 (Order).

together and preserve them for the public." Id. at 723.[7] Moreover, up to that date, RMST had upheld its promise. The court stated:

> RMST has been an [sic] guardian of the TITANIC artifacts: it has recovered thousands of artifacts from the wreck site, has hired a qualified conservator to actively conserve and preserve artifacts, and has organized exhibitions, including a one-year exhibition at the world's foremost maritime museum. RMST has demonstrated to this Court that it is continuing to organize future exhibitions of the artifacts. Hence, the Court finds that RMST has maintained the duties expected of it as salvor in possession of the TITANIC.

Id.

With its status as salvor-in-possession confirmed, RMST undertook additional salvage efforts in 1996 and 1998. Working in conjunction with IFREMER, RMST recovered approximately one hundred forty-four (144) artifacts from Titanic, including a large section of the hull known colloquially as the "Big Piece." R.M.S. Titanic, Inc., 742 F. Supp. 2d at 789.

### C. Continued Salvage; Regulatory Developments

On May 4, 1998, RMST sought an injunction stopping a company named Deep Ocean Expeditions and others from organizing a tourist expedition to Titanic and from photographing the wreck. ECF Nos. 101 (Motion), 104 (Amended Motion). That same day, Christopher Haver, an individual who anticipated visiting Titanic

[7] The court also noted that "RMST's promise to keep the artifacts together was one of the factors this Court considered when it granted salvor-in-possession status to RMST in 1994." R.M.S. Titanic, Inc., 924 F. Supp. at 718 n.10.

with Deep Ocean Expeditions, filed a separate civil action in this court seeking a declaration that he could enter the wreck. See Complaint for Declaratory Judgment, Haver v. R.M.S. Titanic, Inc., No. 2:98-cv-507 (E.D. Va. May 4, 1998), ECF No. 1. RMST filed an Answer and Counterclaim, seeking to enjoin Haver from visiting Titanic. See Answer to Complaint and Counterclaim, Haver v. R.M.S. Titanic, Inc., No. 2:98-cv-507 (E.D. Va. May 11, 1998), ECF No. 2. The court consolidated Haver's declaratory action with the instant in rem action. ECF No. 108. Thereafter, in a published Opinion and Order, the court granted RMST's request for an injunction and enjoined Deep Ocean Expeditions, Haver, and others from visiting and photographing Titanic. ECF No. 130; see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 9 F. Supp. 2d 624, 637 (E.D. Va. 1998). The court found, inter alia, that exclusion of third parties from the wreck site was necessary to safeguard ongoing salvage efforts and "the historical and archeological value of the wreck itself." R.M.S. Titanic, Inc., 9 F. Supp. 2d at 636, 639-40. Moreover, exclusion was necessary to compensate RMST for its salvage efforts, as it "does not sell artifacts" and instead "places them in world-wide museum exhibits for the whole world to see." Id. at 640.

Haver and Deep Ocean Expeditions appealed. ECF No. 131. On March 24, 1999, the Fourth Circuit ruled that the court had acted beyond its powers by enjoining Haver and Deep Ocean Expeditions

from visiting and photographing the Titanic wreck site. R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 971 (4th Cir. 1999), cert. denied, 528 U.S. 825 (1999) ("Titanic 1999"). The Fourth Circuit also, however, upheld this court's exercise of constructive in rem jurisdiction over the Titanic wreck and wreck site, as well as this court's naming of RMST as salvor-in-possession. Id. at 966-69.[8] Specifically, the Fourth Circuit affirmed the court's exercise of "constructive" in rem jurisdiction over Titanic because the court had "a portion of [the res] within its jurisdiction and that this constructive in rem jurisdiction continues as long as the salvage operation continues." Id. at 967.

RMST, working with the P.P. Shirshov Institute of Oceanology, conducted another series of dives at the Titanic wreck site in 2000. See R.M.S. Titanic, Inc., 742 F. Supp. 2d at 790. This time, RMST recovered over nine hundred (900) artifacts. Id.

In April of the following year, pursuant to the Memorial Act, NOAA promulgated "Guidelines for Research, Exploration and Salvage of RMS Titanic." 66 Fed. Reg. 18905 (April 12, 2001) ("NOAA Guidelines"). These Guidelines state, inter alia, that "[a]ll artifacts recovered from RMS Titanic should be . . . kept together and intact as project collections." Id. at 18912.

---

[8] See infra Part IV.A.

The NOAA Guidelines roughly coincided with the negotiation of an international agreement between the United States, the United Kingdom, the Republic of France, and Canada. Agreement Concerning the Shipwrecked Vessel RMS Titanic, Nov. 6, 2003, T.I.A.S. No. 19-1118 ("International Agreement"). The International Agreement, "[d]esiring that artifacts henceforth recovered from RMS Titanic be kept together and intact as project collections in a manner that can provide for public access," id. pmbl. ¶ 6, sets forth in an Annex certain "Rules Concerning Activities Aimed at the RMST Titanic and/or its Artifacts," id. Annex ("International Agreement Rules"). Signatories agree to take reasonable and necessary measures to enforce these Rules, including the requirement that "any artifacts recovered . . . shall be kept together and intact in a manner that provides for public access, curation and . . . availability for educational, scientific, cultural and other public purposes." International Agreement Rule 28. The United States signed the International Agreement on June 18, 2004, but did not enact implementing legislation until May 5, 2017. See Department of Commerce Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 192 (May 5, 2017). The United States then ratified the International Agreement on November 18, 2019. See ECF No. 581 at 2 (Status Report of the United States).

### D. RMST Seeks Title to Titanic Artifacts

In 2000, when the court learned that George Tulloch had been ousted from RMST's management, the court ordered that RMST could not "sell or otherwise dispose of any artifacts or any object recovered from the TITANIC wreck site." ECF No. 164 at 3.[9] Even so, the court learned in the summer of 2001 that RMST had plans to transfer interest in the Titanic artifacts to a nonprofit organization. The court ordered that RMST not convey in any manner any Titanic artifacts in RMST's possession until a hearing had been held. ECF No. 177. A hearing was held on September 24, 2001, after which the court ordered that its previous orders forbidding the sale of Titanic artifacts "were proper and were necessary when entered." ECF No. 182 at 2. After RMST appealed, the court entered an Order further explaining its ruling. ECF No. 185. RMST then filed an Amended Notice of Appeal. ECF No. 186. The Fourth Circuit held an expedited hearing, and it thereafter affirmed the court's ruling:

> The Titanic was a historic ship, and the artifacts recovered from its wreckage therefore have enhanced value. RMST currently has a unique role as the *Titanic's* exclusive salvor, and, having performed salvage services, it has a lien in the artifacts and is entitled to a reward enforceable against those artifacts. At this stage of the proceedings, however, we cannot conclude that RMST has title to any artifacts. We also cannot conclude that the course that the district court is

[9] The court later amended this Order to permit RMST's continued sale of coal recovered from the wreck site. See ECF No. 175.

> pursuing violates the law of salvage or amounts to an abuse of discretion.

Titanic 2002, 286 F.3d at 210.

On February 12, 2004, RMST filed a "Motion for Salvage and/or Finds Award." ECF No. 210. In its Motion, RMST requested that the court recognize the 1993 Procès-Verbal concerning title to the 1987 Artifacts. Id. at 9.[10] RMST also asked whether the court would consider evidence of abandonment of Titanic for the purpose of obtaining title to the Titanic artifacts before this court under the law of finds. Id. at 10. On July 2, 2004, the court issued a Memorandum Opinion and Order that did not recognize the Procès-Verbal under principles of international comity. ECF No. 219; see R.M.S. Titanic, Inc., 323 F. Supp. 2d at 730-34. The court stated that recognition of the Procès-Verbal would contradict public policy as reflected in the Memorial Act and NOAA Guidelines, "because doing so would be tantamount to sanctioning the dispersal of Titanic artifacts." R.M.S. Titanic, Inc., 323 F. Supp. 2d at 734.[11] Additionally, the court ordered that RMST would not be able to submit evidence for the purpose of seeking an award

---

[10] See supra note 4 and accompanying text.

[11] The court stated that "if RMST is declared the owner of the 1987 artifacts, then this court has no legal basis on which to prohibit the company from auctioning off individual artifacts or otherwise disposing of them in a manner that deprives the public of their benefit." R.M.S. Titanic, Inc., 323 F. Supp. 2d at 734 (citing Titanic 2002, 286 F.3d at 209).

of title under the law of finds, finding instead that the law of salvage governs this in rem action. Id. at 734-41, 745. RMST appealed, ECF No. 220, and the court stayed proceedings while the interlocutory appeal was pending, ECF No. 224; see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 327 F. Supp. 2d 664, 665-67 (E.D. Va. 2004).

While the interlocutory appeal was pending, RMST did return to the wreck site over the summer of 2004 and recovered an additional seventy-five (75) artifacts from Titanic. R.M.S. Titanic, Inc., 742 F. Supp. 2d at 791. This 2004 salvage operation was the last time that RMST successfully salvaged artifacts from the wreck of the Titanic, though it would later return to the wreck site in 2010 and 2024 for purposes of survey and study.[12]

On January 31, 2006, the Fourth Circuit issued an Opinion upholding the court's determination that the law of salvage applies in this in rem action, not the law of finds. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 435 F.3d 521, 530-35 (4th Cir. 2006) ("Titanic 2006"). The Fourth Circuit held that the court had erred, however, by refusing to recognize the 1993 Procès-Verbal

[12] RMST initially planned to recover artifacts during its 2024 expedition to Titanic. ECF No. 686 at 2-3 (Periodic Report). RMST abandoned its plan to recover artifacts after the submersible Titan imploded near the wreck on June 18, 2023. ECF No. 694 at 3 (Periodic Report). The catastrophe tragically resulted in the death of RMST's Director of Underwater Research, Titanic expert Paul-Henri Nargeolet. Id. at 1-2.

concerning the Titanic artifacts recovered in 1987 and taken to France at that time. Id. at 527-30.[13] The Fourth Circuit noted that "[i]n reaching its conclusions, the district court implicitly concluded that it had in rem jurisdiction over the 1987 artifacts or jurisdiction to issue a declaratory judgment as to them." Id. at 528. Because the 1987 Artifacts "had already been separated from the Titanic and transported to France" prior to initiation of the instant in rem action in Norfolk in 1993, the 1987 Artifacts "were not part of the res over which the district court could assert in rem jurisdiction." Id. at 528-29. As the 1987 Artifacts "were not otherwise voluntarily subjected to the jurisdiction of the district court," the Fourth Circuit held that this court "did not have in rem jurisdiction over the 1987 artifacts or, absent in rem jurisdiction, any other jurisdictional basis upon which to issue a declaratory judgment." Id. at 528-29. Thus, the Fourth Circuit held that this court had no jurisdictional basis, at that juncture, to adjudicate title in the 1987 Artifacts. Id. at 530.

In remanding the case back to this court, the Fourth Circuit articulated the application of salvage law in this case, given Titanic's status as a "historically or culturally significant

[13] At some point the French Collection was returned to RMST in the United States. RMST stated on August 13, 2026, that the French Collection Artifacts are presently "in Georgia," or that they are otherwise in "other places," presumably on display at RMST's various exhibitions. ECF No. 846 at 10 (Hearing Transcript).

wreck." Id. at 537. The Fourth Circuit noted that it "by default applied traditional salvage law to historic wrecks," and it ratified application of traditional salvage law "for the purpose of formalizing the salvage trust of historic wrecks and better informing the appropriate participation in such a trust." Id. at 537-38. Specifically, the Fourth Circuit noted that district courts were empowered to "appoint the plaintiff to serve as salvor to further the public interest in the wreck's historical, archeological, or cultural aspects and to protect the site through injunctive relief, installing the salvor as its exclusive trustee so long as the salvor continues the operation." Id. at 537. Furthermore, the Fourth Circuit provided:

> The court may, in addition to the traditional salvage remedies, also enter such orders as to the title and use of the property retrieved as will promote the historical, archeological, and cultural purposes of the salvage operation. Indeed, to that end the salvor might be able to obtain public or private funding. Finally, the court must include in its remedies a design to provide the salvor with an appropriate reward, which may include awards in specie, full or restricted ownership of artifacts, limitations on use of the artifacts, rights to income from display and shared research, and future rights to salvage.

Id. at 537-38. In sum, the Fourth Circuit remanded the case to this court "with the recognition that it may apply the principles of traditional salvage law to the wreck of the Titanic in a manner that serves either the [original] owner or, absent an owner, the

public interest and at the same time provides an appropriate award to the salvor." Id. at 538 (emphasis added).[14]

**E. In Specie Salvage Award**

On remand, the court issued a Memorandum Opinion and Order on October 16, 2007, directing RMST to file a motion for a salvage award. ECF No. 275; see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 531 F. Supp. 2d 691, 693 (E.D. Va. 2007). That Memorandum Opinion and Order also entrusted the United States, through the United States Attorney for the Eastern District of Virginia, "to review RMST's continuing actions as salvor and the periodic status reports thereof filed with the court, as well as any salvage award motion which RMST chooses to submit." R.M.S. Titanic, Inc., 531 F. Supp. 2d at 693. Such oversight by the United States was "necessary in order to preserve and protect the R.M.S. Titanic and its artifacts as an international treasure for posterity, and the United States' efforts and interests in this regard, and to ensure compliance with this court's rulings and final orders." Id.

RMST moved for a salvage award on November 30, 2007, seeking an in specie award of title to artifacts recovered between 1993 and 2004 instead of a monetary award from the judicial sale of the

[14] In so remanding the case, the Fourth Circuit provided that the public interest is a key consideration for any in specie award made in this historic shipwreck salvage action. See Titanic 2006, 435 F.3d at 537-38.

artifacts. ECF No. 280.[15] RMST submitted several volumes of exhibits in support of its motion and represented that the fair market value of Titanic artifacts in its possession, excluding the 1987 Artifacts, stood at one hundred ten million, eight hundred fifty-nine thousand, two hundred dollars ($110,859,200). Id. ¶ 10. RMST stated that it was seeking a salvage award between ninety and one hundred percent (90-100%) of this figure. Id. ¶ 11. It further urged the court to make an in specie award, reassuring the court that such an award could be made subject to certain restrictive covenants preventing the dispersal of Titanic artifacts through commercial auction or sale. Id. ¶ 18; ECF No. 281 at 52-55 (Memorandum of Law in Support of RMST's Motion for a Salvage Award).

Given the court's Memorandum Opinion and Order dated October 16, 2007, the United States then sought and obtained leave to appear as amicus curiae and to set forth its views on any salvage award made to RMST. See ECF Nos. 288 (United States' Motion), 291 (Order granting Motion). In its Response to RMST's Motion for a Salvage Award, the United States stated that "an interim in specie award with limitations could serve as an

[15] "If it becomes apparent to the court that the proceeds of any sale would clearly be inadequate to pay the salvor its full reward, then the court might, as a matter of discretion, award the salvor title to the property in lieu of the proceeds of sale, thus saving the costs of sale. The salvor does not have a direct right, however, to title in the property." Titanic 2002, 286 F.3d at 204.

appropriate mechanism to ensure that the artifacts from the R.M.S. Titanic are conserved and curated together in an intact collection that is available to the public and accessible for historical review, educational purposes, and scientific research in perpetuity." ECF No. 289 at 1. Thus, the United States' Response included proposed limitations "furthering the principles" set forth in the Memorial Act, the NOAA Guidelines, and the International Agreement. Id. at 2, 11-16.

On April 15, 2008, the court issued an Order stating that if it ultimately found an in specie salvage award appropriate, "this award would need to contain carefully drafted covenants that would ensure that the R.M.S. Titanic and its artifacts are preserved as an international treasure for posterity." ECF No. 293 at 4. Accordingly, the court directed RMST to submit proposed restrictive covenants. The court ordered:

> At minimum, these proposed covenants must ensure that the artifacts are conserved and curated in an intact collection that is available to the public and accessible for historical review, educational purposes, and scientific research, in perpetuity. The proposed covenants shall incorporate safeguards to ensure that they will remain effective in perpetuity, notwithstanding any further changes in circumstances. Furthermore, the proposed covenants shall guard against contingencies that might impair their future effectiveness.

Id. at 6 n.12; see R.M.S. Titanic, Inc., 742 F. Supp. 2d at 792. Furthermore, the court ordered:

> Specifically, these covenants, at minimum, must ensure the following: (1) that the collection is maintained as an intact collection that joins those artifacts from the R.M.S. Titanic awarded to RMST by a French maritime tribunal; (2) that the collection is managed according to the professional standards recognized in the NOAA Guidelines, the International Agreement and the Annexed Rules, and the federal regulations governing the curation of federally owned and administered archaeological collections; (3) that reasonable, ongoing oversight by NOAA is implemented in order to protect the United States' interests in the Titanic wreck site and the artifacts recovered therefrom, and to ensure compliance with all court-imposed covenants; (4) that the collection is protected in perpetuity by ensuring that the covenants run with the collection to any subsequent purchasers and/or successors-in-interest to RMST; and (5) that the collection is protected in the event of insolvency or bankruptcy by RMST.

ECF No. 293 at 4-5 (footnotes omitted); see R.M.S. Titanic, Inc., 742 F. Supp. 2d at 792.

RMST submitted proposed restrictive covenants in June 2008. ECF Nos. 295 Ex. A, 296 Ex. A. Following consultation with the United States, RMST submitted revised covenants on September 12, 2008. ECF No. 302 Ex. A. The United States filed an amicus Response on October 14, 2008, approving most provisions, criticizing others, and providing proposed revisions. ECF No. 304. The court held a Status Hearing on November 18, 2008, at which the court oversaw additional revisions to the proposed restrictive covenants. See ECF No. 310 (Status Hearing Transcript). Thereafter, the court was satisfied that the proposed restrictive covenants complied with its April 15, 2008, Order. See R.M.S.

Titanic, Inc., 742 F. Supp. 2d at 793.[16] Following an Evidentiary Hearing held over the course of six (6) days in October and November 2009, and after almost seventeen (17) years of proceedings, RMST's Motion for a Salvage Award was ripe for decision. See id.

On August 12, 2010, the court issued an Opinion granting RMST's Motion for a Salvage Award. ECF No. 340; see R.M.S. Titanic, Inc., 742 F. Supp. 2d at 809. After considering the six (6) salvage award factors set forth in The Blackwall, 77 U.S. (10 Wall.) 1, 14 (1869), as well as a seventh factor unique to historic shipwreck cases in the Fourth Circuit, see Columbus-America Discovery Group v. Atlantic Mutual Insurance Co., 974 F.2d 450, 468 (4th Cir. 1992), and after considering possible deductions or salvor misconduct, the court awarded RMST "a salvage award in the amount of **ONE HUNDRED PERCENT (100%)** the fair market value of the artifacts recovered in the 1993, 1994, 1996, 1998, 2000, and 2004 expeditions to the wreck of the R.M.S. Titanic," R.M.S. Titanic, Inc., 742 F. Supp. 2d at 794-809 (emphasis in original). The court reserved the right, however, "to determine the manner in which to pay the award, which decision w[ould] be made no later than August 15, 2011." Id. at 809. Although the court had approved the Covenants and Conditions negotiated and finalized between RMST and

---

[16] See supra note 2.

the United States, the court was concerned that an in specie award would create "a perpetual legal battle with RMST over the meaning and scope of the covenants and conditions." Id. at 808.[17] "Thus, the court reserve[d] its discretion to sell the artifacts in a judicial sale, until which time it may determine that no appropriate buyer for the collection, capable of maintaining and preserving the artifacts for the public interest, has interest in purchasing the collection at a fair market price." Id. No buyer stepped forward, and on August 15, 2011, the court granted RMST an in specie salvage award and conveyed title to the 1993, 1994, 1996, 1998, 2000, and 2004 artifacts to RMST. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011). Such title is, however, "fully subject to the covenants and conditions that the United States, through the United States Attorney, negotiated and finalized with RMST and the court." Id. (emphasis omitted).

---

[17] In assessing possible salvor misconduct before making a salvage award, the court noted it had "grown tired of the repeated attempts of RMST to assert title to the artifacts, despite its established position as salvor-in-possession." R.M.S. Titanic, Inc., 742 F. Supp. 2d at 803-04. The court had previously noted that additional attempts by RMST to assert unrestricted title in the Titanic artifacts would be met with sanctions under Federal Rule of Civil Procedure 11 and a review of RMST's status as salvor-in-possession. See R.M.S. Titanic, Inc., 531 F. Supp. 2d at 693 n.4.

## II. THE COVENANTS AND CONDITIONS

The Covenants and Conditions were a "condition precedent" for RMST's receipt of an in specie salvage award, and they "run in perpetuity." Covenants & Conditions §§ I.A., VI.B. RMST and the United States have, at times, cast the Covenants and Conditions as a contract between RMST, the United States, and the court. See, e.g., ECF Nos. 797 at 8 n.2, 804 at 23-25. The Covenants and Conditions are not, however, a contract. Rather, the Covenants and Conditions are a creature of maritime law and the court's power, exercising in rem jurisdiction, to fashion an award for salvage of historic shipwrecks. See Titanic 1999, 171 F.3d at 963-66; Titanic 2006, 435 F.3d at 538 ("Finally, the court must include in its remedies a design to provide the salvor with an appropriate reward, which may include awards in specie, full or restricted ownership of artifacts, limitations on use of the artifacts, rights to income from display and shared research, and future rights to salvage.").[18]

The court, in conveying "restricted ownership" in the res to RMST as an in specie salvage award, employed the Covenants and Conditions to formalize both (1) the scope and conditions of the in specie salvage award to RMST; and (2) RMST's continuing obligations as Trustee of the res, most critically the obligation

[18] See supra note 14 and accompanying text.

not to dispose of or disperse the res. See Titanic 2006, 435 F.3d at 535-38; Covenants & Conditions § III.A. Thus, the Covenants and Conditions constitute "an equitable servitude and trust imposed for the public interest." Covenants & Conditions § VI.C. In effect, these Covenants and Conditions permit RMST a limited and restricted ownership interest, as well as other rights such as income from exhibition while it remains Trustee. See id. § VII.B. But RMST, as Trustee, is beholden to the public for the conservation and curation of the res as an integral collection of historic artifacts. See Titanic 2006, 435 F.3d at 537-38. This trust relationship is consistent with the traditional role of a salvor under maritime law. See, e.g., id. at 532 ("Because a salvor acts on behalf of a true owner, even when that owner has not been identified, it serves as a trustee of the owner's property and is therefore not permitted to use that property for its own purposes.").

As approved and entered by the court on August 12, 2010, and as explicitly incorporated by the court's Order dated August 15, 2011, see R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509, the Covenants and Conditions "are intended to ensure that TITANIC artifacts within the scope of its terms are, for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes,"

Covenants & Conditions § I.G. To this end, the Covenants and Conditions impose a comprehensive set of obligations on RMST, as Trustee, vis-à-vis two (2) artifact collections salvaged from Titanic. The first consists of the "Subject TITANIC Artifact Collection" ("American Collection" or "STAC"), which encompasses:

> [A]ll objects recovered from the RMS TITANIC wreck site and debris field by RMST that are within the jurisdiction of the Court, namely all those objects and artifacts recovered by RMST during the course of its dive expeditions (conducted in 1993, 1994, 1996, 1998, 2000 and 2004) on the site after the initiation of the pending admiralty action in 1992.

Id. § II.G. The second is the "French TITANIC Artifact Collection" ("French Collection"), which encompasses "the entirety of artifacts that were recovered by RMST's predecessor entity in the 1987 dive expedition on The TITANIC, and which were the subject of an in specie salvage award granted in favor of RMST's predecessor entity in a Procès-Verbal issued October 20, 1993, by the French Maritime Tribunal." Id. § II.F.[19] Together, the "total assemblage" of the French and American Collections comprises "The TITANIC Collections." Id. § II.H.

To ensure that artifacts recovered from Titanic remain available to posterity, the Covenants and Conditions command that "[t]he Subject TITANIC Artifact Collection shall be kept together and intact forever, pursuant to the terms of these Covenants and

[19] See supra Part I.A.

Conditions." Id. § III.A. Further, "[t]he Subject TITANIC Artifact Collection shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the French TITANIC Artifact Collection as an integral whole." Id. Conservation and curation of the TITANIC Collections shall "be carried out in accordance with professional standards." Id. § IV.B.1, 2. Finally, RMST "shall take all necessary measures to protect the physical security of the TITANIC Collections and shall insure it against casualty or loss." Id. § IV.D. Any failure by RMST to carry out these essential Covenants and Conditions "will normally be assumed to be a material default" under the Covenants and Conditions. Id. § V.E.1. Otherwise, a "material default" arises wherever RMST's "conduct or omission" threatens to "seriously compromise and jeopardize the TITANIC Collections and the objective of ensuring that it is available to posterity." Id.

The Covenants and Conditions are not without procedural safeguards or enforcement mechanisms in the event of RMST's material default as Trustee. See id. § V. The United States, specifically NOAA, is "an intended beneficiary of these Covenants and Conditions, with the authority to enforce their terms as appropriate on behalf of the public interest." Id. § II.K; see infra Part III. This authority "is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's

2001 implementing Guidelines." Covenants & Conditions § II.K. Under the Covenants and Conditions, NOAA's authority includes the ability "to gather information and to submit information and/or make reports and recommendations to the Court regarding the compliance of [RMST] with these Covenants and Conditions, subject to the availability of resources, appropriations, and other authorized funds." Id. § V.A. To that end, NOAA may "periodically inspect the TITANIC Collections and the Trustee's operations for the conservation, curation, documentation, and other activities in relation to the STAC." Id. § V.C.1. In carrying out such inspections, NOAA has "full access to the TITANIC Collections, [RMST]'s facilities and personnel, and any documentation NOAA determines is reasonably necessary to evaluate the condition of the STAC." Id. Moreover, NOAA may "consult with, and seek advice from," qualified government departments and agencies or experts "who may be of assistance to evaluate the condition of the TITANIC Collections." Id. § V.C.2.

In appropriate circumstances, NOAA may submit to the court "recommendations as to whether [RMST] is in significant default of an essential Covenant and Condition." Id. § V.C.6. Similarly, NOAA may recommend a "means of response or remediation of such default." Id. § V.E.2.a. If NOAA advises the court in a report that a material default under the Covenants and Conditions "has occurred, or will imminently occur," the Covenants and Conditions set forth

procedures for the court to follow. See id. § V.E.2. First, the court may "request information from [RMST] and/or may convene and conduct an evidentiary hearing in order to ascertain whether a material default has occurred, and what steps the Trustee must undertake to respond or remediate." Id. § V.E.2.b. At the conclusion of the hearing, "NOAA may submit additional information and/or prepare a report and recommendation for the Court, as to whether there has been a material default, and whether the Trustee is unwilling or unable to satisfactorily respond or remediate." Id. § V.E.2.c. After considering any information, report, or response thereto submitted by NOAA and RMST, "[t]he Court may enter an Order as to whether there has been a material default, and, if so, any such action as the Trustee must make, within a specified period of time, to respond or remediate." Id. § V.E.2.e. If the court thereafter "finds that there has been a material default of an essential Covenant and Condition, and the Trustee is unable or unwilling to comply with the Court's order for response or remediation," then the court may order:

> (i) the Trustee to make other reasonable undertakings in order to respond to or remediate the material default; (ii) the Trustee to post additional performance guarantee(s); or (iii) the use of the reserve account in a manner subject to the Court's determination to best protect and preserve the TITANIC Collections.

Id. § V.E.2.f.

As a final note, the Covenants and Conditions memorialize the court's "continuing jurisdiction" to enforce these perpetual Covenants and Conditions. Id. § V.F.[20] Because the court took constructive possession of the entire res and thereafter rendered an in specie salvage award consisting of limited and restricted ownership, i.e., incomplete title in the 1993, 1994, 1996, 1998, 2000, and 2004 artifacts, the court retains in its constructive possession the public beneficiary interest. Thus, under the Covenants and Conditions, the court may exercise "continuing jurisdiction over the Subject TITANIC Artifact Collection as part of the pending admiralty action." Id. § V.F.1. Furthermore, RMST, as Trustee, is subject to the court's jurisdiction in personam "for the purpose of oversight of compliance with these Covenants and Conditions." Id. § V.F.2.

### III. RMST'S PLANNED AUCTION OF FRENCH COLLECTION ARTIFACTS

On March 6, 2026, RMST filed a Periodic Report under seal. ECF No. 790.[21] That Periodic Report notified the court and the

---

[20] See infra Part IV.

[21] On April 21, 2026, the court found that "blanket sealing" of the March Periodic Report and exhibits thereto was inappropriate and unwarranted. ECF No. 808 at 2-6 (Order); see E.D. Va. Civ. R. 5(C). The court ordered that RMST submit proposed redactions to the March Periodic Report and exhibits, ECF No. 808 at 9-11, which the court finally approved on June 4, 2026, ECF No. 821 (Order). While this Opinion and Order generally cites to the sealed versions of these documents, copies of the March Periodic Report and exhibits thereto have been filed on the public docket, subject

United States that RMST intends to auction certain French Collection Artifacts. Id.; see ECF No. 790-1 (listing the "Artifact[s]" to be auctioned).[22] Per the March Periodic Report, RMST planned to announce the auction in April 2026 and to carry out the auction in July or August of 2026. ECF No. 790 at 4. According to RMST, the planned auction is lawful because RMST holds absolute title in the French Collection and because "the Covenants and Conditions do not . . . restrict the sale of artifacts from the French Collection." Id. at 3 (citing Covenants & Conditions § VI). Moreover, RMST claims that this court "does not have subject matter jurisdiction over the French Collection." Id. (citing Titanic 2006, 435 F.3d at 529).

On March 31, 2026, the United States filed its Response to RMST's Notice of Intent to Sell French Artifacts. ECF No. 797.[23] The United States, as amicus curiae and on behalf of NOAA, an intended beneficiary under the Covenants and Conditions, deems

---

only the very limited redactions approved by the court. See ECF No. 822.

[22] See supra note 1.

[23] Consistent with the court's partial unsealing of RMST's March Periodic Report, see supra note 21 and accompanying text, the United States retracted its request to file its Response and exhibits thereto under seal, see ECF Nos. 794 (Motion to Seal), 824 (Response to June 4, 2026, Order). Accordingly, on June 12, 2026, the court directed the Clerk to lift the seal on the United States' Response and exhibits thereto, which are now viewable on the public docket. See ECF Nos. 797 (Response), 826 (Order).

RMST's planned auction a material default under the Covenants and Conditions that is injurious to the public interest in the TITANIC Collections. Id. at 2; see Covenants & Conditions §§ II.K, V. Specifically, the United States contends that RMST's planned auction of French Collection Artifacts poses an imminent material default under Sections III.A, IV.B, and IV.D of the Covenants and Conditions, as well as an imminent violation of this court's Order dated August 15, 2011. ECF No. 797 at 11; see R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509. Accordingly, the United States recommends that the court prohibit RMST from "advertising for sale, or conducting any sale, of any French Artifacts absent approval of this Court." ECF No. 797 at 17. Further, the United States recommends that the Republic of France "be notified of RMST's intent to sell and disburse French Artifacts, provided a copy of the [March] Periodic Report and Exhibit A thereto, and given the opportunity to set forth its position on the intended sale, if it chooses." Id.[24]

On April 2, 2026, the court entered an Order stating that it would hold a hearing pursuant to Covenants and Conditions § V.E.2.b to address RMST's alleged material default, the United States' recommended "means of response or remediation," and "the court's jurisdiction to order such response or remediation." ECF No. 798

[24] See infra Part V.C.

at 5-6; see R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 828 F. Supp. 3d 729, 732 (E.D. Va. 2026).[25] The court also ordered that "until such time as the court has decided whether the planned auction of French Collection artifacts is subject to this court's approval, RMST shall refrain from advertising for sale, or conducting any sale, of any French Collection artifacts, as planned and set forth in the [March] Periodic Report." ECF No. 798 at 6 (emphasis in original). Finally, the court accorded RMST an opportunity to reply to the United States' Response. Id.

RMST filed a reply to the United States Response, styled as a Periodic Report, on April 9, 2026. See ECF No. 804 ("April Periodic Report").[26] RMST stated in its April Periodic Report that it has, "without waiving any rights," "suspended the public announcement of the auction." Id. at 2. In the remainder of the April Periodic Report, RMST argued at length that this court lacks jurisdiction over the French Collection, that the Covenants and

[25] The court entered its April 2, 2026, Order under seal, and subsequently directed the Clerk to lift the seal on April 21, 2026. See ECF No. 808 at 11 (Order).

[26] As with the March Periodic Report, RMST filed its April Periodic Report and accompanying exhibits under seal. On April 21, 2026, the court found that "blanket sealing" of the April Periodic Report and exhibits thereto was inappropriate and unwarranted. ECF No. 808 at 6-7. The court ordered that RMST submit proposed redactions to the April Periodic Report and exhibits, id. at 9-11, which the court finally approved on June 4, 2026, ECF No. 821. On June 5, 2026, RMST filed redacted copies of the April Periodic Report and exhibits thereto on the public docket, subject only to minimal redactions approved by the court. See ECF No. 823.

Conditions do not prohibit RMST's planned auction of the French Collection Artifacts, that this court is otherwise powerless under the terms of the Covenants and Conditions to stop the commercial sale and dispersion of the French Collection Artifacts, and that the Republic of France has abandoned any interest in the French Collection. See generally id. Finally, RMST claims that its planned auction "is in the public interest," as auction proceeds will mitigate RMST's "financial difficulties" and "significant operating losses" and therefore "ensure continued conservation and curation of the remaining collections." Id. at 31.

After completing the time-consuming process of redacting and unsealing filings concerning the planned auction, the court deemed the controversy arising from RMST's planned auction ripe for a hearing. ECF No. 827. Given the scope of the issues before the court, however, the court set a supplemental briefing schedule for RMST and the United States. Id. The United States filed a supplemental brief, ECF No. 830 ("Supplemental Brief"), and RMST did not. RMST filed a Response to the United States' Supplemental Brief on July 10, 2026. ECF No. 837 ("Supplemental Response").

In addition to legal arguments, the United States' Supplemental Brief includes new recommendations pursuant to Covenants and Conditions § V.E.2.a. See ECF No. 830 at 22-23. The United States recommends that the court (1) "find that RMST requires court approval for any proposed sale of French Collection

artifacts"; (2) "find that it possesses the authority to enforce the terms of the Covenants"; (3) find that RMST's planned auction constitutes a material default under the Covenants and Conditions; (4) prohibit RMST "from advertising or conducting any auction or other sale of French Collection artifacts"; (5) require RMST to "explore the disposition of the entire TITANIC Collections to a qualified institution approved by NOAA and the Court"; (6) require RMST to provide the court and NOAA with a "detailed explanation of . . . the causes of RMST's current financial difficulties," any mitigating efforts RMST has taken, and "the impact of such mitigating actions on RMST's ability to care for the TITANIC Artifact Collections"; (7) require RMST to "provide an updated inventory for the TITANIC Artifact Collections, the current locations of all artifacts, and the extent of any conservation the artifacts may require"; and (8) consider appointing experts to address the foregoing issues. Id.

On August 13, 2026, the court conducted a hearing pursuant to its Order dated April 2, 2026, and Covenants and Conditions § V.E.2.b. See ECF Nos. 845 (Hearing Minutes), 846 (Hearing Transcript). Counsel for RMST and the United States appeared and presented oral argument concerning RMST's alleged material default, the United States' recommendations, and the court's jurisdiction vis-à-vis the French Collection. See ECF Nos. 845, 846. With briefing on RMST's planned auction completed, and the

court having held a hearing thereon, the court proceeds to explain why RMST's planned auction is subject to the court's jurisdiction and approval and shall continue to be enjoined, pending further proceedings consistent with this Opinion and Order.

## IV. JURISDICTION

### A. American Collection

This in rem action principally concerns RMST's efforts since 1993 to salvage artifacts from Titanic. This district court's maritime jurisdiction vis-à-vis the wreck and the artifacts recovered since 1993 has been thoroughly documented and affirmed by the Fourth Circuit, most notably in Titanic 1999, 171 F.3d 943. Accordingly, and because RMST and the United States do not contest the court's subject matter or in rem jurisdiction over Titanic or the American Collection, the court does not belabor the subject. See ECF No. 804 at 28 (RMST's April Periodic Report) ("The Court has jurisdiction with respect to the salved property before the Court (i.e., the artifacts RMST recovered during expeditions in 1993, 1994, 1996, 1998, 2000, and 2004) and the in specie award. Accordingly, the Court could modify or rescind the in specie award or RMST's salvor-in-possession status.").

This in rem salvage action falls within this federal district court's maritime subject matter jurisdiction,[27] but to exercise

[27] Article III Section 2 of the United States Constitution and 28 U.S.C. § 1333 vest this district court with subject matter

jurisdiction in rem, the court must take possession of the res, i.e., the property named as the defendant. See Titanic 1999, 171 F.3d at 964; The Moses Taylor, 71 U.S. (4 Wall.) 411, 427 (1866) ("It is this dominion of the suit in admiralty over the vessel or thing itself which gives to the title made under its decrees validity against all the world."). By taking actual possession of parts of the Titanic wreckage in 1993 and 1994,[28] the court obtained constructive in rem jurisdiction over the Titanic wreck and the artifacts brought within the Eastern District of Virginia. ECF Nos. 7 (Order for Issuance of Warrant of Arrest), 10 (Warrant Return of Service); see Titanic 1999, 171 F.3d at 967-68. The court's power to take constructive possession of Titanic while it lies in international waters rests upon the legal premise "that the res is not divided" and that the court's "possession of some of it is constructively possession of all." Titanic 1999, 171 F.3d at 964. Because of the extreme difficulty of caring for artifacts after decades of submersion in the ocean abyss, the court remitted the Titanic artifacts to the care of RMST as the court-appointed

---

jurisdiction over civil maritime matters. See Titanic 1999, 171 F.3d at 958, 960-61. That jurisdiction encompasses actions seeking an award under the maritime law of salvage. See, e.g., Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel, 640 F.2d 560, 566 (5th Cir. Mar. 1981) ("Claims arising out of salvage operations efforts to rescue or recover ships disabled or abandoned at sea or to retrieve their cargo are, unquestionably, within the admiralty jurisdiction of the federal courts.").

[28] See supra notes 5, 6 and accompanying text.

substitute custodian. ECF No. 8 (Order Appointing Substitute Custodian); see Titanic 1999, 171 F.3d. at 964 ("While the res must be in custodia legis (in the court's possession), this possession may be actual or constructive."). Notice of the court's actions was duly published, see ECF Nos. 11, 12, 13, and only one (1) claimant appeared before settling with RMST, see ECF No. 36 (Dismissal Order). The court then found and ordered that RMST is the salvor-in-possession of Titanic. ECF No. 37 (Judgment Order). Thus, when RMST, as salvor-in-possession and the court-appointed substitute custodian, successfully recovered additional artifacts from Titanic through 2004, it also reduced those artifacts to the court's custody and in rem jurisdiction. See Titanic 2002, 286 F.3d at 209 (noting that the 1993, 1994, 1996, 1998, and 2000 artifacts were "in custodia legis, pending further proceedings, even though RMST had physical possession of the property").

As described at the outset of this Opinion and Order,[29] the court awarded RMST title to the American Collection, subject to the Covenants and Conditions, as an in specie award under the maritime law of salvage. R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509. The court retains in rem jurisdiction over the American Collection in this pending salvage action insofar as the court conveyed RMST incomplete and restricted title to those artifacts.

[29] See supra Parts I.E, II.

See Covenants & Conditions § V.F.1. Moreover, the court retains in personam jurisdiction over RMST to oversee its compliance with the Covenants and Conditions. Id. § V.F.2; R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509; see Titanic 1999, 171 F.3d at 957 ("Actions in rem are prosecuted to enforce a right to things, whereas actions in personam are those in which an individual is charged personally." (citation modified)).

**B. French Collection**

The French Collection Artifacts were not part of the res named as the Defendant in this in rem action. ECF No. 1; see Titanic 2006, 435 F.3d at 528-30. Nor have the French Collection Artifacts been arrested or brought within this federal district. Titanic 2006, 435 F.3d at 528-30; see Fed.R.Civ.P. Supp. R. E(4)(b). RMST recovered those artifacts from Titanic with IFREMER and sent them to France in 1987, meaning that RMST separated them from Titanic before it initiated this action and before the court assumed constructive in rem jurisdiction over the wreck. See Titanic 2006, 435 F.3d at 528-30. Accordingly, when RMST requested in 2004 that the court recognize the 1993 Procès-Verbal awarding RMST title to the French Collection, the court erred by refusing to recognize it under principles of international comity. Id. The court lacked the requisite possession and control to exercise in rem jurisdiction and adjudicate title in the French Collection "against the rest of the world." Id. at 529 (quoting Titanic 1999, 171 F.3d at 964);

see Titanic 1999, 171 F.3d at 964 ("[T]o exercise in rem jurisdiction over a ship or its cargo, the ship or cargo must be within the district in which the in rem complaint is filed."). "Absent in rem jurisdiction, there [wa]s no other jurisdictional basis upon which the court could declare the rights to the 1987 artifacts located in France." Titanic 2006, 435 F.3d at 530. In sum, RMST could not "come to a court in the United States and simply assert that the court should declare rights against the world as to property located in a foreign country." Id.

Notwithstanding twenty (20) years of intervening proceedings and the Covenants and Conditions, RMST interprets Titanic 2006 to say that this court is without any jurisdictional basis to enter any order restricting its usage of the French Collection. ECF No. 804 at 15-22. The court disagrees.

The court has never overlooked or ignored the French Collection just because that collection of artifacts was not subject to the court's in rem jurisdiction. As early as December 22, 1993, the court ordered that the Titanic artifacts recovered in connection with this in rem action be restored and conserved together with the French Collection Artifacts at the laboratories of LP3 in France. ECF No. 19 (Order). Since then, the French Collection has featured prominently at various points in this prolonged litigation, notably as RMST sought to obtain title to the American Collection and during proceedings contemporaneous

with RMST's 2016 bankruptcy. See In re RMS Titanic, Inc., No. 3:16-bk-2230 (Bankr. M.D. Fla.). Relevant here, RMST argued in its November 2007 request for an in specie award of title to the American Collection that the court, in its discretion, could render an in specie award of title "conditioned on future use and disposition" of the artifacts. ECF No. 281 at 53 (Memorandum of Law in Support of RMST's Motion for a Salvage Award) (citing Titanic 2006, 435 F.3d at 538). In support of that argument, RMST stated:

> As has been judicially noticed, when the French maritime tribunal granted RMST an in specie salvage award in its order of October 20, 1993, it was with the condition that RMST agree "to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition."

Id. at 53-54 (quoting Titanic 2006, 435 F.3d at 528). RMST continued that it "has always adhered to these conditions," and "thus propose[d] a similar set of covenants for the 1993-2004 expedition Artifacts." Id. at 54. Finally, RMST urged the court to make an in specie award because a judicial sale and monetary award, in the alternative, would result in the "perpetual divorce" of the French and American Collections. Id. at 53. RMST argued that an in specie award was more appropriate because "TITANIC artifacts are worth far more as integral collections than they are as individual objects," and it was "most certainly not RMST's desire to

individually market TITANIC artifacts and break-up the collections." Id. (emphasis added).

Moreover, whether the court grants an in specie salvage award is "a matter of discretion," Titanic 2002, 286 F.3d at 204, and an in specie award may be conditioned on certain performances by the salvor, see, e.g., MDM Salvage, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 631 F. Supp. 308, 313 n.2 (S.D. Fla. 1986). Accordingly, the court made clear in April 2008 that an award of title to the American Collection "would need to contain carefully drafted covenants that would ensure that the R.M.S. Titanic and its artifacts are preserved as an international treasure for posterity." ECF No. 293 at 4; see Titanic 2006, 435 F.3d at 537-38. In addition to upholding the principles set forth in the Memorial Act, the NOAA Guidelines, and the International Agreement, "[t]hese covenants would also have to ensure that the artifacts are maintained in a manner consistent with RMST's previous representations to this court and the Fourth Circuit." ECF No. 293 at 4 (emphasis added). Thus, an in specie award would be conditioned on the resulting collection of artifacts being "maintained as an intact collection that joins those artifacts from the R.M.S. Titanic awarded to RMST by a French maritime tribunal." Id. at 4-5 (emphasis added) (citing Titanic 2006, 435 F.3d at 527-30).

The United States argues in its Supplemental Brief that by seeking an in specie award of title to the American Collection and by acceding to the language of the Covenants and Conditions, "RMST voluntarily subjected the French Collection to the in rem jurisdiction and authority of this Court or otherwise waived any objection to that jurisdiction and authority." ECF No. 830 at 14. Given the foregoing recitation of the provenance and intervening proceedings in this court over the past twenty (20) years, the court, at this juncture, does not explore an expanded theory of its original jurisdiction, in rem or otherwise, empowering the court to generally adjudicate title in the French Collection. Rather, for the immediate purpose of considering RMST's alleged material default under the Covenants and Conditions, and for effectuating the United States' recommended means of response and remediation, the court agrees, at this juncture, with the United States that "[t]he Covenants and Conditions impose enforceable restrictions on RMST with respect to the French Collection artifacts that prohibit RMST's intended sale." Id. at 4.

Alternatively, the United States argues that the Covenants and Conditions, as they concern the French Collection, are enforceable against RMST "under the doctrine of ancillary jurisdiction." Id. at 7. This federal district court is a court "of limited jurisdiction" only empowered to consider cases and controversies as authorized by the Constitution and statutory

grants of subject matter jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (collecting cases).[30] Under the doctrine of ancillary jurisdiction, however, federal courts may exercise jurisdiction "over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." Id. at 378. The court's power to consider claims ancillary to its federal subject matter jurisdiction has been codified at 28 U.S.C. § 1367, but under federal common law, ancillary jurisdiction also extends to certain "related proceedings that are technically separate from the initial case that invoked federal subject matter jurisdiction." Robb Evans & Assocs., LLC v. Holibaugh, 609 F.3d 359, 363 (4th Cir. 2010) (emphasis in original) (quoting 13 Wright & Miller's Federal Practice & Procedure § 3523.2 (3d ed. 2010)); accord Messer v. Garrison Inv. Grp., LP, 177 F.4th 507, 517 (4th Cir. 2026).

In exercise of this jurisdiction, sometimes referred to as "ancillary enforcement jurisdiction," see Messer, 177 F.4th at 517 (citation omitted), a district court "may hear collateral proceedings when necessary to allow it to vindicate its role as a tribunal," United States v. Mitchell, 683 F. Supp. 2d 427, 429 (E.D. Va. 2010) (quoting 13 Wright & Miller's Federal Practice & Procedure § 3523.2 (3d ed. 2008)). Thus, ancillary jurisdiction

---

[30] See supra note 27 and accompanying text.

may be invoked "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen, 511 U.S. at 379-80 (collecting cases). Without such jurisdiction to enforce its decrees and judgments, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." Peacock v. Thomas, 516 U.S. 349, 356 (1996) (quoting Riggs v. Johnson Cnty., 73 U.S. (6 Wall.) 166, 187 (1867)). Ancillary jurisdiction appears to arise principally in "supplementary" proceedings, often involving a third party, such as "attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." Id. at 356-57 (collecting cases).

Here, absent the intervention of the United States,[31] it is unclear that ancillary jurisdiction need be invoked or that the court's jurisdiction is not of a more inherent nature. RMST is the

[31] The court notes that the United States is acting within its authorized capacity as amicus curiae by challenging RMST's planned auction. RMST notified the court of the planned auction in its March Periodic Report, ECF No. 790, and the United States may "review RMST's continuing actions as salvor and the periodic status reports thereof filed with the court," ECF No. 275; see R.M.S. Titanic, Inc., 531 F. Supp. 2d at 693. The United States' review of the planned auction only underscores that its "additional oversight" remains "necessary in order to preserve and protect the R.M.S. Titanic and its artifacts as an international treasure for posterity, and the United States' efforts and interests in this regard, and to ensure compliance with this court's rulings and final orders." R.M.S. Titanic, Inc., 531 F. Supp. 2d at 693.

original Plaintiff to this in rem action, and the court's delivery of an in specie salvage award explicitly incorporated the Covenants and Conditions. See R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509. The court's enforcement of the Covenants and Conditions against RMST in this instance arises in connection with this ongoing salvage action, RMST's continued status as salvor-in-possession, and an apparent threat to the integrity of both the American and French Collections.[32] Thus, by interpreting and enforcing the terms of the Covenants and Conditions as incorporated by the court's orders, the court exercises its "inherent jurisdiction to protect and enforce [its] orders and judgments." RoadTechs, Inc. v. MJ Highway Tech., Ltd., 83 F. Supp. 2d 677, 685 (E.D. Va. 2000) (citing Riggs, 73 U.S. (6 Wall.) at 187); see Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 23 (1825) (Marshall, C.J.) ("The jurisdiction of a Court is not exhausted by the rendition of its judgment, but continues until that judgment shall be satisfied.").

## V. ALLEGED MATERIAL DEFAULT

The United States, as amicus curiae and on behalf of NOAA as an intended beneficiary under the Covenants and Conditions, has alleged that RMST's planned auction of approximately one hundred (100) lots of French Collection Artifacts poses an imminent material default under Section V.E of the Covenants and

[32] See supra Part IV.A; infra Part V.B.

Conditions, as well as an imminent violation of this court's Order dated August 15, 2011. ECF No. 797 at 11; see R.M.S. Titanic, Inc., 804 F. Supp. 2d at 509. RMST counters that because this court lacked in rem jurisdiction over the French Collection in 2006, the Covenants and Conditions cannot restrict RMST's free disposition of French Collection Artifacts. See ECF Nos. 804, 837. Additionally, RMST argues that the Covenants and Conditions do not, by their terms, prohibit a piecemeal auction of French Collection Artifacts. ECF No. 804 at 22-27. Finally, in the event the auction constitutes a material default, RMST argues that the court is limited in its means to remedy the default if RMST "is unable or unwilling" to remedy the default itself. Id. at 27-28; see Covenants & Conditions § V.E.2.f.

**A. Ripeness for a Finding of Material Default**

Under Covenants and Conditions § V.E.1, a "Material Default" occurs wherever RMST's "conduct or omission . . . seriously compromise[s] and jeopardize[s] the TITANIC Collections and the objective of ensuring that it is available to posterity." Covenants & Conditions § V.E.1; see id. § III.B ("The TITANIC Collections shall be available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes."). As described in

this Opinion and Order,[33] the TITANIC Collections consist of "the total assemblage of the French TITANIC Artifact Collection and the Subject TITANIC Artifact Collection." Id. § II.H (emphasis added). "The French TITANIC Artifact Collection" meanwhile consists of "the entirety of artifacts that were recovered by RMST's predecessor entity in the 1987 dive expedition on The TITANIC." Id. § II.F (emphasis added).

It seems straightforward that RMST's separation, sale, and dispersal of certain French Collection Artifacts necessarily detracts from the "entirety" of the French Collection, and that the "total assemblage" of the French and American Collections is necessarily "compromise[d] and jeopardize[d]" as a result. See id. §§ II.F-H, V.E. Importantly, "[t]he Subject TITANIC Artifact Collection shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the French TITANIC Artifact Collection as an integral whole by the Trustee." Id. § III.A.[34] Obviously, the French

---

[33] See supra Part II.

[34] RMST refers to this provision as "aspirational." See, e.g., ECF No. 846 at 51 (Hearing Transcript). The court does not agree with this characterization. First, the word "aspirational" is not found in Covenants and Conditions § III.A, any violation of which is "assumed to be a material default," id. § V.E.1, nor is the word found anywhere else in the Covenants and Conditions. Second, insofar as the language in Covenants and Conditions § III.A concerning the French Collection is "aspirational," the court interprets that language as imposing a standard for RMST's conduct as Trustee under the Covenants and Conditions for the TITANIC

and American Collections cannot "be conserved and curated together" if a portion of one collection is auctioned. Id. RMST argues that "Conservation" and "Curation" are defined terms in the Covenants and Conditions, "which do not govern ownership," see ECF No. 804 at 24, but this argument is a "red herring," see Covenants & Conditions § II.L, M.[35] Both definitions of these terms reference "preserving" the TITANIC Collections "for posterity," Covenants & Conditions § II.L, M, and the March Periodic Report, as well as the briefing thereon, arguments, and evidence before the court, only suggest that RMST intends to auction artifacts to the highest bidder, such that the artifacts may be irreversibly dispersed and lost to the public, see ECF No. 790-4 (Exhibition and Auction Agreement).[36] This scenario poses other problems under the Covenants and Conditions, which mandate that the TITANIC

---

Collections, not an aspiration, i.e., a wish or hope for achievement.

[35] Given the text of 1993 Procès-Verbal and the incorporated September 22, 1993, Letter, see supra Part I.A, as well as RMST's repeated assurances throughout this litigation that it would not, and indeed lacks the authority to, break up the French Collection, see, e.g., ECF No. 302 at 10, any terms in the Covenants and Conditions explicitly restricting the sale and dispersion of the French Collection would have been superfluous. That the French Collection would remain intact is a baseline assumption of the Covenants and Conditions, insofar as they are the "founding document" for the American Collection and the TITANIC Collections.

[36] At the hearing on August 13, 2026, the court questioned counsel for RMST whether RMST is "going to sell things piecemeal," such that "the French collection just becomes dispersed." ECF No. 846 at 34-35. Counsel for RMST responded, "Correct." Id. at 35.

Collections be maintained and curated in accordance with professional standards, be protected physically, and be insured against casualty or loss. See, e.g., Covenants & Conditions § IV.B, D. RMST fails to address any of the foregoing requirements in its Exhibition and Auction Agreement, ECF No. 790-4, which may be "assumed to be a material default," Covenants & Conditions § V.E.1.

RMST has not attempted to show why its list of Titanic artifacts to be auctioned, purportedly belonging to the French Collection, cannot "to the maximum extent possible and consistent with reasonable collections management practices" continue to be conserved and curated with the American Collection, either in RMST's possession or in the possession of a subsequent trustee. Id. § III.A. Nor does RMST attempt to show how, after the auction, the artifacts sold will remain "available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." Id. § III.B. Thus, the court may well ultimately determine that RMST's piecemeal auction and dispersal of Titanic artifacts constitutes a material default under the Covenants and Conditions; briefing submitted by RMST primarily concerns whether the Covenants and Conditions are capable of restraining RMST's disposition of French Collection Artifacts, not whether the auction constitutes a material default. See ECF Nos. 804, 837.

At this juncture, however, the court deems the factual record insufficiently developed for a finding "as to whether there has been a material default," and certainly not so developed that the court may find what "action as [RMST] must make, within a specified period of time, to respond or remediate." Covenants & Conditions § V.E.2.e. Nor is the matter ripe for a final order in the event RMST is found in violation of an "essential Covenant and Condition" and "is unable or unwilling to comply with the Court's order for response or remediation." Id. § V.E.2.f.

**B. Inventory of the TITANIC Collections**

In accordance with Covenants and Conditions § V.E.2.b, the court has overseen briefing and held a hearing. See ECF Nos. 827 (Order), 845 (Hearing Minutes), 846 (Hearing Transcript). In the wake of that hearing, and given the scant evidence presently before the court on the substance and mechanisms of the proposed auction and sale, or the details of the particular artifacts involved, the court readily concludes that RMST's planned auction remains subject to the court's jurisdiction and ultimate approval because the auction, at minimum, implicates the integrity of the American Collection. See Covenants & Conditions § III.A ("The Subject TITANIC Artifact Collection shall be kept together and intact forever, pursuant to the terms of these Covenants and Conditions."). The court's immediate and overriding concern is that the French and American Collections have, almost since the

inception of this *in rem* matter decades ago, been held together by RMST as a *de facto* integral collection. *See* ECF No. 19 (ordering that *Titanic* artifacts recovered in 1993 be conserved with the French Collection at the laboratories of LP3). Since the court awarded RMST restricted title to the American Collection in 2011, RMST has conserved and curated the French and American Collections together "as an integral whole" by the Order of this court explicitly incorporating the Covenants and Conditions. ECF No. 351; *see* *R.M.S. Titanic, Inc.*, 804 F. Supp. 2d at 509. Moreover, as documented in decades of RMST's periodic reports to the court and on the public record, the French and American artifacts have been conserved, curated, and widely exhibited together all over the world as the "TITANIC Collections."

The court has not required regular inventories by RMST, largely because of RMST's repeated assurances and representations over the decades that it would not, and indeed lacks the authority to, break up the TITANIC Collections or reduce *Titanic* artifacts to a commercial auction. *See, e.g.*, ECF No. 302 at 10 ("RMST, and any subsequent holder of the French Collection, would still be obliged under the terms of the October 20, 1993, Procès-Verbal of the French Maritime Tribunal . . . .").[37] It has been well over a decade since RMST has provided the court with an inventory of the

[37] *See* *supra* note 4 and accompanying text.

TITANIC Collections.[38] In notifying the court that it intends to sell certain Titanic artifacts purportedly belonging to the French Collection, RMST has provided the court just a few pages of isolated Accession Numbers and very brief descriptions of the artifacts to be sold. See ECF No. 790-1. As to the American Collection, RMST states that it "will not sell any artifacts from the Subject TITANIC Artifact Collection" and that "[e]ach Artifact to be sold will come from the French TITANIC Artifact Collection." ECF No. 790 at 1-2. However, after decades of proceedings, and in the context of RMST's mounting legal challenges, recent staff reductions, and the worsened financial situation at RMST and its parent company Premier Acquisition Holdings, LLC ("PAHL"), see ECF Nos. 736 (Sealed Periodic Report), 756 (Periodic Report), 782 at 5 n.1 (Sealed Periodic Report), 804 at 31 (RMST's April Periodic Report), RMST's list of isolated Accession Numbers and sparse statements do not assure the court that the American Collection is intact and will remain so after RMST's planned auction. See ECF No. 790-1.[39] Indeed, the court expressed concern at the August 13, 2026, hearing about whether American Collection artifacts have been, or are, "commingled with the French artifacts." See ECF

---

[38] RMST states that it last provided NOAA with information about the whereabouts of the TITANIC Collections on or about October 3, 2018. ECF No. 849 at 2-3 (Corrected Periodic Report).

[39] See infra note 41 and accompanying text.

No. 846 at 19, 33.[40] Counsel stated that "[e]very single artifact has an archival number, and so they are tracked. They are being conserved and stored together in the same facility, but there are tracking numbers and archives that identify the full history of each artifact." Id. at 19; see ECF No. 849 at 3. Moreover, counsel for RMST "agree[d] that the Court has the jurisdiction to order the company to produce documents and information, as it has done many times, to hopefully satisfy the Court that the issues with regard to conservation and maintenance of the collection, et cetera, et cetera, are being handled correctly." ECF No. 846 at 33.

Consistent with the United States' recommendation, see ECF No. 830 at 23, RMST will remain enjoined from carrying out any auction of artifacts salvaged from Titanic, at minimum, until RMST has furnished the court with a complete and satisfactory inventory of the TITANIC Collections, inclusive of the specific identification, enumeration, whereabouts, and status of all artifacts in the TITANIC Collections. See Covenants & Conditions § V.E.2.b; see generally Titanic 2002, 286 F.3d at 210 (holding that this court did not abuse its discretion by ordering RMST not to sell Titanic artifacts). The inventory shall also include conclusive evidence that the artifacts RMST plans to auction do

[40] The court notes that RMST appears poised to auction currency recovered from Titanic, as well as numerous chattels susceptible to commingling like china, eating utensils, and electrical fixtures. See ECF No. 790-1.

not belong to the American Collection and that the American Collection remains intact. RMST shall prepare such inventory "in accordance with current internationally recognized museum standards and practices for collections management." Covenants & Conditions § IV.A. Per Covenants and Conditions § IV.B.4, the inventory shall provide "the systematic and complete recording of the provenance of objects in the TITANIC Collections." Id. § IV.B.4. Further, RMST shall prepare the inventory "only under the guidance of, and in the presence of, qualified technical and/professional experts with the knowledge, experience and demonstrated competence appropriate to the projects undertaken." Id. § IV.C. Accordingly, the inventory will set forth in a separate filing how "all persons associated" with its preparation are "(1) qualified and have demonstrated experience appropriate to their project roles; and (2) fully briefed and understand the work required." Id. Finally, consistent with Covenants and Conditions § V.E.2.c, NOAA, through its counsel, may thereafter submit to the court a report and recommendation addressing RMST's inventory, as well as the integrity and status of the TITANIC Collections, both the American Collection and the French Collection.

To effectuate these proceedings and the development of the factual record, the court will direct RMST, in consultation with the United States, to submit a proposed schedule to the court for the filing of the inventory, any report and recommendation by NOAA,

and related documents. This schedule shall include and incorporate NOAA inspections of the TITANIC Collections and expert input, as appropriate and available under Covenants and Conditions § V.A, C. If RMST and the United States cannot agree upon a schedule, the United States may file a response and proposed alternatives to any schedule submitted to the court by RMST. After considering RMST's inventory, any report and recommendation by NOAA, and any other relevant factual considerations that may arise, the court may hold an evidentiary hearing and issue a final determination as to whether and how the auction poses a "material default" and what means of "response or remediation," if any, are appropriate. See Covenants & Conditions § V.E.2.b, e, f. Accordingly, the court reserves the question of its final authority to permanently enjoin RMST's auction and dispersal of French Collection Artifacts.

**C. Interests of the Republic of France**

In addition to recommending that the court prohibit RMST from advertising for sale and auctioning French Collection Artifacts, the United States recommends that "[t]he French Government should be notified of RMST's intent to sell and disburse French Artifacts, provided a copy of the [March] Periodic Report and Exhibit A thereto, and given the opportunity to set forth its position on the intended sale, if it chooses." ECF No. 797 at 17. RMST counters that "France has no interest in the French Artifacts and has waived its claims." ECF No. 804 at 28-30. In support of this argument,

RMST cites, inter alia, the 1993 Procès-Verbal. See ECF No. 797-1 at 12-17; see also RMS Titanic, Inc. v. French Republic, No. 3:16-ap-183 (Bankr. M.D. Fla. Sept. 29, 2017), ECF No. 67 (Final Default Judgment).[41]

However, after this court completed the process of redacting and unsealing RMST's March and April Periodic Reports on June 4, 2026, the court stated it would not "impede the United States' discretion to communicate information in the public record to France through appropriate diplomatic channels." ECF No. 821 at 8. Through the United States and the United States Department of State, see ECF No. 839-1 at 1, the court received a Diplomatic Note from the Embassy of the Republic of France on July 21, 2026, id. at 2-3. The French Embassy asserts "France's ownership of

---

[41] The United States Bankruptcy Court for the Middle District of Florida declared that "[t]he French Republic a/k/a Republic of France and its government agencies have no interest in the French Artifacts, defined as approximately 2,100 artifacts that were recovered from the wreck site of the RMS Titanic during an expedition conducted in 1987." RMS Titanic, Inc. v. French Republic, No. 3:16-ap-183 (Bankr. M.D. Fla. Sept. 29, 2017), ECF No. 67 (Final Default Judgment) (emphasis added). This court's records in this matter indicate that the French Collection consists of approximately one thousand eight hundred (1,800) Titanic artifacts, not two thousand one hundred (2,100) artifacts. See, e.g., R.M.S. Titanic, Inc., 742 F. Supp. 2d at 788 ("Over the course of thirty-two dives to the Titanic wreck, TVLP recovered approximately 1,800 artifacts ('1987 artifacts'), which were taken to France for conservation and restoration."). While the court has acknowledged that the number of artifacts attributed to each recovery expedition to Titanic is "approximate," id. at 788 n.2, which RMST acknowledges in its Corrected Periodic Report, see ECF No. 849 at 1-2, the court deems the difference of three hundred (300) artifacts significant and further warranting an inventory.

recovered artifacts" that "dates back to the expedition on the site of the wreck in 1987." Id. at 2. The Embassy notes that under the terms of the 1993 Procès-Verbal and the incorporated September 22, 1993, Letter,[42] the French Collection is subject to "conditions and covenants" prohibiting its dispersal. Id. at 2-3. The French Embassy thus expresses "deep concern and opposition to RMS Titanic plans to seek approval to sell and disperse artifacts from the French Collection, in violation of the aforementioned Procès-Verbal and the covenants and conditions of the Eastern District of Virginia Court." Id. at 3.

RMST submitted a Notice later in the day on July 21, 2026, claiming that the French Embassy's Diplomatic Note is "substantively incorrect" and inadmissible, as it is not signed and lacks foundation, "constituting inadmissible hearsay." ECF No. 840 at 2. The court notes, however, that the Diplomatic Note is initialed and dated, and it is stamped with the seal of the French Embassy to the United States. See ECF No. 839-1 at 3. RMST has had a reasonable opportunity to investigate the Diplomatic Note's "authenticity and accuracy," and may take any further appropriate steps to do so; but "good cause" exists at this juncture for the court to treat the Diplomatic Note as "presumptively authentic without final certification," at least

---

[42] See supra Part I.A.

until the United States has had an opportunity to properly authenticate the Diplomatic Note at an evidentiary hearing or otherwise. See Fed.R.Evid. 901, 902(3)(A), (B). Insofar as the Diplomatic Note constitutes inadmissible hearsay, the court does not make an evidentiary ruling at this time.

The United States has recommended that the court permit the Republic of France to set forth its position on RMST's proposed auction. ECF No. 797 at 17. The Republic of France, through its Embassy, has presumptively communicated its position on the auction. ECF No. 839-1 at 2-3. No further court action appears necessary at this time, unless the United States deems otherwise or seeks to further communicate with the Republic of France through appropriate diplomatic channels.

**D. The Public Interest**

Before concluding, the court briefly addresses RMST's contention in its April Periodic Report that its planned auction "is in the public interest." ECF Nos. 804 at 31, 837 at 29 n.13. RMST specifically claims that its sale of certain French Collection Artifacts is necessary to alleviate "financial difficulties" and "significant operating losses." ECF No. 804 at 31. RMST then states that "continuation of such financial difficulties could jeopardize the entirety of the TITANIC Collections." Id. Alternatively, RMST argues that "[t]he public interest, whatever it may be, is not dispositive of the issue before the Court." ECF No. 837 at 29.

RMST's statements trouble the court. In calling into question the continued integrity of the "remaining collections," including the American Collection, id. at 29 n.13, RMST seems to contradict its own representations at the most recent Status Conference held on December 9, 2025, see ECF No. 784 at 39-40 (Redacted Status Conference Transcript), as well its representation to the court on January 15, 2026, that the members of RMST's parent company, PAHL, "are well financed and have historically maintained their commitment to ensuring RMST is adequately capitalized," ECF No. 782 at 7 (Sealed Periodic Report).[43] For this reason, the court deems an inventory, with an opportunity for NOAA, through the United States, to submit a report and recommendation, doubly urgent. RMST's inventory, and any report and recommendation by NOAA, should address the curative condition, integrity, and status of the TITANIC Collections, as well as RMST's continued financial viability to maintain the TITANIC Collections under its obligations as Trustee.[44]

As to the public interest, as described by RMST as "whatever it may be," ECF No. 837 at 29, the court notes, at a threshold

[43] This Periodic Report, and other related sealed documents, may need to be unsealed and made part of the public record should this issue progress further.

[44] In the Corrected Periodic Report filed August 19, 2026, RMST states that "[a]s of August 17, 2026, the balance in RMST's reserve account was $1,641,144.87." ECF No. 849 at 1; see Covenants & Conditions § V.D.

level, the many letters it has received from persons and organizations across this country and Europe in unanimous and eloquent opposition to the auction.[45] Both the historic importance and the international interests in the preservation of the TITANIC Collections is clear. In sum, the court is of the opinion that the public interest in the preservation of the TITANIC Collections is of paramount importance.

## VI. CONCLUSION

For the foregoing reasons, and in accordance with the recommendations of the United States as amicus curiae and on behalf of NOAA as an intended beneficiary under the Covenants and Conditions, the court **FINDS** that RMST's planned auction of approximately one hundred (100) lots of Titanic Artifacts, reported to be from the French Collection, is subject to this court's jurisdiction and ultimate approval by the terms of the Covenants and Conditions. Accordingly, RMST's auction, presently planned for July or August 2026, remains **ENJOINED** pending further proceedings before this court. RMST shall remain so enjoined, at least, until RMST has, pursuant to Covenants and Conditions § V.E.2.b, submitted to this court a complete and satisfactory inventory of the TITANIC Collections in accordance with this

---

[45] The letters received to date by the court in reference to RMST's planned auction are listed in the Annex attached to this Opinion and Order and made a part hereof.

Opinion and Order, and until NOAA, through the United States, has had an opportunity thereafter to submit a report and recommendation to this court pursuant to Covenants and Conditions § V.E.2.c. To effectuate these additional submissions and proceedings, and to incorporate inspections by NOAA and expert input as appropriate and available under Covenants and Conditions § V.A, C, RMST is **ORDERED**, within sixty (60) days of entry of this Opinion and Order, to file a proposed schedule as directed in this Opinion and Order and in consultation with the United States.[46] The United States may, within thirty (30) days of RMST's filing of a proposed schedule, file a response and any alternative schedule.

Pursuant to Covenants and Conditions § V.E.2.c, the court **HOLDS IN ABEYANCE** the remainder of the United States' recommendations, as set forth in its Supplemental Brief, ECF No. 830 at 22-23, pending further proceedings consistent with this Opinion and Order.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to current counsel of record for RMST and the United States.

**IT IS SO ORDERED.**

Rebecca Beach Smith
REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

August 24 , 2026

[46] See supra Part V.B.

**ANNEX**

Letters to the Court in Opposition to RMST's Planned Auction of TITANIC Collections Artifacts

| Date Received | Docket No. | Author | Organization |
|---|---|---|---|
| May 7, 2026 | 811 | Jeneva Wright, PhD | Advisory Council on Underwater Archaeology |
| May 8, 2026 | 812 | Chris Underwood | International Committee on the Underwater Cultural Heritage |
| May 8, 2026 | 813 | Catherine Green | National Maritime Historical Society |
| May 12, 2026 | 814 | Dave Parham | Joint Nautical Archaeology Policy Committee |
| May 19, 2026 | 817 | Kristen L. Greenaway | International Congress of Maritime Museums |
| May 26, 2026 | 819 | Pete Lesher | Council of American Maritime Museums |
| June 26, 2026 | 828 | Charles A. Haas | Titanic International Society, Inc. |
| June 29, 2026 | 829 | Cathy Jutilla Lamet | |
| July 1, 2026 | 831 | Günter Bäbler; Brigitte Saar | Swiss Titanic Society |
| July 7, 2026 | 832 | Stephanie McGuire | Molly Brown House Museum |
| July 7, 2026 | 833 | Cynthia Tulloch | |
| July 8, 2026 | 834 | Melinda Eudy Ratchford, Ed.D | |
| July 9, 2026 | 835 | Ifan Erwyn Pleming | Belfast Titanic Society; Titanic International Society; British Titanic Society |
| July 9, 2026 | 836 | James Penca | |
| July 13, 2026 | 838 | Rudi Newman, PhD | Titanic International Society |
| July 27, 2026 | 841 | François Houllier | IFREMER |

| | | | |
|---|---|---|---|
| July 28, 2026 | 842 | Malte Fiebing-Petersen | German Titanic Society |
| August 6, 2026 | 844 | Kimberly Terbush | Terbush Art, LLC |
| August 19, 2026 | 847 | Dr. Aidan McMichael | Belfast Titanic Society |

**INDEX**

I. CASE HISTORY .................................................. 2
A. Recovery and Acquisition of the French Collection .......... 4
B. Commencement of In Rem Action in Norfolk ................... 6
C. Continued Salvage; Regulatory Developments ................ 10
D. RMST Seeks Title to Titanic Artifacts ..................... 14
E. In Specie Salvage Award ................................... 19

II. THE COVENANTS AND CONDITIONS ................................ 25

III. RMST'S PLANNED AUCTION OF FRENCH COLLECTION ARTIFACTS .... 31

IV. JURISDICTION ................................................ 37
A. American Collection ....................................... 37
B. French Collection ......................................... 40

V. ALLEGED MATERIAL DEFAULT ..................................... 47
A. Ripeness for a Finding of Material Default ................ 48
B. Inventory of the TITANIC Collections ...................... 52
C. Interests of the Republic of France ....................... 57
D. The Public Interest ....................................... 60

VI. CONCLUSION .................................................. 62

ANNEX ........................................................... 64